UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
                                                 :

In re                                     :                   Chapter 11

                                                 :

EXTENDED STAY INC., *et al.*,          :

                                               :                   Case No. 09-13764(JMP)

                                             :

                            Debtors.      :                   (Jointly Administered)
---------------------------------------------------------- x

## MOTION OF THE UNITED STATES TRUSTEE FOR THE APPOINTMENT OF AN EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE

Diana G. Adams, the United States Trustee for Region 2 (the "United States Trustee"), respectfully moves this court for the appointment of an examiner in the above-referenced cases pursuant to section 1104(c) of title 11, United States Code (the "Bankruptcy Code"). In support of this motion (the "Motion"), the United States Trustee respectfully states as follows:

## PRELIMINARY STATEMENT

Serious questions and concerns as to the propriety of certain transactions whereby the Debtors acquired most - if not all - of the assets currently held in their portfolio and the propriety of the subsequent negotiations that followed the acquisition which ultimately culminated in these bankruptcy cases have recently been raised in the respective pleadings filed by various parties, including the Committee of Unsecured Creditors. Rather than the estates being burdened with the litigation costs which they must necessarily bear in order to respond to multiple parties conducting the same discovery and litigations, an examiner should be appointed to investigate the transactions in question.

In the spring of 2004, the Blackstone Group – a private equity firm – acquired lodging chain Extended Stay America, Inc. for approximately $2 billion in cash. After adding some properties to the portfolio, the Blackstone Group sold the hotel chain to the Debtors only three years later, in June 2007, for four times as much as it had paid. Two years after their acquisition, the value of the hotels plunged to approximately $3.3 billion – a decrease of over 41% from their purchase price and less than the amount of the first mortgage. After negotiating with various constituencies, the Debtors ultimately decided to file for bankruptcy protection after reaching an agreement in principle with some of their senior lenders on the terms of a possible restructuring.

The proposed term sheet filed on the first day of these cases in essence proposes to wipe out all of the mezzanine debt that also helped finance the acquisition of the hotel chains in 2007. In addition, it provides protections and safe harbors for the Debtors' insiders. David Lichtenstein – the Debtors' Chief Executive Officer and President – is the only one who appears to be surviving the Debtors' bankruptcy filing relatively unscathed. Under the proposed terms of the restructuring, Lichtenstein would avoid the personal guaranties agreed to in the original loan agreements.

The factual highlights of these cases demonstrate the need for further investigation with respect to certain events that occurred over the past two years that ultimately led to these chapter 11 cases to determine whether claims exist that could be pursued for the benefit of all creditors. Under these circumstances, the appointment of an examiner to conduct the investigation proposed herein is warranted. Section 1104(c)(2) requires <u>mandatory</u> appointment of an examiner, upon the request of a party in interest or the United States Trustee, provided a debtor's unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5

million.  Because  the Debtors in these Chapter 11 proceedings meet the $ 5 million unsecured debt threshold, the appointment of an examiner is required.

Here, the Court must appoint an examiner, not only because it is mandated by statute, but also because preserving the integrity of the Chapter 11 process requires it.  The story of the Debtors' demise and the facts underlying the commencement of these Chapter 11 cases should be investigated and publicly reported to further the Bankruptcy Code's goals of transparency and disclosure to parties in interest.  Moreover, as seen from recent filings, parties, including the Committee, are seeking authority to conduct discovery under Bankruptcy Rule 2004 to investigate the same transactions and pre-petition negotiations proposed herein to be investigated by the examiner.  The appointment of an examiner to undertake that task, however, is preferable to avoid the costs related to having multiple parties conduct the same discovery and bringing piecemeal litigation in these chapter 11 proceedings.

## FACTS

**A.    General Background**

1.      On June 15, 2009 (the "Petition Date"), Extended Stay Inc. and its debtor affiliates (collectively, the "Debtors" or "Extended Stay") each commenced a voluntary case under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On June 24, 2009, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a) of the Bankruptcy Code.

3.     The Debtors are the largest owner and operator of mid-price extended stay hotels in the United States, holding one of the most geographically diverse portfolios in the lodging sector. Their portfolio encompasses over 680 properties, consisting of hotels directly owned or leased by Extended Stay or one of its affiliates. See Declaration of Joseph Teichman Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications at ¶5 (Docket No. 3) (the "Teichman Declaration").

4.     According to the Teichman Declaration, as of the Petition Date, the Debtors' largest unsecured claim consisted of a claim in the estimated amount of $8,542,538.09, representing the outstanding amount on 9 7/8% Senior Subordinated Notes (the "Senior Subordinated Notes") issued pursuant to an indenture dated as of June 27, 2001 between Manufacturers and Traders Trust Company, as Trustee, and Extended Stay America, Inc. (which has since then merged into Extended Stay Inc.). Id. at ¶24 & Schedule 2. The Senior Subordinated Notes mature on June 15, 2011. Id. at ¶24 & Schedule 2.

**B.     Acquisition of Extended Stay Hotels and Resulting Debt Structure**

5.     In spring 2004, private equity firm Blackstone Group acquired the lodging chain Extended Stay of America, Inc. for approximately $2 billion. See Extended Stay America, Inc. Form 8-K dated as of March 5, 2004 and relevant pages of Schedule 14A attached hereto as Exhibit A. Between 2004 and 2007, the Blackstone Group added some hotel properties to the portfolio. See articles attached as Exhibit B.

6.     In June of 2007, Extended Stay was acquired by an investment consortium led by David Lichtenstein ("Lichtenstein"). Teichman Affidavit at ¶16. More specifically, an investment consortium consisting of, among others, Lichtenstein and Arbor Realty Trust ("Arbor

Realty") created DL-DW Holdings LLC ("DL-DW") to acquire Extended Stay from the Blackstone Group (the "Acquisition"). Id. at ¶10. Lightstone Holdings LLC, in turn, owns DL-DW. Id. The purchase price for the Acquisition was $8 billion (the "Purchase Price"). See Jeffrey McCracken and Alex Frangos, *Extended Stay Could Transfer Chain to Lenders*, Wall St. J., December 8, 2008, a copy of which is attached hereto as Exhibit C.

7.      Lichtenstein is the founder of Lightstone Holdings LLC and is presently the Chief Executive Officer and President of Debtors Extended Stay Inc. ("ESI") and Homestead Village L.L.C. ("Homestead"), as well as the President of the Debtors. Id. at Schedule 9.

8.      Lightstone Holdings LLC, with help from Arbor Realty, arranged to put down $600 million of equity for the Acquisition. See Ex. C. The remainder of the Purchase Price was financed through loans in an aggregate amount of approximately $7.4 billion, which consisted of a mortgage loan in the principal amount of $4.1 billion (the "Mortgage Loan") and an aggregate of $3.3 billion in ten mezzanine loan tranches (collectively, the "Mezzanine Debt"). See Teichman Decl. at ¶16.

   *(1)     The Mortgage Loan*

9.      Certain Debtors are borrowers (the "Mortgage Borrowers") under that certain Loan Agreement, dated as of June 11, 2007 (the "Mortgage Loan Agreement") by and among the Mortgage Borrowers and other non-Debtor entities, and Wachovia Bank, N.A. ("Wachovia"), Bear Stearns Commercial Mortgage, Inc. ("Bear"), and Bank of America, N.A. ("BofA," and together with Wachovia and Bear, the "Mortgage Lenders"). Id. Under the Mortgage Loan Agreement, the Mortgage Lenders extended an aggregate $4.1 billion to the Mortgage Borrowers. Id.

10.     The Mortgage Loan is non-recourse with the exception of certain non-recourse carve-outs under the Mortgage Loan Agreement.  Among these carve-outs are certain guarantees entered into by Lichtenstein and entities owned by or associated with him, including Lightstone Holdings, LLC (the "Guaranties").  Id. at ¶18.  The Mortgage Loan is secured by cross-collateralized and cross-defaulted first priority liens on 666 properties.  Id. at ¶19.

11.     Subsequent to the closing of the Acquisition, the Mortgage Lenders sold and assigned their interests in the Mortgage Loan to Wachovia Large Loan, Inc., which in turn, deposited the Mortgage Debt into a trust (the "Trust") created under the Trust and Servicing Agreement among Wachovia Large Loan, Inc., as depositor, Wachovia, as servicer and special servicer, and Wells Fargo Bank, N.A., as trustee (the "Trust and Servicing Agreement"), dated as of August 1, 2007.  Id. at ¶20.

12.     Certain investors subsequently bought interests in the Trust (the "Certificate Holders"), all of whom were then issued certificates with respect to such interest (the "Certificates").  Id.  There are 18 principal classes of Certificates and, under the Trust and Servicing Agreement, distributions with respect to the Mortgage Loan are allocated to each class of Certificates based on their priority pursuant to the Trust and Servicing Agreement.  Id.

13.     After the Petition Date, the special servicing duties with respect to the Mortgage Debt were transferred from Wachovia to TriMont Real Estate Advisors, Inc., and U.S. Bank National Association was appointed as the successor trustee (the "Trustee").  See Final Order (A) Authorizing Use of Cash Collateral , (B) Granting Adequate Protections, and (c) Modifying The Automatic Stay, ¶E.e (Docket No. 205) (the "Cash Collateral Order").

*(2) Mezzanine Loan Agreements*

14.     Certain Debtors are also borrowers under ten different mezzanine loan agreements (the "Mezzanine Loan Agreements") with Wachovia, Bear, and BofA (collectively, the "Mezzanine Lenders"), dated June 11, 2007. Id. at ¶21. The Mezzanine Debt is not secured by any of the collateral securing the Mortgage Loan. Id. at ¶22.

15.     As of the Petition Date, the aggregate principal amount outstanding under the Mezzanine Loan Agreements was approximately $3.3 billion.

16.     The Mortgage Lenders and the Mezzanine Lenders are parties to an Intercreditor Agreement dated as of June 11, 2007 that governs their respective rights and interests in both the Mortgage Loan and the Mezzanine Debt, including their rights upon an event of default. Id. at ¶22.

**C.     Proposed Term Sheet and Estimated Value of the Debtors**

17.     Prior to the Petition Date, the Debtors reached an agreement in principle with an informal group of certain significant Certificate Holders (the "Ad Hoc Mortgage Lender Group") on the terms of a restructuring. The Debtors attached a term sheet memorializing the agreement in principle between the Debtors and the Ad Hoc Mortgage Lender Group to the Teichman Declaration (the "Restructuring Term Sheet"). See id. at Ex. C. Among its most salient terms, the Restructuring Term Sheet proposes the following distributions to various claimants and interest holders:

   (a)     Trustee for the Trust established pursuant to the Trust and Servicing Agreement would receive the following in exchange for the Certificates: (I) $1.8 billion in principal amount of a new three-tranche first lien mortgage loan, (ii) up to $775 million in principal amount of a new second lien mortgage loan secured by second priority mortgages, (iii) up to $471.25 million of new preferred stock to be issued by NewCo (a new holding company created to hold the equity interests of

the Mortgage Borrowers), and (iv) 100% of the new common equity to be issued by Newco. Distributions to Certificateholders under the Restructuring Term Sheet vary pursuant to the class into which the Certificateholder are classified.

(b) The Mezzanine Lenders and the holders of equity interests would not be entitled to receive a distribution on account of their claims arising under the Mezzanine Debt.

(c) Common equity interests would be extinguished and holders thereof would not receive a distribution.

18. The terms set forth in the Restructuring Term Sheet are based on a valuation of the Debtors's assets at $3.3 billion, which the Debtors view as "a valuation that approximates the mid-point of a range of Extended Stay's enterprise value, after adjusting for the capitalized lease." Teichman Decl. at ¶33.

19. Despite the fact that the Mezzanine Lenders and equity would receive no distributions under the Restructuring Term Sheet, the Ad Hoc Mortgage Lender Group agreed to provide Lichtenstein with a number of critical protections and inducements, including the following:

(a) Newco would provide Lichtenstein with a $100,000,000 indemnity against liability under the Guaranties arising by virtue of the bankruptcy filing under the plan of reorganization.

(b) "Accepting Holders" – the lenders who accept benefits under the plan of reorganization – would have to release Lichtenstein from all liability under the Guaranties except with respect to liability arising by virtue of the Debtors' bankruptcy filings.

(c) The holders of Certificates that are proponents of the Restructuring Term Sheet (the "Supporting Holders") would seek a "co-debtor stay" from the Bankruptcy Court with respect to any state court actions seeking to hold Lichtenstein liable under the Guaranties.

(d) In the event that the Bankruptcy Court would not issue the co-debtor stay, the Supporting Holders would cause Newco to provide Lichtenstein with a $5 million defense "war chest" to be used to defend Lichtenstein against the actions of other

lenders against Lichtenstein under the Guaranties provided that the Supporting Holders retain control of the defense and settlement of any such claims including selection and control of defense counsel.

(e)     Newco would enter into new management agreements with Lichtenstein or companies he controls.

**D.     Ensuing Litigation**

20.     Subsequent to the Petition Date, various parties commenced lawsuits against, among other defendants, Lightstone Holdings, LLC and Lichtenstein in connection with, among other things, the commencement of these chapter 11 cases and the Guaranties. Two of the relevant actions are described below.

*(1)     The State Court Action I*

21.     On or about June 16, 2009, BofA, Wachovia, and U.S. Bank National Association, as trustee for Maiden Lane Commercial Mortgage Backed Securities Trust 2008-1 (the "Plaintiffs"), filed a summons with notice in the Supreme Court of the State of New York for a lawsuit captioned *Bank of America, N.A.; Wachovia Bank, N.A.; and U.S. Bank National Association, as Trustee for Maiden Lane Commercial Mortgage Backed Securities Trust 2008-1 v. Lightstone Holdings, LLC and David Lichtenstein*, Index No. 601853/09 (the "State Court Action I"), seeking to enforce the Guaranties entered into by Lichtenstein and Lightstone Holdings, LLC in connection with the financing of the Acquisition.

22.     In the State Court Action I, Plaintiffs seek to recover $100 million pursuant to the Guaranty agreements given by Lightstone Holdings, LLC and Lichtenstein in consideration of the Mezzanine Debt.

23.     On or about July 6, 2009, the Plaintiffs moved the New York State Supreme Court for summary judgment in lieu of a complaint pursuant to CPLR 3213.

24.     On or about July 8, 2009, defendants Lichtenstein and Lightstone Holdings LLC removed the State Court Action I from the New York State Supreme Court to the United States District Court for the Southern District of New York.  Copies of the Summons, the Notice of Removal, and the Motion for Summary Judgment in Lieu of Complaint are attached hereto as Exhibit D.

*(2)     LineTrust and Deuce Properties Action*

25.     On or about June 24, 2009, LineTrust Corporation Ltd. ("LineTrust") and Deuce Properties Ltd. ("Deuce Properties," and, collectively with LineTrust, the "Line Trust Plaintiffs") commenced an action against Lichtenstein, Lightstone Holdings, LLC, Wells Fargo Bank, N.A., Wachovia, BofA, U.S. Bank National Association, Cerberus Capital Management, L.P. and Centerbridge Partners, L.P. (the "Defendants") in the Supreme Court for the State of New York (the "LineTrust and Deuce Properties Action"), alleging tortious interference with a contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of guaranty, and fraudulent concealment, and seeking in excess of $214 million and a permanent injunction.  The lawsuit is captioned *LineTrust Corporation Ltd. And Deuce Properties Ltd. v. David Lichtenstein, Lightstone Holdings, LLC, Wells Fargo Bank, N.A., in its capacity as trustee, Wachovia Bank, N.A. Bank of America, N.A., U.S. Bank National Association, Cerberus capital Management, L.P., Centerbridge Partners, L.P. and John Does 1-20, being persons whose identities are presently unknown to Plaintiffs and who are acting as Supporting Holders of the Term Sheet proposed by Lichtenstein*, Index No. 601951/2009.  Copies of the Summons, Verified Complaint for the

LineTrust and Deuce Properties Action, and the Notice of Removal are attached hereto as

Exhibit E.

26.     The nature of the LineTrust and Deuce Properties Action is described in the

introductory paragraph of the Verified Complaint as follows:

> This action arises in part out of the tortious, conspirational, collusive, bad
> faith and predatory conduct of the senior lender defendants (the "Senior
> Lender Defendants") – the trustee, administrative agent and certain
> certificate holders of the $4.1 billion first mortgage (the "First Mortgage"
> or "Senior Loan") component of the $7.4 billion combined first mortgage
> and mezzanine loan debt structure (collectively, the "Loans"), used to
> finance the 2007 acquisition of the 75,844 unit Extended Stay Hotels
> portfolio (the "Hotel Properties") – who, in cahoots with the other
> defendants, David Lichtenstein ("Lichtenstein"), the managing principle
> of the borrowers (collectively, the "Borrowers"), and his controlled
> company, defendant Lightstone Group (together with Lichtenstein,
> collectively, the "Guarantor Defendants"), both of whom are so-called
> "non-recourse carve out" guarantors with respect to the Loans, by virtue
> of which the Guarantor Defendants have springing liability under such
> guaranties (collectively, the "Guarantees") in the event, *inter alia*, the
> Borrowers file for bankruptcy protection, hatched a Machiavellian
> scheme, whereby the Senior Lender Defendants promised to provide the
> Guarantor Defendants with a $100,000,000 indemnity with respect to the
> liabilities of the Guarantor Defendants if the Borrowers file for bankruptcy
> protection, along with a $5 million litigation defense war chest to resist
> the claims asserted by other lenders against the Guarantor Defendants
> under the Guarantees, as well as an equity participation to Lichtenstein
> through a new management agreement, all as part of a comprehensive
> scheme designed to induce Lichtenstein to do that which the Senior
> Lenders Defendants themselves promised all other lenders, under the
> express terms of the Intercreditor Agreement, they would never do – cause
> the Borrowers to file for bankruptcy protection, despite the numerous
> other "bankruptcy remoteness" provisions build into the relevant loan
> documents.

See Verified Compl. at 2.

27.     In the Verified Complaint, the LineTrust Plaintiffs assert that the original lenders

turned to the bankruptcy option only after another plan to cheat the mezzanine lenders failed.

The Verified Complaint further alleges that under "Plan A," Lichtenstein conspired with the original lenders to "manufacture an Event of Default under the loan documents by intentionally not paying approximately $3.5 million in the Borrower's Operating Expenses" so that the Mortgage Borrowers could engage in a Conveyance in Lieu Transaction, whereby the membership interests owned by certain mezzanine borrowers would be conveyed in lieu of a UCC foreclosure. Verified Compl. at 3. The LineTrust Plaintiffs argue that "Plan A", however, was precluded by the entry of temporary restraining orders entered by the Supreme Court of the State of New York and the District court of Dallas County as a result of actions commenced by more junior mezzanine lenders. See Teichman Decl. at ¶31; see also Verified Compl. at 3-4.

28.     As a result of "Plan A"'s failure, the LineTrust and Deuce Properties Action asserts that "the Senior Lender Defendants and Lichtenstein, who have for several months been negotiating with one another, put into effect a second Machiavellian back up scheme . . . whereby . . . the Senior Lender Defendants, through a series of comprehensive and wrongful protections and inducements, induced Lichtenstein to cause the Borrowers to file for bankruptcy." See Verified Complaint at p. 5.

29.     Among other things, the Verified Complaint asserts that Lichtenstein obtained the consent of the Debtors' independent directors by false pretenses, in that he failed to disclose to them the existence of the inducements present in the Restructuring Term Sheet which protected Lichtenstein from having to repay the Guaranties.

30.     On July 8, 2009, defendants Lichtenstein and Lightstone Holdings LLC removed the Line Trust and Deuce Properties Action from the New York State Supreme Court to the United States District Court for the Southern District of New York.

## RELIEF REQUESTED

31.     The United States Trustee respectfully requests the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code to investigate and report on: (i) the structuring, negotiation and closing of the Acquisition, (ii) the events and circumstances that led to the Debtors' filing for chapter 11 protection, (iii) whether the Debtors' estates have any claims against Lichtenstein and/or any of the companies that he controls or any other insider relating to the Acquisition or the commencement of these Chapter 11 cases, and (iv) whether the Debtors' estates have any claims against the Mortgage Lenders relating to the financing for the Acquisition or the commencement of these Chapter 11 cases.

32.     The Acquisition and the events that unfolded after that transaction – leading to the ultimate bankruptcy filings – require investigation by an independent third party. The Acquisition has been described as a "highly leveraged" transaction and among Lichtenstein's "riskiest". See Ex. C. Only two years after the Acquisition closed, the Debtors collapsed under the unsustainable debt levels that had been created. The negotiations that unfolded after the Acquisition and prior to the bankruptcy filings ultimately led to serious allegations in various complaints against the Debtors' insiders and senior lenders. The allegations assert, among other things, that the senior lenders and the Debtors colluded to provide certain insiders with protection against their Guaranty obligations while wiping out the junior debt. When such allegations of fraud and dishonesty, and breach of fiduciary duty involving the current management are present, the appointment of an examiner is warranted.

## GROUNDS FOR THE RELIEF REQUESTED

33.     Section 1104(c) of the Bankruptcy Code provides as follows

(c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—

> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or

> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c).[1]

34. From the express language of the statute, it is apparent that appointment of an examiner is premised on four factors being satisfied: First, the debtor must still be in possession of the estate and a trustee must not have been appointed.[2] Second, a plan must

---

[1] This section was originally codified as 11 U.S.C. §1104(b). Subsections (b) and (c) of section 1104 were redesignated as subsections (c) and (d) by the Bankruptcy Reform Act of 1994, which added a new subsection (b), authorizing trustee elections in Chapter 11 cases. See Bankruptcy Reform Act of 1994, Pub. L. No. 103-394 (enacted October 22, 1994, and effective in cases filed after that date).

[2] The statute expressly provides that the court cannot appoint an examiner if a trustee is appointed. This limitation, however, was not intended to require the denial of a motion to appoint a trustee as a precondition to the appointment of an examiner. See Keene Corp. v. Coleman (In re Keene Corp.), 164 B.R. 844, 855 (Bankr. S.D. N.Y. 1994). In Keene, the court rejected the creditors' committee's argument that the court could not appoint an examiner unless it first refused to appoint a trustee, holding that "[a] motion to appoint an examiner stands on its own, and need not be part of an unsuccessful motion to appoint the trustee." Id. see also In re Gilman Serv., Inc. , 46 B.R. 322, 327 (Bankr. D. Mass. 1985) (court granted United States Trustee's motion to appoint examiner, where no separate motion to appoint a trustee had been filed). Similarly, in a number of cases, bankruptcy courts have appointed an examiner sua sponte, where no motion to appoint a trustee had been filed. See In re First Am. Health Care of Ga., Inc., 208 B.R. 992, 994 (Bankr. S.D. Ga. 1996); In re Public Serv. Co. of N.H., 99 B.R. 177,

not have been confirmed.  Third, a party in interest or the United States Trustee, as is the case here, must request the appointment.  Lastly, one of the conditions set out in (c)(1) or (c)(2) must be satisfied – either the appointment of the examiner is in the best interests of the creditors or the specified unsecured debts exceed $5 million.  See, e.g., In re UAL Corp., 307 B.R. 80, 84 (Bankr. N.D.Ill. 2004) ("[A]ppointment of an examiner is mandatory if the four conditions are met, but the court retains the discretion to determine the nature and scope of the examiner's investigation").  Here, there cannot be any disagreement on the fact that the first three factors are met.  As to the last one, the appointment of the examiner is not only mandatory in this case under the statutory provisions, but such appointment is also warranted for the best interests of creditors, thus satisfying the last factor.

A.      **The Appointment of An Examiner Is Mandatory Under Section 1104(c)(2)**

35.      Unlike Bankruptcy Code section 1104(c)(1), which requires examiner appointment if it is "in the interests of creditors," section 1104(c)(2) leaves no discretion to the court where, as here, the claims threshold is met.

36.      The only reported United States Court of Appeals decision to squarely address the issue of whether the appointment of an examiner under § 1104(c)(2) is mandatory, as opposed to discretionary, is Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.), 898 F.2d 498 (6th  Cir. 1990).  In Revco, the United States Trustee filed a motion to appoint an examiner for the debtors, owners of a nationwide chain of drug stores acquired in a leveraged buyout, to conduct an

---

182 (Bankr. D. N.H. 1989); In re Jartran, Inc., 78 B.R. 524, 527 (Bankr. N.D. Ill. 1987); In re UNR Indus., Inc., 72 B.R. 789, 795 (Bankr. N.D. Ill. 1987); In re Landscaping Serv., Inc., 39 B.R. 588, 590-91 (Bankr. E.D. N.C. 1984).

investigation of the leveraged buyout, less than two months after the filing of the debtors' Chapter 11 cases. As the parties stipulated that each of the debtors' fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceeded $5,000,000, the United States Trustee contended that the bankruptcy court was required, pursuant to section 1104(b)(2) (now section 1104(c)(2)) to appoint an examiner at the United States Trustee's request. The United States Trustee's motion was opposed by the debtors and the creditors.

37.     The bankruptcy court denied the United States Trustee's motion as premature and unnecessary, specifically rejecting the United States Trustee's contention that the appointment of an examiner was mandatory under the circumstances. Id. at 499. The United States Trustee appealed to the district court, and the district court dismissed the appeal, holding that the United States Trustee lacked standing to appeal because the bankruptcy court's decision had not affected the United States Trustee's pecuniary interest. Id.

38.     On appeal from the district court, the U.S. Court of Appeals for the Sixth Circuit reversed the decisions of the district court and the bankruptcy court and remanded the case to the bankruptcy court with instructions to order the appointment of an examiner under section 1104(b)(2) (now section 1104(c)(2)). Id. at 501. In so doing, the Sixth Circuit held that the appointment of an examiner is mandatory under that section, based upon the plain meaning of the statute. Id. at 500-01.

39.     In addition, the court addressed the debtors' concerns that the mandatory construction of the statute may invite abuse, and that a party in interest could needlessly prolong a case with last-minute demands for an examiner, noting that the bankruptcy court retains broad

discretion to direct the examiner's investigation, including its nature, extent, and duration. Id.; see 11 U.S.C. § 1104(c) ("the court shall order the examiner to conduct such an investigation of the debtor as is appropriate"); see also In re Walton, 398 B.R. 77, 84 (N.D. Ga. 2008) (district court acknowledged the creditor's committee concerns that the appointment of an examiner would merely duplicate the efforts of the committee of unsecured creditors but concluding that "[n]onethelss, the statute is clear, and '[w]hile Congress may not have foreseen the problems that arise when discretion over an appointment of an examiner is missing, that is not sufficient grounds for refusing to give effect to the plain meaning of the statute.'").

40.     The majority of the other courts addressing this issue have also recognized the mandatory nature of examiner appointments under section 1104(c)(2).  See  In re Loral Space & Commc'ns, Ltd., No. 04 C.V. 8645RPP, 2004 WL 2979785, at *5 (S.D.N.Y. Dec. 23, 2004) (finding that section 1104(c)(2) mandates the appointment of an examiner where the debt threshold is met and reversing bankruptcy court's finding that if the requested appointment is inappropriate, the bankruptcy court should not stretch to fashion a more appropriate job description for the examiner); In re Vision Dev. Group of Broward County, LLC, No. 07-17778-BKC-RBR, 2008 WL 2676827, at *3 (Bankr. S.D. Fla. June 30, 2008) (holding that the appointment of an examiner is mandatory under section 1104(c)(2)); In re UAL Corp., 307 B.R. 80 (Bankr. N.D. Ill. 2004) ("Indeed, if paragraph (c)(2) were not mandatory, then §1104(c) would have the following meaning: 'If specified debt is less than $5 million, it is in the court's discretion to appoint an examiner; and if specified debt is more than $5 million, it is in the court's discretion to appoint an examiner.'");  In re Big Rivers Elec. Corp.,  213 B.R. 962, 965-66 (Bankr. W.D. Ky. 1997) (appointment of examiner was required as a matter of law); In re

Mechem Fin. Of Ohio, Inc., 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988) (mandatory); In re The

Bible Speaks, 74 B.R. 511, 514 (Bankr. D. Mass. 1987) (appointment of examiner is required if

trustee is not appointed, but court appointed trustee); In re 1243 20th St., Inc., 6 B.R. 683, 685 n.3

(Bankr. D. D.C. 1980) (mandatory); In re Lenihan, 4 B.R. 209, 211 (Bankr. D. R.I. 1980)

(mandatory); see also In re Schepps Food Stores, Inc., 148 B.R. 27, 30 (S.D. Tex. 1992)

(mandatory, but creditor waived right to appointment of examiner by failing to make request

until eve of confirmation hearing); In re Bradlees Stores, Inc., 209 B.R. 36, 38 (Bankr. S.D.

N.Y. 1997) (creditors waived right to appointment of examiner to investigate claims arising from

leveraged buyout by failing to make request until approximately two years after cases were filed

and eight months after issuance of report on same matter by debtors' professionals following a

13-month investigation).

**B.      The Appointment of An Examiner Is Also Justified Under Section 1104(c)(1)**

41.      While the appointment of an examiner in this case is mandated by the provisions

of section 1104(c)(2), grounds for such appointment also exist under section 1104(c)(1) because

the appointment would benefit all creditors.  The history of this case, as set forth above, gives

rise to unanswered questions concerning the Acquisition and the negotiations between the

Debtors' insiders and the Mortgage Lenders – ultimately culminating in the Debtors'

predicament – which warrant an answer through the investigation by an independent examiner.

See, e.g., In re Gilman Servs., 46 B.R. 322, 327 (Bankr. D. Mass. 1985) (citation omitted) ("A

debtor's sale of assets to a related corporation before the commencement of the bankruptcy case

warrants an investigation by an examiner where there are unanswered questions concerning the

transaction and interrelationship of the parties involved").

42.     While official committees of unsecured creditors often want to undertake that investigatory role, courts have held that often times an independent examiner is better suited for that role. See, e.g., In re Keene Corp., 164 B.R. 844, 856 (Bankr. S.D. N.Y. 1994) (quoting 1243 20th St., Inc., 6 B.R. at 686) ("While a creditors' committee is well suited to overseeing the operations of a business, especially the financial and economic aspects of the debtor's operations, the examiner is far better able to undertake an in-depth investigation, a function warranted by the facts presented here."). In this case, the Committee is also limited in their ability to pursue causes of action against the Mortgage Lenders by the terms of the Cash Collateral Order. See Cash Collateral Order at ¶ 18.

43.     Having an independent third party conduct an investigation as proposed in this Motion and provide a report which would include the viability of any possible claims against the Debtors' insiders or senior lenders would benefit creditors and equity holders who are presently being wiped out by the terms of the proposed restructuring plan. Moreover, such an appointment could save estate funds in that the examiner can be ordered to share any documents or other materials disclosed in the examiner's report, thus potentially reducing expenses of having various parties conducting the same discovery in these cases, as is presently the case.[3]

---

[3]     As an example of the discovery sought by various parties, on or about June 24, 2009, Line Trust and Deuce Properties filed various applications seeking the examination and production of documents of various parties, which applications were denied on or about July 13, 2009. Subsequently, on July 23, 2009, the Committee filed an Application For Order Authorizing Discovery Pursuant to Bankruptcy Rules 2004 and 9016 (the "Committee Application"). The various applications seeking discovery under Bankruptcy Rule 2004 all focus on the investigation of the Debtors' insiders with respect to the transactions that led to the acquisitions of the Debtors and the negotiations that led to the bankruptcy cases.

44.     The Cash Collateral Order presently provides a deadline of September 16, 2009 for parties in interest (except the Committee) to commence a contested matter or adversary proceeding with respect to various issues, including the validity or perfection of liens by the Mortgage Lenders, and a deadline of November 2, 2009 for the Committee to raise these issues. Cash Collateral Order at ¶19.  Accordingly, to the extent the Motion is granted, these deadlines should be extended to provide the examiner a reasonable time to prepare and file a report and any party to properly review it and pursue any actions they believe is proper.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

WHEREFORE, the United States Trustee respectfully requests that the Court (a) direct the appointment of an examiner to investigate and report on (i) the structuring, negotiation and closing of the Acquisition, (ii) the events and circumstances that led to the Debtors' filing for chapter 11 protection, (iii) whether the Debtors' estates have any claims against Lichtenstein and/or any of the companies that he controls or any other insider relating to the Acquisition or the commencement of these Chapter 11 cases, and (iv) whether the Debtors' estates have any claims against the Mortgage Lenders relating to the financing for the Acquisition or the commencement of these Chapter 11 cases and (b) grant such other and further relief as it may deem just and proper.

Dated: New York, New York
      July 30, 2009

                      Respectfully submitted,

                      DIANA G. ADAMS
                      UNITED STATES TRUSTEE

                      By: */s/ Elisabetta G. Gasparini*
                      Elisabetta G. Gasparini
                      Trial Attorney
                      33 Whitehall Street, 21st Floor
                      New York, New York 10004
                      Tel. (212) 510-0500