# EXHIBIT E



*M-10-468*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Pursuant to Section 157(a) of the Bankruptcy
Amendments and Federal Judgeship Act of 1984, any or all
cases under title 11 and any or all proceedings arising
under title 11 or arising in or related to a case under
title 11 are referred to the bankruptcy judges for this
district.

So Ordered,

ROBERT J. WARD
Acting Chief Judge

July 10, 1984

MICROFILM

11 1984

David M. Friedman
Christopher P. Johnson
David E. Ross
Adina G. Storch
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Counsel to David Lichtenstein and Lightstone Holdings LLC*



RECEIVED JUL -8 2009 U.S.D.C. S.D.N.Y. CASHIERS

JUDGE HOLWELL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

LINE TRUST CORPORATION LTD. and DEUCE :
PROPERTIES LTD.,

          Plaintiffs,

       -against-

DAVID LICHTENSTEIN, LIGHTSTONE
HOLDINGS LLC, WELLS FARGO BANK, N.A., :
in its capacity as trustee, WACHOVIA BANK,
N.A., BANK OF AMERICA, N.A., U.S. BANK
NATIONAL ASSOCIATION, CERBERUS
CAPITAL MANAGEMENT, L.P.,
CENTERBRIDGE PARTNERS, L.P., and JOHN
DOES 1-20, being persons whose identities are
presently unknown to Plaintiffs and who are acting :
as Supporting Holders of the Term Sheet proposed
by Lichtenstein,

          Defendants.
-------------------------------------------------------X

09 CV 6152

NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1452, 28 U.S.C. § 157(a), Federal

Rule of Bankruptcy Procedure 9027, and further based upon the grounds set forth in this Notice

of Removal, defendants David Lichtenstein ("Lichtenstein") and Lightstone Holdings LLC

("Lightstone") (together, the "Removing Defendants"), by and through their attorneys, Kasowitz,

Benson, Torres & Friedman LLP, hereby remove this action from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York. This Court has original jurisdiction of this case pursuant to 28 U.S.C. § 1334.

In support of their Notice of Removal, the Removing Defendants state as follows:

1. This action involves claims brought against the Removing Defendants by successors in interest to certain lenders in a complex commercial real estate financing transaction undertaken in connection with the June 2007 purchase of a hotel chain, Extended Stay Hotels, Inc. ("Extended Stay"), by entities affiliated with the Removing Defendants. Extended Stay was purchased for approximately $8 billion, $7.4 billion of which was financed through a combination of mortgage loans, some of which were subsequently securitized and resold, and so-called "mezzanine" debt (the "Transaction"). In connection with the Transaction, the Removing Defendants entered into a series of agreements with certain lenders which, among other things, are alleged to provide for the guaranty of certain indebtedness up to $100 million in limited circumstances. Removing Defendant Lichtenstein is the Chief Executive Officer, President and Chairman of Extended Stay. Other defendants include Extended Stay's senior mortgage lenders, their trustee and administrative agent, and others within Extended Stay's debt structure.

2. On June 15, 2009, Extended Stay and its affiliates filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). Extended Stay's bankruptcy case is pending before federal Bankruptcy Court Judge James M. Peck under the case name In re Extended Stay Inc., Case No. 09-13764 (JMP) (Bankr. S.D.N.Y.).

3. On June 24, 2009, plaintiffs Line Trust Corporation Ltd. ("Line Trust") and Deuce Properties Ltd. ("Deuce") (together, "Plaintiffs") filed the complaint in this action against

2

the Removing Defendants, among others, in the Supreme Court of the State of New York. Plaintiffs allege, among other claims, claims for breach of a guaranty agreement, breach of fiduciary duty and tortious interference with contractual relations among the various lenders involved in the financing Transaction. A copy of the complaint is attached hereto as Exhibit A.

4.    As of this date, the Removing Defendants have not filed a responsive pleading, and no other proceedings have transpired in the state court action.

5.    The issues and agreements at stake in the present action are inextricably linked to Extended Stay's pending bankruptcy proceedings. The connections to the bankruptcy include but are not limited to the following:

a.    First, if the Bankruptcy Court approves Extended Stay's proposed restructuring plan, the Removing Defendants would be relieved of any liability under the alleged guarantees that the Plaintiffs in the instant action seek to enforce.

b.    Second, under the terms of the loan agreements, any recovery awarded to Plaintiffs under the guarantees depends, among other things, upon a threshold determination of the extent of actual losses suffered by Plaintiffs as a result of the bankruptcy filing. Any such determination would be premature while the bankruptcy case is pending.

c.    Third, Plaintiffs' claims are based in part upon their Intercreditor Agreement with various other lenders that are not parties to this action and whose rights under that agreement, among others, must be construed by the Bankruptcy Court in determining the priority of claims of Extended Stay's various creditors.

d.  Fourth, any recovery awarded under the guarantees would be subject to a contractual *pro rata* allocation agreed upon by the various lenders in the Intercreditor Agreement, as likely to be interpreted by the Bankruptcy Court.

e.  Fifth, the prohibition against duplicative recovery requires that, in the unlikely event a judgment is obtained by Plaintiffs in this action, the resulting recovery be applied as an offset to reduce their claims against the bankruptcy estate, thereby potentially increasing the distribution to lenders junior to Plaintiffs.

f.  Sixth, the claims asserted against the Removing Defendants for pursuing a restructuring plan which Plaintiffs deem unacceptable and actionable will be rendered moot by the ultimate decision of the Bankruptcy Court to either confirm, or deny confirmation of, such plan.

g.  Finally, since certain of the other defendants in this action are also creditors of Extended Stay in the bankruptcy proceeding, if Plaintiffs prevail on their claims against those defendants in the instant action, then the creditor claims of those defendants against the Extended Stay estate could be equitably subordinated to the claims of other Extended Stay creditors, causing a reprioritization in the bankruptcy distribution. See 11 U.S.C. § 510(c).

6.  Each claim and cause of action in this action is related to the Chapter 11 case. This action is one "arising under title 11, or arising in or related to [a case] under title 11," and this Court therefore has original jurisdiction over this action. 28 U.S.C. § 1334(b). Jurisdiction exists under Section 1334(b) if the case "could conceivably have any effect on the estate being administered in bankruptcy." Celotex Corp. v. Edwards, 514 U.S. 300, 308 n.6 (1995) (quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)). See In re Cuyahoga Equip. Corp., 980

4

F.2d 110, 114 (2d Cir. 1992) (adopting the "conceivable effect" standard in the Second Circuit). "Related to" jurisdiction is construed broadly in the Second Circuit to encompass "nearly every matter directly or indirectly related to the bankruptcy." Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 103 (2d Cir. 2004). A proceeding is "related to" a bankruptcy proceeding even if it does not involve claims against the debtor or the debtor's property. See In re Cuyahoga, 980 F.2d at 114.

7.     In addition to the reasons cited above, because the guaranty agreements at issue in the instant action internally reference, and must be construed in connection with, the loan agreements, Intercreditor Agreement and various other agreements central to the administration of Extended Stay's bankruptcy estate, the "conceivable effect" standard is satisfied here.

8.     28 U.S.C. § 1452(a) provides: "A party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." Thus, because this Court has original jurisdiction over Plaintiffs' claims under Section 1334, those claims may be removed to this Court under Section 1452. Further, removal of each claim and cause of action of the civil action to the Bankruptcy Court is authorized by 28 U.S.C. §§ 1452, 1334 and 157 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.) ("Order of Referral"). Removal is in accordance with Rule 9027 of the Federal Rules of Bankruptcy Procedure.

9.     Finally, the claims and causes of action subject to removal are "core" matters with respect to Extended Stay's bankruptcy proceedings because their resolution will have a clear and direct impact on property of the estate under 11 U.S.C. § 541. Indeed, the rights and

responsibilities of the parties to this action cannot be decided without threshold determinations by the Bankruptcy Court, and certain claims may be mooted altogether if the restructuring plan is approved as proposed. Plaintiffs, for example, allege that Extended Stay's filing of its voluntary bankruptcy petition constituted the trigger event giving rise to their breach of contract claims under the guaranty agreement. Moreover, Plaintiffs' complaint attacks the fairness of the proposed restructuring plan. As a result, the complaint in this action clearly involves matters which "invoke[] substantive right[s] provided by title 11" or that "could arise only in the context of a bankruptcy case." See In re Housecraft Indus. USA, Inc., 310 F.3d 64, 70 (2d Cir. 2002), citing In re Wood, 825 F.2d 90, 96 (5th Cir. 1987).

10. In addition, resolution of the claims asserted in this action will significantly affect the handling and administration of the bankruptcy estate, would involve an estimation of claims or interests for the purpose of confirming a plan of reorganization under Chapter 11, and would affect the adjustment of the debtor/creditor or the equity security holder relationship. Consequently, this action also involves "core" bankruptcy matters under 28 U.S.C. § 157 (b)(2)(A), (B) and (O).

11. If the claims are determined to be non-core matters – and they should be not be – the Removing Defendants consent to the entry of final orders or judgments by the Bankruptcy Court.

12. Pursuant to 28 U.S.C. § 1446(a) and/or Federal Rule of Bankruptcy Procedure 9027(a)(1), all process, pleadings and orders served on the Removing Defendants in the state court action are being filed along with this Notice of Removal, and are attached as Exhibit A hereto.

13.    Pursuant to 28 U.S.C. § 1446(d) and/or Federal Rule of Bankruptcy Procedure 9027(b) and (c), promptly after the filing of the instant Notice of Removal with this Court, copies of the instant Notice of Removal (without the attached state court pleadings) will be filed with the Clerk of the Court for the Supreme Court of the State of New York, County of New York and will be served on counsel for the other parties to the removed action.

14.    This Notice of Removal is timely filed within thirty (30) days of service of the complaint in accordance with 28 U.S.C. § 1446(b) and Fed. R. Bankr. P. 9027(a)(3).

WHEREFORE, the instant action is hereby removed to this Court, and should thereafter be referred to the Bankruptcy Court pursuant to the Order of Referral.

Dated: New York, New York
July 8, 2009

KASOWITZ, BENSON,
TORRES & FRIEDMAN LLP

By: _____

David M. Friedman(dfriedman@kasowitz.com)
Christopher P. Johnson
David E. Ross
Adina G. Storch
1633 Broadway
New York, NY 10019
(212) 506-1700

*Counsel to David Lichtenstein and
Lightstone Holdings LLC*

8

# EXHIBIT A

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------X

LINE TRUST CORPORATION LTD. and DEUCE
PROPERTIES LTD.,

        Plaintiffs,

    - against -

DAVID LICHTENSTEIN, LIGHTSTONE
HOLDINGS, LLC, WELLS FARGO BANK, N.A., in
its capacity as trustee, WACHOVIA BANK, N.A.,
BANK OF AMERICA, N.A., U.S. BANK
NATIONAL ASSOCIATION, CERBERUS
CAPITAL MANAGEMENT, L.P., CENTERBRIDGE
PARTNERS, L.P., and JOHN DOES 1-20, being
persons whose identities are presently unknown to
Plaintiffs and who are acting as Supporting Holders of
the Term Sheet proposed by Lichtenstein,

        Defendants.
--------------------------------------------------------------X

COPY

Index No. 601951/2009
Date Purchased: 6/24/2009

## SUMMONS

NEW YORK
COUNTY CLERK'S OFFICE

JUN 24 2009

NOT COMPARED
WITH COPY FILE

To the above-named Defendants:

        YOU ARE HEREBY SUMMONED and required to serve upon Plaintiffs' attorneys
an answer to the Verified Complaint in this action within 20 days of service of this summons,
exclusive of the day of service, or within 30 days after service is complete if this summons is
not personally delivered to you within the State of New York. In case of your failure to
answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Dated: New York, New York
     June 24, 2009

                  MEISTER SEELIG & FEIN LLP

                  By: Stephen B. Meister

                  2 Grand Central Tower
                  140 East 45th Street -19th Floor
                  New York, New York 10017
                  (212) 655-3500
                  *Attorneys for Plaintiffs*

TO:

David Lichtenstein
326 Third Street
Lakewood, New Jersey 08701

Lightstone Holdings LLC
326 Third Street
Lakewood, New Jersey 08701

Wells Fargo Bank, N.A.
420 Montgomery Street
San Francisco, CA 94104

Wachovia Bank, N.A.
Commercial Real Estate Services
8739 Research Drive
URP-4, NC 1075
Charlotte, North Carolina 28262

Bank of America, N.A.
Hearst Tower
214 North Trion Street, 20th Floor
Charlotte, North Carolina 28255

U.S. Bank National Association
(as Trustee for Maiden Lane Commercial
Mortgage Backed Securities Trust 2008-1),
60 Livingston Avenue
EP-MN-WS3D
St. Paul, Minnesota 55107

Cerberus Capital Management, L.P.
299 Park Avenue
New York, NY 10171

Centerbridge Partners, L.P.
375 Park Avenue, 12th Floor
New York, NY 10152-0002

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
LINE TRUST CORPORATION LTD. and DEUCE
PROPERTIES LTD.,

        Plaintiffs,

       - against -

DAVID LICHTENSTEIN, LIGHTSTONE
HOLDINGS, LLC, WELLS FARGO BANK, N.A., in
its capacity as trustee, WACHOVIA BANK, N.A.,
BANK OF AMERICA, N.A., U.S. BANK
NATIONAL ASSOCIATION, CERBERUS
CAPITAL MANAGEMENT, L.P., CENTERBRIDGE
PARTNERS, L.P., and JOHN DOES 1-20, being
persons whose identities are presently unknown to
Plaintiffs and who are acting as Supporting Holders of
the Term Sheet proposed by Lichtenstein,

        Defendants.
------------------------------------------------------------------X

Index No. 601951/2009
Date Purchased: 6/24/2009

**VERIFIED COMPLAINT**

      Plaintiffs Line Trust Corporation Ltd. and Deuce Properties Ltd., by and through their

undersigned counsel, as and for their Verified Complaint against David Lichtenstein, Lightstone

Holdings LLC, Wells Fargo Bank, N.A., in its capacity as trustee, Wachovia Bank, N.A., Bank

of America, N.A., U.S. Bank National Association (as Trustee for Maiden Lane Commercial

Mortgage Backed Securities Trust 2008-1), Cerberus Capital Management, L.P., Centerbridge

Partners, L.P., and John Does 1-20, being persons whose identities are presently unknown to

Plaintiffs and who are acting as Supporting Holders of the Term Sheet proposed by Lichtenstein

as detailed below, upon knowledge as to themselves and upon information and belief as to all

other matters, allege as follows:

# I.  INTRODUCTION

1.     This action arises in part out of the tortious, conspiratorial, collusive, bad faith and predatory conduct of the senior lender defendants (the "Senior Lender Defendants")—the trustee, administrative agent and certain certificate holders of the $4.1 billion first mortgage (the "First Mortgage" or "Senior Loan") component of the $7.4 billion combined first mortgage and mezzanine loan debt structure (collectively, the "Loans"), used to finance the 2007 acquisition of the 75,844 unit Extended Stay Hotels portfolio (the "Hotel Properties")—who, in cahoots with the other defendants, David Lichtenstein ("Lichtenstein"), the managing principal of the borrowers (collectively, the "Borrowers"), and his controlled company, defendant Lightstone Group (together with Lichtenstein, collectively, the "Guarantor Defendants"), both of whom are so-called "non-recourse carve out" guarantors with respect to the Loans, by virtue of which the Guarantor Defendants have springing liability under such guaranties (collectively, the "Guarantees") in the event, *inter alia*, the Borrowers file for bankruptcy protection, hatched a Machiavellian scheme, whereby the Senior Lender Defendants promised to provide the Guarantor Defendants with a $100,000,000 indemnity with respect to the liabilities of the Guarantor Defendants if the Borrowers file for bankruptcy protection, along with a $5 million litigation defense war chest to resist the claims asserted by other lenders against the Guarantor Defendants under the Guarantees, as well as an equity participation to Lichtenstein through a new management agreement, all as part of a comprehensive scheme designed to induce Lichtenstein to do that which the Senior Lender Defendants themselves promised all other lenders, under the express terms of the Intercreditor Agreement, they would never do—cause the Borrowers to file for bankruptcy protection, despite the numerous other "bankruptcy remoteness" provisions built into the relevant loan documents.

2

The Senior Lender Defendants' Machiavellian scheme worked, and as a direct result of the protections and promises offered by the Senior Lender Defendants to the Guarantor Defendants, Lichtenstein caused all the Borrowers and various affiliated entities, none of which is a defendant herein, to file chapter 11 bankruptcy cases on June 13, 2009. As the Term Sheet (the "Term Sheet") proposing a plan of reorganization for the Borrowers filed along with the debtors' chapter 11 petitions makes perfectly clear, for months prior to the June 13th filing, Lichtenstein simultaneously pursued two separate and distinct—but equally Machiavellian—schemes with different groups of lenders.

In his first plan ("Plan A"), Lichtenstein conspired and colluded with the original lender defendants, Bank of America, Wachovia Bank, N.A. and U.S National Bank Association, as successor to Bear Stearns Commercial Mortgage, Inc. (collectively, the "Original Lender Defendants"), all of whom continue to hold substantial positions in Mezzanine Loans B-E, to manufacture an Event of Default under the loan documents by intentionally not paying approximately $3.5 million in the Borrowers' Operating Expenses (as a result of which Borrowers ceased being qualified bankruptcy remote "Special Purpose Entities" ("SPE's") as required under the terms of the loan documents), so that the Borrowers could engage in a Conveyance in Lieu Transaction (the "CIL Transaction"), whereby the membership interests owned by the Mezzanine B Borrower in the Mezzanine A Borrower would be conveyed in lieu of a UCC foreclosure to the Original Lender Defendants in their capacity as the owners of the Mezzanine B Loan (which at the time was only in default by virtue of the unpaid $3.5 million of Operating Expenses).

Under Plan A, it was critical that the CIL Transaction occur by midnight of June 12, 2009 because that day was the initial maturity date under all of the Loans, and while the loan

3

documents provided for three successive one year extension options (the first of which had been duly exercised by the Borrowers), the loan documents also called for the application of a so called "Debt Yield Test" on June 12th, whereby the net operating income of the Hotel Properties was to be divided by the aggregate principal amount of all of the Loans ($7.4 billion) and, if the test were failed, while the loan extension would nonetheless remain in effect, mandatory amortization payments (the "Amortization Payments") would then be required with respect to all of the Loans. Since it was critical to the Original Lender Defendants that the Amortization Payments (payable with respect to the First Mortgage and Mezzanine A Loan) be averted, Plan A required that the CIL Transaction be consummated by no later than midnight on June 12th because, upon consummating the CIL Transaction, all Mezzanine Loans junior to the Mezzanine B level (including those owned by Plaintiffs) would be structurally wiped out (such junior mezzanine loans would technically continue to exist as debts but they are non-recourse loans and their collateral, the limited liability company membership interests in the next most senior Mezzanine Borrower, would cease to exist). Thus, by consummating the CIL Transaction by midnight on June 12th, the aggregate principal amount of the wiped out junior Mezzanine Loans (approximately $2.6 Billion) would cease to exist as debts of the Borrowers, not count for purposes of the Debt Yield Test and thus the Amortization Payments would be averted.

However, when Plaintiffs received notice from the Original Lender Defendants of the contrived Operating Expense based Event of Default in mid May, 2009, they promptly commenced an action entitled *Line Trust Corporation, Ltd., et al. v. Wachovia Bank, N.A., et al.* (Index no. 601713/2009) (the "Plan A Action"). The presiding New York Supreme Court Justice, Richard B. Lowe, III, issued a temporary restraining order in the Plan A Action on June

4

3, 2009 (the "June 3rd TRO).[1]  The June 3rd TRO tolled the time within which the junior Mezzanine Lenders (including Plaintiffs) could cure the alleged Operating Expense default. When the June 3rd TRO was issued by Justice Lowe, at approximately 2:00 pm EDT on June 3rd, there then remained one business day and approximately ten hours of cure period in the ten business day cure period prescribed by the Intercreditor Agreement among the Lenders. Consequently, the June 3rd TRO effectively precluded the Original Lender Defendants from being able to consummate the CIL Transaction until one business day and ten hours after the June 3rd TRO was dissolved.  On June 8th, a hearing was held before Justice Lowe on various preliminary injunctions requested by the Plaintiffs, but Justice Lowe reserved decision and continued the June 3rd TRO. The June 3rd TRO was still in effect on June 12th and consequently, the Original Lender Defendants and Lichtenstein were unable to consummate the CIL Transaction by the June 12th deadline, and Plan A was thereby thwarted.

In consequence, the Senior Lender Defendants and Lichtenstein, who have for several months been negotiating with one another, put into effect a second Machiavellian back up scheme ("Plan B") whereby, as stated above, the Senior Lender Defendants, through a series of comprehensive and wrongful protections and inducements, induced Lichtenstein to cause the Borrowers to file for bankruptcy. Thus at approximately 3:00 am EDT on June 13th, just three (3) hours after Plan A was abandoned, the Borrowers filed chapter 11 petitions.   By promising Lichtenstein, *inter alia*, a $100 million indemnity against liability under the Guaranties, a $5 Million litigation defense war chest and an equity participation in the restructured ownership entities for the Hotel Properties through a new management agreement (collectively, the

---

[1] On Friday, June 5, 2009, the Honorable Judge Bruce Priddy of the Dallas 116th Civil District Court issued a temporary restraining order in favor of another junior mezzanine lender, restraining the Original Lender Defendants from going forward with the CIL Transaction. Upon a motion to dissolve said temporary restraining order by the Original Lender Defendants was subsequently denied on June 10, 2009.

"Fraudulent Bankruptcy Inducements"), the Senior Lender Defendants successfully managed to overcome the comprehensive bankruptcy remote provisions bargained for by the Plaintiffs and other lenders, including the severe springing personal liability to Lichtenstein under the Guaranties arising by virtue of a bankruptcy filing, and simultaneously circumvent the clear anti-bankruptcy covenants made by the Senior Lender Defendants themselves in the Intercreditor Agreement.

Pursuant to the Term Sheet attached to the chapter 11 petitions, various certificate holders who own portions of the $4.1 billion First Mortgage, called "Supporting Holders," negotiated, endorsed and agreed to the Fraudulent Bankruptcy Inducements. Upon information and belief, Defendants Cerberus Capital Management, L.P. and Centerbridge Partners, L.P. are Supporting Holders. Because the identity of the other certificate holders who have acted as well as Supporting Holders are presently unknown to Plaintiffs, those presently unknown persons are sued herein as "John Does 1-20."

Indicative of their bad faith and predatory conduct, the Senior Lender Defendants and the Guarantor Defendants (collectively, the "Plan B Defendants") hatched and implemented Plan B even though the Plaintiffs and the other junior Mezzanine Lenders had proposed and offered to convert all Mezzanine Loans into tranched preferred equity positions in the holding company owning the Borrowers, carrying in lieu of mandatory interest payments as their Mezzanine Loans now do, cash flow only preferred rates of return, and of course, no maturity dates. Had the Plan B Defendants accepted that generous offer before June 12th, the aggregate debt level encumbering the Borrowers would have been reduced from $7.4 billion to $4.1 billion, the Debt Yield Test would have been satisfied, and the Amortization Payments would have been averted. But the Senior Lender Defendants were not content merely to reorganize Borrowers so they were

stable and solvent, but rather insisted upon themselves being able to "steal" the valuable Hotel Properties and wipe out Plaintiffs and the other junior Mezzanine Lenders (while at the same time reinstating their cohort, Lichtenstein, in equity via a management agreement containing an "equity kicker").

By reason of the bankruptcy filings, the Plan A Action was rendered moot and/or stayed, and consequently the Plan A Action was voluntarily discontinued by the Plaintiffs without prejudice. Plaintiffs now bring this Complaint, which makes out claims against the Senior Lender Defendants for breach of the implied covenant of good faith and fair dealing inherent in the Intercreditor Agreement; against the Supporting Holders, presently known and unknown (including those who may become Supporting Holders in the future), for tortious interference with contract (i.e., the Intercreditor Agreement, loan agreements and Guaranties), as such Supporting Holders are not parties to said contracts; against Lichtenstein and Lightstone Holdings for breach of the Guaranties both based on filing the chapter 11 petitions and for violating the SPE covenants, by virtue which the Defendant Guarantors' liability is not limited to $100 million as otherwise set forth in the Guaranties; against Lichtenstein for breaching his fiduciary duties to Plaintiffs (by virtue of the impending insolvency of Borrowers given the Amortization Payments); against the Senior Lender Defendants (including the Supporting Holders) for aiding and abetting Lichtenstein's breach of the fiduciary duties he owed Plaintiffs; against the Guarantor Defendants seeking to enjoin them, based on principles of equitable estoppel, from seeking to enforce the $100,000,000 cap contained in the Guaranties; against the Guarantor Defendants for costs of collections; against the Original Lender Defendants and Lichtenstein for tortiously interfering with contractual relations between the Mezzanine G Borrower and Plaintiffs under the Mezzanine G Loan Agreement; against the Original Lender

7

Defendants for breach of implied covenant of good faith and fair dealing which requires that all the Lender parties to the Intercreditor Agreement recognize one another's Loans subject to and in accordance with the relative priorities of said Loans; against the Original Lender Defendants for fraudulent concealment by failing to disclose their collusive agreement with Lichtenstein to have Lichtenstein cause the Borrowers not to pay Operating Expenses. For these claims, Plaintiffs seek compensatory and punitive damages of $314,000,000, plus interest and costs.

## II.   PARTIES, NON-PARTIES, JURISDICTION AND VENUE

2.   Plaintiff Line Trust Corporation Ltd. ("Line Trust") is a corporation organized under the laws of Gibraltar having an office in New York, New York.

3.   Plaintiff Deuce Properties Ltd. ("Deuce") is a corporation organized under the laws of Gibraltar having an office in New York, New York.

4.   Upon information and belief, Defendant Lichtenstein is an individual residing in Lakewood, New Jersey.

5.   Upon information and belief, Defendant Lightstone Holdings LLC ("Lightstone") is a Delaware limited liability company having its principal place of business at 326 Third Street, Lakewood, New Jersey 08701.

6.   Upon information and belief, Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), is a national banking association with its principal place of business located in San Francisco, California.

7.   Upon information and belief, Defendant Cerberus Capital Management, L.P. ("Cerberus"), is a limited partnership with its principal place of business located in New York, New York.

8.   Upon information and belief, Defendant Centerbridge Partners, L.P.

8

("Centerbridge") is a limited partnership with its principal place of business located in New York, New York.

9. Upon information and belief, Defendant Wachovia Bank, N.A. ("Wachovia") is a national banking association, having an address at Commercial Real Estate Services, 8739 Research Drive, URP-4, NC 1075, Charlotte, North Carolina 28262.

10. Upon information and belief, Defendant Bank of America, N.A. ("BoA," and together with Wachovia and Bear Stearns Commercial Mortgage, Inc., collectively, the "Original Lender Defendants") is a national banking association, having an address at Hearst Tower, 214 North Trion Street, 20th Floor, Charlotte, North Carolina 28255.

11. Upon information and belief, Defendant U.S. Bank National Association as Trustee for Maiden Lane Commercial Mortgage Backed Securities Trust 2008-1 ("U.S. Bank") as successor in interest to Bear Stearns Commercial Mortgage, Inc. ("Bear Stearns"), is a national banking association, having an address at 60 Livingston Avenue, EP-MN-WS3D, St. Paul, Minnesota 55107.

12. Upon information and belief, Defendant John Does 1-20 are holders of certificates of beneficial ownership in a Trust (the "Trust") established under a Trust and Servicing Agreement between Wachovia Large Loan, Inc., as depositor, Wachovia Bank, N.A., as trustee and Wells Fargo Bank, N.A. as trustee. John Does 1-20 are "Supporting Holders" of the Term Sheet and their identities are currently unknown to Plaintiffs.

13. Upon information and belief, non-party Bank of America Securities L.L.C. ("BoA Securities") is a Delaware limited liability company having an address at Hearst Tower, 214 North Trion Street, 20th Floor, Charlotte, North Carolina 28255.

14. Upon information and belief, non-party Merrill Lynch Mortgage Lending, Inc.

9

("Merrill Lynch") is a Delaware corporation having an address at 4 World Financial Center, 10th Floor, New York, New York 10080.

15. Upon information and belief, non-party ESA 2005 Portfolio L.L.C. f/k/a BRE/ESA 2005 Portfolio L.L.C. ("ESA 2005 Portfolio") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

16. Upon information and belief, non-party ESA 2005-San Jose L.L.C. f/k/a BRE/ESA 2005-San Jose L.L.C. ("ESA 2005-San Jose") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

17. Upon information and belief, non-party ESA 2005-Waltham L.L.C. f/k/a BRE/ESA 2005-Waltham L.L.C. ("ESA 2005-Waltham") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

18. Upon information and belief, non-party ESA Acquisition Properties L.L.C. f/k/a BRE/ESA 2005 Acquisition Properties L.L.C. ("ESA Acquisition") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

19. Upon information and belief, non-party ESA Alaska L.L.C. f/k/a BRE/ESA Alaska L.L.C. ("ESA Alaska") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

20. Upon information and belief, non-party ESA Canada Properties Borrower L.L.C. ("ESA Canada") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

21. Upon information and belief, non-party ESA FL Properties L.L.C. f/k/a BRE/ESA

FL Properties L.L.C. ("ESA FL") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

22. Upon information and belief, non-party ESA MD Borrower L.L.C. f/k/a BRE/ESA MD Borrower L.L.C. ("ESA MD") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

23. Upon information and belief, non-party ESA MN Properties L.L.C. f/k/a BRE/ESA MN Properties L.L.C. ("ESA MN") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

24. Upon information and belief, non-party ESA P Portfolio L.L.C. f/k/a BRE/ESA P Portfolio L.L.C. ("ESA P") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

25. Upon information and belief, non-party ESA P Portfolio MD Borrower L.L.C. f/k/a BRE/ESA P Portfolio MD Borrower L.L.C. ("ESA P Portfolio MD") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

26. Upon information and belief, non-party ESA P Portfolio PA Borrower L.L.C. f/k/a BRE/ESA P Portfolio PA Borrower L.L.C. ("ESA P Portfolio PA") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

27. Upon information and belief, non-party ESA P Portfolio TXNC Borrower L.L.C. f/k/a BRE/ESA P Portfolio TXNC Borrower L.L.C. ("ESA P Portfolio TXNC") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

28. Upon information and belief, non-party ESA PA Properties L.L.C. f/k/a BRE/ESA PA Properties L.L.C. ("ESA PA Properties") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

29. Upon information and belief, non-party ESA Properties L.L.C. f/k/a BRE/ESA Properties L.L.C. ("ESA Properties") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

30. Upon information and belief, non-party ESA TX Properties L.P. f/k/a BRE/ESA TX Properties L.P. ("ESA TX Properties") is a Delaware limited partnership having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

31. Upon information and belief, non-party ESH/Homestead Portfolio L.L.C. f/k/a BRE/Homestead Portfolio L.L.C ("ESH/Homestead") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

32. Upon information and belief, non-party ESH/HV Properties L.L.C. f/k/a BRE/HV Properties L.L.C ("ESH/HV") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

33. Upon information and belief, non-party ESH/MSTX Property L.P. f/k/a BRE/MSTX Property ("ESH/MSTX") is a Delaware limited partnership having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

34. Upon information and belief, non-party ESH/TN Properties L.L.C. f/k/a BRE/TN Properties L.L.C ("ESH/TN") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

35. Upon information and belief, non-party ESH/TX Properties L.P. f/k/a BRE/TX Properties L.P. ("ESH/TX"; and together with ESA 2005 Portfolio, ESA 2005-San Jose, ESA

2005-Waltham, ESA Acquisition, ESA Alaska, ESA Canada, ESA FL, ESA MD, ESA MN, ESA P, ESA P Portfolio MD, ESA P Portfolio PA, ESA P Portfolio TXNC, ESA PA Properties, ESA Properties, ESA TX Properties, ESH/Homestead, ESH/HV, ESH/MSTX and ESH/TN, the "Senior Borrowers") is a Delaware limited partnership having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

36.    Upon information and belief, non-party ESA P Portfolio MD Trust f/k/a BRE/ESA P Portfolio MD Trust and ESA MD Properties Business Trust f/k/a BRE/ESA MD Properties Business Trust. ("ESA P Portfolio MD Trust") is a Delaware statutory trust having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

37.    Upon information and belief, non-party ESA Canada Trustee Inc. f/k/a BRE/ESA Canada Trustee Inc. ("ESA Canada Trustee") is a Delaware corporation having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

38.    Upon information and belief, non-party ESA Canada Properties Trust ("ESA Canada Trust") is a Delaware statutory trust having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

39.    Upon information and belief, non-party ESA P Portfolio Operating Lessee Inc. f/k/a Operating Lessee Inc. f/k/a BRE/ESH Portfolio Operating Lessee Inc., ESA 2005 Operating Lessee Inc. f/k/a BRE/ESA 2005 Operating Lessee Inc., ESA Operating Lessee Inc. f/k/a BRE/ESA Operating Lessee Inc. ("ESA P Portfolio Operating") is a Delaware corporation having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

40.    Upon information and belief, non-party ESA Canada Operating Lessee Inc. f/k/a BRE/ESA Canada Operating Lessee Inc. ("ESA Canada Operating") is an Ontario corporation having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

13

41.     Upon information and belief, non-party ESH/Homestead Mezz L.L.C. ("ESH/Homestead Mezz") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

42.     Upon information and belief, non-party ESH P Mezz L.L.C. ("ESH P Mezz") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

43.     Upon information and belief, non-party ESA Mezz L.L.C. ("ESA Mezz"; and together with ESH/Homestead Mezz and ESH P Mezz, the "Mezzanine A Borrower") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

44.     Upon information and belief, non-party ESH/Homestead Mezz 2 L.L.C. ("ESH/Homestead Mezz 2") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

45.     Upon information and belief, non-party ESH P Mezz 2 L.L.C. ("ESH P Mezz 2") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

46.     Upon information and belief, non-party ESA Mezz 2 L.L.C. ("ESA Mezz 2"; and together with ESH/Homestead Mezz 2 and ESH P Mezz 2, the "Mezzanine B Borrower") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

47.     Upon information and belief, non-party ESH/Homestead Mezz 3 L.L.C. ("ESH/Homestead Mezz 3") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

48.     Upon information and belief, non-party ESH P Mezz 3 L.L.C. ("ESH P Mezz 3") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

49.     Upon information and belief, non-party ESA Mezz 3 L.L.C. ("ESA Mezz 3"; and together with ESH/Homestead Mezz 3 and ESH P Mezz 3, the "Mezzanine C Borrower") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

50.     Upon information and belief, non-party ESH/Homestead Mezz 4 L.L.C. ("ESH/Homestead Mezz 4") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

51.     Upon information and belief, non-party ESH P Mezz 4 L.L.C. ("ESH P Mezz 4") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

52.     Upon information and belief, non-party ESA Mezz 4 L.L.C. ("ESA Mezz 4"; and together with ESH/Homestead Mezz 4 and ESH P Mezz 4, the "Mezzanine D Borrower") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

53.     Upon information and belief, non-party ESH/Homestead Mezz 5 L.L.C. ("ESH/Homestead Mezz 5") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

54.     Upon information and belief, non-party ESH P Mezz 5 L.L.C. ("ESH P Mezz 5") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

55.    Upon information and belief, non-party ESA Mezz 5 L.L.C. ("ESA Mezz 5"; and together with ESH/Homestead Mezz 5 and ESH P Mezz 5, the "Mezzanine E Borrower") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

56.    Upon information and belief, non-party ESH/Homestead Mezz 6 L.L.C. ("ESH/Homestead Mezz 6") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

57.    Upon information and belief, non-party ESH P Mezz 6 L.L.C. ("ESH P Mezz 6") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

58.    Upon information and belief, non-party ESA Mezz 6 L.L.C. ("ESA Mezz 6"; and together with ESH/Homestead Mezz 6 and ESH P Mezz 6, the "Mezzanine F Borrower") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306

59.    Upon information and belief, non-party ESH/Homestead Mezz 7 L.L.C. ("ESH/Homestead Mezz 7") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

60.    Upon information and belief, non-party ESH P Mezz 7 L.L.C. ("ESH P Mezz 7") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

61.    Upon information and belief, non-party ESA Mezz 7 L.L.C. ("ESA Mezz 7"; and together with ESH/Homestead Mezz 7 and ESH P Mezz 7, the "Mezzanine G Borrower") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street,

Spartanburg, South Carolina 29306.

62. Upon information and belief, non-party ESH/Homestead Mezz 8 L.L.C. ("ESH/Homestead Mezz 8") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

63. Upon information and belief, non-party ESH P Mezz 8 L.L.C. ("ESH P Mezz 8") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

64. Upon information and belief, non-party ESA Mezz 8 L.L.C. ("ESA Mezz 8"; and together with ESH/Homestead Mezz 8 and ESH P Mezz 8, the "Mezzanine H Borrower") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

65. Upon information and belief, non-party ESH/Homestead Mezz 9 L.L.C. ("ESH/Homestead Mezz 9") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

66. Upon information and belief, non-party ESH P Mezz 9 L.L.C. ("ESH P Mezz 9") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

67. Upon information and belief, non-party ESA Mezz 9 L.L.C. ("ESA Mezz 9"; and together with ESH/Homestead Mezz 9 and ESH P Mezz 9, the "Mezzanine I Borrower") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

68. Upon information and belief, non-party ESH/Homestead Mezz 10 L.L.C. ("ESH/Homestead Mezz 10") is a Delaware limited liability company having its principal place

17

of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

69. Upon information and belief, non-party ESH P Mezz 10 L.L.C. ("ESH P Mezz 10") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306.

70. Upon information and belief, non-party ESA Mezz 10 L.L.C. ("ESA Mezz 10"; and together with ESH/Homestead Mezz 10 and ESH P Mezz 10, the "Mezzanine J Borrower") is a Delaware limited liability company having its principal place of business at 100 Dunbar Street, Spartanburg, South Carolina 29306. The Mezzanine J Borrower, together with Mezzanine A Borrower, Mezzanine B Borrower, Mezzanine C Borrower, Mezzanine D Borrower, Mezzanine E Borrower, Mezzanine F Borrower, Mezzanine G Borrower, Mezzanine H Borrower, Mezzanine I Borrower, is collectively referred to as the "Mezzanine Borrowers."

71. Venue is proper pursuant to CPLR Sections 501 and 503.

72. The Court has jurisdiction over the Defendants pursuant to CPLR Section 302.

### III. FACTS RELEVANT TO ALL CLAIMS

#### A. THE EXTENDED STAY HOTELS PORTFOLIO TRANSACTION

73. On June 11, 2007 (the "Closing Date"), Senior Borrowers and Mezzanine Borrowers (hereinbefore defined collectively as the "Borrowers"), being affiliates of Defendants Lichtenstein and the Lightstone Group (together with Borrowers, the "Purchaser"), purchased from the Blackstone Group LLC, and its affiliates, the Extended Stay Hotels portfolio, consisting of six hundred eighty one (681) hotels, containing seventy five thousand eight hundred forty four (75,844) units throughout forty-four (44) States in the United States of America and Canada and operating under the flags of Extended Stay Deluxe, Extended Stay America, Homestead Studio Suites, StudioPlus and Crossland (collectively the "Portfolio"). Purchaser financed the purchase

of the Portfolio, in part, by obtaining Loans aggregating $7.4 billion U.S. from Wachovia, Bear Stearns and BoA.

74.     Wachovia, Bear Stearns and BoA structured the $7.4 billion debt facility as a Four Billion One Hundred Million and No/100 Dollars ($4,100,000,000.00) senior mortgage loan (heretobefore defined as "First Mortgage" or the "Senior Loan") and ten (10) tranched mezzanine loans in the aggregate principal amount of Three Billion Three Hundred Million and No/100 Dollars ($3,300,000,000.00) (as more particularly described below, the "Mezzanine Loans").

75.     The Senior Loan is secured by, among other things, first mortgages, first leasehold mortgages and deeds of trust (collectively, the "Mortgages") granted by the Senior Borrowers, who directly own the titles and ground leases for the 681 hotel properties (hereinbefore collectively defined as the "Hotel Properties"). As alleged below, shortly after the Closing Date, the Original Lender Defendants securitized the Senior Loan whereby Defendant Wells Fargo as Trustee was transferred ownership of the Senior Loan and Mortgages and the Original Lender Defendants received certificates of beneficial interest in the Trust.

76.     The ten (10) Mezzanine Loans were made to a series of successive upstream parent entities, each owning 100% of the membership/equity interests of the borrower beneath (defined hereinbefore as the "Mezzanine Borrowers"), and were secured by a pledge and first priority lien and U.C.C. security interest in the membership interests in the respective subsidiary limited liability companies.

77.     As further security for the Senior Loan and each of the Mezzanine Loans, Defendants Lightstone and Lichtenstein, along with two non-party debtor entities controlled by Lichtenstein, Extended Stay, Inc. and Homestead Village L.L.C., executed various Guaranty

19

Agreements (hereinbefore collectively defined as a "Guarantee" or the "Guarantees") in favor of the Original Lender Defendants, which now run to Wells Fargo as Trustee with respect to the Guarantee of the Senior Loan, and the various successor owners of the Mezzanine Loans with respect to their respective Guarantees.

78. Upon information and belief, prior to the date hereof, Original Lender Defendants and/or Wells Fargo as Trustee, on the one hand, and Wachovia, as administrator, on the other, entered into separate Administration Agreements pursuant to which Wachovia agreed to act as servicer and administer each of the Loans on the terms and conditions set forth therein. Pursuant to the terms of the Administration Agreements, Wachovia, in its capacity as the administrator of the Loans, was responsible for, among other things, (i) remitting all funds received from each of the Borrowers to the respective participants in the Loans in accordance with the terms of their respective Mezzanine Loan participation agreements, (ii) notifying the Loan certificate holders and/or participants of any defaults on the part of their respective Borrowers under the respective Loans, (iii) keeping and maintaining all accounting records of all amounts payable to the Original Lender Defendants, (iv) determining whether the respective Borrowers have satisfied all of the conditions precedent to the exercise of any proposed extension of the terms of their respective Loans, (v) reviewing the operating statements and financial statements delivered by the Borrowers in accordance with their respective Loans, and (vi) providing the lenders and the loan certificate holders and/or participants with any notices required by the Loan documents or as may be received from the Original Lender Defendants or the Mezzanine Lenders (hereinafter defined) and (vii) abiding by the terms of the Intercreditor Agreement (referenced below).

1. The Senior Loan

79. On the Closing Date, the Senior Borrowers, ESA P Portfolio MD Trust, as

20

Maryland Owner, ESA Canada Trustee, as Signatory Trustee, ESA Canada Trust, a Canadian Trust, ESA P Portfolio Operating, and ESA Canada Operating, collectively, as Operating Lessee, and the Original Lender Defendants entered into a loan agreement (as amended from time to time, the "Senior Loan Agreement"), whereby the Original Lender Defendants made the Senior Loan to the Senior Borrower. The Senior Loan is evidenced by a promissory note (the "Senior Note"), dated as of the Closing Date, executed and delivered by Senior Borrowers to the Original Lender Defendants in the stated principal amount of Four Billion One Hundred Million and No/100 Dollars ($4,100,000,000.00) and secured by, among other things, the Mortgages (the Senior Loan Agreement, Senior Note and documents granting the Mortgages are hereby referred to collectively as the "Senior Loan Documents").

80.    Upon information and belief, pursuant to an Assignment and Assumption Agreement between Bear Stearns, as assignor, and Ebury Finance Limited, as assignee, Bear Stearns assigned a portion of its interest in the Senior Loan to Ebury.

2.  The Ten Tranched Levels of Mezzanine Loans

81.    On the Closing Date, Mezzanine A Borrowers and the Original Lender Defendants entered into a mezzanine loan agreement (as amended from time to time, the "Mezzanine A Loan Agreement"), wherein Original Lender Defendants (for purposes of the Mezzanine A Loan Agreement, the "Mezzanine A Lenders") made a loan ("Mezzanine A Loan"), to Mezzanine A Borrower in the original principal amount of Three Hundred Million and No/100 Dollars ($300,000,000.00). The Mezzanine A Loan is evidenced by a Promissory Note (Mezzanine A Loan) dated as of the Closing Date in the stated principal amount of Three Hundred Million and No/100 Dollars ($300,000,000.00) (the "Mezzanine A Note") and is secured by, a Pledge and Security Agreement (Mezzanine A Loan), dated as of the Closing Date

21

(the "Mezzanine A Pledge Agreement"), from Mezzanine A Borrower in favor of Mezzanine A Lenders pursuant to which Mezzanine A Lenders are granted a first priority lien and U.C.C. security interest in 100% of the membership interests in the Senior Borrower (the Mezzanine A Loan Agreement, Mezzanine A Note and Mezzanine A Pledge agreement are collectively referred to as the "Mezzanine A Loan Documents").

82.    Upon information and belief, pursuant to an Assignment and Assumption Agreement between Bear Stearns, as assignor, and Ebury as assignee, Bear Stearns assigned a portion of its interest in Mezzanine A Loan to Ebury.

83.    On Closing Date, Mezzanine B Borrower and the Original Lender Defendants entered into a mezzanine loan agreement (as amended from time to time, the "Mezzanine B Loan Agreement"), wherein Original Lender Defendants (for purposes of the Mezzanine B Loan Agreement, the "Mezzanine B Lenders") made a loan (the "Mezzanine B Loan") to Mezzanine B Borrower in the original principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00). The Mezzanine B Loan is evidenced by a Promissory Note (Mezzanine B Loan) dated as of the Closing Date in the stated principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00) (the "Mezzanine B Note"), and is secured by, a Pledge and Security Agreement (Mezzanine B Loan), dated as of the Closing Date (the "Mezzanine B Pledge Agreement"), from Mezzanine B Borrower in favor of Mezzanine B Lenders pursuant to which Mezzanine B Lenders are granted a first priority lien and U.C.C. security interest in the 100% membership interests in the Mezzanine A Borrower (the Mezzanine B Loan Agreement, Mezzanine B Note and Mezzanine B Pledge Agreement are to collectively referred to as, the "Mezzanine B Loan Documents").

84.    Upon information and belief, pursuant to an Assignment and Assumption

Agreement between Bear Stearns, as assignor, and Ebury, as assignee, Bear Stearns assigned a portion of its interest in Mezzanine B Loan to Ebury.

85.     On the Closing Date, Mezzanine C Borrower and the Original Lender Defendants entered into a mezzanine loan agreement (as amended from time to time, the "Mezzanine C Loan Agreement"), wherein Original Lender Defendants (for purposes of the Mezzanine C Loan Agreement, the "Mezzanine C Lenders") made a loan (the "Mezzanine C Loan") to Mezzanine C Borrower in the original principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00). The Mezzanine C Loan is evidenced by a Promissory Note (Mezzanine C Loan) dated as of the Closing Date in the stated principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00) (the "Mezzanine C Note") and is secured by a Pledge and Security Agreement (Mezzanine C Loan), dated as of the Closing Date (the "Mezzanine C Pledge Agreement"), from Mezzanine C Borrower in favor of Mezzanine C Lenders pursuant to which Mezzanine C Lenders are granted a first priority lien and U.C.C. security interest in the 100% of the membership interests in the Mezzanine B Borrower (the Mezzanine C Loan Agreement, Mezzanine C Note and Mezzanine C Pledge Agreement are to collectively be referred to as, the "Mezzanine C Loan Documents").

86.     Upon information and belief, pursuant to an Assignment and Assumption Agreement between Bear Stearns, as assignor, and Ebury, as assignee, Bear Stearns assigned a portion of its interest in Mezzanine C Loan to Ebury.

87.     On the Closing Date, Mezzanine D Borrower and the Original Lender Defendants entered into a mezzanine loan agreement (as amended from time to time, the "Mezzanine D Loan Agreement"), wherein Original Lender Defendants (for purposes of the Mezzanine D Loan Agreement, the "Mezzanine D Lenders") made a loan (the "Mezzanine D Loan") to Mezzanine

D Borrower in the original principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00). The Mezzanine D Loan is evidenced by a Promissory Note (Mezzanine D Loan) dated as of the Closing Date in the stated principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00) (the "Mezzanine D Note"), and is secured by a Pledge and Security Agreement (Mezzanine D Loan), dated as of the Closing Date (the "Mezzanine D Pledge Agreement"), from Mezzanine D Borrower in favor of Mezzanine D Lenders pursuant to which Mezzanine D Lenders are granted a first priority lien and U.C.C. security interest in the 100% of the membership interests in the Mezzanine C Borrower (the Mezzanine D Loan Agreement, Mezzanine D Note and Mezzanine D Pledge Agreement are to be collectively referred to as, the "Mezzanine D Loan Documents").

88.     Upon information and belief, pursuant to an Assignment and Assumption Agreement between Bear Stearns, as assignor, and Ebury as assignee, Bear Stearns assigned a portion of its interest in Mezzanine D Loan to Ebury.    .

89.     On the Closing Date, the Mezzanine E Borrower and the Original Lender Defendants entered into a mezzanine loan agreement (as amended from time to time, the "Mezzanine E Loan Agreement"), wherein Original Lender Defendants (for purposes of the Mezzanine E Loan Agreement, the "Mezzanine E Lenders") made a loan (the "Mezzanine E Loan") to Mezzanine E Borrower in the original principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00). The Mezzanine E Loan is evidenced by a Promissory Note (Mezzanine E Loan) dated as of the Closing Date in the stated principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00) (the "Mezzanine E Note"), and is secured by a Pledge and Security Agreement (Mezzanine E Loan), dated as of the Closing Date (the "Mezzanine E Pledge Agreement"), from Mezzanine E Borrower in favor of Mezzanine E

Lenders pursuant to which Mezzanine E Lenders are granted a first priority lien and U.C.C. security interest in the 100% of the membership interest in the Mezzanine D Borrower (the Mezzanine E Loan Agreement, Mezzanine E Note and Mezzanine E Pledge Agreement are to collectively be referred to as, the "Mezzanine E Loan Documents").

90.     Upon information and belief, pursuant to an Assignment and Assumption Agreement between Bear Stearns, as assignor, and Ebury as assignee, Bear Stearns assigned a portion of its interest in Mezzanine E Loan to Ebury.

91.     On the Closing Date, Mezzanine F Borrower and the Original Lender Defendants entered into a certain mezzanine loan agreement (as amended from time to time, the "Mezzanine F Loan Agreement"), wherein Original Lender Defendants (for purposes of the Mezzanine F Loan Agreement, the "Mezzanine F Lenders") made a loan (the "Mezzanine F Loan"), to Mezzanine F Borrower in the original principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00). The Mezzanine F Loan is evidenced by a Promissory Note dated as of the Closing Date in the stated principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00) (the "Mezzanine F Note"), and is secured by a Pledge and Security Agreement, dated as of the Closing Date (the "Mezzanine F Pledge Agreement"), from Mezzanine F Borrower in favor of Mezzanine F Lenders pursuant to which Mezzanine F Lenders are granted a first priority lien and U.C.C. security interest in the 100% of the membership interest in Mezzanine E Borrower (the Mezzanine F Loan Agreement, the Mezzanine F Note and the Mezzanine F Pledge Agreement are to collectively be referred to as, the "Mezzanine F Loan Documents").

92.     Upon information and belief, pursuant to an Assignment and Assumption Agreement between Bear Stearns, as assignor, and Ebury, as assignee, Bear Stearns assigned a

25

portion of its interest in Mezzanine F Loan to Ebury.

93.     On the Closing Date, Mezzanine G Borrower and the Original Lender Defendants entered into a certain mezzanine loan agreement (as amended from time to time, the "Mezzanine G Loan Agreement"), wherein Original Lender Defendants (for purposes of the Mezzanine G Loan Agreement, the "Mezzanine G Lenders") made a loan (the "Mezzanine G Loan") to Mezzanine G Borrower in the original principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00). The Mezzanine G Loan is evidenced by a Promissory Note dated as of the Closing Date in the stated principal amount of Four Hundred Million and No/100 Dollars ($400,000,000.00) (the "Mezzanine G Note"), and is secured by a Pledge and Security Agreement, dated as of the Closing Date (the "Mezzanine G Pledge Agreement"), from Mezzanine G Borrower in favor of Mezzanine G Lenders pursuant to which Mezzanine G Lenders are granted a first priority lien and U.C.C. security interest in the 100% of the membership interest in Mezzanine F Borrower, as defined in and more fully described therein (the Mezzanine G Loan Agreement, Mezzanine G Loan and Mezzanine G Pledge Agreement are to collectively be referred to as, the "Mezzanine G Loan Documents").

94.     Upon information and belief, pursuant to an Assignment and Assumption Agreement between Bear Stearns, as assignor, and Ebury, as assignee, Bear Stearns assigned a portion of its interest in Mezzanine G Loan to Ebury.

95.     On the Closing Date, Mezzanine H Borrower and the Original Lender Defendants entered into a mezzanine loan agreement (as amended from time to time, the "Mezzanine H Loan Agreement"), wherein Original Lender Defendants (for purposes of the Mezzanine H Loan Agreement, the "Mezzanine H Lenders") made a loan (the "Mezzanine H Loan") to Mezzanine H Borrower in the original principal amount of Two Hundred Million and No/100 Dollars

($200,000,000.00). The Mezzanine H Loan is evidenced by a Promissory Note dated as of the Closing Date in the stated principal amount of Two Hundred Million and No/100 Dollars ($200,000,000.00) (the "Mezzanine H Note"), and is secured by a Pledge and Security Agreement, dated as of the Closing Date (the "Mezzanine H Pledge Agreement"), from Mezzanine H Borrower in favor of Mezzanine H Lenders pursuant to which Mezzanine H Lenders are granted a first priority lien and U.C.C. security interest in the 100% of the membership interest in Mezzanine G Borrower (the Mezzanine H Loan Agreement, Mezzanine H Note and Mezzanine H Pledge Agreement are to collectively be referred to as, the "Mezzanine H Loan Documents").

96.     Upon information and belief, pursuant to an Assignment and Assumption Agreement between Bear Stearns, as assignor, and Ebury, as assignee, Bear Stearns, assigned a portion of its interest in Mezzanine H Loan to Ebury.

97.     On the Closing Date, Mezzanine I Borrower and the Original Lender Defendants entered into a mezzanine loan agreement (as amended from time to time, the "Mezzanine I Loan Agreement"), wherein Original Lender Defendants (for purposes of the Mezzanine I Loan Agreement, the "Mezzanine I Lenders") made a loan (the "Mezzanine I Loan") to Mezzanine I Borrower in the original principal amount of Two Hundred Million and No/100 Dollars ($200,000,000.00). The Mezzanine I Loan is evidenced by a certain Promissory Note dated as of the Closing Date in the stated principal amount of Two Hundred Million and No/100 Dollars ($200,000,000.00) (the "Mezzanine I Note"), and is secured by a Pledge and Security Agreement, dated as of the Closing Date (the "Mezzanine I Pledge Agreement"), from Mezzanine I Borrower in favor of Mezzanine I Lenders pursuant to which Mezzanine I Lenders are granted a first priority lien and U.C.C. security interest in the 100% membership interest in

27

Mezzanine H Borrower (the Mezzanine H Loan Agreement, Mezzanine H Note and Mezzanine H Pledge Agreement are to collectively be referred to as, the "Mezzanine I Loan Documents").

98.  Upon information and belief, pursuant to an Assignment and Assumption Agreement between Bear Stearns, as assignor, and Ebury, as assignee, Bear Stearns assigned a portion of its interest in Mezzanine I Loan to Ebury.

99.  On the Closing Date, Mezzanine J Borrower and the Original Lender Defendants entered into a mezzanine loan agreement (as amended from time to time, the "Mezzanine J Loan Agreement"), wherein Original Lender Defendants (for purposes of the Mezzanine J Loan Agreement, the "Mezzanine J Lenders") made a loan (the "Mezzanine J Loan"; and together with the Mezzanine A Loan, the Mezzanine B Loan, the Mezzanine C Loan, the Mezzanine D Loan, the Mezzanine E Loan, the Mezzanine F Loan, the Mezzanine G Loan, the Mezzanine H Loan and the Mezzanine I Loan, collectively, the "Mezzanine Loans") to Mezzanine J Borrower in the original principal amount of Two Hundred Million and No/100 Dollars ($200,000,000.00). The Mezzanine J Loan is evidenced by a Promissory Note (Mezzanine J Loan) dated as of the Closing Date in the stated principal amount of Two Hundred Million and No/100 Dollars ($200,000,000.00) (the "Mezzanine J Note") and is secured by a Pledge and Security Agreement, dated as of the Closing Date (the "Mezzanine J Pledge Agreement"), from Mezzanine J Borrower in favor of Mezzanine J Lenders pursuant to which Mezzanine J Lenders are granted a first priority lien and U.C.C. security interest in the 100% of the membership interest in the Mezzanine I Borrower, as defined in and more fully described therein (the Mezzanine J Loan Agreement, Mezzanine J Note and Mezzanine J Pledge Agreement are collectively be referred to as the "Mezzanine J Loan Documents"; and together with the Mezzanine A Loan Documents, Mezzanine B Loan Documents, Mezzanine C Loan Documents, Mezzanine D Loan Documents,

28

Mezzanine E Loan Documents, Mezzanine F Loan Documents, Mezzanine G Loan Documents, Mezzanine H Loan Documents, and the Mezzanine I Loan Documents, collectively, the "Mezzanine Loan Documents"). Collectively, the Mezzanine A Lenders, the Mezzanine B Lenders, the Mezzanine C Lenders, the Mezzanine D Lenders, the Mezzanine E Lenders, the Mezzanine F Lenders, the Mezzanine G Lenders, the Mezzanine H Lenders, the Mezzanine I Lenders, and the Mezzanino J Lenders are referred to herein as the "Mezzanine Lenders."

100. Upon information and belief, pursuant to an Assignment and Assumption Agreement between Bear Stearns, as assignor, and Ebury, as assignee, Bear Stearns, assigned a portion of its interest in Mezzanine J Loan to Ebury.

101. On the Closing Date, in connection with the Senior Loan, Original Lender Defendants and Senior Borrowers, HVM L.L.C, as property manager, and Homestead Village L.L.C., entered into a Cash Management Agreement (the "Senior Loan Cash Management Agreement") and in connection with the Mezzanine Loans, Original Lender Defendants and each of the Mezzanine Borrowers, entered into a Cash Management Agreement for each of the Mezzanine Loans (each a "Mezzanine Cash Management Agreement," and together with the Senior Loan Cash Management Agreement, collectively, the "Cash Management Agreements"), whereby all of cash receipts from the operations of the Portfolio were swept and deposited into cash management accounts, commonly called "lockboxes," separately established for such purposes with Wachovia, in its capacity as administrative agent for the Mezzanine Loans.

102. On the Closing Date, Original Lender Defendants, in their capacity as (i) the lender under the Senior Loan and (ii) the lender under the respective Mezzanine Loans, entered into an Intercreditor Agreement (the "Intercreditor Agreement") to provide for the relative priority of, and to evidence certain agreements with respect to, the Senior Loan Documents and

29

the Mezzanine Loan Documents. Pursuant to the Intercreditor Agreement, the Lenders in sum and substance promised one another not to cause or prevent the Borrowers to file bankruptcy petitions.

### a. Securitization of Senior Loan and Issuance of Certificated Participation Interests in The Mezzanine Loans

103. Subsequent to the Closing Date, the Original Lender Defendants securitized the Senior Loan by transferring their interests in the Senior Loan and the Mortgages securing the Senior Loan to Wells Fargo as Trustee under a Trust (the "Trust") established among Wachovia Large Loan, Inc., as depositor, Wachovia Bank, N.A. as servicer and special servicer, and Wells Fargo Bank, N.A., as trustee. In connection with such transfer, the Original Lender Defendants received in exchange for transferring their interests in the Senior Loan and the Mortgages to the Trust, certificates representing beneficial interests in the Trust.

104. Subsequent to the securitization of the Senior Loan, the Original Lender Defendants sold certificates ("Certificates") of beneficial interest in the Trust to various persons ("Certificate Holders").

105. Under the terms of the Trust, Certificates are transferrable on certain terms and conditions.

106. Upon information and belief, Defendants Cerberus Capital Management, L.P. ("Cerberus") and Centerbridge Capital Management, L.P. ("Centerbridge") purchased Certificates representing respectively $700,000,000 and $400,000,000 of beneficial interests in the Senior Loan.

107. Upon information and belief, prior to the date hereof, in connection with the Mezzanine A Loan, Mezzanine A Lenders and Ebury, as well as Wachovia, separately in its capacity as administrative agent of the Mezzanine A Loan, and their respective successors and

assigns (collectively, the "Mezzanine A Participation Holders"), entered into a Mezzanine A Loan Participation Agreement (as same may have been amended from time to time, the "Mezzanine A Loan Participation Agreement") to create separate certificated participation interests (each a "Mezzanine A Participation" and collectively, the "Mezzanine A Participations") that represent direct participating beneficial ownership interests in the Mezzanine A Loan. Upon information and belief, upon the dissolution of Bear Stearns, U.S. Bank required the Mezzanine A Lenders and Mezzanine A Borrower to sever the Mezzanine A Note into several replacement notes in favor of Mezzanine A Participation Holders relative to their respective Mezzanine A Participations.

108.    Upon information and belief, prior to the date hereof, in connection with the Mezzanine B Loan, Mezzanine B Lenders and Ebury, as well as Wachovia, separately in its capacity as administrative agent of the Mezzanine B Loan, and their respective successors and assigns (collectively, the "Mezzanine B Participation Holders"), entered into a Mezzanine B Loan Participation Agreement (as same may have been amended from time to time, the "Mezzanine B Loan Participation Agreement") to create separate certificated participation interests (each a "Mezzanine B Participation" and collectively, the "Mezzanine B Participations") that represent direct participating beneficial ownership interests in the Mezzanine B Loan. Upon information and belief, it should be noted that upon the dissolution of Bear Stearns, U.S. Bank required the Mezzanine B Lenders and Mezzanine B Borrower to sever the Mezzanine B Note into several replacement notes in favor of Mezzanine B Participation Holders relative to their respective Mezzanine B Participations.

109.    Upon information and belief, prior to the date hereof, in connection with the Mezzanine C Loan, Mezzanine C Lenders and Ebury, as well as Wachovia, separately in its

capacity as servicer of the Mezzanine C Loans, and their respective successors and assigns (collectively, the "Mezzanine C Participation Holders"), entered into a Mezzanine C Loan Participation Agreement (as same may have been amended from time to time, the "Mezzanine C Loan Participation Agreement") to create separate certificated participation interests (each "Mezzanine C Participation" and collectively, the "Mezzanine C Participations") that represent direct participating beneficial ownership interests in the Mezzanine C Loan. Upon information and belief, it should be noted that upon the dissolution of Bear Stearns, U.S. Bank required the Mezzanine C Lenders and Mezzanine C Borrower to sever the Mezzanine C Note into several replacement notes in favor of Mezzanine C Participation Holders relative to their respective Mezzanine C Participations.

110. Upon information and belief, prior to the date hereof, in connection with the Mezzanine D Loan, Mezzanine D Lenders and Ebury, as well as Wachovia, separately in its capacity as servicer of the Mezzanine D Loans, and their respective successors and assigns (collectively, the "Mezzanine D Participation Holders"), entered into a Mezzanine D Loan Participation Agreement (as same may have been amended from time to time, the "Mezzanine D Loan Participation Agreement") to create separate certificated participation interests (each a "Mezzanine D Participation" and collectively, the "Mezzanine D Participations") that represent direct participating beneficial ownership interests in the Mezzanine D Loan. Upon information and belief, it should be noted that upon the dissolution of Bear Stearns, U.S. Bank required the Mezzanine D Lenders and Mezzanine D Borrower to sever the Mezzanine D Note into several replacement notes in favor of Mezzanine D Participation Holders relative to their respective Mezzanine D Participations.

111. Upon information and belief, prior to the date hereof, in connection with the

Mezzanine E Loan, Mezzanine E Lenders and Ebury, as well as Wachovia, separately in its capacity as servicer of the Mezzanine E Loans, and their respective successors and assigns (collectively, the "Mezzanine E Participation Holders") entered into a Mezzanine E Loan Participation Agreement (as same may have been amended from time to time, the "Mezzanine E Loan Participation Agreement") to create separate certificated participation interests (each a "Mezzanine E Participation" and collectively, the "Mezzanine E Participations") that represent direct participating beneficial ownership interests in the Mezzanine E Loan. Upon information and belief, it should be noted that upon the dissolution of Bear Stearns, U.S. Bank required the Mezzanine E Lenders and Mezzanine E Borrower to sever the Mezzanine E Note into several replacement notes in favor of Mezzanine E Participation Holders relative to their respective Mezzanine E Participations.

112.    Mezzanine G Lenders, Ebury and Wachovia, separately in Wachovia's capacity as administrative agent of the Mezzanine G Loans, and their respective successors and assigns (collectively, the "Mezzanine G Participation Holders"), entered into a Mezzanine G Loan Participation Agreement (as same may have been amended from time to time, the "Mezzanine G Loan Participation Agreement") to create separate certificated participation interests (each a "Mezzanine G Participation" and collectively, the "Mezzanine G Participations") that represent direct participating beneficial ownership interests in the Mezzanine G Loan.    Upon the dissolution of Bear Stearns, U.S. Bank required the Mezzanine G Lenders and Mezzanine G Borrower to sever the Mezzanine G Note into six (6) replacement notes in favor of Mezzanine G Participation Holders relative to their respective Mezzanine G Participations.

113.    Pursuant to the terms of the various Mezzanine Loan Participation Agreements, the Mezzanine Participations are transferrable on certain terms and conditions.    Upon

33

information and belief, various Participations were assigned or issued to BoA Securities and Merrill Lynch.

114.  Upon information and belief, prior to the date hereof, pursuant to an Assignment and Assumption Agreement dated April 16, 2008 between Ebury, as assignor, and Merrill Lynch, as assignee, Ebury assigned its Mezzanine G Participation in the Mezzanine G Loan to Merrill Lynch.

115.  Upon information and belief, on June 26, 2008, Bear Stearns assigned its Mezzanine G Participation in the Mezzanine G Loan to U.S. Bank.

116.  On September 26, 2008, Wachovia assigned its Mezzanine G Participation to Plaintiff Line Trust.

117.  Upon information and belief, on September 26, 2008, Merrill Lynch assigned a portion of its Mezzanine G Participation to FOA ESH LLC.

118.  Upon information and belief, on September 26, 2008, Merrill Lynch assigned a portion of its Mezzanine G Participation to SFF ESH LLC.

119.  On October 3, 2008, Merrill Lynch assigned the remainder of its interest in its Mezzanine G Participation to Plaintiff Deuce.

b.  <u>Guaranties</u>

120.  As stated above, as additional security for the both the Senior Loan and each of the Mezzanine Loans, Guaranties were executed by Defendants Lightstone, Lichtenstein and non-party debtors, Extended Stay, Inc. and Homestead Village LLC.

121.  To that end, on the Closing Date, Defendant Lightstone, Defendant Lichtenstein, non-party Extended Stay, Inc. and non-party Homestead Village L.L.C. entered into a Guaranty Agreement with respect to the Mezzanine G Loan with the Original Lender Defendants (the

34

"Mezzanine G Guaranty").

122. As recited in the Mezzanine G Guaranty, the Guarantors, including Defendants Lightstone and Lichtenstein, being owners of a direct or indirect interest in the Mezzanine G Borrowers, directly benefitted from the Original Lender Defendants making of the Mezzanine G Loan.

123. Pursuant to the Mezzanine G Guaranty, Defendants Lightstone and Lichtenstein irrevocably and unconditionally guaranteed to the Original Lender Defendants (and their successors and assigns including Plaintiffs) the payment and performance of the "Guaranteed Obligations" as and when the same became due and payable, and irrevocably and unconditionally covenanted and agreed that they are liable for the "Guaranteed Obligations" as primary obligors.

124. Under Section 1.2 of the Mezzanine G Guaranty, the term "Guaranteed Obligations" is defined to mean:

> (i) the obligations or liabilities of Borrower to Lender under Section 9.4 of the Loan Agreement, and (ii) any loss, damage, cost, expense, liability, claim or other obligation incurred by [the Original Lender Defendants] (including reasonable attorneys' fees and costs reasonably incurred) arising out of or in accordance with the failure of HVI to pay rent due under HPT Lease to the extent that funds are available from the HPT Property to pay such rent thereunder. Notwithstanding anything to the contrary in this Guaranty or any of the other Loan Documents, the liability of Guarantor (x) to [Mezzanine G Lender] in respect of the Guaranteed Obligations under this Guaranty arising under Section 9.4(a)(xiv) or Section 9.4(b) (other than clause (g) of Section 9.4(b)) of the [Mezzanine G Loan Agreement]; (y) to Mortgage Lender in respect of the Guaranteed Obligations under and as defined in the Guaranty (as such term is defined in the Mortgage Loan Agreement) arising under Section 9.4(a)(xiv) or Section 9.4(b) of the Mortgage Loan Agreement and (z) to the Other Mezzanine Lenders in respect of the Guaranteed Obligations under and as defined in the Guaranty (as such term is defined in the Other Mezzanine Loan Agreements) arising under Section 9.4(a)(xiv) or Section 9.4(b) (other than clause (g) of Section 9.4(b)) of the Other Mezzanine Loan

Agreements, shall not exceed One Hundred Million and No/100 Dollars ($100,000,000.00) in the aggregate.

125.   Section 9.4(a) of the Mezzanine G Loan Agreement, commonly referred to as an "exculpation clause," provides in substance that the Original Lender Defendants will not enforce the obligations of the Mezzanine G Borrower to perform and observe the obligations set forth in the Mezzanine G Loan Documents, by an action or proceeding against the Mezzanine G Borrower except to the extent of the Mezzanine G Borrower's interest in the membership interests in the Mezzanine F Borrower.

126.   However, notwithstanding the foregoing, Section 9.4(a) of the Mezzanine G Loan Agreement, commonly referred to as a "non-recourse carve out clause," provides that the provisions of Section 9.4(a) will not be applicable in the event certain acts are committed by the Mezzanine G Borrower (the "Recourse Events") and, upon the occurrence of those acts, that the Original Lender Defendants may proceed for a money judgment directly against the Mezzanine G Borrower (and all assets of the Mezzanine G Borrower and not just its membership interests in the Mezzanine F Borrower).

127.   Section 1.2 of the Mezzanine G Guaranty provides that in the event of a Recourse Event described in Section 9.4(a)(xiv) or Section 9.4(b) (other than clause (g) of Section 9.4(b)), of the Mezzanine G Loan Agreement, the guarantors under the Mezzanine G Guaranty are liable for not more than $100,000,000.00 (in the aggregate among the Senior Loan and all of the various Mezzanine Loans).

128.   Section 9.4(a)(xiv) of the Mezzanine G Loan Agreement sets forth the following "Recourse Events":

> (xiv) (A) Borrower, any Senior Mezzanine Borrower, Mortgage Borrower, Property Owner, Guarantor, Principal, Mortgage Loan Principal, Senior Mezzanine Loan Principal or Operating Lessee filing a

voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, (B) the filing of an involuntary petition against Borrower, any Senior Mezzanine Borrower, Mortgage Borrower, Property Owner, Guarantor, Principal, Mortgage Loan Principal, Senior Mezzanine Loan Principal or Operating Lessee under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law by any Affiliate of Borrower, any Senior Mezzanine Borrower, Mortgage Borrower, Property Owner, Guarantor, Principal, Mortgage Loan Principal, Senior Mezzanine Loan Principal or Operating Lessee, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against Borrower, any Senior Mezzanine Borrower, Mortgage Borrower, Property Owner, Guarantor, Principal, Mortgage Loan Principal, Senior Mezzanine Loan Principal or Operating Lessee from any Person, (C) Borrower, any Senior Mezzanine Borrower, Mortgage Borrower, Property Owner, Guarantor, Principal, Mortgage Loan Principal, Senior Mezzanine Loan Principal or Operating Lessee filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person (D) Borrower, any Senior Mezzanine Borrower, Mortgage Borrower, Property Owner, Guarantor, Principal, Mortgage Loan Principal, Senior Mezzanine Loan Principal or Operating Lessee consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower, any Senior Mezzanine Borrower, Mortgage Borrower, Property Owner, Guarantor, Principal, Mortgage Loan Principal, Senior Mezzanine Loan Principal or Operating Lessee or any portion of any Individual Property or any portion of the Collateral or any portion of the Senior Mezzanine Loan Collateral, or (E) Borrower, any Senior Mezzanine Borrower, Mortgage Borrower, Property Owner, Guarantor, Principal, Mortgage Loan Principal, Senior Mezzanine Loan Principal or Operating Lessee making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due or (F) Borrower, Senior Mezzanine Borrower, Mortgage Borrower, Property Owner, Guarantor, Principal, Mortgage Loan Principal, Senior Mezzanine Loan Principal or Operating Lessee interfering with Lender's pursuit of any of its remedies under this Agreement or any other Loan Document;

129.     Section 9.4(b) of the Mezzanine G Loan Agreement sets forth the following

further "Recourse Events":

(b)Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other 'provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Pledge Agreement or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event of: (a) Mortgage Borrower, any Senior Mezzanine Borrower, Property Owner, Operating Lessee, Mortgage Loan Principal, Principal, Senior Mezzanine Loan Principal, Guarantor or Borrower filing a voluntary petition under the Bankruptcy Code, the BIA or any other Federal or state bankruptcy or insolvency law or the Companies' Creditors Arrangement Act (Canada) ("CCAA"), (b) the filing of an involuntary petition against any Mortgage Borrower, any Senior Mezzanine Borrower, Property Owner, Operating Lessee, Mortgage Loan Principal, Principal, Senior Mezzanine Loan Principal, Guarantor or Borrower under the Bankruptcy Code, the BIA or the CCAA or any other Federal or state bankruptcy or insolvency law by any Affiliate of Mortgage Borrower, any Senior Mezzanine Borrower, Property Owner, Operating Lessee, Mortgage Loan Principal, Principal, Senior Mezzanine Loan Principal, Guarantor or Borrower, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against Mortgage Borrower, any Senior Mezzanine Borrower, Property Owner, Operating Lessee, Mortgage Loan Principal, Principal, Senior Mezzanine Loan Principal, Guarantor or Borrower from any Person, (c) Mortgage Borrower, any Senior Mezzanine Borrower, Property Owner, Operating Lessee, Mortgage Loan Principal, Principal, Senior Mezzanine Loan Principal, Guarantor or Borrower filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code, the BIA or the CCAA or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person, (d) Mortgage Borrower, any Senior Mezzanine Borrower, Property Owner, Operating Lessee, Mortgage Loan Principal, Principal, Senior Mezzanine Loan Principal, Guarantor or Borrower consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower, any Senior Mezzanine Borrower, Property Owner, Operating Lessee, Mortgage Loan Principal, Principal, Senior Mezzanine Loan Principal, Guarantor or Mortgage Borrower or any portion of any Individual Property or any portion of the Collateral or any portion of the Senior Mezzanine Loan Collateral, (e) Mortgage Borrower, any Senior Mezzanine Borrower, Property Owner, Operating Lessee, Mortgage Loan Principal, Principal, Senior Mezzanine Loan Principal, Guarantor or Borrower making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding (unless

38

failure to make such admission would be a violation of law), its insolvency or inability to pay its debts as they become due, (f) Mortgage Borrower, Senior Mezzanine Borrower, Property Owner, Operating Lessee, Mortgage Loan Principal, Principal, Senior Mezzanine Loan Principal, Guarantor or Borrower interfering with Lender's pursuit of any of its remedies under this Agreement or any other Loan Document or (g) Borrower's failure to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Properties or any interest therein or the Collateral or any interest therein or the Senior Mezzanine Loan Collateral or any interest therein as required by this Agreement, the Pledge Agreement or the other Loan Documents.

130. Pursuant to Section 1.8 of the Mezzanine G Guaranty, the Guarantor Defendants agreed to reimburse Plaintiffs their costs of collection.

B. PLAN A

1. Mezzanine B Default Notice

131. On May 19, 2009, Wachovia, as administrative agent for Mezzanine B Lenders, sent to Mezzanine B Borrower a Notice of Event of Default (the "Mezzanine B Default Notice") alleging that "...certain operating expenses of Mortgage Borrower/Property Owner and/or Operating Lessee are currently more than 60 days outstanding and/or are not being paid when due," and annexed to the Mezzanine B Default Notice a schedule of allegedly past due operating expenses totaling $3,527,360.02 (the "OpEx Amount").

132. The Mezzanine B Default Notice further stated that an "Event of Default" has occurred under the Mezzanine B Loan Agreement, by reason of the fact that the OpEx Amount was outstanding more than sixty (60) days and was not paid when due, and that, by reason thereof, the Mezzanine B Borrower has breached the covenant contained in Section 4.1.30(a)(iv) of the Mezzanine B Loan Agreement, which covenant required that the Senior Borrower, "Mortgage Loan Principal," "Operating Lessee," "Property Owner" and "Beneficial Owner" (each as defined in the Senior Loan Agreement) be and to continue to be a "Special Purpose

Entity" (as defined in the Senior Loan Agreement). Specifically, the Mezzanine B Default

Notice stated:

> "[p]ursuant to clause (xix) of the definition of "Special Purpose Entity" in
> the Mortgage Loan Agreement, the Mortgage Borrower, Property Owner
> and Operating Lessee are entitled to incur liabilities in the ordinary course
> of business, provided, *inter alia*, that such liabilities 'are not more than
> sixty (60) days past the date incurred...and are paid when due.'
> Therefore, one or more of the Mortgage Borrower, Property Owner and/or
> Operating Lessee has failed to be a Special Purpose Entity and, as a result,
> the Borrower has breached the covenant set forth in Section 4.1.30(a)(iv)
> and an Event of Default has occured under the Loan Agreement."

133. Section (xix)(d) of the definition of "Special Purpose Entity" set forth in Section

1.1 of the Senior Loan Agreement of the Senior Loan Agreement, in relevant part, reads as

follows:

> "[No Party required to be a Special Purpose Entity] will incur, create or
> assume no Indebtedness other than (a) the Loan, ... (d) in the case of
> Borrower, Property Owner and Operating Lessee collectively, liabilities
> incurred in the ordinary course of business relating to the ownership and
> operation of the Properties (excluding Taxes and Other Charges) and the
> routine administration of Borrower, in amounts not to exceed in the
> aggregate two (2.0%) percent of the outstanding principal amount of the
> Loan (and with respect to liabilities that are specific to an Individual
> Property, five percent (5%) of the aggregate amount of the Release
> Amounts and Mezzanine Release Amounts for such Individual Property,
> provided that when aggregated with the amount of liabilities that are
> specific to any other Individual Properties, shall in no event exceed two
> percent (2.0%) of the outstanding principal amount of the Loan) which
> liabilities are not more than sixty (60) days past the date incurred, are not
> evidenced by a note and are paid when due, ..."

134. Thus, pursuant to the Mezzanine B Default Notice, the Mezzanine B Lenders

claimed that the Mezzanine B Borrower has committed an Event of Default under the Mezzanine

B Loan Agreement because the Senior Borrowers have incurred liabilities (namely, the OpEx

Amount) that are more than sixty (60) days overdue, and thus, even though such liabilities were

incurred in the ordinary course of business, and in the routine administration of the Senior

Borrowers, none of the Senior Borrowers continued to be a "Special Purpose Entity" within the definition of such term as set forth in Article 1.1 of the Senior Loan Agreement.

135. On May 19, 2009, Wachovia, as administrative agent for Mezzanine B Lenders, sent Plaintiffs and the other Mezzanine Lenders a notice pursuant to Section 12(b)(i) of the Intercreditor Agreement (the "Mezzanine B Junior Loan Default Notice"), advising such junior Mezzanine Lenders of the Mezzanine B Default Notice and providing each junior Mezzanine Lender with a period of ten (10) business days from receipt (or deemed receipt) thereof to cure such Event of Default and stating that:

> "[i]f the Event has not been cured on or prior to such date, the Mezzanine B Lender reserves all rights to accelerate the Mezzanine B Loan, take any Equity Collateral Enforcement Action and/or pursue any other remedies available at law or in equity without further notice to any [Junior Lender], except as may be otherwise required by the terms of the Intercreditor Agreement."

136. Thus, through the Mezzanine B Junior Loan Default Notice, the Mezzanine B Lender provided the junior Mezzanine Lenders and participants, including Plaintiffs, with notice that unless the Mezzanine B Borrower's default is cured within ten (10) business days of May 20, 2009 (the day the Mezzanine B Default Notice was received by the junior Mezzanine Lenders, including Plaintiffs), such junior Mezzanine Lenders would be subject to the remedies available to the Mezzanine B Lenders as set forth in the Mezzanine B Loan Agreement, the Intercreditor Agreement and the applicable Cash Management Agreement.

2. Cash Management

137. Section 3.4 of the Senior Cash Management Agreement sets forth the order of priority for the payment and application of the swept cash receipts from hotel operations maintained on deposit in the cash management "lockbox" account, by stipulating that all such funds must be paid first to ground lease payments; second to real estate taxes; third to property

41

and casualty insurance premiums; fourth to fee and expenses of the Administrative Agent; fifth to debt service payable under the Senior Loan; sixth, to the monthly payments toward replacement reserve; seventh, to interest due at default rates or late payments under the Senior Loan; eighth, to the payment of operating expenses; ninth, to debt service payable under the Mezzanine Loans (to be paid to the Mezzanine Lenders in order of their respective priorities) and thereafter to other payments as more particularly described in the Senior Cash Management Agreement.

138.    However, as a result of the Event of Default alleged in the Mezzanine B Default Notice, Mezzanine B Lenders, pursuant to Section 10(b) of the Intercreditor Agreement, are entitled (assuming a bona fide Event of Default has been declared), to demand and receive payment in full of all amounts due and owing, or that shall become due and owing, under the Mezzanine B Loan, thereby negating the order of priority with respect to application of funds set forth in Section 3.4 of the Senior Cash Management Agreement and the (applicable Mezzanine) Cash Management Agreements, and effectively trapping all of the enhanced summer time seasonal cash flow from the Portfolio at the Mezzanine B level and cutting off the flow of funds to all Mezzanine Lenders junior to Mezzanine Loan B, including Plaintiffs.

### 3. The Event Of Default Occurred as a Result of Collusion Between Original Lender Defendants and Lichtenstein

139.    Upon information and belief, the Original Lender Defendants in bad faith put the Borrowers up to delaying payment of the OpEx amount, by secretly soliciting such delay and offering the Borrowers a "hope certificate" to come back into the equity once the Original Lender Defendants successfully carried out their Machiavellian scheme of wiping out the junior Mezzanine Lenders including Plaintiffs.

140.    In fact, it would have been impossible for the delayed payment of the OpEx

Amount to have occurred absent collusion among the Original Lender Defendants and Lichtenstein because all of the Mezzanine Lenders were current on their interest payments through May 2009 and, under the express terms of the Cash Management Agreements, budgeted operating expenses get paid before Mezzanine Loan interest.

141.     Under the Mezzanine B Default Notice, Mezzanine B Lenders claimed that the Senior Borrower had incurred the OpEx Amount and that such amount was more than sixty (60) days past due, and as a result the Senior Borrowers failed to meet the Special Purpose Entity covenants. Thus, according to the Original Lender Defendants, due to the failure of the Senior Borrowers to pay the OpEx Amount for more than sixty (60) days, the Senior Borrowers violated the Special Purpose Entity covenants and as result the Mezzanine B Borrower breached the Mezzanine B Loan Agreement.

142.     It is clear that the alleged Mezzanine B Default Notice was collusively manufactured by the Original Lender Defendants and Lichtenstein in order to preclude the Borrowers from extending the Loans (as described below) and to deviate from the order of priority as set forth in the Senior Cash Management Agreement, thereby enabling the Mezzanine B Lenders to effectively "trap" the remaining enhanced summertime cash flows until the Mezzanine B Loan is paid in full and cutting off entirely all Mezzanine Lenders junior to the Mezzanine B level from receiving distributable cash flow.

4.  Extension of Maturity Date

143.     The Senior Loan and the Mezzanine Loans matured on June 12, 2009 (the "Maturity Date"), subject to an extension right in the Senior Loan Agreement and the respective Mezzanine Loan Agreements. In particular, Section 2.2.8 of each Mezzanine Loan Agreements state:

43

"Borrower shall have the option to extend the Initial Maturity Date of the Loan for three (3) successive terms (each such option, an "Extension Option" and each such successive term, an "Extension Term") of one (1) year each (the Initial Maturity Date following the exercise of each such Extension Option is hereinafter the "Extended Maturity Date") upon satisfaction of the following terms and conditions:

(a)   No Event of Default shall have occurred and be continuing either on the date on which the notice required in Section 2.2.8(d) is given or on the date such Extension Term is commenced;

(b)   Borrower shall obtain and deliver to Lender, not later than five (5) Business Days prior to the Maturity Date which is to be extended, one or more Replacement Interest Rate Cap Agreements having a LIBOR strike price equal to or less than the Strike Price from an Acceptable Counterparty which Replacement Interest Rate Cap Agreement shall be effective commencing on the date of such extension and shall have a maturity date not earlier than the Extended Maturity Date after giving effect to the Extension Option then being exercised by the Borrower;

(c)   Borrower shall have delivered to Lender together with its notice pursuant to Subsection (c) of this Section 2.2.8 and at Lender's reasonable request, on the commencement date of the applicable Extension Option, an Officer's Certificate in form acceptable to Lender certifying that, to such officer's knowledge, there are no continuing Events of Default as of the date of such certification;

(d)   Borrower shall provide Lender with written notice of its election to extend the Maturity Date as aforesaid not later than thirty (30) days and not earlier than one hundred and twenty (120) days prior to the date the Loan is then scheduled to mature. Once given, such notice shall be irrevocable;

(e)   intentionally omitted;

(f)   With respect to the Third Extension Period only, Borrower shall pay to Lender a fee equal to 0.125% of the outstanding principal balance of the Loan at the time of such extension;

(g)   Mortgage Borrower shall have contemporaneously extended the term of the Mortgage Loan in accordance with the Mortgage Loan Documents and Senior Mezzanine Borrower shall have contemporaneously extended the term of the Senior Mezzanine Loan in accordance with the Senior Mezzanine Loan Documents; and

(h)   With respect to each Extension Period for which the Debt Yield is less than the Debt Yield Amortization Threshold, Borrower shall commence making Amortization Payments to Lender."

(Emphasis supplied.)

144.   Upon information and belief, in accordance with Section 2.2.8(d) of the various

Mezzanine Loan Agreements, each Borrower timely sent a notice dated February 23, 2009

44

exercising the respective first Extension Options to extend the Maturity Date set forth in each Loan.

145.   However, as a result of the Event of Default alleged in the Mezzanine B Default Notice, Mezzanine B Borrower's exercise of the Extension Option (as defined in Section 2.2.8 of the Mezzanine B Loan Agreement) was invalidated by the Mezzanine B Lender for Mezzanine B Borrower's failure to comply with Section 2.2.8(a) of the Mezzanine B Loan Agreement.

146.   Consequently, Mezzanine B Borrower was not able to extend the Maturity Date of the Mezzanine B Loan and the principal balance of $400,000,000 became due on June 12, 2009.

147.   Furthermore, because all of the loan documents evidencing the Mezzanine Loans contain language almost identical to the language set forth in Section 2.2.8 of the Mezzanine B Loan Agreement, the exercise of the respective extension options by each of the Mezzanine Borrowers may be invalidated by the respective Mezzanine Lenders pursuant to the express terms of the Mezzanine Loan Agreements for each Mezzanine Loan that is junior to the Mezzanine B Loan (because such documents state that a default of a senior Mezzanine Loan, constitutes a default under a junior Mezzanine Loan).

148.   Thus, by reason of the Mezzanine B Default Notice, not only was the $400,000,000, plus interest and any additional amounts due on June 12, 2009 under the Mezzanine B Loan, but the aggregate principal balances of the Mezzanine Loans B through J totaling $3,000,000,000, plus interest and any additional amounts, became due on June 12, 2009 as well.

149.   It is clear that the Mezzanine B Lenders asserted an Event of Default under the Mezzanine B Loan Agreement to leverage the remaining Mezzanine Lenders because no junior

45

Mezzanine Lender will agree to permit the Extension Option if the effect of the Event of Default alleged in the Mezzanine B Default Notice is to trap all distributable cash at the Mezzanine B Lenders level pursuant to the Intercreditor Agreement, as opposed to having cash from Hotel Operations distributed pursuant to the (non-default) waterfall set forth in the Cash Management Agreements.

150. As a result of the manufactured notice of an Event of Default under the Mezzanine B Loan Agreement, by undated letter received by Plaintiffs on or about May 21, 2009, the Mezzanine F Lenders sent a notice stating that:

> "Although we have not, and cannot, independently verify the Mezzanine B Loan Default determined by the Mezzanine B Lender, the Default Notice is notice of the occurrence of such Event of Default under the Loan Agreement. Pursuant to Section 12(b)(ii) of the Intercreditor Agreement, prior to accelerating the Loan or commencing any Equity Collateral Enforcement Action, the Mezzanine F Lender is required to deliver a "Junior Loan Default Notice."

151. On June 1, 2009, Kaye Scholer LLP, as counsel to the Mezzanine B Lenders, sent Plaintiffs a letter (the "CIL Letter") stating that:

> In accordance with the terms of Section 12(b)(i) of the Intercreditor Agreement concerning Equitable Collateral Enforcement Actions, we hereby advise you that the Mezzanine B Lender has entered into a conditional agreement with Mezzanine B Borrower which provides among other things that subject to the timely satisfaction of numerous conditions precedent and contingencies (including but not limited to the failure of the Subordinate Junior Lenders to cure the Event of Default describe in the May 19, 2009 Junior Loan Default Notice prior to the expiration of the Junior Loan Monetary Cure Period) the collateral pledged by the Mezzanine B Borrower to the Mezzanine B Lender pursuant to the Mezzanine B Pledge shall be conveyed to the Mezzanine B Lender in lieu of foreclosure of the Mezzanine B Loan.

152. The transfer of the collateral pledged by the Mezzanine B Borrower to the Mezzanine B Lenders pursuant to the conditional agreement (the "CIL Agreement") as described

46

in the CIL Letter would have had the effect of structurally wiping out all of the Mezzanine Lenders junior to the Mezzanine B Lender.

### 5. The Plan A Action

153. In response to the aforesaid actions by the Original Lender Defendants and Lichtenstein, the Plaintiffs, on June 3, 2009, commenced an action by order to show cause seeking a temporary restraining order and preliminary injunction, captioned *Line Trust Corporation, Ltd., et al. v. Wachovia Bank, N.A., et al.*, Supreme Court, New York County, Index No. 601713/09 (the "Plan A Action"), arguing that emergency provisional relief was necessary because Plaintiffs had received the Mezzanine B Default Notice based on the Borrowers' failure to pay the OpEx Amount for more than sixty (60) days, and thus, none of the Senior Borrowers continued to be a "Special Purpose Entity" within the definition of such term as set forth in the Senior Loan Agreement. Plaintiffs thus asserted, in the Plan A Action, that if the Mezzanine B Default Notice went uncured, the Mezzanine Borrowers' exercise of the first Extension Option to extend the Maturity Date pursuant to Section 2.2.8(a) of the Mezzanine B Loan Agreement would be invalidated, as a result of which the Original Lender Defendants and Borrowers would have been able to consummate the CIL Agreement, thereby wiping out Plaintiffs and all other persons holding Mezzanine Loans junior to those held by the Original Lender Defendants.

154. On June 3, 2009, the Court, Hon. Richard B. Lowe, III, J.S.C. issued a temporary restraining order (the "June 3rd TRO"):

> a. temporarily restraining and enjoining Wachovia and all of Wachovia's agents, employees and all persons acting in concert with Wachovia, from distributing funds from hotel operations other than in accordance with the order of priority set forth in such cash management agreements as if an Event of Default has not occurred;

b.    tolling the time within which Plaintiffs and the other junior mezzanine lenders have to cure the alleged "Event of Default" set forth by Defendants in the Mezzanine B Default Notice.

155.    Because the June 3rd TRO was signed by Justice Lowe at approximately 2:00 p.m. EDT on Wednesday, June 3rd, because under the Section 12(a)(i) of the Intercreditor Agreement Plaintiffs were afforded a ten business day cure period, and because such ten business day cure period with respect to the Mezzanine B Default Notice ran out at midnight on June 4th (the Mezzanine B Default Notice was not received by Plaintiffs until May 20th), Plaintiffs had one business day and approximately ten hours remaining on their time to cure the alleged "Event of Default" set forth in the Mezzanine B Default Notice when the June 3rd Order to Show Cause was signed. In consequence, if Plaintiffs lost their bid for the preliminary injunctive relief requested in their Order to Show Cause (commencing the Plan A Action), and the June 3rd TRO were dissolved by the Court, in its order denying preliminary injunctive relief, then, beginning at the point in time when the June 3rd TRO was dissolved, the Plaintiffs' and other junior Mezzanine Lenders' cure periods would resume and they each would then have the remaining one business day and ten hours within which to cure the Event of Default specified in the Mezzanine B Default Notice.

156.    Section 2.2.8(h) of each of the Mezzanine Loan Agreements states that "[w]ith respect to each Extension Period for which the Debt Yield is less than the Debt Yield Amortization Threshold, Borrower shall commence making Amortization Payments to Lender."

157.    The "Debt Yield Amortization Threshold" is determined by looking at the "Debt Yield" of each Loan based on net income from Hotel Operations for the twelve (12) month period ending on the date immediately prior to the Maturity Date, here, June 11, 2009, and the aggregate principal amounts of the Loans on the Maturity Date, June 12, 2009.

158. In opposing Plaintiffs' request for provisional relief in the Plan A Action, the Original Lender Defendants argued that if the emergency provisional relief were granted (declaring Mezzanine B Default Notice's Event of Default a nullity due to collusion), the Original Lender Defendants would be irreparably harmed, because absent wiping out the Mezzanine C through J Lenders, the Debt Yield would be less than the Debt Yield Amortization Threshold. Thus, according to the Original Lender Defendants, had said provisional relief been granted in the Plan A Action, the Borrowers would have been required to pay the Amortization Payments (in addition to interest) during the extended loan term, and the Original Lender Defendants did not want the trapped cash flow from Hotel Operations used to make the required Amortization Payments to the lenders senior to the Original Lender Defendants, namely certificate holders in the Senior Loan and the participation holders in the Mezzanine A Loan.

159. Thus, under "Plan A," the Original Lender Defendants colluded with Lichtenstein to wipe out the Mezzanine C through J Loans by June 12th in order to meet the Debt Yield Amortization Threshold and thereby avert the Amortization Payments with respect to the Senior Loan and the Mezzanine A Loan.

160. However, pursuant to Section 12(b)(i) of the Intercreditor Agreement, Mezzanine B Lender and Mezzanine B Borrowers were not able to consummate the CIL Agreement until the junior Mezzanine Lenders' ten business day opportunity to cure the alleged Event of Default noticed by the Mezzanine B Lender had run (without a cure having been effected), which by virtue of the tolling portion of the June 3rd TRO, as explained above, would not occur until one business day and ten hours after the Court dissolved the June 3rd TRO (if in fact the Court did dissolve the June 3rd TRO).

161. Justice Lowe held a hearing on June 8th regarding Plaintiffs' request in the Plan A

49

Action for preliminary injunctive relief, and reserved decision at such hearing, continuing the June 3rd TRO pending its decision. In consequence, the June 3rd TRO[2] was still in effect on the June 12th Maturity Date, and by reason thereof Plaintiffs and other junior Mezzanine Lenders had unexpired cure rights with respect to the Mezzanine B Default Notice on June 12th. Thus, the Mezzanine B Lenders and Mezzanine B Borrowers were unable to consummate the CIL Agreement by June 12th, "Plan A" was thereby thwarted and the dreaded Amortization Payments were set in stone by 12:01 am on Saturday June 13th.

### 6.  Replacement Interest Cap Agreements

162.  In an obvious effort to circumvent the restraints imposed on the Original Lender Defendants by the June 3rd TRO, defendant Wachovia, in its capacity as servicer of the Senior Loan, on June 10, 2009, delivered to Plaintiffs and other junior Mezzanine Lenders a letter advising them that Wachovia had not yet received "replacement interest cap agreements," other than the interest rate cap agreements applicable to the Senior Loan and the Mezzanine A Loan.

163.  As alleged above, the Borrowers under the various Mezzanine Loan Agreements have the option to extend the Maturity Date of their respective Mezzanine Loans, provided certain conditions are met, including:

> Borrower shall obtain and deliver to Lender, not later than five (5) Business Days prior to the Maturity Date which is to be extended, one or more Replacement Interest Rate Cap Agreements having a LIBOR strike price equal to or less than the Strike Price from an Acceptable Counterparty which Replacement Interest Rate Cap Agreement shall be effective commencing on the date of such extension and shall have a maturity date not earlier than the Extended Maturity Date after giving effect to the Extension Option then being exercised by the Borrower;
>
> See Section 2.2.8(b) of each Mezzanine Loan Agreements.

---

[2] As stated above in footnote 1, certain other junior Mezzanine Lenders obtained a temporary restraining order enjoining and restraining the consummation of the CIL Agreement, which was also a problem for the Mezzanine B Lender.

164.    Wachovia had advised Plaintiffs (and the other lenders), allegedly as a "courtesy," that the condition required by Section 2.2.8(b), i.e., that the Borrowers purchase "Replacement Interest Rate Cap Agreements" at least five (5) days prior to the Maturity Date (June 5, 2009), has not been met.

165.    Thus, despite the fact that all the Mezzanine Borrowers had sent notices on February 23, 2009 duly exercising the first Extension Option, and despite the fact that the parties were before Justice Lowe on Plaintiffs' preliminary injunction application on June 8th, 2009 (at which time Plaintiffs' counsel stated that the Mezzanine Borrowers had duly exercised the first Extension Options, without any statements having been made by opposing counsel to the contrary), Plaintiffs learned for the first time on June 10th, 2009 (five days after the Replacement Interest Rate Cap deadline), that the Mezzanine Borrowers had not purchased the required Replacement Interest Rate Cap Agreements other than those for the Senior Loan and Mezzanine Loan A.

166.    As a result of these further collusive actions by the Original Lender Defendants and Lichtenstein, Plaintiffs on Friday, June 12, 2009, filed a new emergency application with Justice Lowe in the Plan A Action.

167.    The only substantive conditions to the Borrowers' right to exercise the Extension Option is the lack of an Event of Default (the invalidity of the May 19, 2009 Default Notice was of course then the subject of the Plaintiffs' initial application in the Plan A Action), and the purchase by the Borrowers of the aforesaid "rate caps." (All eleven (11) Loans float at various different spreads above the thirty (30) day London Interbank Offered Rate ("LIBOR"), a variable rate. Fortunately, thirty (30) day LIBOR is now roughly one half of one percent per annum, while the "strike price" for the required rate caps stipulated for all eleven (11) Loans is 6%, so

that the counterparty issuing the rate caps is merely insuring that during the one year extension period LIBOR does not go above 6% or roughly 12 times its current level. For this reason, the rate caps are quite inexpensive.)

168.    The Borrowers became unconditionally obligated under the relevant loan documents to purchase the various rate caps by June 5th by reason of the February 23, 2009 loan extension notices.

169.    Wachovia as servicer, even though it sweeps into a lockbox account and controls all funds from Hotel Operations, failed to use those funds to purchase—or insure that the Borrowers purchased— the inexpensive rate caps for all but the two Loans senior to itself and the other Original Lender Defendants, because by doing so the Original Lender Defendants would be safe themselves from being wiped out (any Lender who has received the rate caps for its loan cannot commence foreclosure proceedings), while the Original Lender Defendants themselves would be able to declare a Maturity Date default as to their Loans (in the absence of them having received their rate caps) and thus move forward with their predatory plan to wipe out all the junior Mezzanine Lenders including Plaintiffs (even if Justice Lowe had granted the Plaintiffs' then pending application for preliminary injunctive relief). Thus, by further—and this time even more obvious lender-borrower collusion—the Original Lender Defendants "bought insurance" against the risk of Justice Lowe's ruling (in the Plan A Action) that they could not proceed with their plan to wipe out the junior Mezzanine Lenders (including Plaintiffs) based on the alleged $3.5 million Operating Expense default forming the basis of their prior Mezzanine B Default Notice.

170.    Plaintiffs' second emergency application in the Plan A Action thus sought to compel Wachovia to use the swept lockbox funds to purchase the rate caps for the Loans through

52

and including Plaintiffs' Mezzanine Loan G (the missing rate caps would cost only a few hundred thousand dollars).

171. However, immediately after Plaintiffs filed the second emergency application in the Plan A Action, Plaintiffs learned of an agreement reached between the Original Lender Defendants and the Mezzanine F Lenders whereby the Mezzanine F Lenders agreed to purchase the rate caps for all of the Original Lender Defendants' Mezzanine Loans (Mezzanine Loans B through E).

172. As a result, on Friday, June 12th, Plaintiffs obtained the agreement of the Mezzanine F Lender that if Plaintiffs purchased the rate cap for Mezzanine F Loan, the Mezzanine F Lender would accept same, thereby mooting the second emergency application in the Plan A Action.

173. Plaintiffs, through their counsel, thereafter advised Justice Lowe that they were withdrawing their second emergency application in the Plan A Action.

C. "PLAN B"

174. Sometime on June 15, 2009, shortly after Plaintiffs withdrew the second emergency application in the Plan A Action, Plaintiffs learned that, at approximately 3:00 am EDT on Saturday, June 13th, just hours after it became clear that the CIL Transaction had been thwarted, Borrowers filed Chapter 11 bankruptcy cases (collectively, the "Bankruptcy Petitions") in the United States Bankruptcy Court for the Southern District of New York.

175. In consequence, on the morning of the next day, Tuesday, June 16, 2009, Plaintiffs' counsel advised Justice Lowe of the filing of the Bankruptcy Petitions, and of the automatic stay resulting therefrom. Because the Mezzanine B Default Notice was now superseded by the more critical default arising from the filing of the Bankruptcy Petitions and

53

because the CIL Transaction was by then a moot issue, Plaintiffs thereafter filed a notice voluntarily discontinuing the Plan A Action without prejudice.

176.   The Bankruptcy Petitions are supported by the affidavit of Joseph Teichman, general counsel to the Borrowers.

177.   Upon information and belief, all of Teichman's actions are directed by his boss, Lichtenstein.

178.   In order to file the Bankruptcy Petition, under the express terms of the Borrowers' organizational documents (or stipulated by subdivision (viii) of the definition of "Special Purpose Entity" Section 1.1 of the Loan Agreements). Borrowers were required to obtain the unanimous consent of their "Independent Directors" to the Bankruptcy Petitions.

179.   The Borrowers' Independent Directors, upon information and belief, include Will Cleaver, Kent Rockwell, Robert R. Rowell and Joseph Winrich.

180.   Upon information and belief, the consent of the Independent Directors was obtained, if at all, on false pretenses, in that Lichtenstein failed to disclose to the Independent Directors, the existence of the Fraudulent Bankruptcy Inducements.

181.   In the Teichman Affidavit, Teichman unabashedly explains that the CIL Transaction was prevented by the June 3rd TRO issued by the Court in the Original Action and by the similar temporary restraining order issued by the Dallas 116th Civil District Court on June 4th.

182.   In the Teichman Affidavit, Teichman further goes on to explain that Lichtenstein and various holders of Certificates (of beneficial interests in the Senior Loan) have been having active negotiations (the "Negotiations") for the past nine (9) months.

183.   In the Teichman Affidavit, Teichman explains that pursuant to the Negotiations,

various Certificate holders, who he describes as "Supporting Holders," have agreed to and endorse and support the Plan of Reorganization for the Borrowers as described in a Term Sheet (the "Term Sheet"), which is attached to the Teichman Affidavit as an exhibit thereto, and in substance suggests that the terms set forth in the Term Sheet were critical in forming Lichtenstein's decision to support the Borrowers' filing of the Bankruptcy Petitions.

184.   Teichman does not say who the "Supporting Holders" are, but on information and belief, Defendants Cerberus and Centerbridge are Supporting Holders.

185.   Upon information and belief, given Lichtenstein's enormous personal liability under the Guaranties to all Lenders in the entire $7.4 billion debt stack, Lichtenstein, who is control of the Borrowers, would never have supported the Borrowers' filing of the Bankruptcy Petitions absent substantial protections with respect to such liabilities and other inducements.

186.   Pursuant to the Term Sheet, the Supporting Holders agreed to provide a number of critical protections and inducements to Lichtenstein (hereinbefore defined collectively as, the "Fraudulent Bankruptcy Inducements"), which were designed to induce Lichtenstein to support, and which had the effect of inducing Lichtenstein to support, the filing by the Borrowers (controlled by Lichtenstein) of the Bankruptcy Petitions.

187.   The Fraudulent Bankruptcy Inducements agreed to by the Supporting Holders and described in the Term Sheet include:

    a.   "Providing Lichtenstein with a $100,000,000 indemnity against liability under the Guaranties arising by virtue of the Bankruptcy Petitions issued by "Newco," the new company formed to own the various Borrowers (and therefore the Hotel Properties) under the plan of reorganization (the "Plan of Reorganization") set forth in the Term Sheet.

b. Providing that any "Accepting Holders"—i.e., lenders who accept benefits under the Plan of Reorganization—must release Lichtenstein from all liability under the Guaranties except with respect to liability arising by virtue of the filing of the Bankruptcy Petitions. (This would have the effect of releasing Lichtenstein from liability arising under the Guaranties by reason of the Borrowers ceasing to qualify as Special Purpose Entities by virtue of the nonpayment of Operating Expenses forming the basis of the Mezzanine B Default Notice).

c. Providing that the Supporting Holders will seek a "co-debtor stay" from the Bankruptcy Court with respect to any state court actions, like this one, seeking to hold Lichtenstein liable under the Guaranties.

d. Providing that if the co-debtor stay is not issued by the Bankruptcy Court, the Supporting Holders will cause Newco to provide Lichtenstein with a $5 million defense war chest to be used to defend Lichtenstein against the actions of other Lenders against Lichtenstein under the Guaranties provided that the Supporting Holders retain control of the defense and settlement of any such claims including selection and control of defense counsel.

e. Providing Lichtenstein or companies he controls with new management agreements setting forth "equity participations based on the performance of the [hotel] businesses."

188. The Plan of Reorganization set forth in the Term Sheet is highly predatory, results in Plaintiffs and the other Mezzanine Lenders being wiped out, and effectively allows the Supporting Holders to "steal" the Portfolio for billions of dollars less than its true value even under current market conditions.

56

189.   The Plan of Reorganization including in particular the Fraudulent Bankruptcy Inducements are detailed and complex and, on information and belief, are the product of months of Negotiations among Lichtenstein and the Supporting Holders, through sophisticated legal counsel.

190.   In order to offer Lichtenstein the Fraudulent Bankruptcy Inducements, the Supporting Holders were required to and did violate the terms of the Trust Agreement, by bypassing Wells Fargo as Trustee and Wachovia as Administrator, in that only they can speak on behalf of the first mortgage certificate holders under the terms of the Trust Agreement. Nevertheless, Wells Fargo and Wachovia went along with the Fraudulent Bankruptcy Inducements offered by the Supporting Holders, and failed and refused to take a contrary position--that is, they failed and refused to say that they, as the only parties legally entitled to speak on behalf of the first mortgage certificate holders, did not and would not countenance and support the Fraudulent Bankruptcy Inducements, and it was only through the addition of their failure and refusal to disavow the Fraudulent Bankruptcy Inducements, that Lichtenstein was able to derive sufficient comfort from the FBI to file the Bankruptcy Petitions.

191.   Absent the Fraudulent Bankruptcy Inducements, Lichtenstein would never have caused the Borrowers and affiliated entities to file for bankruptcy.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (Intentional Tortious Interference with Contract as Against the Supporting Holders)

192.   Plaintiffs repeat and reallege each and every allegations contained in paragraphs 1 through 191 herein.

193.   Defendants Cerberus, Centerbridge, and the other Supporting Holders

57

(Defendants John Does 1-20) knew at the time they negotiated and agreed to the Fraudulent Bankruptcy Inducements that such Fraudulent Bankruptcy Inducements would have the effect of inducing a violation of Section 11(d) of the Intercreditor Agreement, pursuant to which all of the Lenders promised one another not to permit the Borrowers to file for bankruptcy protection, and thereby tortiously interfering with the Intercreditor Agreement.

194. Defendants Cerberus, Centerbridge, and the other Supporting Holders (i.e., Defendants John Does 1-20) also knew at the time they negotiated and agreed to the Fraudulent Bankruptcy Inducements, that such Fraudulent Bankruptcy Inducements would have the effect of inducing a violation of the various bankruptcy remote provisions of the Loan Agreements and as well of the Guaranties and Non-Recourse Carve Clauses in the Loan Agreements, all of which were meticulously designed and crafted to assure the Lenders including Plaintiffs that the Borrowers would never file for bankruptcy protection.

195. The Supporting Holders used wrongful means in that the Fraudulent Bankruptcy Inducements were clandestine, predatory and fraudulent.

196. As a result of the Fraudulent Bankruptcy Inducements, the Supporting Holders have induced breaches by the Borrowers and the Guarantor Defendants of the Intercreditor Agreement, the Loan Agreements and the Guaranties, and have thereby tortiously interfered with those contracts.

197. Plaintiffs have suffered substantial damages as a result of the aforementioned tortuous interference in an amount to be determined by the Court, but not less than $214,000,000, and are entitled to judgment therefor, together with a judgment for exemplary damages of at least $100,000,000, given the Supporting Holders' egregiously predatory and intentionally wrongful conduct.

58

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing as against Wells Fargo in its capacity as Trustee and Wachovia in its capacity as Administrator)

198.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 above as if fully set forth herein.

199.    The Intercreditor Agreement is a valid contract between the Defendants Wells Fargo in its capacity as Trustee and Wachovia in its capacity as Administrative Agent, as successors to the Original Lender Defendants in their capacity as Senior Lenders, and the Mezzanine Loan lenders including Plaintiffs, as successor Mezzanine Lenders.

200.    Plaintiffs Mezzanine G Participation Holders are therefore successor parties in interest and beneficiaries under the Intercreditor Agreement.

201.    Under New York law, implicit in every contract, including the Intercreditor Agreement, is an implied covenant of good faith and fair dealing.

202.    The implied covenant of good faith and fair dealing compels any party to a contract governed by New York law, like the Intercreditor Agreement, not to do that which, though not directly proscribed by the contract, has the effect of frustrating the very purpose of the contract.

203.    Here, under the Intercreditor Agreement, each lender party thereto, in sum and substance, promised the other lender parties, that such promising lender would not cause or permit the Borrowers to file for bankruptcy protection and not to cause or permit the filing of involuntary bankruptcy petitions against the Borrowers.

204.    By authorizing the Fraudulent Bankruptcy Inducements throughout the process of the Negotiations, Defendants Wells Fargo and Wachovia, in its capacity as Administrative

59

Agent, violated the implied covenant of good faith and fair dealing inherent in the Intercreditor Agreement.

205.    Plaintiffs have been damaged by virtue of the said Defendants' breach of the implied covenant of good faith and fair dealing inherent in the Intercreditor Agreement, in the amount of at least $214,000,000, or such greater amount as may be determined at trial, and are entitled to judgment therefor, plus interest, costs and attorneys' fees, as well as a judgment for punitive damages of at least $100,000,000 given the egregiously predatory and wrongful conduct of said Defendants.

### AS AND FOR A THIRD CAUSE OF ACTION
(Breach of Fiduciary Duty
against Lichtenstein)

206.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 above as if fully set forth herein.

207.    Lichtenstein owed a fiduciary duty to Plaintiffs as creditors of Borrowers given the impending insolvency of Borrowers arising by virtue of the failure of the Debt Yield Test and the resultant Amortization Payments.

208.    Lichtenstein's fiduciary duty to Plaintiffs required him to afford Plaintiffs the utmost honesty and loyalty in his dealings with them.

209.    By clandestinely agreeing to accept the Fraudulent Bankruptcy Inducements, failing to disclose the Fraudulent Bankruptcy Inducements to Plaintiffs and by filing the Bankruptcy Petitions and agreeing to the terms of the Plan of Reorganization and Term Sheet, Lichtenstein violated his fiduciary duty to Plaintiffs.

210.    Plaintiffs have been substantially damaged by Lichtenstein's violation of his fiduciary duty to Plaintiffs in the amount of at least $214,000,000, or such greater amount as may

be determined at trial, and are entitled to judgment therefor, plus interest, costs and attorneys' fees, as well as a judgment for punitive damages of at least $100,000,000, given the egregiously predatory and wrongful conduct of Lichtenstein.

### AS AND FOR A FOURTH CAUSE OF ACTION
(Aiding and Abetting Breach of Fiduciary Duty
against all Defendants other than Lichtenstein and the Original Lender Defendants)

211.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 above as if fully set forth herein.

212.    By agreeing to provide the Fraudulent Bankruptcy Inducements to Lichtenstein, Defendants (other than Lichtenstein and the Original Lender Defendants) aided and abetted Lichtenstein's aforesaid breach of his fiduciary duties to Plaintiffs.

213.    Plaintiffs have been substantially damaged by said Defendants' aiding and abetting Lichtenstein's violation of his fiduciary duty to Plaintiffs, in the amount of at least $214,000,000, or such greater amount as may be determined at trial, and are entitled to judgment therefor, plus interest, costs and attorneys' fees, as well as a judgment for punitive damages of at least $100,000,000, given the egregiously predatory and wrongful conduct of said Defendants.

### AS AND FOR A FIFTH CAUSE OF ACTION
(Breach of Contract—Guaranty—against the Guarantor Defendants)

214.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 above as if fully set forth herein.

215.    The Mezzanine G Guaranty constitutes an enforceable contract between the Guarantor Defendants and Plaintiffs.

216.    The Guarantor Defendants violated the Mezzanine G Guaranty by filing the Bankruptcy Petitions.

61

217. The Guarantor Defendants further violated the Mezzanine G Guaranty by permitting the Borrowers not to pay the Operating Expenses and thereby violating the SPE covenant contained at Section 9.4(a)(ix) of the Mezzanine G Loan Agreement.

218. The Guarantor Defendants violated the Mezzanine G Guaranty by not following the terms of the organizational documents of the Mezzanine G Borrower in that, on information and belief, the Bankruptcy filings were not duly authorized by the informed consent of the Independent Directors.

219. The Guarantor Defendants are not entitled to the protection of the $100,000,000 limitation of liability set forth in Section 1.2 of the Mezzanine G Guaranty as to the claims of Plaintiffs thereunder described in paragraphs 216 and 217 above.

220. The Guarantor Defendants are not entitled to the protection of the $100,000,000 limitation of liability set forth in Section 1.2 of the Mezzanine G Guaranty as to the claims of Plaintiffs thereunder described in paragraph 215 above because of the unclean hands and bad faith conduct of the Guarantor Defendants in agreeing to file the Bankruptcy Petitions given the Fraudulent Bankruptcy Inducements, as a result of which the Guarantor Defendants are equitably estopped from seeking the protection of the $100,000,000 limitation on liability.

221. By reason of the foregoing, Plaintiffs are entitled to a judgment against the Guarantor Defendants, jointly and severally, for $214,000,000, plus interest and costs.

### AS AND FOR A SIXTH CAUSE OF ACTION
(Permanent Injunction—Equitable Estoppel—as Against Guarantor Defendants)

222. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 above as if fully set forth herein.

223. By virtue of negotiating and accepting the Fraudulent Bankruptcy Inducements,

62

the Guarantor Defendants have unclean hands and have engaged in bad faith conduct.

224. By reason thereof, the Guarantor Defendants are equitably estopped from seeking the protections of the $100,000,000 limitation of liability set forth in the Mezzanine G Guaranty.

225. By reason of the foregoing, Plaintiffs are entitled to a permanent injunction restraining and enjoining the Guarantor Defendants from seeking the protections of the aforesaid $100,000,000 limitation of liability set forth in the Mezzanine G Guaranty.

### AS AND FOR A SEVENTH CAUSE OF ACTION
(Legal Fees As Against Guarantor Defendants)

226. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 above as if fully set forth herein.

227. Pursuant to Section 1.8 of the Mezzanine G Guaranty, Guarantor Defendants agreed that "[i]n the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder."

228. By reason of the foregoing breaches of the Mezzanine G Guaranty by the Guarantor Defendants, Plaintiffs are entitled to a judgment for their attorneys' fees and costs.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
(Tortious Interference With Contractual Relations
As Against the Original Lender Defendants and Lichtenstein)

229. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 above as if fully set forth herein.

230. The Original Lender Defendants colluded and conspired with Lichtenstein to

create the Operating Expense default forming the basis of the Mezzanine B Default Notice.

231. The Original Lender Defendants and Lichtenstein knew that there was a Mezzanine G Loan Agreement between Mezzanine G Borrower and Plaintiffs, wherein Plaintiffs would receive payments in accordance with the Mezzanine G Loan and the applicable Cash Management Agreement.

232. By colluding and conspiring with one another not to pay Operating Expenses, the Original Lender Defendants and Lichtenstein used wrongful means.

233. The Original Lender Defendants and Lichtenstein knew that in sending the Mezzanine B Default Notice and declaring that an Event of Default had occurred, pursuant to Section 10(b) of the Intercreditor Agreement, the Original Lender Defendants would be entitled to receive payment in full of all amounts due and owing, or that shall become due and owing, under the Mezzanine B Loan, thereby negating the order of priority of distributable funds set forth in the applicable Cash Management Agreement and cutting off the flow of funds to junior mezzanine lenders, including Plaintiffs as lenders under the Mezzanine G Loan.

234. By reason of the foregoing, the Original Lender Defendants and Lichtenstein tortuously interfered with the Mezzanine G Loan Agreement.

235. As a result, Plaintiffs suffered substantial damages in the amount of at least $214,000,000, or such greater amount as may be determined at trial, and are entitled to judgment therefor, plus interest, costs and attorneys' fees, as well as a judgment for punitive damages of at least $100,000,000, given the egregiously predatory and wrongful conduct of said Defendants.

### AS AND FOR A NINTH CAUSE OF ACTION
(Breach of the Implied Covenant of Good Faith and Fair Dealing
As Against the Original Lender Defendants)

236. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 191 above as if fully set forth herein.

237. The Intercreditor Agreement is a valid contract between the Original Lender Defendants and the Mezzanine Loan lenders.

238. Plaintiffs, as Mezzanine G Participation Holders are parties to and beneficiaries under the Intercreditor Agreement.

239. Under New York law, implicit in every contract, including the Intercreditor Agreement, is an implied covenant of good faith and fair dealing.

240. In the case of the Intercreditor Agreement, the implied covenant of good faith and fair dealing requires that all the Lender parties thereto recognize one another's Loans subject to and in accordance with the relative priorities of said Loans, as reflected in the waterfall of distributions set forth in the applicable Cash Management Agreements.

241. By reason of the conspiratorial, bad faith and predatory conduct of Original Lender Defendants, said Defendants, violated the aforesaid implied covenant of good faith and fair dealing inherent in the Intercreditor Agreement. The Original Lender Defendants collusively manufactured and arranged, and declared, a trumped up default, based on the Lichtenstein's complicit non-payment of a trivial amount of operating expenses, even though, all mezzanine lenders including the Plaintiffs and other holders of mezzanine loans junior to those owned by the Original Lender Defendants, were then current in their interest payments, the operating expenses are well within the 2008 lender-approved budget and in all events such operating expenses are required to be paid ahead of mezzanine loan interest payments. The object of such collusive conduct and Mezzanine B Default Notice was to wipe out Plaintiffs' loans pursuant to the CIL Transaction and by reason thereof the Original Lender Defendants violated the implied covenant of good faith and fair dealing.

242. Plaintiffs have been damaged by virtue of the Original Lender Defendants' breach of the implied covenant of good faith and fair dealing implied in the Intercreditor Agreement, in the amount of at least approximately $214,000,000, or such greater amount as may be determined at trial, plus interest, costs and attorneys' fees.

## AS AND FOR AN TENTH CAUSE OF ACTION
### (Fraudulent Concealment
### As Against the Original Lender Defendants)

243. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 above as if fully set forth herein.

244. The Original Lender Defendants and the Plaintiffs entered into the Intercreditor Agreement which provided for the relative priority of, and to evidence certain agreements with respect to, the Senior Loan Documents and the Mezzanine Loan Documents.

245. Under New York law, in every contractual relationship there is a duty to disclose relevant information with respect to that contract.

246. By failing to disclose their intent to have Lichtenstein cause the Borrowers not to pay the OpEx Amount, which gave rise to the Mezzanine B Default Notice, the Original Lender Defendants intentionally concealed said conspiracy, thereby breaching their duty of disclosure to Plaintiffs.

247. By reason of the foregoing, the Original Lender Defendants have committed the tort of fraudulent concealment, and as a result, Plaintiffs have been damaged in the amount of at least approximately $214,000,000, or such greater amount as may be determined at trial, plus interest, costs and attorneys' fees.

WHEREFORE, Plaintiffs respectfully request judgment as follows:

a) On the First Cause of Action, a judgment as against the Supporting Holders in an

66

amount to be determined by the Court, but not less than $214,000,000, and are entitled to judgment therefor, together with a judgment for exemplary damages of at least $100,000,000;

b) On the Second Cause of Action, a judgment as against Wells Fargo in its capacity as Trustee, and Wachovia in its capacity as Administrator, in the amount of at least $214,000,000, or such greater amount as may be determined at trial, and are entitled to judgment therefor, plus interest, costs and attorneys' fees, as well as a judgment for punitive damages of at least $100,000,000;

c) On the Third Cause of Action, a judgment as against Lichtenstein in the amount of at least $214,000,000, or such greater amount as may be determined at trial, and are entitled to judgment therefor, plus interest, costs and attorneys' fees, as well as a judgment for punitive damages of at least $100,000,000;

d) On the Fourth Cause of Action, a judgment as against all Defendants other than Lichtenstein and the Original Lender Defendants, in the amount of at least $214,000,000, or such greater amount as may be determined at trial, and are entitled to judgment therefor, plus interest, costs and attorneys' fees, as well as a judgment for punitive damages of at least $100,000,000;

e) On the Fifth Cause of Action, a judgment as against the Guarantor Defendants, jointly and severally for $214,000,000, plus interest and costs;

f) On the Sixth Cause of Action, a permanent injunction restraining and enjoining the Guarantor Defendants from seeking the protections of the aforesaid $100,000,000 limitation of liability set forth in the Mezzanine G Guaranty; and

g) On the Seventh Cause of Action, a judgment as against the Guarantor Defendants for attorneys' fees and costs;

h) On the Eighth Cause of Action, a judgment as against the Original Lender Defendants and Lichtenstein in an amount of at least $214,000,000, or such greater amount as may be determined at trial, and are entitled to judgment therefor, plus interest, costs and attorneys' fees, as well as a judgment for punitive damages of at least $100,000,000;

i) On the Ninth Cause of Action, a judgment as against the Original Lender Defendants in an amount of at least approximately $214,000,000, or such greater amount as may be determined at trial, plus interest, costs and attorneys' fees; and

j) On the Tenth Cause of Action, a judgment as against the Original Lender Defendants in an amount of at least approximately $214,000,000, or such greater amount as may be determined at trial, plus interest, costs and attorneys' fees.

Dated: New York, New York
     June 24, 2009

MEISTER SEELIG & FEIN LLP

By: _____
    Stephen B. Meister
    Stacey M. Ashby
    2 Grand Central Tower
    140 East 45th Street, 19th Floor
    New York, New York 10017
    (212) 655-3500

## VERIFICATION

STATE OF NEW YORK        )
                         )ss.:
COUNTY OF NEW YORK       )

STEPHEN B. MEISTER, being duly sworn, deposes and says:

1.    I am the attorney for Plaintiffs Line Trust Corporation Ltd. and Deuce Properties Ltd. (collectively, "Plaintiffs") in this action. The foregoing complaint is true to my knowledge except as to matters therein stated on information and belief and as to those matters I believe it to be true. The grounds of my belief as to all matters not stated upon my knowledge are correspondence and other writings furnished to me by Plaintiffs and interviews with officers, representatives and employees of Plaintiffs.

2.    This Verification is made pursuant to CPLR Section 3020(d)(3) since Plaintiffs are foreign corporations.

_____
STEPHEN B. MEISTER

Sworn to before me this
24th day of June, 2009

_____
Notary Public

STACEY ASHBY
Notary Public, State Of New York
No. 02-AS0127052
Qualified In New York County
Commission Expires May 29, 20__

69

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
LINE TRUST CORPORATION LTD. and DEUCE :
PROPERTIES LTD.,

             Plaintiffs,      :

           -against-       :

DAVID LICHTENSTEIN, LIGHTSTONE     :
HOLDINGS LLC, WELLS FARGO BANK, N.A., :
in its capacity as trustee, WACHOVIA BANK,  :
N.A., BANK OF AMERICA, N.A., U.S. BANK  :
NATIONAL ASSOCIATION, CERBERUS    :
CAPITAL MANAGEMENT, L.P.,       :
CENTERBRIDGE PARTNERS, L.P., and JOHN  :
DOES 1-20, being persons whose identities are  :
presently unknown to Plaintiffs and who are acting  :
as Supporting Holders of the Term Sheet proposed  :
by Lichtenstein,        :

            Defendants.     :
----------------------------------------------------------X

_09 CV 6152_

**Rule 7.1 Statement**

     Pursuant to Federal Rule of Civil Procedure 7.1 and to enable District Judges and

Magistrate Judges of the Court to evaluate possible disqualification or recusal, the undersigned

counsel for defendants Lightstone Holdings LLC and David Lichtenstein, hereby certifies that

defendant Lightstone Holdings LLC (1) has no parent corporation and (2) that no publicly owned

corporation owns 10% or more of its stock.

Dated:     July 8, 2009
           New York, New York

Respectfully submitted,

KASOWITZ, BENSON,
TORRES & FRIEDMAN LLP

By: /s/ David M. Friedman
    David M. Friedman
    Christopher P. Johnson
    David E. Ross
    Adina G. Storch
    1633 Broadway
    New York, NY 10019
    (212) 506-1700

    *Counsel to David Lichtenstein and*
    *Lightstone Holdings LLC*

2