**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
:
**In re** : **Chapter 11 Case No.**
:
**EXTENDED STAY INC., et al.,** : **09-13764 (JMP)**
:
**Debtors.** : **(Jointly Administered)**
:
------------------------------------------------------------------x
:
**In re** : **Chapter 11 Case No.**
:
**ESH/MSTX GP L.L.C.,** : **10-10807 (JMP)**
:
**Debtor.** :
:
:
------------------------------------------------------------------x
:
**In re** : **Chapter 11 Case No.**
:
**ESH/TXGP L.L.C.,** : **10-10808 (JMP)**
:
**Debtor.** :
:
:
------------------------------------------------------------------x
:
**In re** : **Chapter 11 Case No.**
:
**ESA TXGP L.L.C.,** : **10-10806 (JMP)**
:
**Debtor.** :
:
:
------------------------------------------------------------------x
:
**In re** : **Chapter 11 Case No.**
:
**ESA P Portfolio TXNC GP L.L.C.,** : **10-10805 (JMP)**
:
**Debtor.** :
:
:
------------------------------------------------------------------x

----------------------------------------------------------------x
                                   :

**In re**                              :      **Chapter 11 Case No.**
                                   :

**ESH/TN Member Inc.,**            :      **10-10809 (JMP)**
                                   :

               **Debtor.**           :
                                   :
                                   :
----------------------------------------------------------------x

# DEBTORS' PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors
and Debtors in Possession

Dated: February 19, 2010

# TABLE OF CONTENTS

ARTICLE I    DEFINITIONS ........................................................................... 1

    A.    Defined Terms ................................................................... 1

    1.1    Administrative Bar Date Order ........................................... 1

    1.2    Administrative Expense Claim ........................................... 1

    1.3    Administrative Expense Creditor ....................................... 1

    1.4    Administrative Expense Objection Deadline ...................... 1

    1.5    Affiliate .............................................................................. 1

    1.6    Allowed .............................................................................. 2

    1.7    Allowed Amount ................................................................ 3

    1.8    Ballot ................................................................................. 3

    1.9    Bankruptcy Code ............................................................... 3

    1.10    Bankruptcy Court ............................................................... 3

    1.11    Bankruptcy Rules ............................................................... 3

    1.12    BHAC ................................................................................ 3

    1.13    BHAC IP ........................................................................... 3

    1.14    BHAC License Agreements ............................................... 3

    1.15    BHAC IP Transfer Agreement ........................................... 3

    1.16    Board of Managers ............................................................ 3

    1.17    Business Day ...................................................................... 3

    1.18    Cash ................................................................................... 3

    1.19    Cash Collateral Order ........................................................ 3

    1.20    Cash Distribution .............................................................. 3

    1.21    Certificates ........................................................................ 4

    1.22    Chapter 11 Cases ............................................................... 4

    1.23    Claim ................................................................................. 4

    1.24    Class .................................................................................. 4

    1.25    Class A1 Mortgage Certificates ........................................ 4

    1.26    Class A1 – A4 Mortgage Certificates ............................... 4

    1.27    Class A1 – E Mortgage Certificates .................................. 4

    1.28    Class A2 Mortgage Certificates ........................................ 4

    1.29    Class A3 Mortgage Certificates ........................................ 4

1.30    Class A4 Mortgage Certificates ...........................................................4

1.31    Class B Mortgage Certificates ............................................................4

1.32    Class B - E Mortgage Certificates .......................................................4

1.33    Class B - F Mortgage Certificates .......................................................4

1.34    Class B – F NewCo Common Interests ...............................................4

1.35    Class B - G Mortgage Certificates.......................................................5

1.36    Class B - M Mortgage Certificates ......................................................5

1.37    Class C Mortgage Certificates ............................................................5

1.38    Class D Mortgage Certificates ............................................................5

1.39    Class E Mortgage Certificates ............................................................5

1.40    Class F Mortgage Certificates ............................................................5

1.41    Class F Alternate Note Balance ..........................................................5

1.42    Class F Alternate Note Proportion ......................................................5

1.43    Class G Mortgage Certificates ............................................................5

1.44    Class G NewCo Common Interests .....................................................5

1.45    Class G Proportion ..............................................................................5

1.46    Class H Mortgage Certificates ............................................................5

1.47    Class H – M Mortgage Certificates .....................................................5

1.48    Class I Mortgage Certificates .............................................................6

1.49    Class J Mortgage Certificates .............................................................6

1.50    Class K Mortgage Certificates ............................................................6

1.51    Class L Mortgage Certificates.............................................................6

1.52    Class M Mortgage Certificates ...........................................................6

1.53    Commencement Date ..........................................................................6

1.54    Confirmation Date...............................................................................6

1.55    Confirmation Order .............................................................................6

1.56    Contingent Claim ................................................................................6

1.57    Creditor ...............................................................................................6

1.58    Creditors' Committee ..........................................................................6

1.59    Debtors.................................................................................................6

1.60    Debtor in Possession...........................................................................6

1.61   Disallowed Claim ..................................................................................6

1.62   Disbursing Agent ..................................................................................6

1.63   Disclosure Statement ............................................................................6

1.64   Disputed Claim .....................................................................................6

1.65   Distribution ..........................................................................................7

1.66   Distribution Date ..................................................................................7

1.67   Effective Date .......................................................................................7

1.68   Election Form ........................................................................................7

1.69   Election Period ......................................................................................7

1.70   Equity Interest .......................................................................................7

1.71   ESA Canada Properties Borrower Interests ...........................................7

1.72   ESA Canada Properties Interests ...........................................................7

1.73   ESA MD Borrower Interests ...................................................................7

1.74   ESA MD Properties Trust Certificate .....................................................7

1.75   ESA P Portfolio MD Borrower Interests .................................................7

1.76   ESA P Portfolio MD Trust Certificate ....................................................8

1.77   ESA UD ................................................................................................8

1.78   ESA UD Mortgage Claim .......................................................................8

1.79   ESA UD Mortgage Facility .....................................................................8

1.80   Escrow Account ....................................................................................8

1.81   ESH/ESA General Partnership Interests .................................................8

1.82   ESH/TN Properties Membership Interest ...............................................8

1.83   ESI ........................................................................................................8

1.84   Estate ...................................................................................................8

1.85   Estimated Amount ................................................................................8

1.86   Existing Equity .....................................................................................8

1.87   Existing Letters of Credit ......................................................................8

1.88   Expiration Date .....................................................................................8

1.89   Final Distribution Date ..........................................................................9

1.90   Final Order ...........................................................................................9

1.91   FIRPTA Certificate ................................................................................9

1.93   General Unsecured Claims ..................................................................9

1.94   Guaranty ..............................................................................................9

1.95   Guaranty Claim ....................................................................................9

1.96   Homestead ............................................................................................9

1.97   Homestead IP ........................................................................................9

1.98   Homestead IP Abandonment Motion ..................................................10

1.99   Homestead Village License Agreements ............................................10

1.100  HVM .....................................................................................................10

1.101  HVM Manager ......................................................................................10

1.102  HVM Manager Owner ..........................................................................10

1.103  Impaired ...............................................................................................10

1.104  Initial Distribution Date .......................................................................10

1.105  Intellectual Property ............................................................................10

1.106  Internal Revenue Code ........................................................................10

1.107  Investment ............................................................................................10

1.108  Investment and Standby Purchase Agreement ....................................10

1.109  Investors ...............................................................................................10

1.110  Investor Certificates .............................................................................10

1.111  IRS ........................................................................................................10

1.112  Merrill Swap Agreement ......................................................................11

1.113  Mezzanine Facilities ............................................................................11

1.114  Mortgage Certificate ............................................................................11

1.115  Mortgage Facility Claim ......................................................................11

1.116  Mortgage Facility .................................................................................11

1.117  Mortgage Facility Deficiency Claim ...................................................11

1.118  New A Warrants ....................................................................................11

1.119  New Alternate Mortgage Loan .............................................................11

1.120  New Alternate Notes .............................................................................11

1.121  New B Warrants ....................................................................................11

1.122  New B – G Rights .................................................................................11

1.123  New Class A1 Mortgage Notes ............................................................11

1.124   New Class A2 Mortgage Notes ...........................................................................11

1.125   New Class A3 Mortgage Notes ...........................................................................12

1.126   New Class A4 Mortgage Notes ...........................................................................12

1.127   New Debt Securities ...........................................................................................12

1.128   New Debtor Equity ..............................................................................................12

1.129   New Equity Securities .........................................................................................12

1.130   New ESA UD Mortgage Facility .........................................................................12

1.131   New ESA UD Mortgage Note..............................................................................12

1.132   New H – M Rights ...............................................................................................12

1.133   New Mortgage Loan ............................................................................................12

1.134   New Mortgage Notes ...........................................................................................12

1.135   New Securities .....................................................................................................12

1.136   New Trustee .........................................................................................................12

1.137   New Unsecured Notes Indenture ........................................................................13

1.138   New Unsecured Notes ..........................................................................................13

1.139   New Unsecured Notes Cap ..................................................................................13

1.140   New Unsecured Notes Election............................................................................13

1.141   New Unsecured Notes Election Date ...................................................................13

1.142   NewCo ..................................................................................................................13

1.143   NewCo Certificate of Formation .........................................................................13

1.144   NewCo Common Interests ...................................................................................13

1.145   NewCo IP Note ....................................................................................................13

1.146   NewCo Management Incentive Plan ....................................................................13

1.147   NewCo Operating Agreement...............................................................................13

1.148   Other Existing Equity Interests ...........................................................................13

1.149   Person ..................................................................................................................13

1.150   Plan ......................................................................................................................14

1.151   Plan Documents ..................................................................................................14

1.152   Plan Supplement..................................................................................................14

1.153   Priority Claim......................................................................................................14

1.154   Priority Tax Claim ..............................................................................................14

1.155    Pro Rata Share ........................................................................................... 14

1.156    Purchase Notice ......................................................................................... 14

1.157    Record Date ............................................................................................... 14

1.158    Registration Rights Agreement ................................................................. 14

1.159    Released Parties ......................................................................................... 14

1.160    Reorganized Debtors .................................................................................. 15

1.161    Rights ......................................................................................................... 15

1.162    Rights Certificate ....................................................................................... 15

1.163    Rights Holder ............................................................................................. 15

1.164    Rights Offering ........................................................................................... 15

1.165    Rights Offering Amount ............................................................................ 15

1.166    Rights Offering Payment Date ................................................................... 15

1.167    Rights Offering Participant ........................................................................ 15

1.168    Satisfaction Notice ..................................................................................... 15

1.169    Schedules ................................................................................................... 15

1.170    Secured Claim ............................................................................................ 15

1.171    Securities Act ............................................................................................. 15

1.172    Special Servicer .......................................................................................... 15

1.173    Subscription Agent ..................................................................................... 16

1.174    Subscription Commencement Date ............................................................ 16

1.175    Subscription Price ...................................................................................... 16

1.176    Successor Trustee ....................................................................................... 16

1.177    Swap Agreements ....................................................................................... 16

1.178    Tier 1 Debtors ............................................................................................ 16

1.179    Tier 2 Debtors ............................................................................................ 16

1.180    Tranche A ................................................................................................... 16

1.181    Tranche B ................................................................................................... 16

1.182    Tranche C ................................................................................................... 16

1.183    Tranche D ................................................................................................... 16

1.184    Treasury Regulations ................................................................................. 16

1.185    Trustee ........................................................................................................ 16

1.186 Unimpaired ........................................................................................16

1.187 Unliquidated Claim ...........................................................................16

1.188 Unsubscribed Rights..........................................................................17

1.189 Wachovia Swap Agreement...............................................................17

B. Other Terms..................................................................................................17

C. Exhibits .......................................................................................................17

ARTICLE II PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND
PRIORITY TAX CLAIMS ....................................................................17

2.1 Payment of Allowed Administrative Expense Claims .........................17

2.2 Compensation and Reimbursement Claims .........................................18

2.3 Priority Tax Claims ...........................................................................18

ARTICLE III CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ...................18

3.1 Summary..........................................................................................18

ARTICLE IV TREATMENT OF CLAIMS AND EQUITY INTERESTS .........................19

4.1 Class 1 .............................................................................................19

4.2 Class 2 .............................................................................................19

4.3 Class 3 .............................................................................................21

4.4 Class 4 .............................................................................................21

4.5 Class 5 .............................................................................................21

4.6 Class 6 .............................................................................................22

4.7 Class 7 .............................................................................................22

4.8 Class 8 .............................................................................................22

4.9 Class 9 .............................................................................................22

4.10 Class 10............................................................................................23

4.11 Class 11............................................................................................23

4.12 Class 12............................................................................................23

4.13 Class 13............................................................................................23

4.14 Class 14............................................................................................24

4.15 Class 15............................................................................................24

ARTICLE V ACCEPTANCE, REJECTION, AND REVOCATION OR
WITHDRAWAL OF THE PLAN ............................................................24

5.1 Impaired Classes to Vote ...................................................................24

| | | | |
|---|---|---|---|
| | 5.2 | Acceptance by Class of Claims | 24 |
| | 5.3 | Nonconsensual Confirmation | 24 |
| | 5.4 | Revocation or Withdrawal | 25 |
| | 5.5 | Amendment of Plan Documents | 25 |
| ARTICLE VI | | IMPLEMENTATION OF THE PLAN | 25 |
| | 6.1 | Substantive Consolidation | 25 |
| | 6.2 | Distributions to Certificate Holders | 25 |
| | 6.3 | Creation of NewCo | 28 |
| | 6.4 | Cancellation of Existing Debt Securities | 29 |
| | 6.5 | Management of NewCo | 30 |
| | 6.6 | Corporate Reorganization Actions | 30 |
| | 6.7 | Investment | 30 |
| | 6.8 | Rights Offering | 31 |
| | 6.9 | New Unsecured Notes Election | 34 |
| | 6.10 | Effectuating Documents and Further Transactions | 36 |
| | 6.11 | Allocation of Plan Distributions Between Principal and Interest | 36 |
| | 6.12 | Surrender and Cancellation of Instruments | 36 |
| | 6.13 | Letters of Credit | 37 |
| | 6.14 | Intellectual Property | 37 |
| | 6.15 | Consistent Tax Reporting | 37 |
| ARTICLE VII | | TREATMENT OF DISPUTED CLAIMS | 38 |
| | 7.1 | Objections to Claims; Prosecution of Disputed Claims | 38 |
| | 7.2 | Distributions on Account of Disputed Claims | 38 |
| ARTICLE VIII | | DISTRIBUTIONS | 38 |
| | 8.1 | Distributions under the Plan | 38 |
| | 8.2 | Timing of Distributions under the Plan | 39 |
| | 8.3 | Distributions with Respect to General Unsecured Claims | 39 |
| | 8.4 | Distributions with Respect to The Mortgage Facility Claim | 39 |
| | 8.5 | Calculations Subject to Adjustment | 39 |
| | 8.6 | Disbursing Agent | 39 |
| | 8.7 | Record Date | 39 |

| | | | |
|---|---|---|---|
| | 8.8 | Manner of Payment under the Plan | 40 |
| | 8.9 | Hart-Scott-Rodino Compliance | 40 |
| | 8.10 | Fractional NewCo Common Interests or Other Distributions | 40 |
| | 8.11 | Distribution of Unclaimed Property | 40 |
| ARTICLE IX | | CONDITIONS PRECEDENT | 40 |
| | 9.1 | Conditions Precedent to the Effective Date | 40 |
| | 9.2 | Effect of Failure of Conditions to Effective Date | 41 |
| ARTICLE X | | EFFECT OF CONFIRMATION | 41 |
| | 10.1 | Vesting of Assets | 41 |
| | 10.2 | Title to Assets; Discharge of Liabilities | 42 |
| | 10.3 | Binding Effect | 42 |
| | 10.4 | Claims Extinguished | 42 |
| | 10.5 | Discharge of Claims and Termination of Equity Interests | 42 |
| | 10.6 | Injunction | 42 |
| | 10.7 | Term of Injunctions or Stays | 43 |
| | 10.8 | Injunction Against Interference With Plan of Reorganization | 43 |
| | 10.9 | Exculpation | 43 |
| | 10.10 | Releases | 43 |
| | 10.11 | Indemnification Obligations | 44 |
| | 10.12 | Avoidance Actions | 45 |
| | 10.13 | Retention of Causes of Action/Reservation of Rights | 46 |
| | 10.14 | Limitations on Exculpation and Releases of Representatives | 46 |
| ARTICLE XI | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 46 |
| | 11.1 | Assumption of Executory Contracts and Unexpired Leases | 46 |
| | 11.2 | Rejection of Executory Contracts and Unexpired Leases | 47 |
| | 11.3 | Claims Arising from Rejection, Termination or Expiration | 47 |
| | 11.4 | Insurance Policies and Agreements | 47 |
| | 11.5 | Management Agreements | 47 |
| ARTICLE XII | | RETENTION OF JURISDICTION | 48 |
| ARTICLE XIII | | MISCELLANEOUS PROVISIONS | 49 |
| | 13.1 | Modification of the Plan | 49 |

**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| 13.2 | Payment of Statutory Fees | 49 |
| 13.3 | Rights of Action | 49 |
| 13.4 | Subordination Agreements | 49 |
| 13.5 | Swap Agreements | 50 |
| 13.6 | Dissolution of Creditors' Committee | 50 |
| 13.7 | Notices | 50 |
| 13.8 | Headings | 51 |
| 13.9 | Severability | 51 |
| 13.10 | Governing Law | 51 |
| 13.11 | Plan Supplement /Exhibits/Schedules | 51 |
| 13.12 | Compliance with Tax Requirements | 52 |
| 13.13 | Exemption from Transfer Taxes | 52 |
| 13.14 | Expedited Determination of Postpetition Taxes | 52 |
| 13.15 | Sections 1125 and 1126 of the Bankruptcy Code | 52 |
| 13.16 | Time | 52 |

# EXHIBIT LIST

Exhibit A – Debtors

Exhibit  B – BHAC License Agreements

Exhibit  C – Tier 1 Debtors

Exhibit  D – Tier 2 Debtors

Exhibit  E – Existing Letters of Credit

Exhibit  F – Homestead Village License Agreements

Exhibit  G – Mezzanine Facilities

Exhibit  H – New Mortgage Notes

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                            :
In re                                       :      Chapter 11 Case No.
                                            :
EXTENDED STAY INC., et al.,                 :      09-13764 (JMP)
                                            :
     Debtors.                               :      (Jointly Administered)
                                            :
---------------------------------------------------------------x
                                            :
In re                                       :      Chapter 11 Case No.
                                            :
ESH/MSTX GP L.L.C.,                         :      10-10807 (JMP)
                                            :
     Debtor.                                :
                                            :
                                            :
---------------------------------------------------------------x
                                            :
In re                                       :      Chapter 11 Case No.
                                            :
ESH/TXGP L.L.C.,                           :      10-10808 (JMP)
                                            :
     Debtor.                                :
                                            :
                                            :
---------------------------------------------------------------x
                                            :
In re                                       :      Chapter 11 Case No.
                                            :
ESA TXGP L.L.C.,                           :      10-10806 (JMP)
                                            :
     Debtor.                                :
                                            :
                                            :
---------------------------------------------------------------x
                                            :
In re                                       :      Chapter 11 Case No.
                                            :
ESA P Portfolio TXNC GP L.L.C.,            :      10-10805 (JMP)
                                            :
     Debtor.                                :
                                            :
                                            :
---------------------------------------------------------------x

```
-------------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11 Case No.
                                          :
ESH/TN Member Inc.,                       :        10-10809 (JMP)
                                          :
              Debtor.                     :
                                          :
                                          :
-------------------------------------------------------------------x
```

## DEBTORS' PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

ESA Properties LLC and its affiliated debtors set forth on Exhibit A annexed hereto (the "Debtors") hereby propose the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

## ARTICLE I

## DEFINITIONS

**A.    Defined Terms.**  As used herein, the following terms shall have the respective meanings specified below:

1.1    *Administrative Bar Date Order* means an order of the Bankruptcy Court setting a deadline for the filing of certain Administrative Expense Claims.

1.2    *Administrative Expense Claim* means any Claim constituting a cost or expense of administration in the Debtors' Chapter 11 Cases under section 503 of the Bankruptcy Code, including, without express or implied limitation, any actual and necessary costs and expenses of preserving the Estate of any Debtor, any expenses of professionals under sections 330 and 331 of the Bankruptcy Code, any actual and necessary costs and expenses of operating the businesses of any Debtor, any indebtedness or obligations incurred or assumed by any Debtor, as Debtor in Possession, in connection with the conduct of its business or for the acquisition or lease of property or the rendition of services, any allowed compensation or reimbursement of expenses under section 503(b)(2)-(5) of the Bankruptcy Code, and any fees or charges assessed against any Estate under section 1930, chapter 123, title 28, United States Code.

1.3    *Administrative Expense Creditor* means any Creditor entitled to payment of an Administrative Expense Claim.

1.4    *Administrative Expense Objection Deadline* means the first Business Day that is thirty (30) days after the Effective Date, as such date may be extended from time to time by order of the Bankruptcy Court.

1.5    *Affiliate* means, as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person (for this purpose "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities

or partnership or other ownership interests, by contract or otherwise).

1.6     ***Allowed*** means:

(a)     With respect to any Claim (other than an Administrative Expense Claim), proof of which was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Bankruptcy Court, (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, such Claim to the extent asserted in the proof of such Claim, or (ii) as to which an objection has been interposed, such Claim to the extent that it has been allowed in whole or in part by a Final Order.

(b)     With respect to any Claim (other than an Administrative Expense Claim), as to which no proof of claim was filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, such Claim to the extent that it has been listed in the Schedules as liquidated in amount and not disputed or contingent.

(c)     With respect to any Claim that is asserted to constitute an Administrative Expense Claim:

(i)     that represents an actual or necessary expense of preserving the Estate or operating the business of any Debtor for payment of goods, services, wages, or benefits or for credit extended to any Debtor, as a Debtor in Possession, any such Claim to the extent that such claim is reflected as a postpetition liability of any Debtor on such Debtor's books and records as of the Effective Date;

(ii)     in an action against any Debtor pending as of the Confirmation Date or not required to be filed against any Debtor pursuant to the Administrative Bar Date Order, any such Claim to the extent (x) it is allowed by a final order of a court of competent jurisdiction or by agreement between NewCo and the holder of such Administrative Expense Claim, and (y) if any Debtor disputes that such claim is a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code, to the extent the Bankruptcy Court determines by a Final Order that it constitutes a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code;

(iii)     timely filed in accordance with the Administrative Bar Date Order, any such Claim to the extent (i) no objection is interposed by the Administrative Expense Objection Deadline or (ii) if an objection is interposed by the Administrative Expense Objection Deadline, is allowed in whole or in part by a Final Order and only to the extent that such allowed portion is deemed, pursuant to a Final Order, to constitute a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code; or

(iv)     that represents a Claim of a professional person employed under section 327, 328 or 1103 of the Bankruptcy Code that is required to apply to the Bankruptcy Court for the allowance of compensation and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code or an Administrative Expense Claim arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code, such Claim to the extent it is allowed by a

Final Order.

1.7 ***Allowed Amount*** means the lesser of (a) the dollar amount of an Allowed Claim or (b) the Estimated Amount of such Claim. Unless otherwise specified herein or by Final Order, the Allowed Amount of an Allowed Claim shall not include interest accruing on such Allowed Claim from and after the Commencement Date.

1.8 ***Ballot*** means the form or forms distributed to holders of impaired Claims on which the acceptance or rejection of the Plan is to be indicated.

1.9 ***Bankruptcy Code*** means the Bankruptcy Reform Act of 1978, as amended, and as codified in title 11 of the United States Code, as applicable to the Chapter 11 Cases.

1.10 ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to section 157 of title 28 of the United States Code, the unit of such District Court constituted pursuant to section 151 of title 28 of the United States Code.

1.11 ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases, including the Local Rules of the Bankruptcy Court.

1.12 ***BHAC*** means BHAC Capital IV, LLC, a Delaware limited liability company.

1.13 ***BHAC IP*** means the Intellectual Property owned or controlled by BHAC.

1.14 ***BHAC License Agreements*** means, collectively, the license agreements described on Exhibit B annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.15 ***BHAC IP Transfer Agreement*** shall have the meaning set forth in Section 6.14 hereof.

1.16 ***Board of Managers*** means the Board of Managers or other governing body of NewCo, as it may exist from time to time.

1.17 ***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.18 ***Cash*** means lawful currency of the United States of America.

1.19 ***Cash Collateral Order*** means has the meaning set forth in Section VII.B.1 of the Disclosure Statement.

1.20 ***Cash Distribution*** means cash in the amount of $500,000 to be made available for distribution to holders of the General Unsecured Claims.

1.21    **_Certificates_** means the Certificates issued under the Mortgage Facility.

1.22    **_Chapter 11 Cases_** means the cases under chapter 11 of the Bankruptcy Code commenced by ESI, the Debtors and certain of their Affiliates on June 15, 2009 pending in the Bankruptcy Court as _In re Extended Stay Inc., et al._, Case No. 09-13764 (JMP) (Jointly Administered).

1.23    **_Claim_** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

1.24    **_Class_** means any group of Claims or Equity Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

1.25    **_Class A1 Mortgage Certificates_** means the Class A1 Certificates issued under the Mortgage Facility.

1.26    **_Class A1 – A4 Mortgage Certificates_** means the Class A1 Mortgage Certificates, the Class A2 Mortgage Certificates, the Class A3 Mortgage Certificates, and the Class A4 Mortgage Certificates.

1.27    **_Class A1 – E Mortgage Certificates_** means the Class A1 Mortgage Certificates, the Class A2 Mortgage Certificates, the Class A3 Mortgage Certificates, the Class A4 Mortgage Certificates, the Class B Mortgage Certificates, the Class C Mortgage Certificates, the Class D Mortgage Certificates and the Class E Mortgage Certificates.

1.28    **_Class A2 Mortgage Certificates_** means the Class A2 Certificates issued under the Mortgage Facility.

1.29    **_Class A3 Mortgage Certificates_** means the Class A3 Certificates issued under the Mortgage Facility.

1.30    **_Class A4 Mortgage Certificates_** means the Class A4 Certificates issued under the Mortgage Facility.

1.31    **_Class B Mortgage Certificates_** means the Class B Certificates issued under the Mortgage Facility.

1.32    **_Class B - E Mortgage Certificates_** means the Class B Mortgage Certificates, the Class C Mortgage Certificates, the Class D Mortgage Certificates, and the Class E Mortgage Certificates.

1.33    **_Class B - F Mortgage Certificates_** means the Class B Mortgage Certificates, the Class C Mortgage Certificates, the Class D Mortgage Certificates, the Class E Mortgage Certificates, and the Class F Mortgage Certificates.

1.34    **_Class B – F NewCo Common Interests_** means  the membership interests or, as applicable, other common equity interests, in NewCo which are to be authorized and issued to holders of Class B - F Mortgage Certificates pursuant to section 6.2(a)(v) of the Plan, without taking into account the impact of the Investment, the Rights Offering, the New Unsecured Notes or the exercise of any New A Warrants or New B Warrants.

1.35    ***Class B - G Mortgage Certificates*** means the Class B Mortgage Certificates, the Class C Mortgage Certificates, the Class D Mortgage Certificates, the Class E Mortgage Certificates, the Class F Mortgage Certificates and the Class G Mortgage Certificates.

1.36    ***Class B - M Mortgage Certificates*** means the Class B Mortgage Certificates, the Class C Mortgage Certificates, the Class D Mortgage Certificates, the Class E Mortgage Certificates, the Class F Mortgage Certificates, the Class G Mortgage Certificates, the Class H Mortgage Certificates, the Class I Mortgage Certificates, the Class J Mortgage Certificates, the Class K Mortgage Certificates, the Class L Mortgage Certificates, and the Class M Mortgage Certificates.

1.37    ***Class C Mortgage Certificates*** means the Class C Certificates issued under the Mortgage Facility.

1.38    ***Class D Mortgage Certificates*** means the Class D Certificates issued under the Mortgage Facility.

1.39    ***Class E Mortgage Certificates*** means the Class E Certificates issued under the Mortgage Facility.

1.40    ***Class F Mortgage Certificates*** means the Class F Certificates issued under the Mortgage Facility.

1.41    ***Class F Alternate Note Balance*** means the amount of New Alternate Notes to be allocated to holders of the Class F Mortgage Certificates, which shall be equal to the principal amount of the New Alternate Mortgage Loan minus the face amount of the Class A1 – E Mortgage Certificates.

1.42    ***Class F Alternate Note Proportion*** means the Class F Alternate Note Balance as a percent of the New Alternate Mortgage Loan.

1.43    ***Class G Mortgage Certificates*** means the Class G Certificates issued under the Mortgage Facility.

1.44    ***Class G NewCo Common Interests*** means, the membership interests or, as applicable, other common equity interests, in NewCo which are to be authorized and issued to holders of Class G Mortgage Certificates pursuant to section 6.2(a)(vi) of the Plan; without taking into account the impact of the Investment, the Rights Offering, the New Unsecured Notes or the exercise of any New A Warrants or New B Warrants.

1.45    ***Class G Proportion*** means, the value of the Class G NewCo Common Interests (calculated as the par value of each NewCo Common Interest multiplied by the number of Class G NewCo Common Interests) as a percent of the total claim amount of the holders of Class G Mortgage Certificates.

1.46    ***Class H Mortgage Certificates*** means the Class H Certificates issued under the Mortgage Facility.

1.47    ***Class H – M Mortgage Certificates*** means the Class H Mortgage Certificates, the Class I Mortgage Certificates, the Class J Mortgage Certificates, the Class K Mortgage Certificates, the Class L Mortgage Certificates, and the Class M Mortgage Certificates.

1.48     ***Class I Mortgage Certificates*** means the Class I Certificates issued under the Mortgage Facility.

1.49     ***Class J Mortgage Certificates*** means the Class J Certificates issued under the Mortgage Facility.

1.50     ***Class K Mortgage Certificates*** means the Class K Certificates issued under the Mortgage Facility.

1.51     ***Class L Mortgage Certificates*** means the Class L Certificates issued under the Mortgage Facility.

1.52     ***Class M Mortgage Certificates*** means the Class M Certificates issued under the Mortgage Facility.

1.53     ***Commencement Date*** means June 15, 2009.

1.54     ***Confirmation Date*** means the date on which the Confirmation Order has been entered by the Clerk of the Bankruptcy Court.

1.55     ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.56     ***Contingent Claim*** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening, or is triggered by, an event, which event has not yet occurred, happened, or been triggered, as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.57     ***Creditor*** means any Person that holds an Allowed Claim.

1.58     ***Creditors' Committee*** means the Official Committee of Unsecured Creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

1.59     ***Debtors*** has the meaning set forth in the preamble hereof.

1.60     ***Debtor in Possession*** means each Debtor in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

1.61     ***Disallowed Claim*** means a Claim or a portion of a Claim that is disallowed by an order of the Bankruptcy Court or such other court of competent jurisdiction.

1.62     ***Disbursing Agent*** means any Person in its capacity as a disbursing agent under Section 8.4 hereof.

1.63     ***Disclosure Statement*** means the disclosure statement related to the Plan filed with and approved by the Bankruptcy Court, as such disclosure statement may be amended, modified or supplemented.

1.64     ***Disputed Claim*** means any Claim (including any Administrative Expense Claim) against any Debtor, proof of which was timely and properly filed, which is

disputed under the Plan or as to which the Debtors have interposed a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed. A Claim that is disputed by the Debtors as to its amount only shall be deemed Allowed in the amount the Debtors admit owing, if any, and disputed as to the excess.

1.65    *Distribution* means the payment or distribution under the Plan of property or interests in property to the holders of Allowed Claims.

1.66    *Distribution Date* means each of (a) the Initial Distribution Date, (b) the first Business Day after the end of the months of March and September, commencing with the first such date to occur after the Effective Date, and (c) the Final Distribution Date.

1.67    *Effective Date* means a Business Day on or after the Confirmation Date selected by the Debtors and the Investors on which (i) all of the conditions precedent to the effectiveness of the Plan specified in Section 9.1 have been satisfied or waived and (ii) no stay of the Confirmation Order is in effect.

1.68    *Election Form* means the form that the holder of a Class B – G Mortgage Certificate shall be required to complete and return to the Subscription Agent if such holder wishes to make the New Unsecured Notes Election.

1.69    *Election Period* means the period during which the New Unsecured Notes Election may be exercised.

1.70    *Equity Interest* means the interests of any holder of an equity security of any of the Debtors represented by any issued and outstanding shares of common stock or preferred stock, or any membership interest, partnership interest or other instrument evidencing a present ownership interest in any of the Debtors, including any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.71    *ESA Canada Properties Borrower Interests* means the limited liability company interests of ESA Canada Properties Borrower LLC, authorized pursuant to its limited liability company agreement, as in effect immediately prior to the Effective Date.

1.72    *ESA Canada Properties Interests* means the shares of beneficial interest of ESA Canada Properties Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.73    *ESA MD Borrower Interests* means the limited liability company interests of ESA MD Borrower LLC, authorized pursuant to its limited liability company agreement, as in effect immediately prior to the Effective Date.

1.74    *ESA MD Properties Trust Certificate* means the certificate of ESA MD Properties Business Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.75    *ESA P Portfolio MD Borrower Interests* means the limited liability company interests of ESA P Portfolio MD Borrower LLC, authorized pursuant to its limited

liability company agreement, as in effect immediately prior to the Effective Date.

1.76 ***ESA P Portfolio MD Trust Certificate*** means the certificate of ESA P Portfolio MD Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.77 ***ESA UD*** means ESA UD Properties LLC, a Delaware limited liability company.

1.78 ***ESA UD Mortgage Claim*** means the Claim of Bank of America, N.A. under the ESA UD Mortgage Facility.

1.79 ***ESA UD Mortgage Facility*** means the Loan Agreement, dated February 14, 2008, among ESA UD, ESA 2007 Operating Lessee Inc. and Bank of America, N.A.

1.80 ***Escrow Account*** means the bank account to be established by the Debtors for the purpose of holding all amounts paid by Rights Offering Participants in connection with the exercise of the Rights pursuant to the Rights Offering.

1.81 ***ESH/ESA General Partnership Interests*** means the 1% general partnership interests in ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., and ESA P Portfolio TXNC Properties L.P., held by ESH/MSTX GP L.L.C., ESH/TXGP L.L.C., ESA TXGP L.L.C., and ESA P Portfolio TXNC GP L.L.C. respectively, as authorized pursuant to the limited partnership agreements of ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., and ESA P Portfolio TXNC Properties L.P., as in effect immediately prior to the Effective Date.

1.82 ***ESH/TN Properties Membership Interest*** means the 1% membership interest in ESH/TN Properties L.L.C. held by ESH/TN Member Inc., authorized pursuant to the limited liability company agreement of ESH/TN Properties L.L.C., as in effect immediately prior to the Effective Date.

1.83 ***ESI*** means Extended Stay Inc., a Delaware corporation.

1.84 ***Estate*** means the estate of each Debtor as created under section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

1.85 ***Estimated Amount*** means the estimated dollar value of an Unliquidated Claim, Disputed Claim or Contingent Claim pursuant to section 502(c) of the Bankruptcy Code or as otherwise agreed to between the holder of such Claim and the applicable Debtor or NewCo, or as otherwise determined by the Bankruptcy Court.

1.86 ***Existing Equity*** means the Equity Interest of each of the Debtors, other than the Tier 2 Debtors, authorized pursuant to its certificate of incorporation or other organizational documents, as in effect immediately prior to the Effective Date.

1.87 ***Existing Letters of Credit*** means, collectively, the letters of credit described on Exhibit E annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.88 ***Expiration Date*** means the date that is five (5) Business Days after the

deadline for voting on the Plan, which date shall be the deadline for accepting the Rights Offering as specified in the Ballot and the Rights Certificate, as such date may be extended from time to time by the Debtors with the approval of the Investors, such approval not to be unreasonably withheld.

1.89 ***Final Distribution Date*** means a date on or after the Initial Distribution Date and after all Disputed Claims have become either Allowed Claims or Disallowed Claims that is selected by NewCo in its discretion but, in any event, is no later than thirty (30) days thereafter, or such later date as the Bankruptcy Court may establish, upon request by NewCo, for cause shown.

1.90 ***Final Order*** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, which has not been reversed, vacated, or stayed, and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

1.91 ***G&A Reimbursement Agreements*** means the G&A Reimbursement Agreements entered into between HVM and one or more of the Debtors, as the same have been amended from time to time.

1.92 ***General Unsecured Claims*** means any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Claim, a Secured Claim or the Mortgage Facility Deficiency Claim.

1.93 ***Guaranty*** means the Guaranty Agreement, dated as of June 11, 2007, by Lightstone Holdings LLC, HVM Manager Owner, ESI and Homestead in respect of the obligations of the borrowers under the Mortgage Facility and the Mezzanine Facilities.

1.94 ***Guaranty Claim*** means any rights to the payment of damages, claims, causes of action, charges, suits, demands, defaults, rights of recovery, assessments, rights of set-off or rights of recoupment arising under or relating to the Guaranty (whether relating to the Mortgage Facility or the Mezzanine Facilities and whether paid prior to or following the Effective Date) as a result of the commencement of any of the Chapter 11 Cases.

1.95 ***Homestead*** means Homestead Village L.L.C., a Delaware limited liability company.

1.96 ***Homestead IP*** means the Intellectual Property owned or controlled by Homestead.

1.97 ***Homestead IP Abandonment Motion*** means the motion filed by

Homestead on or about the date of entry of the order of the Bankruptcy Court approving the Disclosure Statement pursuant to which Homestead will have requested entry of an order authorizing Homestead to abandon all of its rights, title and interests in the Homestead IP to NewCo pursuant to Section 554 of the Bankruptcy Code.

      1.98    ***Homestead Village License Agreements*** means, collectively, the license agreements described on Exhibit F annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

      1.99    ***HVM*** means HVM L.L.C., a Delaware limited liability company.

      1.100    ***HVM Manager*** means HVM Manager L.L.C., a Delaware limited liability company and the manager of HVM.

      1.101    ***HVM Manager Owner*** means David Lichtenstein.

      1.102    ***Impaired*** means, with respect to any Class of Claims or Equity Interests, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

      1.103    ***Initial Distribution Date*** means a date after the Effective Date that is selected by NewCo in its discretion but, in any event, is no later than five (5) days after the Effective Date, or such later date as the Bankruptcy Court may establish upon request by NewCo, for cause shown.

      1.104    ***Intellectual Property*** means, collectively, patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, domain names, copyrights, licenses and know-how (including, without limitation, trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) and any registrations or applications to register the foregoing.

      1.105    ***Internal Revenue Code*** means the Internal Revenue Code of 1986, as amended from time to time, and any applicable rulings, Treasury Regulations, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

      1.106    ***Investment*** means the investment that is to be made by the Investors as further described in Section 6.7 hereof.

      1.107    ***Investment and Standby Purchase Agreement*** means the agreement dated March __, 2010 by and among the Debtors, HVM Manager, HVM and the Investors.

      1.108    ***Investors*** means, collectively, Centerbridge Partners, L.P. and Paulson & Co. Inc., each on behalf of certain investment funds and accounts managed by them.

      1.109    ***Investor Certificates*** means those Certificates beneficially owned by each of the Investors or on behalf of certain of their investment funds or accounts managed by each of them.

      1.110    ***IRS*** means the United States Internal Revenue Service.

1.111    ***Merrill Swap Agreement*** means the Master Agreement, dated August 28, 2007, by and among Merrill Lynch Capital Services, Inc. and Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass Through Certificates, Series 2007-ESH Trust, and all Schedules thereto, including the Elections and Variables to the 1994 ISDA Credit Support Annex.

1.112    ***Mezzanine Facilities*** means, collectively, the mezzanine loan facilities described on Exhibit G annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.113    ***Mortgage Certificate*** means a mortgage certificate that was issued in connection with the Mortgage Facility.

1.114    ***Mortgage Facility Claim*** means the Secured Claim of the Trustee under the Mortgage Facility.

1.115    ***Mortgage Facility*** means the Mortgage Loan Agreement, dated as of June 11, 2007, by and among the Borrowers listed on Schedule 1.1(a) thereto and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A., as Lenders, as amended or modified from time to time and all documents entered into in connection therewith.

1.116    ***Mortgage Facility Deficiency Claim*** means the Claim of the Trustee in respect of the Mortgage Facility, to the extent that the value of the collateral for the Mortgage Facility is less than $4.1 billion.

1.117    ***New A Warrants*** means the warrants to acquire NewCo Common Interests, substantially in the form to be set forth in the Plan Supplement.

1.118    ***New Alternate Mortgage Loan*** means the amended and restated Mortgage Loan Agreement pursuant to which the New Alternate Notes shall be issued, substantially in the form to be set forth in the Plan Supplement, by and among NewCo, as borrower, and the lenders thereunder.

1.119    ***New Alternate Notes*** means the new notes to be issued pursuant to the New Alternate Mortgage Loan to the holder of the Allowed Mortgage Facility Claim pursuant to Section 4.2(b)(ii) hereof in the event that Class 2 rejects the Plan.

1.120    ***New B Warrants*** means the warrants to acquire NewCo Common Interests, substantially in the form to be set forth in the Plan Supplement, and as further described in Section 6.3(F) and Section 6.14 hereof.

1.121    ***New B – G Rights*** means Rights which may be used by holders of Class B – G Mortgage Certificates to subscribe for NewCo Common Interests that have an aggregate Subscription Price of $212,000,000.

1.122    ***New Class A1 Mortgage Notes*** means the A1 notes issued pursuant to Tranche A of the New Mortgage Loan.

1.123    ***New Class A2 Mortgage Notes*** means the A2 notes issued pursuant to Tranche B of the New Mortgage Loan.

1.124　**New Class A3 Mortgage Notes** means the A3 notes issued pursuant to Tranche C of the New Mortgage Loan.

1.125　**New Class A4 Mortgage Notes** means the A4 notes issued pursuant to Tranche D of the New Mortgage Loan.

1.126　**New Debt Securities** means, collectively, the New Class A1 Mortgage Notes, the New Class A2 Mortgage Notes, the New Class A3 Mortgage Notes, the New Class A4 Mortgage Notes and the New Unsecured Notes, or, as applicable, the New Alternate Notes.

1.127　**New Debtor Equity** means the common stock, preferred stock, limited liability company interests or limited or general partnership interests, as the case may be, of each of the Debtors, other than the Debtors listed on Exhibit D annexed hereto, which is to be authorized and issued pursuant to the Plan.

1.128　**New Equity Securities** means, collectively, the NewCo Common Interests, the New A Warrants and the New B Warrants.

1.129　**New ESA UD Mortgage Facility** means the new mortgage facility, in the principal amount of $5,000,000 memorialized in a loan agreement, substantially the form to be set forth in the Plan Supplement, by and among ESA UD, as borrower, and the lender thereunder.

1.130　**New ESA UD Mortgage Note** means the note to be issued to ESA UD pursuant to the New ESA UD Mortgage Facility in the principal amount of $5,000,000, bearing interest at the rate of 5.0% per annum and due and payable 5 years from the Effective Date.

1.131　**New H – M Rights** means Rights which may be used by holders of Class H – M Mortgage Certificates to subscribe for NewCo Common Interests that have an aggregate Subscription Price of $13,000,000.

1.132　**New Mortgage Loan** means the amended and restated Mortgage Facility comprising Tranche A, Tranche B, Tranche C and Tranche D, in the aggregate principal amount of $2,547,297,223, in the amounts and bearing the rates of interest set forth on Exhibit H hereof, subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes, as memorialized in the amended and restated Mortgage Loan Agreement, substantially in the form to be set forth in the Plan Supplement, by and among NewCo, as borrower, and the lenders thereunder.

1.133　**New Mortgage Notes** means the New Class A1 Mortgage Notes, the New Class A2 Mortgage Notes, the New Class A3 Mortgage Notes, and the New Class A4 Mortgage Notes.

1.134　**New Securities** means, collectively, New Equity Securities and New Debt Securities.

1.135　**New Trustee** means the indenture trustee for the New Unsecured Notes, to be identified in the Plan Supplement.

1.136　**New Unsecured Notes Indenture** means the indenture, substantially in the form to be set forth in the Plan Supplement, by and between NewCo, as the issuer, and the New Trustee, pursuant to which the New Unsecured Notes will be issued.

1.137  **New Unsecured Notes** means the unsecured notes, in the aggregate principal amount of up to $225,000,000, to be issued pursuant to the New Unsecured Notes Indenture.

1.138  **New Unsecured Notes Cap** means $225,000,000.

1.139  **New Unsecured Notes Election** means the election for holders of Class B – G Mortgage Certificates set forth in Section 4.2(c) to receive New Unsecured Notes in lieu of NewCo Common Interests.

1.140  **New Unsecured Notes Election Date** means the date that is the deadline for voting on the Plan fixed by the Bankruptcy Court, or such later date fixed by the Debtors with the approval of the Investors, such approval not to be unreasonably withheld.

1.141  **NewCo** means a newly formed Delaware limited liability company, or such alternate corporate or other organizational entity that may be selected by the Investors, to be organized as of the Effective Date in accordance with Section 6.6 hereof, or any successors in interest thereto, from and after the Effective Date.

1.142  **NewCo Certificate of Formation** means the Certificate of Formation of NewCo, substantially in the form to be set forth in the Plan Supplement.

1.143  **NewCo Common Interests** means the membership interests or, as applicable, other common equity interests, in NewCo, having a par value of $1,000 per share, which are to be authorized and issued pursuant to the Plan.

1.144  **NewCo IP Note** means the promissiory note, in the principal amount of NewCo's bid at the section 363 sale of the Homestead IP conducted pursuant to section 6.14(b) of the Plan, to the extent such bid is successful, which note shall have terms substantially similar to the terms of the New Alternate Notes.

1.145  **NewCo Management Incentive Plan** means the NewCo Management Incentive Plan, substantially in the form to be set forth in the Plan Supplement.

1.146  **NewCo Operating Agreement** means the Operating Agreement of NewCo, substantially in the form to be set forth in the Plan Supplement.

1.147  **Other Existing Equity Interests** means the Equity Interests in ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., ESA P Portfolio TXNC Properties L.P. and ESH/TN Properties L.L.C., other than the ESH/ESA General Partnership Interests and the ESH/TN Properties Membership Interest.

1.148  **Person** means an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof, or any other entity or group.

1.149  **Plan** means this plan of reorganization under chapter 11 of the Bankruptcy Code, including the Plan Documents, the Plan Supplement, and the Exhibits to the Plan annexed hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of this Plan, which amendments shall be reasonably acceptable to the Investors.

1.150   ***Plan Documents*** means the documents to be executed, delivered, assumed, and/or performed in conjunction with the consummation of the Plan on the Effective Date.

1.151   ***Plan Supplement*** means the compilation of documents and forms of documents, schedules and exhibits, each in form and substance reasonably acceptable to the Investors, to be filed on or before the date that is ten (10) days prior to the last day on which votes to accept or reject the plan are accepted and which may be amended from time to time until the Confirmation Date.

1.152   ***Priority Claim*** means any Claim to the extent such claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or Priority Tax Claim.

1.153   ***Priority Tax Claim*** means an unsecured Claim of a governmental unit of a kind specified in section 507(a)(8) of the Bankruptcy Code.

1.154   ***Pro Rata Share*** means (i) with respect to Allowed Claims, the ratio (expressed as a percentage) of the amount of an Allowed Claim in a Class (or, with respect to any New Securities received by more than one Class, the applicable Classes) to the aggregate amount of all Allowed Claims in the same Class (or applicable Classes), and (ii) with respect to the Certificates, the ratio (expressed as a percentage) of the amount of a Certificate in a class of Certificates to the aggregate amount of all Certificates in the same class of Certificates.

1.155   ***Purchase Notice*** has the meaning set forth in Section 6.8(g) hereof.

1.156   ***Record Date*** means the date to be established by the Bankruptcy Court for purposes of determining those holders of allowed claims that are entitled to vote to accept or reject this Plan.

1.157   ***Registration Rights Agreement*** means the registration rights agreement to be entered into by NewCo and the Investors and included in the Plan Supplement.

1.158   ***Released Parties*** means (i) the Debtors, (ii) NewCo, (iii) each member of the Creditors' Committee, (iv) the Investors, (v) BHAC (provided that BHAC has entered into the BHAC IP Transfer Agreement as provided in Section 6.14 herein), (vi) HVM, (vii) HVM Manager, (viii) HVM Manager Owner, (ix) the Special Servicer, (x) the Trustee, (xi) the Successor Trustee, (xii) Lightstone Holdings LLC, and (xiii) any present or former director, manager, officer, member, equity holder (and their respective Affiliates), employee, agent, financial advisor, partner, Affiliate, attorney, other professional advisor or representative (and their respective Affiliates) of the persons or parties described in clauses (i) through [(xii)] hereof or of any Affiliate thereof.

1.159   ***Reorganized Debtors*** means the Debtors, as reorganized as of the Effective Date in accordance with this Plan, and their successors.

1.160   ***Rights*** means the non-transferable subscription rights of Rights Holders to purchase NewCo Common Interests in connection with the Rights Offering on the terms and subject to the conditions set forth in Section 6.8 hereof.

1.161   ***Rights Certificate*** means a certificate representing the Rights, which

certificate shall provide (i) a place whereby each Rights Offering Participant may indicate its commitment to exercise all or a portion of its Rights, and (ii) instructions for the exercise of the Rights.

1.162 ***Rights Holder*** means a holder of a Class B – M Mortgage Certificate as of the Subscription Commencement Date, provided that if Class 2 votes to reject the Plan, any such holder will cease to be a Rights Holder and the Rights Offering will be terminated and canceled.

1.163 ***Rights Offering*** means the offering of Rights to the holders of Class B – M Mortgage Certificates to purchase NewCo Common Interests at the Subscription Price and for an aggregate purchase price equal to the Rights Offering Amount as further described in Section 6.8 hereof.

1.164 ***Rights Offering Amount*** means, if Class 2 votes to accept the Plan, $225,000,000 and, if Class 2 votes to reject the Plan, $0.

1.165 ***Rights Offering Payment Date*** means the date and time by which payments in connection with the Rights Offering must be made, which date shall be no later than the Expiration Date.

1.166 ***Rights Offering Participant*** means a Rights Holder which exercises Rights in connection with the Rights Offering.

1.167 ***Satisfaction Notice*** has the meaning set forth in Section 6.8(g) hereof.

1.168 ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors with the Bankruptcy Court on September 28, 2009, as required by section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been and may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

1.169 ***Secured Claim*** means any Claim to the extent reflected in the Schedules or a proof of claim as a secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.170 ***Securities Act*** means the Securities Act of 1933, as amended.

1.171 ***Special Servicer*** means TriMont Real Estate Advisors, Inc., or any successor thereto.

1.172 ***Subscription Agent*** means any entity reasonably acceptable to the Debtors and the Investors that is selected to act as the Debtors' agent in connection with the Rights Offering and the New Unsecured Notes Election.

1.173 ***Subscription Commencement Date*** means the date on which (i) Rights Certificates are first mailed to Rights Holders, and (ii) Election Forms are first mailed to the holders of Class B – G Mortgage Certificates.

1.174  **Subscription Price** means the price per NewCo Common Interest to be determined by dividing two-hundred twenty-five million dollars ($225,000,000) by the aggregate number of NewCo Common Interests to be issued in connection with the Rights Offering (including the Unsubscribed Rights).

1.175  **Successor Trustee** means U.S. Bank National Association, as successor in interest to Wells Fargo Bank, N.A., as Successor Trustee in Trust for holders of Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH.

1.176  **Swap Agreements** means, collectively, (i) the Merrill Swap Agreement, and (ii) the Wachovia Swap Agreement.

1.177  **Tier 1 Debtors** means the Debtors set forth on Exhibit C hereof.

1.178  **Tier 2 Debtors** means the Debtors set forth on Exhibit D hereof.

1.179  **Tranche A** means Tranche A of the New Mortgage Loan, in the principal amount of $550,382,072, subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.180  **Tranche B** means Tranche B of the New Mortgage Loan, in the principal amount of $400,945,750, subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.181  **Tranche C** means Tranche C of the New Mortgage Loan, in the principal amount of $801,908,167, subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.182  **Tranche D** means Tranche D of the New Mortgage Loan, in the principal amount of $794,061,234, subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.183  **Treasury Regulations** means regulations (including temporary and proposed) promulgated under the Internal Revenue Code of 1986, as amended from time to time.

1.184  **Trustee** means Wells Fargo Bank, N.A., as Trustee in Trust for holders of certificates under the Mortgage Facility.

1.185  **Unimpaired** means, with respect to a Class of Claims, a Claim that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

1.186  **Unliquidated Claim** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be estimated.

1.187  **Unsubscribed Rights** means those NewCo Common Interests offered in connection with the Rights Offering that are not validly subscribed for pursuant to the Rights Offering prior to the Expiration Date or for which payment has not been received by the Subscription Agent by the Rights Offering Payment Date.

1.188 ***Wachovia Swap Agreement*** means the Master Agreement, dated August 28, 2007, by and among Wachovia Bank, National Association, and Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass Through Certificates, Series 2007-ESH Trust, and all Schedules thereto, including the Elections and Variables to the 1994 ISDA Credit Support Annex.

**B.** **Other Terms**. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.

**C.** **Exhibits**. All exhibits to the Plan are annexed hereto. All Plan Documents to be included in exhibits to the Plan Supplement shall be contained in a separate Plan Supplement Exhibit Volume, which shall be filed with the Clerk of the Bankruptcy Court not later than the date that is ten (10) days prior to the last date on which votes to accept or reject the Plan are accepted. Such Plan Supplement Exhibit Volume may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court. Such Plan Supplement Exhibit Volume shall also be available for download from the following website: http://www.kccllc.net/extendedstay. Holders of Claims may also obtain a copy of such Plan Supplement Exhibit Volume, once filed, from the Debtors by a written request sent to the following address:

c/o HVM L.L.C.
100 Dunbar Street,
Spartanburg, South Carolina 29306
Attn: Kevin McDougall, Esq.

**ARTICLE II**

**PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS**

2.1 ***Payment of Allowed Administrative Expense Claims***. The Allowed Amount of each Administrative Expense Claim that is Allowed as of the Effective Date shall be paid in full, in Cash, on the Effective Date; *provided*, *however*, that Administrative Expense Claims of the type specified in Section 1.6(c)(i) hereof shall be assumed and paid by NewCo in accordance with the terms and conditions of the particular transactions and any agreements relating thereto. Each holder of an Administrative Expense Claim of the type specified in Section 1.6(c)(ii) or Section 1.6(c)(iii) hereof shall be paid the Allowed Amount of such Administrative Expense Claim in full, in Cash, as soon as practicable after such Administrative Expense Claim is Allowed.

2.2 ***Compensation and Reimbursement Claims***. The Bankruptcy Court shall fix in the Confirmation Order a date for the filing of, and a date to hear and determine, all applications for final allowances of compensation or reimbursement of expenses under section 330 of the Bankruptcy Code or applications for allowance of Administrative Expense Claims arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy

Code. The Allowed Amount of all Administrative Expense Claims arising under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code shall be paid in full, in Cash, (a) upon the later of (i) the Effective Date and (ii) the date upon which any such Administrative Expense Claim becomes Allowed or (b) at such later date or upon such other terms as may be mutually agreed upon between each such Administrative Expense Creditor and NewCo.

2.3 ***Priority Tax Claims***. Each holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Allowed Priority Tax Claim either (a) in full, in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law or (b) upon such other terms as may be mutually agreed upon between each holder of a Priority Tax Claim and NewCo.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

3.1 ***Summary***. The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| CLASS | DESIGNATION | STATUS | ENTITLED TO VOTE? |
|---|---|---|---|
| **Class 1** | Priority Claims | Unimpaired | No |
| **Class 2** | Mortgage Facility Claim | Impaired | Yes |
| **Class 3** | ESA UD Mortgage Claim | Impaired | Yes |
| **Class 4** | Mortgage Facility Deficiency Claim | Impaired | Yes |
| **Class 5** | General Unsecured Claims | Impaired | Yes |
| **Class 6** | Existing Equity | Impaired | No |
| **Class 7** | ESA MD Properties Trust Certificate | Unimpaired | No |
| **Class 8** | ESA MD Borrower Interests | Unimpaired | No |
| **Class 9** | ESA P Portfolio MD Trust Certificate | Unimpaired | No |
| **Class 10** | ESA P Portfolio MD Borrower Interests | Unimpaired | No |
| **Class 11** | ESA Canada Properties Interests | Unimpaired | No |
| **Class 12** | ESA Canada Properties Borrower Interests | Unimpaired | No |
| **Class 13** | ESH/TN Properties L.L.C. Membership Interests | Unimpaired | No |
| **Class 14** | ESH/ESA General Partnership Interests | Unimpaired | No |
| **Class 15** | Other Existing Equity Interests | Impaired | No |

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1     ***Class 1.  Priority Claims***.

(a)     *Classification*:  Class 1 consists of the Allowed Priority Claims.

(b)     *Treatment*:  Each holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim, in full, in Cash, on the later of the Effective Date and as soon as practicable after the date such Priority Claim becomes Allowed.

(c)     *Voting*:  Class 1 is not impaired.  The holders of the Claims in Class 1 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.2     ***Class 2.  Mortgage Facility Claim***.

(a)     *Classification*:  Class 2 consists of the Allowed Mortgage Facility Claim.

(b)     *Treatment*:

(i)     Subject to Section 6.2(a)(xii), in the event that Class 2 accepts the Plan, the holder of the Allowed Mortgage Facility Claim shall receive (A) 100% of the Rights, and (B) on the Initial Distribution Date, 100% of the New Class A1 Mortgage Notes, 100% of the New Class A2 Mortgage Notes, 100% of the New Class A3 Mortgage Notes, 100% of the New Class A4 Mortgage Notes, 470,482 NewCo Common Interests (with such number of NewCo Common Interests representing 39.282% of the issued and outstanding NewCo Common Interests after giving effect to subsequent transactions taking place on the Effective Date, as adjusted for the issuance of any New Unsecured Notes pursuant to the New Unsecured Notes Election, and assuming that none of the New A Warrants or New B Warrants are exercised on the Effective Date), and 100% of the New Unsecured Notes.

(ii)     In the event that Class 2 rejects the Plan, the holder of the Allowed Mortgage Facility Claim shall receive, on the Initial Distribution Date, the New Alternate Notes in an aggregate principal amount not to exceed $3,200,000,000, which represents the value of the collateral securing the Allowed Mortgage Facility Claim, and which New Alternate Notes shall bear interest at the rate of 5.34% per annum or such lower rate as shall be fixed by the Bankruptcy Court, and shall have a final maturity date that is nine (9) years after the Initial Distribution Date.  The Debtors, with the consent of the Investors, reserve the right to seek confirmation of a plan under section 1129(b) of the Bankruptcy Code, pursuant to which the holder of the Allowed Mortgage Facility Claim will receive New Alternate Notes in an aggregate principal amount less than $3,200,000,000, with the difference between such amount of such New Alternate Note and $3,200,000,000 being provided in New Equity Securities, to the extent permitted by law.  In either such circumstance, the Rights shall be extinguished.

(c)     *New Unsecured Notes Election for Class B – G Mortgage Certificates.*

Provided Class 2 is entitled to the treatment set forth in Section 4.2(b)(i) hereof, at the election of any holder of (i) a Class B - F Mortgage Certificate, such holder shall receive, in lieu of all or a portion of the NewCo Common Interests that such holder is entitled to receive, $1.00 of aggregate principal amount of New Unsecured Notes for each $1.00 of face amount of the Class B – F Mortgage Certificates that such holder holds and for which such holder elects to receive New Unsecured Notes in lieu of NewCo Common Interests, and (ii) a Class G Mortgage Certificate, such holder shall receive, in lieu of all or a portion of the NewCo Common Interests that such holder is entitled to receive, $1.00 of New Unsecured Notes multiplied by the Class G Proportion, for each $1.00 of face amount of the Class G Mortgage Certificates that such holder holds and for which such holder elects to receive New Unsecured Notes in lieu of NewCo Common Interests; *provided*, that, in the case of both (i) and (ii), the aggregate principal amount of all New Unsecured Notes received by all holders of Class B - G Mortgage Certificates in lieu of NewCo Common Interests does not exceed, in the aggregate, the New Unsecured Notes Cap. In the event the holders of Class B - G Mortgage Certificates collectively elect to receive an aggregate principal amount of New Unsecured Notes in excess of the New Unsecured Notes Cap, the New Unsecured Notes shall be allocated to the holders of Class B – G Mortgage Certificates in accordance with the respective priority of the Class B - G Mortgage Certificates until the New Unsecured Notes issued equals the New Unsecured Notes Cap. Each holder of a Class B - G Mortgage Certificate electing to receive New Unsecured Notes shall receive on the Initial Distribution Date (A) its Pro Rata Share of New Unsecured Notes having an aggregate principal amount equal to the New Unsecured Notes Cap, *provided, however*, that in the case of holders of Class G Mortgage Certificates, the Pro Rata Share shall be calculated as provided in clause (ii) above, and (B) with respect to the Class B – F Mortgage Certificates, NewCo Common Interests having a reorganized equity value of $1.00 (without taking into account the impact of the Investment, the Rights Offering, the New Unsecured Notes or the exercise of any New A Warrants or New B Warrants) for each and every $1.00 of aggregate principal amount of New Unsecured Notes that such holder elected to receive but did not receive, and with respect to the Class G Mortgage Certificates, NewCo Common Interests having a reorganized equity value of $1.00 (without taking into account the impact of the Investment, the Rights Offering, the New Unsecured Notes or the exercise of any New A Warrants or New B Warrants) multiplied by the Class G Proportion for each and every $1.00 of aggregate principal amount of New Unsecured Notes that such holder elected to receive but did not receive.

(d)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mortgage Facility Claim.

(e)     *Voting*:  Class 2 is impaired.  The holder of the Claim in Class 2 is entitled to vote to accept or reject the Plan.

### 4.3     **Class 3.  ESA UD Mortgage Claim**.

(a)     *Classification*:  Class 3 consists of the Allowed ESA UD Mortgage Claim.

(b)     *Treatment:*  The holder of the Allowed ESA UD Mortgage Claim shall receive on the Distribution Date the New ESA UD Mortgage Note in full settlement, satisfaction, release and discharge of the Allowed ESA UD Mortgage Claim.

(c)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed ESA UD Mortgage Claim.

(d)     *Voting*:  Class 3 is impaired.  The holder of the Claim in Class 3 is entitled to vote to accept or reject the Plan.

### 4.4     ***Class 4.  Mortgage Facility Deficiency Claim***.

(a)     *Classification*:  Class 4 consists of the Mortgage Facility Deficiency Claim.

(b)     *Treatment*:  No distribution shall be made under the Plan in respect of the Mortgage Facility Deficiency Claim; *provided, however*, that in order to facilitate a consensual Plan, if Class 4 votes to accept the Plan, Class 4 shall receive its Pro Rata Share of the New A Warrants.  For purposes of calculating Pro Rata Share hereunder, the Allowed Claims of the holders of the Mortgage Facility Deficiency Claim and the General Unsecured Claims shall be aggregated.

(c)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mortgage Facility Deficiency Claim.

(d)     ***Voting***:  Class 4 is impaired.  The holder of the Claim in Class 4 is entitled to vote to accept or reject the Plan.

### 4.5     ***Class 5.  General Unsecured Claims***.

(a)     *Classification*:  Class 5 consists of the General Unsecured Claims.

(b)     *Treatment*:  No distribution shall be made under the Plan in respect of the General Unsecured Claims; *provided, however*, that in order to facilitate a consensual Plan, if Class 5 accepts the Plan, each holder of a General Unsecured Claim shall receive, at its election, either (i) its Pro Rata Share of New A Warrants, or (ii) if its claim is $100,000 or less, or it elects to reduce its claim to $100,000, its Pro Rata Share of the Cash Distribution; *provided, however*, that if Class 4 accepts the Plan, all holders of General Unsecured Claims shall be deemed to have elected the Cash option.  For purposes of calculating Pro Rata Share hereunder, the Allowed Claims of the holders of the Mortgage Facility Deficiency Claim and the General Unsecured Claims shall be aggregated.

(c)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to Allowed General Unsecured Claims.

(d)     *Voting*:  Class 5 is impaired.  The holders of the Claims in Class 5 are entitled to vote to accept or reject the Plan.

### 4.6     ***Class 6.  Existing Equity***.

(a)     *Classification*:  Class 6 consists of the Existing Equity.

(b)     *Treatment*:  No distribution shall be made under the Plan from the Estates in respect of the Existing Equity.  On the Effective Date, the certificates that previously evidenced ownership of Existing Equity shall be cancelled and shall be null and void, the holder(s) thereof shall no longer have any rights in respect of the Existing Equity, and such certificates shall not evidence any rights under the Plan.

(c)     *Voting*:  Class 6 is impaired.  The holders of Existing Equity in Class 6 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

### 4.7     ***Class 7.  ESA MD Properties Trust Certificate***.

(a)     *Classification*:  Class 7 consists of the ESA MD Properties Trust Certificate.

(b)     *Treatment*:  The holder of the ESA MD Properties Trust Certificate shall retain the ESA MD Properties Trust Certificate.

(c)     *Voting*:  Class 7 is not impaired.  The holder of the Equity Interests in Class 7 is deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

### 4.8     ***Class 8.  ESA MD Borrower Interests***.

(a)     *Classification*:  Class 8 consists of the ESA MD Borrower Interests.

(b)     *Treatment*:  Each holder of ESA MD Borrower Interests shall retain its ESA MD Borrower Interests.

(c)     *Voting*:  Class 8 is not impaired.  The holders of the Equity Interests in Class 8 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

### 4.9     ***Class 9.  ESA P Portfolio MD Trust Certificate***

(a)     *Classification*:  Class 9 consists of the ESA P MD Portfolio Trust Certificate.

(b)     *Treatment*:  The holder of the ESA P MD Portfolio Trust Certificate shall retain the ESA P Portfolio Trust Certificate.

(c)     *Voting*:  Class 9 is not impaired.  The holder of the Equity Interests in Class 9 is deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

### 4.10     ***Class 10.  ESA P Portfolio MD Borrower Interests***

(a)     *Classification*:  Class 10 consists of the ESA P Portfolio MD Borrower Interests.

(b)     *Treatment*:  Each holder of ESA P Portfolio MD Borrower Interests shall retain its ESA P Portfolio MD Borrower Interests.

(c)     *Voting*:  Class 10 is not impaired.  The holders of the Equity Interests in Class 10 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.11 ***Class 11.  ESA Canada Properties Interests***.

(a) *Classification*:  Class 11 consists of the ESA Canada Properties Interests.

(b) *Treatment*:  Each holder of ESA Canada Properties Interests shall retain its ESA Canada Properties Interests.

(c) *Voting*:  Class 11 is not impaired.  The holders of the Equity Interests in Class 11 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.12 ***Class 12.  ESA Canada Properties Borrower Interests.***

(a) *Classification*:  Class 12 consists of the ESA Canada Properties Borrower Interests.

(b) *Treatment*:  Each holder of ESA Canada Properties Borrower Interests shall retain its ESA Canada Properties Borrower Interests.

(c) *Voting*:  Class 12 is not impaired.  The holders of the Equity Interests in Class 12 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.13 ***Class 13.  ESH/TN Properties Membership Interest.***

(a) *Classification:*  Class 13 consists of the ESH/TN Properties Membership Interest.

(b) *Treatment:*  The holder of the ESH/TN Properties Membership Interest shall retain its ESH/TN Properties Membership Interest.

(c) *Voting:*  Class 13 is not impaired.  The holder of the Equity Interest in Class 13 is deemed to accept the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

4.14 ***Class 14.  ESH/ESA General Partnership Interests.***

(a) *Classification:*  Class 14 consists of the ESH/ESA General Partnership Interests.

(b) *Treatment:*  Each holder of ESH/ESA General Partnership Interests shall retain its ESH/ESA General Partnership Interests.

(c) *Voting:*  Class 14 is not impaired.  The holders of the Equity Interests in Class 14 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.15 ***Class 15.  Other Existing Equity Interests.***

(a) *Classification:*  Class 15 consists of the Other Existing Equity Interests.

(b)  *Treatment*:  No distribution shall be made under the Plan from the Estates in respect of the Other Existing Equity Interests.  On the Effective Date, the certificates that previously evidenced ownership of the Other Existing Equity Interests shall be cancelled and shall be null and void, the holders thereof shall no longer have any rights in respect of the Other Existing Equity Interests, and such certificates shall not evidence any rights under the Plan.

(c)  *Voting*:  Class 15 is impaired.  The holders of the Other Existing Equity Interests in Class 15 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

## ARTICLE V

## ACCEPTANCE, REJECTION, AND REVOCATION OR WITHDRAWAL OF THE PLAN

5.1  ***Impaired Classes to Vote***.  Each holder of a Claim in an impaired Class as of the Record Date shall be entitled to vote to accept or reject the Plan, in its sole and absolute discretion, subject to applicable law.

5.2  ***Acceptance by Class of Claims***.  An Impaired class of Claims shall be deemed to accept the Plan if (a) holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

5.3  ***Nonconsensual Confirmation***.  In the event that any Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority required by section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, or (b) amend the Plan in accordance with Section 13.1 hereof.

5.4  ***Revocation or Withdrawal***.

(a)  *Right to Revoke*.  The Plan may be revoked or withdrawn prior to the Effective Date by the Debtors, in their sole and absolute discretion.

(b)  *Effect of Withdrawal or Revocation*.  If the Plan is revoked or withdrawn prior to the Effective Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims or defenses or any admission or statement against interest by any Debtor, the Creditors' Committee, the Investors or any other Person or to prejudice in any manner the rights of the Debtors, the Creditors' Committee, the Investors or any Person in any further proceedings involving any Debtor.

5.5  ***Amendment of Plan Documents***.  From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan and any documents attached to such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan shall be as provided in such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan and their respective

attachments.

# ARTICLE VI

# IMPLEMENTATION OF THE PLAN

6.1     ***Substantive Consolidation***.The Plan is premised upon the substantive consolidation of the Debtors for all purposes related to this Plan, including, without limitation, for purposes of voting, confirmation and distribution.  On and after the Effective Date, the Debtors and their Estates shall be deemed merged and (i) all assets and liabilities of the Debtors shall be treated for purposes of the Plan as though they were merged, (ii) all guarantees of the Debtors of payment, performance or collection of obligations of any other of the Debtors shall be eliminated and cancelled, (iii) all joint obligations of two or more of the Debtors and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, and (iv) any Claim filed against any of the Debtors shall be deemed filed against the consolidated Debtors and shall be one Claim against and a single obligation of the consolidated Debtors.

6.2     ***Distributions to Certificate Holders***.

(a)     If Class 2 votes to accept the Plan, and Class 2 is, therefore, entitled to the treatment set forth in Section 4.2(b)(i) hereof, the New Securities shall be distributed by the Trustee as follows, *provided, however*, that distributions to the Investors shall be made in accordance with Section 6.2(a)(xii) hereof:

(i)     *Holders of Class A1 Mortgage Certificates*.  Each holder of a Class A1 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A1 Mortgage Notes.

(ii)     *Holders of Class A2 Mortgage Certificates*.  Each holder of a Class A2 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A2 Mortgage Notes.

(iii)     *Holders of Class A3 Mortgage Certificates*.  Each holder of a Class A3 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A3 Mortgage Notes.

(iv)     *Holders of Class A4 Mortgage Certificates*.  Each holder of a Class A4 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A4 Mortgage Notes.

(v)     *Holders of Class B- F Mortgage Certificates*.  Each holder of a Class B - F Mortgage Certificate, shall receive (A) its Pro Rata Share of the New B - G Rights (calculated as such holder's Pro Rata Share of the percentage of NewCo Common Interests that is to be distributed to the Class of Mortgage Certificates of which such holder is a member pursuant to the Plan, subject to adjustment for the New Unsecured Note Election), and (B) on the Initial Distribution Date, other than NewCo as holder of the Investor Certificates, its Pro Rata Share (calculated as such holder's Pro Rata Share of the aggregate amount of all Class B - F Mortgage Certificates) of 408,097 NewCo Common Interests (with such number of NewCo Common Interests representing approximately

34.073% of the issued and outstanding NewCo Common Interests after giving effect to subsequent transactions taking place on the Effective Date as adjusted for the issuance of any New Unsecured Notes pursuant to the New Unsecured Notes Election, and assuming that none of the New A Warrants or New B Warrants are exercised on the Effective Date).

(vi) *Holders of Class G Mortgage Certificates*.  Each holder of a Class G Mortgage Certificate shall receive (A) its Pro Rata Share of the New B - G Rights (calculated as such holder's Pro Rata Share of the percentage of NewCo Common Interests that is to be distributed to holders of Class G Mortgage Certificates, subject to adjustment for the New Unsecured Note Election)), and (B) on the Initial Distribution Date, its Pro Rata Share of 62,385 NewCo Common Interests (with such number of NewCo Common Interests representing approximately 5.209% of the issued and outstanding NewCo Common Interests after giving effect to subsequent transactions taking place on the Effective Date as adjusted for the issuance of any New Unsecured Notes pursuant to the New Unsecured Notes Election, and assuming that none of the New A Warrants or New B Warrants are exercised on the Effective Date).

(vii) *Holders of Class H Mortgage Certificates*.  Each holder of a Class H Mortgage Certificate shall receive its Pro Rata Share of 32.4% of the New H - M Rights.

(viii) *Holders of Class J Mortgage Certificates*.  Each holder of a Class J Mortgage Certificate shall receive its Pro Rata Share of 20.6% of the New H - M Rights.

(ix) *Holders of Class K Mortgage Certificates*.  Each holder of a Class K Mortgage Certificate shall receive its Pro Rata Share of 29.4% of the New H - M Rights.

(x) *Holders of Class L Mortgage Certificates*.  Each holder of a Class L Mortgage Certificate shall receive its Pro Rata Share of 14.7% of the New H - M Rights.

(xi) *Holders of Class M Mortgage Certificates*.  Each holder of a Class M Mortgage Certificate shall receive its Pro Rata Share of 2.9% of the New H - M Rights.

(xii) *Investors*.  In accordance with Section 4.2(b), on the Initial Distribution Date, the New Securities to be distributed to each of the Investors on account of their ownership of the Investor Certificates, which shall be determined by reference to Schedule 1.2a of the Investment and Standby Purchase Agreement, but subject to adjustment as provided in Section 1.3 thereof, shall be directly distributed by the Debtors to the Investors.

(b) If Class 2 votes to reject the Plan, and Class 2 is, therefore, entitled to the treatment set forth in Section 4.2(b)(ii), the New Alternate Notes shall be distributed by the Trustee to the holders of the Class A1 – E Mortgage Certificates (including NewCo as holder of the Investor Certificates) and the holders of the Class F Mortgage Certificates as follows:

(i) *Holders of Class A1 – E Mortgage Certificates.* Each holder of a Class A1 - E Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the New Alternate Notes (calculated as such holder's Pro Rata Share of the aggregate principal amount of the Class A1 – E Mortgage Certificates).

(ii) *Holders of Class F Mortgage Certificates.* Each holder of a Class F Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Class F Alternate Note Proportion of the New Alternate Notes.

(c) If Class 4 votes to accept the Plan and, in accordance with Section 4.4(b) hereof, receives its Pro Rata Share of the New A Warrants, the New A Warrants shall be distributed by the holder of the Mortgage Facility Deficiency Claim as follows:

(i) *Holders of Class G Mortgage Certificates.* Each holder of a Class G Mortgage Certificate shall receive on the Initial Distribution Date, its Pro Rata Share of 15.0% of the New A Warrants.

(ii) *Holders of Class H Mortgage Certificates.* Each holder of a Class H Mortgage Certificate shall receive on the Initial Distribution Date, its Pro Rata Share of 27.5% of the New A Warrants.

(iii) *Holders of Class J Mortgage Certificates.* Each holder of a Class J Mortgage Certificate shall receive on the Initial Distribution Date, its Pro Rata Share of 17.5% of the New A Warrants.

(iv) *Holders of Class K Mortgage Certificates.* Each holder of a Class K Mortgage Certificate shall receive on the Initial Distribution Date, its Pro Rata Share of 25.0% of the New A Warrants.

(v) *Holders of Class L Mortgage Certificates.* Each holder of a Class L Mortgage Certificate shall receive on the Initial Distribution Date, its Pro Rata Share of 12.5% of the New A Warrants.

(vi) *Holders of Class M Mortgage Certificates.* Each holder of a Class M Mortgage Certificate shall receive on the Initial Distribution Date, its Pro Rata Share of 2.5% of the New A Warrants.

6.3    ***Creation of NewCo.***

(a) *Certificate of Formation.* The NewCo Certificate of Formation shall be filed with the Delaware secretary of state on or before the Effective Date substantially in the form of the NewCo Certificate of Formation and shall, *inter alia*, include a provision prohibiting the issuance of non-voting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code and authorize 1,437,244 NewCo Common Interests, with such rights, preferences and privileges as may be determined by the Board of Managers. Pursuant to the Plan:

(A) Provided that Class 2 accepts the Plan, NewCo Common Interests comprising 38.218%of the total issued NewCo Common Interests as of the Effective Date (assuming that (a) none of the New A Warrants or New B Warrants have been exercised as of the

Effective Date, and (b) none of the holders of any of the Class B - G Mortgage Certificates have made the New Unsecured Notes Election) shall be issued to the Investors on the Effective Date immediately after the consummation of the issuance described in clause (C) below.  In the event that Class 2 rejects the Plan, NewCo Common Interests comprising 100% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the New A Warrants or New B Warrants have been exercised as of the Effective Date) shall be issued to the Investors on the Effective Date immediately after the consummation of the issuance described in clause (C) below;

(B)     Provided that Class 2 accepts the Plan, NewCo Common Interests representing 22.500% of the total issued NewCo Common Interests as of the Effective Date (assuming that (a) none of the New A Warrants or New B Warrants have been exercised as of the Effective Date, and (b) none of the holders of any of the Class B - G Mortgage Certificates have made the New Unsecured Notes Election) shall be issued in connection with the Rights Offering on the Effective Date immediately after the consummation of the issuance described in clause (C) below.  In the event that Class 2 rejects the Plan, the Rights Offering shall be terminated, canceled or otherwise not effectuated and all Rights and any exercise of any Right shall be canceled and be null and void and no NewCo Common Interests shall be issued in connection with the Rights Offering.

(C)     Provided that Class 2 accepts the Plan, NewCo Common Interests representing 39.282% of the total issued NewCo Common Interests as of the Effective Date (assuming that (a) none of the New A Warrants or New B Warrants have been exercised as of the Effective Date, and (b) none of the holders of any of the Class B - G Mortgage Certificates have made the New Unsecured Notes Election) shall be issued to the holders of the Class B – G Mortgage Certificates in accordance with the Plan.  [In the event that Class 2 rejects the Plan, except for NewCo Common Interests issued to the Investors on account of their Investment, no NewCo Common Interests shall be issued to holders of Class B – G Mortgage Certificates];

(D)     Additional NewCo Common Interests, in an amount agreed upon by the Debtors and the Investors, shall be reserved for issuance under the NewCo Management Incentive Plan;

(E)     Provided that Class 4 accepts the Plan, New A Warrants to acquire NewCo Common Interests shall be allocated to the holders of Class G-M Mortgage Certificates, with such NewCo Common Interests representing 10% of the issued and outstanding NewCo Common Interests as of the Effective Date (assuming that (a) none of the New A Warrants or New B Warrants have been exercised as of the Effective Date, and (b) none of the holders of any of the Class B - G Mortgage Certificates have made the New Unsecured Notes Election);

(F)     Provided that Class 5 accepts the Plan and Class 4 does not accept the Plan, New A Warrants to acquire NewCo Common Interests shall be allocated to holders of Allowed General Unsecured Claims with such NewCo Common Interests representing up to 10% of the issued and outstanding NewCo Common Interests as of the Effective Date (assuming that (a) none of the New A Warrants or New B Warrants have been exercised as of the Effective Date, and (b) none of the holders of any of the Class B - G Mortgage Certificates have made the New Unsecured Notes Election, subject to adjustment for the cash election in accordance with Section 4.6(b));

(G)     As provided in Section 6.14 hereof, in the event BHAC and NewCo enter into a BHAC IP Transfer Agreement, New B Warrants to acquire NewCo Common Interests shall be allocated to BHAC, with such NewCo Common Interests representing 2.5% of the issued and outstanding NewCo Common Interests as of the Effective Date (assuming that (a) none of the New A Warrants or New B Warrants have been exercised as of the Effective Date, and (b) none of the holders of any of the Class B - G Mortgage Certificates have made the New Unsecured Notes Election); and

(H)     the remainder of the authorized NewCo Common Interests shall be reserved for future issuance.

(b)     *NewCo Operating Agreement*.  The NewCo Operating Agreement shall be adopted substantially in the form included in the Plan Supplement and shall be deemed to become valid, binding and enforceable in accordance with its terms on the Effective Date.  Each holder of NewCo Common Interests shall be bound by the terms of the NewCo Operating Agreement without the need for execution by any party thereto other than NewCo and the Investors.

(c)     *Registration Rights*.  Pursuant to the terms of the Registration Rights Agreement, which shall be substantially in the form to be included in the Plan Supplement, the Investors shall be entitled to certain registration rights as set forth therein.

6.4     ***Cancellation of Existing Debt Securities***.  As of the Effective Date, all notes, agreements, certificates and securities evidencing the Mortgage Facility, the Class A1 – A4 Mortgage Certificates, the Class B – M Mortgage Certificates, the General Unsecured Claims, and the rights of the holders thereof thereunder, shall be cancelled and deemed null and void and of no further force and effect, and the holders thereof shall have no rights, and such notes, agreements, certificates and securities shall evidence no rights, except the right to receive the Distributions provided herein.

6.5     ***Management of NewCo***.  On the Effective Date, the Board of Managers shall consist of seven (7) individuals and will be comprised as follows: (a) the chief executive officer of NewCo, (b) four (4) individuals designated by the Investors, and (c) two (2) independent managers, both of whom shall be reasonably acceptable to the Investors.  Each of the members of such Board of Managers shall be identified in the Plan Supplement and shall serve in accordance with the NewCo Certificate of Formation and the NewCo Operating Agreement.  If Class 2 votes in favor of the Plan, the NewCo Operating Agreement will provide, among other things, that so long as the Investors continue to hold, collectively, at least 25.0% of the NewCo Common Interests or 50.0% of the NewCo Common Interests issued to them on the Effective Date, the Investors will continue to have the right to elect four (4) members of the Board of Managers.  The officers of NewCo shall be identified in the Plan Supplement and shall serve in accordance with the NewCo Certificate of Formation, the NewCo Operating Agreement, Section 11.5 hereof and the requirements of applicable nonbankruptcy law.

6.6     ***Corporate Reorganization Actions***.  On or as soon as practicable after the Effective Date, the Debtors and/or NewCo, as applicable, shall take such actions as may be or become necessary to effectuate the following, all of which shall be authorized and approved in all respects, in each case without further action being required under applicable law, regulation, order, or rule (including, without limitation, any action by the board of directors, stockholders, partners or members of any Debtor or the Board of Managers or members of NewCo):

(a)     the NewCo Certificate of Formation will be filed with the Secretary of State of the State of Delaware effecting the formation of NewCo;

(b)     100% of the New Debtor Equity of the Tier 1 Debtors shall be issued to NewCo; and

(c)     the Equity Interests of each of the Tier 2 Debtors shall remain outstanding and unimpaired.

6.7     ***Investment***.

If Class 2 accepts the Plan, on the Effective Date immediately after the consummation of the issuance described in Section 6.3(a)(C) hereof, and subject to the terms of the Investment and Standby Purchase Agreement, the Investors shall (i) purchase, on a several basis, the NewCo Common Interests from NewCo as set forth in the Investment and Standby Purchase Agreement for Cash in the aggregate amount of $225,000,000, and (ii) contribute to NewCo the Investor Certificates (together with the payment specified in clause (i) above, which payment shall be increased in the circumstances set forth under the second paragraph of this Section 6.7, the "Investment").  Assuming that (a) none of the New A Warrants or New B Warrants have been exercised as of the Effective Date, and (b) none of the holders of any of the Class B - G Mortgage Certificates has made the Unsecured Notes Election, the NewCo Common Interests that the Investors shall receive on the Effective Date as a result of the Investment will comprise approximately 38.218% of the total issued and outstanding NewCo Common Interests as of the Effective Date, with such amount of NewCo Common Interests to be increased by the amount of NewCo Common Interests that would have been provided to those holders of Class B – G Mortgage Certificates who made the New Unsecured Notes Election as if such holders had instead not made the New Unsecured Notes Election; *provided* that each of the Investors may elect to deliver on the Effective Date less than or more than the amount of Certificates beneficially owned by it as reflected on Schedule 1.2a to the Investment and Standby Purchase Agreement, in which case (i) the amount of NewCo Common Interests purchased by the Investors will be adjusted by an amount commensurate with the amount of NewCo Common Interests to be issued in respect of the Certificates delivered on the Effective Date and (ii) the amount of NewCo Common Interest to be distributed in accordance with Section 4.2(b)(i) will be adjusted to reflect such change in the amount of NewCo Common Interests being purchased by and distributed directly to the Investors in exchange for their Investor Certificates.

If Class 2 does not accept the Plan, on the Effective Date immediately after the consummation of the issuance described in Section 6.3(a)(C) hereof, and subject to the terms of the Investment and Standby Purchase Agreement, the Investors shall (i) purchase, on a several basis, NewCo Common Interests from NewCo for Cash in the aggregate amount of three hundred, twenty million dollars ($320,000,000), and (ii) contribute to NewCo their Investor Certificates held as of the Effective Date.  The NewCo Common Interests that the Investors shall receive on the Effective Date as a result of the Investment will comprise 100% of the total issued and outstanding NewCo Common Interests as of the Effective Date.

If the Investors determine in their sole and absolute discretion that NewCo shall have an alternate corporate or organizational structure, form or identity, the structure of the Investment contemplated in this Section 6.7 shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

6.8     ***Rights Offering***.

(a)     *The Rights*.  Each Rights Holder, including the Investors, shall have the right to purchase one NewCo Common Interest for each Right that the Rights Holder holds, at a purchase price that is equal to the Subscription Price.  Rights Holders have the right, but not the obligation, to participate in the Rights Offering as provided herein.  The number of NewCo Common Interests distributed to the Rights Holders will be rounded down to the nearest whole number.  No fractional NewCo Common Interests will be issued in respect of fractional Rights and holders of fractional Rights will not be entitled to receive any Cash in lieu thereof.

(b)     *Subscription Period*.  The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Expiration Date.  Each Rights Holder intending to participate in the Rights Offering must affirmatively elect to exercise its Rights, in whole or in part, on or prior to the Expiration Date.  On the Effective Date, all Unsubscribed Rights shall be acquired by the Investors in accordance with and subject to the terms and conditions contained in the Investment and Standby Purchase Agreement and this Plan, and any exercise of such Rights after the Expiration Date (other than the purchase of NewCo Common Interests by the Investors pursuant to the Investment and Standby Purchase Agreement) shall be null and void and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Expiration Date, regardless of when the documents relating to such exercise were sent.

(c)     *Subscription Price*.  Each Rights Offering Participant choosing to exercise its Rights, in whole or in part, shall pay the aggregate Subscription Price for the NewCo Common Interests that such Rights Offering Participant is to acquire pursuant to the exercise of the Rights not later than the Rights Offering Payment Date.  If the Effective Date does not occur, the Subscription Price that each Rights Offering Participant has paid shall be refunded to such Rights Offering Participant without payment of any interest.

(d)     *Exercise of Rights*.  In order to exercise the Rights, each Rights Holder must: (i) return a duly completed and executed Rights Certificate to the Subscription Agent on or before the Expiration Date in which the Rights Holder represents that it is (A) a "qualified institutional buyer" as such term is defined in Rule 144A under the Securities Act, (B) an "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act, or (C) a non-US person purchasing under Regulation S under the Securities Act, and (ii) pay to the Subscription Agent (on behalf of the Debtors) on or before the Rights Offering Payment Date such Rights Holder's aggregate Subscription Price in accordance with the wire instructions set forth on the Rights Certificate or by bank or cashier's check delivered to the Subscription Agent as specified in the Rights Certificate.  If the Subscription Agent for any reason does not receive from a given Rights Holder (i) a duly completed and executed Rights Certificate on or prior to the Expiration Date, and (ii) immediately available funds in an amount equal to such holder's aggregate Subscription Price on or prior to the Rights Offering Payment Date, such Rights Holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering and any NewCo Common Interests that such Rights Holder could have purchased upon its valid exercise of the Rights shall be deemed to be Unsubscribed Rights.  The payments made in accordance with the Rights Offering shall be deposited and held by the Subscription Agent in the Escrow Account, which account will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date.  The Subscription Agent shall not use such funds for any other purpose or release such funds to the Debtors prior to such date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance.

Each Rights Offering Participant may exercise all or any portion of such holder's Rights pursuant to the instructions set forth in the Rights Certificate, but the exercise of any Rights shall be irrevocable and shall obligate the exercising Rights Offering Participant to purchase the applicable NewCo Common Interests and to pay the aggregate Subscription Price for such NewCo Common Interests on or prior to the Rights Offering Payment Date. In order to facilitate the exercise of the Rights, on the Subscription Commencement Date, a Rights Certificate will be mailed to each Rights Holder together with appropriate instructions for the proper completion, due execution and timely delivery of the Rights Certificate. Each Rights Offering Participant exercising its Rights shall agree to support and not take any action to oppose or delay confirmation and implementation of the Plan.

(e)     *Rights Offering Procedures.*  Notwithstanding anything contained herein to the contrary, the Debtors and the Investors may mutually agree, without the consent of any Rights Holder, to modify the procedures relating to the Rights Offering or adopt such additional detailed procedures consistent with the provisions of this Section 6.8 to administer more efficiently the exercise of the Rights.

(f)     *Transfer Restriction; Revocation.*  The Rights are not transferable by any Rights Holder, other than the Investors, *provided, however,* that any transfer of Rights by any Investor shall not relieve such Investor of its obligation pursuant to Section 6.8(g) hereof.  Any transfer or attempted transfer by a Rights Holder, other than the Investors, will be null and void, and no purported transferee will be treated as the holder of, or permitted to exercise, any Rights. Once a Rights Offering Participant has properly exercised its Rights, such exercise will not be permitted to be revoked.

(g)     *Rights Offering Backstop.*  Subject to the terms and conditions in the Investment and Standby Purchase Agreement, each of the Investors has agreed, severally and not jointly, to subscribe for and purchase on the Effective Date, at the aggregate Subscription Price therefor, its allocated percentage of Unsubscribed Rights as set forth in the Investment and Standby Purchase Agreement as of the Effective Date.  The Debtors shall notify or cause the Subscription Agent to notify the Investors, on each Friday during the period from the Subscription Commencement Date to the Expiration Date (and any extensions thereof) and on each business day during the five (5) business days prior to the Expiration Date (and any extensions thereof), or more frequently if requested by either of the Investors, of the aggregate number of Rights known by the Debtors or the Subscription Agent to have been validly exercised as of the close of business on the preceding business day or the most recent practicable time before such request, as the case may be.  Within one (1) business day after the Expiration Date and in any event no later than four (4) Business Days prior to the Effective Date, the Debtors and the Subscription Agent shall give the Investors by e-mail a certificate by an executive officer of the Debtors in .pdf format  setting forth either (i) in the event that there are Unsubscribed Rights, (x) a true and accurate calculation of the number of NewCo Common Interests elected to be purchased by the Rights Offering Participants pursuant to validly exercised Rights and the aggregate Subscription Price therefor, and (y) a true and accurate calculation of the number of Unsubscribed Rights, and the aggregate Subscription Price attributable to such Unsubscribed Rights (a "Purchase Notice") or (ii) in the absence of any Unsubscribed Rights, the fact that there are no Unsubscribed Rights and that the Investors' obligation to purchase any Unsubscribed Rights is terminated (a "Satisfaction Notice") .  The Debtors shall provide the Investors with a certification by the Subscription Agent of the Unsubscribed Rights and a written backup to the determination of the Unsubscribed Rights as any Investor may reasonably request.  The Investors shall pay to the Subscription Agent, by wire transfer in immediately available funds on or prior to the Effective Date, Cash in an amount equal to the aggregate Subscription Price attributable to the

amount of Unsubscribed Rights. On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(C) hereof, the Investors will purchase only such number of Unsubscribed Rights as are listed in the Purchase Notice, without prejudice to the rights of the Investors to later seek an upward or downward adjustment if the number of Unsubscribed Rights in such Purchase Notice is inaccurate.

(h)     *Distribution of the NewCo Common Interests.*  On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(C) hereof, the Subscription Agent shall (i) distribute the NewCo Common Interests to each Rights Offering Participant that has properly exercised its Rights and paid the aggregate Subscription Price for the NewCo Common Interests that such Rights Offering Participant has agreed to purchase, and (ii) distribute the Unsubscribed Rights, if any, to the Investors.  All NewCo Common Interests shall be delivered with any and all issue, stamp, transfer, sales and use, or similar taxes or duties payable, if any, in connection with such delivery having been duly paid by NewCo.  If the exercise of a Right would result in the issuance of a fractional NewCo Common Interest, then the number of NewCo Common Interests to be issued in respect of such Right will be rounded down to the closest whole NewCo Common Interest.  Any unissued fractional NewCo Common Interests underlying a Right, whether caused by the rounding or a Rights Offering Participant's choice not to exercise its Rights in full, will become Unsubscribed Rights to be acquired by the Investors on the Effective Date. The Investors, in their sole discretion, may deliver a written schedule to the Debtors within ten (10) days after entry of the Confirmation Order to designate that some or all of the NewCo Common Interests to be issued to the Investors pursuant to this Section 6.8(h) or Section 6.7 be issued in the name of, and delivered to, one or more of their managed funds and/or respective affiliates, so long as such issuance and delivery is in compliance with federal and state securities laws and does not require NewCo to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended and the rules and regulations of the Securities and Exchange Commission thereunder.

(i)     *Validity of Exercise of Rights.*  All questions concerning the timeliness, viability, form and eligibility of any exercise of Rights shall be determined by the Subscription Agent as directed by the Debtors with the written consent of the Investors, which consent shall not be unreasonably withheld.  Subject to the foregoing, the Subscription Agent's good faith determinations shall be final and binding.  The Subscription Agent as directed by the Debtors with the written consent of the Investors, which consent shall not be unreasonably withheld, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Rights, *provided*, *however*, that without limiting any other circumstances that could give rise to the Investors' right to withhold consent to any waiver, permission or rejection specified above, it will be deemed reasonable for the Investors to withhold consent to any such waiver, permission or rejection that adversely affects the interests of the Investors.  Rights Certificates shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Subscription Agent determines as directed by the Debtors with the written consent of the Investors, such consent not to be unreasonably withheld.  The Subscription Agent will use commercially reasonable efforts to give notice to any Rights Offering Participants regarding any defect or irregularity in connection with any purported exercise of Rights by such participant and, may permit such defect or irregularity to be cured within such time as the Subscription Agent determines as directed by the Debtors with the written consent of the Investors, such consent not to be unreasonably withheld; *provided, however,* that neither the Debtors, the Investors nor the Subscription Agent shall incur any liability for failure to give such notification.  Within five (5) days after the Expiration Date, the Subscription Agent shall file with the Bankruptcy Court a

report regarding the results of the Rights Offering including a list identifying all those Rights Certificates deemed rejected due to defect or irregularity.

(j)     *Cancellation of Rights Offering.*  In the event that Class 2 does not accept the Plan and the Rights Offering is terminated, canceled or otherwise not effectuated, all Rights and any exercise of any Right shall be canceled and be null and void and there shall be no obligation to honor any such purported exercise.  In such event, (i) the aggregate Subscription Price paid by any Rights Offering Participant shall be refunded to such Rights Offering Participant without payment of interest and (ii) the Investors' commitment to subscribe for and purchase on the Effective Date the Unsubscribed Rights shall terminate and be null and void.

(k)     *Alteration of Rights Offering.*  If the Investors determine in their sole and absolute discretion that NewCo shall have an alternate corporate or organizational structure, form or identity, the structure of the Rights Offering contemplated in this Section 6.8 shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

### 6.9     *New Unsecured Notes Election.*

(a)     *The Unsecured Notes Election.*  Provided Class 2 is entitled to the treatment set forth in Section 4.2(b)(i) hereof, the holders of Class B – G Mortgage Certificates shall have the right, but not the obligation, to elect to make the New Unsecured Notes Election as further described in Section 4.2(c) hereof.

(b)     *Election Period.*  The Election Period shall commence on the Subscription Commencement Date and shall expire on the New Unsecured Notes Election Date. The holder of a Class B – G Mortgage Certificate who intends to make the New Unsecured Notes Election must affirmatively make the New Unsecured Notes Election, in whole or in part, on or prior to the New Unsecured Notes Election Date.  Any exercise of the New Unsecured Notes Election after the New Unsecured Notes Election Date shall be null and void and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the New Unsecured Notes Election Date, regardless of when the documents relating to such exercise were sent.

(c)     *Exercise of New Unsecured Notes Election.*  In order to exercise the New Unsecured Notes Election, each holder of a Class B – G Mortgage Certificate must return a duly completed Election Form to the Subscription Agent on or before the New Unsecured Notes Election Date.  If the Subscription Agent for any reason does not receive a given holder's duly completed Election Form on or prior to the New Unsecured Notes Election Date, such holder shall be deemed to have relinquished and waived its right to participate in the New Unsecured Notes Election.  The exercise of any New Unsecured Notes Election shall be irrevocable and shall obligate the exercising holder of a Class B – G Mortgage Certificate to receive New Unsecured Notes as reflected in such New Unsecured Notes Election.  In order to facilitate the exercise of the New Unsecured Notes Election, on the Subscription Commencement Date, an Election Form will be mailed to each holder of Class B – G Mortgage Certificates together with appropriate instructions for the proper completion, due execution and timely delivery of the Election Form. Each holder of a Class B – G Mortgage Certificate exercising its New Unsecured Note Election shall agree to support and not take any action to oppose or delay confirmation and implementation of the Plan.

(d)     *New Unsecured Notes Election Procedures.*  Notwithstanding anything contained herein to the contrary, the Debtors and the Investors may mutually agree, without the

consent of any holder of a Class B – G Mortgage Certificate, to modify the procedures relating to the New Unsecured Notes Election or adopt such additional detailed procedures consistent with the provisions of Section 4.2(c) and this Section 6.9 to administer more efficiently the exercise of the New Unsecured Notes Election.

(e)     *Transfer Restriction*.  The New Unsecured Notes Election is not transferable by any holder of a Class B – G Mortgage Certificate.  Any transfer or attempted transfer by a holder of a Class B – G Mortgage Certificate will be null and void, and no purported transferee will be treated as the holder of, or permitted to exercise, the New Unsecured Notes Election.

(f)     *Distribution of the New Unsecured Notes*.  On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(C) hereof, the Subscription Agent shall distribute the New Unsecured Notes to each holder of a Class B – G Mortgage Certificate that has properly exercised its New Unsecured Notes Election in accordance with Section 4.2(c) hereof and this Section 6.9.

(g)     *Validity of Exercise of New Unsecured Notes Election.*  All questions concerning the timeliness, viability, form and eligibility of any exercise of the New Unsecured Notes Election shall be determined by the Subscription Agent as directed by the Debtors with the written consent of the Investors, which consent shall not be unreasonably withheld.  Subject to the foregoing, the Subscription Agent's good faith determinations shall be final and binding.  The Subscription Agent as directed by the Debtors with the written consent of the Investors, which consent shall not be unreasonably withheld, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any New Unsecured Notes Election, *provided*, *however*, that without limiting any other circumstances that could give rise to the Investors' right to withhold consent to any waiver, permission or rejection specified above, it will be deemed reasonable for Investors to withhold consent to any such waiver, permission or rejection that adversely affects the interests of the Investors.  Election Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Subscription Agent determines as directed by the Debtors with the written consent of the Investors, such consent not to be unreasonably withheld.  The Subscription Agent will use commercially reasonable efforts to give notice to any holder of a Class B – G Mortgage Certificate regarding any defect or irregularity in connection with any purported exercise of the New Unsecured Notes Election by such participant and, may permit such defect or irregularity to be cured within such time as the Subscription Agent, with the consent of the Debtors and the Investors, may determine in good faith to be appropriate; *provided, however,* that neither the Debtors, the Investors nor the Subscription Agent shall incur any liability for failure to give such notification.  Within five (5) days after the New Unsecured Notes Election Date, the Subscription Agent shall file with the Bankruptcy Court a report regarding the results of the New Unsecured Notes Election including a list identifying all those Election Forms deemed rejected due to defect or irregularity.

6.10     ***Effectuating Documents and Further Transactions***.  On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to the Investors as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Each of the officers of the Debtors and NewCo is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any notes

or securities issued pursuant to the Plan.

6.11    ***Allocation of Plan Distributions Between Principal and Interest***.  To
the extent that any Allowed General Unsecured Claims entitled to a Distribution under the Plan is
comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be
allocated to the principal amount of the Claim (as determined for federal income tax purposes)
first and then, to the extent the consideration exceeds the principal amount of the Claim, to
accrued but unpaid interest.

6.12    ***Surrender and Cancellation of Instruments***.  Each holder of an
instrument evidencing a Claim shall surrender such instrument to NewCo or, in the case of the
holders of any Class A1 – A4 Mortgage Certificates or Class B – M Mortgage Certificates
(excluding the Class of B - M Mortgage Certificates held by the Investors which shall be
surrendered to NewCo), to the Trustee, and NewCo (or the Trustee in the case of the holders of
any Class A1- A4 Mortgage Certificates of Class B - M Mortgage Certificates, excluding the
Class of B - M Mortgage Certificates held by the Investors) shall distribute or cause to be
distributed to the holder thereof the appropriate Distribution (if any) provided hereunder.  At the
option of NewCo (in its sole and absolute discretion), no Distribution hereunder shall be made to
or on behalf of any holder of such Claim unless and until such instrument is received or the
unavailability of such instrument is reasonably established to the satisfaction of NewCo.  In
accordance with section 1143 of the Bankruptcy Code, any such holder of such a Claim that fails
to surrender or cause to be surrendered such instrument or to execute and deliver an affidavit of
loss and indemnity reasonably satisfactory to NewCo and, in the event that NewCo requests, fails
to furnish a bond in form and substance (including, without limitation, amount) reasonably
satisfactory to NewCo shall be deemed to have forfeited all rights, claims, and interests and shall
not participate in any Distribution hereunder.

6.13    ***Letters of Credit***.  At or prior to the Effective Date, (i) the Existing
Letters of Credit shall be terminated and any cash collateral provided thereunder shall be released
to the entity that posted such collateral; and (ii) NewCo shall provide any and all letters of credit
and related cash collateral necessary to obtain and maintain in effect all such forms of insurance
as are customary to operate a business of the size and type of the Debtors.

6.14    ***Intellectual Property.***

(a)    ***BHAC IP Transfer Agreement.***  NewCo shall seek to enter into an
intellectual property transfer agreement (the "BHAC IP Transfer Agreement") with BHAC,
pursuant to which, on the Effective Date, BHAC shall transfer to NewCo the BHAC IP in
consideration for the issuance to BHAC of the New B Warrants.  The initial exercise price of
each New B Warrant shall be $1,377,358,194, with such exercise price compounding annually at
a rate of 20.0% per annum.  In the event NewCo and BHAC do not reach agreement on the terms
of the BHAC IP Transfer Agreement prior to the Effective Date, BHAC shall not be entitled to
receive the New B Warrants, the BHAC License Agreements shall be assumed by the applicable
debtors in accordance with Section 11.1 hereof, and the holder of the Mortgage Facility Claim
shall transfer, assign and contribute to NewCo its security interest in and all rights and remedies
with respect to the BHAC IP and NewCo shall exercise all such rights and remedies with respect
to the BHAC IP in order to foreclose on the BHAC IP and effectuate the transfer of the BHAC IP
to NewCo.

(b)    ***Homestead IP.***  If the Bankruptcy Court grants the Homestead IP
Abandonment Motion, on the Effective Date the Homestead IP shall be deemed abandoned to

NewCo, and NewCo shall have all right, title and interest to the Homestead IP. If the Bankruptcy Court does not grant the Homestead IP Abandonment Motion, a sale of the Homestead IP shall be conducted under section 363(b) of the Bankruptcy Code. In the event that NewCo (or the Investors on behalf of NewCo) is the successful bidder at such sale, then on the Effective Date, all right, title and interest to the Homestead IP shall be sold and transferred to NewCo in exchange for the NewCo IP Note, and NewCo shall issue the NewCo IP Note to Homestead, which NewCo IP Note shall constitute proceeds of the Homestead IP realized by Homestead and, accordingly, shall be substituted for the Homestead IP under Homestead's pledge of the Homestead IP in connection with the Mortgage Loan Facility, and the aggregate principal amount of the New Mortgage Notes or the New Alternate Mortgage Notes, as applicable, shall be decreased by an amount equal to the principal amount of the NewCo IP Note.

6.15 ***Consistent Tax Reporting***.

(a) For federal income tax purposes, (i) the distributions described in Section 4.2 shall be treated as a distribution of undivided interests in the assets of NewCo to the holder of the Allowed Mortgage Facility Claim, immediately followed by a distribution of such assets to the holders of the Mortgage Certificates in complete liquidation of the holder of the Allowed Mortgage Facility Claim, followed by a contribution of such assets to NewCo by the holders of the Mortgage Certificates receiving solely NewCo Common Interests, a sale of such assets to NewCo by the holders of Mortgage Certificates receiving only New A Warrants and/or New Debt Securities and a part contribution/part sale of such assets to NewCo by the holders of Mortgage Certificates receiving both NewCo Common Interests and other property, and (ii) the distribution described in Section 4.4 shall be treated as a distribution of undivided interests in the assets of NewCo to the holder of the Allowed ESA UD Mortgage Claim followed by a sale of such assets to NewCo for the New ESA UD Mortgage Note. All parties will be required to report for all federal income tax purposes in a manner consistent with the characterization of the distributions described above.

(b) As soon as possible after the Effective Date, but in no event later than thirty (30) days thereafter, the Board of Managers shall determine the value of the underlying assets of NewCo as of the Effective Date (as appropriate for federal income tax purposes) and the portions of such value that are allocable, respectively, to the New ESA UD Mortgage Note and the various classes of New Equity Securities and New Debt Securities. Such allocation will take into account the relative fair market values of the New Equity Securities, New Debt Securities and the New ESA UD Mortgage Note. The Board of Managers will apprise, in writing, all parties of such valuation and allocation. The valuation and allocation shall be used consistently by all parties (including NewCo, the holders of Mortgage Certificates and the holder of the Allowed ESA UD Mortgage Claim) for all federal income tax purposes.

## ARTICLE VII

## TREATMENT OF DISPUTED CLAIMS

7.1 ***Objections to Claims; Prosecution of Disputed Claims***. NewCo shall object to the allowance of Claims filed with the Bankruptcy Court with respect to which NewCo disputes liability in whole or in part. All objections that are filed and prosecuted by NewCo as provided herein shall be litigated to Final Order by NewCo. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by NewCo to Claims shall be served and filed no later than ninety (90) days after the Effective Date.

7.2     ***Distributions on Account of Disputed Claims***.  Notwithstanding Article IV hereof, a Distribution shall only be made by NewCo to the holder of a Disputed Claim when, and to the extent that, such Disputed Claim becomes Allowed.  No interest shall be paid on account of Disputed Claims that later become Allowed except to the extent that payment of interest is required under section 506(b) of the Bankruptcy Code.  No Distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 7.1 hereof.  To the extent that any funds remain reserved for payment of Allowed Claims after the final resolution of all Disputed Claims (and all such Disputed Claim that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall revert to and be fully vested in NewCo.

# ARTICLE VIII

# DISTRIBUTIONS

8.1     ***Distributions under the Plan***.  Whenever any Distribution to be made under this Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

8.2     ***Timing of Distributions under the Plan***.  Except for Distributions made on the Initial Distribution Date, any Distribution to be made by any Debtor or, the Disbursing Agent or NewCo pursuant to the Plan shall be deemed to have been timely made if made within ten (10) days after the time therefore specified in the Plan.  No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

8.3     ***Distributions with Respect to General Unsecured Claims***.  Distributions with respect to Class 5 shall only be made on each Distribution Date; *provided, however,* that, if a Claim in Class 5 becomes Allowed subsequent to the Initial Distribution Date, NewCo may, in its sole discretion, make a Distribution with respect to such Claim prior to a Distribution Date.  For purposes of treatment and Distribution under the Plan, all General Unsecured Claims held by a Creditor shall be aggregated and treated as a single Claim.  At the written request of the Disbursing Agent, any Creditor holding multiple General Unsecured Claims shall provide to the Disbursing Agent a single address to which any Distributions shall be sent.  At the written request of any Creditor holding multiple General Unsecured Claims made to the Disbursing Agent within thirty (30) days prior to a Distribution Date, such Creditor shall receive an itemized statement of the General Unsecured Claims for which the Distribution is being made.

8.4     ***Distributions with Respect to The Mortgage Facility Claim.***  The amount of the New Debt Securities, New Equity Securities, and/or Rights to which any holder of Certificates is entitled shall be determined based upon such holder's share of principal and accrued interest on the Certificates as of the Confirmation Date.  As a result, although the Debtors will still be entitled to use cash collateral consistent with the terms of the Cash Collateral Order, they shall be relieved of the obligation to make Adequate Protection Payments (as defined in the Cash Collateral Order) as of the Confirmation Date.

8.5     ***Calculations Subject to Adjustment.***  The allocation of the New Debt Securities, New Equity Securities, and/or Rights to various classes and subclasses of Claims under the Plan is based on a projected Confirmation Date of June 30, 2010, and is subject to

adjustment based on the actual Confirmation Date.

8.6 ***Disbursing Agent***.  Unless otherwise provided herein, all distributions under the Plan shall be made by NewCo as Disbursing Agent or such other entity designated by NewCo with the written consent of the Investors, as a Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by NewCo.

8.7 ***Record Date***.  As of the close of business on the Record Date, the various transfer and claims registers for each of the classes of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims.  The Debtors and NewCo shall have no obligation to recognize any transfer of the Claims occurring after the close of business on the Record Date.  The Debtors and the Disbursing Agent shall be entitled to recognize and deal hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Record Date, to the extent applicable.

8.8 ***Manner of Payment under the Plan***.  Unless the Person receiving a payment agrees otherwise, any payment in Cash to be made by the Debtors or NewCo shall be made, at the election of the Debtors or NewCo (as the case may be), by check drawn on a domestic bank or by wire transfer from a domestic bank.

8.9 ***Hart-Scott-Rodino Compliance***.  Any NewCo Common Interests to be distributed under the Plan to any Person required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Person shall have expired or been terminated.

8.10 ***Fractional NewCo Common Interests or Other Distributions***.  Notwithstanding anything to the contrary contained herein, no fractional NewCo Common Interests shall be distributed, and no Cash payments of fractions of cents will be made.  Fractional dollars shall be rounded down to the nearest whole dollar.  Fractional NewCo Common Interests shall be rounded down to the nearest whole unit.  No Cash will be paid in lieu of such fractional NewCo Common Interests or dollars.

8.11 ***Distribution of Unclaimed Property***.  Any Distribution under the Plan that is unclaimed after one hundred eighty (180) days following the date such property is distributed shall be deemed not to have been made and shall be transferred to NewCo, free and clear of any claims or interests of any Entities, including, without express or implied limitation, any claims or interests of any governmental unit under escheat principles.  Nothing contained herein shall affect the discharge of the Claim with respect to which such Distribution was made, and the holder of such Claim shall be forever barred from enforcing such Claim against NewCo or the Debtors, or NewCo's or the Debtors' assets, estate, properties, or interests in property.

## ARTICLE IX

### CONDITIONS PRECEDENT

9.1 ***Conditions Precedent to the Effective Date***.  The occurrence of the

Effective Date of the Plan is subject to the following conditions precedent:

(a) the Bankruptcy Court shall have entered a Confirmation Order with respect to the Plan in form and substance approved by the Investors, and such Confirmation Order shall be non-appealable, shall not have been appealed within fourteen (14) calendar days of entry or, if such Confirmation Order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such Confirmation Order;

(b) all actions, documents, and agreements necessary to implement the Plan, including, without limitation, all actions, documents, and agreements necessary to implement the corporate reorganization described in Section 6.6, the Investment described in Section 6.7, and the Rights Offering described in Section 6.8, shall have been effected or executed;

(c) the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are determined by the Debtors to be necessary to implement the Plan and that are required by law, regulation, or order;

(d) the NewCo Certificate of Formation shall have been filed with the Secretary of State of the State of Delaware and the NewCo Operating Agreement shall be in place;

(e) the Registration Rights Agreement shall be in full force and effect; and

(f) all of the conditions to closing that are contained in Section 13 of the Investment and Standby Purchase Agreement shall have been satisfied or waived.

The conditions precedent specified above, with the exception of Section 9.1(a), may be waived in whole or in part by the Debtors with the prior consent of the Investors. Subject to the foregoing, any such written waiver of a condition precedent set forth in this Section may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If the Debtors decide that one of the foregoing conditions cannot be satisfied, and the occurrence of such condition is not waived in writing by the Debtors with the prior consent of the Investors, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

9.2 ***Effect of Failure of Conditions to Effective Date***. If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 120 days after the Confirmation Date, or by such later date as is proposed by the Debtors (with the consent of the Investors, which shall not be unreasonably withheld), then upon motion by the Debtors (after consultation with the Investors) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions to consummation is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to this section 9.2, this Plan will be null and void in all respects, and (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Equity Interests shall

be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, (iii) the obligations of the Investors under the Investment and Standby Purchase Agreement will terminate, and (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors.

## ARTICLE X

## EFFECT OF CONFIRMATION

10.1     ***Vesting of Assets***.  Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors shall vest in the Reorganized Debtors and/or NewCo free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors and/or NewCo may operate the Debtors' business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.

10.2     ***Title to Assets; Discharge of Liabilities***.  Except as otherwise provided in the Plan, on the Effective Date, title to all assets and properties and interests in property dealt with by the Plan shall vest in the Reorganized Debtors or NewCo, as provided in the Plan, free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors arising prior to the Effective Date, except as may be otherwise provided in the Plan.

10.3     ***Binding Effect***.  Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

10.4     ***Claims Extinguished***.  As of the Effective Date, any and all alter-ego or derivative claims accruing to the Debtors or Debtors in Possession against present or former officers, managers and directors of the Debtors who were officers, managers or directors of the Debtors at any time during the Bankruptcy Cases shall be extinguished whether or not then pending.

10.5    ***Discharge of Claims and Termination of Equity Interests***.  The rights afforded in the Plan and the payments and distributions to be made hereunder shall discharge all existing debts and Claims, and shall terminate all Equity Interests, of any kind, nature, or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Equity Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, NewCo, their respective successors or assignees, or any of their respective assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest, and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

10.6    ***Injunction***.  **Except as otherwise expressly provided in the Plan, all Persons who have held, hold or may hold Claims or Equity Interests including Claims and Equity Interests that have been released pursuant to Section 10.10 hereof or are subject to exculpation pursuant to Section 10.9 hereof, and all other parties in interest, along with their respective present or former employees, agents, officers, managers, directors, principals and Affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest against the Debtors, the Reorganized Debtors, NewCo or the Released Parties, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Reorganized Debtors, NewCo or the Released Parties, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, NewCo or the Released Parties, or against the property or interests in property of the Debtors, the Reorganized Debtors, NewCo or the Released Parties, or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Reorganized Debtors, NewCo, the Released Parties or against the property or interests in property of the Debtors, the Reorganized Debtors NewCo or the Released Parties, with respect to any such Claim or Equity Interest.  Such injunction shall extend to any successors of the Debtors, the Reorganized Debtors, NewCo and the Released Parties and their respective properties and interest in properties.**

10.7    ***Term of Injunctions or Stays***.  Unless otherwise provided, all injunctions or stays arising under or entered during the Bankruptcy Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, other than injunctions issued pursuant to this Plan (including injunctions under Section 10.6), shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.8    ***Injunction Against Interference With Plan of Reorganization***.  **Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, managers, directors, principals and Affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

10.9    ***Exculpation***.  Notwithstanding anything herein to the contrary, as of the Effective Date, none of (i) the Debtors, (ii) NewCo, (iii) the Creditors' Committee and any subcommittee thereof, (iv) BHAC (provided that BHAC has entered into the BHAC IP Transfer Agreement as provided in Section 6.14 hereof), (v) the accountants, financial advisors, investment bankers, agents and attorneys for the Debtors, (vi) HVM, (vii) HVM Manager, (viii) the Special Servicer, (ix) the Trustee, (x) HVM Manager Owner, (xi) the Investors, and (xii) any present or former director, manager, officer, member, equity holder (and their respective Affiliates), employee, agent, financial advisor, partner, Affiliate, attorney, other professional advisor or representative (and their respective Affiliates) of the persons or parties described in clauses (i) through (xi) of this Section 10.9 or of their respective Affiliates (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Bankruptcy Cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Bankruptcy Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto, including, without limitation, the Investment and Standby Purchase Agreement; *provided*, *however*, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

10.10   ***Releases***.  Effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; and (f) the substantial contribution of the Investors and their Affiliates: (i) the Debtors and NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; and (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that does not vote to accept the Plan, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date, including without limitation, the Guaranty Claims, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise.

### 10.11    ***Indemnification Obligations***

(a)     Notwithstanding anything to the contrary herein, subject to the occurrence of the Effective Date, the obligations of the Debtors as provided in the Debtors' respective certificates of incorporation, bylaws, or other applicable organizational documents, other agreements or law as of the Commencement Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers who were officers or employees of such Debtors or their respective Affiliates at any time prior to the Effective Date, and who will be officers of the Debtors or NewCo from and after the Effective Date, against any claims, causes of action or obligations whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen

or unforeseen, asserted or unasserted, shall survive confirmation of the Plan, remain unaffected thereby after the Effective Date and not be discharged, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Commencement Date.

(b)     As of the Effective Date, each Debtor's certificate of incorporation, bylaws or similar organizational documents or other agreement shall provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, officers who were officers of such Debtor or any of its respective Affiliates at any time prior to the Effective Date and who will continue to be officers or employees of the Debtors or NewCo from and after the Effective Date at least to the same extent as the bylaws of such Debtor in effect on the Commencement Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Debtors shall amend and/or restate its certificate of incorporation, bylaws or similar organizational document or other agreement before or after the Effective Date to terminate or materially adversely affect any of the Debtors' obligations or such officers' rights under this Section 10.11(b).

(c)     Any Claim based on NewCo's or the Debtors' obligations set forth in this Section 10.11 shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

10.12   ***Avoidance Actions***.  Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, NewCo shall have the right to prosecute any avoidance or equitable subordination or recovery actions under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.  The proceeds of any such avoidance actions shall be paid to NewCo; *provided, however,* that after the amount of proceeds paid to NewCo in respect of such avoidance actions exceeds the sum of the Mortgage Facility Claim and the Mortgage Facility Deficiency Claim, less the amount of the New Mortgage Notes or the New Alternate Notes, as applicable, such proceeds shall be deposited into a reserve account and subject to disposition as determined by further order of the Bankruptcy Court.

10.13   ***Retention of Causes of Action/Reservation of Rights***.

(a)     Except as provided in Section 10.11 hereof, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors or NewCo may have or which NewCo may choose to assert on behalf of the Debtors' estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, NewCo, their officers, directors, managers or representatives and (ii) the turnover of any property of the Debtors' estates.

(b)     Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan.  NewCo shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Commencement Date fully as if the

Bankruptcy Cases had not been commenced, and all of NewCo's legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Bankruptcy Cases had not been commenced.

10.14   ***Limitations on Exculpation and Releases of Representatives***.  Nothing in Section 10.10 or Section 10.11 hereof shall (i) be construed to release or exculpate any Person from, or require indemnification of any Person against losses arising from, the fraud, malpractice, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or ultra vires acts of such Person, or (ii) limit the liability of the professionals of the Debtors, NewCo or the Creditors' Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

## ARTICLE XI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

11.1   ***Assumption of Executory Contracts and Unexpired Leases***.  Any executory contracts or unexpired leases listed in the relevant Exhibit to the Plan Supplement or that have not been rejected by the Debtors with the approval of the Bankruptcy Court and that are not the subject of pending motions to reject on the Confirmation Date, shall be deemed to have been assumed by the applicable Debtor and assigned to NewCo as of the Effective Date, and the Plan shall constitute a motion to assume and assign such executory contracts and unexpired leases.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions and assignments pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption and assignment is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.  With respect to each such executory contract or unexpired lease assumed and assigned to NewCo, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, the dollar amount required to cure any defaults of the applicable Debtor existing as of the Confirmation Date shall be conclusively presumed to be the amount set forth in an Exhibit to the Plan Supplement with respect to such executory contract or unexpired lease.  Subject to the occurrence of the Effective Date, any such cure amount shall be treated as an Allowed Administrative Expense Claim under the Plan, and, upon payment of such Allowed Administrative Expense Claim, all defaults of the applicable Debtor existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

11.2   ***Rejection of Executory Contracts and Unexpired Leases***.  Any executory contracts or unexpired leases of any Debtor that are set forth in the relevant Exhibit to the Plan Supplement shall be deemed to have been rejected by the applicable Debtor, and the Plan shall constitute a motion to reject such executory contracts and unexpired leases, and NewCo shall have no liability thereunder except as is specifically provided in the Plan.  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.

11.3   ***Claims Arising from Rejection, Termination or Expiration***.  Claims created by the rejection of executory contracts or unexpired leases (including, without limitation,

the rejection provided in Section 11.2 hereof) or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after (i) in the case of an executory contract or unexpired lease that was terminated or expired by its terms prior to the Confirmation Date, the Confirmation Date, (ii) in the case of an executory contract or unexpired lease rejected by the Debtors, the entry of the order of the Bankruptcy Court authorizing such rejection, or (iii) in the case of an executory contract or unexpired lease that is deemed rejected pursuant to section 11.2 hereof, the Confirmation Date.  Any rejection claim for which a proof of claim is not filed and served within the time provided herein will be forever barred from assertion and shall not be enforceable against the Debtors, their assets, properties, or interests in property, or NewCo or its estate, assets, properties, or interests in property.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of ARTICLE VII of the Plan.

        11.4    ***Insurance Policies and Agreements***.  Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as executory contracts under the Plan of Reorganization and will be assumed by and assigned to NewCo, effective as of the Effective Date.  Nothing contained in this Section 11.4 shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

        11.5    ***Management Agreements***.  As of the Effective Date, all existing management agreements between any Debtor and HVM, including any related administrative services agreements or G&A Reimbursement Agreements will be rejected.  HVM will not have any Claims arising from the rejection of such agreements; *provided, however*, that NewCo and the Reorganized Debtors will treat all amounts owing thereunder at such time (excluding any amount owing to directors, officers or members of HVM pursuant to any employment or retention agreements other than those previously approved by the Bankruptcy Court) as administrative expenses of the Chapter 11 Cases, to be paid in accordance with Section 2.1 hereof unless otherwise agreed by HVM.

## ARTICLE XII

## RETENTION OF JURISDICTION

        Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) to perform any of the following actions:

        12.1    To hear and determine any and all motions or applications pending on the Confirmation Date for the assumption and/or assignment or rejection of executory contracts or unexpired leases to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear and determine any and all Claims resulting therefrom or from the expiration or termination prior to the Confirmation Date of any executory contract or unexpired lease;

        12.2    To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to

the Plan, may be instituted by NewCo after the Effective Date, including, without express or implied limitation, any claims to avoid any preferences, fraudulent transfers, or other voidable transfers, or otherwise to recover assets for the benefit of the Debtors' estates;

12.3    To hear and determine any objections to the allowance of Claims arising prior to the Effective Date, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow or disallow any Disputed Claim in whole or in part;

12.4    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein.

12.5    To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

12.6    To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without express or implied limitation, the Confirmation Order;

12.7    To hear and determine all applications for allowances of compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan;

12.8    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan (and all Exhibits to the Plan Supplement and Exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

12.9    To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against any Debtor's Estate;

12.10   To determine such other matters that may be set forth in the Plan or the Confirmation Order, or that may arise in connection with the Plan, the Disclosure Statement or the Confirmation Order;

12.11   To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtors, as Debtors or Debtors in Possession, may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any request for expedited determination under section 505(b) of the Bankruptcy Code);

12.12   To hear and determine all questions and disputes arising out of or relating to the Investment Standby & Purchase Agreement, the Rights Offering or the BHAC IP Transfer Agreement; and

12.13   To enter an order or final decree closing the Chapter 11 Cases.

# ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1 ***Modification of the Plan***.  This Plan may be altered, amended or modified by the Debtors, in consultation with the Investors, before or after the Confirmation Date, as provided in section 1127 of the Bankruptcy Code; provided, however, that no such alterations, amendments or modifications that are material shall be made without the consent of the Investors, which shall not be unreasonably withheld.  A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

13.2 ***Payment of Statutory Fees***.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, shall be paid by the Debtors on or before the Effective Date.

13.3 ***Rights of Action***.  Any rights, claims, or causes of action accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including, without express or implied limitation, any avoidance or recovery actions under sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code and (except as provided in ARTICLE XIII hereof) any rights to, claims or causes of action for recovery under any policies of insurance issued to or on behalf of the Debtors shall remain assets of the Debtors' estates and, on the Effective Date, shall be transferred to NewCo.  NewCo shall be deemed the appointed representative to, and may, pursue, litigate, and compromise and settle any such rights, claims, or causes of action, as appropriate, in accordance with what is in the best interests of and for the benefit of NewCo.

13.4 ***Subordination Agreements***.  The distributions under the Plan take into account the relative priority of the Claims in each class in connection with any contractual subordination provisions relating thereto.  Accordingly, the Distributions to the various classes of Claims hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise.  On the Effective Date, all Creditors shall be deemed to have waived any and all contractual subordination rights which they may have with respect to such distribution and the Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Creditors from enforcing or attempting to enforce any such rights with respect to the distributions under the Plan.

13.5 ***Swap Agreements.***  The distributions that are to be made pursuant to Article IV hereof shall be deemed to satisfy fully any rights that each Class may have in respect of the Swap Agreements.

13.6 ***Dissolution of Creditors' Committee***.  On the Effective Date, the Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Debtors' Chapter 11 Cases, and, except for the limited purpose of presenting final applications for fee and expenses, the Creditors' Committee shall be deemed dissolved; *provided*, *however*, (i) if the Effective Date occurs before the Confirmation Order becomes a Final Order, the Creditors' Committee may continue to exist and to serve for the purposes of pursuing any appeal of the Confirmation Order, and (ii) if any adversary proceeding in which the Creditors' Committee is participating is pending as of the Effective Date, the Creditors' Committee may continue to exist

for the limited purpose of litigating such adversary proceeding.

13.7    ***Notices***.  Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| | |
|---|---|
| If to the Debtors: | c/o HVM L.L.C.<br>100 Dunbar Street,<br>Spartanburg, South Carolina  29306<br>Attn: Kevin McDougall, Esq.<br>Tel: (864) 573-1600<br>Fax: (864) 573-1665 |
| | *and* |
| | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York  10153<br>Attn: Marcia L. Goldstein, Esq., Jacqueline Marcus, Esq.<br>Tel: (212) 310-8000<br>Fax: (212) 310-8007 |
| If to the Creditors' Committee: | Hahn & Hessen LLP<br>488 Madison Avenue<br>New York, New York  10022<br>Attn: Mark T. Power, Esq., Mark T. Indelicato, Esq.<br>Tel: (212) 478-7200<br>Fax: (212) 478-7400 |
| If to the Investors: | Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, New York  10004<br>Attn:  Brad Eric Scheler, Esq., Jennifer L. Rodburg, Esq.<br>Tel: (212) 859-8000<br>Fax: (212) 859-4000 |
| | *and* |
| | Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>Attn: David M. Feldman, Esq.<br>Tel: (212) 351-4000<br>Fax: (212) 351-4035 |

13.8    ***Headings***.  The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

13.9     *Severability*.  If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors with the written consent of the Investors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, unless agreed otherwise by the Debtors with the written consent of the Investors, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.10     *Governing Law*.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or by Delaware corporate, partnership or limited liability company law, the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

13.11     *Plan Supplement /Exhibits/Schedules*.  All exhibits and schedules to the Plan, including the Plan Supplement and the Exhibits to the Plan Supplement, are incorporated into and are a part of the Plan as set forth in full herein.

13.12     *Compliance with Tax Requirements*.  In connection with the Plan, the Debtors and the Disbursing Agent will comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities, and all distributions hereunder shall be subject to such withholding and reporting requirements.

13.13     *Exemption from Transfer Taxes*.  Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any sales and use, stamp, real estate transfer, mortgage recording, or other similar tax.

13.14     *Expedited Determination of Postpetition Taxes*.  The Debtors and NewCo are authorized (but not required) to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for all taxable periods (or portions thereof) from the Commencement Date through (and including) the Effective Date.

13.15     *Sections 1125 and 1126 of the Bankruptcy Code*.  As of and subject to the occurrence of the Confirmation Date:  (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (ii) the Debtors, the members of the Creditors' Committee, the Investors, and each of their respective Affiliates, agents, directors, managers, officers, employees, advisors, and attorneys shall be deemed to have participated in good faith

and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

13.16   ***Time***.  In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 as amended effective December 1, 2009 shall apply.

Dated: New York, New York
February 19, 2010

Respectfully submitted,

ESA PROPERTIES LLC
ESA 2005 PORTFOLIO LLC
ESA 2005- SAN JOSE LLC
ESA 2005- WALTHAM LLC
ESA ACQUISITION PROPERTIES LLC
ESA ALASKA LLC
ESA CANADA PROPERTIES BORROWER LLC
ESA FL PROPERTIES LLC
ESA MD BORROWER LLC
ESA MN PROPERTIES LLC
ESA P PORTFOLIO LLC
ESA P PORTFOLIO MD BORROWER LLC
ESA P PORTFOLIO PA PROPERTIES LLC
ESA P PORTFOLIO TXNC PROPERTIES LP
ESA PA PROPERTIES LLC
ESA TX PROPERTIES LP
ESH/HOMESTEAD PORTFOLIO LLC
ESH/HV PROPERTIES LLC
ESH/MSTX PROPERTY LP
ESH/TN PROPERTIES LLC
ESH/TX PROPERTIES LP
ESA MD BENEFICIARY LLC
ESA MD PROPERTIES BUSINESS TRUST
ESA P PORTFOLIO MD BENEFICIARY LLC
ESA P PORTFOLIO MD TRUST
ESA CANADA PROPERTIES TRUST
ESA CANADA TRUSTEE INC.
ESA CANADA BENEFICIARY INC.
ESA UD PROPERTIES LLC
ESA 2007 OPERATING LESSEE, INC.
ESA 2005 OPERATING LESSEE INC.
ESA OPERATING LESSEE INC.
ESA P PORTFOLIO OPERATING LESSEE INC.
ESA CANADA OPERATING LESSEE INC.
[ONTARIO CORP.]

ESA P PORTFOLIO TXNC GP L.L.C.
ESA TXGP L.L.C.
ESH/MSTX GP L.L.C.
ESH/TXGP L.L.C.
ESH/TN MEMBER INC.


By:   /s/ David Lichtenstein
      Name:   David Lichtenstein
      Title:    President

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

**Exhibit A**

**Debtors**

| | Entity | State of Organization |
|---|---|---|
| 1 | ESA Properties LLC | Delaware |
| 2 | ESA 2005 Portfolio LLC | Delaware |
| 3 | ESA 2005- San Jose LLC | Delaware |
| 4 | ESA 2005- Waltham LLC | Delaware |
| 5 | ESA Acquisition Properties LLC | Delaware |
| 6 | ESA Alaska LLC | Delaware |
| 7 | ESA Canada Properties Borrower LLC | Delaware |
| 8 | ESA FL Properties LLC | Delaware |
| 9 | ESA MD Borrower LLC | Delaware |
| 10 | ESA MN Properties LLC | Delaware |
| 11 | ESA P Portfolio LLC | Delaware |
| 12 | ESA P Portfolio MD Borrower LLC | Delaware |
| 13 | ESA P Porfolio PA Properties LLC | Delaware |
| 14 | ESA P Porfolio TXNC Properties LP | Delaware |
| 15 | ESA PA Properties LLC | Delaware |
| 16 | ESA TX Properties LP | Delaware |
| 17 | ESH/Homestead Portfolio LLC | Delaware |
| 18 | ESH/HV Properties LLC | Delaware |
| 19 | ESH/MSTX Property LP | Delaware |
| 20 | ESH/TN Properties LLC | Delaware |
| 21 | ESH/TX Properties LP | Delaware |
| 22 | ESA MD Beneficiary LLC | Delaware |

| | Entity | State of Organization |
|---|---|---|
| 23 | ESA MD Properties Business Trust | Delaware |
| 24 | ESA P Portfolio MD Beneficiary LLC | Delaware |
| 25 | ESA P Portfolio MD Trust | Delaware |
| 26 | ESA Canada Properties Trust | Delaware |
| 27 | ESA Canada Trustee Inc. | Delaware |
| 28 | ESA Canada Beneficiary Inc. | Delaware |
| 29 | ESA UD Properties LLC | Delaware |
| 30 | ESA 2007 Operating Lessee, Inc. | Delaware |
| 31 | ESA 2005 Operating Lessee Inc. | Delaware |
| 32 | ESA Operating Lessee Inc. | Delaware |
| 33 | ESA P Portfolio Operating Lessee Inc. | Delaware |
| 34 | ESA Canada Operating Lessee Inc. [Ontario Corp.] | Ontario, Canada |
| 35 | ESA P Portfolio TXNC GP L.L.C. | Delaware |
| 36 | ESA TXGP L.L.C. | Delaware |
| 37 | ESH/MSTX GP L.L.C. | Delaware |
| 38 | ESH/TXGP L.L.C. | Delaware |
| 39 | ESH/TN Member Inc. | Delaware |

**Exhibit B**

**BHAC License Agreements**

Amended and Restated Trademark License Agreement, dated as of July 11, 2005, between BHAC Capital IV, L.L.C. and ESA P Portfolio Operating Lessee Inc. (f/k/a BRE/ESA P Portfolio Operating Lessee Inc.)

Trademark License Agreement, dated as of July 12, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA Canada Operating Lessee Inc.

Trademark License Agreement, dated as of June 13, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of October 31, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA Canada Operating Lessee Inc.

Trademark License Agreement, dated as of October __, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of October 25, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of March 24, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of June 29, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of August 11, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of April __, 2007, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc. (as assigned by ESA 2005 Operating Lessee, Inc. (f/k/a BRE/ESA 2005 Operating Lessee, Inc.) to ESA 2007 Operating Lessee, Inc. pursuant to the Assignment and Assumption of Trademark License Agreement, dated as of June 11, 2007).

Trademark License Agreement, dated as of April __, 2007, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

**Exhibit C**

**Tier 1 Debtors**

ESA Properties LLC

ESA 2005 Portfolio LLC

ESA 2005- San Jose LLC

ESA 2005- Waltham LLC

ESA Acquisition Properties LLC

ESA Alaska LLC

ESA FL Properties LLC

ESA MN Properties LLC

ESA P Portfolio LLC

ESA P Porfolio PA Properties LLC

ESA PA Properties LLC

ESH/Homestead Portfolio LLC

ESH/HV Properties LLC

ESA MD Beneficiary LLC

ESA P Portfolio MD Beneficiary LLC

ESA Canada Trustee Inc.

ESA Canada Beneficiary Inc.

ESA UD Properties LLC

ESA 2007 Operating Lessee, Inc.

ESA 2005 Operating Lessee Inc.

ESA Operating Lessee Inc.

ESA P Portfolio Operating Lessee Inc.

ESA Canada Operating Lessee Inc. [Ontario Corp.]

ESA P Portfolio TXNC GP L.L.C.

ESA TXGP L.L.C.

ESH/MSTX GP L.L.C.

ESH/TXGP L.L.C.

ESH/TN Member Inc.

**<u>Exhibit D</u>**

**Tier 2 Debtors**

ESA Canada Properties Borrower LLC

ESA Canada Properties Trust

ESA P Portfolio MD Borrower LLC

ESA P Portfolio MD Trust

ESA MD Borrower LLC

ESA MD Properties Business Trust

ESA P Portfolio TXNC Properties L.P.

ESA TX Properties L.P.

ESH/TN Properties L.L.C.

ESH/TX Properties L.P.

ESH/MSTX Property L.P.

**Exhibit E**

**Existing Letters of Credit**

Irrevocable Letter of Credit Number S-17551, dated June 11, 2007, issued by Deutsche Bank to Zurich American Insurance Company, as beneficiary, in the amount of $1,100,000

Irrevocable Letter of Credit Number S-17552, dated June 11, 2007, issued by Deutsche Bank to Zurich American Insurance Company, as beneficiary, in the amount of $16,375,000

**<u>Exhibit F</u>**

**Homestead Village License Agreements**

Second Amended and Restated Trademark License Agreement, dated as of July 11, 2005, between Homestead Village L.L.C. (f/k/a BRE/Homestead Village LLC), as licensor, and ESH/HV Properties LLC (f/k/a BRE/HV Properties LLC)

Second Amended and Restated Trademark License Agreement, dated as of July 11, 2005, between Homestead Village L.L.C. (f/k/a BRE/Homestead Village LLC), as licensor, and ESH/MSTX Property LP (f/k/a BRE/MSTX Property L.P.)

Second Amended and Restated Trademark License Agreement, dated as of July 11, 2005, between Homestead Village L.L.C. (f/k/a BRE/Homestead Village LLC), as licensor, and ESH/Homestead Portfolio LLC (f/k/a BRE/Homestead Portfolio LLC)

Second Amended and Restated Trademark License Agreement, dated as of July 11, 2005, between Homestead Village L.L.C. (f/k/a BRE/Homestead Village LLC), as licensor, and ESH/TN Properties LLC (f/k/a BRE/TN Properties LLC)

Second Amended and Restated Trademark License Agreement, dated as of July 11, 2005, between Homestead Village L.L.C. (f/k/a BRE/Homestead Village LLC), as licensor, and ESH/TX Properties LP (f/k/a BRE/TX Properties L.P.)

# Exhibit G

## Mezzanine Facilities

Mezzanine A Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz L.L.C., ESA P Mezz L.L.C., and ESA Mezz L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine B Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 2 L.L.C., ESA P Mezz 2 L.L.C., and ESA Mezz 2 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine C Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 3 L.L.C., ESA P Mezz 3 L.L.C., and ESA Mezz 3 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine D Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 4 L.L.C., ESA P Mezz 4 L.L.C., and ESA Mezz 4 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine E Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 5 L.L.C., ESA P Mezz 5 L.L.C., and ESA Mezz 5 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine F Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 6 L.L.C., ESA P Mezz 6 L.L.C., and ESA Mezz 6 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine G Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 7 L.L.C., ESA P Mezz 7 L.L.C., and ESA Mezz 7 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine H Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 8 L.L.C., ESA P Mezz 8 L.L.C., and ESA Mezz 8 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine I Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 9 L.L.C., ESA P Mezz 9 L.L.C., and ESA Mezz 9 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine J Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 10 L.L.C., ESA P Mezz 10 L.L.C., and ESA Mezz 10 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

# Exhibit H

## New Mortgage Notes[*]

| Tranche | Amount | Rate (Years 1-5) | Rate (Year 6) | Rate (Year 7) |
|---|---|---|---|---|
| Certificate A1/ Tranche A | $550.382 million | L + 1.20545% | L + 1.70545% | L + 2.20545% |
| Certificate A2/ Tranche B | $400.946 million | 6.67995% | 7.17995% | 7.67995% |
| Certificate A3/ Tranche C | $801.908 million | 7.22995% | 7.72995% | 8.22995% |
| Certificate A4/ Tranche D | $794.061 million | 7.72995% | 8.22995%% | 8.72995% |

---

[*] Projected as of 6/30/10; subject to change based on Confirmation Date.