WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Jacqueline Marcus

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                         :

In re                         :          **Chapter 11 Case No.**
                          :

**EXTENDED STAY INC., et al.,**   :          **09-13764 (JMP)**
                          :

         **Debtors.**         :          **(Jointly Administered)**
                          :

------------------------------------------------------------x

## NOTICE OF HEARING REGARDING DEBTORS' AMENDED MOTION PURSUANT TO SECTIONS 105 AND 363(b) OF THE BANKRUPTCY CODE APPROVING INVESTMENT AND STANDBY PURCHASE AGREEMENT

PLEASE TAKE NOTICE that a hearing on the annexed amended motion (the "Amended Motion") of Extended Stay Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to section 363(b) of chapter 11 of title 11 of the United States Code, seeking entry of an order authorizing certain Debtors to enter into the Investment and Standby Purchase Agreement, all as more fully described in the Amended Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court") on **April 8, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Amended Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to the chambers of the Honorable James M. Peck), and shall be served upon: (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Marcia L. Goldstein, Esq., and Jacqueline Marcus, Esq., attorneys for the Debtors; (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Paul Schwartzburg, Esq.; (iii) Hahn & Hessen LLP, attorneys for the Official Committee of Unsecured Creditors, 488 Madison Avenue, New York, NY 10022, Attn: Mark T. Power, Esq., Mark S. Indelicato, Esq. and Christopher Jarvinen, Esq.; and (iv) Greenberg Traurig, LLP, attorneys for Starwood ESH, L.L.C., 200 Park Avenue, New York, NY 10166, Attn: Bruce R. Zirinsky, Esq. and Gary Ticoll, Esq.; so as to be filed and received by no later than **April 2, 2010 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Amended Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.


Dated: March 17, 2010
      New York, New York


           /s/ Jacqueline Marcus

           Marcia L. Goldstein
           Jacqueline Marcus
           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           Telephone: (212) 310-8000
           Facsimile: (212) 310-8007

           Attorneys for Debtors
           and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Jacqueline Marcus
Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11 Case No.
                                          :
EXTENDED STAY INC., et al.,               :        09-13764 (JMP)
                                          :
            Debtors.                      :        (Jointly Administered)
                                          :
------------------------------------------------------------x
```

**DEBTORS' AMENDED MOTION PURSUANT TO SECTIONS 105**
**AND 363(b) OF THE BANKRUPTCY CODE APPROVING**
**INVESTMENT AND STANDBY PURCHASE AGREEMENT**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Extended Stay Inc. and its debtor affiliates, as debtors and debtors in possession

in the above-captioned chapter 11 cases (collectively, the "Debtors"),[1] submit this amended

motion (the "Amended Motion") and respectfully represent:

**The Starwood Agreements**

1. On February 19, 2010, the Debtors filed their original motion pursuant to

sections 105 and 363(b) of the Bankruptcy Code for an order authorizing Debtors to enter into an

investment and standby purchase agreement (the "Original Motion") [Docket No. 768]. The

---

[1] A list of the Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax
identification number, is attached hereto as "Exhibit A."

Original Motion sought approval of an investment agreement, entered into among certain Debtors and Centerbridge Partners, L.P. ("Centerbridge") and Paulson & Co. Inc. ("Paulson", and together with Centerbridge, the "Centerbridge Investors"), dated as of February 19, 2010 (as amended, the "Centerbridge Agreement"), which provided for a $450 million cash infusion by the Centerbridge Investors into the reorganized Debtors.  As a result of further discussions between the Debtors and the Centerbridge Investors, an amended commitment letter, together with a revised form of the Centerbridge Agreement, was filed with the Court on March 5, 2010 [Docket No. 798].

2.	Consistent with their fiduciary duties, the Debtors have continued to discuss the terms of a possible alternative transaction and related plan with Starwood ESH, L.L.C. (the "Starwood Investor"), the indirect members of which are (a) Starwood Global Opportunity Fund VIII, L.P., Starwood U.S. Opportunity Fund VIII-1, L.P., Starwood U.S. Opportunity Fund VIII-2, L.P., Starwood Capital Hospitality Fund II Global, L.P. and Starwood Capital Hospitality Fund II U.S., L.P. (all of which are affiliates of Starwood Capital Group Global, L.P.), (b) Five Mile Capital Partners II LP, FMCP II Principals LP and Five Mile Capital Partners II (AIV), LP (all of which are affiliates of Five Mile Capital Partners LLC) and (c) TPG Partners V, L.P. and TPG Partners VI, L.P. (which are affiliates of TPG Capital).

3.	The Debtors conducted their negotiations with the Starwood Investor, balancing the need to maintain the Centerbridge Agreement in the interim.  When virtually all of the terms of the Starwood Agreements (as defined below) were fully negotiated, the Debtors' board of directors convened to consider whether to proceed with the Starwood Agreements or continue to seek approval of the Centerbridge Agreement.  The Debtors' boards of directors determined that the terms of the Starwood Agreements taken as a whole, were more favorable to

the Debtors, their creditors and their estates than the Centerbridge Agreement. Consequently, on March 15, 2010, the Debtors terminated the Centerbridge Agreement and, later that same day, proceeded to sign the Commitment Letter, dated March 15, 2010, a copy of which is annexed hereto as <u>Exhibit B</u>[2] and the Investment and Standby Purchase Agreement, which is annexed as Exhibit A to the Commitment Letter (the "<u>Investment Agreement</u>" and, collectively with the Commitment Letter, the "<u>Starwood Agreements</u>").[3] Each of the indirect members of the Starwood Investor has provided the Debtors with a letter reflecting its several, not joint, commitment for the individual sponsor limit set forth on Schedule I to the Commitment Letter.

    4.    The Starwood Agreements provide substantially more value and flexibility to the Debtors' creditors and estates than the Centerbridge Agreement. Moreover, the Starwood Agreements provide for an investment of up to $905 million by the Starwood Investor, which substantially exceeds the $450 million investment set forth in the Centerbridge Agreement. The $905 million amount consists of (a) a $450 million equity investment (the "<u>Investment</u>"), (b) a $200 million rights offering (the "<u>Rights Offering</u>") that is fully backstopped by the Starwood Investor (the "<u>Backstop Commitment</u>"), and (c) up to $255 million to be made available to the holders of certificates secured by the $4.1 billion mortgage loan (the "<u>Certificates</u>") in Classes B through H Mortgage, to the extent that such certificate holders would prefer to receive cash in

---

[2] The attached Investment Agreement does not include the Disclosure Schedules (as defined therein), which are voluminous.

[3] Blacklined copies of the Starwood Agreements that reflect the changes from the corresponding documents filed in connection with the Centerbridge Agreement, will be provided by the Debtors' attorneys to parties in interest in these cases, upon e-mail request therefor, sent to Duke.amponsah@weil.com.

lieu of the equity offered under the Starwood Agreements (the ("Cash Election Commitment").[4] Importantly, the Starwood Agreements permit the Debtors to entertain higher and better offers, thus creating an even higher floor for competing bids.

5.      Although the merits of the amended plan of reorganization (the "Amended Plan") underlying the Starwood Agreements are not currently before the Court, for the convenience of the Court and all parties in interest, the Debtors note the following significant differences between the Starwood Agreements and the Centerbridge Agreement, in addition to the different amounts of the Investment and the Rights Offering:

- the Amended Plan includes all of the Debtors other than Extended Stay Inc. (the "Plan Debtors");

- the Amended Plan provides for a potential recovery for *all* creditors of the Plan Debtors, including all holders of mortgage certificates, all holders of mezzanine debt and all general unsecured creditors, whether in the form of debt, equity, cash or sub-equity and whether the Amended Plan is confirmed consensually or non-consensually, as set forth in detail in the Amended Plan;

- the Amended Plan provides for a cash paydown of $200 million to the holders of Class A4 certificates;

- the Amended Plan provides for $2.823 billion of new mortgage debt (after the cash paydown to the holders of the A4 Certificates, as described below) which allows for distributions to more holders of mortgage certificates;

- the Amended Plan provides for increased optionality with respect to the form of consideration received by the holders of the Class B - H mortgage certificates. Such certificate holders have the ability to elect new debt, new equity or a combination thereof; provided that claims representing 50% of the Class B - H Certificates, in the aggregate, receive new debt and claims representing 50% of the Class B - H Certificates, in the aggregate, receive new equity. Moreover, the holders of the Class B - H mortgage certificates also have the option of receiving cash in lieu of new equity;

---

[4] This cash amount is sufficient to allow all holders of the Class B - H mortgage certificates (other than any such certificates held by the Starwood Investor or its affiliates) to elect to receive cash in lieu of the equity offered under the Starwood Agreements.

- the Amended Plan provides an opportunity for the holders of Class J - M Certificates and the mezzanine lenders to realize recoveries through sub-equity distributions from future capital events pursuant to the waterfall that is set forth as Exhibits I and J to the Amended Plan;

- the Amended Plan provides for a distribution of sub-equity to holders of Class J through Class M mortgage certificates and holders of all mezzanine facility claims, even if the Amended Plan is confirmed pursuant to section 1129(b) of the Bankruptcy Code;

- the Amended Plan does not release David Lichtenstein from liability for claims arising from his guarantees of the Mortgage Loan or the Mezzanine Loans;

- the Amended Plan provides for payment of an annual management fee to the an affiliate of Starwood Capital Group based on the Committed Proceeds and incentive compensation to such affiliate of Starwood Capital Group for the NewCo Common Interests purchased as a result of the Investment, but not paid by the equity provided to existing stakeholders; and

- the Starwood Agreement provides for payment of fees relating to the Cash Election Commitment, which could be as much as 3% of the Cash Election Commitment (the "Cash Election Commitment Fee"), which fee is payable if the Amended Plan becomes effective.

6.      Like the Centerbridge Agreement, the Starwood Agreements impose

several time constraints on the Debtors.  The following milestones must be achieved by the

Debtors in order to preclude the Starwood Investor from terminating the Starwood Agreements:

- the Debtors must file this Amended Motion on or before 5:00 p.m. on March 18, 2010

- the Debtors must file the Amended Plan on or before March 22, 2010

- the Debtors must file an amended disclosure statement pertaining to, and consistent with, the Amended Plan (the "Amended Disclosure Statement") on or before March 26, 2010

- the hearing with respect to this Amended Motion (the Approval Hearing") must occur on or before April 8, 2010

- the Court must enter an order, substantially in the form attached hereto as Exhibit C (the "Proposed Order") on or before April 9, 2010

- the hearing on the Amended Disclosure Statement must occur by April 26, 2010

- the Court must enter an order approving the Amended Disclosure Statement within three business days of the hearing on the adequacy of the information contained therein

- the confirmation hearing must occur by June 4, 2010

- the effective date of the Amended Plan must occur within 15 days after the confirmation hearing

7. Consequently, in order to comply with the proposed timetable, take advantage of an offer that is markedly higher and better than the transaction reflected in the Centerbridge Agreement, and continue the process that will result in a successful conclusion of these chapter 11 cases, the Debtors request that the Court approve the Starwood Agreements.

## Background

8. Each of the Debtors commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on either June 15, 2009, or February 18, 2010 (as applicable, the "Commencement Date"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9. On June 19, 2009, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee"). On September 28, 2009, Ralph R. Mabey was appointed examiner in these chapter 11 cases (the "Examiner")

and by order dated September 29, 2009, the Court approved the appointment of the Examiner. The Examiner's report was filed, under seal, on March 12, 2010.

## Jurisdiction and Venue

10.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Extended Stay's Business

11.    Extended Stay is the largest owner and operator of mid-price extended stay hotels in the United States, holding one of the most geographically diverse portfolios in the lodging sector with properties located across 44 states and two provinces in Canada.  Extended Stay's portfolio encompasses over 666 properties, consisting of hotels directly owned or leased by Extended Stay or one of its affiliates.  Extended Stay currently operates five hotel brands: (i) Crossland Economy Studios, (ii) Extended Stay America, (iii) Extended Stay Deluxe, (iv) Homestead Studio Suites, and (v) StudioPLUS Deluxe Studios, each designed to appeal to value-conscious customers at different price points in their respective markets, and offering Extended Stay guests a range of amenities and services.

12.    Extended Stay's business model is a hybrid between a hotel and an apartment, as it provides value-conscious guests seeking longer-term accommodations with an affordable, attractive alternative to traditional hotels and apartments.  Extended Stay achieves lower operating costs than traditional hotels, which provide higher service levels such as room service and daily maid service, by eliminating these services and other amenities in exchange for a lower per night price and a fully equipped kitchen, cable TV, and wireless internet access in each of its available rooms, in addition to on site laundry facilities.  Typical Extended Stay guests include government and business travelers, people on temporary work assignments or

training programs, individuals relocating or purchasing a home and individuals with other short-term housing needs.

13.     All Extended Stay hotels are managed by HVM L.L.C. ("<u>HVM</u>"), and HVM, on behalf of Extended Stay, pays all property level expenses of the hotels, contracts with service providers and purchases all goods and materials utilized in the operation of the business. HVM employs approximately 9,000 employees in connection with the operation of the hotels at any given point in time.

**<u>Relief Requested</u>**

14.     Pursuant to sections 105 and 363(b) of the Bankruptcy Code, the Debtors seek approval of the Starwood Agreements, including without limitation, (a) the Debtors' payment to the Starwood Investor of all consideration and fees contemplated under the Investment Agreement, including the Commitment Payment (as defined hereinafter), the Expense Reimbursement (as defined hereinafter) and the Cash Election Commitment Fee (as defined hereinafter), and (b) the Minimum Overbid Amount (as defined hereinafter). In addition, the Debtors request that the Court determine that any amounts that the Debtors are obligated to pay to the Starwood Investor (as defined hereinafter) on account of the Commitment Payment and the Expense Reimbursement, be allowed as administrative expenses of the Debtors' estates. To implement the relief requested as soon as practicable, the Debtors also request a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## The Investment Agreement[5]

15.      The Investment Agreement has three principal components:  (i) the Investment, (ii) the Rights Offering and Backstop Commitment, and (iii) the Cash Election Commitment.  Although the Investment Agreement contemplates that the foregoing components would be implemented pursuant to and in accordance with the terms of the Amended Plan, the approval sought herein does not constitute actual or *de facto* approval of the terms of the Amended Plan.  Instead, the Amended Plan and the Amended Disclosure Statement will be subject to all of the procedures and protections provided in the Bankruptcy Code, including, without limitation, sections 1125 and 1129.  In the immediate future, the Debtors intend to file the Amended Plan, together with a motion requesting that the Court extend a date for the filing of the Amended Disclosure Statement.[6]  The Debtors intend to file the Amended Disclosure Statement, that provides adequate information about the Amended Plan, on or before March 26, 2010.

16.      Pursuant to the terms of the Investment Agreement, the Starwood Investor will make the Investment of $450 million to purchase 42.85% of the common interests (the

---

[5] The following is a summary of the terms of the Investment Agreement and should not be construed to modify or amend such agreement.  The actual terms of the Investment Agreement will govern in all instances.  The description of the terms of the Investment Agreement presumes that the Plan will be confirmed on a consensual basis.  Alternate terms that would apply if the Plan is confirmed pursuant to Section 1129(b) of the Bankruptcy Code are described in the Plan and the Investment Agreement.

[6] The Amended Plan effectively replaces the Debtors' First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code, filed in connection with the Centerbridge Agreement, on March 5, 2010 (the "First Amended Plan") [Docket Nos. 769 and 797].  Accordingly, the Debtors have cancelled the previously scheduled hearing for approval of the disclosure statement relating to the First Amended Plan [Docket No. 846].

"NewCo Common Interests") in the entity that will be the parent company of the Debtors ("NewCo").[7]

17.     The Investment Agreement includes the Starwood Investor's Backstop Commitment for the $200 million Rights Offering, which will be made available to the holders of Certificates in Classes B through K.  The rights that the Starwood Investor has agreed to purchase under the Backstop Commitment , to the extent such rights are not exercised, represent an additional 19.04% of the NewCo Common Interests.

18.     In addition to the Investment and the Backstop Commitment, the Investment Agreement provides for the Cash Election Commitment of up to $255,400,000, to be used by the Starwood Investor to purchase the NewCo Common Interests at a 30% discount to the accreted amount thereof estimated as of June 30, 2010, directly from holders of Class B through H Certificates who elect to receive cash in lieu of NewCo Common Interests. Accordingly, in the aggregate, the Starwood Investor is willing to commit to investing up to $905,400,000 in connection with the Backstop Commitment, the Rights Offering and the Cash Election Commitment.

19.     Notably, the Investment Agreement does not preclude the Debtors from negotiating with other potential plan sponsors; in fact, it specifically contemplates that the Debtors might elect to proceed with an alternate transaction, thereby increasing the distributions available for their stakeholders.  The Investment Agreement does not preclude the Debtors from continuing discussions with the Centerbridge Investors or with any other potential interested

---

[7] The Starwood Investor has reserved its right to cut back the size of the Rights Offering to the extent that the Starwood Investor and its affiliates would hold less than 51% of the NewCo Common Interests. Based upon current holdings of indebtedness by affiliates of the Starwood Investor, it is anticipated that the Starwood Investor and its affiliates would own in excess of 51% of the NewCo Common Interests upon consummation of the Plan, without taking into account any NewCo Common Interests that may be acquired as a result of the Backstop Commitment.

parties, but it does include provisions for payment of the Commitment Payment, and the Expense Reimbursement, and require a Minimum Overbid Amount , all of which are defined and described below.

### *The Commitment Payment, Waiver and Minimum Overbid Amount*

        20.     In return for the Investment and the Backstop Commitment, the Debtors have agreed to make a non-refundable payment to the Starwood Investor in the amount of $19,500,000, or three percent (3%) of the Investment and Backstop Commitment (the "Commitment Payment"). The percentage of the Commitment Payment compares favorably to the commitment payment set forth in the Centerbridge Agreement, and falls squarely within the parameters set forth by governing case law. The Debtors note that, while the dollar amount of the Commitment Payment is only slightly less than the proposed commitment payment required under the Centerbridge Agreement, due to the fact that the Committed Payment under the Starwood Agreements is based upon a $650 million Investment and Backstop Commitment as compared to a $450 million investment and backstop commitment under the Centerbridge Agreement. The Commitment Payment shall be fully earned upon the entry of the Proposed Order; *provided that* the Starwood Investor will waive payment of the Commitment Payment if (a) the Effective Date occurs and the Investment and Rights Offering close, or (b) the Starwood Investor materially breaches the Investment Agreement, or terminates the Investment Agreement due to the Debtors' inability to satisfy conditions relating to the form and substance of the order confirming the Plan, the organizational structure of the transactions or of the Debtors or NewCo on and after the Effective Date, or the accuracy of certain ERISA representations, in which case the Starwood Investor would only be entitled to the Expense Reimbursement (as defined hereinafter) (collectively, the "Waiver"). *See* Investment Agreement, §5.1.

21.     Pursuant to the Investment Agreement, if the Waiver of the Commitment Payment does not occur, the Commitment Payment is due and payable in full, in cash within fifteen (15) days of either (i) the Debtors' delivery of written notice to the Starwood Investor that the Debtors have determined to enter into an alternate transaction (subject to the Starwood Investor's right to elect to receive the Commitment Payment in equity of the reorganized Debtors or such entity that emerges from the chapter 11 cases pursuant to and upon the effective date of the alternative transaction, upon the Debtors' consent, as set forth in § 15.7(a)(i) of the Agreement); (ii) the Starwood Investor's delivery of written notice to the Debtors of the entry of an order in these chapter 11 cases approving a sale under section 363 of the Bankruptcy Code, under a plan of reorganization or otherwise, or granting a lifting of the stay that would permit a deed-in-lieu or other taking collateral in satisfaction; (iii) the Starwood Investor's delivery of written notice to the Debtors of the entry of an order confirming a plan of reorganization that is not supported by the Debtors and that provides for an alternate transaction; or (iv) the Starwood Investor's delivery of written notice to the Debtors of the termination of the Investment Agreement due to the Debtors' breach of their obligations under the Investment Agreement or failure to satisfy any of the conditions precedent to closing as set forth in the Plan or the Investment Agreement.  However, if the conditions to the Investment Agreement cannot be satisfied through no fault of the Debtors or the Investor, then the Commitment Payment shall be payable on the *later* of (x) fifteen (15) days from the Debtors' receipt of written notice from the Starwood Investor or (y) the date that the Debtors' available cash, after payment of the Commitment Payment, would be at least $22.5 million (the "Cash Threshold"), but in any event no later then the Debtors' emergence from bankruptcy.[8]  *See* Investment Agreement, §15.7.

---

8 The Cash Threshold is calculated in the same manner as under the Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay, dated July 23,

Thus, the Starwood Investor has agreed to the same exclusions agreed to by the Centerbridge Investors.

22.     If the Proposed Order is granted, any alternate transaction accepted by the Debtors would have to provide value that is greater than the sum of (a) the aggregate amount of consideration to be distributed to all creditors of the Debtors (including, without limitation, all cash, notes, equity, and sub-equity consideration) pursuant to the Plan plus (ii) $50 million (the "Minimum Overbid Amount"). *See* Investment Agreement, § 8.1. In addition, in the Commitment Letter the Debtors have agreed that if they accept an offer that is less than the Minimum Overbid Amount before the Court grants the relief requested in this Amended Motion, then the Debtors will seek authorization to pay the Starwood Investor its Expense Reimbursement, subject to a cap of $10 million.

### ***The Expense Reimbursement and Other Protections***

23.     Upon the entry of the Proposed Order, and every thirty (30) days thereafter, the Debtors will be obligated to reimburse the Starwood Investor for all reasonable costs, fees and expenses incurred by the Starwood Investor and/or its professionals in connection with the Investment Agreement and the Amended Plan. To the extent that the Commitment Payment is due and owing under the Investment Agreement, any fees and expenses (other than those fees and expenses incurred by the Starwood Investor and its advisors in connection with any litigation relating to the Investment Agreement, the Investment, the Rights Offering, the Backstop Commitment and the Plan) exceeding $10 million shall be credited against any Commitment Payment subsequently payable by the Debtors (the "Expense Reimbursement").

---

2009 [Docket No. 2051], as amended by the Stipulation, Agreement and Order Between the Debtors and the Mortgage Debt Parties Modifying Final Cash Collateral Order, dated December 15, 2009 [Docket No. 634].

*See* Investment Agreement, §§ 5.2 and 5.3.  The Expense Reimbursement is not payable if the

Debtors terminate the Investment Agreement based on the Starwood Investor's material breach.

*See* Investment Agreement, § 5.2.

      24.     The Investment Agreement also provides that, in certain circumstances in

which the Starwood Investor terminates the Investment Agreement, in which the Commitment

Payment is not due but the Expense Reimbursement is required, the amount of the Expense

Reimbursement shall be limited to $10 million.  *See* Investment Agreement, § 5.2

      25.     Finally, the Investment Agreement further provides that the Debtors will

indemnify the Starwood Investor and certain affiliated parties and agents from any losses claims

and damages arising out of or related to the Investment Agreement, the Investment, the Rights

Offering, the Backstop Commitment or the Plan.  *See* Investment Agreement, § 16.

### *The Cash Election Commitment Fee*

      26.     The Starwood Agreements include an additional element of cost for the

Debtors' estates that is not present in the Centerbridge Agreements, however, such additional

cost only exists upon the closing of the Starwood Agreements.  Pursuant to the Investment

Agreement, the Starwood Investor will receive a Cash Election Commitment Fee equal to the

sum of (i) $5,108,000, which is equal to 2.0% of the Cash Election Commitment, and (ii) 1.0%

of the amount of the Cash Election Commitment actually paid by the Starwood Investor under

the Cash Election Commitment.  *See* Investment Agreement, § 5.1.  For illustrative purposes, if

the entire amount of the Cash Election Commitment were fully funded by the Investor, then the

Debtors would be obligated to pay the Investor the sum of $7,662,000.  Unlike the Commitment

Payment and the Backstop Commitment, the Cash Election Commitment Fee shall be fully

earned only upon the entry of the order confirming the Plan and shall be paid to the Starwood

Investor in cash only upon the closing of the transactions contemplated in the Investment Agreement.

27.     The Cash Election Commitment Fee will not be payable unless and until the Amended Plan is confirmed and consummated.  Nevertheless, because payment of the Cash Election Commitment Fee at such time is a condition to the obligations of the Starwood Investor, the Debtors submit that the Cash Election Commitment Fee should be approved at this time.

### *Other Terms: HVM Manager and Management*

28.     The Investment Agreement also contemplates the transfer of control of HVM, which is a condition precedent to the closing of the Investment Agreement.  The Starwood Investor, the Debtors and David Lichtenstein have entered into a Membership Investment Purchase Agreement, dated March 15, 2010, pursuant to which David Lichtenstein has agreed to sell HVM Manager L.L.C., or control of HVM, to the Starwood Investor for the sum of $40 million to be paid from the Investment.  As noted above, unlike the Centerbridge Plan, the Amended Plan does not contemplate the release of any claims against David Lichtenstein relating to the non-recourse carve-out guarantees he executed in connection with the Mortgage Loan and the Mezzanine Loans.

29.     Like the Centerbridge Agreement, the Starwood Agreements contemplate that the Starwood Investor may renegotiate the management agreements pursuant to which HVM manages the Extended Stay hotels, and also contemplates that new arrangements will be made with members of senior management of HVM.  At present, no such agreements exist and the Debtors anticipate that there will be an arms' length negotiation between the Starwood Investor and members of HVM's management in the future.  Notably, satisfaction of the Starwood

Investor with the terms of such negotiations is not a condition to closing under the Starwood

Agreements. *See* Investment Agreement, § 11.3.

**Approval of the Investment Agreement is Warranted and is in the Best**
**Interests of the Debtors and their Estates**

30. The Debtors seek authority to enter into the Investment Agreement and to

pay the Commitment Payment, the Expense Reimbursement and the Cash Election Commitment

Fee on the terms set forth in the Investment Agreement, to compensate the Starwood Investor for

committing to the Investment, the Backstop Commitment and the Cash Election Commitment,

and for their significant time and expenses incurred. Approval of the Commitment Payment, the

Expense Reimbursement and the Cash Election Commitment Fee is warranted in the instant

situation because of (i) the significant benefit to the estates of having a definitive agreement with

a plan sponsor willing to commit as much as $905 million to fund the Plan, (ii) the significant

time, effort, and substantial costs the Starwood Investor has incurred and will incur in connection

with conducting due diligence and negotiating the Starwood Agreements and related Amended

Plan and Amended Disclosure Statement, (iii) the risk to the Starwood Investor that the Debtors

may ultimately enter into an alternate transaction with another party, and (iv) the benefits to the

Debtors' estates resulting from having the terms of the Starwood as a floor bid for further offers.[9]

31. The Debtors fully support the restructuring transactions set forth in the

Investment Agreement. The provisions of the Investment Agreement that provide for the

Commitment Payment, the Expense Reimbursement and the Cash Election Commitment Fee

have been heavily negotiated for and are bargained-for and integral parts of the transactions

specified in the Investment Agreement. The Debtors have been advised that, without such

---

[9] Indeed, the Debtors hope that others may attempt to outbid the Starwood Investor and sponsor a further
revised plan for the Debtors.

inducements, the Starwood Investor would not have agreed to provide the Investment, the Backstop Commitment, and the Cash Election Commitment. The Investment Agreement provides the Debtors with a capital infusion of $650 million, to be used for distributions to creditors and/or to operate their business post confirmation. The Debtors believe that the Commitment Payment, the Expense Reimbursement, the Cash Election Commitment Fee and the Overbid Amount (collectively, the "Bid Protections"), while not insignificant, are reasonable in light of the magnitude of the transaction and the tangible benefit to the Debtors of having a sponsor that is committed to funding the Amended Plan. If the Bid Protections are not approved, the Debtors' access to the Starwood Investor's $905 million – more than double the amount of the cash investment proposed by the Centerbridge Investors -- will be jeopardized. Accordingly, approval of the Bid Protections is necessary to the Debtors' reorganization and to preserve and enhance the value of the Debtors' estates.

32.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Furthermore, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

33.     Historically, bankruptcy courts have approved protections similar to the Bid Protections by deferring to the business judgment of the debtor's board of directors. In essence, the "business judgment rule" discourages judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. When considering a transaction outside the ordinary course of business, courts in the Second Circuit, and others, require that such transaction be based upon the sound business judgment of

the debtor.  *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In Re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986).

34.     It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

35.     The Debtors submit that the 3% Commitment Payment, which is the product of extended, good faith, arm's length negotiations between the Debtors and the Starwood Investor, is reasonable and customary given the type of transaction, the size of these chapter 11 cases, and the complexity of the Debtors' structure.  Approval of commitment fees, break-up fees and expense reimbursements as a form of protection in connection with these types of restructuring transactions has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale or investment to a contractually committed buyer or investor at a price the debtor believes is fair, while still providing the debtor with the potential of obtaining

an enhanced recovery in the event a superior proposal is received. *See, e.g.*, *In re Premier International Holdings Inc.*, Case No. 09-12019 (CSS) (Bankr. D. Del. December 18, 2009) (Docket No. 1235) (approving a 5% commitment fee and expense reimbursement on a $450 million rights offering); *In re Dayton Superior Corporation*, Case No. 09-11351 (BLS) (Bankr. D. Del. August, 24, 2009) (Docket No. 480) (approving a 3% commitment fee and expense reimbursement on a $100 million rights offering); *In re Landsource Communities Development LLC*, Case No. 08-11111 (KJC) (Bankr. D. Del. June 2, 2009) (Docket No. 1762) (approving a 5% commitment fee and expense reimbursement on a $140 million total rights offering); *In re Fortunoff Fine Jewelry and Silverware, LLC*, Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. February 22, 2008) (Docket No. 190) (approving break-up fee and expense reimbursement of $2,250,000 and $1,000,000 respectively, on a proposed $80 million purchase price); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395(BRL) (Docket No. 269) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement in the amount of $10 million and $3 to 5 million respectively, on a $233.6 million proposed purchase price); *In re G+G Retail, Inc.*, Case No. 06-10152 (RDD) (Docket No. 58) (Bankr. S.D.N.Y. Jan. 30, 2006) (approving a $456,000 break-up fee on a $15.2 million proposed purchase price); *In re Footstar, Inc.* Case No. 04-22350 (ASH) (Docket No. 316) (Bankr. S.D.N.Y. Apr. 6, 2004) (authorizing the debtors to enter into purchase agreements with break-up fees); *In re Twinlab Corp., et al.*, Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (Docket No. 81) (approving a $3,435,000 break-up fee and reasonable expense reimbursement on a proposed purchase price of $68.7 million); *In re Adelphia Business Solutions, Inc., et al.*, Case No. 02-11389 (REG) (Docket No. 833) (Bankr. S.D.N.Y. 2002) (approving a break-up fee and expense reimbursement in the amount of $50,000 and $30,000 respectively, in a $2,450,000 proposed purchase price).

Accordingly, the Commitment Payment is within the range of percentage fees paid in similar transactions. The Starwood Investor's agreement to the Waiver ensures that no amounts beyond the Expense Reimbursement and the Cash Election Commitment Fee amounts are paid to the Starwood Investor if the Plan is confirmed, enabling the estates to retain the full value of the Investment.

36.     As the United States District Court for the Southern District of New York held in *Integrated Resources, supra*:

> The appropriate question is whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders.

147 B.R. at 662. In the instant case, the Commitment Payment Cash Election Commitment Fee serve all three functions.

37.     The Minimum Overbid Amount is a condition required by the Starwood Investor in order to proceed with the transaction. The Minimum Overbid Amount ensures that the Debtors will realize more than enough proceeds from an alternate transaction to satisfy their obligations to pay the Starwood Investor the Commitment Payment and the Expense Reimbursement. In addition, the Minimum Overbid Amount provides assurance that the Debtors' estates will not have to endure the time, expense, and delay associated with accepting an alternate transaction, unless the terms of the alternate transaction are materially better than the terms provided in the Starwood Agreements. Minimum overbids have been regularly approved by courts in the context of sales effected pursuant to section 363 of the Bankruptcy Code. *See, e.g., In re: Chrysler LLC*, Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. May 7, 2009) (Docket No. 492) (requiring minimum overbids to exceed purchaser's initial offer of $2 billion by at least $100 million or 5%); *In re Calpine Corporation*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y.

February 7, 2007) (Docket No. 3617) (requiring an initial minimum overbid amount to exceed purchaser's initial offer of $200 million by $500,000 or 5%); *In re Colony Hill Assocs.,* 111 F.3d 269, 271 (2d Cir. 1997) (requiring minimum overbids to exceed purchaser's initial offer of $7.5 million by at least $650,000 or 8.6%); *In re Financial News Network,* 980 F.2d 165, 166-67 (requiring minimum overbids to exceed purchaser's offer of $105 million by at least $10 million or 9.5%); *In re Tempo Technology Corp.,* 202 B.R. 363, 369 (D. Del. 1996) (requiring minimum overbids of $1.4 million in cash where original purchase price was $150,000 cash plus $3 million in stock of the purchaser and $500,000 of assumed liabilities); *In re Wintex, Inc.,* 158 B.R. 540, 543 (D. Mass. 1992) ("Debtor may avoid the increased costs and complexity associated with considering additional bids for sale of debtor's property unless the additional bids are high enough to justify their pursuit. The 10% increase requirement is one example of a reasonable litmus test."). The Debtors believe that this Minimum Overbid Amount is both reasonable and necessary to enable the Debtors to maximize the value of their assets as well as encourage a competitive sale process.

38. The Debtors' entry into the Investment Agreement and the payment of the Commitment Payment, the Expense Reimbursement and the Cash Election Commitment Fee under the terms and conditions provided in the Investment Agreement, are within the Debtors' business judgment, and are in the best interests of the Debtors, their estates, and all parties in interest therein because such reimbursement will allow the Debtors to proceed with a plan that (i) if consummated would adequately capitalize the Debtors' business with at least $650 million in committed financing and provide a path for the Debtors' emergence from chapter 11 in the near term, (ii) provides an option for certain holders of Certificates to monetize their claims and

receive cash upon the effective date, rather than the new equity; (iii) delivers significant value to creditors; and (iv) is subject to higher and better offers, thus creating a floor for competing bids.

39.     Based upon the foregoing, the Debtors submit that a sound business justification exists to authorize the Debtors to enter into the Investment Agreement, including the Bid Protection provisions thereof, and the Amended Motion should be granted.

### The Commitment Payment and the Expense Reimbursement Should Constitute Allowed Administrative Expenses Pursuant to Section 503(b) of the Bankruptcy Code

40.     Section 503(b)(1)(A)(i) of the Bankruptcy Code provides that

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502 (f) of this title, including—
(1)(A) the actual, necessary costs and expenses of preserving the estate . . . .

41.     The Commitment Payment and the Expense Reimbursement are necessary in order to persuade the Starwood Investor to sponsor the Amended Plan.  In the event that the Commitment Payment and/or the Expense Reimbursement become payable under the terms of the Investment Agreement, such expenses should be allowed administrative expenses of the Debtors' estates.

### Relief Under Bankruptcy Rule 6004(h)

42.     The Debtors hereby request relief from Bankruptcy Rule 6004(h), which provides that an "order authorizing the use . . . of property . . . is stayed until expiration of 14 days after entry of the order, unless the Court orders otherwise."  Fed. R. Bank. P. 6004(h).

## <u>Notice</u>

43.     No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the order entered

on July 17, 2009 governing case management and administrative procedures for these cases

[Docket No. 176] on (i) the U.S. Trustee, (ii) the attorneys for the Creditors' Committee, (iii) the

Special Servicer, and (iv) all parties who have requested notice in these chapter 11 cases.  The

Debtors submit that no other or further notice need be provided.

WHEREFORE the Debtors respectfully requests that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated: March 17, 2010
       New York, New York

/s/ Jacqueline Marcus
Marcia L. Goldstein
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession