**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
                                                    :
**In re**                                           :   **Chapter 11 Case No.**
                                                    :
**EXTENDED STAY INC., et al.,**                     :   **09-13764 (JMP)**
                                                    :
**Debtors.**                                        :   **(Jointly Administered)**
                                                    :
--------------------------------------------------------------------x

## DEBTORS' THIRD AMENDED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors
and Debtors in Possession

Dated: March 24, 2010

**TABLE OF CONTENTS**

Page

ARTICLE I    DEFINITIONS ...................................................................................................1

    A.    Defined Terms .....................................................................................................1

        1.1    Administrative Bar Date Order ...........................................................1

        1.2    Administrative Expense Claim.............................................................1

        1.3    Administrative Expense Creditor .........................................................1

        1.4    Administrative Expense Objection Deadline .......................................1

        1.5    Affiliate ...............................................................................................1

        1.6    Allowed ...............................................................................................1

        1.7    Allowed Amount ..................................................................................2

        1.8    Ballot ...................................................................................................2

        1.9    Bankruptcy Code..................................................................................3

        1.10    Bankruptcy Court..................................................................................3

        1.11    Bankruptcy Rules .................................................................................3

        1.12    BHAC ...................................................................................................3

        1.13    BHAC IP ..............................................................................................3

        1.14    BHAC License Agreements ..................................................................3

        1.15    BHAC IP Transfer Agreement .............................................................3

        1.16    Business Day.........................................................................................3

        1.17    Cash ......................................................................................................3

        1.18    Cash Collateral Order ..........................................................................3

        1.19    Certificates ...........................................................................................3

        1.20    Chapter 11 Cases ..................................................................................3

        1.21    Claim ....................................................................................................3

        1.22    Class .....................................................................................................3

        1.23    Class A1 Mortgage Certificates ...........................................................3

        1.24    Class A1 - F Mortgage Certificates ......................................................4

        1.25    Class A2 Mortgage Certificates ...........................................................4

        1.26    Class A3 Mortgage Certificates ...........................................................4

        1.27    Class A4 Cash Paydown.......................................................................4

        1.28    Class A4 Mortgage Certificates ...........................................................4

        1.29    Class B Mortgage Certificates .............................................................4

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

i

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| 1.30 | Class B - H Debt/Equity Election | 4 |
| 1.31 | Class B - H Election Date | 4 |
| 1.32 | Class B - H Elections | 4 |
| 1.33 | Class B - H Equity Cashout Option | 4 |
| 1.34 | Class B - H Equity Cashout Option Election | 5 |
| 1.35 | Class B - H Mortgage Certificates | 5 |
| 1.36 | Class B - H Mortgage Debt | 5 |
| 1.37 | Class B - K Mortgage Certificates | 5 |
| 1.38 | Class C Mortgage Certificates | 5 |
| 1.39 | Class D Mortgage Certificates | 5 |
| 1.40 | Class E Mortgage Certificates | 5 |
| 1.41 | Class F Mortgage Certificates | 5 |
| 1.42 | Class G Alternate Note Balance | 5 |
| 1.43 | Class G Alternate Note Proportion | 5 |
| 1.44 | Class G Mortgage Certificates | 5 |
| 1.45 | Class H Mortgage Certificates | 5 |
| 1.46 | Class J Mortgage Certificates | 5 |
| 1.47 | Class K Mortgage Certificates | 6 |
| 1.48 | Class L Mortgage Certificates | 6 |
| 1.49 | Class M Mortgage Certificates | 6 |
| 1.50 | Commencement Date | 6 |
| 1.51 | Confirmation Date | 6 |
| 1.52 | Confirmation Order | 6 |
| 1.53 | Contingent Claim | 6 |
| 1.54 | Creditor | 6 |
| 1.55 | Creditors' Committee | 6 |
| 1.56 | Debtors | 6 |
| 1.57 | Debtor in Possession | 6 |
| 1.58 | Disallowed Claim | 6 |
| 1.59 | Disbursing Agent | 6 |
| 1.60 | Disclosure Statement | 6 |

# TABLE OF CONTENTS
## (continued)

1.61    Disputed Claim ..................................................................................... 6

1.62    Distribution ........................................................................................... 7

1.63    Distribution Date ................................................................................... 7

1.64    Effective Date ....................................................................................... 7

1.65    Election Form ........................................................................................ 7

1.66    Election Period ...................................................................................... 7

1.67    Equity Interest ....................................................................................... 7

1.68    ESA Canada Properties Borrower Interests ......................................... 7

1.69    ESA Canada Properties Interests .......................................................... 7

1.70    ESA MD Borrower Interests ................................................................. 7

1.71    ESA MD Properties Trust Certificate ................................................... 7

1.72    ESA P Portfolio MD Borrower Interests .............................................. 7

1.73    ESA P Portfolio MD Trust Certificate .................................................. 8

1.74    ESA UD ................................................................................................. 8

1.75    ESA UD Mortgage Claim ..................................................................... 8

1.76    ESA UD Mortgage Facility ................................................................... 8

1.77    Escrow Account ..................................................................................... 8

1.78    ESH/ESA General Partnership Interests ............................................... 8

1.79    ESH/TN Properties Membership Interest .............................................. 8

1.80    ESI ......................................................................................................... 8

1.81    Estate ..................................................................................................... 8

1.82    Estimated Amount ................................................................................. 8

1.83    Excess Equity ........................................................................................ 8

1.84    Existing Equity ...................................................................................... 8

1.85    Existing Letters of Credit ...................................................................... 9

1.86    Expiration Date ...................................................................................... 9

1.87    Final Distribution Date .......................................................................... 9

1.88    Final Order ............................................................................................ 9

1.89    G&A Reimbursement Agreements ........................................................ 9

1.90    General Unsecured Claims .................................................................... 9

1.91    Guaranty ................................................................................................ 9

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 1.92 | Guaranty Claim | 9 |
| 1.93 | Homestead | 9 |
| 1.94 | HVM | 9 |
| 1.95 | HVM Manager | 10 |
| 1.96 | HVM Manager Owner | 10 |
| 1.97 | Impaired | 10 |
| 1.98 | Initial Distribution Date | 10 |
| 1.99 | Intellectual Property | 10 |
| 1.100 | Internal Revenue Code | 10 |
| 1.101 | Investment | 10 |
| 1.102 | Investment and Standby Purchase Agreement | 10 |
| 1.103 | Investor | 10 |
| 1.104 | IRS | 10 |
| 1.105 | M1 Mezzanine Facility Claims | 10 |
| 1.106 | M2 Mezzanine Facility Claims | 10 |
| 1.107 | M3 Mezzanine Facility Claims | 10 |
| 1.108 | M4 Mezzanine Facility Claims | 11 |
| 1.109 | M5 Mezzanine Facility Claims | 11 |
| 1.110 | M6 Mezzanine Facility Claims | 11 |
| 1.111 | M7 Mezzanine Facility Claims | 11 |
| 1.112 | M8 Mezzanine Facility Claims | 11 |
| 1.113 | M9 Mezzanine Facility Claims | 11 |
| 1.114 | M10 Mezzanine Facility Claims | 11 |
| 1.115 | Merrill Swap Agreement | 11 |
| 1.116 | Mezzanine Facilities | 12 |
| 1.117 | Mezzanine Facilities Claims | 12 |
| 1.118 | Mortgage Certificate | 12 |
| 1.119 | Mortgage Facility | 12 |
| 1.120 | Mortgage Facility Claim | 12 |
| 1.121 | Mortgage Facility Deficiency Claim | 12 |
| 1.122 | New Alternate Mortgage Loan | 12 |

# TABLE OF CONTENTS
## (continued)

1.123    New Alternate Notes ........................................................................ 12

1.124    New B – H Rights .......................................................................... 12

1.125    New Class A1 Mortgage Notes ...................................................... 12

1.126    New Class A2 Mortgage Notes ...................................................... 13

1.127    New Class A3 Mortgage Notes ...................................................... 13

1.128    New Class A4 Mortgage Notes ...................................................... 13

1.129    New Class B Mortgage Notes ........................................................ 13

1.130    New Class B - H Mortgage Notes .................................................. 13

1.131    New Class C Mortgage Notes ........................................................ 13

1.132    New Class D Mortgage Notes ........................................................ 13

1.133    New Class E Mortgage Notes ........................................................ 13

1.134    New Class F Mortgage Notes ........................................................ 13

1.135    New Class G Mortgage Notes ........................................................ 13

1.136    New Class H Mortgage Notes ........................................................ 13

1.137    New Debt Securities ...................................................................... 13

1.138    New Debtor Equity ........................................................................ 13

1.139    New Equity Securities ................................................................... 13

1.140    New ESA UD Mortgage Facility ................................................... 14

1.141    New ESA UD Mortgage Note ........................................................ 14

1.142    New J - K Rights ........................................................................... 14

1.143    New Money Equity Investment ..................................................... 14

1.144    New Money Equity Waterfall ....................................................... 14

1.145    New Mortgage Loan ...................................................................... 14

1.146    New Mortgage Notes ..................................................................... 15

1.147    New Securities .............................................................................. 15

1.148    New Warrants ............................................................................... 15

1.149    NewCo .......................................................................................... 15

1.150    NewCo Certificate of Formation ................................................... 15

1.151    NewCo Common Interests ............................................................. 15

1.152    NewCo Management Committee .................................................... 15

1.153    NewCo Manager ........................................................................... 15

| | | |
|---|---|---|
| 1.154 | NewCo Management Incentive Plan | 15 |
| 1.155 | NewCo Operating Agreement | 15 |
| 1.156 | Other Existing Equity Interests | 15 |
| 1.157 | Person | 15 |
| 1.158 | Plan | 16 |
| 1.159 | Plan Documents | 16 |
| 1.160 | Plan Supplement | 16 |
| 1.161 | Priority Claim | 16 |
| 1.162 | Priority Tax Claim | 16 |
| 1.163 | Pro Rata Share | 16 |
| 1.164 | Purchase Notice | 16 |
| 1.165 | Real Estate Investment Trust | 16 |
| 1.166 | Record Date | 16 |
| 1.167 | Registration Rights Agreement | 16 |
| 1.168 | Released Parties | 16 |
| 1.169 | Reorganized Debtors | 17 |
| 1.170 | Rights | 17 |
| 1.171 | Rights Certificate | 17 |
| 1.172 | Rights Holder | 17 |
| 1.173 | Rights Offering | 17 |
| 1.174 | Rights Offering Amount | 17 |
| 1.175 | Rights Offering Payment Date | 17 |
| 1.176 | Rights Offering Participant | 17 |
| 1.177 | Rollover Equity | 17 |
| 1.178 | Rollover Equity Waterfall | 17 |
| 1.179 | SCG Incentive Comp | 17 |
| 1.180 | Schedules | 17 |
| 1.181 | Secured Claim | 18 |
| 1.182 | Securities Act | 18 |
| 1.183 | Special Servicer | 18 |
| 1.184 | Sponsors | 18 |

1.185   Sub-Equity ......................................................................................................18

1.186   Sub-Equity Class 2 ............................................................................................18

1.187   Sub-Equity Class 3 ............................................................................................18

1.188   Sub-Equity Class 4 ............................................................................................18

1.189   Sub-Equity Class 5 ............................................................................................19

1.190   Sub-Equity Class 6 ............................................................................................19

1.191   Sub-Equity Class 7 ............................................................................................19

1.192   Sub-Equity Class 8 ............................................................................................19

1.193   Sub-Equity Class 9 ............................................................................................19

1.194   Sub-Equity Class 10 ..........................................................................................19

1.195   Sub-Equity Class 11 ..........................................................................................19

1.196   Sub-Equity Class 12 ..........................................................................................20

1.197   Sub-Equity Class 13 ..........................................................................................20

1.198   Sub-Equity Class 14 ..........................................................................................20

1.199   Sub-Equity Class 15 ..........................................................................................20

1.200   Sub-Equity Class 16 ..........................................................................................20

1.201   Sub-Equity Class 17 ..........................................................................................20

1.202   Subscription Agent ...........................................................................................20

1.203   Subscription Commencement Date ...................................................................20

1.204   Subscription Price.............................................................................................20

1.205   Successor Trustee .............................................................................................21

1.206   Swap Agreements .............................................................................................21

1.207   Tier 1 Debtors ..................................................................................................21

1.208   Tier 2 Debtors ..................................................................................................21

1.209   Tier 3 Debtors ..................................................................................................21

1.210   Tranche A .........................................................................................................21

1.211   Tranche B..........................................................................................................21

1.212   Tranche C..........................................................................................................21

1.213   Tranche D. ........................................................................................................21

1.214   Tranche E ..........................................................................................................21

1.215   Tranche F ..........................................................................................................21

**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| 1.216 | Tranche G | 21 |
| 1.217 | Tranche H | 22 |
| 1.218 | Tranche I | 22 |
| 1.219 | Tranche J | 22 |
| 1.220 | Tranche K | 22 |
| 1.221 | Treasury Regulations | 22 |
| 1.222 | Trustee | 22 |
| 1.223 | Unimpaired | 22 |
| 1.224 | Unliquidated Claim | 22 |
| 1.225 | Unsubscribed Rights | 22 |
| 1.226 | Voting Deadline | 22 |
| 1.227 | Wachovia Swap Agreement | 22 |
| B. | Other Terms | 23 |
| C. | Exhibits | 23 |
| ARTICLE II | PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS | 23 |
| 2.1 | Payment of Allowed Administrative Expense Claims | 23 |
| 2.2 | Compensation and Reimbursement Claims | 23 |
| 2.3 | Priority Tax Claims | 24 |
| ARTICLE III | CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS | 24 |
| 3.1 | Summary | 24 |
| ARTICLE IV | TREATMENT OF CLAIMS AND EQUITY INTERESTS | 24 |
| 4.1 | Class 1 | 25 |
| 4.2 | Class 2 | 25 |
| 4.3 | Class 3 | 26 |
| 4.4 | Class 4 | 26 |
| 4.5 | Class 5 | 27 |
| 4.6 | Class 6 | 27 |
| 4.7 | Class 7 | 27 |
| 4.8 | Class 8 | 28 |
| 4.9 | Class 9 | 28 |
| 4.10 | Class 10 | 28 |

| | | |
|---|---|---|
| 4.11 | Class 11 | 28 |
| 4.12 | Class 12 | 28 |
| 4.13 | Class 13 | 29 |
| 4.14 | Class 14 | 29 |
| 4.15 | Class 15 | 29 |
| ARTICLE V | ACCEPTANCE, REJECTION, AND REVOCATION OR WITHDRAWAL OF THE PLAN | 29 |
| 5.1 | Classes Entitled to Vote | 30 |
| 5.2 | Acceptance by Class of Claims | 30 |
| 5.3 | Nonconsensual Confirmation | 30 |
| 5.4 | Revocation or Withdrawal | 30 |
| 5.5 | Amendment of Plan Documents | 30 |
| 5.6 | Removal of Debtors | 30 |
| ARTICLE VI | IMPLEMENTATION OF THE PLAN | 31 |
| 6.1 | Substantive Consolidation | 31 |
| 6.2 | Distribution of New Securities | 31 |
| 6.3 | Creation of NewCo | 34 |
| 6.4 | Cancellation of Existing Debt Securities | 36 |
| 6.5 | Management of NewCo | 36 |
| 6.6 | NewCo Management Incentive Plan | 36 |
| 6.7 | Corporate Reorganization Actions | 37 |
| 6.8 | Investment | 37 |
| 6.9 | Rights Offering | 38 |
| 6.10 | Class B - H Elections | 41 |
| 6.11 | Effectuating Documents and Further Transactions | 43 |
| 6.12 | Allocation of Plan Distributions Between Principal and Interest | 43 |
| 6.13 | Surrender and Cancellation of Instruments | 43 |
| 6.14 | Letters of Credit | 43 |
| 6.15 | BHAC IP Transfer Agreement | 44 |
| 6.16 | Consistent Tax Reporting | 44 |
| 6.17 | Issuance of NewCo Common Interests to Investor or Sponsor Affiliates | 44 |

# TABLE OF CONTENTS
## (continued)

| | 6.18 | Allowed Mortgage Facility Claim | 45 |
|---|---|---|---|
| ARTICLE VII | | TREATMENT OF DISPUTED CLAIMS | 45 |
| | 7.1 | Objections to Claims; Prosecution of Disputed Claims | 45 |
| | 7.2 | Distributions on Account of Disputed Claims | 45 |
| ARTICLE VIII | | DISTRIBUTIONS | 46 |
| | 8.1 | Distributions under the Plan | 46 |
| | 8.2 | Timing of Distributions under the Plan | 46 |
| | 8.3 | Distributions with Respect to Mortgage Facility Deficiency Claim, Mezzanine Facility Claims, and General Unsecured Claims | 46 |
| | 8.4 | Distributions with Respect to The Mortgage Facility Claim | 46 |
| | 8.5 | Calculations Subject to Adjustment | 46 |
| | 8.6 | Disbursing Agent | 46 |
| | 8.7 | Record Date | 47 |
| | 8.8 | Manner of Payment under the Plan | 47 |
| | 8.9 | Hart-Scott-Rodino Compliance | 47 |
| | 8.10 | Fractional NewCo Common Interests or Other Distributions | 47 |
| | 8.11 | Distribution of Unclaimed Property | 47 |
| ARTICLE IX | | CONDITIONS PRECEDENT | 47 |
| | 9.1 | Conditions Precedent to the Effective Date | 47 |
| | 9.2 | Effect of Failure of Conditions to Effective Date | 48 |
| ARTICLE X | | EFFECT OF CONFIRMATION | 49 |
| | 10.1 | Vesting of Assets | 49 |
| | 10.2 | Title to Assets; Discharge of Liabilities | 49 |
| | 10.3 | Binding Effect | 49 |
| | 10.4 | Claims Extinguished | 49 |
| | 10.5 | Discharge of Claims and Termination of Equity Interests | 49 |
| | 10.6 | Injunction | 50 |
| | 10.7 | Term of Injunctions or Stays | 50 |
| | 10.8 | Injunction Against Interference With Plan of Reorganization | 50 |
| | 10.9 | Exculpation | 50 |
| | 10.10 | Releases | 51 |

**TABLE OF CONTENTS**
**(continued)**

Page

| | | | |
|---|---|---|---|
| | 10.11 | Indemnification Obligations | 51 |
| | 10.12 | Avoidance Actions | 52 |
| | 10.13 | Retention of Causes of Action/Reservation of Rights | 52 |
| | 10.14 | Limitations on Exculpation and Releases of Representatives | 52 |
| ARTICLE XI | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 53 |
| | 11.1 | Assumption of Executory Contracts and Unexpired Leases | 53 |
| | 11.2 | Rejection of Executory Contracts and Unexpired Leases | 53 |
| | 11.3 | Claims Arising from Rejection, Termination or Expiration | 53 |
| | 11.4 | Insurance Policies and Agreements | 54 |
| | 11.5 | Management Agreements | 54 |
| ARTICLE XII | | RETENTION OF JURISDICTION | 54 |
| ARTICLE XIII | | MISCELLANEOUS PROVISIONS | 55 |
| | 13.1 | Modification of the Plan | 55 |
| | 13.2 | Payment of Statutory Fees | 56 |
| | 13.3 | Rights of Action | 56 |
| | 13.4 | Subordination Agreements | 56 |
| | 13.5 | Swap Agreements | 56 |
| | 13.6 | Dissolution of Creditors' Committee | 56 |
| | 13.7 | Notices | 56 |
| | 13.8 | Headings | 58 |
| | 13.9 | Severability | 58 |
| | 13.10 | Governing Law | 59 |
| | 13.11 | Plan Supplement /Exhibits/Schedules | 59 |
| | 13.12 | Compliance with Tax Requirements | 59 |
| | 13.13 | Exemption from Transfer Taxes | 59 |
| | 13.14 | Expedited Determination of Postpetition Taxes | 59 |
| | 13.15 | Sections 1125 and 1126 of the Bankruptcy Code | 59 |
| | 13.16 | Time | 59 |

## EXHIBIT LIST

| | | |
|---|---|---|
| Exhibit A | – | Debtors |
| Exhibit B | – | BHAC License Agreements |
| Exhibit C | – | Tier 1 Debtors |
| Exhibit D | – | Tier 2 Debtors |
| Exhibit E | - | Tier 3 Debtors |
| Exhibit F | – | Existing Letters of Credit |
| Exhibit G | – | Mezzanine Facilities |
| Exhibit H | – | New Mortgage Notes |
| Exhibit I | – | New Money Equity Waterfall and Rollover Equity Waterfall (Consensual Plan) |
| Exhibit J | – | New Money Equity Waterfall (Non-Consensual Plan) |

# DEBTORS' THIRD AMENDED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

ESA Properties LLC and its affiliated debtors set forth on Exhibit A annexed hereto (the "Debtors") hereby propose the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

## ARTICLE I

## DEFINITIONS

### A.    Defined Terms.

As used herein, the following terms shall have the respective meanings specified below:

1.1    ***Administrative Bar Date Order*** means an order of the Bankruptcy Court setting a deadline for the filing of certain Administrative Expense Claims.

1.2    ***Administrative Expense Claim*** means any Claim constituting a cost or expense of administration in the Debtors' Chapter 11 Cases under section 503 of the Bankruptcy Code, including, without express or implied limitation, any actual and necessary costs and expenses of preserving the Estate of any Debtor, any expenses of professionals under sections 330 and 331 of the Bankruptcy Code, any actual and necessary costs and expenses of operating the businesses of any Debtor, any indebtedness or obligations incurred or assumed by any Debtor, as Debtor in Possession, in connection with the conduct of its business or for the acquisition or lease of property or the rendition of services, any allowed compensation or reimbursement of expenses under section 503(b)(2)-(6) of the Bankruptcy Code, and any fees or charges assessed against any Estate under section 1930, chapter 123, title 28, United States Code.

1.3    ***Administrative Expense Creditor*** means any Creditor entitled to payment of an Administrative Expense Claim.

1.4    ***Administrative Expense Objection Deadline*** means the first Business Day that is thirty (30) days after the Effective Date, as such date may be extended from time to time by order of the Bankruptcy Court.

1.5    ***Affiliate*** means, as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person (for this purpose "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise).

1.6    ***Allowed*** means:

(a)    With respect to any Claim (other than an Administrative Expense Claim), proof of which was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Bankruptcy Court, (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

1

Bankruptcy Code, the Bankruptcy Rules, or a Final Order, such Claim to the extent asserted in the proof of such Claim, or (ii) as to which an objection has been interposed, such Claim to the extent that it has been allowed in whole or in part by a Final Order.

(b)    With respect to any Claim (other than an Administrative Expense Claim), as to which no proof of claim was filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, such Claim to the extent that it has been listed in the Schedules as liquidated in amount and not disputed or contingent.

(c)    With respect to any Claim that is asserted to constitute an Administrative Expense Claim:

(i)    that represents an actual or necessary expense of preserving the Estate or operating the business of any Debtor for payment of goods, services, wages, or benefits or for credit extended to any Debtor, as a Debtor in Possession, any such Claim to the extent that such claim is reflected as a postpetition liability of any Debtor on such Debtor's books and records as of the Effective Date;

(ii)    in an action against any Debtor pending as of the Confirmation Date or not required to be filed against any Debtor pursuant to the Administrative Bar Date Order, any such Claim to the extent (x) it is allowed by a final order of a court of competent jurisdiction or by agreement between NewCo and the holder of such Administrative Expense Claim, and (y) if any Debtor disputes that such claim is a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code, to the extent the Bankruptcy Court determines by a Final Order that it constitutes a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code;

(iii)    timely filed in accordance with the Administrative Bar Date Order, any such Claim to the extent (x) no objection is interposed by the Administrative Expense Objection Deadline or (y) if an objection is interposed by the Administrative Expense Objection Deadline, is allowed in whole or in part by a Final Order and only to the extent that such allowed portion is deemed, pursuant to a Final Order, to constitute a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code; or

(iv)    that represents a Claim of a professional person employed under section 327, 328 or 1103 of the Bankruptcy Code that is required to apply to the Bankruptcy Court for the allowance of compensation and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code or an Administrative Expense Claim arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code, such Claim to the extent it is allowed by a Final Order.

1.7    ***Allowed Amount*** means the lesser of (a) the dollar amount of an Allowed Claim or (b) the Estimated Amount of such Claim.  Unless otherwise specified herein or by Final Order, the Allowed Amount of an Allowed Claim shall not include interest accruing on such Allowed Claim from and after the Commencement Date.

1.8    ***Ballot*** means the form or forms distributed to holders of Impaired Claims on which the acceptance or rejection of the Plan is to be indicated.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

2

1.9     ***Bankruptcy Code*** means the Bankruptcy Reform Act of 1978, as amended, and as codified in title 11 of the United States Code, as applicable to the Chapter 11 Cases.

1.10     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to section 157 of title 28 of the United States Code, the unit of such District Court constituted pursuant to section 151 of title 28 of the United States Code.

1.11     ***Bankruptcy Rules***  means the Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases, including the Local Rules of the Bankruptcy Court.

1.12     ***BHAC*** means BHAC Capital IV, LLC, a Delaware limited liability company.

1.13     ***BHAC IP*** means the Intellectual Property owned or controlled by BHAC.

1.14     ***BHAC License Agreements*** means, collectively, the license agreements described on Exhibit B annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.15     ***BHAC IP Transfer Agreement*** shall have the meaning set forth in Section 6.15 hereof.

1.16     ***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.17     ***Cash*** means lawful currency of the United States of America.

1.18     ***Cash Collateral Order*** means that certain Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay, including any and all modifications or amendments thereto.

1.19     ***Certificates*** means the Certificates issued under the Mortgage Facility.

1.20     ***Chapter 11 Cases*** means (a) the cases under chapter 11 of the Bankruptcy Code commenced by ESI, the Debtors and certain of their Affiliates on June 15, 2009 pending in the Bankruptcy Court as In re Extended Stay Inc., et al., Case No. 09-13764 (JMP) (Jointly Administered) and (b) the cases under Chapter 11 of the Bankruptcy Code commenced by ESA P Portfolio TXNC GP L.L.C., ESA TXGP L.L.C., ESH/MSTX GP L.L.C., ESH/TXGP L.L.C. and ESH/TN Member Inc. on February 18, 2010 pending in the Bankruptcy Court as Case Nos. 10-10805, 10-10806, 10-10807, 10-10808 and 10-10809, respectively.

1.21     ***Claim*** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

1.22     ***Class*** means any group of Claims or Equity Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

1.23     ***Class A1 Mortgage Certificates*** means the Class A1 Certificates issued under the Mortgage Facility.

1.24     ***Class A1 - F Mortgage Certificates*** means the Class A1 Mortgage Certificates, the Class A2 Mortgage Certificates, the Class A3 Mortgage Certificates, the Class A4 Mortgage Certificates, the Class B Mortgage Certificates, the Class C Mortgage Certificates, the Class D Mortgage Certificates, the Class E Mortgage Certificates and the Class F Mortgage Certificates.

1.25     ***Class A2 Mortgage Certificates*** means the Class A2 Certificates issued under the Mortgage Facility.

1.26     ***Class A3 Mortgage Certificates*** means the Class A3 Certificates issued under the Mortgage Facility.

1.27     ***Class A4 Cash Paydown*** means two-hundred million dollars ($200,000,000) to be paid to the holders of the Class A4 Mortgage Certificates, each of whom shall receive its respective Pro Rata Share of such two-hundred million dollars ($200,000,000).

1.28     ***Class A4 Mortgage Certificates*** means the Class A4 Certificates issued under the Mortgage Facility.

1.29     ***Class B Mortgage Certificates*** means the Class B Certificates issued under the Mortgage Facility.

1.30     ***Class B - H Debt/Equity Election*** means the election of a holder of a Class B - H Mortgage Certificate to receive a distribution under the Plan on account of its Class B - H Mortgage Certificate other than as follows: (a) its Pro Rata Share of the Rollover Equity in satisfaction of 50% of such holder's Class B - H Mortgage Certificates and (b) its Pro Rata Share of the New Class B - H Mortgage Notes in satisfaction of 50% of such holder's Class B - H Mortgage Certificates; provided, however, that in the event such an election is made, such revised allocation of the distribution of the Rollover Equity and the New Class B - H Mortgage Notes to the holders of the Class B - H Mortgage Certificates shall be as agreed to between the Debtors, the Investor and each of the Sponsors within ten (10) days after the Voting Deadline and if such agreement cannot be reached, each holder of a Class B - H Mortgage Certificates shall receive (y) its Pro Rata Share of the Rollover Equity in satisfaction of 50% of such holder's Class B - H Mortgage Certificates and (z) its Pro Rata Share of the New Class B - H Mortgage Notes in satisfaction of 50% of such holder's Class B - H Mortgage Certificate, and provided further, that, in the aggregate, 50% of the Class B - H Mortgage Debt will have been satisfied by the New Class B - H Mortgage Notes and 50% of the Class B - H Mortgage Debt will have been satisfied by the Rollover Equity, subject to Section 4.2(d) hereof.

1.31     ***Class B - H Election Date*** means the date that is five (5) Business Days after the Voting Deadline, or such later date fixed by the Debtors with the approval of the Investor and each of the Sponsors, such approval not to be unreasonably withheld.

1.32     ***Class B - H Elections*** means the Class B - H Debt/Equity Election and the Class B - H Equity Cashout Option Election.

1.33     ***Class B - H Equity Cashout Option*** means the purchase, on the Effective Date, of Class B - H Certificates, at a 30% discount to the accreted amount thereof estimated as of June 30, 2010, in the aggregate amount of up to two-hundred, fifty-five million, four-hundred thousand dollars ($255,400,000), assuming that all of the holders thereof elect to receive cash in lieu

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

4

of the Rollover Equity, by the Investor (or one or more of the Investor's members or their respective affiliates) directly from the holders of the Class B - H Certificates.

1.34     ***Class B - H Equity Cashout Option Election*** means the election for the holders of Class B - H Certificates set forth in Section 4.2(d) hereof to receive the Class B - H Equity Cashout Option in lieu of the Rollover Equity.

1.35     ***Class B - H Mortgage Certificates*** means the Class B Mortgage Certificates, the Class C Mortgage Certificates, the Class D Mortgage Certificates, the Class E Mortgage Certificates, the Class F Mortgage Certificates, the Class G Mortgage Certificates and the Class H Mortgage Certificates.

1.36     ***Class B - H Mortgage Debt*** means the amount due and owing, in the aggregate, to the holders of the Class B - H Mortgage Certificates under the Mortgage Facility.

1.37     ***Class B - K Mortgage Certificates*** means the Class B Mortgage Certificates, the Class C Mortgage Certificates, the Class D Mortgage Certificates, the Class E Mortgage Certificates, the Class F Mortgage Certificates, the Class G Mortgage Certificates, the Class H Mortgage Certificates, the Class J Mortgage Certificates and the Class K Mortgage Certificates.

1.38     ***Class C Mortgage Certificates*** means the Class C Certificates issued under the Mortgage Facility.

1.39     ***Class D Mortgage Certificates*** means the Class D Certificates issued under the Mortgage Facility.

1.40     ***Class E Mortgage Certificates*** means the Class E Certificates issued under the Mortgage Facility.

1.41     ***Class F Mortgage Certificates*** means the Class F Certificates issued under the Mortgage Facility.

1.42     ***Class G Alternate Note Balance*** means the amount of New Alternate Notes to be allocated to holders of the Class G Mortgage Certificates, which shall be equal to the principal amount of the New Alternate Mortgage Loan minus the face amount of the Class A1 - F Mortgage Certificates.

1.43     ***Class G Alternate Note Proportion*** means the Class G Alternate Note Balance as a percent of the New Alternate Mortgage Loan.

1.44     ***Class G Mortgage Certificates*** means the Class G Certificates issued under the Mortgage Facility.

1.45     ***Class H Mortgage Certificates*** means the Class H Certificates issued under the Mortgage Facility.

1.46     ***Class J Mortgage Certificates*** means the Class J Certificates issued under the Mortgage Facility.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

5

1.47    ***Class K Mortgage Certificates*** means the Class K Certificates issued under the Mortgage Facility.

1.48    ***Class L Mortgage Certificates*** means the Class L Certificates issued under the Mortgage Facility.

1.49    ***Class M Mortgage Certificates*** means the Class M Certificates issued under the Mortgage Facility.

1.50    ***Commencement Date*** means June 15, 2009 or February 18, 2010, as applicable to the particular Debtor.

1.51    ***Confirmation Date*** means the date on which the Confirmation Order has been entered on the docket by the Clerk of the Bankruptcy Court.

1.52    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.53    ***Contingent Claim*** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening, or is triggered by, an event, which event has not yet occurred, happened, or been triggered, as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.54    ***Creditor*** means any Person that holds an Allowed Claim.

1.55    ***Creditors' Committee*** means the Official Committee of Unsecured Creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

1.56    ***Debtors*** has the meaning set forth in the preamble hereof.

1.57    ***Debtor in Possession*** means each Debtor in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

1.58    ***Disallowed Claim*** means a Claim or a portion of a Claim that is disallowed by an order of the Bankruptcy Court or such other court of competent jurisdiction.

1.59    ***Disbursing Agent*** means any Person in its capacity as a disbursing agent under Section 8.6 hereof.

1.60    ***Disclosure Statement*** means the disclosure statement related to the Plan filed with and approved by the Bankruptcy Court, as such disclosure statement may be amended, modified or supplemented.

1.61    ***Disputed Claim*** means any Claim (including any Administrative Expense Claim) against any Debtor, proof of which was timely and properly filed, which is disputed under the Plan or as to which the Debtors have interposed a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

6

proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed. A Claim that is disputed by the Debtors as to its amount only shall be deemed Allowed in the amount the Debtors admit owing, if any, and disputed as to the excess.

1.62 ***Distribution*** means the payment or distribution under the Plan of property or interests in property to the holders of Allowed Claims.

1.63 ***Distribution Date*** means each of (a) the Initial Distribution Date, (b) the first Business Day after the end of the months of March and September, commencing with the first such date to occur after the Effective Date, and (c) the Final Distribution Date.

1.64 ***Effective Date*** means a Business Day on or after the Confirmation Date selected by the Debtors, the Investor and each of the Sponsors on which (a) all of the conditions precedent to the effectiveness of the Plan specified in Section 9.1 have been satisfied or waived and (b) no stay of the Confirmation Order is in effect.

1.65 ***Election Form*** means the form that the holder of a Class B – H Mortgage Certificate shall be required to complete and return to the Subscription Agent if such holder wishes to make the Class B - H Equity Cashout Option Election or wishes to make the Class B - H Debt/Equity Election.

1.66 ***Election Period*** means the period during which the Class B - H Equity Cashout Option Election and Class B - H Debt/Equity Election may be exercised.

1.67 ***Equity Interest*** means the interests of any holder of an equity security of any of the Debtors represented by any issued and outstanding shares of common stock or preferred stock, or any membership interest, partnership interest or other instrument evidencing a present ownership interest in any of the Debtors, including any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.68 ***ESA Canada Properties Borrower Interests*** means the limited liability company interests of ESA Canada Properties Borrower LLC, authorized pursuant to its limited liability company agreement, as in effect immediately prior to the Effective Date.

1.69 ***ESA Canada Properties Interests*** means the shares of beneficial interest of ESA Canada Properties Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.70 ***ESA MD Borrower Interests*** means the limited liability company interests of ESA MD Borrower LLC, authorized pursuant to its limited liability company agreement, as in effect immediately prior to the Effective Date.

1.71 ***ESA MD Properties Trust Certificate*** means the certificate of ESA MD Properties Business Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.72 ***ESA P Portfolio MD Borrower Interests*** means the limited liability company interests of ESA P Portfolio MD Borrower LLC, authorized pursuant to its limited liability company agreement, as in effect immediately prior to the Effective Date.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

7

1.73 ***ESA P Portfolio MD Trust Certificate*** means the certificate of ESA P Portfolio MD Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.74 ***ESA UD*** means ESA UD Properties LLC, a Delaware limited liability company.

1.75 ***ESA UD Mortgage Claim*** means the Claim of Bank of America, N.A. under the ESA UD Mortgage Facility.

1.76 ***ESA UD Mortgage Facility*** means the Loan Agreement, dated February 14, 2008, among ESA UD, ESA 2007 Operating Lessee Inc. and Bank of America, N.A.

1.77 ***Escrow Account*** means the bank account to be established by the Debtors for the purpose of holding all amounts paid by Rights Offering Participants in connection with the exercise of the Rights pursuant to the Rights Offering.

1.78 ***ESH/ESA General Partnership Interests*** means the 1% general partnership interests in ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., and ESA P Portfolio TXNC Properties L.P., held by ESH/MSTX GP L.L.C., ESH/TXGP L.L.C., ESA TXGP L.L.C., and ESA P Portfolio TXNC GP L.L.C. respectively, as authorized pursuant to the limited partnership agreements of ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., and ESA P Portfolio TXNC Properties L.P., as in effect immediately prior to the Effective Date.

1.79 ***ESH/TN Properties Membership Interest*** means the 1% membership interest in ESH/TN Properties L.L.C. held by ESH/TN Member Inc., authorized pursuant to the limited liability company agreement of ESH/TN Properties L.L.C., as in effect immediately prior to the Effective Date.

1.80 ***ESI*** means Extended Stay Inc., a Delaware corporation.

1.81 ***Estate*** means the estate of each Debtor as created under section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

1.82 ***Estimated Amount*** means the estimated dollar value of an Unliquidated Claim, Disputed Claim or Contingent Claim pursuant to section 502(c) of the Bankruptcy Code or as otherwise agreed to between the holder of such Claim and the applicable Debtor or NewCo, or as otherwise determined by the Bankruptcy Court.

1.83 ***Excess Equity*** means, in the event that any holders of Class B - H Mortgage Certificates do not elect to receive 50% of their distribution in Rollover Equity, the right of the other holders of Class B - H Mortgage Certificates to elect to receive a greater portion of their distribution in Rollover Equity up to the amount of any such then remaining Rollover Equity, subject to proration.

1.84 ***Existing Equity*** means the Equity Interest of each of the Debtors, other than the Tier 2 Debtors, authorized pursuant to its certificate of incorporation or other organizational documents, as in effect immediately prior to the Effective Date.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

8

1.85    ***Existing Letters of Credit*** means, collectively, the letters of credit described on Exhibit F annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.86    ***Expiration Date*** means the date that is five (5) Business Days after the Voting Deadline, which date shall be the deadline for accepting the Rights Offering as specified in the Ballot and the Rights Certificate, as such date may be extended from time to time by the Debtors with the approval of the Investor and each of the Sponsors, such approval not to be unreasonably withheld.

1.87    ***Final Distribution Date*** means a date on or after the Initial Distribution Date and after all Disputed Claims have become either Allowed Claims or Disallowed Claims that is selected by NewCo in its discretion but, in any event, is no later than thirty (30) days thereafter, or such later date as the Bankruptcy Court may establish, upon request by NewCo, for cause shown.

1.88    ***Final Order*** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, which has not been reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

1.89    ***G&A Reimbursement Agreements*** means the G&A Reimbursement Agreements entered into between HVM and one or more of the Debtors, as the same have been amended from time to time.

1.90    ***General Unsecured Claims*** means any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Claim, a Secured Claim, the Mortgage Facility Deficiency Claim or a Mezzanine Facilities Claim.

1.91    ***Guaranty*** means the Guaranty Agreement, dated as of June 11, 2007, by Lightstone Holdings LLC, HVM Manager Owner, ESI and Homestead in respect of the obligations of the borrowers under the Mortgage Facility and the Mezzanine Facilities.

1.92    ***Guaranty Claim*** means any rights to the payment of damages, claims, causes of action, charges, suits, demands, defaults, rights of recovery, assessments, rights of set-off or rights of recoupment arising under or relating to the Guaranty (whether relating to the Mortgage Facility or the Mezzanine Facilities and whether paid prior to or following the Effective Date) as a result of the commencement of any of the Chapter 11 Cases.

1.93    ***Homestead*** means Homestead Village L.L.C., a Delaware limited liability company.

1.94    ***HVM*** means HVM L.L.C., a Delaware limited liability company.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

9

1.95 ***HVM Manager*** means HVM Manager L.L.C., a Delaware limited liability company and the manager of HVM.

1.96 ***HVM Manager Owner*** means David Lichtenstein.

1.97 ***Impaired*** means, with respect to any Class of Claims or Equity Interests, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.98 ***Initial Distribution Date*** means a date after the Effective Date that is selected by NewCo in its discretion but, in any event, is no later than five (5) days after the Effective Date, or such later date as the Bankruptcy Court may establish upon request by NewCo, for cause shown.

1.99 ***Intellectual Property*** means, collectively, patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, domain names, copyrights, licenses and know-how (including, without limitation, trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures as well as other inventions, works of authorship, confidential information, technology, software and documentation, data and databases and websites) and any registrations or applications to register the foregoing.

1.100 ***Internal Revenue Code*** means the Internal Revenue Code of 1986, as amended from time to time, and any applicable rulings, Treasury Regulations, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

1.101 ***Investment*** means the investment that is to be made by the Investor as further described in Section 6.8 hereof.

1.102 ***Investment and Standby Purchase Agreement*** means the agreement dated March 12, 2010 by and among the Debtors, HVM Manager, HVM and the Investor.

1.103 ***Investor*** means Starwood ESH, L.L.C., a newly formed entity to be owned by the Sponsors.

1.104 ***IRS*** means the United States Internal Revenue Service.

1.105 ***M1 Mezzanine Facility Claims*** means the Claims arising under Mezzanine A Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz L.L.C., ESA P Mezz L.L.C., and ESA Mezz L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.106 ***M2 Mezzanine Facility Claims*** means the Claims arising under Mezzanine B Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 2 L.L.C., ESA P Mezz 2 L.L.C., and ESA Mezz 2 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.107 ***M3 Mezzanine Facility Claims*** means the Claims arising under Mezzanine C Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 3 L.L.C., ESA P Mezz 3 L.L.C., and ESA Mezz 3 L.L.C., as Borrowers, and Wachovia Bank, National Association,

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

10

Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.108    ***M4 Mezzanine Facility Claims*** means the Claims arising under Mezzanine D Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 4 L.L.C., ESA P Mezz 4 L.L.C., and ESA Mezz 4 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.109    ***M5 Mezzanine Facility Claims*** means the Claims arising under Mezzanine E Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 5 L.L.C., ESA P Mezz 5 L.L.C., and ESA Mezz 5 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.110    ***M6 Mezzanine Facility Claims*** means the Claims arising under Mezzanine F Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 6 L.L.C., ESA P Mezz 6 L.L.C., and ESA Mezz 6 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.111    ***M7 Mezzanine Facility Claims*** means the Claims arising under Mezzanine G Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 7 L.L.C., ESA P Mezz 7 L.L.C., and ESA Mezz 7 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.112    ***M8 Mezzanine Facility Claims*** means the Claims arising under Mezzanine H Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 8 L.L.C., ESA P Mezz 8 L.L.C., and ESA Mezz 8 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.113    ***M9 Mezzanine Facility Claims*** means the Claims arising under Mezzanine I Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 9 L.L.C., ESA P Mezz 9 L.L.C., and ESA Mezz 9 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.114    ***M10 Mezzanine Facility Claims*** means the Claims arising under Mezzanine J Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 10 L.L.C., ESA P Mezz 10 L.L.C., and ESA Mezz 10 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.115    ***Merrill Swap Agreement*** means the Master Agreement, dated August 28, 2007, by and among Merrill Lynch Capital Services, Inc. and Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass Through Certificates, Series 2007-ESH Trust, and all Schedules thereto, including the Elections and Variables to the 1994 ISDA Credit Support Annex.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

11

1.116   ***Mezzanine Facilities*** means, collectively, the mezzanine loan facilities described on Exhibit G annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.117   ***Mezzanine Facilities Claims*** means, collective, the Claims arising under the Mezzanine Facilities.

1.118   ***Mortgage Certificate*** means a mortgage certificate that was issued in connection with the Mortgage Facility.

1.119   ***Mortgage Facility*** means the Mortgage Loan Agreement, dated as of June 11, 2007, by and among the Borrowers listed on Schedule 1.1(a) thereto and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A., as Lenders, as amended or modified from time to time and all documents entered into in connection therewith.

1.120   ***Mortgage Facility Claim*** means the Secured Claim of the Trustee under the Mortgage Facility.

1.121   ***Mortgage Facility Deficiency Claim*** means the Claim of the Trustee in respect of the Mortgage Facility, as calculated pursuant to Section 6.18 hereof.

1.122   ***New Alternate Mortgage Loan*** means the amended and restated Mortgage Loan Agreement, substantially in the form to be set forth in the Plan Supplement, pursuant to which the New Alternate Notes shall be issued, which must be reasonably acceptable to the Investor and each of the Sponsors and shall include reasonable modifications to the existing loan documents that (a) are generally consistent with (i) current valuations of the properties (including, but not limited to, the impact of valuations on release provisions) and (ii) the Plan and  the Disclosure Statement, (b) permit the Reorganized Debtors to prepay all or any portion of the New Alternate Mortgage Loan, at any time and from time to time, without any penalty or premium and without any defeasance requirement, (c) do not require any guarantee from or recourse liability to the Investor's members or affiliates other than NewCo with respect to recourse carve-out liability, (d) do not contain any mandatory prepayment requirements, event of default provisions, rights of redemption or any other restrictions or rights to change the material terms of the loan in a manner adverse to the Reorganized Debtors in the event of any change-in-control or sale of all or substantially all assets in connection with the purchaser assuming and after the purchaser assumes the New Alternate Mortgage Loan, and (e) are no less favorable to the Reorganized Debtors than the existing loan documents, subject to Exhibit H hereto.

1.123   ***New Alternate Notes*** means the new notes to be issued pursuant to the New Alternate Mortgage Loan to the holder of the Allowed Mortgage Facility Claim pursuant to Section 4.2(b)(ii) hereof in the event that Class 2 rejects the Plan.

1.124   ***New B – H Rights*** means Rights which may be used by holders of Class B – H Mortgage Certificates to subscribe for NewCo Common Interests that have an aggregate Subscription Price of one-hundred, eighty-eight million dollars ($188,000,000).

1.125   ***New Class A1 Mortgage Notes*** means the A1 notes issued pursuant to Tranche A of the New Mortgage Loan.

1.126   ***New Class A2 Mortgage Notes*** means the A2 notes issued pursuant to Tranche B of the New Mortgage Loan.

1.127   ***New Class A3 Mortgage Notes*** means the A3 notes issued pursuant to Tranche C of the New Mortgage Loan.

1.128   ***New Class A4 Mortgage Notes*** means the A4 notes issued pursuant to Tranche D of the New Mortgage Loan.

1.129   ***New Class B Mortgage Notes*** means the B notes issued pursuant to Tranche E of the New Mortgage Loan.

1.130   ***New Class B - H Mortgage Notes*** means the New Class B Mortgage Notes, the New Class C Mortgage Notes, the New Class D Mortgage Notes, the New Class E Mortgage Notes, the New Class F Mortgage Notes, the New Class G Mortgage Notes and the New Class H Mortgage Notes.

1.131   ***New Class C Mortgage Notes*** means the C notes issued pursuant to Tranche F of the New Mortgage Loan.

1.132   ***New Class D Mortgage Notes*** means the D notes issued pursuant to Tranche G of the New Mortgage Loan.

1.133   ***New Class E Mortgage Notes*** means the E notes issued pursuant to Tranche H of the New Mortgage Loan.

1.134   ***New Class F Mortgage Notes*** means the F notes issued pursuant to Tranche I of the New Mortgage Loan.

1.135   ***New Class G Mortgage Notes*** means the G notes issued pursuant to Tranche J of the New Mortgage Loan.

1.136   ***New Class H Mortgage Notes*** means the H notes issued pursuant to Tranche K of the New Mortgage Loan.

1.137   ***New Debt Securities*** means, collectively, the New Class A1 Mortgage Notes, the New Class A2 Mortgage Notes, the New Class A3 Mortgage Notes, the New Class A4 Mortgage Notes, the New Class B Mortgage Notes, the New Class C Mortgage Notes, the New Class D Mortgage Notes, the New Class E Mortgage Notes, the New Class F Mortgage Notes, the New Class G Mortgage Notes and the New Class H Mortgage Notes.

1.138   ***New Debtor Equity*** means the common stock, preferred stock, limited liability company interests or limited or general partnership interests, as the case may be, of each of the Debtors, other than the Tier 2 Debtors, the Tier 3 Debtors, the ESH/ESA General Partnership Interests and the ESH/TN Properties Membership Interests, which is to be authorized and issued pursuant to the Plan.

1.139   ***New Equity Securities*** means, collectively, the NewCo Common Interests, the Sub-Equity and the New Warrants.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

13

1.140    ***New ESA UD Mortgage Facility*** means the new mortgage facility, in the principal amount of five million dollars ($5,000,000) memorialized in a loan agreement, substantially in the form to be set forth in the Plan Supplement, by and among ESA UD, as borrower, and the lender thereunder.

1.141    ***New ESA UD Mortgage Note*** means the note to be issued to ESA UD pursuant to the New ESA UD Mortgage Facility in the principal amount of five million dollars ($5,000,000), bearing interest at the rate of 5.0% per annum and due and payable 5 years from the Effective Date.

1.142    ***New J - K Rights*** means the Rights which may be used by holders of Class J - K Mortgage Certificates to subscribe for NewCo Common Interests that have an aggregate Subscription Price of twelve million dollars ($12,000,000).

1.143    ***New Money Equity Investment*** means (a) in a consensual plan, the up to six-hundred fifty million dollars ($650,000,000) in equity commitments to be made by the Investor into NewCo on the Effective Date consisting of (i) the four-hundred fifty million dollar ($450,000,000) equity investment to be made by the Investor in NewCo (subject to an increase pursuant to clause (ii)) plus (ii) the Investor's commitment to backstop an offering of up to two-hundred million dollars ($200,000,000) of the Rights Offering (subject to Section 6.9(l) hereof, in which event the amount of the Investment shall be increased so that the total amount of the New Money Equity Investment is six-hundred fifty million dollars ($650,000,000)) and on account of which the Investor will be entitled to the distributions pursuant to the New Money Equity Waterfall, and (b) in a non-consensual plan, the four- hundred million dollars ($400,000,000) in equity commitments to be made by the Investor in NewCo on the Effective Date and on account of which the Investor will be entitled to the distributions pursuant to the New Money Equity Waterfall.

1.144    ***New Money Equity Waterfall*** shall have the meaning set forth on Exhibit I to the Plan in the event of a consensual plan and shall have the meaning set forth on Exhibit J to the Plan in the event of a non-consensual plan.

1.145    ***New Mortgage Loan*** means the amended and restated Mortgage Facility comprising Tranche A, Tranche B, Tranche C, Tranche D, Tranche E, Tranche F, Tranche G, Tranche H, Tranche I, Tranche J, and Tranche K, in the aggregate principal amount of two billion, eight-hundred eighteen million, one-hundred eighty-four thousand, two-hundred forty-three dollars ($2,818,184,243), subject to adjustment pursuant to Section 8.5 hereof, after the Class A4 Cash Paydown, in the amounts and bearing the rates of interest set forth on Exhibit I hereof, subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes, as memorialized in the amended and restated Mortgage Loan Agreement by and among existing borrowers under the Mortgage Loan Facility, as borrower, and the lenders thereunder, which shall be substantially in the form to be set forth in the Plan Supplement, which must be reasonably acceptable to the Investor and each of the Sponsors and shall include reasonable modifications to the existing loan documents that (a) are generally consistent with (i) current valuations of the properties (including, but not limited to, the impact of valuations on release provisions) and (ii) the Plan and  the Disclosure Statement, (b) permit the Reorganized Debtors to prepay all or any portion of the New Mortgage Loan, at any time and from time to time, without any penalty or premium and without any defeasance requirement, (c) do not require any guarantee from or recourse liability to the Investor's members or affiliates, (d) do not contain any mandatory prepayment requirements, event of default provisions, rights of redemption or any other restrictions or rights to change the material terms of the loan in a manner adverse to the Reorganized Debtors in the

event of any change-in-control or sale of all or substantially all assets in connection with the purchaser assuming and after the purchaser assumes the New Mortgage Loan, and (e) are no less favorable to the Reorganized Debtors than the existing loan documents, subject to Exhibit H hereto.

1.146 **New Mortgage Notes** means the New Class A1 Mortgage Notes, the New Class A2 Mortgage Notes, the New Class A3 Mortgage Notes, the New Class A4 Mortgage Notes, New Class B Mortgage Notes, the New Class C Mortgage Notes, the New Class D Mortgage Notes, the New Class E Mortgage Notes, New Class F Mortgage Notes, the New Class G Mortgage Notes and the New Class H Mortgage Notes.

1.147 **New Securities** means, collectively, New Equity Securities and New Debt Securities.

1.148 **New Warrants** means the warrants to acquire NewCo Common Interests, substantially in the form to be set forth in the Plan Supplement, and as further described in Section 6.3 and Section 6.15 hereof.

1.149 **NewCo** means a newly formed limited liability company, or such alternate corporate or other organizational entity that may be selected by the Investor and each of the Sponsors, to be organized as of the Effective Date in accordance with Section 6.7 hereof, or any successors in interest thereto, from and after the Effective Date.

1.150 **NewCo Certificate of Formation** means the Certificate of Formation of NewCo, substantially in the form to be set forth in the Plan Supplement.

1.151 **NewCo Common Interests** means the membership interests or, as applicable, other common equity interests, in NewCo, having a stated value of one-thousand dollars ($1,000) per membership interest, which are to be authorized and issued pursuant to the Plan.

1.152 **NewCo Management Committee** means the management committee or other governing body of NewCo, as it may exist from time to time.

1.153 **NewCo Manager** means a newly formed limited liability company owned and controlled by Persons affiliated with or designated by the Investor and appointed as the successor manager of HVM, which may be a third party.

1.154 **NewCo Management Incentive Plan** means the NewCo Management Incentive Plan, substantially in the form to be set forth in the Plan Supplement.

1.155 **NewCo Operating Agreement** means the Operating Agreement of NewCo, substantially in the form to be set forth in the Plan Supplement.

1.156 **Other Existing Equity Interests** means the Equity Interests in ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., ESA P Portfolio TXNC Properties L.P. and ESH/TN Properties L.L.C., other than the ESH/ESA General Partnership Interests and the ESH/TN Properties Membership Interest.

1.157 **Person** means an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof, or any other entity or group.

1.158　***Plan*** means this plan of reorganization under chapter 11 of the Bankruptcy Code, including the Plan Documents, the Plan Supplement, and the Exhibits to the Plan annexed hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of this Plan, which amendments shall be reasonably acceptable to the Investor and each of the Sponsors.

1.159　***Plan Documents*** means the documents to be executed, delivered, assumed, and/or performed in conjunction with the consummation of the Plan on the Effective Date.

1.160　***Plan Supplement*** means the compilation of documents and forms of documents, schedules and exhibits, each in form and substance reasonably acceptable to the Investor and each of the Sponsors, to be filed on or before the date that is ten (10) days prior to the last day on which votes to accept or reject the plan are accepted and which may be amended from time to time until the Confirmation Date.

1.161　***Priority Claim*** means any Claim to the extent such claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or Priority Tax Claim.

1.162　***Priority Tax Claim*** means an unsecured Claim of a governmental unit of a kind specified in section 507(a)(8) of the Bankruptcy Code.

1.163　***Pro Rata Share*** means (a) with respect to Allowed Claims, the ratio (expressed as a percentage) of the amount of an Allowed Claim in a Class (or, with respect to any New Securities received by more than one Class, the applicable Classes) to the aggregate amount of all Allowed Claims in the same Class (or applicable Classes), and (b) with respect to the Certificates, the ratio (expressed as a percentage) of the amount of a Certificate in a Class of Certificates to the aggregate amount of all Certificates in the same Class of Certificates.

1.164　***Purchase Notice*** has the meaning set forth in Section 6.9(g) hereof.

1.165　***Real Estate Investment Trust*** means a real estate investment trust within the meaning of Section 856 of the Internal Revenue Code.

1.166　***Record Date*** means the date to be established by the Bankruptcy Court for purposes of determining those holders of allowed claims that are entitled to vote to accept or reject this Plan.

1.167　***Registration Rights Agreement*** means the registration rights agreement to be entered into by NewCo and the Investor and included in the Plan Supplement, as such agreement may be amended from time to time in accordance with its terms.

1.168　***Released Parties*** means (a) the Debtors, (b) NewCo, (c) each member of the Creditors' Committee, (d) the Investor, (e) each Sponsor, (f) BHAC (provided that BHAC has entered into the BHAC IP Transfer Agreement as provided in Section 6.15 herein), (g) HVM, (h) HVM Manager, (i) HVM Manager Owner, (j) the Special Servicer, (k) the Trustee, (l) the Successor Trustee, (m) Lightstone Holdings LLC and (n) any present or former director, manager, officer, member, equity holder (and their respective Affiliates), employee, agent, financial advisor, partner, Affiliate, attorney, other professional advisor or representative (and their respective Affiliates) of the persons or parties described in clauses (a) through (n) hereof or of any Affiliate thereof.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

16

1.169   ***Reorganized Debtors*** means the Debtors, as reorganized as of the Effective Date in accordance with this Plan, and their successors.

1.170   ***Rights*** means the non-transferable subscription rights of Rights Holders to purchase NewCo Common Interests in connection with the Rights Offering on the terms and subject to the conditions set forth in Section 6.9 hereof.

1.171   ***Rights Certificate*** means a certificate representing the Rights, which certificate shall provide (a) a place whereby each Rights Offering Participant may indicate its commitment to exercise all or a portion of its Rights, and (b) instructions for the exercise of the Rights.

1.172   ***Rights Holder*** means a holder of a Class B – K Mortgage Certificate as of the Subscription Commencement Date.

1.173   ***Rights Offering*** means the offering of Rights to the holders of Class B – K Mortgage Certificates to purchase NewCo Common Interests at the Subscription Price and for an aggregate purchase price equal to the Rights Offering Amount as further described in Section 6.9 hereof.

1.174   ***Rights Offering Amount*** means up to two-hundred million dollars ($200,000,000), subject to Section 6.9(l).

1.175   ***Rights Offering Payment Date*** means the date and time by which payments in connection with the Rights Offering must be made, which date shall be no later than the Expiration Date; provided that the Investor, the Sponsors and each of their respective Affiliates shall make any and all payments in connection with the Rights Offering, including, the exercise of the Rights and the purchase of the Unsubscribed Rights, on the Effective Date.

1.176   ***Rights Offering Participant*** means a Rights Holder which exercises Rights in connection with the Rights Offering.

1.177   ***Rollover Equity*** means 38.11% of the issued and outstanding NewCo Common Interests, with such NewCo Common Interests to be issued to the holders of the Class B-H Mortgage Certificates and to be entitled to distributions in accordance with the Rollover Equity Waterfall.

1.178   ***Rollover Equity Waterfall*** the shall have the meaning set forth on Exhibit I to the Plan.

1.179   ***SCG Incentive Comp*** means incentive compensation to be paid to a designated affiliate of Starwood Capital Group that will be a managing member of NewCo, which is entitled to the distributions pursuant to the New Money Equity Waterfall.

1.180   ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors with the Bankruptcy Court on September 28, 2009 and on March 4, 2010, as required by section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been and may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

17

1.181 **_Secured Claim_** means any Claim to the extent reflected in the Schedules or a proof of claim as a secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.182 **_Securities Act_** means the Securities Act of 1933, as amended.

1.183 **_Special Servicer_** means TriMont Real Estate Advisors, Inc., or any successor thereto.

1.184 **_Sponsors_** Starwood Global Opportunity Fund VIII, L.P., Starwood U.S. Opportunity Fund VIII-1, L.P., Starwood U.S. Opportunity Fund VIII-2, L.P., Starwood Capital Hospitality Fund II Global, L.P., Starwood Capital Hospitality Fund II U.S., L.P., Five Mile Capital Partners II LP, FMCP II Principals LP, Five Mile Capital Partners II (AIV) LP, TPG Partners V, L.P. and TPG Partners VI, L.P., subject to the assignment provisions of that certain commitment letter dated March 15, 2010 by and between the Debtors, HVM Manager, HVM, the Investor and each of the Sponsors.

1.185 **_Sub-Equity_** means, in a consensual plan, Sub-Equity Class 2, Sub-Equity Class 3, Sub-Equity Class 4, Sub-Equity Class 5, Sub-Equity Class 6, Sub-Equity Class 7, Sub-Equity Class 8, Sub-Equity Class 9, Sub-Equity Class 10, Sub-Equity Class 11, Sub-Equity Class 12, Sub-Equity Class 13, Sub-Equity Class 14 and Sub-Equity Class 15, and in a non-consensual plan, Sub-Equity Class 2, Sub-Equity Class 3, Sub-Equity Class 4, Sub-Equity Class 5, Sub-Equity Class 6, Sub-Equity Class 7, Sub-Equity Class 8, Sub-Equity Class 9, Sub-Equity Class 10, Sub-Equity Class 11, Sub-Equity Class 12, Sub-Equity Class 13, Sub-Equity Class 14, Sub-Equity Class 15, Sub-Equity Class 16 and Sub-Equity Class 17.

1.186 **_Sub-Equity Class 2_** means the equity distributions in the aggregate amount of up to one-hundred million dollars ($100,000,000) distributed by NewCo to the holders of Class J Mortgage Certificates in a consensual plan, and in the aggregate amount of up to one-hundred thirty-one million forty-thousand dollars ($131,040,000) to the Class G Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.187 **_Sub-Equity Class 3_** means the equity distributions in the aggregate amount of up to two-hundred fourteen million dollars ($214,000,000) distributed by NewCo to the holders of Class K Mortgage Certificates in a consensual plan, and in the aggregate amount of up to one-hundred thirty million four-hundred forty thousand dollars ($130,440,000) to the Class H Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.188 **_Sub-Equity Class 4_** means the equity distributions in the aggregate amount of up to two-hundred million dollars ($200,000,000) distributed by NewCo to the holders of Class L Mortgage Certificates in a consensual plan, and in the aggregate amount of up to one-hundred million dollars ($100,000,000) to the Class J Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.189    ***Sub-Equity Class 5*** means the equity distributions in the aggregate amount of up to one-hundred million dollars ($100,000,000) distributed by NewCo to the holders of Class M Mortgage Certificates in a consensual plan, and in the aggregate amount of up to two-hundred fourteen million dollars ($214,000,000) to the Class K Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.190    ***Sub-Equity Class 6*** means the equity distributions in the aggregate amount of up to three-hundred million dollars ($300,000,000) distributed by NewCo to the holders of M1 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to two-hundred million dollars ($200,000,000) to the Class L Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.191    ***Sub-Equity Class 7*** means the equity distributions in the aggregate amount of up to four-hundred million dollars ($400,000,000) distributed by NewCo to the holders of M2 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to one-hundred million dollars ($100,000,000) to the Class M Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.192    ***Sub-Equity Class 8*** means the equity distributions in the aggregate amount of up to four-hundred million dollars ($400,000,000) distributed by NewCo to the holders of M3 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to three-hundred million dollars ($300,000,000) to the M1 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.193    ***Sub-Equity Class 9*** means the equity distributions in the aggregate amount of up to four-hundred million dollars ($400,000,000) distributed by NewCo to the holders of M4 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four-hundred million dollars ($400,000,000) to the M2 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.194    ***Sub-Equity Class 10*** means the equity distributions in the aggregate amount of up to four-hundred million dollars ($400,000,000) distributed by NewCo to the holders of M5 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four-hundred million dollars ($400,000,000) to the M3 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.195    ***Sub-Equity Class 11*** means the equity distributions in the aggregate amount of up to four-hundred million dollars ($400,000,000) distributed by NewCo to the holders of M6 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four-hundred million dollars ($400,000,000) to the M4 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

19

1.196 ***Sub-Equity Class 12*** means the equity distributions in the aggregate amount of up to four-hundred million dollars ($400,000,000) distributed by NewCo to the holders of M7 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four-hundred million dollars ($400,000,000) to the M5 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.197 ***Sub-Equity Class 13*** means the equity distributions in the aggregate amount of up to two-hundred million dollars ($200,000,000) distributed by NewCo to the holders of M8 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four-hundred million dollars ($400,000,000) to the M6 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.198 ***Sub-Equity Class 14*** means the equity distributions in the aggregate amount of up to two-hundred million dollars ($200,000,000) distributed by NewCo to the holders of M9 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four-hundred million dollars ($400,000,000) to the M7 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.199 ***Sub-Equity Class 15*** means the equity distributions in the aggregate amount of up to one-hundred ninety-five million four-hundred fifty-five thousand five-hundred and forty dollars ($195,455,540) distributed by NewCo to the holders of M10 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to two-hundred million dollars ($200,000,000) to the M8 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.200 ***Sub-Equity Class 16*** means the equity distributions in the aggregate amount of up to two-hundred million dollars ($200,000,000) distributed by NewCo to the holders of M9 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall; provided that the Sub-Equity Class 16 shall not be issued in the event a consensual plan is confirmed.

1.201 ***Sub-Equity Class 17*** means the equity distributions in the aggregate amount of up to one-hundred ninety-five million four-hundred fifty-five thousand five-hundred and forty dollars ($195,455,540) distributed by NewCo to the holders of M10 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall; provided that this Sub-Equity Class 17 shall not be issued in the event a consensual plan is confirmed.

1.202 ***Subscription Agent*** means any entity reasonably acceptable to the Debtors, the Investor and each of the Sponsors that is selected to act as the Debtors' agent in connection with the Rights Offering and the Class B - H Elections.

1.203 ***Subscription Commencement Date*** means the date on which (a) Rights Certificates are first mailed to Rights Holders, and (b) Election Forms are first mailed to the holders of Class B – H Mortgage Certificates.

1.204 ***Subscription Price*** means the price per NewCo Common Interest to be determined by dividing two-hundred million dollars ($200,000,000), subject to adjustment pursuant

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

20

to Section 6.9(1) hereof, by the aggregate number of NewCo Common Interests to be issued in connection with the Rights Offering (including the Unsubscribed Rights).

1.205 **Successor Trustee** means U.S. Bank National Association, as successor in interest to Wells Fargo Bank, N.A., as Successor Trustee in Trust for holders of Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH.

1.206 **Swap Agreements** means, collectively, (a) the Merrill Swap Agreement, and (b) the Wachovia Swap Agreement.

1.207 **Tier 1 Debtors** means the Debtors set forth on Exhibit C hereof.

1.208 **Tier 2 Debtors** means the Debtors set forth on Exhibit D hereof.

1.209 **Tier 3 Debtors** means the Debtors set forth on Exhibit E hereof, which shall be liquidated and dissolved pursuant to this Plan.

1.210 **Tranche A** means Tranche A of the New Mortgage Loan, in the principal amount of five-hundred fifty million, three-hundred eight-two thousand and seventy-two dollars ($550,382,072), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.211 **Tranche B** means Tranche B of the New Mortgage Loan, in the principal amount of four-hundred million, nine-hundred forty-five thousand and seventy-five dollars ($400,945,750), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.212 **Tranche C** means Tranche C of the New Mortgage Loan, in the principal amount of eight-hundred one million, nine-hundred eight thousand and one-hundred sixty seven dollars ($801,908,167), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.213 **Tranche D.** means Tranche D of the New Mortgage Loan, in the principal amount of five-hundred ninety four million, sixty-one thousand and two-hundred thirty four dollars ($594,061,234), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.214 **Tranche E** means Tranche E of the New Mortgage Loan, in the principal amount of sixty-five million, six-hundred twenty-six thousand dollars ($65,626,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.215 **Tranche F** means Tranche F of the New Mortgage Loan, in the principal amount of ninety-three million, two hundred forty one thousand dollars ($93,241,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.216 **Tranche G** means Tranche G of the New Mortgage Loan, in the principal amount of fifty-six million, four-hundred seventy-eight thousand dollars ($56,478,000), subject to

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

21

adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.217 ***Tranche H*** means Tranche H of the New Mortgage Loan, in the principal amount of fifty-nine million, nine-hundred sixty-eight thousand dollars ($59,968,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.218 ***Tranche I*** means Tranche I of the New Mortgage Loan, in the principal amount of sixty-three million, one-hundred thirty-three thousand dollars ($63,133,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.219 ***Tranche J*** means Tranche J of the New Mortgage Loan, in the principal amount of sixty-six million, three-hundred seven thousand dollars ($66,307,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.220 ***Tranche K*** means Tranche K of the New Mortgage Loan, in the principal amount of sixty-six million, one-hundred thirty-four thousand dollars ($66,134,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.221 ***Treasury Regulations*** means regulations (including temporary and proposed) promulgated under the Internal Revenue Code of 1986, as amended from time to time.

1.222 ***Trustee*** means Wells Fargo Bank, N.A., as Trustee in Trust for holders of certificates under the Mortgage Facility.

1.223 ***Unimpaired*** means, with respect to a Class of Claims, a Claim that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

1.224 ***Unliquidated Claim*** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be estimated.

1.225 ***Unsubscribed Rights*** means those NewCo Common Interests offered in connection with the Rights Offering that are not validly subscribed for pursuant to the Rights Offering prior to the Expiration Date or for which payment has not been received by the Subscription Agent by the Rights Offering Payment Date.

1.226 ***Voting Deadline*** means the deadline for voting on the Plan fixed by the Bankruptcy Court, or such later date fixed by the Debtors with the approval of the Investor and each of the Sponsors, such approval not to be unreasonably withheld.

1.227 ***Wachovia Swap Agreement*** means the Master Agreement, dated August 28, 2007, by and among Wachovia Bank, National Association, and Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass Through Certificates, Series 2007-ESH Trust, and all Schedules thereto, including the Elections and Variables to the 1994 ISDA Credit Support Annex.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

22

### B. Other Terms.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.

### C. Exhibits.

All exhibits to the Plan are annexed hereto. All Plan Documents to be included in exhibits to the Plan Supplement shall be contained in a separate Plan Supplement Exhibit Volume, which shall be filed with the Clerk of the Bankruptcy Court not later than the date that is ten (10) days prior to the last date on which votes to accept or reject the Plan are accepted. Such Plan Supplement Exhibit Volume may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court. Such Plan Supplement Exhibit Volume shall also be available for download from the following website: http://www.kccllc.net/extendedstay. Holders of Claims may also obtain a copy of such Plan Supplement Exhibit Volume, once filed, from the Debtors by a written request sent to the following address:

c/o HVM L.L.C.
100 Dunbar Street,
Spartanburg, South Carolina 29306
Attn: Gary A. DeLapp, Esq.

## ARTICLE II

## PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS
## AND PRIORITY TAX CLAIMS

2.1 ***Payment of Allowed Administrative Expense Claims.*** The Allowed Amount of each Administrative Expense Claim that is Allowed as of the Effective Date shall be paid in full, in Cash, on the Effective Date; provided, however, that Administrative Expense Claims of the type specified in Section 1.6(c)(i) hereof shall be assumed and paid by the Reorganized Debtors or NewCo, as applicable, in accordance with the terms and conditions of the particular transactions and any agreements relating thereto. Each holder of an Administrative Expense Claim of the type specified in Section 1.6(c)(ii) or Section 1.6(c)(iii) hereof shall be paid the Allowed Amount of such Administrative Expense Claim in full, in Cash, as soon as practicable after such Administrative Expense Claim is Allowed.

2.2 ***Compensation and Reimbursement Claims.*** The Bankruptcy Court shall fix in the Confirmation Order a date for the filing of, and a date to hear and determine, all applications for final allowances of compensation or reimbursement of expenses under section 330 of the Bankruptcy Code or applications for allowance of Administrative Expense Claims arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code. The Allowed Amount of all Administrative Expense Claims arising under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code shall be paid in full, in Cash, (a) upon the later of (i) the Effective Date and (ii) the date upon which any such Administrative Expense

Claim becomes Allowed or (b) at such later date or upon such other terms as may be mutually agreed upon between each such Administrative Expense Creditor and the Reorganized Debtors or NewCo, as applicable.

2.3 **Priority Tax Claims.** Each holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Allowed Priority Tax Claim either (a) in full, in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law or (b) upon such other terms as may be mutually agreed upon between each holder of a Priority Tax Claim and the Reorganized Debtors or NewCo, as applicable.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

3.1 **Summary.** The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| CLASS | DESIGNATION | STATUS | ENTITLED TO VOTE? |
|-------|-------------|--------|-------------------|
| Class 1 | Priority Claims | Unimpaired | No |
| Class 2 | Mortgage Facility Claim | Impaired | Yes |
| Class 3 | ESA UD Mortgage Claim | Impaired | Yes |
| Class 4 | Mortgage Facility Deficiency Claim and the Mezzanine Facilities Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Impaired | Yes |
| Class 6 | Existing Equity | Impaired | No |
| Class 7 | ESA MD Properties Trust Certificate | Unimpaired | No |
| Class 8 | ESA MD Borrower Interests | Unimpaired | No |
| Class 9 | ESA P Portfolio MD Trust Certificate | Unimpaired | No |
| Class 10 | ESA P Portfolio MD Borrower Interests | Unimpaired | No |
| Class 11 | ESA Canada Properties Interests | Unimpaired | No |
| Class 12 | ESA Canada Properties Borrower Interests | Unimpaired | No |
| Class 13 | ESH/TN Properties L.L.C. Membership Interests | Unimpaired | No |
| Class 14 | ESH/ESA General Partnership Interests | Unimpaired | No |
| Class 15 | Other Existing Equity Interests | Impaired | No |

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

24

4.1     ***Class 1.***  Priority Claims.

(a)     *Classification*:  Class 1 consists of the Allowed Priority Claims.

(b)     *Treatment*:  Each holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim, in full, in Cash, on the later of the Effective Date and as soon as practicable after the date such Priority Claim becomes Allowed.

(c)     *Voting*:  Class 1 is Unimpaired.  The holders of the Claims in Class 1 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.2     ***Class 2.***  Mortgage Facility Claim.

(a)     *Classification*:  Class 2 consists of the Allowed Mortgage Facility Claim.

(b)     *Treatment*:

(i)     *Treatment If Class 2 Accepts Plan*.  In the event that Class 2 accepts the Plan, the holder of the Allowed Mortgage Facility Claim shall receive the following to be distributed in accordance with Section 6.2 hereof:  (i) 100% of the Rights, (ii) on the Initial Distribution Date, 100% of the New Class A1 Mortgage Notes, 100% of the New Class A2 Mortgage Notes, 100% of the New Class A3 Mortgage Notes, 100% of the New Class A4 Mortgage Notes, 100% of the New Class B Mortgage Notes, 100% of the New Class C Mortgage Notes, 100% of the New Class D Mortgage Notes, 100% of the New Class E Mortgage Notes, 100% of the New Class F Mortgage Notes, 100% of the New Class G Mortgage Notes, 100% of the New Class H Mortgage Notes, (iii) 100% of the Class A4 Cash Paydown, (iv) the Rollover Equity, or in lieu of the Rollover Equity, the Class B - H Equity Cashout Option and (v) 100% of the Sub-Equity Class 2, 100% of the Sub-Equity Class 3, 100% of the Sub-Equity Class 4 and 100% of the Sub-Equity Class 5.

(ii)     *Treatment If Class 2 Rejects the Plan*.  In the event that Class 2 rejects the Plan, the holder of the Allowed Mortgage Facility Claim shall receive, on the Distribution Date, the New Alternate Notes in an aggregate principal amount not to exceed three billion, three-hundred million dollars ($3,300,000,000), which represents the value of the collateral securing the Allowed Mortgage Facility Claim, and which New Alternate Notes shall bear interest at the rate of 5.34% per annum or such lower rate as shall be fixed by the Bankruptcy Court, and shall have a final maturity date that is seven (7) years after the Initial Distribution Date. Notwithstanding the foregoing, in the event that the Debtors seek to confirm the Plan under section 1129(b) of the Bankruptcy Code pursuant to this Section 4.2(b)(ii), the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 hereof, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, to offer different treatment to Class 2, including, without limitation, offering different forms of consideration such as notes, equity warrants or sub-equity to Class 2, to the extent that such forms of consideration comply with the requirements of section 1129(b) of the Bankruptcy Code.  The Rights Offering shall be cancelled if Class 2 rejects the Plan.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

25

(c)     *Class B - H Debt/Equity Election*.  Each holder of a Class B - H Mortgage Certificate may exercise the Class B - H Debt/Equity Election, provided that on the Effective Date, 50% of the Class B - H Mortgage Debt will have been satisfied by the New Class B - H Mortgage Notes and 50% of the Class B - H Mortgage Debt will have been satisfied by the Rollover Equity, subject to Section 4.2(d) below.  In the event that any holder of a Class B - H Mortgage Certificate elects to receive less than 50% of its consideration in Rollover Equity, then the other holders of Class B - H Mortgage Certificates shall have the right to elect to receive their Pro Rata Share of the Excess Equity.  In the event that Class 2 rejects the Plan, the Class B-H Debt/Equity Election will be cancelled and extinguished.

(d)     *Class B - H Equity Cashout Option Election for Class B* – H Mortgage Certificates.  At the election of any holder of a Class B - H Mortgage Certificate, such holder shall receive, in lieu of the Rollover Equity that such holder is entitled to receive, the Class B - H Equity Cashout Option.  In the event that Class 2 rejects the Plan, the Class B - H Equity Cashout Option will be cancelled and extinguished.

(e)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mortgage Facility Claim.

(f)     *Voting*:  Class 2 is Impaired.  The holder of the Claim in Class 2 is entitled to vote to accept or reject the Plan.

4.3     **Class 3.**  ESA UD Mortgage Claim.

(a)     *Classification*:  Class 3 consists of the Allowed ESA UD Mortgage Claim.

(b)     *Treatment*:  The holder of the Allowed ESA UD Mortgage Claim shall receive on the Distribution Date the New ESA UD Mortgage Note in full settlement, satisfaction, release and discharge of the Allowed ESA UD Mortgage Claim.

(c)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed ESA UD Mortgage Claim.

(d)     *Voting*:  Class 3 is Impaired.  The holder of the Claim in Class 3 is entitled to vote to accept or reject the Plan.

4.4     **Class 4.**  Mortgage Facility Deficiency Claim and Mezzanine Facilities Claims.

(a)     *Classification*:  Class 4 consists of the Mortgage Facility Deficiency Claim and Mezzanine Facilities Claims.

(b)     *Treatment*:

(i)     *Treatment if Class 2 Accepts the Plan*.  If Class 2 accepts the Plan, the holders of the Allowed Mortgage Facility Deficiency Claim (which amount shall be allowed pursuant to Section 6.18 hereof) and the Allowed Mezzanine Facilities Claims shall receive the following, which shall be distributed pursuant to Section 6.2 hereof, 100% of the Sub-Equity Class 6, 100% of the Sub-Equity Class 7, 100% of the Sub-Equity Class 8, 100% of the Sub-Equity Class 9, 100% of the Sub-Equity

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

26

Class 10, 100% of the Sub-Equity Class 11, 100% of the Sub-Equity Class 12, 100% of the Sub-Equity Class 13, 100% of the Sub-Equity Class 14 and 100% of the Sub-Equity Class 15.

(ii) *Treatment if Class 2 Rejects the Plan*. If Class 2 rejects the Plan, the holders of the Allowed Mortgage Facility Deficiency Claim (which shall be valued pursuant to Section 6.18 hereof) and the Allowed Mezzanine Facilities Claims shall receive 100% of the Sub-Equity, *provided* that such distribution complies with section 1129(b) of the Bankruptcy Code and, in the event that such distribution does not comply with section 1129(b) of the Bankruptcy Code, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 hereof, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, to offer different treatment to Class 4.

(c) *Interest*: Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mortgage Facility Deficiency Claim.

(d) *Voting*: Class 4 is Impaired. The holder of the Claim in Class 4 is entitled to vote to accept or reject the Plan.

4.5 **Class 5.** General Unsecured Claims.

(a) *Classification*: Class 5 consists of the General Unsecured Claims.

(b) *Treatment*: No distribution shall be made under the Plan with respect to the General Unsecured Claims; provided, however, that in order to facilitate a consensual Plan, if Class 5 votes to accept the Plan, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of five-hundred thousand dollars ($500,000).

(c) *Interest*: Interest shall neither accrue nor be payable from and after the Commencement Date with respect to Allowed General Unsecured Claims.

(d) *Voting*: Class 5 is Impaired. The holders of the Claims in Class 5 are entitled to vote to accept or reject the Plan.

4.6 **Class 6.** Existing Equity.

(a) *Classification*: Class 6 consists of the Existing Equity.

(b) *Treatment*: No distribution shall be made under the Plan from the Estates in respect of the Existing Equity. On the Effective Date, the certificates that previously evidenced ownership of Existing Equity shall be cancelled and shall be null and void, the holder(s) thereof shall no longer have any rights in respect of the Existing Equity, and such certificates shall not evidence any rights under the Plan.

(c) *Voting*: Class 6 is Impaired. The holders of Existing Equity in Class 6 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.7 **Class 7.** ESA MD Properties Trust Certificate.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

27

(a)     *Classification*:  Class 7 consists of the ESA MD Properties Trust Certificate.

(b)     *Treatment*:  The holder of the ESA MD Properties Trust Certificate shall retain the ESA MD Properties Trust Certificate.

(c)     *Voting*:  Class 7 is Unimpaired.  The holder of the Equity Interests in Class 7 is deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.8     ***Class 8.***  ESA MD Borrower Interests.

(a)     *Classification*:  Class 8 consists of the ESA MD Borrower Interests.

(b)     *Treatment*:  Each holder of ESA MD Borrower Interests shall retain its ESA MD Borrower Interests.

(c)     *Voting*:  Class 8 is Unimpaired.  The holders of the Equity Interests in Class 8 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.9     ***Class 9.***  ESA P Portfolio MD Trust Certificate

(a)     *Classification*:  Class 9 consists of the ESA P MD Portfolio Trust Certificate.

(b)     *Treatment*:  The holder of the ESA P MD Portfolio Trust Certificate shall retain the ESA P Portfolio Trust Certificate.

(c)     *Voting*:  Class 9 is Unimpaired.  The holder of the Equity Interests in Class 9 is deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.10    ***Class 10.***  ESA P Portfolio MD Borrower Interests

(a)     *Classification*:  Class 10 consists of the ESA P Portfolio MD Borrower Interests.

(b)     *Treatment*:  Each holder of ESA P Portfolio MD Borrower Interests shall retain its ESA P Portfolio MD Borrower Interests.

(c)     *Voting*:  Class 10 is Unimpaired.  The holders of the Equity Interests in Class 10 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.11    ***Class 11.***  ESA Canada Properties Interests.

(a)     *Classification*:  Class 11 consists of the ESA Canada Properties Interests.

(b)     *Treatment*:  Each holder of ESA Canada Properties Interests shall retain its ESA Canada Properties Interests.

(c)     *Voting*:  Class 11 is Unimpaired.  The holders of the Equity Interests in Class 11 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.12    ***Class 12.***  ESA Canada Properties Borrower Interests.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

28

(a)    *Classification*:  Class 12 consists of the ESA Canada Properties Borrower Interests.

(b)    *Treatment*:  Each holder of ESA Canada Properties Borrower Interests shall retain its ESA Canada Properties Borrower Interests.

(c)    *Voting*:  Class 12 is Unimpaired.  The holders of the Equity Interests in Class 12 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.13    **Class 13.**  ESH/TN Properties Membership Interest.

(a)    *Classification*:  Class 13 consists of the ESH/TN Properties Membership Interest.

(b)    *Treatment*:  The holder of the ESH/TN Properties Membership Interest shall retain its ESH/TN Properties Membership Interest.

(c)    *Voting*:  Class 13 is Unimpaired.  The holder of the Equity Interest in Class 13 is deemed to accept the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

4.14    **Class 14.**  ESH/ESA General Partnership Interests.

(a)    *Classification*:  Class 14 consists of the ESH/ESA General Partnership Interests.

(b)    *Treatment*:  Each holder of ESH/ESA General Partnership Interests shall retain its ESH/ESA General Partnership Interests.

(c)    *Voting*:  Class 14 is Unimpaired.  The holders of the Equity Interests in Class 14 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.15    **Class 15.**  Other Existing Equity Interests.

(a)    *Classification*:  Class 15 consists of the Other Existing Equity Interests.

(b)    *Treatment*:  No distribution shall be made under the Plan from the Estates in respect of the Other Existing Equity Interests.  On the Effective Date, the certificates that previously evidenced ownership of the Other Existing Equity Interests shall be cancelled and shall be null and void, the holders thereof shall no longer have any rights in respect of the Other Existing Equity Interests, and such certificates shall not evidence any rights under the Plan.

(c)    *Voting*:  Class 15 is Impaired.  The holders of the Other Existing Equity Interests in Class 15 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**ARTICLE V**

**ACCEPTANCE, REJECTION, AND REVOCATION
OR WITHDRAWAL OF THE PLAN**

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

29

5.1     **Classes Entitled to Vote.**  Each holder of a Claim, as of the Record Date, in an Impaired Class, other than those Classes that are deemed to reject the Plan, shall be entitled to vote to accept or reject the Plan, in its sole and absolute discretion, subject to applicable law.

5.2     **Acceptance by Class of Claims.**  An Impaired Class of Claims shall be deemed to accept the Plan if (a) holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

5.3     **Nonconsensual Confirmation.**  In the event that any Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority required by section 1129(a) of the Bankruptcy Code, the Debtors, with the consent of the Investor and each of the Sponsors, reserve the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, or (b) alter, amend or modify the Plan in accordance with Section 13.1 hereof.  At the request of the Investor and each of the Sponsors, the Debtors shall exercise the right to seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code in the manner reasonably requested by the Investors and each of the Sponsors, provided that the value of the Investment contemplated by Section 6.8 hereof, in the event that Class 2 rejects the Plan, shall not be reduced without the Debtors' prior written consent.

5.4     **Revocation or Withdrawal.**

(a)     *Right to Revoke or Withdraw.*  The Plan may be revoked or withdrawn prior to the Confirmation Date (i) by the Debtors, in their sole discretion, in the event that the Investment and Standby Purchase Agreement is terminated in accordance with Section 15 thereof, and (ii) in all other circumstances, by the Debtors, with the consent of the Investor and each of the Sponsors, in their sole discretion.

(b)     *Effect of Withdrawal or Revocation.*  If the Plan is revoked or withdrawn prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims or defenses or any admission or statement against interest by any Debtor, the Creditors' Committee, the Investor, any Sponsor or any other Person or to prejudice in any manner the rights of the Debtors, the Creditors' Committee, the Investor, any Sponsor or any Person in any further proceedings involving any Debtor.

5.5     **Amendment of Plan Documents.**  From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan and any documents attached to such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan shall be as provided in such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan and their respective attachments.

5.6     **Removal of Debtors.**  At the option of the Investor and each of the Sponsors, with the consent of the Debtors, which consent shall not be unreasonably withheld, a Debtor may be removed from this Plan.  In such event, the Plan will omit any treatment of the assets and liabilities of such Debtor, unless otherwise agreed.  The removal of any Debtor from this Plan will not affect this Plan with respect to any other Debtor.

# ARTICLE VI

# IMPLEMENTATION OF THE PLAN

6.1     ***Substantive Consolidation.***  The Plan is premised upon the substantive consolidation of the Debtors for all purposes related to this Plan, including, without limitation, for purposes of voting, confirmation and distribution.  On and after the Effective Date, the Debtors and their Estates shall be deemed merged and (i) all assets and liabilities of the Debtors shall be treated for purposes of the Plan as though they were merged, (ii) all guarantees of the Debtors of payment, performance or collection of obligations of any other of the Debtors shall be eliminated and cancelled, (iii) all joint obligations of two or more of the Debtors and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, and (iv) any Claim filed against any of the Debtors shall be deemed filed against the consolidated Debtors and shall be one Claim against and a single obligation of the consolidated Debtors.

6.2     ***Distribution of New Securities.***  The New Securities shall be distributed by the holder of the Mortgage Facility Claim (to the holders of Certificates) as follows:

(a)     If Class 2 votes to accept the Plan, and Class 2 is, therefore, entitled to the treatment set forth in Section 4.2(b)(i) hereof, the New Securities shall be distributed by the holder of the Mortgage Facility Claim (to the holders of Certificates) as follows:

(i)     *Holders of Class A1 Mortgage Certificates*.  Each holder of a Class A1 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A1 Mortgage Notes.

(ii)     *Holders of Class A2 Mortgage Certificates*.  Each holder of a Class A2 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A2 Mortgage Notes.

(iii)     *Holders of Class A3 Mortgage Certificates*.  Each holder of a Class A3 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A3 Mortgage Notes.

(iv)     *Holders of Class A4 Mortgage Certificates*.  Each holder of a Class A4 Mortgage Certificate shall receive on the Initial Distribution Date (x) its Pro Rata Share of the Class A4 Cash Paydown and (y) its Pro Rata Share of the New Class A4 Mortgage Notes.

(v)     *Holders of Class B - H Mortgage Certificates*.  Each holder of a Class B - H Mortgage Certificate, shall receive (x) on the Initial Distribution Date, its Pro Rata Share of the New Class B - H Mortgage Notes, subject to the Class B - H Debt/Equity Election, (y) on the Initial Distribution Date, its Pro Rata Share of the Rollover Equity or, in lieu thereof, the Class B - H Equity Cashout Option and subject to the Class B - H Debt/Equity Election, and (z) New B - H Rights (calculated as such holder's Pro Rata Share of the percentage of NewCo Common Interests that is to be distributed to the Class of Mortgage Certificates of which such holder is a member pursuant to the Plan).

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

31

(vi) *Holders of Class J Mortgage Certificates*. Each holder of a Class J Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 2 and the New J - K Rights (calculated as such holder's Pro Rata Share of the percentage of NewCo Common Interests that is to be distributed to the Class of Mortgage Certificates of which such holder is a member pursuant to the Plan).

(vii) *Holders of Class K Mortgage Certificates*. Each holder of a Class K Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 3 and the New J - K Rights (calculated as such holder's Pro Rata Share of the percentage of NewCo Common Interests that is to be distributed to the Class of Mortgage Certificates of which such holder is a member pursuant to the Plan).

(viii) *Holders of Class L Mortgage Certificates*. Each holder of a Class L Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 4.

(ix) *Holders of Class M Mortgage Certificates*. Each holder of a Class M Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 5.

(b) If Class 2 votes to reject the Plan, and Class 2 is, therefore, entitled to the treatment set forth in Section 4.2(b)(ii) herein, the New Alternate Notes shall be distributed by the holder of the Mortgage Facility Claim to the holders of the Class A1 - F Mortgage Certificates and the holders of the Class G Mortgage Certificates as follows:

(i) *Holders of Class A1- F Mortgage Certificates*. Each holder of a Class A1 - F Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the New Alternate Notes (calculated as such holder's Pro Rata Share of the aggregate principal amount of the Class A1 - F Mortgage Certificates).

(ii) *Holders of Class G Mortgage Certificates*. Each holder of a Class G Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Class G Alternate Note Proportion of the New Alternate Notes.

(c) If Class 2 votes to accept the Plan, in accordance with Section 4.4(b)(i) hereof, Class 4 receives certain of the Sub-Equity which shall be distributed by NewCo or the Reorganized Debtors as follows:

(i) *Holders of M1 Mezzanine Facility Claims*. Each holder of an M1 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 6.

(ii) *Holders of M2 Mezzanine Facility Claims*. Each holder of an M2 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 7.

(iii) *Holders of M3 Mezzanine Facility Claims*. Each holder of an M3 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 8.

(iv) *Holders of M4 Mezzanine Facility Claims*. Each holder of an M4 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 9.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

32

(v)   *Holders of M5 Mezzanine Facility Claims.*  Each holder of an M5 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 10.

(vi)   *Holders of M6 Mezzanine Facility Claims.*  Each holder of an M6 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 11.

(vii)   *Holders of M7 Mezzanine Facility Claims.*  Each holder of an M7 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 12.

(viii)   *Holders of M8 Mezzanine Facility Claims.*  Each holder of an M8 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 13.

(ix)   *Holders of M9 Mezzanine Facility Claims.*  Each holder of an M9 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 14.

(x)   *Holders of M10 Mezzanine Facility Claims.*  Each holder of an M10 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 15.

(d)   If Class 2 votes to reject the Plan, in accordance with Section 4.4(b)(ii) hereof, Class 4 receives 100% of the Sub-Equity which shall be distributed by the holder of the Mortgage Facility Deficiency Claim (to holders of Certificates) and by NewCo or the Reorganized Debtors (to holders of Mezzanine Facilities Claims) as follows:

(i)   *Holders of Class G Mortgage Certificates.*  Each holder of a Class G Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 2.

(ii)   *Holders of Class H Mortgage Certificates.*  Each holder of a Class H Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 3.

(iii)   *Holders of Class J Mortgage Certificates.*  Each holder of a Class J Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 4.

(iv)   *Holders of Class K Mortgage Certificates.*  Each holder of a Class K Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 5.

(v)   *Holders of Class L Mortgage Certificates.*  Each holder of a Class L Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 6.

(vi)   *Holders of Class M Mortgage Certificates.*  Each holder of a Class M Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 7.

(vii)   *Holders of M1 Mezzanine Facility Claims.*  Each holder of an M1 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 8.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

33

(viii) *Holders of M2 Mezzanine Facility Claims*. Each holder of an M2 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 9.

(ix) *Holders of M3 Mezzanine Facility Claims*. Each holder of an M3 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 10.

(x) *Holders of M4 Mezzanine Facility Claims*. Each holder of an M4 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 11.

(xi) *Holders of M5 Mezzanine Facility Claims*. Each holder of an M5 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 12.

(xii) *Holders of M6 Mezzanine Facility Claims*. Each holder of an M6 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 13.

(xiii) *Holders of M7 Mezzanine Facility Claims*. Each holder of an M7 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 14.

(xiv) *Holders of M8 Mezzanine Facility Claims*. Each holder of an M8 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 15.

(xv) *Holders of M9 Mezzanine Facility Claims*. Each holder of an M9 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 16.

(xvi) *Holders of M10 Mezzanine Facility Claims*. Each holder of an M10 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 17.

6.3 ***Creation of NewCo.***

(a) *Certificate of Formation*. The NewCo Certificate of Formation shall be filed with the applicable Secretary of State on or before the Effective Date substantially in the form of the NewCo Certificate of Formation and shall, inter alia, include a provision prohibiting the issuance of non-voting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code. Pursuant to the Plan:

(i) Provided that Class 2 accepts the Plan, NewCo Common Interests comprising 42.85% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the New Warrants have been exercised as of the Effective Date) shall be issued to the Investor on the Effective Date immediately after the consummation of the issuance described in clause (iv) below. In the event that Class 2 rejects the Plan, NewCo Common Interests comprising 100% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

34

New Warrants have been exercised as of the Effective Date) shall be issued to the Investor on the Effective Date immediately after consummation of the issuance described in (iv) below;

(ii)     Provided that Class 2 accepts the Plan, NewCo Common Interests representing 19.04% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the New Warrants have been exercised as of the Effective Date) shall be issued in connection with the Rights Offering on the Effective Date immediately after the consummation of the issuance described in clause (iv) below.  In the event that Class 2 rejects the Plan, the Rights Offering shall be terminated, canceled or otherwise not effectuated and all Rights and any exercise of any Right shall be canceled and be null and void and no NewCo Common Interests shall be issued in connection with the Rights Offering;

(iii)     Provided that Class 2 accepts the Plan, NewCo Common Interests representing 38.11% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the New Warrants have been exercised as of the Effective Date) shall be issued to the holders of the Class B – H Mortgage Certificates as Rollover Equity in accordance with the Plan.  In the event that any holders of the Class B - H Mortgage Certificates exercise the Class B - H Equity Cashout Option, the corresponding NewCo Common Interests shall be issued to the Investor.  In the event that Class 2 rejects the Plan, except for NewCo Common Interests issued to the Investor on account of the Investment, no NewCo Common Interests shall be issued to holders of Class B - H Mortgage Certificates;

(iv)     Additional NewCo Common Interests, in an amount agreed upon by the Debtors, the Investor and each of the Sponsors, shall be reserved for issuance under the NewCo Management Incentive Plan and the SCG Incentive Comp; and

(v)     As provided in Section 6.15 hereof, in the event BHAC and NewCo enter into a BHAC IP Transfer Agreement, New Warrants to acquire NewCo Common Interests shall be allocated to BHAC, with such NewCo Common Interests representing 2.5% of the issued and outstanding NewCo Common Interests as of the Effective Date.

If the Investor and the Sponsors determine, in their sole and absolute discretion, that an alternate corporate or organizational structure, form or identity is appropriate, this Section 6.3(a) shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

(b)     *NewCo Operating Agreement*.  The NewCo Operating Agreement shall be adopted substantially in the form to be included in the Plan Supplement and shall be deemed to become valid, binding and enforceable in accordance with its terms on the Effective Date.  Each holder of NewCo Common Interests shall be bound by the terms of the NewCo Operating Agreement without the need for execution by any party thereto other than NewCo.

(c)     *Registration Rights*.  Pursuant to the terms of the Registration Rights Agreement, which shall be substantially in the form to be included in the Plan Supplement, the Investor shall be entitled to certain registration rights as set forth therein.

6.4     ***Cancellation of Existing Debt Securities.***  As of the Effective Date, all notes, agreements, certificates and securities evidencing the Mortgage Facility, the Class A1 Mortgage Certificates, Class A2 Mortgage Certificates, Class A3 Mortgage Certificates, Class A4 Mortgage Certificates, the Class B – M Mortgage Certificates, the EA UD Mortgage Claim, the Mezzanine Facilities, the General Unsecured Claims, and the rights of the holders thereof thereunder, shall be cancelled and deemed null and void and of no further force and effect, and the holders thereof shall have no rights, and such notes, agreements, certificates and securities shall evidence no rights, except the right to receive the Distributions provided herein.

6.5     ***Management of NewCo.***  Subject to the immediately following sentence, as of the Effective Date, the NewCo Management Committee shall be a six (6) member committee and shall be comprised as follows: (a) four (4) individuals designated by the Investor, (b) one (1) individual initially designated by the largest holder, as of the Effective Date, of Rollover Equity, other than the Investor and its members and affiliates, and thereafter, by the holders of the Rollover Equity as set forth in the Operating Agreement, and (c) the chief executive officer of HVM or NewCo Manager, as determined by the Investor, each of whom will have one vote on all matters to be voted on by the NewCo Management Committee.  In the event that the Plan is confirmed under Section 1129(b) under the Bankruptcy Code, the NewCo Management Committee shall be a five (5) member committee and shall be comprised as follows: (a) four (4) individuals designated by the Investor and (b) the chief executive officer of HVM or NewCo Manager, as determined by the Investor, each of whom will have one vote on all matters to be voted on by the NewCo Management Committee.  Each of the members of such NewCo Management Committee shall be identified in the Plan Supplement and shall serve in accordance with the NewCo Certificate of Formation and the NewCo Operating Agreement.  If Class 2 votes in favor of the Plan, from and after the Effective Date, members of the NewCo Management Committee shall serve and be selected pursuant to the terms of the NewCo Operating Agreement, which shall provide, among other things, that so long as the Investor continue to hold at least 25.00% of the NewCo Common Interests issued to it on the Effective Date, the Investor shall continue to have the right to elect four (4) members of the NewCo Management Committee.  The NewCo Operating Agreement shall further provide, among other things, that the management of NewCo shall be vested exclusively in the NewCo Management Committee, which shall have all of the rights, powers and authority to manage and control all matters concerning NewCo, including, without limitation, the business, affairs, transactions, existence and governance (other than the composition of the NewCo Management Committee) of NewCo.  The officers of NewCo shall be identified in the Plan Supplement and shall serve in accordance with the NewCo Certificate of Formation, the NewCo Operating Agreement, Section 11.5 hereof and the requirements of applicable nonbankruptcy law.

6.6     ***NewCo Management Incentive Plan.***  On and after the Effective Date, NewCo shall implement the NewCo Management Incentive Plan, in form and substance reasonably acceptable to the Investor and each of the Sponsors, which shall provide for cash distributions to participants therein based upon a waterfall to be determined by the NewCo Management Committee. The identity of recipients, the cash distribution waterfall and all other terms shall be determined by the NewCo Management Committee. The NewCo Management Incentive Plan will be designed to provide additional compensation to HVM for their management services. Alternatively, NewCo or one of its affiliates may seek to provide incentives to HVM by providing additional performance-based compensation to HVM pursuant to and in connection with the management agreements with HVM that are being assumed by, or assumed and assigned to, NewCo or one or more newly formed subsidiaries (which newly formed subsidiaries, are wholly owned either directly or indirectly by NewCo, or designated by an existing Debtor that is a Real Estate Investment Trust subsidiary) and

modified on the Effective Date pursuant to the terms of the Plan to provide for, among other things, such payments.

6.7     ***Corporate Reorganization Actions.***  On or as soon as practicable after the Effective Date, the Debtors and/or NewCo, as applicable, shall take such actions as may be or become necessary to effectuate the following, all of which shall be authorized and approved in all respects, in each case without further action being required under applicable law, regulation, order, or rule (including, without limitation, any action by the board of directors, stockholders, partners or members of any Debtor or members of NewCo):

(a)     the NewCo Certificate of Formation will be filed with the applicable Secretary of State effecting the formation of NewCo.  At the option of the Investor and each of the Sponsors, the Debtors or NewCo may form additional subsidiaries owned in whole, or in part, by NewCo in order to effectuate the transactions contemplated hereunder;

(b)     100% of the New Debtor Equity of the Tier 1 Debtors shall be issued to NewCo or a subsidiary of NewCo;

(c)     the Equity Interests of each of the Tier 2 Debtors, the ESH/ESA General Partnership Interests and the ESH/TN Properties Membership Interests shall remain outstanding and Unimpaired; and

(d)     the Equity Interests of each of the Tier 3 Debtors shall be canceled, extinguished and not re-issued.  The Tier 3 Debtors shall be deemed liquidated and dissolved by the Debtors for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided that, in its sole discretion, the Debtors may (but shall not be required to) file with the Office of the Secretary of State for the applicable state a certificate of dissolution.

If the Investor and the Sponsors determine, in their sole and absolute discretion, subject to the terms and conditions of the Investment and Standby Purchase Agreement and the Plan, that NewCo shall have an alternate corporate or organizational structure, form or identity, this Section 6.7 shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

6.8     ***Investment.***

If Class 2 accepts the Plan, on the Effective Date immediately after the consummation of the issuance described in Section 6.3(a)(iii) hereof, and subject to the terms of, and adjustments contained in Sections 2.2 and 3.4 of the Investment and Standby Purchase Agreement, the Investor shall purchase the NewCo Common Interests from NewCo as set forth in the Investment and Standby Purchase Agreement for Cash in the aggregate amount of four-hundred fifty million dollars ($450,000,000), subject to increase after giving effect to Section 6.9(l) hereof so that the total amount of the Investment is in the maximum aggregate amount of six-hundred fifty million dollars ($650,000,000).  Assuming that none of the New Warrants have been exercised as of the Effective Date, the NewCo Common Interests that the Investor shall receive on the Effective Date as a result of the Investment will comprise approximately 42.85% of the total issued and outstanding NewCo Common Interests as of the Effective Date (the "Investment"), with such amount of NewCo Common Interests to be increased by the amount of NewCo Common Interests that are acquired by the Investor through the Class B - H Equity Cashout Option and the Rights Offering.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

37

If Class 2 does not accept the Plan, on the Effective Date, immediately after the consummation of the issuance described in Section 6.3(a)(iii) hereof, and subject to the terms of the Investment and Standby Purchase Agreement, Investor shall purchase NewCo Common Interests from NewCo for Cash in the aggregate amount of four-hundred million dollars ($400,000,000). The NewCo Common Interest that the Investor shall receive on the Effective Date as a result of the Investment will comprise 100% of the total issued and outstanding NewCo Common Interests as of the Effective Date.

If the Investor and the Sponsors determine in their sole and absolute discretion that NewCo shall have an alternate corporate or organizational structure, form or identity, the structure of the Investment contemplated in this Section 6.8 shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

6.9 ***Rights Offering.***

(a) *The Rights.* Each Rights Holder, including the Sponsors, shall have the right to purchase one NewCo Common Interest for each Right that the Rights Holder holds, at a purchase price that is equal to the Subscription Price. Rights Holders have the right, but not the obligation, to participate in the Rights Offering as provided herein. The number of NewCo Common Interests distributed to the Rights Holders will be rounded down to the nearest whole number. No fractional NewCo Common Interests will be issued in respect of fractional Rights and holders of fractional Rights will not be entitled to receive any Cash in lieu thereof. There shall be no over-subscription rights provided in connection with the Rights Offering.

(b) *Subscription Period.* The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Expiration Date. Each Rights Holder intending to participate in the Rights Offering must affirmatively elect to exercise its Rights, in whole or in part, on or prior to the Expiration Date. On the Effective Date, all Unsubscribed Rights shall be acquired by the Investor in accordance with and subject to the terms and conditions contained in the Investment and Standby Purchase Agreement and this Plan, and any exercise of such Rights after the Expiration Date (other than the purchase of NewCo Common Interests by the Investor pursuant to the Investment and Standby Purchase Agreement) shall be null and void and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Expiration Date, regardless of when the documents relating to such exercise were sent.

(c) *Subscription Price.* Each Rights Offering Participant choosing to exercise its Rights, in whole or in part, shall pay the aggregate Subscription Price for the NewCo Common Interests that such Rights Offering Participant is to acquire pursuant to the exercise of the Rights not later than the Rights Offering Payment Date. If the Effective Date does not occur, the Subscription Price that each Rights Offering Participant has paid shall be refunded to such Rights Offering Participant without payment of any interest.

(d) *Exercise of Rights.* In order to exercise the Rights, each Rights Holder must: (i) return a duly completed and executed Rights Certificate to the Subscription Agent on or before the Expiration Date in which the Rights Holder represents that it is (x) a "qualified institutional buyer" as such term is defined in Rule 144A under the Securities Act, (y) an "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act, or (z) a non-US person purchasing under Regulation S under the Securities Act, and (ii) pay to the Subscription Agent (on behalf of the Debtors) on or before the Rights Offering Payment Date such Rights Holder's aggregate Subscription Price in accordance with the wire instructions set forth on the Rights

Certificate or by bank or cashier's check delivered to the Subscription Agent as specified in the Rights Certificate. If the Subscription Agent for any reason does not receive from a given Rights Holder (i) a duly completed and executed Rights Certificate on or prior to the Expiration Date, and (ii) immediately available funds in an amount equal to such holder's aggregate Subscription Price on or prior to the Rights Offering Payment Date, such Rights Holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering and any NewCo Common Interests that such Rights Holder could have purchased upon its valid exercise of the Rights shall be deemed to be Unsubscribed Rights. The payments made in accordance with the Rights Offering shall be deposited and held by the Subscription Agent in the Escrow Account, which account will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date. The Subscription Agent shall not use such funds for any other purpose or release such funds to the Debtors prior to such date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance.

Each Rights Offering Participant may exercise all or any portion of such holder's Rights pursuant to the instructions set forth in the Rights Certificate, but the exercise of any Rights shall be irrevocable and shall obligate the exercising Rights Offering Participant to purchase the applicable NewCo Common Interests and to pay the aggregate Subscription Price for such NewCo Common Interests on or prior to the Rights Offering Payment Date. In order to facilitate the exercise of the Rights, on the Subscription Commencement Date, a Rights Certificate will be mailed to each Rights Holder together with appropriate instructions for the proper completion, due execution and timely delivery of the Rights Certificate. Each Rights Offering Participant exercising its Rights shall agree to support and not take any action to oppose or delay confirmation and implementation of the Plan.

(e) *Rights Offering Procedures*. Notwithstanding anything contained herein to the contrary, the Debtors, the Investor and the Sponsors may mutually agree, without the consent of any Rights Holder, to modify the procedures relating to the Rights Offering or adopt such additional detailed procedures consistent with the provisions of this Section 6.9 to administer more efficiently the exercise of the Rights.

(f) *Transfer Restriction; Revocation*. The Rights are not transferable by any Rights Holder, subject to Section 6.17 hereof. Any transfer or attempted transfer by a Rights Holder, subject to Section 6.17 hereof, will be null and void, and no purported transferee will be treated as the holder of, or permitted to exercise, any Rights. Once a Rights Offering Participant has properly exercised its Rights, such exercise will not be permitted to be revoked.

(g) *Rights Offering Backstop*. Subject to the terms and conditions in the Investment and Standby Purchase Agreement, the Investor has agreed to subscribe for and purchase on the Effective Date, at the aggregate Subscription Price therefor, its allocated percentage of Unsubscribed Rights as set forth in the Investment and Standby Purchase Agreement as of the Effective Date. The Debtors shall notify or cause the Subscription Agent to notify the Investor, on each Friday during the period from the Subscription Commencement Date to the Expiration Date (and any extensions thereof) and on each business day during the five (5) business days prior to the Expiration Date (and any extensions thereof), or more frequently if requested by the Investor, of the aggregate number of Rights known by the Debtors or the Subscription Agent to have been validly exercised as of the close of business on the preceding business day or the most recent practicable time before such request, as the case may be. Within one (1) business day after the Expiration Date and in any event no later than four (4) Business Days prior to the Effective Date, the Debtors and the Subscription Agent shall give the Investor by e-mail a certificate by an executive officer of the

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

39

Debtors in .pdf format setting forth either (i) in the event that there are Unsubscribed Rights, (x) a true and accurate calculation of the number of NewCo Common Interests elected to be purchased by the Rights Offering Participants pursuant to validly exercised Rights and the aggregate Subscription Price therefor, and (y) a true and accurate calculation of the number of Unsubscribed Rights, and the aggregate Subscription Price attributable to such Unsubscribed Rights (a "Purchase Notice") or (ii) in the absence of any Unsubscribed Rights, the fact that there are no Unsubscribed Rights and that the Investor's obligation to purchase any Unsubscribed Rights is terminated (a "Satisfaction Notice"). The Debtors shall provide the Investor with a certification by the Subscription Agent of the Unsubscribed Rights and a written backup to the determination of the Unsubscribed Rights as any Investor may reasonably request. The Investor shall pay to the Subscription Agent, by wire transfer in immediately available funds on or prior to the Effective Date, Cash in an amount equal to the aggregate Subscription Price attributable to the amount of Unsubscribed Rights. On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(ii) and Section 6.3(a)(iii) hereof, the Investor will purchase only such number of Unsubscribed Rights as are listed in the Purchase Notice, without prejudice to the rights of the Investor to later seek an upward or downward adjustment if the number of Unsubscribed Rights in such Purchase Notice is inaccurate.

(h)     *Distribution of the NewCo Common Interests.* On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(iii) hereof, the Subscription Agent shall (i) distribute the NewCo Common Interests to each Rights Offering Participant that has properly exercised its Rights and paid the aggregate Subscription Price for the NewCo Common Interests that such Rights Offering Participant has agreed to purchase, and (ii) distribute the Unsubscribed Rights, if any, to the Investor. All NewCo Common Interests shall be delivered with any and all issue, stamp, transfer, sales and use, or similar taxes or duties payable, if any, in connection with such delivery having been duly paid by NewCo. If the exercise of a Right would result in the issuance of a fractional NewCo Common Interest, then the number of NewCo Common Interests to be issued in respect of such Right will be rounded down to the closest whole NewCo Common Interest. Any unissued fractional NewCo Common Interests underlying a Right, whether caused by the rounding or a Rights Offering Participant's choice not to exercise its Rights in full, will become Unsubscribed Rights to be acquired by the Investor on the Effective Date.

(i)     *Validity of Exercise of Rights.* All questions concerning the timeliness, viability, form and eligibility of any exercise of Rights shall be determined by the Subscription Agent as directed by the Debtors with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld. Subject to the foregoing, the Subscription Agent's good faith determinations shall be final and binding. The Subscription Agent as directed by the Debtors with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Rights, provided, however, that without limiting any other circumstances that could give rise to the Investor's or the Sponsor's right to withhold consent to any waiver, permission or rejection specified above, it will be deemed reasonable for the Investor to withhold consent to any such waiver, permission or rejection that adversely affects the interests of the Investor or the Sponsors. Rights Certificates shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Subscription Agent determines as directed by the Debtors with the written consent of the Investor and each of the Sponsors, such consent not to be unreasonably withheld. The Subscription Agent will use commercially reasonable efforts to give notice to any Rights Offering Participants regarding any defect or irregularity in connection with any purported exercise of Rights by such participant and, may permit such defect or irregularity to be cured within such time as the

Subscription Agent determines as directed by the Debtors with the written consent of the Investor and each of the Sponsors, such consent not to be unreasonably withheld; provided, however, that neither the Debtors, the Investor, the Sponsors nor the Subscription Agent shall incur any liability for failure to give such notification. Within five (5) days after the Expiration Date, the Subscription Agent shall file with the Bankruptcy Court a report regarding the results of the Rights Offering including a list identifying all those Rights Certificates deemed rejected due to defect or irregularity.

(j)     *Cancellation of Rights Offering*.  In the event that Class 2 does not accept the Plan and the Rights Offering is terminated, canceled or otherwise not effectuated, all Rights and any exercise of any Right shall be canceled and be null and void and there shall be no obligation to honor any such purported exercise.  In such event, (i) the aggregate Subscription Price paid by any Rights Offering Participant shall be refunded to such Rights Offering Participant without payment of interest and (ii) the Investor's commitment to subscribe for and purchase on the Effective Date the Unsubscribed Rights shall terminate and be null and void.

(k)     *Alteration of Rights Offering*.  If the Investor and the Sponsors determine, in their sole and absolute discretion that NewCo shall have an alternate corporate or organizational structure, form or identity, the structure of the Rights Offering contemplated in this Section 6.9 shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

(l)     *Adjustment of Rights Offering Amount*.  The amount of the Rights Offering shall be reduced to the extent necessary to ensure that the Investor, including its members and its members' Affiliates, shall own not less than 51% of the NewCo Common Interests after giving effect to the Investment and the Rights Offering.  In the event of such reduction, any excess Subscription Price shall be refunded without payment of interest.

### 6.10     *Class B - H Elections.*

(a)     *The Class B - H Elections*. The holders of Class B – H Mortgage Certificates shall have the right, but not the obligation, to elect the Class B - H Equity Cashout Option Election, as further described in Section 4.2(d) hereof.  The holders of Class B - H Mortgage Certificates shall also have the right, but not the obligation, to exercise the Class B - H Debt/Equity Election as further described in Section 4.2(c) hereof.

(b)     *Election Period*.  The Election Period shall commence on the Subscription Commencement Date and shall expire on the Class B - H Election Date.  The holder of a Class B – H Mortgage Certificate who intends to make the Class B - H Equity Cashout Option Election must affirmatively make the Class B - H Equity Cashout Option Election, in whole or in part, on or prior to the Class B - H Election Date.  Each holder of a Class B - H Mortgage Certificate will receive, in full and final satisfaction of its Certificate, 50% of its distribution in Rollover Equity and 50% of its distribution in New B - H Mortgage Notes, pursuant to Sections 4.2(c) and 6.2 hereof, unless such holder of a Class B - H Mortgage Certificate has exercised its respective Class B - H Debt/Equity Election in accordance with this Section 6.10 and subject to the limitations set forth in the Plan.  Any exercise of the Class B - H Elections after the Class B – H Election Date shall be null and void, and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Class B – H Election Date, regardless of when the documents relating to such exercise were sent.

(c)     *Exercise of the Class B - H Elections*.  In order to exercise the Class B - H Elections, each holder of a Class B – H Mortgage Certificate must return duly completed Election

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

41

Forms to the Subscription Agent on or before the Class B – H Election Date.  If the Subscription Agent for any reason does not receive a given holder's duly completed Election Form on or prior to the applicable Class B – H Election Date, such holder shall be deemed to have relinquished and waived its right to participate in the Class B - H Equity Cashout Option Election or the Class B - H Debt/Equity Election, as applicable.  The exercise of any Class B - H Election shall be irrevocable, subject to the proration requirements of the Class B - H Debt/Equity Election, and shall obligate the exercising holder of a Class B – H Mortgage Certificate to receive its distribution as reflected in such Class B - H Equity Cashout Option Election or the Class B - H Debt/Equity Election.  In order to facilitate the exercise of the Class B - H Elections, on the Subscription Commencement Date, Election Forms will be mailed to each holder of Class B – H Mortgage Certificates together with appropriate instructions for the proper completion, due execution and timely delivery of the Election Forms.  Each holder of a Class B – H Mortgage Certificate exercising one or more of its Class B - H Elections shall agree to support and not take any action to oppose or delay confirmation and implementation of the Plan.

(d)     *Class B - H Elections Procedures*.  Notwithstanding anything contained herein to the contrary, the Debtors, the Investor and the Sponsors may mutually agree, without the consent of any holder of a Class B – H Mortgage Certificate, to modify the procedures relating to the Class B - H Elections or adopt such additional detailed procedures consistent with the provisions of Section 4.2(c) and this Section 6.10 to administer more efficiently the exercise of the Class B - H Elections.

(e)     *Transfer Restriction*.  The Class B - H Elections are not transferable by any holder of a Class B – H Mortgage Certificate.  Any transfer or attempted transfer by a holder of a Class B – H Mortgage Certificate will be null and void, and no purported transferee will be treated as the holder of, or permitted to exercise, the Class B - H Elections.

(f)     *Distribution of the Class B - H Equity Cashout Option and the Class B - H Debt/Equity Option*.  On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(iii) hereof, the Investor shall fund and the Subscription Agent shall distribute cash to each holder of a Class B – H Mortgage Certificate that has properly exercised its Class B – H Equity Cashout Option Election in accordance with Section 4.2(d) hereof and this Section 6.10 and shall issue such Rollover Equity that would have otherwise been distributed to such Holder of a Class B - H Mortgage Certificate to the Investor or its members or members' affiliates, as appropriate.  In addition, on the Effective Date and after the consummation of the issuance described in Section 6.3(a)(iii) hereof, the Subscription Agent shall distribute to the holders of the Class B - H Certificates the New B - H Mortgage Notes and the Rollover Equity in accordance with the Class B - H Debt/Equity Elections and subject to Sections 4.2(c) and 6.2 hereof.

(g)     *Validity of Exercise of Class B - H Elections*.  All questions concerning the timeliness, viability, form and eligibility of any exercise of the Class B - H Elections shall be determined by the Subscription Agent as directed by the Debtors with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld.  Subject to the foregoing, the Subscription Agent's good faith determinations shall be final and binding.  The Subscription Agent as directed by the Debtors with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Class B - H Elections, provided, however, that without limiting any other circumstances that could give rise to the Investor's or any Sponsors' right to withhold consent to any waiver, permission or rejection specified above, it will be deemed reasonable for Investor and each

Sponsor to withhold consent to any such waiver, permission or rejection that adversely affects the interests of the Investor or the Sponsor.  Election Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Subscription Agent determines as directed by the Debtors with the written consent of the Investor and each Sponsor, such consent not to be unreasonably withheld.  The Subscription Agent will use commercially reasonable efforts to give notice to any holder of a Class B – H Mortgage Certificate regarding any defect or irregularity in connection with any purported exercise of the Class B - H Elections by such participant and, may permit such defect or irregularity to be cured within such time as the Subscription Agent, with the consent of the Debtors, the Investor and each Sponsor, may determine in good faith to be appropriate; provided, however, that neither the Debtors, the Investor, the Sponsors nor the Subscription Agent shall incur any liability for failure to give such notification.  Within five (5) days after the Class B – H Election Date, the Subscription Agent shall file with the Bankruptcy Court a report regarding the results of the Class B - H Elections including a list identifying all those Election Forms deemed rejected due to defect or irregularity.

6.11 ***Effectuating Documents and Further Transactions.***  On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to the Investor and each of the Sponsors as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Each of the officers of the Debtors and NewCo is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

6.12 ***Allocation of Plan Distributions Between Principal and Interest.***  To the extent that any Allowed Mortgage Deficiency Facility Claim, Allowed Mezzanine Facility Claim, or Allowed General Unsecured Claim scheduled to receive a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim (as determined for federal income tax purposes) first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

6.13 ***Surrender and Cancellation of Instruments.***  Each holder of an instrument evidencing a Claim shall surrender such instrument to the Reorganized Debtors or, in the case of the holders of any Mortgage Certificates, to the Trustee, and the Trustee shall distribute or cause to be distributed to the holder thereof the appropriate Distribution (if any) provided hereunder.  At the option of the Reorganized Debtors or NewCo, as applicable (in their sole and absolute discretion), no Distribution hereunder shall be made to or on behalf of any holder of such Claim unless and until such instrument is received or the unavailability of such instrument is reasonably established to the satisfaction of the Reorganized Debtors.  In accordance with section 1143 of the Bankruptcy Code, any such holder of such a Claim that fails to surrender or cause to be surrendered such instrument or to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Reorganized Debtors and, in the event that the Reorganized Debtors requests, fails to furnish a bond in form and substance (including, without limitation, amount) reasonably satisfactory to the Reorganized Debtors shall be deemed to have forfeited all rights, claims, and interests and shall not participate in any Distribution hereunder.

6.14 ***Letters of Credit.***  At or prior to the Effective Date, in the Debtors' discretion, with the consent of the Investor and each of the Sponsors, (a) the Existing Letters of Credit shall be terminated and any cash collateral provided thereunder shall be released to the entity that

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

43

posted such collateral; and (b) the Reorganized Debtors shall provide any and all letters of credit and related cash collateral necessary to obtain and maintain in effect all such forms of insurance as are customary to operate a business of the size and type of the Debtors.

6.15    ***BHAC IP Transfer Agreement.***  The Investor or NewCo shall seek to enter into an intellectual property transfer agreement (the "<u>BHAC IP Transfer Agreement</u>") with BHAC, pursuant to which, on the Effective Date, BHAC shall transfer to NewCo or its designee, which may be a third party, the BHAC IP in consideration for the issuance to BHAC of the New Warrants.  The initial exercise price of each New Warrant shall be $1,150.00 per NewCo Common Interest, with such exercise price compounding annually at a rate of 20.0% per annum, subject to adjustment for dilution as to be provided in the agreements governing the New Warrants.  In the event the Investor or NewCo and BHAC do not reach agreement on the terms of the BHAC IP Transfer Agreement prior to the Effective Date, BHAC shall not be entitled to receive the New Warrants, the BHAC License Agreements shall be assumed by the applicable debtors in accordance with Section 11.1 hereof, and the holder of the Mortgage Facility Claim shall transfer, assign and contribute to NewCo or its designee, which may be a third party, its security interest in and all rights and remedies with respect to the BHAC IP and NewCo or its designee, which may be a third party, shall exercise all such rights and remedies with respect to the BHAC IP in order to foreclose on the BHAC IP and effectuate the transfer of the BHAC IP to NewCo or its designee, which may be a third party.

6.16    ***Consistent Tax Reporting.***

(a)    For federal income tax purposes, (i) the distributions described in Section 4.2 shall be treated as a distribution of undivided interests in the assets of NewCo to the holder of the Allowed Mortgage Facility Claim, immediately followed by a distribution of such assets to the holders of the Mortgage Certificates in complete liquidation of the holder of the Allowed Mortgage Facility Claim, followed by a contribution of such assets to NewCo by the holders of the Mortgage Certificates receiving NewCo Common Interests, a sale of such assets to NewCo by the holders of Mortgage Certificates receiving New Debt Securities and a part contribution/part sale of such assets to NewCo by the holders of Mortgage Certificates receiving both NewCo Common Interests and other property, and (ii) the distribution described in Section 4.3 shall be treated as a distribution of undivided interests in the assets of NewCo to the holder of the Allowed ESA UD Mortgage Claim followed by a sale of such assets to NewCo for the New ESA UD Mortgage Note.  All parties will be required to report for all federal income tax purposes in a manner consistent with the characterization of the distributions described above.

(b)    As soon as possible after the Effective Date, and to the extent required by Section 1060 of the Internal Revenue Code, the NewCo Management Committee shall determine the aggregate value of the underlying assets of NewCo as of the Effective Date and the portions of such value that are allocable, respectively, to the New ESA UD Mortgage Note and the various classes of New Equity Securities and New Debt Securities.  Such allocation will take into account the relative fair market values of the New Equity Securities, New Debt Securities and the New ESA UD Mortgage Note.  The NewCo Management Committee will apprise, in writing, all parties of such aggregate valuation and allocation.  The aggregate valuation and allocation shall be used consistently by all parties (including NewCo, the holders of Mortgage Certificates and the holder of the Allowed ESA UD Mortgage Claim) for all federal income tax purposes.

6.17    ***Issuance of NewCo Common Interests to Investor or Sponsor Affiliates.***

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

44

(a)     The Investor, the Sponsors or their Affiliates, in their respective sole discretion, may deliver a written schedule to the Debtors within ten (10) days after entry of the Confirmation Order to designate that some or all of the NewCo Common Interests to be issued to the Investor, the Sponsors or their Affiliates under the Plan be issued in the name of, and delivered to, one or more of their managed funds and/or respective affiliates, so long as such issuance and delivery is in compliance with federal and state securities laws and does not require NewCo to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended and the rules and regulations of the Securities and Exchange Commission thereunder.

(b)     In the event that the Investors, the Sponsors or their Affiliates make the designation pursuant to Section 6.17(a) above, the funds managed by the Investors, the Sponsors and/or their respective affiliates that are so designated shall have the rights, entitlements and benefit that would otherwise inure to the Investor, the Sponsors or their Affiliates in their capacity as a holder of the NewCo Common Interest as provided in the Plan, including those rights, entitlements and benefits of the Investor, the Sponsor or the Affiliate specified in Sections 6.3(a)(i), 6.3(c) and 6.5 above.

6.18     ***Allowed Mortgage Facility Claim.***  In the event that Class 2 votes in favor of the Plan, all Claims in respect of the Mortgage Facility shall be satisfied in full by the treatment of Class 2, as set forth in Section 4.2(b)(i) of the Plan, and the holder of such Claim shall be deemed to have consented to the allowance of the Mortgage Facility Deficiency Claim at $0.  In the event that Class 2 rejects the Plan, the Allowed Mortgage Facility Deficiency Claim shall be equal to the principal, accrued interest, fees and costs due and owing on account of the Mortgage Facility as of the Commencement Date, less the amounts of the New Alternate Notes and any payments made on account of the Mortgage Facility during the Chapter 11 cases, including, without limitation, adequate protection payments, fees, costs or expenses.

## ARTICLE VII

## TREATMENT OF DISPUTED CLAIMS

7.1     ***Objections to Claims; Prosecution of Disputed Claims.***  NewCo or the Reorganized Debtors shall object to the allowance of Claims filed with the Bankruptcy Court  with respect to which NewCo or the Reorganized Debtors, as applicable, dispute liability in whole or in part.  All objections that are filed and prosecuted by NewCo or the Reorganized Debtors as provided herein shall be litigated to Final Order by NewCo or the Reorganized Debtors, as applicable.  Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by NewCo or the Reorganized Debtors to Claims shall be served and filed no later than ninety (90) days after the Effective Date.

7.2     ***Distributions on Account of Disputed Claims.***  Notwithstanding Article IV hereof, a Distribution shall only be made by NewCo or the Reorganized Debtors to the holder of a Disputed Claim when, and to the extent that, such Disputed Claim becomes Allowed.  No interest shall be paid on account of Disputed Claims that later become Allowed except to the extent that payment of interest is required under section 506(b) of the Bankruptcy Code.  No Distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 7.1 hereof.  To the extent that any funds remain reserved for payment of Allowed Claims after the final resolution of all Disputed Claims (and all such Disputed

Claim that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall revert to and be fully vested in NewCo or the Reorganized Debtors, as applicable.

## ARTICLE VIII

## DISTRIBUTIONS

8.1 ***Distributions under the Plan.*** Whenever any Distribution to be made under this Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

8.2 ***Timing of Distributions under the Plan.*** Except for Distributions made on the Initial Distribution Date, any Distribution to be made by any Debtor or the Disbursing Agent, NewCo or the Reorganized Debtors pursuant to the Plan shall be deemed to have been timely made if made within ten (10) days after the time therefore specified in the Plan. No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

8.3 ***Distributions with Respect to Mortgage Facility Deficiency Claim, Mezzanine Facility Claims, and General Unsecured Claims.*** Distributions with respect to Classes 4 and 5 shall only be made on each Distribution Date; provided, however, that, if a Claim in Class 4 or 5 becomes Allowed subsequent to the Initial Distribution Date, NewCo or the Reorganized Debtors may, in its sole discretion, make a Distribution with respect to such Claim prior to a Distribution Date. For purposes of treatment and Distribution under the Plan, all General Unsecured Claims held by a Creditor shall be aggregated and treated as a single Claim. At the written request of the Disbursing Agent, any Creditor holding multiple General Unsecured Claims shall provide to the Disbursing Agent a single address to which any Distributions shall be sent. At the written request of any Creditor holding multiple General Unsecured Claims made to the Disbursing Agent within thirty (30) days prior to a Distribution Date, such Creditor shall receive an itemized statement of the General Unsecured Claims for which the Distribution is being made.

8.4 ***Distributions with Respect to The Mortgage Facility Claim.*** The amount of the New Debt Securities, New Equity Securities, and/or Rights to which any holder of Certificates is entitled shall be determined based upon such holder's share of principal and accrued interest on the Certificates as of the Confirmation Date. As a result, although the Debtors will still be entitled to use cash collateral consistent with the terms of the Cash Collateral Order, they shall be relieved of the obligation to make Adequate Protection Payments (as defined in the Cash Collateral Order), if any, as of the Confirmation Date.

8.5 ***Calculations Subject to Adjustment.*** The allocation of the New Debt Securities, New Equity Securities, and/or Rights to various Classes and subclasses of Claims under the Plan is based on a projected Confirmation Date of June 30, 2010, and is subject to adjustment based on the actual Confirmation Date.

8.6 ***Disbursing Agent.*** Unless otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtors or NewCo, as applicable, as Disbursing Agent or such other entity designated by NewCo or the Reorganized Debtors with the written consent of the Investor and each of the Sponsors. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy

Court, and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by NewCo or the Reorganized Debtors, as applicable.

8.7 **_Record Date._** As of the close of business on the Record Date, the various transfer and claims registers for each of the Classes of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims. The Debtors and NewCo or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims occurring after the close of business on the Record Date. The Debtors and the Disbursing Agent shall be entitled to recognize and deal hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Record Date, to the extent applicable.

8.8 **_Manner of Payment under the Plan._** Unless the Person receiving a payment agrees otherwise, any payment in Cash to be made by the Debtors, NewCo or the Reorganized Debtors shall be made, at the election of the Debtors, NewCo or the Reorganized Debtors (as the case may be), by check drawn on a domestic bank or by wire transfer from a domestic bank.

8.9 **_Hart-Scott-Rodino Compliance._** Any NewCo Common Interests to be distributed under the Plan to any Person required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Person shall have expired or been terminated.

8.10 **_Fractional NewCo Common Interests or Other Distributions._** Notwithstanding anything to the contrary contained herein, no fractional NewCo Common Interests shall be distributed, and no Cash payments of fractions of cents will be made. Fractional dollars shall be rounded down to the nearest whole dollar. Fractional NewCo Common Interests shall be rounded down to the nearest whole unit. No Cash will be paid in lieu of such fractional NewCo Common Interests or dollars.

8.11 **_Distribution of Unclaimed Property._** Any Distribution under the Plan that is unclaimed after one hundred eighty (180) days following the date such property is distributed shall be deemed not to have been made and shall be transferred to NewCo or the Reorganized Debtors, as applicable, free and clear of any claims or interests of any Entities, including, without express or implied limitation, any claims or interests of any governmental unit under escheat principles. Nothing contained herein shall affect the discharge of the Claim with respect to which such Distribution was made, and the holder of such Claim shall be forever barred from enforcing such Claim against NewCo, the Reorganized Debtors or the Debtors, or the assets, estate, properties, or interests in property of the Debtors, NewCo or the Reorganized Debtors.

## ARTICLE IX

## CONDITIONS PRECEDENT

9.1 **_Conditions Precedent to the Effective Date._** The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a) the Bankruptcy Court shall have entered a Confirmation Order with respect to the Plan in form and substance approved by the Investor and each of the Sponsors, and such

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

47

Confirmation Order shall be non-appealable, shall not have been appealed within fourteen (14) calendar days of entry or, if such Confirmation Order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such Confirmation Order;

(b)     all actions, documents, and agreements necessary to implement the Plan, including, without limitation, all actions, documents, and agreements necessary to implement the New Mortgage Notes, the corporate reorganization described in Section 6.7, the Investment described in Section 6.8, and the Rights Offering described in Section 6.9, shall have been effected or executed;

(c)     the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are determined by the Debtors to be necessary to implement the Plan and that are required by law, regulation, or order;

(d)     the NewCo Certificate of Formation (and any certificates of formation for newly formed subsidiaries of NewCo, if any) shall have been filed with the applicable Secretary of State, and the NewCo Operating Agreement (and any operating agreements for newly formed subsidiaries of NewCo, if any) shall be in place;

(e)     the Registration Rights Agreement shall be in full force and effect; and

(f)     all of the conditions to closing that are contained in Section 13.1 of the Investment and Standby Purchase Agreement shall have been satisfied or waived.

The conditions precedent specified above, with the exception of Section 9.1(a), may be waived in whole or in part by the Debtors, with the prior consent of the Investor and each of the Sponsors. Subject to the foregoing, any such written waiver of a condition precedent set forth in this Section 9.1 may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors decide that one of the foregoing conditions cannot be satisfied, and the occurrence of such condition is not waived in writing by the Debtors with the prior consent of the Investor and each of the Sponsors, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

9.2     ***Effect of Failure of Conditions to Effective Date.***  If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 120 days after the Confirmation Date, or by such later date as is proposed by the Debtors (with the consent of the Investor and each of the Sponsors, which shall not be unreasonably withheld), then upon motion by the Debtors (after consultation with the Investor and each of the Sponsors) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions to consummation is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to this Section 9.2, this Plan will be null and void in all respects, and (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, (iii) the obligations of the Investor under the Investment and

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

48

Standby Purchase Agreement will terminate, and (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors.

## ARTICLE X

## EFFECT OF CONFIRMATION

10.1    ***Vesting of Assets.***  Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors shall vest in the Reorganized Debtors and/or NewCo free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors and/or NewCo may operate the Debtors' business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.

10.2    ***Title to Assets; Discharge of Liabilities.***  Except as otherwise provided in the Plan, on the Effective Date, title to all assets and properties and interests in property dealt with by the Plan shall vest in the Reorganized Debtors or NewCo, as provided in the Plan, free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors arising prior to the Effective Date, except as may be otherwise provided in the Plan.

10.3    ***Binding Effect.***  Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

10.4    ***Claims Extinguished.***  As of the Effective Date, any and all alter-ego or derivative claims accruing to the Debtors or Debtors in Possession against present or former officers, managers and directors of the Debtors who were officers, managers or directors of the Debtors at any time during the Chapter 11 Cases shall be extinguished whether or not then pending.

10.5    ***Discharge of Claims and Termination of Equity Interests.***  Except as provided herein, the rights afforded in the Plan and the payments and distributions to be made hereunder shall discharge all existing debts and Claims, and shall terminate all Equity Interests, of any kind, nature, or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided herein, upon the Effective Date, all existing Claims against the Debtors and Equity Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, NewCo, their respective successors or assignees, or any of their respective assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest, and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.  Upon the Effective Date, all such persons shall be

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

49

forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

10.6     **Injunction.**    Except as otherwise expressly provided in the Plan, all Persons who have held, hold or may hold Claims or Equity Interests including Claims and Equity Interests that have been released pursuant to Section 10.10 hereof or are subject to exculpation pursuant to Section 10.9 hereof, and all other parties in interest, along with their respective present or former employees, agents, officers, managers, directors, principals and Affiliates, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest against the Debtors, the Reorganized Debtors, NewCo or the Released Parties, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Reorganized Debtors, NewCo or the Released Parties, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, NewCo or the Released Parties, or against the property or interests in property of the Debtors, the Reorganized Debtors, NewCo or the Released Parties, or (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Reorganized Debtors, NewCo, the Released Parties or against the property or interests in property of the Debtors, the Reorganized Debtors NewCo or the Released Parties, with respect to any such Claim or Equity Interest.  Such injunction shall extend to any successors of the Debtors, the Reorganized Debtors, NewCo and the Released Parties and their respective properties and interest in properties.

10.7     **Term of Injunctions or Stays.**    Unless otherwise provided, all injunctions or stays arising under or entered during the Bankruptcy Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, other than injunctions issued pursuant to this Plan (including injunctions under Section 10.6), shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.8     **Injunction Against Interference With Plan of Reorganization.**    Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, managers, directors, principals and Affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

10.9     **Exculpation.**    Notwithstanding anything herein to the contrary, as of the Effective Date, none of (a) the Debtors or the Reorganized Debtors, (b) NewCo, (c) the Creditors' Committee and any subcommittee thereof, (d) BHAC (provided that BHAC has entered into the BHAC IP Transfer Agreement as provided in Section 6.15 hereof), (e) the accountants, financial advisors, investment bankers, agents and attorneys for the Debtors, (f) HVM, (g) HVM Manager, (h) the Special Servicer, (i) the Trustee, (j) HVM Manager Owner, (k) the Investor, (l) each Sponsor and (m) any present or former director, manager, officer, member, equity holder (and their respective Affiliates), employee, agent, financial advisor, partner, Affiliate, attorney, other professional advisor or representative (and their respective Affiliates) of the persons or parties described in clauses (a) through (m) of this Section 10.9 or of their respective Affiliates (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Bankruptcy Cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Bankruptcy Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other

agreement related thereto, including, without limitation, the Investment and Standby Purchase Agreement; provided, however, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence and provided further that nothing in this Section 10.9 shall be construed as a release or exculpation for any Guaranty Claim other than a Guaranty Claim against Homestead.

10.10   ***Releases.***  As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; and (f) the substantial contribution of the Investor, each of the Sponsors and their Affiliates: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; and (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that does not vote to accept the Plan, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; provided that nothing in this Section 10.10 shall be construed as a release for any Guaranty Claim other than a Guaranty Claim against Homestead.

10.11   ***Indemnification Obligations***

(a)     Notwithstanding anything to the contrary herein, subject to the occurrence of the Effective Date, the obligations of the Debtors as provided in the Debtors' respective certificates of incorporation, bylaws, or other applicable organizational documents, other agreements or law as of the Commencement Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers who were officers or employees of such Debtors or their respective Affiliates at any time prior to the Effective Date, and who will be officers of the Debtors or NewCo from and after the Effective Date, against any claims, causes of action or obligations whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, shall survive confirmation of the Plan, remain unaffected thereby after the Effective Date and not be discharged, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Commencement Date.

(b)     As of the Effective Date, each Debtor's certificate of incorporation, bylaws or similar organizational documents or other agreement shall provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, officers who were officers of such Debtor or any of its respective Affiliates at any time prior to the Effective Date and who will continue to be officers or employees of the Debtors or NewCo from and after the Effective Date at least to the same extent as the bylaws of such Debtor in effect on the Commencement Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Debtors shall amend and/or restate its certificate of incorporation, bylaws or similar organizational

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

51

document or other agreement before or after the Effective Date to terminate or materially adversely affect any of the Debtors' obligations or such officers' rights under this Section 10.11(b).

(c)     Any Claim based on NewCo's or the Debtors' obligations set forth in this Section 10.11 shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

(d)     For avoidance of doubt, nothing in this Section 10.11 shall be construed as an indemnification for any Guaranty Claim.

10.12    *Avoidance Actions.*  Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, NewCo or the Reorganized Debtors, as applicable, shall have the right to prosecute any avoidance or equitable subordination or recovery actions under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession. The proceeds of any such avoidance actions shall be paid to NewCo or the Reorganized Debtors, as applicable.

10.13    *Retention of Causes of Action/Reservation of Rights.*

(a)     Except as provided in Section 10.10 hereof, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Reorganized Debtors or NewCo may have or which NewCo or the Reorganized Debtors may choose to assert on behalf of the Debtors' estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, NewCo, their officers, directors, managers or representatives and (ii) the turnover of any property of the Debtors' estates.

(b)     Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan.  NewCo or the Reorganized Debtors, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Commencement Date fully as if the Bankruptcy Cases had not been commenced, and all of the legal and equitable rights of NewCo or the Reorganized Debtors, as applicable, respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Bankruptcy Cases had not been commenced.

10.14    *Limitations on Exculpation and Releases of Representatives.*  Nothing in Section 10.9 or Section 10.10 hereof shall (a) be construed to release or exculpate any Person from, or require indemnification of any Person against losses arising from, the fraud, malpractice, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or ultra vires acts of such Person, or (b) limit the liability of the professionals of the Debtors, the Reorganized Debtors, NewCo or the Creditors' Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

52

## ARTICLE XI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

11.1 ***Assumption of Executory Contracts and Unexpired Leases.*** Any executory contracts or unexpired leases listed in the relevant Exhibit to the Plan Supplement (which Exhibit shall contain those contracts or unexpired leases identified by the Investor, in its sole discretion) or that have not been rejected by the Debtors with the approval of the Bankruptcy Court and that are not the subject of pending motions to reject on the Confirmation Date, shall be deemed to have been assumed by the applicable Debtor and assigned to NewCo, at Investor's option, as of the Effective Date, and the Plan shall constitute a motion to assume and assign such executory contracts and unexpired leases. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions and assignments pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption and assignment is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases. With respect to each such executory contract or unexpired lease assumed and assigned to NewCo, if applicable, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, the dollar amount required to cure any defaults of the applicable Debtor existing as of the Confirmation Date shall be conclusively presumed to be the amount set forth in an Exhibit to the Plan Supplement with respect to such executory contract or unexpired lease. Subject to the occurrence of the Effective Date, any such cure amount shall be treated as an Allowed Administrative Expense Claim under the Plan, and, upon payment of such Allowed Administrative Expense Claim, all defaults of the applicable Debtor existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

11.2 ***Rejection of Executory Contracts and Unexpired Leases.*** Any executory contracts or unexpired leases of any Debtor that are set forth in the relevant Exhibit to the Plan Supplement (which Exhibit shall contain those contracts and unexpired leases identified by the Investor, in its sole discretion) shall be deemed to have been rejected by the applicable Debtor, and the Plan shall constitute a motion to reject such executory contracts and unexpired leases, and NewCo and the Reorganized Debtors shall have no liability thereunder except as is specifically provided in the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.

11.3 ***Claims Arising from Rejection, Termination or Expiration.*** Claims created by the rejection of executory contracts or unexpired leases (including, without limitation, the rejection provided in Section 11.2 hereof) or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after (a) in the case of an executory contract or unexpired lease that was terminated or expired by its terms prior to the Confirmation Date, the Confirmation Date, (b) in the case of an executory contract or unexpired lease rejected by the Debtors, the entry of the order of the Bankruptcy Court authorizing such rejection, or (c) in the case of an executory contract or unexpired lease that is deemed rejected pursuant to Section 11.2 hereof, the Confirmation Date. Any rejection claim for which a proof of claim is not filed and served within the time provided herein will be forever barred from assertion and shall not be enforceable against the Debtors, their

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

53

assets, properties, or interests in property, or the Reorganized Debtors or its estate, assets, properties, or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of ARTICLE VII of the Plan.

11.4 **_Insurance Policies and Agreements._** Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as executory contracts under the Plan of Reorganization and will be assumed by the applicable Reorganized Debtor and assigned to NewCo, at Investor's option, effective as of the Effective Date. Nothing contained in this Section 11.4 shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

11.5 **_Management Agreements_** As of the Effective Date, all existing management agreements between any Debtor and HVM, including any related administrative services agreements or G&A Reimbursement Agreements, will be assumed by such Debtor or assumed and assigned to NewCo, one of its subsidiaries, or a third party; provided that such management agreements to be assumed or assumed and assigned (i) shall be modified or amended by modified agreements that shall be included in the Plan Supplement, which terms shall be acceptable to Investor, each Sponsor and HVM and (ii) shall be assumed or assumed and assigned as modified or amended. Entry of the Confirmation Order, subject to and upon the occurrence of the Effective Date, shall constitute the approval, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, of the assumption or assumption and assignment, as applicable, of such agreements on the terms set forth in the Plan and Plan Supplement.

## ARTICLE XII

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) to perform any of the following actions:

12.1 To hear and determine any and all motions or applications pending on the Confirmation Date for the assumption and/or assignment or rejection of executory contracts or unexpired leases to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear and determine any and all Claims resulting therefrom or from the expiration or termination prior to the Confirmation Date of any executory contract or unexpired lease;

12.2 To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by NewCo or the Reorganized Debtors after the Effective Date, including, without express or implied limitation, any claims to avoid any preferences, fraudulent transfers, or other voidable transfers, or otherwise to recover assets for the benefit of the Debtors' estates;

12.3 To hear and determine any objections to the allowance of Claims arising prior to the Effective Date, whether filed, asserted, or made before or after the Effective Date,

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

54

including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow or disallow any Disputed Claim in whole or in part;

12.4     To hear and determine any disputes relating to the distributions to holders of Allowed Claims as provided herein.

12.5     To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

12.6     To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without express or implied limitation, the Confirmation Order;

12.7     To hear and determine all applications for allowances of compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan;

12.8     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan (and all Exhibits to the Plan Supplement and Exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

12.9     To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against any Debtor's Estate;

12.10    To determine such other matters that may be set forth in the Plan or the Confirmation Order, or that may arise in connection with the Plan, the Disclosure Statement or the Confirmation Order;

12.11    To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtors, as Debtors or Debtors in Possession, may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any request for expedited determination under section 505(b)(2) of the Bankruptcy Code);

12.12    To hear and determine all questions and disputes arising out of or relating to the Investment Standby and Purchase Agreement, the Rights Offering or the BHAC IP Transfer Agreement; and

12.13    To enter an order or final decree closing the Chapter 11 Cases.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1     ***Modification of the Plan.***  This Plan may be altered, amended or modified by the Debtors, in consultation with the Investor and each of the Sponsors, before or after the Confirmation Date, as provided in section 1127 of the Bankruptcy Code; provided, however, that no such alterations, amendments or modifications that are material shall be made without the consent of the Investor and each of the Sponsors, which shall not be unreasonably withheld.  A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

55

the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

13.2 **_Payment of Statutory Fees._** All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, shall be paid by the Debtors on or before the Effective Date.

13.3 **_Rights of Action._** Any rights, claims, or causes of action accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including, without express or implied limitation, any avoidance or recovery actions under sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code and (except as provided in Article XIII hereof) any rights to, claims or causes of action for recovery under any policies of insurance issued to or on behalf of the Debtors shall remain assets of the Debtors' estates and, on the Effective Date, shall be transferred to the Reorganized Debtors. NewCo shall be deemed the appointed representative to, and may, pursue, litigate, and compromise and settle any such rights, claims, or causes of action, as appropriate, in accordance with what is in the best interests of and for the benefit of the Reorganized Debtors.

13.4 **_Subordination Agreements._** The distributions under the Plan take into account the relative priority of the Claims in each Class in connection with any contractual subordination provisions relating thereto. On the Effective Date, all Creditors shall be deemed to have waived any and all contractual subordination rights which they may have with respect to such distribution and the Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Creditors from enforcing or attempting to enforce any such rights with respect to the distributions under the Plan.

13.5 **_Swap Agreements._** The distributions that are to be made pursuant to Article IV hereof shall be deemed to satisfy fully any rights that each Class may have in respect of the Swap Agreements.

13.6 **_Dissolution of Creditors' Committee._** On the Effective Date, the Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Debtors' Chapter 11 Cases, and, except for the limited purpose of presenting final applications for fee and expenses, the Creditors' Committee shall be deemed dissolved; provided, however, (a) if the Effective Date occurs before the Confirmation Order becomes a Final Order, the Creditors' Committee may continue to exist and to serve for the purposes of pursuing any appeal of the Confirmation Order, and (b) if any adversary proceeding in which the Creditors' Committee is participating is pending as of the Effective Date, the Creditors' Committee may continue to exist for the limited purpose of litigating such adversary proceeding.

13.7 **_Notices._** Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors:                    c/o HVM L.L.C.
                                      100 Dunbar Street,
                                      Spartanburg, South Carolina  29306

Attn: Gary A. DeLapp
Tel: (864) 573-1600
Fax: (864) 573-1665

*and*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Marcia L. Goldstein, Esq., Jacqueline Marcus, Esq.
Tel: (212) 310-8000
Fax: (212) 310-8007

If to the Creditors' Committee:    Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022
Attn: Mark T. Power, Esq., Mark T. Indelicato, Esq.
Tel: (212) 478-7200
Fax: (212) 478-7400

If to the Investor:    Starwood ESH LLC
c/o Starwood Capital Group Global, L.P.
591 West Putnam Avenue
Greenwich, CT 06830
Attn: Terry Hatton, Jeff Dishner

*and*

Greenberg Traurig, LLP
200 Park Avenue
New York, New York 10166
Attn: Bruce Zirinsky, Esq., Gary Ticoll, Esq.
Email: zirinskyb@gtlaw.com
ticollg@gtlaw.com
Tel: (212) 801-9200
Fax: (212) 801-6400

*and*

Rinaldi, Finkelstein & Franklin, LLC
591 W. Putnam Avenue
Greenwich, Connecticut 06830
Attention: Ellis Rinaldi, Esq.
Email: rinaldi@starwood.com

If to the Sponsors:    Greenberg Traurig, LLP
200 Park Avenue
New York, New York 10166
Attn: Bruce Zirinsky, Esq., Gary Ticoll, Esq.
Email: zirinskyb@gtlaw.com

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

57

ticollg@gtlaw.com
Tel:  (212) 801-9200
Fax:  (212) 801-6400

*and*

Rinaldi, Finkelstein & Franklin, LLC
591 W. Putnam Avenue
Greenwich, Connecticut  06830
Attention:  Ellis Rinaldi, Esq.
Email: rinaldi@starwood.com

Haynes and Boone, LLP
1221 Avenue of the Americas, 26th Floor
New York, New York 10020-1007
Attention: Carolyn Sullivan, Esq.
           Lawrence Mittman
Email:     carolyn.sullivan@haynesboone.com
           lawrence.mittman@haynesboone.com

*and*

Ropes & Gray LLP
One International Place
Boston, MA 02110
Facsimile: (617) 951-7050
Attn:    Julie H. Jones
         D. Ross Martin
Email:   julie.jones@ropesgray.com
         ross.martin@ropesgray.com

13.8     ***Headings.***  The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

13.9     ***Severability.***  If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors with the written consent of the Investor and each of the Sponsors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, unless agreed otherwise by the Debtors with the written consent of the Investor or each of the Sponsors, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

58

13.10     **Governing Law.**  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or by Delaware corporate, partnership or limited liability company law, the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

13.11     **Plan Supplement /Exhibits/Schedules.**  All exhibits and schedules to the Plan, including the Plan Supplement and the Exhibits to the Plan Supplement, are incorporated into and are a part of the Plan as set forth in full herein.

13.12     **Compliance with Tax Requirements.**  In connection with the Plan, the Debtors and the Disbursing Agent will comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities, and all distributions hereunder shall be subject to such withholding and reporting requirements.

13.13     **Exemption from Transfer Taxes.**  Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any sales and use, stamp, real estate transfer, mortgage recording, or other similar tax.

13.14     **Expedited Determination of Postpetition Taxes.**  The Debtors and the Reorganized Debtors are authorized (but not required) to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for all taxable periods (or portions thereof) from the Commencement Date through (and including) the Effective Date.

13.15     **Sections 1125 and 1126 of the Bankruptcy Code.**  As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors, the members of the Creditors' Committee, the Investor, each Sponsor and each of their respective Affiliates, agents, directors, managers, officers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

13.16     **Time.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 as amended effective December 1, 2009 shall apply.

Dated:  New York, New York
        March 24, 2010

                    Respectfully submitted,

                    ESA PROPERTIES LLC
                    ESA 2005 PORTFOLIO LLC
                    ESA 2005- SAN JOSE LLC
                    ESA 2005- WALTHAM LLC
                    ESA ACQUISITION PROPERTIES LLC
                    ESA ALASKA LLC
                    ESA CANADA PROPERTIES BORROWER LLC
                    ESA FL PROPERTIES LLC
                    ESA MD BORROWER LLC
                    ESA MN PROPERTIES LLC
                    ESA P PORTFOLIO LLC
                    ESA P PORTFOLIO MD BORROWER LLC
                    ESA P PORTFOLIO PA PROPERTIES LLC
                    ESA P PORTFOLIO TXNC PROPERTIES LP
                    ESA PA PROPERTIES LLC
                    ESA TX PROPERTIES LP
                    ESH/HOMESTEAD PORTFOLIO LLC
                    ESH/HV PROPERTIES LLC
                    ESH/MSTX PROPERTY LP
                    ESH/TN PROPERTIES LLC
                    ESH/TX PROPERTIES LP
                    ESA MD BENEFICIARY LLC
                    ESA MD PROPERTIES BUSINESS TRUST
                    ESA P PORTFOLIO MD BENEFICIARY LLC
                    ESA P PORTFOLIO MD TRUST
                    ESA CANADA PROPERTIES TRUST
                    ESA CANADA TRUSTEE INC.
                    ESA CANADA BENEFICIARY INC.
                    ESA UD PROPERTIES LLC
                    ESA 2007 OPERATING LESSEE, INC.
                    ESA 2005 OPERATING LESSEE INC.
                    ESA OPERATING LESSEE INC.
                    ESA P PORTFOLIO OPERATING LESSEE INC.
                    ESA CANADA OPERATING LESSEE INC.
                    ESA P PORTFOLIO TXNC GP L.L.C.
                    ESA TXGP L.L.C.
                    ESH/MSTX GP L.L.C.
                    ESH/TXGP L.L.C.
                    ESH/TN MEMBER INC.
                    ESH/HOMESTEAD MEZZ L.L.C.
                    ESH/HOMESTEAD MEZZ 2 L.L.C.
                    ESH/HOMESTEAD MEZZ 3 L.L.C.
                    ESH/HOMESTEAD MEZZ 4 L.L.C.
                    ESH/HOMESTEAD MEZZ 5 L.L.C.

ESH/HOMESTEAD MEZZ 6 L.L.C.
ESH/HOMESTEAD MEZZ 7 L.L.C.
ESH/HOMESTEAD MEZZ 8 L.L.C.
ESH/HOMESTEAD MEZZ 9 L.L.C.
ESH/HOMESTEAD MEZZ 10 L.L.C.
ESA MEZZ L.L.C.
ESA MEZZ 2 L.L.C.
ESA MEZZ 3 L.L.C.
ESA MEZZ 4 L.L.C.
ESA MEZZ 5 L.L.C.
ESA MEZZ 6 L.L.C.
ESA MEZZ 7 L.L.C.
ESA MEZZ 8 L.L.C.
ESA MEZZ 9 L.L.C.
ESA MEZZ 10 L.L.C.
ESA P MEZZ L.L.C.
ESA P MEZZ 2 L.L.C.
ESA P MEZZ 3 L.L.C.
ESA P MEZZ 4 L.L.C.
ESA P MEZZ 5 L.L.C.
ESA P MEZZ 6 L.L.C.
ESA P MEZZ 7 L.L.C.
ESA P MEZZ 8 L.L.C.
ESA P MEZZ 9 L.L.C.
ESA P MEZZ 10 L.L.C.
HOMESTEAD VILLAGE L.L.C.
EXTENDED STAY HOTELS L.L.C.
ESA P PORTFOLIO HOLDINGS L.L.C.
ESA MANAGEMENT L.L.C.
ESA BUSINESS TRUST

By:    /s/ David Lichtenstein
       Name:    David Lichtenstein
       Title:    President

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

## Exhibit A

### Debtors

|   | Entity | State of Organization |
|---|--------|----------------------|
| 1 | ESA Properties LLC | Delaware |
| 2 | ESA 2005 Portfolio LLC | Delaware |
| 3 | ESA 2005- San Jose LLC | Delaware |
| 4 | ESA 2005- Waltham LLC | Delaware |
| 5 | ESA Acquisition Properties LLC | Delaware |
| 6 | ESA Alaska LLC | Delaware |
| 7 | ESA Canada Properties Borrower LLC | Delaware |
| 8 | ESA FL Properties LLC | Delaware |
| 9 | ESA MD Borrower LLC | Delaware |
| 10 | ESA MN Properties LLC | Delaware |
| 11 | ESA P Portfolio LLC | Delaware |
| 12 | ESA P Portfolio MD Borrower LLC | Delaware |
| 13 | ESA P Portfolio PA Properties LLC | Delaware |
| 14 | ESA P Portfolio TXNC Properties LP | Delaware |
| 15 | ESA PA Properties LLC | Delaware |
| 16 | ESA TX Properties LP | Delaware |
| 17 | ESH/Homestead Portfolio LLC | Delaware |
| 18 | ESH/HV Properties LLC | Delaware |
| 19 | ESH/MSTX Property LP | Delaware |
| 20 | ESH/TN Properties LLC | Delaware |
| 21 | ESH/TX Properties LP | Delaware |
| 22 | ESA MD Beneficiary LLC | Delaware |

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

62

| | Entity | State of Organization |
|---|---|---|
| 23 | ESA MD Properties Business Trust | Delaware |
| 24 | ESA P Portfolio MD Beneficiary LLC | Delaware |
| 25 | ESA P Portfolio MD Trust | Delaware |
| 26 | ESA Canada Properties Trust | Delaware |
| 27 | ESA Canada Trustee Inc. | Delaware |
| 28 | ESA Canada Beneficiary Inc. | Delaware |
| 29 | ESA UD Properties LLC | Delaware |
| 30 | ESA 2007 Operating Lessee, Inc. | Delaware |
| 31 | ESA 2005 Operating Lessee Inc. | Delaware |
| 32 | ESA Operating Lessee Inc. | Delaware |
| 33 | ESA P Portfolio Operating Lessee Inc. | Delaware |
| 34 | ESA Canada Operating Lessee Inc. [Ontario Corp.] | Ontario, Canada |
| 35 | ESA P Portfolio TXNC GP L.L.C. | Delaware |
| 36 | ESA TXGP L.L.C. | Delaware |
| 37 | ESH/MSTX GP L.L.C. | Delaware |
| 38 | ESH/TXGP L.L.C. | Delaware |
| 39 | ESH/TN Member Inc. | Delaware |
| 40 | ESH/Homestead Mezz L.L.C. | Delaware |
| 41 | ESH/Homestead Mezz 2 L.L.C. | Delaware |
| 42 | ESH/Homestead Mezz 3 L.L.C. | Delaware |
| 43 | ESH/Homestead Mezz 4 L.L.C. | Delaware |
| 44 | ESH/Homestead Mezz 5 L.L.C. | Delaware |
| 45 | ESH/Homestead Mezz 6 L.L.C. | Delaware |
| 46 | ESH/Homestead Mezz 7 L.L.C. | Delaware |

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

63

| | Entity | State of Organization |
|---|---|---|
| 47 | ESH/Homestead Mezz 8 L.L.C. | Delaware |
| 48 | ESH/Homestead Mezz 9 L.L.C. | Delaware |
| 49 | ESH/Homestead Mezz 10 L.L.C. | Delaware |
| 50 | ESA Mezz L.L.C. | Delaware |
| 51 | ESA Mezz 2 L.L.C. | Delaware |
| 52 | ESA Mezz 3 L.L.C. | Delaware |
| 53 | ESA Mezz 4 L.L.C. | Delaware |
| 54 | ESA Mezz 5 L.L.C. | Delaware |
| 55 | ESA Mezz 6 L.L.C. | Delaware |
| 56 | ESA Mezz 7 L.L.C. | Delaware |
| 57 | ESA Mezz 8 L.L.C. | Delaware |
| 58 | ESA Mezz 9 L.L.C. | Delaware |
| 59 | ESA Mezz 10 L.L.C. | Delaware |
| 60 | ESA P Mezz L.L.C. | Delaware |
| 61 | ESA P Mezz 2 L.L.C. | Delaware |
| 62 | ESA P Mezz 3 L.L.C. | Delaware |
| 63 | ESA P Mezz 4 L.L.C. | Delaware |
| 64 | ESA P Mezz 5 L.L.C. | Delaware |
| 65 | ESA P Mezz 6 L.L.C. | Delaware |
| 66 | ESA P Mezz 7 L.L.C. | Delaware |
| 67 | ESA P Mezz 8 L.L.C. | Delaware |
| 68 | ESA P Mezz 9 L.L.C. | Delaware |
| 69 | ESA P Mezz 10 L.L.C. | Delaware |
| 70 | Homestead Village L.L.C. | Delaware |

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

64

| | Entity | State of Organization |
|---|---|---|
| 71 | Extended Stay Hotels L.L.C. | Delaware |
| 72 | ESA P Portfolio Holdings L.L.P. | Delaware |
| 73 | ESA Management L.L.C. | Delaware |
| 74 | ESA Business Trust | Delaware |

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

65

## Exhibit B

### BHAC License Agreements

Amended and Restated Trademark License Agreement, dated as of July 11, 2005, between BHAC Capital IV, L.L.C. and ESA P Portfolio Operating Lessee Inc. (f/k/a BRE/ESA P Portfolio Operating Lessee Inc.)

Trademark License Agreement, dated as of July 12, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA Canada Operating Lessee Inc.

Trademark License Agreement, dated as of June 13, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of October 31, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA Canada Operating Lessee Inc.

Trademark License Agreement, dated as of October __, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of October 25, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of March 24, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of June 29, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of August 11, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of April __, 2007, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc. (as assigned by ESA 2005 Operating Lessee, Inc. (f/k/a BRE/ESA 2005 Operating Lessee, Inc.) to ESA 2007 Operating Lessee, Inc. pursuant to the Assignment and Assumption of Trademark License Agreement, dated as of June 11, 2007).

Trademark License Agreement, dated as of April __, 2007, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

66

## Exhibit C

## Tier 1 Debtors

ESA Properties LLC

ESA 2005 Portfolio LLC

ESA 2005- San Jose LLC

ESA 2005- Waltham LLC

ESA Acquisition Properties LLC

ESA Alaska LLC

ESA FL Properties LLC

ESA MN Properties LLC

ESA P Portfolio LLC

ESA P Portfolio PA Properties LLC

ESA PA Properties LLC

ESH/Homestead Portfolio LLC

ESH/HV Properties LLC

ESA MD Beneficiary LLC

ESA P Portfolio MD Beneficiary LLC

ESA Canada Trustee Inc.

ESA Canada Beneficiary Inc.

ESA UD Properties LLC

ESA 2007 Operating Lessee, Inc.

ESA 2005 Operating Lessee Inc.

ESA Operating Lessee Inc.

ESA P Portfolio Operating Lessee Inc.

ESA Canada Operating Lessee Inc.

ESA P Portfolio TXNC GP L.L.C.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

67

ESA TXGP L.L.C.

ESH/MSTX GP L.L.C.

ESH/TXGP L.L.C.

ESH/TN Member Inc.

ESA P Portfolio TXNC Properties L.P.

ESA TX Properties L.P.

ESH/TN Properties L.L.C.

ESH/TX Properties L.P.

ESH/MSTX Property L.P.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

68

**Exhibit D**

**Tier 2 Debtors**

ESA Canada Properties Borrower LLC

ESA Canada Properties Trust

ESA P Portfolio MD Borrower LLC

ESA P Portfolio MD Trust

ESA MD Borrower LLC

ESA MD Properties Business Trust

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

69

## Exhibit E

### Tier 3 Debtors

ESH/Homestead Mezz L.L.C.

ESH/Homestead Mezz 2 L.L.C.

ESH/Homestead Mezz 3 L.L.C.

ESH/Homestead Mezz 4 L.L.C.

ESH/Homestead Mezz 5 L.L.C.

ESH/Homestead Mezz 6 L.L.C.

ESH/Homestead Mezz 7 L.L.C.

ESH/Homestead Mezz 8 L.L.C.

ESH/Homestead Mezz 9 L.L.C.

ESH/Homestead Mezz 10 L.L.C.

ESA Mezz L.L.C.

ESA Mezz 2 L.L.C.

ESA Mezz 3 L.L.C.

ESA Mezz 4 L.L.C.

ESA Mezz 5 L.L.C.

ESA Mezz 6 L.L.C.

ESA Mezz 7 L.L.C.

ESA Mezz 8 L.L.C.

ESA Mezz 9 L.L.C.

ESA Mezz 10 L.L.C.

ESA P Mezz L.L.C.

ESA P Mezz 2 L.L.C.

ESA P Mezz 3 L.L.C.

ESA P Mezz 4 L.L.C.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

70

ESA P Mezz 5 L.L.C.

ESA P Mezz 6 L.L.C.

ESA P Mezz 7 L.L.C.

ESA P Mezz 8 L.L.C.

ESA P Mezz 9 L.L.C.

ESA P Mezz 10 L.L.C.

Homestead Village L.L.C.

Extended Stay Hotels L.L.C.

ESA P Portfolio Holdings L.L.C.

ESA Management L.L.C.

ESA Business Trust

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

71

**Exhibit F**

**Existing Letters of Credit**

Irrevocable Letter of Credit Number S-17551, dated June 11, 2007, issued by Deutsche Bank to Zurich American Insurance Company, as beneficiary, in the amount of $1,100,000

Irrevocable Letter of Credit Number S-17552, dated June 11, 2007, issued by Deutsche Bank to Zurich American Insurance Company, as beneficiary, in the amount of $16,375,000

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

72

## Exhibit G

## Mezzanine Facilities

Mezzanine A Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz L.L.C., ESA P Mezz L.L.C., and ESA Mezz L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine B Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 2 L.L.C., ESA P Mezz 2 L.L.C., and ESA Mezz 2 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine C Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 3 L.L.C., ESA P Mezz 3 L.L.C., and ESA Mezz 3 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine D Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 4 L.L.C., ESA P Mezz 4 L.L.C., and ESA Mezz 4 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine E Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 5 L.L.C., ESA P Mezz 5 L.L.C., and ESA Mezz 5 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine F Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 6 L.L.C., ESA P Mezz 6 L.L.C., and ESA Mezz 6 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine G Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 7 L.L.C., ESA P Mezz 7 L.L.C., and ESA Mezz 7 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine H Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 8 L.L.C., ESA P Mezz 8 L.L.C., and ESA Mezz 8 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine I Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 9 L.L.C., ESA P Mezz 9 L.L.C., and ESA Mezz 9 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

73

Mezzanine J Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 10 L.L.C., ESA P Mezz 10 L.L.C., and ESA Mezz 10 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

74

## Exhibit H

## New Mortgage Notes[*]

| Tranche | Amount | Rate (Years 1-5) | Rate (Year 6) | Rate (Year 7) |
|---|---|---|---|---|
| Certificate A1/ Tranche A | $550.382 million | L + 1.205450% | L + 1.705450% | L + 2.205450% |
| Certificate A2/ Tranche B | $400.946 million | 6.679950% | 7.179950% | 7.679950% |
| Certificate A3/ Tranche C | $801.908 million | 7.229950% | 7.729950% | 8.229950% |
| Certificate A4/ Tranche D | $594.061 million | 7.729950% cash 1.5% PIK | 8.229950% cash 1.5% PIK | 8.72995% cash 1.5% PIK |
| Certificate B /Tranche E | $65.626 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate C/Tranche F | $93.241 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate D/Tranche G | $56.478 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate E/Tranche H | $59.968 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate F/Tranche I | $63.133 million | 6.500000% | 6.500000% | 6.500000% |

[*] Projected as of 6/30/10; subject to change based on Confirmation Date.

**Assumes 50% rollover of debt held by the holders of the Class B-H Certificate Mortgage Certificates and takes into account the $200,000,000 Class A4 Cash Paydown.

***New Mortgage Loan has an initial five year maturity with two, one year extension options at NewCo's election. Please note higher cash-pay rates in year six and year seven. Also, PIK of 150 bps for holders of Class A4 Mortgage Certificates would continue in year six and year seven for avoidance of doubt.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

75

| | | | | |
|---|---|---|---|---|
| Certificate G/Tranche J | $66.307 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate H/Tranche K | $66.134 million | 6.500000% | 6.500000% | 6.500000% |

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

76

# Exhibit I

## New Money Equity Waterfall and Rollover Equity Waterfall (Consensual Plan)

The New Money Equity Waterfall and the Rollover Equity Waterfall will be entitled to distributions from net cash flow and/or capital events based on the respective equity ownership percentages for the New Money Equity Investment, which is approximately 61.9%, and the Rollover Equity, which is approximately 38.1%; provided, however, that any NewCo Common Interests that are issued upon the exercise of the New Warrants (which shall have an initial aggregate exercise price equal to 115% of 2.5% of the Plan reorganized equity value to be agreed upon by the Debtors, the Investor and each of the Sponsors, which shall increase by 20% per year) shall dilute, on a pari passu basis, the New Money Equity Investment and the Rollover Equity under both the New Money Equity Waterfall and the Rollover Equity Waterfall. Distributions among the Sub-Equity will follow a waterfall so that each Class of Sub-Equity gets paid the stated value of its contributed claim before a more junior Sub-Equity Class receives a distribution, consistent with the existing priority of payments.

*New Money Equity Waterfall*

Pursuant to the New Money Equity Waterfall, the New Money Equity Investment, SCG Incentive Comp and Sub-Equity shall be entitled to distributions from net cash flow and/or capital events (collectively, "NCF") as follows:

– *Tier 1*: 100% of NCF to New Money Equity Investment until New Money Equity Investment has received a 12% IRR on $650 million;

– *Tier 2*: The balance, if any, of distributable funds remaining after the distributions pursuant to Tier 1 shall be made as follows, until aggregate distributions are made pursuant to Tier 1 and this Tier 2 in an amount equal to the total distributions required for New Money Equity Investment to receive a 12% IRR on $765 million

    (a)  90% to New Money Equity Investment

    (b)  10% to SCG Incentive Comp

– *Tier 3*: The balance, if any, of distributable funds remaining after the distributions pursuant to Tier 1 through Tier 2 shall be distributed as follows, until SCG Incentive Comp has received distributions pursuant to this Tier 3, including distributions received pursuant to Tier 2 (b) above, in an amount equal to the difference between (i) ten percent (10%) of the sum of (x) all distributions made pursuant to Tier 1 through Tier 2 above and (y) all distributions made to this Tier 3, and (ii) ten percent (10%) of all capital contributions returned:

    (c)  38% to New Money Equity Investment

    (d)  57% to SCG Incentive Comp

    (e)  5% to Sub-Equity

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

77

- *Tier 4*: 85% of NCF to New Money Equity Investment, 10% to SCG Incentive Comp and 5% to Sub-Equity, until New Money Equity Investment has received a 15% IRR on $765 million;

- *Tier 5*: 75% of NCF to New Money Equity Investment, 10% to SCG Incentive Comp and 15% to Sub-Equity, until New Money Equity Investment has received a 20% IRR on $765 million;

- *Tier 6*: 70% of NCF to New Money Equity Investment, 10% to SCG Incentive Comp and 20% to Sub-Equity, until New Money Equity Investment has received a 25% IRR on $765 million;

- *Tier 7*: 60% of NCF to New Money Equity Investment, 10% to SCG Incentive Comp and 30% to Sub-Equity, until total distributions to the Sub-Equity equals the outstanding principal balance of Sub-Equity claims (excluding accrued and unpaid interest, costs, fees and expenses), and

- *Tier 8*: thereafter, 90% of NCF to New Money Equity Investment, and 10% to SCG Incentive Comp.

## *Rollover Equity Waterfall*

Pursuant to the Rollover Equity Waterfall, Rollover Equity and Sub-Equity shall be entitled to distributions of NCF:

- *Tier 1*: 100% of NCF to Rollover Equity until Rollover Equity has received a 12% IRR (return of and on Rollover Equity of $471 million);

- *Tier 2*: 95% of NCF to Rollover Equity, 5% to Sub-Equity, until Rollover Equity has received a 15% IRR;

- *Tier 3*: 85% of NCF to Rollover Equity, 15% to Sub-Equity, until Rollover Equity has received a 20% IRR;

- *Tier 4*: 80% of NCF to Rollover Equity, 20% to Sub-Equity, until Rollover Equity has received a 25% IRR;

- *Tier 5*: 70% of NCF to Rollover Equity, 30% to Sub-Equity, until total distributions to Sub-Equity equals the outstanding principal balance of Sub-Equity claims (excluding accrued and unpaid interest, costs, fees and expenses), and

- *Tier 6*: thereafter, 100% of NCF to Rollover Equity.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

78

## Exhibit J

## New Money Equity Waterfall (Non-Consensual Plan)

The New Money Equity Waterfall will be entitled to distributions from net cash flow and/or capital events based on the 100% equity ownership for the New Money Equity Investment; provided, however, that any NewCo Common Interests that are issued upon the exercise of the New Warrants (which shall have an initial aggregate exercise price equal to 115% of 2.5% of the Plan reorganized equity value to be agreed upon by the Debtors, the Investor and each of the Sponsors, which shall increase by 20% per year) shall dilute, on a pari passu basis, the New Money Equity Investment under the New Money Equity Waterfall. Distributions among the Sub-Equity will follow a waterfall so that each Class of Sub-Equity gets paid the stated value of its contributed claim before a more junior Sub-Equity Class receives a distribution, consistent with the existing priority of payments.

Pursuant to the New Money Equity Waterfall, the New Money Equity Investment, SCG Incentive Comp and Sub-Equity shall be entitled to distributions from net cash flow and/or capital events (collectively, "NCF") as follows:

–   *Tier 1*: 100% of NCF to New Money Equity Investment until New Money Equity Investment has received a 12% IRR (return of and on New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time);

–   *Tier 2*: The balance, if any, of distributable funds remaining after the distributions pursuant to Tier 1 shall be made as follows, until aggregate distributions are made pursuant to Tier 1 and this Tier 2 in an amount equal to the total distributions required for New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time to receive a 15% IRR

   (f)   90% to New Money Equity Investment

   (g)   10% to SCG Incentive Comp

–   *Tier 3*: The balance, if any, of distributable funds remaining after the distributions pursuant to Tier 1 through 2 shall be distributed as follows, until SCG Incentive Comp has received distributions pursuant to this Tier 3, including distribution received under Tier 2(b) above,, in an amount equal to the difference between (i) ten percent (10%) of the sum of (x) all distributions made pursuant to Tier 1 through Tier 2 above and (y) all distributions made to this Tier 3, and (ii) ten percent (10%) of all capital contributions returned:

   (a)   38% to New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time

   (b)   57% to SCG Incentive Comp

   (c)   5% to Sub-Equity

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

79

- *Tier 4*: 80% of NCF to New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time, 10% to SCG Incentive Comp and 10% to Sub-Equity, until New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time has received a 20% IRR;

- *Tier 5*: 77.5% of NCF to New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time, 10% to SCG Incentive Comp and 12.5% to Sub-Equity, until New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time has received a 25% IRR;

- *Tier 6*: 75% of NCF to New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time, 10% to SCG Incentive Comp and 15% to Sub-Equity, until total distributions to the Sub-Equity equals the outstanding principal balance of Sub-Equity claims (excluding accrued and unpaid interest, costs, fees and expenses), and

- *Tier 7*: thereafter, 90% of NCF to New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time, and 10% to SCG Incentive Comp.

C:\DOCUMENTS AND SETTINGS\AMPONSAH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\HN2DS1UO\US_ACTIVE_STARWOOD PLAN - FINAL - 3 15 10_43337055_6.DOC

80