**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                          :
In re:                                    :     Chapter 11
                                          :
Extended Stay, Inc., *et al.*,            :     Case No. 09-13764 (JMP)
                                          :
                    Debtors.              :     (Jointly Administered)
                                          :
-------------------------------------------------------------x


# REPORT OF

# RALPH R. MABEY,

# AS EXAMINER


STUTMAN, TREISTER & GLATT                   ALVAREZ & MARSAL
PROFESSIONAL CORPORATION                    DISPUTE ANALYSIS & FORENSIC
1901 Avenue of the Stars, 12th Floor    SERVICES LLC
Los Angeles, CA 90067                       125 Park Avenue
Telephone:    (310) 228-5600                New York, NY 10017
Facsimile:    (310) 228-5788                Telephone:    (212) 763-9568
Robert A. Greenfield (Admitted *Pro Hac Vice*)   Facsimile:    (917) 797-6691
George C. Webster II (Admitted *Pro Hac Vice*)   Laureen M. Ryan, Managing Director
Eric D. Goldberg (Admitted *Pro Hac Vice*)
H. Alexander Fisch (Admitted *Pro Hac Vice*)
Margreta M. Morgulas (MM 7441)

*Counsel to the Examiner*                    *Financial Advisor to the Examiner*


Preliminary Report filed under seal March 12, 2010
Public Report filed April 8, 2010


537960v2

# TABLE OF CONTENTS

**Pages**

PREFACE .................................................................................................. 1

I.      THE EXAMINATION ...................................................................... 1

        A.      Appointment of the Examiner ................................................ 1

        B.      Scope of the Examination ..................................................... 2

II.     EXAMINATION METHODOLOGY ................................................ 3

        A.      Initial Interviews and Requests for Information ................... 3

        B.      Document Production ............................................................ 4

        C.      In-Person Meetings and Depositions .................................... 7

        D.      Financial Investigation and Analysis ................................... 9

        E.      Legal Analysis ....................................................................... 9

III.    FINDINGS ....................................................................................... 9

        A.      The U.S. Extended Stay Lodging Industry ........................... 9

                1.      Key Lodging Performance Metrics ........................... 12

                2.      Economic Conditions and the Impact on the Lodging
                        Industry ..................................................................... 13

                3.      Acquisition Activity .................................................. 17

        B.      Company Background and Pre-Acquisition Financial Overview ........................... 19

                1.      Property-Level Financial Performance 2005 to 2007 (Pro
                        Forma) ........................................................................ 24

                2.      Corporate Overhead Expenses for 2005, 2006 and projected
                        2007 ............................................................................ 33

                3.      Capital Expenditures ................................................. 34

        C.      2007 Sale Process ................................................................. 36

                1.      Offering Memorandum ............................................... 36

                2.      Sale Process ............................................................... 38

                3.      Lightstone's Due Diligence ....................................... 40

                4.      Lightstone's Definitive Offer and Sellers' Acceptance ................... 43

i

5.      Non-Binding Offer to Purchase Controlling Equity Position ..................... 46

6.      HVS Appraisal ........................................................................................ 48

D.      Closing of the Acquisition ............................................................................... 48

1.      DL-DW's Credits .................................................................................... 51

2.      Sellers' Charges ..................................................................................... 54

3.      True-Up of Purchase Price ...................................................................... 60

4.      Recording of the Acquisition .................................................................. 61

E.      Key Elements of Post-Acquisition Capital Structure ....................................... 65

1.      Capital Structure .................................................................................... 65

      a.      Overview of CMBS Structure ..................................................... 65

            (1)      Mortgage Loan .................................................................. 65

            (2)      Mezzanine Loans ............................................................... 69

      b.      SPE/Separateness Covenants ....................................................... 73

      c.      Debt Yield and Financial Reporting Covenants ........................... 76

            (1)      Debt Yield .......................................................................... 76

            (2)      Financial Reporting ........................................................... 78

      d.      Prepayment/Release .................................................................... 80

      e.      Events of Default/Borrowers' Rights to Cure ............................... 81

      f.      Lenders' Remedies ..................................................................... 83

      g.      Non-Consolidation Opinions ...................................................... 83

      h.      Amendments ............................................................................... 86

            (1)      Mortgage Loan .................................................................. 86

            (2)      Mezzanine Loans ............................................................... 88

2.      Cash Management Agreement ................................................................. 89

3.      Inter-Creditor Agreement ....................................................................... 93

4.      Guarantees ............................................................................................. 99

5.      Contribution Agreements ...................................................................... 101

      a.      Mortgage Borrowers ................................................................. 101

|  |  | b. | Mezzanine Borrowers | 102 |

| | 6. | Key Differences Between Pre- and Post-Acquisition Capital Structure | 103 |
| | | a. | Debt Yield | 103 |
| | | b. | Cash Management Agreement | 104 |
| | | c. | Approval of Annual Budget | 105 |
| | 7. | Directors & Officers | 105 |

| F. | Post-Acquisition Operations of the Company | 106 |
| | 1. | HVM LLC and Management Agreements | 106 |
| | 2. | Accounting by the Company | 114 |
| | | a. | Financial Statements | 121 |
| | | b. | Servicer Reports | 122 |
| | | c. | Management Reports | 122 |
| | 3. | Officer Certificates | 122 |

| G. | Underwriters' Marketing of Mortgage and Mezzanine Debt Certificates | 125 |
| | 1. | HPT Alleged Default | 128 |
| | 2. | Gary DeLapp Employment Contract | 131 |
| | 3. | Lightstone's Post-Acquisition Efforts to Sell Preferred Equity | 132 |
| | 4. | DL-DW Purchase of LIBOR Floor Certificates | 134 |

| H. | 2007 Post-Acquisition Performance | 135 |
| | 1. | 2007 Post-Acquisition Financial Performance | 135 |
| | 2. | 2007 Budget and the 2008 Budget Submission | 143 |
| | 3. | Debt Yield Test and Cash Trap | 146 |
| | 4. | 2007 Dividends and Distributions | 149 |

I.     2008 Post-Acquisition Performance ...................................................... 151

    1.    Debt Yield Test and Cash Trap Event ..................................... 151

    2.    2008 Budget Negotiations with Fortress.................................. 152

    3.    March 2008 Subordinated Debt Due ....................................... 154

    4.    2008 Financial Performance ................................................... 157

    5.    Dividends and Distributions to Equity Holders...................... 165

J.    2009 Post-Acquisition Performance through the Petition Date........................... 166

K.    Pre-Filing Negotiations.......................................................................... 172

    1.    Mortgage Debt Negotiations................................................... 173

    2.    Mezzanine Debt Negotiations................................................. 179

    3.    CIL Negotiations..................................................................... 183

    4.    Term Sheet Negotiations......................................................... 187

    5.    Weekend of the Bankruptcy Filing ......................................... 190

    6.    Bankruptcy Code Section 548 Statute of Limitations Period Issues................... 193

    7.    Concerns Regarding Independent Director Authorizations for Filings.................. 194

L.    Creditor Information .............................................................................. 196

    1.    Claims Analysis ...................................................................... 196

        a.    Accounts Payable Analysis........................................... 197

        b.    Bankruptcy Claimants.................................................. 200

    2.    Litigation/Tort Claims ............................................................ 201

IV.    FINANCIAL ANALYSIS ................................................................................. 202

A.    Approach to the Solvency Analysis........................................................ 204

B.    Balance Sheet Test................................................................................. 204

    1.    Multiple Analysis.................................................................... 206

    2.    Determination of the Purchase Price....................................... 208

        a.    The Sales Process......................................................... 208

| | | | | |
|---|---|---|---|---|
| | | b. | Due Diligence Performed by the Buyer and Underwriters | 209 |
| | | c. | HVS Appraisal | 211 |
| C. | Cash Flow Test | | | 213 |
| | 1. | Selection of the Projections Used | | 214 |
| | 2. | Adjustments to the Projections | | 218 |
| | 3. | Sensitivities Performed | | 219 |
| | 4. | Impact of the CMA Structure on the Cash Flows | | 221 |
| | 5. | Impact of a Potential Cash Trap | | 224 |
| D. | Capital Adequacy Test | | | 225 |
| | 1. | Impact of the Increased Debt | | 226 |
| | 2. | Equity Distributions and Contributions | | 229 |
| | 3. | Debt Yield Test | | 232 |
| | 4. | Other Ratio Analysis | | 233 |
| | 5. | Working Capital Needs of Hospitality Industry | | 234 |
| E. | Dividends/Distributions made after the Closing of the Acquisition | | | 236 |
| V. | CLAIMS OF THE ESTATE | | | 236 |
| A. | Summary | | | 236 |
| | 1. | Characterization of Structure/Transfers – An Overview | | 238 |
| | | a. | Structure | 238 |
| | | | (1) Secured Debt | 239 |
| | | | (a) Impact of the Intercreditor Agreement | 240 |
| | | | (2) Other Claims | 241 |
| | | | (3) Impact of Substantive Consolidation | 241 |
| | | b. | Transferors, Transfers and Claims | 242 |
| | | | (1) Transfers Made In Connection With the Acquisition | 242 |
| | | | (a) Transfers to the Lenders | 242 |

(b) Transfers to the Sellers ...........................................243

(c) Transfers to the Professionals ..............................244

(d) Transfers to the Buyer ..........................................244

(e) Recharacterization of the Transfers .....................244

B. Matters Regarding Corporate Form ........................................245

1. Substantive Consolidation .......................................246

a. Generally ...........................................................246

b. Consolidation of a Debtor with Non-Debtors ............................251

c. Consolidation of Special Purpose Entities ...................252

d. Partial Consolidation ..........................................253

e. Substantive Consolidation of the Debtors Is Appropriate ........................................255

(1) The Debtors Operated As a Single Economic Unit ................................255

(2) Creditors Will Not Be Prejudiced By Consolidation of the Debtors' Estates ..............................258

C. Fraudulent Transfer Claims ........................................261

1. Choice-of-Law ...................................................262

a. Analysis...........................................................262

(1) Overview of New York Choice-of-Law Principles..........................................263

(a) Absent an Applicable Choice-of-Law Provision in the Governing Documents, the "Interest Analysis" Applies ..................................263

(b) Under an "Interest Analysis," the Fraudulent Transfer Claims will be Governed by the Substantive Law of either New York, Delaware, or South Carolina..........................................266

(i) New York.................................268

(ii) South Carolina .........................269

(c)     Where the Jurisdiction's Laws Conflict, the Law of the Locus Jurisdiction Applies. .............................. 270

b.      The Federal Debt Collection Procedure Act ............................... 277

(1)     Application of the FDCPA Requires a Debt to the United States ............................... 279

(2)     As an Agency of the United States, the Internal Revenue Service Claim Satisfies the FDCPA United States Debt Requirement ....................... 279

2.      Substantive Claims ............................................................ 280

a.      Overview of New York Law ............................................. 280

b.      Applicability of Fraudulent Transfer Analysis to LBOs ......................................................... 282

c.      Analyzing the Economic Substance of an LBO .......................... 283

d.      Analyzing the Acquisition ....................................... 286

(1)     Triggering Creditors ........................................ 287

(a)     544(a) .................................................. 287

(b)     Claims Requiring Pre-Existing Creditors ............................................ 289

(i)      Actual Creditors and Section 544(b) ....................................... 290

(ii)     Continuous Creditors ............................... 292

(iii)    Litigation and Tort Creditors ................... 293

(c)     Conclusions ........................................... 294

(2)     Equivalence of Value Provided ....................... 294

(a)     Indirect Benefits Obtained by Target in an LBO ........................................... 295

(b)     Conclusion ........................................... 296

(3)     Solvency / Inadequate Capital / Ability to Pay Debts ............................................ 297

(a)     Solvency ............................................... 297

(i)      Valuation Methodologies ........................ 298

|  |  |  | (ii) | Valuation – Purchase Price is Highly Probative But Not Determinative | 299 |

(ii) Valuation – Purchase Price is Highly Probative But Not Determinative ............................................. 299

(iii) Conclusion .............................................. 300

(b) Unreasonably Small Capital ............................... 300

(i) Statutory Language .................................... 300

(ii) Application of Unreasonably Small Capital Test .................................... 301

(iii) Conclusion .............................................. 307

(c) Ability to Pay Debts As They Come Due .................................................... 308

(i) Statutory Language .................................... 308

(ii) Conclusion .............................................. 314

e. Conclusions re Viable Claims .................................... 314

3. Defenses ............................................................. 315

a. Section 278(2) of the NY DCL ............................... 315

(1) Purchaser ................................................ 315

(a) "Without Actual Fraudulent Intent" .................... 316

(b) Purchaser May Only Retain the Property or Obligation to Extent of Value Given ............................... 317

(2) Application of NY DCL Section 278(2) ........................ 317

(a) Sellers ................................................ 317

(b) Buyer ................................................. 318

(c) Lenders ............................................... 318

(d) Professionals ......................................... 318

4. Other Issues ........................................................ 318

a. Applicability of Participant Bar ............................... 318

(1) Conclusion .............................................. 323

b. Avoidance Actions May Be Maintained for the Benefit of the Estates. .................................... 324

c.    546(e) ..................................................................... 326

    (1)    Introduction.................................................... 326

    (2)    History of Section 546(e)................................ 330

    (3)    Applicability Of Section 546(e) To
            Leveraged Buyouts ........................................ 334

           (a)    The 2009 Cases and Their
                    Predecessors .................................... 335

           (b)    Cases From the Other Side of the
                    2009 Decisions.................................. 341

           (c)    Impact of the 2006 Amendments......... 348

    (4)    Preemption and the Prospect of
            Abandonment................................................ 352

           (a)    Preemption ....................................... 352

           (b)    Abandonment.................................... 359

    (5)    The Possible Application of Section 546(e)
            to Potential Claims ........................................ 363

           (a)    Avoidance Claims .............................. 364

                  (i)    Claims against The Sellers....... 365

                  (ii)    Claims against the Lenders ...... 367

                        (a)    Liens................................ 368

                        (b)    Obligations ...................... 370

                        (c)    Payments to the
                                  Lenders............................ 372

                  (iii)    Claims against The
                        Professionals. .......................... 373

                  (iv)    Claims Regarding
                      Intercompany Transfers ........... 373

            (b)    Section 546(e), Recovery Actions
                  under Section 550, and Disallowance
                  under Section 502(d).......................... 374

           (c)    Illegal Distributions/Dividends and
                  Unjust Enrichment Claims................... 377

           (d)    Breach of Fiduciary Duty and Aiding
                  and Abetting Claims. .......................... 377

|  |  | d. | Recovery Under Section 550 | 378 |
|  |  |  | (1) The Buyer As A Beneficiary Or Transferee | 379 |
|  |  |  | (2) Payments to the Sellers and the Professionals | 382 |

D. Non-Fraudulent Transfer Claims ... 384

1. Illegal Corporate Distributions ... 385

   a. Choice-of-Law ... 385

   b. Illegal Dividends and Redemptions under the DGCL ... 386

      (1) Dividends May Be Declared Only from Surplus or Net Profits ... 386

      (2) A Corporation May Purchase or Redeem Its Own Stock Only from Its Surplus ... 386

      (3) Calculation of "Surplus" ... 387

      (4) Director Liability For Authorizing Illegal Distributions ... 388

      (5) Shareholder Liability for Receiving Illegal Payments ... 390

   c. Illegal Distributions Under the DLLCA ... 392

   d. The Illegal Distribution Inquiry Looks to the Economic Substance of the Transaction, and Is Not Limited by Form ... 394

   e. Standing to Assert Claim ... 395

   f. Conclusion ... 396

      (1) Liability under the DGCL ... 396

      (2) Liability under the DLLCA ... 397

2. Breach of Fiduciary Duty ... 397

   a. Choice-of-Law ... 397

      (1) New York Choice-of-Law Rules Apply ... 397

      (2) Under New York's Choice-of-Law Rules, Delaware Law Will Govern the Estates' Breach of Duty Claims ... 398

b.    Directors, Officers, and Controlling Shareholders Owe Fiduciary Duties to the Corporation .................................... 400

    (1)    Duties Owed by a Fiduciary ................................ 400

        (a)    The Duty of Care .................................. 401

        (b)    The Duty of Loyalty.............................. 403

        (c)    Parent's Duties to Its Subsidiary .......................... 404

        (d)    Fiduciaries of Insolvent Corporations Owe Duties to Creditors under Delaware Law ...................................... 405

        (e)    Damages for Breach of Duty ................................ 407

c.    Fiduciary Duties Owed By Members of a Limited Liability Company ........................................................ 408

d.    Conclusions.................................................................. 409

    (1)    The Debtors' Fiduciaries .................................... 410

    (2)    Impact of Insolvency Determination ................................ 410

    (3)    Duty of Care.................................................... 412

    (4)    Duty of Loyalty.................................................. 414

        (a)    The Acquisition and the Post-Acquisition Distributions...................... 414

        (b)    The Financial Circumstances That Led to the Filing of the Chapter 11 Cases ................................................ 415

    (5)    Damages.......................................................... 416

3.    Aiding and Abetting a Breach of Fiduciary Duty .................................... 416

a.    Choice-of-Law .............................................................. 417

b.    Liability for Aiding and Abetting a Breach of Fiduciary Duty .......................................................... 417

c.    The *Wagoner* Rule and *In Pari Delicto* .......................................... 418

d.    Conclusion .................................................................. 420

4.    Unjust Enrichment ................................................................ 421

a.    Choice-of-Law .............................................................. 421

b.    New York Unjust Enrichment Law. .............................................. 422

       c.     Unjust Enrichment Actions in LBO Cases. .................................... 424

       d.     Conclusion ............................................................................. 424

    5.     Alter Ego Liability ..................................................................... 425

       a.     Conclusion ............................................................................. 427

    6.     Subrogation .............................................................................. 427

VI.    SUMMARY OF FINDINGS AND CONCLUSIONS ..................................................... 430

537960v2

**PREFACE**

No one disputes that since Lightstone's[1] Acquisition of the Company in June 2007 an earthquake has shifted the economic ground under us. My assignment as Examiner, however, is not to report on the earthquake, but, rather, to examine the financial and legal circumstances surrounding the Acquisition shortly before the earthquake, and the Company's run up to bankruptcy thereafter.

The Acquisition was one of the last large structured finance leveraged buyouts before the temblor. The run up to bankruptcy was one of the first by an enterprise that included a CMBS mortgage, special purpose entities, a REIT structure, and a hotel business dependent upon operating funds disbursed through a structured finance waterfall. I have carefully measured the conduct and complexities of the Acquisition, and of the run up to bankruptcy, against appropriate financial and legal standards.

In view of the intervening economic earthquake, the complex – largely untested – financial structures, and my limited assignment, my views are not categorical. This Report shines objective light on the Acquisition and the run up to bankruptcy, with the hope that it will assist the parties in interest and the Court as the Chapter 11 Cases move forward.

I.   **THE EXAMINATION**

   A.   **Appointment of the Examiner**

On July 30, 2009, the Office of the United States Trustee filed the Examiner Motion with the Bankruptcy Court, seeking the appointment of an examiner pursuant to Bankruptcy Code section 1104(c) to, among other things, investigate certain concerns raised by parties in interest in connection with the June 11, 2007 Acquisition and the commencement of the Chapter 11 Cases of the Debtors[2] on June 15, 2009. The Examiner Motion came before the Bankruptcy Court on September 22, 2009, and was approved without opposition.

---

[1]   *See* Appendix 1: Defined Terms, for all capitalized terms not otherwise defined in the body of this Report.
[2]   A list of the Debtors is annexed hereto as Exhibit I-A-1.

On September 24, 2009, the Bankruptcy Court entered the Appointment Order directing the United States Trustee to appoint an examiner in the Chapter 11 Cases.  On September 28, 2009, the United States Trustee appointed Ralph R. Mabey as Examiner, and filed its notice of the appointment, and application for an order of the Bankruptcy Court approving the appointment.  On September 29, 2009, the Bankruptcy Court entered its Order Approving Appointment of Examiner.

On December 11, 2009, the Bankruptcy Court entered orders granting the Examiner's applications to employ ST&G as his counsel *nunc pro tunc* to September 24, 2009, and A&M as his financial advisors *nunc pro tunc* to October 13, 2009.

B.      Scope of the Examination

The Examiner, his counsel, and his financial advisors reviewed the proposed scope of the Investigation as set forth in the Appointment Order and consulted with numerous parties in interest in connection with the preparation of the proposed Examiner Work Plan.  On October 13, 2009, the Examiner filed his "Motion to Approve Examiner's Preliminary Work Plan and Budget" with the Bankruptcy Court.  Objections were filed and the Examiner and his professionals again met with parties in interest and resolved most concerns, although widely divergent views of the appropriate scope of the Investigation were expressed.  At a hearing held on November 12, 2009, the Bankruptcy Court approved the final form of Examiner Work Plan.

Specifically, pursuant to the Examiner Work Plan, the Bankruptcy Court approved the following general description of the scope of the Investigation:

a.      the negotiation and documentation of the Acquisition, and certain compensation and fees paid in connection therewith;

b.      the data, information, and materials relied upon by the parties to the Acquisition, including, without limitation, any valuations or appraisals of the assets to be purchased/sold, business plans and/or projections, and the applicable loan agreements;

c.      potential causes of actions stemming from the Acquisition;

2

d. the financial circumstances that led to the filing of the Chapter 11 Cases, including, but not limited to, the projected and actual financial performance of the Debtors (including variances between the Debtors' projections and actual financial performance), with a primary focus on the year immediately preceding the commencement of the Chapter 11 Cases; and

e. claims of the estates relating to the above-described items.

## II. EXAMINATION METHODOLOGY

### A. Initial Interviews and Requests for Information

In connection with the efforts of the Examiner to craft a work plan, the Examiner and his professionals spoke or met with several parties in interest in these Chapter 11 Cases, representing markedly divergent points of views about the need for, and the appropriate scope of, the Investigation. The following table describes these interviews:

| Date of Call or Meeting | Non-Examiner Parties Present | Parties Represented |
| --- | --- | --- |
| October 1, 2009 | M. Goldstein/J. Marcus | Debtors |
| October 2, 2009 | M. Power | Creditors' Committee |
| October 5, 2009 | S. Meister/S. Rich | Line Trust |
| October 6, 2009 | B. Scheler/J. Rodburg | Centerbridge |
| October 6, 2009 | D. Friedman | The Lightstone Group/ David Lichtenstein |
| October 7, 2009 | S. Leventhal/S. Heller/P. McArdle | New York Federal Reserve |
| October 7, 2009 | G. Marsh/M. Seider | U.S. Bank/TriMont |
| October 8, 2009 | G. Beckenroth/M. Power/J. Orbach/ Z. Newman/A. Schrag/R. White/ D. Losito/A. Rohan | Creditors' Committee |
| October 9, 2009 | A. Harris/H. Godnik | Cerberus |
| October 15, 2009 | B. Schorling/M. Caloway | Key Bank |
| October 16, 2009 | H. Kaplan/M. Hebbeln/O. Petukhova | M&T Trust |

During the course of these initial interviews, the Examiner gathered general information about the Debtors, the Acquisition, the Company's financial decline from 2007-2009, and the Debtors' chapter 11 filings in June 2009. In addition, the Examiner discussed the process with respect to the Investigation and solicited the parties' input. The Examiner

encouraged parties to share any information and documents that they believed would aid the Examiner in his Investigation.

On October 30, 2009, the Examiner sent a letter to more than twenty parties in interest that the Examiner had reason to believe might have information pertinent to the Investigation ("October 30 Letter"). In the October 30 Letter, the Examiner requested that each recipient consider sending the Examiner a list, letter, operative document, or other writings to draw his attention to any persons, sources, exhibits, analyses, legal authorities, declarations, position statements, and the like that the recipient believed bore meaningfully upon the factual or legal subject matter of the Investigation, especially as it pertained to the recipient's client(s). The request was made in an attempt to make the Investigation more efficient than commencing with a wide swath of document discovery, and a time consuming and unfocused review of potentially hundreds of thousands of documents and emails. Only one recipient, Ashford Hospitality Group, responded meaningfully to the Examiner's October 30 Letter.

## B. Document Production

During the first week in November 2009, the Examiner issued his first formal requests for document production. In order to limit the costs of the Investigation, the Examiner and his professionals initially sought documents on a consensual basis without the use of subpoenas. While this process was effective, it required the negotiation of numerous confidentiality agreements and many supplemental requests for documents.

The Examiner encountered considerable resistance to the production of electronic mail, and he anticipated that litigation to force production would be expensive and time consuming. While the Examiner was prepared to litigate over the production of emails if appropriate, he decided, in light of the Examination's narrow focus and short deadline, to rely largely upon documents, interviews, and a few depositions.

Accordingly, parties desiring to pursue any causes of action or further investigate any issues raised in the Report should know that, with very few exceptions, electronic

communications have not been produced by parties in interest in connection with any document requests.[3]

Parties initially refused to produce anything to the Examiner that had been provided to them by the Company. This proved problematic, especially in connection with the Investigation of the Acquisition. With respect to the original underwriting banks, only Wachovia produced a significant amount of materials in response to the Examiner's document requests. Accordingly, parties desiring to pursue causes of action or further investigate issues raised in the Report should be aware that the underwriting files have not, with the possible exception of Wachovia, been produced to the Examiner in any meaningful detail.

Below is a document production table. The Examiner has and will continue to maintain in his files the document requests that were given to each party and the responses thereto. Further, the Examiner's electronic document repository contains all documents produced to the Examiner. All, however, are subject to the aforementioned confidentiality agreements.

| Party From Which Documents Were Requested | Documents Produced | Approximate Date(s) of Documents Produced |
|---|---|---|
| Debtors (including non-debtor affiliates such as HVM, LLC) and Debtors' Court-Appointed Professionals | Yes | October 25, 2009, November 16 and 17, 2009, December 2, 9, 14, and 31, 2009, January 5, 11, 15, 20, 23, and 29, 2010, February 5, 9, 24, and 26, 2010, March 1, 4, 10, and 11 2010 |
| Creditors' Committee | Yes | December 2, 2009 |
| Lightstone Holdings LLC | Yes | December 18, 2009, January 29, 2010, and February 9, 2010 |
| Arbor Realty Trust Inc. | Yes | January 26, 2010 |
| Blackstone Group | Yes | December 2 and 23, 2009, January 22, 2010 and February 26, 2010 |
| Federal Reserve Bank of New York, Maiden Lane, and BlackRock | Yes | February 3, 2010 |
| Wachovia Bank | Yes | November 25, 2009, December 2, 16, 22, and 23, 2009, and January 11, 20, and 22, 2010 |

---

[3]     Exceptions to this practice include productions of certain limited electronic communications from Lightstone Holdings LLC; Citi GM; the Debtors; Fortress; Arbor; Centerbridge; and the Servicer.

| Party From Which Documents Were Requested | Documents Produced | Approximate Date(s) of Documents Produced |
|---|---|---|
| Wachovia Securities | Yes | January 20 and 26, 2010, February 12 and 25, 2010, and March 9, 2010 |
| Bank of America, N.A. (including Merrill Lynch Mortgage Lending, Inc.) | Yes | January 22 and 26, 2010 |
| Cerberus | No, Cerberus Informed Examiner That It Had No Responsive Documents That Were Not Produced To Cerberus By The Debtors, Irrelevant To The Investigation, Or Privileged | |
| Centerbridge | Yes | December 16, 23, and 31, 2009 |
| Five Mile | No, Five Mile Informed Examiner That It Had No Responsive Documents | |
| Starwood | No, Starwood Informed Examiner That It Had No Responsive Documents | |
| Ashford Hospitality Finance L.P. | Yes | November 25, 2009, and December 5, 2009 |
| First American Title Insurance Company of New York | Yes | January 15 and 20, 2010 |
| Key Bank Real Estate Capital | Yes | January 11, 2010 |
| Line Trust | No, Line Trust Informed Examiner That It Had No Responsive Documents | |
| Citi GM | Yes[4] | February 26, 2010 |
| Fortress Investment Group LLC | Yes | February 5, 2010 |

A substantial volume of documents and information that was in the possession of various parties in interest was collected and maintained in a repository. In total, the Examiner has received 20,098 documents and 513,699 pages (the equivalent of 38.4 GB). The repository provided the Examiner and his professionals with an organized vehicle by which they could review documents in an efficient manner and has been used to maintain the source of the documents provided to facilitate later identification as required.

---

[4] However, the Examiner did not receive all of the information requested from Citi GM, the Buyer's financial advisor.

### C.   In-Person Meetings and Depositions

Commencing the first week in November 2009, the Examiner and his professionals began issuing requests for parties to meet with the Examiner in person to discuss the matters relevant to his Investigation.  Generally speaking, once confidentiality agreements were agreed upon by the parties and schedules were coordinated, most parties were very accommodating in making a representative available to the Examiner and his professionals to be interviewed.  Given the informal nature of the interviews, the Examiner believes that he was able to acquire information that might not otherwise have been provided in a more formal setting, such as a deposition.  Most of the interviews lasted between a few hours and a day.  Some required follow-up telephone calls and questions.  However, the Examiner was ultimately able to get most of the information he sought from the parties during these informal meetings and, therefore, ordinarily did not need to rely upon the use of depositions.  The Examiner's professionals kept detailed notes from each of the interviews and will maintain them in the work product files associated with the Investigation.

Below is a table containing information regarding the in-person and telephonic interviews that the Examiner conducted during the Investigation.

| Date of Interview | Non-Examiner Person(s) In Attendance | Party(s) Represented |
|---|---|---|
| November 5, 2009 | A. Lefkowitz, P. Summers, M. Goldstein, J. Marcus, J. Kim, J. Rogers | Debtors |
| November 17, 2009 | D. Losito, A. Rohan, M. Hank, G. Beckenroth, C. Jervinen, J. Orbach | Creditors' Committee |
| November 24, 2009 | D. Lichtenstein | N/A |
| November 24, 2009 | J. Teichman | N/A |
| December 3, 2009 | G. DeLapp | HVM, LLC/Debtors |
| December 4, 2009 | D. Brooks, D. Ebanks | Ashford Hospitality |
| December 10, 2009 | F.J. Rogers | HVM, LLC/Debtors |
| December 15, 2009 | M. Mesard, H. Mucciolo, M. Patrick, H. Zelbo, N. Forrest | New York Federal Reserve, Maiden Lane, and Blackrock |
| December 17, 2009 | W. Rahm, B. Steingart, J. Rodburg, A. Rothman | Centerbridge |
| December 18, 2009 | W. Stein, B. Angiolillo, A. Cattell | Blackstone Group |
| December 21, 2009 | J. McLaughlin, K. Ahern, G. Lane, J. Morrison, M. Calloway | Key Bank |
| December 22, 2009 | D. Kim, J. Marcus, A. Reicher | Debtors |
| December 23, 2009 | W. Rahm, B. Steingart, J. Rodburg (Telephone) | Centerbridge |

537960v2

| Date of Interview | Non-Examiner Person(s) In Attendance | Party(s) Represented |
|---|---|---|
| December 30, 2009 | F.J. Rogers, J. Kim | Debtors |
| January 5, 2010 | M. Benner, M. Kaplan, A. Jeffrey | Wachovia Servicing |
| January 12, 2010 | M. Hager, B. Miller, R. Wetheimer, M. Edelstein, Wachovia Bank Representatives | Wachovia Bank |
| January 14, 2010 | R. Rawl, J. Manning, A. Dennis (Telephone) | National Registered Agents |
| January 14, 2010 | J. Hoyle, J. Parver, S. Talmadge, B. Dockwell | Bank of America/Merrill Lynch |
| January 15, 2010 | B. deVinck, A. Reicher (Telephone) | Member, Board of Directors of ESI |
| January 21, 2010 | I. Kaufman, A. Levander, L. Solomon | Arbor Realty |
| January 24, 2010 | P. Summers, J. Altman, A. Ruger, J. Marcus (Telephone) | Lazard |
| February 17, 2010 | S. Heller, H. Zelbo (Telephone) | New York Federal Reserve, Maiden Lane |
| February 22, 2010 | S. Mehrara, B. Angiolillo, A. Cattell (Telephone) | Blackstone Group |
| February 22, 2010 | M. Brenner, A.M. Jefferey (Telephone) | Servicer |
| February 25, 2010 | J. Carroll, M. Robertson (Telephone) | Cadwalader, Wickersham & Taft LLP |
| February 25, 2010 | J. Kornberg (Telephone) | Former Employee of Lightstone |
| March 1, 2010 | P. Sullivan (Telephone) | Former Independent Contractor for Lightstone |

In addition to the foregoing, the Examiner took three depositions. In the case of Mr. Lichtenstein and Mr. Teichman, the Examiner found it necessary that they be deposed because of the central role that each played in both the Acquisition and the operation of the Company during the period in which it was apparently determined that it was necessary to file the Chapter 11 Cases. Further, given the amount of speculation in these cases regarding undisclosed "side deals" and "back room" negotiations, the Examiner believed it important that both Mr. Lichtenstein and Mr. Teichman be questioned under oath regarding such matters. The final deposition taken was that of F. Joseph Rogers, who heads the accounting group for HVM. In the course of their work, the Examiner's professionals determined that a significant amount of information regarding the accounting and financial reporting practices of the Company resided within the institutional knowledge of HVM. Accordingly, the Examiner's professionals wanted to have information on these matters recorded in a more formal evidentiary format.

D.    **Financial Investigation and Analysis**

Relying upon the information gained from the documents produced and publicly available, interviews, depositions, and independent research, A&M performed detailed financial analyses which included, among other things, (1) the financial performance of the Company immediately prior to the Acquisition, (2) the Closing of the Acquisition and the activities related thereto, (3) certain solvency analyses, and (4) the operations, performance, and financial decline of the Company leading up to the filing of the Chapter 11 Cases on June 15, 2009. A&M also investigated and performed certain analyses that provided the basis for potential causes of action as requested by counsel.

E.    **Legal Analysis**

The Examiner and his counsel explored the potential claims that could be asserted by the Estates in connection with the Acquisition and the actions taken during the time preceding the commencement of the Chapter 11 Cases. Analysis of the fraudulent transfer claims that often follow a failed leveraged buyout was made more difficult by the Debtors' complex corporate and financing structure present here, and the evolving law regarding avoidance actions in connection with securities transactions. The legal analysis of the potential claims of the Estates is in section V of the Report.

III.    **FINDINGS**

A.    **The U.S. Extended Stay Lodging Industry**

The U.S. extended-stay hotel segment began as a niche concept over 30 years ago with the opening of Residence Inn hotels.[5] An "extended-stay" segment is defined as a guest stay longer than five consecutive nights, as opposed to a "transient-stay", which is a stay of typically one to four nights.[6] Extended-stay hotels often attract customers that require a stay longer than a transient stay hotel, but not long enough to justify the expense and commitment of entering into a

---

[5]    Daniel McGinn, "Won't You Stay a Bit Longer?" Newsweek, Sept. 27, 2008.

[6]    The Highland Group, *Report on the Extended Stay Lodging Industry in the United States – 2007* [Bates Nos. WACH 034637-034654].

lease.  In addition, the extended-stay segment has been known for its relatively steady customer demand, low operating costs, and high returns.

The extended-stay segment is also different from the transient hotel segment in that the rooms include a fully equipped kitchenette, a separate sleeping area (a bedroom or an area set-off from the common areas), office/work space, communal laundry facilities, and communal fitness centers.[7]  In addition, extended-stay hotels do not typically offer daily housekeeping, twenty-four hour front desk staff,[8] extensive common areas, restaurants, or lounges, and they typically have fewer rooms per hotel.[9]

Approximately 20% of all hotel stays in the U.S. are estimated to be five nights or longer.[10]  This significant portion of the hotel market provided the driving force behind the growth in the extended-stay lodging segment. In fact, the U.S. extended-stay market had grown to over 270,000 rooms by 2006 and was expected to increase to over 361,000 rooms by 2011.[11]

The Highland Group segregated the extended-stay segment into three sub-segments based on the average weekly rate:[12]

| Sub-Segments of the Extended-Stay Market | | | |
|---|---|---|---|
| **Sub-Segment** | **Weekly Rate ($/week)** | **Average Stay (Days)** | **Room Supply** |
| **Economy** | < $300 | 34 | 54,186 |
| **Mid-Price** | $300 - $600 | 14 | 113,883 |
| **Upscale** | > $600 | 4 | 102,443 |
| **Average/Total** | | 14 | 270,512 |

*Source: The Highland Group, Extended-Stay Lodging Industry in the U.S. - 2007*

---

7   Bureau of Labor Statistics, *Extended-stay hotels* - http://www.bls.gov/oco/cg/cgs036.htm.

8   Typically the front desk is staffed for 12-16 hours a day for the extended stay segment. Offering Memorandum, at 39 [Bates Nos. BLA-002201-002287].

9   In 2006 full service hotels had 310 rooms on average, whereas limited service hotels had only 113 rooms. *Smith Travel Research – The HOST Study Report for the Year 2006.*

10   *Korpacz Real Estate Investor Survey, First Quarter 2007* at 47.

11   *See supra* note 6.

12   *Id.*

As shown above, the price of the extended-stay segment and the length of the average stay have an inverse relationship. This inverse relationship results, in part, from the additional conveniences and amenities expected by a shorter stay guest, which factors increase the expenses of operating the more upscale extended-stay hotels. Accordingly, as the hotel expenses increase for amenities, the Average Daily Rate ("ADR") also increases, since the hotels can charge more for each stay.

However, longer duration guests are usually not interested in the amenities and services provided by the transient hotel market and are more cost sensitive. The typical extended-stay customer is someone traveling on business (commercial travelers) that stays for over 5 consecutive nights. In contrast, the more upscale extended-stay hotels are more likely to attract the transient traveler, as shown below:

| Extended-Stay Segment Business Mix in 2006 | | | | |
|---|---|---|---|---|
| | Type of Guest | | Type of Stay | |
| Sub-Segment | Commercial | Leisure | Extended-Stay | Transient |
| Economy | 71% | 30% | 90% | 10% |
| Mid-Price | 80% | 20% | 71% | 29% |
| Upscale | 70% | 30% | 50% | 50% |
| *Source: The Highland Group, Extended-Stay Lodging Industry in the U.S. - 2007* | | | | |

With fewer amenities, the extended-stay segment generally features a lower cost structure and higher profit margin than typical full-service transient hotels as shown below:

| Average Income and Expense by Sub-Segments of the Extended-Stay Market | | | | |
|---|---|---|---|---|
| | **Full Service Segment** [1] | **Extended-Stay Segment** [2] | | |
| **Sub-Segment** | **Full Service** | **Economy** | **Mid-Price** | **Upscale** |
| **Avg. Rooms per Hotel** | 310 | 127 | 115 | 116 |
| **Stabilized Occupancy** | 70% | 78% | 72% | 78% |
| **Average Rate** | $ 156.11 | $ 37.24 | $ 57.36 | $ 112.17 |
| **Room Revenue** | $ 12,014,050 | $ 1,348,510 | $ 1,742,933 | $ 3,690,011 |
| **Other Revenue** | $ 7,283,450 | $ 31,325 | $ 36,418 | $ 109,719 |
| **Total Revenue** | $ 19,297,500 | $ 1,379,835 | $ 1,779,351 | $ 3,799,729 |
| **Total Expenses** | $ 14,552,330 | $ 819,859 | $ 1,058,775 | $ 2,522,335 |
| **Net Operating Income** | $ 4,745,170 | $ 559,976 | $ 720,576 | $ 1,277,394 |
| **Net Operating Margin** | 25% | 41% | 40% | 34% |

*Sources:*
[1] *Smith Travel Research, HOST Study Report for the Year 2006.*
[2] *The Highland Group, Extended-Stay Lodging Industry in the U.S. - 2007.*

The discussion that follows includes (a) key performance metrics used in the lodging industry; (b) the economic conditions that drive the lodging industry and the related impact; and (c) the level of hotel acquisition activity in the period leading up to the Acquisition.

1.      **Key Lodging Performance Metrics**

The key operational and financial performance metrics used by the lodging industry (and referenced throughout this report) are as follows:

| Lodging Industy Performance Metrics | |
|---|---|
| **Metric** | **Description** |
| Demand | Demand is measured by occupied room nights, which equals aggregate nights stayed by all customers. |
| Supply | Supply is measured by available room nights. Available room nights equal the product of total available rooms and the number of days in a year. |
| Occupancy ("OCC") | Occupancy percentage captures the interaction of supply and demand. It equals the aggregate nights stayed by all customers divided by available room nights. |
| Average Daily Rate ("ADR") | Average daily rate gives the room rate for all occupied rooms. ADR equals the room revenues divided by occupied room nights. |
| Revenue per Available Room ("RevPAR") | Revenue per available room demonstrates the revenue efficiency of a hotel. RevPAR equals the product of OCC and ADR. |

12

The Company used Smith Travel Research ("STR") reports to benchmark its financial performance against its chosen competitive set. On a weekly basis, the Company reported its hotel activity (*e.g.*, OCC, ADR, and RevPAR, as defined in the preceding chart) to STR. In turn, STR provided the Company with weekly trend reports that displayed up to six years of monthly performance data for the Company and its peers including occupancy, ADR, RevPAR, supply, demand, and revenue per hotel. In addition, the STR reports showed each property's performance and the aggregated performance of the chosen competitive set with indices and rankings. The STR program was the benchmarking tool used by the majority of international and national hotel chains as well as many independently operated hotels to track performance relative to its peers.[13]

2. <u>Economic Conditions and the Impact on the Lodging Industry</u>

Like most businesses, the hotel industry is influenced by the relationship between supply and demand, which influences a hotel's occupancy and average room rate. In a market where demand is increasing faster than supply, occupancy rises and average rate growth generally exceeds inflation. When supply is increasing faster than demand, occupancy falls and average room rates typically remain level or decline. Since hotels generate revenue primarily based on occupancy and average room rates, the supply and demand relationship is an important factor in analyzing profits and value.[14]

In addition, the hotel industry, and particularly the extended stay segment, is impacted by the state of the economy and the economic health of the regional economies where its visitors originate.[15] The U.S. economic slowdown and the events of September 11, 2001 resulted in employers across the country significantly reducing travel expenditures in 2001 and 2002.[16] However, from 2003 to 2006, the U.S. economy recovered from the recession, retail

---

[13]    The STR reports are available at http://www.strglobal.com.

[14]    HVS Appraisal at 4-2 [Bates Nos. DL_LS_EXMN0087881-0088182].

[15]    *Id*. at 4-7 & 4-27.

[16]    *Id*. at 4-7.

13

sales were growing, job growth improved, and business investment increased.[17]  As a result of the factors described above, average room rates declined in 2002, remained relatively stable in 2003, and had moderate to strong increases from 2004 through 2006.[18]

In 2007, the economy slowed and the travel industry softened.  Occupancy for the U.S. lodging industry began to show signs of stress in 2007, declining for the first time since 2002.[19]  However, ADR and RevPAR for all U.S. hotels reached record levels in 2007 of $103.78 and $65.52, respectively.[20]

The extended-stay segment experienced similar performance for 2007 with record levels for ADR and RevPAR of $80.76 and $59.54, respectively.[21]  The Highland Group reported that RevPAR growth for the extended-stay segment in 2007 was marginally slower than the RevPAR growth for the overall lodging industry.[22]  Additionally, the upscale extended-stay segment drove the overall extended-stay segment growth of RevPAR in 2007.[23]  However, occupancy for the extended-stay segment experienced a second year of declines in 2007, finishing the year at 73.7%.

In 2008, the U.S. lodging industry experienced a downturn due to a slowing economy, business slowdown, higher operating costs, and lingering effects from the sub-prime mortgage meltdown in 2007.[24]  In the first half of 2008, the extended-stay segment ADR increased 5.4% and RevPAR increased by less than 1% over the prior year.[25]  However, extended-stay room supply increased by 6.1%, while demand only increased by 1.6% during the

---

[17]   *Id*. at 4-27.

[18]   Hotels are unlike the commercial real estate market, because their room rates can be adjusted at any time.  As a result, hotels can use sophisticated management tools to monitor the demand curve and maximize room rates whenever the market permits.  HVS Appraisal at 4-10; 4-27 [Bates Nos. DL_LS_EXMN0087881-0088182].

[19]   *Smith Travel Research – The HOST Study Report for the year 2007* at 3.

[20]   *Id*.

[21]   The Highland Group, *U.S. Extended Stay Lodging Market 2008* at 9 [Bates Nos. WACH 035322-035356].

[22]   *Id*. at 8.

[23]   *Id*. at 8.

[24]   *Smith Travel Research – The HOST Study Report for the year 2007* at 3.

[25]   *The 2008 US Extended-Stay Lodging Report: Mid-Year*, The Highland Group at 1.

first half of 2008 over the prior year.[26]  Further, full year 2008 results reflected the drop-off resulting from the decline in the economy and overall lodging industry: RevPAR decreased by 1.5% year-over-year driven by strong room supply growth of 6.7%.[27]  Notably, the more current performance data reflected that the 4th quarter 2008 RevPAR decreased 6.4% from the 4th quarter 2007.[28]

The economic impact described above is reflected in the changes in the following key performance metrics for the U.S. Lodging Industry for the years 2001 to 2008:

| Lodging Industry Selected Performance Measures | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
| Occupancy Rate | 59.8% | 59.1% | 59.2% | 61.4% | 63.1% | 63.3% | 63.1% | 60.4% |
| Percentage Change (Year-Over-Year) | -5.5% | -1.2% | 0.2% | 3.7% | 2.8% | 0.3% | -0.3% | -4.3% |
| ADR | $ 84.07 | $ 82.82 | $ 82.96 | $ 86.41 | $ 91.16 | $ 98.00 | $104.08 | $106.55 |
| Percentage Change (Year-Over-Year) | -1.4% | -1.5% | 0.2% | 4.2% | 5.5% | 7.5% | 6.2% | 2.4% |
| RevPAR | $ 50.26 | $ 48.91 | $ 49.15 | $ 53.03 | $ 57.56 | $ 62.03 | $ 65.63 | $ 64.37 |
| Percentage Change (Year-Over-Year) | -7.0% | -2.7% | 0.5% | 7.9% | 8.5% | 7.8% | 5.8% | -1.9% |

*Source: Smith Travel Research, Hotel Operating Statistics Study Report for the Year 2008.*

As shown above, in 2008, RevPAR for the overall lodging industry suffered its first year-over-year decline since 2002, with a decrease of 1.9%.  The OCC and RevPAR decline was partially a result of the additional supply (increase of 2.7%) which outpaced the incremental demand (increase of 1.6%) over the prior year.[29]  Also in 2008, OCC dropped to the lowest level

---

[26]  *Id.*

[27]  *US Extended-Stay Lodging Report: 2009*, The Highland Group at 2.

[28]  *Id.* at 4.

[29]  *Smith Travel Research – The HOST Study Report for the year 2008.*

537960v2

in the last five years.[30] The ADR represented the only positive point in 2008, although with the smallest increase in the last five years of 2.4% year-over-year.

The economic impact described above had a similar impact on the performance for the extended-stay segment for the years 2001 through 2008:

| Extended-Stay Segment Selected Performance Measures | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
| Occupancy Rate | 73.8% | 72.3% | 71.8% | 73.5% | 76.1% | 74.5% | 73.7% | 70.1% |
| Percentage Change (Year-Over-Year) | -5.1% | -2.0% | -0.7% | 2.4% | 3.5% | -2.1% | -1.1% | -4.9% |
| ADR | $ 65.88 | $ 62.68 | $ 62.31 | $ 63.93 | $ 68.59 | $ 75.78 | $ 80.73 | $ 83.81 |
| Percentage Change (Year-Over-Year) | 2.33% | -4.86% | -0.59% | 2.60% | 7.29% | 10.48% | 6.53% | 3.8% |
| RevPAR | $ 48.59 | $ 45.33 | $ 44.72 | $ 46.97 | $ 52.21 | $ 56.43 | $ 59.52 | $ 58.72 |
| Percentage Change (Year-Over-Year) | -2.98% | -6.71% | -1.35% | 5.03% | 11.16% | 8.08% | 5.48% | -1.3% |

*Source: Highland Group, U.S. Extended Stay Lodging Market 2010.*

In 2009, the U.S. lodging sector experienced the full effects of the global economic downturn. An initial 2009 forecast projected that ADR would decrease by approximately 5% with a corresponding decrease in RevPAR of over 11%.[31] In fact, RevPAR decreased by 15.9% in the second quarter of 2009 from the same period in 2008.[32] The significant decrease in RevPAR was beyond what many analysts, investors, and management teams ever expected or modeled as a "worst case" scenario.[33] Further, certain "select-service"

---

[30]   *Id.*

[31]   1Q 2009 Korpacz Real Estate Investor Survey, PricewaterhouseCoopers at 53.

[32]   The 2009 US Extended-Stay Lodging Report: Mid-Year, The Highland Group at 7.

[33]   The worst case scenario often used before 2009 was the negative impact resulting from the September 11, 2001 terrorist attacks. The negative impact to the lodging industry was immediate and severe following September 11, 2001, and the worst decline in RevPAR since the great depression.

537960v2

hotel investors expected further RevPAR declines with a potential recovery in early to mid-2010.[34]

### 3. Acquisition Activity

In 2005, interest rates remained extremely low, loan-to-value ratios increased, and both debt and equity capital were widely available. These factors, combined with the continued positive outlook for improved RevPAR and net operating income ("NOI") levels led to an exceptionally strong year for merger and acquisition activity and raising capital.

In 2006, extremely low interest rates, combined with higher loan-to-value ratios and other aggressive lending parameters, resulted in more debt available for hotel projects, and at a lower cost, than at any time previously observed. At the same time, the number of equity investors led to competitive market conditions. As a result, 2006 was another strong year in terms of both hotel sales and the average price per room sold.[35]

During the first half of 2007, the conditions that supported hospitality investment in 2006 were still in place. Both debt and equity sources of capital were widely available, and investors were aggressively pursuing hospitality transactions.[36] Commercial real estate deals hit a record level in the first half of 2007 with sales of $231.4 billion,[37] reaching the ultimate peak of approximately $500 billion[38] for the full year 2007.

However, commercial real estate loan delinquency rates began a dramatic upward movement in 2007, and continued to increase in 2008 and through the first half of 2009, reaching delinquency rates near 7%.[39] Sales of full-service and limited-service properties in 2008 dropped

---

[34] Select-service hotels are usually in the mid-tier segment of the hotel industry and include economy to mid-market hotel chains. (*U.S. Select Service Hotel Investor Survey*, Jones Lang LaSalle Hotels, at 5 and www.joneslanglasallehotels.com).

[35] HVS Appraisal pp.4-15 [Bates Nos. DL_LS_EXMN0087881-0088182].

[36] *Id.*

[37] "U.S. Commercial Property Boom Decades Away – Report." Reuters.

[38] Special Report, 2009 National Investor Survey, CBRE, July 2009.

[39] "The US Financial and Economic Crisis: Where Does It Stand and Where Do We Go From Here?", Baily and Elliott, Initiative on Business and Public Policy at Brookings, June 2009 at 8.

86% from 2007's record.[40]  The decrease in acquisition activity reflected the deteriorating economic conditions of 2008.

The following chart showing the annual U.S. commercial real estate property sales data from 2001 through 2009 reflects these trends.[41]



In fact, since the Closing of the Acquisition, commercial real estate sales experienced a dramatic decline as sales activity ground to a halt, and transactional activity in the U.S. lodging industry decreased further from already depressed 2008 levels.  The median sales price per room decreased by approximately 32% and the total number of transactions decreased by 50% from the first half of 2008 to the first half of 2009.[42]  The extended-stay segment transactional market was nearly non-existent in the first half of 2009; only three sales were reported at a median price per room of approximately $60,000, which was approximately half of the median sales price per room during the same period in 2008.[43]

[40]    *2008 Hotel: Investment Don't Look Back*, Real Capital Analytics at 1.

[41]    Special Report, 2009 Investor Survey, CBRE, July 2009.

[42]    "Transaction Volume Down", PKF Hospitality Research, Oct. 20, 2009.

[43]    *Id.*

## B. Company Background and Pre-Acquisition Financial Overview

Extended Stay Hotels is the largest owner/operator of mid-priced extended-stay properties in the U.S., with 684 hotels located in 44 states.[44] A summary of the competition within the extended-stay market, sorted by sub-segments, is as follows:

| US Extended-Stay Brands by Weekly Rate Range | | |
|---|---|---|
| **Upscale $600+** | **Mid-Price $300-$600** | **Economy Under $300** |
| Chase Suite Hotels | Bradford Homesuites | Budget Suites |
| Homewood Suites by Hilton | Candlewood Suites (IHG) | **Crossland Suites** |
| Hyatt Summerfield Suites | Crestwood Suites | InTown Suites |
| Larkspur Landing | **Extended Stay America** | Lodge America |
| Potomac Hospitality | **Extended Stay Deluxe** | Savannah Suites |
| Residence Inn by Marriott | Hawthorn Suites | Studio 6 |
| Sierra Suites | **Homestead Studio Suites Hotels** | Suburban Extended Stay Hotels |
| Staybridge Suites (IHG) | Home-Towne Suites | Sun Suites |
| Woodfin Suites | Mainstay Suites by Choice | Value Place |
| | **Studio Plus** | Other Independents |
| | TownePlace Suites by Marriott | |
| *Source: The Highland Group, Report on the Extended-Stay Lodging Industry in the US, 2007.* | | |

The Company made significant acquisitions during the period from 2001 through 2006. Blackstone affiliates made the first acquisition – Homestead Village – from Security Capital, in November 2001. The Company's largest acquisition was made in May 2004, when it acquired Extended Stay America for approximately $2 billion plus the assumption of $1.13 billion in debt.[45] By the end of 2006, the Company had approximately 65% of the mid-priced extended-stay segment, and the portfolio of hotels was relatively young, with an average age, according to the Offering Memorandum, of approximately 7.5 years.[46] A summary of the

---

[44] While the Offering Memorandum (dated January 2007) referenced 682 hotels, two additional hotels were acquired by the Acquisition date. The two additional hotels were owned by ESA UD properties L.L.C., a debtor, and are located at 1067 Highway 315, Plain Township, PA; and 2355 Tiffin Ave Findlay, OH. These two hotels were included in the Acquisition Agreement and the Loan Agreement, but did not constitute collateral for the Mortgage Debt. The Loan Agreement defines the Plain Township, PA; and Findlay, OH hotels collectively as "Excluded Properties". The Net Sales Proceeds from the sale of either of the Excluded Properties was to be deposited into the Operating Expense Subaccount, an account below the Mortgage Loan debt service account. See Loan Agreement, Section 1.1 for definition of Excluded Properties and Section 5.1.27 (Catalyst ID 00000811).

[45] "Equity group buys Extended Stay Hotels for $8 billion," New York Times, Duhigg, Charles, Apr. 18, 2007.

[46] According to the Offering Memorandum, the age of the properties was 7.5 years. However, the actual age from the construction date of the properties was approximately 9 years according to documentation provided

acquisitions and organic growth, which together comprise the hotels sold in conjunction with the Acquisition, follows.[47] This chart reflects the average age of the properties as of the Acquisition, not adjusted for renovations:

| Historical Acquisitions Comprising Extended Stay Hotels | | | |
|---|---|---|---|
| Acquired Company or Portfolio | Date Acquired or Developed | Number of Hotels Acquired | Average Age - Not Adjusted for Renovations *As of 6/11/2007* |
| Homestead Village | November 2001 | 111 | 9.49 |
| MainStay Suites & Other | 2002-2003 | 21 | 8.95 |
| Extended Stay America | May 2004 | 482 | 8.78 |
| Wellesley Inn & Suites | October 2004 | 36 | 8.94 |
| Sierra Suites | May 2005 | 16 | 9.13 |
| Other Acquisitions & Internally Developed | 2005-2007 | 18 | 9.44 |
| **Total Hotels** | | **684** | **8.93** |

*Sources: ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*
         *ESH Valuation Analyzer (ESH0039685-39840).*

       In January 2007, the Company was geographically diversified with no single state containing over 20% of the Company's hotels and with the largest concentration of hotels located in the states reflected in the chart below:

---

by the Debtors. Offering Memorandum p.1 [Bates Nos. BLA-002201-002287] and ESH Valuation Analyzer [Bates Nos. ESH0039685-0039840].

[47]    An office building located in Spartansburg, SC and a parcel of vacant land were also sold in conjunction with the Acquisition.



Geographic Diversity of the Extended Stay Hotel Portfolio

Washington
23 Hotels

Illinois
34 Hotels

Michigan
19 Hotels

Ohio
29 Hotels

New York
11 Hotels

Massachusetts
13 Hotels

Pennsylvania
15 Hotels

California
86 Hotels

Virginia
30 Hotels

North Carolina
33 Hotels

Arizona
19 Hotels

Colorado
17 Hotels

Texas
67 Hotels

Georgia
31 Hotels

Florida
54 Hotels

*Source: Mortgage Loan Agreement, Schedule 1.1b (Catalyst ID 00000811).*

The typical Extended Stay Hotels customer stays an average of 20 nights, which is less than the average for economy extended-stay hotels (34 nights), but more than the average for mid-price extended stay hotels (14 nights).  Like the extended-stay industry model, the Extended Stay Hotels rooms are designed for travelers who desire a lodging experience that lies somewhere between an apartment and a traditional hotel.  Extended Stay Hotel's rooms generally have kitchens and office/work space, and have access to communal, coin-operated laundry machines and fitness centers.[48]  Travelers are able to stay for extended periods without signing a lease but with many of the comforts of a fully furnished apartment.  The following charts show the customer profile and reason for staying at an Extended Stay Hotel:

---

[48]     Offering Memorandum at 60 [Bates Nos. BLA-002201-002287].



| Reason for Stay | Customer Profile |
|---|---|

Relocation 7%
Training 7%
Personal 11%
Leisure 19%
Business/Government Related Travel 56%

Government 8%
Engineering/Accounting/Management 8%
Transportation/Utilities/Communication 8%
Business Services 11%
Other 11%
Leisure/Personal 30%
Retail 11%
Manufacturing/Construction 13%

*Source: Confidential Information Memorandum, January 2007, pg. 21. (BLA-002201-2287)*

The Company's properties were managed by HVM, under long term contracts.[49] At the time of the Acquisition, Extended Stay Hotels were operated under six different brand names, although Blackstone was part way through the process of re-branding the portfolio to change all of the properties to one of three names (ExtendedStay Deluxe; ExtendedStay America or ExtendedStay Economy). Of 682 hotels acquired, 213 properties remained to be re-branded to an Extended Stay brand as of January 2007.[50]

---

[49] HVM managed two additional hotels located in Houston, Texas that were acquired after the Acquisition ("Houston Properties"). The two Houston Properties are owned by non-debtor entities outside of the corporate structure of DL-DW. The first property is located at 15385 Katy Freeway (property number 5050) and is owned by ESD 5050 Houston Katy. The second property is located at 13420 Southwest Freeway (property number 5051) and is owned by ESD #5051 Houston – Sugar Land LLC. Offering Memorandum [Bates Nos. BLA-002201-002287], Loan Agreement (Catalyst ID 00000811) and Teichman First Day Declaration.

[50] Offering Memorandum [Bates Nos. BLA-002201-002287]. The HVS Appraisal and the Offering Memorandum do not include the two Excluded Properties, which were branded ExtendedStay Deluxe. The two Excluded Properties were opened March 27, 2007 (Finley) and June 1, 2007 (Plain Township).

537960v2

| ESH Brand Consolidation Plans Under Blackstone | | | |
|---|---|---|---|
| **Brands at Acquisition** | **Pre-Consolidation** [1] [2] | **At Acquisition** [2] | **Post-Consolidation** [2] |
| ExtendedStay Deluxe | 0 | 103 | 209 |
| Extended Stay America | 350 | 365 | 432 |
| Extended Stay Economy | 0 | 0 | 41 |
| Homestead Studio Suite | 132 | 132 | 0 |
| StudioPlus Deluxe Suite | 95 | 46 | 0 |
| Crossland | 39 | 34 | 0 |
| Wellesley Inns & Suites | 37 | 1 | 0 |
| Sierra Suites | 16 | 0 | 0 |
| **Total Hotels** | **669** | **681** | **682** |

*Notes:(1) Excludes 12 Aquired Assets, (2) Excludes San Rafael, CA.*

*Source: Confidential Information Memorandum, January 2007, pg. 20 (BLA-002201-2287).*

## Pre-Acquisition Financial Overview

The pre-Acquisition financial performance of the Company from 2005 through the date of the Acquisition is summarized below. [51] [52]

---

[51] Although property-level financial performance was available on an annual basis back to 2000, the hotels were not all under the ownership of Blackstone at that time. *See* Exhibit III-B-1 for this information. The pro-forma 2007 financials include actual results through May 2007 and budgeted amounts for the remaining months in 2007. The budgeted amounts are equal to the monthly 2007 Approved Annual Budget used by the Servicer. A monthly budget breakdown of the forecast included in the Offering Memorandum was not provided. Therefore, since the monthly budget provided to the Servicer (*i.e.*, 2007 Approved Annual Budget) on a property-level basis was not significantly different from the Offering Memorandum, the Servicer's report was used for this analysis (*e.g.*, revenues were lower by $17 million.) *See* section III.H., 2007 Post Acquisition Performance, below for further discussion on the 2007 budgets and projections.

[52] As the table shows, Total Revenue is comprised of Room Revenue and Other Revenue. Other Revenue is the "net revenue" derived from miscellaneous services such as telephone, guest laundry, and snacks/drink commissions. Other Revenue is reported on the Company's internal management reports (and reports to the Servicer) <u>net</u> of the related costs. (For GAAP financial reporting purposes the Company reports Other Revenue and Expenses separately on a gross basis). The gross revenue from these "non room rate revenue" services totaled $14.8 million in the 2007 Annual Approved Budget (or less than 2% of the gross budgeted revenue of around $ 1.1 Billion). In addition, the net "Other Revenue" in 2005 (negative $2.5 million), in 2006 (negative $500,000) and in 2007 Pro-Forma (negative $500,000) reflects that the Company lost money on the "non room rate revenue" for all three years. (ESH Historical Financials 2000-2007 (Catalyst ID 00003681). Since the financial information provided by the Company reports Other Revenue and Total Revenue in this manner, and because of the minimal impact of Other Revenue figures, we have not attempted to gross up all the revenue figures for our analysis throughout this report, unless specifically noted.

| Historical and Budgeted Performance | | | | | |
|---|---|---|---|---|---|
| | | **2005 Actual** | | **2006 Actual** | **2007 Pro-Forma** |
| Occupancy | | 72.4% | | 68.4% | 71.2% |
| ADR | $ | 50.02 | $ | 55.15 $ | 56.82 |
| RevPAR | $ | 36.23 | $ | 37.71 $ | 40.44 |
| **Revenues** | | | | | |
| Room Revenue | $ | 984.0 | $ | 1,037.0 $ | 1,120.3 |
| Other Revenue | | (2.5) | | (0.5) | (0.5) |
| **Total Revenue** | | 981.5 | | 1,036.5 | 1,119.8 |
| **Expenses** | | | | | |
| Controllable | | (328.9) | | (336.7) | (349.5) |
| Non-Controllable | | (80.1) | | (85.3) | (91.2) |
| **Total Expenses** | | (408.9) | | (422.0) | (440.7) |
| **Property Level EBITDA** | $ | **572.6** | $ | **614.6** $ | **679.1** |
| *% Margin* | | *58.3%* | | *59.3%* | *60.6%* |
| Corporate Overhead | $ | (59.9) | $ | (60.9) $ | (61.9) |
| **EBITDA** | $ | **512.7** | $ | **553.7** $ | **617.2** |
| *% Margin* | | *52.2%* | | *53.4%* | *55.1%* |

*Sources:*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*
*2007 Monthly Budget (ESH0041627) and ESH Corporate Model v23(ESH0075563).*
*Confidential Information Memorandum - January 2007 (BLA-002201-2287).*

The sections that follow provide further discussion of the pre-Acquisition (1) financial performance at the property-level; (2) overhead expenses; and (3) capital expenditures.

### 1. Property-Level Financial Performance 2005 to 2007 (Pro Forma)

The Company generally compared its performance to the reported performance of the extended stay-segment at the property-level.[53] The property-level analysis excludes certain items such as corporate overhead, debt payments and interest expense, and depreciation/capital expenditures.[54]

---

[53] The Company also evaluates the performance of individual properties by benchmarking results to comparable properties through Smith Travel Research. A property by property comparison or analysis of the individual hotels has not been prepared for the purposes of this report.

[54] Property-level ESH historical financials 2000-2007 (Catalyst ID 00003681).

As previously discussed, revenues of the hotels are driven by changes in the supply and demand of rooms in the market. As shown below, while the demand outpaced supply in 2005, this trend reversed in 2006 and 2007:

| Supply and Demand Growth for the Extended-Stay Segment | | | |
|---|---|---|---|
| | 2005 | 2006 | 2007 |
| Rooms | 254,909 | 265,891 | 277,194 |
| *Supply Growth* | *5.6%* | *4.3%* | *4.3%* |
| Rooms Sold (Thousands) | 69,814 | 71,153 | 73,021 |
| *Demand Growth* | *8.0%* | *1.9%* | *2.6%* |

*Source:*
*The Highland Group Reports, US Extended Stay Lodging Market 2008 (WACH 035322-35356).*

Revenues for the Company were derived mainly from room stays, since Extended Stay Hotels did not provide other services, such as food and beverage. As shown below, the Company's room revenues increased 5.4% from 2005 to 2006, and 8% from 2006 to 2007:[55]

| Summary of Revenues for Company Properties | | | |
|---|---|---|---|
| Year | Number of Properties | Room Revenues | Room Revenues Percentage Change |
| 2005 | 671 | $ 984,030,532 | |
| 2006 | 681 | $ 1,037,025,387 | 5.4% |
| 2007 Pro-Forma | 682 | $ 1,120,288,249 | 8.0% |

*Sources:*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*
*2007 Monthly Budget (ESH0041627) and ESH Corporate Model v23(ESH0075563).*

Room revenues for the hotels were driven by RevPAR growth and the increase in the number of hotels. The room revenue growth from 2005 to 2006 for the same 671 hotels and the new hotels was approximately 4.3% and 1%, respectively. Therefore, the 2007 pro-forma

---

[55] As previously noted, the Pro-Forma 2007 financials include actual results through May 2007 and budgeted amounts for the remaining months in 2007 extracted from the 2007 Approved Annual Budget used by the Servicer.

room revenue growth of 8% is more comparable to the 4.3% same-hotel growth in 2006, as only one additional hotel was projected to be added in 2007. The 2007 pro-forma room revenue growth rate was approximately double the 2006 same hotel growth rate. The key performance metrics (OCC, ADR and RevPAR) for the Company and the extended-stay segment for 2005, 2006 and pro forma 2007 are summarized below:

| Key Performance Metrics for Company and U.S. Extended-Stay Segment | | | | | | |
|---|---|---|---|---|---|---|
| | | 2005 | | 2006 | | 2007 |
| **Company Hotels** | | | | | | |
| OCC | | 72.43% | | 68.37% | | 71.18% |
| ADR | $ | 50.02 | $ | 55.15 | $ | 56.82 |
| RevPAR | $ | 36.23 | $ | 37.71 | $ | 40.44 |
| | | | | | | |
| **Economy Extended-Stay Segment** | | | | | | |
| OCC | | 80.20% | | 79.40% | | 79.00% |
| ADR | $ | 30.82 | $ | 34.13 | $ | 35.15 |
| RevPAR | $ | 24.72 | $ | 27.10 | $ | 27.76 |
| | | | | | | |
| **Mid-Price Extended-Stay Segment** | | | | | | |
| OCC | | 72.70% | | 69.80% | | 70.50% |
| ADR | $ | 57.21 | $ | 63.20 | $ | 64.52 |
| RevPAR | $ | 41.56 | $ | 44.13 | $ | 45.46 |

*Note:  2007 U.S. Mid Price and Economy Segments reflect Mid-Year amounts for 2007.*
*Sources:*
*Highland Group, Extended Stay Lodging Industry in the U.S. - 2009.*
*Highland Group, Extended Stay Lodging Report: Mid-Year - 2008.*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*
*2007 Monthly Budget (ESH0041627) and ESH Corporate Model v23(ESH0075563).*

A discussion regarding the changes in each of the key metrics for the period 2005 through 2007 follows.

### Observations on the Occupancy (OCC) Metric

As previously noted, OCC is a measure of supply and demand. As shown above, the Company's hotel occupancy trends most closely tracked the U.S. mid-price extended-stay segment. However, the Company's hotels experienced a 5.6% decrease in OCC in 2006, which was greater than the U.S. extended-stay mid-price segment decrease of 4.0%. Notwithstanding this comparison, the 2007 pro-forma OCC for the 682 hotels reflected an increase of approximately 4.1% from 2006 levels, nearing the OCC levels of 2005. A summary of the OCC

for the Company compared to the U.S. extended-stay mid-price and economy segments for 2005 to 2007 is shown below.

| Historical Occupancy Rates - Company and U.S. Extended-Stay Economy and Mid-Price Segments | | | |
|---|---|---|---|
| | **2005** | **2006** | **2007 Pro-Forma** |
| **Company** | 72.43% | 68.37% | 71.18% |
| **U.S. Mid-Price Segment** | 72.70% | 69.80% | 70.50% |
| **U.S. Economy Segment** | 80.20% | 79.40% | 79.00% |

*Note: 2007 U.S. Mid Price and Economy Segments reflect Mid-Year amounts for 2007.*
*Sources:*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*
*The Highland Group, Report on the Extended Stay Lodging Industry in the United States – 2009.*

## Observations on the Average Daily Rate (ADR) Metric

The ADR for the Company's hotels experienced strong growth (10% increase) from 2005 to 2006 along with the U.S. extended-stay mid-price segment. The pro forma for 2007 reflects an increase in ADR, but at a reduced rate of growth when compared to 2006 (increase of 3%). However, while the Company's OCC was approximately equal to the OCC for the mid-price segment, the ADR for the Company's hotels lagged the mid-price segment by more than $7.00 per room from 2005 to 2007 (*i.e.*, Company's ADR was approximately 87.4% of the mid-price segment ADR for 2005 and 2006). This indicates that, on the whole, the Company's hotels had to offer an ADR lower than the rest of the mid-price segment in order to maintain an OCC equal to the mid-price segment. The following chart compares the ADR for the Company to the U.S. extended-stay mid-price and economy segments for 2005 to 2007.



**Historical ADR Rates - Company and U.S. Extended-Stay Economy and Mid-Price Segments**

*Note:* *2007 U.S. Mid Price and Economy Segments reflect Mid-Year amounts for 2007.*

*Sources:*

*ESH Historical Financials 2000-2007 (Catalyst ID 00003681)*
*2007 Monthly Budget (ESH0041627) and ESH Corporate Model v23(ESH0075563).*
*The Highland Group, Extended Stay Lodging Report: Mid-Year 2008.*
*The Highland Group, Extended Stay Lodging Industry in the United States – 2009.*

### Observations on the Revenue Per Available Room (RevPAR) Metric

As discussed above, RevPAR is the product of OCC and ADR, and represents the amount of revenue for each available room per night. The Company RevPAR increased 4.1% in 2006 from 2005 levels. However, the spread between the mid-price segment and Company RevPAR widened from $5.33 to $6.42. Therefore, the Company RevPAR did not increase at the same rate as the mid-price segment.

In 2007, the Company's RevPAR increased by 7.2% from 2006 levels, reflecting the highest increase in RevPAR in the prior three years. While the growth in 2007 pro-forma RevPAR was driven more by the projected gains in OCC than the projected gains in ADR, in 2007 both OCC and ADR were projected to increase from 2006 levels. The following chart compares the Company RevPAR to the mid-price and economy extended-stay segments for 2005 through 2007:



**Historical RevPAR Rates - Company and U.S. Extended-Stay Economy and Mid-Price Segments**

*Note:* *2007 U.S. Mid Price and Economy Segments reflect Mid-Year amounts for 2007.*

*Sources:*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681)*
*2007 Monthly Budget (ESH0041627) and ESH Corporate Model v23(ESH0075563).*
*The Highland Group, Extended Stay Lodging Report: Mid-Year 2008.*
*The Highland Group, Extended Stay Lodging Industry in the United States – 2009.*

### Property-Level Expenses

Property-level expenses were categorized as 'controllable' and 'non-controllable' in the historical financials for the Company hotels, and were comprised of the following sub-categories:

| Controllable and Non-Controlable Expense Categories | |
| --- | --- |
| **Controllable Expenses Categories** | **Non-Controllable Expenses Categories** |
| Hotel Employee Payroll | Property Insurance |
| Ancillary Payroll Expenses | Real Estate Taxes |
| Room Expenses | Special Assessments |
| Maintenance Expenses | Business License Taxes |
| Sales and Marketing Expenses | Ground Lease Expenses |
| G&A Expenses | Occupancy Tax Discounts |
| Commissions | Prior Year Adjustments |
| Cash/Credit Management Expenses | Other Miscellaneous Expenses |
| Utilities | |

*Sources: 2007 Monthly Budget and 2006 Monthly Actual (ESH0041627)*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681)*

29

The Company believes that approximately 70% of its controllable property-level expenses, and approximately 80% of its total expenses, are fixed.[56]

As shown below, in 2006, the Company's controllable expenses (expressed as a percentage of total revenues) decreased 3.0% from 2005, and were projected to decrease an incremental 3.9% in 2007 on a pro-forma basis.  Additionally, the Company's non-controllable expenses (expressed as a percentage of total revenues) remained stable at 8.2% from 2005 to 2006, and were projected to decrease marginally in 2007.

| Historical Total Revenues and Expenses *(Millions)* | | | | | |
|---|---|---|---|---|---|
| | **2005** | | **2006** | | **2007 Pro-Forma** |
| Total Revenue | $ | 981.5 | $ | 1,036.5 | $ 1,119.8 |
| Controllable Expenses | $ | 328.9 | $ | 336.7 | $ 349.5 |
| Non-Controllable Expenses | $ | 80.1 | $ | 85.3 | $ 91.2 |

*Sources:*
*2007 Monthly Budget (ESH0041627) and ESH Corporate Model v23 (ESH0075563).*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*

---

[56] Given the lack of amenities, the costs of extended stay segment hotels do not vary significantly with occupancy.  *See* Analysis of Fixed/Variable Cost basis for Controllable Expenses [Bates No. ESH0003192]. Total expenses were estimated to be 80% fixed based on the Company analysis of controllable expenses and assuming that non-controllable expenses and corporate overhead expenses are 100% fixed.  Applying these fixed/variable ratios to the 2006 financials produces a total expense ratio of 80% fixed.

537960v2



**Controllable and Non-Controllable Expenses as a Percentage of Total Revenue**

Expenses (in Millions)

| | 2005 | 2006 | 2007 Pro-Forma |
| --- | --- | --- | --- |
| Non-Controllable | 8.2% | 8.2% | 8.1% |
| Controllable | 33.5% | 32.5% | 31.2% |

■ Controllable Expenses  ■ Non-Controllable Expenses

*Sources:*
*2007 Monthly Budget (ESH0041627) and ESH Corporate Model v23(ESH0075563).*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*

In addition, from 2005 through 2006, as the number of Company hotels increased, the controllable expenses per hotel remained consistent at approximately $492,000 per hotel. The controllable expenses per hotel were, however, projected to increase in 2007 to approximately $512,000 as shown below:

**Total Controllable and Non-Controllable Expenses Per Hotel *(in 000's)***

| Year | Number of Hotels | Controllable per Hotel | Non-Controllable per Hotel | Total Expenses per Hotel |
| --- | --- | --- | --- | --- |
| 2005 | 671 | $ 490.12 | $ 119.32 | $ 609.43 |
| 2006 | 681 | $ 494.41 | $ 125.20 | $ 619.61 |
| 2007 Pro-Forma | 682 | $ 512.46 | $ 133.79 | $ 646.24 |

*Sources:*
*2007 Monthly Budget (ESH0041627) and ESH Corporate Model v23(ESH0075563).*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*

The Company's non-controllable expenses per hotel also increased from approximately $119,000 in 2005 to approximately $125,000 per hotel in 2006. A further increase in non-controllable expenses to $133,000 per hotel was projected for 2007.

537960v2

**Property-Level EBITDA**

Property-level EBITDA as a percentage of total revenues increased 7.3% from $572.6 million in 2005 to $614.6 million in 2006.  In 2007, pro-forma EBITDA as a percentage of total revenues was projected to exceed 60.6% (an increase of 18.6% over 2005 EBITDA levels) as shown below:



**Historical EBITDA as a Percentage of Total Revenues**

*Sources:*
*2007 Monthly Budget (ESH0041627) and ESH Corporate Model v23(ESH0075563).*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*

In addition, the EBITDA per hotel in 2005 was approximately $853,300 and projected to grow to $995,700 for pro-forma 2007.  The projected growth for 2007 EBITDA per hotel was 10.3% more than the 2006 EBITDA per hotel of $902,500, as shown below:



**Historical EBITDA Per Hotel** (*in 000's*)

Sources:
*2007 Monthly Budget (ESH0041627) and ESH Corporate Model v23(ESH0075563).*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*

2. **Corporate Overhead Expenses for 2005, 2006 and projected 2007**

Corporate overhead was generally comprised of direct and indirect expenses incurred to support the hotel operations that were not allocated at the property-level, and were comprised of the following items:

| Corporate Overhead Expenses Categories | |
| --- | --- |
| General Corporate Expenses | Sales & Marketing |
| Corporate Operations | Accounting & Finance |
| Technology | Facilities & Purchasing |
| Legal | Executive |
| Revenue Management | Training |
| Human Resources | Acquisition & Development |
| Capitalized Expense | Reservation/TA Commissions |

*Source: Confidential Information Memorandum - January 2007 (BLA-002201-2287).*

Corporate overhead increased marginally from 2005 to 2006 and was projected to increase from 2006 to 2007 on both a total and a per-hotel basis, as shown below:

| Historical Corporate Overhead | | | |
|---|---|---|---|
| | **2005** | **2006** | **2007 Pro-Forma** |
| Number of Hotels | 671 | 681 | 682 |
| Corporate Overhead (Thousands) | $ 59,900 | $ 60,900 | $ 61,900 |
| Corporate Overhead per Hotel (Thousands) | $ 89.27 | $ 89.43 | $ 90.76 |
| Corporate Overhead as a % of Total Revenues | 6.10% | 5.88% | 5.53% |

*Sources:*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*
*Confidential Information Memorandum - January 2007 (BLA-002201-2287).*

### 3.    Capital Expenditures

The Offering Memorandum described the condition of the 682 hotels as "excellent."[57]  As shown below, historical capital expenditures on a per hotel basis steadily increased from 2002 through 2006 when the average capital expenditures per hotel reached $156,638.[58]

---

[57]    Offering Memorandum, dated January 2007 at 35 [Bates Nos. BLA-002201-002287].

[58]    Excel Workbook Supporting Tables in the Offering Memorandum (Catalyst ID 00009490).

| Capital Expenditures by Brand | | | | | | |
|---|---|---|---|---|---|---|
| **Hotel Brand** | **2002** | **2003** | **2004** | **2005** | **2006** | **Total** |
| **ESA & Homestead Hotels** | | | | | | |
| Extended Stay America | 5,807,409 | 11,318,427 | 23,338,510 | 29,927,748 | 26,834,037 | 97,226,130 |
| Homestead Suites | 9,948,625 | 9,804,453 | 10,050,259 | 10,451,333 | 7,798,373 | 48,053,042 |
| **Total ESA & Homestead** | **$15,756,034** | **$21,122,880** | **$33,388,769** | **$40,379,080** | **$34,632,409** | **$145,279,172** |
| Number of Hotels | 424 | 441 | 444 | 444 | 444 | |
| CapEx per Hotel | $ 37,160 | $ 47,898 | $ 75,200 | $ 90,944 | $ 78,001 | |
| **Other Brands** | | | | | | |
| Crossland Economy Studios | | | $ 3,114,251 | $ 7,999,432 | $ 5,411,118 | $ 16,524,801 |
| Studio Plus Deluxe Studios | | | 9,344,879 | 14,124,852 | 36,574,545 | 60,044,276 |
| Wellesley Inns & Suites | | | 562,828 | 9,001,540 | 25,477,953 | 35,042,320 |
| Other | | | 4,894,675 | 9,635,795 | 3,477,893 | 18,008,362 |
| **Total Other Brands** | **$ -** | **$ -** | **$17,916,632** | **$40,761,617** | **$70,941,509** | **$129,619,759** |
| Number of Hotels | - | - | 197 | 227 | 230 | |
| CapEx per Hotel | $ - | $ - | $ 90,947 | $ 179,567 | $ 308,441 | |
| **Total CapEx per Hotel** | **$ 37,160** | **$ 47,898** | **$ 80,040** | **$ 120,925** | **$ 156,638** | |

*Source:*
*Workbook Supporting Tables in Offering Memorandum (Catalyst ID 00009490).*

Prior to the Acquisition, the capital expenditures incurred by the Sellers fell into two different types: a) the maintenance capital expenditures associated with 444 hotels that were initially branded Homestead or Extended Stay America; and b) the capital upgrades for the other 238 hotels - StudioPlus, Crossland, Wellesley, and other hotels:[59]

    a.    444 hotels - the five year historical investment in maintenance capital expenditures associated with those 444 properties averaged 4.3% of revenues, or $145.3 million in total.[60]

    b.    238 hotels - the capital expenditures associated with the remaining 238 hotels totaled $129.6 million.

Twenty percent of the hotels accounted for 72.5% of the total capital expenditures for 2006.[61]

---

[59]   *Id.*

[60]   Offering Memorandum at 35 [Bates No. BLA-002201-002287].

[61]   Workbook Supporting Tables in Offering Memorandum (Catalyst ID 00009490).

537960v2

Capital expenditures as a percent of revenues were 10.2% for 2006 and 8.3% for 2005, both of which were significantly greater than the projected capital expenditure levels included in the Offering Memorandum of 4.5% of total revenues.

| Capital Expenditures as a Percentage of Revenue | | | | |
|---|---|---|---|---|
| | **2005** | | **2006** | |
| Number of Hotels with Capital Expenditures | | 671 | | 674 |
| Capital Expenditures | $ | 81,140,698 | $ | 105,573,919 |
| Total Hotel Revenues | $ | 981,508,161 | $ | 1,036,534,104 |
| CapEx as a % of Revenue | | 8.3% | | 10.2% |

*Source:*
*Workbook Supporting Tables in Offering Memorandum (Catalyst ID 00009490).*

No property-level capital expenditure data was provided for 2007. On a company level, approximately $25.3 million was spent on "building improvements and purchases of furniture, fixtures, and equipment" for the period of January 1, 2007 through June 10, 2007, or approximately 5.3% of revenues.[62]

## C.    2007 Sale Process

### 1.    Offering Memorandum

In connection with the June 2007 Acquisition, the Sellers and their advisors, BS&C; Blackstone; Merrill Lynch; and Banc of America Securities LLC ("BAS", and together with the foregoing, the "Sellers' Advisors") produced the Offering Memorandum dated January 2007.[63] According to the first unnumbered page following the Table of Contents, the information contained in the Offering Memorandum was prepared "from information furnished . . . by the Company and from publicly available sources." Despite the continuity in the management of the Company pre and post-Acquisition, senior members of HVM (the Company's management company) with whom the Examiner spoke during the course of the Investigation generally

---

[62] Calculated as $25.3 million of capital expenditures divided by total revenue of $478.9 million (after eliminations). BRE/Homestead Village L.L.C. and Subsidiaries Consolidated Financial Statements, dated June 10, 2007 & Extended Stay Inc. and Subsidiaries Consolidated Financial Statements, dated June 10, 2007.

[63] *Id.* at 12, 29-36 [Bates No. BLA-002201- 002287].

36

disavowed knowledge of the source of most of the information in the Offering Memorandum,[64] and stated that they were not involved in the preparation of the Offering Memorandum.

During the Investigation, the Examiner and the Examiner's Professionals met with a representative of Blackstone, an individual who had been involved in the sale process, including the preparation and distribution of the Offering Memorandum.  According to this individual, the financial information in the Offering Memorandum was created using historical and 2007 budgeted financial data provided by HVM.  This individual further believed that, for periods beyond 2007, Blackstone and HVM together would have created the projections and estimates.  For other, non-financial portions of the Offering Memorandum, this same person stated that, while BS&C and the other Sellers' Advisors contributed and compiled significant market research and data, Blackstone was primarily responsible for the content of the final product, and getting it "out the door" to the potentially interested investors.[65]

The Offering Memorandum generally contains the Sellers' overview of the Company and the reasons why the Sellers believed it represented a good investment opportunity.  For instance, the Offering Memorandum stated that the Company had strong business fundamentals, had a simple business model, had higher EBITDA margins and generated significantly greater cash flow as compared to full service and limited service hotels, and was geographically diversified in attractive markets.[66]  In addition, the Offering Memorandum highlighted the fact that the Sellers believed that the Company had been positioned to take advantage of several opportunities to further increase revenues through re-branding and marketing initiatives, acquisitions, and the addition of new customer bases.[67]  In support, the Offering Memorandum included historical and projected financial performance data, together with assumptions that supported the projections.[68]

---

[64]  *See, e.g.*, Rogers Deposition, dated February 8, 2010, at 56:1-5.

[65]  Interview with William Stein, Senior Managing Director, Real Estate, The Blackstone Group, Offices of Simpson Thacher & Bartlett LLP, New York, New York, Dec. 18, 2009.

[66]  "Confidential Information Memorandum" dated January 2007 at 2 [Bates No. BLA-002201-002287].

[67]  *Id.* at 3.

[68]  *Id.* at 12, 29-36 [Bates No. BLA-002201-002287].

The Offering Memorandum also explained that the Sellers had arranged for "stapled financing" in connection with the sale of the Company through BAS, BS&C, Merrill Lynch and Deutsche Bank Securities, Inc. (collectively, the "Stapled Financing Lenders") on the terms described in Appendix E of the Offering Memorandum. "Stapled" or "Staple" financing refers to a financing package that accompanies (is "stapled" to) an offering memorandum and is available to a buyer. Among other things, the "stapled" financing indicates the expected debt capacity of the business being sold, and how much equity the buyer will need to provide in order to avail itself of the Stapled Financing.

Here, in the case of the Offering Memorandum, the Stapled Financing Lenders indicated that they would finance up to $6.8 billion of the purchase price for the Company. The initial stapled terms offered were such that the loan-to-value ratio couldn't exceed 87.5% when combined with the assumption of the obligations under the HPT lease[69] of $200 million.[70]

## 2. Sale Process

The Sellers' Advisors reportedly distributed the Offering Memorandum to approximately 150 potential investors. According to the Blackstone representative that the Examiner and the Examiner's Professionals interviewed, these potential investors were given the opportunity to perform due diligence with respect to the Company if they were willing to execute a confidentiality agreement.[71] Based upon documents produced by Blackstone to the Examiner, it appears that over 30 different parties signed such confidentiality agreements in February 2007, permitting them access to due diligence information (in addition to that contained in the Offering Memorandum).[72] Among the parties executing confidentiality agreements were Lightstone[73] and Arbor.[74]

---

[69]  An explanation of the HPT lease is in Report § III.G.1, below.

[70]  "Confidential Information Memorandum" dated January 2007, Appendix E [Bates No. BLA-002201-002287].

[71]  Interview with William Stein, Senior Managing Director, Real Estate, The Blackstone Group, Offices of Simpson Thacher & Bartlett LLP, New York, New York, Dec. 18, 2009.

[72]  *See, e.g.*, Bates Nos. BLA-000001; BLA-000016; BLA-000037; BLA-000037; BLA-000045; BLA-000053; BLA-000064; BLA-000079; BLA-000258; BLA-000266; BLA-000273.

[73]  Blackstone Document [Bates No. BLA-000203].

[74]  Blackstone Document [Bates No. BLA-000016].

The Examiner is informed, but has no independent evidence, that those parties executing the confidentiality agreement then were given access to an electronic data room that was populated with documents and information regarding the Company. The Examiner and the Examiner's Professionals were given a DVD said to contain copies of the documents and information that were included in the data room and, to the extent applicable to the Investigation, reviewed such documents and information.

At some point prior to March 1, 2007, the Sellers requested that Prospective Purchasers submit written, non-binding indications of further interest to Sellers' Advisors (collectively, "IOI Letters"). According to the documents produced to the Examiner by Blackstone, on March 1, 2007, the Sellers' Advisors received 4 IOI Letters from various parties.[75] Although non-binding, the IOI Letters indicated that the submitting parties would be willing to pay as much as $7.6-$8.0 billion for the Company (net of certain amounts, such as the assumption of the HPT capital lease). Lightstone's initial proposed purchase price was $7.6 billion, net of the assumption of the existing HPT capital lease.[76] In other words, Lightstone's initial expression of interest was on the lower end of those expressions of interest that Blackstone received.

After the submission of the IOI Letters, Blackstone's representative informed the Examiner that the Seller and the Sellers' Advisors held further discussions with the interested parties, and narrowed the field down to those parties willing and able to submit definitive offers within the approximately 90-day time frame required by the Sellers for consummating the transaction.[77] Accordingly, only 2 of the 4 entities or groups of entities that submitted IOI Letters remained after the field was narrowed by the Seller and the Sellers' Advisors. On March 25, 2007, the Sellers' Advisors sent a letter to Lightstone[78] and another to Centerbridge

---

[75] *See* Bates No. BLA-002184, BLA-002193, BLA-2197, and BLA-002180.

[76] Mar. 1, 2007 Letter from David Lichtenstein to Lonny Henry, at 1:¶ 1 [Bates No. BLA-002180].

[77] Interview with William Stein, Senior Managing Director, Real Estate, The Blackstone Group, Offices of Simpson Thacher & Bartlett LLP, New York, New York, Dec. 18, 2009.

[78] Mar. 25, 2007 Letter from Lonny Henry to David Lichtenstein [Bates No. BLA-002168].

Partners, L.P and Fortress Investment Group, LLC,[79] jointly ("Centerbridge/Fortress"), inviting both Lightstone and Centerbridge/Fortress to submit definitive proposals for the acquisition of the Company by April 11, 2007 (the "March 25 Letters").

Exactly what happened after the transmission of the March 25 Letters requesting definitive offer submissions is not known with certainty by the Examiner. There is only evidence that one definitive offer was received by the Sellers for the purchase of the Company – the offer made by Lightstone pursuant to an offer letter dated April 12, 2007 ("April 12 Offer Letter").[80] Mr. Lichtenstein stated that he believed at the time that Lightstone was competing with Centerbridge for the right to purchase the Company, but acknowledged that he had no way of knowing if that was true.[81] During the Examiner's interview of Blackstone's representative, he indicated that it was possible that Centerbridge/Fortress may have submitted a further offer, although possibly not in written form. However, given the strict guidelines contained in the March 25 Letters with respect to the submission of offers,[82] *i.e.*, the requirement that further offers be submitted in writing, this seems unlikely. Further, when the Examiner spoke with a representative of Centerbridge, he stated without equivocation that neither Centerbridge nor Centerbridge/Fortress submitted a definitive offer for the purchase of the Company, and that Centerbridge/Fortress dropped out of the bidding process before the definitive offer deadline.[83] Counsel to Fortress also confirmed that no definitive offer for the purchase of the Company was ever made.

### 3.    Lightstone's Due Diligence

As part of his investigation, the Examiner requested that Lightstone provide information and documents regarding the due diligence performed by or on behalf of Lightstone

---

[79]    *See* Bates No. BLA-002164.

[80]    April 12, 2007 Letter from David Lichtenstein to Lonny Henry [Bates No. BLA-002173].

[81]    Lichtenstein Deposition at 85:4-86:20.

[82]    *See, e.g.*, Mar. 25, 2007 Letter from Lonny Henry to David Lichtenstein at 2 [Bates No. BLA-002168].

[83]    Interview with William D. Rahm, Principal, Centerbridge Partners, L.P., Offices of Fried, Frank, Harris, Shriver & Jacobson LLP, New York, New York, Dec. 17, 2009; Telephone Interview by Margreta M. Morgulas with William D. Rahm, Principal, Centerbridge Partners, L.P., Dec. 23, 2009.

in connection with the Acquisition. During the interviews and depositions with the Lightstone representatives, Mr. Lichtenstein and, to a certain extent Mr. Teichman, represented that Lightstone relied heavily on the Sellers, the Sellers' Advisors, and the advisors that Lightstone had hired when it came to determining whether to pursue the Acquisition.[84]

Lightstone hired Citi GM as its financial advisor in connection with the Acquisition pursuant to a letter agreement dated March 22, 2007.[85] Based on the documents the Examiner obtained through discovery, Citi GM performed due diligence and financial modeling on behalf of Lightstone in connection with the Acquisition. As reflected in the tens of thousands of pages produced by Citi GM to the Examiner, including hundreds of e-mails between Citi GM and Lightstone, Citi GM worked closely with senior people at Lightstone to analyze the data and refine their financial models.

Lightstone also consulted with Lehman Brothers in connection with both finding the capital necessary to finance the equity portion of the Acquisition, and with planning potential exit strategies with respect to Lightstone's investment in the Company.[86] Although the correspondence produced by Lightstone suggests that certain of Lightstone's senior managers had some involvement with the due diligence process, only one Lightstone employee had hospitality experience, Lightstone's then-CFO Michael Schurer (formerly with Marriott International and Grand Heritage Hotel Group). Another individual joined Lightstone just before the Acquisition (an independent contractor) who had acquisition experience, Lightstone's then-Director of Acquisitions, Joshua Kornberg. Accordingly, there is no reason to believe that meaningful diligence was beyond Lightstone's internal capabilities. Both Mr. Schurer and Mr. Kornberg appear to have met with members of HVM's management team, consistent with what

---

[84]  Lichtenstein Deposition at 46-49; Lichtenstein Deposition at 45:7-10 ("We hired various and small little advisors, but basically we relied a lot on Citi and we also relied to a certain extent on Wachovia's underwriting"); Lichtenstein Deposition at 46:14-18 ("I relied on Citibank substantially and on Wachovia and the fact that Wachovia said: 'Look, you have Ernst & Young numbers' . . . and we also relied a lot on Blackstone"); Teichman Deposition at 26-7.

[85]  *See* Lightstone Document [Bates No. DL_LS_EXMN00088753].

[86]  *See, e.g.,* Lehman Brothers Report: "The Lightstone Group, ESH Analysis, May 15, 2007" [Bates No. DL_LS_EXMN00088365]; *see, also, e.g.,* E-Mail Correspondence [Bates No. DL_LS_EXMN00088364].

the Examiner was told during the deposition of Joseph Rogers.[87]  In addition, internal correspondence does indicate that members of Lightstone toured hotel properties in certain key markets and even produced reports with respect to certain of the properties.[88]  In fact, Mr. Kornberg related to the Examiner's Professionals that he personally visited numerous properties prior to the Acquisition.[89]  Lightstone's management also reached out to seasoned members of the hospitality industry with whom they had contacts, including, for instance, The Highland Group.[90]  Notwithstanding the above, it appears that Lightstone relied primarily on its retained professional advisors to conduct due diligence, and that Lightstone conducted a limited investigation of the Company on its own before submitting its definitive bid.

According to Mr. Lichtenstein, however, none of the due diligence that was done by or for Lightstone enabled Lightstone to recognize the significant issues that Mr. Lichtenstein contends existed with the Offering Memorandum and the other due diligence materials with which Lightstone was provided in connection with the Acquisition until after the Closing. Examples of the same identified by Mr. Lichtenstein during his deposition included the allegation that a significant amount of property-related expenses were inappropriately placed "above the line," at the corporate level.[91]  The practical effect, according to Mr. Lichtenstein, was the overstatement of the net operating income of the properties, which was problematic because the underwriting of the Mortgage Debt and Mezzanine Debt was based only upon the property-level numbers and, therefore, made the debt even more difficult for the Company to service.[92] Similarly, the projections in the Offering Memorandum assumed a rate of growth that, in the opinion of Mr. Lichtenstein, was unrealistic and unachievable in even the best of circumstances

---

[87]   *See* Bates No. DL_LS_EXMN00000003; *see also* Rogers Deposition at 59:22-24.

[88]   Bates No. DL_LS_EXMN00058805.

[89]   Telephone Interview by Laureen Ryan with Joshua Kornberg, Former Director of Acquisitions of The Lightstone Group, Feb. 25, 2010.

[90]   *See* E-Mail Correspondence [Bates No. DL_LS_EXMN00000005]; *see also, e.g.*, Deposition Transcript of David Lichtenstein dated Jan. 20, 2010 at 74-76

[91]   Lichtenstein Deposition at 61:3-8; 62-64.

[92]   Lichtenstein Deposition at 62-64.

in the hospitality industry.[93]  However, prior to the Acquisition, Mr. Lichtenstein had no relevant experience that he believed would have enabled him to evaluate the assumptions underlying the projections.  His advisors did, and, in his opinion, should have recognized such issues.  Ultimately, Mr. Lichtenstein made it quite clear that he was not attempting to absolve himself of blame in connection with any failures in the due diligence process or in connection with the Acquisition in general.  In fact, he was quite frank with respect to the same, stating in his deposition:

> at the end of the day, nobody put a gun to my head and said sign the documents.  But it was like a lot of – it was – it was a brew that was cooked with a lot of people's help.  Like the banks just said it's not – you know, blow the damn stuff out.  It's – we really don't care, just sell the paper as fast as you can.  Citibank just said pay us as many fees as you can.  And I said I'm getting 95, 99 percent financing.  Okay?  So it was a combination; there were a lot of people who [erred] here.

Lichtenstein Deposition at 69:17-25-70:1-5.

### 4.    Lightstone's Definitive Offer and Sellers' Acceptance

As set forth in the April 12 Offer Letter, Lightstone offered to purchase 100% of the membership interests of the Sellers for an aggregate cash consideration of $8.0 billion, net of the assumption of the obligations under the HPT capital lease, and subject to certain other adjustments described therein.[94]  According to the April 12 Offer Letter, Lightstone proposed to finance the Acquisition through a combination of equity, including $200 million in Blackstone's "rollover" equity, and third party indebtedness.[95]  When it referred to Blackstone's "rollover" equity, the April 12 Offer Letter contemplated that Blackstone would contribute $200 million in equity or, in other words, would retain a $200 million ownership interest in the Company at the Closing of the Acquisition.  According to Mr. Lichtenstein, the reason that the $200 million in

---

[93]    Lichtenstein Deposition at 66-69.
[94]    April 12 Offer Letter at 1 [Bates No. BLA-002173].
[95]    *Id.* at 1-2 [Bates No. BLA-002173].

"rollover" equity was included was because it was the only way that he was able to reach the $8 billion Purchase Price.[96]

Pursuant to the Acquisition Agreement dated April 17, 2007, which was executed by the Buyer and the Sellers, Lightstone's offer to purchase the Company from Blackstone was formally accepted by the Sellers.[97]  As set forth in the Acquisition Agreement, Lightstone agreed to provide a commitment letter for debt financing of not less than $7.4 billion, over $600 million more than the amount indicated in the Stapled Financing, on or before May 1, 2007.[98]  This meant that the loan-to-cost ratio under the Lightstone deal was going to be *at least* approximately 92.5%.  Ultimately, as set forth in Exhibit IV-B-4, the total debt-to-cost ratio under the Lightstone deal reached approximately 97.5%.  The remainder of the Purchase Price was to be funded by equity contributions, which, according to the April 12 Offer Letter, had been previously assembled by Lightstone.[99]  With the exception of the Blackstone "rollover" equity piece, the remaining $620 million of equity that was put into the Company at the time of the Acquisition came from Lightstone-related entities, Arbor-related entities, and entities said to be brought in by either Lightstone or Arbor.

The Acquisition Agreement required that most of the pre-Acquisition debt be satisfied by the Buyer in advance, or at the time of, the Closing of the Acquisition, including the Subordinated Notes.  Accordingly, Section 5.14 of the original draft of the Purchase Agreement dated April 17, 2007 provided that the Sellers were responsible for ensuring that ESI[100] redeemed, *i.e.*, paid off, any outstanding Subordinated Notes due June 15, 2011, prior to the

---

[96]     Lichtenstein Deposition at 93:11-19, 94:2.

[97]     *See* Acquisition Agreement [Bates No. DL_LS_EXMN00058833].

[98]     *Id.* at § 5.5 [Bates No. DL_LS_EXMN00058833].

[99]     April 12 Offer Letter at p. 2 ("We have assembled the equity resources necessary to consummate the transaction and are making this Proposal without financing contingencies") [Bates No. BLA-002173].

[100]    The Examiner notes that according to the respective Indentures, the Subordinated Notes and the 9.875% Notes are the obligation of Extended Stay America, Inc., a legal entity that apparently no longer exists.  Counsel to the Indenture Trustee, Manufacturers and Traders Trust Company, informed the Examiner and his counsel that it has no record of having ever receiving any information of the dissolution of that entity through any means and/or of a request that the relevant Indentures for the Notes be amended to reflect the same.  However, as noted below, ESI has assumed the obligation to satisfy the Subordinated Notes that remained unsatisfied at the time of the Closing of the Acquisition.

537960v2

Closing of the Acquisition.[101]  At the time, the principal face amount of these obligations was approximately $30.9 million and approximately $8.15 million, respectively.[102]  However, in Section 3 of an amendment to the Acquisition Agreement dated May 31, 2007, the obligation of the Sellers to ensure that ESI redeemed any outstanding Subordinated Notes was removed.[103]  The Examiner was unable to obtain any meaningful information regarding the elimination of the requirement that the Sellers satisfy the Subordinated Notes before the Closing.  The practical effect of the same was that as of the Closing, the obligations remained unsatisfied and were assumed by the Company.  A summary of the amounts and terms of the Subordinated Note obligations are as follows:[104]

| Summary of Subordinated Notes Assumed at the Acquisition | | |
|---|---|---|
| **Terms** | **9.15% Notes** | **9.875% Notes** |
| Issue Date | March 1998 | June 2001 |
| Issuer | ESI | ESI |
| Holder | M&T Trust | M&T Trust |
| Interest Rate | 9.15% | 9.88% |
| Payment Dates | Mar 15 & Sep 15 | Jun 15 & Dec 15 |
| Maturity Date | 15-Mar-08 | 15-Jun-11 |
| Outstanding Balance 6/11/2007 | $    30,900,000 | $    8,149,000 |

*Sources:*
*Indenture Agreements (ESH0003718-0003817 and Catalyst ID 00020244).*
*DL-DW Consolidated Financial Statements and Other Financial Information for the Year Ended December 31, 2007 and for the Period from Acquisition (June 11, 2007) to December 31, 2007 (WACH28803-28847).*

On June 11, 2007, the Subordinated Notes were reflected on the balance sheet of ESI.[105]  The 9.15% Notes due in March 2008 were recorded on ESI's balance sheet at

---

[101]    Purchase Agreement, [Bates No. DL_LS_EXMN00058833].

[102]    *See* Section 2.3(c) of the Company Disclosure Schedule to the Purchase Agreement, [Bates No. BLA-000408]

[103]    "First Amendment of Agreement of Purchase and Sale," § 3 [Bates No. DL_LS_EXMN00059036].

[104]    *See* "DL-DW Consolidated Financial Statements for the year ended December 31, 2007" [Bates Nos. WACH28803-288471].

[105]    *Id.*

537960v2

approximately $29.6 million, net of a discount of $1.3 million and fair valued at a discount to yield of 15.3%. The 9.875% Notes due in June 2011 were recorded on ESI's balance sheet at approximately $6.9 million net of a discount of approximately $1.3 million. All of the Subordinated Notes are unsecured and subordinate to the Company's other secured indebtedness, and all of the notes are considered *pari passu*.[106]

According to interviews and depositions of Mr. Lichtenstein[107] and Mr. Rogers,[108] no accommodations for the repayment of these assumed obligations (*e.g.*, escrowing of funds) were made at the time of the Closing of the Acquisition in June 2007, even though approximately $30.9 million of the 9.15% Notes would come due less than a year later, on March 15, 2008.[109] As discussed in Section III.I.3. of this Report, the repayment of the 9.15% Notes would prove to be one of the first significant financial problems that the Company would face post-Acquisition.

## 5. Non-Binding Offer to Purchase Controlling Equity Position

One of the complexities associated with the Acquisition was that Blackstone required that the REIT status of certain of the entities be maintained. Lightstone was keenly aware that it would need to make accommodations to ensure that the regulations for maintaining the REIT status were met. This, according to Mr. Lichtenstein and Mr. Teichman, was one of the reasons that Mr. Lichtenstein responded to overtures from Centerbridge that he and others at Lightstone began to receive shortly after the execution of the Purchase Agreement on April 17.[110]

From the end of April through May 2007,[111] representatives of Lightstone, Arbor, Centerbridge, and Centerbridge's co-investors, met several times to discuss a possible transaction

---

[106] *Id.*

[107] *See, e.g.*, Lichtenstein Deposition at 204:18-21.

[108] Rogers Deposition, at 221-22.

[109] *See, e.g.*, Consolidated Financial Statements and Other Financial Information of DL-DW Holdings, LLC, as of December 31, 2008 and 2007 (Restated) at 34 [Bates No. CB00105].

[110] Lichtenstein Deposition at 107:2-8; Teichman Deposition at 93-102; *see also, e.g.*, E-mail from Joshua Kornberg to David Lichtenstein dated April 19, 2007 [Bates No. DL_LS_EXMN00088461].

[111] *See, e.g.*, Bates No. DL_LS_EXMN00088480.

whereby Centerbridge and its co-investors might buy a significant or controlling portion of the equity in connection with the Acquisition. These talks apparently culminated in the proposal by Centerbridge of a non-binding equity investment term sheet, a draft of which was sent by Centerbridge to Lightstone on May 20, 2007.[112]

Under Centerbridge's May 20 proposal, Centerbridge and its co-investors were to invest all but $75 million of the roughly $400 million in equity that was required to close the Acquisition. The remaining $75 million would have come from Lightstone. Significantly, under this proposal, Centerbridge and its co-investors also proposed to restructure part of the financing for the Acquisition, converting the $200 million junior tranche of the $7.4 billion financing to a "toggle note." Such a note would provide greater financial flexibility requiring the payment of cash interest only to the extent that the borrowers had sufficient cash available.[113] In sum, Centerbridge and its co-investors appeared to be looking to relieve some of the leverage in connection with the Acquisition.[114]

Thereafter, presumably using the May 20 proposal as a starting point, Lightstone, Arbor, Centerbridge and its co-investors worked to negotiate a deal that was acceptable to all parties in interest. However, in an e-mail dated June 3, 2007, from Lance West of Centerbridge to Mr. Lichtenstein of Lightstone and other parties, Centerbridge and its co-investors indicated that they were ending the negotiations because they were unable to reach agreements on certain terms within the time frame required by Lightstone and others.[115]

Ultimately the necessary equity was provided by a variety of different sources. Approximately $210 million was contributed by Arbor and parties that Arbor brought into the

---

[112]   *See* "Letter to David Lichtenstein from Lance West and William Rahm of Centerbridge Partners Containing Draft Equity Investment Agreement" [Bates No. DL_LS_EXMN00088483].

[113]   *See* "Letter to David Lichtenstein from Lance West and William Rahm of Centerbridge Partners Containing Draft Equity Investment Agreement" [Bates No. DL_LS_EXMN00088483].

[114]   Given that it was only tangentially related to the focus of the Investigation, the Examiner did not request nor did he generally receive much information regarding the negotiations concerning the offer of Centerbridge and its co-investors to purchase equity. For instance, the Examiner has virtually no electronic communications and has no communications by and between Centerbridge and its proposed co-investors.

[115]   *See, e.g.*, Bates No. DL_LS_EXMN00088512.

deal.[116]  The remainder was invested by entities in which Mr. Lichtenstein held an interest –
Lightstone contributed approximately $98 million and PGRT ESH, Inc., a wholly-owned
subsidiary of Prime Group Realty Trust, contributed approximately $120 million.

6.    **HVS Appraisal**

Shortly before the Closing of the Acquisition, in May 2007, HVS International
("HVS") submitted to Wachovia Corporation; BS&C Stearns Commercial Mortgage, Inc.;
Merrill Lynch Mortgage; Merrill Lynch Bank USA; Ebury Finance Limited; and BofA an
appraisal of the 664 hotel and miscellaneous properties that were owned by the Company and
used to secure the financing incurred in connection with the Acquisition, as well as the HPT
leasehold interests.[117]  According to HVS, the "As Is" market value" of the combined fee simple
and leasehold interests in 664 distinct parcels currently improved with extended-stay hotels as of
June 1, 2007, was $7,993,200,000; the value of the leasehold interests in the 18 HPT-owned
assets was $155,800,000; and the value of the miscellaneous real estate (essentially the
commercial office building and vacant land) was $12,800,000.  Accordingly, HVS concluded
that the total value of the portfolio to be sold in the Acquisition was $8,161,800,000 as of
May 30, 2007, which was 102% of the Acquisition price.[118]

D.    **Closing of the Acquisition**

The Acquisition Agreement stated that the Purchase Price would consist of
(i) $7,800,000,000 in cash, minus the Adjustment Amount (discussed below), and (ii) the JV
Equity Interests, which would be deemed to be valued at $200,000,000 at Closing.[119]  The
Estimated Adjustment Amount for purposes of the Closing was agreed to be $238,798,672.[120]
No later than 90 days following the Closing, the Buyer was required to deliver to the Sellers a

---

[116]    Arbor ultimately ended up holding $115.2 million in preferred equity.  *See* Arbor Realty Trust, Inc. &
Subsidiaries, Current Report (Form 10-K) at 85 (Dec. 31, 2008).  According to Mr. Lichtenstein, Arbor
syndicated the remainder of the $210 million to various other parties.  *See* Lichtenstein Deposition at 34:4-7.

[117]    *See* "Self Contained Appraisal Report, Dated May 30, 2007" [Bates No. BofA 0027233].

[118]    The Examiner did not perform any independent valuation or appraisal of the assets since the same was beyond
the scope of his Investigation, as reflected in the approved Examiner Work Plan and Budget.

[119]    Acquisition Agreement [Bates Nos. DL_LS_EXMN00058833-58919].

[120]    *Id.*

revised schedule ("Adjustment Amount Schedule").  The Acquisition Agreement further provided that if the Adjustment Amount were greater than the Estimated Adjustment Amount, then the Sellers would pay the Buyer, and *vice versa*.[121]

The Closing of the Acquisition took place on June 11, 2007 at the offices of Simpson Thacher & Bartlett, LLP, which firm represented the Sellers.  The Buyer was represented by Herrick Feinstein LLP.[122]

As previously discussed, Earnest Money totaling $85 million was wired by the Buyer on April 16, 2007 to Chicago Title (account number XXXX-7251 at Citibank) for the benefit of the Sellers.[123]  Mr. Lichtenstein testified that Wachovia put up the money for the Earnest Money deposit.[124]

Two title companies were used to facilitate the Closing: First American and Chicago Title.  First American handled all of the instructions related to the receipts and disbursements of the Acquisition, with the exception of the Earnest Money deposit.

First American used a single account at JPMorgan Chase ("JPM") to conduct the Closing (account number XXX-XX1931).[125]  Cash was moved into and out of the account at various times throughout the day as funding occurred and disbursements were made on behalf of, and to, the Sellers and the Buyer.  A majority of the transfers were conducted by wire transfer, but a handful of disbursements were made using checks or book transfers to other Chase Bank accounts.[126]  A summary of the various movements of cash into and out of the closing account arranged according to the time of transfer is provided in Exhibit III-D-1.

On the day of the Closing, the Earnest Money of $85,611,012 held by Chicago Title was wired directly to BHAC IV, LLC, one of the Sellers (*i.e.*, it did not go through the First American closing account and is shown as a non-cash adjustment on the Settlement

---

[121]  *Id.* at § 1.6(b).

[122]  *Id.*

[123]  Domestic Wire Transfer Detail [Bates Nos. ESH0028986-28987].

[124]  Lichtenstein Deposition at 45.

[125]  First American Wire Instructions (Catalyst ID 00019188).

[126]  All of the deposits into the accounts were made by wire transfer.

Statement).[127]  Based on instructions from DL-DW and the Sellers, Chicago Title wired the Earnest Money from Citibank, N.A. (account number XXXX-7251) to Chase Bank (account number XXX-XX3893) benefiting BHAC IV, LLC.

In connection with the Closing, First American prepared a Settlement Statement reflecting the credits and charges of the Buyer and the Sellers dated June 11, 2007.[128]  The Settlement Statement reconciled the credits and charges attributable to the Buyer and the Sellers, including their respective transaction costs.  In addition to cash charges and credits, the Settlement Statement also contained three non-cash items, as shown in the following table.

| Non-Cash Adjustments to the Final Settlement Statement | |
| --- | --- |
| **Description** | **Amount** |
| Earnest Money held by Chicago Title Insurance | $ 85,611,012 |
| Schedule 1.6 Adjustments | $ 238,798,672 |
| Blackstone Rollover Equity | $ 200,000,000 |
| Total Adjustments | $ 524,409,684 |

*Source: First American Final Settlement Statement (ESH0000178-180)*

As mentioned earlier, the Earnest Money was transferred directly to the Sellers. The second item, Schedule 1.6 Adjustments, was the Estimated Adjustment Amount to "true-up" the Purchase Price provided for in the Acquisition Agreement in section 1.6, and related to changes in the working capital accounts, the HPT Capital lease obligation, and other miscellaneous amounts.[129]  Since the Estimated Adjustment Schedule reflected the fact that the book value of certain liabilities assumed was greater than certain assets acquired, pursuant to the definition provided in section 1.6 of the Acquisition Agreement, the Purchase Price was initially reduced by the Estimated Adjustment Amount (and was reflected as a non-cash item).

---

[127]  Joint Instruction Letter [Bates No. BLA 000822].

[128]  First American Settlement Statement [Bates Nos. ESH0000178-0000180].

[129]  Schedule 1.6 Adjustments [Bates Nos. DL_LS_EXMN00059206] and Acquisition Agreement [Bates Nos. DL_LS_EXMN00058839-00058841].

The third item, Blackstone Rollover Equity, represents a portion of the equity for DL-DW, which was formed to acquire and manage BHAC and Homestead at the Closing.[130]  DL-DW was capitalized with initial cash capital contributions sufficient to complete the Acquisition in accordance with the terms of the Acquisition Agreement, and pay the related expenses, and Blackstone was deemed to have contributed $200 million.[131]

Blackstone continued to retain a $200 million equity interest in DL-DW.  The Blackstone Rollover Equity investment was funded through a non-cash reduction in the Purchase Price equal to the $200 million rollover investment.[132] [133]

1.  **DL-DW's Credits**

A summary of the credits attributable to the Buyer is provided below.

| DL-DW's Credits on June 11, 2007 | |
| --- | --- |
| **Description** | **Amount** |
| Chicago Title Escrow Account - Earnest Money | $ 85,611,012 |
| Schedule 1.6 Adjustments | $ 238,798,672 |
| Blackstone Rollover Equity Interest | $ 200,000,000 |
| New Debt incurred by Borrowers | $ 7,400,000,000 |
| Cash Infusions on behalf of DL-DW | $ 245,506,217 |
| Total DL-DW Credits | $ 8,169,915,901 |

*Source: First American Final Settlement Statement (ESH0000178-180)*

---

[130]  Exhibit C to the Acquisition Agreement is a Term Sheet outlining the terms for the formation of a Joint Venture between Lightstone and Blackstone to acquire and manage the Companies.  This Joint Venture was effectuated through the formation of DL-DW.

[131]  Acquisition Agreement § 1.2 [Bates Nos. DL_LS_EXMN00058833-58919].

[132]  Acquisition Agreement [Bates Nos. DL_LS_EXMN00058833-00058919].

[133]  Subsequent to the Closing, the DL-DW, BHAC, and Homestead Agreements were amended and restated to reflect a change in the ownership structure.  The change of ownership structure affected DL-DW's membership interests in BHAC and, as a result, Homestead's membership interests in BHAC as well, since under the changed structure, DL-DW's membership interests in BHAC were transferred to Homestead.  Under the new ownership structure, certain outside parties invested in BHAC and received a percentage of BHAC's membership interests, resulting in DL-DW's (and as a result, Homestead's) membership interests being reduced.  Since the Debtors may be creditors of both DL-DW and BHAC as a result of the transfers that accompanied the Acquisition, the question of whether fair consideration was paid by the outside investors, and the legality of subsequent distributions to the equity owners of both DL-DW and BHAC, may have to be further investigated.  Because an independent valuation of the Company was not performed as of June 29, 2007, the Examiner makes no factual findings, and expresses no opinion, regarding the changes in ownership structure as of June 29, 2007.

51

As shown above, to satisfy the stated Purchase Price and the costs related to the Acquisition, (1) the Borrowers obtained new debt in the amount of $7.4 billion;[134] (2) certain cash infusions were made on behalf of DL-DW; (3) the stated purchase price was reduced by the Estimated Adjustment Amount; and (4) a credit was given on account of the Earnest Money, as previously discussed.  The new debt represented 92.5% of the initial $8 billion Acquisition Purchase Price (or 95.4% of the cash purchase price paid at closing of $7,761,201,328 which excludes post Closing adjustments).

The following table summarizes the various financing ratios contemplated through the progression of the Acquisition financing.[135]

| Comparison of Financing Ratios | |
| --- | --- |
| **Source** | **Ratio** |
| Stapled Financing maximum Loan-to-Value Ratio | 87.5% |
| Commitment Letter maximum Loan-to-Cost Ratio | 92.5% |
| Actual Loan-to-Cost Ratio | 92.5% |
| *Sources:*<br>*Commitment Letter (Catalyst ID 00003536).*<br>*Offering Memorandum (BLA002201-002287).* | |

The cash infused by DL-DW to fund the Acquisition and the related costs totaled approximately $331.1 million, comprised of the $85,611,012 Earnest Money plus $245,506,217 (including a $10 million reserve for post Closing costs) required to be transferred to First American at Closing.[136]  However, DL-DW deposited a total of approximately $313.6 million into the First American closing account, which exceeded the required DL-DW cash deposit of

---

[134] The Buyer was obligated under the Acquisition Agreement to pay the entire Purchase Price to the Seller.  The Borrowers were not obligated under the Acquisition Agreement to pay any portion of the Purchase Price.

[135] The Commitment Letter contemplated that 684 properties and all intangibles would be part of the collateral pool.  However, only 664 properties were included and no intangibles were pledged.  Commitment Letter (Catalyst ID 3536).  Offering Memorandum [Bates Nos. BLA002201-002287].  First American Final Settlement Statement [Bates Nos. ESH 00000178-00000180].

[136] The total Professional Fees attributable to the Buyer for the Acquisition were $65,968,527.  *See* Exhibit III-D-2 for a summary of the Professional Fees paid at the Closing.

$245,506,217 by approximately $68.1 million.  The following table is a summary of the DL-DW transfers into the First American closing account as shown on the Settlement Statement.

| DL-DW Cash Deposits to First American Closing Account | |
| --- | --- |
| **Account Name** | **Amount** |
| Lightstone Group | $ 16,970,167 |
| David Lichtenstein | $ 120,000,000 |
| Arbor Realty | $ 1,639,949 |
| Universal Master Servicing | $ 175,000,000 |
| DL-DW Cash Deposits to First American Closing Account | $ 313,610,116 |

*Source: First American Wire Transfer Confirmations (Catalyst ID 00019092).*

At the end of the Closing, First American sent a wire transfer to Wachovia totaling approximately $78.1 million for the benefit of the Buyer.[137]  The amount comprised the overpayment of $68.1 million and the $10 million reserve that had been established to cover post Closing costs.  Wachovia then used approximately $736,915 to pay transaction costs not paid for at the Closing.[138]  Thereafter, Wachovia transferred the remaining funds totaling $77,366,984, via wire transfer, into a DL-DW account on July 17, 2007.[139]  A summary of the activity discussed above is shown in the following table.

---

[137] First American wire transfer confirmation in the amount of $78,103,898.86 dated June 11, 2007 at 6:00 p.m. EST RE: ESH Portfolio – Return of Funds (Catalyst ID 00019092).

[138] Cash from Borrower Detail – Equity Contribution Support [Bates Nos. ESH0076615] and Email from Wachovia regarding excess Buyer funds sent to Wachovia [Bates Nos. ESH0076601].

[139] Wachovia Full Transaction Report, dated July 17, 2007 [Bates Nos. ESH0076584].

| DL-DW Cash Back After Closing | |
|---|---|
| **Account Name** | **Amount** |
| DL-DW Cash Deposits to First American Closing Account | $ 313,610,116 |
| Less: Cash Required per Settlement Statement | $ (245,506,217) |
| Over Funding of Closing Account | $ 68,103,899 |
| Plus: Unused Reserve Account | $ 10,000,000 |
| DL-DW Excess Cash After Closing (to Wachovia) | $ 78,103,899 |
| Less: Invoices Paid Outside of Closing (by Wachovia) | $ (736,915) |
| Transfer to DL-DW on July 17, 2007 | $ 77,366,984 |

***Sources:***
*First American Wire Transfer Confirmations (Catalyst ID 00019092).*
*Cash From Borrower Detail (ESH0076615).*
*Wachovia Full Transaction Report (ESH0076584).*

### 2.  Sellers' Charges

The Sellers instructed that the funds associated with the Acquisition were to be used to retire existing debt and pay the Sellers' fees and expenses associated with the sale. The remaining balance of cash was disbursed directly to the Sellers. The following table is a summary of the Sellers' charges related to the Acquisition reflected on the First American Settlement Statement, and includes the non-cash adjustments previously discussed.[140]

---

[140]   Following the Closing on June 13, 2007, EuroHypo, one of the pre-Acquisition lenders, sent a request to Blackstone's counsel (Simpson Thacher & Bartlett LLP) for additional interest due on the pre-Acquisition debt. It appears interest due EuroHypo as reflected in the payoff letter was miscalculated by $124,500 [Bates Nos. BLA-001826 and BLA-001815]. No evidence was provided to show whether or not the additional interest amount was paid by Blackstone following the Closing of the Acquisition. However, if the additional interest was paid, the net cash received by Blackstone would be reduced by $124,500 and the amount of pre-Acquisition debt would be increased by $105,202.50 for BRE/ESA P Mezz 2 LLC, BRE/Homestead Mezz 2 LLC and $19,297.50 for BRE/ESA Mezz 3 LLC.

537960v2

| Sellers' Charges on June 11, 2007 | |
| --- | --- |
| **Description** | **Amount** |
| Chicago Title Escrow Account - Earnest Money | $ 85,611,012 |
| Schedule 1.6 Adjustments | $ 238,798,672 |
| Blackstone Rollover Equity Interest | $ 200,000,000 |
| Repayment of Debt | $ 5,747,900,327 |
| Fees associated with Closing | $ 9,159,966 |
| Sellers' Cash out at Closing | $ 1,776,421,344 |
| Total Sellers' Charges | $ 8,057,891,321 |

*Source: First American Final Settlement Statement (ESH0000178-180)*

As the above table shows, after retiring the existing debt[141] and paying the Sellers' fees and expenses associated with the sale, the Sellers received cash totaling approximately $1.8 billion from the First American account. The cash was received through intra-bank transfers from the First American closing account as follows.[142]

| Sellers' Cash Receipts from First American Closing Account | | |
| --- | --- | --- |
| **Account Name** | **Representing** | **Amount** |
| BHAC IV, LLC | Purchase Price payable to Seller | $ 1,282,764,450 |
| Blackstone Hospitality Acquisitions LLC | Purchase Price payable to Seller | $ 489,546,290 |
| Prime Hospitality LLC | Balance of the Gwinnett purchase price after payment of debt costs and closing costs | $ 4,110,604 |
| Sellers' Cash Receipts from First American Closing Account | | $ 1,776,421,344 |

*Source: First American Final Settlement Statement (ESH0000178-180)*
*Simpson Thacher Escrow Instructions, Exhibit I. (BLA-000778-820)*

The reference above to cash receipts for the Gwinnett purchase price relates to a hotel that was owned by a Blackstone affiliate.[143] The Gwinnett County hotel was included in the 684 hotels sold to the Buyer.[144] The closing of the Gwinnett property sale occurred

---

[141] The total debt repayment amount of $5,747,900,327 includes the repayment of debt to Wilmington Trust Company in the amount of $691,860,442. This amount was included in the fees section of the First American Final Settlement Statement [Bates Nos. ESH0000178-180].

[142] First American wire transfer confirmations (Catalyst 00019092).

[143] Acquisition Agreement [Bates Nos. DL_LS_EXMN0058833-0058919].

[144] *Id.*

simultaneously with the Closing of the Acquisition, and some of the funds the seller was entitled to receive from the sale on the Gwinnett County property were directed to be deposited into a separate account.[145]

In addition, an analysis of the timing of deposits and disbursements from the First American closing account reflects the Buyer's credits that were used to fund the sellers' charges. More specifically, a first-in-first-out ("FIFO") approach provides the source of the disbursements based on the timing of the deposits. *See* Exhibit III-D-3 for a summary of the FIFO analysis performed on the First American closing account. The following table isolates the sources of the funds used to pay the Sellers approximately $1.8 billion using the FIFO approach:

| Summary of FIFO Analysis of First American Closing Account | | | | |
|---|---|---|---|---|
| | BHAC IV, LLC | Prime Hospitality LLC | Blackstone Hospitality Acquisitions LLC | Total |
| Sellers' Cash Receipts | $1,282,764,450 | $ 4,110,604 | $ 489,546,290 | $1,776,421,344 |
| Time of Transfer on 6/11/2007 | 3:10 PM | 3:10 PM | 3:21 PM | |
| Sourced to Borrower's Lenders | $1,282,764,450 | $ 4,110,604 | $ 302,578,052 | $1,589,453,106 |
| Sourced to Buyer's Equity | $          - | $            - | $ 186,968,238 | $  186,968,238 |
| **Total** | $1,282,764,450 | $ 4,110,604 | $ 489,546,290 | $1,776,421,344 |

*Source: Exhibit III-D-3*

At the Closing, the Sellers also received directly from Chicago Title the Earnest Money of $85,611,011, resulting in the Sellers receiving total cash of approximately $1.862 billion from the Acquisition.[146] *See* Exhibit III-D-4 for a summary of the Buyer's and Sellers' cash deposits and receipts. A summary of the wire transfer instructions showing the beneficiaries and accounts receiving the funds is included in the following table.[147] [148]

---

[145] The Acquisition Agreement provided that BHAC and Homestead were not responsible for any fees or purchase costs in connection with the conveyance of the property's fee simple title.

[146] The Earnest Money was wired directly from an escrow account at Chicago Title to the Sellers under direction from DL-DW and the Sellers. Joint Instruction Letter [Bates Nos. BLA000822-000825].

[147] The Examiner also learned that approximately 75 employees of HVM received approximately $100 million from Blackstone based on an existing equity incentive compensation plan as a result of the Closing of the

| Sellers' Account Information Receiving Cash | | | |
|---|---|---|---|
| Account Name | Bank | Account Number | Amount |
| BHAC IV, LLC | JP Morgan Chase | XXX-XX3893 | $ 1,282,764,450 |
| Blackstone Hospitality Acquisitions LLC | JP Morgan Chase | XXX-XX8077 | $ 489,546,290 |
| Prime Hospitality LLC | JP Morgan Chase | XXX-XX8984 | $ 4,110,604 |
| BHAC IV, LLC | JP Morgan Chase | XXX-XX3893 | $ 85,611,012 |
| Sellers' Total Cash Receipts | | | $ 1,862,032,356 |

*Sources:*
*First American Final Settlement Statement (ESH0000178-180).*
*Simpson Thacher Escrow Instructions (BLA-000778-820).*

As a result of the Acquisition, the Mortgage Debt increased by $749.4 million[149] and the Mezzanine Debt increased by $905.3 million.[150] The following table summarizes the changes in the pre- and post-Acquisition debt by the Mortgage Borrowers.[151]

---

Acquisition. Interview with Gary DeLapp, HVM, L.L.C., Offices of Weil, Gotshal & Manges, LLP, New York, New York, Nov. 24, 2009.

[148] Simpson Thacher & Bartlett LLP Escrow Instructions, dated June 11, 2007 [Bates Nos. BLA-000778-000820].

[149] If the Borrowers with a *reduction* in Mortgage Debt pre- vs. post-Acquisition are excluded from the calculations, the additional debt for the remaining Borrowers totals $802,910,156.

[150] If the Mezzanine A and Mezzanine D Borrowers (which had a lower amount of debt post-Acquisition) are excluded, the mezzanine debt increased approximately $1,097,014,037 for the remaining Mezzanine Borrowers. The payoff amounts for the pre-Acquisition debt include principal, accrued interest, prepayment penalties, and fees. *See* Blackstone debt payoff letters [Bates Nos. BLA-002016-002018, Bates Nos. BLA-002054-002055, Bates Nos. BLA-002075-002076, Bates Nos. BLA-001911-001914, Bates Nos. BLA-001815, Bates Nos. BLA-001826, Bates Nos. BLA-002029-002032, Bates Nos. BLA-001737-001746, Bates Nos. BLA-001681, Bates Nos. BLA-002020-002023, and Bates Nos. BLA-001753-001756].

[151] Eight new mezzanine entities were formed in conjunction with the Acquisition. The formation agreements for the eight new mezzanine entities contain similar language that is similar among the agreements, which states: "The Member has contributed to the Company property of an agreed value as listed in the books and records of the Company." *See, e.g.,* Limited Liability Company Agreement of ESH/Homestead Mezz 10 L.L.C. [Bates Nos. WACH031093-31125]. However, separate books and records are not maintained for any of the mezzanine entities. *See* Rogers Deposition at 136. Therefore, it appears, at least the eight mezzanine entities were not adequately capitalized at formation, if ever. The books and records, if any, of the Mortgage Borrowers and Mezzanine Borrowers were not available for the period before the Acquisition. Accordingly, what the pre-Acquisition books and records might reflect with respect to the capitalization of those entities is not known. However, it does appear that all of the Borrowers' formation documents contain similar provisions referring to the Borrowers' books and records to determine the amount of the Borrowers' initial capitalization.

| Summary of Pre and Post-Acquisition Mortgage Debt | | | |
|---|---|---|---|
| **Mortgage Borrower** | **Payoff Amount** | **New Debt** | **Difference** |
| BRE/ESA 2005 Portfolio L.L.C. | $ 83,175,203 | $ 73,966,369 | $ (9,208,834) |
| BRE/ESA 2005-San Jose L.L.C. | 11,092,362 | 14,909,595 | 3,817,233 |
| BRE/ESA 2005-Waltham L.L.C. | 12,215,677 | 10,611,061 | (1,604,616) |
| BRE/ESA Alaska L.L.C. | 36,721,553 | 42,129,064 | 5,407,511 |
| BRE/ESA Acquisition Properties L.L.C. | 32,285,382 | 37,039,636 | 4,754,254 |
| BRE/ESA Canada Properties Trust | 42,680,978 | - | (42,680,978) |
| ESA Canada Properties Borrower L.L.C. | - | 43,074,603 | 43,074,603 |
| BRE/ESA FL Properties, L.L.C. | 29,694,951 | 53,588,108 | 23,893,157 |
| BRE/ESA MD Borrower L.L.C. | 40,209,311 | 51,742,056 | 11,532,745 |
| BRE/ESA MN Properties L.L.C | 5,943,985 | 11,077,201 | 5,133,216 |
| BRE/ESA P Portfolio L.L.C. | 1,454,513,493 | 1,644,091,269 | 189,577,776 |
| BRE/ESA P Portfolio MD Borrower L.L.C. | 62,765,385 | 67,868,768 | 5,103,383 |
| BRE/ESA P Portfolio PA Properties L.L.C. | 49,945,630 | 56,883,343 | 6,937,713 |
| BRE/ESA P Portfolio TXNC Properties L.P. | 165,258,912 | 231,919,959 | 66,661,047 |
| BRE/ESA PA Properties L.L.C | 15,442,706 | 23,660,878 | 8,218,172 |
| BRE/ESA Properties, L.L.C. | 524,163,473 | 788,096,085 | 263,932,612 |
| BRE/ESA TX Properties L.P. | 76,406,016 | 133,373,679 | 56,967,663 |
| BRE/Homestead Portfolio L.L.C. | 83,781,941 | 90,901,914 | 7,119,973 |
| BRE/HV Properties L.L.C. | 544,241,841 | 620,741,761 | 76,499,920 |
| BRE/MSTX Property L.P. | 2,872,538 | 4,359,990 | 1,487,452 |
| BRE/TN Properties L.L.C. | 16,496,143 | 21,064,531 | 4,568,388 |
| BRE/TX Properties L.P. | 60,676,727 | 78,900,066 | 18,223,339 |
| **Total Mortgage Debt of Borrowers** | **$3,350,584,208** | **$4,099,999,936** | **$749,415,728** |

*Note:* Difference from the $4.1 billion mortgage amount due to rounding from allocation.

*Source: Exhibit III-D-5*

In the table above, the pre- and post-Acquisition Mortgage Debt was allocated based on the release prices for each of the mortgage loans and the principal balances for the pre-Acquisition line of credit used to acquire the properties held by BRE/ESA Alaska L.L.C. and BRE/ESA Acquisition Properties L.L.C. Additionally, the Mezzanine Debt was allocated to the individual Mezzanine Borrowers based on the release prices contained in the Mezzanine Loan Agreements. The following table is a summary of the pre- and post-Acquisition Mezzanine Debt aggregated for each level.

| Summary of Pre and Post- Acquisition Mezzanine Debt | | | |
|---|---|---|---|
| **Mezzanine Borrower** | **Payoff Amount** | **New Debt** | **Difference** |
| Mezzanine A Borrowers | $ 331,367,563 | $ 300,000,000 | $ (31,367,563) |
| Mezzanine B Borrowers | $ 207,940,351 | $ 400,000,000 | $ 192,059,649 |
| Mezzanine C Borrowers | $ 287,811,096 | $ 400,000,000 | $ 112,188,904 |
| Mezzanine D Borrowers | $ 560,325,301 | $ 400,000,000 | $ (160,325,301) |
| Mezzanine E Borrowers | $ 351,009,841 | $ 400,000,000 | $ 48,990,159 |
| Mezzanine F Borrowers | $ 304,245,380 | $ 400,000,000 | $ 95,754,620 |
| Mezzanine G Borrowers | $ 304,733,195 | $ 400,000,000 | $ 95,266,805 |
| Mezzanine H Borrowers | $ 47,246,099 | $ 200,000,000 | $ 152,753,901 |
| Mezzanine I Borrowers | $ - | $ 200,000,000 | $ 200,000,000 |
| Mezzanine J Borrowers | $ - | $ 200,000,000 | $ 200,000,000 |
| **Total Mezzaine Borrowers** | $2,394,678,827 | $3,300,000,000 | $ 905,321,173 |

*Source: See Exhibit III-D-6*

After the Acquisition, the Borrowers were subject to a significantly greater amount of debt than they were immediately prior to the Acquisition. This new incremental debt, totaling approximately $1.7 billion, greatly exceeded any direct or indirect benefits that might have been provided through the Acquisition. Indirect benefits theoretically could have included: the benefit of the new owners' experience; expected synergies that may have resulted from business plans and strategies expected to be employed by, and unique to, the new owner; any enhanced ability of the entity to borrow money that would make certain business opportunities available or provide opportunities for expansion; additional capital that was made available as a result of the Acquisition for capital improvements or expansion; and/or certain guarantees provided by the new owner. In fact, however, the new owner (the Lichtenstein/Lightstone entities) had no experience operating any hotel chain or an entity of this size and magnitude, nor were there any expected synergies or strategies that the new owner was bringing to the organization that could be called "consideration."

In addition, the borrowing capacity of the Company post-Acquisition was almost non-existent, and a pre-Acquisition line of credit that provided for hotel acquisition funding was

not available post-Acquisition.[152]  Therefore, the capital available for capital improvements or expansion was no greater (or even less than) before the Acquisition.  Finally, the so-called Lichtenstein guarantee of $100 million was only available to the Lenders under certain circumstances, including if the Company filed for bankruptcy, and therefore provided no value to the Company operating as a going concern.  *See* Section III.E.4 of this Report.  Therefore, any benefits to the Borrowers related to the new owner, if monetized, are negligible compared to the increase in debt, or the amount paid to the Sellers, as a result of the Acquisition.

### 3.      True-Up of Purchase Price

As required by the Acquisition Agreement, subsequent to the Closing, the Buyer and the Sellers agreed to a Schedule 1.6(b) final adjustment amount[153] of $241,141,000, which was greater than the estimated adjustment amount of $238,798,672.  Therefore, the Sellers were required to pay $2,342,000 to DL-DW.[154]  Blackstone wired the $2,342,000 true-up payment on October 17, 2007 from a Chase Bank account to an account at Bank of America, N.A. benefiting HV Properties LLC (account number XXXXXX0089).[155]

As a result of the final schedule 1.6(b) adjustment, the final purchase price amount pursuant to the Acquisition Agreement was $7,748,859,000 ($8,000,000,000, less the final schedule 1.6(b) adjustment amount of $241,141,000 and $10,000,000 Sellers' post Closing credit related to the July 26, 2007 letter agreement).[156]  Therefore, the new debt of $7.4 billion represented 95.4% of the final cash purchase price.

---

[152]   In the pre-Acquisition period, ESI had a line of credit that provided up to $105 million in available funding for the acquisition of hotels.  Extended Stay Inc. and Subsidiaries Consolidated Financial Statements as of June 10, 2007 [Bates Nos. ESH0003597-0003641].

[153]   Final Adjustment Schedule, dated September 21, 2007 [Bates Nos. ESH0076564-0076568].

[154]   *Id.*  The Final Adjustment Schedule only shows amounts rounded to the nearest thousand dollars.

[155]   Bank of America, N.A. Account Statement, dated October 31, 2007 [Bates Nos. ESH0076569].

[156]   Letter Agreement between Sellers and DL-DW dated July 26, 2007, where Sellers agreed to provide a Post Closing Credit in the amount of $10,000,000 if DL-DW entered into a purchase and sale agreement relating to the HPT properties [Bates Nos. ESH0076570-0076574].

## 4. **Recording of the Acquisition**

After the Closing, an opening balance sheet for DL-DW was prepared that considered the impact of the Acquisition and the appropriate allocation of the price paid for the Acquisition. The Acquisition was recorded as follows:

- The Mortgage Debt and the Mezzanine Debt were recorded at the ESI (database 10) and Homestead (database 03) accounting database levels, as opposed to being recorded by the individual legal entity Mortgage Borrowers or Mezzanine Borrowers;[157]
- Certain assets and liabilities, such as the hotel property and equipment amounts, were recorded at the database level (not the legal entity level) using property-specific general ledger codes within a database, as opposed to being recorded by the individual entity level; and
- The remaining asset, liability and equity amounts were recorded at certain accounting database levels (not the legal entity levels).[158]

Refer to Section III.F.2 of this Report, Accounting by the Company, for a detailed discussion related to how the Company maintained its books and records and the related accounting database levels (which did not include every legal entity or property level on a separate basis).

### **Opening Balance Sheet**

DL-DW accounted for the Acquisition as a business combination using the purchase method of accounting in accordance with Statement of Financial Accounting Standards No. 141, Business Combinations.[159] As required by GAAP, the Company performed a reconciliation of the price paid for the Acquisition to determine the total purchase price amount to be allocated, as summarized below:

---

[157] DLDW Pro Forma Consolidated Opening Balance Sheet [Bates Nos. ESH0075844-0076102] and Rogers Deposition at 141-143. 20% of the Mortgage Debt and Mezzanine Debt was recorded on the books of Homestead (database 03), and 80% of such debt was recorded on the books of ESI (database 10).

[158] DLDW Pro Forma Consolidated Opening Balance Sheet [Bates Nos. ESH0075844-0076102].

[159] DL-DW Consolidated Financial Statements for the year ended December 31, 2008 [Bates Nos. ESH0000107-0000164].

537960v2

| Reconciliation of Cash Purchase Price to Total GAAP Allocated Purchase Price | |
|---|---|
| **Description** | **Amount** |
| Cash Purchase Price | $ 7,748,859,000 |
| Adjusted For Acquisition Related Items: | |
| Professional Fees and Transfer Fees | 18,171,797 |
| Other Acquisition Related Adjustments | (4,115,547) |
| Plus Liabilities Assumed: | |
| Working Capital Liabilities Assumed | 123,038,333 |
| Subordinated Debentures at Fair Value | 36,465,775 |
| Capital Lease Obligations at Fair Value | 115,131,693 |
| Total GAAP Allocated Purchase Price | $ 8,037,551,051 |

*Sources: Purchase Price Allocation worksheet (ESH0076103) and Settlement Statement Accounting Reconciliation (ESH004505-004514)*

The amount paid was then allocated to the assets acquired, as of the date of the Closing.[160]  Based on preliminary estimates, the Company presented an allocation in the 12/31/07 audited financial statements.  This allocation was later adjusted based on the finalization of certain amounts and was presented in the 12/31/08 audited financial statements as follows:[161]

---

[160]  *Id.*

[161]  Although HVM is not owned by DL-DW, GAAP required the Company to consolidate the assets, liabilities, and results of activities of HVM with the Company's own financials.  Therefore, HVM's working capital assets were also considered when determining the appropriate Purchase Price allocations.

| Total Allocated Purchase Price per Audited Financial Statements | |
|---|---|
| **Description** | **Amount** |
| Cash | $ 47,199,000 |
| Other Assets | 81,774,000 |
| Property and Equipment | 7,217,066,000 |
| Capital Lease Asset | 115,000,000 |
| Land Available For Sale | 2,000,000 |
| Trademarks | 58,000,000 |
| Intangible Assets Subject to Amortization | 170,200,000 |
| Goodwill | 346,312,000 |
| Total GAAP Allocated Purchase Price | $ 8,037,551,000 |

*Source: DL-DW Consolidated Financial Statements for the year ended December 31, 2008 (ESH0000107-0000164).*

See Exhibit III-D-7 for a DL-DW Pro-Forma Consolidated Opening Balance Sheet prepared by the Company.[162]

### Pro Forma Balance Sheet for Borrowers

As previously discussed, the Mortgage Debt and the Mezzanine Debt were recorded at the ESI and Homestead accounting database levels, as opposed to being recorded by each legal entity Mortgage Borrower or Mezzanine Borrower. In addition, although the Loan Agreements required that each borrower maintain separate books and records, this was not done.

The Mezzanine Loan Agreements restricted the use of proceeds from the new debt resulting from the Acquisition. More specifically, these agreements provided that the proceeds be distributed to the more senior Mezzanine Borrower, and ultimately provided to the Mortgage Borrowers as an equity contribution as provided below.[163]

Borrower shall use the proceeds of the Loan solely to (a) make an equity contribution to Mortgage Borrower through Senior

---

[162] During 2007 and early 2008, the Company had prepared opening balance sheet schedules sufficient to appropriately adjust the Company's general ledger. However, the Company recently prepared a DL-DW Pro-Forma Consolidated Opening Balance Sheet in conjunction with this examination and therefore this pro-forma balance sheet was not subject to any independent auditing procedures. *See* Rogers Deposition at 98-103.

[163] *See* Mezzanine Loan Agreements § 2.1.4; (Catalyst ID 00006481, Mezzanine A Loan Agreement).

Mezzanine Borrower in order to cause Mortgage Borrower to use such amounts for any use permitted pursuant to Section 2.1.5 of the Mortgage Loan Agreement, (b) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender and (c) distribute the balance, if any, to Borrower.

However, this was not actually how the Borrowers received and distributed the loan proceeds. In fact, all the loan proceeds went into one account, and then were distributed in connection with the Closing, as previously discussed. Furthermore, the means by which the Borrowers accounted for the loan proceeds did not conform to the requirements of the Loan Agreements, because the Borrowers recorded no loan proceeds as equity contributions received at the Borrower entity levels.

Similarly, the Borrowers recorded no dividends or intercompany receivables or payables at the Borrower level entities. If the Borrowers had done what was required by the Loan Agreements, then their books and records should show a series of intercompany loans made to upstream entities, and finally to both Homestead and ESI, in order for the Acquisition to be completed by Homestead's and ESI's payment of the Purchase Price through the First American escrow account.[164]

In addition, the Mortgage Loan Agreement provided that:[165]

Borrower shall use the proceeds of the Loan solely to (a) repay or discharge any existing loans relating to the Properties, (b) pay all past-due Basic Carrying Costs, if any, with respect to the Properties, (c) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, (d) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (e) fund any working capital requirements of the Properties and (f) distribute the balance, if any, to Borrower.[166]

Finally, the Loan Agreements required each respective Borrower to maintain separate books and records.[167] Again, not only did the Borrowers not record the loan activity as

---

[164]  It is the Examiner's position that these transactions would be reflected as intercompany loans, rather than dividends, since the Loan Agreement prohibited the Borrower from making any dividends at the Closing because the Debt Yield test could not then be satisfied.

[165]  Mortgage Loan Agreement § 2.1.5 (Catalyst ID 00000811).

[166]  Interestingly, none of the authorized uses includes payment to the Sellers.

[167]  *See* Mortgage Loan Agreement (Catalyst ID 00000811).

required, but they also failed to maintain separate books and records as required.  If the Company had established and maintained separate books for each of the individual Mortgage Borrowers and Mezzanine Borrowers as of the Acquisition, then the accounting by the Mortgage Borrowers and Mezzanine Borrowers should have reflected:

- The Mortgage Debt and the related proceeds - at each legal entity level for the individual Mortgage Borrowers; allocated based on the release amounts included in Schedule 1.1(b) to the Mortgage Loan Agreement[168]; and

- The Mezzanine Debt and the related proceeds – at the legal entity level for the individual Mezzanine Borrowers; allocated based on the sum of the allocated release amounts included in Schedule 1.1(b) to the Mortgage Loan Agreement for the Mortgage Borrowers directly below the relevant Mezzanine Borrower.

E.    **Key Elements of Post-Acquisition Capital Structure**

1.    **Capital Structure**

a.    **Overview of CMBS Structure**

The Company's post-Acquisition capital structure can be summarized as follows: (a) the Mortgage Loan in the amount of $4.1 billion, secured by encumbrances on the Mortgaged Properties; and (b) ten tranches of Mezzanine Loans, in an aggregate amount of $3.3 billion, each tranche secured by the equity in the Borrower beneath it.  The capital structure was designed to permit the securitization of the Mortgage Loan by the sale of CMBS and, in fact, the Mortgage Loan has been so securitized.[169]

(1)    **Mortgage Loan**

The Mortgage Loan Agreement is between the Mortgage Lenders and twenty-one Mortgage Borrowers.[170]  All but three of the Mortgage Borrowers own properties.  The parent

---

[168]    *See, e.g.*, Mortgage Loan Agreement Schedule 1.1(b) (Catalyst ID 00000811).

[169]    As this Report will explain, the Examiner has concluded that, without directly encumbering the Mortgage Properties, the Mezzanine Loan structure nevertheless indirectly gave the Mezzanine Lenders subordinate interests in the Mortgage Properties.  *See* Andrew R. Berman, *"Once a Mortgage, Always a Mortgage" – The Use (and Misuse) of Mezzanine Loans and Preferred Equity Investments*, 11 Stan. J.L. Bus. & Fin. 76 (2005). This supports the Examiner's position that the Debtors' Estates ought to be substantively consolidated.  *See* Report § V.B.1.

[170]    *See* Mortgage Loan Agreement, recitals, at 1, and Schedule 1.1(a) (WACH000772-1009).  The Mortgage Borrowers are: ESA 2005 Portfolio L.L.C.; ESA 2005-San Jose L.L.C.; ESA 2005-Waltham L.L.C.; ESA Acquisition Properties L.L.C.; ESA Alaska L.L.C.; ESA Canada Properties Borrower L.L.C.;  ESA FL Properties L.L.C.; ESA MD Borrower L.L.C.; ESA MN Properties L.L.C.; ESA P Portfolio L.L.C.; ESA P

entities ("Property Owners") of the three non property-owning Mortgage Borrowers[171] are also parties to, but not borrowers under, the Mortgage Loan Agreement.[172]  In addition, four operating lessees[173] are parties to, but not borrowers under, the Mortgage Loan Agreement.

The Mortgage Borrowers signed the single consolidated Mortgage Note[174] in the amount of $4.1 billion.  The Mortgage Borrowers are jointly and severally liable under the Mortgage Note[175] and the Mortgage Loan Agreement.[176]

Each of the eighteen property-owning Mortgage Borrowers and Property Owners secured the Mortgage Loan by first-priority encumbrances[177] (the "Security Instruments") on their respective properties (the "Mortgaged Properties").[178]  In addition, pursuant to a separate "Trademark Security Agreement" executed concurrently with the Mortgage Loan Agreement,

---

Portfolio MD Borrower L.L.C.; ESA P Portfolio PA Properties L.L.C.; ESA P Portfolio TXNC Properties L.P.; ESA PA Properties L.L.C.; ESA Properties L.L.C.; ESA TX Properties L.P.; ESH/Homestead Portfolio L.L.C.; ESH/HV Properties L.L.C.; ESH/MSTX Property L.P.; ESH/TN Properties L.L.C.; and ESH/TX Properties L.P.

[171] ESA MD Borrower L.L.C. and ESA P Portfolio MD Borrower L.L.C. (collectively, "Maryland Borrower"), and ESA Canada Properties Borrower L.L.C. ("Canadian Borrower").

[172] ESA MD Properties Business Trust and ESP P Portfolio MD Trust (collectively, "Maryland Owner"), and ESA Canada Properties Trust and ESA Canada Trustee Inc. (collectively, "Canadian Owner" and, together with Maryland Owner, "Property Owners").

[173] ESA P Portfolio Operating Lessee Inc.; ESA 2005 Operating Lessee Inc.; ESA Operating Lessee Inc.; and ESA Canada Operating Lessee Inc. (collectively, "Operating Lessees").  *See* Mortgage Loan Agreement, recitals, at 1.

[174] *See* "Amended, Restated and Consolidated Promissory Note," dated June 11, 2007 (the "Mortgage Note") (Catalyst ID 00000029).

[175] Mortgage Note, Article XI(a), at 3.

[176] Mortgage Loan Agreement § 10.23, at 174-75.

[177] Because the scope of the Investigation does not contemplate that the Examiner would conduct a perfection analysis concerning the recording and filing of mortgages and other financing documents, and because the Examiner was informed that such perfection analysis was being done by the Official Committee of Unsecured Creditors, the Examiner has not investigated the recordings and filings of the mortgages and other financing documents.  This Report assumes that such interests are perfected.

[178] In addition: (a) each Property Owner executed an "Indemnity Guaranty Agreement," dated June 11, 2007, in favor of the Mortgage Lenders, guaranteeing its respective subsidiary Mortgage Borrower's performance under the Mortgage Loan Agreement (Catalyst ID 00000043, 00000044); and (b) each beneficiary of each Property Owner executed a "Pledge and Security Agreement," dated June 11, 2007, pledging its beneficial interests in such Property Owner to the Mortgage Lenders as additional collateral for the Mortgage Loan (Catalyst ID 00000046, 00000047).

Homestead and BHAC each granted the Mortgage Lenders a security interest in the trademarks and licenses connected with the hotel properties (the "Hotel License").[179]

The Mortgage Loan Agreement, Mortgage Note, and Security Instruments are cross-collateralized and cross-defaulted.[180]

The Mortgage Loan is comprised of fixed and floating rate components. The fixed components bear interest at various fixed rates.[181] The floating components bear interest at various fluctuating rates, defined as LIBOR plus spread.[182] Default interest is roughly 4% above the regular interest rates.[183] In addition, there is a late payment charge of 5% of unpaid amounts.[184]

With respect to the fixed rate components, the Mortgage Loan matures in June, 2012.[185] With respect to the floating rate components, the Mortgage Loan matured in June, 2009;[186] with three optional extensions of one year each; provided, however, that with respect to each extension period for which the Debt Yield[187] was less than certain specified percentages,[188]

---

[179] *See* "Trademark Security Agreement," dated June 11, 2007, between Homestead and BHAC, on the one hand, and the Mortgage Lenders, on the other (Catalyst ID 00000823).

The Mortgage Loan was additionally collateralized in connection with the following agreements:

(a) the "Collateral Assignment of Note," dated June 11, 2007, pursuant to which ESA Properties LLC assigned its interest in a $8.05 million note from BRE/Baton Operating Lessee Inc. to the Mortgage Lenders (Catalyst ID 00000051); and

(b) the "Account Control Agreement," dated July 13, 2007, pursuant to which DL-DW set up a segregated bank account (to be used only "for working capital expenses (including debt service) incurred with respect to the [Mortgage] Property for which cash flow therefrom is not sufficient to pay"), and granted the Mortgage Lenders a security interest therein (Catalyst ID 00000049).

[180] Mortgage Loan Agreement § 10.18(a), at 172.

[181] *See* definition of "Fixed Interest Rate," Mortgage Loan Agreement, at 14.

[182] *See* definitions of "Floating Interest Rate" and "Spread," Mortgage Loan Agreement, at 14 & 52.

[183] *See* definition of "Default Rate," Mortgage Loan Agreement, at 11.

[184] Mortgage Loan Agreement § 2.3.4, at 63.

[185] *See* definition of "Maturity Date," Mortgage Loan Agreement, at 24.

[186] *See id.*

[187] The definition of "Debt Yield" can be roughly summarized as a fraction: (a) the numerator of which is net operating income *less* (i) assumed management, marketing and franchise fees equal to 4% gross income, (ii) replacement reserve fund contributions equal to 4% gross income, and (iii) income generated by leased properties; and (b) the denominator of which is the combined total outstanding principal balances on the Mortgage Loan and the Mezzanine Loans. *See* definition of "Debt Yield," Mortgage Loan Agreement, at 10; *infra* note 241.

[188] *See* definition of "Debt Yield Amortization Threshold," Mortgage Loan Agreement, at 10.

the Mortgage Borrowers were required to make amortization payments[189] to the Mortgage

Lenders.[190]

      With respect to use of the Mortgage Loan proceeds, the Mortgage Loan

Agreement provides that:

> Borrower shall use the proceeds of the Loan solely to (a) repay or
> discharge any existing loans relating to the Properties, (b) pay all past-due
> Basic Carrying Costs, if any, with respect to the Properties, (c) make
> deposits into the Reserve Funds on the Closing Date in the amounts
> provided herein, (d) pay costs and expenses incurred in connection with
> the closing of the Loan, as approved by Lender, (e) fund any working
> capital requirements of the Properties[191] and (f) distribute the balance, if
> any, to Borrower.[192]

      Notably, the authorized uses do not include a specific reference to the payment to

the Sellers under the Acquisition Agreement.  Moreover, notwithstanding this provision, the

Mortgage Loan proceeds were not received by any Mortgage Borrower.  To the contrary, all

Mortgage Loan proceeds were deposited in the First American escrow account and a substantial

portion was paid out to the Sellers under the Acquisition Agreement.  *See* Report Section III.D.

      The Mortgage Loan Agreement provides for the establishment of a "Cash

Management Account,"[193] in which the Mortgage Lenders are granted a first priority security

interest.[194]  The Mortgage Borrowers, Property Owners, Operating Lessees, and HVM are

required to deposit all rents, receipts payable, and all other amounts received in connection with

the Mortgaged Properties into applicable property and clearing accounts,[195] which are to be swept

---

[189]  *See* definition of "Amortization Payment," Mortgage Loan Agreement, at 3.

[190]  *See* Mortgage Loan Agreement § 2.2.8, at 61-62.

[191]  Mortgage Loan Agreement § 5.1.25 requires the Mortgage Borrowers to deposit at least $50 million into the
"Working Capital Reserve Account," in which the Mortgage Lenders have a security interest as additional
collateral for the Mortgage Loan.  Mortgage Loan Agreement § 5.1.25, at 116-117.

[192]  Mortgage Loan Agreement § 2.1.5, at 55-56.

[193]  Mortgage Loan Agreement § 2.6, at 83-84.

[194]  Mortgage Loan Agreement § 2.6.1(a), at 83.

[195]  Mortgage Loan Agreement § 2.6.1(b), at 83.

537960v2

daily into a single, commingled Cash Management Account.[196]  Distribution of funds from the Cash Management Account is governed by the Mortgage Cash Management Agreement.[197]

        The Mortgage Loan is non-recourse (*i.e.*, the Mortgage Lenders' recovery is limited to the value of the Mortgaged Properties),[198] except that the Mortgage Lenders may recover damages caused by certain circumstances,[199] including the Mortgage Borrowers' breach of the special purpose entity/separateness representations.[200]  In addition, the Mortgage Loan Agreement provides that the Mortgage Loan becomes fully recourse upon the filing for bankruptcy by or against any Mortgage Borrower, Property Owner, or Operating Lessee.[201]

        The Mortgage Loan Agreement provides that it is governed by New York law.[202]

### (2)    **Mezzanine Loans**

        The Mortgage Borrowers, Property Owners, and Operating Lessees divide into three groups.  The first group is directly owned by ESA Mezz L.L.C.; the second group by ESA P Mezz L.L.C.; and the third group by ESH/Homestead Mezz L.L.C.  Each of these three mezzanine entities is, in turn, owned by another set of three mezzanine entities: ESA Mezz 2 L.L.C.; ESA P Mezz 2 L.L.C.; and ESH/Homestead Mezz 2 L.L.C.  There are another eight mezzanine entities up each of the three ownership chains: (1) ESA Mezz [3 - 10] L.L.C; (2) ESA P Mezz [3 - 10] L.L.C.; and. (3) ESH/Homestead Mezz [3 - 10] L.L.C.

---

[196]    Mortgage Loan Agreement § 2.6.1(c), at 83-84.

[197]    Mortgage Loan Agreement § 2.6.1(c), at 83-84; *see infra* Section IV.E.2 for a discussion of the Cash Management Agreement.

[198]    Mortgage Loan Agreement § 9.4(a), at 159.

[199]    Mortgage Loan Agreement § 9.4(a)(i)-(xix), at 159-61.  These non-recourse exceptions – colloquially referred to as "bad boy" provisions – include fraud, intentional misrepresentation, conversion, and the like.

[200]    Mortgage Loan Agreement § 9.4(a)(viii) & (xi), at 160-61.

[201]    Mortgage Loan Agreement § 9.4(b), at 162.  Under section 1111(b) of the Bankruptcy Code, a non-recourse loan is treated as having recourse with certain exceptions.  11 U.S.C. § 1111(b).  These exceptions include the sale of the collateral under Section 363 of the Bankruptcy Code, 11 U.S.C. § 363, or under a plan of reorganization.  11 U.S.C. § 1111(b)(1)(A)(ii).  This Report assumes that the exceptions do not apply and, therefore, that the Mortgage Loan and the Mezzanine Loans are recourse.

[202]    Mortgage Loan Agreement § 10.3, at 165-66.

537960v2

The ESA and ESA P ownership chains both wind their way up through: ESI; BHAC; Homestead; DL-DW; Lightstone; and Mr. Lichtenstein. The ESH/Homestead ownership chain goes through: Homestead; DL-DW; Lightstone; and Mr. Lichtenstein.

Imposed upon this ownership structure are ten tranches of Mezzanine Loans, labeled Mezzanine A Loan, Mezzanine B Loan, Mezzanine C Loan, etc., to and including Mezzanine J Loan.[203]

Each Mezzanine Loan Agreement[204] is between the applicable Mezzanine Lender and three equal-level mezzanine entities, one from each of the three ownership chains: (1) ESA Mezz [2 - 10] L.L.C; (2) ESA P Mezz [2 - 10] L.L.C.; and (3) ESH/Homestead Mezz [2 - 10] L.L.C.[205]

Mezzanine A Loan is in the amount of $300 million; Mezzanine B to G Loans are in the amount of $400 million each; and Mezzanine H to J Loans are in the amount of $200 million each, for an aggregate amount of $3.3 billion.

Each set of three Mezzanine Borrowers signed a single consolidated Mezzanine Note[206] in the amount of its Mezzanine Loan. Each of the three Mezzanine Borrowers is jointly and severally liable under the Mezzanine Note and Mezzanine Loan Agreement.[207]

Each of the three Mezzanine Borrowers "is the legal and beneficial owner of all direct interests in" the Borrower beneath it (*i.e.*, each of the three Mezzanine A Borrowers owns

---

[203]  These ten tranches of Mezzanine Loans are indirectly the second, third, fourth, fifth, etc., loans against the Mortgage Properties. As remarked *supra* note 169, this evidences that the Mezzanine Loan structure indirectly gave the Mezzanine Lenders subordinate interests in the Mortgage Properties.

[204]  *See* Catalyst ID 00006481, 00006222, 00006251, 00006280, 00006309, 00006338, 00006367, 00006395, 00006423, 00006451.

[205]  *See, e.g.,* Mezzanine A Loan Agreement, at 1 (Catalyst ID 00006481). For example: ESA Mezz L.L.C., ESA P Mezz L.L.C., and ESH/Homestead Mezz L.L.C. are the Mezzanine Borrower on Mezzanine A Loan; ESA Mezz 2 L.L.C., ESA P 2 Mezz L.L.C., and ESH/Homestead Mezz 2 L.L.C. are the Mezzanine Borrower on Mezzanine B Loan; and ESA Mezz 3 L.L.C., ESA P Mezz 3 L.L.C., and ESH/Homestead Mezz 3 L.L.C. are the Mezzanine Borrower on Mezzanine C Loan, etc.

[206]  *See, e.g.*, "Promissory Note (Mezzanine A Loan)," dated June 11, 2007 (the "Mezzanine A Note") (Catalyst ID 00006192). The provisions of all ten Mezzanine Loan Agreements and Mezzanine Notes are virtually identical. Hence, for ease of reference, Section III.E of the Report will cite to the Mezzanine A Loan Agreement and Mezzanine A Note as representative of all.

[207]  *See, e.g.,* Mezzanine A Loan Agreement § 10.23, at 148-49; Mezzanine A Note, Article XI, at 3.

70

all direct equity interests in the Mortgage Borrowers in its respective ownership chain; each of the three Mezzanine B Borrowers owns all direct equity interests in the Mezzanine A Borrower directly beneath it in its respective ownership chain; each of the three Mezzanine C Borrowers owns all direct equity interests in the Mezzanine B Borrower directly beneath it in its respective ownership chain, etc.).[208]

Each Mezzanine Borrower entered into a "Pledge and Security Agreement," dated June 11, 2007, granting the Mezzanine Lender a first priority security interest in its equity interests in the Borrower directly beneath it in its respective ownership chain (the "Collateral").[209]

Each Mezzanine Loan accrued interest at a floating rate of LIBOR plus spread,[210] defined as an increasingly higher percentage from Mezzanine A Loan to Mezzanine J Loan.[211] Default interest is 4% higher than the regular interest rate.[212] In addition, there is a late payment charge of 5% of unpaid amounts.[213]

Each Mezzanine Loan matured in June 2009, with three optional extensions of one year each;[214] provided, however, that with respect to each extension period for which the Debt Yield[215] was less than certain specified percentages,[216] the Mezzanine Borrowers were required to make amortization payments[217] to the applicable Mezzanine Lender.

With respect to use of the Mezzanine Loan proceeds, the Mezzanine Loan Agreements provide that:

> Borrower shall use the proceeds of the Loan solely to (a) make an equity
> contribution to Mortgage Borrower [through Senior Mezzanine

---

[208] *See, e.g.,* Mezzanine A Loan Agreement, at 2.

[209] *See, e.g.,* Mezzanine A Loan Agreement, at 2. *See supra* note 177 regarding perfection.

[210] *See, e.g.,* definitions of "Floating Interest Rate" and "Spread," Mezzanine A Loan Agreement at 11, 42.

[211] For example, the spread for the Mezzanine A Loan was 1.75%, and the spread for the Mezzanine J Loan was 7%.

[212] *See, e.g.,* definition of "Default Rate," Mezzanine A Loan Agreement at 9.

[213] *See, e.g.,* Mezzanine A Loan Agreement § 2.3.4 at 52.

[214] *See, e.g.,* Mezzanine A Loan Agreement § 2.2.8 at 51.

[215] The Mezzanine Loan Agreements incorporate the definition of "Debt Yield" in the Mortgage Loan Agreement. *See supra* note 187; *see, e.g.,* definition of "Debt Yield," Mezzanine A Loan Agreement, at 8.

[216] *See, e.g.,* definition of "Debt Yield Amortization Threshold," Mezzanine A Loan Agreement, at 8.

[217] See, *e.g.,* definition of "Amortization Payment," Mezzanine A Loan Agreement, at 3.

Borrower[218]] in order to cause Mortgage Borrower to use such amounts for any use permitted pursuant to Section 2.1.5 of the Mortgage Loan Agreement, (b) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender and (c) distribute the balance, if any, to Borrower.[219]

Notwithstanding the provisions in (a) above, the Mezzanine Loan proceeds were not received by any Mezzanine Borrower and were never contributed to the Mortgage Borrowers through any Senior Mezzanine Borrower by equity contributions, or otherwise. To the contrary, all Mezzanine Loan proceeds were deposited in the First American escrow account and a substantial portion was paid out to the Seller under the Acquisition Agreement. *See* Report at Section III.D.

The Mezzanine Loan Agreements acknowledge the establishment of a single, commingled Cash Management Account under the control of the Mortgage Lenders.[220] Provided no event of default has occurred, the Mortgage Lenders are to apply all funds in the Cash Management Account in accordance with the Mortgage Cash Management Agreement. Although the Mezzanine Lenders had no direct interest in the Mortgage Properties, the Mezzanine Lenders were nevertheless paid directly from the commingled Cash Management Account, comprising net rents from the Mortgage Properties, and not by the Mezzanine Borrowers themselves.[221]

The Mezzanine Loans are non-recourse (*i.e.*, the Mezzanine Lenders' recovery is limited to the value of the Collateral),[222] except that the Mezzanine Lenders may recover damages caused by certain circumstances,[223] including the Mortgage or Mezzanine Borrowers' breach of the special purpose entity/separateness representations.[224] In addition, the Mezzanine

---

[218] This bracketed language was included in the Mezzanine B-J Loan Agreements.

[219] *See, e.g.,* Mezzanine A Loan Agreement § 2.1.4, at 45.

[220] *See, e.g.,* Mezzanine A Loan Agreement § 2.6, at 63-66.

[221] The fact that the Mezzanine Lenders were paid directly from the proceeds of the Mortgage Properties evidences that the Mezzanine Loan structure indirectly gave the Mezzanine Lenders subordinate interests in the Mortgage Properties.

[222] *See, e.g.,* Mezzanine A Loan Agreement § 9.4(a), at 135.

[223] *See, e.g.,* Mezzanine A Loan Agreement § 9.4(a)(i)-(xix), at 136-38. *See supra* note 199.

[224] *See, e.g.,* Mezzanine A Loan Agreement § 9.4(a)(ix) & (x), at 136-37.

Loan Agreements provide that the Mezzanine Loans become fully recourse upon the filing for bankruptcy by or against the applicable Mezzanine Borrower, any Mortgage Borrower or any senior Mezzanine Borrower.[225]

The Mezzanine Loan Agreements provide that they are governed by New York law.[226]

### b.    SPE/Separateness Covenants

The Mortgage Loan Agreement and Mezzanine Loan Agreements each contain extensive special purpose entity and separateness representations and covenants, requiring, among other things, that:

(1)    each Mortgage Borrower, Operating Lessee, Property Owner and Principal[227] (collectively, "Mortgage Entity") and Mezzanine Borrower has not made and will not make any loans or advances to any Person and has not acquired and will not acquire obligations or securities of any Related Party;[228]

(2)    each Mortgage Entity and Mezzanine Borrower has paid and will pay its debts and liabilities from its assets as such debts and liabilities have become due;[229]

(3)    each Mortgage Entity and Mezzanine Borrower has done and will do all things necessary to observe organizational formalities;[230]

---

[225]    *See, e.g.,* Mezzanine A Loan Agreement § 9.4(b), at 138.  *See supra* note 199.

[226]    *See, e.g.,* Mezzanine A Loan Agreement § 10.3, at 140-41.

[227]    "Principal" is defined in the Mortgage Loan Agreement as "collectively (a) ESA TXGP L.L.C., (b) ESA MD Beneficiary L.L.C., (c) ESA Mezz L.L.C., (d) ESA P Portfolio TXNC GP L.L.C., a Delaware limited liability company, (e) ESA P Mezz L.L.C., a Delaware limited liability company, (f) Property Owner, (g) Maryland Beneficiary, (h) Canadian Owner, (i) ESH/TXGP L.L.C., a Delaware limited liability company, (j) ESH/MSTX GP L.L.C., a Delaware limited liability company, (k) ESH/TN Member Inc., a Delaware corporation, together with their successors and permitted assigns, (l) ESH/Homestead Mezz L.L.C., a Delaware limited liability company, and (m) Canadian Beneficiary."  Mortgage Loan Agreement at 40.

[228]    Mortgage Loan Agreement § 4.30(b)(v) & (xvii), at 96-97; Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xxvii), at 51; Mezzanine A Loan Agreement § 4.30(c)(v) & (xvii), at 75-76; Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xxvii), at 41.

[229]    Mortgage Loan Agreement § 4.30(b)(vi), at 96; Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (ix) & (xvii), at 49; Mezzanine A Loan Agreement § 4.30(c)(vi), at 75; Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (ix) & (xvii), at 39-40.

[230]    Mortgage Loan Agreement § 4.30(b)(vii), at 96; Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xviii), at 49; Mezzanine A Loan Agreement § 4.30(c)(vii), at 75; Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xviii), at 40.

    (4)        each Mortgage Entity and Mezzanine Borrower will maintain all of its books, records, financial statements, and bank accounts separate from those of any other Person. Each Mortgage Entity and Mezzanine Borrower has filed and will file its own tax returns, except to the extent it is required by law to file consolidated returns. Each Mortgage Entity and Mezzanine Borrower has maintained and will maintain its books as official records;[231]

    (5)        each Mortgage Entity and Mezzanine Borrower has conducted and will conduct its business in its own name, has not identified and will not identify itself or any of its Affiliates as a division or part of the other, and has maintained and utilized and will maintain and utilize separate stationery, invoices, and checks bearing its own name;[232]

    (6)        except as expressly permitted under the applicable Mortgage Loan Agreement, Mezzanine Loan Agreement, or Cash Management Agreement, each Mortgage Entity and Mezzanine Borrower will not commingle its assets with those of any other Person and will hold all of its assets in its own name;[233]

    (7)        each Mortgage Entity and Mezzanine Borrower has not guaranteed or become obligated for the debts of any other Person or held itself out as being responsible for the debts of any other Person;[234]

    (8)        each Mortgage Entity and Mezzanine Borrower has not pledged and will not pledge its assets for the benefit of any other person other than with respect to the Mortgage Loan or Mezzanine Loans, as applicable;[235]

---

[231]    Mortgage Loan Agreement § 4.30(b)(viii), at 96-97; Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xi) & (xvi) at 49; Mezzanine A Loan Agreement § 4.30(c)(viii), at 75; Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xi) & (xvi), at 39-40.

[232]    Mortgage Loan Agreement § 4.30(b)(ix), at 97; Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (x), (xv), (xxiii), (xxv) & (xxviii), at 49-51; Mezzanine A Loan Agreement § 4.30(c)(ix), at 75; Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (x), (xv), (xxiii), (xxv) & (xxviii), at 39-41.

[233]    Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xiii) & (xiv), at 49; Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xiii) & (xiv), at 39.

[234]    Mortgage Loan Agreement § 4.30(b)(xi), at 97; Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xx), at 50; Mezzanine A Loan Agreement § 4.30(c)(xi), at 76; Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xx), at 40.

[235]    Mortgage Loan Agreement § 4.30(b)(xiii), at 97; Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xxiv), at 50; Mezzanine A Loan Agreement § 4.30(c)(xiii), at 76; Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xxiv), at 40.

(9)     each Mortgage Entity and Mezzanine Borrower is and will remain solvent and has and will maintain adequate capital in light of its contemplated business operations;[236]

(10)    each Mortgage Entity and Mezzanine Borrower has maintained and will maintain a sufficient number of employees in light of its contemplated business operations and has paid the salaries of its own employees from its own funds;[237]

(11)    the Mortgage Borrowers, Property Owners, and Operating Lessees, collectively, will assume or incur no liabilities except the Mortgage Loan, Operating Rent Credits not to exceed $10 million, and "liabilities incurred in the ordinary course of business relating to the ownership and operation of the Mortgaged Properties (excluding Taxes and Other Charges) and the routine administration of Borrower, in amounts not to exceed in the aggregate two percent (2.0%) of the outstanding principal amount of the Loan (and with respect to liabilities that are specific to an Individual Property, five percent (5%) of the aggregate amount of the Release Amounts and the Mezzanine Release Amounts for such Individual Property, provided that when aggregated with the amount of liabilities that are specific to any other Individual Mortgaged Properties, shall in no event exceed two percent (2.0%) of the outstanding principal amount of the Loan), which liabilities are not more than sixty (60) days past the date incurred, are not evidenced by a note and are paid when due;"[238]

(12)    each Mezzanine Borrower will assume or incur no liabilities except the Mezzanine Loan and "liabilities incurred in the ordinary course of business relating to the ownership and operation of the Collateral and the routine administration of Mortgage Borrower, in amounts not to exceed in the aggregate $10,000.00, which liabilities are not more than sixty (60) days past the date incurred, are not evidenced by a note and are paid when due;"[239] and

(13)    each Mortgage Entity and Mezzanine Borrower will maintain its assets and liabilities in such a manner that it will not be costly or

---

[236]   Mortgage Loan Agreement § 4.30(b)(xiv), at 97; Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (ix), at 49; Mezzanine A Loan Agreement § 4.30(c)(xiv), at 76; Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (ix), at 39.

[237]   Mortgage Loan Agreement § 4.30(b)(xv), at 97; Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xvii), at 49; Mezzanine A Loan Agreement § 4.30(c)(xv), at 76; Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xvii), at 40.

[238]   Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xix), at 50.

[239]   Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xix), at 40.

difficult to segregate, ascertain or identify its individual assets and liabilities from those of any other person.[240]

### c.    Debt Yield and Financial Reporting Covenants

#### (1)    Debt Yield

As noted above, the Mortgage Loan Agreement's definition of "Debt Yield" can be roughly summarized as a fraction: (a) the numerator of which is net operating income less (i) assumed management, marketing, and franchise fees equal to 4% gross income, (ii) replacement reserve fund contributions equal to 4% gross income, and (iii) income generated by leased properties; and (b) the denominator of which is the combined total outstanding principal balances on the Mortgage Loan and the Mezzanine Loans.[241]  The Mezzanine Loan Agreements incorporate this definition.[242]

The Mortgage and Mezzanine Borrowers have not represented or covenanted that they will meet any specific Debt Yield numbers.  Nevertheless, the failure of the Borrowers to meet certain Debt Yield numbers has the following significant consequences:

(1)    a "Debt Yield Event"[243] occurs, which triggers a "Cash Trap Event"[244] and stops excess cash from operations (after taxes, reserves, and debt service) from going to pay

---

[240]    Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xxvi), at 51; Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xxvi), at 41.

[241]    Mortgage Loan Agreement, at 10.  "Debt Yield" is defined in full as:

for any date of determination, the percentage obtained by dividing:

(a)    the Net Operating Income (excluding interest on credit accounts) for the immediately preceding twelve (12) month period for those Properties subject to the Lien of a Security Instrument as of such date of determination as set forth in the statements required hereunder, less (A) the greater of (x) actual management, franchise and marketing fees (or if managed or franchised by an unaffiliated third party, pro forma contractual management, franchise and marketing fees) and (y) assumed management, marketing and franchise fees equal to four percent (4.0%) of Gross Income from Operations, (B) Replacement Reserve Fund contributions equal to four percent (4%) of Gross Income from Operations, and (C) income generated from the HPT Properties; by

(b)    the sum of (i) the aggregate of all Cash Trap Exception Prepayments and Mezzanine Cash Trap Exception Prepayments made during the term of the Loan and (ii) the sum of the outstanding principal balances of (x) all Components comprising the Loan and (y) the Mezzanine Loans, less the aggregate of the principal balances of any Defeased Notes.

*Id.*

[242]    *See, e.g.,* Mezzanine A Loan Agreement, at 8.

[243]    Mortgage Loan Agreement, at 10-11; *see, e.g.,* Mezzanine A Loan Agreement, at 8.

"Debt Yield Event" is defined as "(a) as of the seventh (7th) through and including the twelfth (12th) Payment Dates, a Debt Yield of less than 7.5%, (b) as of the 13th through and including the 24th Payment Dates, a Debt

costs of operations outside of the Approved Annual Budget under the Cash Management Agreement, including capital expenditures beyond the 4% FF&E reserve;[245]

(2)    if the Debt Yield is below the "Debt Yield Amortization Threshold,"[246] then the Borrowers must make "Amortization Payments"[247] on the floating rate portion of the Mortgage Loans beginning on June 12, 2009;[248] and

(3)    no equity distributions can be made (except to preferred equity in BHAC) by either the Mortgage Borrowers, the Property Owners, the Operating Lessees, or the Mezzanine Borrowers unless the Debt Yield equals or exceeds 7.75%.[249]

On June 30, 2007, the Debt Yield was 7.09%.[250] By interpolation, the Debt Yield was less than 7.5% from and after the Closing. This means both that: (a) a Debt Yield Event would occur without significant improvement in the Debt Yield; and (b) equity distributions were prohibited from and after the Closing[251] since the Debt Yield never improved in any material respect.

---

Yield of less than 7.65%, (c) if the applicable Extension Option is exercised, as of the 25th through and including the 36th Payment Dates, a Debt Yield of less than 7.9%, (d) if the applicable Extension Option is exercised, as of the 37th through and including the 48th Payment Dates, a Debt Yield of less than 8.0%, and (e) if the applicable Extension Option is exercised, as of the 49th through and including the Maturity Date, as extended, a Debt Yield of less than 8.1%." *Id.*

[244]    Mortgage Loan Agreement, at 7; *see, e.g.*, Mezzanine A Loan Agreement, at 6.

[245]    *See* discussion *infra* Section § IV.E.2.

[246]    Mortgage Loan Agreement, at 10; *see, e.g.*, Mezzanine A Loan Agreement, at 8.

"Debt Yield Amortization Threshold" is defined as "(i) with respect to the First Extension Period, 8.5%, (ii) with respect to the Second Extension Period, 9.5% and (iii) with respect to the Third Extension Period, 10.5%." *Id*.

[247]    Mortgage Loan Agreement, at 3; *see, e.g.*, Mezzanine A Loan Agreement, at 3.

[248]    Mortgage Loan Agreement § 2.2.8(g), at 62; see, *e.g.*, Mezzanine A Loan Agreement § 2.2.8(h), at 51.

[249]    Mortgage Loan Agreement § 5.2.13, at 127; *see, e.g.*, Mezzanine A Loan Agreement § 5.2.13, at 109-10.

[250]    A&M prepared an independent Debt Yield calculation in accordance with the methodology outlined in the Mortgage Loan Agreement on a monthly basis for the months of June 2007 through May 2009. Although the Mortgage Loan Agreement requires the Mortgage Borrowers to submit a calculation of the Debt Yield each month (*see* Section IV.E.1.c.ii *infra*), the Examiner has seen no such calculations submitted until January 21, 2008 (for the preceding 12 months, ending December 31, 2007). While, technically, a Debt Yield Event is only determined from the 7th payment date (*see* note 243 *infra*), the Company was out of compliance with the minimum Debt Yield requirements shortly following the Acquisition.

[251]    Except to preferred Series A-1 equity in BHAC.

537960v2

## (2)    <u>Financial Reporting</u>

The Mortgage Loan Agreement and Mezzanine Loan Agreements contain extensive virtually identical financial reporting covenants, which include:

(1)    Within 60 days after the end of each fiscal year, each Mortgage and Mezzanine Borrower must furnish its respective Lender with ESA's and Homestead Village's annual financial statements audited by a "Big Four" accounting firm and prepared according to GAAP. The financial statements must include an unqualified opinion of such accounting firm. Together with these financial statements, each Borrower must include an Officer's Certificate certifying whether there is an Event of Default and if so, what it is, how long it has existed, and what actions have been taken to remedy it.[252]

(2)    Within 20 days after each month, each Mortgage and Mezzanine Borrower must furnish its respective Lender with respect to the Mortgage Properties (and such Lender's Collateral, if applicable): (i) an occupancy report; (ii) monthly and year-to-date operating statements; (iii) a calculation of the Debt Yield on the last day of the month; and (iv) the amount of all operating rent due for the month. All calculations of the Debt Yield are subject to verification by each of the Lenders.[253]

(3)    Within 30 days after each quarter and each month, each Mortgage and Mezzanine Borrower must furnish its respective Lender with an Officer's Certificate stating that the monthly financials provided are accurate and that the representations and warranties set forth in Subsection (xix) of the definition of "Special Purpose Entity" are correct.[254] In sum, the Subsection (xix) representations are that ordinary course of business liabilities have not exceeded certain amounts and have been paid within 60 days of the date they were incurred.[255]

---

[252]    Mortgage Loan Agreement § 5.1.11(b), at 106; *see, e.g.*, Mezzanine A Loan Agreement § 5.1.11(b), at 85-86.

[253]    Mortgage Loan Agreement § 5.1.11(c), at 106-07; *see, e.g.*, Mezzanine A Loan Agreement § 5.1.11(c), at 86.

[254]    Mortgage Loan Agreement § 5.1.11(d), at 107; *see, e.g.*, Mezzanine A Loan Agreement § 5.1.11(d), at 86-87.

[255]    *See supra* Section IV.E.1.b points 11 & 12; Mortgage Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xix), at 50; *see, e.g.,* Mezzanine A Loan Agreement § 4.30(a) & definition of "Special Purpose Entity," (xix), at 40.

537960v2

(4)     Within 30 days before the start of each Fiscal Year, the Mortgage Borrowers and Property Owners must submit to the Mortgage Lenders a proposed Annual Budget, which is subject to the written approval of the Mortgage Lenders and the "Most Junior Mezzanine Lender."[256]

The Mortgage Lenders and Most Junior Mezzanine Lender must submit their objections to the proposed Annual Budget within 15 days after its receipt, and the Mortgage Borrowers must promptly revise and resubmit the proposed Annual Budget until both the Mortgage Lenders and Most Junior Mezzanine Lender approve the proposed Annual Budget. Until both the Mortgage Lenders and Most Junior Mezzanine Lender approve a proposed Annual Budget ("which approval shall not be unreasonably withheld or delayed"),[257] the most recent Approved Annual Budget applies.[258]

All expenses set forth in an Approved Annual Budget are deemed "Approved Operating Expenses," provided that in no event shall Capital Expenditures[259] or Management Fees[260] be Approved Operating Expenses. Management Fees and Approved Operating Expenses will be payable and disbursed in accordance with the Cash Management Agreement.[261]

---

[256]  "Most Junior Mezzanine Lender" is defined as "at the time of determination, the then most junior Mezzanine Lender that is not an Affiliate of Borrower, Principal or Sponsor." Mortgage Loan Agreement, at 33; *see, e.g.* Mezzanine A Loan Agreement, at 26. Notably, this approval right is given to the Most Junior Mezzanine Lender notwithstanding the fact that such Mezzanine Lender is not a lender to the Mortgage Borrowers. As remarked in note 169, *supra*, this evidences that the Mezzanine Loan structure indirectly gave the Mezzanine Lenders subordinate interests in the Mortgage Properties.

[257]  Mortgage Loan Agreement § 5.1.11(e), at 107; *see, e.g.*, Mezzanine A Loan Agreement § 5.1.11(e), at 87.

[258]  Mortgage Loan Agreement § 5.1.11(e), at 107-08; *see, e.g.*, Mezzanine A Loan Agreement § 5.1.11(e), at 87.

[259]  "Capital Expenditures" are defined as "for any period, the amount expended for items capitalized under GAAP and the Uniform System of Accounts (including expenditures for building improvements or major repairs)." Mortgage Loan Agreement, at 7; *see, e.g.*, Mezzanine A Loan Agreement, at 6.

[260]  "Management Fees" are defined as "collectively, base management and franchise fees payable to Manager and/or Franchisor pursuant to the Management Agreement and the Franchise Agreement, as applicable." Mortgage Loan Agreement, at 23; *see, e.g.*, Mezzanine A Loan Agreement, at 18.

[261]  *See infra* Report §IV.E.2.

537960v2

#### d.    **Prepayment/Release**

The Mortgage Borrowers can elect, under certain conditions, to prepay a portion of the Mortgage Loan.[262]  They may concurrently obtain a release of an Individual Property,[263] provided certain additional conditions are met,[264] including:

   (1)    there is no Event of Default (including a bankruptcy filing) under the Mortgage Loan Agreement;

   (2)    the amount to be repaid equals or exceeds the "Adjusted Release Amount;"[265]

   (3)    after giving effect to such release, the Debt Yield for the remaining Mortgage Properties equals or exceeds the "Release Debt Yield;"[266] and

   (4)    at the same time, each Mezzanine Borrower makes a partial repayment of its Mezzanine Loan equal to the "Mezzanine Adjusted Release Amount."[267]

The Mezzanine Loan Agreements contain similar provisions,[268] providing, upon partial repayment,[269] for the Mezzanine Borrower's "release . . . of [Mezzanine] Borrower's obligations under the [Mezzanine] Loan Documents with respect to such Individual Property . . . ."[270]

Again, such release can only be obtained if:

---

[262]   Mortgage Loan Agreement § 2.4, at 63-73.

[263]   "Individual Property" is defined as one of the Mortgaged Properties.  Mortgage Loan Agreement, at 20.

[264]   Mortgage Loan Agreement § 2.5.2, at 74-75.

[265]   *See* definition of "Adjusted Release Amount," Mortgage Loan Agreement, at 3.

[266]   *See* definition of "Release Debt Yield," Mortgage Loan Agreement, at 43.

[267]   *See* definition of "Mezzanine Adjusted Release Amount," Mortgage Loan Agreement, at 25.  This definition incorporates the Mezzanine Adjusted Release Amounts provided in each Mezzanine Loan Agreement.

   As remarked in note 169, *supra,* the fact that the Mezzanine Borrowers must prepay the Mezzanine Loans in order to release a Mortgage Property demonstrates that the Mezzanine Loan structure indirectly gave the Mezzanine Lenders subordinate interests in the Mortgage Properties.

[268]   *See, e.g.,* Mezzanine A Loan Agreement § 2.5.2, at 58-59.

[269]   *See, e.g.,* Mezzanine A Loan Agreement § 2.4, at 52-58.

[270]   *See, e.g.,* Mezzanine A Loan Agreement § 2.5.2, at 58.  "Individual Property" is defined in the Mezzanine Loan Agreements to mean the Mortgage Properties.  *See, e.g.,* Mezzanine A Loan Agreement, at 14-15.

   As remarked *supra* note 169, the fact that the Mezzanine Borrowers were required to prepay a portion of the Mezzanine Loans in order to release a Mortgage Property evidences that the Mezzanine Loan structure indirectly gave the Mezzanine Lenders subordinate interests in the Mortgage Properties.

(1)       there is no Event of Default (including a bankruptcy filing) under the applicable Mezzanine Loan Agreement;

(2)       the amount to be repaid on such Mezzanine Loan equals or exceeds the "Adjusted Release Amount;"[271]

(3)       after giving effect to such release, the Debt Yield for the remaining Mortgage Properties equals or exceeds the "Release Debt Yield;"[272] and

(4)       at the same time, the Mortgage Borrowers and all other Mezzanine Borrowers make partial repayments of their Loans equal to the applicable Adjusted Release Amount.

The Mortgage Loan and each Mezzanine Loan attach schedules listing Release Amounts for all of the individual Mortgage Properties.[273]

In addition, before Homestead or BHAC can sell the Hotel License to an unaffiliated third party, the Mortgage Borrowers and all of the Mezzanine Borrowers must prepay a portion of their respective Loans in an aggregate amount equal to the sale proceeds or an amount sufficient to achieve certain Debt Yield percentages.[274]

### e.      Events of Default/Borrowers' Rights to Cure

The Mortgage Loan Agreement and Mezzanine Loan Agreements contain similar provisions governing events of default and the applicable Borrowers' rights to cure.

---

[271] *See, e.g.,* definition of "Adjusted Release Amount," Mezzanine A Loan Agreement, at 2-3 (essentially the same as the "Adjusted Release Amount" in the Mortgage Loan Agreement).

[272] *See, e.g.,* definition of "Release Debt Yield," Mezzanine A Loan Agreement, at 35 (incorporating the definition of "Release Debt Yield" in the Mortgage Loan Agreement).

[273] Mortgage Loan Agreement, Schedule 1.1(b); Mezzanine A-J Loan Agreements, Schedule I.

In the case of the Mortgage Loan, the Release Amounts listed total $4.1 billion.

In the case of six of the Mezzanine Loans, the Release Amounts listed total the principal balance of the respective Mezzanine Loans. In the case of four of the Mezzanine Loans, there was a discrepancy between the Release Amounts listed and the principal balance of the respective Mezzanine Loans. Based on information from counsel for the Mortgage Borrowers, it appears that the principal balances of these four loans were changed shortly after the Closing, but the Release Amount schedules were not updated to reflect the revised principal balances. Nevertheless, the aggregate Release Amounts total $3.3 billion, the aggregate principal balance of all ten Mezzanine Loans.

[274] Mortgage Loan Agreement § 5.2.10(g), at 124; *see, e.g.,* Mezzanine A Loan Agreement § 5.2.10(g), at 107.

Although the Mezzanine Lenders have no direct lien on the Hotel License, their Mezzanine Loans must be paid down before the Hotel License can be transferred. As remarked *supra* note 169 this release arrangement evidences that the Mezzanine Loan structure indirectly gave the Mezzanine Lenders subordinate interests in the Mortgage Properties.

Specifically, each of the Mortgage and Mezzanine Loan Agreements provides that

Events of Default include:[275]

(1)    if the applicable Borrower fails to pay any portion of the applicable debt, including any Amortization Payment, when due;[276]

(2)    if any representation or warranty made by the applicable Borrower in any loan document, or in any report, certificate, financial statement or other instrument, agreement or document is false or misleading in any material respect as of the date the representation or warranty was made; provided, however, that if such untrue representation or warranty is susceptible of being cured, the Borrower shall have the right to cure it within sixty days of receipt of notice from the applicable Lender;[277]

(3)    with respect to the Mortgage Loan, if any Mortgage Entity or Guarantor files for bankruptcy; and with respect to the Mezzanine Loans, if the applicable Mezzanine Borrower or any more senior Mezzanine Borrower, Mortgage Entity or Guarantor files for bankruptcy;[278]

(4)    if the applicable Borrower breaches any of its negative covenants, any of the special purpose entity/separateness covenants,[279] or any of its financial reporting covenants;[280]

(5)    if any of the assumptions in the Non-Consolidation Opinions is or becomes untrue in any material adverse respect;[281]

(6)    if the applicable Borrower continues to be in default of any other terms, covenants or conditions of the applicable Loan Agreement not otherwise specified for ten days after written notice to Borrower from Lender with respect to any monetary default, and thirty days after notice of any other default; provided, however, that if the Borrower commences to cure a non-monetary default within the thirty days, then the Borrower shall have such additional

---

[275]   Mortgage Loan Agreement § 8.1(a), at 146-49; *see, e.g.*, Mezzanine A Loan Agreement § 8.1(a), at 123-26.

[276]   Mortgage Loan Agreement § 8.1(a)(i), at 146; *see, e.g.*, Mezzanine A Loan Agreement § 8.1(a)(i), at 123.

[277]   Mortgage Loan Agreement § 8.1(a)(v), at. 147; *see, e.g.*, Mezzanine A Loan Agreement § 8.1(a)(v), at 123.

[278]   Mortgage Loan Agreement § 8.1(a)(vii), at 147; *see, e.g.*, Mezzanine A Loan Agreement § 8.1(a)(vii), at 123-24.

[279]   *See supra* Report § IV.E.1.b.

[280]   Mortgage Loan Agreement § 8.1(a)(ix), at 147; *see, e.g.*, Mezzanine A Loan Agreement § 8.1(a)(ix), at 124. *See infra* § III.E.1.c.ii for a discussion of the financial reporting covenants.

[281]   Mortgage Loan Agreement § 8.1(a)(xi), at 148; *see, e.g.*, Mezzanine A Loan Agreement § 8.1(a)(xi), at 124; *see* Report § III.E.1.g for a discussion of the Non-Consolidation Opinions.

537960v2

time as reasonably necessary to cure such default, up to ninety days;[282] and

(7)       an event of default under any more senior Loan Agreement.[283]

With respect to a breach of the subsection (xix) special purpose entity covenant (that ordinary course of business liabilities have not exceeded certain amounts and have been paid within sixty days of the date they were incurred), the applicable Borrower is given sixty days to cure a misrepresentation in a certificate,[284] but is given *no cure period* with respect to either the underlying breach[285] or the fact that such breach would cause one or more of the assumptions in the applicable Non-Consolidation Opinion[286] to be untrue.[287]

### f.      <u>Lenders' Remedies</u>

Upon the occurrence of an Event of Default, the applicable Lender may, without notice or demand, declare the applicable debt due and payable and take such other actions and exercise such other remedies available.[288]  If the Event of Default is caused by a bankruptcy filing, the applicable debt automatically becomes due and payable.[289]

### g.      <u>Non-Consolidation Opinions</u>

Before entering into the Mortgage Loan Agreement, the Mortgage Borrowers, Property Owners, Operating Lessees, and certain other Affiliates[290] (the "Requesting Mortgage

---

[282]    Mortgage Loan Agreement § 8.1(a)(xvi), at 148-49; *see, e.g.*, Mezzanine A Loan Agreement § 8.1(a)(xvi), at 125.

[283]    *See, e.g.*, Mezzanine A Loan Agreement § 8.1(a)(xix), at 125.  With respect to the Mezzanine A Loan, this includes an event of default under the Mortgage Loan; with respect to the Mezzanine B Loan, this includes an event of default under either the Mortgage Loan or the Mezzanine A Loan; with respect to the Mezzanine C Loan, this includes an event of default under either the Mortgage Loan, the Mezzanine A Loan or the Mezzanine B Loan, etc.

[284]    Mortgage Loan Agreement § 8.1(a)(v), at 147; *see, e.g.*, Mezzanine A Loan Agreement § 8.1(a)(v), at 123.

[285]    Mortgage Loan Agreement § 8.1(a)(ix), at 147; *see, e.g.*, Mezzanine A Loan Agreement § 8.1(a)(ix), at 124.

[286]    *See infra* § III.E.1.g.

[287]    Mortgage Loan Agreement § 8.1(a)(xi), at 148; *see, e.g.*, Mezzanine A Loan Agreement § 8.1(a)(xi), at 124.

[288]    Mortgage Loan Agreement §§ 8.1(b), 8.2 & 8.3, at 149-51; *see, e.g.*, Mezzanine A Loan Agreement §§ 8.1(b) & 8.2, at 125-28.

[289]    Mortgage Loan Agreement § 8.1(b), at 149; *see, e.g.*, Mezzanine A Loan Agreement § 8.1(b), at 125-26.

[290]    ESA P Portfolio TXNC GP L.L.C.; ESH/TN Member, Inc.; ESH/MSTX GP L.L.C.; ESH/TXGP L.L.C.; ESA TXGP L.L.C.; ESA Canada Beneficiary Inc.; ESA P Portfolio MD Beneficiary L.L.C.; and ESA MD Beneficiary L.L.C.

Entities") requested the law firm of Richards, Layton & Finger PA ("Richards, Layton") to provide a non-consolidation opinion letter. In addition, before entering into the Mezzanine Loan Agreements, each set of three Mezzanine Borrowers (the "Requesting Mezzanine Entities") requested Richards, Layton to provide non-consolidation opinion letters. (The Requesting Mortgage Entities, together with the Requesting Mezzanine Entities, are collectively referred to as the "Requesting Entities").

The eleven non-consolidation opinion letters (the "Non-Consolidation Opinions")[291] each dated June 11, 2007, are substantively identical.[292]

In each Non-Consolidation Opinion, Richards, Layton was asked to opine whether, in the event that any entity further up the ownership chain[293] from the Requesting Entities were to file for bankruptcy (such entities being referred to as the "Debtor Parties"), the bankruptcy court would disregard the separate legal existence of any of the Requesting Parties so as to order the consolidation of the assets and liabilities of any of the Requesting Parties with those of any of the Debtor Parties.[294]

In each Non-Consolidation Opinion, Richards, Layton made numerous assumptions, including that all of the special purpose entity/separateness representations and

---

[291]  The Mortgage Loan Agreement and Mezzanine Loan Agreements refer to the Non-Consolidation Opinions as "Insolvency Opinions." Mortgage Loan Agreement, at 20 ("Insolvency Opinion" shall mean that certain non-consolidation opinion letter dated the date hereof delivered by Richards, Layton & Finger, P.A. in connection with the Loan"); *see, e.g.,* Mezzanine A Loan Agreement, at 15 (same).

The Non-Consolidation Opinions do not examine, but instead merely assume, the Requesting Entities' solvency. In fact, there were no expert opinions provided concerning the solvency of the Mortgage or Mezzanine Borrowers at the time of the Acquisition.

[292]  *See* WACH030504-653; Catalyst ID 00006213, 00006242, 00006271, 00006300, 00006329, 00006358, 00006386, 00006414, 00006442, 00006470.

[293]  *See* Report § III.E.1.a.(2).

[294]  *See, e.g.,* Richards, Layton letter dated June 11, 2007 regarding "Project ESH – Mortgage Borrower" ("Mortgage Non-Consolidation Opinion"), at 3 (WACH030504-653).

covenants (discussed *supra* Report § IV.E.1.b) were and would remain true and correct,[295] and that each of the Requesting Entities was and would remain adequately capitalized and solvent.[296]

Richards, Layton concluded that a bankruptcy court would not order substantive consolidation, based principally, if not entirely, upon the accuracy of the special purpose entity/separateness representations and covenants. In reaching this opinion, Richards, Layton specifically noted that:

> First, the financial and business affairs of each Special Purpose Entity have been and will be segregated from those of the Debtor Parties as described herein, and it will not be costly to distinguish the financial and business affairs of any Special Purpose Entity from those of any of the Debtor Parties. *Thus, the assets and liabilities of each Special Purpose Entity will be readily ascertainable or otherwise distinguishable so as to preclude valid assertions of financial entanglement as a basis for granting a motion to substantively consolidate under any of the tests discussed above.*

> Second, . . . [a]s a result of each Special Purpose Entity's compliance with all limited liability company, trust, corporate or limited partnership, and other statutory formalities as they relate to separateness and preservation of all indicia of separateness as assumed above . . . *no creditors of any of the Debtor Parties should reasonably rely on the assets of any Special Purpose Entity to satisfy the obligations of any Debtor Party.*

> Third, the absence of other factors supports denying a motion to consolidate. For example: (i) except as contemplated by the Loan Documents and except as may be provided in the Guaranties, each Special Purpose Entity has paid and will pay its liabilities and expenses from its own assets; (ii) none of the Special Purpose Entities has referred and none will refer to itself as a division or department of any of the Debtor Parties; . . . (iv) as indicated above, each Special Purpose Entity has done all things necessary to observe and will observe in all material respects all formal legal requirements pertaining to its separateness; (v) as indicated above, *each Special Purpose Entity's respective assets and liabilities are not and should not become hopelessly entangled with those of any of the Debtor Parties or so scrambled that separating them would be prohibitive*

---

[295] *See, e.g.,* Mortgage Non-Consolidation Opinion, at 4-6, 12-19. As is clear from all of the Non-Consolidation Opinions, no due diligence was performed to verify that any of the special purpose entity representations and covenants were true and correct.

[296] *See, e.g.*, Mortgage Non-Consolidation Opinion, at 19. As is also clear from all of the Non-Consolidation Opinions, no due diligence was performed to verify that the Requesting Entities were and would remain adequately capitalized or were and would remain solvent.

*and hurt all creditors;* (vi) except as provided in the Guaranties, none of the Debtor Parties will hold itself out as being liable or its assets as being available for the payment of any liability of any Special Purpose Entity, and no Special Purpose Entity will hold out itself or its assets as being available for the payment of any liability of any of the Debtor Parties; (vii) *no Special Purpose Entity has commingled nor will commingle its assets with those of any Debtor Party,* and (viii) the Special Purpose Entities have observed and will observe all required limited liability company, statutory trust, corporate or limited partnership formalities, in accordance with the Operating Agreements and the Transaction Documents.[297]

Richards, Layton observed that the existence of the Guarantees (discussed in Report § III.E.4) is "a factor arguably *favoring substantive consolidation* . . . ."[298]  Nevertheless, "in the absence of other, *more critical factors* such as *commingling, fraudulent transfers, undercapitalization and disregard of corporate formalities,*" Richards, Layton concluded that "the existence of the Guarant[ees] does not alter our opinion set forth herein."[299]

###### h.      Amendments

####### (1)      Mortgage Loan

There were two amendments to the Mortgage Loan Agreement.

(1)      The "First Amendment to Loan Agreement," dated August 17, 2007, is between the same parties to the Mortgage Loan, with the addition of Ebury as a fourth Mortgage Lender.[300]  In essence, the First Amendment alters various existing components of the Mortgage Loan in principal amounts and interest rates, and adds several new components, as well.

(2)      The "Second Amendment to Loan Agreement and Guaranty Affirmation," dated April 15, 2008, is between the same parties to the Mortgage Loan, except that the Mortgage Lenders had transferred their interest to Wachovia Bank Commercial Mortgage Trust in connection with the securitization ("Mortgage Loan Second Amendment").[301]

---

[297]   *See, e.g.,* Mortgage Non-Consolidation Opinion, at 27-28 (emphasis added).

[298]   *See, e.g.*, Mortgage Non-Consolidation Opinion, at 29 (emphasis added).

[299]   *See, e.g.*, Mortgage Non-Consolidation Opinion, at 30 (emphasis added).

[300]   *See* Catalyst ID 00000041.

[301]   *See* Catalyst ID 00006480.

The Mortgage Loan Second Amendment adds a new section 5.2.14 to the Mortgage Loan, which contains extensive restrictions on the Mortgage Borrowers' use of income, cash, fees, proceeds, property or revenue from the Mortgaged Properties (including disbursements to the Mortgage Borrowers of excess cash flow under the Cash Management Agreement) ("Restricted Excess Cash Flow"). In essence, the new section 5.2.14 prohibits the Mortgage Borrowers' distribution of Restricted Excess Cash Flow to any Affiliate or other Person except: (a) to make disbursements from the Preferred Equity Subaccount in the Cash Management Agreement and any additional amounts required to pay the "Preferred Return" to preferred equity in BHAC; (b) to pay Management Fees or required reimbursements, to the extent and in the priority provided in the Cash Management Agreement; (c) to make distributions, contributions, or other transfers among the Individual Mortgage Borrowers to pay debt service on the Mortgage and Mezzanine Loans; (d) to pay Corporate Taxes; (e) to make intercompany transfers among the Mortgage Borrowers and Mezzanine Borrowers; (f) to make intercompany transfers to pay certain expenses relating to the Mortgaged Properties; and (g) for "General Corporate Purposes," defined as expenses of running the business of the Mortgage Borrowers and Mezzanine Borrowers.[302]

Moreover, the new section 5.2.14 requires the Mortgage Borrowers to "use commercially reasonable efforts" to cause any contributions, distributions, or other transfers of Restricted Excess Cash Flow intended to be between the Mortgage Borrowers or the Mezzanine Borrowers to be completed as a direct transfer or intercompany loan between the individual Mortgage Borrowers or Mezzanine Borrowers and not to include any intermediate transfers or loans to ESI, BHAC, Homestead, or any other Person. If, however, such contributions, distributions or transfers are made to include intermediate transfers or loans, the Mortgage Borrowers will not be in breach of the new section 5.2.14, provided that (a) such transfers are made as expeditiously as possible or such loans are immediately repaid or transferred to the

---

[302] _See_ Mortgage Loan Second Amendment, § 1.1 (Section 5.2.14(a)), at 3-5.

Mortgage or the Mezzanine Borrowers; and (b) the Mortgage Borrowers and the Guarantors indemnify the Mortgage Lenders for any damages resulting from such intermediate transfers.[303]

In addition, the Mortgage Loan Second Amendment makes the Mortgage Borrowers' breach of the new section 5.2.14 to be one of the "bad boy" non-recourse exceptions under section 9.4(a),[304] meaning that the Mortgage Lenders could seek a money judgment for damages flowing from such a breach. Finally, the Guarantors agree that a breach of the new section 5.2.14 is one of their Guaranteed Obligations under the Guarantees.[305]

### (2)  **Mezzanine Loans**

The Mezzanine A – F Loan Agreements were amended twice:

(1)  the First Amendment, dated August 17, 2007, redefining "Spread" (*i.e.*, revising the Interest Rate);[306] and

(2)  the Second Amendment, dated November 2, 2007, redefining numerous terms and replacing section 2.4.5(c) (regarding voluntary repayment) with entirely new language.[307]

The Mezzanine G – I Loan Agreements were amended only once, by the First Amendment, dated November 2, 2007. This First Amendment is virtually identical to the Second Amendment to Mezzanine A – F Loan Agreements (redefining numerous terms and replacing section 2.4.5(c)).[308]

The Mezzanine J Loan Agreement was amended only once, by the First Amendment, dated November 2, 2007, which simply replaced section 2.4.5(c).[309]

---

[303]  *See* Mortgage Loan Second Amendment, § 1.1 (Section 5.2.14(b)), at 5.

[304]  *See* Mortgage Loan Second Amendment, § 1.2 (Section 9.4(a)(xiii)), at 5.

[305]  *See* Mortgage Loan Second Amendment, § 2.1, at 5-6. *See infra* Report § III.E.4 for a discussion of the Guarantees.

[306]  *See* Catalyst ID 00006482, 00006223, 00006252, 00006281, 00006310, 00006494.

[307]  *See* Catalyst ID 00006195, 00006224, 00006253, 00006282, 00006311, 00006340.

[308]  *See* Catalyst ID 00006368, 00006396, 00006424.

[309]  See Catalyst ID 00006452.

## 2. **Cash Management Agreement**

In conjunction with the Mortgage Loan, the Mortgage Borrowers, Property Owners, Operating Lessees, HVM, Homestead, the Mortgage Lenders, and Wachovia, as Agent, entered into the "Cash Management Agreement," dated June 11, 2007 (the "Mortgage Cash Management Agreement").[310]

The Mortgage Borrowers, Property Owners, Operating Lessees and Agent established the "Cash Management Account."[311] The Mortgage Lenders have a first priority security interest in the Cash Management Account and all funds therein.[312]

Pursuant to the Mortgage Loan Agreement, the Mortgage Borrowers, Property Owners, Operating Lessees, and HMV are required to deposit all Rents[313] from the Mortgage Properties into certain property accounts, and all credit card receipts and payments on account receivables into certain clearing accounts.[314] The funds in the property accounts and clearing accounts are to be swept daily into a single, commingled Cash Management Account.[315] In addition, Homestead is required to deposit all distributions with respect to its ownership interest in HVI (2) LLC[316] into the Cash Management Account.[317]

The Agent is required to maintain numerous subaccounts of the Cash Management Account (each a "Subaccount") on a ledger-entry basis:[318] the Tax Escrow

---

[310] The Mortgage Cash Management Agreement (Catalyst ID 00000801) was subsequently amended by the "First Amendment" dated August 17, 2007 (Catalyst ID 00000851). The First Amendment changed the description of the Mortgage Loan Debt Service Subaccount to reflect the new Mortgage Loan components created in connection with the securitization.

[311] Mortgage Cash Management Agreement § 2.1, at 9.

[312] Mortgage Cash Management Agreement § 5.1, at 20.

[313] *See* definition of "Rents," Mortgage Loan Agreement, at 43-44.

[314] Mortgage Cash Management Agreement § 3.1(a), (c) & (d), at 12.

[315] Mortgage Cash Management Agreement § 3.1(b), at 12; § 3.3, at 13.

[316] HVI (2) LLC ("HVI") was the lessee of 18 properties from HPT Properties Trust and HPT HSD Properties Trust (collectively, "HPT") (an unaffiliated company). HPT subsequently sold 17 of the properties to HFI Acquisitions Company, LLC ("HFI") (a company controlled by Lichtenstein) on July 26, 2007. HVI currently leases 17 properties from HFI; and ESA-NAV LLC leases one property from HUB Properties GA LLC (an unaffiliated company).

[317] Mortgage Cash Management Agreement § 3.1(j), at 13.

[318] Mortgage Cash Management Agreement § 3.4, at 13-17.

Because the subaccounts were designated by ledger-entry only, this meant that the funds remained in a single commingled account until distribution.

Subaccount; the Insurance Escrow Subaccount; the Agent Subaccount; the Replacement Reserve Subaccount;[319] the Debt Service Subaccount (for the Mortgage Loan); the Ground Lease Reserve Subaccount;[320] the Operating Expense Subaccount; the Management Fee Subaccount; the Excess Cash Flow Subaccount;[321] the Special Reserve Subaccount;[322] the Mezzanine A-J Debt Service Subaccounts; the Operating Lessee Remainder Subaccount;[323] and the Preferred Equity

---

[319]  Mortgage Loan Agreement § 7.3.1 requires the Mortgage Borrowers and Property Owners to deposit 4% of gross income from operations per month into the "Replacement Reserve Fund" to fund replacements, FF&E, and other CapEx required for the Mortgaged Properties.  Mortgage Loan Agreement § 7.3.1, at 138.

[320]  Mortgage Loan Agreement § 7.4.1 requires the Mortgage Borrowers and Property Owners to deposit monthly an amount equal to 1/12 of the estimated rents due under the ground leases for the next year into the "Ground Lease Reserve Fund."  Mortgage Loan Agreement § 7.4.1, at 142.

[321]  Mortgage Cash Management Agreement § 2.1(j) defines the "Excess Cash Flow Subaccount" as "[a] Subaccount into which all funds deposited pursuant to Section 3.4(f) hereof, if any, are to be deposited."  Mortgage Cash Management Agreement § 2.1(j), at 9.

Section 3.4(f), in turn, addresses "funds sufficient to pay the next Replacement Reserve Monthly Deposit."  *Id.* § 3.4(f), at 13.

The correct reference should have been to Section 3.4(v), which provides that "during the continuance of a Cash Trap Period, all remaining funds shall be deposited into the Excess Cash Flow Subaccount."  *Id.* § 3.4(v), at 16.

The post-Acquisition loan agreements and related documents contain numerous other inaccuracies and inconsistencies, including the following few examples:

       (1)      The Mortgage Loan Agreement also incorrectly references Section 3.4(f) of the Cash Management Agreement as pertaining to the excess cash flow subaccount.  Mortgage Loan Agreement § 7.6, at 144-45.

       (2)      In describing the "Guaranteed Obligations" subject to the $100 million aggregate cap, the Mortgage Guaranty references section 9.4(a)(xiii) of the Mezzanine Loan Agreements.  Mortgage Guaranty § 1.2, at 2.  Section 9.4(a)(xiii), however, carves out "Canadian Trust's failure to comply with all (or violation of any) applicable laws and regulations of the State of Delaware as the same pertain to Canadian Trust's existence as a Delaware statutory trust" from the general non-recourse provision.  *See, e.g.*, Mezzanine A Loan Agreement § 9.4(a)(xiii), at 137.  The correct reference should have been to section 9.4(xiv) of the Mezzanine Loan Agreements, which carves out the Mezzanine Borrowers' filing for bankruptcy.  *See, e.g., id.* § 9.4(a)(xiv), at 137.

       (3)      The Mortgage Loan Agreement defines "Canadian Owner" as ESA Canada Properties Trust and ESA Canada Trustee Inc., collectively.  Mortgage Loan Agreement, at 1 & 7.  The Cash Management Agreement defines "Canadian Owner" as only ESA Canada Trustee Inc.  Mortgage Cash Management Agreement, at 1.

       (4)      The Mortgage Loan Agreement defines "Maryland Borrower" as only ESA P MD Borrower LLC.  Mortgage Loan Agreement, at 1.  The Indemnity Guaranty Agreement, executed one June 11, 2007, by Maryland Owner, defines "Maryland Borrower" as both ESA P MD Borrower LLC and ESA MD Borrower LLC.

[322]  Mortgage Loan Agreement § 7.5.1 requires the Mortgage Borrowers and Property Owners to deposit a certain "Cure Amount" necessary to remedy any "Material Defects" relating to "Special Reserve Properties" listed on Schedule 1.1(d) (which was blank).  Mortgage Loan Agreement § 7.5.1, at 143-44.

[323]  Mortgage Cash Management Agreement § 2.1(x) defines the "Operating Lessee Remainder Subaccount" as "[a] Subaccount into which all amount not otherwise required to be deposited into any other Subaccount pursuant to the terms of this Agreement shall be deposited at Borrower's direction."  Mortgage Cash Management Agreement § 2.1(x), at 10.

90

Subaccount.  Because these Subaccounts were merely book-entries, all the funds therein remained commingled in the single Cash Management Account until payment.

On each business day, the Agent is required to apply all funds on deposit in the Cash Management Account in the following amounts and priority:[324]

(a) the monthly deposit to the Ground Lease Reserve Fund into the Ground Lease Subaccount;

(b) the monthly deposit to the Tax Escrow Fund into the Tax Escrow Subaccount;

(c) the monthly deposit to the Insurance Escrow Fund into the Insurance Escrow Subaccount;

(d) the Agent's fees and expenses into the Agent Subaccount;

(e) monthly debt service on the Mortgage Loan into the Debt Service Subaccount;

(f) the Replacement Reserve Monthly Deposit into the Replacement Reserve Subaccount;

(g) if applicable, default interest and late charges due on the Mortgage Loan into the Debt Service Subaccount;

(h) payments for Approved Operating Expenses (excluding Management Fees) into the Operating Expense Subaccount;

(i)-(r) provided no Event of Default under the Mortgage Loan or any senior Mezzanine Loan, Mezzanine Loan debt service to the Mezzanine A – J Debt Service Subaccounts;[325]

(s) provided no Cash Trap Event Period (other than one caused by a Debt Yield Event) is continuing, payment of Management Fees into the Management Fee Subaccount;

(t) any amounts required into the Special Reserve Subaccount;

---

[324] Mortgage Cash Management Agreement § 3.4, at 13-17.

[325] Although the Mezzanine Lenders had no direct interest in the Mortgage Properties, they were nevertheless paid directly from the commingled Cash Management Account, comprising net rents from the Mortgaged Properties, and not by the Mezzanine Borrowers themselves.  As remarked *supra* note 169, this evidences that the Mezzanine Loan structure indirectly gave the Mezzanine Lenders subordinate interests in the Mortgage Properties.

(u)     provided no Cash Trap Event Period (other than one caused by a Debt Yield Event), the lesser of $1.25 million or an amount that would yield 8% return to Preferred Equity Holders into the Preferred Equity Subaccount;

(v)     during a Cash Trap Event Period, all remaining funds into the Excess Cash Flow Subaccount;

(w)-(ff)     provided no Event of Default, all remaining funds into the Mezzanine A – J Subaccounts, in that order, unless the Mezzanine A – J Loans have been paid in full; and

(gg)     provided no Event of Default and all Mezzanine Loans have been paid in full, all remaining amounts into the Operating Lessee Remainder Subaccount, at the Mortgage Borrowers' direction.

Except for the first six months after Closing, there was a continuous Cash Trap Event Period under the Mortgage Loan Agreement. As noted above, during a Cash Trap Event Period, all remaining funds, after payment of debt service and other certain items, go into the Excess Cash Flow Subaccount (at the direction of the Mortgage Lenders[326]), and never reach the Operating Lessee Remainder Subaccount. A Cash Trap Event, triggering a Cash Trap Event Period, occurs upon: (a) an Event of Default under the Mortgage Loan Agreement or any Mezzanine Loan Agreement; (b) a Debt Yield Event;[327] or (c) HMV's filing for bankruptcy.[328] A Cash Trap Event can be cured under certain circumstances, including, if it was caused by a Debt Yield Event, the Mortgage Borrowers' achievement of certain Debt Yield numbers for six consecutive months.[329]

For the first six months after Closing, there was no Cash Trap Event Period due solely to the fact that a Debt Yield Event was not measured until the seventh payment date.[330]

---

[326]    Mortgage Loan Agreement § 7.6 provides that "during the continuance of a Cash Trap Event Period Borrower and Property Owner shall deposit with Lender certain excess cash flow in the Cash Management Account, which shall be held by Lender as additional security for the Loan . . . ." Mortgage Loan Agreement § 7.6, at 144.

[327]    *See supra* note 243.

[328]    Mortgage Loan Agreement, definition of "Cash Trap Event," at 7.

[329]    Mortgage Loan Agreement, definition of "Cash Trap Event Cure," at 7-8, and definition of "Debt Yield Cure," at 10.

[330]    Debt Yield was 7.09% on June 30, 2007; under the Mortgage Loan Agreement, Debt Yield was required to equal or exceed 7.5% to prevent a Debt Yield Event from occurring. The Examiner believes, based on the

During those six months, the Mortgage Cash Management Agreement provides that all remaining funds are to be deposited into the Mezzanine A Debt Service Account.[331] The Mezzanine A - J Cash Management Agreements provide that the remaining funds will be transferred from Mezzanine Lender to Mezzanine Lender, A – J, until finally Mezzanine J Lender deposits them in its Borrower Remainder Subaccount.[332] In reality, the remaining funds were transferred by the Agent directly to a bank account held by ESA P Portfolio Operating Lessee, Inc., thereby bypassing all Mezzanine Lenders.

The Agent is required to make disbursements from the Cash Management Account at various times.[333] For example, on each payment date under the Mortgage Loan, the Agent must disburse all funds in the Debt Service Subaccount and Excess Cash Flow Subaccount to the Mortgage Lenders.[334] Twice a week, the Agent must disburse the funds in the Operating Expense Subaccount and the Management Fees Subaccount to the Operating Lessee Remainder Subaccount, and from the Operating Lessee Remainder Subaccount to the Mortgage Borrowers.[335] On each business day, the Agent must disburse all funds in the Mezzanine A – J Debt Service Subaccounts to the Mezzanine A – J Debt Service Accounts.[336]

The Mortgage Lenders have sole dominion and control over the Cash Management Account and all Subaccounts and, upon an Event of Default, the Mortgage Lenders may apply any funds in the Cash Management Account to the Mortgage Loan debt.

### 3. Inter-Creditor Agreement

The Mortgage Lenders and all of the Mezzanine Lenders entered into the "Intercreditor Agreement," dated as of June 11, 2007.

---

information provided, that the Debt Yield did not equal 7.5% on the Acquisition Date. *See supra* notes 243 & 250.

[331] Mortgage Cash Management Agreement § 3.4(w), at 16.

[332] *See, e.g.*, Mezzanine A –J Cash Management Agreements, § 3.4 (Catalyst ID 00006201, 00006230, 00006259, 00006288, 00006317, 00006346, 00006374, 00006402, 00006430, 00006458).

[333] Mortgage Cash Management Agreement § 4.1, at 17-19.

[334] Mortgage Cash Management Agreement § 4.1(e) & (j), at 18.

[335] Mortgage Cash Management Agreement § 4.1(d) & (i), at 18.

[336] Mortgage Cash Management Agreement § 4.1(m)-(v), at 18-19.

Pursuant to the Intercreditor Agreement, the Mezzanine Lenders agree that:

(1)     the Mortgage Borrowers have no obligation with respect to the Mezzanine Loans;

(2)     the Mezzanine Loans do not impose any lien on the Mortgage Properties or "otherwise grant to any [Mezzanine] Lender the status as a creditor of [Mortgage] Borrower,"[337]

(3)     the Mezzanine Lenders "shall not assert, claim or raise as a defense, any such lien, encumbrance or security interest in the [Mortgage Properties] or any status as a creditor of [Mortgage] Borrower in any action or proceeding including any insolvency or bankruptcy proceeding commenced by or against [Mortgage] Borrower;" and

(4)     the Mezzanine Lenders "shall not assert, pursue, confirm or acquiesce in any way to any recharacterization of the [Mezzanine] Loans as having conferred upon any [Mezzanine] Lender any lien or encumbrance upon, or security interest in, the [Mortgage Properties] or any portion thereof or as having conferred upon [Mezzanine] Lenders the status of a creditor of Borrower."[338]

Each Mezzanine Lender further agrees that:

(1)     no Mezzanine Borrower other than the Mezzanine Borrower on its respective Mezzanine Loan has any obligation with respect to such Mezzanine Loan;

(2)     its Mezzanine Loan does not impose a lien on the collateral securing any other Mezzanine Loan;

(3)     its Mezzanine Loan does not grant it the status of creditor of any other Mezzanine Borrower;

(4)     it will not assert a lien on or security interest in the collateral securing any other Mezzanine Loan;

(5)     it will "not assert, claim or raise as a defense any status as a creditor of any [other Mezzanine] Borrower in any action or proceeding, including any insolvency or bankruptcy proceeding commenced by or against [its] Borrower;" and

---

[337]   Notwithstanding such provision, it is the Examiner's conclusion that the Mezzanine Loan structure indirectly gave the Mezzanine Lenders subordinate interests in the Mortgage Properties.  *See supra* note 169.

[338]   Intercreditor Agreement § 2(a), at 37 (Catalyst ID 00006508).

(6)     it will "not assert, pursue, confirm or acquiesce in any way to any recharacterization of [its Mezzanine] Loan as having conferred upon [it] any lien or encumbrance upon, or security interest in, the Separate Collateral securing any [other Mezzanine] Loan or as having conferred upon . . . [it] the status of a creditor of any [other Mezzanine] Borrower."[339]

The Mortgage Lenders likewise agree that:

(1)     no Mezzanine Borrower will have any obligation with respect to the Mortgage Loan;

(2)     the Mortgage Loan does not impose a lien upon any of the collateral for the Mezzanine Loans;

(3)     the Mortgage Loan does not grant the Mortgage Lenders the status as a creditor of any Mezzanine Borrower;

(4)     they will not assert a lien in the collateral securing the Mezzanine Loans;

(5)     they will "not assert, claim or raise as a defense any status as a creditor of any [Mezzanine] Borrower in any action or proceeding, including any insolvency or bankruptcy proceeding commenced by or against any [Mezzanine] Borrower;" and

(6)     they will "not assert, pursue, confirm or acquiesce in any way to any recharacterization of the [Mortgage] Loan as having conferred upon [Mortgage] Lender any lien or encumbrance upon, or security interest in, the Separate Collateral securing any [Mezzanine] Loan or as having conferred upon [Mortgage] Lender the status of a creditor of any [Mezzanine] Borrower."[340]

The Intercreditor Agreement confirms that the Mortgage Loan is not cross-defaulted with any other loan (including any Mezzanine Loan),[341] and that each Mezzanine Loan is cross-defaulted only with the Mortgage Loan and any senior Mezzanine Loans.[342]

The Intercreditor Agreement contains two subordination provisions. The first one provides that: (1) each of the Mezzanine Loans is subordinate to (a) the Mortgage Loan and each more senior Mezzanine Loan, and (b) the liens created pursuant to the Mortgage Loan and each

---

[339]   Intercreditor Agreement § 2(b)-(k), at 37-38.

[340]   Intercreditor Agreement § 2(l), at 42.

[341]   Intercreditor Agreement § 4(a)(x), at 44.

[342]   Intercreditor Agreement § 4(c)-(l), at 46-50.

more senior Mezzanine Loan; (2) no property of any Mezzanine Borrower is collateral for the Mortgage Loan or any senior Mezzanine Loan; and (3) the Mortgage Lenders are not creditors of any Mezzanine Borrower, and each Mezzanine Lender is not a creditor of any junior Mezzanine Borrower.[343]

The second subordination provision governs payment and provides, in pertinent part, that:

> all of [each Mezzanine] Lender's rights to payment of the [Mezzanine] Loan held by such [Mezzanine] Lender and the obligations evidenced by the related [Mezzanine] Loan Documents are hereby subordinated to all of [Mortgage] Lender's rights to payment by [Mortgage] Borrower of the [Mortgage] Loan and the obligations secured by the [Mortgage] Loan Documents, and such [Mezzanine] Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise, but excluding, the proceeds received from any bona fide third party in connection with a secured party sale of such [Mezzanine] Lender's Equity Collateral, which may be retained by such [Mezzanine] Lender) from [Mortgage] Borrower and/or from the [Mortgage Properties] prior to the date that all of the [Mortgage] Loan Liabilities then due to [Mortgage] Lender under the [Mortgage] Loan Documents are paid in full.[344]

In the event that the Mortgage Borrowers file for bankruptcy, the Mortgage Lenders "shall be entitled to receive payment and performance in full of all amounts due or to become due to [Mortgage] Lender before any [Mezzanine] Lender is entitled to receive any payment (including any payment which may be payable by reason of the payment of any other indebtedness of [Mortgage] Borrower being subordinated to the payment of the [Mezzanine] Loans) on account of any [Mezzanine] Loan (other than payments with respect to a [Mezzanine] Lender's Separate Collateral permitted pursuant to this Agreement)."[345]

Similar provisions give the senior Mezzanine Lenders rights to payment in full before junior Mezzanine Lenders are entitled to receive any payment.[346]

---

[343]   Intercreditor Agreement § 9, at 60-62.

[344]   Intercreditor Agreement § 10(a), at. 62.

[345]   Intercreditor Agreement § 10(b), at 62-63.

[346]   Intercreditor Agreement §§ 10(a) & (b), at 62-63.

537960v2

All payments received by a Mezzanine Lender contrary to the provisions of the Intercreditor Agreement are received in trust for the Mortgage Lenders or senior Mezzanine Lenders, as applicable, and must be paid over within two business days.[347]

No Mezzanine Lender has subrogation rights against the Mortgage Borrowers until the Mortgage Loan has been paid in full, or against any senior Mezzanine Borrower until such senior Mezzanine Loan has been paid in full.[348]

The Intercreditor Agreement applies during the bankruptcy case of any of the Mortgage Borrowers or Mezzanine Borrowers, and provides that, so long as the Mortgage Loan is outstanding, no Mezzanine Lender will "solicit, direct or cause" any person to, among other things, "seek to consolidate the [Mortgage Properties] or any other assets of [Mortgage] Borrower . . . with the assets of any [Mezzanine] Borrower or any member of the Borrower Group in any proceeding relating to bankruptcy, insolvency, reorganization or relief of debtors" or "seek to consolidate [Mortgage] Borrower with any [Mezzanine] Borrower or any member of Borrower Group."[349]

Nevertheless, *"[i]n the event that a [Mezzanine] Lender is deemed to be a creditor of [Mortgage] Borrower in any [bankruptcy] Proceeding* [presumably as a result of substantive consolidation]:"

> (1)     such Mezzanine Lender "agrees that it shall not make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against [Mortgage] Borrower . . . without the prior consent of [Mortgage] Lender, except to the extent necessary to preserve or realize upon such [Mezzanine] Lender's interest in any Separate Collateral pledged to such [Mezzanine] Lender pursuant to the Junior Loan Documents related to the [Mezzanine] Loan held by such [Mezzanine] Lender; <u>provided</u> <u>however</u>, that

---

[347]   Intercreditor Agreement § 10(b), at 63.

[348]   Intercreditor Agreement § 11(c), at 66-67.

[349]   Intercreditor Agreement § 11(d)(ii), at 67.

   Although the Mezzanine Lenders may not seek substantive consolidation, there is no prohibition against the Mezzanine Lenders getting the benefits of such substantive consolidation, subject to the subordination provisions of the Intercreditor Agreement.

any such filing shall not be as a creditor of the [Mortgage] Borrower;"

(2) the Mortgage Lenders may vote all claims of such Mezzanine Lender, provided, however, the Mortgage Lenders may vote such claims with respect to a plan of reorganization only if the proposed plan impairs the Mortgage Lenders; and

(3) no Mezzanine Lender shall challenge the validity or amount of any claims or valuations of the Mortgage Properties submitted by the Mortgage Lenders.[350]

Similar provisions apply, prohibiting any junior Mezzanine Lender from seeking substantive consolidation of its Mezzanine Borrower with a senior Mezzanine Borrower,[351] and providing that should such junior Mezzanine Lender be deemed to be a creditor in a senior Mezzanine Borrower's bankruptcy case [presumably as a result of substantive consolidation], such junior Mezzanine Lender may not take any action without the senior Mezzanine Lender's consent, and that the senior Mezzanine Lender may vote such junior Mezzanine Lender's claims with respect to a plan of reorganization if such senior Mezzanine Lender is impaired under the proposed plan.[352]

The Intercreditor Agreement requires the Mortgage Lenders to give notice to the Mezzanine Lenders of any default by the Mortgage Borrowers under the Mortgage Loan.  The Mezzanine Lenders have until ten business days after the later of (a) receipt of the default notice or (b) the expiration of the Mortgage Borrowers' cure period, to cure such default (provided, however, that if the default is non-monetary, the cure period may be extended under certain circumstances).[353]  Similar provisions govern the junior Mezzanine Lenders' rights to cure a default on a senior Mezzanine Loan.[354]

Each Mezzanine Lender agrees that its rights to payment under the Guarantees (discussed in Section III.E.4 of the Report) are subordinate to the claims and rights to payment of

---

[350] Intercreditor Agreement § 11(d)(iii), at 68 (emphasis added).
[351] *See supra* note 349.
[352] Intercreditor Agreement § 11(d)(iv)-(v), at 68-69.
[353] Intercreditor Agreement § 12(a), at 70-73.
[354] Intercreditor Agreement § 12(b), at 73-77.

the Mortgage Lenders and any senior Mezzanine Lender against the Guarantors.[355]  The $100 million monetary cap for bankruptcy-related events (*see* Report Section III.E.4) is to be applied on a pro rata basis among the Mezzanine Loans.[356]

The obligations of the Mortgage and Mezzanine Lenders under the Intercreditor Agreement remain in full force and effect irrespective of the lack of validity or unenforceability of any of the Mortgage or Mezzanine Loan Documents or any non-perfection of collateral, or any other circumstance that might constitute a defense available to any Mortgage or Mezzanine Borrower, or Mortgage or Mezzanine Lender.[357]

If any party breaches the Intercreditor Agreement, the non-breaching party may seek specific performance.[358]

The Intercreditor Agreement continues in effect until the earlier of: (a) payment in full of the Mortgage Loan and all Mezzanine Loans; (b) transfer of title to the Mezzanine Lenders of their Collateral; or (c) transfer of all of the Mortgage Properties to the Mortgage Lenders by foreclosure or deed-in-lieu.[359]  In addition, the Intercreditor Agreement continues in effect or is reinstated if the Mortgage Lenders or any Mezzanine Lender must return any payment received on its respective Loan due to any Borrower's filing for bankruptcy, as though such payment had not been made.[360]

## 4.    Guarantees

Mr. Lichtenstein, Lightstone, ESI and Homestead (collectively, the "Guarantors") executed guarantees (the "Guarantees") in favor of the respective Lenders, guaranteeing certain of the respective Borrowers' obligations under the Mortgage Loan and each Mezzanine Loan.[361]

---

[355]    Intercreditor Agreement § 6(b), at 53-54.

[356]    Intercreditor Agreement § 15(q), at 89-90.

[357]    Intercreditor Agreement § 17, at 98-99.

[358]    Intercreditor Agreement § 34, at 105.

[359]    Intercreditor Agreement § 31, at 104.

[360]    Intercreditor Agreement § 17(g), at 99.

[361]    *See* "Guaranty Agreement," executed as of June 11, 2007 by the Guarantors in favor of the Mortgage Lenders (the "Mortgage Guaranty") (Catalyst ID 00000042); *see, e.g.*, "Guaranty Agreement," executed as of June 11, 2007 by the Guarantors in favor of the Mezzanine A Lender (the "Mezzanine A Guaranty") (Catalyst ID

Specifically, the Guarantors are jointly and severally liable for the payment and performance of the "Guaranteed Obligations," which are defined to mean the respective Borrowers'[362] obligations or liabilities to the respective Lenders under Section 9.4 of the respective Loan Agreements.[363]

Sections 9.4 of the Mortgage and Mezzanine Loan Agreements are virtually identical. Section 9.4(a) provides that the respective Loans are non-recourse, except to the extent of the Lenders' damages arising out of various "bad boy" circumstances, including: (a) the Borrowers' breach of any of the special purpose entity/separateness covenants; and (b) the Borrowers' filing for bankruptcy.[364]

Section 9.4(b) provides that the respective Loans are fully recourse in the event that the Borrowers file for bankruptcy.[365]

The Guarantees further provide, however, that with respect to the obligations arising from the Borrowers' filing for bankruptcy (Sections 9.4(a)(xvi) & (b) in the Mortgage Loan Agreement; Sections 9.4(xiv) & (b) in the Mezzanine Loan Agreements), the Guarantors' aggregate liability to the Mortgage and Mezzanine Lenders shall not exceed $100 million.[366]

The Lenders can enforce the obligations of the Guarantors under the Guarantees without first exhausting the Lenders' remedies against their respective Borrowers or enforcing the Lenders' rights against any of their collateral.[367]

The Guarantors waive any claims against, or rights to contribution or reimbursement from, any Borrowers or other parties liable for the Guaranteed Obligations for

---

00006204). Guarantees were executed in favor of each of Mezzanine A – J Lenders (Catalyst ID 00006204, 00006233, 00006262, 00006291, 00006320, 00006349, 00006377, 00006405, 00006433, 00006461).

[362] With respect to the Mortgage Guaranty, the use of the term "Borrower" herein includes Property Owner.

[363] "Guaranteed Obligations" also includes damages arising out of HVI's failure to pay rent due under the HPT Lease to the extent that funds are available from the HPT Property to pay such rent. Mortgage Guaranty §§ 1.1 & 1.2, at 2; *see, e.g.,* Mezzanine A Guaranty §§ 1.1 & 1.2, at 2.

[364] Mortgage Loan Agreement § 9.4(a), at 159-61; *see, e.g.,* Mezzanine A Loan Agreement, § 9.4(a), at 135-38. *See supra* note 199.

[365] Mortgage Loan Agreement § 9.4(b), at 162; *see, e.g.,* Mezzanine A Loan Agreement, § 9.4(a), at 138.

[366] Mortgage Guaranty § 1.2, at 2; *see, e.g.,* Mezzanine A Guaranty § 1.2, at 2.

[367] Mortgage Guaranty § 1.6, at 3; *see, e.g.,* Mezzanine A Guaranty § 1.6, at 3.

any payments made by the Guarantors under the Guarantees.[368]  In addition, all other claims of the Guarantors against the respective Borrowers (the "Guarantor Claims") are subordinate to the Lenders' claims, and the Guarantors cannot receive any payment on the Guarantor Claims until the Mortgage and Mezzanine Loans have been paid in full.[369]  Moreover, in the event that the Guarantors file for bankruptcy, the Lenders are entitled to prove their claims against the Guarantors and receive payments on the Guarantor Claims.  After the Guaranteed Obligations, the Mortgage Loan and Mezzanine Loans have been paid in full, the Guarantors have certain subrogation rights.[370]

### 5.    Contribution Agreements

#### a.    Mortgage Borrowers

The Mortgage Borrowers and Property Owners[371] entered into the "Contribution Agreement," dated June 11, 2007, in connection with their repayment of the Mortgage Loan (the "Mortgage Contribution Agreement").[372]  The Mortgage Lenders and all Mezzanine Lenders are explicit third party beneficiaries thereunder.[373]

In the event that any Mortgage Borrower or Property Owner pays more (by payment or foreclosure on its assets) than its "Allocable Principal Balance,"[374] then such "Overpaying Borrower" is entitled to contribution from each benefitted Borrower, up to each such benefitted Borrower's Allocable Principal Balance.  These contribution rights only arise, however, after payment in full of the Mortgage Loan and all Mezzanine Loans.[375]

---

[368]  Mortgage Guaranty § 1.10, at 4; *see, e.g.*, Mezzanine A Guaranty § 1.10, at 4.

[369]  Mortgage Guaranty § 4.1, at 8; *see, e.g.,* Mezzanine A Guaranty § 4.1, at 8.

[370]  Mortgage Guaranty § 4.2, at 8-9; *see, e.g.*, Mezzanine A Guaranty § 4.2, at 8.

[371]  The Mortgage Contribution Agreement omits, however, ESA Canada Properties Trust from its definition of Property Owner (versus the Mortgage Loan Agreement).

[372]  *See* Catalyst ID 00000668.

[373]  Mortgage Contribution Agreement ¶ 4, at 2.

[374]  Mortgage Contribution Agreement ¶ 1, at 1, and Schedule B.  The "Allocable Principal Balance" for each Mortgage Borrower on Schedule B equals the sum of the "Release Prices" for its Mortgage Properties under the Mortgage Loan Agreement.  *See* Mortgage Loan Agreement, Schedule 1.1(b).

[375]  Mortgage Contribution Agreement ¶ 1, at 1-2.  As remarked in note 169, *supra*, the fact that there are no contribution rights among the Mortgage Borrowers until the Mezzanine Loans have been paid in full, further evidences that the Mortgage Loan structure indirectly gave the Mezzanine Lenders subordinate interests in the Mortgage Properties.

If any benefitted Mortgage Borrower fails to make a contribution payment, the Overpaying Borrower is subrogated to the Mortgage Lenders' rights against such "Defaulting Borrower," including the right to receive a portion of the Defaulting Borrower's "Collateral."[376] Again, these subrogation rights arise only after payment in full of the Mortgage Loan and all Mezzanine Loans. If, however, the Mortgage Lenders return any payments in connection with a Mortgage Borrower's bankruptcy, all subrogated Mortgage Borrowers shall jointly and severally repay the Mortgage Lenders all amounts repaid, plus interest.[377]

### b.    <u>Mezzanine Borrowers</u>

Each set of three Mezzanine Borrowers also entered into a "Contribution Agreement," dated June 11, 2007, in connection with their repayment of their respective Mezzanine Loans (the "Mezzanine Contribution Agreements").[378] The Mortgage Lenders and all Mezzanine Lenders are explicit beneficiaries thereunder.[379]

In the event that any of the three Mezzanine Borrowers pays more (by payment or foreclosure on its assets) than "its proportionate share (based upon the relative value of the Collateral owned by such Borrower),"[380] then such "Overpaying Borrower" is entitled to contribution from each benefitted Mezzanine Borrower, up to each such benefitted Borrower's "proportionate share of amounts payable with respect to the [Mezzanine] Loan (based upon the

---

[376] Mortgage Contribution Agreement ¶ 2, at 2, and Schedule A. The "Collateral" set forth on Schedule A is each Mortgage Borrower's Mortgage Properties.

[377] Mortgage Contribution Agreement ¶ 2, at 2.

[378] *See* Catalyst ID 00006202, 00006231, 00006260, 00006289, 00006318, 00006347,00006375, 00006403, 00006431, 00006459.

[379] *See, e.g.,* Mezzanine A Contribution Agreement ¶ 4, at 2 (Catalyst ID 00006202).

[380] *See, e.g.,* Mezzanine A Contribution Agreement ¶ 1, at 1.
"Collateral" is defined as the collateral pledged to the Mezzanine Lender in connection with the Mezzanine Loan (*i.e.,* the equity interests in the Borrower beneath). *See, e.g.,* Mezzanine A Contribution Agreement, at 1.
The Mezzanine Contribution Agreement provides no explanation of how to determine the "relative value" of the Collateral owned by each Mezzanine Borrower. *See id.*

relative value of the Collateral owned by such Borrower) . . . ."[381]  These contribution rights only arise, however, after payment in full of the Mortgage Loan and all Mezzanine Loans.[382]

If any benefitted Mezzanine Borrower fails to make a contribution payment, the Overpaying Borrower is subrogated to the Mezzanine Lender's rights against such "Defaulting Borrower," including the right to receive a portion of the Defaulting Borrower's Collateral.[383] Again, these subrogation rights arise only after payment in full of the Mortgage Loan and all Mezzanine Loans.  If, however, the Mezzanine Lender returns any payments in connection with a Mezzanine Borrower's bankruptcy, all subrogated Mezzanine Borrowers shall jointly and severally repay the Mezzanine Lender all amounts repaid, plus interest.[384]

### 6. Key Differences Between Pre- and Post-Acquisition Capital Structure

It is beyond the scope of this Report to conduct a thorough analysis of the Company's pre-Acquisition capital structure.  However, based upon the Examiner's review of an offering circular prepared by Banc of America Securities LLC in 2005,[385] the Examiner believes that there may have been a number of significant differences between the Company's pre- and post-Acquisition capital structure.  These key differences include the following:

### a. Debt Yield

Although the calculation of Debt Yield appears to be essentially the same under the pre-Acquisition loan agreements and the Mortgage Loan Agreement,[386] the numerator (cash flow) and, more significantly, the denominator (aggregate debt) changed.

---

[381]  *See, e.g.,* Mezzanine A Contribution Agreement ¶ 1, at 2.

[382]  *See, e.g.,* Mezzanine A Contribution Agreement ¶ 1, at 1-2.  As remarked in note 375, *supra,* the fact that there are no contribution rights among the Mezzanine Borrowers until the Mortgage Loan and all other Mezzanine Loans have been paid in full, further evidences that the Mezzanine Loan structure indirectly gave the Mezzanine Lenders subordinate interests in the Mortgage Properties, and that each Mezzanine Loan was tied into the others, even though they purport not to be cross-collateralized.

[383]  *See, e.g.,* Mezzanine A Contribution Agreement ¶ 2, at 2; *see supra* note 382.

[384]  *See, e.g.,* Mezzanine A Contribution Agreement ¶ 2, at 2.

[385]  "Offering Circular, $1,755,000,000 Banc of America Large Loan, Inc., Commercial Mortgage Pass-Through Certificates, Series 2005-ESH," dated September 23, 2005 ("2005 Offering Circular") [Bates No. BLA-003963].

[386]  2005 Offering Circular, at 75-76; *see* Report § III.E.1.c.(1) *supra.*

The number of properties generating the cash flow (used in the numerator of the Debt Yield calculation) increased from 650 to 664, while the aggregate amount of debt (used in the denominator) increased from $5.55 billion to $7.4 billion.  This small increase in the numerator (2.15%) compared to the sizable increase in the denominator (33.3%), required the Mortgage Lenders to decrease the Debt Yield minimums post-Acquisition.[387]  However, the decrease given was not sufficient:  the Examiner believes that the Borrowers failed the Debt Yield test even on the Acquisition Date.[388]  Accordingly, the Company was required to grow to avoid Cash Trap Events and Amortization payments.

### b.   Cash Management Agreement

There appear to be at least two significant differences between the pre- and post-Acquisition Cash Management Agreements.

*First*, the pre-Acquisition cash management agreement provided that Management Fees were higher in priority on the "waterfall" than debt service on the Mezzanine Loans, and thus Management Fees would be paid before Mezzanine Loan debt service if there were insufficient funds to pay both.[389]

The post-Acquisition Mortgage Cash Management Agreement provides the opposite:  Mezzanine Loan debt service is higher in priority than Management Fees, and must be paid first if there are insufficient funds to pay both.[390]

*Second*, in the event of a Cash Trap Event Period triggered by a Debt Yield Event, the pre-Acquisition cash management agreement provided that the percentage of excess cash flow trapped in the Excess Cash Flow Reserve Fund was either 25%, 40% or 100%, depending

---

[387] According to the 2005 Offering Circular, a pre-Acquisition Debt Yield Event was triggered during the 7th through 12th payment dates by a Debt Yield of 8% or less; during the 13th through 24th payment dates, by a Debt Yield of 9% or less; and during the 25th to 36th payment dates, by a Debt Yield of 9.5% or less.  2005 Offering Circular, at 75; *compare to* note 241 *supra*.

[388] Debt Yield was 7.09% on June 30, 2007; under the Mortgage Loan Agreement, Debt Yield was required to equal or exceed 7.5% to prevent a Debt Yield Event from occurring.  The Examiner believes, based on the information provided, that the Debt Yield did not equal 7.5% on the Acquisition Date.  *See* notes 243 & 250 *supra*.

[389] 2005 Offering Circular, at 71-72.

[390] *See* Report § III.E.2 *supra*.

upon how far out in the payment schedule the Debt Yield Event occurred and what percentage the Debt Yield was at the time.[391]

In contrast, the post-Acquisition Mortgage Cash Management Agreement traps 100% of excess cash flow during every Cash Trap Event Period.[392]

### c. <u>Approval of Annual Budget</u>

Under the pre-Acquisition mortgage loan agreement, in proposing each annual budget, the borrowers needed to obtain the approval of only the servicer for the mortgage loan.[393] Post-Acquisition, in proposing an annual budget, the Borrowers are required to obtain the approval of both the Mortgage Lenders (after securitization, the Servicer) and the Most Junior Mezzanine Lender.[394]

### 7. <u>Directors & Officers</u>

Of the seventy-five Extended Stay entities that filed Chapter 11 Cases prior to February 28, 2010, only sixty-nine filed a Statement of Financial Affairs ("SOFA") with the Bankruptcy Court.[395]  For these sixty-nine Debtors, their officers and directors were identified in their respective SOFAs,[396] [397] including the name, title, address, and equity ownership percentage of each officer and director.

The directors of the Debtors generally were comprised primarily of Company insiders and officers.  For example, Mr. Lichtenstein and Mr. Teichman each served on sixty-five of the boards, and Mr. Rogers served on fifty-five of the boards.  In addition, however, each of the Borrowers was required to have two independent directors.[398]

---

[391]   2005 Offering Circular, at 74-75.

[392]   *See* Report§ III.E.2 *supra.*

[393]   2005 Offering Circular, at 93.

[394]   *See* Section III.E.1.c.ii *supra.*

[395]   Portfolio MD Beneficiary, a debtor, did not file a SOFA with the Bankruptcy Court.  SOFAs also have not been filed for the following five (5) additional Debtors:  ESA P Portfolio TXNC GP L.L.C., ESA TXGP L.L.C., ESH/MSTX GP L.L.C., ESH/TXGP L.L.C., ESH/TN Member Inc.

[396]   No directors were listed for ESA P Portfolio TXNC Properties L.P., ESA TX Properties L.P., ESH/MSTX Property L.P., and ESH/TX Properties L.P.

[397]   A claims agent, Kurtzman Carson Consultants, maintains the SOFAs.

[398]   Mortgage Loan Agreement, at 48.

These independent directors were individuals employed by National Registered Agents, Inc., a firm that provides "independent directors for hire" for special purpose entities like the Mortgage Borrowers and the Mezzanine Borrowers.  In total, although thirty-four different individuals served on the seventy-five Debtor boards, most of the non-insider directors were the hired independents, which formed a minority of each board.  Accordingly, each entity's board of directors was effectively controlled by insiders.

A summary of the officers and directors information summarized by director or officer name and by Debtor is provided in Exhibit III-E-1 and III-E-2, respectively.

## F.    Post-Acquisition Operations of the Company

### 1.    HVM LLC and Management Agreements

Before the Closing, HVM, and its subsidiary HVM Canada, were formed to provide the operational, management, and administrative functions for all of the Extended Stay Hotels.  HVM and HVM Canada were apparently established as entities outside of the primary ESI ownership structure in order to comply with IRS rules and regulations regarding REITs.  Such IRS rules generally require that, in order to qualify for and maintain REIT status, the REIT properties had to be managed by an independently-owned company.[399]

After the Closing, all Extended Stay Hotels continued to be managed by HVM, except for three properties in Canada, which were operated by HVM Canada.  HVM paid all property-level expenses of the hotels, contracted with service providers, and purchased all goods and materials utilized in the operation of the business.  In connection with the operation of the hotels, HVM employed approximately 10,000 people at any given point in time.[400]  As a result of

---

[399]    ESH Business Update Presentation dated April 6, 2009 at 10 [Bates Nos. ESH0003167-3196].  Rogers Deposition at 17-18.

[400]    Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for Order Authorizing Debtors to Continue Using Existing Centralized Cash Management System.

the management arrangement with HVM and HVM Canada, the Debtors do not have any of their own employees.[401]

Since the Acquisition, Mr. DeLapp, Mr. Rogers, Robert Micklash, Marshall Dildy, David Weiss, Steve Woolridge, Tim Groves, Roy Clayton, among others, have, at various times, had an ownership stake in HVM. Currently, the owners are Mr. DeLapp (President), Mr. Rogers (EVP of Accounting and Finance), and Robert Micklash (Chief Operating Officer).

HVM's headquarters have been located in Spartanburg, South Carolina in an office building owned by ESI since May 2004.[402] ESI leased a portion of the office building to BHAC, which in turn leased approximately half of the space to HVM for its corporate offices.[403] The remaining space was/is occupied by third-party tenants.[404]

In addition, HVM owns the technology licenses and related infrastructure for the systems used by the Company.[405] Certain of the technology assets were retained by HVM when it became independently owned in 2004. Since the Closing, any new assets acquired by HVM for use in Spartanburg were paid for by ESI under the G&A Agreements (which are discussed below), although those assets are still shown as assets on HVM's books and records.[406]

Although HVM is owned by Mr. DeLapp, Mr. Micklash and Mr. Rogers, it is managed by another entity, HVM Manager. HVM Manager was formed in conjunction with the Acquisition, and its sole member, Mr. Lichtenstein, was given the power to manage the business and affairs of the Company, as well as the right and authority to direct the operations of HVM. [407]

---

[401]  Teichman First Day Declaration at 7. Mr. Teichman also stated that Extended Stay, through HVM, employs approximately 10,000 employees.

[402]  Lease Agreement between ESA Spartanburg LLC and BHAC Capital IV dated May 11, 2004 (Catalyst ID 00009448).

[403]  DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (Restated) and for the Year Ended December 31, 2008 and for the Period From Acquisition (June 11, 2007) to December 31, 2007 (Restated) [Bates Nos. ESH0000107-164].

[404]  Mr. Rogers confirmed during December 30, 2009 meeting at HVM.

[405]  Offering Memorandum dated January 2007 [Bates Nos. WACH028997-29085].

[406]  Rogers Deposition at 34-38.

[407]  HVM Manager LLC Certificate of Formation and Limited Liability Company Agreement dated June 8, 2007 [Bates Nos. DL_LS_EXMN00090204-90209].

However, neither HVM Manager nor Mr. Lichtenstein had any ownership or economic interest in HVM, nor were any fees paid by HVM to HVM Manager.[408]

### Personnel and Departments

The majority of HVM's 10,000 employees are property-level personnel responsible for operating the individual hotels in every respect (*e.g.*, housekeeping, managing the front desk, property administration, etc.). Approximately 380 employees work at HVM corporate under the direction of Mr. DeLapp in various overhead departments, such as accounting, finance, operations, revenue management, information technology, marketing, human resources, facilities/purchasing, sales, training and legal.[409] All HVM finance and accounting employees, and the related books and records of HVM, were located at HVM's headquarters in Spartanburg, South Carolina.[410]

HVM employees typically held themselves out to third parties and thought of themselves as employees of the Extended Stay Hotels, as opposed to HVM.[411] For example, (1) the email addresses for all HVM employees are name@extendedstay.com; (2) the business cards for the three owners prominently show the Extended Stay Hotels and the various brand names, but the reference to "HVM LLC" is in very small font; [412] and their only stock letterhead available is for the Extended Stay Hotel brands, not for HVM.[413] Also, the signage at the Spartanburg headquarters reflected the Extended Stay Hotel brands only, with no apparent reference to HVM.[414]

---

[408]   Teichman First Day Declaration at 7. Mr. Rogers, however, testified that Mr. Lightstone was paid an asset management fee by the Company of up to $1 million annually. Rogers Deposition at 39-41.

[409]   2009 G&A Budget Summary at 1 (Catalyst ID 00001059).

[410]   Rogers Deposition pp. 16-17, 20-21.

[411]   Rogers Deposition at 53. Also noted by Messrs. DeLapp and Kim during their interviews on November 24, 2009 and December 22, 2009, respectively.

[412]   Business cards of Mr. Rogers (Catalyst ID 00021289), Mr. Micklash [Bates Nos. ESH0076629], and Mr. DeLapp [Bates Nos. ESH0076628].

[413]   Confirmed by Mr. Rogers through counsel to Debtors.

[414]   Rogers Deposition at 55. Also, observed during December 30, 2009 meeting at HVM.

HVM's accounting department, which consisted of approximately 95 employees,[415] maintained the books and records of the Company, and also prepared the quarterly/annual GAAP financial reports and monthly Servicer Reports. HVM's accounting department also handled the tax and treasury functions of the Company.[416] As EVP of Accounting & Finance, Mr. Rogers was responsible for HVM's accounting department, and reported directly to Mr. DeLapp.

The HVM financial planning and analysis group prepared analyses and constructed models to project the financial performance of the Extended Stay Hotels, including corporate overhead expenses and the related cash flows. This department also prepared budget-to-actual profit and loss comparisons for management reporting purposes.[417] The various models and analyses prepared by HVM also were used to construct the Approved Annual Budgets. HVM's financial planning and analysis group was led by Mr. Kim, EVP of Finance, who reported directly to Mr. DeLapp.[418]

**Management Agreements with Debtors**

Prior to the Acquisition, HVM entered into three types of agreements with entities within the Company structure: (1) Management Agreements, (2) G&A Agreements, and (3) Services Agreements. Upon the Closing of the Acquisition, the non-HVM interests in these agreements were transferred to the Buyer.[419]

In sum, these three types of agreements set forth the rights, duties and responsibilities of HVM with respect to the management of the Company and its hotels. These agreements also specify the Management Fee to be paid, and the reimbursements due to HVM for costs incurred in managing the properties.[420] There are eighteen Management Agreements

---

[415]   2009 G&A Budget Summary at 1 (Catalyst ID 00001059).

[416]   Rogers Deposition at 11.

[417]   For example, see Monthly Executive Committee Meeting dated February 4, 2009 (Catalyst ID 00001052).

[418]   Departmental organization chart dated June 22, 2009 at 1 (Catalyst ID 00001092).

[419]   Acquisition Agreement [Bates Nos. DL_LS_EXMN00058833-59035].

[420]   This reference does not include an agreement HVM has with HVI(2), a non-debtor entity that leases certain properties. The HVI(2) agreement differs from the Management Agreements for the Mortgaged Properties such as it includes a different fee structure (Catalyst ID 00009474).

between HVM and the Debtors.[421]  There are two G&A Agreements[422]  and two Services

Agreements[423] – one between HVM and ESI, and another between HVM and Homestead.   The

terms and conditions of the various agreements are generally consistent by agreement type and

are further described below.

      The Management Agreements appoint HVM as the exclusive agent to supervise,

direct and control the management and operation of the hotels.  Under the Management

Agreements, HVM generally has the authority and duty to direct, supervise, manage and operate

the hotels in an efficient and economical manner, and to determine the programs and policies to

be followed in accordance with the provisions of the agreements and the Annual Business Plan.

More specifically, the Management Agreements provide for HVM, among other things, to:[424]

- Hire, supervise, direct the work of, discharge and determine the compensation and other benefits of hotel employees;
- Provide maintenance, human resources and personnel, administration, hotel operations, housekeeping, advertising, food and beverage operations, sales promotions, forecasting and operations analysis, staff planning, accounting, and oversight of reservations services;
- Establish all prices, price schedules, rates and rate schedules, rents, lease charges, and concession charges of the hotels;
- Maintain books and records including accounting records and procedures;
- Monitor reserves;
- Administer leases, license and concession agreements for all public space at the hotels, including stores, office space and lobby space;
- Keep furniture, fixtures & equipment in good order and make or oversee necessary repairs, improvements, additions and substitutions when necessary;
- Assist in the analysis of asset acquisitions and dispositions;

---

[421] As an example, see Management Agreement between BRE/ESA 2005 Operating Lessee Inc. dated October 2005 [Bates Nos. ESH0003883-3907].  For a complete list of the Management Agreements see Section 2.16 of the Acquisition Agreement.

[422] G&A Expense Reimbursement Agreement between HVM and ESI, as amended, dated May 11, 2004 [Bates Nos. ESH0003839-3851] and G&A Expense Reimbursement Agreement between HVM and Homestead, as amended, dated May 11, 2004 [Bates Nos. ESH0003856-3878].  There is also the G&A Non-Termination Agreement between ESI and Homestead dated May 11, 2004 [Bates Nos. ESH0003836-3838] which states that each party agrees not to terminate the G&A Agreements without each others' consent.

[423] Services Agreement between HVM and ESI dated January 1, 2006 [Bates Nos. ESH0003852-3855] and Services Agreement between HVM and Homestead dated January 1, 2006 [Bates Nos. ESH0003879-3882].

[424] Management Agreements §§ 2.1 & 3.1 [Bates Nos. ESH0003883-3907].  Services Agreements § 1 [Bates Nos. ESH0003852-3855].  Annual Business Plan is defined in the Management Agreements § 9.1.

- Negotiate and enter into services contracts and licenses on behalf of the Company required in the ordinary course of business;
- Supervise and purchase inventories and supplies needed and make payment to the vendors on behalf of the property;
- Coordinate legal services and administer insurance claims; and
- Prepare and submit an annual budget for the Company.

The Management Agreements provide that any costs incurred by HVM to perform the above services are reimbursable to HVM. In addition, the Management Agreements state that the obligations incurred by HVM on behalf of the hotel operations are solely obligations of the Company, as follows.[425]

- Expenses incurred under this Agreement shall be for and on behalf of the [hotel operating lessee or owner] and for its account;
- All debts and liabilities arising in the course of business of the [hotel] are and shall be obligations of the [hotel operating lessee or owner], and, provided such debts have been incurred in accordance with the terms and provisions of [the Management Agreements], [HVM] shall not be liable for any of such obligations by reasons of its management; and
- HVM is not obligated to advance any of its own funds to incur any such liabilities.[426]

## Purchasing

Under the Management Agreements, HVM was responsible for the procurement of goods and services related to the operations of the Company. As a result, HVM interacted directly with the various vendors that provided such goods and services for the hotels. In order to gain a general understanding of which legal entities were party to the various vendor contracts, a sample of vendor contracts and invoices were reviewed.

It appears that certain vendors were unclear as to exactly which entity was the vendor's obligor.[427] The contracts and invoices reflected inconsistencies among: 1) the Company's accounts payable entity (HVM, HVM Canada, or ESI); 2) the Company legal entity

---

[425] Management Agreements, Article IV [Bates Nos. ESH0003883-3907].

[426] In July 2009, the Bankruptcy Court authorized, but did obligate, the Debtors to reimburse HVM for amounts due for operating expenses incurred on the Debtors' behalf prior to the Petition Date that become due and payable by HVM.

[427] Rogers Deposition at 49-52.

name within the vendor contract; and/or 3) the Company legal entity name listed on the vendor invoice. [428]

### **Management Fee Earned by HVM**

In the hospitality industry, hotel management fees are typically comprised of two components – a base fee, usually charged as a percentage of revenue, and an incentive fee. The amount of the incentive fee is usually based on a percent of the profits earned once a certain threshold is reached.[429]

Industry practice indicated that total management fees – base fee plus incentive fee – as a percentage of gross revenue were different for full-service hotels and limited-service hotels like the Extended Stay Hotels. For fiscal years 2006, 2007, and 2008, total fees for full-service properties averaged 3.7%, 3.7%, and 3.6% of gross revenue, respectively. Over the same time period, limited service hotels incurred fees at average rates of 3.9%, 4.2% and 4.1%, respectively.[430] HVM's management fee arrangement, however, was different from the industry practice; the total amount of fees paid to HVM, pre- and post-Acquisition, was 6% of the total corporate overhead expenses incurred by HVM on behalf of the Company.[431]

HVM's total fee arrangement included three types of fee agreements between HVM and the Company: (1) Management Agreements; (2) G&A Agreements; and (3) Services Agreements. As discussed below, these three types of agreements were interrelated, and generally provided for HVM to be compensated as a function of the costs it incurred in managing the operation of the Company and the hotels.

First, under the Management Agreements HVM received a monthly management fee and the reimbursement of all direct property-level expenses incurred on behalf of the hotels

---

[428] *See* Exhibit III-F-1 for a summary of the contracts and invoices reviewed and the observations made.

[429] *Hotel Management Fees on the Rise, Incentive Clauses Triggered in 2005*, PKF Consulting, dated June 15, 2006. This report also indicated that the majority of contracts with incentives structured to allow for an owner's priority return are calculated on total project or acquisition cost versus the investor's actual equity.

[430] *Host 2009: Hotel Operating Statistics Study – Report for the Year 2008*, Smith Travel Research. Statistics only include properties that incurred such management fees.

[431] Rogers Deposition at 26.

at the actual cost (*e.g.*, hotel employees, electric, towels, etc.).[432] As the hotel manager, HVM was entitled to receive a management fee of 3.8% or 4% (depending on the particular agreement) of the Company's Gross Operating Revenue.[433]

Second, the G&A Agreements and Services Agreements together provided that any corporate overhead, and services expenses incurred by HVM on behalf of the Company were reimbursed at 106% of the actual cost. However, the 106% G&A fee was required to be paid only to the extent that the 106% amount exceeded the Management Fee for the period. Examples of the corporate overhead costs included in this calculation included HVM's corporate salaries and benefits for the approximately 380 HVM employees (excluding HVM owners' compensation), marketing and advertising costs, legal fees, accounting fees, professional fees, occupancy costs and expenses, insurance premiums (including directors and officers liability coverage), travel agent commissions, and technology expenditures including hardware and software costs.[434]

As an example, assume that for a given period Gross Operating Revenue of the properties equals $100, total corporate overhead expenses incurred equal $10, and the Management Fee rate is 4%. In this scenario, the Management Fee payable to HVM would equal $4.00 ($100 * 4%). However, pursuant to the G&A Agreements and the Services Agreements, total funds due to HVM equal $10.60 ($10 X 106%). Therefore, $4.00 would be paid as a Management Fee, $6.60 would be reimbursed via the G&A Agreements and Services Agreements, and HVM's operating profit for the period would be $0.60 ($10.60 less $10 of costs incurred).

In every month from the Closing to the Petition Date, the total reimbursement pursuant to the G&A Agreements and the Services Agreements was significantly higher than the

---

[432]    Management Agreements Article IV [Bates Nos. ESH0003883-3907].

[433]    Gross Operating Revenue is defined as the gross revenue of the hotels, exclusive of taxes collected. Management Agreements § 1.11. The Management Agreement with BRE/ESA Operating Lessee had a 4% Management Fee while all other Management Agreements have a 3.8% Management Fee.

[434]    G&A Agreements §§ 1.1 & 2.1 [Bates Nos. ESH0003839-3851]; Services Agreements §§ 1 & 2 [Bates Nos. ESH0003852-3855].

113

Management Fee.  As a result, the total amount of fees paid to HVM was effectively 6% of the total corporate overhead expenses incurred by HVM on behalf of the Company. [435]

Given the collective obligations for fees under the various agreements discussed above, HVM's profit was directly proportional to the amount HVM incurred on corporate overhead expenses.  A summary of HVM net income, owner compensation/draws, and owner distributions is summarized in the table below.[436]

| Summary of HVM Net Income, Owner Draws and Owner Distributions (in 000's) | | |
|---|---|---|
| **Period** | **FY 2007** | **FY 2008** |
| **Net Income (before owner draws)** | $       4,293 | $       4,357 |
| Owner Draws | $       1,790 | $       1,813 |
| Owner Distributions | 3,896 | 1,907 |
| **Total Owner Draws + Distributions** | $       5,686 | $       3,720 |

*Source: DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (Restated) and for the Year Ended December 31, 2008 and for the Period From Acquisition (June 11, 2007) to December 31, 2007 (Restated) (ESH0000107-164), DL-DW Holdings Consolidated Financial Statements and Other Financial Information for Year Ended December 31, 2007 and for the Period from Acquisition (June 11, 2007) to December 31, 2007 (WACH028803-28847), ESI and Subsidiaries Consolidated Financial Statements for the period January 1, 2007 through June 10, 2007 (ESH00003597-3641), Owner Draws/Distributions confirmed by Rogers through counsel to Debtors.*

## 2.    Accounting by the Company

As previously discussed, HVM's responsibilities included the accounting and financial reporting for the Company.  Accordingly, this responsibility included maintaining the accounting and tax books and records, preparing management reporting packages, and preparing financial statements in accordance with GAAP.[437]

---

[435]  Rogers Deposition at 26. Mr. Rogers confirmed that the fee paid pre-Closing was also 6%. Rogers Deposition at 71.

[436]  Owner draws and distributions do not include any compensation related to retention plans. Confirmed by Mr. Rogers through counsel to Debtors.

[437]  Management Agreements § 3.1; G&A Agreements § 1.1; and Services Agreements § 1.

**General Ledger Structure**

Although HVM maintained accounting records for all of the Debtor and non-debtor entities under the DL-DW umbrella, the accounting records were not completely segregated by legal entity. Instead, the general ledger was apparently designed primarily to simplify the transactional accounting processes for the Company, as discussed below. This system, while simple, did not result in there being separate books and records for each legal entity or borrower under the Loan Agreements.

For the period from June 2007 through May 2009, the Company's operations were tracked in thirteen discrete accounting databases numbered 01 through 15 (numbers 09 and 13 were not used).[438] The Company allocated corporate overhead expenses (*e.g.*, accounting, finance, facilities and purchasing, human resources, legal, marketing, revenue management, sales, IT, training, office administration, reservation systems, travel agent commissions, etc.), incurred by HVM on behalf of the Company, only at the accounting database level. Therefore, the Company did not separately maintain records of the complete accounting activity related to each legal entity or property, and would be unable to readily prepare a complete balance sheet or income statement at these levels.[439]

---

[438] For example, see the balance sheet and income statement trial balances as of August 31, 2008 which show the thirteen general ledger databases used by the Company [Bates Nos. ESH0072143-72157 and ESH0072370-72376].

[439] Rogers Deposition at 131-138.

115

The following table illustrates how each of the thirteen accounting databases "rolled up" to the consolidating and consolidated reporting levels.[440]

| Summary of General Ledger Accounting Database Levels and Roll-up of Each to the Consolidating and Consolidated Financial Reporting Levels | | | | | | | |
|---|---|---|---|---|---|---|---|
| **No.** | **Database Level** | **Consolidating Level** | | **Consolidated Level** | | | |
| 05 | ESA UD Properties | REIT | ESI & Subsidiaries | ESI Consolidated | BHAC Capital IV LLC Consolidated | Homestead Village LLC Consolidated | DL-DW Holdings LLC Consolidated |
| 10 | ESA REIT | | | | | | |
| 11 | ESA Spartanburg | | | | | | |
| 02 | ESA Operating Lessee | TRS Operating Lessees | | | | | |
| 06 | ESA West | | | | | | |
| 07 | ESA P Portfolio Operating Lessee | | | | | | |
| 08 | ESA 2005 Operating Lessee | | | | | | |
| 12 | ESA Canada Operating Lessee | | | | | | |
| 01 | HVM LLC | HVM LLC and Subsidiary | | | | | |
| 12 | HVM Canada | | | | | | |
| 14 | BHAC Capital IV | BHAC Capital IV LLC | | | | | |
| 03 | Homestead Village | Homestead Village LLC & Subsidiaries | | | | | |
| 04 | HVI(2) & ES-NA V | | | | | | |
| 15 | DL-DW Holdings | DL-DW Holdings LLC | | | | | |

*Sources: Monthly trial balances, June 2007 - May 2009 (ESH0071947-72438), Consolidating year end trial balances for the year ended December 31, 2007 (ESH0072439-72533) and the year ended December 31, 2008 (ESH0072702-72823).*

HVM did maintain certain property-specific revenue and expense transactions and balance sheet items to facilitate reporting the operating profit of each hotel.[441]  In fact, the Loan Agreements required the Company to maintain and report certain income statement data at the property-level.[442]  The following table summarizes the financial information that was and was not tracked at the property-level:

---

[440]  Database 12 is used for both HVM Canada and ESA Canada Operating Lessee.  *See* Exhibit III-F-2 for a comprehensive list of legal entities segregated by accounting database.

[441]  List of general ledger accounts tracked at the property level [Bates Nos. ESH0077001-77008].

[442]  Loan Agreements § 5.1.11(c).  *See* Exhibit III-F-3 for a summary of the property level information provided to the Servicer.

| Summary of Items Regularly Tracked / Not Tracked at Property Level | | |
|---|---|---|
| | **Income Statement** | **Balance Sheet** |
| **Tracked** | Revenue | Cash |
| | Property-specific expenses | Accounts receivable |
| | | Property, plant and equipment |
| | | Hotel inventory |
| | | Sales tax prepaid |
| | | Certain accruals |
| **Not Tracked** | Management / G&A Fee | Intercompany activity |
| | Corporate overhead expenses | Debt |
| | Interest income / expense | Equity |

*Source: List of general ledger accounts tracked at property level (ESH0077001-77008).*

## Intercompany Activity – HVM

As previously discussed, HVM, on behalf of the Company and its hotels, procured the majority of hotel-related items such as linens, soap and furnishings, and made the related disbursements to trade vendors and other creditors.[443]  These expenses were tracked on the Company's books at the property-level, using a property designation in each journal entry, and a corresponding intercompany payable due to HVM.  The "Due to HVM" account was maintained at a database/consolidated level (*i.e.*, intercompany accounts were not maintained at a legal entity or property-level).  HVM simultaneously recorded an intercompany receivable and accounts payable related to the specific vendor obligation. When the vendor was paid, the HVM vendor's accounts payable balance was reduced/eliminated.[444]

In addition, HVM recorded intercompany transactions for its management fees. When HVM earned a fee, it recorded fee revenue and an intercompany receivable on its books, and a corresponding fee expense and an intercompany payable for the entity for which services were provided (*i.e.*, ESI or Homestead).

---

[443]  Teichman First Day Declaration at 3-4.

[444]  Rogers Deposition at 118 & 44-47.  Mr. Rogers also confirmed this intercompany accounting during a meeting held at HVM on December 30, 2009.

### Intercompany Activity between Other Entities

Intercompany transactions between and among entities were also recorded under the DL-DW umbrella that did not involve HVM. For example, the property-owning REIT entities leased their properties to the operating lessee entities. This resulted in intercompany lease income / expense and intercompany receivables / payables being recorded between these entities on a regular basis.[445]

In addition, BHAC owned certain Company trademarks, which it leased to ESI's operating lessees.[446] BHAC recorded trademark fee income and a corresponding intercompany receivable due from the operating lessee. In turn, the operating lessee recorded a trademark fee expense with a corresponding intercompany payable due to BHAC.[447]

Also, as noted above, BHAC leased the Spartanburg, South Carolina Company headquarters from ESI.[448] Therefore, BHAC and ESI recorded intercompany lease income and expense, and any related receivables and payables, on a regular basis.[449]

Finally, a Working Capital Reserve Account, which was established for the benefit of all the Debtors shortly after the Closing, was held in bank accounts within DL-DW's consolidating accounting database (database 15).[450] This account originally held over $50,000,000. Since the funds were established on behalf of the Debtors, an offsetting intercompany payable was also recorded. As cash transfers were made to fund operating

---

[445] For example, see the balance sheet and income statement consolidating trial balances as of December 31, 2008 [Bates Nos. ESH0072702-72823 and ESH0072824-72919, respectively].

[446] DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (Restated) and for the Year Ended December 31, 2008 and for the Period From Acquisition (June 11, 2007) to December 31, 2007 (Restated) [Bates Nos. ESH0000107-164].

[447] For example, see the balance sheet and income statement consolidating trial balances as of December 31, 2008 [Bates Nos. ESH0072702-72823 and ESH0072824-72919, respectively].

[448] DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (Restated) and for the Year Ended December 31, 2008 and for the Period From Acquisition (June 11, 2007) to December 31, 2007 (Restated) [Bates Nos. ESH0000107-164].

[449] For example, see the balance sheet and income statement consolidating trial balances as of December 31, 2008 [Bates Nos. ESH0072702-72823 and ESH0072824-72919, respectively].

[450] Balance sheet monthly trial balance as of July 31, 2007 [Bates Nos. ESH0071965-71982]. This account was required under the Loan Agreements.

expenses from this working capital account, the intercompany payable on DL-DW's books was reduced.[451]

### Recording of Mortgage Debt and Mezzanine Debt

The Mortgage Debt and Mezzanine Debt were recorded at a consolidated level within the Homestead and ESI entities in accounting databases 03 and 10, respectively,[452] and the related debt service that was paid out of the Cash Management Account was recorded only at these levels (*i.e.*, not by Mezzanine Borrower or Mortgage Borrower). Significantly, the financial and accounting activities related to the Mortgage Debt and the Mezzanine Debt facilities were not recorded in the accounting records at any accounting level by a specific borrower. This is so, at least in part, because none of the Mortgage Borrowers or the Mezzanine Borrowers even maintained separate books and records.[453] Similarly, none of the Mezzanine Borrowers maintained separate bank accounts and the Mortgage Borrowers generally only maintained depository bank accounts that were swept into the Cash Management Account on a daily basis.[454] In fact, the legal entities that are Mezzanine Borrowers did not have specific general ledger codes within the Company's accounting system with which to track specific accounting activity.[455] Further, as previously discussed, only property-level accounting activity is maintained for the Mortgage Borrowers (*i.e.*, the records exclude certain items such as corporate overhead).

### Cash Movement

Most hotel customers paid using credit cards. The Company maintained several credit card settlement accounts to consolidate all credit card collections.[456] In addition, each of

---

[451] Rogers Deposition at 90 & 148-149.

[452] For example, see the balance sheet and income statement consolidating trial balances as of December 31, 2008 [Bates Nos. ESH0072702-72823 and ESH0072824-72919, respectively]. Also, Rogers Deposition at 141-143.

[453] Rogers Deposition at 131-138.

[454] *See* discussion related to Cash Movements below and Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for Order Authorizing Debtors to Continues Using Existing Centralized Cash Management System, Exhibit 2.

[455] *See* Exhibit III-F-2 for a comprehensive list of legal entities segregated by accounting database.

[456] The credit card settlement accounts were held at six entities: (1) ESA Properties LLC; (2) ESA P Portfolio LLC; (3) ESA 2005 Operating Lessee Inc.; (4) Homestead Village LLC; (5) ESA 2007 Operating Lessee Inc.

the Extended Stay Hotels had a local bank depository account and made daily deposits of the proceeds from cash sales. Cash from the depository and settlement accounts was transferred through frequent cash sweeps to the Cash Management Account (typically daily).[457] The Cash Management Account bank account was held at ESA P Portfolio LLC. The Servicer was in control of this bank account and made the Waterfall disbursements from this account.[458]

The Company tracked the cash collected on a property-level basis using specific general ledger codes.[459] When a cash sweep occurred, the Company recorded a journal entry to move the cash from the depository/settlement general ledger account to the Cash Management Account (*i.e.*, debit the Cash Management Account, credit the depository account). These entries were made <u>within</u> accounting database (03) for Homestead-related activity, and <u>within</u> database (10) for REIT-related activity. Accordingly, no intercompany activity was recorded in the books and records to reflect the transfer of cash between the Company's various legal entities, or to dividend or distribute cash up to, and through, the Mezzanine Borrowers.[460]

Once the cash entered the Cash Management Account, it then was disbursed by the Servicer in accordance with the priorities set forth in the Cash Management Agreements. The disbursements made to service the monthly interest payments on the Mortgage Debt and Mezzanine Debt were recorded on a consolidated level (interest expense) at the Homestead and ESI accounting levels (accounting databases (03) and (10), respectively). These disbursements also included the Approved Operating Expenses and excess cash, if any, which were transferred by the Servicer to a bank account held by ESA P Portfolio Operating Lessee, Inc.[461]

---

and (6) ESA Canada Operating Lessee Inc. (Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for Order Authorizing Debtors to Continue Using Existing Centralized Cash Management System, Exhibit 2.)

[457] *See* Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for Order Authorizing Debtors to Continue Using Existing Centralized Cash Management System.

[458] *Id.*

[459] Confirmed by Mr. Rogers through counsel to Debtors.

[460] Rogers Deposition at 141-144.

[461] The bank account within ESA P Portfolio Operating Lessee, Inc. is the account to which Approved Operating Expenses are transferred from the Cash Management Account. Rogers Deposition at 155-56.

As needed, funds were transferred from the operating bank account held by ESA P Portfolio Operating Lessee, Inc. to an HVM operating account to pay for costs of the operations of the Company. As a result, the intercompany balances on the Company's books, which were tracked only at the accounting database level (*i.e.*, due to HVM), were reduced for the amount of the funds transferred to HVM.[462]

**Financial Reporting**

HVM's financial reporting responsibilities included the preparation of (1) annual GAAP financial statements; (2) monthly Servicer Reports submitted to lenders pursuant to the Loan Agreements; and (3) management reports used for internal analysis. HVM also compiled financial data for the Approved Annual Budget.[463]

a.      **Financial Statements**

In the period between the Closing and the Petition Date, the Company issued audited GAAP consolidated and consolidating financial statements for the period from Closing to December 31, 2007[464] and for the twelve months ended December 31, 2008[465] for the BHAC and DL-DW consolidated levels. These consolidated statements included HVM, as required by GAAP, notwithstanding the fact that HVM was a separately-owned entity.[466] HVM also compiled unaudited quarterly consolidated and consolidating financial statements for BHAC and DL-DW as of March 31, 2008,[467] June 30, 2008,[468] September 30, 2008,[469] March 31, 2009,[470] and

---

[462]    Rogers Deposition at 150-56.

[463]    Management Agreements § 3.1.

[464]    DL-DW Holdings Consolidated Financial Statements and Other Financial Information for Year Ended December 31, 2007 and for the Period from Acquisition (June 11, 2007) to December 31, 2007 (WACH028803-28847). The statement of operations, the statement of changes in members' equity, and statement of cash flows were for the period from the Acquisition through December 31, 2007.

[465]    DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (Restated) and for the Year Ended December 31, 2008 and for the Period From Acquisition (June 11, 2007) to December 31, 2007 (Restated) [Bates Nos. ESH0000107-164].

[466]    *Id.*

[467]    BHAC and DL-DW Consolidated and Consolidating financial statements for the period ending March 31, 2008 [Bates Nos. ESH0005472-5478 and ESH0005516-5520, respectively].

[468]    BHAC and DL-DW Consolidated and Consolidating financial statements for the period ending June 30, 2008 [Bates Nos. ESH0005479-5487 and ESH0005522-5529, respectively].

June 30, 2009.[471]  HVM did not prepare quarterly financial reports for any entities as of June 30, 2007 or September 30, 2007.

### b. Servicer Reports

Servicer Reports were prepared by HVM on a monthly basis as required that contained certain property level and consolidated financial information.[472]  The Servicer made these monthly reporting packages available to the various Mortgage Lenders and Mezzanine Lenders.  (See Exhibit III-F-3 for a list of information provided in the Servicer Reports.)

### c. Management Reports

HVM also compiled certain financial reports that were used for internal management reporting.  These reports included monthly property-level actual and budgeted income statements,[473] monthly cash flow projections,[474] monthly capital expenditure reports,[475] and monthly corporate overhead reports.[476]  Certain of these management reports, such as property-level income statement data, cash flow projections, and capital expenditure reports, had various iterations for the different hotel subsets (*i.e.*, the 664 financed properties, the leased properties, the 552 ESI properties, etc.).

### 3. Officer Certificates

The Mortgage Loan Agreements and Mezzanine Loan Agreements include certain covenants that are substantially the same across the various Loan Agreements.  Among other things, these covenants included obligations with respect to financial reporting.  More specifically, the Loan Agreements contained covenants under which each Borrower and Property

---

[469]  BHAC and DL-DW Consolidated and Consolidating financial statements for the period ending September 30, 2008 [Bates Nos. ESH0005488-5495 and ESH0005530-5536, respectively].

[470]  BHAC and DL-DW Consolidated and Consolidating financial statements for the period ending March 31, 2009 [Bates Nos. ESH0005496-5506 and ESH0005537-5544, respectively].

[471]  BHAC and DL-DW Consolidated and Consolidating financial statements for the period ending June 30, 2009 [Bates Nos. ESH0005507-5515 and ESH0005545-5552, respectively].

[472]  As required by the Loan Agreements, § 5.1.11(c).

[473]  For example, see P and L Analyzer analysis dated February 2009 [Bates Nos. ESH0064295-67940].

[474]  For example, see ESH Corporate Model dated January 2009 [Bates Nos. ESH0040017-40355].

[475]  For example, see 2008 monthly Capex reports [Bates Nos. ESH0077473-77490].

[476]  For example, see 2008 Corporate Overhead report dated December 31, 2008 [Bates Nos. ESH0072971-72974].

Owner agreed that it would keep proper books, records and accounts, reconciled in accordance with GAAP and furnish the Mortgage Lenders and Mezzanine Lenders within: [477]

- 60 days after the end of each Fiscal Year, a copy of (i) ESA's and Homestead Village's annual financial statements audited by a "Big Four" accounting firm including an unqualified opinion; (ii) an Officer's Certificate stating that the financial statements comply with GAAP; and (iii) certain other supplemental financial information.

- 20 days after each month, with: (i) occupancy reports; (ii) monthly and year-to-date operating statements; (iii) calculation of Debt Yield on the last day of the month; and (iv) the amount of all operating rent due.

- 30 days after each month, with an Officer's Certificate stating that the financial information provided is accurate and that the representations and warranties set forth in subsection (xix) of the definition of Special Purpose Entity are correct. This definition includes a representation that, among other requirements, the SPE will: [478]

  o maintain its own accounts, records, books, accounting records, financial statements, resolutions and agreements, unless otherwise provided in the Loan Agreements;

  o conduct its business in its own name, except for services rendered under the management services agreement, in which case the manager must hold itself out as an agent;

  o not incur, create or assume liabilities that (a) are more than sixty (60) days past the date incurred, (b) are evidenced by a note, or (c) not are paid when due.

### Annual Officer Certificates

As required by the Loan Agreements discussed above, the Company filed two annual compliance certificates during the period from the Closing to the Petition Date, as described below:

- **Fiscal 2007** - The officer certificate for fiscal 2007 was issued on May 29, 2008, was signed by Mr. Rogers and stated that:

  To the undersigned's knowledge, as of the date of this certificate, no default or event of default under the loan documents exists, except for the matter of the date of delivery of the 2007 audited financial statements for which lender has provided an extension

---

[477] For example, see Mortgage Loan Agreement Art. V [Bates Nos. WACH000772-1009].

[478] For example, see Mortgage Loan Agreement, Special Purpose Entity definition included in § 1.1 [Bates Nos. WACH000772-1009].

through May 30, 2008, and delivery as of this date constitutes compliance for the delivery of the 2007 audited financial statements.[479]

The 2007 audited financial statements were issued on May 22, 2008.[480]

- **Fiscal 2008** - The officer certificate for fiscal 2008 was issued on March 16, 2009 was signed by Mr. Teichman and stated that:[481]

> To the undersigned's knowledge, as of the date of this certificate, no default or event of default under the loan documents exists after giving effect to an extension of the time to comply with Section 5.1.11 (b) of the Loan Agreement to March 16, 2009 and provided that no certification is made as to whether the requirements of Section 5.1.11 (b) have been satisfied.[482]

The 2008 audited financial statements were issued on March 12, 2009 and reflected a "going concern" audit opinion.[483] [484]

### **Monthly Officer Certificates**

The Company filed the various monthly certificates required under the Loan Agreements, which were signed by Mr. Rogers, and stated that: [485]

- For the period June 2007 through February 2009:
  1. The items furnished to Lender pursuant to Section 5.1.11 (c) for [time period] are true, correct, accurate, and complete in all material respects and fairly present the results and operations of the

---

[479] Officer's Certificate dated May 29, 2008 [Bates Nos. ESH0029075].

[480] The DL-DW Holdings Consolidated Financial Statements and Other Financial Information for Year Ended December 31, 2007 and for the Period from Acquisition (June 11, 2007) to December 31, 2007 were dated May 22, 2008 [Bates Nos. WACH028803-28847].

[481] Although the signature on the certificate was illegible, Mr. Rogers testified that Mr. Teichman signed this certificate. *See* Rogers Deposition at 207.

[482] Officer's Certificate dated March 16, 2009 [Bates Nos. ESH0029015].

[483] The audit opinion states "the Company's recurring losses from operations, net working capital deficiency, members' deficit, and inability to generate sufficient cash flow to meet its obligations and sustain its operations raise substantial doubt about its ability to continue as a going concern." [Bates Nos. ESH 0000109]. This is typically referred to as "going concern" opinion. While it may not impact the auditor's unqualified opinion, Generally Accepted Auditing Standards requires an explanatory paragraph be added to the standard report when an auditor has substantial doubt about the entity's ability to continue as a going concern.

[484] DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (Restated) and for the Year Ended December 31, 2008 and for the Period From Acquisition (June 11, 2007) to December 31, 2007 (Restated) [Bates Nos. ESH0000107-164].

[485] Rogers Deposition pp. 205 & 208.

Borrower, Property Owner and the Properties, subject to normal year-end adjustments.

2.   The representations and warranties of Borrower and Property Owner set forth in Subsection (xix) of the definition of "Special Purpose Entity" in Section 1.1 are true and correct as of the date of this certificate.[486]

- <u>For the period March and April 2009</u>, the same language noted above except for the bolded modification:

  The representations and warranties of Borrower and Property Owner set forth in Subsection (xix) of the definition of "Special Purpose Entity" in Section 1.1 are true and correct ***in all material respects*** as of the date of this certificate.[487]

- <u>For the period May and June 2009</u>, the same language noted above except for the bolded modification:

  Regarding the representations and warranties of Borrower and Property Owner set forth in Subsection (xix) of the definition of "Special Purpose Entity" in Section 1.1 ***no representation is made*** as of the date of this certificate.[488]

When Mr. Rogers was asked about the reason for changing the language in the monthly officer certificates, he stated that they were made based on discussions with counsel.[489]

## G.   Underwriters' Marketing of Mortgage and Mezzanine Debt Certificates

After the execution of the funding commitment letter on May 1, 2007,[490] but prior to the Closing of the Acquisition, the lenders that had committed to finance the Acquisition tried to sell portions of the Mezzanine Debt. Those efforts, however, were not successful.[491]

---

[486]   Officer's Certificates for the period from July 2007 through February 2009 [Bates Nos. ESH0029122, ESH0029125-29137, ESH0029139, and ESH0029141-29146].

[487]   Officer's Certificate dated April 30, 2009 [Bates No. ESH0029138] and Officer's Certificate dated May, 30 2009 [Bates Nos. ESH0029140]. (Emphasis added.)

[488]   Officer's Certificate dated June 30, 2009 [Bates No. ESH0029123] and Officer's Certificate dated July 30, 2009 [Bates No. ESH0029124]. (Emphasis added.)

[489]   Rogers Deposition at 205-207.

[490]   Commitment Letter from Wachovia Bank and Bear Sterns Commercial Mortgage [Bates No. DL_LS_EXMN00059043].

[491]   Telephone Interview by Margreta M. Morgulas with Representatives of Wachovia Bank, N.A., Feb. 18, 2010.

Accordingly, as of the Closing on June 11, 2007, the banks that financed the Acquisition[492] – Wachovia, Bear, and BofA – held all of the Mezzanine A and Mortgage Debt.

According to Wachovia and other underwriting banks, all of the underwriting banks prepared the marketing materials that were used in connection with the offering to investors of both the CMBS and the Mezzanine Debt.[493] The sale process for both the CMBS and the Mezzanine Debt was very fluid and the banks, whether selling together, as they did in the beginning, or separately, as they did later in the process, relied on the market to help them properly price the debt.[494] By way of example, the opening pages of the Mezzanine Debt offering memorandums produced by the underwriting banks in June 2007, November 2007, and February 2008 reflect the changing terms at which debt in the various tranches was being offered for sale by the banks.[495]

According to Wachovia, once all of the necessary reports, opinions, and audited financials were received, the banks crafted the necessary offering materials for the CMBS, priced the debt at the various tranches, and immediately began marketing the CMBS debt. Although at the beginning of the sale process the CMBS market was very active, Wachovia said that they quickly began to see a softening in the market, starting in late July or early August 2007.[496] Not surprisingly, the weaker market conditions resulted in fewer orders being placed. Accordingly, the banks began taking more aggressive steps to move the CMBS debt. For instance, as early as August 2007, the banks began discounting the CMBS debt and revising the price guidance.

---

[492] Subsequently, other banks would join as lenders pursuant to amendments to the various Loan Agreements; however, as of June 11, 2007, Wachovia Bank, N.A.; Bear; and BofA were the lenders under the Mortgage and Mezzanine Loan Agreements.

[493] Interview with Representatives of Wachovia Bank, N.A., Offices of Morrison & Foerster LLP, New York, New York, January 12, 2010.

[494] *Id.*

[495] *See* "Confidential Mezzanine Debt Offering Memorandum, $7.4 Billion Acquisition Financing, June 2007" (Catalyst ID17882); "Confidential Mezzanine Debt Offering Memorandum, $7.4 Billion Acquisition Financing, November 2007" [Bates No. WACH000713]; "Confidential Mezzanine Debt Offering Memorandum, $7.4 Billion Acquisition Financing, Feb. 2008" [Bates No. WACH000003].

[496] Interview with Representatives of Wachovia Bank, N.A., Offices of Morrison & Foerster LLP, New York, New York, Jan. 12, 2010.

At this time, discounts were being offered for the Mezzanine Debt as well, where general market conditions and concerns about the leverage in the deal put additional pressures on the banks to reduce prices.[497]  Indeed, Wachovia stated that at a certain point, it became *necessary* to offer discounts to move any paper.  The banks also reportedly began offering to provide buyers of the Mezzanine Debt with financing ("repo financing") to help buyers purchase the debt.  However, as both Wachovia and other underwriters pointed out, while such repo financing may have not been a common market practice in the latter parts of 2007, certainly by some point in 2008 it became much more common to see such financing being offered, both in connection with the sale of the Company's debt, as well as in the debt markets in general.[498]

In an August 29, 2007 article that appeared in the Wall Street Journal, Mr. Lichtenstein acknowledged what the banks were, of no doubt painfully aware regarding the banks' difficulties in selling the Extended Stay debt:  "I know they're not selling well," said Mr. Lichtenstein, "[b]ut I don't think a lot is selling, period."[499]  In other words, Mr. Lichtenstein suggested that the sources of the problem with selling the Extended Stay CMBS debt were the CMBS market and global economic issues, and not issues unique to the Acquisition or the Company.  According to the Wall Street Journal article, in addition to the market issues generally, investors may have been less interested in investing in the Extended Stay CMBS debt because they were part of a so-called single-borrower issue, meaning they were not part of a more diversified pool of loans made to different borrowers.[500]

In addition to offering discounts to sell the CMBS and Mezzanine Debt, according to Mr. Lichtenstein, the banks made certain demands on him and the Company regarding actions that they believed needed to be taken to make the CMBS and Mezzanine Debt more attractive to potential investors.  Several of the more significant demands cited to the

---

[497]  *Id.*

[498]  *Id.*

[499]  Chittum, Ryan and Dunham, Kemba J., "What's Brewing in the Real Estate Market: Test for Mortgage-Backed Securities," Aug. 29, 2007, p. B4.

[500]  *Id.*

Examiner by Mr. Lichtenstein and others are explored in greater detail in the following subsections. Mr. Lichtenstein and/or the appropriate persons at the Company made decisions, for reasons that they alone know, to honor such demands. The Examiner does not draw any conclusions about the advisability of having complied with such demands, as those matters are beyond the scope of this Investigation.

### 1. HPT Alleged Default

Prior to the Acquisition, HVI(2) Incorporated, an entity within the Company's corporate umbrella, entered into a lease agreement dated February 23, 1999 ("HPT Lease"), pursuant to which it, as lessee, leased from HPT HSD Properties Trust, as lessor ("HPT HSD"), eighteen hotel properties located in Georgia, Florida, Maryland, North Carolina and Virginia. Prior to the Acquisition, the term of the HPT Lease ran through December 31, 2015, and was subject to two fifteen year renewal options. The HPT Lease imposed on HVI(2) Incorporated, as lessee, certain covenants, including the requirement to maintain certain specified net worth during the term of the HPT Lease.[501]

In addition, the HPT Lease apparently required certain things to be done in the event that the lessee intended to effect a change of control, such as that effected through the Acquisition. While Mr. Lichtenstein takes the position that Lightstone fully and timely complied with the applicable change of control provisions in the HPT Lease,[502] it was apparently the position of the lessor, HPT HSD, that Lightstone had not. Accordingly, shortly after the Closing of the Acquisition, on June 18, 2007, HPT HSD issued its "Notice of Event of Default and Lease Termination."[503] That same day, HPT also issued a Press Release that provided as follows:

> HPT's decision to declare a lease default and termination is based upon the facts that a Lightstone Group affiliate acquired control of the Homestead tenant on June 11, 2007, without first obtaining HPT's consent and without providing HPT with timely evidence by which HPT might reasonably

---

[501] *See* Offering Memorandum, Appendix C [Bates No. BLA-002273]; *see also*, Lichtenstein Deposition at 186 l-12, 187:1-16.

[502] *See* Letter from Joseph E. Teichman to John G. Murray dated June 20, 2007 [Bates No. DL_LS_EXMN00089104]; *see also* Lichtenstein Deposition at 187:13-15.

[503] *See* Hospitality Properties Trust, Current Report (Form 8-K), Exhibits 99.1 and 99.2 (June 22, 2007)

determine that the tenant has a sufficient net worth, as required by the Lease.[504]

According to Mr. Lichtenstein, Lightstone viewed HPT HSD's allegations to be unfounded and without merit and, therefore, he believed that the Company likely could litigate and prevail in the matter.[505]  However, HPT HSD's allegations that the Company had defaulted under the HPT Lease apparently caused great concern among the Lenders, because such a default could lead to an event of default under the CMBS and Mezzanine Loan Agreements. Accordingly, in his deposition, Mr. Lichtenstein stated that, after HPT HSD declared a default and termination of the HPT Lease, he was told by Wachovia, "'Resolve the defaults or else.'"[506] With respect to Mr. Lichtenstein's beliefs that the Company could prevail in litigation against HPT HSD relating to the alleged defaults under the HPT Lease, Mr. Lichtenstein alleges that Wachovia told him that "'we don't care that they're going to lose.  We can't sell our paper.  You figure it out.'"[507]  When the Examiner's Professionals approached Wachovia regarding this matter, they were informed that the bank does not believe that any such pressure was ever put on Mr. Lichtenstein with respect to the HPT Lease situation.[508]  Indeed, as Wachovia pointed out, it would lend Mr. Lichtenstein, who would acquire the properties through HFI Acquisitions LLC ("HFI"), nearly $70 million in connection with the transaction.

Thereafter, Mr. Lichtenstein said he met with representatives of HPT HSD and was presented with one option to resolve the outstanding issues between the parties – to purchase the properties that were subject to the HPT Lease.[509]  Given what Mr. Lichtenstein described as feeling like he had little choice, Mr. Lichtenstein contends that he personally borrowed and/or put together the approximately $192 million necessary to purchase 17 of the 18 leased properties.[510]  According to a settlement motion recently filed in the Chapter 11 Cases [Docket

---

[504]   *Id.* at Exhibit 99.1 at 1.

[505]   Lichtenstein Deposition at 187:13-15.

[506]   Lichtenstein Deposition at 161:5-8.

[507]   Lichtenstein Deposition at 187:16-18.

[508]   Telephone Interview by Margreta M. Morgulas with Representatives of Wachovia Bank, N.A., Feb. 18, 2010.

[509]   Lichtenstein Deposition at 187:19-21.

[510]   *See* "HPT Portfolio Sources and Uses Summary, Dated July 26, 2007" [Bates No. ESH0076587].

No. 760] ("HPT Settlement Motion"), HFI partially financed its acquisition by borrowing an aggregate of approximately $170.5 million in mortgage and mezzanine loans from Wachovia, Bear, BofA and Merrill Lynch Mortgage. As reflected on the "HPT Portfolio Sources and Uses Summary, Dated July 26, 2007," the remainder of the Purchase Price came from a variety of sources, some of which appear to be Company sources.[511]

As reflected in the HPT Settlement Motion, after Mr. Lichtenstein acquired the properties formerly subject to the HPT Lease, those hotels continued to be leased by HVI(2) LLC ("HVI(2)") and operated by HVM. According to the HPT Settlement Motion, commencing on August 3, 2009, and continuing thereafter, HVI(2) failed to make required lease payments to HFI and, therefore, defaulted under the terms of the operative lease agreement. On August 6, 2009, HFI declared a default under the terms of the relevant lease agreement.[512] According to Mr. Lichtenstein, HFI thereafter defaulted under the terms of its financing agreements and the banks foreclosed on the properties.[513] What apparently transpired was that the parties negotiated a complex series of restructuring agreements which, when fully consummated, would permit: (i) the lenders to exercise their remedies under the financing agreements in a controlled manner, (ii) HVI(2) to remain as the lessee of the properties (with HVM managing the same) and continue to reap the financial benefits associated therewith, and (iii) appropriate releases to be approved by the Bankruptcy Court upon notice and an opportunity for a hearing after full disclosure of the operative facts to the parties in interest in the Chapter 11 Cases.

---

[511] Bates No. ESH0076587. Because the issue of the purchase of the HPT properties was outside the scope of the Investigation, the Examiner did not have the time or resources necessary to develop the facts related to the HPT HSD lease purchase transaction. During his deposition, Lichtenstein stated that HPT HSD permitted him to use the approximately $15-16 million security deposit under the HPT Lease towards the purchase price. Lichtenstein Deposition at 190: 5-8. His counsel subsequently challenged the accuracy of this statement. However, the use of the deposit appears to be confirmed on the Sources and Uses from the HPT closing statement. [Bates No. ESH0076587]. According to the Debtors, the deposit was the property of non-Debtor HVI(2), LLC. The Examiner has not done any further investigation into the facts of the source or use of the deposit.

[512] *See* HPT Settlement Motion at 3-6.

[513] Lichtenstein Deposition at 191:20-24.

## 2.    <u>Gary DeLapp Employment Contract</u>

Given the fact that Mr. Lichtenstein had no prior experience in the hospitality industry and Gary DeLapp had been with, and, in Mr. Lichtenstein's opinion, had successfully managed some portion of the Extended Stay properties for over two decades, Wachovia said that the lenders financing the Acquisition requested that the Company execute an employment agreement with Mr. DeLapp prior to the Closing of the Acquisition.  In Wachovia's opinion, this was critical to easing the concerns of potential investors about the relative inexperience of the new owners of the Company.[514]  This concept is reflected in the "Confidential Mezzanine Debt Offering Memorandum, $7.4 Billion Acquisition Financing, June 2007," wherein it states that "ESH's senior management team, including Gary DeLapp . . . are expected to remain on board after the Acquisition."[515]  In other words, the banks wanted potential investors to know that the Company and its assets were being managed by people with experience not only in the industry in general, but with the Company in particular.

In his deposition, Mr. Lichtenstein contended that, after the Closing of the Acquisition, "the banks" began demanding that he agree to execute a three-year employment agreement with Mr. DeLapp on terms that Mr. Lichtenstein implied were less than favorable, because "the banks" believed that having such a longer-term contract in place would help the banks sell their debt.[516]  Wachovia did not dispute that, subsequent to the Closing of the Acquisition, it began to put additional pressure on Mr. Lichtenstein to ensure that Mr. DeLapp was contractually bound to remain with the Company for a reasonable period of time following the Acquisition.  Wachovia stated, however, that it had encouraged Mr. Lichtenstein to put in place more long-term arrangements with Mr. DeLapp well in advance of the Closing of the Acquisition.  According to Wachovia, if any delay cost Mr. Lichtenstein or the Company additional money, Mr. Lichtenstein has no one but himself to blame.[517]

---

[514]    Telephone Interview by Margreta M. Morgulas with Representatives of Wachovia Bank, N.A., Feb. 18, 2010.

[515]    *See* "Confidential Mezzanine Debt Offering Memorandum, $7.4 Billion Acquisition Financing, June 2007" at 5 (Catalyst ID 17882).

[516]    Lichtenstein Deposition at 160:11, 161: 4.

[517]    Telephone Interview by Margreta M. Morgulas with Representatives of Wachovia Bank, N.A., Feb. 18, 2010.

Regardless of the reasons, on July 10, 2007, Mr. Lichtenstein, on behalf of HVM, executed a three-year employment agreement with Mr. DeLapp.[518]  The banks highlighted the terms of the contractual arrangement for potential lenders in the mezzanine offering materials dated November 2007:[519]

> Gary DeLapp signed a 3-year contract to remain President and CEO.  Mr. DeLapp is co-invested with the Sponsors in the Acquisitions.  In addition, other key senior management personnel remained with the Company after the acquisition.

### 3. Lightstone's Post-Acquisition Efforts to Sell Preferred Equity

According to Mr. Lichtenstein, after the Closing of the Acquisition, Wachovia and the other banks that financed the Acquisition agreed to permit him to try to sell approximately half of the $220 million in equity that he had purchased in connection with the Acquisition, the portion that he borrowed $120 million from Citibank to buy.[520]  In connection with those sale efforts, Mr. Lichtenstein hired Atlantic Pacific Capital, Inc. as Placement Agent ("Atlantic") immediately following the June 11, 2007 Closing.[521]  As reflected in the documents produced by Lightstone, Atlantic subsequently prepared offering materials[522] and immediately began contacting what it later represented to be over 60 potential investors.

No definitive buyers for the preferred equity were located within the period that Atlantic worked on this project.  However, according to the e-mails produced by Lightstone, Atlantic purported to have found a number of potentially interested parties that were willing to sign confidentiality agreements.  In addition, Atlantic arranged a number of meetings between potential investors, Mr. Lichtenstein, and other members of Lightstone's management team.[523]

---

[518]  "Employment Agreement," dated July 10, 2007 [Bates No. ESH0076826].

[519]  *See* "Confidential Mezzanine Debt Offering Memorandum, $7.4 Billion Acquisition Financing, November 2007" [Bates No. WACH 000713].

[520]  Lichtenstein Deposition at 142:24, 143:2.

[521]  Lichtenstein Deposition at 146:17.

[522]  *See* "The Lightstone Group Acquisition of Extended Stay Hotels," dated May 2007 [Bates No. DL_LS_EXMN00088518]

[523]  *See* Bates Nos. DL_LS_EXMN00000088556, 00088560, 00088610, 0088617, 0088621, 0088649.

In the middle of Atlantic's work on behalf of Mr. Lichtenstein, Wachovia contacted Mr. Lichtenstein and requested that he limit his sales efforts so as not to interfere with the bank's ongoing efforts to sell the debt. In an e-mail from Robert Verrone of Wachovia to Joshua Kornberg of Lightstone, Mr. Verrone stated, in pertinent part:[524]

> joshua- as per our discussion we only want you to talk to the following guys for the next 45 days- after that we should have a bunch of mezz sold and we will be more open to you going out to the world. We need one message and right now we have [too] many. Can we have an agreement that [the] four listed below are the only ones you will talk to and you will stop the rest of the calls for 45 days
>
> david- first citi went to [the] world[525]
>
> Then ivan went to the world[526]
>
> Then HPT
>
> now this
>
> we need some help
>
> thanks

The response from Mr. Kornberg to Mr. Verrone on July 18, 2007 was simply: "We will fully cooperate with you during your efforts to sell the mezz."[527] There is no indication in the documents produced to the Examiner that Lightstone did anything other than that which it indicated it would do – cooperate with Mr. Verrone's request. Indeed it appears Lightstone went further than Mr. Verrone requested, and completely terminated its relationship with Atlantic. However, it is unclear whether Atlantic was terminated in order to accommodate the bank's request, or because Atlantic had not been successful in locating buyers for the preferred equity,

---

[524] E-Mail from Robert Verrone to Joshua Kornberg dated July 17, 2007 [Bates No. DL_LS_EXMN00088635].

[525] This is assumed to be a reference to the fact that David Lichtenstein and his financial advisors previously sought co-investors with respect to a portion of the total equity, approximately $220 million that he invested in connection with the Acquisition.

[526] This is assumed to be a reference to Ivan Kaufman of Arbor Realty Trust ("Arbor"). In total, Arbor was committed to purchase approximately $210 million in equity in connection with the Acquisition. Arbor ultimately would find purchasers for a portion of this total commitment, presumably through marketing efforts.

[527] E-Mail from Joshua Kornberg to Robert Verrone dated July 18, 2007 [Bates No. DL_LS_EXMN00088635].

or both.  In any event, pursuant to a formal letter dated August 3, 2007, from Joshua Kornberg of Lightstone to James Manley of Atlantic, Lightstone terminated its relationship with Atlantic, citing the "state of the market and the associated challenges of marketing the Extended Stay Hotels Preferred Equity Investment."[528]

### 4.  DL-DW Purchase of LIBOR Floor Certificates

According to Wachovia, early on in the process of trying to sell the debt, it realized that it needed to amend the financing agreements in order to make the debt more palatable to potential investors.[529]  The amendment, which related to the application of proceeds from prepayments, was accomplished through a letter agreement dated August 31, 2007.[530]  As provided in that amendment, in exchange for the borrowers' consent to the amendment, the lenders agreed to issue to the borrowers (or their designees) Class X-A and X-B certificates from the securitization (collectively, the "X-A/X-B Certificates" or "LIBOR Floor Certificates").[531]

On November 2, 2007, the X-A/X-B Certificates were issued, in physical form, to DL-DW rather than to one of the borrowers under the loan agreements.[532]  The X-A/X-B Certificates were investment grade (AAA) "LIBOR floor certificates."  The LIBOR Floor Certificates represented the right to receive the payment stream of the difference in the LIBOR floors pursuant to the floating rate components of the Mortgage Debt and actual LIBOR.  Thus, while not representing a right of offset, DL-DW's ownership of these certificates effectively eliminated the floating rate components of the Mortgage Debt.  As LIBOR began dropping throughout 2008-09, the X-A/X-B Certificates became increasingly valuable.  The X-A/X-B Certificates are no longer in the possession of DL-DW or any other entity related to the Debtors as discussed in section III.J. of this Report.

---

[528]  *See* Bates No. DL_LS_EXMN00088675.

[529]  Telephone Interview by Margreta M. Morgulas with Representatives of Wachovia Bank, N.A., Feb. 18, 2010; *see also* Deposition Transcript of Joseph Teichman dated Jan. 21, 2010 at 197-99.

[530]  *See* Letter Agreement dated August 31, 2007 [Bates No. ESH0076706].

[531]  *Id.*

[532]  *See* Bates Nos. ESH0076727, ESH 0076729, ESH0076737.

### H. 2007 Post-Acquisition Performance

After the Acquisition, the Company's overall performance in 2007 declined, and it missed various performance metrics set forth in its budgets. In addition, following the Acquisition, the Company had problems with the Servicer when certain operating funds were not made available, and there was disagreement about the composition of the 2007 budget. The Company's 2007 post-Acquisition performance, and the beginning of its liquidity problems, are discussed below in the following sections: (1) 2007 Post-Acquisition Financial Performance of the Company; (2) 2007 Budget and the 2008 Budget Submission; (3) Debt Yield Test and Cash Trap; and (4) Distributions and Dividends paid during 2007.

#### 1. 2007 Post-Acquisition Financial Performance

As of the Petition Date, although the Company operated and managed 684 hotel properties under one ultimate owner (*i.e.*, DL-DW),[533] the cash flows from only 664 of the hotels were available in the Cash Management Account to service the Debt.[534] [535] Further, the entities that filed for bankruptcy included those that own or operate the 664 properties.[536] The discussion related to the 2007 post-Acquisition financial performance that follows provides financial information about the Company and certain isolated performance measures with respect to the 664 hotels.

As shown below, the Company's 2007 post-Acquisition revenues were approximately $623 million, as compared to a pro-forma budget[537] of approximately $655 million, or 5% below the budget. Also, the 2007 post-Acquisition pro-forma EBITDA was approximately $327 million (or a 52% margin), as compared to a pro-forma budget EBITDA of $364 million (or a 56% margin).

---

[533] The 684 hotels operated by the Company comprised 664 hotels that were pledged under the $7.4 billion Mortgage Debt and Mezzanine Debt facilities, 18 leased properties and 2 "Excluded Properties" which were hotels located in Ohio and Pennsylvania and pledged as collateral under a separate $8.5 million loan with Bank of America.

[534] Teichman First Day Declaration at ¶¶ 19 & 22.

[535] In addition, only 664 of the 684 hotels were pledged as collateral for the Debt.

[536] As of February 26, 2010, a total of 75 entities related to the Company have filed for bankruptcy. See Exhibit I-A-1 for a list of the entities that have filed and the date it filed.

[537] *See* Exhibit III-H-1 for the calculation of the pro-forma budget.

| 2007 Post-Acquisition Pro-Forma EBIDTA (in 000's) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | June 11, 2007 through December 31, 2007 | | | | Variance | | |
| | DLDW 684 Hotels | % of Rev | Pro-Forma Budget | % of Rev | | $ | % |
| Total Revenue | $ 623,104 | *100%* | $ 654,656 | *100%* | $ | (31,552) | *-5%* |
| Property operating expenses | (261,303) | *-42%* | (255,985) | *-39%* | | 5,318 | *2%* |
| **Pro-forma Property-Level EBITDA** | 361,801 | *58%* | 398,671 | *61%* | | (36,870) | *-9%* |
| Corporate operating expenses | (34,849) | *-6%* | (34,596) | *-5%* | | 253 | *1%* |
| **Pro-forma Corporate-Level EBITDA** | $ 326,952 | *52%* | $ 364,075 | *56%* | $ | (37,123) | *-10%* |

*Source: DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (restated) and for the Year Ended December 31, 2008 and for the Period from Acquisition (June 11, 2007) to December 31, 2007 (Restated) (ESH0000107-164).*

## 2007 Post-Acquisition Performance Metrics (OCC, ADR and RevPAR)

During the second half of 2007, the Company experienced a reduction in room demand, and the monthly ADR, OCC, and RevPAR were at or below budget in every month following the Acquisition in 2007 as shown below:[538]

---

[538] The budgeted key metrics included in this table were obtained from the 2007 Approved Annual Budget, which is based on 682 hotels as opposed to the 684 hotels acquired. Because the Company prepared its budget using a "top-down" approach by using average metrics for all hotels (as opposed to building the budget from the bottom up, hotel by hotel), the budget metrics were used for both the Company (684 hotels) and the subset of 664 hotels for trend analysis.

| Period | OCC Act | OCC v. Bud | OCC YoY | ADR Act | ADR v. Bud | ADR YoY | RevPAR Act | RevPAR v. Bud | RevPAR YoY |
|---|---|---|---|---|---|---|---|---|---|
| **Monthly Trends in Key Financial Performance Indicators** | | | | | | | | | |
| **684 Properties** | | | | | | | | | |
| July 2007 | 77% | *-1%* | *5%* | $ 56.44 | *-3%* | *0%* | $ 43.71 | *-4%* | *5%* |
| August 2007 | 76% | *-1%* | *4%* | $ 56.90 | *-3%* | *1%* | $ 43.29 | *-3%* | *5%* |
| September 2007 | 72% | *-3%* | *2%* | $ 56.65 | *-2%* | *2%* | $ 40.54 | *-5%* | *4%* |
| October 2007 | 72% | *-5%* | *-1%* | $ 57.39 | *0%* | *4%* | $ 41.26 | *-5%* | *3%* |
| November 2007 | 63% | *-7%* | *-5%* | $ 57.16 | *0%* | *5%* | $ 36.26 | *-7%* | *0%* |
| December 2007 | 53% | *-8%* | *-8%* | $ 55.87 | *-2%* | *5%* | $ 29.34 | *-10%* | *-4%* |
| **664 Properties** | | | | | | | | | |
| July 2007 | 78% | *-1%* | *5%* | $ 56.35 | *-3%* | *0%* | $ 43.82 | *-4%* | *5%* |
| August 2007 | 76% | *-1%* | *4%* | $ 56.84 | *-3%* | *1%* | $ 43.36 | *-3%* | *5%* |
| September 2007 | 72% | *-3%* | *2%* | $ 56.57 | *-2%* | *2%* | $ 40.52 | *-5%* | *4%* |
| October 2007 | 72% | *-5%* | *-1%* | $ 57.34 | *0%* | *4%* | $ 41.21 | *-5%* | *3%* |
| November 2007 | 63% | *-7%* | *-5%* | $ 57.09 | *0%* | *5%* | $ 36.16 | *-7%* | *0%* |
| December 2007 | 52% | *-9%* | *-8%* | $ 55.77 | *-2%* | *5%* | $ 29.18 | *-11%* | *-4%* |

*Sources: P and L Analyzer workbook April 2008 (ESH0056425-60070), ESH 682 Budget Trend for fiscal year 2007 (ESH0075805-75823).*

The Company's performance relative to its selected competitive peer group reflected that, while the Company's occupancy rate was higher than that of its peers (by 6% to 13%), the revenue earned by the Company was significantly below its peers (*i.e.*, the ADR and RevPAR were less than the peer group by 10% to 22%), as shown below:

| Monthly Trends in Key Financial Performance Indicators vs. Peer Set | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Period | OCC Act | OCC Peer Set | OCC v. Peer Set | ADR Act | ADR Peer Set | Act v. Peer Set | RevPAR Act | RevPAR Peer Set | RevPAR v. Peer Set |
| **684 Properties** | | | | | | | | | |
| July 2007 | 77% | 69% | *12%* | $ 56.44 | $ 72.57 | *-22%* | $ 43.71 | $ 50.02 | *-13%* |
| August 2007 | 76% | 69% | *11%* | $ 56.90 | $ 72.52 | *-22%* | $ 43.29 | $ 49.74 | *-13%* |
| September 2007 | 72% | 63% | *13%* | $ 56.65 | $ 70.83 | *-20%* | $ 40.54 | $ 44.96 | *-10%* |
| October 2007 | 72% | 66% | *9%* | $ 57.39 | $ 72.18 | *-20%* | $ 41.26 | $ 47.68 | *-13%* |
| November 2007 | 63% | 59% | *7%* | $ 57.16 | $ 70.06 | *-18%* | $ 36.26 | $ 41.36 | *-12%* |
| December 2007 | 53% | 49% | *6%* | $ 55.87 | $ 66.82 | *-16%* | $ 29.34 | $ 32.97 | *-11%* |
| **664 Properties** | | | | | | | | | |
| July 2007 | 78% | 69% | *13%* | $ 56.35 | $ 72.43 | *-22%* | $ 43.82 | $ 50.01 | *-12%* |
| August 2007 | 76% | 69% | *11%* | $ 56.84 | $ 72.37 | *-21%* | $ 43.36 | $ 49.68 | *-13%* |
| September 2007 | 72% | 63% | *13%* | $ 56.57 | $ 70.62 | *-20%* | $ 40.52 | $ 44.82 | *-10%* |
| October 2007 | 72% | 66% | *9%* | $ 57.34 | $ 71.92 | *-20%* | $ 41.21 | $ 47.45 | *-13%* |
| November 2007 | 63% | 59% | *7%* | $ 57.09 | $ 69.79 | *-18%* | $ 36.16 | $ 41.13 | *-12%* |
| December 2007 | 52% | 49% | *6%* | $ 55.77 | $ 66.58 | *-16%* | $ 29.18 | $ 32.75 | *-11%* |

***Sources:***

*P and L Analyzer workbook dated April 2008 (ESH0056425-60070).*
*Mo STAR-Analyzer(May 09_with '07 Data) (ESH0077009-77317).*
*Monthly STAR Analyzer dated August 2009 (Catalyst ID 00002329).*

Further, the upward trend in revenue growth that was shown in the first half of 2007 reversed in the second half, and the Company missed its projections for room revenue and property-level EBITDA[539] in every quarter of 2007 except for the first quarter, as shown below:

---

[539]   The budgeted room revenue and property-level EBITDA included in the table were obtained from the 2007 Approved Annual Budget (based on 682 properties), compared to actual results for 684 properties. The performance of the two additional hotels had less than a 1% impact on the actual vs. budget % variance metrics included in this table. In addition, property-level EBITDA excludes management fees and corporate overhead expenses.

| Quarterly Trends in 2007 Room Revenue and Property-Level EBIDTA (in 000's) | | | | | | |
|---|---|---|---|---|---|---|
| | **Room Revenue** | | | **Property Level EBITDA** | | |
| **Period** | **Act** | **Act v Bud** | **YoY Growth** | **Act** | **Act v Bud** | **YoY Growth** |
| **684 Properties** | | | | | | |
| Q1 2007 | $ 253,367 | *0%* | *4%* | $ 145,241 | *0%* | *4%* |
| Q2 2007 | $ 286,446 | *-1%* | *8%* | $ 174,579 | *-3%* | *7%* |
| Q3 2007 | $ 297,363 | *-4%* | *5%* | $ 179,857 | *-8%* | *6%* |
| Q4 2007 | $ 249,003 | *-7%* | *1%* | $ 140,460 | *-12%* | *-1%* |
| **664 Properties** | | | | | | |
| Q1 2007 | $ 243,486 | *n/a* | *5%* | $ 138,825 | *n/a* | *4%* |
| Q2 2007 | $ 276,316 | *n/a* | *9%* | $ 168,065 | *n/a* | *8%* |
| Q3 2007 | $ 287,767 | *n/a* | *5%* | $ 174,024 | *n/a* | *6%* |
| Q4 2007 | $ 239,958 | *n/a* | *0%* | $ 134,944 | *n/a* | *-1%* |

*Sources: P and L Analyzer workbook dated April 2008 (ESH0056425-60070), ESH 682 Budget Trend for fiscal year 2007 (ESH0075805-75823).*

During 2007, the Company consistently missed its property-level EBITDA projections by a higher percentage than it missed its revenue projections. For example, the Company missed its fourth quarter of 2007 budgeted property-level EBITDA by 12%, and its room revenue target by 7%. This is explained by the Company's property expense structure, whereby most expenses are fixed in nature, and do not readily change with occupancy levels.[540] As a consequence of this structure, changes in revenue volume drive a larger relative change in the Company's margins, as compared to the overall lodging industry, which has a more variable cost structure.[541] The Company's expense structure is a benefit during periods of increasing revenue, as it provides incremental margin. However, in periods of declining revenue, the Company's expense structure has the opposite effect.

---

[540] The Company prepared an analysis concluding that the majority (around 70%) of property-level expenses are fixed in nature. ESH Business Update [Bates Nos. ESH0003167-3196].

[541] For example, in contrast to a typical mid to upper-level service hotel, the Company would not increase or decrease the number of food and beverage related personnel based on occupancy rates, since it provides little, if any, food and beverage services. The majority of the Company's property-level expenses remain static regardless of changes in occupancy volume.

## The Company's Efforts to Address its Declining Performance

In addition to the industry reports, the Company received weekly reports showing how its deteriorating performance compared to its peer group in the second half of 2007.[542] Further, during a November 15, 2007 Board meeting, it was reported that during the third quarter, certain metrics were below budget: RevPAR was below by 3% and property-level EBITDA was below by 5.7% year to date through September; RevPAR was below by 5.9% and property-level EBITDA was below by 10.5% for the third quarter 2007.[543] The Company's management was thus aware that its performance was not only below its peer group, but was also below its internal targets.

However, in late 2007 the Company was still bullish on the outlook for 2008 and 2009. In fact, at the same November 2007 Board meeting, Mr. David Kim, the Executive Vice President of Finance for HVM, anticipated double digit corporate EBITDA growth for 2008 and 2009, driven by anticipated RevPAR growth of more than 7% in both years, based on the Company's re-branding strategy.[544] This re-branding strategy was based upon approximately $50.7 million being available to spend on brand strategy initiatives in the first quarter of 2008.[545] However, the projected Debt Yield calculation for the fourth quarter of 2007 and the first two quarters of 2008 was expected to be below the minimum requirement under the Loan Agreements, which meant a Cash Trap Event would occur. In addition, the Company's projections reflected negative cash flows for the fourth quarter of 2007 and the first quarter of 2008.[546] These projected results suggest that the optimistic growth that Mr. Kim discussed with

---

[542]  *See* discussion in Report § III.A. regarding the Smith Travel Research reports by the Company.

[543]  Board of Directors Meeting – Extended Stay Hotels – presentation dated November 15, 2007 [Bates Nos. ESH0036820-36894 at ESH36860].

[544]  Minutes of Meeting of The Board of Directors – Extended Stay Hotels – November 15, 2007 [Bates Nos. ESH0038732-38735].

[545]  *Id.*; *see also* Board of Directors Meeting – Extended Stay Hotels – presentation dated November 15, 2007 [Bates Nos. ESH0036820-0036894, at ESH36860].

[546]  Kim also assumed the negative cash flows would be funded from the $58 million Working Capital Reserve Account. *Id.*; *see also* Board of Directors Meeting – Extended Stay Hotels – presentation dated November 15, 2007 [Bates Nos. ESH0036820-36894, at ESH0036890].

the Board was not going to have an impact in the short term nor was the cash going to be available to fund these expenditures from operations.

Meanwhile, the Company had switched from a very aggressive room rate strategy in 2006 (*i.e.*, focus was on increasing room rates) to an occupancy rate strategy (*i.e.*, increasing occupancy levels) in 2007. By November 2007, management believed that the optimal approach for the Company's unique mix of business was somewhere in between (*i.e.*, blending a strategy of increasing rates while at the same time increasing occupancy) due to (1) the competitive peer sets that continued to focus on rate growth, and (2) the Company's inability to maintain early 2007 OCC growth rates.[547]

The Company's actual performance in late 2007, which reflected some ADR growth over the prior year, was still at or below budgeted ADR (below budget by 2% in December), was not strong enough to mitigate the decline in OCC (below budget by 8% in December), and began to impact the Company's liquidity situation. The decline in performance, coupled with the seasonal impact on fourth quarter revenues,[548] put a strain on the Company's liquidity position. During the fourth quarter of 2007, approximately $15.5 million of the approximately $57 million initially available in the Working Capital Reserve Account was used to fund operating expenses.[549] Similarly, the total general ledger cash balance available for operations decreased from $75.2 million as of September 30, 2007 to $52.4 million as of December 31, 2007.[550]

### 2007 Corporate Overhead

During 2007, the Company incurred $73.4 million in corporate overhead expenses, or approximately $11.5 million (or 19%) greater than the budget of $61.9 million. The

---

[547] Board of Directors Meeting – Extended Stay Hotels – presentation dated November 15, 2007 [Bates Nos. ESH0036820-36894 at ESH0036867].

[548] Revenue trends vary monthly due to seasonality in the lodging industry. *See* Exhibits III-H-2 and III-H-3 which show the peak season for the Extended Stay Hotels was typically June through August and the low point was typically November through February.

[549] *See* Exhibit III-H-4 for a summary of uses of the Working Capital Reserve Account(s) and other operating accounts held at DL-DW.

[550] *See* Exhibit III-H-5 for trends in operating cash balances.

variance was related to Lightstone advisor fees ($0.7 million), electronic marketing ($0.5 million), a corporate-wide brand study ($0.7 million), merger/sale expenses ($1.2 million) and legal expenses related to REIT matters ($2.1 million).[551]  However, approximately half ($5.6 million) of the incremental costs were incurred by Blackstone prior to the Acquisition, and were not part of the Company's typical corporate overhead expenses.[552]

### 2007 Capital Expenditures

In 2007, the Company spent approximately $67.1 million on capital expenditures. This figure was comprised primarily of the items below:

| Capital Expenditures - 2007 (in '000s) | |
|---|---|
| Description | 2007 Act |
| Recurring capital expenditures | $    32,210 |
| Project capital expenditures | 14,383 |
| Facilities Capitalization | 1,578 |
| Technology Projects | 5,161 |
| Renovation of Acquired Properties | 13,098 |
| Misc. | 641 |
| **Total Capital Expenditures** | **$     67,071** |

*Source: 2007 Capex report (ESH0077459-77472).*

During the 2007 post-Acquisition period, the Company did not fund any of the incremental capital expenditures discussed in the Offering Memorandum (*i.e.*, StudioPlus conversion and re-branding initiatives).  In fact, the Company indicated that it was changing its re-branding strategy in order to re-brand itself under the Homestead name rather than the Extended Stay brand, as stated in the Offering Memorandum.  After the Acquisition, the Company apparently came to believe the Homestead name was a better fit for the Company.[553]

---

[551]   Corporate Overhead general corporate actual to budget report dated December 2007 [Bates Nos. ESH0072944-72945], Corporate Overhead Actual vs. Budget Report dated December 2007 [Bates Nos. ESH0073007-73009], Offering Memorandum [Bates Nos. WACH028997-29085] and 2009 Budget with year-over-year comparisons [Bates Nos. ESH0036970-36976].

[552]   Corporate Overhead report dated June 2007 [Bates Nos. ESH0072920-72934].

[553]   Board of Directors Meeting presentation dated November 15, 2007 [Bates Nos. ESH0036820-36894].

Additionally, at this time the Company began to plan for several incremental projects, such as exterior surface remediation and a "refresh" of the Extended Stay America brand.[554]

## 2. 2007 Budget and the 2008 Budget Submission

HVM was required to prepare annual and monthly financial budgets for the Company.[555] These budgets, which required the approval of certain lenders, played a direct role in determining the level of funds available to the Company, all as described below in greater detail.

The Approved Annual Budget was subject to "the Lender's and Most Junior Mezzanine Lender's written approval."[556] In addition, the Loan Agreements detailed the process governing any negotiations related to the approval of the budget.[557] If the parties could not come to agreement, and a particular budget was not approved, the Loan Agreements required that "[u]ntil such time that Lender and Most Junior Mezzanine Lender approve a proposed Annual Budget, the most recently Approved Annual Budget shall apply."[558]

In addition, the Loan Agreements and the Cash Management Agreements provided that funds for operating expenses would be made available to the Company through the Waterfall, subject to the Approved Annual Budget. The funds to cover the budgeted operating expenses, if available, would be transferred by the Servicer to the Company twice a week. At the end of the Waterfall period, if any cash remained after all parts of the Waterfall were funded, then the excess funds would be provided to the Company. However, during a Cash Trap Event Period, any excess cash that would have been transferred to the Company at the end of a Waterfall period would be trapped and not distributed.[559]

---

[554]  *Id.*

[555]  Management Agreement § 9.1.

[556]  Mortgage Loan Agreement [Bates Nos. WACH000772-1009].

[557]  *Id.*

[558]  *Id.*

[559]  Cash Management Agreement (Catalyst ID 00000801).

The difficulties related to the budget used during the 2007 post-Acquisition period, and the 2008 initial budget submission, are discussed below.

**The 2007 Budget**

Immediately following the Acquisition, the Servicer began administering the Waterfall pursuant to a 2007 Approved Annual Budget. During the Examiner's Investigation, however, no one from the Company would acknowledge having provided or prepared the 2007 budget used by the Servicer. Similarly, the Investigation revealed that there was confusion within the Company as to where the 2007 Approved Annual Budget originated.[560] In addition, the 2007 Approved Annual Budget that was being used by the Servicer: 1) included 682 hotel properties, as opposed to the 664 hotel properties subject to the Waterfall; 2) did not include occupancy taxes; and 3) only included property-level expenses.[561] Therefore, necessary occupancy taxes and corporate overhead costs (*e.g.*, reservation services, travel agent commissions and certain management fees)[562] were not provided for in the budgeted operating expenses.[563] As a result, funds related to these expenses would only be distributed to the Company from excess Waterfall funds, if available.

**Occupancy Taxes Missing in Waterfall**

In November 2007, Mr. Rogers emailed the Servicer seeking clarity regarding receipt of funds from the Waterfall for the payment of occupancy taxes.[564] In his email to the Servicer, Mr. Rogers explained that the occupancy taxes should be treated as a pass-through amount and distributed back to the Company, since the occupancy taxes are funds belonging to governmental jurisdictions held in trust on those jurisdictions' behalf. Mr. Rogers noted that occupancy taxes totaled $6 million to $8 million per month, a significant portion of the funds

---

[560]   Email correspondence regarding origin of the 2007 budget [Bates Nos. ESH0068139].

[561]   Extended Stay Hotels – ESH Total 682 – 2007 Budget Trend [Bates Nos. WACHOVIA00001-28].

[562]   Rogers Deposition at 173-174.

[563]   Extended Stay Hotels – ESH Total 682 – 2007 Budget Trend [Bates Nos. WACHOVIA00001-28].

[564]   Rogers email regarding Occupancy Taxes Collections Pass Through, dated November 12, 2007 [Bates Nos. ESH0067941-67943].

transferred into the Waterfall.[565]  The Servicer responded by stating that, in previous deals, occupancy taxes were not carved out, and through internal discussions "with our deal side," the occupancy taxes would have to be handled through the Company's working capital account.[566]  In other words, the occupancy taxes collected would come into the Waterfall, but no disbursements would be made from the Waterfall to pay these taxes.  As a result, the Company would either have to use excess cash available after all parts of the Waterfall were funded, to the extent cash was available, or fund the taxes required to be paid from other working capital reserve funds.

In 2007 the Company was operating in a period in which a Cash Trap Event was not invoked.  Therefore, all funds remaining in the Waterfall after the various Waterfall obligations were paid were made available to the Company.  Accordingly, the exclusion of certain items from the 2007 Approved Annual Budget used by the Servicer did not impact the amount of cash distributed to the Company through the Waterfall.  Although the confusion surrounding the 2007 Approved Annual Budget was of concern to the Company, in the words of Mr. Rogers, "it was sort of a no harm, no foul."[567]

Notwithstanding the minimal cash flow impact in 2007 related to the 2007 Approved Annual Budget confusion, it is surprising that such an important operational matter would not have been more thoroughly understood prior to closing the Acquisition or immediately following the transaction.  Corporate overhead represented approximately 16% of the total property and corporate expenses of the Company.[568]  Without any changes to the budget composition for 2008, it is likely that the Company would have experienced significant cash flow constraints during a Cash Trap Event Period, which, under the Loan Agreements, would last for a minimum of six months.  Further, during a Cash Trap Event Period, the Company

---

[565]  *Id.*

[566]  *Id.*

[567]  Rogers Deposition at 171.  While Mr. Rogers' statement may be true with regards to 2007, when a Cash Trap was not in place, in 2008 following the Cash Trap implementation, the "harm" became evident, as the Company's cash balance available to fund operations began to decrease.

[568]  In 2008, total corporate operating expenses of $85.5 million represented 16% of total property and corporate operating expenses of approximately $545.8 million.  DL-DW Consolidated Financial Statements dated December 31, 2008 [Bates Nos. ESH0000107-164].

would have had to fund corporate overhead and occupancy taxes from working capital.[569]  See Section IV. for further discussion of the cash funding issues.

### 2008 Budget Submission

The 2008 budget was submitted for approval in early December 2007.[570]  This budget reflected an increase in the overall property-level expenses and included the occupancy taxes and corporate overhead expenses.[571]  The budget submitted also included significant anticipated future costs of approximately $59 million related to non-recurring, discretionary capital expenditures associated with the Company's proposed re-branding strategy.[572]  Due to the anticipated Debt Yield Event and the pending Cash Trap Event that would be triggered in early 2008,[573] the Company sought to ensure that all costs would be covered through funds available in the Waterfall through the 2008 budget submitted for approval.[574]  The 2008 budget was subject to the approval of Fortress, the most junior Mezzanine Lender.[575]

### 3.      Debt Yield Test and Cash Trap

Most lenders use a two-pronged approach to calculating the risk on a loan: (1) the loan-to-value ("LTV") ratio, and (2) a debt yield test.  Leverage metrics (*e.g.*, LTV) are most relevant at loan origination, loan maturity, balloon payment maturity, or in the event of a default.  In contrast, a lender will measure a borrower's estimated debt yield using a borrower's projections at loan origination, and then again periodically based on actual results (usually monthly) until the loan matures.

---

[569]  While this oversight was ultimately corrected and added to the Approved Annual Budget for 2008, the payment of occupancy taxes and non-recurring capital expenditures were still subordinated to all other payments identified in the Waterfall.

[570]  Email from Mr. Rogers to Servicer submitting 2008 budget [Bates Nos. ESH0039594-39596].

[571]  2008 presentation with draft budget [Bates Nos. ESH0039597-39655].

[572]  *Id.*

[573]  Board of Directors Meeting presentation dated November 15, 2007 [Bates Nos. ESH0036820-36894].

[574]  Rogers Deposition at 165-167.

[575]  Mortgage Loan Agreement [Bates Nos. WACH000772-1009] and Fortress 2008 budget approval letter [Bates Nos. FORTRESS001725-1728].

Debt yield tests generally measure net operating income as a percentage of the outstanding loan amount. Debt yield is a lender's preferred measure of a borrower's net operating income cushion available to pay debt service. The higher the debt yield, the more attractive the loan is to the lender.

In the case of the Company, the Debt Yield under the Mortgage Loan Agreement provided an indication of the amount of cash generated by the Mortgaged Properties compared to the level of debt associated with those properties.[576] The Debt Yield measured the Company's ability to generate cash to service debt <u>after</u> considering the costs for certain management fees and FF&E expenditures necessary for ordinary repairs and necessary refurbishments in the hotels.[577] As discussed previously, the Loan Agreements provide that the Debt Yield measurement is calculated on a periodic basis for the purposes of determining whether (1) certain distributions can be made by the Company; (2) a Cash Trap Event is instituted; or (3) amortization can be deferred on the floating rate components of the Debt.

### Pending Cash Trap Event

As previously discussed, the Loan Agreements provide that a Debt Yield Event occurs when the Debt Yield falls below a certain threshold level during the relevant period of the loan. The Debt Yield Event in turn results in a Cash Trap Event, causing any unallocated cash to be "trapped" in a restricted account within the Cash Management Account.[578] Once a Cash Trap is triggered, the Company must maintain the Debt Yield above the cure amount for a period of six months to eliminate the Cash Trap, and then will once again receive any unallocated cash available after the Waterfall has been satisfied on a monthly basis.[579]

---

[576] As previously discussed in § III.E.6. of this Report, the Company's pre-Acquisition loan agreements also required the same Debt Yield calculation.

[577] The definition however did not consider the occupancy taxes.

[578] Mortgage Loan Agreement at 10 [Bates Nos. WACH000772-1009].

[579] *Id.*

The Mortgage Loan Agreement provides the following minimum Debt Yield requirements to avoid a Cash Trap, and also specifies the required cure amounts once a Cash Trap has been triggered through a Debt Yield Event.

| Debt Yield Requirements - Mortgage Loan Agreement | | |
|---|---|---|
| Payment Dates | Minimum Debt Yield | Debt Yield Cure |
| 7th - 12th | 7.50% | 7.60% |
| 13th - 24th | 7.65% | 7.75% |
| 25th - 36th | 7.90% | 8.00% |

*Source: Mortgage Loan Agreement (WACH000772-001009).*

In November 2007, the Board identified the Debt Yield test and the pending Cash Trap as an imminent issue. The anticipated Debt Yield was below the required monthly Debt Yield from the fourth quarter 2007 through the second quarter 2008. In the third quarter of 2008, however, the Company anticipated the Debt Yield to be 7.84%, which was above the cure amount of 7.75% needed at that time.[580] Therefore, the Company knew it would likely fail the Debt Yield Test as early as November 2007. (The first test used for the Cash Trap was not until the 7th Payment Date –January 12, 2008.)[581]

At this time, the Company also projected it would maintain the Debt Yield over 7.75%, as required by the third quarter of 2008 and for a period of 6 months thereafter to cure the Cash Trap Event and expected to be able to extend the amortization on the floating rate debt in June 2009.

During late 2007, Company management identified certain deficiencies related to the Waterfall, such as expenses that were not included in the operating budget.[582] The

---

[580] Board of Directors for Extended Stay Hotels Meeting presentation dated November 15, 2007 [Bates Nos. ESH0036820-36894].

[581] The Company was required to submit monthly calculations of the Debt Yield. However, the first Debt Yield calculation provided to the Servicer was for the period ending December 31, 2007. Mortgage Loan Agreement § 5.1.11(d); *see, e.g.*, Mezzanine A Loan Agreement § 5.1.11(d).

[582] Rogers email regarding Occupancy Taxes Collections Pass Through, dated November 12, 2007 [Bates Nos. ESH0067941-67943].

combination of the pending Cash Trap Event, the costs excluded from budget, and the order of the Waterfall (discussed below) precipitated the liquidity squeeze and severe cash flow problems for the Company.

### 4. 2007 Dividends and Distributions

The Mortgage Loan Agreement provides that the Debt Yield, measured on a quarterly basis, must be greater than 7.75% for equity distributions to be made, with the exception of distributions to Series A-1 preferred equity.[583]

Although the first Debt Yield calculation should have been completed in July 2007, this was not done.[584] As discussed below, the first calculation of the Debt Yield performed and reported to the Servicer was in January 2008 for the 12 month period ending December 31, 2007. As shown below, the Company did not meet the minimum requirement of 7.75%.

| Reported Debt Yield and Debt Yield Requirements for 2007 | | | |
|---|---|---|---|
| Date | Actual Debt Yield Reported | Quarterly Debt Yield Requirement | Monthly Debt Yield Requirement |
| December 31, 2007 | 7.20% | 7.75% | 7.50% |

*Source: December 31, 2007 Servicer Report (ESH006585-6586) and Mortgage Loan Agreement (WACH000772-1009).*

Notwithstanding the foregoing, the Company made cash distributions to certain equity units other than the A-1 Series Units from June 11, 2007 through December 31, 2007.[585] [586]

---

[583] Mortgage Loan Agreement, § 5.2.13(e) [Bates Nos. WACH000772-1009].

[584] See § III.E. of this Report for the discussion related to the debt requirements.

[585] Extended Stay Hotels, Listing of Dividends, Distributions, and Transfers to Owners & Affiliates [Bates No. ESH0005013] and DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (Restated) and for the Year Ended December 31, 2008 and for the Period From Acquisition (June 11, 2007) to December 31, 2007 (Restated) [Bates Nos. ESH0000107-164].

[586] It is possible BHAC's 2007 distributions of approximately $19.2 million to the A-1 Series Units and the A-2 Series Units were funded from funds received by BHAC in 2007 for its Series A-1 preferred equity distributions from ESI, since the amounts are the same, but no documentation was provided to confirm this. It appears that the source of funds for DL-DW's 2007 distribution to Lightstone was from the interest income earned in 2007. See DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information for Year Ended December 31, 2007 and for the Period from Acquisition (June 11, 2007) to December 31, 2007 [Bates Nos. WACH028803-28847].

As shown in the tables below, BHAC distributed $6.2 million to the A-2 Series Units and DL-DW distributed $2.7 million to the A-3 Series Units in 2007, despite not ever meeting the minimum Debt Yield requirement. No distributions were made to the other equity series in 2007.[587]

| 2007 Equity Distributions by Entity (in 000's) | | |
|---|---|---|
| | | **2007** |
| **BHAC Capital IV, LLC** | | |
| A-1 Series Units | $ | 13,090 |
| A-2 Series Units | $ | 6,176 |
| Total BHAC Capital IV LLC | $ | 19,266 |
| **DL-DW Holdings, LLC** | | |
| A-3 Series Units | $ | 2,668 |
| Total DL-DW Holdings LLC | $ | 2,668 |

*Source: BHAC and DL-DW Distributions 2007, 2008, 2009 (ESH0073447-73451).*

| 2007 Distributions to A-2 and A-3 Series Units (in 000's) | | | |
|---|---|---|---|
| **Payor** | **Recipient** | **Date Paid** | **Amount** |
| **Series A-2 Units** | | | |
| HVM fbo BHAC Capital IV, LLC | PGRT ESH Inc. | 7/30/2007 | $ 1,067 |
| HVM fbo BHAC Capital IV, LLC | PGRT ESH Inc. | 8/30/2007 | $ 1,033 |
| HVM fbo BHAC Capital IV, LLC | PGRT ESH Inc. | 9/27/2007 | $ 1,000 |
| BHAC Capital IV, LLC | PGRT ESH Inc. | 10/30/2007 | $ 1,033 |
| BHAC Capital IV, LLC | PGRT ESH Inc. | 11/29/2007 | $ 1,000 |
| BHAC Capital IV, LLC | PGRT ESH Inc. | 12/28/2007 | $ 1,033 |
| Total A-2 Series Units | | | $ 6,167 |
| **Series A-3 Units** | | | |
| DL-DW Holdings LLC | Lightstone Holdings LLC | 8/31/2007 | $ 2,668 |

*Source: BHAC and DL-DW Distributions 2007, 2008, 2009 (ESH 0073447-73451).*

In addition, it appears that the Company prepared Debt Yield calculations using a different approach than was required by the Mortgage Loan Agreement. Instead of calculating

---

[587]  Listing of Distributions, BHAC Capital IV LLC & DL-DW Holdings LLC [Bates No. ESH0073447].

the management fee as 4% of gross revenues, the Company used the actual management costs, which in most cases resulted in a higher total management fee amount.[588]

A&M prepared an independent Debt Yield calculation on a monthly basis for the months of June 2007 through May 2009.[589]  On June 30, 2007, immediately following the Acquisition, the Debt Yield was 7.09%, compared to a requirement of 7.5% needed to avoid a Cash Trap Event in February 2008.[590]  In fact, following the Acquisition, the Debt Yield was <u>never</u> over the minimum levels required to make equity distributions and to avoid a Cash Trap, and only showed marginal improvement in 5 out of the 24 months between the Acquisition and the Petition Date.  (Notwithstanding the above, the difference between the Debt Yield calculation using the Company's approach and the calculation performed by A&M were negligible.)

## I.        2008 Post-Acquisition Performance

In 2008, the overall performance of the Company continued to decline, budgets were missed, a Cash Trap Event occurred, and certain debt had to be refinanced.  As discussed below in greater detail, during 2008 the Company: (1) failed the Debt Yield test and a Cash Trap Event occurred; (2) completed its negotiations on the 2008 budget with Fortress; (3) refinanced and paid the 9.15% Notes due in March 2008; (4) continued to suffer declining performance and (5) continued to make certain dividends and distributions to equity holders.

### 1.        Debt Yield Test and Cash Trap Event

As previously discussed, the Loan Agreements provide that the Debt Yield measurement is calculated on a periodic basis for the purposes of determining whether (1) certain distributions can be made by the Company; (2) a Cash Trap Event is instituted; or 3) amortization can be deferred on the floating rate components of the Mortgage Debt and Mezzanine Debt.  The Mortgage Loan Agreement further provides the minimum Debt Yield

---

[588]    *See* Exhibit III-H-6 for a summary of the monthly Debt Yield Test calculations provided to the Servicer and the related impact of using this method.

[589]    *See* Exhibit III-H-7 for A&M's Debt Yield calculations for the Examination Period.

[590]    Mortgage Loan Agreement, Debt Yield Event at 10-11 [Bates Nos. WACH 000772-1009].

requirements to avoid a Cash Trap, as well as the required cure amounts after a Cash Trap has been triggered through a Debt Yield Event.

The first Debt Yield calculation was provided to the Servicer on January 21, 2008 for the period ending December 31, 2007.[591] Since the calculation reflected that the Company did not meet the minimum Debt Yield of 7.5% at that time, both a Debt Yield Event and a Cash Trap Event were triggered. As a result, as of February 2008,[592] any unallocated cash available after the Waterfall had been satisfied on a monthly basis was "trapped" by the Servicer in a restricted account within the Cash Management Account.[593] The fact that cash was now "trapped" put a liquidity strain on the Company at the lowest point in its season, and required the Company to use funds from the Working Capital Reserve Account in order to fund regular operations. In fact, in the first quarter of 2008, the Company transferred over $27 million from the Working Capital Reserve Account to cover operating expenses.[594]

In addition, in November 2007, the Company's projections reflected that it would not be able to maintain the Debt Yield above the cure amount of 7.6% for a period of six months in order to eliminate the Cash Trap and reinstate the opportunity to receive any unallocated cash available after the Waterfall had been satisfied on a monthly basis.[595]

### 2.    2008 Budget Negotiations with Fortress

As previously noted, the Company submitted its initial 2008 budget for approval in early December of 2007. Fortress objected to certain aspects of the initial 2008 budget, including (a) certain of the revenue projections in light of the current economic climate and outlook for the industry; (b) proposed one-time capital expenditure expenses or corporate overhead costs that did not constitute property-level operating expenses; and (c) other costs that

---

[591]   Email from Rogers to Servicer dated January 21, 2008 [Bates No. ESH0006530] and Debt Yield Calculation [Bates Nos. ESH0006585-6586].

[592]   Waterfall reconciliation [Bates Nos. ESH0037318-37499].

[593]   Cash Management Agreement (Catalyst ID 00000801).

[594]   *See* Exhibit III-H-4 for a summary of Working Capital Reserve Account uses.

[595]   Board of Directors Meeting presentation dated November 15, 2007 [Bates Nos. ESH0036820-36894].

were not explained by the Company.[596]  The Company responded to each of the objections raised by providing some additional information and its position on each issue, and highlighted certain items that it believed were not properly included in the Waterfall.[597]  The negotiations related to the budget continued for several months, until April 2008.

Meanwhile, when administering the Waterfall, the Servicer continued to use the 2007 Approved Annual Budget until the 2008 budget was approved.[598]  The use of the 2007 Approved Annual Budget (for the Company Pre-Acquisition) for the first four months of 2008 created some financial strain for the Company, as funding for certain costs was not available to the Company through the Waterfall (*e.g.*, reservation system, occupancy taxes), the amounts disbursed were lower than what was needed, a Cash Trap Event had occurred (which restricted the availability of any excess cash), and the 9.15% Notes became due.[599]  (See sections below for further discussion related to the first quarter performance and the 9.15% Notes due in 2008.)

On April 16, 2008, the Company and Fortress finally completed their negotiations related to the 2008 budget, and the revised 2008 budget was approved.[600]  The budget revisions and related agreements included the following:

- In contrast to the 2007 Approved Annual Budget, the 2008 Approved Annual Budget included corporate overhead expenses and the remittance of hotel occupancy taxes to the applicable governmental authorities, conditional upon certification of such amounts by the Company.[601]

- The key changes to the initial 2008 budget submitted included: (a) revenue was reduced by almost 10% (a 2% drop from 2007); (b) property-level EBITDA was reduced by 14% (a 4% drop from 2007); and

---

[596]   Letter from Fortress to Lichtenstein dated March 11, 2008 [Bates Nos. ESH0042179-180]; Letter from Lichtenstein to Fortress dated March 18, 2008 [Bates Nos. FORTRESS000092-93]; and Letter from Fortress to Lichtenstein dated March 27, 2008 [Bates Nos. ESH0042185-42188].

[597]   Draft Letter from Lichtenstein to Fortress dated April 8, 2008 [Bates Nos. ESH0041678-691].  This letter was never executed but was shared with Wachovia for discussion purposes [Bates No. ESH0077425].

[598]   Mortgage Loan Agreement [Bates Nos. WACH000772-1009].

[599]   Rogers Deposition at 182.  As discussed below, the Company received $23 million in May 2008 as a "true-up" payment once the budget was approved for the difference between the 2007 and 2008 budgets for the first four months of 2008.

[600]   Fortress 2008 budget approval letter dated April 16, 2008 [Bates Nos. ESH0004745-4754].

[601]   *Id.*

(c) discretionary capital expenditures were reduced by more than $40 million to approximately $32 million.[602]

- The 2008 Approved Annual Budget reflected that certain items could be paid out of funds trapped due to the Cash Trap Event, including certain approved extraordinary items such as additional sales / marketing expenses and discretionary capital expenditures.

- On April 15, 2008, the 2nd Amendment to the Mortgage Loan Agreement was executed. This amendment placed certain restrictions on any excess Waterfall funds distributed to the Company, including restrictions on payments to various equity holders.[603]

- In mid-May 2008, approximately $23 million was released to the Company to "true-up" the difference between the 2007 Approved Annual Budget and the 2008 Approved Annual Budget for the first four months of 2008, as well as to fund certain occupancy taxes from the first four months of 2008.[604]

### 3.     March 2008 Subordinated Debt Due

On March 15, 2008, the 9.15% Notes had matured and the principal balance of $30.9 million, together with accrued interest of approximately $1.4 million, came due.[605] The Company failed to pay the amounts when due, and a default was declared by Manufacturers and Traders Trust Company on March 24, 2008.[606] The Company informed Manufacturers and Traders Trust that it was expediting attempts to restructure the obligations under the 9.15% Notes.[607]

Attempts to refinance the 9.15% Notes with third parties proved unsuccessful. Mr. Lichtenstein testified that when the Company tried to refinance the 9.15% Notes in 2008, there was no interest among potential lenders, and the Company could not find a willing investor.[608] With no other options, on April 16, 2008, DL-DW secured a $22 million loan from

---

[602] *See* Exhibit III-I-1 for a comparison of the initial submission and the 2008 Approved Annual Budget.

[603] Second Amendment to Loan Agreement and Guaranty Affirmation [Bates Nos. ESH0028921-28939].

[604] Email from Servicer regarding release of "true-up" funds [Bates Nos. ESH0041757] and Rogers Deposition at 184-85.

[605] DL-DW Consolidated Financial Statements and Other Financial Information for Year Ended December 31, 2007 and for the Period from Acquisition (June 11, 2007) to December 31, 2007 [Bates Nos. WACH28803-28847].

[606] Notice of default dated March 24, 2008 [Bates Nos. ESH0003818-3820].

[607] *Id.* at 2.

[608] Lichtenstein Deposition at 205-206.

154

affiliated investors in the Company.  As discussed below, this new $22 million loan, together with additional funds from DL-DW, were used to pay off the matured 9.15% Notes.

The new loan came with onerous terms:  it was guaranteed by BHAC, secured by the LIBOR Floor Certificates[609] pledged by DL-DW,[610] accrued interest at an annual rate of 25%, and was to mature on May 1, 2011 ("25% Note").  The following table is a summary of the affiliated lenders and participation in the 25% Note:[611] [612]

| Lender's Interest in the 25% Note | | | |
| --- | --- | --- | --- |
| **Lender** | **Affiliate Relationship** | **Participation** | **Participation Amount** |
| ABT-ESI LLC | Arbor | Lead Lender / Servicer | $  5,225,000 |
| Park Avenue Funding LLC | Lichtenstein | Co-Lender | 11,000,000 |
| Princeton ESH LLC | Princeton | Co-Lender | 550,000 |
| Mericash Funding LLC | Joseph Chetrit | Co-Lender | 5,225,000 |
| | | | $ 22,000,000 |
| *Source: Co-Lender Agreement dated April 16, 2008 (ESH29203-29219)* | | | |

Concurrent with the execution of the 25% Note on April 16, 2008, the Company paid off the $31 million outstanding principal balance of the 9.15% Notes, together with the accrued interest of approximately $1.7 million and $100,000 of professional fees.[613]  The total

---

[609]  The DL-DW 2007 Consolidated Financial Statements describe the LIBOR Floor Certificates as follows: "In conjunction with amendment of certain terms of the mortgages for securitization of the mortgage debt, as well as amendments to the mezzanine loan agreements, the Company was issued certificates from the securitizing trust which represent the right to receive the payment stream of the difference in the LIBOR floors and actual LIBOR, if less than the floors, on the $700 million floating components.  Thus, while not representing a right of offset, the Company's ownership of these certificates effectively eliminates the LIBOR floors of the Mortgage Debt." The LIBOR Floor Certificates were obtained by the Company on November 5, 2007 [Bates Nos. WACH028803-22847].

[610]  Through a letter agreement dated August 31, 2007, the LIBOR Floor Certificates were issued to the Borrowers on, or about, November 5, 2007.  On the date of issuance the LIBOR Floor Certificates were valued at approximately $24,930,000.  DL-DW was the registered owner of the LIBOR Floor Certificates and it does not appear DL-DW paid the Borrowers for the LIBOR Floor Certificates.  [Bates Nos. ESH0076706-76726], [Bates Nos. ESH0076727-76728], [Bates Nos. ESH0076729-76736], [Bates Nos. ESH0076737-76744].

[611]  Promissory Note, dated April 16, 2008 in the Amount of $22,000,000 [Bates Nos. ESH0028908-28920].

[612]  Co-Lender Agreement, dated April 16, 2008 [Bates Nos. ESH0029203-29219].

[613]  DL-DW Consolidated Financial Statements and Other Financial Information for Year Ended December 31, 2007 and for the Period from Acquisition (June 11, 2007) to December 31, 2007 [Bates Nos. WACH28803-28847].

payments of approximately $33 million were made using (a) the proceeds from the 25% Note of $22 million; plus (b) approximately $10.7 million of DL-DW's funds.[614]

The Company accounted for activities related to the repayment of the 9.15% Notes and the securing of the 25% Note by recording the $22 million as additional paid in capital on ESI's books, with a corresponding intercompany note payable to DL-DW of approximately $10.6 million. A summary of the account entries related to the payment of the 9.15% Note follows:

| Accounting Journal Entries Relating to Payment of 9.15% Notes in April 2008 | | |
|---|---|---|
| **Journal Entry** | **Debit** | **Credit** |
| **Entries for DL-DW** | | |
| $22 Million Note Payable | | $ (22,000,000) |
| Cash - Working Capital Cash | | $ (10,732,431) |
| Investment in Homestead Village LLC | $ 22,000,000 | |
| Deferred Financing Cost | $ 100,000 | |
| Intercompany Receivable - Homestead | $ 10,632,431 | |
| Total Entries for DL-DW | $ 32,732,431 | $ (32,732,431) |
| **Entries for Homestead** | | |
| Investment in BHAC | $ 22,000,000 | |
| Additional Paid in Capital | | $ (22,000,000) |
| Intercompany Receivable - BHAC | $ 10,632,431 | |
| Intercompany Payable - DL-DW | | $ (10,632,431) |
| Total Entries for Homestead | $ 32,632,431 | $ (32,632,431) |
| **Entries for BHAC** | | |
| Investment in ESI | $ 22,000,000 | |
| Additional Paid in Capital | | $ (22,000,000) |
| Intercompany Receivable - ESI | $ 10,632,431 | |
| Intercompany Payable - Homestead | | $ (10,632,431) |
| Total Entries for BHAC | $ 32,632,431 | $ (32,632,431) |
| **Entries for ESI** | | |
| Subordinated Notes Due 2008 - Principal | $ 30,900,000 | |
| Subordinated Notes Due 2008 - Accrued Interest | $ 1,723,931 | |
| Other Professional Fees Expense | $ 8,500 | |
| Additional Paid in Capital | | $ (22,000,000) |
| Intercompany Payable - BHAC | | $ (10,632,431) |
| Total Entries for ESI | $ 32,632,431 | $ (32,632,431) |

*Source: Email from J. Rogers accounting for 9.15% Note paydown accounting (ESH0068148-68151).*

---

[614]   DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (Restated) and for the Year Ended December 31, 2008 and for the Period From Acquisition (June 11, 2007) to December 31, 2007 (Restated) [Bates Nos. ESH0000107-164].

All income generated from the LIBOR Floor Certificates was used to satisfy interest and principal payments through the term of the 25% Note.[615]  To the extent the cash income from the LIBOR Floor Certificates was greater than the principal and interest payments due on the 25% Note, the excess income from the LIBOR Floor Certificates was deposited into a reserve bank account for the benefit of BHAC Series A-1 Units ("Floor Bonds Reserve Account").[616]  As of December 31, 2008, DL-DW paid down $3.3 million of the principal on the 25% Note, leaving a remaining principal balance outstanding of $18.7 million.[617]  Additionally, $3.6 million was paid as interest on the 25% Note for 2008, and the Floor Bonds Reserve Account contained a balance of $2.1 million as of December 31, 2008.[618]  According to the terms of the 25% Note, the maximum monthly principal repayment was $416,666.[619]  Since the Floor Bonds Reserve Account contained a balance at the end of 2008, the cash flow from the LIBOR Floor Certificates was sufficient to pay all accrued interest and the maximum monthly principal payments during 2008.

### 4. 2008 Financial Performance

In 2008, the financial performance of the Company continued to decline and its liquidity issues became more acute.  The following section describes the Company's 2008 quarterly deterioration in performance, the state of the hotel industry during this period, and the Company's continuing optimistic view of the future of the Company.

### First Quarter 2008

In early 2008, notwithstanding a prediction of a decline in occupancy rates, the Company's leadership appeared to remain optimistic.  During a Board meeting on February 15, 2008, Mr. Kim predicted a slight decline in occupancy and 5.1% increase in RevPAR as a result

---

[615]  Promissory Note, dated April 16, 2008 in the Amount of $22,000,000 at 6 [Bates Nos. ESH0028908-28920].

[616]  DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (Restated) and for the Year Ended December 31, 2008 and for the Period From Acquisition (June 11, 2007) to December 31, 2007 (Restated) [Bates Nos. ESH0000107-164] and Cash Account Matrix provided by the Company [Bates Nos. ESH0077349-77356].

[617]  *Id*. at 41.

[618]  *Id*. at 36 and 41.

[619]  Promissory Note, dated April 16, 2008 in the Amount of $22,000,000 at 6 [Bates Nos. ESH0028908-28920].

of expected increases in room rates.  He also noted that RevPAR typically lagged the economy and his analysis of three scenarios (slow down, mild recession and severe recession) showed that only during a severe recession would RevPAR decline, by 0.5%.[620]

The softening of room demand experienced by the Company in late 2007 continued into 2008.  While still in line with budgeted projections, OCC decreased 7% as compared to the first quarter of 2007.[621]  The extended-stay segment saw ADR increase 5% in the first half of 2008, but overall supply increased 6.1% while demand only increased 1.6%.[622]

In addition, as discussed above, the 2008 Approved Annual Budget was not finalized until April 2008.  As such, funds distributed to the Company from the Waterfall through April 2008 were based on the 2007 Approved Annual Budget.  Again, as previously discussed, the 2007 Approved Annual Budget did not include overhead costs, Management Fees or any reimbursement to the Company for occupancy taxes that had been swept into the Cash Management Account.

Further, the Company was also operating under a Cash Trap Event Period in 2008; thus any excess funds potentially available to the Company through the monthly Waterfall were trapped and not available to fund any non-budgeted expenses during this period.  Confusion ensued as the Company attempted to work with the Servicer to receive funds for certain of these expenses.[623]  These factors, coupled with the continued declines in year-over-year OCC, had a negative impact on the Company's liquidity situation.

As its liquidity grew more and more constrained, in the first quarter of 2008, the Company had to take over $27 million from the Working Capital Reserve Account to cover

---

[620]  Minutes of Meeting of The Board of Directors – Extended Stay Hotels – February 14th, 2008 [Bates Nos. ESH0036816-ESH36819].

[621]  *See* Exhibit III-I-2 for a summary of 2008 key performance metrics.

[622]  *See* Report § III.A. for further discussion of extended-stay segment performance.

[623]  For example, during the first four months of 2008, the Company received reimbursement for only a portion of occupancy taxes and management fees. In addition, the reports provided by the Servicer related to the monthly Waterfall distributions were difficult to decipher and reconcile with the funds distributed to the Company. Also, the monthly activity of disbursements appeared inconsistent from month to month for certain items in the Waterfall.  See Exhibit III-I-3 for a summary of funds distributed to the Company through the Waterfall.

operating expenses.[624]  In January of 2008, the Company was required to transfer $8.1 million from its main operating account to the Cash Management Account to cover a shortfall in the Waterfall and ensure that certain obligations were met, including interest payments on the Mezzanine Debt.[625]  Consequently, the general ledger balance of cash available to the Company to fund operating expenses as of March 31, 2008 decreased to $42.0 million from $52.4 million as of December 31, 2007.[626]

### Second Quarter of 2008

In the second quarter of 2008, although ADR was still holding to budgeted expectations, OCC began to decline more quickly than expected, with a decrease of 8% as compared to the second quarter of 2007.[627]  On May 15, 2008, the Boards discussed the occupancy decline and the related impact on RevPAR (then adjusted down to an estimated 1.9% decline year-over-year).  To overcome this trend, the Company instituted an action plan to increase marketing and focus on opportunistic markets.[628]

In addition, the "Audit Update" (included in the May 2008 Board package) noted that: (a) debt waivers were required; (b) certain liquidity concerns had to be addressed for audit issuance, including a total of approximately $32 million due on March 15, 2008 for the 9.15% Notes, the Cash Trap effects, and the cash flow forecast through the next audit opinion date.  In addition, a cash flow forecast prepared by the Company predicted that the effect of LIBOR rates would significantly impact liquidity, such that cash at year end was projected to range from $19.5 million to $49.8 million, depending on the LIBOR rates assumed.[629]

---

[624]  *See* Exhibit III-H-4 for a summary of Working Capital Reserve Account uses.

[625]  "ESA Portfolio Operating" January 2008 bank statement for account number XXXXXX3741 held at Bank of America [Bates No. ESH0039982] and "ESA P Portfolio LLC for the Benefit of Wachovia Bank" January 2008 bank statement for account number XXXXXX5044 held at Wachovia [Bates Nos. ESH0039983-39984].

[626]  *See* Exhibit III-H-5 for a summary of trends in operating cash balances.

[627]  *See* Exhibit III-I-2 for a summary of 2008 key performance metrics.

[628]  Minutes of Meeting of The Board of Directors – Extended Stay Hotels – May 15, 2008 [Bates Nos. ESH0040720-40723].

[629]  Package from the Board of Directors meeting – Extended Stay Hotels – May 15, 2008 [Bates Nos. ESH0040698-718].

Ultimately, in May of 2008, the Company received from the Servicer a "true-up" payment of approximately $23 million.[630] This "true up" payment was made to reimburse the Company for 1) the shortfall in operating expense funds distributed to the Company for the first four months of 2008, and 2) any occupancy taxes that had not been reimbursed to the Company for the first four months of 2008.[631] This true-up payment, coupled with decreases in LIBOR rates,[632] helped to offset the impact of paying down the 9.15% Notes, and improved the Company's short-term liquidity situation. The general ledger cash balance available for operations increased to approximately $60.5 million as of June 30, 2008.

### Third Quarter of 2008

In a July 2008 presentation, Lazard predicted that the Company's liquidity could be depleted entirely as soon as January 2009. Lazard also anticipated the Company would not meet the Debt Yield Amortization Threshold in June 2009, thereby triggering the requirement that the Company make amortization payments estimated at $51 million for 2009.[633] An increase in anticipated cash needs of more than $50 million during a period of declining performance and liquidity issues was indeed cause for serious concern by the Company.

Lazard also noted in its presentation that all cash flows were subject to a Cash Trap and that the Company was not projected to achieve a Debt Yield cure in 2008 or 2009. Further, the presentation noted that it might be difficult for the Company to obtain a going concern audit opinion at the end of 2008, which could result in a default under the Loan Agreements. Lazard further observed that the approval of the 2009 budget "may be a critical trigger event," given the challenges to, and questions raised by, Fortress with respect to the budget in 2008.

---

[630] Email from Servicer regarding release of "true-up" funds [Bates No. ESH0041757] and Rogers Deposition at 184-185.

[631] "True-up" reconciliation [Bates No. ESH0041758].

[632] A significant portion of the interest payments on the Mortgage Debt and Mezzanine Debt were tied to a LIBOR index. This LIBOR rate dropped from 4.24% as of January 2008 to 2.47% as of June 2008. Cash Flow Analysis – Extended Stay Hotels [Bates Nos. ESH0041551-41557].

[633] Lazard presentation – July 2008 [Bates Nos. ESH0003052-3109].

Further complicating matters was the fact that the year-over-year ADR growth experienced in the first half of 2008 reversed in the second half of 2008. In the third quarter of 2008, RevPAR decreased by 7% compared to the prior year, and was lower than budget by 5%.[634] The peak season volume, although down from the prior year, increased the general ledger balance of cash available for operations to approximately $72.5 million as of September 30, 2008.[635] However, this seasonal increase in cash was not enough to ameliorate the Company's near-term liquidity situation, and Lazard assisted the Company with the implementation of a thirteen week cash flow model.[636]

### Fourth Quarter of 2008

During the fourth quarter of 2008, management was keenly aware of the Company's declining financial performance and related liquidity concerns. On November 13, 2008, the Board discussed actions that had been taken to mitigate the declining performance and maximize net operating income. These actions included, among other items: increasing marketing staff, implementing a hiring freeze on full time field employees, halting distributions to equity, and implementing a travel freeze.[637] In early December of 2008, the Company submitted for the lenders' approval a 2009 budget that assumed an approximate 6% decline in room revenues, and a 12% decline in property-level EBITDA (which was more than a 3 point drop in EBITDA margins from the 2008 margin projected at that point in time).[638] At this point, however, the Company was more focused on survival than on budget approvals and negotiations; according to Mr. Lichtenstein, "it was just a question of like staying alive for another few weeks."[639]

---

[634]   *See* Exhibit III-I-2 for a summary of 2008 key performance metrics.

[635]   *See* Exhibit III-H-5 for a summary of trends in operating cash balances.

[636]   *See* Exhibit III-I-4 for a summary of the thirteen week cash flow modeling prepared by the Company with Lazard's assistance.

[637]   Minutes of Meeting of The Board of Directors – Extended Stay Hotels – November 13, 2008 [Bates Nos. ESH0036949-36952].

[638]   2009 Budget – Extended Stay Hotels – Dec. 1, 2008 [Bates Nos. ESH0036970-36976].

[639]   Lichtenstein Deposition at 185.

In the fourth quarter of 2008, ADR and OCC continued to decline, with RevPAR significantly deteriorating by the end of 2008. In addition, RevPAR performance was down 14% from 2007 and 13% off budgeted projections.[640] As a result, fourth quarter 2008 revenue and property-level EBITDA performance had double-digit declines over the prior year.

By the end of 2008, total Company revenue was below pro-forma budgeted expectations by 5%, and pro-forma EBITDA was off by 9%. In addition, the pro-forma EBITDA margins dropped from 52% in 2007 to 47% for fiscal 2008:[641]

| 2008 Pro-Forma EBIDTA (in 000's) | | | | | | |
|---|---|---|---|---|---|---|
| | Fiscal 2008 | | | | Variance | |
| | DLDW 684 Hotels | % of Rev | Pro-Forma Budget | % of Rev | $ | % |
| Total Revenue | $1,032,945 | *100%* | $1,083,639 | *100%* | $ (50,694) | *-5%* |
| Property operating expenses | (460,340) | *-45%* | (467,823) | *-43%* | (7,483) | *-2%* |
| **Pro-forma Property-Level EBITDA** | 572,605 | *55%* | 615,816 | *57%* | (43,211) | *-7%* |
| Corporate operating expenses | (85,512) | *-8%* | (78,966) | *-7%* | 6,546 | *8%* |
| **Pro-forma EBITDA** | $ 487,093 | *47%* | $ 536,850 | *50%* | $ (49,757) | *-9%* |
| *Sources: DL-DW Consolidated Financial Statements for the year ended December 31, 2008 as restated (ESH0000107-164).* | | | | | | |

In relative terms, the Company's performance during 2008 declined at a faster rate than its competitive peer set. In comparison to the prior year, the Company's monthly fourth quarter RevPAR decreased between 12% to 15%, as compared to 9% to 14%, for its competitive

---

[640] *See* Exhibit III-I-2 for a summary of 2008 key performance metrics.

[641] See Exhibit III-I-5 for the assumptions used in creating a pro-forma budget for this period. As noted in the exhibit, the Company's internal management reporting and budgeting reporting (and reports to the Servicer) presented Other Revenue on a "net" basis. For GAAP financial reporting purposes the Company reports Other Revenue and the related expenses separately on a gross basis. Other Revenue is derived from miscellaneous services such as telephone, guest laundry, and snacks/drink commissions. Interestingly, this "net" treatment of Other Revenue had a negative impact on the Company's liquidity situation. Because the Other Revenue-related expenses were presented on a "net" basis, they were not included in the operating expense funds that were distributed to the Company through the Waterfall. For 2007, the Other Revenue-related expenses included in the Approved Annual Budget that were presented on a "net" basis in Other Revenue totaled approximately $15 million. ESH Total 682 2007 Budget Trend [Bates Nos. ESH0075805-75823].

peer set.[642]  The Company's liquidity situation continued to deteriorate, and by December 31,

2008 the general ledger balance of cash available to fund operations had slipped to $26.5 million.

### 2008 Corporate Overhead Expense

The Company incurred $85.5 million in corporate overhead expenses in 2008,[643]

or approximately $6.5 million (or 8%) greater than the budget of $79.0 million.[644] The variance

was primarily related to restructuring related costs ($5.1 million), various legal costs ($1.1

million), and legal costs for a specific case initiated pre-Acquisition ($4.6 million), which are

primarily offset by sales and marketing expenses below budget by $3.0 million.[645] [646]

### 2008 Capital Expenditures Compared to Projections

Only certain non-recurring, discretionary capital expenditure items were approved

in the 2008 Approved Annual Budget (*i.e.*, expenses above and beyond the 4% of revenue

provided for through the Replacement Reserve Account).  The table below compares (a) the

capital expenditures discussed in the Offering Memorandum and included in an internal

management presentation, (b) the expenditures projected post-Acquisition but prior to approval

of the 2008 budget, and (c) the actual, approved 2008 expenditures (including costs identified in

the 2008 budget but deferred beyond 2008).

---

[642]  *See* Exhibit III-I-2 for a summary of 2008 key performance metrics.

[643]  DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (Restated) and for the Year Ended December 31, 2008 and for the Period From Acquisition (June 11, 2007) to December 31, 2007 (Restated) [Bates Nos. ESH0000107-164].

[644]  The 2008 budget was based on the Approved Annual budget approved in April 2008.  *See* 2008 Approved Annual Budget [Bates Nos. ESH0004749-4754].

[645]  Corporate Overhead report dated December 2008 [Bates Nos. ESH0072971-72974].

[646]  Total budgeted sales and marketing expense for 2008 was $24.9 million, which included $11 million that was classified as a "special item" in the Approved Annual Budget to be used for internet, offline and direct mail advertising, funds to develop a loyalty program, and other related marketing costs.  2008 Approved Annual Budget [Bates Nos. ESH0004749-4754].  "Special items" were funded only to the extent excess funds were available from the Waterfall.  Rogers Deposition at 179-80.  Fortress 2008 budget approval letter [Bates Nos. ESH0004745-4748].

| Capital Expenditure Projection Comparison (in '000s) | | | | | |
|---|---|---|---|---|---|
| | | | **2008 Budget** | | |
| **Capital Expenditure** | **Management Presentation / Offering Memorandum** | **2008 Estimate as of Nov. 2007** | **Budgeted 2008 Spend** | **Deferred Beyond 2008** | **Total - 2008 Budget** |
| Recurring capital expenditures | $ 54,800 | $ 47,342 | $ 41,200 | $ - | $ 41,200 |
| Technology Projects | - | 7,500 | 5,273 | - | 5,273 |
| Renovation of Acquired Properties | - | 3,264 | - | - | - |
| StudioPlus Conversions | 30,000 | 30,000 | - | 30,000 | 30,000 |
| Extended Stay America Refresh | - | 34,500 | 26,600 | 15,000 | 41,600 |
| Exterior Surfaces Remediation | - | 10,000 | - | - | - |
| Rebranding: Homestead Deluxe Conversion | - | 7,500 | - | 9,000 | 9,000 |
| Rebranding: Signage Replacement | 10,000 | 15,226 | - | 18,000 | 18,000 |
| **Total Capital Expenditures** | **$ 94,800** | **$ 155,332** | **$ 73,073** | **$ 72,000** | **$ 145,073** |

*Sources: Board of Directors Meeting presentation, dated November 15, 2007 (ESH0036820-36894), 2008 Approved Annual Budget (ESH0004749-4754), Management Presentation (undated) (WACH034773-34797), Offering Memorandum (WACH028997-29085).*

Actual capital expenditures (both recurring and other) during 2008 (of $62.7 million) were under budget (of $73.1 million) by approximately 14%.  A summary of the items budgeted and incurred related to capital expenditures is provided below:[647]

| Capital Expenditures - 2008 Actual vs. 2008 Budget (in '000s) | | | | |
|---|---|---|---|---|
| | | | **2008 Actual vs. 2008 Budget** | |
| **Description** | **2008 Actual** | **2008 Budget** | **$ Var** | **% Var** |
| Recurring capital expenditures | $ 31,523 | $ 41,200 | *$ (9,677)* | *-23%* |
| Project capital expenditures | 4,800 | - | *4,800* | |
| Facilities Capitalization | 1,616 | - | *1,616* | |
| Technology Projects | 4,415 | 5,273 | *(858)* | *-16%* |
| Extended Stay America Refresh | 16,794 | 26,600 | *(9,806)* | *-37%* |
| Renovation of Acquired Properties | 2,738 | - | *2,738* | |
| Misc. | 840 | - | *840* | |
| **Total Capital Expenditures** | **$ 62,726** | **$ 73,073** | ***$ (10,347)*** | ***-14%*** |

*Sources: 2008 Capex Report (ESH0077473-77490), 2008 Approved Annual Budget (ESH0004749-4754).*

---

[647] The 2008 budgeted recurring expenditures were based on revenue of only the 664 hotels, whereas actual expenditures for 2008 include all Company properties.

537960v2

### 5.     Dividends and Distributions to Equity Holders

Beginning in 2008, equity distributions were only made by BHAC to the A-1 Series unit holders, as shown below:[648]

| 2008 Equity Distributions by BHAC Capital IV, LLC | |
| --- | --- |
| **A-1 Series Units Recipient** | **Amount** |
| Arbor Commercial Mortgage LLC | $     14,877,000 |
| Arbor Commercial Mortgage LLC & Ron Invest LLC | 263,000 |
| Glida One LLC | 3,695,000 |
| Polar Extended Stay USA L.P. | 672,000 |
| Princeton ESH, LLC | 672,000 |
| Ron Invest LLC | 1,171,000 |
| **Total 2008** | $     21,350,000 |

*Source: BHAC and DL-DW Distributions 2007, 2008, 2009 (ESH 0073447).*

Although the Company was not always consistent in how distributions were paid to each entity, it is assumed that Arbor disbursed the funds according to the co-investors' ownership percentage in the A-1 Series units.  In late 2008, via a resolution of the Board on November 13, 2008, dividends were stopped for the A-1 Series unit holders.[649]

Notwithstanding the foregoing, a Preferred Equity Holder reserve account, created at the Closing and held by the Servicer as security for the Series A-1 unit holders, could also be used to make equity distributions. The reserve account was funded with $20 million at the Closing and the BHAC A-1 Series unit holders could instruct the escrow agent to make equity distributions from the preferred equity return reserve account. To the extent that the preferred equity return reserve account was used BHAC was required to replenish the reserve

---

[648]   In 2008, the Company stopped making dividend payments to unit holders other than the Series A-1 Unit holders, which received distributions from BHAC totaling approximately $21 million.  It is likely that some of the funds used by BHAC to make those 2008 distributions were comprised of: (i) approximately $14 million in distributions made by ESI to BHAC; and (ii) income related to the LIBOR Floor Certificates.  However, no documentation was provided to confirm the source of the funds used by BHAC to pay the $21 million in distributions to the A-1 Unit Series holders in 2008.  (DL-DW Holdings LLC Consolidated Financial Statements and Other Financial Information as of December 31, 2008 and 2007 (Restated) and for the Year Ended December 31, 2008 and for the Period From Acquisition (June 11, 2007) to December 31, 2007 (Restated) [Bates Nos. ESH0000107-164]).

[649]   Minutes of Meeting of The Board of Directors – Extended Stay Hotels – November 13, 2008 [Bates Nos. ESH0036949-36952].

back up to $20 million.[650]  The following table represents the distributions from the preferred equity reserve account following the November 13, 2008 Board of Directors meeting:

| Summary of Distributions from the Preferred Equity Reserve Account | | |
|---|---|---|
| **Date** | **Recepient** | **Amount** |
| 12/18/2008 | Arbor Commercial Mortgage LLC | $ 1,750,000 |
| 1/20/2009 | Arbor Commercial Mortgage LLC | 1,808,333 |
| 2/20/2009 | Arbor Commercial Mortgage LLC | 1,808,333 |
| 3/11/2009 | Arbor Commercial Mortgage LLC | 15,178,971 |
| | | $ 20,545,637 |

*Source: BHAC and DL-DW Distributions 2007, 2008, 2009 (ESH 0073447)*

In conjunction with the Floor Bonds Agreement, the preferred equity return reserve account was liquidated in March of 2009 and the remaining balance was wired to the A-1 Series unit holders.[651]

## J.    2009 Post-Acquisition Performance through the Petition Date

In the first half of 2009, key lodging industry metrics declined beyond what many analysts, investors and management teams ever expected or modeled as a "worst-case" scenario.[652]  The Company followed suit and its performance in 2009 plunged dramatically.  As discussed below, during 2009, the Company (a) refinanced the 25% Note; (b) continued its negotiations with the Mortgage Lenders and Mezzanine Lenders to restructure the debt;[653] and (c) suffered declining performance and liquidity issues, which ultimately resulted in the Debtors filing for chapter 11.

### First Quarter of 2009

As a result of the declining performance in December 2008 and January 2009, the receipts transferred to the Waterfall were not sufficient to cover the interest due on the

---

[650]   DL-DW Holdings L.L.C. Consolidated Financial Statements and Other Financial Information for Year Ended Dec. 31, 2007 and for the Period from Acquisition (June 11, 2007) to Dec. 31, 2007 [Bates No. WACH028803-28847].

[651]   *See* discussion of the 9.15% Notes in Report § III.I.3. above.

[652]   *See* Report § III.A. for further discussion regarding industry expectations and performance.

[653]   *See* Report § III.K. for a discussion of the pre-filing negotiations.

Mezzanine Debt in January 2009. Consequently, the Company was forced to transfer $5.9 million from its main operating account (held at ESA P Portfolio Operating Lessee Inc.) to the Cash Management Account to cover this shortfall.[654] Only $19 million was distributed from the Cash Management Account to the Company for budgeted operating expenses in January 2009.[655] This was the lowest monthly amount distributed to the Company since the Closing. Consequently, from mid December 2008 to late March 2009, the Company was forced to fund certain occupancy taxes and unfunded operating expenses totaling approximately $20 million out of cash on hand.[656]

In February 2009, the Company's legal advisors issued a memorandum to the independent directors of ESI and its affiliates regarding the Company's deteriorating liquidity situation.[657] On March 11, 2009, the Boards of Directors of DL-DW, BHAC, Homestead, and ESI met to discuss the 25% Note. Teichman informed the Boards that the 25% Note needed to be refinanced, and further proposed that the Company retire the 25% Note in exchange for transferring the LIBOR Floor Certificates to the holders of the 25% Note. That same day, the Boards approved the transaction as proposed by Mr. Teichman.[658]

On March 12, 2009, the Floor Bonds Agreement was executed, pursuant to which the LIBOR Floor Certificates were assigned to the 25% Note holders.[659] In the first quarter of 2009, the cash flow from the LIBOR Floor Certificates was sufficient to pay the principal and interest on the 25% Note. At the time of the execution of the Floor Bonds Agreement, the outstanding principal balance on the 25% Note was $17.4 million. The LIBOR Floor

---

[654] "ESA Portfolio Operating" January 2009 bank statement for account number XXXXXX741 held at Bank of America [Bates Nos. ESH0039985] and "ESA P Portfolio LLC for the Benefit of Wachovia Bank" January 2009 bank statement for account number XXXXXXXXX5044 held at Wachovia [Bates Nos. ESH0039986-39987].

[655] *See* Exhibit III-I-3 for a monthly summary of funds distributed to the Company from the Waterfall.

[656] ESH Business Update dated April 6, 2009 [Bates Nos. ESH0003167-3196].

[657] Weil Memorandum to The Independent Directors of Extended Stay Inc. dated February 6, 2009 [Bates Nos. ESH0068141-68147].

[658] Minutes of Meeting of The Board of Directors Extended Stay Hotels dated March 11, 2009 [Bates Nos. ESH0039503-39504].

[659] Floor Bonds Agreement dated March 12, 2009 [Bates Nos. ESH0038894-38900].

Certificates were assigned a value of $12.6 million and the Floor Bonds Reserve Account then contained a balance of $4.8 million.[660]  Both the LIBOR Floor Certificates and the Floor Bonds Reserve Account were transferred to retire the 25% Note as provided in the Floor Bonds Agreement.

Pursuant to the Floor Bonds Agreement, the balance in the Floor Bonds Reserve Account was transferred to LCM[661] and the rights to this account were waived by the Series A-1 Unit holders in BHAC.  Additionally, the LIBOR Floor Certificates were assigned to ABT-ESI LLC which, simultaneously with the execution of the Floor Bonds Agreement, entered into an amended and restated limited liability company agreement.[662]  Each of the lenders under the 25% Note contributed to ABT-ESI LLC their respective rights and interests in the 25% Note as lenders in exchange for a pro rata membership interest in ABT-ESI LLC.[663]

By the end of the first quarter of 2009, ADR and OCC had declined more than 10%, and RevPAR declined by 23% compared to the previous year.[664]  The steep declines in ADR and OCC drove significant declines in room revenue (a 23% decline) and property-level EBITDA (a 37% decline) compared to the prior year.

In addition, although the monthly OCC declines for the Company ranged from 7% to 13% for the quarter (which was relatively consistent with its competitive peer set of 11% to 13%), the Company's monthly ADR declined at a much steeper pace, dropping by 9% to 17%, compared to the prior year.  Consequently, the Company's monthly RevPAR declines of 21% to 24% were much steeper than its competitive peer set, which experienced monthly declines of 14% to 20%.[665]  As a result, the general ledger balance of cash available to the Company to fund

---

[660]  DL-DW Consolidated Statements of Cash Flows, Three Months Ended March 31, 2009 (Unaudited) [Bates No. ESH0005018].  The Consolidated Audited Financial Statements of DL-DW reported that the value of the Floor Bond Certificates was $7.6 million as of December 31, 2008.  We have not prepared an independent valuation of the Floor Bond Certificates.

[661]  Prior to March 12, 2009, Park Avenue Funding LLC transferred its rights and interest as lender under the 25% Note to LCM.  Floor Bonds Agreement dated March 12, 2009 [Bates Nos. ESH0038894-38900].

[662]  Floor Bonds Agreement dated March 12, 2009 [Bates Nos. ESH0038894-38900].

[663]  *Id.*

[664]  *See* Exhibit III-J-1 for a summary of 2009 key performance metrics.

[665]  *Id.*

operating expenses as of March 31, 2009 decreased to only approximately $16.2 million, from approximately $26.5 million as of December 31, 2008.[666]

### Second Quarter of 2009

In the second quarter of 2009, the Company continued capital expenditure freezes (excluding life safety and business continuity expenses), and instituted hiring freezes related to all full-time and part-time personnel.[667]  In addition, as the liquidity situation worsened, Company management discussed actions to preserve cash.  For example, in April of 2009, the Board discussed how vendor payments were being delayed to conserve cash.[668]  On April 30, 2009 the Company's outstanding accounts payable balance over 60 days old of $1.3 million was more than 10% of the total accounts payable balance of approximately $11 million, the highest percentage since the Acquisition.[669]

As a result, the deterioration of the Company's financial performance in 2009 was quite drastic.  Although the Company's OCC declines were less severe than its competitive peer set, the Company's ADR declined at a much steeper pace.  It is possible that the Company's efforts to reduce capital expenditure spending (which probably reduced the perceived level of hotel quality) contributed to the Company's steeper ADR decline.  Also, the Company's monthly year-over-year RevPAR declines began to level off with its competitive peer set in the second quarter of 2009, with monthly declines ranging from 23% to 24%, as compared to 21% to 23% for its competitive peer set.  Meanwhile, the Company's room revenues were down 23% from the second quarter of 2008, and property-level EBITDA was down 35%.[670]

In a presentation to the Board on May 14, 2009, Lazard highlighted that the Company might not have enough unrestricted cash to fund its operations through May 2009.[671]

---

[666]  *See* Exhibit III-H-5 for a summary of trends in operating cash balances.

[667]  ESH Business Update dated April 6, 2009 [Bates Nos. ESH0003167-3196].

[668]  Minutes of Meeting of the Board of Directors Extended Stay Hotels – April 21, 2009 [Bates Nos. ESH0039509-39511].

[669]  *See* Exhibit III-J-2 for monthly accounts payable trends.

[670]  *See* Exhibit III-J-1 for a summary of 2009 key performance metrics.

[671]  Board Update – Extended Stay Hotels – May 14, 2009 [Bates Nos. ESH0003197-3210].

Further, the Company's declining cash position was expected to be exacerbated by the pending amortization triggered by the anticipated breach of the Debt Yield Amortization Threshold covenant, which amortization would have to be funded through the Cash Management Account beginning with the June 13th Waterfall cycle. Although restructuring alternatives were discussed in this presentation, none included an identification of how, in the absence of a restructuring, the Company would obtain the funds needed to make the upcoming amortization payments, which would total approximately $50 million for the remainder of 2009.[672]

As of May 31, 2009, the general ledger cash balance available to fund operating expenses had dropped to approximately $4.6 million, down from approximately $26.5 million as of December 31, 2008. Things were not expected to get better soon. The Company's thirteen-week cash flow model reflected only a slight increase to $10.6 million as of June 5, 2009.[673]

In addition, actual corporate overhead expenses for the five months ended May 2009 ($38.0 million) were 20% greater than the five months ended May 31, 2008 ($31.8 million).[674] The variance was primarily driven by restructuring expenses of $5.5 million that were not incurred in the prior period.[675][676]

Also, actual capital expenditures for the five months ending May 2009 were minimal and mainly spent on life safety related expenses due to a capital freeze imposed by the

---

[672] *Id.*; Lazard presentation – July 2008 [Bates Nos. ESH0003052-3109].

[673] *See* Exhibit III-I-4 for a summary of the thirteen week cash flow modeling.

[674] Corporate Overhead Report dated May 2009 [Bates Nos. ESH0072987-72988], Corporate Overhead Actual to Budget Summary dated May 2009 [Bates Nos. ESH0073055-73060] and Corporate Overhead Report dated May 2008 [Bates Nos. ESH0072955-72956].

[675] The draft 2009 budgeted corporate overhead expenses totaled $86.5 million, and were comprised of $79 million of recurring expenses and $7.5 million for restructuring costs. This represented a 12% increase compared to 2008 actual recurring expenses of $70.3 million, and a 48% increase in the restructuring costs of $5.1 million. Note that for 2009 draft budget purposes, total sales and marketing expenses were approximately $20.6 million. Total actual sales and marketing costs for 2008 were approximately $21.9 million, including the $6.4 million that was segregated as a "special item". 2009 Draft Budget [Bates Nos. ESH0036970-36976] and 2008 Corporate Overhead report [Bates Nos. ESH0072971-72974].

[676] The 2009 draft budget was never approved. Additionally, the Company never prepared or produced a draft 2009 budget in monthly format.

Company.[677][678]  The table below summarizes projected 2009 expenditures, incremental expenditures deferred into 2010 and 2011, as well as actual expenditures through May 2009. [679]

| Capital Expenditures: 2009 Actual (YTD May) and Full Year Draft Budget (in '000s) | | | | |
|---|---|---|---|---|
| | | **2009 Draft Budget** | | |
| **Capital Expenditure** | **Actual Spend 5 Months ended May 31, 2009** | **Budgeted 2009 Spend** | **Deferred until 2010/2011** | **Total - 2009 Budget** |
| Recurring capital expenditures | $ 4,701 | $ 36,857 | | $ 36,857 |
| Project capital expenditures | 855 | - | | |
| Facilities Capitalization | 535 | - | | |
| Technology Projects | 1,685 | 600 | $ 9,400 | 10,000 |
| Renovation of Acquired Properties | 3 | - | - | - |
| StudioPlus Conversions | - | - | 27,900 | 27,900 |
| Extended Stay America Refresh | (277) | 56,000 | 18,400 | 74,400 |
| Exterior Projects | - | 3,400 | 15,200 | 18,600 |
| Rebranding: Homestead Conversions | - | - | 50,700 | 50,700 |
| Rebranding: Signage Replacement | - | - | 24,700 | 24,700 |
| Renovation: Sierra Suites | - | - | 13,600 | 13,600 |
| Misc | 2 | - | - | - |
| **Total Projected Capital Expenditures** | **$ 7,504** | **$ 96,857** | **$ 159,900** | **$ 256,757** |

*Sources: 2009 Budget dated December 1, 2008 (ESH0036970-36976), 2009 Capex report (ESH0077441-77458).*

In June 2009, as a result of the severe liquidity situation and the pending amortization payments required under the Loan Agreements estimated to be over $50 million for the balance of the year,[680] Lazard projected that the Company would completely deplete its liquidity by the end of June 2009, and would be unable to meet payroll of approximately $9 million on Tuesday, June 16, 2009.[681]  Shortly before that time, the certain of the Debtors filed

---

[677]  Cost Benefit Analysis of CapEx Spend for Rooms Out of Service, dated July 28, 2009 at 2 (Catalyst ID 00001048).

[678]  Board of Directors Meeting presentation, dated November 13, 2008  [Bates Nos. ESH0036945-36948].

[679]  The 2009 draft budget, which was never approved, included significant incremental capital expenditures, the majority of which were deferred until 2010 and 2011.

[680]  Lazard presentation – July 2008 [Bates Nos. ESH0003052-3109].

[681]  Board Update – Extended Stay Hotels – June 2009 [Bates Nos. ESH0003211-3232].

for bankruptcy on the Petition Date. Report Section III.K., which follows, further discusses the weeks leading up to, and the decision to file for, chapter 11 bankruptcy.

## K. Pre-Filing Negotiations

On Wednesday, November 13, 2008, a meeting of the Boards of Directors of the "Extended Stay Hotels family of companies" was commenced at the offices of Weil in New York City ("November 13 Board Meeting").[682] As reflected in the majority of the meeting minutes, the "boards of the Extended Stay Hotels family of companies, principally comprised of Extended Stay, Inc., Homestead Village, LLC, DL-DW Holdings, LLC, and BHAC Capital IV, LLC" met and acted collectively, apparently suggesting that their respective organizational documents permitted the same.[683] The minutes of the November 13 Board Meeting ("November 13 Minutes"), reflect that in attendance were Mr. Lichtenstein, Mr. Teichman, Peyton "Chip" Owen, Guy Milone, Bruno de Vinck, and a series of "invited guests," including equity holders of various entities and their respective counsel, owners and employees of HVM (although all are identified as representing "Extended Stay Hotels"), and various professionals from Lazard and Weil.

It was at the November 13 Board Meeting that Lazard and Weil first addressed the Boards to request formal authorization to approach the debt holders regarding the Company's financial problems. Early on in the November 13 Board Meeting, Lazard informed the Boards that the Company could deplete all of its "free cash" as early as February 2009. Therefore, Lazard recommended to the Boards that Lazard and the Company immediately commence dialogues with holders of the Company's debt. Thereafter, as reflected in the November 13 Minutes, the Boards unanimously passed the following resolution:

> **RESOLVED** that Lazard be instructed to commence dialogue with the Company's lenders in connection with a possible restructuring of the Company's debts.

---

[682] *See* "Minutes of Meeting of The Board of Directors of Extended Stay Hotels," November 13, 2008 [Bates No. ESH0036949].

[683] Because it was considered to be outside the scope of the Investigation, the Examiner did not review all of the underlying organizational documents to determine whether this was the case.

1. **Mortgage Debt Negotiations**

According to the Examiner's discussions with the Debtors and their professionals, immediately following the November 13 Board Meeting, Lazard, on behalf of the Company, began reaching out to those parties that it believed held direct economic interests in the outcome of any restructuring negotiations, *i.e.*, – the Certificate Holders[684][685]  With respect to the Mortgage Debt, the Examiner inquired whether the Company or its professionals had contacted the Servicer or Wells Fargo Bank, N.A., as the trustee for the mortgage trust ("Trustee") to determine if the Company could communicate directly with the Certificate Holders.  In response, Lazard told the Examiner that the Servicer had not expressed any concerns regarding the Company and its advisors interfacing directly with the Certificate Holders.[686]  Lazard stated, however, that the Servicer expressed an interest in being kept informed as to what was going on with the negotiations with the Certificate Holders, and according to Lazard, the Company and Lazard made a conscious effort to do that.[687]

When it came to actually contacting the Certificate Holders, the initial hurdle that Lazard indicated it faced was that it did not have a complete list of the Certificate Holders. Further, the Company did not have access to contact information for the Certificate Holders as it did for the Mezzanine Lenders to whom the Company indirectly made debt service payments each month.  Therefore, Lazard contended that it initially had to reach out to those Certificate Holders that Lazard had happened to learn owned Certificates in the Trust.[688]  By way of example, Lazard indicated that it happened to know that Centerbridge and Cerberus Capital Management, L.P. ("Cerberus") were Certificate Holders, and thus was able to contact them. According to Lazard, over time, it came to learn of, and contact, other Certificate Holders

---

[684]  In connection with the securitization of the mortgage loan, the lenders sold their interests in the mortgage loan and received, in exchange the certificates ("Certificates"), representing the ownership of the beneficial interests of the Trust, which held the mortgage loan and the collateral therefor.

[685]  Interview with Joseph Rogers, HVM, L.L.C.; Ari Lefkowitz, Phillip Summers, Lazard. Ltd.; Marcia Goldstein, Jacqueline Marcus, Jae Kim, Weil, Gotshal & Manges, LLP, Offices of Weil, Gotshal & Manges, LLP, New York, New York, Nov. 5, 2009.

[686]  *Id.;* telephone interview with Phillip Summers, Jeff Altman, Lazard, Ltd., Feb. 24, 2010.

[687]  Telephone interview with Phillip Summers, Jeff Altman, Lazard, Ltd., Feb. 24, 2010.

[688]  *Id.*

through these initial contacts.[689]  Indeed, in a few e-mails produced by Centerbridge, Lazard and Centerbridge did appear to be attempting to contact parties that were presumed to be other Certificate Holders.[690]

In total, throughout the course of its work for the Company in 2008-09, Lazard estimated that it learned of and tried to contact approximately 15-20 Certificate Holders (including those parties that held both Mezzanine Debt and Mortgage Debt).[691]  The Examiner was provided evidence of meetings that took place between Lazard and six different Certificate Holders during that timeframe; however, it appears that three of the six met with Lazard only once in March 2009.  There is no evidence that Lazard ever spoke to the banks (or their successors in interest) that financed the Acquisition in their position as Certificate Holders regarding the Company's restructuring efforts at the mortgage level.[692]  Similarly, there is no evidence that the other Certificate Holders, some of whom would form a small "ad hoc group," ever tried to engage the original lenders in such discussions.

Lazard informed the Examiner that before the end of 2008, Lazard generally was reaching out to the few Certificate Holders of which it was aware, and letting them know that Lazard had been retained by the Company and was getting up to speed, that the Company was facing financial trouble, and that Lazard would be back in touch to discuss the Company's financial situation.[693]  According to Lazard, substantive conversations with most of the Certificate Holders that it contacted did not take place until 2009.[694]  According to the documents and information produced to the Examiner, Lazard was clearly having substantive discussions with at least two Certificate Holders – Centerbridge and Cerberus – before the end of 2008.

---

[689]   Telephone interview with Phillip Summers, Jeff Altman, Lazard, Ltd., Feb. 24, 2010.

[690]   *See* E-Mail Correspondence Dated Jan. 23, 2009 [Bates No. CB0002]; *see also, e.g.*, E-Mail Correspondence Dated Mar. 17, 2009 [Bates No. CB00006].

[691]   Interview with Joseph Rogers, HVM, L.L.C.; Ari Lefkowitz, Phillip Summers, Lazard, Ltd.; Marcia Goldstein, Jacqueline Marcus, Jae Kim, Weil, Gotshal & Manges, LLP, Offices of Weil, Gotshal & Manges, LLP, New York, New York, Nov. 5, 2009.

[692]   *See, e.g.*, "Lazard meetings with Mortgage and Mezzanine Debt Holders" [Bates No. ESH0076976]

[693]   Telephone interview with Phillip Summers, Jeff Altman, Lazard, Ltd., Feb. 24, 2010.

[694]   Telephone interview with Phillip Summers, Jeff Altman, Lazard, Ltd., Feb. 24, 2010.

Centerbridge, its financial advisor, Houlihan Lokey ("Houlihan"), and Centerbridge's counsel, Fried Frank Harris Shriver & Jacobson LLP ("Fried Frank"), met with the Company, Lazard and Weil to discuss the Company's significant financial problems and potential solutions thereto, prior to the end of 2008.[695]  According to counsel to Centerbridge, when Centerbridge began talking to Lazard and the Company, there were times when Centerbridge was being told that the Company needed to have a restructuring deal in place *before* the end of 2008.[696]  Additionally, although counsel to Cerberus stated that Centerbridge and its advisors took the lead in the discussions, Cerberus, too, was involved in discussions with the Company and Lazard during this same time period.

It was also prior to the end of 2008 that Houlihan and Fried Frank broadened the scope of their respective representations from representing Centerbridge alone, to representing an "ad hoc group" of Certificate Holders ("Ad Hoc CH Group"), the composition of which (other than Centerbridge and Cerberus) was unclear at the time.  Pursuant to a letter agreement dated December 18, 2008, between Houlihan and ESI-Homestead ("Houlihan Agreement"), Houlihan requested that the Company agree to an arrangement whereby the Company would pay Houlihan certain fees and expenses incurred by Houlihan in connection with its representation of an "Informal Mortgage Lender Group," comprised of unidentified Certificate Holders.[697]  The Boards spent several meetings, from December 16, 2008, to January 15, 2009, debating whether to sign the Houlihan Agreement.[698]

The Boards' concerns appear to have included (a) how to determine which Certificate Holders Houlihan actually represented; and (b) whether the terms of the Houlihan

---

[695]    Telephone Interview with Brad Scheler and Jennifer Rodburg, Fried Frank Harris Shriver & Jacobson LLP, Oct. 6, 2009.

[696]    *Id.*

[697]    *See* Letter from Saul Burian of Houlihan Lokey Howard & Zukin Capital, Inc. to Extended Stay, Inc. c/o Joseph Teichman at The Lightstone Group [Bates No. ESH0076754].

         Generally, the Houlihan Agreement provides for the payment of an initial fee of $200,000, the payment of a monthly fee of $150,000, and the payment, upon the consummation of a Restructuring Transaction (as defined therein) of a $7 million fee.

[698]    *See* Bates Nos. ESH0038744, ESH0038746, ESH0036960, ESH0036962.

Agreement were standard in the restructuring context.[699]  As reflected in the minutes of the meeting of the Boards on January 15, 2009,[700] after much debate, the members of the Boards resolved to permit the Company to enter into the Houlihan Agreement.  A similar agreement, although this time without the approval of the Company's Boards, was entered into on January 12, 2009, with Fried Frank ("Fried Frank Agreement"), whereby the Company agreed to reimburse Fried Frank for its regular hourly fees and expenses incurred in connection with the restructuring negotiations.[701]  According to the Schedule of Assets and Liabilities filed by ESI on September 28, 2009, a total of $569,744 and $368,431 was paid to Fried Frank and Houlihan, respectively, in the 90 days prior to the Petition Date (and presumably excluding the payment of any retainers and other amounts).[702]

According to information provided to the Examiner, the composition of the Ad Hoc CH Group was relatively small and fluid, with the only apparent constants being Centerbridge and Cerberus.  Cerberus, however, was also represented by its own counsel, Schulte, Roth & Zabel, LLP, while a member of the Ad Hoc CH Group.[703]  At a meeting of the Boards of the Company held on January 15, 2009, the directors were informed that Houlihan was advising the Company that the members of the Ad Hoc CH Group then included DE Shaw, Citi, and Starwood, although Houlihan informed the Company that none were "contractually committed to Houlihan."[704]  Additionally, Centerbridge informed the Examiner that, although the

---

[699]    *Id.*

[700]    *See* Bates No. ESH0036962

[701]    *See* Engagement Letter Dated January 12, 2009 [Bates No. ESH0076703].
Generally, the Fried Frank Agreement provided for a $500,000 "advance payment," and that the Company would ensure that as each monthly statement was issued, the Company would remit such amounts as necessary to bring the Company's advance as of the billing date up to the amount of the then agreed upon advance payment amount.

[702]    *See* "Statement of Financial Affairs for Extended Stay, Inc.," dated September 28, 2009, Chapter 11 Docket No. 454.  Because this matter did not fall within the scope his Investigation, the Examiner has not investigated whether such payments may be avoidable and/or recoverable, or otherwise may give rise to a cause of action that may benefit the Debtors' estates.  Further, the Examiner did not request information sufficient to determine the total amount of monies paid to either Houlihan or Fried Frank during the entire prepetition period.

[703]    Telephone Interview with Brad Scheler and Jennifer Rodburg, Fried Frank Harris Shriver & Jacobson LLP, Oct. 6, 2009.

[704]    *See* "Minutes of Meeting of The Board of Directors of Extended Stay Hotels," January 14, 2009 [Bates No. ESH0036962].

membership in the Ad Hoc CH Group fluctuated over time, major players also included Five Mile Capital, Starwood, GEM Capital, and The Blackstone Group.[705] According to information produced to the Examiner by Lazard, GEM appears to have attended a few of the earlier meetings with Centerbridge and Cerberus in 2009. However, the Examiner obtained evidence of only one meeting taking place where DE Shaw, Blackstone, and Five Mile were present when the Ad Hoc CH Group met with Lazard in 2009.[706] The length or level of involvement of these additional parties in the Ad Hoc CH Group was not substantiated by the Examiner.

Given the scope of the Investigation, the Examiner was not given, nor did he actively endeavor to obtain, information necessary to evaluate the work that was actually done by Houlihan and/or Fried Frank for the Ad Hoc CH Group and at the expense of the Company. What the Examiner was able to ascertain from documents and information otherwise produced can be summarized as follows. In January 2009, Houlihan worked with Lazard to perform due diligence on the Company, such as visiting the Company's facility in South Carolina and reviewing, with Lazard, the Company's books and records.[707] At the same time, it appears that Fried Frank crafted a restructuring proposal ("Fried Frank January Proposal") that it presented to the Company's professionals on January 27, 2009.[708] According to the minutes of the meeting of the Boards on January 29, 2009 ("January 29 Minutes"),[709] the Boards met to discuss the Fried Frank January Proposal, which was a non-binding term sheet to be employed in connection with a chapter 11 filing. The Fried Frank January Proposal contemplated a comprehensive restructuring of the Company, including eliminating all of the existing Mezzanine Debt and the equity in the Company. With respect to Mr. Lichtenstein's guarantees, it provided that the parties were to discuss the satisfaction of his obligations in connection with a chapter 11 filing and that there was a possibility for a limited recourse indemnity in the form of the issuance of

---

[705] Telephone Interview with Brad Scheler and Jennifer Rodburg, Fried Frank Harris Shriver & Jacobson LLP, Oct. 6, 2009.

[706] *See, e.g.*, "Lazard meetings with Mortgage and Mezzanine Debt Holders" [Bates No. ESH0076976].

[707] *See* "Minutes of the Board of Directors of Extended Stay Hotels, January 6, 2009" [Bates No. ESH0036960].

[708] *See* E-Mail from Fried Frank to Weil dated January 27, 2009 [Bates No. ESH0004755]

[709] *See* "Minutes of the Board of Directors of Extended Stay Hotels, January 29, 2009" [Bates No. ESH 0036966]

common stock to Mr. Lichtenstein in the post-chapter 11 corporate entity.[710]  The Fried Frank January Proposal can fairly be viewed as a rough first draft of the restructuring term sheet that ultimately would be filed, with the approval of Centerbridge and Cerberus, with the chapter 11 petitions on the Petition Date.

On January 29, 2009, the Boards of the Company resolved to permit Lazard to send, on behalf of the Company, restructuring proposals to "each of the lender [groups] to start a dialogue."[711]  Accordingly, on or about January 29, 2009, Lazard sent to Fried Frank and Houlihan the "Overview of Transaction Proposal to Mortgage Lenders" ("January 2009 Mortgage Proposal"), pursuant to which the Company proposed a complete restructuring of the Company's debt and equity, including (1) replacing the existing $4.1 billion in mortgage loans with $2.0 billion in mortgage loans, $1 billion in mezzanine loans, and reorganized equity; (2) replacing the existing $3.3 billion in mezzanine loans with reorganized equity; and (3) replacing the existing equity with reorganized equity and warrants; and (4) granting the existing equity holders releases and indemnities from all guarantees.  Thus, pursuant to the January 2009 Mortgage Proposal, the Company would be left with only $3 billion in debt and Mr. Lichtenstein would be absolved of all liability under his guarantees and share in restructured equity and warrants. Further, the proposal assumed the reinstatement of the existing capital lease (involving the properties owned by Mr. Lichtenstein), and the negotiation of a satisfactory cash collateral agreement that provided sufficient cash to fund the Company's 2009 business plan (whether in or out of chapter 11).[712]

As reflected in an e-mail produced to the Examiner by the Debtors,[713] the January 2009 Mortgage Proposal was sent to Houlihan and Fried Frank with the request that it be forwarded to the Certificate Holders that they represented.  According to Lazard, because there was no way for the Company to reach all of the Certificate Holders directly, as there was with

---

[710]  *See* E-Mail from Fried Frank to Weil dated January 27, 2009 [Bates No. ESH0004755]

[711]  *See* "Minutes of the Board of Directors of Extended Stay Hotels, January 29, 2009" [Bates No. ESH 0036966]

[712]  *See* E-Mail and "Preliminary Proposal to Mortgage Dated January 2009" [Bates No. ESH 0004767]

[713]  *Id.*

the Mezzanine Lenders (which could be contacted through the Servicer), it was unable to otherwise generally distribute the proposal to any additional Certificate Holders.[714] It is unclear why Lazard did not, for instance, send it to other significant holders of which it was certainly aware, such as BofA, Wachovia, and the Fed – none of which ever received the January 2009 Mortgage Proposal. Each of the original lenders (or their successors) told the Examiner that they were never included in *any* discussions regarding restructuring efforts at the mortgage level.[715] If accurate, a legitimate question remains why the Company and its advisors would choose to omit such significant holders from restructuring negotiations at the mortgage level.

According to subsequent presentations prepared by Lazard for the Boards, Lazard never received a formal response to the January 29 Mortgage Proposal from the Ad Hoc CH Group.[716] As discussed in Section III.K.4, discussions between Lazard and the Ad Hoc CH Group would commence again in earnest in March 2009.

### 2.  Mezzanine Debt Negotiations

After the November 13, 2008 Board Meeting, Lazard, on behalf of the Company, also apparently began reaching out to Mezzanine Lenders. According to Lazard, it was much easier to reach the Mezzanine Lenders for two reasons. First, the Company and Lazard were able to gather contact information for the Mezzanine Lenders from the information used to make the debt service payments each month as the payments to the Mezzanine Lenders were made through the Company's Cash Management Account. In contrast, payments to the Certificate Holders were made by the Trustee to the Trust, and the Company, therefore, did not have access to similar information for the Certificate Holders. Second, the Company and Lazard were able to request that the Servicer send messages to the Mezzanine Lenders. Apparently, it was not

---

[714]  Telephone Interview with Phillip Summers, Jeff Altman, Lazard, Ltd., Feb. 24, 2010.

[715]  Interview with Representatives of Wachovia Bank, N.A., Offices of Morrison & Foerster LLP, New York, New York, Jan. 12, 2010; Telephone interview with Shari Leventhal Stephanie Heller, Patrick McArdle, Federal Reserve Bank of New York, Oct. 7, 2009; Interview with Michael Mesard, BlackRock; Helen Mucciolo, Michael Patrick, Federal Reserve Bank of New York, New York, Dec. 15, 2009.

[716]  *See* "Board Update, 14 May 2009" at 8 [Bates No. ESH 0039993]

permissible for the Company or its professionals to contact the individual Certificate Holders through the Servicer or the Trustee to the Trust.[717]

As with the Certificate Holders, in 2008, Lazard said that those Mezzanine Lenders that it contacted were told that Lazard had been hired and was getting up to speed, that the Company was facing financial trouble, and that Lazard would be back in touch with them for further discussions of the Company's financial issues.[718] Not surprisingly, the existence of such discussions was leaking out to the marketplace; at least one popular private equity real estate publication was reporting as of December 8, 2008, that "The Lightstone Group is reportedly in talks to hand the US hospitality chain, Extended Stay Hotels, over to the chain's lenders."[719] Although the on-line publication cited no source, it would certainly later prove accurately to reflect the discussions that the Company's professionals were having with certain of the Mezzanine Lenders.

After receiving the approval of the Boards to send restructuring proposals to the lender groups at the end of January 2009, on February 3, Lazard forwarded its "Overview of Proposal to Mezzanine" ("February 2009 Mezzanine Proposal") to the owner of the junior-most tranche of the Mezzanine Debt, Fortress Investment Group, LLC ("Fortress") and to the financial advisor to BofA, Capstone Advisory Group, LLC ("Capstone").[720] Under the February 2009 Mezzanine Proposal, the Company proposed to (1) reinstate the $4.1 billion mortgage loan on its existing terms, (2) replace the $3.3 billion in Mezzanine Debt with a combination of mezzanine debt and equity; (3) replace existing equity with a combination of mezzanine debt and equity; and (4) grant equity holders releases from all existing guarantees, including Mr. Lichtenstein from his significant personal guarantees. By its terms, implementation of the February 2009

---

[717]    Telephone Interview with Phillip Summers, Jeff Altman, Lazard, Ltd., Feb. 24, 2010.

[718]    Telephone Interview with Phillip Summers, Jeff Altman, Lazard, Ltd., Feb. 24, 2010.

[719]    http://www.preenews.com, Extended Stay reportedly in talks with lenders, http://www.perenews.com/Article.aspx?article=32828&hashID=C75187CB3CF0604F15 C37299AB36B6804E73DC55 (last visited Mar. 12, 2010).

[720]    *See* E-Mails Containing "Preliminary Proposal to Mezzanine Dated Feb. 2009" [Bates Nos. ESH0004770 and ESH00076745].

Mezzanine Proposal would require the approval of 100% of all of the Mezzanine Lenders.[721]  As with the January 2009 Mortgage Proposal, Lazard reported that it never received a formal response to the February 2009 Mezzanine Proposal.[722]

In addition to the February 2009 Mezzanine Proposal, the Company, through Lazard, pursued interest forbearance agreements with the Mezzanine Lenders commencing in February 2009.[723]  To assist Lazard in obtaining forbearances, the Boards of the Company approved the retention of Spartan Capital LLC as an advisor.[724]  Certain of the senior Mezzanine Lenders understood the Company's need for an interest forbearance and, therefore, tried to assist in obtaining the other Mezzanine Lenders' consent.  To that end, on March 20, 2009, the five senior most tranches of Mezzanine Lenders disseminated an "Interest Deferral Agreement" to all of the Mezzanine Lenders for discussion.[725]  Ultimately, however, no forbearance agreement with the Mezzanine Lenders was ever reached.  According to Mr. Teichman, this was, at least in part, because the offer presented by the Mezzanine Lenders in response to the Company's request for forbearance was so complex, and was structured in such a way that it was not realistic for the Company to consider.[726]

The Examiner spoke with a number of different Mezzanine Lenders that hold positions throughout the mezzanine stack.  The Mezzanine Lenders with which the Examiner spoke reported having generally participated in a number of conference calls and in-person meetings with a variety of different other Mezzanine Lenders.  Some, such as Ashford Hospitality Group, even independently formulated restructuring proposals that they tried to "sell" to the larger Mezzanine Lender group.[727]  In the end, however, with the exception of the ill-fated

---

[721]  *See* E-Mail Containing "Preliminary Proposal to Mezzanine Dated February 2009" [Bates No. ESH0004770].

[722]  *See* "Board Update, 14 May 2009," p. 8 [Bates No. ESH0039993]

[723]  *See* "Board Update, 14 May 2009," p. 1 [Bates No. ESH0039993].

[724]  *See* "Minutes of Meeting of the Board of Directors of Extended Stay Hotels, March 17, 2009" [Bates No. ESH0039505].

[725]  *See* Bates No. FORTRESS0171665.

[726]  *See* "Minutes of the Board of Directors of Extended Stay Hotels, March 31, 2009" [Bates No. ESH0039507].

[727]  *See* "Ashford Hospitality Trust/Remington Value Maximization Plan," April 2009 (Catalyst ID 3657).

CIL Transaction discussed in the next section, none of the independent efforts ever gained any traction. The general consensus of the different parties with whom the Examiner spoke was that there were simply too many different lenders, with too many different agendas, for a restructuring consensus to be reached in a short period. A similar sentiment was apparently expressed by Mr. Teichman when addressing the Boards at the end of March. He reportedly said that the major barrier to moving the discussions forward with the Mezzanine Lenders was the large number and lack of cohesion among the various parties.[728] At his deposition, Mr. Lichtenstein echoed the same general sentiments.[729]

Although some of the Mezzanine Lenders to which the Examiner spoke would complain that they were not provided the level of transparency that they believe is typical in restructuring negotiations,[730] the Company generally appears to have provided the lenders with those things to which they were entitled under the Loan Agreements. Further, for those Lenders that were willing to sign confidentiality agreements providing for certain buy/sell restrictions and other protections the Company deemed necessary, the Company was willing to provide certain projections.[731] At the end of March 2009, Lazard requested that the Servicer send an email to all of the Mezzanine Lenders reminding them that they were not to share with other lenders forecast information that was disseminated by Lazard pursuant to confidentiality agreements. In this same email, Lazard reiterated its desire to continue to negotiate and communicate with all of the Lenders with regard to the Company's restructuring efforts.[732]

---

[728] *See* "Minutes of Meeting of the Board of Directors of Extended Stay Hotels, March 31, 2009" [Bates No. ESH 0039507].

[729] Lichtenstein Deposition at 224:5-12.

[730] Interview by Margreta M. Morgulas with Jim McLaughlin, Kathleen Ahern, Greg Lane, Jeff Morrison, Key Bank, Offices of Buchanan Ingersoll & Rooney, New York, New York, Dec. 21, 2009.

[731] *See, e.g.*, Bates Nos. ESH0073523, ESH0073545, ESH0073550, ESH73528.

[732] *See* E-Mail dated March 27, 2009 [Bates No. ESH0004860].

### 3. CIL Negotiations

In late January and early February 2009,[733] the Company and its advisors began discussions with a subset of the senior Mezzanine Lenders, effectively comprised of BofA, BofA's Merrill Lynch group, Wachovia (then part of Wells Fargo), and the Fed (which holds certain of the positions formerly held by Bear in the Maiden Lane vehicles established by the Fed) (collectively, the "Mezz B-E Lenders"). In addition to several other positions that are not relevant to this discussion, these lenders together held all of the Mezzanine Debt in tranches B-E, totaling approximately $1.6 billion of the total $3.3 billion of Mezzanine Debt.

According to documents produced to the Examiner by the Debtors, the idea of a consensual transfer of the Company equity to its lenders was first raised as early as mid-February 2009. In an email dated February 18, 2009, counsel to BofA attached a half-page of "overview points" regarding how a consensual turnover of the control of the Company might occur.[734] No further mention of a consensual equity transfer was made, according to documents produced to the Examiner, until April 1, 2009, when counsel for BofA circulated a summary term sheet for a proposed "conveyance in lieu of foreclosure transaction" via e-mail to Wachovia, the Fed, and the Company.[735] After exchanging several draft term sheets, on April 20, 2009, Mr. Lichtenstein, Ivan Kaufman of Arbor, and certain professionals from Weil met with representatives of the Mezz B-E Lenders regarding what would later come to be commonly referred to by many as the "Conveyance In Lieu" transaction.[736] Over the course of the next few weeks, several additional drafts of the operative documents governing the CIL Transaction were exchanged among the parties.

---

[733] According to Lazard's non-exhaustive list of meetings with Mortgage and Mezzanine Debt holders, on January 23, 2009, Lazard met with Capstone, advisor to BofA, reportedly in connection with BofA's mezzanine positions. *See* Bates No. ESH0076976. Further, BofA and possibly other of the banks involved in the CIL Transaction executed a confidentiality/non-disclosure agreement with the Company on or about February 2, 2009.

[734] *See* E-Mail dated February 18, 2009 [Bates No. ESH0004817].

[735] *See* E-Mail dated April 1, 2009 [Bates No. ESH0004866]

[736] *See* "Minutes of Meeting of the Board of Directors of Extended Stay Hotels, April 21, 2009" [Bates No. ESH0039509]

On May 14, 2009, a meeting of the Boards of the Company was held in which Weil and Lazard made presentations regarding the CIL Transaction, including a summary of its terms and the alleged potential benefits to the Company. Although not all of the members of the Boards voted in favor of the resolution approving entry into an agreement permitting the consummation of the CIL Transaction, the resolution was reportedly approved by the requisite number of Board members.[737]

On May 19, 2009, an "Agreement" by and between (i) ESH Homestead Mezz 2, LLC and ESA Mezz 2 LLC as borrowers, (ii) Mr. Lichtenstein, Lightstone, Homestead Village, and ESI as guarantors, and (iii) the Mezz B-E Lenders as lenders, was executed, providing, among other things, that the parties would, upon the occurrence of certain necessary conditions precedent, consummate the CIL Transaction.[738] At a meeting of the Boards of the Company held the next day, Mr. Lichtenstein reportedly described the deal as "far superior for the Company than any deal that was available with the mortgage lenders."[739]

Also on May 19, 2009, the lenders ("Mezzanine B Lenders") under the mezzanine B loan ("Mezzanine B Loan") declared an event of default by the Mezzanine B Loan borrower by providing written notice as required in the Administration Agreement dated March 28, 2008 by and between the Mezzanine B Lenders and Wachovia Bank, as Administrator.[740] The alleged default was on account of a failure of the borrower to maintain its special purpose entity ("SPE") status by failing to pay, within the permissible time period prescribed in the Mezzanine B Loan, approximately $3.5 million in trade payables ("Trade Payables Default").[741]

---

[737] *See* "Minutes of the Meeting of the Board of Directors of Extended Stay Hotels, May 14, 2009" [Bates No. ESH0036968]

[738] *See* Bates No. ESH-NYFED00000027.

[739] *See* "Minutes of the Board of Directors of Extended Stay Hotels, May 20, 2009" [Bates No. ESH0038752]

[740] *See* Letter from Wachovia Bank National Association, Master Servicer to Wells Fargo Bank, Corporate Trust Services dated May 28, 2009 [Bates No. WACHOVIA01511].

[741] *Id.*

Subsection (xix) of the definition of "Special Purpose Entity" in Section 1.1 of the

Mezzanine B Loan provides,[742] in pertinent part, as follows:

> "**Special Purpose Entity**" shall mean a corporation, limited partnership or limited liability corporation which at all times on and after the date hereof
>
> (xix)   will incur, create, or assume no Indebtedness other than . . . (b) liabilities incurred in the ordinary course of business relating to the ownership and operation of the Collateral and the routine administration of the applicable Senior Mezzanine Borrower, in amounts not to exceed in the aggregate $10,000.00, which liabilities are not more than sixty (60) days past the date incurred, are not evidenced by a note and are paid when due . . . .

It was alleged by the Mezzanine B Lenders that the borrower under the Mezzanine B Loan failed

to comply with this provision with respect to the $3.5 million in trade payables and, therefore,

that the borrower failed to maintain its SPE status.

In connection with that alleged default, the Mezzanine B Lenders directed that the

Administrator deliver: (1) a notice of default to the Mortgage Lenders and each of the other

Mezzanine Lenders,[743] and (2) a notice of opportunity to cure to each to the Mezzanine Lenders

that were junior in priority to the Mezzanine B Lenders (collectively, "Mezz B Notices of

Default").[744]  The reaction to the Trade Payables Default was swift and ultimately fatal to the

attempts to consummate the CIL Transaction.

With respect to the Trade Payables Default, the Examiner interviewed a number

of parties that took part in its identification and ultimate declaration, including BofA, Wachovia,

the Fed and Blackrock, as well as representatives of the Company, Lazard and Lightstone.

Generally speaking, the Examiner was told that it was counsel to those lenders that had initially

identified the potential default in the relevant loan agreement, and requested that Lazard and the

Company produce to these lenders information pertaining the trade payables, and whether the

Company was in compliance with the SPE requirements in the Mezzanine B Loan.[745]  Based

---

[742]   For a more detailed discussion of this provision, *see* Section III.E.1.b. of this Report.

[743]   *See* Catalyst ID 00003360.

[744]   *See* Catalyst ID 00003361.

[745]   *See* Deposition of David Lichtenstein at  257-58.

upon the information produced by the Company and Lazard to the lenders, the lenders determined that a default occurred and took the actions necessary to declare the default. In other words, neither Lazard nor the Company were alleged to have assisted in the determination that a default had occurred or the process of declaring the default.[746]

Mr. Teichman stated that the Company never took a position regarding whether the Trade Payables Default had actually occurred.[747] In response to requests of Mezzanine Lenders for additional information about the alleged Trade Payable Default, Wachovia sent a detailed letter to Mr. Rogers, as an officer of the mezzanine B borrower, requesting additional information from the Company about the alleged default. Wachovia, however, never received a response to its request.[748] Mr. Rogers acknowledged that he never answered Wachovia's request for information about the alleged default, and that he referred the request for information to the attention of counsel to the Company and to Lightstone.[749] Further, the Debtors produced no document suggesting that another representative of the Company had responded to Wachovia's request for information regarding the alleged default.

Mr. Rogers freely acknowledged that after the Closing of the Acquisition in June 2007, there likely always had been payables that were greater than 60 days outstanding.[750] Thus, if this was a legitimate default, the Company had likely been in continuing default since the Closing of the Acquisition. This raises the issue whether the various compliance certificates that the Company provided to the lenders, certifying that there were no defaults under the Loan Agreements, were in fact accurate. As reflected in Section III.F.3 hereof, on a monthly basis

---

[746] Interview with Michael Mussard, BlackRock; Helen Micciolo, Michael Patrick, Federal Reserve Bank of New York, New York, New York, Dec. 15, 2009.

[747] Deposition of Joseph Teichman at 214

[748] Interview with Wachovia Bank, N.A. representatives, Offices of Morrison & Foerster LLP, New York, New York, Jan. 12, 2010.

[749] Deposition of F. Joseph Rogers at 231:8. In his deposition, Mr. Rogers said he is unsure how to interpret the relevant provision of the loan agreements regarding the requirement that certain payables be made within 60 days. Accordingly, he said he was unable to determine whether the Trade Payable Default had occurred. Deposition of F. Joseph Rogers at 232. Mr. Rogers did, however, sign monthly compliance certificates certifying that the Company was not in default of the same provision under the loan agreements, as described in the next paragraph of this Section.

[750] Deposition of F. Joseph Rogers at 233-34.

Rogers signed certificates certifying that the representations and warranties of the borrower under the Mezzanine B Loan (and all of the other Mezzanine Loan and the Mortgage Loan) were true and correct as of the date of the certificate, as required by Section 5.1.11 of the Mezzanine B Loan (and the other loan agreements).  Legitimate concerns are raised about the accuracy of such monthly certificates in light of this issue.

On June 1, 2009, Kaye Scholer LLP sent a letter to each of the Mezzanine Lenders providing them notice that the Mezzanine B Lenders had entered into an agreement whereby the borrower under the Mezzanine B Loan had agreed to convey the collateral securing the Mezzanine B Loan to the Mezzanine B Lenders in lieu of foreclosure under the Mezzanine B Loan ("June 1 CIL Letter").[751]  In response to the June 1 CIL Letter, actions were instituted in two separate courts seeking to enjoin the consummation of the CIL Transaction.  On June 4, 2009, the Supreme Court for the State of New York, New York County entered a temporary restraining order in the case styled *Line Trust Corp., et al v. Wachovia Bank, N.A., et al.*, Index No. 601713/2009.  On June 4, 2009, the District Court in Dallas County, Texas entered a "Temporary Restraining Order and Order Setting Hearing for Temporary Injunction" in the case styled *Atlas Venture I, LLC v. Wachovia Bank, N.A., et al.*, Index No. 09-07058.[752]  These orders brought a halt to the attempts to consummate the CIL Transaction, although litigation ensued among the parties to dissolve the TROs and proceed with the CIL Transaction.  When these attempts failed, the parties came to the negotiating table.

### 4.    Term Sheet Negotiations

Through March and April 2009, the minutes of the Boards make it clear that the Company's discussions continued with the Ad Hoc CH Group.[753]  For instance, in the minutes of

---

[751]    *See* Catalyst ID 3005.

[752]    Ashford Hospitality Finance LP ("Ashford") would subsequently intervene in the lawsuit as a plaintiff and thus end up negotiating with the lenders and the Company with respect to subsequent efforts to resurrect the CIL Transaction.

[753]    It is presumed that the references in the board minutes for this period to "senior lenders" is to the members of the Ad Hoc CH Group as the Examiner is in possession of no evidence suggesting that Lazard was speaking with any other Certificate Holders.

the meeting of the Boards of the Company for March 3, 2009, the following is noted concerning Lazard's February 27, 2009 meeting[754] with Centerbridge and Cerberus:

> Cerberus took the lead. Cerberus' position is that the mortgage holders should get 100% of the equity because of the current value of the business.[755]

During this same period, it appears that the Ad Hoc CH Group struggled to propose a deal to the Company because its members – namely Centerbridge and Cerberus – had trouble coming to terms on a restructuring proposal.[756] Lazard appears to have spent time during this period trying to bridge this gap and work toward a deal. In an e-mail dated April 3, 2009, Terry Savage of Lazard appears to have tried to encourage Jeff Aronson of Centerbridge to move things along with Cerberus by warning him of the possibility that further delay could result in a deal being done with the Mezzanine Lenders instead of the Ad Hoc CH Group, saying, in part:

> What is the delay in getting a term sheet on this one? People are saying Cerberus is the hold up but we thought they were on board. People should know that the more time this takes, the more time the Mezz has to put something together and they are working on something. This result can't be the result you want. Let me know your thoughts.

Later in the same e-mail exchange, Mr. Savage would sum up his concern to Mr. Aronson by saying, "I just worry that this thing gets out of control which is only bad for folks who really have value."[757]

Meanwhile, Centerbridge and Cerberus, with the apparent support of Lazard, continued to struggle over the course of the next few weeks to finalize a restructuring proposal for the Company. According to the minutes of the meeting of the Boards of the Company for April 21, 2009:

---

[754] The minutes for the March 3, 2009, meeting of the Boards refer to Lazard's February 27, 2009, meeting with "some of the mortgage holders" [Bates No. ESH0039501], Lazard's meeting schedule indicates that it met with Centerbridge and Cerberus on February 27, 2009 [Bates No. ESH0076976].

[755] *See* "Minutes of Meeting of the Board of Directors of Extended Stay Hotels, March 3, 2009" [Bates No. ESH0039501].

[756] *See, e.g.*, E-Mail Communication Dated March 28, 2009 [Bates No. CB00080].

[757] *See* E-Mail Dated April 4, 2009 [Bates No. CB00081].

> Cerberus and Centerbridge cannot agree on basic points making it very difficult to obtain a written deal. Mr. Teichman stated that there are structural issues still open and the senior lenders have little inclination to do anything at this point. It appears that Centerbridge wants to take over and run the Company.[758]

Through the end of April and into early May, Lazard continued to check with Centerbridge and Cerberus to see when the Company could expect to receive a proposal.[759] On May 15, 2009, Lazard received a restructuring proposal from Centerbridge and Cerberus.[760] The transmittal e-mail that accompanied the proposal said that Houlihan was going to try to get as many Certificate Holders on board as possible with respect the May 15 proposal.[761] This would appear to be an early iteration of the Restructuring Term Sheet that would be filed as Exhibit "C" to the Teichman First Day Declaration. Houlihan was ultimately unable to secure any additional Certificate Holders to support the filing of the Restructuring Term Sheet.

As is clear from the correspondence and documents produced to the Examiner by the Debtors and Centerbridge, the Company, Centerbridge, and Cerberus would continue to exchange drafts of the Restructuring Term Sheet through the remainder of May and into June.[762] Throughout this time, Centerbridge and Cerberus appear to have continued to put pressure on the Company and its professionals with respect to the necessity of filing for chapter 11 protection. For instance, during this period, Centerbridge and Cerberus raised issues with the Servicer of the Mortgage Debt on at least two separate occasions with regard to the possible existence of incurable, non-monetary defaults under the Mortgage Loan Agreement.[763] As Cerberus and

---

[758] *See* "Minutes of Meeting of the Board of Directors of Extended Stay Hotels, April 21, 2009" [Bates No. ESH 0039509].

[759] *See, e.g.*, E-Mail Dated April 30, 2009 [Bates No. CB00095], E-Mail Dated May 4, 2009 [Bates No. CB00096].

[760] *See* E-Mail Containing "ESH Revised Term Sheet" [Bates No. ESH0004901].

[761] *Id.*

[762] *See, e.g.*, Bates No. ESH0004934, ESH0004950.

[763] On May 12, 2009, both Centerbridge and Cerberus separately contacted Wachovia in its capacity as Servicer under the Mortgage Loan [Bates Nos. WACHOVIA01867 and WACHOVIA02060]. Both asserted that the failure of the Company to timely deliver annual audited financial statements, with a fully compliant officer's certificate, and an allegedly unqualified opinion of a "Big Four" accounting firm resulted in incurable defaults under the Mortgage Loan Agreement that could and should not have been waived by the Servicer under the Trust and Servicing Agreement.

Centerbridge would have been well aware, had such defaults occurred, it was probable that the Company would be unable to exercise the option to extend the Mortgage Loan in June 2009 and, therefore, to continue to operate without a chapter 11 filing.

Similarly, as the threat of the consummation of the CIL Transaction became more real, on May 27, 2009, in a letter to the "Members of the Board of Directors of Extended Stay Hotel, Inc. . . ," Cerberus alleged that the continued pursuit of the settlement with the Mezzanine Lenders "amounts to a complete and utter disregard of your fiduciary responsibilities to the Company and its stakeholders . . . ." Cerberus, therefore, demanded that the Board cease all negotiations with the Mezzanine Lenders and, "alternatively, to pursue other strategic alternatives, including negotiations with Lender and the holders of Certificates in an attempt to structure a settlement that will better protect and preserve the value of the Mortgaged Properties, the continued operation of the Company as a going concern and the interest of the stakeholders, of commencing proceedings under Chapter 11 of the Bankruptcy Code."[764]

After several drafts of the Restructuring Term Sheet had been exchanged by parties, in an email from Fried Frank sent to Weil on the afternoon of June 12, 2009, Fried Frank indicated that the Restructuring Term Sheet had been approved by Cerberus and Centerbridge.[765] Accordingly, all that remained was approval of chapter 11 filings for the Company and of the filing of the Restructuring Term Sheet.

### 5. Weekend of the Bankruptcy Filing

Shortly after the June 11, 2009 two-year anniversary of the Closing of the Acquisition, the Company was going to be required to determine if the Debt Yield was below the Debt Yield Amortization Threshold. If so, the borrowers were going to be liable for the payment

---

On May 20, 2009 and May 21, 2009, Cerberus and Centerbridge contacted Wachovia in its capacity as Servicer under the Mortgage Loan [Bates Nos. WACHOVIA01869 and WACHOVIA02057] stating that the failure of one of the Mezzanine Lenders to maintain their SPE status (due to the failure to timely pay its trade payables as was alleged in connection with the CIL Transaction) resulted in an incurable nonmonetary default that could and should not have been waived by the Servicer under the Trust and Servicing Agreement.

[764] *See* Bates No. WACHOVIA01871.

[765] *See* Bates No. ESH0004998

of additional monthly amortization payments estimated to total as much as $51 million for the remainder of 2009. Clearly, given the Company's cash flow issues, it could not afford for this to happen. Accordingly, unless the Company could find a way to consummate the CIL Transaction or reach some other agreement with its lenders that permitted the Company to avoid making such amortization payments each month, it appeared all but certain that the Company had to file for chapter 11 protection.

In addition, according to the Examiner's discussions with Weil and Lazard, if the Company was to file, it wanted to do so before making the interest payment to the Mezzanine Lenders that was set to leave the Company's Cash Management Account as soon as on Friday, June 12, 2009. According to Weil and Lazard, it was uncertain whether, without such funds, the Company would be able to survive the upcoming week as such significant expenditures as payroll would be due and payable during that time. Further, it was the stated understanding of the Company that once the funds necessary to make the Mezzanine Lenders' monthly interest payment left the Cash Management Account, the Company would not be able to recall them and, therefore, would not have access to funds as cash collateral in a chapter 11 case. Accordingly, from the perspective of Weil and Lazard, going into the weekend of June 12, 2009, the Boards needed to determine whether to file as quickly as possible.

On Friday, June 12, 2009 at 12:45 p.m. ("June 12 Meeting") the Boards met to discuss their options. According to the minutes of the meeting, BofA was continuing to work with those parties that had obtained temporary restraining orders to reach a monetary settlement with such parties that would permit the consummation of the CIL Transaction. The professionals in attendance expressed several concerns about the ability to consummate the CIL Transaction even if such settlements were reached, but the June 12 Meeting Minutes indicated that Mr. Lichtenstein and others did want to salvage the transaction if possible.[766]

---

[766] *See* "Minutes of Meeting of the Board of Directors of Extended Stay Hotels, June 12, 2009" [Bates No. ESH 0077491].

It was at the June 12 Meeting that Lazard presented an unsigned version of the Restructuring Term Sheet to the Company's Boards for consideration. While the Restructuring Term Sheet was not executed, the minutes reflect that the professionals in attendance told the Boards that they believed that they had the authorization of the necessary parties with respect to the filing of the Restructuring Term Sheet and encouraged its immediate approval by the Boards as well. The professionals in attendance unanimously recommended a bankruptcy filing by the Company, including the filing of the Restructuring Term Sheet. The Boards resolved that, if there was no deal made with the Mezzanine Lenders by 3:00 p.m. on June 12, the filing of the chapter 11 petitions could occur.[767]

For some, religious observances lead to a lull in negotiations to save the CIL Transaction for the better part of Saturday, June 13, 2009; others informed the Examiner that negotiations continued throughout that day. On Sunday, June 14, 2009 at 3:30 p.m. ("June 14 Meeting") the Boards of the Company again met to discuss their options. According to the minutes of the meeting, it was the view of the Boards that "all efforts had been taken and the proposed deal with the Mezzanine Lenders could not close." Thereafter, the members of the Boards discussed the Restructuring Term Sheet and its filing. Ultimately, all of the voting members of the Boards voted in favor of the filing of the chapter 11 petitions, however, one member stated that he was not voting on approving the filing of the Restructuring Term Sheet.[768]

Why the efforts to "save" the deal with the Mezzanine Lenders ultimately failed and the chapter 11 petitions were ultimately filed in the early morning hours of June 15, 2009 depends largely upon whom you ask. Mr. Lichtenstein and Weil told the Examiner that when BofA was unwilling or unable to commit to certain monetary demands, such as, according to Mr. Lichtenstein, agreeing to ensure that certain of the Company's expenses would be met in the upcoming week and agreeing to return to the Company interest payments received if the deal

---

[767] *See* "Minutes of Meeting of the Board of Directors of Extended Stay Hotels, June 12, 2009" [Bates No. ESH 0077491].

[768] *See* "Minutes of Meeting of the Board of Directors of Extended Stay Hotels, June 14, 2009" [Bates No. ESH 0038726].

could not be reached and a filing had to occur, and instead "went to bed;" the deal died.[769] However, BofA's counsel told the Examiner that they were working on turning drafts of deal documents well into the early morning hours of June 15, 2009 and were shocked to learn of the filing. In all events the chapter 11 petitions were filed on June 15, 2009.

The Restructuring Term Sheet was filed, unsigned, as an exhibit to the Teichman First Day Declaration. It is by its terms non-binding, and the parties associated with the term sheet seemed to clearly understand that it is not enforceable in part or whole. Every party with knowledge with whom the Examiner spoke unequivocally confirmed that there were no undisclosed "side deals" struck between or among any parties in connection with the filing of the chapter 11 petitions or the Restructuring Term Sheet.[770]

**6.** **Bankruptcy Code Section 548 Statute of Limitations Period Issues**

The first group of Chapter 11 Cases were filed on Monday, June 15, 2009, two years and four days after the Acquisition closed on June 11, 2007. As a result, the statute of limitations for any causes of action arising under Bankruptcy Code section 548 expired on June 11, 2009, four days before the Petition Date. Concerned about the impact of such timing on potential estate causes of action, the Examiner sought to determine why the statute of limitations was permitted to run so close to the Petition Date. The results of the Examiner's work in this regard are summarized as follows:

- In his initial interview, Mr. Lichtenstein told the Examiner that he had never heard anyone even mention a statute of limitations period, or discuss it with him, when it came to determining the date of the filing of the bankruptcy cases.[771] This was confirmed under oath and on the record at Mr. Lichtenstein's deposition.[772]

---

[769] Interview with Joseph Rogers, HVM, L.L.C.; Ari Lefkowitz, Phillip Summers, Lazard, Ltd.; Marcia Goldstein, Jacqueline Marcus, Jae Kim, Weil, Gotshal & Manges, LLP, Offices of Weil, Gotshal & Manges, LLP, New York, New York, Nov. 5, 2009.

[770] Deposition of David Lichtenstein at 277; interview with William D. Rahm, Principle, Centerbridge Partners, L.P., Offices of Fried, Frank, Harris, Shriver & Jacobson LLP, New York, New York, Dec. 17, 2009; Interview with Adam Harris and Howard Godnik, Schulte Roth & Zabel, New York, New York, Oct. 9, 2009.

[771] Interview by Margreta M. Morgulas with David Lichtenstein, Offices of Kasowitz Benson Torres & Friedman, New York, New York, Nov. 24, 2009.

[772] Deposition of David Lichtenstein at 253.

- At the initial interview of Mr. Teichman, who was the general counsel to The Lightstone Group, the Secretary of each of the Debtors, and the General Counsel of Extended Stay, Inc. and Homestead Village LLC, Mr. Teichman told the Examiner that he was unaware of any discussions concerning the statute of limitations period under Bankruptcy Code section 548 or otherwise as it related to the filing of the bankruptcy cases.[773] This was confirmed under oath and on the record at Mr. Teichman's deposition.[774]

- In all of the minutes of the meetings of the Company's Boards that were reviewed by the Examiner, there were no specific references to the statute of limitations for fraudulent transfer actions. Similarly, none of the minutes reviewed contained any reference to the issue of whether, if the Company did not file for bankruptcy on or before June 11, 2009, any statute of limitations with respect to claims arising out of the Acquisition might expire.

Given the foregoing facts, it is unclear whether the Company's decision not to file for bankruptcy until after the expiration of the statute of limitations under section 548 of the Bankruptcy Code was intentional or inadvertent. It may, for example, have been the case that the Company deliberately chose not to file before June 11, 2009 because it believed that it would be able to consummate the CIL Transaction, and thereby avoid the need to file for bankruptcy altogether. Ultimately, the Examiner was not able to obtain sufficient information to make a determination as to exactly how it came to pass that the statute expired before the Petition Date.

However, in order to determine whether the expiration of the section 548 statute of limitation actually had any adverse consequences for the Debtors' Estates, it is first necessary to determine whether the Estates had any viable causes of action that might be barred by such statute of limitation. This issue is discussed elsewhere in Section V.C of this Report. Depending upon the ultimate resolution of the legal issues discussed therein, the issue of the expiration of the section 548 statute of limitations may merit further factual investigation.

7. **Concerns Regarding Independent Director Authorizations for Filings**

A concern that certain of the Mezzanine Lenders expressed to the Examiner was that they had seen no evidence reflecting that the independent directors for each of the

---

[773] Interview by Margreta M. Morgulas with Joseph Teichman, Offices of Kasowitz Benson Torres & Friedman, New York, New York, Nov. 24, 2009.

[774] Deposition of Joseph Teichman at 251.

Mezzanine Borrowers had properly authorized the filing of the chapter 11 petitions. Section 10 of the Limited Liability Company Agreements for each of the Mezzanine Borrowers requires that there be two independent directors (collectively, for all of the Mezzanine Borrowers, the "Independent Directors").[775] In order to fulfill this obligation, the Company has an agreement with National Registered Agents, Inc. ("NRA"), whereby the Company pays a fee in exchange for a slate of Independent Directors. According to a representative of NRA, the Company pays approximately $750-$850 per year per entity for the service. In exchange for the yearly fee, NRA selects "appropriate persons" from its staff to serve as directors for each entity. According to NRA, certain persons may serve as directors for more than one of the mezzanine entities.[776]

According to the Examiner's interview with NRA, there are generally no meetings held with a company's independent directors until a company experiences a significant event related to a potential bankruptcy because independent directors typically have limited powers and duties. The same was true, according to NRA, in the present case.[777] Indeed, according to the Independent Directors of ESH/Homestead Mezz 8 L.L.C. (together, "ESH/Homestead Mezz 8 Directors") with whom the Examiner spoke, they never received any communications or reports from the Company subsequent to their appointment in 2007 until approximately four months before the filing of the chapter 11 petitions. According to a representative of NRA, starting in February 2009, Weil began holding informational meetings and discussions with all of the Independent Directors of the various mezzanine entities of the Company and disseminating, through NRA, information about the Company to the Independent Directors. While the ESH/Homestead Mezz 8 Directors said that they did not recall any of their questions going unanswered or requests for documents going unfulfilled, they did not appear to have any

---

[775] *See* Organizational Agreements for ESH/Homestead Mezz 8 L.L.C., [Bates No. ESH0039554]

[776] Telephone Interview by Eric D. Goldberg with Jay Manning, Abby Dennis, Rob Rawl, National Registered Agents, Jan. 14, 2010.

[777] This representation is consistent with the general duties and responsibilities of the independent directors specified in the organization agreements in these cases. *See, e.g.*, Organizational Agreements for ESH/Homestead Mezz 8 L.L.C. [Bates No. ESH0039554].

recollection of receiving any information about the terms of the relevant loan agreements or restructuring alternatives that the Company had available.[778]

The consents of the Independent Directors to the filing of the chapter 11 petitions were purportedly acquired at a "joint meeting" of all of the Independent Directors of the various mezzanine entities of the Company that was held by phone on June 14, 2009.[779]  According to the ESH/Homestead Mezz 8 Directors, they learned of the meeting approximately one week prior thereto and were provided with no agenda in advance.  The meeting was conducted by telephone and lasted an estimated 45 – 60 minutes.  At the conclusion of the meeting, a general voice vote was held regarding whether to file for bankruptcy.  No entity-by-entity vote was taken.  Neither the ESH/Homestead Mezz 8 Directors, nor the representative of NRA, could recall anyone responding in the negative to the question of whether the company should file for bankruptcy. The representative of NRA received and distributed the Directors' Consents on June 14, 2009 and stated that all were executed that day.  Both of the ESH/Homestead Mezz 8 Directors did recall signing the consents.[780]  The Examiner has copies of the Directors' Consents for each of the mezzanine entities.

## L.    Creditor Information

### 1.    Claims Analysis

To assist in evaluating potential causes of action, a limited claims analysis was performed.  The discussion that follows:  (a) compares the Company's accounts payable balances, as of the Closing, with the accounts payable balances as of the Petition Date; and (b) summarizes certain proofs of unsecured claims filed against the Debtors.

---

[778]    Telephone Interview by Eric D. Goldberg with Jay Manning, Abby Dennis, Rob Rawl, National Registered Agents, Jan. 14, 2010.

[779]    While the Examiner's January 14, 2010 interview notes of National Registered Agents reflect that the meeting took place on June 14, 2009, Debtors' counsel subsequently informed the Examiner that the meeting took place on June 12, 2009.  The Examiner was unable to independently verify the accuracy of either date.

[780]    *See* "ESH/Homestead Mezz 8 LLC Directors' Consent as of June 14, 2009" [Bates No. ESH39127].

## a.    Accounts Payable Analysis

As previously discussed, HVM maintained all the books and records for the Debtors.  In connection therewith, HVM tracked the Company's trade payables in three separate accounts payable ledgers: (1) HVM; (2) HVM Canada; and (3) ESI.

The majority of the accounts payable activity for the Company was handled through the HVM accounts payable ledger.  Minimal accounts payable activity relating to the hotels located in Canada was handled through the HVM Canada accounts payable ledger.  ESI's accounts payable activity was also minimal, and related primarily to professional fees.[781]

In an attempt to ascertain whether any pre-Acquisition creditors of the Debtors existed as of the Petition Date, the Examiner's Professionals performed certain comparisons, and made certain observations, on the three separate populations of accounts payable, all as described below.[782]

## HVM Accounts Payable

The HVM accounts payable reports contain over 1,500 vendor names.  A limited selection of the vendor names on the HVM accounts payable reports was reviewed, as of both the Closing and the Petition Date.[783]  This limited review revealed that the Company had at least 100 separate vendors listed with amounts owing as of both dates.  *See* Exhibit III-L-1 for a summary of the 100 vendors.  In addition, at least one vendor amount was readily identified as being the same obligation as of both dates (Chereco, Inc. who was owed $1,307).  In other

---

[781]  ESI accounts payable as of June 9, 2007 [Bates Nos. ESH0036469-36470] and ESI accounts payable as of June 15, 2009 [Bates No. ESH0036468].

[782]  The Debtors filed a motion with the Bankruptcy Court seeking authorization to reimburse HVM for certain critical operating expenses of approximately $23 million.  The Bankruptcy Court subsequently approved reimbursement to HVM for critical operating expenses that become due and payable by HVM (Debtors' Motion Pursuant to Sections 105 and 363(B) of the Bankruptcy Code for Authorization to Reimburse HVM L.L.C. for Critical Operating Expenses Incurred on Debtors' Behalf Prior to the Commencement Date and Final Order Pursuant to Sections 105 and 363(B) of the Bankruptcy Code Authorizing Debtors to Reimburse HVM L.L.C. for Critical Operating Expenses Incurred on Debtors' Behalf Prior to the Commencement Date).

[783]  HVM accounts payable as of June 9, 2007 [Bates Nos. ESH0034345-34376] and HVM accounts payable as of June 12, 2009 [Bates Nos. ESH0036471-36763].  Mr. Rogers confirmed the 2007 reports represent the obligations assumed by the Company at Acquisition.  Rogers Deposition at 157.

words, Chereco is an unsecured creditor whose claim existed as of the Closing, and remained unpaid as of the Petition Date.[784]

Given the limited time and resources available to the Examiner's Professionals, they were unable to perform a comprehensive review of all vendor names. However, based on the sampling of accounts that were reviewed, it is not unreasonable to assume that, if a full comparison was made between the two reports (Closing date creditors and Petition Date creditors), additional vendors would be identified with amounts owing as of both dates.[785] With respect to the 100 claims that were reviewed by the Examiner's Professionals it should be noted that the underlying documentation was not reviewed to determine whether the amounts outstanding as of the two dates related to the same obligations for the same goods or services.

The Examiner's Professionals did, however, review the contracts and invoices for a small subset of the 100 vendors. It was noted that, in one instance, the obligor on the vendor contract was an entity other than HVM, HVM Canada or ESI. More specifically, the contract with World Cinema Inc. included the following Debtor entities as parties to the contract: (1) ESA Operating Lessee, Inc.; (2) ESA P Portfolio Operating Lessee Inc.; and (3) ESA 2005 Operating Lessee, Inc.[786] Accordingly, it is not unreasonable to assume that, if a larger population of contracts and invoices were reviewed, additional instances might be identified where the Debtor legal entity that was a party to the vendor contract was an entity other than HVM, HVM Canada or ESI.[787]

---

[784] Mr. Rogers confirmed through Debtors' counsel that this amount was in dispute as of the date of the Closing and as of the Petition Date.

[785] The HVM accounts payable reports were voluminous and produced in hard copy format only.

[786] Contract dated April 1, 2006 between World Cinema, Inc. and HVM LLC, BRE/ESA Operating Lessee Inc., BRE/ESA P Portfolio Operating Lessee Inc. and BRE/ESA 2005 Operating Lessee Inc [Bates Nos. ESH0037204-37216]. These legal entities survived the Acquisition and post-Acquisition legal entity names were HVM LLC, ESA Operating Lessee Inc, ESA P Portfolio Operating Lessee Inc. and ESA 2005 Operating Lessee Inc, respectively.

[787] Rogers Deposition at 50-52.

**HVM Canada Accounts Payable**

The HVM Canada accounts payable reports contain approximately 60 vendor names, and were also reviewed as of both the Closing and the Petition Date.[788]  This review identified twenty-two separate vendors for which the Company had obligations as of both dates. It does not appear that any of balances owed to the twenty-two vendors represent the same specific obligation, because the underlying invoice numbers are different.  However, the actual invoices were not reviewed to confirm this observation.  *See* Exhibit III-L-2 for a summary of the twenty-two vendors.

**ESI Accounts Payable**

The ESI accounts payable reports contain less than twenty vendor names.  The ESI accounts payable reports also were reviewed and compared as of the Closing and the Petition Date.[789]  This review identified two vendors for which obligations existed as of both the Closing and the Petition Date, as follows:

| ESI - Comparison of Accounts Payable as of the Acquisition and Petition Dates | | |
|---|---|---|
| **Vendor Name** | **June 9, 2007 Balance** | **June 15, 2009 Balance** |
| Venable LLP | $               1,232 | $               8,220 |
| Alston & Bird LLP | $             41,355 | $               7,041 |

*Sources:  ESI accounts payable as of June 9, 2007 (ESH0036469-0036470) and Monthly Operating Report as of November 30, 2009.*

---

[788]   HVM Canada accounts payable as of June 9, 2007 [Bates Nos. ESH0036450-36467] and HVM Canada accounts payable as of June 15, 2009 [Bates Nos. ESH0036444-36449].

[789]   ESI accounts payable as of June 9, 2007 [Bates Nos. ESH0036469-36470] and ESI accounts payable as of June 15, 2009 [Bates Nos. ESH0036468] which the Company confirmed represented the Petition Date claimants.  However, an updated ESI accounts payable report as of Petition Date filed with the November 2009 MOR was also reviewed as it contained some additional obligations, likely because invoices were received subsequent to the Petition Date.

537960v2

### b.  Bankruptcy Claimants

The deadline for filing proofs of claims against the Debtors was January 15, 2010.[790]  As of February 28, 2010, over 1,900 claims had been filed against the Debtors by approximately 280 claimants.[791]  Similar to the discussion above, it is not unreasonable to assume that a comprehensive comparison of the claims filed for amounts owing as of the Petition Date to the accounts payable reports as of the Closing might very well identify additional parties that had claims owed to them by one or more of the Debtors as of both dates.  *See* Exhibit III-L-3 for a summary of the claims filed as of February 28, 2010.

Within the population of claims filed in the Bankruptcy Case, eighteen proofs of claim were originally filed by the IRS; however fifteen of these claims were subsequently withdrawn.[792]  Michael Scotto, the IRS agent responsible for filing the proofs of claims,[793] indicated that he withdrew the claims after speaking to Robert Shaw, Director of Tax at HVM.  Mr. Shaw had explained to Mr. Scotto that the entities relating to fifteen IRS proofs of claim did not have any taxable activities, and that all payroll, expenses, etc. were handled through parent companies.[794]

The three remaining IRS claims were filed against: (1) ESA Management LLC, (2) ESI, and (3) ESA Operating Lessee Inc.  The claim against ESA Operating Lessee Inc. is for corporate income taxes, while the claims against ESA Management LLC and ESI are for miscellaneous penalties.  ESA Operating Lessee Inc. and ESI both filed federal income tax

---

[790]  Order Pursuant to Section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3003(c) (3) Establishing the Deadline for Filing Proofs of Claim.

[791]  *See* claims register maintained by claims agent, Kurtzman Carson Consultants (www.kccllc.com).

[792]  *See* Exhibit III-L-4 for a summary of the original eighteen claims filed.

[793]  A&M spoke to Mr. Scotto on February 12, 2010.

[794]  The 2008 Audited Consolidated Financial Statements for DL-DW stated that the DL-DW, as well as Homestead, BHAC, and HVM, were limited liability companies which were not subject to federal income taxes.  Accordingly, federal income taxes were not recorded.  For federal income tax purposes, the operating results of DL-DW, Homestead, BHAC, and HVM were reportable by each limited liability company's members.  The Company is subject to state and local taxes in certain jurisdictions.  Further, ESI was generally not subject to federal corporate income tax on its separately filed federal tax return as long as ESI complied with various requirements to maintain REIT status.  In May 2009, the Board of ESI decided to withdraw ESI's REIT status.  Minutes of Meeting of the Board of Directors, Extended Stay Hotels, May 20, 2009 [Bates Nos. ESH0038719-38720].  Therefore, ESI would be subject to federal and state income taxes in 2009.

537960v2

returns prior to the Petition Date, resulting in the potential for IRS bankruptcy claims. The miscellaneous penalties filed against ESA Management LLC may be questionable because this entity does not appear to have filed federal income tax returns.

### 2. Litigation/Tort Claims

The Company Disclosure Schedule attached to the Acquisition Agreement outlined the outstanding claims involving the Company as required by Section 2.9(a) of the Acquisition Agreement. The claims included in the Company Disclosure Schedule were categorized into several general claim types, including: construction, employment, real estate, insurance, workers' compensation, transfer tax.[795]

Additionally, each of the Debtors disclosed all outstanding litigation related claims as of the Petition Date in each debtor's Statements of Financial Affairs filed with the Bankruptcy Court. The claims included in the Statements of Financial Affairs involved disputes that were categorized into several general categories, including: construction, employment, real estate, threatened employment matters, and insurance coverage.[796]

A comparison of the claimants related to outstanding or threatened litigation shows five unresolved cases from the time of the Closing through the Petition Date. The five unresolved matters are summarized in the following table:

---

[795] Company Disclosure Schedule attached to the Acquisition Agreement [Bates Nos. BLA000495-610].

[796] Debtors' Statements of Financial Affairs, Attachment 4a, dated September 28, 2009.

| Summary of Continuous Claims from Closing through Petition Date | | | |
|---|---|---|---|
| **Caption of Suit** | **Case Number** | **Nature of Proceeding** | **Claim in Dispute** |
| BRE/HV PROPERTIES, L.L.C. v. Wermers Multi-Family Corporation, et al. | 04-AS-01135 | Breach of Contract (design and construction defect) | Construction defects at four hotel properties |
| State of New Jersey by Commissioner of Transportation v. BRE/HV Properties L.L.C., et al. | MRS-L-1659-06 | Condemnation and breach of contract (lease) | Conveyance of leased property to the State of New Jersey |
| Extended Stay, Inc., et al. v. Quaker Window Products Company, Inc., et al. | 060S-CC00027 | Garnishment action | Insurance payouts relating to defective windows |
| Barbara Burke v. Extended Stay America Inc. | 05-1334225 | General Liability | Ant bites suffered in 2002 |
| Sharon and Robert Schroader v. BRE/Homestead Portfolio L.L.C. | 05-C1-10602 | General Liability | Slip and fall suffered in 2004 |

*Source: Company Disclosure Schedule attached to the Acquisition Agreement (BLA000495-610) and Debtors' Statements of Financial Affairs.*

## IV.   FINANCIAL ANALYSIS

In order to help determine whether claims may lie under certain fraudulent transfer statutes, the Bankruptcy Code, or certain illegal distribution statutes, the Examiner's financial advisors performed various financial analyses.[797]  In general, these analyses were prepared for the purpose of making initial observations as to (i) the solvency of Extended Stay upon the Closing of the Acquisition (Solvency Analysis); or (ii) the solvency of Extended Stay at the time of certain distribution/dividends that were made after the Acquisition (Dividend/Distribution Analysis).

The fact that a company files for bankruptcy after an LBO does not, by itself, suggest that the company was insolvent immediately following the LBO.  A company could, for example, be rendered insolvent due to events that took place after, and had nothing to do with, the LBO.  Accordingly, in order to help determine solvency, it is necessary to analyze the

---

[797]   *See* §§ V.C. and V.D.1. of this Report for the related legal discussion.

financial condition of the company immediately following the LBO. This analysis should include a review of the company's financial projections for its future operations.

  The financial analysis that the Examiner's financial advisors performed for this Report were performed with respect to Extended Stay as a whole (as opposed to just the Extended Stay Debtor entities) unless otherwise noted. As discussed elsewhere in this Report, the Company generally prepared its management reports and financial statements on a consolidated basis, except with regard to certain property-level information reported as previously described. As part of this financial analysis, the Examiner's financial advisors also considered, when appropriate, the availability of capital from certain non-Debtor entities.[798] In addition, based on the analysis performed, it is believed that the impact of excluding certain of the non-Debtor entities would not substantially change the resulting observations.[799]

  The discussion that follows provides: (A) a general description of the approach used for the solvency analysis; (B) an application of the balance sheet test for solvency; (C) an application of the cash flow test for solvency; (D) an application of the capital adequacy test for solvency; and (E) an analysis of the dividends/distributions made after the Closing, in light of the various solvency analyses performed.

---

[798] For example, HVI(2) and ES-NAV, LLC are two non-Debtor entities with operations that have been included in the analysis. At the time of the Acquisition, HVI(2), LLC leased 18 hotels from HPT. As more fully described in § III.F. of this Report, in July of 2007, 17 of the HPT-owned properties were sold to HFI, a Lichtenstein controlled company. Additionally, a working capital account in excess of $57 million held at DL-DW, a non-Debtor, was also included in the analysis. Of the $57 million that was in the account initially, at least $50 million represented a working capital reserve that was required to be established on behalf of the Borrowers at Closing. For purposes of the solvency analysis, the Examiner's financial advisors assumed that the balance of funds held in this Working Capital Reserve account could be made available to fund Extended Stay's operations. *See* § III.F. of this Report for a discussion related to this account.

[799] For example, the hotel revenue from the non-Debtor entities in 2008 and 2007 was less than 4% of the total revenue for the Company (P and L Analyzer workbook dated August 2009, Catalyst ID 00001063). Further, although the cash flows from the hotels owned by non-Debtor entities did not flow through the Waterfall, cash generated from operations of these hotels was available to service the corporate overhead costs and other obligations in the Waterfall, if needed. *See* §§ III.H. through III.J. of this Report for further discussion related to trends in cash available for operations.

## A.   Approach to the Solvency Analysis

"Solvency" refers to a company's long-term viability, as well as its ability to pay its obligations as they come due.  An evaluation of Extended Stay's solvency can be made by performing three tests, commonly referred to as the Solvency Tests, which address the following questions:

1. <u>Balance Sheet Test</u>: Was the fair value of Extended Stay's assets in excess of Extended Stay's liabilities?

2. <u>Cash Flow Test</u>:  Did Extended Stay have the ability to pay its debts as they came due?

3. <u>Capital Adequacy Test</u> – Did Extended Stay have adequate capital for the business in which it was engaged?

For purposes of this Report, the above tests were applied to determine whether Extended Stay was insolvent at the time of the Closing, or whether Extended Stay received less than reasonably equivalent value in connection with the Acquisition.  The following financial analysis is based on information that was contemporaneously available to the Sellers, Buyer, and/or management prior to and leading up to the Closing.[800]  This analysis is also based on information that would have been available to these parties through due diligence.  As a result, such parties knew or should have known the conclusions reached with respect to such analyses.

## B.   Balance Sheet Test

In general, an enterprise is considered to be solvent when the sum of its assets, at fair valuation, is greater than its debts.  The price paid for an asset purchased in an arm's length transaction can be recognized as an indication of the fair value of such an asset.

In this case, and as discussed above, the Buyer's offer to purchase the Company was accepted by the Sellers on April 17, 2007,[801] and the financing was committed several weeks later, on May 1, 2007,[802] all within the few weeks prior to the Closing on June 11, 2007.  Here,

---

[800]   In other words, hindsight was not used in preparing the analysis or making certain observations.  For example, the fact that the industry deteriorated significantly following the Acquisition would be considered "hindsight" information.

[801]   Acquisition Agreement [Bates Nos. DL_LS_EXMN00058833-58919].

[802]   Commitment Letter (Catalyst ID 00003536).

the determination of the value of Extended Stay would be based on the premise that the business enterprise was expected to continue to operate in the future. Therefore, the balance sheet test involves a comparison of (a) the fair value of the assets (on a going concern basis) or the enterprise value, to (b) the long term debt.[803][804]

The two established approaches that would be used to determine the enterprise value for this analysis include: the Income Approach and the Market Approach. The generally accepted methods widely used under these approaches to determine enterprise value include:

- <u>Guideline Public Company Method</u> (a Market Approach) – Value is determined by referencing verifiable transaction prices for similar (comparable or guideline) companies.

- <u>Comparable Acquisition Method</u> (a Market Approach) – Value is determined by referencing verifiable transaction prices for similar (comparable or guideline) company interests.

- <u>Discounted Cash Flow Method</u> (an Income Approach) – Value is derived from the earnings potential of the company; and the projections of the future economic benefit from the ownership of the operations, taking into consideration the projected future investments required to maintain those levels of benefits (*i.e.*, net cash flows available to all invested capital – both equity and debt).

An independent determination of the enterprise value of Extended Stay was not performed, as it was outside the scope of this Report. However, the discussion and analysis that follows may assist those interested in performing such an analysis in the future. This Report provides some information related to the key drivers that might impact the results of the various valuation methodologies described above. In this regard, the following discussion provides some

---

[803] In general, GAAP supports this approach as its "purchase method of accounting" requires that all assets be adjusted to fair values and any excess be recorded as "goodwill," in recognition that the enterprise may have value beyond the assets recorded. Financial Accounting Standards Board, *Original Pronouncements, 2007/2008 Edition, Accounting Principles Board – Opinion 16, Business Combinations* at 5, ¶ 11. Another approach, which seems more appropriate in the context of liquidation, is to determine the value ascribed to each of Extended Stay's assets and the sum of those values would be compared to Extended Stay's liabilities. However, given that Extended Stay was expected to continue as a going concern at the time of the Acquisition, this approach was not considered.

[804] For purposes of this analysis, contingent and other liabilities not reflected on the balance sheet should be considered and valued based upon the appropriate likelihood that the liability would be incurred. However, given the limited scope of the analysis, these types of potential liabilities were not analyzed.

information related to (1) the market multiples observed within a few years prior to the Acquisition, compared to the implied multiple from the Acquisition: (2) the determination and due diligence on the purchase price; and (3) the industry data available at the time of the Acquisition that was related to Extended Stay's valuation metrics.

### 1. <u>Multiple Analysis</u>

As previously noted, the stated purchase price in the Acquisition Agreement was $8 billion. The inherent Acquisition multiple was approximately 14.0 times trailing twelve month ("TTM") earnings before interest, taxes, depreciation and amortization ( "EBITDA"), and approximately 12.9 times 2007 pro-forma EBITDA.[805] The EBITDA multiple for the Acquisition could be compared to the transaction prices paid for controlling interests in other public or private companies based on selected financial fundamentals. Mergers and acquisitions involving companies in the same general industry as Extended Stay were obtained from public sources using the following criteria:

| Summary of Selection Criteria for Comparable Transactions | |
|---|---|
| **Category** | **Criteria** |
| 1) Announcement | 1/1/2004 through 12/31/2007 |
| 2) Industry Classification | Hotels and Motels |
| 3) Geographic Location | United States of America |
| 4) Implied Enterprise Value/EBITDA | Reported |
| 5) Transaction Value | Greater than $200 Million |

The following table lists the companies that had transactions using the above criteria during the period 2004 through 2007:

---

[805]  See Exhibit IV-B-1 – Calculation of the Implied Acquisition TTM EBITDA Multiple, and Exhibit IV-B-2 – Calculation of the Implied Acquisition Pro-Forma EBITDA Multiple.

| Target Companies in Market Analysis | |
|---|---|
| Boca Resorts Inc. | La Quinta Corporation |
| Coast Casinos Inc. | Mandalay Resort Group |
| Diamond Resorts Corporation | Prime Hospitality Corp. |
| Hard Rock Hotel Holdings, LLC | Red Roof Inns, Inc. |
| Hilton Worldwide | Renaissance Vinoy & Renaissance Esmeralda |
| HVM L.L.C. (dba Extended Stay Hotels) | Trump Indiana Inc. |
| Jameson Inns Inc. | Westin St. Francis Hotel |
| John Q. Hammons Hotels Inc. | Wyndham International Inc. |

*Source: Capital IQ.*

A list of the transactions involving the above companies, and related EBITDA multiples, is provided in Exhibit IV-B-3 for informational purposes only.[806] The range of transaction values and EBITDA multiples by year is summarized in the table below:[807]

| | Summary of Market Transaction EBITDA Multiples | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Transaction Value (millions) | | | TTM EBITDA (millions) | | | Transaction Value/EBITDA | | |
| | High | Median | Low | High | Median | Low | High | Median | Low |
| 2004 | $ 7,861 | $ 1,279 | $ 795 | $ 729 | $ 139 | $ 61 | 14.1 | 11.9 | 7.1 |
| 2005 | $ 3,357 | $ 2,097 | $ 305 | $ 237 | $ 173 | $ 24 | 14.7 | 13.3 | 7.4 |
| 2006 | $ 620 | $ 440 | $ 365 | $ 35 | $ 30 | $ 26 | 17.6 | 16.8 | 12.3 |
| 2007 | $ 25,142 | $ 1,003 | $ 225 | $ 1,676 | $ 94 | $ 13 | 17.3 | 13.1 | 9.7 |
| | | | | Weighted-Average EBITDA Multiple | | | 13.6 | | |

*Source: Capital IQ.*

As shown above, during the period 2004 through 2007, the transaction multiples ranged from 7.1 times TTM EBITDA to 17.6 times TTM EBITDA, and the average TTM EBITDA, weighted according to the transaction size, was 13.6 times TTM EBITDA. Also, the median multiple for 2007 was 13.1 times TTM EBITDA. Based on this limited information and analysis, the Acquisition purchase price TTM EBITDA multiple of 14.0 appears marginally higher than the market-observed transactions for 2007 and the weighted-average TTM EBITDA multiple of 13.6 for the four year period preceding the Acquisition.

---

[806] An analysis of the specific financial and operational characteristics of the companies on this list was not performed.

[807] See Exhibit IV-B-3 – Summary of Market Transactions for the Hospitality Industry 2004 through 2007.

537960v2

In addition, Citi GM (the Buyer's financial advisor) prepared an analysis of certain lodging C-corps and REITs using a projected EBITDA multiple for 2007. The summary of the Citi GM analysis below reflects that the implied projected EBITDA multiple for the Acquisition was below the weighted average for lodging C-corps, but very close to the weighted average for lodging REITs.[808]

| Range of Projected EBITDA Multiples for Citi GM Comparable Companies | | |
|---|---|---|
| | **Lodging C-Corps** | **Lodging REITs** |
| Minimum | 6.6 | 11.5 |
| Maximum | 16.1 | 15.0 |
| Weighted Average | 15.2 | 12.7 |
| Simple Average | 13.1 | 12.8 |
| Median | 13.0 | 12.5 |
| | | |
| **Extended Stay Hotels[(1)]** | | **12.6** |
| *Notes:* | | |
| *[(1)] ESH EBITDA Multiple was calculated using the projected 2007 EBITDA from the Offering Memorandum and $8 billion Purchase Price.* | | |
| *Sources:* | | |
| *Comparable Lodging C-Corps and REITS (CITI 01285-01286).* | | |
| *Offering Memorandum (BLA-002201-002287).* | | |

## 2. Determination of the Purchase Price

A fair market valuation assumes that assets are sold in an arms-length transaction, within a reasonable time, in an existing market. In this case, the following observations were made in regard to the (a) sales process, (b) the due diligence performed by the Buyer and underwriters, and (c) the appraisal performed by HVS.

### a. The Sales Process

As discussed above, the Sellers used an auction process to offer the Extended Stay assets to the market.[809] The marketing period was relatively short, and ultimately resulted in the

---

[808] See Exhibit IV-B-4 - Select Metrics for Comparable Companies prepared by Citi GM.

[809] The sales process is more fully discussed in § III.C. of this Report.

Sellers receiving only four letters of interest, and a single binding offer to purchase. These facts may raise questions as to the value and validity of the underlying auction process.

### b. Due Diligence Performed by the Buyer and Underwriters

It appears that little meaningful due diligence was performed by the Buyer and the Underwriters prior to the Acquisition. For example:

- **The Buyer and the Buyer's Advisors** – The Buyer provided almost no documentation evidencing that any meaningful due diligence was performed. It appears that the Buyer simply accepted as the basis for the Acquisition the projections prepared by Blackstone in the Offering Memorandum.[810] Nor was there any evidence suggesting that the terms of the Mortgage Debt and Mezzanine Debt facilities were actively negotiated by the Buyer. In fact, the Mortgage Loan Agreements appear to be poorly drafted and, as previously discussed, the Waterfall structure and the level of debt in this case created a set of circumstances that, at best, would have been difficult for an operating company to manage.

  Lichtenstein stated that, in deciding whether to proceed with the Acquisition, he relied heavily on his advisor, Citi GM.[811] Although Citi GM prepared various analyses of the Company's projected performance, most of these scenarios reflected growth and/or performance even higher than that included in the Offering Memorandum. Several of these analyses also reflected the possibility of monetizing the brand name with a corresponding assumed increase in room rate growth; however the Citi GM analysis included no information as to the strategy to achieve the projected growth rates modeled by this option. In addition, there were no reasonable sensitivities performed, no evidence that management's assumptions were challenged, and no indication that in performing these analyses, Citi GM analyzed the effect of the Waterfall.[812]

  Further, the limited analysis performed by Citi GM on the projected Debt Yield test (and potential Cash Trap Event) used the results for all of the hotels, as opposed to just the Mortgaged Properties, and the projections were not stress-tested to evaluate the impact of a Debt Yield Event.[813] Additionally, there were no

---

[810] Lichtenstein Deposition at 56-57.

[811] Lichtenstein Deposition at 46.

[812] While several of the Citi GM models contain downside scenarios, none of the downside models were produced in native format and therefore could not be evaluated in a meaningful manner. However, many of the downside parameters that were visible did not show a significant deviation from base case projections contained in the Citi GM models. One downside scenario was produced in a presentation format that showed no deviation from the base case for the years 2007 and 2008, and only a $13.1 million negative impact to cash flow before debt service in 2009 vs. 2008 [Bates Nos. CITI 6908-6934].

[813] Citi GM Brand Sale Model [Bates Nos. CITI 01022].

models of the cash trap or evaluation of the impact of amortization that would have been triggered as a result of failing to exercise the Extension Option. Given the amount of leverage, and the complexity of the financing, the absence of these analyses is surprising.

- **The Stapled Financing Underwriters** – It appears that the Underwriter committed to the terms of the Stapled Financing package based on the cash flows and assumptions contained within the Offering Memorandum. Although the lenders involved in the Stapled Financing package had financed the Company's acquisitions and operations in the past, the leverage associated with the Stapled Financing was significantly greater than had been previously provided. In fact, immediately prior to the Acquisition, the total debt was approximately $5.7 billion, as compared to the proposed financing of $6.8 billion (with an 87.5% loan-to-cost ratio and attractive interest rate of LIBOR plus 140 basis points) in the Stapled Financing package. The terms and support of the lenders involved in the Stapled Financing suggest that due diligence was performed and would have provided some level of comfort to potential buyers and other lenders.[814]

- **The Final Underwriters** – The Buyer engaged Wachovia to take the lead on the underwriting. The banks involved with the Stapled Financing all aggressively pursued Wachovia and the Buyer, seeking to participate in the financing package and were bidding against each other to be allowed to participate in the financing of the Acquisition.[815][816] The Extended Stay Acquisition was one of the largest and last transactions to close in 2007, and had favorable financing terms. Although the loan-to-value ratio was already high (87.5%) for the Stapled Financing of $6.8 billion, ultimately, the actual financing for the Acquisition increased by $600 million to $7.4 billion, or 92.5% of the transaction price.[817] In addition, the Series 2007-ESH Offering Memorandum that the Underwriters used to sell the CMBS certificates in August 2007 reflected projections that were not substantially different than those set forth in the Offering Memorandum.[818]

---

[814] Although the Examiner was not been provided with any evidence that suggests sufficient due diligence was performed, the Investigation was limited by its scope and the discovery process for this examination.

[815] As previously discussed, the availability of low cost money in 2007 created a deal frenzy in the market, and the total value of deals hit a record in 2007. *See* § III.A. of this Report for a further discussion regarding the economic factors impacting the industry and related merger and acquisition activity in the period leading up to the Acquisition.

[816] Lichtenstein Deposition at 103-04.

[817] In addition, the Stapled Financing did not contemplate that any Subordinated Notes would be assumed, which they were, under the Acquisition. Consequently, after the Acquisition there was $36.5 million of additional debt assumed, in addition to the $7.4 billion. *See* § III.D. of this Report for further discussion related to the Acquisition.

[818] Although the Examiner was not provided with any evidence that suggests sufficient due diligence was performed, the Investigation in these Chapter 11 Cases was limited by the scope of the Examiner Work Plan And Approval Order, and there may be additional evidence that the Examiner has not been afforded an opportunity to review.

- **Other Lenders** – For their due diligence, various lenders and purchasers of the CMBS certificates apparently relied on the "value" of the underlying equity, the leverage provided, the sophistication level of the Underwriters and other participants in the debt stack who had deep knowledge in the hospitality industry, and the validity of the auction process in setting the final purchase price. Further, it appears that some of the CMBS certificate investors did not fully understand the underlying investment and operations. Although financial information was provided to the Servicer (and ultimately to the CMBS certificate holders) on a monthly basis, this information was focused primarily at the property-level, and did not provide a comprehensive picture of Extended Stay's operations. The corporate costs necessary to run the hotels were generally understood to be consumed in the 4% management fee, in error.[819]

Ultimately, the structure, lender involvement, lack of independence, and easy access to debt may have upwardly influenced the price paid by Buyer.

### c. HVS Appraisal

In connection with the Acquisition, HVS prepared an appraisal on behalf of the Underwriters of the 682 hotels, the office building, and a vacant parcel of land, which appraisal reflected a total value of $8,161,800,000 as of June 1, 2007.[820] The HVS Appraisal separated the hotels into two groups (1) the 664 hotels subject to the Mortgage Loan, and (2) the 18 HPT-owned leased hotels. The Company's vacant land and office building were included in a third category of "miscellaneous real estate." A summary of the HVS Appraisal is presented in the following table:

---

[819] Although the other Certificate investors bought the CMBS certificates after the Closing of the Acquisition, they also appeared to continue the pattern of performing little due diligence and relying heavily on the experience of other investors and surrounding classes of debt. The CMBS structure itself may have lent a false sense of security to investors, especially those who were not part of the "lowest" tier of funding since other investors and equity were below their position. This type of thinking appears to have, in some cases, provided unfounded comfort to each investor in the Certificates. Given the amount of leverage and the overly burdensome cash management system, the exposure was greater than many (or any) fully appreciated.

[820] The HVS Appraisal does not include the two Excluded Properties contained in the Mortgage Loan and therefore does not total to the 684 hotels that were actually part of the Acquisition by DL-DW. See § III.B. of this Report for a description of the hotels and properties owned.

| Summary of HVS Appraisal | | |
|---|---|---|
| | **Value as of June 1, 2007** | |
| "As-Is" Market Value - 664 Hotels | $ | 7,993,200,000 |
| Value of Leasehold Interest - 18 HPT-owned Hotels | | 155,800,000 |
| Value of Miscellaneous Real Estate | | 12,800,000 |
| **Total Appraised Value** | $ | **8,161,800,000** |

*Source: HVS Appraisal (DL_LS_EXMN0087881-888182).*

The financial information and analysis included in the HVS Appraisal, some of which is summarized in Exhibit IV-B-5 for the combined 682 hotels, reflects the following:

- **Annual Forecasts** – The fiscal year used in the HVS Appraisal begins April 1 and ends March 31. This is different from the annual fiscal year used by the Company. The HVS Appraisal does not provide monthly calculations of cash flows or EBITDA to allow the user to understand the seasonality embedded within the appraisal.

- **Revenue Growth** – The HVS Appraisal was based on achieving RevPAR growth resulting in RevPAR of $45.85 in 2009/10. The actual historical RevPAR for the TTM ending March 31, 2007 was substantially lower, at $37.85. Therefore, the HVS Appraisal was based on a compound annual growth rate for RevPAR of 6.6% to reach the projected RevPAR of $45.85 in 2009/10. As a result of their RevPAR growth assumptions, HVS projected total revenues to increase 7.9% and 8.2% year-over-year in 2007/08 and 2008/09 respectively.[821]

- **Room Expense Growth** – Room expenses were projected to decline to 10.8% of room revenue in the first projection year, and to continue to decline to 10.4% of room revenues.[822] The HVS Appraisal stated that comparable mid-price extended-stay hotels had room expenses of 14.8% of room revenue for 2006.[823] Therefore, the HVS Appraisal assumed that the Company's room expense rate would continue to decrease, further widening the gap between the Company and comparable mid-price extended-stay hotels.

- **EBITDA Growth –** Projected EBITDA for 2007/08 and 2008/09 were projected to increase by 6.6% and 11.8% respectively.

- **Financing** – The HVS Appraisal assumed financing would be obtained with a loan-to-value ratio of 80% at a fixed rate amortizing over 30 years.[824] The actual financing relating to the Acquisition was over 97%

---

[821]  HVS Appraisal at 9-34.

[822]  See Exhibit IV-B-5.

[823]  HVS Appraisal at 9-23.

[824]  *Id.* at 1-2.

212

loan-to-cost, including the subordinated Notes, capital lease, and preferred equity.

- **Capital Expenditures** – Capital expenditures were projected to be 4.5% of total revenues for each year, which equals the FF&E reserve included in the Offering Memorandum. However, the HVS assumed FF&E reserve did not reflect or provide for any non-recurring capital expenditures.

As a result of the foregoing examples, the "as is" market value of the Mortgage Properties contained in the HVS Appraisal is not conclusive for purposes of determining the fair value of the Mortgage Properties.

**Balance Sheet Test - Summary of Observations and Conclusion**

In summary, it appears that the auction process may not have been completely transparent, and that the assets sold in the Acquisition may not have received adequate exposure to the market, especially given the relative paucity of bids actually submitted. Further, it appears that little due diligence was performed by the parties involved in order to determine the Purchase Price, evaluate the terms of the Loan Agreements, or analyze the level of debt Extended Stay could reasonably manage. Also, the largest single factor impacting the balance sheet was the amount of debt, and here, the debt level resulting from the Acquisition was significantly higher than the initial analysis of other companies and REITs in the hospitality industry.

However, the above analysis and observations are limited by the scope of this Investigation and the information obtained. Proper application of the Balance Sheet Test would require an independent valuation of the assets on a going concern basis, using information available as of the date of the Acquisition. The Examiner's financial advisors have not prepared an independent valuation, or a sufficiently detailed analysis, to conclude whether the fair value of the assets exceeded the liabilities of Extended Stay as a result of the Acquisition. Such an evaluation might be the subject of further investigation by the Examiner or some other party in interest in these Chapter 11 Cases.

C.     **Cash Flow Test**

The cash flow test involves an analysis of Extended Stay's ability to pay its debts as they came due. The cash flow test is based on a projection of the expected cash flows

generated by the assets, minus the debts as they come due, including scheduled obligations (*e.g.*, debt principal and interest payments), as well as trade obligations (*e.g.*, payroll and accounts payable). For this analysis, the debts would be paid from either: (1) cash accumulated from Extended Stay's prior earnings (*i.e.*, cash on hand); (2) free cash flow earned during the projection period; and/or (3) other borrowing availability.[825] The determination as to whether a company can meet its obligations as they come due is dependent upon whether the obligations can be satisfied from these potential sources of cash.

The following discussion related to the cash flow test is based on the information that was available to the Buyer, Sellers, and Extended Stay's management, up to and including the date of the Closing. As a result, these parties knew, or should have known, the conclusions reached with respect to such analyses. The determination as to whether Extended Stay would be able to pay its debts as they came due is dependent on the reasonableness of the financial projections, which is a function of, among other things, the underlying assumptions. These projections should not reflect hindsight, or developments that could not have been reasonably foreseen at the time of the Acquisition.

In order to arrive at the cash flows that were used in the final analysis, the discussion that follows describes the: (1) selection of the projections used; (2) adjustments made to the projections and the underlying assumptions; (3) sensitivities performed to analyze Extended Stay's ability to withstand a typical amount of fluctuation in the financial results; (4) impact of the Cash Management Agreement, on the cash flows; and (5) impact of a potential Cash Trap Event:

### 1. Selection of the Projections Used

In performing the cash flow test analysis, the Examiner's financial advisors identified several sources of projections relating to the Acquisition and the determination of the Purchase Price, including (a) management prepared budgets; (b) the Offering Memorandum;

---

[825] There was no commitment provided for in the Limited Liability Company Agreements for DL-DW or BHAC to make additional capital calls from the investors after the Closing, nor was there any commitment to provide additional capital infusions within the Loan Agreements.

(c) the HVS Appraisal;[826] (d) the due diligence models produced from Citi GM, and (e) the 2007 Approved Annual Budget projections provided to the Servicer in connection with the Acquisition.

For the purposes of the cash flow test, the Offering Memorandum was used as a starting point, since these projections (a) were used/relied upon by the Buyer and its financial advisors (Citi GM) in connection with the Buyer's decision to proceed with the Acquisition;[827] and (b) were the projections used by the lenders in underwriting the loans.[828]

The projections included in the Offering Memorandum were reviewed in context of the various projections identified above and the historical results.[829] The 2007 projections included in the Offering Memorandum reflected total revenue and property-level EBITDA growth rates of 9.84% and 13.35%, respectively, over 2006 actual results. However, the actual results for the first five months of 2007, which should have been available to the Buyer prior to the Closing, reflect that the performance was below the Offering Memorandum projections. To achieve the projected growth rates reflected in the Offering Memorandum, which were used by the Buyer and the Underwriter in evaluating this transaction, the Company would have had to achieve total revenue and property-level EBITDA growth rates of 12.04% and 17.65%, respectively, for the remaining seven months of 2007 as shown below:

---

[826]  The HVS Appraisal was used by the Lenders to support the purchase price of the Acquisition. The valuation date for the HVS Appraisal was dated June 1, 2007, and the projections were based on a fiscal year of April 1 through March 31. As a result, the projections were not directly comparable to other budgets or projections, which were based on an annual fiscal year of January 1 through December 31.

[827]  In fact, the 2007 revenue growth rates included in the Citi GM models were the same or greater than the revenue growth rates projected in the Offering Memorandum. Although, as previously discussed, Citi GM prepared certain other projections in connection with its limited due diligence activities, the analyses appear to focus primarily on more aggressive growth assumptions than the Offering Memorandum, and the monetization of the brand, without an explanation of the strategy or underlying assumptions. However, these observations of the Examiner's financial advisors are necessarily limited by the scope of the Examiner Work Plan.

[828]  This is evidenced by, at a minimum, by the Stapled Financing included in the Offering Memorandum.

[829]  See Exhibit IV-C-1 to IV-C-1.3 for a comparison of the various projections identified and Exhibit III-B-1 for a summary of historical property-level financials.

| Analysis of 2007 Actual Revenues vs. Offering Memorandum Projections | | | | | | |
|---|---|---|---|---|---|---|
| | | **2007** | | | | |
| *Dollars in Thousands* | | **Jan - May** | | **Jun - Dec** | | **Total** |
| **2006 Actual Total Revenues (1)** | $ | 413,070 | $ | 623,464 | $ | 1,036,534 |
| **2007 Projected Revenues (3)** | $ | 453,699 | $ | 684,789 | $ | 1,138,488 |
| **2007 Projected Growth Rate** | | 9.84% | | 9.84% | | 9.84% |
| **2007 Actual Revenues (2)** | $ | 439,938 | | | | |
| **2007 Actual Growth** | | 6.50% | | | | |
| **Difference from Projections** | $ | 13,761 | | | | |
| **Required Revenues** | | | $ | 698,550 | $ | 1,138,488 |
| **Required Growth Rate** | | | | 12.04% | | 9.84% |
| **Difference from Projections** | | | $ | (13,761) | | |

Source: 1) ESH 682 Portfolio 2006 Actual Trend (ESH0041627).
2) ESH Corporate Model v23 (ESH0075563).
3) Offering Memorandum p. 13 (BLA-002201-002287).


| Analysis of 2007 Actual EBITDA vs. Offering Memorandum Projections | | | | | | |
|---|---|---|---|---|---|---|
| | | **2007** | | | | |
| *Dollars in Thousands* | | **Jan - May** | | **Jun - Dec** | | **Total** |
| **2006 Actual Total EBITDA (1)** | $ | 242,277 | $ | 372,295 | $ | 614,572 |
| **2007 Projected EBITDA (3)** | $ | 274,614 | $ | 421,986 | $ | 696,600 |
| **2007 Projected Growth Rate** | | 13.35% | | 13.35% | | 13.35% |
| **2007 Actual EBITDA (2)** | $ | 258,596 | | | | |
| **2007 Actual Growth** | | 6.74% | | | | |
| **Difference from Projections** | $ | 16,018 | | | | |
| **Required EBITDA** | | | $ | 438,004 | $ | 696,600 |
| **Required Growth Rate** | | | | 17.65% | | 13.35% |
| **Difference from Projections** | | | $ | (16,018) | | |

Source: 1) ESH 682 Portfolio 2006 Actual Trend (ESH0041627).
2) ESH Corporate Model v23 (ESH0075563).
3) Offering Memorandum p. 13 (BLA-002201-002287).

It was also observed that the 2007 Approved Annual Budget had a lower projected growth rate for total revenue and property-level EBITDA of 8.14% and 10.82%, respectively. However, given the Company's performance during the first five months of 2007, as compared to this budget, Extended Stay would have needed total revenue and property-level

216

EBITDA growth rates of 9.23% and 13.48% for the remaining seven months of 2007 to achieve the results included in the 2007 Approved Annual Budget as shown below:

| Analysis of 2007 Actual Revenues vs. 2007 Approved Annual Budget | | | |
|---|---|---|---|
| *Dollars in Thousands* | **2007** | | |
| | **Jan - May** | **Jun - Dec** | **Total** |
| **2006 Actual Total Revenues (1)** | $ 413,070 | $ 623,464 | $ 1,036,534 |
| **2007 Projected Revenues (3)** | $ 441,066 | $ 679,887 | $ 1,120,953 |
| **2007 Projected Growth Rate** | 6.78% | 9.05% | 8.14% |
| **2007 Actual Revenues (2)** | $ 439,938 | | |
| **2007 Actual Growth** | 6.50% | | |
| **Difference from Projections** | $ 1,128 | | |
| **Required Revenues** | | $ 681,015 | $ 1,120,953 |
| **Required Growth Rate** | | 9.23% | 8.14% |
| **Difference from Projections** | | $ (1,128) | |

Source: 1) ESH 682 Portfolio 2006 Actual Trend (ESH0041627).
2) ESH Corporate Model v23 (ESH0075563).
3) 2007 Approved Annual Budget (ESH0041627)

| Analysis of 2007 Actual EBITDA vs. 2007 Approved Annual Budget | | | |
|---|---|---|---|
| *Dollars in Thousands* | **2007** | | |
| | **Jan - May** | **Jun - Dec** | **Total** |
| **2006 Actual Total EBITDA (1)** | $ 242,277 | $ 372,295 | $ 614,572 |
| **2007 Projected EBITDA (3)** | $ 260,583 | $ 420,490 | $ 681,073 |
| **2007 Projected Growth Rate** | 7.56% | 12.95% | 10.82% |
| **2007 Actual EBITDA (2)** | $ 258,596 | | |
| **2007 Actual Growth** | 6.74% | | |
| **Difference from Projections** | $ 1,987 | | |
| **Required EBITDA** | | $ 422,477 | $ 681,073 |
| **Required Growth Rate** | | 13.48% | 10.82% |
| **Difference from Projections** | | $ (1,987) | |

Source: 1) ESH 682 Portfolio 2006 Actual Trend (ESH0041627).
2) ESH Corporate Model v23 (ESH0075563).
3) 2007 Approved Annual Budget (ESH0041627)

## 2.      **Adjustments to the Projections**

The Offering Memorandum provided annual projections for (a) the property-level performance for 682 of the total 684 hotels acquired; (b) corporate overhead expense; and (c) Extended Stay's FF&E Reserve, for 2007, 2008 and 2009.  Accordingly, the following adjustments were made to complete the base projections ("Base Management Projections"):[830]

- <u>Missing Properties</u>:  The projected operating results associated with the office building and the two Excluded Properties were added.

- <u>Debt Obligations</u>:  The obligations related to the Mortgage Debt, the Mezzanine Debt, the Subordinated Notes and certain distributions to Preferred Equity Holders were added.

- <u>Cash Balance as of the Acquisition</u>:  The base year of the projections was adjusted to reflect the actual cash balances immediately following the Acquisition.  While most of these funds were held at DL-DW (a non-Debtor), it is reasonable to assume that these funds would be available to Extended Stay for working capital needs, especially since the Loan Agreements required the funding of a minimum working capital reserve fund of $50 million.  Including the working capital reserve fund, the total cash available to Extended Stay as of June 11, 2007 was approximately $87 million.[831]

- <u>Incremental Capital Expenditures</u>:  Non-recurring capital expenditures that were not reflected in the FF&E Reserve (of 4.5%) were added based upon the average actual historical capital expenditures for the four years prior to the Acquisition and industry averages.[832]

- <u>Completion of re-branding efforts</u>:  Projected re-branding costs related to the unification of the brands, which costs were discussed, but not provided for, in the Offering Memorandum Projections, were added based on amounts reflected in the Citi GM models.

- <u>Controllable and non-controllable expenses</u>:  The 2006 actual ratios of controllable and non-controllable expenses to total revenue were used, given the <u>significant</u> reduction in costs that had occurred pre-Acquisition, and the questionable nature of continued reductions in costs as a

---

[830]   *See* Exhibit IV-C-2: Summary of Base Management Projection Assumptions for the details related to each adjustment and the source of the related information.

[831]   The $87 million is comprised of $30 million cash balance as of June 11, 2007, plus the $57 million working capital reserve required under section 5.1.25 of the Mortgage Loan Agreement. Although the $57 million was not actually transferred to the Company's Working Capital Reserve Account until July 2007, the total amount was reflected in the cash flow analysis as if it was available immediately after the Acquisition. Also, a small cash balance from some unexplained miscellaneous accounts was excluded from the total cash available for operations, which if included, would have a minimal impact. *See* Exhibit III-D-7 for the DL-DW Pro-Forma Opening Balance Sheet.

[832]   *See* Exhibit IV-C-7 for the analysis of capital expenditures.

percentage of revenues. Additionally, several Citi GM models reflected controllable and non-controllable expense ratios approximately equal to the ratios based on the 2006 actual property-level financials.

The cash flows incorporating the Base Management Projections reflect that, although the projected cash balance is $74.5 million at the end of December 2007, the cash balance drops to $956,000 by the end of May 2008, increases to only $10.5 million at the end of 2008, and by February 2009, the cash balance is projected to be negative or less than $13 million for most of 2009. (*See* Exhibit IV-C-3 for the Base Management Projections cash flow analysis for the years 2007 through 2009.)

The above results are conservative, as they assume that certain funds would have not been trapped, and that they would be available to fund operations in the normal course.[833] For example, under the Base Management Projections, a Cash Trap Event would have occurred beginning February 2008, and continued until August 2008. As a result, assuming an average occupancy tax rate of 9.2% of room revenues for the months of February through July 2008, approximately $54.6 million of occupancy taxes would have been trapped in the Waterfall.[834] Consequently, the ending cash balance for Extended Stay would have been at least $54.6 million lower in July 2008, resulting in a negative cash balance of $67.7 million.

### 3.    <u>Sensitivities Performed</u>

Next, two simple sensitivities were applied to the Base Projections to analyze Extended Stay's ability to withstand a reasonable amount of fluctuation from the Base Projections. Only two parameters were varied: The RevPAR growth rate and the amount of spending related to re-branding capital expenditures. These sensitivities were based on an

---

[833]    Occupancy Taxes and expenses associated with other revenues have been assumed to be paid within the Waterfall, prior to any Cash Trap. In practice, the Cash Management Agreements were not drafted to permit disbursements to be made to pay these costs within the Waterfall. Therefore, if the Cash Trap were accurately reflected in the projections, the cash flows available to the Company would have been less than modeled. In fact, as discussed in Report § III.H., in 2007 the Servicer did not provide funds for these expenses within the Waterfall.

[834]    The average occupancy tax rate of 9.2% is based on 2008 occupancy taxes as reported in the Officer Certificates, divided by the monthly room revenues for 2008. *See* Exhibit IV-C-11 and below for a discussion of the impact of occupancy taxes on the Waterfall.

analysis of certain financial information, including the historical performance of the hotels, management's growth expectations, economic conditions, and other information reviewed and available prior to the Acquisition. A summary of the assumptions for the Base Management Projection and the two sensitivities (Sensitivity A and Sensitivity B) is provided in Exhibit IV-C-4.

The results of the Sensitivity A and B analyses reflect that these small adjustments in RevPAR growth and capital expenditure investment significantly, and negatively, impact the cash flows of Extended Stay. *See* Exhibits IV-C-5 and IV-C-6. In most of the months between June 2007 and June 2009, the sensitivity analyses reflect negative monthly cash flows. [835] Over time, these negative cash flows would have to be funded through reductions in the working capital funds available to Extended Stay, as shown in the following chart:[836]



*Source: Exhibits IV-C-3, IV-C-5, IV-C-6, IV-C-9*

---

[835]  *See* Exhibit IV-C-8: Summary of Monthly Net Cash Flows for the Base Management Projections and Sensitivity A & B.

[836]  *See* Exhibit IV-C-9: Summary of Monthly Cash Balances for the Base Management Projections and Sensitivity A & B.

537960v2

More importantly, based on these analyses, it appears that, as early as March 2008, Extended Stay would not have had sufficient resources to pay its debts as they became due. In addition, the results reflected in the Sensitivity A & B analyses are conservative, in that they assume certain funds would not have been trapped, and therefore would be available to fund operations in the normal course. However, under both Sensitivity A & B, a Cash Trap Event would have occurred for the entire projection period for Sensitivity B, and all months except one under Sensitivity A projections.

### 4. Impact of the CMA Structure on the Cash Flows

What the cash flow analyses above do not reflect are the exact implementation of the Cash Management Agreements and the Waterfall, as provided for in the Cash Management Agreements. The actual application of the Cash Management Agreements and the Waterfall on the projections discussed above would negatively impact the amount and timing of the cash flows available to Extended Stay on a monthly basis.[837] In fact, given the debt levels associated with the Acquisition, the Cash Management Agreements and Waterfall structure appear to be inappropriate for an operating business like Extended Stay.

CMBS structures are typically used for portfolios of commercial real estate, which contain multi-year, "triple-net" leases that include specific provisions related to capital expenditures, leasehold improvements, expense escalations and other such items. These leases, with regular monthly revenues (rent) and specified rates of revenue growth (rent escalations) provide for cash flows that are much more predictable than those of an operating business like Extended Stay's. Unlike Extended Stay, most CMBS borrowers are not subject to seasonality, and do not have to take into account the expenses of operating a business, such as variable weekly payrolls of 10,000 employees, serving customers, and the on-going maintenance of the hotels, among other things.

---

[837] It is important for borrowers to negotiate all servicing requests and agreements upfront prior to the closing of any CMBS loan agreement. Borrower Guide to CMBS, Commercial Mortgage Securities Association at 3.

In addition, the pre-Acquisition lending agreements provided a different priority of payments than did the post-Acquisition Waterfall. The pre-Acquisition lending agreements provided for Management Fees to be paid before the mezzanine debt. More importantly, the pre-Acquisition loan agreements would not have trapped 100% of the cash upon a Debt Yield Event, but instead would have provided for only a percentage of funds to be trapped based on the severity of the Debt Yield test failure.[838] Additionally, because the pre-Acquisition debt levels were significantly lower than they were post-Acquisition, the lower leverage helped to mask the issues that were encountered post-Acquisition relating to certain expenses being excluded in the Annual Budget (*e.g.*, corporate capital expenditures, reservations system costs, property-level capital expenditures above the FF&E reserve). The lower level of pre-Acquisition debt also resulted in a higher Debt Yield calculation, and a lower monthly debt service payment. Finally, prior to the Acquisition, the Sellers also were able to, and did, provide additional cash contributions into the Company when needed.

In practice, the post-Acquisition Waterfall was much less forgiving than the cash flow analyses described above show. The deposits into the Cash Management Account related to the Mortgaged Properties represented over 97% of the hotels owned and operated by Extended Stay. Notwithstanding that most of the hotel revenues were swept into the Cash Management Account daily, certain costs related to the hotel operations were not provided for in the monthly Waterfall distributions.[839] Specifically, certain overhead costs and necessary capital expenditures were excluded from the Waterfall (*e.g.*, corporate overhead, non-recurring capital expenditures and certain marketing initiatives). The exclusion of these necessary corporate overhead expenses could impact the timing and amount of cash made available as described below:

a.  Corporate Overhead: Not all of the corporate overhead expenses necessary to operate the business on a daily basis were included as items for disbursement.[840] Therefore, once a Cash Trap Event

---

[838] *See* § III.E.6. of this Report.

[839] That is, the costs were not included in the Approved Operating Expenses bucket in the 2007 Approved Annual Budget.

[840] As previously noted, these expense items include reservation system costs, website expenses, technology costs, and marketing expenses.

began, Extended Stay was forced to rely upon working capital to fund necessary corporate overhead expenses needed by the Mortgaged Properties, in order to keep the business operating. The 4% Management Fee (which was based on a percentage of total revenues) provided in the Waterfall was insufficient to cover the total corporate overhead costs and fees that had to be paid to HVM (which were cost plus 6%).[841]

b.     Occupancy Taxes:  Although occupancy taxes collected on behalf of local taxing jurisdictions were included in the cash receipts from the Mortgaged Properties and swept into the Waterfall on a daily basis, the 2007 Approved Annual Budget, and arguably the Cash Management Agreements as well, did not provide for the payment of occupancy taxes.  As a result, to the extent that excess cash flows were not available after all disbursements of the Waterfall were satisfied, or if a Cash Trap Event were in place, Extended Stay would be required to separately fund the payment of the occupancy taxes.  Generally, occupancy taxes totaled approximately 9.2% of room revenues per month (or approximately $ 59.5 million based on the 2007 Approved Annual Budget for the period of June 11, 2007 through December 31, 2007).[842] [843]  Therefore, there was a $59.5 million hole in the annual budget.  (For the cash flow analyses above, the Examiner's financial advisors took a conservative approach and excluded the receipts and disbursements related to the occupancy taxes, effectively removing this issue from the Waterfall).[844]

---

[841]  Given the Waterfall and CMBS Structure, and other evidence, it appears that there was much confusion in regard to the HVM fee arrangement and what it covered or represented.  Unlike the situation where a hotel owner retains an independent management company (*e.g.*, Marriott International), who provides a brand and operates the hotel on behalf of its owners for a fee, Extended Stay was effectively self-managed.  It owned the intellectual property and was managed by an affiliate.  In addition, all of the overhead costs necessary to operate Extended Stay hotels ran through the fee agreements (which were effectively charging fees at the rate of cost plus 6%) between HVM and Extended Stay, and therefore should have been included in the operating budget for the hotels.  However, these total amounts were not included in the 2007 Approved Annual Budget provided to the Servicer.  In other words, the 4% Management Fee allowed for in the Waterfall was insufficient to cover the actual corporate overhead costs associated with running the business.

[842]  The occupancy tax rate of 9.2% is the average occupancy tax rate for 2008, based on the Officer Certificates provided by the Company to the Servicer and the room revenues reported for the 684 hotels.  The estimate of occupancy taxes for the 2007 Approved Annual Budget is calculated as 9.2% of the budgeted room revenues.

[843]  This missing bucket in the Waterfall appears to be a significant oversight in the Cash Management Agreements, and an issue the Company spent significant effort negotiating with the Servicer and Fortress to get added as an approved disbursement (although at the bottom of the Waterfall), post-Acquisition.  *See* § III.J. of this Report for the related discussion.

[844]  Given the nature of the occupancy taxes, it is reasonable to assume that the Company would have had these funds available, or that the funds would be disbursed from the Waterfall during a Cash Trap Event Period.  However, the Cash Management Agreements made no provision for the payment of occupancy taxes.  Therefore, occupancy taxes would have to have been paid at the bottom of the Waterfall.  More importantly, once a Cash Trap Event occurs, the Waterfall would have trapped all excess funds (including the occupancy taxes), and Extended Stay would have been required to pay the occupancy taxes from its working capital

c.  Other Revenue and Expenses:  The revenues reflected in the 2007 Approved Annual Budget included certain "other revenues" that are net of the related expenses.  These "other revenues" were net of the costs incurred to achieve such revenues, resulting in the costs being excluded from the operating expenses in the 2007 Approved Annual Budget.  In other words, the expenses related to the "other revenues" were not included by the Servicer in the Approved Operating Expense bucket within the Waterfall.[845] [846]  Therefore, again, Extended Stay would be required to separately fund the payment of "other expenses" to the extent that excess cash flows were not available after all parts of the Waterfall were satisfied or a Cash Trap Event period was in place.  Despite this oversight, for the cash flow analyses above, the Examiner's financial advisors took a conservative approach, and included other revenues on a net basis.[847]

## 5.  Impact of a Potential Cash Trap

The cash flow analyses also do not reflect the full impact of a Cash Trap Event, as a result of conservative assumptions employed by the Examiner's financial advisors regarding occupancy taxes and other expenses.  As previously discussed, the Debt Yield test[848] was used monthly to determine whether a Cash Trap Event would occur, whether equity distributions could be made, and whether the Mortgage Borrowers would have to start making amortization

---

accounts.  Therefore, the cash assumption used for the cash flow analyses with respect to occupancy taxes is conservative.

[845]  It was surprising that the 2007 Approved Annual Budget was not carefully prepared prior to the Closing.  It did not include certain items, did not break out other revenues and expenses separately, and reflected the 682 properties (as opposed to just the Mortgaged Properties). In addition, the budget was not presented in a manner to facilitate agreement between the Mortgage Borrowers and Lenders, or to allow the Servicer to readily identify the amounts that should be included in the various Waterfall disbursement buckets.

[846]  For example in the 2007 Approved Annual Budget, the other revenues (revenue portion) totaled approximately $14.8 million with costs to achieve the other revenues of $15.6 million.  These amounts were netted reflected as negative $0.8 million in other revenues, and reported as a component of total revenues (above the expenses section of the 2007 Approved Annual Budget).  See Exhibit IV-C-10 for a summary of the other revenue and expenses included in the 2007 Approved Annual Budget.

[847]  This assumption was necessary, as the information necessary to separate the other revenue and expenses from the net number reported for each month was not provided.  The impact of our assumption conservatively assumes that the other revenue expenses are paid within the Waterfall and are not held during a Cash Trap Event Period.

[848]  As previously noted, the Debt Yield calculation is only impacted by the growth and property-level operations of the Mortgaged Properties.  Therefore, the required growth in the Debt Yield test to avoid a Cash Trap Event and exercise the Extension Option on the Mortgage and Mezzanine Debt must come from the Mortgaged Properties.

payments on June 12, 2009.[849]  If a Cash Trap Event were to occur, the operating expenses or other funds needed (*e.g.*, non-reoccurring capital expenditures, overhead expenses, etc.) that were not provided for in the Approved Annual Budget, could not be funded from the cash flows from Extended Stay's operations.  Instead, these items would have to be funded from working capital reserves or additional capital contributions.

### Cash Flow Test - Summary of Observations

In summary, based on the above cash flow analyses, and the observations made with respect to the Cash Management Agreement and the ever-present potential for a Cash Trap Event, it does not appear that Extended Stay would have had sufficient resources to pay its debts as they became due from and after the Closing of the Acquisition.[850]  However, the above analysis and observations are limited by the scope of this investigation and the information obtained.

### D.    Capital Adequacy Test

The Capital Adequacy Test is based on the concept that the key to maintaining a company's solvency lies in its retention of adequate capital to fund its operations and to survive economic downturns in business.  As applied here, this test evaluates whether, as of the Closing, Extended Stay had, or had access to, sufficient capital in the form of cash on hand and/or available credit.  This is a systematic analysis of certain objective criteria using tools (*e.g.*, ratio analysis, debt covenant tests, and other appropriate factors) to perform an evaluation of items such as the capital structure, interest coverage on debt, and compliance with debt covenants within its lending agreements.  Adequacy of capital may be demonstrated by factors such as the

---

[849]    According to the Loan Agreements, the entire amount of Mortgage Debt and Mezzanine Debt would begin amortizing if the Debt Yield Amortization Threshold was not met and each applicable Extension Option could not be exercised.  Mortgage Loan Agreement at 10-11 (Catalyst ID 00000811).

[850]    This conclusion as to the insufficiency of Extended Stay's resources to pay its debts as they became due applies equally to each Mortgage Borrower and to each Mezzanine Borrower, since all of such Borrowers' revenues were consolidated into a single, commingled Cash Management Account, and all disbursements for the account of such Borrower's were made from such Cash Management Account.  *See* Report § III.E.

company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue.

The Capital Adequacy Test incorporates the results of the analysis performed under the Cash Flow Test, in that it takes into account the sensitivities performed on the Base Management Projections in evaluating Extended Stay's ability to withstand a typical amount of fluctuation in its financial results. The Capital Adequacy test considers whether Extended Stay could survive if its actual performance were worse than what was projected by management, taking into consideration the ability to satisfy its (1) operating expenditures, (2) capital expenditure requirements, and (3) debt service obligations.

As with the Cash Flow Test, a sensitivity analysis is used to evaluate whether the transfer in question leaves Extended Stay with an unreasonably small amount of capital with which to manage the business through reasonable business fluctuations. By utilizing a sensitivity analysis on the cash flow projections of Extended Stay, a determination can be made as to the sufficiency of Extended Stay's cash and credit to meet its business needs after the Closing. In performing this analysis, the Examiner's financial advisors used the same scenarios as were employed for the Cash Flow Test.

In the sections that follow, capital adequacy is evaluated by considering: (1) the impact of the increased debt resulting from the Acquisition; (2) a comparison of the amount of equity distributions and contributions made pre-Acquisition to the cash flows available post-Acquisition; (3) an evaluation of the Debt Yield test; (4) other ratio analysis; and (5) an evaluation of the typical working capital needs of hotels. The following discussion related to the Capital Adequacy Test is based on the information that was available to the Buyer, Sellers, and Extended Stay's management up to and including the date of the Closing. As a result, such parties knew or should have known the conclusions reached with respect to such analyses.

## 1. __Impact of the Increased Debt__

As the number of hotels in the Company's portfolio increased, so did the level of debt carried by the Company. From 2004 to the Closing, the overall Extended Stay debt

increased from $3.5 billion following the 2004 Blackstone acquisition of Extended Stay America, to approximately $5.7 billion immediately prior to the Closing.[851] Additionally, the amount of debt per hotel nearly doubled from the end of 2004 to the Closing. As shown below, as a result of the Acquisition, Extended Stay's debt per hotel increased by 30.2%, to $11.2 million, from its 2005 levels of $8.6 million:[852]

| Debt Principal Balances *(Millions)* | | | | | |
|---|---|---|---|---|---|
| **Debt** | **12/31/2004** | **12/31/2005** | **12/31/2006** | **6/10/2007** | **6/11/2007** [2] |
| Mortgage Debt | $ 2,629.4 | $ 3,204.5 | $ 3,227.5 | $ 3,227.5 | $ 4,100.0 |
| Mezzanine Debt | $ 866.6 | $ 2,364.5 | $ 2,364.5 | $ 2,364.5 | $ 3,300.0 |
| Line of Credit | $ 5.4 | $ 16.4 | $ 55.0 | $ 68.4 | $ - |
| Subordinated Debt | $ 41.4 | $ 40.9 | $ 40.5 | $ 40.3 | $ 36.5 |
| **Total Debt** | **$ 3,542.8** | **$ 5,626.3** | **$ 5,687.4** | **$ 5,700.6** | **$ 7,436.5** |
| Number of Hotels [1] | 632 | 653 | 663 | 664 | 664 |
| **Debt per Hotel** | **$ 5.6** | **$ 8.6** | **$ 8.6** | **$ 8.6** | **$ 11.2** |

*Notes:*

[1] Excludes 18 leased hotels.

[2] Exhibit III-D-7: DL-DW Pro-Forma Opening Balance Sheet

*Sources:*

*BRE/Homestead Village L.L.C. Consolidated Financial Statements, 2005 (Catalyst ID 0003671).*
*BRE/Homestead Village L.L.C. Consolidated Financial Statements, 2006 (Catalyst ID 0003673).*
*BRE/Homestead Village L.L.C. Consolidated Financial Statements, June 10, 2007 (ESH0003642-3666).*
*Extended Stay Inc. Consolidated Financial Statements, 2005 (Catalyst ID 0003684).*
*Extended Stay Inc. Consolidated Financial Statements, 2006 (Catalyst ID 0003683).*
*Extended Stay Inc. Consolidated Financial Statements, June 10, 2007 (ESH0003597-3641).*
*DL-DW Holdings LLC Opening Balance Sheet (ESH0075844).*
*Exhibit III-D-7 DL-DW Pro-Forma Opening Balance Sheet.*

---

[851] *See* BRE/Homestead Village L.L.C. and Subsidiaries Consolidated Financial Statements, Yearly 2004-2007 & Extended Stay Inc. and Subsidiaries Consolidated Financial Statements, Yearly 2004-2007.

[852] The June 11, 2007 level of debt assumed for this calculation is based on the Stapled Financing package attached to the Offering Memorandum. The $6.8 billion level of debt assumed for this calculation is calculated as 87.5% of the Acquisition purchase price, with consideration given to the $200mm HPT lease. The actual financing was $7.4 billion in debt.

Further, as a result of the increased leverage, Extended Stay's Debt Service Coverage Ratio (which is a measure of financial health) decreased significantly from 2005 levels from 1.64 in 2005, to 1.16 on a pro-forma basis (a decrease of 29.3%), as shown below:[853]

| Debt Service Coverage Ratio *(Millions)* | | | | | |
|---|---|---|---|---|---|
| | **2005** | | **2006** | | **2007** |
| Interest Expense [1] | $ 313.46 | $ | 442.02 | $ | 534.00 |
| EBITDA (Including Corp OH) [1] | $ 512.68 | $ | 553.68 | $ | 617.19 |
| Debt Service Coverage Ratio | 1.64 | | 1.25 | | 1.16 |

*Notes:*

[1] *2007 Interest Expense is actual and 2007 EBITDA is pro-forma.*

*Sources:*

*BRE/Homestead Village L.L.C. Consolidated Financial Statements, 2005 (Catalyst ID 0003671).*
*BRE/Homestead Village L.L.C. Consolidated Financial Statements, 2006 (Catalyst ID 0003673).*
*BRE/Homestead Village L.L.C. Consolidated Financial Statements, June 10, 2007 (ESH0003642-3666).*
*Extended Stay Inc. Consolidated Financial Statements, 2005 (Catalyst ID 0003684).*
*Extended Stay Inc. Consolidated Financial Statements, 2006 (Catalyst ID 0003683).*
*Extended Stay Inc. Consolidated Financial Statements, June 10, 2007 (ESH0003597-3641).*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*

Additionally, the Company's ratio of total debt to total assets was approximately 0.92.[854] This ratio indicates that all or virtually all of the Company's assets are levered. Given this high ratio of debt to assets, it was highly unlikely the Company would have the ability to obtain additional financing to fund its operations after the Acquisition, either in the form of a line-of-credit or loans, since such further extensions of credit would have required lenders to accept loan-to-value ratios of almost 1:1 or higher, which is practically unheard of in the marketplace. In light of this information, it is unclear how, for example, the Buyer planned to

---

[853] For comparison purposes, the average Debt Service Ratio in the hotel/lodging industry for the 2nd quarter of 2007 was 1.57 for secured loans with a range of 1.00 to 3.00. Investor Survey, RealtyRates.com, 3rd Quarter 2007 at 6.

[854] The debt to total assets ratio is a leverage ratio commonly used to compare the debt levels between companies. It reflects the total amount of leverage a company has when compared to its total balance sheet assets. Another measure of leverage is the debt to equity ratio. However, this ratio is not meaningful for the pre-Acquisition period because the Company had negative equity in the years leading up to the Acquisition.

537960v2

repay the 9.15% Notes due in March 2008, which obligations were assumed in connection with the Acquisition.

## 2.    Equity Distributions and Contributions

As previously noted, neither the Acquisition Agreements nor the Loan Agreements required the Buyer (owners) to make additional capital contributions into Extended Stay when such capital was needed. In fact, the Limited Liability Company Agreements provide no mechanism for Extended Stay to make capital calls from Extended Stay's owners.[855] Without any mechanism to require its owners to contribute capital when needed, Extended Stay would be forced to seek capital through other sources, such as debt, which would likely come at a significant cost, given the leverage ratio discussed above, and the initial reactions of potential preferred equity investors.[856]

Prior to the Acquisition, on behalf of the Buyer, Citi GM solicited expressions of interest from over 30 potential preferred equity investors. Significantly, many of the comments received from these potential investors noted that the leverage of the deal was too high; that the transaction was "too levered;" that it "wouldn't take much to wipe them out;" that there was not enough equity in the deal; that there was not sufficient return for the risk; and that Lightstone/Lichtenstein lacked hospitality experience.[857]

In addition, Extended Stay's 2007 projected interest expense was estimated to be $523 million,[858] or approximately $81 million greater (18% higher) than the interest expense for Extended Stay in 2006. When compared to the total annual distributions made by ESI and BRE/Homestead Village from 2005 to 2006 (as shown in the table below), it does not appear that

---

[855] Limited Liability Company Agreements for DL-DW, Homestead, and BHAC (Catalyst ID 00000513, Catalyst ID 00000469) and [Bates No. DL_DW_EXMN00000508].

[856] DL-DW was able to obtain additional debt in April 2008. However, this loan was obtained from insiders and came with an annual interest rate of 25%. Furthermore, Extended Stay had little choice but to obtain a loan from insiders, as Extended Stay had already unsuccessfully tried to secure capital in the market, and the obligation was nearing default. *See* discussion of 9.15% Notes payoff in Section III.I.3 of this Report.

[857] Citi GM Presentation dated April 25, 2007 [Bates Nos. CITI 01687-1724].

[858] Citi GM cash flow model with no brand sale [Bates Nos. CITI 09337-9530].

there would be sufficient excess cash flow from operations to cover this additional interest expense. [859]

| Equity Distributions | | | |
|---|---|---|---|
| *Amounts Shown in Millions* | **2005** | **2006** | **June 10 2007** |
| Dividends - Extended Stay Inc. [1] | $ 47.60 | $ 14.19 | $ - |
| Distributions - BRE/Homestead Village LLC[1] | $ 12.27 | $ 10.00 | $ 25.00 |
| Equity Distributions[1] | $ 59.87 | $ 24.19 | $ 25.00 |
| EBITDA (Including Corp OH)[2] | $ 512.68 | $ 553.68 | $ 241.24 |
| Equity Distributions as a % of EBITDA | 11.68% | 4.37% | 10.36% |

*Notes:*
[1] *Excludes $1.87 billion distribution in 2005 related to refinancing.*
[2] *2007 EBITDA is through June 10, 2007.*

*Sources:*
*BRE/Homestead Village L.L.C. Consolidated Financial Statements, 2006 (Catalyst ID 0003673).*
*BRE/Homestead Village L.L.C. Consolidated Financial Statements, June 10, 2007 (ESH0003642-3666).*
*Extended Stay Inc. Consolidated Financial Statements, 2006 (Catalyst ID 0003683).*
*Extended Stay Inc. Consolidated Financial Statements, June 10, 2007 (ESH0003597-3641).*
*ESH Historical Financials 2000-2007 (Catalyst ID 00003681).*

In addition, in 2005 and 2006, capital contributions were also made into the Company, as shown below:

---

[859] ESI was a real estate investment trust (REIT) which, through its qualified subsidiaries, owned and leased hotel properties. Therefore, all of the Mortgaged Properties owned by REIT-related entities are leased out to affiliates of the Borrowers, most of which are Debtors. A REIT is a company that owns real estate and qualifies for tax benefits as long as it complies with a series of rules, the most significant of which are: (1) its primary business is owning and managing groups of income-producing properties; and (2) it must distribute at least 90% of its taxable income as dividends on an annual basis. REITs can deduct dividends paid to its shareholders from its corporate taxable income, but are subject to corporate tax on amounts retained and not distributed. For these reasons, most REITs distribute 100% of their income as dividends. The REIT shareholders, however, pay taxes on dividends received and on any capital gains.

| Capital Contributions *(Millions)* | | | | | | |
|---|---|---|---|---|---|---|
| | | **2005** | | **2006** | | **June 10 2007** |
| Capital Contributions - Extended Stay Inc. | $ | 32.13 | $ | 47.95 | $ | - |
| Capital Contributions - BRE/Homestead Village LLC | $ | 1.25 | $ | - | $ | - |
| Total Capital Contributions | $ | 33.37 | $ | 47.95 | $ | - |

*Sources:*
*BRE/Homestead Village L.L.C. Consolidated Financial Statements, 2005 (Catalyst ID 0003671).*
*BRE/Homestead Village L.L.C. Consolidated Financial Statements, 2006 (Catalyst ID 0003673).*
*BRE/Homestead Village L.L.C. Consolidated Financial Statements, June 10, 2007 (ESH0003642-3666).*
*Extended Stay Inc. Consolidated Financial Statements, 2005 (Catalyst ID 0003684).*
*Extended Stay Inc. Consolidated Financial Statements, 2006 (Catalyst ID 0003683).*
*Extended Stay Inc. Consolidated Financial Statements, June 10, 2007 (ESH0003597-3641).*

The dividends and distributions in 2005 of approximately $59.9 million, net of the special dividend related to the refinancing, were partially offset by approximately $33.4 million of additional capital contributions. In 2006, the capital contributions made to ESI were greater than the dividends paid out during the same year. In 2006, the owner contributed more money into Extended Stay than they received back in dividends during that year.

As shown above, prior to the Acquisition, the Company had an owner that was willing and able to infuse additional capital as needed. The need for additional capital contributions in 2005 and 2006 can be explained in part by the acquisitions and investing activities undertaken by the owners during that period. For example, the 2006 Consolidated Statements of Cash Flow for ESI reflect investments in building improvements, and furniture, fixtures, and equipment, of $129.7 million, which is greater than the net cash provided by operating activities of $127.5 million. Additionally, ESI acquired $87.7 million in new properties in 2006, which may have created a need for additional capital contributions by the owners.[860]

---

[860] Consolidated Financial Statements for Extended Stay Inc. and Subsidiaries dated June 10, 2007 (Catalyst ID 00003600).

### 3. Debt Yield Test

The Debt Yield test was an important metric to be measured on a forward-looking basis. Among other things, the Debt Yield test was used to determine whether a Cash Trap Event would occur and whether the debt would begin amortizing on June 12, 2009.[861] An analysis of the Debt Yield test using the Base Management Projections for the period from the Closing through the Petition Date shows that: (1) a Debt Yield Event would have occurred in December 2007 resulting in a Cash Trap Event,[862] and (2) Extended Stay would not have passed the Debt Yield Amortization Threshold in June 2009.[863] Therefore, all excess cash not specifically identified for distributions through the Waterfall would begin being trapped starting February 2008, until the Debt Yield Event was cured.

The projected cash flow analyses above indicate when a Cash Trap Event would likely occur, but conservatively assume that occupancy taxes and expenses associated with other revenue are still paid through the Waterfall. As discussed above, occupancy taxes averaged approximately 9.2% of revenues, and expenses for other revenues were budgeted as approximately $15.6 million for 2007. This means that approximately $1.3 million of expenses for other revenues, and approximately $8.4 million of occupancy taxes, would have been trapped in the Cash Management Account on a monthly basis. Therefore, the cash flow analysis conservatively assumes that these amounts are paid through the Waterfall, when in actuality, they would have been trapped according to how the Cash Management Agreements were written and how the Servicer interpreted the budgets.

The Mortgaged Properties did not pass the Debt Yield test even at the Closing. This means that in order to pass the Debt Yield test for December 2007, the Company would have had to grow quite significantly. Therefore, it appears that the Mortgage and Mezzanine

---

[861] According to the Loan Agreements, the entire amount of Mortgage Debt and Mezzanine Debt would begin amortizing if a Debt Yield Event occurred and each applicable Extension Option could not be exercised. Mortgage Loan Agreement pp. 10-11 (Catalyst 00000811).

[862] While the Debt Yield calculation is failed for the TTM months ending December 31, 2007, the Debt Yield calculation is not required to be provided to the Servicer until January 20. This timing delay would cause the cash trap not to begin until the February 2008 Payment Date.

[863] See Exhibit IV-C-3: Summary of Base Management Projections – Cash Flow Analysis.

Lenders were willing to lend the Debtors $7.4 billion under the assumption that the Debtors would be able to materially increase sales and EBITDA in a six month period, in order to pass the Debt Yield test and avoid a Cash Trap Event. This was a significant risk that appears to have been not fully understood by the parties involved, or accepted without fully understanding the impact of the Cash Trap Event as drafted, or both. In any event, the bottom line is that the Loan Agreements appear to include a debt metric that the Mortgage Borrowers could not satisfy at Closing.

### 4. **Other Ratio Analysis**

An analysis of Extended Stay's pro-forma interest coverage ratio, debt to enterprise value, and total debt to total asset ratio, compared to other hospitality REITs, reflects that (1) the Company's interest coverage ratio was 1.13, compared to the hospitality REIT average of 2.7, and was below the low end of the observed range of 1.36 to 4.46 for hospitality REITs; (2) the leverage ratios for Extended Stay were approximately double the average of hospitality REITs, and significantly above the high end of the range for the hospitality REITs.[864]

Additionally, Citi GM prepared an analysis of certain lodging C-corps' and REITs' leverage ratios for 2007. A summary of the Citi GM analysis below shows that the range and median leverage ratios of these comparable companies is significantly lower than the leverage ratios anticipated as a result of the Acquisition [865]

---

[864] See Exhibit IV-D-1 Select Liquidity and Leverage Ratios for Hospitality REITs.

[865] *See* Exhibit IV-B-4 for a list of the companies included in the analysis.

| Net Debt plus Preferred Equity / Enterprise Value for Citi GM Comparable Companies | | |
|---|---|---|
| | **Lodging C-Corps** | **Lodging REITs** |
| Minimum | 2.6% | 29.6% |
| Maximum | 42.8% | 65.1% |
| Weighted Average | 12.5% | 41.1% |
| Simple Average | 19.2% | 44.7% |
| Median | 18.0% | 43.5% |
| | | |
| **Extended Stay Hotels**[1] | | **97.0%** |

*Notes:*

[1] *ESH Net Debt plus Preferred Equity to EBITDA percentage was calculated using the mortgage, mezzanine, capital lease, and subordinated debt from the DL-DW Pro-Forma Opening Balance Sheet plus the $210 million of Series A-1 preferred equity from the DL-DW Consolidated Financial Statements for 2007-2008 and the $8 billion purchase price.*

*Sources:*

*Comparable Lodging C-Corps and REITS (CITI 01285-01286).*

*DL-DW Consolidated Financial Statements 2007-2008 (ESH0000107-0000164).*

*DL-DW Pro-Forma Opening Balance Sheet (See Exhibit-III-D-7).*

In addition, Extended Stay's leverage ratio post-Acquisition would be nearly double that of other lodging REITs, and over five times the leverage of lodging C-corps.

### 5. Working Capital Needs of Hospitality Industry

Working capital, as typically defined, measures the difference between the amount of a company's current assets and its current liabilities. However, in certain industries such as hospitality, the traditional definition of working capital may not be appropriate. As a result of very quick collections, companies in the hospitality industry typically have relatively low accounts receivable, because hotel rooms typically are either pre-paid or paid upon checkout, while liabilities incurred by the operating company can be paid on terms. Therefore, the working capital needs for the hospitality industry can vary widely and in fact be negative. Very low or negative working is a typical sign of a company that operates efficiently or on a cash basis.

Given the low working capital needs of the hospitality industry, cash from operations would be used for debt service, capital expenditures, corporate costs, and other non-property level expenses. Therefore, Extended Stay should have evaluated its cash needs on a monthly basis to determine whether it could meet its working capital needs. During the course of this Investigation, the Examiner's financial advisors saw no evidence of Extended Stay having performed such monthly analyses of its projected cash flows and other capital needs, such as rebranding capital expenditures, capital expenditures above the 4% FF&E reserve, marketing costs, and other costs.

**Capital Adequacy Test Summary Observations**

Based on the above analysis and observations, it does not appear that Extended Stay had adequate capital to fund its operations and survive economic downturns in the business.[866] In summary, the following observations were made:

- The Acquisition resulted in a significant increase in the amount of Extended Stay's debt;

- Prior to the Acquisition, the historical capital and cash flows available to fund debt service were higher than the cash flows available post-Acquisition;

- The projected Debt Yield test would have resulted in a Debt Yield Event, a Cash Trap Event, and a required amortization in June of 2009;

- Other ratio analysis reflected that Extended Stay was highly levered;

- When considered in light of the typical working capital needs of hotels, that the level of working capital available to Extended Stay was far too low; and

- After the Acquisition, Extended Stay's leverage was significantly higher than any other hospitality companies or REITs.

---

[866] This conclusion by the Examiner as to the inadequate capital of Extended Stay applies equally to each Mortgage Borrower and each Mezzanine Borrower, since all of such Borrowers' revenues were consolidated into a single, commingled Cash Management Account and all disbursements for the account of such Borrower's were made from such Cash Management Account. *See* Report § III.F.

However, the above analysis and observations are limited by the scope of this Investigation and the information obtained.

### E. Dividends/Distributions made after the Closing of the Acquisition

As previously discussed, following the Closing, certain dividends, distributions, and transfers were made to Extended Stay's owners and affiliates. *See* Exhibit IV-E-1 and Exhibit IV-E-2 for a summary of the disbursements by year. In light of the solvency analyses performed above, and the deteriorating performance of Extended Stay during the period from the Closing to the Petition Date, as discussed above, Extended Stay did not have adequate capital as of the date that each of these distributions was made.[867] However, since the Examiner's financial advisors have not performed an independent valuation or a sufficiently detailed analysis to conclude whether the fair value of the Extended Stay's assets exceeded its liabilities on the date that each of these distributions was made, the Examiner is unable to express an opinion as to whether these distributions were valid under applicable non-bankruptcy laws governing distributions made by corporations and LLCs.[868]

## V. CLAIMS OF THE ESTATE

The Examiner's charge includes the duty to investigate whether the Estates have any claims with respect to the Acquisition and the financial circumstances that led to the filing of the Chapter 11 Cases. The foregoing facts implicate a host of legal issues.

### A. Summary

Each cause of action suggested by the facts drawn from the Investigation will be discussed briefly below; a detailed discussion of possible estate causes of action will follow, organized by way of a claim by claim analysis. Consistent with the purpose of this aspect of the Report – to assist the parties in interest in assessing the merits of possible causes of action – the

---

[867] In addition, under the Loan Agreements, the Borrowers were prohibited from making any dividends from and after the Closing of the Acquisition when they could not meet the Debt Yield test. *See* Report § III.H.

[868] However, *see* note 1435 regarding whether, based on the fact that on the date of each distribution Extended Stay had inadequate capital, such distributions could be challenged as constructive fraudulent transfers.

Report includes analysis of certain defenses that might be relevant to each potential cause of action. What follows is a brief description of the claims investigated by the Examiner.

### Fraudulent Transfer Claims[869]

The negotiation, structure, and closing of the Acquisition compel an analysis of potential fraudulent transfer claims. As discussed above, the Examiner believes that the parties to the Acquisition, and those involved in it, knew or should have known that the effect of the Acquisition would be to transfer funds to the Sellers by encumbering Extended Stay with unserviceable debt, for which Extended Stay received nothing of value. The Examiner further believes that the parties involved contemporaneously knew or should have known that this increased debt, as well as pre-existing and future debt, was unlikely to be repaid according to its terms, and that Extended Stay was operating with unreasonably small capital as a result of the Acquisition. *See* Report at §§ IV.B.&C.

### Illegal Dividends[870]

The Examiner analyzed the propriety and recoverability of both the distribution of approximately $1.7 billion to the Sellers in connection with the Acquisition, and certain post-Acquisition dividends.

### Breach of Fiduciary Duty[871]

Because the Investigation was precipitated by suggestions of impropriety, and given that the Acquisition was followed relatively closely by bankruptcy, the Examiner has investigated possible breach of fiduciary duty claims relating to the Acquisition and the financial circumstances that led to the filing of the Chapter 11 Cases.

### Aiding and Abetting Breach of Fiduciary Duties[872]

To the extent that any of the Debtors' fiduciaries breached their respective duties, it may also be possible to hold other entities liable for aiding and abetting those breaches.

---

[869] *See* Report § V.C.
[870] *See* Report § V.E.1.
[871] *See* Report § V.E.2.
[872] *See* Report § V.E.3.

237

<u>Unjust Enrichment</u>[873]

Because the Sellers and Professionals retained, in the aggregate, approximately $1.7 billion for which Extended Stay received nothing of value, the Examiner has analyzed the viability of a claim for unjust enrichment. The Examiner has also analyzed whether the Buyer may be held liable on a claim for unjust enrichment by virtue of its receipt of control and payment of the Purchase Price.

<u>Alter Ego</u>[874]

The Examiner has investigated whether a direct or indirect controlling entity may be held directly liable for causing a target involved in an LBO to make transfers to such entity, giving rise to direct claims by the target against the controlling entity.

<u>Subrogation</u>[875]

As a result of the transfers to the Sellers and the Professionals, the Examiner has investigated whether Homestead and ESI were subrogated to the rights of the Sellers and the Professionals against the Buyer to be paid the Purchase Price and the Professional Fees due under the Acquisition Agreement, or otherwise.

### 1. <u>Characterization of Structure/Transfers – An Overview</u>

#### a. <u>Structure</u>

The Examiner's task of determining whether the various transfers resulting from the Acquisition create claims under applicable fraudulent transfer law, or otherwise, is greatly complicated by the complex corporate and debt structure of Extended Stay and BHAC. If this were a case involving a single corporate debtor or LLC and a single lender, the analysis would be relatively straightforward. But this is not such a case.

The Debtors consist of seventy-five entities, fifty-eight LLCs, four limited partnerships, four trusts, and nine corporations. At the time of the Acquisition, there were (and

---

[873] *See* Report § V.E.4.
[874] *See* Report § V.E.5.
[875] *See* Report § V.E.6.

still are) two branches of entities coming down from the ultimate holding company, DL-DW. One branch comes down directly from DL-DW (a non-Debtor) to Homestead (a Debtor), and then to Homestead's subsidiaries (which are for the most part Debtors) other than BHAC and ESI, and includes 10 Mezzanine Borrowers (all Debtors) and certain of the Mortgage Borrowers (all Debtors) (the "Homestead Branch")

The second branch comes down directly from DL-DW (a non-Debtor) to BHAC (a non-Debtor), to ESI (a Debtor), and then to ESI's subsidiaries (which are for the most part Debtors) (the "ESI Branch"). This second branch itself includes 2 branches each containing 10 Mezzanine Borrowers (all Debtors) and all of the remaining Mortgage Borrowers (all Debtors) that are not included in the Homestead Branch.

To further complicate this structure, immediately following the Acquisition, DL-DW transferred ownership of the BHAC Branch to Homestead, and BHAC simultaneously sold to outside investors a percentage of BHAC's membership interests. Therefore, Homestead's membership interests in BHAC were reduced. As a consequence, the structure of the ESI Branch presently has BHAC (a non-Debtor) interposed between Homestead and ESI (both Debtors) with Homestead and other investors owning membership interests in BHAC.[876]

### (1) Secured Debt

Although the nominally secured debt of the Debtors exceeds $7.4 billion, certain of the Debtors take the position that the Mortgage Debt is undersecured, and that the Mezzanine Debt is, therefore, totally unsecured.[877] The Mortgage Debtor's Plan, which was joined in and filed by only 39 Debtors (the "Mortgage Debtors")[878], takes the position that the Mortgaged Properties are worth $3.2 billion which is substantially less than the Mortgage Debt of approximately $4.1 billion. If that is the case (and the Examiner takes no position on such

---

[876]  *See* Report § III.D.; Corporate Chart in Report at Exhibit V-A-1.

[877]  *See* § 4.2(b)(ii) of the Debtors' First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated March 5, 2010 (the "Mortgage Debtors' Plan") at 19.

[878]  *See* Exhibit A to Mortgage Debtor's Plan. The Mortgage Debtors include the 18 Mortgage Borrowers, the 5 Operating Lessees, and 16 other Debtor entities listed on Exhibit A, including the 5 additional Debtors that filed for relief on February 18, 2010.

valuation for purposes of this Report)[879]: (a) the Mortgage Debt would be undersecured and the resulting deficiency claims of approximately $900 million would share *pari passu* with the other general unsecured claims against the Mortgage Debtors, and (b) the Mezzanine Debt of approximately $3.3 billion would be totally unsecured.

### (a) Impact of the Intercreditor Agreement

This unusual debt structure described above is further complicated by the Intercreditor Agreement between the Mortgage Lenders and the Mezzanine Lenders. Under the Intercreditor Agreement, the Mezzanine Lenders are not entitled to receive any payments from the Debtors' Estates until the Mortgage Lenders have been paid in full. This is so even if the liens on the Mortgaged Properties and the Mortgage Debt are invalidated as a result of, among other things, a successful fraudulent transfer attack.[880]

It would appear, however, that if there is a recovery from any of the Sellers, the Buyer, the Professionals, or other parties by the Debtors on claims arising from the Acquisition, and the Mezzanine Lenders share in that recovery, then the Mezzanine Lenders would be subrogated to the claims of the Mortgage Lenders upon the payment over of any recoveries by the Mezzanine Lenders. In such a case, the Mezzanine Lenders could be repaid some or all of those proceeds if and when the Mortgage Lenders were otherwise paid in full. However, due to the subordination provisions of the Intercreditor Agreement, avoidance of the Mortgage Debt or the liens on the Mortgaged Properties would not benefit the Mezzanine Lenders.[881]

---

[879] The Examiner has not independently determined the fair market value of the Mortgaged Properties because such valuation is beyond the scope of the Investigation as set forth in the Work Plan and Approval Order.

[880] *See* Report § V.C.3.

[881] *See* Report § III.E.3. Because of this unusual and complicated debt structure, and the rights and claims described in this Report, a sensible resolution might result in the payment of the Non-Mezzanine Unsecured Debt and the 9.875% Notes of ESI. This might leave the unsecured claims of the Mezzanine Lenders as the only remaining creditor constituency once the deficiency owed to the Mortgage Lenders was paid in full, and the only beneficiaries of any Acquisition related claims by the Debtors. However, the likelihood of any recovery that would benefit the Mezzanine Lenders is reduced if the premise of the Mortgage Debtors' Plan, that the deficiency claims of the Mortgage Lenders exceed $900 million, were correct. The first $900 million recovered from the Sellers, the Buyers, the Professionals, or other parties would, therefore, have to be paid over by the Mezzanine Lenders to the Mortgage Lenders unless the Mortgage Debtors' Plan resulted in the termination of the Intercreditor Agreement. If it did not, presumably the Mezzanine Lenders would recognize

### (2)  Other Claims

In addition to the possibly unsecured claims of the Mezzanine Lenders, and the possibly unsecured deficiency claims of the Mortgage Lenders[882], apparently the only other unsecured creditors of the Debtors are: (1) a small number of trade vendors, utility providers, taxing authorities, and tort claimants whose claims are not material in amount (the "Non-Mezzanine Unsecured Debt"),[883] and (2) approximately $8.5 million of 9.875% Notes at ESI.[884]

### (3)  Impact of Substantive Consolidation

In analyzing whether the Debtors' Estates may have claims against the Sellers, the Buyer, the Professionals, and other parties resulting from the Acquisition, there are two ways in which the Debtors may be treated: as a consolidated enterprise, or as separate legal entities.

Based upon the factual findings of the Examiner,[885] and the legal analysis of the applicable law regarding substantive consolidation,[886] the 39 Mortgage Debtors' Estates should be substantively consolidated.[887]  Indeed, it is the Examiner's view that the rest of the Debtors' Estates consisting of the 36 additional Debtors (the "Mezzanine Debtors")[888] ought to be substantively consolidated with the Estates of the Mortgage Debtors.[889]  The facts strongly

---

that the prospects of recovering more than $900 million from those parties would be such that a settlement would likely result.

[882]  The Mortgage Lenders claims will be satisfied under the Mortgage Debtors' Plan by the issuance of a combination of new mortgage notes, equity in the reorganized Mortgage Debtor, unsecured notes, warrants to purchase additional equity in the reorganized Mortgage Debtors, and the ability to participate in a rights offering for additional equity in the reorganized Mortgage Debtors. *See* § 4.2(b)(1) of the Mortgage Debtors' Plan at 19.

[883]  These unsecured creditors hold claims at the property owner, Mortgage Borrower, and/or the operating lease levels, but not at the Mezzanine Borrower levels.

[884]  *See* Report § III.L.

[885]  *See* Report § III.

[886]  *See* Report § V.B.1.

[887]  The 39 Mortgage Debtors' Estates will be substantively consolidated if the Mortgage Debtors' Plan is confirmed.  See § 6.1 of the Mortgage Debtors' Plan at 25.

[888]  The Mezzanine Debtors are comprised of all of the 30 Mezzanine Borrowers and the remaining 6 upper tier Debtors: Homestead, ESI, Extended Stay Hotels L.L.C., ESA Business Trust, ESA Management L.L.C., and ESA P Portfolio Holdings, L.L.C.

[889]  Although under the Intercreditor Agreement a Mezzanine Lender may not file claims in the cases of any Mortgage Borrower or other Mezzanine Borrower that was not its Borrower, subject to the provisions of the Intercreditor Agreement, including the subordination provisions, the Intercreditor Agreement does not prevent a Mezzanine Lender from having a claim against the consolidated Estates resulting from substantive consolidation.  *See* Report § III.E.3.

241

suggest that substantive consolidation of the Mortgage Debtors' Estates ought to occur, and the case for substantive consolidation of the Mezzanine Debtors' Estates is just as strong.[890]

What follows is an overview of how the Examiner analyzes the transfers by and claims of the Debtors resulting from the Acquisition in the following alternative scenarios: (1) the Estates of all of the Debtors' Estates are substantively consolidated (or as a subcategory, the Estates of the Mortgage Debtors are substantively consolidated separately from the substantively consolidated Estates of the Mezzanine Debtors), or (2) the Estates of all of the Debtors are maintained as separate legal entities.

### b.  Transferors, Transfers and Claims

#### (1)  Transfers Made In Connection With the Acquisition

##### (a)  Transfers to the Lenders

There are a number of perspectives on the transfers in connection with the Acquisition depending on the structural assumptions made. With respect to the transfers of liens to the Mortgage Lenders and the Mezzanine Lenders (or the incurrence of the Mortgage Debt and Mezzanine Debt), assuming that there is no substantive consolidation, the transferors (or the Debtors that incurred the Debt) were the Borrowers, or the owners of the Mortgaged Properties. However, if all of the Debtors' Estates are substantively consolidated, or either or both of the Mortgage Debtors' Estates or the Mezzanine Debtors' Estates are substantively consolidated, then the transfers would be considered as having been made, and the Debt incurred, by the merged Estates of the substantively consolidated group, whether of the Mortgage Debtors, or of the Mezzanine Debtors, or of all of the Debtors.[891]

---

[890]  *See* Report § V.B.1. If the Estates of the Mezzanine Debtors are not substantively consolidated with the Estates of the Mortgage Debtors, it is the Examiner's position that the Estates of the Mezzanine Debtors ought to be substantively consolidated with each other. If that occurs, then the Intercreditor Agreement provides that the claims of each Mezzanine Lender are subordinated to the claims of the other Mezzanine Lenders at lower tier Mezzanine Borrowers. *See* Report § III.E.3. In addition, if any of the Estates are substantially consolidated, special treatment may be warranted for the Non-Mezzanine Unsecured Debt and the 7.875% Notes at ESI. *See* Report at § V.B.1.

[891]  *See* Report § V.B.1.

### (b)  Transfers to the Sellers

With respect to the transfers to the Sellers, assuming that the Estates are not substantively consolidated, arguably the transfers to the Sellers were made by the Mortgage Borrowers.  Under the Loan Agreements all of the loan proceeds were to have been loaned directly to the Mortgage Borrowers by the Mortgage Lenders, or loaned to the Mezzanine Borrowers by the Mezzanine Lenders and indirectly invested by the Mezzanine Borrowers in the Mortgage Borrowers.  The Mortgage Borrowers would then have paid the Sellers that portion of the Purchase Price to which they were entitled under the Acquisition Agreement.[892]

However, that is not how the funds flowed.  The Mortgage Loan proceeds and Mezzanine Loan proceeds were sent directly from the Mortgage Lenders and the Mezzanine Lenders to the First American escrow account.  First American disbursed to the Sellers out of the escrow account that portion of the Purchase Price to which the Sellers were entitled under the Acquisition Agreement.  In fact, notwithstanding the provisions of the Mortgage Loan Agreement and the Mezzanine Loan Agreement, the only evidence of the incurrence of debt on the books of the Debtors as a result of the Acquisition was the recordation of the Mortgage Loans and the Mezzanine Loans as liabilities on the books of Homestead and ESI.[893]  Therefore, assuming that there is no substantive consolidation of the Debtors' Estates, or if only the Mortgage Debtors' Estates are substantively consolidated, it is the position of the Examiner that Homestead and ESI should be considered the transferors to the Sellers.[894]  If all of the Extended

---

[892]   *See* Report § III.E.  Under this scenario, it is also arguable that the Mezzanine Borrowers made the transfers to the Sellers from the loan proceeds of the Mezzanine Loans.

[893]   Homestead and ESI were not borrowers.  Moreover, although both Homestead and ESI executed Non-Recourse Carve Out Guarantees, they had no liability under those guarantees unless and until the so-called "bad boy" provisions under the guarantees were triggered, which included the filing of bankruptcy by the Borrowers.

[894]   *See* Report at § V.C.2.d.  Since the Loan proceeds should have been received by the Mortgage Borrowers, but were not, it is the Examiner's position that the transaction should be recharacterized as if the Mortgage Borrowers received the loan proceeds, advanced the loan proceeds through intercompany advances from the Mortgage Borrowers up the chain of entities, through the Mezzanine Borrowers, and finally to Homestead and ESI who then paid the Sellers under the Acquisition Agreement.  Under the Mortgage Loan Documents and Mezzanine Loan Documents, no dividends could have been made following the Closing, and no dividends were recorded by any Extended Stay Debtor.  The only remaining alternative is the upstream transfer by intercompany loans.  As a result, if the Mortgage Debtors were substantively consolidated separately from the Mezzanine Debtors, then the Mortgage Debtors' merged Estates would have intercompany claims against the

Stay Estates are substantively consolidated, or if the Mezzanine Debtors (which would include the Estates of Homestead and ESI) were substantively consolidated, the transferor would be the merged Estates of these substantively consolidated Debtors' Estates.

### (c) Transfers to the Professionals

For the reasons set forth above, the transfers to the Professionals were also made by Homestead and ESI, and substantive consolidation would have the same result on those transfers as was suggested above with respect to the transfers to the Sellers.

### (d) Transfers to the Buyer

The transfers made by Homestead and ESI to the Sellers were for the benefit of the Buyer. Under the Acquisition Agreement, the Buyer was obligated to the Sellers for the Purchase Price. Homestead and ESI were not obligated for the Purchase Price, nor were any of the Borrowers. The payment of the Purchase Price to the Sellers was for the benefit of the Buyer since this payment satisfied the Buyer's obligation to the Sellers to pay the Purchase Price.[895] Substantive consolidation would have the same result on those transfers as was suggested above with respect to transfers to the Sellers.

### (e) Recharacterization of the Transfers

There are alternative ways to recharacterize the payments under the Acquisition Agreement other than as direct payments from Homestead and ESI, or from the Borrowers. Each alternative has implications on claims against the Sellers, the Buyer, the Professionals, and other parties, as follows:

(1) The transfers to Sellers and the Professionals were the result of loans by Homestead to DL-DW, and loans by ESI to BHAC and then to DL-DW.[896]

---

merged Estates of the Mezzanine Debtors, but the direct claim against the Sellers would still reside with the Mezzanine Debtors since Homestead and ESI would be part of the Mezzanine Debtors' substantively consolidated Estates. Notwithstanding substantive consolidation, under the Intercreditor Agreement, the Mezzanine Lenders are not entitled to benefit from any invalidation of the Mortgage Lenders' liens or Mortgage Debt. *See* Report § III.E.3.

[895] *See* Report § III.D.

[896] *See* Report § III.D.

(2)     Upon receipt of the loans referred to in (1) above, DL-DW paid the Sellers the balance of the Purchase Price of over $1.7 billion, and the Professionals' fees that Buyer owed.  Since it is unlikely that either DL-DW or BHAC had the ability to repay Homestead or ESI at the time of the Closing, or within the foreseeable future, those loans might be considered constructive fraudulent transfers.[897]  The Sellers and the Professionals were subsequent transferees from DL-DW or BHAC, the initial transferees, or the loans were made for the benefit of the Sellers and the Professionals since the loans enabled the Buyer to pay the portion of the Purchase Price that was owed by the Buyer to Seller, and to pay the Professional Fees that the Buyer owed.[898]

(3)     In the case of Homestead, the payments to the Sellers were for the redemptions or buy-backs of the Sellers' LLC membership interests in Homestead.  Homestead subsequently reissued or resold those LLC membership interests in Homestead to Buyer for which nothing was paid by Buyer.[899]

(4)     In the case of ESI, since BHAC is not a Debtor, and ESI's equity interests were not transferred, the payments to Sellers were dividends by ESI to BHAC which were paid directly to Sellers, in consideration for the transfer of BHAC's equity interests from Sellers to Buyer.[900]

## B.     **Matters Regarding Corporate Form**

As discussed in Section V.A.3. of the Report, the financing of the Acquisition and the resulting corporate structure of the Company present interesting analytical challenges.  At least one scholarly article[901] written in 2005 recognized that, although no court had yet grappled with the structural problems caused by complex mezzanine financing arrangements at that time, those problems would inevitably surface.  The Examiner believes that the Chapter 11 Cases may

---

[897]     *See* Report § V.C.2.d(3).

[898]     *See* Report §§ V.C.2.d.; V.C.4.d; V.D.4&6.

[899]     *See* Report § V.D.1.

[900]     *See* Report §§ V.D.1, 4&6.

[901]     Andrew Berman, "*Once a Mortgage, Always a Mortgage:" The Use (and Misuse) of Mezzanine Loans and Preferred Equity Investments*, 11 Stan. J.L. Bus. & Fin. 76 (2005).

present one of the first opportunities for a court to review several legal questions that arise from a leveraged buy out like the Acquisition, which relied heavily on mezzanine financing. Among these questions is whether the corporate forms of the numerous Debtors ought to be disregarded in bankruptcy.

Courts generally respect the corporate separateness even of closely affiliated entities.[902] Where equity requires, however, bankruptcy courts are empowered to disregard the corporate form and consolidate the assets of multiple entities.[903] Because much of the following analysis of legal claims will be affected by how the Debtors' structure is viewed, the Examiner first discusses whether the evidence supports the substantive consolidation of some or all of the Debtors' Estates.

### 1. Substantive Consolidation

#### a. Generally

Substantive consolidation has no express statutory foundation in the Bankruptcy Code, but has been among a bankruptcy court's powers for almost seventy years.[904] The Court of Appeals for the Third Circuit recently summarized the effect of substantive consolidation as follows:

---

[902] *See generally Chemical Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 848 (2d Cir. 1966) (Friendly, J. concurring) ("I cannot agree that a practice of handling the business of a group of corporations so as to impede or even prevent completely accurate ascertainment of their respective assets and liabilities in their subsequent bankruptcy justifies failure to make every reasonable endeavor to reach the best possible approximation in order to do justice to a creditor who had relied on the credit of one – especially to a creditor who was ignorant of the loose manner in which corporate affairs were being conducted. Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite . . . ."); *see also Anderson v. Abbott*, 321 U.S. 349, 361-62 (1944) ("Normally, the corporation is an insulator from liability on claims of creditors. . . . Limited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted.").

[903] *See Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219 (1941) ("The power of the bankruptcy court to subordinate claims or to adjudicate equities arising out of the relationship between the several creditors is complete."); *see also Anderson*, 321 U.S. at 363 ("We are dealing here with a principle of liability which is concerned with realities not forms."); *Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Ass'n*, 247 U.S. 490, 501 (1918) ("[T]he courts will not permit themselves to be blinded or deceived by mere forms or law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require.").

[904] *See Sampsell.*, 313 U.S. at 219 (1941). The "authority to order substantive consolidation [has been] implied from the bankruptcy court's general equitable powers." *Reider v. FDIC (In re Reider)*, 31 F.3d 1102, 1105 (11th Cir. 1994) (citing *Pepper v. Litton*, 308 U.S. 295, 304 (1939)).

246

Substantive consolidation, a construct of federal common law, emanates from equity. It treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.[905]

Because substantive consolidation affects the substantive rights of creditors, courts have stressed that it should not be used solely for administrative or analytical convenience. Indeed, most courts apply the principle that, "[t]he power to consolidate should be used sparingly because of the possibility of unfair treatment of creditors of a corporate debtor who have dealt solely with that debtor without knowledge of its interrelationship with others."[906] Still, substantive consolidation is a powerful tool available to bankruptcy courts that may be used to ensure the equitable treatment of creditors.[907] In light of that purpose, several courts have specifically authorized consolidation to enhance the collective's ability to avoid transfers for the benefit of creditors.[908]

---

[905] *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005) (quoting *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 423 (3d Cir. 2005)); *see also Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.)*, 392 B.R. 541, 552 (S.D.N.Y. 2008) (holding that "[s]ubstantive consolidation results in the pooling of multiple entities' assets and claims, which allows those entities to satisfy their liabilities from a common fund, to eliminate inter-company claims, and to combine the entities' creditors for purposes of voting on reorganization plans. . . . Its 'sole purpose' is 'to ensure the equitable treatment of all creditors,' and it is to be used 'sparingly.'") (quoting *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988)).

[906] *In re Reider*, 31 F.3d at 1107 (quoting *Flora Mir Candy Corp. v Dickson & Co. (In re Flora Mir Candy Corp.)*, 432 F.2d 1060, 1062-63 (2d Cir. 1970)); *see also Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 767 (9th Cir. 2000) (explaining that, "almost every other court has noted, [that substantive consolidation] should be used 'sparingly'"); *but see* Kenneth C. Kettering, *Securitization And Its Discontents: The Dynamics Of Financial Product Development*, 29 Cardozo L. Rev. 1553, 1625-31 (2008) (noting that, "despite the cases' liturgical repetition that the doctrine is to be applied 'sparingly,' a study found that it has been applied in a majority of recent large public bankruptcy cases.") (citing William H. Widen, *Prevalence of Substantive Consolidation in Large Bankruptcies from 2000 to 2004: Preliminary Results*, 14 Am. Bankr. Inst. L. Rev. 47, 53-54 (2006)).

[907] *See In re Augie/Restivo Baking Co.*, 860 F.2d at 515.

[908] *See, e.g.*, *In re Bonham*, 229 F.3d at 768 (explaining that, "[t]he primary motivation for ordering substantive consolidation in the instant appeal is to allow the trustee to pursue avoidance actions"); *see also Kroh Bros. Dev. Co. v. Kroh Bros. (In re Kroh Bros. Dev. Co.)*, 117 B.R. 499, 502 (W.D. Mo. 1989) (affirming consolidation order providing *nunc pro tunc* relief, which allowed trustee to pursue avoidance actions).

247

Substantive consolidation requires a fact-specific analysis and is decided on a case-by-case basis.[909]  In *Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*,[910] the Second Circuit established what has become the predominant standard for authorizing substantive consolidation.  The court determined that the "two critical factors" in determining whether substantive consolidation is appropriate are "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors."[911]  The presence of either factor is sufficient to grant substantive consolidation.[912]

Numerous courts have adopted and explained the test set forth above,[913] and courts in the Southern District of New York have found a variety of factors persuasive in demonstrating the "lack of separate identity" prong, including, *inter alia*: operation under unified direction and

---

[909]   2 Collier on Bankruptcy ¶ 105.09[2] (15th ed. rev. 2002) (citing *In re Crown Mach. & Welding, Inc.*, 100 B.R. 25, 27-28 (Bankr. D. Mont. 1989)); *FDIC v. Colonial Realty Co.*, 966 F.2d 57, (2d Cir. 1992); *Central Claims Servs. v. Eagle-Picher, Ltd. (In re Eagle-Picher Ind., Inc.)*, 192 B.R. 903, 905 (Bankr. S.D. Ohio 1996)).

[910]   860 F.2d 515 (2d Cir. 1988).

[911]   *Id.* at 518 (emphasizing with respect to the first factor that, "creditors who make loans on the basis of the financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan," and, with respect to the second factor, "the commingling of the debtors' assets and operations must be so intertwined that it would be prejudicial not to order substantive consolidation."); *see also In re Source Enters., Inc.*, 392 B.R. 541, 553-54 (S.D.N.Y. 2008) (stating that, "[t]he question, of course, is not whether some affairs were not entangled, but rather whether the commingling in this case was so pervasive that the time and expense necessary even to attempt to unscramble the debtors' books would be 'so substantial as to threaten the realization of any net assets for all the creditors . . . or where no accurate identification and allocation of assets is possible.") (internal quotations omitted).

[912]   *In re Augie/Restivo Baking Co.*, 860 F.2d at 518; *see also In re Bonham*, 229 F.3d at 766.

[913]   *See, e.g., In re Bonham*, 229 F.3d at 766.  In *In re Owens Corning*, the Third Circuit also followed the Second Circuit's test, which it recharacterized as follows:

        what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

        *In re Owens Corning*, 419 F.3d 195, 212 (3d Cir. 2005) (and stating that disregard of separate entities may be established by evidence that the debtors, "creat[ed] contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity," and, where creditors are moving for consolidation, they must also "show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity"; creditors may defeat consolidation, however, "if they can prove they are adversely affected and actually relied on debtors' separate existence").

248

control, failure to observe corporate formalities, dissemination of consolidated financial information to creditors, use of consolidated cash management systems, and whether one entity was run in the interest of another.[914]

A recent opinion from the District Court for the Southern District of New York in *Windels Marx Lane & Mittendorf, LLP v. Source Enterprises, Inc. (In re Source Enterprises, Inc.)*,[915] is instructive. The debtors in that case consisted of 19 entities, including both corporations and LLC entities, the majority of which were subsidiaries of 3 primary debtor

---

[914] *In re The Leslie Fay Cos.*, 207 B.R. 764, 771 (Bankr. S.D.N.Y. 1997); *see also In re Lionel L.L.C.*, No. 04-17324, 2008 Bankr. LEXIS 1047, at *1 (Bankr. S.D.N.Y. Mar. 31, 2008) (finding that, "[a]s a result of the Debtors' integrated and interdependent operations, substantial intercompany guaranties, common officers and directors, common control and decision making, reliance on a consolidated cash management system, and dissemination of principally consolidated financial information to third parties, the Debtors believe that they operated, and creditors dealt with the Debtors, as a single, integrated economic unit."); *cf. In re 599 Consumer Elecs., Inc.*, 195 B.R. 244 (S.D.N.Y. 1996) (consolidation was not appropriate where there was no evidence of creditor confusion as to the debtors' separateness).

Factors considered by other courts to be persuasive in demonstrating a lack of separate identity include:

- the degree of difficulty in segregating individual assets and liabilities;
- the presence or absence of consolidated financial statements;
- the commingling of assets and business functions;
- the unity of interests and ownership between the various corporate entities;
- the existence of parent and inter-corporate guarantees on loans;
- the transfer of assets without the formal observance of corporate formalities;
- parent corporation owns all or a majority of the capital stock of the subsidiary;
- parent and subsidiary have common officers and directors;
- parent finances subsidiary;
- parent is responsible for incorporation of subsidiary;
- subsidiary has grossly inadequate capital;
- parent pays salaries, expenses or losses of subsidiary;
- subsidiary has substantially no business except with parent;
- subsidiary has essentially no assets except for those conveyed by parent;
- parent refers to subsidiary as department or division of parent;
- directors or officers of subsidiary do not act in interests of subsidiaries, but take directions from parent; and
- formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

*In re Vecco Constr. Indus., Inc.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980); 2 Collier on Bankruptcy ¶ 105.09[2][a] (15th ed. rev. 2002) (citing *In re Tureaud*, 45 B.R. 658, 662 (Bankr. N.D. Okla. 1985), *aff'd*, 59 B.R. 973 (N.D. Okla. 1986)). In considering these factors, courts have stressed that no one or combination of factors is determinative.

[915] 392 B.R. 541, 552 (S.D.N.Y. 2008).

entities.[916]  The lower court[917] had confirmed a plan of reorganization that resulted in the substantive consolidation of the debtors' estates over the objection of a creditor that opposed its treatment under the plan.  In addition to finding a "substantial identity between the entities to be consolidated," the bankruptcy court also held that consolidation would cause no prejudice to creditors because a secured creditor of the debtors "had a claim 'far in excess' of the entire value of the debtors' assets," and unsecured creditors would be subordinated to the secured creditor's claim even in the absence of consolidation.[918]

Following a recitation of the Second Circuit's standard for consolidation set forth in *In re Augie/Restivo Baking Co.*, the District Court explained, "[i]n determining whether entities should be consolidated, courts will consider a number of factors, including whether the entities share costs or obligations; fail to observe corporate formalities; or, in the case of a subsidiary and parent, fail to act independently."[919]  Notwithstanding the creditor's contention that each of the debtor entities was formed for its own purposes, maintained its own creditor body, conducted business independently of the primary debtors, and incurred its own expenses, the court concluded that substantive consolidation was appropriate in that case.

The District Court found the following evidence persuasive in concluding that the debtors in *In re Source Enterprises, Inc.* operated as a single economic unit: (i) creditors "dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit," (ii) "all of the economic activity of debtors was maintained only on [a single debtor's] books and records," (iii) the President and CEO of debtors "testified that the debtors were treated 'all as one company,'" (iv) "[c]reditors also used the various debtors' names interchangeably and regarded the debtors as a single economic entity," (v) "most--although not all--of the subsidiary debtors consisted of nothing more than 'minute books' on a shelf," and (vi) "the debtor entities were run as one company without observing corporate formalities and [ ]

---

[916] *Id.* at 545.

[917] *In re Source Enters., Inc.*, No. 06-11707 (AJG), 2008 Bankr. LEXIS 934 (Bankr. S.D.N.Y. Apr. 4, 2008).

[918] *In re Source Enters.*, 392 B.R. at 546-47.

[919] *Id.* (citing *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992)).

537960v2

all of the finances were handled through [a single debtor]."[920]  The District Court also referenced the lower court's findings that "the debtors had the same officers, directors, and shareholders, conducted the same business operations under similar names, corporate formalities were not observed for inter-company dealings, and accounts receivable were billed from [a single debtor] alone."[921]  On these facts, the District Court held that the first *Augie/Restivo* factor had been met.

The District Court also held that the second factor of the *Augie/Restivo* test was met in that case, because substantive consolidation would not prejudice the debtors' creditors.[922] Referencing the bankruptcy court's findings that the debtors' affairs were sufficiently entangled, the District Court agreed with the lower court that "all creditors would benefit from a substantive consolidation, especially because under any other iteration of the Plan, all of the creditors would be subordinated to [the secured creditor]."[923]

### b.    Consolidation of a Debtor with Non-Debtors

Most courts, including the Second Circuit, have permitted the substantive consolidation of non-debtor entities with a debtor pursuant to the same standard applicable to the consolidation of multiple debtors.[924]  Indeed, several courts have recognized that the doctrine of substantive consolidation was born out of the Supreme Court's ruling in *Sampsell v. Imperial Paper & Color Corp.*, wherein the Court affirmed a bankruptcy referee's order to marshal a non-

---

[920]    *Id.*

[921]    *Id.*

[922]    *Id.* at 554.

[923]    *Id.*

[924]    *See, e.g., Soviero v. Franklin Nat'l Bank of Long Island*, 328 F.2d 446 (2d Cir. 1964); *In re Bonham*, 229 F.3d 750, 765 (noting that the substantive consolidation of a debtor with non-debtors is within the equitable powers of the bankruptcy court and citing cases); *see also In re Owens Corning*, 419 F.3d 195, 208, n.13 (3d Cir. 2005) (noting that courts "have not restricted the remedy to debtors, allowing the consolidation of debtors with non-debtors," and citing cases); *In re Munford, Inc.*, 115 B.R. 390, 397-98 (Bankr. N.D. Ga. 1990) (applying the two-part substantive consolidation test of the Second Circuit and consolidating the debtor with a non-debtor entity); *cf. Official Comm. Of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 463 (Bankr. S.D.N.Y. 2006) (stating, "[a]lthough there is some authority to the contrary, it is assumed that in an appropriate case, it would be possible for the bankruptcy court to substantively consolidate debtor and non-debtor entities.").

debtor entity's assets for the benefit of the debtor's estate, which it described as "consolidating the estates."[925]

### c.    Consolidation of Special Purpose Entities

At least one circuit court has recognized that, "[w]ithout the check of substantive consolidation, debtors could insulate money through transfers among inter-company shell corporations with impunity."[926]  Still, some courts have found that where a lender negotiates to extend credit to certain entities within a corporate enterprise, and each entity maintains its separateness from the others, a court will respect the parties' intentions and refuse to substantively consolidate the entities to the detriment of the lender.[927]

The law is little developed with respect to whether courts will analyze substantive consolidation any differently when confronted with an effort to consolidate a debtor with a special purpose entity.  Such entities are generally created to insulate assets from related entities,

---

[925]  *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219 (1941); *see also White v. Creditors Serv. Corp. (In re Creditors Serv. Corp.)*, 195 B.R. 680, 689 (Bankr. S.D. Ohio 1996) (authorizing substantive consolidation of debtors and nondebtors and relying on *Sampsell* as authority); Norton Bankruptcy Law & Practice, § 21:15 (3d ed. 2008) (stating that, "bankruptcy courts clearly have the power to substantively consolidate debtor and nondebtor entities," and citing *Sampsell*); 2 Collier on Bankruptcy ¶ 105.09[1][c] (15th rev. ed. 2002) (noting that "[m]ost decisions have permitted [substantive] consolidation [of non-debtor entities]."). Some courts have cautioned against the consolidation of a debtor with a non-debtor entity, however, or have suggested that a stricter standard would apply.  *See, e.g., Wells Fargo Bank of Texas N.A. v. Sommers (In re Amco Ins.)*, 444 F.3d 690, 695-96 n.3 (5th Cir. 2006) (recognizing that some courts "have cautioned that 'as careful as the courts must be in allowing substantive consolidation of debtors to occur . . . , the caution must be multiplied exponentially in a situation where a consolidation of a debtor's case with a non-debtor is attempted") (quoting *Morse Operations v. Robins Le-Cocq (In re Lease-A-Fleet)*, 141 B.R. 869 (Bankr. E.D. Pa. 1992); *Helena Chem. Co. v. Circle Land and Cattle Corp. (In re Circle Land and Cattle Corp.)*, 213 B.R. 870, 876-77 (Bankr. D. Kan. 1997).

[926]  *In re Bonham*, 229 F.3d at 764; *see also* Kettering, *supra*, 29 Cardozo L. Rev. at 1625-31 (explaining that, although special purpose entities are generally formed with strict covenants to prevent substantive consolidation, such "separateness covenants" should not prevent consolidation of such entities with a corporate debtor where equity requires and recognizing that such covenants are often not observed by SPEs in any event).

[927]  *See, e.g, In re Cent. European Ind. Dev. Co.*, 288 B.R. 572 (Bankr. N.D. Cal. 2003) (dismissing a motion to substantively consolidate multiple debtors' estates, where one of the debtors was a "bankruptcy-remote" entity and had only a single creditor, which specifically relied on that entity's separateness in extending credit.  The court further found that there was neither excessive entanglement of the debtors' affairs nor common ownership among the entities.); *see also In re Owens Corning*, 149 F.3d 195 (denying substantive consolidation where debtors and lenders had bargained for a separate entity structure, the entities actually maintained their separateness, and the lenders relied on each entity's separate credit).

252

and great effort is often undertaken to guard against the possibility of substantive consolidation of the special purpose entity with a debtor in bankruptcy.[928]

### d.    Partial Consolidation

"'[T]he bankruptcy court has the power, in appropriate circumstances, to order less than complete substantive consolidation, or to place conditions on the substantive consolidation,' including the preservation of avoidance claims by the formerly separate estates."[929]  Thus, where equity requires, a court may order the substantive consolidation of

---

[928] Arguably, the very purpose and design of a special purpose entity demonstrates a lack of separate identity, which may explain why great efforts are generally taken to maintain the separateness of such entities.  *See generally In re Gen. Growth Props., Inc.*, 409 B.R. 43, 61 (Bankr. S.D.N.Y. 2009) (noting that, "[t]here is no question that a principal goal of the SPE structure is to guard against substantive consolidation"); Peter J. Lahny IV, *Asset Securitization: A Discussion of the Traditional Bankruptcy Attacks and an Analysis of the Next Potential Attack, Substantive Consolidation*, 9 Am. Bankr. Inst. L. Rev. 815, 823 (2001) ("The SPV, by design is a 'mere instrumentality' of the originator.").  Courts might be swayed, however, that substantive consolidation principles should be even more sparingly applied in connection with special purpose entities.  For example, after dismissing an argument that a confirmed plan had effected a *de facto* consolidation of "a bankruptcy-remote special purpose entity[,]" the Fifth Circuit Court of Appeals recently stated as follows:

> Substantive consolidation is of special concern in cases involving special purpose entities like Scopac.  Special purpose entities are often used in securitized lending because they are bankruptcy-remote, that is, they decrease the likelihood that the originator's financial trouble will affect the special purpose entity's assets serving as collateral for the notes.  Nevertheless, there is a danger that a court will substantively consolidate the two entities, using the value of the investors' collateral to satisfy the originator's debts.  If courts are not wary about substantive consolidation of special purpose entities, investors will grow less confident in the value of the collateral securing their loans; the practice of securitization, a powerful engine for generating capital, will become less useful; and the cost of capital will increase.

*Bank of N.Y. Trust Co. v. Official Unsecured Creditor's Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 249 n.25 (5th Cir. 2009).

[929] *In re Bonham*, 229 F.3d at 769 (quoting *Gill v. Sierra Pac. Const., Inc. (In re Parkway Calabasas Ltd.)*, 89 B.R. 832, 837 (Bankr. C.D. Cal. 1988)); *see also First Nat'l Bank v. Giller (In re Giller)*, 962 F.2d 796, 799 (8th Cir. 1992) (holding that "[t]he bankruptcy court retains the power to order a less than complete consolidation").  Indeed, the Supreme Court's opinion in *Sampsell* is often cited as authority not only for the deep roots of the doctrine of substantive consolidation generally, but also for a court's power to order a "partial" consolidation, where equity requires.  *Sampsell*, 313 U.S. at 219, 221 (explaining that, "where the relationship between the stockholder and the corporation was such as to justify the use of summary proceedings to absorb the corporate assets into the bankruptcy estate of the stockholder, the corporation's unsecured creditors would have the burden of showing that their equity was paramount in order to obtain priority as respects the corporate assets," and recognizing that different treatment may be appropriate where consolidation "would work an injustice," but denying such relief to a creditor that "had at least some knowledge as to the fraudulent character of [the] corporation."); *see also* Kettering, *supra*, 29 Cardozo L. Rev. at 1631 (noting that, "*Sampsell* itself distinguished between substantive consolidation and the priorities of creditors' claims against the consolidated estate").

multiple entities, but continue to treat certain claims as if no consolidation had occurred.[930]

Similarly, where consolidation would have the effect of eliminating avoidance claims that would otherwise remain valuable to the consolidated estate, a court may condition consolidation on the preservation of such claims.[931]

Although cases effecting a partial or conditional consolidation appear relatively infrequently, the Examiner submits that nothing has deprived bankruptcy courts of the remedy since the United States Supreme Court implicitly endorsed it in *Sampsell*.[932]

---

[930] *See, e.g.*, *FDIC. v. Hogan (In re Gulfco Inv. Corp.)*, 593 F.2d 921, 929 (10th Cir. 1979) (recognizing earlier precedent that certain creditors of a consolidated entity might be entitled to priority and stating, "[t]hus creditors who were innocent victims were entitled to have their rights recognized.") (citing *Fish v. East*, 114 F.2d 177 (10th Cir. 1940)); *see also* Mary Elisabeth Kors, *Altered Egos: Deciphering Substantive Consolidation*, 59 U. Pitt. L. Rev. 381, 391, 450-51 (1998) (citing cases); Kettering, *supra*, 29 Cardozo L. Rev. at 1631 (explaining that cases after *Sampsell* have "stated that when substantive consolidation is ordered, innocent unsecured creditors who relied on the separateness of an entity being consolidated are entitled to a distribution calculated as if the consolidation had not occurred.").

By contrast, courts may also use their equitable powers to prevent a creditor from reaping a windfall as the result of consolidation. For example, in *Talcott v. Wharton (In re Cont'l Vending Mach. Corp.)*, 517 F.2d 997, 1001 (2d Cir. 1975), the Second Circuit upheld the substantive consolidation of a parent corporation and its wholly-owned subsidiary. A creditor holding an over-secured claim against the subsidiary and an independent, under-secured claim against the parent argued that it should be permitted to satisfy its separate debts against the combined assets of the consolidated entities. *Id.* at 999. The Court held that equity did not justify such a result because the creditor had not bargained for those rights, and explained:

> We have made it very plain that because consolidation in bankruptcy is "a measure vitally affecting substantive rights," the inequities it involves must be heavily outweighed by practical considerations . . . . Thus, there is nothing to say for the proposition that in the exercise of the bankruptcy court's equity powers, it cannot treat unsecured claims as consolidated and secured claims as not . . . . In the allowance or disallowance of claims, the court has the equitable power . . . to make certain that injustice or unfairness does not occur.

*Id.* at 1001 (quoting *Sampsell*, 313 U.S. at 219).

[931] *See, e.g., In re Bonham*, 229 F.3d at 769 (conditioning consolidation upon the preservation of certain avoidance claims); *see also First Nat'l Bank of El Dorado v. Giller (In re Giller)*, 962 F.2d 796, 799 (8th Cir. 1992) (stating that, "eliminating the trustee's avoidance power after consolidation would also eliminate the very reason for ordering consolidation in the first place," and preserving actions to avoid transfers by one debtor to a third party for the benefit of another debtor for the benefit of the consolidated estate).

[932] *In re Giller*, 962 F.2d at 799 ("[T]he bankruptcy court retains the power to order a less than complete consolidation."); *In re Parkway Calabasas, Ltd.*, 89 B.R. at 837 (Bankr. C.D. Cal. 1988) ("The bankruptcy court has the power, in appropriate circumstances, to order less than complete substantive consolidation, or to place conditions on the substantive consolidation. Where, for example, property subject to a security interest would be enlarged by substantive consolidation . . . , the court may qualify the consolidation to protect unsecured creditors. The court may order consolidation with respect to unsecured claims, and leave the cases unconsolidated with respect to secured claims. Where property subject to a security interest would disappear, such as stock in a subsidiary to be substantively consolidated with a parent corporation, the secured creditor is entitled to have the security valued and to receive an appropriate priority in a reorganization plan.") (citing *In*

### e.    Substantive Consolidation of the Debtors Is Appropriate

As set forth above, substantive consolidation is appropriate under the law of this Circuit where either multiple entities operate as a "single economic unit" or the entities' affairs are so entangled that consolidation will benefit all creditors.  The Examiner has concluded that all of the Debtors' Estates should be substantively consolidated under this standard.

### (1)    The Debtors Operated As a Single Economic Unit

The Examiner's review of the Debtors' operations reveals that many, if not all of the factors considered by the courts of this Circuit to be persuasive evidence of a "lack of separate identity" are present here.  Perhaps most important to the substantive consolidation analysis, the overwhelming majority of the Debtors' creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit.  Each of the Mortgage Lenders and the Mezzanine Lenders knowingly lent into the Debtors' intermingled structure and premised their loans on the credit-worthiness of the Company as a whole.  Both at the time the Loan Agreements were executed and after that date the Debtors operated as a "single economic unit" (as described below), and there is no evidence that the Mortgage Lenders or the Mezzanine Lenders ever considered the credit-worthiness of any individual Debtor at the time they extended credit under the Loan Agreements.

Moreover, as best as the Examiner can tell, the Debtors made no effort to maintain their separateness.  As set forth in more details in Sections III.E. and III.F of this Report, the Examiner has determined the following facts to be true of the Debtors' operations:

- The business and affairs of each of the Debtors are managed and controlled by HVM Manager, of which Mr. Lichtenstein is the sole member;

- The Company's operations were integrated and interdependent and each of the Debtors was run in the interest of the Buyer;

- With few exceptions, all of the Debtors are wholly-owned by the Buyer;

---

re Cont'l Vending Mach. Corp., 517 F.2d at 999; In re Pittsburgh Rys. Co., 155 F.2d 477, 484-85 (3d Cir. 1946), cert. denied, 329 U.S. 731 (1946)).

- The Debtors were treated internally as part of one Company;

- None of the individual Mortgage Borrowers or individual Mezzanine Borrowers kept their own books and records;

- The Company disseminated consolidated financial information to third parties;

- *No* bank accounts were maintained by the Mezzanine Borrowers. The Mortgage Borrowers generally only maintained depository bank accounts that were swept into the Cash Management Account;

- Debt to the Mortgage and Mezzanine Lenders was recorded *only* at the ESI and Homestead levels,[933] and debt service was paid only from the Debtors' consolidated Cash Management Account;

- All salaries, revenues and working capital of the Debtors were generally funded from the Company's consolidated Cash Management Account and Working Capital Reserve Account;[934]

- Individual Mortgage Borrowers and Mezzanine Borrowers had no separate capital;

- The Debtors failed to observe corporate formalities for intercompany transfers, which generally have not been recorded among the individual Debtors;

- The Debtors' assets and business functions were commingled and would be difficult to segregate;

- Creditors exhibited confusion as to which entity was the creditor's obligor;

- Mr. Lichtenstein executed guarantees with respect to the obligations of each Borrower;

- The Debtors have common officers and directors;

- The Mortgage Borrowers are jointly and severally liable on the Mortgage Debt, and the Mezzanine Debt acts as indirect mortgages against the Mortgaged Properties;

- Features of the Mezzanine Debt suggest that it was cross-collateralized;

- Features of the Contribution Agreement among the Mezzanine Borrowers prevent any individual Mezzanine Borrower from enforcing its contribution rights against the others until after all of the Mezzanine Debt and Mortgage Debt has been paid in full.

---

[933] Specifically, the Mortgage Debt and Mezzanine Debt were recorded at ESI and Homestead through accounting database levels 10 and 03, respectively. *See* Report § III.F.

[934] Working capital needs were generally funded through (1) disbursements to the Company from the Cash Management Account and (2) funds available in the Working Capital Reserve Account held by DL-DW.

Indeed, few objective indices of corporate separateness exist here. For these reasons, the Examiner submits that the Debtors' Estates[935] should be substantively consolidated.[936]

To the extent that any creditors did rely upon the separate credit of any of the individual Debtors, and those creditors would be unfairly prejudiced as the result of the substantive consolidation of the Debtors, the Court could avoid any such prejudice by granting some form of priority to those claims following consolidation, based upon the authority cited above.[937] Moreover, to the extent that substantive consolidation of the Debtors might result in the elimination of certain avoidance powers held by the individual Debtors' Estates, the Court could condition consolidation on the preservation of those powers for the benefit of the consolidated Debtors.

Finally, although the Mortgage Borrowers and the Mezzanine Borrowers are arguably special purpose entities and ordering the substantive consolidation of those entities is perhaps facially less appealing, the Examiner submits that the consolidation of those entities is appropriate on the facts of this case. As set forth above, the evidence available to the Examiner confirms that the Mortgage Borrowers and the Mezzanine Borrowers simply did not maintain

---

[935] The Mortgage Debtors' Plan provides for the substantive consolidation of the 39 Debtors that filed and joined in the Mortgage Debtors' Plan. The Examiner agrees with that result. If the Estates of the 36 additional Debtors that have not been included in the Mortgage Debtors' Plan are not substantively consolidated with the Estates of such 39 Debtors, then it is the Examiner's position that the Estates of the 36 additional Debtors ought to substantively consolidated with each other. If that occurs, the Intercreditor Agreement provides that the claims of each Mezzanine Lender is subordinated to the claims of the other Mezzanine Lenders at lower tier Mezzanine Borrowers. *See* Report § III.E. In addition, special treatment may be warranted for the Non-Mezzanine Unsecured Debt, if any, and 9.875% Notes at ESI.

[936] In light of the fundamental character of the Mezzanine Debt as junior secured debt, as discussed in Report § V.B.1.(e)(2) of the Report, the Examiner sees no clear reason why only the Mortgage Debtors should be consolidated. To the contrary, there is no principled reason why third party creditors should be prejudiced by any aspect of the Debtors' comingled structure.

[937] For example, the Mezzanine Borrowers agreed to be structurally subordinate to the Non-Mezzanine Unsecured Debt. If all of the Debtors' Estates are substantively consolidated, or if the Estates of the 36 Debtors that are not part of the Mortgage Debtors' Plan are separately substantively consolidated with each other, priority may be given to the claims of the Non-Mezzanine Unsecured Debt over the claims of the Mezzanine Debt. Similarly, it may be appropriate to grant priority to the 9.875% Notes at ESI over the unsecured deficiency claims of the Mortgage Lenders and the unsecured claims of the Mezzanine Lenders under either substantive consolidation scenario, since as a result of the LBO, more than $2 billion of additional debt was created which substantially diluted the claims of the 9.875% Notes at ESI.

any semblance of corporate separateness from the other Debtors, and each other.[938]  This is simply not a case involving special purpose entities that took the steps necessary to ensure the level of separateness that would withstand consolidation.[939]

### (2) Creditors Will Not Be Prejudiced By Consolidation of the Debtors' Estates

Moreover, no prejudice will result to the Mortgage and Mezzanine Lenders as the result of the substantive consolidation of the Debtors, because the Mortgage and Mezzanine Lenders are bound to the terms of the Intercreditor Agreement.  That agreement dictates the rights and priorities between the Mortgage Lenders and the Mezzanine Lenders, regardless of consolidation.  Similar to the facts present in *Source Enterprises*,[940] where the District Court concluded that unsecured creditors would not be prejudiced by substantive consolidation when their claims would have been subordinated to the rights of a secured creditor whether or not consolidation was ordered, the presence of the Intercreditor Agreement will dispel any possible prejudice to the Mortgage and Mezzanine Lenders arising from consolidation in this case.  Since the consolidation of the Mezzanine Borrowers with the Mortgage Borrowers will not prejudice any party in interest, and for all of the reasons set forth above, the Examiner maintains that the consolidation of all of the Debtors' Estates is appropriate.

Additionally, the Examiner finds persuasive the fact that substantive consolidation of the Estates in these cases would treat the Mezzanine Debt in effectively the same way that

---

[938] Although each of the Mezzanine Borrowers obtained a legal "non-consolidation" opinion letter, it appears to the Examiner that those entities made no effort to effect or preserve the "separateness covenants" that underlie the numerous assumptions upon which those legal opinions are based.  The Examiner is not persuaded that legal opinions premised upon completely unfounded assumptions about separateness should contradict the overwhelming evidence that no such separateness was maintained here.

[939] Although the Examiner appreciates the role that special purpose entities play in the broader marketplace, the substantive consolidation of the Mezzanine Borrowers should not disrupt any expectations held in the market.  Where the intent of parties is to create an entity that will withstand consolidation, the Examiner maintains that the parties should be responsible for ensuring that those entities remain separate in practice.  Here, however, the Mezzanine Borrowers simply took no action to maintain their separateness from the other Debtors.

[940] *Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc (In re Source Enters. Inc.)*, 392 B.R. 541 (S.D.N.Y. 2008).  It should also be pointed out that under the Mortgage Debtor's Plan, the thirty-nine Debtors governed by the plan take the position that the Mortgage Lenders are undersecured to the extent of over $900 million and that the Mezzanine Lenders are totally unsecured.  §4.2(b)(ii) of the Mortgage Debtors' Plan at 19.

Andrew R. Berman in *"Once a Mortgage, Always a Mortgage" – The Use (and Misuse of) Mezzanine Loans and Preferred Equity Investments*,[941] urges that, for historical, policy, and practical reasons, mezzanine financing should be treated.  Tracing developments in real estate financing from the middle ages to the present, the author sees mezzanine financing as the latest step[942] in an historic pattern, with lenders over time creating new contractual devices to increase their rights,[943] and courts of equity intervening to level the playing field by modifying the lenders' rights under each new financing arrangement,[944] and believes that the intervention of the courts is once again necessary to deal with mezzanine financing.

Recognizing that "courts have not had the opportunity to review the structure of these new financing techniques and it remains unclear whether courts will respect the crafty legal structures underlying mezzanine loans,"[945] Mr. Berman argues that mezzanine financing is functionally the same as junior mortgages, and should be so treated.

Establishing a number of factors for analyzing whether a given mezzanine financing should be treated as a junior mortgage,[946] all of which seem to apply to the debt

---

[941]  11 Stan. J. L. Bus. & Fin. 76 (2005)

[942]  *Id.* at 113 ("We are now also in a new era of real estate law where lenders and borrowers structure financing transactions to resemble something other than a junior mortgage.").

[943]  *Id.* at 85 ("From the first use of Glanville's gage to Bracton's mortgage and then Littleton's gage, the lender increasingly obtained stronger rights in the mortgaged land."); *id.* at 113 ("To accomplish this task and later to avoid the borrower's equity of redemption, lenders structured and documented these early financing transactions to appear as something other than a mortgage.").

[944]  *Id.* at 113 ("Throughout this early period, judges increasingly began to look beyond the four corners of the contract, disregarding the lender's self-serving characterization of the transaction.").

[945]  *Id.* at 81.  Showing considerable foresight at the time of the article, Mr. Berman predicted that "it is only a question of time before courts will address a similar set of issues that common law courts in England addressed – should these non-traditional financings be treated as mortgage substitutes?"  *Id.* at 116.

[946]  Among the factors that the author believes bear upon the issue of whether a court should treat mezzanine financing as junior mortgages are:

1.  Whether the mezzanine lender is "substantively acting in the same capacity as a junior mortgagee?  Is the mezzanine loan. . . in the intermediate level of the. . . capital structure?  If so, there is an equitable argument that the law ought to treat similarly situated parties in the same manner."  *Id.* at 119-20.

2.  "[W]hat is the loan-to-value ratio of the various financings, and is there any collateral for the mezzanine loan. . . other than the underlying real property?  To the extent that the loan-to-value ratio begins to approach 85%-90% of the value of the property and the only collateral consists entirely of the underlying real property, these non-traditional financings once again begin to look like a junior mortgage."  *Id.* at 120.

3.  Whether the mezzanine loan is "being made simultaneously with, or otherwise in contemplation of, a senior mortgage loan."  "Are the parties attempting to make the related mortgage loan 'securitizable' so

---

259

structure in these cases, and militate in favor of the treatment of the Mezzanine Debt as junior mortgages, Mr. Berman opines that:

> [A] court could easily conclude that mezzanine loans and preferred equity financings remain substantively indistinguishable from junior mortgage financing. Despite the parties' attempt to put in place formalistic and largely artificial legal structures, these transactions remain in essence real estate financings. Simply put, once a mortgage, always a mortgage. If land and real property is to remain an integral part of our financing system, . . . then the law ought to treat mezzanine loans, preferred equity financings and junior mortgages similarly (at least vis-a-vis the senior lender and mortgage borrower). This approach is also consistent with the historical approach that courts have taken with real estate financings.[947]

While the article mentions substantive consolidation[948], it does not suggest substantive consolidation as the means to achieve the proposed resolution. Instead, the author advocates "that courts ought to apply the established body of law relating to mortgage substitutes to these new non-traditional financing techniques,"[949] and should use "traditional property theory":

> [I]n an attempt to undercut the rights and remedies of borrowers, legal practitioners have drafted complicated legal structures and documents for mezzanine loans and preferred equity financings. . . . Since junior mortgages, mezzanine loans and preferred equity financings all occupy the same intermediate position in the capital structure of a property owner, there is no acceptable justification to treat these financings differently. . . Based on the centuries-old property law adage – "once a mortgage, always a mortgage" – mezzanine loans and preferred equity financings are in effect mortgage substitutes, and the law should apply traditional property theory to these new financing techniques and treat them as mortgages.[950]

---

that it may be included in a CMBS transaction? If so, because of the enormous power of the national rating agencies and their near-monopolistic control of the market, it is likely that both the property owner and the non-traditional lender have significantly diminished bargaining power." *Id.*

4. Is it "the intent of the parties that the underlying real property serve as the principal collateral for the mezzanine lender. . .? Are these non-traditional lenders attempting to obtain the same package of rights that a typical junior mortgagee would have? As with traditional mortgage substitutes, the law ought to seek to protect the parties' expectations and intent in entering into these transactions in the first place." *Id.*

[947] *Id.* at 121.

[948] See *id.* at 102 n.133.

[949] *Id.* at 124.

[950] *Id.* at 125.

Since substantive consolidation generally achieves the result called for in the article, there is, in these cases, no need to employ "traditional property theory" to remove the contractual barriers between the Mezzanine Debt and the value in the Mortgaged Properties.

For all these reasons, the Examiner submits that the Debtors' Estates should be substantively consolidated.[951]

## C.    Fraudulent Transfer Claims

Sections 544(a),[952] 544(b),[953] and 548[954] of the Bankruptcy Code allow a trustee or debtor in possession to avoid fraudulent transfers.  Fraudulent transfer claims that might be pursued by the Debtors' Estates (the "Fraudulent Transfer Claims") are discussed here.

---

[951]  The Examiner takes no position as to whether BHAC, DL-DW, and/or other non-Debtors should be substantively consolidated with the Estates.  Whether it would be appropriate to consolidate any non-Debtor entities with the Estates in this case warrants further review.

[952]  Bankruptcy Code section 544(a) provides that:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by –

> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

> (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

> (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

As discussed in Report § V.C.2, section 544(a) allows the trustee to pursue fraudulent transfer actions that would be available to any of the three hypothetical creditors set forth.

[953]  Bankruptcy Code section 544(b) creates the ability to avoid "any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [section 502 of the Bankruptcy Code]."  See Bankruptcy Code section 544(b).  Section 544(b) functionally integrates relevant applicable fraudulent transfer law into the Bankruptcy Code.  To assert a claim under section 544(b), then, one must prove that: (i) there was a transfer of an interest of the debtor in property; (ii) that there actually exists an unsecured creditor holding an allowable claim; and (iii) applicable law allows that unsecured creditor to void the transfer.

[954]  Bankruptcy Code section 548 establishes a separate, federal cause of action for avoiding fraudulent transfers that is similar to the Uniform Fraudulent Transfer Act sections 4 and 5.  Section 548, however, applies only to transfers made or incurred on or within 2 years before the date of the filing of the petition.

1.      **Choice-of-Law**

An analysis of New York choice-of-law principles is required to determine what substantive law applies to the Fraudulent Transfer Claims that may be brought against the Sellers, the Lenders, the Buyer, and the Professionals. In this case, the facts relate to a complex series of transactions involving dozens of parties with contacts in many states, including New York, South Carolina, and Delaware. Nevertheless, for the reasons discussed below, it appears likely that the substantive law of New York should govern the Fraudulent Transfer Claims.

a.      **Analysis**

The Examiner believes that New York choice-of-law principles will apply to the Fraudulent Transfer Claims. According to the Second Circuit, "bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice-of-law rules of the forum state."[955] The forum state in this instance is New York because that is where the Chapter 11 Cases are pending. As such, the Bankruptcy Court must apply the choice-of-law rules of New York *unless* the Fraudulent Transfer Claims implicate federal policy concerns.

Recent decisions from bankruptcy courts in the Southern District of New York have impliedly determined that fraudulent transfer actions do not implicate federal policy concerns. In *Official Committee of Unsecured Creditors of Enron Corp v. Whalen (In re Enron Corp.)*, 357 B.R. 32 (Bankr. S.D.N.Y. 2006), the official committee of unsecured creditors (the "Whalen Committee") brought suit for, among other things, fraudulent transfers pursuant to §§ 270 to 281 of the New York Debtor & Creditor Law (the "NY DCL"). The court determined that Texas state substantive law applied rather than New York state substantive law. In making that determination, the court noted in a footnote that:

> Whalen incorrectly cites the law in arguing that this Court should apply federal choice of law rules to resolve this issue. Whalen cites the Ninth Circuit's decision in *Lindsay v. Beneficial Reinsurance Co. (In re Lindsay)* for the proposition that "[i]n federal question cases with exclusive

---

[955]    *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601-02 (2d Cir. 2001); *see also In re PSINet Inc.*, 268 B.R. 358, 376 (Bankr. S.D.N.Y. 2001) ("Where, as here, this Court's subject matter jurisdiction is based on 28 U.S.C. § 1334, the Court applies, with respect to matters of state law, the conflicts of law principles of the forum state, *i.e.*, the State of New York.").

jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules." 59 F.3d 942, 948 (9th Cir. 1995). The Second Circuit, however, reached the opposite conclusion in *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599 (2d Cir. 2001). In that decision, the court held that bankruptcy courts should apply the choice of law rules of the forum state unless a significant federal policy is implicated, and that the federal interest in national uniformity, as identified by the Ninth Circuit in *Lindsay*, is not such a significant federal policy. *Id.* at 605-07. Nonetheless, the Court reaches the same conclusion applying New York state choice of law rules as it would applying federal choice of law rules, namely, that Texas state substantive law should [sic] applied in the instant proceeding.[956]

In concluding that New York choice-of-law rules applied, the United States Bankruptcy Court for the Southern District of New York implicitly held that the fraudulent transfer actions at issue did not implicate federal policy concerns. Otherwise, adherence to the Second Circuit's decision in *Erkins* would have required the application of federal choice-of-law rules. Thus, *Whalen* stands for the proposition that fraudulent transfer claims that arise under state law do not implicate federal policy concerns.[957] Accordingly, the Examiner will apply the choice-of-law principles of New York with respect to the Fraudulent Transfer Claims.

### (1)    Overview of New York Choice-of-Law Principles

#### (a)    Absent an Applicable Choice-of-Law Provision in the Governing Documents, the "Interest Analysis" Applies

In the absence of an applicable choice-of-law provision in the documents and agreements related to the Acquisition, including, but not limited to, the Mortgage Loan Agreement, the Mezzanine Loan Agreements, and the Acquisition Agreement ("the Acquisition Contracts"), New York choice-of-law principles will apply to the Fraudulent Transfer Claims.[958]

---

[956] *Official Comm. of Unsecured Creditors of Enron Corp v. Whalen (In re Enron Corp.)*, 357 B.R. 32, 50 n.22 (Bankr. S.D.N.Y. 2006).

[957] *See also Savage & Assoc., P.C. v. Mandl (In re Teligent Inc.)*, 380 B.R. 324, 332 n.6 (Bankr. S.D.N.Y. 2008) (applying choice-of-law rules of the forum state with respect to fraudulent transfer action); *Terry v. Walker*, No. 3:04CV00064, 2006 U.S. Dist. LEXIS 24076, at *8 (W.D. Va. March 23, 2006) (holding fraudulent transfer action does not present a federal interest sufficiently compelling to justify federal choice-of-law rules).

[958] The Second Circuit Court of Appeals treats an applicable choice-of-law provision as controlling with respect to fraud-related choice-of-law issues. As such, New York courts should only conduct an "interest analysis" (discussed below in this Section) under New York choice-of-law principles in the absence of an applicable choice-of-law provision. *See Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) ("In the absence of an

263

"Under New York law, in order for a choice-of-law provision to apply to claims for tort[959] arising incident to [a] contract, the express language of the provision must be "sufficiently broad" as to encompass the entire relationship between the contracting parties."[960]  Specifically, with respect to tort claims arising incident to a contract, choice-of-law provisions will be honored if (1) the contractual language includes "arising out of or relating to" language that would extend to the tort in question,[961] and (2) the parties to the tort claim are the same parties as the original parties to the underlying contract.[962]

---

applicable choice-of-law provision, New York has adopted an 'interest analysis. . . .'"); *Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 309-10 (2d Cir. 1994) (applying law provided for under applicable choice-of-law provision without ever conducting an "interest analysis" with respect to common law fraud claims); *Drenis v. Haligiannis,* 452 F. Supp. 2d 418, 425-27 (S.D.N.Y. 2006) (determining choice-of-law provision not controlling before conducting an "interest analysis"); *but see Roselink Investors, L.L.C. v. Shenkman,* 386 F. Supp. 2d 209, 226 (S.D.N.Y. 2004) (analyzing pertinent choice-of-law provision after conducting "interest analysis" and holding law provided under applicable choice-of-law provision should apply with respect to fraudulent transfer claims); *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd.,* No. 94 Civ. 520 (JFK), 1999 U.S. Dist. LEXIS 1265, at *18 (S.D.N.Y. Feb. 8, 1999) (treating "applicable" choice-of-law provision as "influential," but not controlling with respect to choice-of-law issues).

[959] For New York choice-of-law issues, it is fairly well-established that a fraudulent transfer action sounds in tort. *See Advanced Portfolio,* 1999 U.S. Dist. LEXIS 1265, at *15 ("Tort choice-of-law principles are applicable in fraudulent conveyance cases such as the instant case."); *RCA Corp. v. Tucker,* 696 F. Supp. 845, 854 (E.D.N.Y 1988) ("[B]oth logic and authority dictate that the issue presented in this case – whether the assignment of [a] note may be avoided as a fraud on New York creditors – should be characterized as a tort for purposes of selecting the appropriate New York conflict of laws principles."); *Drenis,* 452 F. Supp. 2d at 427 (characterizing fraudulent transfer claims as tort claims under New York choice-of-law rules).

[960] *Krock,* 97 F.3d at 645.

[961] *See Roselink,* 386 F. Supp. 2d at 226 (honoring choice-of-law provision that included "arising out of or relating to" language with respect to fraudulent transfer claim); *Turtur,* 26 F.3d at 310 (honoring choice-of-law provision that included "arising out of or relating to" language with respect to common law fraud claim); *Drenis,* 452 F. Supp. 2d at 426-27 (not honoring choice-of-law provision that did not include "arising out of or relating to" language with respect to fraudulent transfer claim, among other claims); *Knieriemen v. Bache Halsey Stuart Shields, Inc.,* 74 A.D.2d 290, 293 (N.Y. App. Div. 1980) *overruled on other grounds, Rescildo v. R.H. Macy's,* 187 A.D.2d 112 (N.Y. App. Div. 1993) (choice-of-law provision that did not include "arising out of or relating to" language was not broad enough to reach tort claims); *Krock,* 97 F.3d at 645 (2d Cir. 1996) (not honoring choice-of-law provision that did not include "arising out of or relating to" language with respect to fraudulent transfer claim, among other claims).

[962] *See Williams v. Deutsche Bank Sec., Inc.,* No. 04 Civ. 7588 (GEL), 2005 U.S. Dist. LEXIS 12121, *15-16 (S.D.N.Y. June 13, 2005) ("Choice of law provisions do not apply to disputes between entities who were not parties to the contract."); *Cromer Fin. Ltd. v. Berger,* 158 F. Supp. 2d 347, 358 (S.D.N.Y. 2001) (finding that the choice-of-law provision in a contract between multiple defendants did not apply to tort disputes arguably arising under contract because plaintiff investors were not a party to the underlying contract); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F. Supp. 2d 198, 214 (S.D.N.Y. 2002) (with respect to various tort claims against defendants, including fraudulent transfer claims, holding meritless plaintiff's argument that court should give effect to choice-of-law provision in contract that was entered into by plaintiff and some, but not all, of the defendants since "it is well-settled under New York law that a contractual choice of law provision does not bind the contract's parties — let alone individuals who are not parties to the contract

The Examiner believes that, even if the Acquisition Contracts contain the requisite "arising out of relating to language," because of the nature of a fraudulent conveyance claim brought in the context of a bankruptcy, the choice-of-law provisions in the financing and other agreements are entitled to little weight. Although the parties to those documents might properly have expected the choice-of-law provisions to be given effect in any dispute between themselves, a fraudulent conveyance claim would be brought on behalf of the estate and its creditors, including creditors who were not parties to the Acquisition Contracts. The very purpose would be to attack the validity of the contracting parties' interests under the agreements. The Examiner is persuaded by the bankruptcy court's conclusion in *Morse Tool*, that, to the extent that the choice-of-law provisions in the Acquisition Contracts are enforceable, they bind only the parties to such agreements, not the Estates, with respect to avoidance actions relating to the Acquisition Contracts.[963]

---

in question . . . [certain of the defendants] with respect to causes of action sounding in tort"); *Midlantic Bank, N.A. v. Strong*, No. 94 CV 4901 (SJ), 1996 U.S. Dist. LEXIS 22384, *21-22 (E.D.N.Y. November 26, 1996) (holding plaintiff's fraudulent transfer claim against guarantor and his wife was "not necessarily governed by the Guarantee's choice of law provision" because, among other reasons, guarantor's wife, who was allegedly involved in the fraudulent conveyances, "was not a party to that contract"); *Marine Midland Bank v. Portnoy (In re Portnoy)*, 201 B.R. 685, 701 (Bankr. S.D.N.Y. 1996) ("[A] choice of law provision will not be regarded where it would operate to the detriment of strangers to the agreement, such as creditors or lienholders."); *see also Morse Tool, Inc. v. Barclay's Bus. Credit, Inc. (In re Morse Tool)*, 108 B.R. 384, 386-87 (Bankr. D. Mass. 1989):

> The choice-of-law clause carries little weight in the context of this adversary proceeding. The parties to a contract can specify which forum's law will govern their contract, and courts often follow their choice because both parties to the contract, and therefore to the suit on the contract, have agreed upon the choice. But this is a fraudulent conveyance action, not a contract action. And one of the parties to this suit – the Trustee, who stands in the shoes of the creditors – was not a party to the contract. The parties to a contractual conveyance cannot in their contract make a choice-of-law that binds creditors who allege that they were defrauded by the conveyance. The choice-of-law binds only parties to the contract, not the Trustee or the creditors.
>
> . . . .
>
> [T]he contract is not between the parties to the suit, but between two parties whom the plaintiff (a creditor or a bankruptcy trustee) alleges executed the contract for the very purpose of defrauding creditors. In view of this, it makes no sense to follow the choice-of-law clause in the agreement between Barclays and the Debtor. That would be tantamount to giving the defendant unilateral control over the choice-of-law, which clearly would violate the requirements of due process.

[963] *Morse Tool*, 108 B.R. at 386; *accord RCA Corp. v. Tucker*, 696 F. Supp. 845, 853 (E.D.N.Y 1988).

Since there appears to be no applicable choice-of-law provision in the Acquisition Contracts (because at least certain of the creditors of the Estates were not parties to the Acquisition Contracts), the Examiner will apply New York choice-of-law principles to determine what substantive law will govern the Fraudulent Transfer Claims. Under New York's choice-of-law principles, courts will conduct an "interest analysis" with respect to choice-of-law issues concerning torts, including fraudulent transfers.[964] The Southern District of New York has described the "interest analysis" as follows:

> The so-called "interest analysis" is applied in New York to choice-of-law issues concerning torts. Under an interest analysis, the law of the jurisdiction having the greatest interest in the application of its law to the litigation in question will apply. The relevant factors in conducting this analysis are the nature of the legal issue in conflict, the policy or purpose supporting the provision in conflict, and an examination of the contacts of the competing jurisdictions to determine which jurisdiction has the greatest concern with the specific issue in question.[965]

**(b)** **Under an "Interest Analysis," the Fraudulent Transfer Claims will be Governed by the Substantive Law of either New York, Delaware, or South Carolina**

The Examiner acknowledges that the fraudulent transfer provisions of New York, Delaware, or South Carolina may be applicable in the instant cases. Each of the three applicable states has adopted its own fraudulent transfer law: New York has adopted the Uniform Fraudulent Conveyance Act (the "UFCA"), Delaware has adopted the Uniform Fraudulent Transfer Act (the "UFTA"), and South Carolina, which has adopted neither the UFCA nor the UFCA, applies the Statute of Elizabeth to fraudulent transfer claims.

The Examiner also acknowledges that there would be no need to conduct a choice-of-law analysis if the constructive fraudulent transfer provisions of New York, Delaware, and South Carolina were substantively the same.[966] The Examiner notes that certain courts in the

---

[964] *See Advanced Portfolio*, 1999 U.S. Dist. LEXIS 1265, at *15 (applying "interest analysis" to, among other things, fraudulent transfer claim). *See supra* note 959 stating that fraudulent transfer actions sound in tort.

[965] *Advanced Portfolio*, 1999 U.S. Dist. LEXIS 1265, at *15-16 (citations omitted).

[966] *See NextWave Pers. Commc'ns Inc. v. FCC (In re NextWave Pers. Commc'ns Inc.)*, 235 B.R. 277, 289 (Bankr. S.D.N.Y. 1999), *rev'd on other grounds*, 200 F.3d 43 (2d Cir. 1999) (avoiding choice-of-law analysis by

Southern District of New York have viewed the constructive fraudulent transfer provisions of New York and Delaware as substantively the same. Specifically, the Examiner has identified at least one bankruptcy court opinion and one district court opinion from the Southern District of New York that have determined that the constructive fraudulent transfer provisions of the UFTA and the UFCA are essentially the same in all material respects, acknowledging certain minor exceptions discussed herein.[967] The Examiner submits that such an analysis is entirely appropriate in a case where the differences between the substantive law of New York and Delaware are immaterial to the merits; however, given the breadth of issues implicated by the Acquisition, minor substantive differences must be assumed to be, and as will be discussed are, material.[968]

The Examiner has determined that it would be inappropriate for the fraudulent transfer law of Delaware to govern the Fraudulent Transfer Claims. The case law suggests that if a transferee's or transferor's state of incorporation has no connection to the alleged fraudulent transfer at issue, other than being a relevant entity's state of incorporation, then the substantive

---

concluding that all applicable fraudulent transfer laws were the same in all material respects); *Interpool Ltd. v. Patterson*, 890 F. Supp. 259, 265 (S.D.N.Y. 1995) (same).

[967] In *NextWave*, the Bankruptcy Court for the Southern District of New York, in considering the appropriate choice-of-law to apply to constructive fraudulent claims, determined that there was no substantive difference between the fraudulent transfer laws of California (adopted UFTA), New York (adopted UFCA), and Washington D.C. (adopted UFTA). *See* 235 B.R. at 288 ("[T]he fraudulent conveyance statutes in each of these states are, in all material respects, the same with a minor exception in the case of New York."); *Interpool*, 890 F. Supp. at 265 (holding no conflict between New York's UFCA and Florida's UFTA with respect to constructive fraudulent transfer claims at issue).

[968] For the purposes of this Report, the Examiner notes, among others, the following differences between the UFCA and the UFTA: (1) the UFCA incorporates the concept of good faith in the definition of fair consideration, while the UFTA does not incorporate such a concept in its corresponding definition of reasonably equivalent value; (2) the UFTA includes a presumption of insolvency if a debtor is generally not paying debts as they become due, while the UFCA does not include such a presumption; and (3) NY DCL section 274, concerning avoidance where a transfer leaves the debtor with unreasonably small capital, pertains only to the avoidance of *conveyances*, not *obligations*; however, the comparable Delaware provision, Del. C. Ann. tit. 6, § 1304(a)(2)(a) provides for the avoidance of transfers *and* obligations. The Examiner also notes an additional difference in New York and Delaware's interpretation of the "ability to pay debts as they become due" solvency test. New York and Delaware law provide that a transfer may be avoided where, among other reasons, the debtor intended to incur debts beyond its ability to pay them as they matured. *See* NY DCL section 275; Del. C. Ann. tit. 6, § 1304(a)(2)(b) (2010).

law of the state of incorporation should not govern the fraudulent transfer claim.[969]  The

Examiner has determined that Delaware's only connections to the Fraudulent Transfer Claims are

(1) that seventy-four (74) of the seventy-five (75) Debtors are Delaware entities, and (2) that the

Debtors own one property in Delaware.  As such, it makes little sense for the law of Delaware to

govern to the Fraudulent Transfer Claims.  Accordingly, the substantive law of either New York

or South Carolina should govern the Fraudulent Transfer Claims.

        The Examiner recognizes that the issue of whether New York law or South

Carolina law applies is critical in light of the fact that a true conflict exists between the two

state's fraudulent transfer laws.  Surprisingly little authority plumbs deep into the circumstances

where choice-of-law for fraudulent transfers involves contacts in more than two states or where

the choice-of-law could be outcome-determinative.[970]

### (i)    New York

        New York's policy or purpose in enacting the constructive fraud provisions of the

UFCA was to extend protection to New York creditors against various transactions by a debtor

entered into "without fair consideration" where the debtor is "insolvent" or is left with

"unreasonably small capital" or will "incur debts beyond his ability to pay as they mature."[971]  In

fact, several New York Courts have acknowledged that New York has an "especially strong"

interest" in protecting New York estate creditors against fraudulent conveyances.[972]  This

---

[969]   *See In re Teligent, Inc.*, 380 B.R. at 332 n.6 (in conducting an "interest analysis," holding the state of the debtor's incorporation—Delaware—inapplicable to fraudulent transfer claim since the fraudulent transfer occurred in another jurisdiction); *Faulkner v. Kornman (In re Heritage Org. L.L.C.)*, 413 B.R. 438, 462 (Bankr. N.D. Tex. 2009) (in conducting a "most significant factor" choice-of-law analysis, holding Delaware fraudulent transfer law inapplicable because the "only connection the Trustee's fraudulent transfer claims have to Delaware is that [transferor] and the [transferees] are Delaware entities"); *Official Comm. of Asbestos Personal Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 281 B.R. 852, 855 (Bankr. D. Del. 2002) (in choice-of-law analysis, holding Delaware fraudulent transfer law inapplicable because "Delaware's only contact with this matter is that it is the state of incorporation of the transferee and the subsidiary that is the subject of this fraudulent transfer action").

[970]   *See In re Best Prods. Co., Inc.*, 168 B.R. 35, 54 (Bankr. S.D.N.Y. 1994) (citing T. Day, *Solution for Conflict of Laws Governing Fraudulent Transfers:  Apply the Law That Was Enacted to Benefit the Creditors,* 48 Bus. Law. 889 (1993)), *aff'd*, 68 F.3d 26 (2d Cir. 1995).

[971]   *See* NY DCL §§ 273-275 (2010).

[972]   *See Advanced Portfolio.*, 1999 U.S. Dist. LEXIS 1265 at *16-17 ("New York has an 'especially strong' interest in applying its law when one of its domiciliaries alleges that it has been defrauded."); *Hassett v. Far West Federal Savings & Loan Ass'n (In re O.P.M. Leasing Servs., Inc.)*, 40 B.R. 380, 392-93 (Bankr. S.D.N.Y.

268

"especially strong interest" is reflected in the fact that the plaintiff of a fraudulent transfer action must establish by a preponderance of the evidence, rather than South Carolina's clear and convincing evidence standard,[973] that a constructive fraudulent transfer occurred.[974]  Once the plaintiff has established that the conveyance was made without fair consideration, the NY DCL presumes that the transfer rendered the debtor insolvent.[975]  The burden then shifts to the transferee to overcome that presumption by demonstrating the debtor's continued solvency after the transfer.[976]  This burden shifting is yet another example of how the NY DCL evinces a policy protective of estate creditors.

### (ii)    South Carolina

In contrast to New York, South Carolina's policy or purpose as reflected by its fraudulent transfer statutes is difficult to discern.  The Supreme Court of South Carolina has made clear that the concept of constructive fraudulent transfer, familiar to most bankruptcy practitioners, is not a part of South Carolina law.  Although a "gratuitous" transfer (*i.e.*, one for no consideration) may be set aside as fraudulent, the fact that the consideration provided is grossly inadequate serves as no more than a single "badge of fraud" tending to prove an actual fraudulent conveyance.[977]  Unlike under the UFTA or UFCA, even a "peppercorn" of consideration is sufficient to force a third party creditor to prove actual fraud under South

---

1984) (same) *aff'd*, 44 B.R. 1023 (S.D.N.Y. 1984); *RCA Corp. v. Tucker*, 696 F. Supp. 845, 856 (E.D.N.Y 1988) (same); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) (considering "the strong interest New York has in seeing its law applied when one of its domiciliaries alleges it has been defrauded").

[973]   *See Campbell v. Deans (In re J.R. Deans Co.)*, 249 B.R. 121, 134 (Bankr. D.S.C. 2000) ("The standard for finding actual and constructive fraud in South Carolina is the clear and convincing evidence standard.").

[974]   *See Silverman v. Sound Around, Inc. (In re Allou Distrib., Inc.)*, 404 B.R. 710, 717 (Bankr. E.D.N.Y. 2009).

[975]   *See Sullivan v. Messer (In re Corcoran)*, 246 B.R. 152, 163 (E.D.N.Y. 2000).

[976]   *See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 938 (S.D.N.Y. 1995).  If the transferee is able to overcome the presumption of insolvency, then the plaintiff must prove that the debtor was "insolvent" or left with "unreasonably small capital" or "incurred debts beyond his ability to pay as they matured."  *See id.* at 943-44.  Although the case law is sparse for South Carolina, it does not appear that South Carolina applies similar presumptions of insolvency and burden shifting under its fraudulent transfer regime.

[977]   *See Royal Z Lanes, Inc. v Collins Holding Corp.*, 337 S.C. 592 (1999) (holding when there is a gross inadequacy of consideration, an actual intent to defraud must still be shown to set aside the conveyance as fraudulent).

269

Carolina law.[978]  Additionally, South Carolina's fraudulent transfer statute facially suggests that South Carolina's interest in regulating constructive fraudulent transfers, as opposed to actual fraudulent transfers, is comparatively slight.[979]  Thus, it appears that South Carolina does not have the same "especially strong interest" as New York in protecting its estate creditors against constructive fraudulent transfers.[980]

If the applicable law is South Carolina's, the Estates would have to prove that the Acquisition resulted in a wholly gratuitous transfer, or demonstrate sufficient badges of fraud to support a claim for actual fraud.

### (c)     Where the Jurisdiction's Laws Conflict, the Law of the Locus Jurisdiction Applies.

In situations like the instant cases in which a true conflict exists between the laws of two jurisdictions, the Second Circuit suggests that courts, in applying an "interest analysis" should:

> look only to those facts or contacts that relate to the purpose of the particulars laws in conflict.  "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort. . . ."  As part of interest analysis, the New York Court of Appeals has distinguished between rules regulating conduct and rules governing loss allocation.  *Generally, when the laws in conflict are conduct regulating, the law of the locus jurisdiction applies*. . . .   The locus jurisdiction has the predominant interest where rules regulating conduct are at issue, because of its interest in affecting the conduct of those who act within the

---

[978]  *See id.*

[979]  Section 27-23-10 of the South Carolina Code provides, in relevant part, as follows:

(A) Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments . . . which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken . . . to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

*See* S.C. Code Ann. § 27-23-10 (2008).

[980]  As between New York and South Carolina, South Carolina arguably has a more "protective" statute of limitations from a transfer recipient's perspective.  In contrast to a six-year statute of limitation's period in New York, under South Carolina law, an action to set aside a constructive fraudulent transfer must be brought within three years from the date of discovery.  *See GFL Advantage Fund, Ltd. v. Colkitt*, No. 3 Civ. 1256 (JSM), 2003 U.S. Dist. LEXIS 10643, at *7 (S.D.N.Y. June 24, 2003); S.C. Code Ann. § 15-3-530(7) (2008).

jurisdiction and of a reliance interest on the part of the actors whose conduct is at issue.[981]

The purpose of a fraudulent transfer statute is to regulate conduct, rather than govern loss allocation.[982]  As indicated in *Arochem,* the highest tribunal for the state of New York has stated that "when the laws in conflict are conduct regulating, the law of the locus jurisdiction applies."[983]  Accordingly, the substantive law of the jurisdiction where the Acquisition occurred will likely apply to the Fraudulent Transfer Claims.[984]

The Examiner believes that, for the purposes of choice-of-law analysis for potential fraudulent conveyance claims, the "place of the tort" – the location of the Acquisition – is likely the place where the last event took place giving rise to liability.  In *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 195 (1985), the New York Court of Appeals indicated that, in determining the "place of the tort" where the wrongful conduct occurred in one jurisdiction and the plaintiff's injuries were felt in another,[985] "the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurs."[986]  In the instant cases, the conduct underlying the potential fraudulent transfers and the creditors' injuries certainly did not

---

[981]   *Arochem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992) (emphasis added) (citations omitted).

[982]   *See Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) ("When the law is one which regulates conduct, such as fraudulent conveyance statutes, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."); *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004) ("A fraudulent conveyance statute is conduct regulating rather than loss allocating.").

[983]   *Arochem*, 968 F.2d at 270.  *Accord Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 522 (1994) ("If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.") (citing *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993)); *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 198 (1985) ("[W]hen the conflicting rules involve the appropriate standards of conduct . . . the law of the place of the tort will usually have a predominant, if not exclusive, concern.") (citing *Babcock v. Jackson*, 12 N.Y.2d. 473, 483 (1963)).

[984]   A number of courts in New York have applied the law of the locus jurisdiction with respect to New York choice-of-law issues regarding fraudulent transfers.  *See, e.g., Roselink*, 386 F. Supp. 2d at 225 (among other reasons, applying law of New York with respect to alleged fraudulent transfer that took place in New York because "when the laws in conflict are conduct regulating, the law of the locus jurisdiction applies"); *GFL*, 2003 U.S. Dist. LEXIS 10643, at *9 (among other reasons, applying law of Pennsylvania with respect to alleged fraudulent transfer that took place in Pennsylvania since "the state in which the tort took place has the greatest interest in regulating activities that take place within its jurisdiction").

[985]   The Examiner submits that the Debtors' creditors suffered their respective "injuries" in the states where they are located.

[986]   *Accord Globe Commc'n Corp. v. R.C.S. Rizzoli Periodici, S.p.A.*, 729 F. Supp. 973, 976 (S.D.N.Y. 1990).

occur in the same jurisdiction since the Debtors' creditors' "injuries" presumptively occurred in jurisdictions throughout the United States. As such, the Examiner submits that the "place of the tort" will likely be in the state where the consummation of the various transactions, corresponding "transfers," and incurrence of debt in connection with the Acquisition took place.[987] As described more fully below, these events primarily occurred in New York. What follows is a list of all of the Debtors' significant contacts with New York that are determinative of the place of the fraudulent transfer that occurred in connection with the Acquisition:

**The April 17, 2007 Acquisition Agreement**

      1.      The Acquisition Agreement was negotiated in the state of New York.

      2.      The Acquisition Agreement states that it shall be governed by, interpreted under, and construed and enforced in accordance with, the law of the state of New York.[988]

      3.      The Acquisition Agreement states that the key parties under such agreement submit to the jurisdiction of the courts of New York in the event that any suit, action, or other proceeding arises out of such agreement.[989]

**The Sellers**

      4.      Both Sellers under the Acquisition Agreement were owned by Blackstone entities, which were located in New York.[990]

      5.      The Sellers were represented by the New York office of Simpson Thacher & Bartlett LLP in connection with the Acquisition.[991]

---

[987] In a pre-*Erkins* case, in performing an "interest analysis," the examiner who was appointed in *In re Best Prods. Co.,* No. 91-B-10048 (TLB) (Bankr. S.D.N.Y) considered these exact events – where the consummation of the various transactions, corresponding "transfers," and debt incurrences occurred – to determine where the last event took place giving rise to liability with respect to a leveraged buyout that formed the basis of potential fraudulent transfer claims in the event that New York choice-of-law rules applied rather than federal choice-of-law rules. *See Interim Report of Examiner on Choice of Law Issues Regarding Potential Fraudulent Conveyance Claims,* dated July 2, 1992 at 47.

[988] *See* Acquisition Agreement § 9.11.

[989] *See id.* at § 9.12.

[990] *See id.* at § 9.3(a), FIRPTA CERTIFICATE pursuant to § 1.6(b)(v) of Acquisition Agreement.

[991] *See* Acquisition Agreement § 9.3(a).

6.      Blackstone Corporate Advisory, Banc of America Securities, Merrill Lynch & Co., and BS&C acted as financial advisors to the Sellers.  With the exception of Banc of America Securities, the sellers worked primarily with the New York offices of these financial advisory firms.[992]

**The Buyer**

7.      DL-DW, the buyer under the Acquisition Agreement, was primarily owned by Lightstone and Arbor.  Arbor was primarily located in New York.  Much of the work performed in conjunction with the Acquisition Agreement was done out of Lightstone's New York office by, among other people, Josh Kornberg, Lightstone's Director of Acquisitions.  The owner of Lightstone, Mr. Lichtenstein, is also a resident of New York.[993]

8.      Arbor and Lightstone were represented by the New York office of Dechert LLP in connection with the Acquisition Agreement.[994]

9.      Arbor and Lightstone also received certain tax advice regarding the Acquisition Agreement from the New York office of Proskauer Rose LLP.[995]

10.      Arbor and Lightstone hired Citi GM to advise it about financial matters in connection with the Acquisition Agreement.  DL-DW and Lightstone worked primarily with Citi GM – New York office in connection with such matters.[996]

**Financing the Acquisition**

11.      Lightstone transferred funds into an escrow account on April 17, 2007 in accordance with the Acquisition Agreement.  This escrow account was managed by an escrow

---

[992]   *See* Offering Memorandum at Preamble.

[993]   Lichtenstein has a personal residence and offices in both New York and New Jersey.  In light of the fact that Lichtenstein's family lives at his New York residence, the Examiner will treat Lichtenstein as living in New York, rather than New Jersey, for the purposes of this Report.  *See* Lichtenstein Deposition at 8.

[994]   *See* Acquisition Agreement § 9.3(b).

[995]   *See* Lichtenstein Deposition at 45.

[996]   *See id.* at 44.

537960v2

agent of Chicago Title Insurance Company who was located in the state of New York.[997] The escrow account itself was also located at a bank in the state of New York.[998]

12.     Lightstone met with the Lenders at Wachovia's New York office to discuss various issues related to the financing of the Acquisition.[999]

**The Mortgage Loan Agreement**

13.     The Mortgage Loan Agreement was negotiated in the state of New York.[1000]

14.     The $4.1 billion Mortgage Loan was made by the Mortgage Lenders and accepted by the Mortgage Borrowers in New York.[1001]

15.     The proceeds of the Mortgage Loan were disbursed from the State of New York.[1002]

16.     All of the key parties to the Mortgage Loan Agreement had a substantial relationship with the state of New York.[1003]

17.     One of the Mortgage Lenders, Bears Stearns Commercial Mortgage, Inc., was a New York corporation.[1004]

18.     The New York offices of the Mortgage Lenders were principally involved in providing the financing under the Mortgage Loan Agreement.[1005]

19.     The Mortgage Borrowers were represented by the New York office of Herrick Feinstein LLP in connection with the Mortgage Loan Agreement.[1006]

---

[997] *See* Acquisition Agreement § 9.3(c).

[998] *See* Bates Nos. ESH0028986-28987.

[999] *See* Teichman Deposition at 93.

[1000] *See* Mortgage Loan Agreement § 10.3.

[1001] *Id.*

[1002] *Id.*

[1003] *Id.*

[1004] *See id.* at Preamble.

[1005] *See* Decl. of Joseph Teichman Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications Sched. 3 [Docket No. 3] (listing New York addresses for Mortgage Lenders' secured claims).

[1006] *See* Mortgage Loan Agreement § 10.6.

537960v2

20.     The Mortgage Loan Agreement states that it shall be governed by, interpreted under, and construed and enforced in accordance with, the law of the state of New York.[1007]

21.     The Mortgage Loan Agreement states that the key parties under such agreement submit to the jurisdiction of the courts of New York in the event that any suit, action, or other proceeding arises out of such agreement.[1008]

**The Mezzanine Loan Agreements**

22.     The Mezzanine Loan Agreements were negotiated in the State of New York.[1009]

23.     The $3.3 billion dollar loan (the "Mezzanine Loan") under the Mezzanine Loan Agreements were made by the Mezzanine Lenders and accepted by the Mezzanine Borrowers in New York.[1010]

24.     The proceeds of the Mezzanine Loan were disbursed from the State of New York.[1011]

25.     All of the key parties to the Mezzanine Loan Agreements had a substantial relationship with the state of New York.[1012]

26.     One of the Mezzanine Lenders, Bears Stearns Commercial Mortgage, Inc., was a New York corporation.[1013]

27.     The New York offices of the Mezzanine Lenders were principally involved in providing the financing under the Mezzanine Loan Agreements.[1014]

---

[1007]   *Id.* at § 10.3.

[1008]   *Id.*

[1009]   *See* Mezzanine Loan Agreements § 10.3.

[1010]   *Id.*

[1011]   *Id.*

[1012]   *Id.*

[1013]   *Id.* at Preamble.

[1014]   *See* Teichman Decl. Sched. 3 (listing New York addresses for Mezzanine Lenders' secured claims).

28.     The Mezzanine Borrowers were represented by the New York office of Herrick Feinstein LLP in connection with the Mezzanine Loan Agreements.[1015]

29.     The Mezzanine Loan Agreements state that they shall be governed by, interpreted under, and construed and enforced in accordance with, the law of the state of New York.[1016]

30.     The Mezzanine Loan Agreements state that the key parties under such agreements submit to the jurisdiction of the courts of New York in the event that any suit, action, or other proceeding arises out of such agreements.[1017]

**The Closing**

31.     The Escrow Agreement, dated June 11, 2007, was drafted by the New York office of Cadwalader, Wickersham & Taft LLP.  In accordance with the Escrow Agreement, the closing account was managed by an escrow agent of First American Title Insurance Company of New York who was located in New York.  The closing account itself was also located at a bank in the state of New York.[1018]

32.     The June 11, 2007 Closing of the Acquisition was held in New York at the New York office of Simpson Thacher & Bartlett LLP.[1019]

As the foregoing indicates, the transactions constituting the Acquisition, which would form the basis of any fraudulent conveyance claims, had overwhelming contacts with the state of New York.  Although the Debtors may be headquartered in South Carolina and incorporated or organized in Delaware,[1020] such contacts deserve little weight in light of the fact that the Acquisition itself was the product of negotiations that took place in New York by primarily New-York based parties who were represented by primarily New-York based

---

[1015]  *See* Mezzanine Loan Agreements § 10.6.

[1016]  *Id.* at § 10.3.

[1017]  *Id.*

[1018]  *See* Wire Instructions – New York Office from FATCO.

[1019]  *See* Acquisition Agreement § 1.4(b).

[1020]  One debtor was incorporated in Ontario, Canada, rather than in Delaware.

537960v2

professionals. As such, the Examiner submits that the last event giving rise to liability most likely occurred in New York.

Accordingly, the Examiner believes that the substantive law of New York will likely govern the Fraudulent Transfer Claims.[1021]

### b. The Federal Debt Collection Procedure Act

In addition to avoidance and recovery of the fraudulent transfers under New York law, it appears that the estates have available Subchapter D of the Federal Debt Collection Procedure Act (the "FDCPA"), which is codified at 28 U.S.C. §§ 3301-3308, as a means to attack the transfers made and obligations incurred in connection with the Acquisition. Subchapter D of the FDCPA is an independent federal version of the UFTA applicable in cases involving a "debt to the United States."[1022]

In the instant cases, the Examiner believes that a trustee would have standing to bring a FDCPA cause of action under § 544(b).[1023] Subchapter D of the FDCPA is very similar to the UFTA,[1024] which as previously discussed is similar in many respects to the NY DCL.[1025] [1026]

---

[1021] As established by the foregoing analysis, the facts strongly suggest that the substantive law of New York should apply to the fraudulent transfer claims. The Examiner is, however, aware of the Bankruptcy Court's recent decision in *Statutory Comm. Of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007). In *Iridium*, the Court stated in a footnote to the opinion that "[f]or the purposes of this [fraudulent transfer] litigation, the DCUFCA is applicable because [the debtors'] principal place of business was located in Washington, D.C." *Id.* at 342 n.49. If principal place of business alone is determinative, then the Debtors' principal place of business is their nerve center, as discussed in *Hertz Corp. v. Friend*, 559 U.S. ____, 130 S. Ct. 1181 (2010), 2010 U.S. LEXIS 1897. Although much of the day-to-day operations of the Debtors' enterprise are conducted in South Carolina, Mr. Lichtenstein, a resident of New York, manages the business and affairs of the Company, and has the right and authority to direct the operations of HVM. *See* Report § III.F.1; [Bates Nos. DL_LS_EXMN00090204-90209] (HVM Manager LLC Certificate of Formation and Limited Liability Company Agreement dated June 8, 2007); n. 994, *supra*. Mr. Lichtenstein's control is likely sufficient to shift the "nerve center" to New York. In any event, because principal place of business is just one factor in the "interest analysis," and the Court's ruling in *Iridium* was limited to the specific litigation at hand, the Examiner believes that it is not determinative of the fraudulent transfer choice-of-law issue in these cases, and that application of the "interest analysis" compels the conclusion that New York law should govern.

[1022] 28 U.S.C. § 3304.

[1023] *Allred v. Porter (In re Porter)*, No. 06-10119, 2009 Bankr. LEXIS 1119, at *64 (Bankr. D. S.D. 2009) (trustee brought fraudulent transfer claim under § 544(b) and FDCPA); *Followell v. United States of Am. (In re Gurley)*, 357 B.R. 868, 872 (Bankr. M.D. Fla. 2006) (same).

[1024] *Allred*, at *66 (Bankr. D. S.D. 2009) ("The provisions of FDCPA are very similar to those of UFTA."); *United States v. Billheimer*, 197 F. Supp. 2d 1051 (S.D. Ohio 2002) ("[T]he statutory factors that are to be considered in determining whether a transfer of property was fraudulently done are substantially similar" under Ohio's

277

[1027] The Examiner submits that there is no need to discuss the FDCPA, except to the extent that New York law would foreclose an estate cause of action that the FDCPA would support, in a circumstance where the FDCPA is available to the relevant Estate or Estates.

---

UFTA and the FDCPA); *United States of Am. v. Sherrill*, 626 F. Supp. 2d 1267, 1276 (M.D. Ga. 2009) ("The Court notes that the relevant provisions of the UFTA [such as the constructive fraudulent transfer provisions] enacted by Georgia . . . contain virtually identical language to the FDCPA.").

[1025] *See, e.g.*, *NextWave Pers. Commc'ns Inc. v. FCC (In re NextWave Pers. Commc'ns Inc.)*, 235 B.R. 277, 289 (Bankr. S.D.N.Y. 1999), *rev'd on other grounds*, 200 F.3d 43 (2d Cir. 1999) (avoiding choice-of-law analysis by concluding that constructive fraudulent transfer provisions of UFTA and UFCA were the same in all material respects); *Interpool Ltd. v. Patterson*, 890 F. Supp. 259, 265 (S.D.N.Y. 1995) (same).

[1026] Subsection 3304(a) of the FDCPA provides in pertinent part as follows:

> [A] transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States which arises before the transfer is made or the obligation is incurred if . . . the debtor makes the transfer or incurs the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and . . . the debtor is insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation.

28 U.S.C § 3304(a).

This subsection of the FDCPA is materially the same as § 273 of the NY DCL that provides as follows:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

NY DCL § 273 (2010).

[1027] Subsection 3304(b) of the FDCDPA provides in pertinent part as follows:

> [A] transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor . . . was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or . . . intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

28 U.S.C 3304(b).

This subsection of the FDCPA is similar to §§ 274 and 275 of the NY DCL that provide as follows:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

NY DCL § 274 (2010).

> Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

NY DCL § 275 (2010).

### (1) Application of the FDCPA Requires a Debt to the United States

Application of the FDCPA requires "a debt to the United States."[1028]  In particular, there must be a (1) "debt" and (2) such debt must be owed to the "United States."  "Debt" is defined very broadly so as to include "an amount that is owing to the United States on account of a . . . penalty" for the purposes of the FDCPA.[1029]  The "United States" is defined as "an agency, department, commission, board, or other entity of the United States."[1030]

### (2) As an Agency of the United States, the Internal Revenue Service Claim Satisfies the FDCPA United States Debt Requirement

The Examiner submits that there is a "debt" due the IRS by certain of the Debtors.  Specifically, the IRS has a claim against ESI – a transferor of the alleged fraudulent transfers – for miscellaneous penalties.[1031]

The IRS's claim against ESI constitutes a debt due the "United States."  There is no dispute that the IRS is an agency of the United States.  Furthermore, it has been held that for the purposes of the FDCPA, a debt due to the IRS is a debt due to the United States.[1032]  Accordingly, the IRS's claim against ESI constitutes a "debt to the United States" and the FDCPA is therefore applicable to the potential fraudulent transfer claims in the instant cases.[1033]

---

[1028]  28 U.S.C. § 3304.

[1029]  28 U.S.C. § 3002(3)(B).

[1030]  28 U.S.C. § 3002(15)(B).

[1031]  The IRS originally filed eighteen (18) claims against various Debtors, but later withdrew fourteen (14) of these claims for partnership taxes because such claims were apparently against entities that did not have any taxable activities.  The remaining four IRS claims are against (1) ESI for miscellaneous penalties, (2) ESA Management LLC for miscellaneous penalties, (3) ESA Operating Lessee Inc. for corporate income taxes, and (4) ESA P Portfolio Operating Lessee Inc. for corporate income taxes.  *See* Telephone Interview by James Toal with Michael Scotto, Internal Revenue Service (Feb. 15, 2010).

[1032]  *See, e.g., Leonard, Jr. v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207, 213 n.5 (Bankr. D. Nev. 2007) ("Given the status of the Internal Revenue Service as a creditor, the Trustee could also have sought to set aside the transfers under [the FDCPA].").

[1033]  There are other claims in these cases that also might be debts due the United States for the purposes of the FDCPA. U.S. Bank National Association as Trustee for Maiden Lane Commercial Mortgage-Backed Securities Trust 2008-1 (in its capacity as Trustee and in no other capacity) has filed bankruptcy claims against all of the Mezzanine Borrowers, except for ESA P Mezz 10 LLC, ESA Mezz 10 LLC, and ESH/Homestead Mezz 10 LLC on account of such Mezzanine Debt holdings.  Maiden Lane LLC holds approximately $153 million of AAA CMBS bonds that it acquired from its predecessor as lender, Bear Stearns Commercial Mortgage Inc.  *See* Interview with Helen Mucciolo, Senior Vice President, Fed. Reserve Bank of New York,

537960v2

## 2. **Substantive Claims**

### a. **Overview of New York Law**

Because New York law should apply to the Estates' Fraudulent Transfer Claims, the Examiner's discussion will primarily focus on the UFCA as enacted in New York, with some reference to Bankruptcy Code section 548, Delaware's version of the UFTA,[1034] and South Carolina's codified version of the Statute of Elizabeth.[1035]

"The [NY DCL] identifies several situations involving 'constructive fraud,' in which a transfer made without fair consideration constitutes a fraudulent conveyance, regardless of the intent of the transferor."[1036] Thus, the first step in demonstrating a constructively

---

and Michael Patrick, Counsel, Fed. Reserve Bank of New York, in N.Y., N.Y. (Dec. 15, 2009); s*ee also* http://www.newyorkfed.org/markets/maidenlane.html (last visited Feb. 22, 2010). Maiden Lane LLC is a Delaware limited liability company; the sole and managing member of Maiden Lane LLC is the Fed. Reserve Bank of New York. *See id.* After repayment of the loans from the Fed. Reserve Bank of New York and JPMorgan Chase & Co. to Maiden Lane LLC, any remaining value of Maiden Lane LLC is to be paid to the Fed. Reserve Bank of New York. *Id.* Maiden Lane LLC also holds all of the certificates of Maiden Lane Commercial Mortgage-Backed Securities Trust 2008-1, which includes in its holdings approximately $744 million of Mezzanine Debt in tranches A through I that it acquired from Bear Stearns Commercial Mortgage Inc. *See* Interview with Helen Mucciolo, Senior Vice President, Fed. Reserve Bank of New York, and Michael Patrick, Counsel, Fed. Reserve Bank of New York, in N.Y., N.Y. (Dec. 15, 2009); Telephone Interview by George C. Webster II and Margreta M. Morgulas with Stephanie Heller, Assistant General Counsel and Senior Vice President, Fed. Reserve Bank of New York, in N.Y., N.Y. (Feb. 17, 2010). It has been held that for the purposes of the FDCPA, a debt originally due a private party that is later acquired by the United States cannot constitute a "debt." *See, e.g., Sobranes Recovery Pool I, LLC v. Todd & Hughes Constr. Corp.*, 509 F.3d 216 (5th Cir. 2007) (holding successor-in-interest to FDIC could not use FDCPA when FDIC was not an original party to the underlying contract). In light of the fact that Maiden Lane LLC's bankruptcy claims were acquired from a private party, the Examiner submits that the FDCPA is most likely inapplicable with respect to Maiden Lane LLC's claims.

[1034]  Delaware has adopted the UFTA in Title 6 of the Delaware Code.

[1035]  South Carolina's fraudulent conveyance law is significantly different from that of Delaware and New York. South Carolina's Statute of Elizabeth, as interpreted by the state courts, authorizes avoidance of fraudulent transfers by both existing and subsequent creditors. *See Mathis v. Burton*, 319 S.C. 261, (S.C. Ct. App. 1995). For a transfer to be "voluntary" for purposes of establishing a constructive fraudulent conveyance, the transfer had to have been gratuitous – for no consideration at all. If the debtor received any consideration or benefit from the transfer, it is not "voluntary" for purposes of the Statute of Elizabeth. *Campbell v. Collins (In re Collins)*, No. 03-04179, 2005 Bankr. LEXIS 2924 at *17-18 (Bankr. D. S.C. Apr. 26, 2005). Because a transfer is "voluntary" only if it is gratuitous, where valuable consideration exists, a transfer will be set aside as a fraudulent conveyance only if an actual intent existed to defraud creditors imputable to the grantee. A transfer made for even grossly inadequate consideration is not "voluntary" and the lack of adequate consideration is treated only as a "badge of fraud," which creates a rebuttable presumption of intent to defraud, such that, where there is gross inadequacy of consideration, an actual intent to defraud must be shown to set aside the conveyance. *Id.*; *see also In Royal Z Lanes, Inc. v. Collins Holding Corp.*, 337 S.C. 592, 596 (1999).

[1036]  *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 633 (2d Cir. 1995).

fraudulent transfer under any section[1037] of the NY DCL is to establish[1038] that the debtor did not receive "fair consideration."[1039] "The fair consideration test 'is profitably analyzed as follows: (1) . . . the recipient of the debtor's property[] must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be a '*fair equivalent*' of the property received; and (3) such exchange must be '*in good faith*.'"[1040] The "good faith" at issue is that of the transferee, not of the transferor.[1041]

Although "[g]ood faith is an elusive concept[,]"[1042] a lack of good faith is proven when:

> one or more of the following factors is lacking: (1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others. The term "good faith" does not merely mean the opposite of the phrase "actual intent to defraud." That is to say, an absence of fraudulent intent does not mean that the transaction was necessarily entered into in good faith. The lack of good faith imports a failure to deal honestly, fairly and openly.[1043]

---

[1037] *See* NY DCL sections 273-275.

[1038] The party challenging the transaction generally bears the burden of proving that a transfer was made for less than fair consideration. *See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 936-37 (S.D.N.Y. 1995) citing *United States v. McCombs*, 30 F.3d 310, 323 (2nd Cir. 1994); *Gelbard v. Esses*, 465 N.Y.S.2d 264, 268 (App. Div. 1983); *Am. Inv. Bank, N.A. v. Marine Midland Bank, N.A.*, 595 N.Y.S.2d 537, 538 (App. Div. 1993).

[1039] Pursuant to NY DCL section 272:

> Fair consideration is given for property, or obligation,
>
> a. When in exchange for such property, or obligation, as a *fair equivalent therefor, and in good faith*, property is conveyed or an antecedent debt is satisfied, or
>
> b. When such property, or obligation is received *in good faith* to secure a present advance or antecedent debt in amount *not disproportionately small* as compared with the value of the property, or obligation obtained.

NY DCL section 272 (emphasis added).

[1040] *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2nd Cir. 2005) (quoting *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1058-59 (2nd Cir. 1995)) (emphasis added).

[1041] *See, e.g., Sharp Int'l*, 403 F.3d at 54 n.4.

[1042] *Id.* at 54.

[1043] *S. Indus. v. Jeremias*, 411 N.Y.S.2d 945, 949 (App. Div. 1978)

Once a lack of fair consideration is shown, the burden of production shifts to the transferee.[1044]  If the transferee produces evidence of solvency, the burden of persuasion remains with the debtor.[1045]  Proof of insolvency rests on three tests, commonly referred to as the "balance sheet" test, *i.e.*, the transferor is insolvent or will be rendered insolvent by the transfer in question;[1046] the "unreasonably small capital" test, *i.e.*, the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital;[1047] and the "ability to pay debts" test, *i.e.*, the transferor believes that it will incur debt beyond its ability to pay.[1048]

In New York, the reach-back for fraudulent conveyances is six years.[1049]

### b.    Applicability of Fraudulent Transfer Analysis to LBOs

LBOs often present fraudulent transfer issues because the target generally does not receive fair consideration for assets it conveys in exchange for consideration that passes to a third party.  Obligations that debtors incur solely for the benefit of third parties are presumptively not supported by fair consideration.  The constructive fraud provisions of the NY DCL are

---

[1044]   *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 938 (S.D.N.Y. 1995) ("Where, as here, the absence of fair consideration has been demonstrated, the burden of coming forward with proof that the debtor nonetheless remained solvent shifts to the defendants.").

[1045]   *Id.* ("[D]efendants have presented some proof of . . . solvency through, among other things, the . . . reports of their expert witnesses and have thus satisfied their burden of production.  The burden of persuasion remains with the plaintiffs.").

[1046]   NY DCL section 273 ("Every *conveyance* made and every *obligation* incurred by a person who is or will be thereby rendered insolvent is fraudulent as to *creditors* without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.") (emphasis added).

[1047]   NY DCL section 274 ("Every *conveyance* made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an *unreasonably small capital*, is fraudulent as to *creditors and as to other persons who become creditors* during the continuance of such business or transaction without regard to his actual intent.") (emphasis added).

[1048]   NY DCL section 275 ("Every *conveyance* made and every *obligation* incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts *beyond his ability to pay as they mature*, is fraudulent as to both *present and future creditors*.") (emphasis added).

[1049]   *See* NY DCL section 213.  Under 6 Del. Code Ann. § 1309, with regard to "constructively fraudulent" transfers, the statute of limitation is "within four years after the transfer was made or the obligation was incurred."  In South Carolina, an action to set aside a transfer asserting that the transfer is a fraudulent conveyance must be brought within three years from the date of discovery.  *See* S.C. Code Ann. § 15-3-530(7).

regularly applied by courts to LBOs "[b]ecause the assets of the target are pledged as security for a loan that benefits the target's former owners rather than the target itself, [and] it is [therefore] unlikely that any LBO can satisfy fair consideration requirements."[1050]  "[A] leveraged buyout . . . can harm creditors in exactly the way fraudulent conveyance laws are designed to prevent."[1051]

Fraudulent transfer laws are designed to protect creditors' rights, and thus transactions must be viewed from the perspective of creditors.[1052]  Prior to an LBO, creditors could look to a debtor's property through judicial levy and thus realize its market value; similarly, in bankruptcy, a debtor's property passes to its estate, where creditors can benefit from the procedures designed to maximize value.  However, in an LBO, where a debtor transfers property for less than fair consideration, it deprives its creditors of the difference between the fair market value of its assets and the consideration received.

c.      **Analyzing the Economic Substance of an LBO**

LBOs present special problems in the context of constructive fraud analysis.  One particular problem is that LBOs are often structured such that participants in a constructively fraudulent scheme are able, if contractual formalities are respected, to escape fraudulent transfer liability, notwithstanding the unjustified risk that they have placed on the target's creditors.  To prevent contractual formality from vitiating fraudulent transfer law, courts are empowered to

---

[1050]   *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y 1995).

[1051]   *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 998 (S.D.N.Y. 1991); *see also United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1297 (3rd Cir. 1986), *cert. denied sub nom. McClellan Realty Corp. v. United States*, 483 U.S. 1005 (1987) ("If the UFCA is not to be applied to leveraged buyouts," we said, "it should be for the state legislatures, not the courts, to decide."); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 644-46 (3rd Cir. 1991) (holding that the fraudulent conveyance provisions of the Bankruptcy Code are applicable to leveraged buyouts); *Marquis Prods., Inc. v. Conquest Mills, Inc. (In re Marquis Prods., Inc.)*, 150 B.R. 487, 491 (Bankr. D. Me. 1993 ) ("It may be said that, as a general rule, an insolvent debtor receives 'less than a reasonable equivalent value' where it transfers its property in exchange for a consideration which passes to a third party. In such a case, it ordinarily receives little or no value.") (citations omitted).

[1052]   *See Crowthers McCall,* 129 B.R. at 998; *Murphy v. Meritor Savings Bank (In re O'Day Corp.)*, 126 B.R. 370, 394 (Bankr. D. Mass. 1991).

look beyond the formal structure of such transactions to remedy any harm that would result from respecting a scheme that is intentionally or constructively fraudulent.[1053]

To this end, courts often recharacterize LBO transactions.[1054]  Typically, plaintiffs request that the court "collapse" the LBO to show that, in a complex transaction, the insolvent target did not in the aggregate receive fair consideration or reasonably equivalent value for the assets it transferred.[1055]  In the "paradigmatic scheme":

> [O]ne transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee.  The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing.
>
> Under these circumstances, the initial transfer of the debtor's property to the first transferee is constructively fraudulent if two conditions are satisfied.  First, in accordance with the foregoing paradigm, the consideration received from the first transferee must be reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors.  If, instead, the debtor retains the proceeds from the first exchange, reconveys them for fair consideration, or uses them for some other legitimate purpose, including the preferential repayment of pre-existing debts, and if the debtor does not make the subsequent transfer with actual fraudulent intent, then the entire transaction, even if

---

[1053]  *Rosener v. Majestic Mgmt. (In re OODC, LLC*, 321 B.R. 128, 138 (Bankr. D. Del. 2005); *see also Off. Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 347 (W. D. Penn. 2006) ("It is now widely accepted that multilateral transactions may . . . be collapsed and treated as phases of a single transaction for the purposes of applying fraudulent conveyance principles.") (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2nd Cir. 1995) (*as amended on denial of pet. for reh'g en banc*); *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2nd Cir. 1993) (citing cases).

[1054]  *See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934-35 (S.D.N.Y. 1995) ("This principle [of collapsing] applies with full force to LBOs.  No single transfer would take place without the expectation that the entire transaction will be consummated."); s*ee also United States v. Tabor Realty Corp.*, 803 F.2d 1288, 1302-03 (3d Cir. 1986); *cert. denied*, 483 U.S. 1005, 97 L. Ed. 2d 735, 107 S. Ct. 3229 (1987).  Accordingly, LBOs are routinely treated as unitary transactions for purposes of fraudulent conveyance laws.  *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2nd Cir. 1995); *Kupetz v. Wolf*, 845 F.2d 842, 846 n.6 (9th Cir. 1988); *Murphy v. Mentor Savings Bank (In re O'Day Corp.)*, 126 B.R. 370, 394 (Bankr. D. Mass. 1991); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 502 (N.D. Ill. 1988).

[1055]  *See Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 138 (Bankr. D. Del. 2005) ("In deciding whether to 'collapse' a series of transactions into one integrated transaction, the issue is not whether there was common ownership on both sides of the transaction or whether the transfer was a stock or an asset sale, but rather whether there was an overall scheme to defraud the estate and its creditors by depleting all the assets through the use of a leveraged buyout.").

"collapsed," cannot be a fraudulent conveyance, because it does not adversely affect the debtor's ability to meet its overall obligations.

Second . . . the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent.

However, the transferee need not have actual knowledge of the scheme that renders the conveyance fraudulent. Constructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry.[1056]

Because the typical case involves a multi-stepped transaction that creates a structure that does not reflect economic reality, courts generally consider whether each step of a transaction would have occurred on its own or, alternatively, whether the parties intended that each step depend upon the occurrence of the additional steps. Arguably the most important factor is a defendant's awareness as to the structure of the entire transaction and the intent of the parties involved, as well as whether there was an overall scheme to defraud creditors, whether intentional or constructive.[1057]

*In re Bay Plastics, Inc.*[1058] demonstrates the circumstances in which a court will recharacterize a transaction in a situation where the flow of funds in the LBO was somewhat analogous to the Acquisition. In *Bay Plastics*, the target's shareholders sold their stock in the company for $3.5 million to BPI Acquisition Corp. (BPI), a subsidiary of Milhous Corporation (Milhous). Milhous did not invest any money in BPI. Milhous caused Bay Plastics to borrow

---

[1056] *HBE Leasing Corp.*, 48 F.3d at 635-36 (citations omitted); *see also Off. Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. (In re Hechinger Inv. Co. of Del., Inc)*, 274 B.R. 71, 90-91 (D. Del. 2002) ("Regardless of the various complex structures of leveraged buyouts, which often involve various loans, stock purchases, mergers, and repayment obligations, courts have found that a set of transactions may be viewed as one integrated transaction if the transactions 'reasonably collapse into a single integrated plan and either defraud creditors or leave the debtor with less than equivalent value post-exchange.'") (quoting *CPY Co. v. Ameriscribe Corp.*, 145 B.R. 131, 137 (Bankr. S.D.N.Y. 1992)).

[1057] *See HBE Leasing Corp.*, 48 F.3d at 635-36 ("The existence of a knowledge requirement reflects the UFCA's policy of protecting innocent creditors or purchasers for value who have received the debtor's property without awareness of any fraudulent scheme."); *Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.)*, 327 B.R. 537, 546 (D. Del. 2005); *MFS/Sun Life Trust - High Yield Series v. Van Dusen Airport Serv. Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 502 (N.D. Ill. 1988) ("A court should focus not on the formal structure of the transaction but rather on the knowledge or intent of the parties involved in the transaction.").

[1058] *Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.)*, 187 B.R. 315 (Bankr. C.D. Cal. 1995).

approximately $3.95 million from BT Commercial Corp. (BT) secured by a first priority lien on all of Bay Plastics' assets. Milhous then caused the debtor to direct $3.5 million of the loan be disbursed to BPI. BPI in turn directed that the $3.5 million be paid directly to the selling shareholders in substantial payment for their stock. Thus, at the closing, $3.5 million of the funds paid into escrow by BT went directly to the selling shareholders, and were never in the possession of the target.

Bay Plastics sought bankruptcy relief fifteen months later, and the debtor brought suit against the selling shareholders under Bankruptcy Code section 544(b) and California's version of the UFTA. On the debtor's motion for summary judgment, the court noted that the parties to the transaction were aware that it was an LBO and stated that the "structure obscured the reality of the transaction . . . ." Accordingly, the court deemed the $3.5 million payment as having been transferred directly to the selling shareholders. "[I]n substance $3.5 million of the funds that Bay Plastics borrowed from BT went to pay for the stock of the selling shareholders, rather than to Bay Plastics" but "[t]he loan obligation, in contrast, was undertaken by Bay Plastics, which also provided the security for the loan. As a result Bay Plastics received no reasonably equivalent value for the security interest in all of its assets that it gave to BT in exchange for BT's funding of the stock sale."[1059]

### d. Analyzing the Acquisition

When parties receive consideration from a debtor with the knowledge that the transaction is structured to deplete the debtor's assets, courts will step in to recharacterize the transaction. Here, the Buyer, the Sellers, the Mezzanine Lenders, the Mortgage Lenders, and the Professionals constructed a financing structure upon which they hung an unreasonably heavy debt load. Each understood that the Acquisition would provide Extended Stay with no consideration in that it would not retain most or any of the proceeds that were to be loaned under the Loan Agreements.[1060]

---

[1059] *Id.* at 328-29.
[1060] *See* Section IV.C. & D.

The Examiner believes that the Acquisition should therefore be characterized as follows: the Borrowers gave liens to the Mezzanine Lenders and Mortgage Lenders and incurred debt to retire pre-Acquisition debt, thus making collateral available to secure the financing needed to accomplish the LBO. The proceeds of these loans were funneled to the Mortgage Borrowers. The Mortgage Borrowers, in turn, transferred the funds upstream through the new corporate structure. None of the Loan Agreements allowed for the issuance of dividends immediately after the Acquisition,[1061] and dividends could not possibly have been made to the Sellers following the Closing. Indeed, no dividends were recorded by any Debtor. The only remaining alternative is a series of intercompany loans. These loans aggregated in ESI and Homestead, which recorded the debt in their books and advanced the Purchase Price to the Sellers on behalf of the Buyer in satisfaction of the Purchase Price, and paid the Professionals.[1062]

### (1)  Triggering Creditors

#### (a)  544(a)

A trustee or debtor in possession may use Bankruptcy Code section 544(a) to assert a fraudulent transfer action that would be available to any one of three hypothetical creditors[1063] under other applicable law:

> Not only is a trustee empowered to stand in the shoes of a debtor to set aside transfers to third parties, but the fiction permits the trustee also to assume the guise of a creditor with a judgment against the debtor. Under that guise, the trustee may invoke whatever remedies [are] provided by state law to judgment lien creditors to satisfy judgments against the debtor.[1064]

---

[1061]  *See* Section III.E.

[1062]  Alternatively, the transfers to Sellers and the Professionals may be viewed as loans by Homestead to the Buyer, and loans by ESI to BHAC and then to the Buyer, with the Buyer then satisfying its obligations to the Sellers and Professionals.

[1063]  Bankruptcy Code sections 544(a)(1)-(3).

[1064]  *Zilkha Energy Co. v. Leighton*, 920 F.2d 1520, 1523 (10th Cir. 1990) (stating that lower court erred in not permitting trustee to pursue fraudulent conveyance action with standing conferred by Bankruptcy Code section 544(a)); *see Belford v. Cantavero (In re Bassett)*, 221 B.R. 49, 52-53 (Bankr. D. Conn. 1998) ("As a hypothetical lien creditor under section 544(a)(1), the Trustee enjoys rights under, *inter alia*, Connecticut state fraudulent transfer law . . . .").

For example, in *Goscienski v. Larosa (In re Montclair Homes)*, 200 B.R. 84, 94 (Bankr. E.D.N.Y. 1996), the court permitted a creditor acting on behalf of the bankruptcy trustee to use the trustee's hypothetical status as a judgment lienholder to assert a fraudulent conveyance action under the NY DCL, thus gaining the benefit of the NY DCL's six-year reachback period.[1065]  Other courts have agreed with this analysis.[1066]

Section 544(a), however, only confers on the trustee the standing of a hypothetical creditor "as of the commencement of the case," *i.e.*, the trustee may assert only the rights of a creditor who acquired his or her claim *after* the challenged transaction.  NY DCL section 274 provides that "[e]very **conveyance** made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an **unreasonably small capital**, is fraudulent as to creditors **and as to other persons who become creditors** during the continuance of such business or transaction without regard to his actual intent" (emphasis added).  Thus, although an *obligation* might not be avoided under DCL section 274, a *lien* may still be avoided by a subsequent creditor, such as a trustee, under that section where the debtor does not receive fair consideration for the transfer and is left with unreasonably small capital.[1067 1068]

---

[1065]  N.Y. Civ. Prac. L.&R. § 213.

[1066]  *Kleven v. Stewart (In re Myers)*, 320 B.R. 667, 670 (Bankr. N.D. Ind. 2005) ("Exercising the rights and powers of the hypothetical lien creditor, the trustee could have challenged the transactions through § 544(a)."); *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 587 (Bankr. N.D. Ill. 2005) ("Essentially similar provisions – but with a longer limitations period – are contained in Section 5 of the Uniform Fraudulent Transfer Act . . . , and available to a trustee in bankruptcy pursuant to § 544(a) of the Code.")

[1067]  *See, e.g., In re Best Prods. Co., Inc.,* 168 B.R. 35, 56 (Bankr. S.D.N.Y. 1994) (finding that lenders that financed an LBO could likely retain their claims, but not their liens, against the estates under NY DCL section 274); *see also In re Sharrer v. Sandlas,* 477 N.Y.S.2d 897 (N.Y. App. Div. 1984) (avoiding security interest under NY DCL section 274 since, among other things, no consideration flowed to company that mortgaged its assets to repay debt to selling shareholders); *cf. Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 734 (Bankr. S.D.N.Y. 2008) (stating that, "[b]y its terms, § 274 applies to conveyances but not obligations, and cannot be relied on to invalidate the debtors' loan debt or guaranties to the Pre-Petition Banks ," and concluding that, where the debtor received actually the full benefit of the loans, "the delivery of collateral to secure a non-avoidable debt or obligation constitutes a transfer supported by 'fair consideration' that cannot be set aside under the NY DCL").

[1068]  This represents a significant difference from Bankruptcy Code section 548, which also permits the avoidance of transfers **and obligations incurred** for less than reasonably equivalent value when the debtor is left with unreasonably small capital.

288

NY DCL section 275 is also available to future creditors seeking to avoid conveyances *or* obligations, where the debtor's predicate financial condition is that he "intends or believes that he will incur debts beyond his ability to pay as they mature."[1069]  "Courts have interpreted 'intends or believes' as 'awareness by the transferor that, as [a] result of the conveyance, he will not be able to pay present and future debts.'"[1070]  Arguably, intent can be shown by the circumstances surrounding a transfer.[1071]  NY DCL section 275 has been applied to LBO transactions.[1072]

### (b)    Claims Requiring Pre-Existing Creditors

NY DCL section 273 provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent *as to creditors* without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration" (emphasis added).[1073]  Accordingly, New York courts have

---

[1069]    *9281 Shore Rd. Owners Corp. v. Seminole Realty Corp. (In re 9281 Shore Rd. Owners Corp.),* 187 B.R. 83, 851 (E.D.N.Y. 1995); *see also Laco X-Ray Sys, Inc. v. Fingerhut*, 453 N.Y.S.2d 757, 762 (N.Y. App. Div. 1982) (stating NY DCL section 274 applies to all existing creditors and persons who become creditors while business is in operation); *In re RCM Global Long Term Capital Appreciation Fund*, 200 B.R. 514, 523 n. 2 (Bankr. S.D.N.Y. 1996) (noting that a creditor need not exist at the time of transfer under § 544(b) of the Bankruptcy Code as long as the state statute allows it, and citing § 274 as an example of such statute).

[1070]    *Ostashko v. Ostashko (In re Ostashko)*, 00-CV-7162, 2002 U.S. Dist. LEXIS 27015, 77-78, at * 78 (E.D.N.Y. Dec. 10, 2002) (citing *The Cadle Company v. Lieberman*, 96 CV 495, 1998 U.S. Dist. LEXIS 23093, at *29 (E.D.N.Y. Sept. 11, 1998)) *aff'd, Ostashko v. Zuritta-Teks, Ltd.,* 79 Fed. Appx. 492 (2d Cir. N.Y. 2003).

[1071]    *See, e.g.*, *United States v. 58th Street Plaza Theatre, Inc.*, 287 F. Supp. 475, 498 (S.D.N.Y. 1968) ("It is clear that Leo knew at all times between January 1, 1943 and October 1, 1953 that Plaza would be unable to pay the tax claims of the United States if such claims were upheld.  During those years, however, he and the other stockholders, officers and directors authorized transfers of funds to themselves.")

[1072]    *See, e.g., Official Comm. of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Lattman (In re Norstan Apparel Shops, Inc.),* 367 B.R. 68 (Bankr. E.D.N.Y. 2007) (where a constructive fraudulent transfer avoidance complaint was filed by unsecured creditors' committee against former shareholders who received more than $55 million in connection with an LBO of their stock in debtor-corporation, and where debtor received no consideration in connection with the LBO but saw its previously unencumbered assets encumbered and its working capital drastically reduced to just 2.1% of its net sales and 1% of its total assets, such that, on closing of the LBO, the debtor was forced to immediately borrow money to pay closing costs, alleged facts were sufficient to support the inference that former shareholders knew that the debtor would be unable to pay its debts as they matured).

[1073]    Del. C. Ann. tit. 6, § 1305(a) provides: "A transfer made or obligation incurred by a debtor is fraudulent *as to a creditor whose claim arose before the transfer was made or the obligation was incurred* if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."  Under S.C. Code Ann. § 27-23-10, existing creditors may set aside conveyances in two instances:

held that only present creditors, *i.e.*, creditors in existence at the time of the challenged transfer, may assert claims under NY DCL section 273.[1074] [1075]  At least one court has held that because NY DCL sections 275 and 276 are "explicitly enforceable by both 'present and future creditors'" and NY DCL section 273 contains no such language, "its provisions are limited to unsecured creditors whose claim was in existence at the time of the allegedly fraudulent transfer."[1076]

### (i)    Actual Creditors and Section 544(b)

Bankruptcy Code section 544(b)[1077] allows the trustee to avoid "any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding

---

First, where the challenged transfer was made for a valuable consideration, it will be set aside if the plaintiff establishes that (1) the transfer was made by the grantor with the actual intent of defrauding his creditors; (2) the grantor was indebted at the time of the transfer; and (3) the grantor's intent is imputable to the grantee.

Second, where the transfer was not made on a valuable consideration, no actual intent to hinder or delay creditors must be proven.  Instead, as a matter of equity, the transfer will be set aside if the plaintiff shows that (1) the grantor was indebted to him at the time of the transfer; (2) the conveyance was voluntary; and (3) the grantor failed to retain sufficient property to pay the indebtedness to the plaintiff in full – not merely at the time of the transfer, but in the final analysis when the creditor seeks to collect his debt.

*Mathis v. Burton*, 319 S.C. 261, 264-65 (S.C. Ct. App. 1995) (quoting *Durham v. Blackard*, S.C. 313 S.C. 432 (S.C. Ct. App. 1993) (citations omitted) (interpreting the Statute of Elizabeth)).

At least one Delaware court has applied this analysis to an LBO, holding that since no "valuable consideration" was given for a guarantee of personal debt used to finance the LBO, no actual intent to defraud need be shown.  *Future Group II v. NationsBank,* 479 S.E.2d 45,48 (S.C. 1996) ("Under §27-23-10, a transfer made without valuable consideration will be set aside as a fraudulent conveyance if the grantor was indebted to the plaintiff at the time of the transfer and the grantor failed to retain sufficient property to pay his debt to the plaintiff, not merely at the time of transfer, but at the time the plaintiff seeks to collect . . . if there is valuable consideration, the transfer will be set aside only where the grantor was indebted at the time of the transfer and had an actual intent to defraud creditors imputable to the grantee.").

[1074] *See Shelly v. Doe*, 660 N.Y.S.2d 937, 944-45 (1997), *modified and aff'd,* 671 N.Y.S.2d 803 (N.Y. App. 1998); *Standard Chartered Bank v. Kittay*, 628 N.Y.S.2d 307, 308 (N.Y. App. Div. 1995) (NY DCL section 273 "makes no provision for those who become creditors subsequent to a fraudulent transfer.").

[1075] Del. C. Ann. tit. 6, § 1305(a) provides: "A transfer made or obligation incurred by a debtor is fraudulent ***as to a creditor whose claim arose before the transfer was made or the obligation was incurred*** if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.") (emphasis added).

[1076] *Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 35 (S.D.N.Y. 2002) (citing *In re Manshul Construction Corp.*, 97 Civ. 8851, 2000 U.S. Dist. LEXIS 12576 at *43-44 (S.D.N.Y. 2000)).

[1077] Finding a single creditor with the requisite cause of action under section 544(b) is significant.  Once a transfer is voidable under section 544(b), the transfer is avoided in its entirety for the benefit of ***all*** creditors, not just to

an unsecured claim that is allowable under [section 502 of the Bankruptcy Code]." Thus, the trustee must identify a creditor holding an allowable claim with standing to avoid a transfer under state law in order to pursue a fraudulent transfer action under section 544(b).[1078] If such creditor was also a creditor as of the date of an avoidable transaction or is a subsequent creditor with standing under state law, the trustee has standing.

As set forth in Section III.L.1., the Examiner's limited review of the HVM accounts payable system found a vendor, Chereco, Inc., that was an unsecured creditor before the Acquisition and remained unpaid on its pre-Acquisition Claim as of the Petition Date. Additionally, four IRS[1079] claims are asserted against ESI; ESA Management LLC; ESA Operating Lessee Inc.; and ESA P Portfolio Operating Lessee Inc. Finally, the 9.875% Notes were issued by ESI in June 2001 and remain outstanding.[1080]

If the triggering creditor holds an allowed claim on the petition date and can prosecute the transfer at the petition date, then the creditor need not hold a claim at the commencement of a postpetition avoidance action. Courts have held that satisfaction of a triggering creditor's claim postpetition does not eliminate the trustee's ability to bring a section 544(b) cause of action so long as the claim existed at the date of the bankruptcy petition.[1081] In

---

the extent necessary to satisfy the individual creditor actually holding the avoidance claim. *See Moore v. Bay*, 284 U.S. 4, 5 (1931).

[1078] *See* 11 U.S.C. § 544(b); *see also Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Inc.)*, 139 F.3d 574, 577 (7th Cir. 1998).

[1079] The IRS claims confer on either the ESI Estate, the consolidated Mezzanine Estates, or the consolidated Extended Stay Estates, depending on whether substantive consolidation is ordered, the ability to pursue a claim under the FDCPA. Subsection 3304(b) of the FDCPA provides for the avoidance of claims *or* liens for which the debtor failed to obtain reasonably equivalent value, whether the United States' debt arose before or after the challenged transfer, and where the debtor is either insolvent, left with unreasonably small capital, or unable to pay debts as they come due.

[1080] In the Disclosure Statement (at 97), for the Mortgage Debtors' Plan, the Mortgage Debtors and the professionals currently estimate that there are approximately $3,500,000 of claims asserted against the Mortgage Debtors.

[1081] *In re Acequia, Inc.*, 34 F.3d 800, 808 (finding debtor could invoke § 544(b) despite paying triggering creditors in a plan); *MC Asset Recovery, L.L.C. v. S. Co.*, Civil Action No. 1:06-CV-0417, 2006 U.S. Dist LEXIS 97034, *12-14 (N.D. Ga. Dec. 11, 2006) (finding debtor had standing so long as the triggering creditor had allowable claim that could have avoided the transfer at the date of petition despite the fact that the triggering creditor was paid in full in a plan); *In re DLC, Ltd.*, 295 B.R. at 605 (debtor had standing where two triggering creditors had settled their claims postpetition and one claim was withdrawn postpetition).

two cases, triggering creditors were paid in full in a plan.[1082]  In another case, the plaintiff alleged that two triggering creditors settled their claims postpetition and one triggering creditor withdrew its claim.[1083]  In all three cases, the court held that the debtor still had standing for section 544(b) despite the postpetition satisfaction of the triggering creditors' claims.[1084]  The logic, as explained by the Eighth Circuit B.A.P., is that the petition date is the "date of cleavage" where "the rights of the debtor and other parties in interest are generally fixed. . . ."[1085]  Therefore, it is appropriate to take a snapshot of the situation at the petition date to determine to what rights the debtor can succeed.

### (ii) Continuous Creditors

Several courts have held that a creditor that existed at the time of an avoidable transfer whose debt is subsequently paid, but again becomes a creditor of the debtor prior to the petition date, will qualify as a pre-existing creditor sufficient to grant the trustee standing to assert an avoidance claim under section 544(b) as a pre-existing creditor.[1086]  These courts have

---

[1082]  *In re Acequia*, 34 F.3d at 808 (allowing recovery of fraudulent transfers even though unsecured creditors have been paid in full when recovery would aid continuing performance of post confirmation obligations and reimburse the bankruptcy estate for fraudulent conveyance litigation costs); *MC Asset Recovery*, 2006 U.S. Dist. LEXIS 97034 at *12-14.

[1083]  *In re DLC, Inc.*, 295 B.R. at 605.

[1084]  *In re Acequia*. 34 F.3d at 808; *MC Asset Recovery*, 2006 U.S. Dist. LEXIS 97034 at *12-14; *In re DLC, Inc.*, 295 B.R. at 605.

[1085]  *In re DLC*, 295 B.R. at 605 (citing *Mickelson v. Detlefsen (In re Detlefsen)*, 610 F.2d 512, 519 (8th Cir. 1979)).

[1086]  *See, e.g., In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 523 (Bankr. S.D.N.Y. 1996) (finding that professionals that provided services to debtor were pre-existing creditors even though they had been paid in full at various points between the transfer date and the petition date and holding, "[i]t is not necessary 'that the claim held by that creditor at the bankruptcy filing be identical to the one held at the time of the [fraudulent conveyance]'") (citing *In re Healthco Int'l Co.*, 195 Bankr. 971, 980 (Bankr. D. Mass. 1996)); *Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 890 (Bankr. N.D. Ill. 1991) ("Claims arising from open trade accounts with Debtor constitute preexisting claims … [as] a typical trade account contemplates a revolving indebtedness even after payment without the execution of any new contract with new terms."); *Belfance v. Bushey (In re Bushey)*, 210 B.R. 95, 100 (6th Cir. B.A.P. 1997) (a credit card company was a creditor with a claim at the time of the transfer and at the date of the petition even though the account had no balance for a period of time between the transfer and the filing date).

The Bankruptcy Court for the Eastern District of New York recently held in *Silverman v. Sound Around, Inc. (In re Allou Distribs.)*, 392 B.R. 24, 34 (Bankr. E.D.N.Y. 2008), that while a triggering creditor "must be the same creditor on both the Transfer Date and the Petition Date, [it] need not hold the same claim at these two essential points in time."  Thus, where the debtor's trade creditors were paid in full following the subject transfer, but later extended credit to the debtor that remained outstanding as of the petition date, those creditors qualified as pre-existing creditors for purposes of section 544(b).

recognized that "[t]he focus of § 544(b) is on the identity of the *creditor*, not on the historical relationship between that creditor's claim and the debtor."[1087]

Thus, even if all of the Debtors' creditors that existed at the time of an avoidable transfer were subsequently paid in full, the representatives of the Estates would still have standing to avoid a transfer under state law requiring a pre-existing creditor if any such creditors held allowable claims against the same Debtor on the Petition Date.

As more fully set forth in section III.L.1., in his Investigation, the Examiner found evidence of twenty-four creditors who may have held claims as of the Closing and as of the Petition Date.

### (iii)    Litigation and Tort Creditors

Under New York law, a litigation or tort claimant becomes a creditor of the debtor at "the moment the cause of action accrues," and obtains standing to set aside a fraudulent transfer as a creditor under state law at that time.[1088]  This is true whether or not such creditor has reduced its claim to judgment at the time of the transfer.[1089]

Thus, to the extent that any cause of action against a Debtor or Debtors arose prior to the date of an avoidable transfer, the relevant creditor would obtain standing to avoid the transfer as a pre-existing creditor under New York law.[1090]  As a result, the representatives of the respective Estates would also have such standing under Bankruptcy Code section 544(b).

---

[1087] *In re Bushey*, 210 B.R. at 101.

[1088] *Shelly v. Doe*, 671 N.Y.S.2d 803, 805 (N.Y. App. Div. 1998).

[1089] *See, e.g., Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20 (S.D.N.Y. 2002) (holding that contingent liabilities existing at the time of an allegedly fraudulent transfer were sufficient to qualify a creditor as a pre-existing creditor); *N. Fork Bank v. Schmidt*, 697 N.Y.S.2d 106 (N.Y. App. Div. 1999) (judgment creditor had standing to avoid a conveyance made during the pendency of the suit, because the conveyance was void as to the judgment creditor while he was a plaintiff); *see also Farm Stores, Inc. v. School Feeding Corp.*, 477 N.Y.S.2d 374 (N.Y. App. Div. 1984) (same), *aff'd* 479 N.E.2d 222 (N.Y. 1985); *Gager v. Pittsford Dev. Corp.*, 164 N.Y.S.2d 324, 326 (N.Y. Sup. Ct. 1957) (explaining that "[t]here is no merit in defendants' contention that plaintiff lacks the status to maintain the action because his claim was contingent and unmatured at the time of the conveyance to defendants").

[1090] *Shelly*, 671 N.Y.S.2d at 805 (holding that "inasmuch as respondent's cause of action arose prior to the subject transfer, we find that she was a creditor who could pursue relief under Debtor and Creditor Law § 273.").

As described in Section III.L., the Investigation uncovered five claims that were the subject of outstanding or threatened litigation both as of the Closing and on the Petition Date. Those claims are against BRE/HV Properties, L.L.C.; ESI; Extended Stay America Inc.; and BRE/Homestead Portfolio L.L.C.

(c)     <u>Conclusions</u>

### Section 544(a)

Each of the Estates has its own hypothetical creditor under Bankruptcy Code section 544(a). Accordingly, the representatives of each Estate have standing as a subsequent creditor to pursue an avoidance action against the Buyer, the Seller, the Lenders and the Professionals in connection with the Acquisition. Under New York law, that status as a subsequent creditor is somewhat circumscribed. NY DCL section 274 limits a subsequent creditor's ability to maintain an avoidance action premised on unreasonably small capital to the ability to set aside a fraudulent conveyance, but not an obligation. NY DCL section 275 would allow the representatives of each Estate to avoid conveyances or obligations, where the debtor's predicate financial condition is that he "intends or believes that he will incur debts beyond his ability to pay as they mature . . . ."

### Section 544(b)

The Investigation has revealed several actual creditors that were creditors of certain Debtors as of the Closing and on the Petition Date. Additionally, some estates have a United States creditor. As a result of Bankruptcy Code section 544(b), each such Estate would thus have standing to assert avoidance actions pursuant to, at least, the FDCPA,[1091] and NY DCL §§ 273, 274 and 275. [1092]

(2)     <u>Equivalence of Value Provided</u>

As set forth in Section V.C.2.a., demonstrating constructive fraud under the NY DCL first requires a showing that the debtor did not receive "fair consideration." As further set

---

[1091]  *See* Report § V.C.1.b.

[1092]  *See* Report § V.C.2.

294

forth in Section V.C.2.b., it is "unlikely that any LBO can satisfy fair consideration requirements."[1093]

### (a) Indirect Benefits Obtained by Target in an LBO

Courts have recognized that a "LBO or other complex corporate transaction may give rise to indirect benefits to the debtor that must also be included in the calculation" of whether the target/debtor received fair consideration in the transaction.[1094] Once the plaintiff proves that the debtor did not recover reasonably equivalent value from the direct benefits, the burden of proof shifts to the defendant to prove evidence of the value of any indirect benefits.[1095] Such indirect benefits can include, among other things, the synergistic effects of new corporate relationships, the tax benefits that a target receives as a consequence of an LBO, and benefits that may result from the arrival of a new management team.[1096]

While courts recognize that synergies might flow from the merger of two complimentary companies or the addition of new management, when a target is acquired and no significant operational or other changes result from the acquisition, and there is no newly formed symbiotic relationship that is created, it is difficult to argue that the target received any indirect benefits.[1097]

---

[1093] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y 1995).

[1094] *Id.* at 937. *Accord Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991) ("[I]n evaluating whether reasonably equivalent value has been given the debtor under section 548, indirect benefits may also be evaluated." ).

[1095] *Official Committee of Unsecured Creditors of TOUSA, Inc. v. Citicorp Int'l. America, Inc. (In re TOUSA Inc.)*, 2009 Bankr. LEXIS 3311 (Bankr. S.D. Fla. 2009). To make out the elements of a fraudulent conveyance claim, a plaintiff must prove that a debtor did not receive direct benefits reasonably equivalent to the value which it gave up. If the plaintiff meets that burden, the burden is then on defendants to produce (if they can) evidence that the debtors indirectly received sufficient, concrete value. *Id.* at *233. The defendants must "carry their burden of producing evidence of indirect benefits that were tangible and concrete, and of quantifying the value of those benefits with reasonable precision." *Id.* at *236.

[1096] For example, in *Mellon Bank*, 945 F.2d at 648, the court recognized the legitimacy and value of the indirect benefits such as synergy that the defendant lenders expected would be produced through the affiliation of two companies, the buyer and seller of broadcasting rights and producer and broadcaster of the athletic events, as well as certain asserted tax benefits that became available to the target, for purposes of evaluating whether the target's assets were fraudulently conveyed under section 548.

[1097] *See Brandt v. Hicks, Muse & Co. (In re Healthco Int'l)*, 195 B.R. 971, 980-81 (Bankr. D. Mass. 1996) (finding that debtor's "merger with a newly-organized shell corporation obviously produced no synergy or enhancement of operating efficiency."); *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 193 B.R. 451, 456 (Bankr. S.D. Ohio 1995) ("new management is not the consideration received by the Debtor against which

295

Other possible indirect benefits include the availability of additional credit to the company after the transaction, especially if it is demonstrated that it facilitates additional business opportunities for the target.[1098]  Courts have also found under other circumstances that "the opportunity to incur debt is not 'consideration' for purposes of the UFCA."[1099]

### (b)    Conclusion

Extended Stay received no direct or indirect benefits that would arguably provide "fair consideration" in exchange for the approximately $1.7 billion in new debt with which the Debtors were saddled as a result of the Acquisition.  Specifically, as set forth in Section III.D.2., the Acquisition increased the mortgage debt by approximately $749.4 million and the mezzanine debt by approximately $905.3 million.

The Examiner specifically considered typical indirect benefits, such as the experience of the new owner, possible synergies, an enhanced ability to borrow money that would make business opportunities available or provide opportunities for expansion, additional capital that might be made available as a result of the acquisition for capital improvements or

---

adequacy or fairness of any consideration must be measured"); *Moody v. Security Pacific Business Credit, Inc.*, 127 B.R. 958, 993 (W.D. Penn. 1991) *aff'd*, 971 F.2d 1056 (3d Cir. 1992) (new management does not fall within definition of fair consideration); *Credit Managers Assoc. v. Fed. Co.*, 629 F. Supp. 175, 182 (C.D. Cal. 1985) (management's services not fair consideration when no identifiable monetary value); *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), *cert. denied*, 483 U.S. 1005, 107 S. Ct. 3229, 97 L. Ed. 2d 735 (1987).

[1098] *See, e.g.*, *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 152-54 (3d Cir. 1996) (conditional $53 million commitment letter could serve as reasonably equivalent value for payment of $515,000 in fees if it provided at least some chance of a future economic benefit, but finding lack of reasonably equivalent value because lender knew debtor had little chance of obtaining the "highly conditional" credit facility when lender received fees).

[1099] *In re Structurlite Plastics Corp.*, 193 B.R. at 456 (citing *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 Bankr. 370, 395 (Bankr. D. Mass. 1991)); *see also Moody.*, 127 B.R. at 976.  Similarly, in *MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 939, the company became insolvent and the holders of senior subordinated notes alleged that the LBO of the company constituted a fraudulent conveyance.  In evaluating the constructive fraudulent conveyance claims, the court looked past the various steps of the LBO transaction to find that, in essence, that the debtor incurred $55 million in debt but only retired $27 million in preexisting debt and retained $1.2 million of the loan proceeds.  In other words, the direct consideration received by the debtor in the LBO was approximately $26.8 million short of being equivalent to the obligations it incurred. *Id.* at 937.  Although the court was willing to consider indirect benefits that the debtor might have received in the form of favorable tax treatment and the availability of a $10 million revolving credit line from the lender, there was no evidence to substantiate that the value of such benefits was reasonably equivalent to the $26.8 million shortfall in consideration.  Because it could not be said that such indirect benefits qualified as fair consideration, the plaintiffs thereby established the first element of constructive fraud: the absence of fair consideration.

296

expansion, or guarantees provided by the new owner. The Examiner found no such indirect benefits. Instead, Extended Stay received a new owner with no experience operating a hotel chain or any other entity of Extended Stay's size and magnitude, and its ability to borrow was severely reduced. Further, Mr. Lichtenstein's so-called guarantee was of no value to Extended Stay as a going concern, since it only arose in the event of bankruptcy.[1100]

The benefits that ESI received as part of the overall LBO transaction appear limited to the elimination of existing debt. Ultimately, the Acquisition served only to further encumber Extended Stay. Accordingly, the Examiner believes that a court would move to the next step of a constructive fraudulent transfer analysis, which is to consider Extended Stay's financial condition as of, or as a result of, the Acquisition under the various tests discussed below.[1101]

### (3) Solvency / Inadequate Capital / Ability to Pay Debts

#### (a) Solvency

Section 271 of the NY DCL, entitled "Insolvency," provides that

A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.[1102]

"There is no accepted test for determining insolvency under [NY] DCL section 271.[1103] The courts in New York have not, for the most part, drawn a distinction between the

---

[1100]  *See* Section III.D.2.

[1101]  Demonstration of a lack of fair consideration triggers a shift in the burden of production to the transferee or obligor. *See MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 938 ("Where, as here, the absence of fair consideration has been demonstrated, the burden of coming forward with proof that the debtor nonetheless remained solvent shifts to the defendants.").

[1102]  N.Y. DCL § 271(1). In contrast, Delaware's fraudulent transfer statute states that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." Del. Code Ann. tit. 6 § 1302.

[1103]  *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 171-72 (Bankr. S.D.N.Y. 1998) (citing *In re Best Prods. Co.*, 168 B.R. 35, 53 (Bankr. S.D.N.Y. 1994), *appeal dismissed*, 177 B.R. 791 (S.D.N.Y. 1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995)). The definitions of insolvency under the various fraudulent transfer statutes differ. The UFCA adopts the "equity" or "cash flow" test of insolvency, under which a debtor is insolvent if the present fair salable value of the debtor's assets is less than the amount required to pay existing debts as they become due. *See, e.g.* NY DCL § 271. The Bankruptcy Code adopts the balance sheet definition of insolvency, under which a debtor is insolvent if the debtor's liabilities exceed the debtor's assets. 11 U.S.C.A.

537960v2

UFCA and the Bankruptcy Code test of insolvency.[1104]  Other courts considering solvency under the UFCA often look to decisions reached under the Bankruptcy Code's fraudulent transfer provisions despite the differences in the statutory language.[1105]

The UFCA, and NY DCL section 271, consider the "present fair salable value" of an entity's assets in the evaluation of insolvency.  To be "salable" an asset must have "an existing and not theoretical market."[1106]  "Where bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis."[1107]

### (i)  Valuation Methodologies

In performing the balance sheet test, courts will consider a combination of valuation methodologies, including: (a) actual sale price; (b) discounted cash flow method; (c) adjusted balance sheet method; (d) market multiple approach; (e) comparable transactions analysis; and (f) market capitalization.[1108]  The valuation methodologies include a comparison of "total enterprise value" to the value of the company's debts.[1109]

§ 101(32)(A).  Under the UFTA, a debtor is insolvent if the debtor's liabilities exceed the debtor's assets (the balance sheet definition), and the debtor is presumed to be insolvent if the debtor is generally not paying his or her debts as they become due (the equity or cash flow test).  *See, e.g.,* Del. Code Ann. tit. 6, § 1302(a).

[1104]  *In re Centennial Textiles*, 220 B.R. at 173 ("[T]he courts in New York have not, for the most part, drawn any distinction between the UFCA and the Bankruptcy Code's test of insolvency.").

[1105]  *See Moody v. Security Pac. Business Credit*, 971 F.2d 1056, 1068 (3d Cir. 1992) ("[A]lthough the UFCA's 'present fair salable value' language differs from the Bankruptcy Code's "fair valuation" requirement, see 11 U.S.C. § 101(31)(A), we find the bankruptcy cases instructive on the proper valuation standard here. ") (citations omitted).

[1106]  *United States v. Gleneagles Inv. Co. Inc.*, 565 F. Supp. 556, 578 (M.D. Pa. 1983); *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 398 (Bankr. Mass. 1991) ("A reasonable construction of the statutory definition of insolvency indicates that it not only encompasses insolvency in the bankruptcy sense, *i.e.*, a deficit net worth, but also includes a condition wherein a debtor has insufficient presently salable assets to pay existing debts as they mature.  If a debtor has a deficit net worth, then the present salable value of his assets must be less than the amount required to pay the liability on his debts as they mature.  A debtor may have substantial paper net worth including assets which have a small salable value, but which if held to a subsequent date could have a much higher salable value.  Nevertheless, if the *present* salable value of his assets are [sic] less than the amount required to pay existing debts as they mature, the debtor is insolvent." (citations omitted)).

[1107]  *See Moody v. Security Pac. Bus. Credit*, 971 F.2d 1056, 1068 (3d Cir. 1992) ("[A]lthough the UFCA's 'present fair salable value' language differs from the Bankruptcy Code's "fair valuation" requirement [...] we find the bankruptcy cases instructive on the proper valuation standard here. ") (citations omitted).

[1108]  *Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007), citing *In re Coated Sales, Inc.*, 144 B.R. 663, 670 (Bankr. S.D.N.Y. 1992) (actual sale); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 939 (S.D.N.Y. 1995) (asset purchase

**(ii)** **Valuation – Purchase Price is Highly Probative But Not Determinative.**

Although not determinative, a purchase price may be highly probative of a company's value immediately after an LBO.[1110]  In considering the solvency of the debtor in *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*,[1111] the court noted that "determination of solvency requires a comparison of [the debtor's] assets to its liabilities immediately after the LBO."  In performing the valuation of the debtor's assets, the court considered the purchase price as evidence of valuation, as well as the discounted cash flows, the valuation of comparable businesses, and the amount of the debtor's working capital.  The plaintiffs argued that the purchase price should be discounted by any transfers that were made by the debtor without consideration.  The court disagreed: "to the extent that the purchaser in an LBO knows of any transfer that will drain assets from the target, he has necessarily considered that transfer in establishing the price he is willing to pay.  In other words, the market has already taken such transfers into account.  In this case [the acquirer] was fully aware of all aspects of the LBO.  Thus, there is no basis for modifying the purchase price."[1112]  The court found that acquirer proceeded with the LBO with full information and without coercion.  Furthermore, other bidders expressed interest in purchasing the debtor at prices similar to that ultimately paid.[1113]

---

price, discounted cash flow, comparable transactions); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 104 (Bankr. D. Del. 1999) (discounted cash flow), *Lids Corp. v Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 541 (Bankr. D. Del. 2002) (adjusted balance sheet, market multiple approach, and comparable transactions); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (market capitalization).

[1109] *See, e.g.*, *Official Comm. of Unsecured Creditors v. Citicorp N. Am. (In re TOUSA)*, Case No. 08-10928, 2009 Bankr. LEXIS 3311, *112 (Bankr. S.D. Fla. Oct. 13, 2009) ("If the enterprise's TEV is less than its net debt (its outstanding indebtedness minus its cash on hand), then its liabilities exceed the fair value of its assets and it is insolvent.") .

[1110] *Moody*, 971 F.2d at 1067; *MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 939 ("Where a transaction is consummated after arms-length negotiations, and particularly where other potential purchasers expressed interest in buying the company on similar terms, the sale price is a good indicator of the value of the target's assets.").

[1111] 910 F. Supp. 913.

[1112] *Id.* at 938.

[1113] *Id.*; *cf. FCC v. Nextwave Personal Commc'ns., Inc. (In re Nextwave Personal Commc'ns., Inc.)*, 200 F.3d 43, 49 (2d Cir. 1999) (valuing property purchased in an auction at the auction price).

299

### (iii)    Conclusion

As stated in Section IV.B., the Examiner's Professionals did not perform an independent valuation of the Company or Extended Stay as that was outside of the scope of this Investigation.  However, as discussed below, the Examiner's Professionals did provide some observations related to the valuation of the Company and have also concluded that the Acquisition left Extended Stay inadequately capitalized and unable to pay its debts as contemplated by NY DCL sections 274 and 275, respectively.  *See* Sections IV.C.&D.

### (b)    Unreasonably Small Capital

### (i)    Statutory Language

Section 274 of the NY DCL[1114] provides that a conveyance is fraudulent where the debtor is left with capital that is "unreasonably small" following the transfer.[1115]  The term "unreasonably small capital" is not defined in the Bankruptcy Code or the UFCA.[1116]  Courts have generally described the term as a financial condition short of equitable insolvency,[1117] but

---

[1114]   Section 274 is entitled "Conveyances by persons in business" and provides:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction *for which the property remaining in his hands after the conveyance is an unreasonably small capital*, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

NY DCL § 274 (emphasis added).

[1115]   By contrast, section 1304 of title 6 of the Delaware Code (which adopts the UFTA) provides that "[a] *transfer made or obligation* incurred by a debtor is fraudulent as to a creditor . . . if the debtor . . . [w]*as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction . . . .*"  Del. Code Ann. tit. 6 § 1304  (emphasis added).  Courts have made no distinction between the relevant language of the UFTA and UFCA in determining whether the transferor's assets are "unreasonably small" following the transfer.  *See, e.g., Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 396, n. 137 (S.D. Tex. 2008) (noting that many courts have adopted the analysis applied in *Moody v. Security Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. l992), interpreting the UFCA, when interpreting the analogous provisions in the UFTA and the Bankruptcy Code).  South Carolina's fraudulent transfer statute, which, as described above, is not modeled on either the UFTA or the UFCA, does not contain language synonymous with the concept of "unreasonably small capital," *see* S.C. Code Ann. § 27-23-10, and the courts of that state do not appear to have included a similar test in the common law.

[1116]   *See, e.g., Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) (citing cases).

[1117]   *Asarco*, 396 B.R. at 396 (citing *MFS/SUN Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995)); *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009) (same); *see also Murphy v. Meritor Savings Bank (In re O'Day Corp.)*, 126 B.R. 370, 407 (Bankr. D. Mass. 1991) ("[U]nreasonably small capitalization encompasses financial difficulties which are short of equitable

which leaves the transferor unable "to generate sufficient profits to sustain operations."[1118]  In other words, "the test is aimed at transfers that leave the transferor technically solvent but doomed to fail."[1119]  Thus, the unreasonably small capital test is designed to capture those situations where a debtor, though not rendered insolvent by a transaction, is left with so few assets that insolvency should have been "reasonably foreseeable."[1120]

### (ii) Application of Unreasonably Small Capital Test

Since the unreasonably small capital test focuses on whether insolvency was reasonably foreseeable following a transaction, "courts compare a company's projected cash inflows (also referred to as 'working capital' or 'operating funds') with the company's capital needs throughout a reasonable period of time after the questioned transfer."[1121]  "In determining whether a company was adequately capitalized, courts examine not what ultimately happened to the company, but whether the company's then-existing cash flow projections (*i.e.*, projected working capital) were reasonable and prudent when made."[1122]

---

insolvency or bankruptcy insolvency but are likely to lead to some type of insolvency eventually."); *Brandt v. Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*) , 208 B.R. 288, 300 (Bankr. D. Mass. 1997) (finding that, "a transaction leaves a company with unreasonably small capital when it creates an *unreasonable risk* of insolvency, not necessarily a likelihood of insolvency") (emphasis added).

[1118]  *Iridium Operating LLC*, 373 B.R. at 345 (quoting *Moody*, 971 F.2d at 1070); *see also Boyer v. Crown Stock Distrib.*, 587 F.3d 787, 792 (7th Cir. 2009) (holding that a corporation is left with unreasonably small capital when, as a result of the transfer it is "left with insufficient assets to have a reasonable chance of surviving indefinitely").

[1119]  *MFS/SUN Life*, 910 F. Supp. at 944; *Pereira v. Cogan*, 294 B.R. 449, 521 (S.D.N.Y. 2003) (same).

[1120]  *See, e.g.*, Robert J. Stearn, Jr., *Proving Solvency: Defending Preference and Fraudulent Transfer Litigation*, 62 Bus. Law. 359 (2007) (stating that, "[a]t bottom, the inquiry is prospective: the test for unreasonably small capital is reasonable foreseeability, *i.e.*, was it reasonably foreseeable on the transfer date that the debtor would have unreasonably small capital to carry out its business?") (citations omitted); *see also* Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital,* 21 Ind. L. Rev. 469, 499 (1988) ("[T]he existing cases can be distilled into the following: capital remaining after a transfer is unreasonably small when the unpaid creditor/plaintiff can show its non-payment was a reasonably foreseeable effect of the transferor's failure to retain, or failure to provide for, an adequate amount of resources from and after the transfer to satisfy the unpaid plaintiff/creditor's claim.").

[1121]  *Iridium IP LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) (citing *Moody*, 971 F.2d at 1071-72); *see also Barrett v. Continental Ill. Nat'l Bank & Trust Co.*, 882 F.2d 1, 4 (1st Cir. 1989) (The "critical inquiry . . . weighs raw financial data against both the nature of the enterprise itself and the extent of the enterprise's need for capital during the period in question."); *Asarco LLC*, 396 B.R. at 396-97 (quoting same).

[1122]  *Iridium Operating,* 373 B.R. at 345; *see also Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009) ("The test for determining whether parties to a leveraged buy-out left a business with unreasonably small assets

When evaluating a company's financial condition at the time of the transfer, courts place great weight on "contemporaneous evidence 'untainted by hindsight or post-hoc litigation interests.'"[1123] The United States Bankruptcy Court for the Southern District of New York recently stated that, "[w]ithout a firm basis to replace management's cost projections with those developed for litigation, the starting point for solvency analysis should be management's projections."[1124] Courts have also found "expert analysis by investment bankers and independent accounting firms which affirm management's projections" instructive in assessing whether those projections are reasonable.[1125]

Adequacy of capital may be demonstrated by such factors as "the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue."[1126] "Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses."[1127] Projected cash inflows, for example, are reasonable only if the company should have expected to receive them, "whether from new equity, cash from operations, or available credit,"[1128] and the court should test those projections against the company's historical data.[1129]

Reliance on historical data alone is not sufficient, however; "parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general

---

is whether it was reasonably foreseeable that an acquisition would fail at the time the projections were made, and a court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made.") (quoting *Fidelity Bond & Mortgage Co. v. Brand*, 371 B.R. 708, 723 (E.D. Pa. 2007)); *Asarco LLC*, 396 B.R. at 396-97 ("The test for unreasonably small assets is 'reasonable foreseeability.' This determination requires an objective assessment of the company's financial projections – the critical question being whether those projections were reasonable . . . at the time made, not in hindsight.") (citations omitted).

[1123] *Kipperman*, 411 B.R. at 836 ("Such contemporaneous evidence may include a company's stock price or opinions by contemporaneous market participants.") (citing *Iridium*, 373 B.R. at 346-47).

[1124] *Iridium Operating*, 373 B.R. at 347-48 (internal quotation omitted).

[1125] *Kipperman*, 411 B.R. at 836 (citing *Iridium Operating LLC*, 373 B.R. at 347).

[1126] *Id.* (quoting *MFS/Sun Life*, 910 F. Supp. at 944).

[1127] *Moody v. Security Pac. Business Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992); *Peltz v. Hatten*, 279 B.R. 710, 745 (D. Del. 2002) (same); *Pereira v. Cogan*, 294 B.R. 449 (S.D.N.Y. 2003).

[1128] *Asarco*, 396 B.R. at 397 (citing *Iridium Operating LLC*, 373 B.R. at 343).

[1129] *Id.* (citing *Moody*, 971 F.2d at 1073).

economic downturns, and otherwise incorporate some margin for error."[1130]  For example, in *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*, the District Court for the Southern District of New York considered whether a company that was the target of an LBO was left with unreasonably small capital following the LBO.[1131]  Almost immediately following the LBO, the company missed its financial targets and was ultimately liquidated approximately two years later.[1132]  In assessing the reasonableness of the company's financial projections at the time of the LBO, the court explained:

> the question the court must decide is not whether the projection was correct, for it clearly was not, but whether it was reasonable and prudent when made.  Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance . . . .  Nevertheless, reliance on historical data alone is not enough.  To a degree, parties must also account for difficulties that are likely to arise . . . and . . . incorporate some margin for error.[1133]

Thus, projections that are based upon an unreasonably optimistic outlook as to the company's ability to cover its costs following a transfer do not support a finding of adequate capitalization.[1134]  Where contemporaneous projections reasonably account for predictable events following the transfer, however, a company will generally not be found to have been left with unreasonably small capital.[1135]

---

[1130]  *Moody*, 971 F.2d at 1073; *Peltz*, 279 B.R. at 745 (same); *Pereira*, 294 B.R. 449.

[1131]  *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913 (S.D.N.Y. 1995).

[1132]  *Id.* at 920-21.

[1133]  *Id.* at 943 (finding that the company had "built into its forecast some cushion.  It did not, for example, simply adopt the aggressive [ ] Model, but instead chose a more likely outcome built on identified assumptions.  Moreover, independent analyses that utilized still more conservative assumptions found that [the company] would be able to meet its obligations.") (internal citations omitted).

[1134]  *See, e.g., In re: TOUSA, Inc.*, 2009 Bankr. LEXIS 3311, *221-22 (Bankr. S.D. Fla. October 13, 2009) (finding considerable evidence that each of the transferors "was overleveraged at the time of the [transfer] and faced considerable risk of failure as a result of the transaction"); *Murphy v. Meritor Savings Bank (In re O'Day Corp.)*, 126 B.R. 370 (Bankr. D. Mass. 1991) (finding financial projections unreasonable, and noting that, "labor problems, cost variances and cyclicality in the industry were the major contributors to [the debtor's] fiscal woes and were manifest and readily predictable prior to the LBO").

[1135]  *See, e.g., Moody*, 971 F.2d at 1066 (finding projections reasonable and that the company's bankruptcy "was caused by a number of complex factors" that were not caused by the LBO); *Iridium Operating LLC*, 373 B.R. at 345 (noting "the substantial work, both from within and from outside the company, that went into creation and testing of Iridium's projections," and finding those projections to be reasonable).

Although, as described above, the courts generally look to the company's projections to determine whether the company was adequately capitalized, the Second Circuit Court of Appeals has held that the over-encumbrance of a debtor's assets leaves the debtor with unreasonably small capitalization *per se.*[1136]  More generally, courts have found unreasonably small capital where the debtor has been so saddled with debt arising out of an LBO that it had inadequate funds to operate.[1137]

When determining whether a company has been left with adequate capital following a transfer, a court "examines the relationship, if any, between the amount of capital remaining in the business in the period after the transfer and the business' ability to continue operations during that period in the same manner as it conducted them before the transfer."[1138] Courts also consider "a company's capital throughout a reasonable period of time surrounding the precise date of a challenged transfer," which "avoids the risk of ascribing undue weight to the state of a company's balance sheet on a particular day, and allows the court to make a realistic assessment of the impact of a transfer on a company's ability to conduct its affairs."[1139]

---

[1136]  *See Diller v. Irving Trust Co. (In re College Chemists)*, 62 F. 2d 1058 (2d Cir. 1933) (where sole shareholder sold all of the corporation's stock to a third party and received a lien on all the corporation's assets to secure payment of the purchase price "which was much greater" than the value of the assets, the court found that "the mortgage was clearly within section 274" and explained that "[t]he property remaining in the bankrupt's hands was 'an unreasonably small capital'; indeed there was no capital at all, because Weiner's debt was more than its value."); *see also Pirrone v. Toboroff (In re Vaninan Int'l, Inc.)*, 22 B.R. 166, 186 (Bankr. E.D.N.Y. 1982); *Sharrer v. Sandlas*, 477 N.Y.S.2d 897 (N.Y. App. Div. 1984) (finding that the business was left with unreasonably small capital because, "[a]fter the transaction, Sharrer's corporate property was so encumbered by petitioners' mortgage and lien that it was effectively left with no capital, and with a $1,850,000 debt. Accordingly, section 274 of the Debtor and Creditor Law mandates that the transaction in question be condemned as fraudulent and that the security interest created as a result thereof, as far as respondents are concerned, is rendered a nullity.").

[1137]  *See, e.g., Wells Fargo Bank v. Desert View Building Supplies, Inc.*, 475 F. Supp. 693 (D. Nev. 1978), *aff'd*, 633 F.2d 221 (9th Cir. 1980) (concluding that an LBO "placed [the company] in a situation where it had little working capital at a time when it needed to expand its sales in order to repay a loan from which it derived little or no benefit").

[1138]  *Barrett*, 882 F.2d at 4.

[1139]  *Id.*; *see also Asarco*, 396 B.R. at 396-97 ("To determine whether a corporation has unreasonably small assets, the Court should compare ASARCO's projected cash flow . . . with ASARCO's capital needs through a reasonable time after the challenged transfer.") (citing *Iridium Operating LLC*, 373 B.R. at 345); *In re Suburban Motor Freight, Inc.*, 124 B.R. 984, 1000 (Bankr. S.D. Ohio 1990) (holding that "the proper application . . . requires a court to examine a company's capital throughout a reasonable period of time surrounding the precise date of the challenged transfer").

537960v2

Additionally, many courts have considered the length of time the debtor survived after the challenged transfer as evidence of whether the debtor's projections were reasonable.[1140] This is so because a debtor's ability to operate for an extended period of time following the transfer suggests that it had sufficient capital to carry on its business.[1141] Some courts[1142] appear to place more emphasis on this factor than others.[1143] Generally, however, the weight placed by most courts on a debtor's ability to survive for a substantial period of time following the transfer tends to be guided by independent evidence of whether the company's projections were reasonable.

For example, in concluding that the debtor in *MFS/Sun* had retained sufficient capital, the court explained that "the adequacy of capital need only be tested within a reasonable period of the transfer at issue. While a company must be adequately capitalized, it does not need resources sufficient 'to withstand any and all setbacks.'"[1144] The court found the fact that the debtor continued to meet its debt obligations for more than a year after the LBO "strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout."[1145] Ultimately, the court concluded that the company "failed because of a concurrence

---

[1140] *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 234 (3d Cir. 2000) ("Actual performance of the debtor following the transaction is evidence of whether the parties' projections were reasonable."); *see also Fidelity Bond & Mortgage Co.*, 371 B.R. at 728 ("Another factor to consider in the unreasonably small assets test is the length of time a company continued to operate and pay creditors after the disputed transfer.").

[1141] *See, e.g., Fidelity Bond & Mortgage Co.*, 371 B.R. at 728 (finding evidence that the debtor did not file for bankruptcy until more than 14 months, made all interest payments due to its creditors during that time, and had positive cash balances for 8 months persuasive in demonstrating adequate capital); *Moody*, 971 F.2d at 1073 ("Jeannette's actual performance after the acquisition supports the district court's finding that the parties' projections were reasonable.").

[1142] *See, e.g., In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) (stating that "courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction . . . .").

[1143] *See, e.g., Asarco*, 396 B.R. at 398 (concluding that "the length of time a corporation survives after the challenged transfer is an important factor, but is nevertheless merely one factor to consider in the unreasonably small assets analysis," and "the fact that ASARCO did not file bankruptcy until over two years after the transfer is not dispositive").

[1144] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (citing *Barrett v. Continental Ill. Nat'l Bank & Trust Co.*, 882 F.2d 1, 4 (1st Cir. 1989)); *see also Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009) (quoting same).

[1145] *MFS/Sun Life*, 910 F. Supp. at 944. (citing *Moody v. Security Pac. Bus. Credit, Inc.*, 127 B.R. 958, 985 (W.D. Penn. 1991)).

of factors not related to the financial structuring of the LBO" and held that, "[n]o doubt, VDAS could have weathered even these setbacks if it had unlimited working capital, but that is not the proper legal standard. VDAS did retain sufficient capital to sustain its operation for a substantial period after the LBO."[1146]

Quite recently, the Seventh Circuit Court of Appeals in *Boyer v. Crown Stock Distribution, Inc.* considered whether, "despite a load of debt and a dearth of cash," a corporation that was the target of an LBO could be found to have had unreasonably small capital, even though it "limped along for three-and-a-half years before collapsing into the arms of the bankruptcy court."[1147] In an opinion written by Judge Posner, the court found that following the LBO, the entity "had been so depleted by the debt it had taken on that it had been . . . on 'life support' from the get-go",[1148] and that the LBO "left the firm with so few assets that it would have had to be extremely lucky to survive."[1149] The court further explained that the length of time the company survived following the LBO was not determinative:

> By encumbering all the company's assets, the sale reduced its ability to borrow on favorable terms, as it could offer no collateral to lenders . . . .
>
> The difference between insolvency and "unreasonably small" assets in the LBO context is the difference between being bankrupt on the day the LBO is consummated and having at that moment such meager assets that bankruptcy is a consequence both likely and foreseeable. Focusing on the second question avoids haggling over whether at the moment of the transfer the corporation became "technically" insolvent, a question that only accountants could relish having to answer.
>
> But one has to be careful with a term like "unreasonably small." It is fuzzy, and in danger of being interpreted under the influence of hindsight bias. One is tempted to suppose that because a firm failed it must have been inadequately capitalized. The temptation must be resisted. . . . But new Crown started life almost with no assets at all, for all its physical assets were encumbered twice over, and the dividend plus new Crown's interest obligations drained the company of virtually all its cash. It was naked to any financial storms that might assail it. . . .

---

[1146] *Id.*

[1147] *Boyer v. Crown Stock Distr., Inc.*, 587 F.3d 787, 793 (7th Cir. 2009).

[1148] *Id.* at 791.

[1149] *Id.* at 793.

Whether a transfer was fraudulent when made depends on conditions that existed when it was made, not on what happened later to affect the timing of the company's collapse. Not that the length of the interval between the LBO and the collapse is irrelevant to determining the effect of the transfer. It is pertinent evidence. The longer the interval, the less likely that the collapse was fated at the formation of the new company, although we are skeptical of cases that can be read to suggest that ten or twelve months is a long enough interval to create a presumption that the terms of the LBO were not responsible for the company's failure. An inadequately capitalized company may be able to stagger along for quite some time, concealing its parlous state or persuading creditors to avoid forcing it into a bankruptcy proceeding in which perhaps only the lawyers will do well.

The interval was longer than in previous cases, but the defendants are unable to sketch a plausible narrative in which new Crown could have survived indefinitely despite being cash starved as a result of the terms of the LBO that brought it into being. . . .[1150]

### (iii)  Conclusion

The Examiner has found that the Acquisition left the Debtors with insufficient resources, unreasonably small capital, *see* Sections IV.C& D of this Report, and moreover, this was known or should have been known by the Buyer, the Sellers, the Lenders and the management of the Debtors prior to the Closing. After subjecting Extended Stay's contemporaneous projections to cash flow and capital adequacy tests, the Examiner has concluded that Extended Stay and, indeed, each Borrower after the Acquisition did not appear to have adequate capital to fund operations and weather business downturns.

That the Debtors did not file for bankruptcy protection until approximately two years after the Acquisition does not detract from the conclusion. Shortly after the Closing, a series of problems surfaced. The Examiner finds Judge Posner's opinion in *Boyer v. Crown Stock Distribution, Inc.*[1151] to be particularly instructive. As in that case, all of Extended Stay's assets here were encumbered following the Closing and, shortly thereafter the Debtors were left with insufficient funds to pay virtually any debts other than its new debt. As the court stated

---

[1150]  *Id.* at 794–95. *See also Asarco*, 396 B.R. at 399 (finding that the company "survived for over two years primarily because it took drastic measures to do so . . . and that its "ability to avoid a total collapse for over two years after the transfer does not persuade this Court that ASARCO's cash flow was sufficient to meet its capital needs").

[1151]  587 F.3d 787 (7th Cir. 2009)

with respect to the situation in *Boyer*, "[a]n inadequately capitalized company may be able to stagger along for quite some time . . . ." That is exactly what appears to have happened here. As the court stated with respect to the situation in *Boyer*, it is difficult to imagine "a plausible narrative" in which Extended Stay could have "survived indefinitely despite being cash starved as a result of the terms of the LBO."[1152]

Moreover, the Second Circuit's holding in *Diller* and its progeny[1153] would support a finding of unreasonably small capital in these cases because all of the Debtors' respective assets were encumbered following the Acquisition. As discussed above, following the LBO, all of the Debtors' property was encumbered in order to secure the new debt, upon which each of the Debtors became joint and severally liable. Although the Debtors' assets were encumbered prior to the Acquisition, Extended Stay's debt per hotel increased by 30.2% as a result of the Acquisition. *See* Section IV.D.1.[1154]

### (c)      Ability to Pay Debts As They Come Due

### (i)      Statutory Language

Both New York and Delaware law provide that a transfer may be avoided where, in addition to receiving less than reasonably equivalent value, the debtor intended to incur debts beyond its ability to pay them as they matured.[1155] As discussed below, however, differences

---

[1152]  *Id.* at 795.

[1153]  See note 1136, *supra.*

[1154]  *See Official Comm. Of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc. (In re Tousa, Inc.)*, 422 B.R. 783, 2009 Bankr. LEXIS 3311 at *41 (S.D. Fla. 2009) ("And because of the consolidated enterprise's shared cash structure, the lack of adequate capital on a consolidated basis necessarily shows that the individual Conveying Subsidiaries had unreasonably small capital as well.").

[1155]  N.Y. Debt. & Cred. Law § 275; Del. C. Ann. tit. 6 § 1304. Meanwhile, South Carolina's fraudulent transfer statute does not contain language similar to the "ability to pay" test, but the courts of that state have defined a common law standard that permits pre-existing creditors to avoid a transfer where the debtor transferred property without consideration and "failed to retain sufficient property to pay the indebtedness to the plaintiff in full – not merely at the time of the transfer, but in the final analysis when the creditor seeks to collect his debt." *Durham v. Blackard*, 438 S. E. 2d 259, 262 (S.C. Ct. App. 1993).

This test has not been well expounded upon, but it appears that the requirement that the grantor "retain sufficient property to pay" creditors is somewhat similar to the objective prong of the UFTA regarding the debtor's ability to pay debts when due. Courts of that state have held that this test turns on whether "the grantor reserves a sufficient amount of property to pay his creditors." *Gardner v. Kirven*, 184 S.C. 37 at ***7 (S.C. 1937). This test is particularly strict, however, because it would invalidate a "voluntary" transfer even if the debtor retains a sufficient amount of property to pay its debts at the time of the transfer, where the debtor does

exist in the language of each state's statute that should lead to varying applications of this test under New York and Delaware law.

The "ability to pay debts" test is often referred to as "equitable insolvency" and requires a court to undertake a "forward-looking" analysis of the debtor's ability to meet its obligations following the date of the transfer.[1156]  Some courts have had trouble distinguishing between the "unreasonably small capital" and "ability to pay debts" tests.  Several courts have suggested that the latter is a more difficult test and that, where a company is shown to have been left with adequate capital, it will always be able to pay its debts as they come due.[1157]  Perhaps because the ability to pay test is more difficult to prove, and also because certain interpretations

---

not retain "an amount from which in the final analysis the creditors are able to collect their indebtedness in full."  *Id.* (citing *Penning v. Reid*, 167 S.C. 263, 283 (S.C. 1932) (holding that, "[t]he law will not permit one who is indebted at the time to give his property away, provided such gift proves prejudicial to the interest of existing creditors.")).  *See also Leasing Enter., Inc. v. Goodwin*, 312 S.C. 122, 125 (S.C. Ct. App. 1993) (holding that the test "instructs an equity court to review the facts and 'in the final analysis' determine if the grantor/debtor has retained enough property to pay the indebtedness 'when the creditor seeks to collect his debt'").

Few courts have actually applied this test, and none appear to have discussed its application in great detail.  *See, e.g., Gardner*, 184 S.C. at 37 (holding that the debtor's transfer of virtually all of his assets to his wife and daughter while an action was pending against him left insufficient assets from which his creditors could be paid); *see also Goodwin*, 312 S.C. at 125 (finding that, although the grantor failed to retain sufficient property to pay debts owed at the time of the conveyance, a co-debtor "retained the subject property and it remained within the reach of [the creditor].  Thus, the end result of the grantor/debtor's actions is not detrimental to the creditor.").

[1156]  *See, e.g., MFS/Sun Life*, 910 F. Supp. at 943 ("A transfer may be set aside as fraudulent if the transferor, though its assets exceed its liabilities, is rendered unable to pay its debts as they come due.  This forward-looking standard is generally referred to as equitable insolvency.") (citations omitted). *See also Kipperman*, 411 B.R. at 836 (stating that, "'[e]quitable insolvency,' or whether a debtor is able to pay its debts as they become due, is a forward-looking standard").

[1157]  *See, e.g., Moody*, 971 F.2d at 1070 (holding that "the better view is that unreasonably small capital denotes a financial condition short of equitable insolvency. . . . [A]n 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations.  Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable solvency [sic]"). *Id.* at 1075 ("[b]ecause we assume the notion of unreasonably small capital denotes a financial condition short of equitable insolvency, it follows that the transaction did not render Jeannette equitably insolvent either"). *See also Peltz*, 279 B.R. 710, 744 (D. Del. 2002); *In Ferrari v. Barclays Business Credit, Inc.,* 148 B.R. 97, 132 (Bankr. D. Mass. 1992*)* (stating that "[u]nreasonably small capital describes a condition short of equitable insolvency--the inability to pay obligations as they come due – because 'an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they come due'").

309

of the test require evidence of the debtor's subjective intent, relatively little case law exists in which the test is described in much detail.[1158]

As noted above, NY DCL section 275, which is derived from the UFCA and which contains language substantially similar to section 548(a)(1)(B)(ii)(III) of the Bankruptcy Code, provides for the avoidance of a transfer where the debtor "intends or believes that he will incur debts beyond his ability to pay as they mature."[1159] The case law in New York is clear that this test "requires proof of the debtor's subjective intent or belief that it will incur debts beyond its ability to pay," as a result of the transfer.[1160] Thus, the courts of that state have found the test to be satisfied by direct evidence of the transferor's intent at the time of the transfer.[1161] Still, several courts interpreting nearly identical language under the Bankruptcy Code have attempted

---

[1158] *See, e.g., In re Suburban Motor Freight, Inc.*, 124 B.R. 984, 1000 n.14 (Bankr. S.D. Ohio 1990) (noting that "[t]here are few rulings on this particular prong of [section 548], and it is rarely used by parties seeking to avoid a transfer as it appears to require the courts to undergo a subjective, rather than objective, inquiry into a party's intent"). *See also Asarco*, 396 B.R. at 399 (interpreting the Delaware provision and noting that "[t]here is relatively little case law on this section").

[1159] N.Y. Debt. & Cred. Law § 275.

[1160] *Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest.)*, 337 B.R. 495, 509 (Bankr. S.D.N.Y. 2006) (holding that, "Section 275 requires proof of the debtor's subjective intent or belief that it will incur debts beyond its ability to pay as they mature," and noting that, "[i]n contrast, the parallel provision of UFTA […] imposes an objective standard. It requires proof that 'the debtor intended to incur, or believed or reasonably should have believed that he [or she] would incur, debts beyond his [or her] ability to pay as they became due.") (citing *MFS/Sun Life*, 910 F. Supp. at 943); s*ee also Shelly v. Doe*, 249 A.D.2d 756, 757-58 (N.Y. App. Div. 1998) (holding that, "Section 275 is a constructive fraud provision which comes into play when a person making a conveyance without fair consideration intends or believes that he or she will incur debts beyond his or her ability to pay them as they mature . . . ."); *Wall Street Assocs. v. Brodsky*, 257 A.D.2d 526, 528 (N.Y. App. Div. 1999) ("A claim under this provision requires, in addition to the conveyance and unfair consideration elements. . . , an element of intent or belief that insolvency will result."). Such proof need not, however, be direct. *See* notes 1070 & 1071.

[1161] *See, e.g., Shelly*, 249 A.D.2d at 758 (finding evidence regarding the debtor's inability to pay his debts from testimony that, at the time of the transaction, the debtor "had a good indication of oncoming insolvency"); s*ee also Geron v. Schulman (In re Manshul Constr. Corp.)*, 2000 U.S. Dist. LEXIS 12576, at *146 (S.D.N.Y. 2000) (holding that the debtor's principal knew that the debtor was incurring debts beyond its ability to pay"); *Brodsky*, 257 A.D.2d at 528 (finding test satisfied by testimony that "it was his intent that issuance of his shares to his spouse would insulate him from anticipated legal liability"); *United States v. 58th Street Plaza Theatre, Inc*., 287 F. Supp. 475, 498 (S.D.N.Y. 1968) (finding corporation fraudulently transferred property under Section 275 when insider knew that the corporation would be unable to pay federal tax claims if upheld); *Julien J. Studley, Inc. v. Lefrak*, 412 N.Y.S.2d 901, 907 (N.Y. App. Div. 1979) (holding transfers "were made when the corporations knew that debts would be incurred beyond their ability to pay as the debts matured"), *aff'd*, 48 N.Y.2d 954 (N.Y. 1979)). *Cf. In re Nirvana Rest.*, 337 B.R. at 509 (holding that the plaintiff failed to sustain his burden under section 275 because he "failed to offer evidence at trial showing Nirvana's subjective intent or belief relating to its future debts or its ability to pay those debts").

to infer intent from the facts and circumstances surrounding the transfer, using a reasonable person standard.[1162]  In either case, the inquiry is concerned with the debtor's contemporaneous belief of its ability to pay its debts and may not be based on hindsight.[1163]

The Delaware test, which is derived from the UFTA, has been rarely discussed in the case law, but those courts that have analyzed the provision generally recognize that it differs from the UFCA and Bankruptcy Code tests in that it contains both objective and subjective prongs.[1164]

In one of the more in-depth applications of the "ability to pay debts" test, the Texas bankruptcy court in *Asarco* recently interpreted Delaware's statute to find that the test contains both a subjective and objective prong, and that the test may be satisfied if either prong is met.[1165]  First, the court stated that, "[t]he subjective prong is met if it can be shown that 'the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured.'"[1166]  Although the court

---

[1162]  S*ee, e.g., WRT Creditors Liquidation Trust v. WRT Bankruptcy Litig. Master File (In re WRT Energy Corp.),* 282 B.R. 343, 415 (Bankr. W.D. La. 2001) (explaining that, "[w]hile the statute suggests a standard based on objective [sic] intent, the courts have held that the intent requirement can he inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured"); *In re Taubman,* 160 B.R. at 986 (stating that, "[t]he record is silent as to any expressed intention or belief by the Debtor to incur debts beyond her ability to pay, however, the record does offer facts and circumstances from which such an intention may be found"); *In re Suburban Motor Freight, Inc*., 124 B.R. at 1001 (same).  *Cf. 58th Street Plaza Theatre, Inc.,* 287 F. Supp. at 498.  *See also* notes 1071 & 1072.

[1163]  *See, e.g., In re WRT Energy Corp.,* 282 B.R. at 414 (explaining that, "[a]dequacy of capital and belief as to ability to pay debts must be judged by what was reasonably believed at the time of the transaction and not on the basis of hindsight informed by [. . .] unforeseeable losses"); *id.* at 415 ("the Trust has failed in its burden of proving a subjective intent on the part of WRT . . . to incur debts beyond its ability to repay. . . .  Nor did the Trust produce sufficient facts and circumstances surrounding the transactions to enable the court to infer that the debtor's belief it would be able to pay its debts as they matured was unreasonable.").

[1164]  *See, e.g., Asarco LLC,* 396 B.R. at 399 (finding that the Delaware test for "ability to pay" differs from the "unreasonably small assets" standard because the former "has an objective and subjective prong, and the test is satisfied if either prong is met."); *but see Kipperman v. Onex Corp.,* 411 B.R. 805, 836 (N.D. Ga. 2009) (applying the Georgia's version of the UFTA and stating that "[i]t is unclear whether a plaintiff must show that the debtor subjectively intended to become incapable of paying its debts or whether a plaintiff must merely show that a debtor should have foreseen such an outcome to [satisfy the test]").

[1165]  *Asarco LLC,* 396 B.R. at 399.  The court undertook this analysis after concluding both that the debtor was insolvent and had been left with unreasonably small capital following the transfer.

[1166]  *Id.* (quoting *In re WRT Energy Corp.,* 282 B.R. at 415 (Bankr. W.D. La. 2001) (discussing analogous provision in Bankruptcy Code).

311

recognized that "[i]ntent may be inferred from the facts and circumstances surrounding the transaction,"[1167] it explained that the debtor "must show more than simply a chronological relationship."[1168]  Rather, "[t]here must be evidence sufficient for the Court to conclude that the debtor's transfer was contemporaneous with an intent or belief that its subsequent creditors would be injured, *i.e.*, that the debtor would be unable to pay such debts as they matured."[1169]

Relevant to the application of NY DCL section 275, the subjective prong of the inability to pay debts test was met in *Asarco* through considerable evidence, including testimony from a number of key sources, that prior to the transaction the debtor was in arrears on most of its obligations, was not paying its debts as they became due, and had stopped checks due to its creditors.[1170]  The court explained:

> The proof in this case is so convincing on the aspect of ASARCO's inability to pay debts as they came due at the time of the closing and on the fact that it left the closing with less cash than it had before the transaction that it would be impossible not to conclude that future creditors and obligations would not be paid.  Further, there were numerous predictions of major cash shortages, most of which turned out to be all too accurate.  This evidence may be circumstantial, but it is overwhelming and it was verified by what actually happened at ASARCO.  This evidence proves that ASARCO not only had a subjective belief but in fact knew that past, current, and subsequent creditors would not be paid as their claims matured.[1171]

Following its review of the subjective prong, the court held that the debtor had also satisfied the objective prong of the test, which it summarized as measuring "whether ASARCO, as a going concern, would reasonably have been able to pay its debts after making the

---

[1167]  *Id.* (citing *In re WRT Energy Corp.*, 282 B.R. at 415).

[1168]  *Id.* (citing *In re Suburban Motor Freight*, 124 B.R. at 994); *cf.* 5 Collier on Bankruptcy, ¶ 548.05[4], at 548-52.1 (15th ed. rev. 2009) (stating that under analogous provision of section 548, the trustee must show "more than a chronological relation between the act of the debtor and the subsequently incurred debts.  Proof must be adduced sufficient to justify the conclusion that the debtor's transfer or obligation was contemporaneous with an intent or belief that subsequent creditors will be injured, *i.e.*, that the debtor will be unable to take care of them as their claims mature.").

[1169]  *Id.* (citing *In re Suburban Motor Freight*, 124 B.R. at 994).

[1170]  *Id.*

[1171]  *Id.* at 400.

challenged transfer."[1172]  Stating that "[r]easonableness is often measured through contemporaneous cash flow projections and other forward-looking sources," the court pointed to, among other things, evidence of the debtor's cash flow problems and its inability to timely pay creditors, including its primary operating lenders, prior to the transaction as evidence that the debtor "would continue to be financially unstable and unable to generate sufficient cash to pay its debts even after the transaction."[1173]  Also influential was the fact that the debtor's "contemporaneous projections [we]re supported by the events that actually occurred after the transaction;" namely that the debtor's projections of negative cash flows following the transaction were realized, causing the debtor further financial strain.[1174]  The court concluded:

> Considering the fact that ASARCO had been unable to pay its debts in a timely manner for well over a year prior to the transfer and taking into account the contemporaneous projections that predicted negative cash flows after the transfer, the Court finds that ASARCO, as a going concern, would not reasonably have been able to pay its debts after closing the [ ] transaction.[1175]

Few cases provide details on the particular financial analysis to be used to determine whether a debtor is able to pay its debts as they come due following a transfer.[1176]  Certain commentators have suggested the following, practical approach:

> [F]uture post-transaction debt payments . . . are computed and scheduled by due date.  Then a projection of the amount of liquidity available to the company to meet its debt requirements is estimated. . . .  To calculate a

---

[1172]  *Id.* (citing *In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 593 (Bankr. N.D. Cal. 1994) (discussing California's version of the UFTA and finding that "'[r]easonableness' is often measured through the use of cash flow projections and other forward-looking sources of evidence available to the debtor and its creditors at the time of the transfer.  If these sources were flawed and overly optimistic from the beginning, then they were unreasonable.  However, if they were improvident only in the light of intervening circumstances…, then the 'reasonable ability' test has not been violated.").

[1173]  *Id.* (citing *Pajaro Dunes Rental Agency, Inc.*, 174 B.R. at 593).

[1174]  *Id.*

[1175]  *Id.* at 401.

[1176]  One case that did undertake this analysis is *In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557 (Bankr. N.D. Cal. 1994).  After considering testimony of insiders as to their belief regarding the debtor's ability to pay its primary debt obligation, the court undertook a valuation of the debtor's business as a going concern by applying a balance sheet test.  *Id.* at 594-95.  The court concluded that a negative valuation, when combined with evidence that the debtor had no new financing commitments, was sufficient evidence of the debtor's inability to pay its debts as they matured.  *Id.* at 595.

537960v2

company's liquidity available for debt repayment, the analyst should project each of the following for the company for several periods after the transaction: (1) any excess cash on hand, (2) free cash flows earned during each period, and (3) the company's borrowing availability on each due date to pay its debts. A comparison would then be made between the amount of debt payments required during each period and the liquidity available to satisfy such requirements. A company will pass the ability to pay debts test in any projected period if it can pay its debts as they come due either through cash accumulated on its prior earnings or through free cash flow earned in the period, or by having enough borrowing availability to pay its debts.[1177]

### (ii)    Conclusion

The tests described in detail in Section IV.C. lead the Examiner to conclude that the Debtors knew or should have known as of the Closing that they could not pay their debts as they became due. The Examiner believes that Extended Stay knew or should have known at the time of the Closing that the Acquisition was unduly risky, and would leave Extended Stay and each of the Borrowers unable to pay their debts when they came due.

### e.    Conclusions re Viable Claims

The Examiner believes that the Estates of the Debtors, individually or on a consolidated basis, can plead a fraudulent transfer case under New York law and under the FDCPA. The Debtors made transfers and incurred obligations without receiving fair consideration or reasonably equivalent value; indeed, the Debtors received virtually no consideration or value in the Acquisition. Even if the Debtors were not insolvent at the time of the Acquisition, an assumption about which the Examiner takes no position, the additional secured debt undertaken by the Debtors and the transfers of cash left them with unreasonably small capital and debts they could not afford to pay. Whether, after complete discovery, it could

---

[1177] Robert J. Stearn, Jr., *Proving Solvency: Defending Preference and Fraudulent Transfer Litig.*, 62 Bus. Law. 359 (2007) (quoting Robert F. Reilly & Robert P. Schweihs, *The Handbook Of Advanced Business Valuation* (Irwin Library of Inv. & Fin.) 341-42 (2000); *cf. MFS/Sun Life High Yield Series*, 910 F. Supp. at 943-44 ("The plaintiffs make much of the fact that in 1994 VDAS would be required to make a balloon payment on the principal owed to Security Pacific. But this fails to demonstrate VDAS' inability to meet its debts for several reasons. First, according to the VDAS budget, much of Security Pacific's senior debt would have been paid off by 1994. Second, the plaintiffs presented no credible evidence that VDAS would be unable to refinance its debt in 1994.").

be proven that the Debtors believed that they would not have the ability to pay such debts is an open issue.

As discussed below, certain potential defendants may have viable defenses to these claims. Nonetheless, at this point in the analysis, and before consideration of the defenses discussed below, the Examiner believes claims could be pled to avoid the incurring of debt and the transfers to the Lenders, the Sellers, the Buyer, and the Professionals, depending upon the characterization of the structure and course of the transfers.

### 3. Defenses

#### a. Section 278(2) of the NY DCL

Although section 548(c)[1178] of the Bankruptcy Code is inapplicable in these cases, NY DCL section 278(2) provides a similar defense under state law.[1179] Section 278(2) of the NY DCL protects recipients of constructive fraudulent transfers to the extent that such transferee (or purchaser as required under the NY DCL) gave value to the debtor, so long as the transferee (or purchaser) acted in good faith.[1180]

Section 278(2) of the NY DCL provides that "[a] purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment."[1181]

#### (1) Purchaser

Only "purchasers" are protected under section 278(2) of the NY DCL. Although "purchaser" is not defined in the NY DCL, courts have found that lenders can be "purchasers" for

---

[1178] Section 548(c) provides that "[e]xcept to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation. 11 U.S.C. § 548(c).

[1179] *See also* Del. C. Ann. tit. 6, § 1308(d).

[1180] *See id.* There appears to be no analogue under South Carolina law, which is unsurprising because, under South Carolina law, a transfer may only be constructively fraudulent if, among other things, absolutely no consideration was received by the debtor. *See Royal Z Lanes, Inc.,* 337 S.C. 592 (1999).

[1181] NY DCL section 278(2) (2009).

the purposes of section 278(2).[1182]  The Sellers, however, cannot be "purchasers" for such purposes.[1183]

### (a)  "Without Actual Fraudulent Intent"

Under NY DCL section 278(2), a purchaser will only be protected if, among other things, such purchaser can demonstrate[1184] that it acted "without actual fraudulent intent."[1185]  At least one court has determined that "good faith" under Bankruptcy Code section 548(c) and "without actual fraudulent intent" under NY DCL section 278(2) "are to be construed such that they are identical."[1186] [1187]  Accordingly, a purchaser must also demonstrate (1) "an arm's length

---

[1182]  *See, e.g., Foxmeyer Drug Co. v. Gen. Elec. Capital Corp. (In re Foxmeyer Corp.)*, 286 B.R. 546 (Bankr. D. Del. 2002) (applying section 278(2) of NY DCL to defendant lenders).

[1183]  *See, e.g., Teitelbaum v. Voss (In re Tuller's Inc.)*, 480 F.2d 49, 52 (2d Cir. 1973) (holding that since appellant was a seller, she was not entitled to protection as a good faith purchaser under section 278 of the NY DCL).  By parity of reasoning, that ought to apply to the Professionals.

[1184]  Under NY DCL section 278(2), the burden of proof is on the transferee.  *See Foxmeyer*, 286 B.R. at 582.

[1185]  "The language 'without actual fraudulent intent' under NY DCL section 278(2) must mean without participation in or knowledge of a transferor's fraudulent scheme."  *Id.* at 580 (citations and quotation marks omitted).

[1186]  *Id.* at 581.

[1187]  Del. C. Ann. tit. 6, § 1308(d) provides as follows:

Notwithstanding voidability of a transfer or an obligation under this chapter, a good-faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to (1) A lien on or a right to retain any interest in the asset transferred; (2) Enforcement of any obligation incurred; or (3) A reduction in the amount of the liability on the judgment.

Under Del. C. Ann. tit. 6, § 1308(d), a good faith transferee is thus entitled to a lien on any assets transferred to the extent of value given, and may enforce any obligation incurred, or reduce the amount of liability on a judgment, to the extent of value provided to the debtor.  Delaware does not appear to have considered the meaning of "good faith."  Other UFTA jurisdictions are split as to whether an objective or subjective test is appropriate.  *Compare Cushman v. Wilkinson*, 879 P.2d 873, 876 (Or. Ct. App. 1994) (applying subjective "good faith" test) *with DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes Inc.*, No. 3:99-CV-059RM, 2002 U.S. Dist. LEXIS 28029, at *12 (N.D. Ind., July 22, 2002) (applying objective "good faith" test in holding that transferee who paid $20,000 for assets valued at $470,000 should be denied right of setoff in amount of $20,000 since "in light of the value of the assets exchanged, the court can't say that either of the defendants was a good-faith purchaser").  The Examiner suggests that Delaware would adopt the subjective test as the better reasoned test.  *See Cushman*, 879 P.2d at 876 ("[A]n objective standard of 'good faith' could render [Oregon's version of section 1308(d)] meaningless, something the legislature could not have intended . . . .").  "Value" under section 1308(d) must flow to the debtor, not third parties.  *Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.)*, 187 B.R. 315, 336 (Bankr. C.D. Cal. 1995); *see also Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*, No. 6:03-00299 (KSJ), 2010 Bankr. LEXIS 84, at *18 (Bankr. M.D. Fla., Jan. 15, 2010) (holding counterpart statute inapplicable to transferee since debtor received nothing in return from transferee at time of transfer).

316

transaction," (2) "an honest belief in the propriety of the activities in question," and (3) "no intent to take unconscionable advantage of others."[1188]

### (b) Purchaser May Only Retain the Property or Obligation to Extent of Value Given

Although the statutory language of NY DCL section 278(2) appears to require that a purchaser, who gave less than fair consideration, retain the *entire* property or obligation it received in exchange for its transfer to the debtor, a New York trial court has held that "[s]urely such provision [§ 278(2)] would not be in the statute if the Legislature did not intend to require that an innocent purchaser could be required by creditors to surrender the assets he acquired, to the extent that they exceeded the value of the consideration which he paid."[1189]

Accordingly, under NY DCL section 278(2), a good faith purchaser may only retain the property or obligation it received to the extent of the value such purchaser gave to the debtor in exchange for such property or obligation.

### (2) Application of NY DCL Section 278(2)

The potential fraudulent transfer defendants are the Lenders, the Buyer, the Seller and the Professionals. If any is found to have received a fraudulent transfer, in order to benefit from this defense, that defendant would have to demonstrate that it (1) acted in good faith; (2) gave at least some value to Extended Stay; and (3) must also show that it is a "purchaser" in order to be entitled to protection.

### (a) Sellers

The Seller would not hold a valid defense under NY DCL section 278(2). Regardless of whether the Seller acted in good faith, the Seller provided Extended Stay with no

---

[1188] *Foxmeyer*, 286 B.R. at 581 n.10.

[1189] *Gager v. Pittsford Dev. Corp.*, 164 N.Y.S.2d 324, 326 (N.Y. Sup. Ct. 1957); *Foxmeyer*, 286 B.R. at 572 ("NY DCL § 278(2) permit[s] a transferee to retain property received from a debtor to the extent that such transferee gave value in good faith, and notwithstanding whether such transfer is otherwise avoidable as a fraudulent conveyance.").

value.  Additionally, the Seller does not appear to qualify as a "purchaser" under NY DCL section 278(2).[1190]

### (b)    Buyer

Regardless of whether the Buyer acted in good faith, the Examiner has seen no evidence that the Buyer provided Extended Stay with any value, by virtue of indirect benefits to Extended Stay or otherwise.  The Buyer is unlikely to hold a valid NY DCL section 278(2) defense.

### (c)    Lenders

The Lenders provided value to Extended Stay at least to the extent of the satisfaction of Extended Stay's prior indebtedness in the amount of $5.7 billion.  The Lenders also qualify as "purchasers" under the NY DCL.[1191]  The Examiner has not uncovered convincing evidence that the Lenders failed to act in good faith, other than the fact that the Lenders knew or should have known that the Acquisition would render the Debtors unable to meet their future obligations and that the Debtors were inadequately capitalized.

If a constructive fraudulent transfer is found, the Lenders may have a defense to the extent of value – $5.7 billion – that they provided to the Debtors.

### (d)    Professionals

The Examiner did not uncover information during the course of his Investigation to indicate that the Professionals failed to act in good faith.

### 4.    Other Issues

### a.    Applicability of Participant Bar

An argument can be made that creditors whose claims were created as part of the Acquisition may not participate in any recovery of a fraudulent transfer that was an integral part of the Acquisition.  In particular, courts have denied the prosecution of a fraudulent transfer by a trustee if the recovery would only benefit a creditor that had previously consented to such a

---

[1190]   *Teitelbaum v. Voss (In re Tuller's Inc.)*, 480 F.2d 49, 52 (2d Cir. 1973).

[1191]   *See Foxmeyer,* 286 B.R. 546.

transfer.[1192]  Courts have found that, by participating in the underlying transaction, such creditors have treated the transfers as valid[1193] and cannot later benefit from the estate's recovery of the same transfers. [1194]

As the Bankruptcy Court for the Southern District of New York has recognized, "[a] fraudulent transfer is not void, but avoidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance."[1195]  Courts have applied the doctrine of ratification to transactions involving fraudulent transfers.  As one court explained, "[r]atification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding."[1196]

Courts have suggested, however, that these "participating creditors" may still be entitled to a recovery from a debtor's estate and, therefore, may indirectly benefit from the recovery of a fraudulent transfer.  For example, in a classic leveraged buyout, banks lend money to a target company on a fully secured basis, which proceeds are used to pay off the former shareholders of the merged entity but may also be used, in part, towards working capital needs.

---

[1192]  *Morin v. OYO Instruments, L.P. (In re Labelon Corp.)*, No. 02-22582, 2006 Bankr. LEXIS 2490, at *10 (Bankr. W.D.N.Y. Aug. 28, 2006) (in denying the trustee's motion to amend a complaint to include fraudulent transfer claims, holding that, "on equitable grounds, this Court would not make a finding of avoidance and recovery [of a fraudulent conveyance either under Bankruptcy Code section 548 or New York state law], when the only entity that would benefit from that avoidance and recovery would be [that creditor], which specifically approved the . . . transaction in writing and benefited from the transaction…"); *Harris v. Huff (In re Huff),* 160 B.R. 256 (Bankr. M.D. Ga. 1993) (dismissing a Bankruptcy Code section 544(b) action because the only unsecured triggering creditor had consented to the conveyance pre-petition and was estopped from pursuing such recovery); *Durrett v. Harris*, 148 Ark. 4, 10-11 (1921) (denying an action by the trustee to recover a fraudulent transfer based on a claim of a creditor who had previously treated such conveyance as valid).

[1193]  *See In re Labelon Corp.,* 2006 Bankr. LEXIS 2490 at *12 (finding that the creditor had "specifically approved the transaction in writing and benefit[ed] from it"); *In re Huff,* 160 B.R. at 258 (finding that, upon being informed of the transfer, the bank had specifically elected not to contest the conveyance and treat it as valid); *Durrett*, 148 Ark. at 10-11 (finding that the bank had knowledge of the source of the funds when it accepted payment and could not subsequently seek to treat such transfer as a fraudulent conveyance).

[1194]  *See In re PWS Holding Corp*., 228 F.3d 224, 235 (3rd Cir. 2000) (noting that the examiner's report concluded that constructive fraudulent transfer claims at issue in a plan confirmation dispute had little value based, in part, on the fact that a significant number of the debtor's unsecured creditors would be estopped from sharing in any of the fraudulent transfer recoveries because they had participated in the underlying recapitalization).

[1195]  *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994); s*ee also HSBC Bank USA, N.A. v. Adelphia Commc'ns. Corp.*, 2009 U.S. Dist. LEXIS 10675, at *18 (W.D.N.Y. Feb. 12, 2009) (deciding that fraudulent transfer actions were without merit based on the fact that "Adelphia ratified the very transactions . . . that Adelphia and the Committee now contend should be avoided as fraudulent transfers").

[1196]  *Id.* at *16 (citing 57 *N.Y. Jur. (Second) Estoppel, Ratification and Waiver* § 87 (2007)).

At a minimum, to the extent that the banks are determined to have given value to the debtor, the bank has an allowed claim against the debtor's estate.[1197]

As one court explained, "the recoveries to the estate and the avoidance of obligations would enure [sic] to some extent to the benefit of the Banks [which had participated in the underlying transaction] . . . diminishing the recoveries to the other creditors . . . ."[1198] Whether the portion of the lender's claim for which no consideration had been given to the debtor is entitled to benefit from a recovery is not clear. As the *Best Products* court summarized:

> There is respectable commentary to the effect that LBO lenders should have a claim for all the consideration with which they have parted. . . .[1199]
>
> On the other hand, if the underlying fraudulent transfer statute (such as DCL § 273) provides for the avoidance as fraudulent of an obligation incurred, it could be argued fairly persuasively that so much of the obligation which the debtor incurred as was not supported by consideration *to the debtor,* ought be avoidable.[1200]

In practice, several courts have fashioned *ad hoc* equitable relief for the portion of a participant creditor's claim in excess of the value that such creditor actually provided to the debtor, most commonly by equitably subordinating the "excess" to the claims of all other unsecured creditors.[1201] The United States Bankruptcy Court for the Southern District of New

---

[1197] As discussed in § V.C, most fraudulent transfer statutes preserve a creditor's claim to the extent that a creditor has provided value or fair consideration to the debtor. In this case, the mezzanine debt was used to pay off existing debt of the Mezzanine Debtors in the amount of approximately $2.4 billion.

[1198] *In re Best Prods. Co.*, 168 B.R. 35, 59 (Bankr. S.D.N.Y. 1994).

[1199] *Id.* (*citing* R. White, *Leveraged Buyouts and Fraudulent Conveyance Laws Under the Bankruptcy Code – Like Oil and Water, They Just Don't Mix*, 357 Ann. Survey of Am. Law (1991) ("Invalidation of the LBO lenders' obligations against the estate (perhaps coupled with a return of all pre-petition transfers of the debtor's property) is the harshest available remedy. Invalidation seems particularly draconian in a legitimate LBO because the creditors actually parted with value. Fortunately, courts have severely limited this remedy to situations involving intentional fraud, upstream guaranties and the exchange of debt for equity. In such cases, the cancellation of obligations works no injustice."); *Misty Mgmt. Corp. v. Lockwood*, 539 F.2d 1205, 1214 (9th Cir. 1976) (under former Bankruptcy Act, transferee in case of actual fraud was allowed an unsecured claim against the estate in the amount of the consideration it gave rather than in the lesser amount of the consideration received by the transferor debtor).

[1200] *Best Prods. Co.*, 168 B.R. at 59 (emphasis in original) (citing *McColley v. Rosenberg (In re Candor Diamond Corp.)*, 76 B.R. 342 (Bankr. S.D.N.Y. 1987) (under section 548 of the Bankruptcy Code, where consideration for transfers which left debtor insolvent was paid to debtor's principal and his family, rather than to the debtor, the debtor's transfers were made for less than a reasonably equivalent value and were avoidable)).

[1201] *See Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency)*, 174 B.R. 557, 598 (Bankr. N.D. Cal. 1994) (equitably subordinating the remaining balance of creditor's claim for which the creditor did not give consideration in good faith after determining the value given in good faith with respect to the

York, in considering a settlement of a fraudulent transfer claim, specifically noted that, to the extent the lender's claim was determined not to have been given for value, its claim would be subordinated to the claims of the other creditors.[1202]

Based on the forgoing authority, the Lenders here might be subjected to any of three different treatments: (i) they might be prohibited from sharing in any recovery; (ii) their ability to share in any recovery might be limited to a claim, if any, for value actually provided to Extended Stay; or (iii) they might share in any recovery on a subordinated basis, either with respect to their entire claim, or for those amounts in excess of value or fair consideration actually provided to Extended Stay.

Moreover, the Examiner understands that the Lenders transferred certain claims held against the Estates following the Acquisition. Generally, courts have recognized that innocent claimants should not be held liable for the misconduct of others, even where there may be grounds to impute knowledge of the wrongful conduct to those parties. For example, in *In re Crowthers McCall Pattern*,[1203] the United States Bankruptcy Court for the Southern District of New York considered objections to confirmation of a plan of reorganization that contained settlements of certain fraudulent transfer claims. The underlying transaction involved a leveraged buyout of the debtor, secured by the debtor's assets. After the closing of the transaction, another entity ("Travelers"), which did not participate in the acquisition, provided the debtor with takeout financing of old debt and obtained senior secured notes. After the debtor filed for bankruptcy, the estate sought to avoid Travelers' secured claims as fraudulent transfers.

The court concluded that, if the debtor were to prevail on the fraudulent transfer claim, Traveler's claims would be equitably subordinated to the claims of other unsecured

---

creditor's claim). *Cf. HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2nd Cir. 1995) (noting that equitable subordination does not apply to state-law fraudulent transfer actions and is reserved only for federal bankruptcy courts); *In re Revco D.S., Inc.*, No. 588-1308, 1990 Bankr. LEXIS 2966 (Bankr. N.D. Ohio 1990) (in an examiner's report exploring potential fraudulent transfer actions, finding that it is likely that the claims of the participating creditors would be subordinated to the non-LBO related claims).

[1202] *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 288 (Bankr. S.D.N.Y. 1990) (noting that, if the debtor were successful in its fraudulent transfer claim, it would result in the full subordination of the creditor's claim).

[1203] 120 B.R. 279 (Bankr. S.D.N.Y. 1990).

creditors, enabling certain creditors (including those subordinated to Travelers) to be paid in full.[1204]  In contrast, the settlements proposed in the plan provided for Travelers and other noteholders to share in the debtor's assets.  Finding that the settlement was reasonable, the Court emphasized the fact that Travelers was not an original participant in the underlying buyout.[1205]  Relying on *Wieboldt Stores, Inc. v. Schottenstein*,[1206] in which the court dismissed fraudulent transfer claims against tendering shareholders who "neither participated in the structuring of the financing nor had knowledge of the structure of the transaction" but allowed the claims to proceed against the controlling shareholders and lenders who structured the leveraged buyout, the court concluded that it would be very difficult to impose liability on Travelers for these fraudulent transfer claims absent some involvement in the original transaction.[1207]

Where one party obtains the actual claims formerly held by a wrongdoer, however, courts may hold the transferee accountable for the original claimant's misconduct.[1208] For example, the New York District Court recently considered whether a claim held by a transferee could be either equitably subordinated under Bankruptcy Code section 510(b) or disallowed under Bankruptcy Code section 502(d) based on the misconduct of the original claimant in *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*.[1209]  Initially, the court distinguished between "disabilities" associated with a claim or a remedy that is "personal" as to the original claimant from those that "inhere" in the claim itself.  Applying the principle that "an

---

[1204]  *Id.* at 288.

[1205]  *Id.* at 288-89 (stating that "no case has been called to our attention that has awarded recovery against a lender on a fraudulent transfer theory as part of a step transaction where the lender was not involved in the incurrence of the original obligation by the debtor, the proceeds served to pay off existing debt, and the lender did not structure the overall allegedly fraudulent transaction or is not charged with actual intent to harm creditors").

[1206]  94 B.R. 488 (N.D. Ill. 1988).

[1207]  *In re Crowthers McCall Pattern*, 120 B.R. at 290.  *See also MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, No. 91-3451, 1994 U.S. Dist. LEXIS 14527 (S.D.N.Y. 1994).

[1208]  *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2nd Cir. 1995) (noting that, "[w]hile some cases have stated that purchasers who do not make appropriate inquiries are charged with 'the knowledge that ordinary diligence would have elicited,' . . . others appear to have required a more active avoidance of the truth") (citations omitted).

[1209]  379 B.R. 425 (S.D.N.Y. 2007).

assignee stands in the shoes of the assignor and subject to all equities against the assignor," the court held:

> [a]lthough characteristics that inhere in a claim may travel with the claim regardless of the mode of transfer, the same cannot be said for personal disabilities of claimants. A personal disability that has attached to a creditor who transfers its claim will travel to the transferee if the claim is *assigned,* but will not travel to the transferee if the claim is *sold.*[1210]

Next, the court considered whether equitable subordination and claim disallowance under section 502(d) were disabilities that were personal to the original claimant; if so, those disabilities could only be transferred to an assignee of the claims.[1211] Ultimately, the court concluded that both remedies for equitable subordination and disallowance under section 502(d) were personal to the original claimant, because each remedy arose due to the claimant's misconduct, and not as the result of a defect latent in the underlying claim.[1212]

### (1) Conclusion

It does not appear that any court has considered whether a remedy enforceable against a "participating creditor" would qualify as a "personal disability" under the analysis set forth in *Enron*. It is likely, however, that this remedy is similar to the equitable subordination remedy considered in *Enron*, as both arise from the individual claimant's misconduct. As a result, a remedy enforceable against a "participating creditor" would probably constitute a "personal disability", and would be transferable to a subsequent creditor only if the transferee was an assignee of the original creditor's claim, or took the claim in bad faith. Thus, if the transferees of the Lenders' claims are determined to have purchased the claims in good faith, and

---

[1210] *Id.* at 436 (emphasis in original).

[1211] In its decision, the *Enron* court emphasized the difference between purchasers and assignees:

> The distinction is particularly imperative in the distressed debt market context, where sellers are often anonymous and purchasers have no way of ascertaining whether the seller (or a transferee up the line) has acted inequitably or received a preference. No amount of due diligence on their part will reveal that information, and it is unclear how the market would price such unknowable risk. Parties to true assignments, by contrast, can easily contract around the risk of equitable subordination or disallowance by entering into indemnity agreements to protect the assignee.

*Id.* at 442.

[1212] *Id.* at 445.

not received them through assignment, those transferees may take the claims free and clear of any participant bar.

### b. Avoidance Actions May Be Maintained for the Benefit of the Estates.

As a general rule, avoiding powers may be exercised by a debtor only for the benefit of creditors, and not for the benefit of the debtor itself.[1213] Based on this doctrine, courts have dismissed, for lack of standing, avoidance actions where recovery would *solely* benefit the debtor.[1214] It is the exceptional case, however, where the only beneficiary of an avoidance action would be the debtor *qua* debtor, with no benefits flowing to the estate.[1215] Indeed, where an avoidance action will benefit administrative claims, or even place "the reorganized debtor . . . in a better position to meet its financial commitments[,]" particularly where creditors will receive equity in the reorganized debtor under a plan, the estate has standing to pursue avoidance actions.[1216]

---

[1213] *Adelphia Recovery Trust, v. Bank of Am., N.A.*, 390 B.R. 80, 94 (S.D.N.Y. 2008); *Whiteford Plastics Co. v. Chase Nat'l Bank*, 179 F.2d 582, 584 (2d Cir. 1950); *Vintero Corp. v. Corporacion Venezolana de Fomento (In re Vintero Corp.)*, 735 F.2d 740, 742 (2d Cir. 1984); *In re Liggett*, 118 B.R. 219, 222 (Bankr. S.D.N.Y. 1990).

[1214] *Cf. Adelphia Recovery*, 390 B.R. at 95 ("It is clear from the Joint Plan's provisions that all of the creditors of the Obligor Debtors have been paid in full. Under the principles of federal jurisdiction, a party does not have standing to sue where the party is not able to allege an injury that is likely to be redressed by the relief sought. Given that the creditors of the Obligor Debtors have received full payment with interest under the Plans, it follows that these creditors do not stand to benefit from recovery on [avoidance, subordination and disallowance claims] at issue, and the [Recovery Trust] does not have standing to bring these claims on their behalf.").

[1215] In *Adelphia Recovery*, 390 B.R. at 94-96, for example, the subsidiary debtors, which were the specific debtors whose transfers were to be avoided, expressly maintained a separate legal existence and paid their creditors in cash in full with interest under the confirmed plan. *Id.* at 87 n.13. In *Dunes Hotel Assocs. v. Hyatt Corp. (In re Dunes Hotel Assocs.)*, 245 B.R. 492, 498, 507-08 (Bankr. D.S.C. 2000), the debtor was completely solvent.

[1216] *Citicorp Acceptance Co. v. Robison (In re Sweetwater)*, 884 F.2d 1323, 1327 (10th Cir. 1989); *Calpine Corp. v. Rosetta Res., Inc. (In re Calpine Corp.)*, 377 B.R. 808, 814-15 (Bankr. S.D.N.Y. 2007) ("Under the proposed plan of reorganization, several classes of unsecured creditors will be impaired because they are receiving only an equity stake in the reorganized company. Accordingly it is not beyond purview that the Debtor may be able to establish at trial that a recovery in this action will result in a benefit to these estates") (citations omitted); *see also Kennedy Inn Assocs. v. Perab Realty Corp. (In re Kennedy Inn Assocs.)*, 221 B.R. 704, 715 (Bankr. S.D.N.Y. 1998) ("What matters is whether creditors will receive some benefit from the recovery of the challenged transfers, even if it is not an increase in the amount the creditors will receive, but in the form of a debtor increasing its assets and improving its financial health so that its prospects of being able to satisfy its obligations to its creditors under the plan are improved.") (citations, quotation, and alteration marks omitted); *cf. Bayou Accredited Fund, LLC v. Redwood Growth Partners (In re Bayou Group, LLC)*, 372 B.R. 661, 664 (Bankr. S.D.N.Y. 2007) ("It is *not* clear that fraudulent conveyance claims can *never* be brought in whole or in part to benefit equity. . . . In most cases, from the perspective of Bankruptcy Code objectives, it makes sense

324

Since the prosecution of avoidance claims could provide substantial value to the Estates' unsecured creditors, the Examiner believes that the representatives of the Estates have standing to pursue avoidance claims in these Chapter 11 Cases. Moreover, recoveries obtained by the Estates would, for the most part, ultimately be distributed among the Lenders in accordance with the Intercreditor Agreement.[1217] In *Boyer v. Crown Stock Distribution, Inc.*,[1218] the Seventh Circuit held that the selling shareholders of the target of a leveraged buyout were liable for receiving a dividend payment that was determined to be a fraudulent transfer. The former shareholders argued that the trustee should not be permitted to recover the transfer, because the estate would receive a "windfall" by recovering assets in an amount that far exceeded the amount of claims filed in the case.[1219]

> The Seventh Circuit rejected the shareholders' argument and stated:
>
> There will be no windfall. . . . Although the debtor is new Crown rather than old Crown, the fact that the debtor receives any surplus obtained by the trustee in his efforts to maximize the debtor's estate doesn't mean that the money stays there. It can't stay there for long, since the estate is dissolved at the conclusion of the bankruptcy proceeding. The ultimate recipients of assets remaining in the estate when it is closed depend on state law, because any federal interest has been exhausted. . . .should all

---

to say that fraudulent conveyance claims may be asserted only to the extent necessary to benefit creditors, as opposed to the debtor and the debtor's equity. But I decline, to embrace an all-encompassing bright line rule holding that a fraudulent conveyance claim can never be brought to benefit equity.").

[1217] As discussed in § V.E.3., the Intercreditor Agreement will dictate how any affirmative recoveries are shared among the vast majority of the Debtors' creditors and that agreement is likely to be enforceable. Section 510(a) of the Bankruptcy Code expressly provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). A review of reported cases indicates that intercreditor agreements are regularly enforced in bankruptcy cases under section 510(a). *See, e.g., Citibank, N.A. v Smith Jones, Inc.,* 17 BR 128 (Bankr. D. Minn. 1982) (holding intercreditor subordination agreement is enforceable under section 510(a) where creditor committed itself to subordinate position with respect to all existing and legitimate future and continuing financing from bank creditor and such agreement survives as to postpetition indebtedness to bank and its security); *Blue Ridge Investors, II, Ltd. P'ship v. Wachovia Bank, National Ass'n (In re Aerosol Packaging, LLC)*, 362 B.R. 43 (Bankr. N.D. Ga. 2006) (enforcing the contractual provisions of an intercreditor agreement that granted the senior lien holder the right to vote the claims of a junior lien holder); *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd.*, Bankruptcy Case No. 09-13125, Adversary Nos. 09-01440, 09-01479, 2009 WL 4047995 (Bankr. S.D.N.Y. Nov. 24, 2009) (J. Peck) (enforcing an intercreditor agreement as written and determining that the effect of subordinating the second lien lenders' position was fully intended and understood).

[1218] 587 F.3d 787, 793 (7th Cir. 2009)

[1219] *Id.* at 797 (citation omitted).

the unsecured creditors of new Crown be paid in full the only other potential claimants to any surplus money in its estate will be the original shareholders. The LBO was fraudulent only with respect to the unsecured creditors. If and when they are paid in full, the wrong committed by the shareholders will have been righted and there will no reason to deny their claims to whatever money is left over.

Another way to put this is that only a creditor can set aside a fraudulent conveyance. And a third way is that our reclassification of the sale of assets as an LBO unravels the sale, because the ostensible buyer paid nothing . . . , having bought the company with the company's own assets. Since the sale is to be ignored, any money received from the sale of the company's assets that is not owed to a creditor belongs to the original shareholders.[1220]

As explained by the court in *Boyer*, avoidance actions do not fail merely because recoveries in excess of claims might benefit the Estates.

### c.    546(e)

### (1)    Introduction

Unless and until the Supreme Court or the Second Circuit Court of Appeals speaks to the applicability of section 546(e) of the Bankruptcy Code to the leveraged buyout of privately held securities, the impact of that provision on the claims against the Sellers, the Lenders, the Buyer, and the Professionals cannot be predicted with certainty. Section 546(e) provides, in pertinent part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities

---

[1220] *Id.* at 797-98. *See also In re FBN Food Servs.*, 82 F.3d 1387, 1395 (7th Cir. 1996) ("Many cases interpreting state fraudulent conveyance law say that, once outside creditors have been satisfied, the transaction remains valid between the transferor and transferee.") (citing *Windle v. Flinn*, 196 Ore. 654, 672, (1952); *Feltinton v. Rudnik*, 401 Ill. 362, 363 (1948); *Serv. Mortgage Corp. v. Welson*, 293 Mass. 410, 413(1936); *cf. Sheffield Steel Corp. v. HMK Enters. (In re Sheffield Steel Corp.)*, 320 B.R. 423, 447 (Bankr. N.D. Okla. 2004) ("[S]everal cases that held that in instances where prepetition creditors were given an equity stake in a reorganized debtor in partial (or full) satisfaction of their prepetition claims, the increase in value of the reorganized debtor realized from the recovery of an avoidable transfer constituted a benefit to those prepetition creditors and therefore a 'benefit to the estate.'").

contract, as defined in section 741(7), . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

The lack of controlling authority regarding the applicability of section 546(e) to leveraged buyouts is not unique to this Investigation. Almost twenty years ago, the examiner in the *Revco D.S., Inc.*, cases confronted the same issue in the absence of controlling authority in the relevant circuit.[1221] At that time, there was only one analogous precedent at the circuit level, decided approximately three months prior to the report;[1222] the Tenth Circuit having held that section 546(e) precluded the avoidance of payments to a brokerage firm that exchanged shares for selling shareholders in a leveraged buyout, a ruling not met with great enthusiasm by the Revco examiner:

> Although 'settlement payment' may be a broadly defined term, the Kaiser approach appears to go beyond the normal usage of the term. . . . Payments to selling shareholders in a leveraged buyout are likely not the type of payment envisioned by Congress as 'settlement payments'. . . . If payments to selling shareholders are exempt from fraudulent conveyance attack as settlement payments, however, any tendering of securities might be shielded from fraudulent transfer attack.[1223]

Since the filing of the Revco Report in 1990, Congress has several times amended section 546(e), and numerous courts, including four other circuit courts of appeal, have addressed the applicability of section 546(e) to leveraged buyouts. As discussed below, the amendments have reflected an expansion, and the rulings have generally reflected an expansive view, of section 546(e), but the rulings are not uniform, nor controlling in this case.

That section 546(e) will be raised by potential fraudulent transfer defendants is virtually certain; while the courts are divided on the precise requirements for its applicability, the circuit court's ruling on the issue have recognized that some transfers to some transferees in the context of a leveraged buyout are protected from avoidance by section 546(e). While it can also

---

[1221] *In re Revco D.S., Inc.*, No. 588-1308, 1990 Bankr. LEXIS 2966, at *91 (Bankr. N.D. Ohio Dec. 17, 1990) [hereinafter "Revco Report"].

[1222] *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846 (10th Cir. 1990) [hereinafter *Kaiser I*].

[1223] Revco Report at * 90-91.

be assumed that the legal issues regarding the applicability of section 546(e) to leveraged buyouts would be contested, many of the material facts should not be in significant dispute.

As discussed in Section III.D. of this Report, pursuant to the Acquisition Agreement the membership interests were sold for approximately $8 billion, including the equity interests valued at $200 million which the Sellers received. The Sellers retained the net purchase price of approximately $1.8 billion (the "Payments to Sellers") from two accounts, an escrow account held by First American Title Company ("First American") at Chase Bank, account number XXX-X1931, and an escrow account held by Chicago Title Insurance Company at Citibank, N.A., account number XXXX-7251.

The disbursement of the Payments to Sellers from the First American escrow account was made by book entries from the First American escrow account to three other accounts at Chase Bank.[1224] BHAC IV, L.L.C. also received $85,611,011.91, representing the Earnest Money from the Chicago Title escrow account; these funds were wire transferred to the BHAC IV, L.L.C. account at Chase Bank, account number XXX-XX3893. The funds used to make the Payments to Sellers were for the most part the proceeds of the Mortgage Debt and Mezzanine Debt.

By its terms, section 546(e) protects from avoidance by the trustee under sections 544, 545, 547, 548(a)(1)(B), and 548(b) of the Bankruptcy Code transfers made before the commencement of the case that are "margin payments," "settlement payments" or "transfers . . . in connection with" a securities contract, commodity contract, or forward contract, if such transfers are "by or to (or for the benefit of)" a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency (each a "Covered Entity"). Avoidance by a trustee under section 548(a)(1)(A) is specifically excluded

---

[1224]   The disbursements were made by book entry to the following accounts:

| Account Name | Account No. | Amount |
| --- | --- | --- |
| BHAC IV, LLC. | XXX-XX3893 | $1,282,754,449.51 |
| Blackstone Hospitality Acquisitions III LLC. | XXX-XX8077 | $489,546,289.86 |
| Prime Hospitality LLC | XXX-XX8984 | $4,110,604.41 |

from the defense.[1225]  While there may be disputes in these cases about whether the Payments to Sellers and the liens transferred to the Lenders were settlement payments and/or transfers in connection with a securities contract, the fundamental issue will likely be whether section 546(e) applies to the leveraged buyout of privately held securities in the Acquisition.

Partially as a result of the amendments made to section 546(e) in 2006, amendments which have not been directly addressed as yet by the courts, the fraudulent transfer claims implicated in these cases will face a significant obstacle in section 546(e).  Twenty years ago, the examiner responsible for the Revco Report, based on *Kaiser I*, evaluated the prospects of a fraudulent transfer claim surviving a section 546(e) defense with tempered optimism:

> Until other circuits adopt the Kaiser approach in a universal fashion, or the Kaiser approach is adopted by the United States Supreme Court, the Examiner believes that the Kaiser case does not, by itself, provide convincing grounds for failing to commence an otherwise legitimate leveraged buyout fraudulent conveyance action against the Selling Shareholders.  The Kaiser decision, does, however, certainly detract from the benefits of such litigation by providing an additional hurdle.[1226]

In light of the subsequent evolution of the case law, particularly three circuit court decisions decided last year and the actions of Congress in 2006, the environment for the consideration of any fraudulent transfer claims brought by a representative of the estates in these cases appears to be less favorable than in 1990.  While the prospects of overcoming section

---

[1225]   Section 546(e) permits claims to be asserted for intentional fraudulent transfers under section 548(a)(1)(A).  This exception to section 546(e) has been interpreted by the only two courts to have addressed the issue to be limited to intentional fraudulent transfer claims under section 548(a)(1)(A), and not to permit the assertion of intentional fraudulent transfer claims under similar state laws.  *See Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 370-71 (W.D. Pa. 2006); *Wyle v. Howard, Weil, Louisse, Friedrichs Inc. (In re Hamilton Taft & Co.)*, 176 B.R. 895, 901 (Bankr. N.D. Cal.), *aff'd*, 196 B.R. 532 (N.D. Cal. 1995), *aff'd*, 114 F.3d 991 (9th Cir. 1997).

In the present cases, the reachback period under section 548, including section 548(a)(1), expired with respect to transfers made, and obligations incurred, on or before June 15, 2007.  Thus, actions under section 548(a)(1)(A) in connection with transfers made or debts incurred on the Closing of the Acquisition on June 11, 2007, would be foreclosed.  Transfers in connection with the Acquisition determined under section 548(d)(1) to have been made on or after June 15, 2007, might still be subject to section 548.  The Examiner has not investigated the recordings and filings of the mortgages and other financing documents, or researched applicable non-bankruptcy laws, to determine whether the transfers of liens in connection with the Acquisition might have been made on or after June 15, 2007, and thus within the section 548 reachback period.

[1226]   Revco Report at *91.

546(e) are smaller than at the time of the Revco Report, neither the Second Circuit Court of Appeals, nor the Supreme Court has ruled on these issues, and are not bound by the cases discussed below.

A history of the statute is set forth in Section V.C.4.c(2) below, followed by a description of the conflicting case law on the applicability of section 546(e) to leveraged buyouts (Section V.C.4.c(3)).  A discussion of the potential for section 546(e) to preclude claims not based upon sections 544, 545, 547, or 548 of the Bankruptcy Code follows, along with consideration of the prospect that creditors could independently assert claims that section 546(e) would prevent a trustee or other estate representative from prosecuting (Section V.C.4.c(4)).  Finally, the concluding section discusses the technical applicability of section 546(e) to fraudulent transfer and other claims against the Sellers, the Lenders, the Buyer, and the Professionals.  (Section V.C.4(c)(5)).

### (2)    History of Section 546(e)

The legislative history of section 546(e) reflects a consistent expansion of its scope.  The predecessor to section 546(e) that was enacted by the Bankruptcy Reform Act of 1978,[1227] section 764(c) of the Bankruptcy Code,[1228] was, for the most part, only applicable in commodity broker liquidation cases,[1229] and prohibited a trustee from avoiding certain transfers, including a settlement payment by a clearing organization, although the term "settlement payment" was not at that time defined:

> Notwithstanding sections 544, 545, 547, 548, and 724(a) of this title, the trustee may not avoid a transfer that is a margin payment to or deposit with a commodity broker or forward contract merchant or is a settlement payment made by a clearing organization and that occurs before

---

[1227]  Pub. L. No. 95-598, 92 Stat. 2549 (1978).

[1228]  *Id.* § 764(c), 92 Stat. 2549, 2619.

[1229]  Although implemented by an erroneous reference to nonexistent section 746(c), section 103(d) of the Bankruptcy Code provided that the transfer of a margin payment to a commodity broker or forward contract merchant by any debtor was subject to section 764(c):  "Subchapter IV of chapter 7 of this title applies only in a case under such chapter concerning a commodity broker except with respect to section 746(c) [sic] which applies to margin payments made by any debtor to a commodity broker or forward contract merchant."  Pub. L. No. 95-598 § 103(d), 92 Stat. 2549, 2555.

the commencement of the case, except under section 548(a)(1) of this title.[1230]

The legislative history to section 764(c) indicated that the provision "facilitates prepetition transfers and protects the ordinary course of business in the market."[1231]

In 1982, section 764(c) was repealed,[1232] and section 546(d) was enacted to expand the application of former section 764(c). Section 546(d) was made applicable in chapter 7, 11, 12, and 13 cases, and applied to the securities markets as well as the commodities markets:

> Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title.[1233]

Along with section 546(d), a definition for "settlement payment" was enacted as Bankruptcy Code section 741(8): "'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, or any other similar payment commonly used in the securities trade."[1234]

The primary source used by the courts for the legislative history of section 546(e) is the report of the House Judiciary Committee accompanying the 1982 Amendments;[1235] portions of the 1982 House Report have been cited by numerous courts dealing with section 546(e),[1236] and provide, in part:

---

[1230] Pub. L. No. 95-598 § 764(c), 92 Stat. 2549, 2619.

[1231] H.R. Rep. No. 95-595, at 392 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6348 [hereinafter 1977 House Report].

[1232] Act of July 27, 1982, Pub. L. No. 97-222, § 17(c), 96 Stat. 235, 240 (1982) [hereinafter 1982 Amendments].

[1233] *Id.* § 4, 96 Stat. 235, 236.

[1234] *Id.* § 8, 96 Stat. 235, 237. In 1990, the definition of settlement payment for the forward contract provisions of the Bankruptcy Code was added to section 101 of the Code. Act of June 25, 1990, Pub. L. 101-311 § 201, 104 Stat. 267, 269 (1990) [hereinafter 1990 Amendments].

[1235] H.R. Rep. No. 97-420 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583 [hereinafter 1982 House Report].

[1236] *See, e.g., Kaiser I*, 913 F.2d at 849; *Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.)*, 321 B.R. 527, 533 n. 6, 536 (B.A.P. 9th Cir. 2005); *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 477 (S.D.N.Y. 2001).

The commodities and securities markets operate through a complex system of accounts and guarantees. Because of the structure of the clearing systems in these industries and the sometimes volatile nature [of] the markets, certain protections are necessary to prevent the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market.

The Bankruptcy Code now expressly provides certain protections to the commodities market to protect against such a "ripple effect." One of the market protections presently contained in the Bankruptcy Code, for example, prevents a trustee in bankruptcy from avoiding or setting aside, as a preferential transfer, margin payments made to a commodity broker (see 11 U.S.C. Sec. 764(c)).

The thrust of several of the amendments contained in H.R. 4935 is to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market. The amendments will ensure that the avoiding powers of a trustee are not construed to permit margin or settlement payments to be set aside except in cases of fraud . . . .

. . . .

The new section 546(d) reiterates and clarifies the provisions of current section 764(c). The new section also encompasses both stock brokers and securities clearing agencies.[1237]

The Bankruptcy Amendments and Federal Judgeship Act of 1984[1238] redesignated section 546(d) as section 546(e), and added "financial institution" as a Covered Entity.[1239] The next material amendment to section 546(e) was made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005[1240] to add "financial participant" as a Covered Entity.[1241]

The latest amendments to section 546(e) were made by the Financial Netting Improvements Act of 2006[1242] which made two changes to section 546(e). First, the phrase "(or for the benefit of)" was inserted in the part of section 546(e) relating to margin payments and

---

[1237]   1982 House Report, at 1-3, 1982 U.S.C.C.A.N. at 583-84.

[1238]   Pub. L. No. 98-353, 98 Stat. 333 (1994) [hereinafter 1984 Amendments].

[1239]   *Id.* §§ 351(2), 461(d), 98 Stat. 333, 358, 377.

[1240]   Pub. L. No. 109-8, 119 Stat. 23 (2005) [hereinafter 2005 Amendments].

[1241]   *Id.* § 907(o), 119 Stat. 23, 182.

[1242]   Pub. L. No. 109-390, 120 Stat. 2692 (2006) [hereinafter 2006 Amendments].

settlement payments.[1243]  Second, the 2006 Amendments inserted the phrase "or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract",[1244] thus creating protection for transfers made in connection with securities contracts, commodity contracts, and forward contracts.  The 2006 Amendments were made effective in cases filed on and after December 12, 2006.[1245]

The sparse legislative history to the 2006 Amendments[1246] that directly relates to section 546(e) states that:

> Section 5(b) amends Sections 546(e) and 546(f) of the Bankruptcy Code, which protect margin payments and settlement payments, to also protect transfers made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, securities clearing agency, or repo participant, in connection with a securities contract, commodity contract, forward contract, or repurchase agreement.  This amendment conforms the language of Sections 546(e) and 546(f) to the language in 546(g), regarding the protection of transfers in connection with swap agreements.[1247]

This statement provides a partial explanation for one of the changes to section 546(e), the addition of the "in connection with" language.  It does not explain the additional language "(or for the benefit of)", which was also added to section 546(g) by the 2006 Amendments.  In contrast to the expansion of section 546(e) by adding protection for transfers "in connection with" certain contracts, but continuing the protection of margin payments and settlement payments, the 2006 Amendments deleted specific references to margin payments and settlement payments from section 546(f), leaving only the protection for transfers "in connection with" repurchase agreements, and making the structure of section 546(f) consonant with the

---

[1243]  *Id.* § 5(b), 120 Stat. 2692, 2697.

[1244]  *Id.*, 120 Stat. 2692, 2697-98.

[1245]  *Id.* § 7, 120 Stat. 2692, 2700.

[1246]  H.R. Rep. No. 109-648 (2006), 2006 WL 6165926 [hereinafter 2006 House Report].

[1247]  *Id.* at 8.

structure of section 546(g).[1248]  Thus, as compared to section 546(f), only section 546(e) still has separate categories of protection for settlement payments, margin payments, and, as a result of the 2006 Amendments, transfers "in connection with" specified contracts.

### (3)   Applicability Of Section 546(e) To Leveraged Buyouts

The case law is divided on the issue of whether section 546(e) applies in the context of the leveraged buyout of privately held securities.  The division involves two primary issues.  First, whether Congress intended to limit the application of section 546(e) to "routine" securities transactions, those that involve publicly traded securities and the "settlement and clearance system" (the "Scope Issue").  Second, whether a Covered Entity must have a beneficial interest in the assets transferred (the "Conduit Issue").

As described in section V.C.4.c(3)(a) below, last year, three circuit courts of appeal ruled on the Scope Issue and/or the Conduit Issue, holding section 546(e) applicable to the leveraged buyout of privately held securities, and not requiring that a Covered Entity hold any beneficial interest in the assets transferred.  The courts primarily relied on their view of the plain language of the statute, rejecting the reasoning of the cases described in Section V.C.4.(c)(3)(b) below, which had held section 546(e) inapplicable to leveraged buyouts of privately held securities based primarily upon the Scope Issue.  In determining the Scope Issue, the cases rejecting the applicability of section 546(e) to leveraged buyouts often looked to the vague definition of settlement payment in section 741(8), causing them to explore the legislative history of the statute and the market system that they believed that the statute was designed to protect.  Courts determining the Conduit Issue to require that a Covered Entity hold a beneficial interest have done so by engrafting the "conduit" doctrine developed under section 550 of the

---

[1248]   Section 546(f) as enacted by the 1984 Amendments extended protections to repo participants with respect to transfers that were margin payments or settlement payments *and* were made "in connection with" repurchase agreements.  1984 Amendments §§ 391, 393, 98 Stat. 333, 364-65.  As discussed in the text above, the 2006 Amendments deleted the references in section 546(f) to margin payments and settlement payments.
Section 546(g) was enacted in 1990 to protect from avoidance "a transfer under a swap agreement" that was also made "in connection with" a swap agreement.  1990 Amendments § 103, 104 Stat. 267, 268.  By the 2005 Amendments, section 546(g) was modified so that a transfer either "under" or "in connection with" a swap agreement was protected.  2005 Amendments § 907(e), 119 Stat. 23, 177.

Bankruptcy Code to the language of section 546(e); a "mere conduit" should not be a transferee or a transferor under section 546(e).

All of the decisions regarding leveraged buyouts discussed below were in cases filed before the 2006 Amendments became applicable. As discussed in Section V.C.4.c(3)(b) below, the 2006 Amendments may have an impact on both the Scope Issue and the Conduit Issue.

### (a)    The 2009 Cases and Their Predecessors

On January 19, 2010, the Supreme Court denied certiorari in *QSI Holdings, Inc. v. Alford*,[1249] declining to review the decision of the Sixth Circuit[1250] that section 546(e) barred a fraudulent transfer suit against the selling shareholders in the leveraged buyout of Quality Stores, Inc., a privately held corporation. The shareholders of Quality Stores received $92 million of stock in the successor corporation and $111.5 million in cash for their shares.[1251] The buyout was facilitated by HSBC Bank USA, which acted as exchange agent for the buyer; HSBC collected the shares and distributed the cash and shares to the approximately 170 former shareholders.[1252] Following the buyout, Quality Stores filed a voluntary chapter 11 petition.[1253] The representatives of the estate commenced an adversary proceeding seeking to recover the cash payments made to the former shareholders, asserting claims for constructive fraudulent transfer under section 544(b) of the Bankruptcy Code and the Michigan Uniform Fraudulent Transfer Act.[1254] Several of the former shareholders moved for summary judgment, contending that the payments were exempt from avoidance because they were settlement payments by or to a financial institution under section 546(e). The bankruptcy court granted the motions and was affirmed by the district court, which was affirmed by the Sixth Circuit.

---

[1249]    78 U.S.L.W. 3417 (U.S. January 19, 2010) (No. 09-439).

[1250]    *QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545 (6th Cir. 2009) [hereinafter *QSI III*], *aff'g* 382 B.R. 731 (W.D. Mich. 2007) [hereinafter *QSI II*], *aff'g* 355 B.R. 629 (Bankr. W.D. Mich. 2006) [hereinafter *QSI I*].

[1251]    *QSI I*, 355 B.R. at 631.

[1252]    *Id.* at 631-32.

[1253]    *Id.* at 632.

[1254]    *Id.*

With *QSI,* the Supreme Court was presented a case in which it could consider both the Scope Issue and the Conduit Issue,[1255] and the denial of review in *QSI* was a lost opportunity for the Court to lay to rest two of the most significant controversies regarding section 546(e). *QSI* was the latest of several chances that the Court has had to rule on the applicability of section 546(e) to leveraged buyouts. For example, in 1998 the Court declined review of *Munford v. Valuation Research Corp. (In re Munford, Inc.).*[1256] *Munford* ruled only on the Conduit Issue, holding that unless a Covered Entity held a beneficial interest in the assets transferred, section 546(e) did not apply. The Court had also denied the petitions for certiorari in *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.),*[1257] and *Lowenschuss v. Resorts Int'l, Inc.,*[1258] discussed *infra* at note 1274.

*QSI* was one of three circuit court decisions in 2009 that dealt with the applicability of section 546(e) to the leveraged buyout of privately held securities and that came to the same result; the Eighth Circuit, prior to *QSI III,* having ruled in *Contemporary Indus. Corp. v. Frost,*[1259] and the Third Circuit, after *QSI III,* deciding *Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.),*[1260] having earlier ruled on the Conduit Issue in *Resorts*.

*Contemporary Industries* involved the leveraged buyout of shares from former shareholders consisting of one individual, two couples, and various family trusts which sold their shares for $26.5 million.[1261] First National Bank of Omaha was party to an escrow agreement

[1255]   *See* Petition for a Writ of Certiorari at 5, *Quality Holdings, Inc. v. Alford*, No. 09-439 (U.S. Oct. 5, 2009), 2009 W.L. 3308849 (U.S.) at *5.

[1256]   98 F.3d 604 (11th Cir. 1996), *cert. denied,* 522 U.S. 1068 (1998) [hereinafter *Munford*].

[1257]   952 F.2d 1230 (10th Cir. 1991), *cert. denied,* 505 U.S. 1213 (1992) [hereinafter *Kaiser II*].

[1258]   181 F.3d 505 (3d Cir.), *cert. denied*, 528 U.S. 1021 (1999) [hereinafter *Resorts*]. The refusals to grant certiorari in these cases are not an indication of the Court's views on the issues. *See, e.g., Bethley v. Louisiana*, 520 U.S. 1259 (1997) (statement of Justice Stevens respecting denial of certiorari; "It is well settled that our decision to deny a petition for writ of certiorari does not in any sense constitute a ruling on the merits of the case . . . ."); *United States v. Carver*, 260 U.S. 482, 490 (1923) ("The denial of a writ of certiorari imports no expression of opinion upon the merits of the case . . . .").

[1259]   564 F.3d 981 (8th Cir. 2009) [hereinafter *Contemporary Industries III*], *aff'g* No. 8:07CV288 (D. Neb. Jan 8, 2008) [hereinafter *Contemporary Industries II*], *aff'g* 2007 Bankr. LEXIS 4609 (Bankr. D. Neb. 2007) [hereinafter *Contemporary Industries I*].

[1260]   590 F.3d 252 (3d Cir. 2009) [hereinafter *Plassein III*], *aff'g* 388 B.R. 46 (D. Del. 2008) [hereinafter *Plassein II*], *aff'g* 366 B.R. 318 (Bank. D. Del. 2007) [hereinafter *Plassein I*].

[1261]   *Contemporary Industries III*, 564 F.3d at 981.

pursuant to which it collected the shares and distributed the funds to the selling shareholders.[1262] Following the transaction, the debtor filed its chapter 11 petition, and a plan was confirmed authorizing the debtor to bring avoidance actions.[1263] The debtor filed suit against the former shareholders alleging that the transfer of funds was an avoidable fraudulent transfer under Bankruptcy Code section 544 and the Nebraska Uniform Fraudulent Transfer Act.[1264] The bankruptcy court granted summary judgment for the defendants, was affirmed by the district court, which was affirmed by the Eighth Circuit, finding that the plain meaning of section 546(e) and the definition of settlement payment in section 741(8) did not exempt the sale of privately held securities in a leveraged buyout from their scope,[1265] nor require that a Covered Entity hold a beneficial interest in the assets transferred.[1266]

Plassein involved several leveraged buyouts of privately held companies, most having only a few shareholders.[1267] In those transactions, the selling shareholders directly delivered their shares to the buyer, which then instructed its bank to wire funds to the shareholders' private accounts at various banks; the parties did not make use of the settlement system of intermediaries and guarantees usually employed in securities transactions.[1268] Thereafter, the buyer and the acquired companies filed chapter 11 cases, the chapter 11 cases were converted to chapter 7, and the trustee brought suit against the former shareholders under Bankruptcy Code section 544(b) and Delaware fraudulent transfer law.[1269] The bankruptcy court granted the defendants' motion to dismiss on two grounds: (1) that section 546(e) prevented the avoidance of the transfers; and (2) that the complaint failed to allege that any debtor had made the transfers to the defendants.[1270] These rulings were affirmed by the district court and,

---

[1262] *Id.* at 987.
[1263] *Contemporary Industries I*, 2007 Bankr. LEXIS at *3.
[1264] *Contemporary Industries III*, 564 F.3d at 984.
[1265] *Id.* at 986.
[1266] *Id.* at 987.
[1267] *Plassein III*, 590 F.3d at 255.
[1268] *Id.*
[1269] *Plassein I*, 366 B.R. at 325, 326.
[1270] *Plassein II*, 388 B.R. at 49.

thereafter, by the Third Circuit with respect only to the section 546(e) issues, the Third Circuit declining to rule on whether the complaint adequately alleged avoidable transfers.[1271]

In coming to the conclusion that section 546(e) applied to leveraged buyouts of privately held securities in situations in which the Covered Entity had no beneficial interest in the transferred assets, the three circuit courts relied on what they believed was the plain meaning of the statute,[1272] on the earlier circuit court precedent from the Tenth Circuit in *Kaiser I* and *Kaiser II*,[1273] the more recent decision in *Resorts*,[1274] and rulings in one or both of the other two 2009 cases.[1275] *Contemporary Industries III* exemplifies the analysis:

---

[1271] *Plassein III*, 590 F.3d at 259 n.6.

[1272] *See QSI III*, 571 F.3d at 550; *Contemporary Industries III*, 564 F.3d at 986, 987. The court in *Plassein III* held that *Resorts* controlled the issues before it. *Plassein III*, 590 F.3d at 257-58. *Resorts* had noted the "statute's plain language." *Resorts*, 181 F.3d at 516.

[1273] *See QSI III*, 571 F.3d at 549; *Contemporary Industries III*, 564 F.3d at 985; *Plassein III*, 590 F.3d at 258. In *Kaiser I*, the case discussed in the Revco Report, the court held that, in the context of a leveraged buyout of publicly held securities, the payments to the broker were settlement payments, notwithstanding that they were made in connection with a leveraged buyout, that while the definition of settlement payment was "somewhat circular", it was extremely broad (*Kaiser I*, 913 F.2d at 848), and that leveraged buyouts were not exempt from the application of section 546(e). *Id.* at 850. In support of its view of the expansive nature of section 546(e), the court found that the "ordinary course" comment in the 1977 House Report regarding section 764(c) reflected the limited application of *that* section, which was expanded in 1982 by the movement of the provision into chapter 5 of the Bankruptcy Code, as well as the extension of its application to the securities market. *Id.* at 849. In short, the court found that the concern of Congress about "the danger of a 'ripple effect' on the entire market is at least as inherent in the avoidance of an LBO as it is in the avoidance of a routine stock sale." *Id.*
The Tenth Circuit decided *Kaiser II* the next year, once again holding that section 546(e) applied to leveraged buyouts, and that it foreclosed a suit against the selling shareholders. *Id.* at 1239-40. *Kaiser II* explicitly determined the Conduit Issue, ruling that section 546(e) is to be applied literally, a Covered Entity need not hold a beneficial interest in the assets subject to the transfer. *Id.* at 1240 ("On its face the statute is clear. The statute exempts payments made *'by or to'* a stockbroker. . . . Again, unless there is some reason to believe the clear application is absurd or otherwise unreasonable, we can leave our inquiry at that.").

[1274] *See QSI III*, 571 F.3d at 549,551; *Contemporary Industries III*, 564 F.3d at 985, 986, 987; *Plassein III*, 590 F.2d at 257-59. *Resorts* involved a section 548 fraudulent transfer claim seeking to recover payments made in connection with a leveraged buyout. In holding that section 546(e) applied to the leveraged buyout, the court reaffirmed its earlier ruling in a Bankruptcy Code section 546(f) repo agreement case, *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n*, 878 F.2d 742 (3d Cir. 1989) [hereinafter *Bevill*], that the term "settlement payment" is "extremely broad". *Resorts*, 181 F.3d at 515. Following *Bevill* and *Kaiser II*, the *Resorts* court held that the term settlement payment "is a broad one that includes almost all securities transactions. Including payments made during LBOs within the scope of the definition is consistent with the broad meaning these cases discern. A payment for shares during an LBO is obviously a common securities transaction . . . ." *Id.* at 515-16. *Resorts* also rejected the requirement set forth by the Eleventh Circuit in *Munford* that the Covered Entity have a beneficial interest in the subject assets; "This requirement is not explicit in section 546." *Id.* at 516. It was not entirely clear whether the holding in *Resorts* would apply to the leveraged buyout of privately held securities; this was done in *Plassein III*. However, after *Resorts*, and prior to *Plassein III*, lower courts in the Third Circuit applied the broad interpretation of section 546(e) in the context of the redemption of privately held stock, *Official Comm. of Unsecured Creditors v. Clark (In re*

---

As noted above, however, our analysis begins – and where the language is plain, usually ends – with the statutory text. Here, the relevant text has sufficiently plain and unambiguous meaning. We agree with our sister circuits that § 741(8) was intended to sweep broadly. Thus, we conclude the term "settlement payment," as used therein, encompasses most transfers of money or securities made to complete a securities transaction. That is exactly what we have before us: the payments at issue were transfers of money made to complete a securities transaction, namely, the sale of the Frosts' Contemporary Industries stock. Nothing in the relevant statutory language suggests Congress intended to exclude these payments from the statutory definition of "settlement payment" simply because the stock at issue was privately held. § 741(8) is certainly not expressly limited to public securities transactions, and neither is § 546(e). Similarly, we do not believe § 741(8)'s concluding phrase "or any other similar payment commonly used in the securities trade" evinces an intent to exclude payments for privately held stock. To the contrary, the phrase follows a long list of various kinds of settlement payments and so we think it is most naturally read as a catchall phrase intended to underscore the breadth of the § 546(e) exemption.[1276]

---

*National Forge Co.)*, 344 B.R. 340 (W.D. Pa. 2006), and the purchase of privately held stock, *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 394 B.R. 760 (Bankr. D. Del. 2008), *Official Comm. of Unsecured Creditors v. Acres of Diamonds L.P. (In re The IT Group, Inc.)*, 359 B.R. 97 (Bankr. D. Del. 2006). *Resorts* was also controlling in two cases in the Third Circuit applying section 546(e) to leveraged buyouts, *Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.)*, 324 B.R. 575 (Bankr. W.D. Pa. 2005) and *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 274 B.R. 71 (D. Del. 2002) [hereinafter *Hechinger*].

[1275] *See QSI III*, 571 F.3d at 549, 550 (referencing *Contemporary Industries III*); *Contemporary Industries III*, 564 F.3d at 986, 987 n.5 (referencing *QSI II*); *Plassein III*, 590 F.3d at 256 (referencing *QSI III* and *Contemporary Industries III*).

[1276] *Contemporary Industries III*, 564 F.3d at 986. *Contemporary Industries* also dealt with the potential for abuse under a broad reading of sections 546(e) and 741(8), the prospect that an insolvent entity could be stripped of its value and the estate would be left without recourse. *Id.* at 987 n. 5 This policy argument had gained traction in some lower court decisions, as discussed in § V.C.4.c.(3)(b) below, but did not cause the *Contemporary Industries* court to sway from its reading of the statute; quoting *QSI II*, the court found that an abusive situation could be excluded from treatment as a "settlement payment" as not being "commonly used." *Id.*

The "commonality" of the transaction might involve the number of shareholders involved. While the court in *QSI III* ruled that transactions involving privately held securities were not exempt from section 546(e), it left open the prospect that leveraged buyouts of closely held private securities, such as occurred in the present cases, might not be subject to section 546(e):

But unlike the instant case, the *Norstan* [*Official Comm. of Unsecured Creditors v Lattman (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68 (Bankr. E.D.N.Y. 2007)] transaction involved the two sole shareholders of a closely held Subchapter S corporation, did not implicate public securities markets, and lacked many of the indicia of transactions "commonly used in the securities trade." *See Norstan,* 367 B.R. at 73. This case, on the other hand, considers a transaction with the characteristics of a common leveraged buyout involving the merger of nearly equal companies, and nothing in the statutory language indicates that Congress sought to limit that protection to publicly traded securities. The value of the privately held securities at issue is substantial and

As illustrated in the above quote, the provision given greatest scrutiny is the definition of settlement payment in section 741(8).  The language of section 741(8) has not changed dramatically since its original enactment in 1982.[1277]  The three circuit courts did not explore at length the legislative history to section 741(8), or to section 546(e), at least as compared to cases excluding leveraged buyouts from the scope of section 546(e).[1278]  Two of the courts did, however, reference opinions, decided in other contexts, determining that the term "settlement payment" and section 546(e) were to be construed broadly.[1279]

In contrast to the cases discussed in Section V.C.4.c.(3)(b) below that rejected the application of section 546(e) to leveraged buyouts, the 2009 circuit court cases were exercises in statutory interpretation based upon the perceived plain meaning of sections 546(e) and 741(8).  The courts were unwilling to follow the *Munford* approach to the Conduit Issue by incorporating the conduit doctrine developed under section 550 of the Bankruptcy Code to their interpretation of what they viewed as the plain language of section 546(e).[1280]  The result, that otherwise recoverable value could be lost to bankruptcy estates, was not repugnant to the courts, much less absurd, nor lead to extensive explorations of legislative history or the mechanics of the clearance and settlement process.

---

there is no reason to think that unwinding that settlement would have any less of an impact on financial markets than publicly traded securities.

*QSI III*, 571 F.3d at 650.

[1277] Current section 741(8) defines settlement payment to mean "a preliminary settlement payment, a partial settlement payment, an interim settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade . . . ."

[1278] *Compare QSI III*, 571 F.3d at 549-50 (quoting part of legislative history from *Kaiser I*), *Contemporary Industries III* (no mention of legislative history), *and Plassein III* (no mention of legislative history) *with Official Comm. of Unsecured Creditors v. Asea Brown Boveri, Inc. (In re Grand Eagle Cos.)*, 288 B.R. 484, 493-94 (Bankr N.D. Ohio 2003) (discussing legislative history) *and Official Comm. of Unsecured Creditors v. Lattman (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68, 76 (Bankr. E.D.N.Y. 2007) (same).

[1279] For example, *Contemporary Industries III* cited not only *Kaiser II* and *Resorts* in support of the proposition that section 741(8) is extremely broad, but referenced *Jonas v. Resolution Trust Corp. (In re Comark)*, 971 F.2d 322 (9th Cir. 1992), a case holding that section 546(e) prevented the avoidance of transfers under a repurchase agreement.  *Contemporary Industries III*, 564 F.3d at 985.  *QSI III* referenced *Comark* as well as *Bevill* for the same proposition.  *QSI III*, 571 F.3d at 549.  The Third Circuit in *Plassein III* did not elaborate on the breadth of the statutes, having previously done so in *Bevill* and *Resorts*.

[1280] *QSI III*, 571 F.3d at 551; *Contemporary Industries III*, 564 F.3d at 986.

From shortly after the filing of the Revco Report and until *Resorts* was decided in 1999, the circuit courts were evenly split on the Conduit Issue, the Tenth Circuit with *Kaiser II*, and the Eleventh Circuit with *Munford*.  During this period, numerous lower courts refused to apply section 546(e) to leveraged buyouts, some by adopting the *Munford* position on the Conduit Issue, and others by way of the Scope Issue, determining that the statutory language, particularly the definition of settlement payment, was vague, exploring the legislative history and the mechanics of the securities markets, and holding that leveraged buyouts of privately held securities were not transactions that Congress intended to protect from avoidance.

1991 saw the filing of the Revco Report as well as the earliest case rejecting the application of section 546(e) to a fraudulent transfer claim based upon a leveraged buyout.  In *Wieboldt Stores, Inc. v. Schottenstein,*[1281] the district court held that section 546(e) did not apply to protect insider shareholders from fraudulent transfer claims; in an earlier opinion, the court had dismissed claims against non-insider shareholders on grounds other than section 546(e).[1282] Setting a pattern for analysis that would be followed by other courts rejecting the application of section 546(e) to leveraged buyouts, the *Wieboldt* court focused on the definition of "settlement payment" under section 741(8), and found it "circuitous" and lacking "the sort of 'plain meaning' . . . which would preclude this court from looking further in construing Section 546(e)."[1283]  As a result, the court reviewed the legislative history to 546(e), as set forth in a number of cases, to determine its purpose and found "that Congress exempted settlement payments in the commodities (and later the securities) industry out of concern that the bankruptcy of one party in the clearance and settlement chain could spread to other parties in that chain."[1284]  Having found that the payments to the insider shareholders were not clearly covered by the "circuitous" language of section 741(8), and having discerned the legislative purpose of

---

[1281]   131 B.R. 655 (N.D. Ill. 1991) [hereinafter *Wieboldt*].

[1282]   *Wieboldt Stores, Inc. v. Schottenstein*, 111 B.R. 162 (N.D. Ill. 1990).

[1283]   *Wieboldt,* 131 B.R. at 663.

[1284]   *Id.* at 664.

section 546(e), the court ruled that section 546(e) was not applicable because requiring the shareholders to return the payments they received "poses no significant threat to those in the clearance and settlement chain."[1285] Thus, in *Wieboldt*, the vague definition of settlement payment caused the court to determine the legislative purpose of section 546(e) and find that such purpose would not be served by applying it in that case. The lack of a beneficial interest by a Covered Entity was a factor in the court's decision; the court noted that no financial intermediary in the clearance and settlement process "would be meaningfully affected" by an avoidance order.[1286]

Just as 2009 saw a record three cases applying section 546(e) to leveraged buyouts, 1996 provided three cases holding section 546(e) inapplicable to those transactions by way of more explicit articulations of the reasons set forth in *Wieboldt*. The first of the class of 1996 was the district court decision in *Jewel Recovery, L.P. v. Gordon*,[1287] which adopted Bankruptcy Judge Felsenthal's report refusing to grant summary judgment to former shareholders of a private company who sold their shares using First Chicago Trust Company of New York as a depository.[1288] The court was not troubled by whether the language of section 546(e) literally applied to the transaction, and spent no time parsing the definition of settlement payment.[1289] Rather, based upon the 1982 House Report, the court found that Congress only intended to protect the public markets, and that applying section 546(e) in a situation not impacting public market trading would be inconsistent with the purposes of the avoiding powers:

> [T]he . . . transaction was a private transaction which did not implicate the clearance and settlement process. . . . No stockbroker, clearing member or clearing agency participated in the transaction and no guarantees were made by third parties to facilitate the transaction.

---

[1285] Id.

[1286] *Id*. at 664-65.

[1287] 196 B.R. 348 (N.D. Tex. 1996).

[1288] *Id*. at 351.

[1289] *Id*. at 352 ("The plain language of § 546(e) would appear to apply to this transaction. Any payments received by the Family Stockholders . . . constitute settlement payments by or to a financial institution, First Chicago . . . .").

The affirmative application of § 546(e) to this transaction would serve to sanction the practice of structuring private stock purchases in an effort to circumvent the avoidance section, merely by utilizing a financial institution.  Private transactions lack the impact on the public market trading systems that Congress intended to protect by § 546(e).  Accordingly, applying the plain language of § 546(e) to this private transaction conflicts and is inconsistent with Congress' statutory scheme in Chapter 5 of the Code.[1290]

The second case from 1996 was the bankruptcy court decision in *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*,[1291] which held that section 546(e) did not apply to the leveraged buyout of privately held securities, and provided a more explicit presentation than *Wieboldt* of the requirement that a Covered Entity hold a beneficial interest in the subject assets.  The court found that the complaint failed to allege a transfer by or to a Covered Entity, simply alleging that the transfer was from the debtor to the former shareholders.[1292]  However, even if a Covered Entity had been alleged to have acted as an intermediary, this alone would be insufficient to make section 546(e) applicable; a Covered Entity acting solely as an intermediary does not make it the type of "transfer" required for 546(e) to apply:[1293]

Gemini's difficulty is that a stockbroker, financial institution or securities clearing agency acting as an intermediary in the payment is not a "transferee".  And because it is not deemed to have received property in a transfer, is cannot be a transferor of property.[1294]

The court also ruled that the transfer was not a settlement payment.[1295]  As did the court in *Wieboldt*, the *Healthco* court found that the definition in section 741(8) invited an exploration of the legislative history of the provision; it called the definition "as opaque as it is

---

[1290]  *Id.* at 352-53.

[1291]  195 B.R. 971 (Bankr. D. Mass. 1996) [hereinafter *Healthco*].

[1292]  *Id.* at 981.

[1293]  *Id.*

[1294]  *Id.* at 982.  The *Healthco* court distinguished *Kaiser II* by saying that *Kaiser II* did not explore the "predicate" of section 546(e) – that a Covered Entity otherwise be considered a transferee subject to an avoidance action, presumably by the same standards used in Bankruptcy Code section 550; "The [*Kaiser II*] court did not, however, focus on the predicate of section 546(e) – that the transfer be otherwise recoverable from such an entity through exercise of an avoiding power.  Apparently the point was not argued."  *Id.* at 983.

[1295]  *Id.* at 983.

circular."[1296]  Reviewing the legislative history, including the "ordinary course" comment in the 1977 House Report,[1297] the court stated:

> Congress was particularly concerned that avoidance of such transfers would leave a securities clearing agency exposed on its guaranty of payment of the sales price and delivery of the securities.  The payment to Gemini was a one-time distribution in complete liquidation of its stock interest.  These circumstances, particularly where there is no showing of a guaranty by a securities clearing agency, are not what Congress had in mind in enacting section 546(e).  The term "settlement payment" should therefore not be interpreted to include payment and settlement of this type of transaction.[1298]

The last of the 1996 cases on this issue was the only circuit court decision to hold section 546(e) inapplicable to a leveraged buyout, the split panel decision by the Eleventh Circuit in *Munford*.  *Munford* involved a leveraged buyout of a public company[1299] using a financial institution as an intermediary to collect and disburse the funds and shares.[1300]  The majority in *Munford* explicitly rejected the view in *Wieboldt* that leveraged buyouts were not the type of transaction that might threaten the markets:

> We reject the reasoning of *Wieboldt* finding that even granting trustees avoidance powers under limited circumstances in the LBO context has the potential to lessen confidence in the commodity market as a whole.[1301]

Instead, the court embraced one of the *Healthco* rulings, the requirement that a Covered Entity hold a beneficial interest in the assets transferred:

> True, a section 546(e) financial institution was presumptively involved in this transaction.  But the bank here was nothing more than an intermediary or conduit. . . .  The bank never acquired a beneficial interest in either the funds or the shares.
>
> Importantly, a trustee may only avoid a transfer to a transferee. . . . See 11 U.S.C. § 550.  Since the bank never acquired a beneficial interest in the funds, it was not a "transferee" in the LBO transaction. . . .  Rather,

---

[1296]  Id.

[1297]  *Id.* at 983 n. 35.

[1298]  *Id.* at 983.

[1299]  *Munford*, 98 F.3d at 606.

[1300]  *Id.* at 607.

[1301]  *Id.* at 610 n. 4

the shareholders were the only "transferees" of the funds here.  And, of course, section 546(e) offers no protection from the trustees avoiding powers to shareholders . . . .[1302]

In support of its conclusion on the Conduit Issue, the court relied on an earlier Eleventh Circuit case dealing with a fraudulent transfer action under section 548, which held that a bank acting as a conduit was not a transferee under section 550.[1303]  The dissenting judge in *Munford* disagreed with the majority based upon his view of the plain meaning of the statute: "I believe the majority . . . chose to disregard the plain language of section 546(e) in order to create a new exception to its application".[1304]

Two years later, the district court in *Zahn v. Yucaipa Capital Fund* [1305] held that section 546(e) did not apply to the leveraged buyout of a privately held company, the court adopting the reasoning of each of *Wieboldt*, *Healthco*, and *Munford*.  After initially reviewing the definition of settlement payment, the court found that the definition "defies plain meaning; to the contrary, courts have recognized that it is circular and cryptic".[1306]  The court then explored the intention of Congress by describing the clearance and settlement system, concluding that:

> The system depends upon a series of guarantees, made by all parties in the chain, that they will live up to their obligations regardless of a default by another party in the chain.  These guarantees allow the parties to trade free of worry about events between the trade date and the settlement date.
>
> The need to preserve the stability of this system led Congress to create the § 546(e) exception to the trustee's avoidance powers.[1307]

Based upon this, the court found it "unlikely that Congress intended the term 'settlement payment' to cover the present transfers."[1308]  Acknowledging that *Kaiser II* had found that payments to shareholders in a leveraged buyout were settlement payments subject to section 546(e), the court noted that *Kaiser II* had been criticized by commentators and, further,

---

[1302]   *Id.* at 610.

[1303]   *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir. 1988).

[1304]   *Munford*, 98 F.3d at 614.

[1305]   218 B.R. 656 (D.R.I. 1998).

[1306]   *Id.* at 675.

[1307]   *Id. at* 676.

[1308]   *Id.*

that *Kaiser II*, as well as *Wieboldt*, both involved the clearance and settlement system; in the case before it, the court found that that system was not even used.[1309]

Without mentioning the involvement of a financial institution, which involvement was likely given that the former shareholders received approximately $59 million,[1310] the court also embraced the *Munford* ruling, elaborating on the Conduit Issue by noting that since conduits do not take beneficial ownership, they would not be subject to an avoidance claim under the case law, and, thus, application of section 546(e) in instances where they are mere conduits would be unnecessary.[1311]

Five years later, in 2003, the bankruptcy court in *Official Committee of Unsecured Creditors v. Asea Brown Boveri, Inc. (In re Grand Eagle Cos.)*,[1312] was the next to rule that section 546(e) was inapplicable to a leveraged buyout of privately held securities. While noting the Conduit Issue,[1313] the court ruled based upon the Scope Issue, its view of the term settlement payment, and the use of that term in the securities industry:

> The reflexive aspect of this provision, *i.e.*, defining the meaning of "settlement payment" by listing a variety of types of "settlement payments", requires the reader to consider extrinsic information and the final modifying phrase "or any other similar payment commonly used in the securities trade" is key to the intended meaning and use of the term. Where Congress has used technical words or terms of art, reference must be made to the art or science (or in this case industry) in which the term was used at the time of the enactment of the statute.[1314]

Thereafter the court repeated at length the description of the clearance and settlement system from *Kaiser II*,[1315] and traced the history of section 546(e) from the original provision that was Bankruptcy Code section 764(c).[1316] Distinguishing *Kaiser II*, *Resorts*, and

---

[1309] *Id.*

[1310] *Zahn*, 218 B.R. 6 at 676-77 n. 31.  *See Zahn v. Yucaipa Capital Fund (In re Almac's, Inc.)*, 202 B.R. 648, 651 (D.R.I. 1996).

[1311] *Zahn,* 218 B.R. 676-77 n.31.

[1312] 288 B.R. 484 (Bankr. N.D. Ohio 2003).

[1313] *Id.* at 494 n. 12.

[1314] *Id.* at 492.

[1315] *Id.* at 492-93.

[1316] *Id.* at 493-94.

*Hechinger* as involving publicly traded companies, the court ruled that section 546(e) had no application to the sale of privately held securities, rejecting the contention that a settlement payment is simply the transfer of cash made to complete a securities transaction:

> Such a simplistic reading of section 546(e) ignores the meaning of the term "settlement payment" within the securities industries and would, essentially, convert that statutory provision into a blanket transactional cleansing mechanism for any entity savvy enough to funnel payments for the purchase and sale of privately held stock through a financial institution.[1317]

*Official Committee of Unsecured Creditors v. Lattman (In re Norstan Apparel Shops, Inc.)*,[1318] is the most recent case to hold section 546(e) inapplicable to a leveraged buyout of privately held securities. In that case, the securities subject to the leveraged buyout were held by two individuals, directly or through trusts.[1319] In denying the former shareholders' motion to dismiss, the court focused on the definition of settlement payment, noting that some courts have broadly interpreted the definition, but, as did the *Grand Eagle Cos.* court, deciding that the key to its understanding was the concluding phrase "or any other similar payment commonly used in the securities trade"; in the absence of this phrase, the definition would be a "meaningless tautology."[1320] Given this premise, the court found that:

> For this reason, and in the context of the legislative history of these provisions, the modifying phrase at the end of § 741(8) must be understood, at a minimum, to mean that in order to be encompassed in the statutory definition of "settlement payment," a transaction must involve the public securities markets. The "securities trade" in this statutory context plainly means the public securities markets. To stretch the

---

[1317] *Id.* at 494.

[1318] 367 B.R. 68 (Bankr. E.D.N.Y. 2007).

[1319] *Id.* at 72.

[1320] *Id.* at 76. The significance of the concluding phrase of section 741(8), and of the typicality of a transaction, is an open issue. In *Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.)*, No. 09 Civ. 9031, 2009 U.S. Dist. LEXIS 123259 (Nov. 20, 2009), *rev'g Enron Creditors Recovery Corp. v. J.P. Morgan Secs., Inc. (In re Enron Creditors Recovery Corp.)*, 407 B.R. 17 (Bankr. S.D.N.Y. 2009), the court ruled that a payment need not be commonly used in the securities trade to qualify as a "settlement payment," and that "settlement payment" as used in section 546(e) "includes any payment in settlement of a securities transaction." *Id.* at *8. The court determined that the concluding phrase in the definition of "settlement payment" in section 741(8), "commonly used in the securities trade", only limits "similar payment" and not the preceding items, such as "preliminary settlement payment" and "final settlement payment." *Id.*

statutory definition of "settlement payment" to include any payment made for securities, whether or not involving the public securities markets, would not only deprive the definition of meaning, it would also render superfluous the statutory examples of types of settlement payments enumerated in § 741(8).[1321]

### (c)      Impact of the 2006 Amendments.

As noted in Section V.C.4.c(2), two changes were made to section 546(e) by the 2006 Amendments. First, the parenthetical phrase "(or for the benefit of)" (the "Benefit Parenthetical") was inserted into section 546(e), as well as being added to sections 546(f) and 546(g). Second, transfers in connection with securities contracts, commodity contracts, and forward contracts were added to margin payments and settlement payments as protected transfers under section 546(e). The legislative history specific to section 546 in the 2006 House Report simply said that the second change was to make section 546(e) conform to the language of section 546(g); this did not fully explain the changes.[1322]

It is a matter of speculation as to the intent of Congress with respect to the Benefit Parenthetical. It could be argued, against the backdrop of the split in the courts as to the Conduit Issue, exemplified at the circuit court level by *Munford* and *Kaiser II* at the time of the 2006 Amendments, and which Congress may be presumed to have been aware,[1323] that Congress wanted to "clarify" its intention that a Covered Entity not be required to have a beneficial interest in the subject assets. On the other hand, it is also plausible that Congress simply wanted to protect transactions in which a Covered Entity was a beneficiary, but not a conduit or recipient, and had no intention of affecting the Conduit Issue.

---

[1321]    *Grand Eagle Cos.*, 367 B.R. at 76.

[1322]    The general statement in the 2006 House Report as to the purpose of the 2006 Amendments said:

> H.R. 5585 makes technical changes to the netting and financial contract provisions incorporated by [the 2005 Amendments] to update the language to reflect current market and regulatory practices, and help reduce systemic risk in the financial markets by clarifying the treatment of certain financial products in cases of bankruptcy or insolvency.

2006 House Report at 2.

[1323]    *See, e.g., Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979) ("It is always appropriate to assume that our elected representatives . . . know the law.").

With respect to the Scope Issue, the expansion of section 546(e) to cover transfers "in connection with" securities contracts, commodities contracts, and forward contracts arguably resolved the dispute by freeing the analysis in the leveraged buyout context from the anchor of the vague definition of settlement payment. There is, as yet, no case law interpreting section 546(e) as amended by the 2006 Amendments, at least no published case law. In dicta in the unpublished opinion in *Contemporary Industries II*, the district court indicated its view that the 2006 Amendments not only put to rest the dispute over the Conduit Issue, but expressed Congressional intention that the sale of private securities in a leveraged buyout be covered by section 546(e):

> The bankruptcy court's memorandum opinion requires no elaboration, but I do find it necessary to point out to the parties that section 546(e) was amended by the Financial Netting Improvements Act of 2006, Pub. L. 109-390, § 5(b). Although the amendatory language does not apply to cases commenced before the effective date of the Act, *see id.,* § 7, the result reached in this case by the bankruptcy court is also consistent with the current version of section 546(e). In fact, it appears that Congress has fully resolved the split of authority that is discussed above by, first of all, extending the protection of section 546(e) to any transfer made "in connection with a securities contract," and, secondly, providing that the transfer can be made "by or to (or for the benefit of)" a financial institution or other listed entity.[1324]

While the district court in *Contemporary Industries II* did not elaborate further on its conclusion, the argument could be made that because much of the case law that excepts the leveraged buyout of private securities from the application of section 546(e) focuses significantly on the vague definition of settlement payment, the expansion of section 546(e) to include transfers in connection with securities contracts removes the necessity for exploring "settlement payment" and its legislative history. The definition of "securities contract" in Bankruptcy Code section 741(7)(A) is considerably more detailed than that of "settlement payment", and includes, in pertinent part:

> (i) a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, any interest in a mortgage loan, a group or index

---

[1324] *Contemporary Industries II* at 5-6.

of securities, certificates of deposit, or mortgage loans or interests therein (including an interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security . . . . ;

. . . .

(vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph . . .

By eliminating the necessity of determining the meaning of the "circular" definition of settlement payment and expanding section 546(e) to apply to transfers "in connection with . . . a contract for the purchase, sale or loan of a security," one could argue that Congress has decided the Scope Issue, subject to an adequate "connection".

There is little case law as to the reach of the phrase "in connection with".  In the context of section 546(g), the court in *Casa de Cambio Majapara v. Wachovia Bank, N.A. (In re Casa de Cambio Majapara S.A. de C.V.)*,[1325] considered a situation in which the debtor and Wachovia Bank were party to foreign exchange transactions which the parties agreed were swap agreements under the Bankruptcy Code.[1326]  The debtor failed to deliver the dollars due Wachovia, and Wachovia filed an action in federal court in New York and state court in Illinois seeking prejudgment relief; Wachovia acquired orders of attachment in both actions.  Thereafter, the debtor filed its chapter 11 petition, and a complaint seeking to avoid both attachments as preferences under Bankruptcy Code section 547.  Wachovia filed a motion for summary judgment based upon the safe harbor of section 546(g), taking the position that the attachments were transfers "in connection with" the swap agreements.

In ruling for Wachovia, the court explored the contours of the phrase "in connection with" under section 546(g):

[T]his court must also determine whether the prejudgment attachments were "in connection with a swap agreement."

The Debtor argues that even under the more inclusive language in the current statute the prejudgment attachments are not "in connection

---

[1325]   390 B.R. 595 (Bankr. N.D. Ill. 2008).
[1326]   *Id.* at 597.

with the swap agreement."  Rather, the Debtor asserts "they were made in connection Wachovia's *ex parte* and false statements to two different courts to the effect that the debtor had and/or was going to fraudulently conceal or transfer assets . . . ."

The fallacy in the Debtor's position is that it is premised on the idea that attachments could only be "in connection with" one subject, either the swap agreements or the accusations by Wachovia of potential wrongdoing by the Debtor.  To the contrary, this court concludes that the prejudgment attachments were made "in connection with" both the swap agreements, which furnish the ultimate basis for the Debtor's liability to Wachovia, and the allegations justifying the prejudgment attachment remedy.

The Debtor's argument also fails because both the New York and Illinois attachments were based at least in part on the merits of the case. . . .  Moreover, even if the attachments were not obtained based on the merits of the case, they would still be "in connection with" the swap agreement[s] because the actions taken by Wachovia stem from the failure of those transactions.  This court concludes that the prejudgment attachments were substantially related to the swap agreement[s] and therefore were "in connection with" the swap agreement[s].[1327]

The court's exposition describes two relationships between the swap agreements and the attachments; the swap agreements were the "ultimate basis for the liability" and the actions taken by Wachovia "stem from the failure" of the swap agreements.  As a result, the court found that the attachments "were substantially related to the swap agreements", and, therefore, the attachments were "in connection with" such agreements.[1328]

As discussed below, it is not difficult to conceive that payments for securities pursuant to a securities contract would be payments "in connection with" that contract, as well as settlement payments.  On the other hand, as discussed below, the transfer of liens for the purpose of securing loans used to fund a leveraged buyout is not so clearly based upon the contract pursuant to which the securities are to be purchased; the transfer of those liens is much more

---

[1327]  *Id.* at 598-99.

[1328]  *Id.* at 599.  *See also Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) (determining the relationship of an attachment and a swap agreement under section 546(g), which, at the time, required that the transfer be both under the swap agreement and in connection with the swap agreement; "A natural reading of 'under' would suggest that a transfer will be under a swap agreement when it is accomplished according to the method prescribed in the agreement itself.  A natural reading of 'in connection with' suggests a broader meaning similar to 'related to.'").

clearly in connection with the loan agreements pursuant to which the liens are granted, raising the question of whether the loan agreements are themselves security agreements.

The changes made by the 2006 Amendments, while arguably supportive of the application of section 546(e) to the leveraged buyout of privately held securities, are not crystalline or commanding, nor does the sparse legislative history explicitly announce their purpose. As a result, the fundamental issue of the applicability of section 546(e) to the leveraged buyouts of privately held securities is still an open question in the Second Circuit.

### (4) Preemption and the Prospect of Abandonment

#### (a) Preemption

In *Kaiser II*, the Tenth Circuit concluded its decision applying section 546(e) to fraudulent transfer claims against selling shareholders in a leveraged buyout by adverting to some prospect of recovery for the estate relating to the transaction:

> While we acknowledge that our holding in this case is broad in its application, we are not convinced it leaves the trustee remediless by way of a suit for damages, or some similar device, against specific individuals or institutions for unlawful acts.[1329]

Ten years later, based upon section 546(e) and following *Resorts*, the bankruptcy court in *Walsh v. Toledo Hospital (In re Financial Management Sciences, Inc.)*,[1330] held that section 546(e) foreclosed the trustee's claim under the Pennsylvania Uniform Fraudulent Transfer Act to avoid and recover funds paid for the purchase of securities. The court then intimated that the trustee's claims for money had and received, unjust enrichment, and conversion might also be subject to section 546(e):

> Count I of the complaint, we previously noted, is brought under PUFTA [the Pennsylvania Uniform Fraudulent Transfer Act]. Counts II, III, and IV are for money had and received, unjust enrichment, and conversion, respectively.
>
> Avoidance of a fraudulent transfer, to the extent necessary to satisfy a creditor's claim, is an available remedy under PUFTA. Although

---

[1329]  *Kaiser II*,952 F.2d at 1241.

[1330]  261 B.R. 150 (Bankr. W.D. Pa. 2001).

the complaint in the Toledo Hospital case does not expressly so state, the chapter 7 trustee unquestionably seeks in Count I to avoid the above settlement payments and to recover from Toledo Hospital. . . .  It therefore follows that § 546(e) prevents the chapter 7 trustee from asserting the claim under PUFTA as set forth in Count I of the complaint in that case.

We are not prepared at this time, however, to conclude with respect to the remaining counts of the complaint that the chapter 7 trustee seeks to *avoid* the above settlement payments.  Consequently, we will not enter summary judgment at this time with respect to the remaining three counts . . . .[1331]

The next year, the district court in *Hechinger* considered motions to dismiss filed by the defendants in a suit brought by a creditors committee asserting:  (a) fraudulent transfer claims under section 544(b) for payments made to former shareholders, the buyers, and the banks that financed the leveraged buyout; (b) claims for breach of fiduciary duty for approving the leveraged buyout and for aiding and abetting the breach of fiduciary duty; and (c) claims for unjust enrichment against the former shareholders.[1332]  Following *Resorts*, the court dismissed the fraudulent transfer claims, finding section 546(e) applicable, and constitutional.[1333]

The court also dismissed the unjust enrichment claims against the former shareholders, finding them preempted by section 546(e) under the doctrines of conflict preemption and field preemption:

In cases like this, where there is no explicit statutory language preempting state law, there are two circumstances where courts will find preemption: (i) conflict preemption, where the state law and federal law directly conflict such that the two together cannot coexist either because "compliance with both federal and state regulations is a physical impossibility" or there is "an inevitable collision between the two schemes of regulation[]"; and, (ii) field preemption, where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.[1334]

With respect to conflict preemption, the court opined:

---

[1331]  *Id.* at 156.

[1332]  274 B.R. at 75-76.

[1333]  *Id.* at 88-89.

[1334]  *Id.* at 96 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963) and *Orson, Inc. v. Miramax FilmCorp.*, 189 F.3d 377, 381 (3d Cir. 1999)).

If the court were to entertain the Committee's unjust enrichment claim, a claim that effectively acts as an avoidance claim against the shareholders in a transaction that the court has already found is an unavoidable settlement payment, and allowed the Committee to circumvent section 546(e) by asserting a state law claim for unjust enrichment based on the same facts and seeking essentially the same relief, the purpose of section 546(e) would be frustrated. . . . Claims that Congress deemed unavoidable under sections 544(b) and 546(e) of the Bankruptcy Code can not be avoided by simply re-labeling avoidance claims as unjust enrichment claims; if they could, the exemption set forth in section 546(e) would be rendered useless. Because the Committee's unjust enrichment claim effectively acts as a section 544 fraudulent conveyance claim, it directly conflicts with the remedial exemption set forth in Code section 546(e).[1335]

With respect to field preemption, the court found that "the Bankruptcy Code, particularly sections 544 and 546(e), provides an exclusive framework for addressing claims that seek to avoid transfers made more than one year before bankruptcy. Thus the Code preempts the field and precludes supplemental state remedies because the Code alone comprehensively addresses such claims."[1336]

The Eighth Circuit Court of Appeals in *Contemporary Industries III* adopted the *Hechinger* position on preemption, finding that section 546(e) barred state law claims for unjust enrichment and illegal and/or excessive shareholder distributions under Nevada law asserted against the recipients of the unavoidable transfers:[1337]

Through its state law claims, CIC seeks to recover the same payments we have already held are unavoidable under § 546(e). Allowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section.[1338]

Implicit in *Hechinger* and *Contemporary Industries III* is that the preempted state law claims were not claims to avoid settlement payments brought under section 544 or the other Bankruptcy Code sections enumerated in the introductory phrase of section 546(e)[1339] (the

---

[1335] *Id.*

[1336] *Id.* at 97.

[1337] 564 F.3d 981 at 983, 988 n. 6.

[1338] *Id.* at 988.

[1339] "Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title . . . ." 11 U.S.C. § 546(e).

"Enumerated Code Provisions"); had the unjust enrichment and corporate law claims been avoidance claims seeking recovery of settlement payments under section 544, or any of the other Enumerated Code Provisions, section 546(e) would have barred those claims, just as it barred claims under the state fraudulent transfer laws.[1340] Preemption became relevant in *Hechinger* and *Contemporary Industries III* only because the claims were not brought under the Enumerated Code Provisions, but presumably as claims of the debtor which became property of the estate under section 541.[1341] Implicitly having found that section 546(e) by its terms would not bar the trustee from asserting the unjust enrichment and corporate law claims, the courts ruled that the state laws were preempted. However, the courts did not address the significance of Congress omitting section 541 from the Enumerated Code Provisions, which omission by Congress implicitly made section 546(e) inapplicable to claims under section 541, and may express its intention that the prosecution of such claims be permitted.

---

[1340] While state law fraudulent transfer claims are much more frequent subjects of section 546(e) cases, claims relating to redemptions violative of state corporate law have also been determined to be subject to section 546(e), without the use of the preemption doctrine. For example, in *PHP Liquidating, LLC v. Robbins*, 291 B.R. 603 (D. Del. 2003), *aff'd* 128 Fed. Appx. 839 (3d Cir. 2005), the court found that a claim for illegal redemption under section 160 of the Delaware General Corporation Law ("DGCL") was an avoidance claim brought under section 544(b), and would be barred by section 546(e) if brought under section 544. *Id.* at 606-607. The court in *Official Committee Of Unsecured Creditors v. Clark (In re National Forge Co.)*, 344 B.R. 340 (W.D. Pa. 2006), went further in its application of section 546(e) to a claim under DGCL section 160. The court found that claims based on a stock redemption in violation of DGCL sections 160 and 173 belong to both the corporation and its creditors, implicating, without mention by the court, Bankruptcy Code section 541. "[D]irector liability for violations of §§ 160 and 173 of the DGCL runs not only to the corporation itself, but also to the corporation's creditors in the event of dissolution or insolvency. Thus, it appears that a trustee-in-bankruptcy or debtor-in-possession (or in this case, the Committee through derivative standing) *does* acquire a right of action under § 544(b) to prosecute violations of §§ 160 and 173 of the DGCL in its capacity as a putative creditor." *Id.* at 380. Indeed, the court notes that "the Committee has asserted Count 7 under both the Delaware General Corporation Law *and* § 544(b)." *Id.* The court held that the claims were barred by section 546(e), without discussing whether the right to bring the claim under section 541 made a difference. *Id.* at 381.

[1341] *See generally Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Co.)*, 398 B.R. 761, 784 (Bankr. S.D.N.Y. 2008) ("The unlawful dividend claim is not an avoidance claim that the trustee must assert, if at all, under 11. U.S.C. § 544(b), even if the same transfer also gives rise to the fraudulent conveyance. . . . Once bankruptcy ensues, the unlawful dividend claim becomes property of the corporation's estate under 11 U.S.C. § 541 for the trustee to assert."); *Faircloth v. Bouchard (In re Int'l Gold Bullion Exch., Inc.)*, 53 B.R. 660, 664 (Bankr. S.D. Fla. 1985) ("Under Section 541, a Trustee's rights are derivative from the rights of the Debtor; under Section 544(a), a Trustee's rights are derivative from the rights of creditors.").

355

While preemption would be irrelevant to a claim covered by section 546(e), the relationship between 546(e) and the claim cannot be too attenuated for preemption to apply. It appears that for preemption to be viable, at a minimum the preempted law must give rise to a claim that at least relates to a settlement payment or margin payment (or, after the 2006 Amendments, presumably a transfer in connection with one of the three specified contracts), the avoidance of which would be barred by section 546(e); the claim that is subject to preemption must have some relationship to a viable section 546(e) defense.[1342]

The soundness of the preemption decisions in *Hechinger* and *Contemporary Industries III* is open to question. Both unjust enrichment and corporate law are traditionally the province of state law.[1343] Both field preemption and conflict preemption are a function of the intent of Congress, and courts have been very reluctant to find that Congress implicitly preempted areas traditionally governed by state law:

> Whether framed in terms of conflict preemption or in terms of the creation of federal common law, the Supreme Court expressly has cautioned against displacement of state law in areas traditionally occupied by the states. *See, e.g.*, *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 . . . (warning that preemption of "areas that have been traditionally occupied by the States" is inappropriate absent "clear and manifest" congressional intent to supersede state law) . . . .
>
> . . . .
>
> To determine whether CERCLA preempts the Delaware statutes, we must ascertain the intent of Congress . . . .
>
> . . . .

---

[1342] *See Liquidating Trust v. Bhatnagar (In re U.S. Wireless Corp.)*, 333 B.R. 688, 693 (Bankr. D. Del. 2005) (unjust enrichment claim to recover taxes paid on behalf of shareholder not preempted; "Bhatnagar's fourth contention asserts that § 546(e) . . . preempts the Liquidating Trust's unjust enrichment claim. On its face, that section has no application . . . ."); *Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC), 321 B.R. 128, 144-45 (Bankr. D. Del. 2005)* (preemption argument rejected where unjust enrichment claim is based on an asset sale; "That section [546(e)] does not govern transactions such as those in this case.").

[1343] *See, e.g.*, *Marsh v. Rosenbloom*, 499 F.3d 165, 176 (2d Cir. 2007) ("We begin with the observation that corporate law is overwhelmingly the province of the states."); *Integrity Mgmt. Int'l, Inc. v. Tombs & Sons, Inc.*, 836 F.2d 485, 488 (10th Cir. 1987) (referring to the "strong presumption against preemption of state law, particularly in those areas of law traditionally regulated by states, such as actions for fraud and unjust enrichment.").

537960v2

> Absent clear congressional intent to the contrary, federal preemption of state law is not favored, especially in areas of law traditionally occupied by the states. As we observed above, corporate law is one of those areas. For preemption to occur in this instance, then, the conflict between state law and federal policy must be a "sharp" one.[1344]

The statute itself gives no indication of any intention of Congress to preempt state law. Section 546(e) is limited to the trustee's avoidance actions, presumably brought under the Enumerated Code Provisions,[1345] section 546(e) and the Enumerated Code Provisions only implicate avoidance claims. Had Congress intended to bar the assertion of all claims that might accomplish the same result as avoidance claims with respect to settlement payments or margin payments (and, after the 2006 Amendments, transfers in connection with certain contracts), it could have omitted the first phrase of section 546(e) listing the Enumerated Code Provisions and not limited section 546(e) to "avoidance" claims.[1346] At a minimum, section 541 might have been included as an Enumerated Code Provision. It is noteworthy that Congress knew how to preempt state law to protect particular transfers when that was its intention; it did so in 1998[1347] to protect charitable contributions: "Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case."[1348]

The conflict posited by the *Hechinger* and *Contemporary Industries III* courts is that certain defendants may be held liable under state law for the return of settlement payments, or amounts equal to settlement payments, which would not be recoverable by a trustee because of section 546(e) if the trustee's claim was an avoidance claim regarding a settlement payment. This, however, is no different in principle from the disparity in liability caused by the varying

---

[1344] *Marsh v. Rosenbloom*, 499 F.3d at 177-78 (quoting *Boyle v. United Tech. Corp.*, 487 U.S. 500, 507 (1988)).

[1345] However, as mentioned *supra* at note 1340, the ability of the debtor corporation to assert claims under DGCL section 160 did not cause the court in *National Forge* to find section 546(e) inapplicable.

[1346] *Cf. National Forge*, 344 B.R. at 370 ("We presume that, if Congress had intended to exempt from § 546(e)'s protection allegations of actual fraud under state law fraudulent transfer theories, it could have easily done so.").

[1347] Religious Liberty and Charitable Donation Protection Act of 1998, Pub. L. No. 105-183, § 3(b), 112 Stat. 517, 518 (1998).

[1348] 11. U.S.C. § 544(b)(2).

state and federal law reachback periods for fraudulent transfers; and the prospect that transfers not recoverable under section 548 because of its reachback period might be recoverable using state law under section 544 is not the type of conflict warranting preemption.[1349]

As noted in *Hechinger*, the ability to assert claims not directly covered by section 546(e) does to some extent "implicate the same concerns regarding the unraveling of settled securities transactions more than one year after settlement."[1350] Nonetheless, Congress made clear that not *all* claims that might "unravel" some securities transactions are barred; section 546(e) specifically permits a trustee to assert claims under section 548(a)(1)(A).

The field preemption argument, a secondary basis for the ruling in *Hechinger* and one not mentioned in *Contemporary Industries III*, is somewhat attenuated:

> Alternatively, the court also finds that the Committee's unjust enrichment claim is preempted because the Bankruptcy Code, particularly sections 544 and 546(e), provides an exclusive framework for addressing claims that seek to avoid transfers made more than one year before bankruptcy. Thus the Code preempts the field and precludes supplemental state remedies because the Code alone comprehensively addresses such claims.[1351]

Congress has long embraced the use of state law under section 544, but placed a limit on it by section 546(e), a limit not directly applicable to the unjust enrichment and corporate law claims at issue in *Hechinger* and *Contemporary Industries III*, otherwise there would be no need to consider preemption. However, those cases reason that by not limiting state law further in section 546(e), Congress must have intended to preempt state law entirely.

---

[1349] *See, e.g.*, *Floyd v. Option One Mortgage Corp. (In re Supplement Spot, LLC)*, 409 B.R. 187, 198-99 (Bankr. S.D. Tex. 2009).

[1350] *Hechinger*, 274 B.R. at 96. It is somewhat ironic that the *Hechinger* court, in support of its preemption analysis, echoed legislative history regarding the intent of Congress, having repeatedly noted that *Resorts* controlled the determination of the Scope Issue and the Conduit Issue, and that *Resorts* was based upon a plain meaning interpretation that obviated the need to look to legislative history. *Hechinger*, 274 B.R. at 84-85 ("Rather, finding the plain meaning of 'settlement payments' to be unambiguous, the *Resorts International* court declined to base its opinion upon the sections of the legislative history of the statute that those courts relied upon."). The *Hechinger* court also used its own "plain meaning" analysis in finding section 546(e) constitutional. *Id.* at 88-89 ("The Committee has not met its burden in demonstrating that this determination or the application of section 546(e) based on the plain language of the statute is irrational.").

[1351] *Id.* at 97.

Field preemption applies to situations in which "the federal interest . . . is so pervasive that no room remains for state action, indicating an implicit intent to occupy the field."[1352]  Given that section 544 largely relies on non-bankruptcy law, it seems an unlikely application of the doctrine.[1353]

The cases expanding the section 546(e) defense by way of preemption have applied preemption only in the context of an estate representative attempting to assert a claim not directly covered by section 546(e); for example, *Hechinger* involved a creditors committee and *Contemporary Industries III* involved a revested debtor and committee.  The expanded application of section 546(e), under the case law and by the 2006 Amendments, may cause creditors to seek avenues not blocked by section 546(e) to assert their own fraudulent transfer claims under state law.  In such situations, there is at least some potential that an attempt will be made to expand the preemptive effect of section 546(e) to contexts beyond those dealt with in *Hechinger* and *Contemporary Industries III*.

### (b)    **Abandonment**

The law has long been settled that if an estate abandons the right to assert fraudulent transfer claims, or if the estate no longer has viable claims, creditors are free to bring claims on their own behalf to the extent permitted by applicable nonbankruptcy law.[1354]  Read

---

[1352]  *Rondout Elec., Inc. v. NYS Dep't of Labor*, 335 F.3d 162, 166 (2d. Cir. 2003).

[1353]  *Cf. Marsh v. Rosenbloom*, 499 F.3d 165, 177 (2d Cir. 2007) ("Nor is the CERCLA regulatory scheme so comprehensive that we reasonably can infer an intent to preempt; in fact, state corporate law can supplement CERCLA in several situations."); *see also* Alan J. Feld, *The Limits of Bankruptcy Code Preemption: Debt Discharge and Voidable Preference Reconsidered in Light of Sherwood Partners*, 28 Cardozo L. Rev. 1447, 1476-82 (2006) (arguing that field preemption does not apply to state law preference or fraudulent transfer claims).

[1354]  *See, e.g.*, *Hatchett v. United States*, 330 F.3d 875, 885-86 (6th Cir. 2003) (after abandonment of fraudulent transfer claim by trustee, IRS had standing to assert state law fraudulent transfer claim); *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999) ("Until the trustee has abandoned his potential fraudulent conveyance action, the Sureties cannot proceed with their claims in district court."); *Unisys Corp. v. Dataware Prods., Inc.*, 848 F.2d 311, 314 (1st Cir. 1988) (creditor had standing to assert fraudulent conveyance claim after abandonment by trustee); *cf. Air Line Pilots Assoc. Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 436 (S.D.N.Y. 1993) ("If a cause of action belongs to the estate, creditors may bring such an action only if the Trustee abandons it or otherwise allows the creditors to pursue it independently."), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *Klingman v. Levinson*, 158 B.R. 109, 113 (N.D. Ill. 1993) ("The trustee's exclusive right to maintain a fraudulent conveyance cause of action expires and creditors may step in (or resume actions) when the trustee no longer has a viable cause of action."); *Barber v. Westbay (In re*

literally, section 546(e) would have no application to those claims; they are not brought by the trustee, and they are not brought pursuant to the Enumerated Code Provisions. At least two courts have made statements casting doubt on the prospect that section 546(e) could bar claims by creditors that, if brought by a trustee, would be prohibited. In *PHP Liquidating, LLC v. Robbins,*[1355] the court held that section 546(e) would *not* apply to claims asserted by an estate representative if such claims were individual creditor's claims assigned to the estate representative by the creditors:

> In the instant case, the Court concludes, based on the broad definition set forth in *Resorts Intern*, that the stock redemptions at issue were settlement payments. . . . Thus, the Court concludes that if the avoidance action were brought by a trustee or a debtor-in-possession (or the successor to a debtor-in-possession), the avoidance action would be barred by Section 546(e). . . . However, in this case, PHP LLC has not asserted its claims against Movants in the capacity of a trustee or as a successor-in-interest to a trustee or debtor-in-possession. Rather, PHP LLC is bringing the instant claims as a direct assignee of the unsecured creditors. As such, Section 546(e) is not a bar to PHP LLC's claims.[1356]

---

*Integrated Agri, Inc.)*, 313 B.R. 419, 427-28 (Bankr. C.D. Ill. 2004) ("A creditor who had the right to bring, outside of bankruptcy, a UFTA claim to recover prepetition transfers fraudulently made by the debtor, has no standing to commence or continue the suit during the bankruptcy case, until and unless the trustee relinquishes the Section 544(b) claim or the trustee no longer has a viable cause of action. . . . The landscape changes, however, once it is determined that the Trustee's claim is no longer viable. A creditor regains standing to pursue a state law fraudulent conveyance action, in its own name and for its own benefit, once the statute of limitations expires on the bankruptcy trustee's right to bring the claim".).

[1355] 291 B.R. 603 (D. Del. 2003), *aff'd,* 128 Fed. Appx. 839 (3d Cir. 2005).

[1356] *Id.* at 607; *see also Hechinger,* 274 B.R. at 97 (acknowledging the "inapplicability of section 546(e) to proceedings outside of bankruptcy", finding it irrelevant as to the question of whether section 546e) "completely occupies the field of proceedings within bankruptcy"). *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.),* 323 B.R. 857 (Bankr. S.D.N.Y. 2005), considered a difficult circular issue. The court found that Oregon law made the purchase by the debtor of its own stock void; because the transfer was void, it did not qualify as a settlement payment subject to section 546(e). If the voiding statute were preempted, the transfer would arguably only be a voidable (under section 548(a)(1)(B)) settlement payment subject to section 546(e). The court in *Enron* rejected the argument that section 546(e) preempted the Oregon law, and ruled that because the transfer was void, it could not qualify as settlement payment warranting protection under section 546(e). *Id*. at 876. In one sentence, the court rejected the argument that section 546(e) preempted the Oregon law. *Id.* ("As a complete nullity, there would be no resulting settlement payment. This consequence is not a result of the bankruptcy filing, it is simply a function of state law that was not preempted by 546(e)."). While it is not clear, *Enron* could be read: (1) to reject the preemptive effect of section 546(e) altogether, although without saying so expressly; or (2) to reject preemption because the transfer was void outside of bankruptcy, and no preemptive effect could occur, if at all, until a bankruptcy case was filed, by which time the transfer was a nullity under Oregon law. *See id.* at 872 ("Enron argues that the Bankruptcy Code is congruent with the Oregon state law and neither conflict nor field preemption apply. Enron maintains that the purpose of section 546. . . is to protect the securities market. . . . Enron contends that this goal is not implicated under the

However, the preemptive effect given section 546(e) by *Hechinger* and

*Contemporary Industries III* could support an argument that section 546(e) precludes a

nonbankruptcy action brought by a creditor asserting its own claims under state law, if the claims

would be barred by section 546(e) if brought by a trustee.  Such an argument would find some

support in the controversial case of *Sherwood Partners, Inc. v. Lycos, Inc.*,[1357] where a split panel

decision of the Ninth Circuit Court of Appeals held that California Code of Civil Procedure

section 1800, which gives an assignee in a general assignment for the benefit of creditors the

power to avoid preferences, was preempted by the Bankruptcy Code.  The opinion of the

majority speaks in terms relating to both field preemption and conflict preemption:

> What goes for state discharge provisions also holds true for state
> statutes that implicate the federal bankruptcy law's other major goal,
> namely equitable distribution.  Bankruptcy law accomplishes equitable
> distribution through a distinctive form of collective proceeding.  This is a
> unique contribution of the Bankruptcy Code that makes bankruptcy
> different from a collection of actions by individual creditors.[1358]
>
> . . . .
>
> Congress has thought carefully about how collective insolvency
> proceedings are to be conducted and set both substantive standards and
> elaborate procedural protections to ensure a result that is fair to debtors
> and creditors alike.  The exercise of the preference avoidance power by
> Sherwood under the authority of section 1800 is inconsistent with the
> enactment and operation of the federal bankruptcy system and is therefore
> preempted.[1359]

The majority took pains to note that the assignee's claims were "beyond" the

claims of individual creditors, claims which a bankruptcy trustee would adopt under section

---

facts of this case because the transfer in issue already was recoverable. . . under Oregon state law.  Enron
argues that as a consequence, avoidance of that transfer in a bankruptcy proceeding will not result in any
further disruption to the markets than otherwise could have occurred absent a bankruptcy filing.").

[1357] 394 F.3d 1198 (9th Cir. 2005).  *Sherwood* has been rejected by federal and state courts, and criticized in
academic commentary.  *See, e.g., Ready Fixtures Co. v. Stevens Cabinets*; 488 F. Supp. 2d 787 (W.D. Wis.
2007); *Credit Managers Assoc. v. Countrywide Home Loans, Inc.*, 50 Cal. Rptr. 3d 259 (Cal. Ct. App. 2006);
*Spector v. Melee Entertainment LLC*, No. 07C-03-191 PLA, 2008 Del. Super. LEXIS 48 (Del. Super. Ct.
Feb. 6, 2008); Feld, *supra* note at 1353, at 1476-82.

[1358] *Id.* at 1203.

[1359] *Id.* at 1205-1206.

544,[1360] in an effort to distinguish the case from *Stellwagen v. Clum,*[1361] which held that Ohio assignment laws were not preempted by the Bankruptcy Act of 1898.[1362] The *Sherwood* majority emphasized that while the claims of the assignee under the Ohio laws at issue in *Stellwagen* were the same as the claims of individual creditors, the claims of the California assignee did not derive from creditors (as do the trustee's rights in bankruptcy cases), but were "new avoidance powers by virtue of his position":[1363]

> This is not a matter for federal concern when the assignee has no special avoidance rights. If individual unsecured creditors can sue to recover preferences under state law, the same powers are also available to a bankruptcy trustee under section 544(b); there is obviously no conflict then between federal law and state law giving those powers to an assignee.[1364]

> . . . .

> State laws incorporated by section 544(b) are part of the incentive system Congress set up in the Bankruptcy Code; they cannot be said to undermine these incentives. State laws that give assignees additional avoidance powers are not part of that system.[1365]

Based upon *Sherwood*, and the rulings in *Hechinger* and *Contemporary Industries III*, it is not unlikely that a defendant that would have a viable section 546(e) defense in a suit brought by a bankruptcy trustee will, in a fraudulent transfer suit brought by individual creditors after abandonment by an estate, contend that section 546(e) preempts the state law giving rise to the claims, arguing that individual creditor's claims can be no more "special" or "additional" than the claims that a trustee could successfully prosecute a bankruptcy case. The argument, in other

---

[1360] *See id.* at 1205 ("We believe that statutes that give state assignees or trustees avoidance powers beyond those that may be exercised by individual creditors trench too close upon the exercise of the federal bankruptcy power.").

[1361] 245 U.S. 605 (1918).

[1362] 30 Stat. 544 (1898) (repealed 1978).

[1363] *Sherwood* at 1202. The *Sherwood* majority found no significance in its conclusion that the statute at issue in *Stellwagen* was more akin to a fraudulent transfer statute. *Id.* at 1202 n.3.

[1364] *Id.* at 1204 n.6.

[1365] *Id.* at 1205 n.7.

words, being that if the bankruptcy trustee could not prevail, it would be antithetical to the Bankruptcy Code to permit individual creditors to do so.

As noted, *Sherwood* has been rejected by other courts in the context in which it was decided, state law preference claims by assignees, and criticized by commentators.[1366] As also noted, the section 546(e) preemption decisions in *Hechinger* and *Contemporary Industries III* are questionable, and have not been exported to apply to the claims of individual creditors. It would be an unfortunate and erroneous expansion of these rulings if they were combined to deprive individual creditors of their historic rights to assert fraudulent transfer claims under state law.

The claims of individual creditors are tangential to this Report. However, given the significant amount of the Payments to Shareholders and the fact that, unlike many bankruptcy cases, a relatively small number of individual creditors in these cases hold large claims, individual suits by creditors may well be practical and it is worth noting the abandonment option, and that questions about the preemptive effect of section 546(e) could arise even if that option is exercised.

### (5)    The Possible Application of Section 546(e) to Potential Claims

The application of section 546(e) to the claims described below assumes that leveraged buyouts of privately held securities are within the scope of section 546(e); as discussed above, in cases filed prior to the effective date of the 2006 Amendments a number of courts were of the view that transfers in the context of leveraged buyout transactions of privately held securities were not the type of transfers that Congress intended to exempt from avoidance laws. Even the *QSI III* court left open the prospect that a leveraged buyout involving only two interest holders might not warrant the application of section 546(e).[1367]

---

[1366] *See* supra note 1357.
[1367] *See supra* note 1276.

As discussed in Section V.C.4.c(3)(c), it is not clear how the 2006 Amendments affected the technical grounds upon which most courts that excluded leveraged buyouts from the coverage of section 546(e) based their rulings. Even if the Conduit Issue may have been resolved by the 2006 Amendments, the 2006 expansion of section 546(e) to cover transfers "in connection with" securities contracts, among others, does not necessarily mandate that leveraged buyouts be considered within its scope. For example, Judge Felsenthal assumed that the transfers at issue in *Jewel Recovery, L.P. v. Gordon*[1368] were settlement payments, but, nonetheless, found section 546(e) inapplicable. The lingering uncertainty on the issue invites a determination by the Supreme Court or the Second Circuit Court of Appeals.

If Judge Felsenthal's view were adopted, most of the issues discussed in this section would be moot: the transfers discussed below took place in the context of a leveraged buyout, and if such transactions do not merit section 546(e) protection, then it makes no difference whether component requirements for its applicability have been satisfied. Similarly, the types of claims that might be subject to preemption under *Hechinger* and *Contemporary Industries III* are extremely unlikely to be preempted if section 546(e) does not apply to the transaction giving rise to the claims.

The discussion below covers the technical relationships of section 546(e) to direct avoidance claims, to recovery claims under Bankruptcy Code section 550 and claims for disallowance under Bankruptcy Code section 502(d), and to other claims that could only be affected by a further expansion of section 546(e) or the preemption by section 546(e) of laws giving rise to claims not directly covered by section 546(e).

### (a) Avoidance Claims

The subsections below deal with the applicability of section 546(e) to avoidance claims against the Sellers, the Lenders, the Professionals, and with respect to presumed intercompany transfers of the funds ultimately received by the Sellers and the Professionals. In each instance, the application of section 546(e) would require a determination that: (i) the

---

[1368] 196 B.R. 348 (N.D. Tex. 1996)

transfers were settlement payments or were made in connection with a securities contract; and (ii) a Covered Entity was involved, perhaps as a party with a beneficial interest.

### (i) Claims against The Sellers

For section 546(e) to apply in these cases, there must be some relationship between the transfers and a "security."[1369] Until the 2006 Amendments, this relationship was necessitated in leveraged buyout contexts by the requirement that the transfer to be avoided be a settlement payment.[1370] After the 2006 Amendments, section 546(e) can be invoked if there is a sufficient relationship between the transfer and a securities contract.[1371] While the cases discussed in Section V.C.4.c(3) dealing with the application of section 546(e) to leveraged buyouts involve corporate stock, and in the present cases interests in limited liability companies were sold, it is likely that a court would hold that the interests sold were securities for the purposes of section 546(e).[1372] As a result, the Payments to Sellers were arguably settlement

---

[1369]  "Security" is defined in Bankruptcy Code section 101(49) to include, among other categories: (a) "stock" (§ 101(49)(A)(ii)); (b) a "transferable share" (§ 101(49)(A)(viii)); (c) an "interest of a limited partner in a limited partnership" (§ 101(49)(A)(xiii)); and (d) an "other claim or interest commonly known as 'security'" (§ 101(49)(A)(xiv)).  The definition is not limiting; "security" includes the listed items, and Bankruptcy Code section 102(3) provides that the use of the term "includes" is not limiting.

[1370]  *See, e.g., Contemporary Industries III,* 564 F.3d at 985 ("Specifically, 'settlement' refers to 'the completion of a securities transaction'") (quoting *Kaiser I,* 913 F.2d at 849); *Resorts,* 181 F.3d at 515 ("[A] settlement payment is generally the transfer of cash or securities made to complete a securities transaction."); *see also Alta S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.),* No. 09 Civ. 9030, 2009 U.S. Dist. Lexis 123259 (Nov. 20, 2009) at *32 ("Courts interpreting section 546(e)'s reach, however, have applied the Bankruptcy Code's definition of 'security' under section 101(49) in deciding whether the safe harbor applied."); *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 482 (S.D.N.Y. 2001) ("Third, because the 'payments' Appellants rely upon to validate their Blue Chips purchases primarily represent Hanover's phony book entries into Adler's books, there were no actually completed transfers of cash and securities.  The Blue Chips were never delivered, and the trades involving them never settled."); *Global Crossing Estate Representative v. Alta Partners Holdings LDC (In re Global Crossing Ltd.),* 385 B.R. 52, 57 n.1 (Bankr. S.D.N.Y. 2008) ("[I]n this district a 'settlement payment' has been judicially recognized to be a 'transfer of cash or securities made to complete a securities transaction.'") (quoting *Enron Corp. v. J.P. Morgan Secs., Inc. (In re Enron Corp.),* 325 B.R. 671 (Bankr. S.D.N.Y. 2005)).

[1371]  "Securities contract" is defined in Bankruptcy Code section 741(7)(A) to mean, among other categories: (a) a contract for the purchase, sale, or loan of a security (§ 741(7)(A)(i)); (b) any extension of credit for the clearance or settlement of securities transactions (§ 741(7)(A)(v)); (c) any other agreement or transaction that is similar to an agreement or transaction referred to in subparagraph 741(7)(A) (§ 741(7)(A)(vii)); and (d) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in section 741(7)(A) (§ 741(7)(A)(xi)).

[1372]  Courts have held that interests in limited liability company are securities.  *See, e.g., SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving, LP),* 579 F.3d 411, 418 (5th Cir. 2009) (subordination under Bankruptcy Code section 510(b); membership interest in limited liability company "either qualifies as a 'transferable share' or falls within the broad residual category" referring to Bankruptcy Code

payments and arguably transfers in connection with a securities contract, the Acquisition Agreement.[1373]

With respect to the required involvement of a Covered Entity, the Payments to Sellers were collected in, and distributed to the Sellers by, Chase Bank; all of the funds were transferred to the Escrow Account at Chase Bank by wire transfer;[1374] and the Earnest Money was sent from Citibank N.A. by wire transfer to the account of one of the Sellers at Chase Bank. Both Citibank N.A. and Chase Bank have been described as commercial banks,[1375] which is one basis for qualifying as a financial institution under the definition in Bankruptcy Code section 101(22),[1376] and both banks are likely to be financial participants under the definition in

---

sections 101(49)(A)(viii) & (xiv)); *Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.)*, 321 B.R. 527, 531-32 (B.A.P. 9th Cir. 2005) ("The parties agree that a membership interest in an LLC that is required to be the subject of a registration statement filed with the SEC is a 'security' under the Bankruptcy Code."); *Chase Manhattan Bank v. Iridium Africa Corp.*, 197 F. Supp.2d 120, 133 (D. Del. 2002) ("'Security' is expansively defined in the Bankruptcy Code. . . . Interests in a limited liability company are analogous to such typical types of 'security.'"); *In re Alta+Cast, LLC*, 301 B.R. 150, 155 (Bankr. D. Del. 2003) (subordination under Bankruptcy Code section 510(b); "The jury found that the breach of the Employment Agreement was not the Debtor's termination of Hays but was the Debtor's failure to purchase back his [LLC] membership interest. That is clearly a claim arising from an agreement for the sale or purchase of a security of the Debtor.").

[1373] Under Bankruptcy Code section 741(7)(A)(i), a contract for the purchase of a security is a securities contract. As stated, these conclusions assume that a leveraged buyout of privately held securities is within the scope of section 546(e).

[1374] That wire transfers were used indicates that a financial institution was involved. *See Plassein I,* 366 B.R. at 323 ("Indeed, federal regulations require that a wire transfer *must* be performed by a bank; thus, a wire transfer must be made through a financial institution."); *Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.)*, 324 B.R. 575, 585 (Bankr. W.D. Pa. 2005) (court finds that because banks are required to facilitate wire transfers, a wire transfer necessarily involves a financial institution for the purposes of section 546(e)).

[1375] *See generally Inv. Co. Inst. v. Conover*, 790 F.2d 925, 926 (D.C. Cir. 1986) ("That Act was designed to preserve public confidence in commercial banks like Citibank . . . ."); *JPMorgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 249 (S.D.N.Y. 2005) ("Plaintiff JPMorgan Chase Bank brings this action on behalf of a syndicate of commercial banks . . . .").

[1376] Bankruptcy Code section 101(22) defines "financial institution" to mean:

(A) a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer; or

(B) in connection with a securities contract (as defined in section 741) an investment company registered under the Investment Company Act of 1940.

Bankruptcy Code section 101(22A).[1377]  As a result, the requirement that a Covered Entity be involved, at least as a conduit, is likely satisfied with respect to the Payments to Sellers.

To the extent that the *Munford* position on the Conduit Issue is still viable, so that the involvement of a Covered Entity as a conduit is insufficient to support the section 546(e) defense, there is an argument that the Sellers could qualify as financial participants.  Whether the Sellers constitute financial participants could depend upon the timing of the calculations under the definition of "financial participant."[1378]  Section 101(22A) uses the language "at the time it enters into a securities contract" as a measurement point for whether the requisite amounts were "outstanding."  It thus appears that amounts relating to the Acquisition Agreement, which were not "outstanding" at the time that the Sellers entered into the Acquisition Agreement, should not be included.  Therefore, unless the Sellers met the requirements for outstanding amounts under section 101(22A) immediately prior to entering into the Acquisition Agreement or within the fifteen-month period preceding the Petition Date, they should not be considered to be financial participants.

### (ii)    Claims against the Lenders

The Lenders are subject to two different aspects of avoidance.  First, as discussed below, the transfers of liens to secure the debts incurred might be avoidable, and might bring section 546(e) into play.  Second, the obligations incurred for the debts might also be avoidable,

---

[1377]  Bankruptcy Code section 101(22A)(A) defines "financial participant" to mean:

> (A) an entity that, at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of the filing of the petition, has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition.

To qualify as a Covered Entity, an entity need only meet one of the descriptions; for example, it need not be both a "financial participant" and a "financial institution".  *See Am. Home Mortgage Inv. Corp. v. Lehman Bros. Inc. (In re Am. Home Mortgage Holdings, Inc.)*, 388 B.R. 69, 83 n.70 (Bankr. D. Del. 2008) ("As the Court finds that Lehman Brothers is a 'stockbroker,' an analysis of whether Lehman Brothers is a 'financial participant' is unnecessary.").

[1378]  *See id.*

and section 546(e) by its terms has no application to the avoidance of debt obligations. If the obligations are avoided, the liens securing those obligations are void, and section 546(e) ought not apply to the recovery of the payments to the Lenders.

### (a) Liens

As discussed in Section V.C.2 of the Report, the transfers of the liens to the Lenders could be subject to avoidance. Until the 2006 Amendments, section 546(e) would have no application to such avoidance; the transfers of liens would not have constituted settlement payments.[1379] However, with the expansion of section 546(e) to protect transfers made in connection with securities contracts, the Lenders could argue that section 546(e) bars an avoidance action with respect to their liens because the transfers were made in connection with a securities contract. The most obvious securities contract would be the Acquisition Agreement; this is likely a securities contract, but raises the issue of whether the transfers of the liens were "in connection with" the Acquisition Agreement. The interpretation of the "connection" language in section 546(f) is discussed in Section V.C.4.c.(3)(c) of the Report. Arguments could be made about whether the connection between the liens and the Acquisition Agreement is sufficient. The transfers of the liens were not required by the Acquisition Agreement; indeed, the obligations of the Buyer were not conditioned on any financing.[1380] On the other hand, the liens were incurred for the purpose of securing loans to fund the Acquisition.

Less attenuated is the relationship between the transfers of the liens and the Loan Agreements between the Borrowers and the Lenders; these contracts have a more direct connection to the transfers of liens than does the Acquisition Agreement. However, it is arguable whether the Loan Agreements are securities contracts. The definition of securities

---

[1379] *Cf. Edelsberg v. Thompson McKinnon Secs. Inc. (In re Edelsberg)*, 101 B.R. 386, 389 (Bankr. S.D. Fla. 1989) (garnishment on a judgment for a claim based upon an nsf check for payment to a securities account was not a settlement payment; "[T]here was no 'settlement payment' by the debtor; there was an attempt by a creditor to execute on a judgment."); *Global Crossing Estate Representative v. Alta Partners Holdings LDC (In Global Crossing Ltd.)*, 385 B.R. 52, 56-57 n.1 (Bankr. S.D.N.Y. 2008) (payment of dividends not a settlement payment); *Ames Dep't Stores, Inc. v. Wertheim Schroder & Co. (In re Ames Dep't Stores, Inc.)*, 161 B.R. 87, 91-92 (Bankr. S.D.N.Y. 1993) (questionable whether payment of underwriting fee constitutes settlement payment).

[1380] *See* Acquisition Agreement § 5.5(a).

contract includes the following categories: (i) "any extension of credit for the clearance or settlement of securities transactions;"[1381] and (ii) "any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in" section 741(7)(A).[1382] The former category arguably may be inapplicable in instances where the extension of credit is not a component of the "clearance and settlement system," it does not clearly describe any type of loan to purchase securities.[1383] The latter category, however, incorporates the term "security agreement," which is defined to mean an "agreement that creates or provides for a security interest."[1384] "Security interest" is defined to mean "lien created by an agreement,"[1385] and would include mortgages on real property.[1386] As a result, the Lenders could make two arguments: first, that the transfers of the liens were made in connection with a securities contract, the Acquisition Agreement; and, second, that the transfers were made pursuant to different securities contracts, the Loan Agreements.

With respect to the requisite Covered Entities, the original Lenders, Wachovia, Bear, and BofA, would be required to qualify as Covered Entities, although they should not find it difficult to qualify as financial participants, financial institutions, or both.

Thus, section 546(e), if applicable to the Acquisition leveraged buyout, would likely present a significant obstacle to any attempt by the estates to avoid the transfers of liens to the Lenders by way of an avoidance action.

---

[1381] 11 U.S.C. § 741(7)(A)(v).

[1382] 11 U.S.C. § 741(7)(A)(xi).

[1383] *See generally Kaiser II*, 952 F. 2d at 1237-38 (describing details of the settlement process); *Wieboldt,* 131 B.R. at 664 n. 9 (describing details of the clearance and settlement system).

[1384] 11 U.S.C. § 101(50).

[1385] 11 U.S.C. § 101(51).

[1386] *See In re Barkley 3A Investors, Ltd.*, 175 B.R. 755, 756 n. 4 (Bankr. D. Kan. 1994) ("The Code therefore classifies a Kansas mortgage and rent assignment as a security agreement and the mortgage lien as a security interest."); *see also In re Garner*, 13 B.R. 799, 801 (Bankr. S.D.N.Y. 1981) ("Prior to the [mortgage] foreclosure judgment Dale Funding held a security interest, which is defined . . . to mean a 'lien created by an agreement.' Reference must also be made to Code section . . . which defines a 'security agreement' to mean an 'agreement that creates or provides for a security interest.' When Dale Funding obtained its rights under the foreclosure judgment it could no longer assert that its rights in the real estate were 'secured only by a security interest' under an existing consensual mortgage . . . .").

### (b)    Obligations

Fraudulent transfer law has long drawn a distinction between the avoidance of transfers and the avoidance of obligations.[1387]  Section 546(e) by its terms only applies to the avoidance of transfers; there is no mention in the statute regarding the avoidance of obligations. While this issue was raised in *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,[1388] the court did not resolve it.[1389]  In an analogous case, however, the Ninth Circuit Court of Appeals found a statute very similar to section 546(e) not to bar the avoidance of an obligation.

In *Wolkowitz v. FDIC (In re Imperial Credit Industries, Inc.)*,[1390] a bank holding company provided a guaranty to the FDIC with respect to obligations of its bank subsidiary. Thereafter, the subsidiary became subject to an FDIC receivership, and the holding company filed a chapter 11 case that was subsequently converted to chapter 7.  An action was filed to avoid the obligations of the holding company under the guaranty.  The FDIC asserted as a defense 12 U.S.C. § 1828(u)(1) which provides, in relevant part:

> No person may bring a claim against any Federal banking agency . . . for the return of assets of . . . [a] controlling shareholder of the insured depository institution transferred to, or for the benefit of, an insured depository institution by such. . . controlling shareholder of the insured depository institution, or a claim against such Federal banking agency for monetary damages or other legal or equitable relief in connection with such transfer . . . .[1391]

---

[1387]   *See, e.g.*, 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor . . . .").  *See also Covey v. Commercial Nat'l Bank*, 960 F.2d 657, 661 (7th Cir. 1992) ("Although a note or guarantee is not a 'transfer' for purposes of 11 U.S.C. § 101(54) . . . both note and guarantee are obligations."); *In re Asia Global Crossing, Ltd.*, 333 B.R. 199, 203-204 (Bankr. S.D.N.Y. 2005) (entry into a guarantee was not a transfer; "It did not grant 360networks any interest in or any right to Asia Global's property.  As such, it was an 'obligation' rather than a 'transfer' within the meaning of § 101(54).").

[1388]   263 B.R. 406 (S.D.N.Y. 2001).

[1389]   *Id.* at 480 ("As an initial matter, the Court does not need to reach the parties' dispute as to whether, as the Trustee holds, § 546(e)'s reference to 'transfer' encompasses only actual movements of cash and securities and not incurrence of obligations, or whether, as Appellants contend, the definition of 'transfer' contained in § 101(54) is broad enough to encompass the various phases of the clearance and settlement process of securities transactions . . . .").

[1390]   527 F.3d 959 (9th Cir. 2008).

[1391]   *Id.* at 971-72 n.13.

In rejecting the contention that the statute barred the avoidance of an obligation, the court stated:

> Wolkowitz argues that the statute prohibits persons from bringing only fraudulent conveyance claims regarding a transfer of assets and thus does not bar Imperial's claim requesting the voiding of an obligation under a performance guaranty. The district court rejected this argument below, holding that Imperial's argument was based on an "unsupported distinction between assets and obligations." To the contrary, we find that the distinction between assets and obligations is supported by the plain language of the statute and the legislative history. On its face, § 1828(u) prohibits persons from bringing fraudulent conveyance claims against federal banking agencies only for "the return of assets . . . transferred to" a federally insured bank. . . . The statute makes no mention of obligations, which is what Imperial is attempting to avoid as a fraudulent conveyance.[1392]

Section 546(e) specifically applies only to the avoidance of a transfer; the avoidance of an obligation does not come within the plain meaning of the statute, and an action to avoid an obligation should be viable notwithstanding section 546(e).[1393] To the extent that the claims of the Lenders are avoided, the liens securing the disallowed claims should, as a matter of law pursuant to section 506(d) of the Bankruptcy Code, be void; the liens would not secure allowed claims.[1394]

---

[1392] *Id.* at 971-72.

[1393] Concerns for the stability of market systems should be significantly less if the only ramification of avoidance is that claims against a debtor are disallowed. Such claims could be worthless independent of any avoidance action, and the likelihood that claim disallowance would give rise to a series of claims against parties in the securities system is less than if the non-debtor party were subject to claims for affirmative recoveries.

[1394] *See generally Terlecky v. Chase Home Fin., LLC (In re Sauer)*, 417 B.R. 523, 530 (Bankr. S.D. Ohio 2009) (discussing the relationship between section 506(d), avoidance, and claim disallowance; "As the Supreme Court explained in *Dewsnup v. Timm* [502 U.S. 410 (1992)], subject to certain exceptions, § 506(d) voids a lien if the underlying claim is disallowed. Here, though, the Trustee provides no basis for disallowing any claim held by Chase. Rather, he asserts a basis for avoiding the Mortgage and, if he is successful, reclassifying Chase's claim as unsecured. Reclassification of the claim, however, would result from avoidance itself, not from the operation of § 506(d). . . . Because § 506(d) permits lien avoidance, but does not govern claim reclassification, allowance or disallowance, it does not provide the remedy sought by the Trustee."); *In re Long*, 353 B.R. 1, 17, 17 n. 23 (Bankr. D. Mass. 2006) ("The Debtor's objection to the secured claim of Portfolio must therefore be sustained, the claim disallowed, and, in accordance with 11 U.S.C. § 506(d), the mortgage declared void. . . . Portfolio's claim was not disallowed under § 502(b)(5). . . or under § 502(e) . . . , so it is not subject to the exception in § 506(d)(1). And a proof of claim was filed as to this lien, thus taking it out of the operation of the exception in § 506(d)(2). Therefore, by operation of § 506(d) and as a consequence of the disallowance of Portfolio's secured claim, the lien being asserted by Portfolio as the basis of its secured claim is void.").

**(c)**      **Payments to the Lenders**

If the liens or claims of the Lenders are avoided, certain payments made on those claims might be recoverable. Section 546(e) should not apply to such actions, although its application may depend upon the grounds for the avoidance of the liens and obligations.

If the Loan Agreements are not securities contracts, the payments pursuant to such documents should not be considered to be in connection with a securities contract; the relationship between the payments to the Lenders and the Acquisition Agreement should be too distant to warrant the payments being considered to be in connection with the Acquisition Agreement.[1395] Even if the payments were made under or in connection with a securities contract, but the claims were void because of the inapplicability of section 546(e) to the avoidance of obligations, and the liens were consequently void under section 506(d), section 546(e) should not prevent the payments from being recovered. First, the recovery may not be an avoidance action, but one for unjust enrichment or a similar claim that is not an avoidance claim. Second, if the claims and liens were already void, section 546(e) should not operate to prevent the recovery of the payments;[1396] it is inconceivable that Congress could have intended the result that payments on void claims be insulated from recovery.[1397]

---

[1395]   *Cf. Edelsberg v. Thompson McKinnon Secs. Inc. (In re Edelsberg)*, 101 B.R. 386, 389 (Bankr. S.D. Fla. 1989) (garnishment on judgment for nsf check sent for payment to securities account was not a settlement payment; "It appears that the garnishment of TMSI was at least two steps removed from a 'settlement payment' as that term is defined in 11 U.S.C. § 741(8).").

[1396]   In *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857 (Bankr. S.D.N.Y. 2005), an action to recover payments by the debtor to acquire its stock, which acquisition was a void transaction under Oregon law, was held not to be subject to section 546(e), the court ruling that: "If the Oregon law was violated, the payment cannot be a settlement payment because the transaction is void and there is no settlement obligation to discharge nor any securities transaction to complete. Thus, if it is established that Enron was insolvent, pursuant to Oregon law, the transaction would be void and have no legal effect at all. As a complete nullity, there would be no resulting settlement payment." *Id.* at 876. While the court distinguished a situation in which the transaction would be voidable by the estate, rather than void (*id.* at 878-79), the present situation is arguably closer to the "void situation" than the "voidable situation". In the present case, consonant with section 546(e), the Lenders' claims would be avoided and, thus, the Lenders would have no right to retain the payments. This avoidance, permissible under section 546(e), would precede any action to recover the payments, just as the voiding of the transaction by Oregon law preceded the claims asserted in *Enron*.

[1397]   *See generally Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 386 (2d Cir. 2004) ("A construction of a statute leading to unjust or absurd consequences should be avoided.") (quoting *Quinn v. Butz*, 510 F.2d 743 (D.C. Cir. 1975)).

### (iii)    Claims against The Professionals.

The Professionals received transfers from the First American escrow account. The payments to the Professionals were not settlement payments, so that section 546(e) could only be applicable if the payments were in connection with a securities contract. The only securities contract relevant to the payments to Professionals would be the Acquisition Agreement; unlike the Lenders, the Professionals should not be able to assert the existence of a potential securities contract other than the Acquisition Agreement. As with the payments to the Lenders, it is debatable whether the nexus between the Acquisition Agreement and the payments to Professionals would be sufficient.

As to the requirement that a Covered Entity be involved, a number of the Professionals would have to rely upon the conduit participation of Chase Bank and, perhaps, the banks to which the payments were sent by Chase Bank for the benefit of the Professionals. If conduit participation by a Covered Entity is insufficient to support the application of section 546(e), some of the Professionals might qualify as financial participants or financial institutions.[1398]

### (iv)    Claims Regarding Intercompany Transfers

The transactions in connection with the Acquisition could be characterized as involving intercompany loans or distributions among the Borrowers, ending up at DL-DW. Those transfers might be avoidable. Section 546(e) should have no application to claims to avoid these intercompany transfers. Unlike the transfers made to the Lenders, an intercompany transferor and transferee are not likely to be Covered Entities, and no Covered Entity was a conduit for those transfers. Thus, a requisite element for the application of section 546(e) would be missing.

The intercompany transferee might argue, based upon the 2006 Amendments, that the transfer was "for the benefit" of a Covered Entity, the Sellers. The success of this argument

---

[1398] For example, Bank of America was among the recipients of payments to the Professionals.

would depend upon whether the Sellers could qualify as financial participants,[1399] and whether the Sellers, as transferees, could also qualify as entities for whose benefit the transfer was made.[1400]

> **(b)** **Section 546(e), Recovery Actions under Section 550, and Disallowance under Section 502(d).**

While section 546(e) might prevent a successful avoidance action under the Enumerated Provisions, it should have no direct impact on the ability of the estates to make recoveries under section 550 if there has been an avoidance. It is settled law that section 550 is not an avoidance provision,[1401] and clear that section 550 is not among the Enumerated Code Provisions. Thus, to the extent that a transfer is avoided, subsequent transferees as well as beneficiaries who would be liable under section 550 should not be able to invoke section 546(e) as a shield against the estates' rights to recover under section 550 as a result of an avoided transfer.[1402]

---

[1399] *See* discussion *supra* § V.C.4.c(5)(a)(i) .

[1400] As discussed in Section V.C.4.d of this Report, in the context of Bankruptcy Code section 550, a transferee cannot also qualify as a beneficiary of the transfer. The Sellers were clearly subsequent transferees of the described intercompany transfers, and thus not beneficiaries under section 550. Whether this doctrine would apply to section 546(e) is unclear.

[1401] *See, e.g., Suhar v. Burns (In re Burns),* 322 F.3d 421, 427 (6th Cir. 2003) ("[A]voidance and recovery are distinct concepts and processes."); *Schnittjer v. Linn Area Credit Union (In re Sickels),* 392 B.R. 423, 426 (Bankr. N.D. Iowa 2008) ("Avoidance and recovery are distinct concepts. . . . The fact that avoidance and recovery are distinct suggests that avoidance need not always trigger recovery."); *Official Comm. Of Unsecured Creditors v. PUC ( In re 360Networks (USA), Inc.),* 316 B.R. 797, 805 (Bankr. S.D.N.Y. 2004) ("[T]he Court's power to determine whether a transfer is avoidable . . . is not dependent on its power to order an affirmative remedy pursuant to § 550."). The contours of section 550 are discussed in Section V.C.4.d of this Report.

[1402] A defendant in a section 550 action might raise section 546(e) to contest the requisite avoidance. In an extraordinary application of the "collapsing doctrine", the court in *Official Committee of Unsecured Creditors v. Clark (In re National Forge Co.),* 344 B.R. 340 (W.D. Pa. 2006), considered a case in which a subsidiary transferred money to its parent, which then transferred it to shareholders to redeem their stock. The creditors committee sought to recover the transfers to the shareholders as subsequent transferees of the alleged avoidable transfer from the subsidiary to the parent. *Id.* at 347. The defendants contended that the transfer from the subsidiary to the parent should not be considered in isolation, and that the steps in the transaction should be collapsed. *Id.* Noting that the collapsing doctrine is typically invoked by the "plaintiff/trustee/creditor" (*id.*), the court used the doctrine at the urging of the defendants to find that the transaction was a single transaction with the shareholders as initial transferees and, as a result, the transfers were held to be settlement payments subject to section 546(e).

While the court acknowledged that the use of the collapsing doctrine for the benefit of the defendants was atypical, it did not discuss the propriety of allowing a fraudulent transferee to use an equitable doctrine designed to achieve justice. *See, e.g., Orr v. Kinderhill Corp.,* 991 F.2d 31, 35 (2d Cir. 1993) ("In equity,

There is an open issue with respect to the impact of section 546(e) on the claim disallowance provision of Bankruptcy Code section 502(d).[1403]  Section 502(d) directs a court to disallow the claims of creditors which have received avoidable transfers, unless the creditor relinquishes the transfer:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.[1404]

Numerous cases have held that the expiration of the statute of limitations in section 546(a), while barring an affirmative recovery, does not preclude the use of section 502(d) to disallow the claim of a transferee.[1405]  Courts have looked at the language of section 502(d), and interpreted it strictly:

> A plain reading of section 502(d) is revealing. . . .  A transfer is an avoidable preference if the transfer satisfies all of the elements set forth in section 547.  Indeed, section 502(d) refers to section 547, not section 546(a)(1). . . .

---

substance will not give way to form, and technical considerations will not prevent substantial justice from being done. . . .  Thus, an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.") (quotations and citations omitted)*; Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.)*, 174 B.R. 557, 584 (Bankr. N.D. Cal. 1994) ("Justice in this case is best accomplished by 'collapsing the transaction' . . . .").

The use of this doctrine by a defendant in order to characterize its way into the application of the technical requirements of section 546(e) is open to significant question.

[1403]   The court in *Enron Corp. v. International Finance Corp. (In re Enron Corp.)*, 341 B.R. 451 (Bankr. S.D.N.Y. 2006) dismissed fraudulent transfer claims on the basis of section 546(e), as well as the companion claim to disallow the defendants' claims under section 502(d).  *Id.* at 455, 459.  Similarly, in *Enron Corp. v. J.P. Morgan Securities, Inc. (In re Enron Corp.)*, 325 B.R. 671, 682 (Bankr. S.D.N.Y. 2005), the plaintiff debtor facing a section 546(e) defense conceded "that a finding that there is an avoidable transfer is a predicate . . . to the disallowance of defendants' other claims, pursuant to section 502(d). . . ."  In neither case was there a discussion about whether section 502(d) could operate independently of section 546(e).

[1404]   11 U.S.C. § 502(d).

[1405]   *See, e.g., El Paso v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.)*, 217 F.3d 1161, 1167 (9th Cir. 2000); *see also Brown v. United* States *(In re Larry's Marineland of Richmond, Inc.)*, 166 B.R. 871, 874 (Bankr. E.D. Ky. 1993) (court rules that Bankruptcy Code section 106 bar to recovery against the United States on fraudulent transfer claim does not override section 502(d)).

. . . .

Moreover, section 502(d) makes no reference to any time limitations. . . . Had Congress intended to impose a time limitation on objections to claims under section 502(d), they could have done so very easily.[1406]

By parity of reasoning, section 502(d) could apply to disallow the claims of a transferee of an avoidable transfer even if section 546(e) would preclude an affirmative avoidance action. There is no reference to section 546(e) in section 502(d), nor is section 546(e) any more an element of an avoidance claim than section 546(a).

There are, however, counterarguments. First, the language in section 502(d) speaks in terms of a transfer being voidable. Unlike section 546(a), section 546(e) explicitly makes certain transfers not voidable. Second, under section 546(a), a transfer subject to that provision is voidable for at least two years after the entry of the order for relief; under section 546(e) a transfer subject to that provision is never voidable.

In *Gitlin v. Societe Generale (In re Maxwell Communication Corp.)*,[1407] the court held that Bankruptcy Code section 547 did not apply with respect to particular transfers on the grounds of international comity. Having so found, the court ruled that the claims of the transferees were not subject to disallowance under section 502(d), distinguishing the cases regarding section 546(a):

The rule that § 502(d) disallowance is not precluded by the expiration of the limitations period governing recovery under § 547,

---

[1406] *United States Lines, Inc. v. United States (In re McLean Indus.)*, 184 B.R. 10, 15 (Bankr. S.D.N.Y. 1995), aff'd, 196 B.R. 670 (S.D.N.Y. 1996). *See also In re Stoecker*, 143 B.R. 118, 132 (Bankr. N. D. Ill.) ("The fatal flaw in this argument rests in Bellwood's . . . attempt to redefine the elements of a recoverable or avoidable transfer to include the limitations period of section 546(a) as an essential element of a preferential transfer. A transfer is avoidable under section 547 if it meets all the elements contained therein. . . . Bellwood . . . urge[s] the Court to add to section 502(d) the additional element of time found in section 546(a). That section, however, has nothing to do with the essential elements necessary to establish an avoidable preferential transfer. . . . Significantly, the express language of section 502(d) never once references section 546(a)."), *aff'd in part, rev'd in part on other grounds*, 143 B.R. 879 (N.D. Ill. 1992); *In re Mid Atl. Fund, Inc.*, 60 B.R. 604, 610 n.11 (Bankr. S.D.N.Y. 1986) ("The argument that the use of the word 'avoidable' in Code § 502(d) is intended to incorporate the statute of limitations fixed by Code § 546 seems to be grasping at straws when it is considered how much more directly and plainly the idea could have been expressed by using the word 'timely' in front of avoidance or adding a reference to Code § 546.").

[1407] 93 F.3d 1036 (2d Cir. 1996).

however sound it may be, does not control in this case. Where a transfer could be avoided under § 547 but for the running of the statute of limitations, disallowance may be warranted because the substantive provisions of § 547, as opposed to the time-limit set forth in § 546(a), still apply to the transfer at issue. . . . But in the present case, the doctrine of comity leads to the conclusion that § 547 does not apply to the pre-petition transfers at all. Consequently, the transfers cannot in any way be included among the "transfers avoidable" listed in § 502(d).[1408]

The reasoning of the court in *Maxwell* does not necessarily support an argument that section 546(e) overrides section 502(d); section 546(e), like section 546(a), does not eliminate the applicability of any avoidance provision, as did comity in *Maxwell*; and the "substantive provisions" of the avoidance statutes are still effective, but their applicability to specific situations is limited by both section 546(a) and section 546(e).

**(c)**      <u>**Illegal Distributions/Dividends and Unjust Enrichment Claims.**</u>

The estates may have viable claims for illegal distributions/dividends and unjust enrichment. No court has ever held that these claims are directly covered by section 546(e). However, as discussed above, two courts have held that state law unjust enrichment claims asserted against transferee shareholders were preempted by section 546(e), and one of those courts also ruled that section 546(e) preempted state law illegal distribution claims asserted against the transferee shareholders. As previously discussed, those rulings are open to question. Moreover, unlike the defendants in those cases, all of whom were former shareholders that received protected "settlement payments", the subjects of the illegal distributions/dividends and unjust enrichment claims in these cases would not just be former shareholders, nor direct recipients of the transfers.

**(d)**      <u>**Breach of Fiduciary Duty and Aiding and Abetting Claims.**</u>

Like the illegal distributions/dividends and unjust enrichment claims, the claims for breach of fiduciary duty and aiding and abetting, are not avoidance claims, and are not brought under the Enumerated Code Provisions. Thus, section 546(e) should have no application

---

[1408] *Id.* at 1054.

to the assertion of these claims.  Unlike the distributions/dividends and unjust enrichment claims, no court has held that the laws giving rise to those claims are preempted by section 546(e) and, indeed, at least one court that found preemption in connection with an unjust enrichment claim did not apply the doctrine to the concurrently asserted breach of fiduciary duty claims.[1409]

### d.    Recovery Under Section 550

Pursuant to section 550(a) of the Bankruptcy Code,[1410] "to the extent that a transfer is avoided" under one of the Bankruptcy Code's avoidance provisions, the trustee may recover the transfer or its value from the initial transferee, the entity for whose benefit the transfer was made, or a subsequent transferee.[1411]  Assuming that the estates hold a viable avoidance claim regarding a transfer, the provisions of section 550 might be invoked.  Discussed below are several circumstances in which section 550 could be relevant to recovery proceedings if the estates have successful avoidance claims.

---

[1409]  *See Hechinger*, 274 B.R. at 98.

[1410]  Section 550(a) provides:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553 (b), or 724 (a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

[1411]  The Bankruptcy Code does not explicitly state whether avoidance must precede an action under section 550. Although some courts have read section 550 to require that the plaintiff must first (or simultaneously) bring a successful avoidance suit against the initial transferee before recovering from the subsequent transferee, the better view is that the trustee can sue the subsequent transferee in the first instance, and need prove only that the initial transfer was avoidable.  *See, e.g., Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 746 (Bankr. S.D.N.Y. 2008) (considering competing case law); *compare Weinman v. Simons (In re Slack-Horner Foundries Co.)*, 971 F.2d 577, 580 (10th Cir. 1992) ("[I]n order to recover from a subsequent transferee the trustee must first have the transfer of the debtor's interest to the initial transferee avoided under § 548") *with In re AVI, Inc.*, 389 B.R. 721 at 735 (B.A.P. 9th Cir. 2008) (holding that "a trustee is not required to avoid the initial transfer from the initial transferee before seeking recovery from subsequent transferees under § 550(a)(2).").

In *M. Fabrikant & Sons, Inc.*, the Bankruptcy Court for the Southern District of New York considered whether the trustee can "recover under § 550(a) from a subsequent transferee without first avoiding the transfer in a suit against the initial transferee."  394 B.R. at 740.  Finding that the Bankruptcy Code does not identify the necessary parties to a fraudulent transfer action, the court looked to Fed. R. Civ. P. 16 concerning the joinder of necessary parties and determined that the trustee was not required to sue or join the initial transferees in an action against the subsequent transferees.  *Id.* at 743-45.  The court further held that avoidance actions brought against one defendant do not generally collaterally estop other defendants from defending against the avoidance of the underlying transfer.  *Id.* at 746.

As an initial matter, however, the transfer of liens and incurrence of obligations, if otherwise avoidable, do not directly implicate section 550. The substantive avoiding powers would render the liens and obligations void, and there would be no need for a recovery under section 550. Courts have recognized that, "[t]he Bankruptcy Code separates the concepts of avoiding a transfer and recovering from the transferee."[1412] *Suhar v. Burns (In re Burns)* is illustrative.[1413] In that case, the debtors had given a mortgage to Alternative Mortgage Source, Inc., which then assigned its interests to IMC Mortgage Co. Thereafter, the debtors filed a chapter 7 case and the trustee sought to avoid the mortgage. IMC, the assignee, asserted defenses under section 550(e) and 550(b), both of which were denied, the court ruling that in the context of simply avoiding a mortgage without seeking a recovery of property actually transferred, section 550 was irrelevant.[1414] Thus, with respect to the transfer of liens and incurrence of obligations to the Lenders, section 550 should not be an issue.[1415]

### (1)    The Buyer As A Beneficiary Or Transferee

There are two different characterizations of the involvement of the Buyer in the payments to the Sellers relating to the Acquisition: (1) the Buyer could have been only a beneficiary of those transfers from the Debtors to the Sellers; or (2) the Buyer could be characterized as the initial transferee of funds from the Debtors, and the transferor to the Sellers and Professionals that it was obligated to pay.[1416]

---

[1412] *Official Comm. of* Unsecured *Creditors of 360networks (USA) Inc. v. PUC (In re 360networks (USA) Inc.)*, 316 B.R. 797, 804 (Bankr. S.D.N.Y. 2004) (quotation marks omitted).

[1413] 322 F.3d 421 (6th Cir. 2003).

[1414] *Id.* at 427-29.

[1415] With respect to the payments to the Lenders, to the extent that they are avoidable, the Lenders are initial transferees of such payments, and would be liable under section 550(a)(1).

[1416] Although as a transferee the Buyer would still have been a beneficiary of the transaction, its status as transferee under section 550 would preclude it from having beneficiary liability. *See generally Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544, 547, (9th Cir. 1991)). *See also Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 57 (2d Cir. 1997) (explaining that "we know that the 'entity for whose benefit' phrase does not simply reference the next pair of hands; it references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds."); *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988) (holding that a subsequent transferee cannot be the "entity for whose benefit" the initial transfer was made); *Tese-Milner v. Brune (In re Red Dot Scenic, Inc.)*, 293 B.R. 116, 121 (S.D.N.Y. 2003) (noting that, "as a general rule, beneficiaries and initial transferees are separate parties to a fraudulent transfer."); *SIPC v. Stratton Oakmont,*

If the Buyer was not a transferee, there should be little question that it was a beneficiary, and liable under section 550(a)(1) if the payments to the Sellers or Professionals are avoidable. Like a guarantor whose obligations are relieved when avoidable transfers are made to the guaranteed creditors of a debtor – thereby benefitting the guarantor[1417] – the Buyer was an entity for whose benefit the transfers to the Sellers were made, as these transfers relieved the Buyer of its own obligations.[1418] As such, the Examiner concludes that to the extent that the payments to the Sellers were not made by the Buyer, and are avoidable, the estates should recover the value of those transfers from the Buyer, and possibly the insiders of the Buyer,[1419] each as an entity for whose benefit such transfers were made.

This conclusion is supported by in *In re Ohio Corrugating Co.,*[1420] in which the court declined to enter summary judgment dismissing fraudulent transfer claims against a leveraged buyout sponsor, holding that "even if it was not in existence at the time of the acts complained of [and if] as a factual matter, Plaintiff can prove that [the sponsor] was an entity for whose benefit the transfer was made, recovery may be had under the terms of Sec. 550(a), provided the remaining elements of Sec. 548 are satisfied."[1421] The court found that "Section 550(a) is equally applicable to [the majority shareholder and president of the parent and held] that recovery may likewise be had against [him] if he is, in fact, an entity for whose benefit the

---

*Inc.*, 234 B.R. 293, 314 (Bankr. S.D.N.Y. 1999) ("As a general rule, initial transferees and entities for whose benefit the initial transfer was made are mutually exclusive.").

[1417] Courts have held that the paradigm of a "benefit" for purposes of establishing liability under section 550(a)(1) is the benefit received by a party, such as a guarantor, whose own obligations are relieved as a result of the transfers. *See, e.g., Baldi v. Lynch (In re McCook Metals, L.L.C.),* 319 B.R. 570, 590 (Bankr. N.D. Ill. 2005) (noting that a typical "transfer beneficiary" is "a party whose indemnification obligations or whose own debts are extinguished or reduced by the transfer").

[1418] Under *section* 1.2(b) of the Acquisition Agreement, the Buyer was obligated to pay to the Sellers an amount equal to the Cash Consideration component of the Purchase Price.

[1419] *See generally Wieboldt Stores, Inc. v. Schottenstein,* 131 B.R. 665 (N.D. Ill. 1991) (holding that section 550(a)(1) contains no requirement that the nontransferee entity actually receive a benefit and concluding that defendants controlling corporate entities that received proceeds from a leveraged buyout through their positions as corporate officers and exercising dominion over the funds in the corporate accounts could be held liable as beneficiaries).

[1420] 70 B.R. 920 (Bankr. N.D. Ohio 1987).

[1421] *Id.* at 924–25.

transfer was made, provided the remaining elements of the statute are satisfied."[1422]  In a later decision, the court explained that this outcome was appropriate in a leveraged buyout transaction because "[t]he acquirer gains by incurring a lower rate of interest, or by even procuring credit at all . . . .  It is the acquirer, not the lender, who receives the benefit of the target's guarantee."[1423]

Courts have held that an entity need not actually benefit from a fraudulent transfer, so long as the transfer was made for that entity's benefit.[1424] Courts have also noted that "[t]he party who forces a debtor to make a transfer is almost always 'the entity for whose benefit the transfer was made' and thus is subject to strict liability."[1425] In light of the fact that the transfers made in connection with the Acquisition were orchestrated by the Buyer for its benefit, if any such transfers are avoidable, section 550(a)(1) should permit the trustee to recover these amounts from the Buyer, and possibly the insiders of the Buyer, on the grounds that the Buyer was "an entity for whose benefit" the transfers were made.

As discussed above, the Buyer may not be a transferee of the funds that were ultimately paid to the Sellers and the Professionals; in which case, the Buyer has beneficiary liability under section 550(a)(1).  If, however, the Buyer was the initial transferee, it would be liable as an initial transferee under section 550(a)(1).

---

[1422] *Id.* at 925.

[1423] *Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.)*, 91 B.R. 430, 434 (Bankr. N.D. Ohio 1988). Similarly, in *Official Committee of Unsecured Creditors of Buckhead America Corp. v. Reliance Capital Group, Inc. (In re Buckhead America Corp.)*, 178 B.R. 956 (D. Del. 1994), a creditors committee commenced a fraudulent transfer action to avoid and recover various transfers, alleging that defendants – direct and indirect owners of the debtor's parent company – "used their control over [the debtor] to cause [the debtor] to make improper transfers and [the] leveraged buyout 'enriched . . . [d]efendants by giving them complete control over all shares of [the parent company] at the expense of [the debtor] and its creditors.'" *Id.* at 963.  The court found that the allegations contained in the complaint stated a valid claim that the fraudulent transfers were for defendants' benefit, and denied defendants' motion to dismiss the complaint.  *Cf. Telesphere Liquidating Trust v. Galesi*, 246 B.R. 315, 323 (N.D. Ill. 2000) (majority shareholder of the buyer in a leveraged buyout not subject to beneficiary liability, the court finding that any benefit "[was] too uncertain to place him within the reach of Code § 550(a).").

[1424] *Danning v. Miller (In re Bullion Reserve)*, 922 F.2d 544, 547 (9th Cir. 1991) (stating that courts have found that an entity need not actually benefit, so long as the transfer was made for his benefit); *see also In re Richmond Produce Co.*, 118 Bankr. 753, 759 (Bankr. N.D. Cal. 1990) (same).

[1425] *Rupp v. Markgraf*, 95 F.3d 936 (10th Cir. 1996); *see also In re Red Dot Scenic, Inc.*, 293 B.R. at 121; *Richardson v. FDIC (In re Blackburn Mitchell, Inc.)*, 164 B.R. 117, 128 (Bankr. N.D. Cal. 1994).

### (2)    **Payments to the Sellers and the Professionals**

The transfers of funds at the Closing to the Sellers and Professionals could be characterized as transfers from the Debtors to the recipients, in which case the Professionals and the Sellers would be initial transferees and, if the transfers were avoidable, they should be subject to liability under section 550(a)(1).  It could also be postulated that these transfers were made by DL-DW, which would have been a transferee of the Debtors.  Assuming that DL-DW was the transferor to the Sellers and the Professionals, the Professionals and the Sellers would be subsequent transferees, and might be able to take advantage of the defenses in section 550(b)(1).

Section 550(b)(1) provides that:

> The trustee may not recover under section (a)(2) of this section from – (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided. . . .

Assuming that the Sellers and the Professionals were to be considered subsequent transferees, it would be the burden of the Sellers and the Professionals to establish each of the three requirements of the section 550(b)(1) defense: value, good faith, and lack of knowledge of voidability.[1426]

Courts considering the meaning of "value" in the context of section 550(b)(1) have generally concluded that the "the *quantum* of value provided need not be reasonably equivalent to the value the transferee received from its transferor."[1427]  Instead,

---

[1426]  *Cassirer v. Sterling Nat'l Bank & Trust Co. of N.Y. (In re Schick)*, 223 B.R. 661, 664-65 (Bankr. S.D.N.Y. 1998); *see also CNB Int'l, Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 329 (Bankr. W.D.N.Y. 2008) ("defense under section 550(b) will arise only if the preponderance of evidence can establish each of three facts: first, that [transferee]  took the transferred assets in exchange for something of value; second, that [transferee] acted in good faith; and third, that [transferee] acted without knowledge of the voidability of the transfer.").

[1427]  *Williams v. Mortillaro (In re Res., Recycling & Remediation, Inc.)*, 314 B.R. 62, 70 (Bankr. W.D. Pa. 2004) (emphasis in original). *See also* 5 Collier on Bankruptcy ¶ 550.03[1], at 550-22 (15th ed. rev. 2009) (explaining that the value required to be paid by the secondary transferee is merely consideration sufficient to support a simple contract, analogous to the value required under state law to achieve the status of a *bona fide* purchaser for value.) (citing *Coleman v. Home Sav. Ass'n (In re Coleman)*, 21 B.R. 832, 836 (Bankr. S.D. Tex. 1982)).

in determining whether a transferee took for "value," the court looks to what the transferee gave up rather than what the debtor received.[1428]

Courts have found a lack of good faith in a wide array of factual circumstances, including where a transferee had knowledge of the transferor's financial difficulties at the time of the transfer.[1429]  Courts have further found that a transferee does not act in good faith when the transferee has sufficient knowledge to put him on inquiry notice of the debtor's potential insolvency.[1430]  Because the good faith requirement has been defined with respect to a transferee's knowledge, some courts have concluded that "there is no meaningful distinction between…'good faith' and 'without knowledge of the voidability of the transfer.'"[1431]

With respect to the "knowledge requirement," courts have looked "not for any certainty of avoidance, but for an awareness of that real possibility."[1432]  That is, "the transferee must have knowledge of sufficient facts that (i) puts the transferee on notice

---

[1428]  *Lewis v. Zermano (In re Stevinson)*, 194 B.R. 509, 513 n.1 (D. Colo. 1996) (holding that "in determining 'value' under § 550(b)(1), the inquiry is on what the transferee gave up in exchange for the transfers," and that noneconomic value received by the debtor cannot be considered value for purposes of this section). *Cf. In re Res., Recycling & Remediation, Inc.*, 314 B.R. 62, 70 ("the term 'for value' in this provision does not require that any value be given by a subsequent transferee to the debtor.").

[1429]  *Tavener v. Smoot (In re Smoot*, 265 B.R. 128, 140 (Bankr. E.D. Va. 1999) (citing *Grant v. Podes (In re O'Connell)*, 119 B.R. 311, 317 (Bankr. M.D. Fla. 1990)); *see also Cohen v. Sutherland*, 257 F.2d 737, 742 (2d Cir. 1958) (analyzing lack of good faith based on transferee's knowledge of the financial position of the bankrupt); *Dokken v. Page*, 147 F. 438, 440-42 (8th Cir. 1906) (finding lack of good faith where transferee has knowledge that the debtor is transferring almost all of its assets).

[1430]  *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1336 (10th Cir. 1996) (quoting *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995)); *see also Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 897-98 (7th Cir. 1988); *In re Anchorage Marina, Inc.*, 93 B.R. 686, 693 (Bankr. D.N.D. 1988).

[1431]  *Genova v. Gottlieb (In re Orange County Sanitation)*, 221 B.R. 323, 328 (Bankr. S.D.N.Y. 1997), *aff'd*, 108 B.R. 432 (S.D.N.Y. 1989).

[1432]  *In re CNB Int'l, Inc.*, 393 B.R. 330; *see also Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1257 (1st Cir. 1991) (transferee not in good faith because he knew of possibility of voidability due to the entity's "unmanageable indebtedness and the likelihood of bankruptcy"); *Kendall v. Sorani (In re Richmond Produce Co.)*, 195 B.R. 455, 464 (N.D. Cal. 1996) (transferee put on notice where there was clear evidence that defendant was aware that debtor was "experiencing financial difficulties . . . and that . . . buyout of debtor's stock was highly leveraged." ).

that the transfer might be avoidable or (ii) requires further inquiry into the situation and such inquiry is likely to lead to the conclusion that the transfer might be avoided."[1433] "Knowledge" thus encompasses both "actual knowledge" and "inquiry notice."[1434]

As set forth in Section IV of this Report, the Sellers knew or should have known, among other things, that it did not appear that Extended Stay would have sufficient resources to pay its debts as they became due from and after the Closing of the Acquisition, or that Extended Stay had adequate capital to finance its operations and survive economic downturns in the business. The Sellers also knew about the extraordinary debt undertaken by the Debtors; that it was, in the aggregate, approximately of $1.7 billion greater than the prior debt.

In such circumstances, it seems likely that the Sellers, if subsequent transferees, may have considerable difficulty in proving good faith, and the lack of knowledge of avoidability.

### D.  Non-Fraudulent Transfer Claims

In addition to the fraudulent transfer claims discussed above, the Estates may possess a number of other claims as the result of both the Acquisition and events that took place after the Acquisition. These causes of action are discussed in detail below, including: (1) claims for illegal corporate distributions (Section V.D.1.); (2) claims for breaches of fiduciary duty (Section V.D.2.); (3) claims for aiding and abetting a breach of fiduciary duty (Section V.D.3.); (4) claims for unjust enrichment (Section V.D.4); (5) "alter ego" claims arising in the context of

---

[1433] *In re CNB Int'l, Inc.*, 393 B.R. at 330 (citing *Mosier v. Goodwin (In re Goodwin)*, 115 B.R. 674, 677 (Bankr. C.D. Cal. 1990)); *see also Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1357 (8th Cir. 1995) ("If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heals, thereby preventing a finding that he has knowledge.").

[1434] *See, e.g., In re Kanterman*, 97 B.R. 768, 779 (supporting the inquiry-notice view); *Brown v. Harris (In re Auxano, Inc.)*, 96 B.R. 957, 965 (Bankr. W.D. Mo. 1989) (supporting the inquiry-notice view).

a leveraged buyout (Section V.D.5.); and (6) claims to which the Estates may be subrogated under state law (Section V.D.5.).

## 1. Illegal Corporate Distributions

The transfers from ESI and Homestead to the Sellers in connection with the Acquisition, and the post-Acquisition transfers, compel the Examiner to consider the possibility that such transfers constituted illegal corporate distributions.[1435] If such distributions violated applicable state corporate law, the Estates may hold claims against certain Individuals and entities for authorizing or receiving the distributions. These potential claims are discussed in detail here.

### a. Choice-of-Law

As discussed in connection with the Estates' fraudulent transfer claims, in the Second Circuit, the choice-of-law rules of the forum state will apply to claims premised on state law, unless state law would conflict with a federal policy or interest.[1436] Thus, New York choice-of-law rules will apply to determine the law governing illegal distribution claims.

All but one[1437] of the Debtors is organized in the state of Delaware. Thus, under New York choice-of-law principles, an action brought on behalf of the Estates for the violation of a distribution statute would be governed by Delaware law.[1438] Many, but not all, of the Debtor

---

[1435] Notably, courts often consider claims for illegal corporate distributions as an alternative theory to fraudulent transfer claims, because the actions giving rise to both claims may be identical. *See, e.g., Soc'y Nat'l Bank v. Brooke Group, Ltd.*, No.13136, 1993 Del. Ch. LEXIS 215, at *5 (Del. Ch. Sept. 28, 1993) (concluding that if a corporation is insolvent, a "distribution may be a fraudulent conveyance, unlawful dividend or both."); *see also Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 970 (D. Del. 1994) (considering fraudulent transfer and illegal distribution claims as alternative causes of action); *Buchwald v. Renco Group, Inc. (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 742 (Bankr. S.D.N.Y. 2009) (same). The Examiner has found no authority that would prohibit transfers from being attacked as fraudulent transfer where the same transfer otherwise may have been authorized in compliance with relevant corporate law. *Cf. Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721 (Del. 1971) (recognizing that, "compliance with the applicable statute may not, under all circumstances, justify all dividend payments.").

[1436] *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601-02 (2d Cir. 2001).

[1437] One debtor is organized under the laws of Ontario, Canada.

[1438] *See, e.g., In re Agway Gen. Agency, Inc. v. Burkeholder (In re Agway, Inc.)*, 2006 Bankr. LEXIS 4552, *25 n.5 (Bankr. N.D.N.Y. March 6, 2006) (citing *Pereira v. Farace*, 413 F. 3d 330, 341 (2d Cir. 2005)). *Cf. Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y. 1998) (holding that actions involving the fiduciary duties owed by directors, *officers*, and controlling shareholders to a corporation are corporate organizational matters,

entities are limited liability companies (each an "LLC") incorporated under the Delaware Limited Liability Company Act (the "DLLCA").  Other Debtor entities are Delaware corporations, subject to the Delaware General Corporations Law (the "DGCL").  As explained below, the DLLCA differs in certain material respects from the DGCL, and the legal analysis applicable to claims held by the various Debtors with respect to distributions will vary depending upon which form of entity asserts the action.[1439]

### b.  Illegal Dividends and Redemptions under the DGCL

#### (1)  Dividends May Be Declared Only from Surplus or Net Profits

Section 170 of the DGCL provides that dividends may only lawfully be declared "either (1) out of a corporation's surplus, as defined in and computed in accordance with §§ 154 and 244 of this title, or (2) in case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year."[1440]

#### (2)  A Corporation May Purchase or Redeem Its Own Stock Only from Its Surplus

Similarly, under section 160 of the DGCL, no shares may be redeemed by the corporation where such redemption would impair the corporation's capital.[1441]  Capital is

---

to be treated in accordance with the law of the state of incorporation.). *See generally Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980) (holding that, under New York choice-of-law rules, the law of the state of incorporation controls in adjudicating corporation's "internal affairs").

[1439]  Although neither the DLLCA nor the case law from Delaware strictly state that the provisions of the DLLCA override analogous provisions of the DGCL, courts that have considered claims involving LLCs have uniformly applied the DLLCA, and not the DGCL.  *See, e.g.*, *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 287 (Del. 1999) (applying provisions of the DLLCA to action against members of a Delaware LLC); *Netjets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 183 (2d Cir. 2008) (same); *Pepsi-Cola Bottling Co. of Salisbury, Md. v. Handy*, No. 1973-S, 2000 Del. Ch. LEXIS 52 (Del. Ch. March 15, 2000). *Cf., Mostel v. Petrycki*, 885 N.Y.S.2d 397, 399 (N.Y. Sup. Ct. 2009) (finding that the statute of limitations imposed by the New York limited liability company act "overrides the limitation period applicable to any claim brought under the [DGCL] with regard to distributions made by a limited liability company to a member").

[1440]  Del. C. Ann. tit. 8, § 170. *See also Pereira v. Farace*, 413 F. 3d at 343 (holding that, under Delaware law, "directors may not authorize dividends while a corporation is insolvent or that would render the corporation insolvent"); *Responsible Pers. of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*,, 398 BR 761, 783 (Bankr. S.D.N.Y. 2008) ("It is well settled that an insolvent Delaware corporation cannot pay a dividend . . . and the corporation's directors may be held personally liable if it does.") (citing *EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 305 (3rd Cir. 2002); Del. C. Ann. tit. 8, § 173 ("No corporation shall pay dividends except in accordance with this chapter.").

[1441]  Section 160(a) provides, in relevant part, as follows:

386

impaired when corporate assets are reduced "below the amount represented by the aggregate outstanding shares of capital stock."[1442] "Hence, the general rule is that a purchase or redemption by a corporation of its own shares is unlawful where the corporation's surplus is a negative amount before a proposed acquisition of shares or would become a negative amount because of the acquisition."[1443]

Thus, the considerations relevant to the illegal dividend analysis under section 170 and the illegal redemption analysis under section 160 are nearly identical.[1444] In both cases, directors are generally only permitted to authorize the corporation's distribution of funds out of surplus.

### (3)    Calculation of "Surplus"

Section 154 of the DGCL provides that "[t]he excess, if any, at any given time, of the net assets of the corporation over the amount so determined to be capital shall be surplus. Net assets means the amount by which total assets exceed total liabilities."[1445] "Capital" is

---

Every corporation may purchase, redeem, receive, take or otherwise acquire . . . its own shares; provided, however, that no corporation shall:

(1) Purchase or redeem its own shares of capital stock for cash or other property *when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation* . . . .

Del. C. Ann. tit. 8, § 160(a) (emphasis added).

[1442] *In re Int'l Radiator Co.*, 92 A. 255, 256 (Del. Ch. 1914).

[1443] Matthew Bender & Co., *Delaware Corporation Law and Practice* § 19.01, at 1-19 (2009).

[1444] *See id.* ("The considerations which go into the determination of asset value for repurchase purposes are identical to those applicable to dividends and the board's duties and responsibilities are the same. Indeed, Section 174, which imposes liability upon directors for unlawful distributions to stockholders, equates Section 160 with Section 173, the dividend authorization provision.").

[1445] Del. C. Ann. tit. 8, § 154. Section 154 defines both "capital" and "surplus" and provides:

Any corporation may, by resolution of its board of directors, determine that only a part of the consideration which shall be received by the corporation for any of the shares of its capital stock which it shall issue from time to time shall be capital; but, in case any of the shares issued shall be shares having a par value, the amount of the part of such consideration so determined to be capital shall be in excess of the aggregate par value of the shares issued for such consideration having a par value, unless all the shares issued shall be shares having a par value, in which case the amount of the part of such consideration so determined to be capital need be only equal to the aggregate par value of such shares. In each such case the board of directors shall specify in dollars the part of such consideration which shall be capital. If the board of directors shall not have determined (1) at the time of issue of any shares of the capital stock of the corporation issued for cash or (2) within 60 days after the issue of any shares of the capital stock of the corporation issued for consideration other than cash what part of the consideration for such shares shall be capital, *the capital of the corporation in respect of such shares shall be an amount equal to the aggregate*

---

generally defined as that portion of the consideration received by the corporation for the issued shares of its capital stock that the directors determine to be capital, but in no event less than the par value of the shares.[1446]  Thus, the surplus of a corporation is calculated as follows: the present fair value of the total assets of the corporation, minus the present fair value of the total liabilities of the corporation, minus the capital of the corporation.[1447]

### (4)  Director Liability For Authorizing Illegal Distributions

Delaware's illegal dividend and redemption statutes are designed to protect creditors of the corporation from actions taken by directors that result in the dissipation of corporate assets.[1448]  Thus, section 174 of the DGCL provides that directors may be held personally liable for willfully or negligently authorizing an illegal dividend or redemption.[1449]

---

*par value of such shares having a par value, plus the amount of the consideration for such shares without par value.*  The amount of the consideration so determined to be capital in respect of any shares without par value shall be the stated capital of such shares.  The capital of the corporation may be increased from time to time by resolution of the board of directors directing that a portion of the net assets of the corporation in excess of the amount so determined to be capital be transferred to the capital account.  The board of directors may direct that the portion of such net assets so transferred shall be treated as capital in respect of any shares of the corporation of any designated class or classes.  *The excess, if any, at any given time, of the net assets of the corporation over the amount so determined to be capital shall be surplus.  Net assets means the amount by which total assets exceed total liabilities.*  Capital and surplus are not liabilities for this purpose.

Del. C. Ann. tit. 8, § 154 (emphasis added).

[1446]  *Id.*

[1447]  *See Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 153 (Del. 1997) ("[T]he amount of the corporation's 'surplus,' [is] defined by 8 Del. C. § 154 to mean the excess of net assets over the par value of the corporation's issued stock.").

[1448]  *Sheffield Steel Corp. v. HMK Enters. (In re Sheffield Steel Corp.)*, 320 B.R. 423, 448-49 (Bankr. N.D. Okla. 2004) (explaining that, "[t]he reason dividends are payable only out of surplus or net profits is 'to prevent boards from draining corporations of assets to the detriment of creditors and the long-term health of the corporation.'") (quoting *Klang*, 702 A.2d at 154 (Del. 1997)).  *See also In re Buckhead Am. Corp.*, 178 B.R. at 972 ("There are few, if any, doctrines more firmly rooted in our jurisprudence than that the capital stock of a corporation is a trust fund for the payment of the corporate indebtedness before any distribution among the shareholders.") (quoting *Hamor v. Taylor-Rice Eng'g Co.*, 84 F. 392, 395 (Bradford, Circuit Justice, C.C. Del. 1897); *Johnston v. Wolf*, 487 A.2d 1132, 1134-35 (Del. 1985)).

[1449]  Section 174(a) provides, in relevant part, as follows:

In case of any willful or negligent violation of § 160 or 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend or after such unlawful stock purchase or redemption, to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued.

Courts have recognized, however, that directors must be granted flexibility in determining the presence of a surplus from which to authorize distributions.[1450]  Where violations of section 160 or 170 are alleged, courts will generally "defer to the board's measurement of surplus unless a plaintiff can show that the directors failed to fulfill their duty to evaluate the assets on the basis of acceptable data and by standards which they are entitled to believe reasonably reflect present values."[1451]

Additionally, section 172 of the DGCL provides directors a broad defense to claims that a distribution has been made beyond what was available as surplus.[1452]  As the District Court of Delaware has recognized, "directors can easily insulate themselves from liability under § 170 . . . by demonstrating that they relied on the reports of employees, committees of the board, or experts 'selected with reasonable care by or on behalf of the corporation as to the availability of surplus.'"[1453]

There are some limitations to the protection offered by section 172, however. First, section 172 is only available where directors have actually relied on information regarding

---

Del. C. Ann. tit. 8, § 174.

[1450]  *See Sheffield*, 320 B.R. at 449 (explaining that, "[i]n assessing the health of a corporation prior to declaring dividends, directors are not limited to assessing assets and liabilities reflected on the balance sheet in calculating the availability of surplus . . . the board may revalue assets and liabilities to include unrealized appreciation when determining whether net assets exceed the capital 'trust fund' reserved for creditors").

[1451]  *Klang*, 702 A.2d at 154-55 (quotation marks omitted) (stating that, "[i]n the absence of bad faith or fraud on the part of the board, courts will not 'substitute [our] concepts of wisdom for that of the directors'").

[1452]  Section 172 provides:

> *A member of the board of directors*, or a member of any committee designated by the board of directors, *shall be fully protected* in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of its officers or employees, or committees of the board of directors, or by any other person as to matters the director reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation, *as to the value and amount of the assets, liabilities and/or net profits of the corporation or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid*, or with which the corporation's stock might properly be purchased or redeemed.

Del. C. Ann. tit. 8, § 172 (emphasis added).

[1453]  *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Blackstone Family Inv. P'ship (In re Color Tile)*, No. 98-358-SLR, 2000 U.S. Dist. LEXIS 1303, at *12 (D. Del. Feb. 9, 2000), *rev'd on other grounds*, *Color Tile Inc. Official Comm. of Unsecured Creditors v. Reliance Ins. Co.*, 2004 U.S. App. LEXIS 2315 (3d Cir. 2004).

the presence of a surplus in good faith.[1454]  Additionally, it is not clear whether a director

involved in an insider transaction, including those between a parent corporation and its

subsidiary,[1455] may benefit from the safe-harbor provided by section 172.[1456]  Just as directors

involved in insider transactions do not enjoy the benefit of the business judgment rule,[1457] and the

presumption of good faith it embodies, the "good faith" requirement imposed by section 172 is

arguably lacking in those instances where a director authorizes a payment to an insider.

      Finally, even where a dividend is authorized in compliance with the statute,

however, it may not be insulated from attack.  The Delaware Supreme Court has held that,

"compliance with the applicable statute may not, under all circumstances, justify all dividend

payments.  If a plaintiff can meet his burden of proving that a dividend cannot be grounded on

any reasonable business objective, then the courts can and will interfere with the board's decision

to pay the dividend."[1458]

### (5)      Shareholder Liability for Receiving Illegal Payments

      Although section 174 of the DGCL only expressly provides for director liability

on account of an illegal distribution, courts have uniformly recognized that a cause of action may

---

[1454] *See, e.g., Sheffield*, 320 B.R. at 451 (finding that protection under section 172 may not apply where, "[t]he record fails to establish that the Board acted with care in selecting experts or professionals to determine, *prior to* declaring the dividends, that a surplus existed from which dividends could be lawfully paid. There is no corporate resolution, minute or other document in the record indicating that the Board made a calculation of surplus before declaring dividends. The audited financial statements indicated an absence of surplus . . . the Board was not entitled to rely upon [a certain legal opinion], which was prepared for the initial purchaser of the Notes and the indenture trustee, neither of whom had a stake in insuring that the proposed dividends were legal and unimpeachable").

[1455] *See generally Schreiber v. Pennzoil Co.*, 419 A.2d 952, 956-57 (Del. Ch. 1980) (where "the transaction involves a parent and a subsidiary with the parent controlling the transaction and fixing the terms . . . , and . . . the parent benefited from the transaction to the exclusion and detriment of its subsidiary, the test of propriety is . . . the intrinsic fairness rule, which places the burden of persuasion on the parent corporation to show that the transaction is objectively fair"). *See also Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1115 (Del. 1994) ("A controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness.").

[1456] No case appears to have addressed the applicability of section 172 to an insider transaction.

[1457] Report § V.D.2.b(1)(a).

[1458] *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721 (Del. 1971).

also be maintained against a shareholder that receives an illegal dividend or redemption payment with notice of its impropriety.[1459]

The Bankruptcy Court for the Southern District of New York recently considered the reach of claims alleged under the DGCL against controlling shareholders in a multi-tiered corporate structure in the case of *Buchwald v. The Renco Group, Inc. (In re Magnesium Corp. of America).*[1460]  The corporate debtor in that case ("Renco Metals") was a wholly-owned subsidiary of the Renco Group, a non-debtor corporation that was privately held, directly or indirectly, by one Rennert.[1461]  The trustee alleged that the Renco Group and Rennert caused Renco Metals to issue dividend payments exceeding $100 million at a time that Renco Metals was insolvent, or was rendered insolvent thereby, in violation of the DGCL.[1462]  The trustee sought to recover those dividends from the Renco Group, as a shareholder, and from Rennert, who acted as Renco Metals' sole director.[1463]

The court explained that, "[t]he Delaware legislature clearly provided that the right to declare dividends and liability for unlawfully issued dividends attached to one group – a corporation's directors."[1464]  The court continued:

> However, this does not wholly end the Court's inquiry, because the trustee seeks also to recover from the one or more shareholders that received allegedly improper dividends and stock redemptions . . . .  Section 174(c) provides that directors found liable under § 174(a) are entitled to have their claim subrogated to the rights of the corporation against stockholders who received the dividend . . . .  Section 174(c) thus recognizes an existing

---

[1459]  *See, e.g., PHP Liquidating LLC v. Robbins*, 291 B.R. 592, 598 (D. Del. 2003) (holding that the language of section 174(c) "'suggests that the shareholder will be liable for any amount received by him but only if he had notice that the dividend was unlawful.'  Stated another way, shareholder liability requires bad faith").

It is not clear whether an action that could be maintained against a shareholder for receiving an illegal distribution could also be maintained against a subsequent transferee of the distribution.  For example, if a shareholder knowingly receives a distribution in violation of Delaware law and subsequently transfers the funds to a third party, it is unclear whether a plaintiff could recover from the third-party transferee and, if so, whether recovery would only be permitted where the transferee did not take the distribution in good faith.

[1460]  399 B.R. 722, 758 (Bankr. S.D.N.Y. 2009) (Gerber, J.).

[1461]  *Id.* at 735.

[1462]  *Id.* at 736-37.

[1463]  *Id.* at 777.

[1464]  *Id.* at 778.

right on the part of the corporation, presumably under common law, to recover, from a receiving shareholder, an unlawfully issued dividend. Otherwise, the provision granting directors the right of subrogation would have no meaning.[1465]

The court ultimately denied the motions to dismiss the trustee's claims against both the Renco Group and Rennert for violations of the DGCL.[1466]

### c. Illegal Distributions Under the DLLCA

Section 18-607[1467] of the DLLCA is titled "Limitations on distribution" and generally provides that an LLC "shall not make a distribution to a member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company . . . exceed the fair value of the assets of the limited liability company."[1468]  "A

---

[1465] *Id.* (quotation marks omitted).

[1466] *Id.* (stating further, "the Trustee has alleged facts with respect to Rennert and Renco Group sufficient to show knowledge that the payments were improper, and to establish any requisite bad faith").

[1467] Section 18-607 provides in full:

(a) A limited liability company shall not make a distribution to a member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company, other than liabilities to members on account of their limited liability company interests and liabilities for which the recourse of creditors is limited to specified property of the limited liability company, exceed the fair value of the assets of the limited liability company, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the limited liability company only to the extent that the fair value of that property exceeds that liability.  For purposes of this subsection (a), the term "distribution" shall not include amounts constituting reasonable compensation for present or past services or reasonable payments made in the ordinary course of business pursuant to a bona fide retirement plan or other benefits program.

(b) A member who receives a distribution in violation of subsection (a) of this section, and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to a limited liability company for the amount of the distribution. A member who receives a distribution in violation of subsection (a) of this section, and who did not know at the time of the distribution that the distribution violated subsection (a) of this section, shall not be liable for the amount of the distribution. Subject to subsection (c) of this section, this subsection shall not affect any obligation or liability of a member under an agreement or other applicable law for the amount of a distribution.

(c) Unless otherwise agreed, a member who receives a distribution from a limited liability company shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of the distribution unless an action to recover the distribution from such member is commenced prior to the expiration of the said 3-year period and an adjudication of liability against such member is made in the said action.

Del. C. Ann. tit. 6, § 18-607.

[1468] Del. C. Ann. tit. 6, § 18-607(a).  *See also Eerie World Entm't, L.L.C. v. Bergrin*, 2004 U.S. Dist. LEXIS 23882, at *6 n.17 (S.D.N.Y. Nov. 29, 2004) (recognizing that section 18-607 requires the "same showing of insolvency" as under section 548 of the Bankruptcy Code).

member who receives a distribution in violation of subsection (a) of this section, and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to a limited liability company for the amount of the distribution."[1469]  The Delaware Chancery Court has summarized the standard for imposing liability on an LLC member for receiving an illegal distribution as follows: "if an LLC member receives a distribution that results in the LLC becoming insolvent, and [the member] knew at that time that the LLC would become insolvent as a result of the distribution, the LLC member is liable to the LLC for the amount of the distribution."[1470]  Although the DLLCA does not define the term "distribution,"[1471] courts have interpreted that term to include most transfers of profits or the return of capital to a member.[1472]

The Delaware Chancery Court has explained that, "section 18-607 prohibits the stripping of corporate assets so as to render an LLC insolvent, and creates a corporate cause of action against LLC members who improperly receive a distribution of those assets."[1473]  Few courts have had occasion to consider claims alleged under section 18-607, however, and none appears to have discussed that provision's application in any detail.  Those that have discussed the provision have indicated that it would be applied according to its terms to prevent a member from withdrawing funds from an insolvent LLC, to the prejudice of the LLC's other members or creditors.[1474]

---

[1469]  Del. C. Ann. tit. 6, § 18-607(b).

[1470]  *Pepsi-Cola Bottling Co. of Salisbury, Md. v. Handy*, No. 1973-S, 2000 Del. Ch. LEXIS 52, *9 (Del. Ch. March 15, 2000).

[1471]  Section 18-607 clarifies only that "the term 'distribution' shall not include amounts constituting reasonable compensation for present or past services or reasonable payments made in the ordinary course of business pursuant to a bona fide retirement plan or other benefits program."  Del. C. Ann. tit. 6, § 18-607(a).

[1472]  *See, e.g.*, *RANDS, LLC v. Young (In re Young)*, 384 B.R. 94, 101 (Bankr. D.N.J. 2008) (construing New Jersey LLC Act, which is similar to the DLLCA, and recognizing that "[t]he typical nature of a distribution is the distribution of profits or the return of capital," but finding that claims for embezzlement and misappropriation of LLC funds were not "distributions" subject to the Act's statute of limitations); *see also Mostel v. Petrycki*, 885 N.Y.S.2d 397, 400 (N.Y. Sup. Ct. 2009) (holding that the return of a member's capital investment was a distribution governed by DLLCA section 18-607).

[1473]  *Handy*, 2000 Del. Ch. LEXIS 52, at *16.

[1474]  *See, e.g., Handy*, 2000 Del. Ch. LEXIS 52, at *16; *see also Netjets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 183 (2nd Cir. 2008) (finding that withdrawals may have been prohibited distributions under § 18-607(a) where principal's payments to LLC were alleged to have been deliberately mischaracterized as loans and recognizing that a fact finder could "properly find fraud or an unfair siphoning of [the LLC]'s assets" as a result).

393

### d. The Illegal Distribution Inquiry Looks to the Economic Substance of the Transaction, and Is Not Limited by Form

Illegal distributions have been found even where the formal structure of the transaction does not evidence a dividend. Of particular note, courts have generally upheld claims alleged under the DGCL against directors and shareholders of the target company involved in a leveraged buyout for authorizing and/or receiving illegal dividends. These courts recognize that "the substantive economic effect of a particular transaction that depletes the debtor's assets and transfers them to shareholders may be actionable as unlawful dividends."[1475]

For example, in *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.)*, the Delaware District Court denied a motion to dismiss claims alleged by the official creditors' committee on behalf of the debtors' estates for violations of the DGCL arising out of two leveraged buyouts.[1476] In that case, minority shareholders were alleged to have caused Days Inn of America, Inc. ("DIA"), a wholly-owned subsidiary of Days Inn of America Corp. ("DIC"), to pay for the acquisition of the outstanding shares of its parent company's stock by a third party.[1477] One year later, the purchaser sold all of its DIC stock to another third party, with the purchase price again being financed by DIA.[1478] The committee alleged that these transactions were fraudulent conveyances and illegal stock redemptions in violation of the DGCL.[1479]

---

[1475] *AT&T Corp. v. Walker*, 2006 WL 2927659, at *2 (W.D. Wash. Oct. 12, 2006) (applying Delaware law); *see also In re Musicland Holding Corp.*, 398 BR 761, 784 (Bankr. S.D.N.Y. 2008) (holding that a court "looks to the substance, not the form, of the transaction," to determine whether transfers are dividends); *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 970 (D. Del. 1994) ("Courts which have previously addressed the application of [statutes similar to DGCL §§ 160 and 173] to LBO transactions have rejected arguments which concentrate on the form of the transaction rather than its substantive economic effect"); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1000-01 (S.D.N.Y. 1991) (denying a motion to dismiss a claim for unlawful dividends under Delaware law in connection with a LBO and holding that "the economic substance of the transactions in question brings them within the purview of the relevant sections of the [DGCL]").

[1476] 178 B.R. 956, 970 (D. Del. 1994).

[1477] *Id.*

[1478] *Id.* at 969-70.

[1479] *Id.* (explaining further that "plaintiff argues that the purchases of DIC stock and payments received by DIC shareholders in connection with the subject LBO transactions are properly characterized as dividend payments by DIA and purchases of DIA stock [b]ecause DIA was wholly owned by DIC and, therefore, the economic

The court accepted the committee's contention that "the subject LBOs should be 'collapsed' and the 'economic reality of the transactions' should be considered" in determining whether the transactions at issue were in violation of the DGCL.[1480]  Although the court determined that the transactions could not be characterized as illegal stock redemptions by DIA, because DIA was not alleged to have redeemed its own stock, it denied the defendants' motions to dismiss, finding that "DIA's financing of these transactions may properly be treated as an unlawful dividend payment or distribution from DIA to its parent company and sole shareholder, DIC."[1481]

**e.**     **Standing to Assert Claim**

Causes of action for illegal distributions under both the DGCL and the DLLCA are held by the corporation and may be brought derivatively on the corporation's behalf.[1482]  The Delaware Supreme Court has held that claims asserted under section 174 of the DGCL may be brought only by creditors that existed at the time of the illegal distribution.[1483]  It is unclear whether a different standard would apply to an action brought under section 18-607 of the DLLCA.[1484]

---

reality of the [LBOs] was that funds were paid by DIA to its economic owners, *i.e.*, the DIC shareholders") (quotation marks omitted).

[1480]  *Id.* at 969.

[1481]  *Id.* at 973.

[1482]  *See* Del. C. Ann. tit. 8, § 174(a); Del. C. Ann. tit. 6, § 18-1001.  *See also Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 294 (Del. 1999) (holding that, "[t]he [DLLCA] expressly allows for a derivative suit, providing that 'a member . . . may bring an action . . . in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed") (quoting Del. C. Ann. tit. 6, § 18-1001).

[1483]  *Johnston v. Wolf*, 487 A.2d 1132, 1136 (Del. 1985) (holding that "[w]hen the statute seeks to protect 'its creditors' such phrase refers to those creditors who were already creditors at the time of the action challenged under the statute").

[1484]  Moreover, whether illegal distribution claims alleged under either the DGCL or the DLLCA become property of a debtor's estate pursuant to section 541 of the Bankruptcy Code, or are instead asserted by the trustee pursuant to section 544(b) is an unsettled issue.  This Court recently explained in *In re Musicland Holding Corp.*, 398 BR 761 (Bankr. S.D.N.Y. 2008) that "[t]he unlawful dividend claim is not an avoidance claim that the trustee must assert, if at all, under 11 U.S.C. § 544(b), even if the same transfer also gives rise to a fraudulent conveyance.  Instead, it imposes statutory liability on directors who may or may not also be transferees. . . .  [T]he unlawful dividend claim becomes property of the corporation's estate under 11 U.S.C. § 541 for the trustee to assert." *Id.* at 784.  Other courts have reached a different conclusion. *See, e.g., In re National Forge Co.*, 344 B.R. 340, 348 (W.D. Penn. 2006) (stating that "director liability for violations of §§

395

### f.    Conclusion

As described above, courts have generally viewed a series of transactions having the effect of depleting corporate assets and transferring those assets to shareholders as distributions that are subject to Delaware's illegal distribution statutes.  This is particularly true in the context of leveraged buyouts, where the selling shareholder receives value from the transaction at the expense of the corporation.  Distributions made by ESI and Homestead in connection with the Acquisition (culminating in transfers made to the Sellers) may, therefore, be the proper subject of illegal distribution claims.  Claims may also exist in connection with distributions authorized by ESI and Homestead following the Acquisition.  These claims are discussed in more detail below.

### (1)    Liability under the DGCL

Although the majority of the Debtors are Delaware LLCs, ESI was incorporated under the DGCL.  To the extent that any amounts transferred by ESI to its shareholders were not paid out of "surplus," in compliance with section 160 or 170 of the DGCL, the directors of ESI may be liable for the amounts wrongfully transferred under section 174.  Notably, ESI is majority owned by BHAC, and any dividends made by ESI both in connection with the Acquisition and after the Acquisition to its controlling shareholder, to the exclusion of ESI's minority shareholders, would be subject to strict scrutiny under Delaware law.  Moreover, it is questionable whether ESI's directors may claim the benefit of the section 172 safe harbor for relying "in good faith" upon information evidencing the presence of a surplus.  As discussed above, courts also recognize that claims may be maintained under the DGCL against shareholders that receive illegal distributions with knowledge of the circumstances surrounding those distributions (*i.e.*, that such distributions were not made from surplus).

Determining whether ESI had a surplus at any time prior to the Petition Date was beyond the scope of the Examiner's Investigation, and the Examiner has not confirmed whether

---

160 and 173 of the DGCL runs not only to the corporation itself, but also to the corporation's creditors in the event of dissolution or insolvency.  Thus, it appears that a trustee in bankruptcy or debtor-in-possession . . . *does* acquire a right of action under § 544(b) to prosecute violations of §§ 160 and 173 of the DGCL in its capacity as a putative creditor.") (emphasis added).

ESI's directors or shareholders had evidence of a surplus at the time dividends were issued by ESI. As a result, whether claims for illegal dividends could be successfully pled on behalf of ESI's Estate may require further investigation.

### (2)    Liability under the DLLCA

As most of the Debtors, including Homestead, are LLCs formed under the DLLCA, any distributions made by such LLCs at the time of the Acquisition, or following the Acquisition, would be recoverable by the Estates if (i) such LLC's liabilities exceeded the fair value of its assets at the time any distributions were authorized, and (ii) the Sellers/Buyer knew that such was the case.

Determining whether Homestead's liabilities exceeded the fair value of its assets at the time it issued distributions was beyond the scope of the Examiner's Investigation, and the Examiner has not confirmed whether Homestead's managing member had evidence of such a surplus at the time distributions were issued by Homestead. As a result, whether claims for illegal distributions could be successfully pled on behalf of Homestead's Estate may require further investigation.

### 2.    Breach of Fiduciary Duty

The Examiner has also considered the possibility that various entities and individuals may be liable for breaching their respective fiduciary duties to the Debtors by authorizing the Acquisition and the Post-Acquisition Distributions, which operated to the detriment of the Debtors. Report Sections V.D.2.b. through V.D.2.c. discuss the legal standards relevant to breach of fiduciary duty claims applicable to both corporations and LLCs, which standards are then applied to the facts of these Chapter 11 Cases in Section V.D.2.d.

### a.    Choice-of-Law

### (1)    New York Choice-of-Law Rules Apply

As set forth above, New York's choice-of-law rules will apply with respect to claims premised on state law, unless state law would conflict with a federal policy or interest. Courts in the Southern District of New York have held that claims for breach of fiduciary duty

do not implicate federal policy concerns.[1485]  The Examiner does not believe that state law concerning possible breach of fiduciary duty claims would conflict with any federal policy or interest here, and will therefore apply the choice-of-law principles of New York to determine the applicable substantive law concerning fiduciary duty.

### (2)    Under New York's Choice-of-Law Rules, Delaware Law Will Govern the Estates' Breach of Duty Claims

Courts applying New York's choice-of-law rules have determined that the law of a corporate entity's state of incorporation should govern a claim for breach of fiduciary duty.[1486] This so-called "internal affairs doctrine" – which holds that the law governing a company's breach of fiduciary duty claims is the law of the state of incorporation – represents the majority view.[1487]  The Examiner will adhere to the majority view and assumes that any claims for breach of fiduciary duty will be governed by the law of each respective corporation's state of incorporation or formation.[1488]

---

[1485]  *See BHC Interim Funding, L.P. v. Finantra Capital, Inc.*, 283 F. Supp. 2d 968, 989 (S.D.N.Y. 2003) (concluding that claim for breach of fiduciary duty did not conflict with a federal policy or interest and accordingly applying New York choice-of-law principles to such claim); *Pereira v. Grecogas Limited (In re Saba Enters., Inc.)*, No. 05-B-60144 (AJG), 2009 Bankr. LEXIS 2745 at *70 (Bankr. S.D.N.Y. Sept. 18, 2009) (acknowledging that bankruptcy court hearing state law claims that do not implicate federal policy concerns should apply the choice-of-law rules of the forum state and accordingly applying New York choice-of-law rules to claim for breach of fiduciary duty).

[1486]  *See Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y. 1998) (citing *Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980)); *see also Hart v. Gen. Motors Corp.*, 517 N.Y.S.2d 490, 492 (N.Y. App. Div. 1987) (quoting *CTS Corp. v Dynamics Corp. of Am.*, 481 U.S. 69, 89-90 (1987)).  Indeed, the principle that the state of incorporation provides the law of corporate governance is so settled that courts rarely engage in any significant analysis in arriving at the conclusion.

[1487]  *See, e.g., Buchwald v. Renco Group, Inc. (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 742 (Bankr. S.D.N.Y. 2009) ("As to matters relating to the duties of officers and directors to the corporations they serve . . . the Court must apply the law of the state of incorporation."); *Crazy Eddie, Inc. v. Antar (In re Crazy Eddie, Inc.)*, No. 89B11313-11457 (TLB), 1992 Bankr. LEXIS 2018, at *38 (Bankr. S.D.N.Y. December 17, 1992) ("New York choice of law rules require that 'the Court must apply the law of the state of incorporation to determine the existence and extent of corporate fiduciary obligations and liability for violations.'") (citing *Davidge v. White*, 377 F. Supp. 1084, 1088 (S.D.N.Y. 1974); *Official Comm. Of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 471 n.14 (Bankr. S.D.N.Y. 2006); *Kull v. Davidoff of Geneva (NY), Inc.*, No. 01 Civ. 4831 (LMM), 2004 U.S. Dist. LEXIS 11575, *56- 7 (S.D.N.Y. June 22, 2004); *In re Luxottica Group S.p.A. Sec. Litig.*, 293 F. Supp. 2d 224, 237 (E.D.N.Y. 2003); *Rubinstein v. Skyteller, Inc.*, 48 F. Supp. 2d 315, 323 (S.D.N.Y. 1999); *High View Fund, L.P. v. Hall*, 27 F. Supp. 2d 420, 428 n.6 (S.D.N.Y. 1998)).

[1488]  The Examiner acknowledges that some courts have interpreted certain *dicta* from *Greenspun v. Lindley*, 330 N.E.2d 79 (1975), a case involving a business trust decided by New York's highest appellate tribunal, as

With respect to limited partnerships or limited liability companies, the Examiner submits that the law of the state in which the respective business entity is organized should similarly govern fiduciary duty claims against the directors and officers, or managing members, of such entities. In New York, the internal affairs doctrine is codified with respect to limited partnerships and limited liability corporations.[1489] Among the few cases illustrating the application of these statutes, in *Trump v. Cheng*, No. 602877/05, 2006 N.Y. Misc. LEXIS 2465, at *3, (Sup. Ct. July 24, 2006), a New York court recognized the codification of the internal affairs doctrine with respect to a foreign limited partnership. Thus Delaware law applied to a Delaware limited partnership in connection with a claim for breach of fiduciary duty.[1490] Likewise, in *Official Committee Of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings, LLC)*,[1491] the United States Bankruptcy Court for the Southern District of New York recognized that the internal affairs doctrine is codified in regard to foreign limited liability

---

calling into question the automatic application of the law of the state of incorporation to claims for breach of fiduciary duty. *See, e.g., Norlin Corp. v. Rooney, Pace, Inc.,* 744 F.2d 255 (2d Cir. 1984); *Schonfeld v. Hilliard,* 62 F. Supp. 2d 1062 (S.D.N.Y. 1999), *aff'd, in part, rev'd, in part, vacated, remanded,* 218 F.3d 164 (2d Cir. 2000); *FDIC v. Cohen,* No. 95 Civ. 683 (LLS), 1996 U.S. Dist. LEXIS 2247 (S.D.N.Y. Feb. 28, 1996); *Stephens v. Nat'l Distillers & Chem. Corp.,* No. 91 Civ. 2901 (JSM), 1996 U.S. Dist. LEXIS 6915, at *12 (S.D.N.Y. May 20, 1996). The Examiner does not believe that the line of cases purporting to follow *Greenspun* accurately reflects New York law. The Examiner's conclusion is bolstered by several post-*Greenspun* decisions, which, consonant with the majority view, automatically apply the law of the state of incorporation to breach of fiduciary duty claims without discussing *Greenspun* or engaging in the test suggested in its *dicta. See supra* note 1487.

[1489]  N.Y. P'ship Law § 121-901 (2010) ("Subject to the constitution of this state, the laws of the jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs and the liability of its limited partners."); N.Y. Ltd. Liab. Co. § 801 (2010) ("[T]he laws of the jurisdiction under which a foreign limited liability company is formed govern its organization and internal affairs and the liability of its members and managers.").

[1490]  *See also JFK Family Ltd. P'ship v. Millbrae Natural Gas Dev. Fund 2005, L.P.,* 873 N.Y.S.2d 234, *23 (N.Y. Sup. Ct. 2008) ("The Court agrees with Defendants that Delaware Law applies to Plaintiff's claims for breach of fiduciary duty because it is the laws of the jurisdiction under which a foreign limited partnership is organized . . . [that] govern its organization and internal affairs and the liability of its limited partners.").

[1491]  No. 08-14604 (MG), 2009 Bankr. LEXIS 3712, at *26-27 (Bankr. S.D.N.Y. Nov. 24, 2009).

537960v2

companies and selected Delaware law as governing a Delaware limited liability company[1492] with respect to a breach of fiduciary duty claim, among other things.[1493]

Because the Debtors are organized under Delaware law,[1494] the Examiner will apply Delaware law to analyze potential breach of fiduciary duty claims.

### b. Directors, Officers, and Controlling Shareholders Owe Fiduciary Duties to the Corporation

Delaware law is clear: the directors and officers of a corporation owe fiduciary duties to the corporation.[1495] Additionally, the Supreme Court of Delaware has held that "[a] shareholder owes fiduciary duties in two instances: (1) when it is a 'majority shareholder,' owning more than 50 percent of the shares, or (2) when it 'exercises control over the business affairs of the corporation.'"[1496]

### (1) Duties Owed by a Fiduciary[1497]

In general, the term "fiduciary duty" comprises three sub-duties: the duty of loyalty, the duty of care, and the related duty to act in good faith.[1498] These duties not only

---

[1492] The New York Limited Liability Company Law contains a similar provision to that of section 121-901 of the New York Partnership Law. Under § 801 of the New York Limited Liability Company Law, "the laws of the jurisdiction under which a foreign limited liability company is formed govern its organization and internal affairs and the liability of its members and managers." N.Y. Ltd. Liab. Co. § 801 (2010).

[1493] *See also Faulkner v. Kornman (In re Heritage Org. L.L.C.)*, No. 04-35574-BJH-11, 2008 Bankr. LEXIS 3220, at *50-51 (Bankr. N.D. Tex. December 12, 2008) (applying Delaware law to trustee's breach of fiduciary duty claims because the entity against whom the alleged breach was committed was a Delaware limited liability company); *Health Robotics, LLC v. Bennett*, No. 09-CV-0627, 2009 U.S. Dist. LEXIS 119945, at *17 (E.D. Penn. Dec. 22, 2009) (same).

[1494] The sole exception concerns any claims against the principals of ESA Canada. With respect to any such claims, Ontario, Canada would supply the appropriate governing law.

[1495] *See, e.g.*, *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000).

[1496] *Superior Vision Servs., Inc. v. Reliastar Life Ins. Co.*, No. 1668-N, 2006 Del. Ch. LEXIS 160, at *13-14 (Del. Ch. 2006) (stating that, "[i]n order to append the label of 'controlling shareholder,' pervasive control over the corporation's actions is not required; indeed, a plaintiff 'can survive the motion to dismiss by alleging actual control with regard to the particular transaction that is being challenged'") (quoting *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987)); *see also Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1113-14 (Del. 1994) (holding that "a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation").

[1497] As explained below, the fiduciary duties discussed in this section are the same as those owed by the fiduciaries of an LLC and the discussion that follows regarding these duties is equally applicable to LLCs.

[1498] *See, e.g., Skeen*, 750 A.2d at 1172. Only the duties of care and loyalty are discussed in detail here as only violations of those duties may serve to establish liability. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("The obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing

"demand that corporate fiduciaries absolutely refrain from any act which breaches the trust reposed in them, but also to affirmatively protect and defend those interests entrusted to them."[1499]

### (a)  The Duty of Care

"The fiduciary duty of due care requires that directors of a Delaware corporation use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent."[1500]  "Under Delaware law, 'to show a breach of the duty of care, plaintiffs must overcome the presumption, known as the business judgment rule, that the defendant directors have acted on an informed basis and in the honest belief they acted in the best interest of the corporation.'"[1501]

To overcome the presumption of the business judgment rule, it must be demonstrated "that the defendant directors failed to act (1) in good faith; (2) in the honest belief that the action was in the best interest of the corporation; or (3) on an informed basis."[1502]  "If a party demonstrates that there was neither a business decision, nor disinterestedness and

---

as the duties of care and loyalty.  Only the later two duties, where violated, may directly result in liability . . . .").  The Bankruptcy Court for the Southern District of New York recently recognized that the duty of good faith "is subsumed in both the fiduciary duty of care, and the fiduciary duty of loyalty" and explained that bad faith is "not simply bad judgment or negligence, but rather . . . a state of mind affirmatively operating with furtive design or ill will."  *Official Comm. Of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings, LLC)*, 420 B.R. 112, 147 (Bankr. S.D.N.Y. 2009) (quoting *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 221 (S.D.N.Y. 2004)).

[1499]  *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)).

[1500]  *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 146 (quoting *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005)).

[1501]  *Id.* (quoting *CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, No. 03 Civ. 7936 (DAB), 2007 U.S. Dist. LEXIS 74723, at *3 (S.D.N.Y. Oct. 4, 2007).

[1502]  *Id.* (quoting *Crescent Mach I Partners L.P. v. Turner*, 846 A.2d 963, 984 (Del. Ch. 2000)); *cf. Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that, "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task. Delaware courts have said that it may be accomplished by showing either irrationality or inattention. A plaintiff may overcome the presumption that directors and officers acted in good faith by establishing that a decision was so egregious as to constitute corporate waste.").

independence, nor due care, nor good faith was present, the burden of proof shifts to the defendant to show the entire fairness of a transaction."[1503]

However, "'the protection of the business [judgment] rule 'can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment' [; accordingly], directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.'"[1504] Thus, the court will apply an "entire fairness"[1505] standard of review where "a majority of the directors 'were either self-interested or dominated by an interested party,' or the only explanation for their conduct is bad faith."[1506] For example, the debtor in *Musicland Holding Corp.* was a wholly-owned subsidiary of another entity, and the entities had shared directors who were alleged to have "lacked independence" in authorizing a transaction that benefited the parent. The Bankruptcy Court for the Southern District of New York denied a motion to dismiss claims alleged in that case for breach of the duty of care against the debtor's directors.[1507]

---

[1503] *Mills Acquisition,* 559 A.2d at 1280; *cf. In re Walt Disney*, 907 A.2d at 747 ("This presumption applies when there is no evidence of fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment on the part of the directors. In the absence of this evidence, the board's decision will be upheld unless it cannot be attributed to any rational business purpose.") (footnotes and quotation marks omitted).

[1504] *Musicland Holding Corp. v. Best Buy Co., Inc. (In re Musicland Holding Corp.)*, 398 B.R. 761, 788 (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)); *cf. In re Walt Disney*, 907 A.2d at 748 ("[L]iability determinations must be on a director-by-director basis.").

[1505] The entire fairness standard of judicial review is far more stringent than the deference of the business judgment rule, and requires "the defendant directors [to] establish to the court's satisfaction that the transaction was the product of both *fair dealing and fair price*." *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993) (emphasis added).

[1506] *Crescent Mach I Partners L.P.*, 846 A.2d at 981; *see also In re Tower Air, Inc.,*, 416 F.3d at 238 (explaining that "[a]lternatively, a plaintiff may overcome the presumption that directors and officers acted on an *informed basis* by establishing that a decision was the product of an irrational process *or* that directors failed to establish an information and reporting system reasonably designed to provide the senior management and the board with information regarding the corporation's legal compliance and business performance, resulting in liability.") (emphasis in original).

[1507] *In re Musicland Holding Corp.*, 398 B.R. at 789; *see also Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.)*, 274 B.R. 71, 91 (D. Del. 2002) (denying motions to dismiss breach of duty claims against directors that authorized an LBO where it was alleged that harm to the corporation from the LBO was reasonably foreseeable); *Brandt v. Hicks Muse & Co., Inc. (In re Healthco Int'l, Inc.)*, 195 B.R. 971, 984-85 (Bankr. D. Mass. 1996) (same).

Section 102(b)(7) of the DGCL permits shareholders to protect directors and officers from liability arising from a breach of the fiduciary duty of care.[1508] Thus, where a corporation's certificate of incorporation contains such a provision, it is enforceable under Delaware law to insulate directors from actions for breaches of the duty of care, but not for breaches of the duty of loyalty or actions taken in bad faith.[1509] The relevant terms of ESI's Certificate of Incorporation are discussed below.

### (b)    <u>The Duty of Loyalty</u>

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[1510] Courts have held that, "[a] breach of loyalty claim requires some form of self-dealing or misuse of corporate office for personal gain."[1511] For example, where a corporation's directors authorized an LBO and received a direct benefit, either as shareholders or through affiliation with the corporation's controlling shareholders, a court may infer that the directors acted in their own interests.[1512]

---

[1508] Section 102(b)(7) provides, in relevant part, that a company's certificate of incorporation may contain:

> A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective . . . .

> Del. Code Ann. tit. 8, § 102(b)(7) (2010); *see also Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168**,** 192 (Del. Ch. 2006) (enforcing an exculpatory provision under Delaware law).

[1509] *See Trenwick*, 906 A.2d at 192.

[1510] *Cede & Co.*, 634 A.2d at 361; *see also Mills Acquisition*, 559 A.2d at 1280 (holding that, "[o]fficers and directors must exert all reasonable and lawful efforts to ensure that the corporation is not deprived of any advantage to which it is entitled," and explaining that, "directors are required to demonstrate both their utmost good faith and the most scrupulous inherent fairness of transactions in which they possess a financial, business or other personal interest which does not devolve upon the corporation or all stockholders generally").

[1511] *CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, 2007 U.S. Dist. LEXIS 74723, at *3 (S.D.N.Y. Oct. 4, 2007).

[1512] *See Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 510 (N.D. Ill. 1988) (explaining that even though "the directors may have adequately investigated the terms of the LBO and had anticipated the effect the LBO would have on the corporation, the court can reasonably infer from the complaint that the directors did not act in good faith and in furtherance of the corporation's best interests")

In one particular application of the duty of loyalty, if a fiduciary acts to reduce its personal exposure on a guarantee of the obligations of the entity to which it owes fiduciary duties, to the detriment of the entity, the fiduciary will have breached its duty of loyalty to the entity.[1513]  For example, in *In re USA Detergents*,[1514] the plaintiff trustee alleged that the eighty percent stockholder of the debtor ("Titan") and related entities executed two corporate guarantees in favor of the debtor.  Titan was a borrower from the same lender as the debtor, and operated the debtor.  The plaintiff alleged that as the debtor's business deteriorated, Titan commenced a wind down of the debtor focusing on minimizing both the lender's interest and Titan's exposure under the guarantees, rather than maximizing value for all creditors.  The court denied Titan's motion to dismiss because if such facts were true, then the fiduciaries had breached their fiduciary duties.[1515]

### (c)    Parent's Duties to Its Subsidiary

A parent corporation generally does not owe fiduciary duties to its wholly-owned subsidiaries or their creditors under Delaware law,[1516] and directors of a solvent subsidiary are held to owe duties only to the parent.[1517]  If the subsidiary is not wholly-owned, however, the

---

[1513]  *See, e.g.*, *Gibralt Capital Corp. v. Smith*, No. 17422, 2001 Del. Ch. LEXIS 68 (Del. Ch. May 8, 2001) (denying motion to dismiss with respect to claims alleging that controlling shareholder caused corporation's subsidiary to release guarantee allegedly in favor of parent for no consideration to enable controlling shareholder's affiliate to receive shares of stock of the subsidiary). *Cf. Seidman v. Office of Thrift Supervision, Dep't of the Treasury*, 37 F.3d 911 (3d Cir. 1994) (holding that fiduciary did not breach his duty to entity where his act of obtaining a release of his personal guaranty benefitted entity to which he owed duty).

[1514]  *Miller v. Greystone Bus. Credit II, L.L.C. (In re USA Detergents, Inc.)*, 418 B.R. 533, 546-46 (Bankr. D. Del. 2009) (denying motion to dismiss claim for breach of the duty of loyalty where fiduciary acted to reduce exposure on its guarantee and to preserve value for lender rather than maximize value for creditors).

[1515]  Similarly, corporate fiduciaries may be liable for a breach of duty by timing the filing of a bankruptcy case to serve their self interest.  For example, in *Roth v. Mims*, 298 B.R. 272 (Bankr. S.D. Tex. 2003), the debtor's bankruptcy trustee sued the debtor's CEO for breach of duty for simultaneously negotiating the sale of the debtor's assets along with the terms of his employment with the proposed purchaser.  The court found that the CEO breached his duties of care and loyalty by, among other things, delaying the filing in order to finalize the terms of his employment and failing to disclose his conflict of interest to the board.  In contrast, in *Seidman v. Office of Thrift Supervision*, 37 F.3d 911, the principal obtained a guarantee release that benefitted himself, but "substantial evidence [showed that the principal] acted to further the interests of [the company], not just his own, when he attempted to obtain a release from his guarantee, and therefore his actions did not constitute a breach of the fiduciary duty of loyalty . . . ." *Id.* at 935.

[1516]  *Trenwick*, 906 A.2d at 191.  Similarly, absent insolvency, "[a] wholly-owned subsidiary is to be operated for the benefit of its parent." *Id.* at 174.

[1517]  *Anadarko Petro. Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988).

parent is held to owe a fiduciary duty to the subsidiary when there are parent-subsidiary dealings.[1518]  A transaction between a parent and subsidiary constitutes self-dealing and is subject to additional scrutiny "when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary."[1519]  Such transactions are reviewed for intrinsic fairness, which places the burden on the self-dealing parent company to show that the transaction was characterized by fair dealing and a fair price.[1520]

### (d)  Fiduciaries of Insolvent Corporations Owe Duties to Creditors under Delaware Law

Generally, corporate fiduciaries owe their duties to the corporation and its shareholders.[1521]  When the corporation is insolvent, however, a shift occurs under Delaware law and directors are held to owe fiduciary duties to the corporation's creditors.[1522]  Similarly, the directors of a wholly-owned subsidiary are held to owe duties to the subsidiary's creditors upon insolvency.[1523]  "Consequently, the creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties."[1524]

---

[1518]  *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971).

[1519]  *Id. Cf. Getty Oil Co. v. Skelly Oil Co.*, 267 A.2d 883, 888 (Del. 1970) (stating the rule, but applying business judgment rule because a third party set the terms of the parent-subsidiary transaction).

[1520]  *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710-11 (Del. 1981) (explaining that "[t]he concept of fairness has two basic aspects: fair dealing and fair price.  The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.  The latter aspect of fairness relates to the economic and financial considerations of the proposed [transaction].").

[1521]  *See N. Am. Catholic Ed. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007).

[1522]  *Id.* at 101; *see also Trenwick*, 906 A.2d at 204, n. 96 (recognizing that, "[i]f the firm is insolvent, its residual claimants are the creditors and it is for their benefit that the directors must now manage the firm.  A purposeful fraudulent transfer to stockholders who are 'out of the money' is obviously inconsistent with the best interest of the creditors, the firm's new residual claimants.").

[1523]  *Claybrook v. Morris (In re Scott Acquisition Corp.)*, 344 B.R. 283, 290 (Bankr. D. Del. 2006); *see also In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 367 (3d Cir. 2007) (holding that if a subsidiary is not wholly-owned, "whoever controls the subsidiary" must maximize its economic value for the benefit of the minority shareholders; and "similarly, if the subsidiary is insolvent, we require the same in the interest of protecting the subsidiary's creditors.").

[1524]  *Gheewalla*, 930 A.2d at 101.

This principle was recently explained by the United States Bankruptcy Court for the Southern District of New York in *Magnesium Corp. of America*.[1525] The bankruptcy trustee in that case alleged claims for breach of duty against the former officers and directors of the debtor and its corporate parent for causing the debtor to issue payments to shareholders exceeding $100 million at a time that it was insolvent or was rendered insolvent thereby.[1526] The court denied the defendants' motions to dismiss the breach of duty claims under Delaware law, explaining:

> The contentions by [the controlling shareholder and director] and the Director and Officer Defendants motions that they owed no fiduciary duties under the facts here to the corporations of which they were officers and directors – and impliedly, that they could authorize millions of dollars of dividends and other gratuitous transfers when their companies were insolvent, because it was in the interests of their company's shareholder that they do so – are wholly without merit. *Those contentions fail to take into account the allegations of insolvency in the complaint here, and the legal principle that while officers and directors of subsidiaries may legitimately advance the interests of the corporate parent when the subsidiaries are not insolvent, they may no longer do so when the subsidiaries are insolvent, or would be rendered insolvent by the contemplated action. Rather, they must then look to the needs and concerns of the subsidiaries for whom they are officers or directors, and must take into account, in any corporate decision-making, the fact that creditors will have a superior claim to corporate assets.*[1527]

Under Delaware law, insolvency, for the purposes of determining when directors and officers of a wholly owned subsidiary owe a duty beyond their duty to the parent, is demonstrated by evidence of: "(1) a deficiency of assets below liabilities with no reasonable

---

[1525] 399 B.R. 722 (Bankr. S.D.N.Y. 2009).

[1526] *Id.* at 772.

[1527] *Id.* at 773 (emphasis added); *see also Scott Acquisition Corp.*, 344 B.R. at 289 (recognizing that insolvency "is precisely when a director must be most acutely sensitive to the needs of a corporation's separate community of interests, including both the parent shareholder and the corporation's creditors. . . . There is no basis for the principle . . . that the directors of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its parent corporation").

prospect that the business can be successfully continued in the face thereof, or (2) an inability to meet maturing obligations as they fall due in the ordinary course of business."[1528]

## (e)     Damages for Breach of Duty

Liability for breaches of duty is not constrained by traditional damage principles.[1529]  Indeed, "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly," because "[t]he strict imposition of penalties under Delaware law are designed to discourage disloyalty."[1530]  Thus, once disloyalty has been established, Delaware law requires that the fiduciary be forced to disgorge any benefits it received from improper self-dealing, even if the transaction did not harm the corporation.[1531]

Section 144 of the DGCL also provides a statutory basis for invalidating so-called "interested transactions" – one where a fiduciary or related entities stand on both sides of a transaction involving the corporation.[1532]  Such transactions are not *per se* invalid, but absent the

---

[1528]  *Musicland Holding Corp.*, 398 B.R. at 787 (quoting *Prod. Res. Group, L.L.C. v. NCT Group, Inc*., 863 A.2d 772, 782 (Del. Ch. 2004)); *see also Teleglobe*, 392 B.R. 561, 599-604 (Bankr. D. Del. 2008) (explaining that insolvency can only be shown via the balance sheet test or the cash flow test).

[1529]  *See, e.g., Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994) (recognizing that "breaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages"); *see also In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 334 (Del. 1993) (explaining that "no Delaware court has extended the damage rule to actions for breach of the duty of loyalty").

[1530]  *Thorpe by Castleman v. CERBCO, Inc.*, 676 A. 2d 436, 445 (Del. 1996).  The court in *Thorpe* also quoted the oft-cited language from *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939), wherein that court explained:

> The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

> *Id.* at 510.

[1531]  *See, e.g.*, *Cantor v. Perelman*, 414 F.3d 430, 435 (3d Cir. 2005) ("Where, as here, the record will support a finding that the defendants exploited their fiduciary position for personal gain, summary judgment is inappropriate.  Such exploitation would constitute a breach of fiduciary duty and that breach would justify an unjust enrichment award without regard to whether the fiduciary caused the beneficiary to act to its detriment."); *see also In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 262 (Del. Ch. 2006) (holding that, "[e]ven in a case where transactional damages are not present, a disloyal fiduciary may still be held liable for incidental damages.  Concerns of equity and deterrence justify loosen[ing] normally stringent requirements of causation and damages when a breach of the duty of loyalty is shown.").

[1532]  Section 144 provides in relevant part:

> (a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason . . ., if:

537960v2

good faith approval of the transaction by a disinterested board or shareholder majority following complete disclosure of the insider's interests, the transaction must be fair and reasonable to the corporation.[1533]

The Delaware Chancery court applied section 144 to a controlling shareholder in *Merritt*, and summarized the law as follows:

> whenever a controlling shareholder sets out to exercise his power to set the terms of [an interested] transaction and compel its effectuation, he assumes a new and significant responsibility: the burden of establishing an independent body . . . on full and complete information, that the transaction is fully fair. In all events, should a reviewing court be required to pass upon the fairness of such a transaction, the self-dealing fiduciary may be required to respond in damages or with another appropriate remedy if the transaction, despite any good faith on his part, is found to be not an entirely fair one to the corporation. . . .[1534]

### c. Fiduciary Duties Owed By Members of a Limited Liability Company

Each of the fiduciary duties of care, loyalty and good faith owed by the fiduciaries of a Delaware corporation, as set forth above,[1535] are generally applicable to the managing member of a Delaware LLC. As the Delaware Chancery Court recently explained, "[t]he Delaware LLC Act gives members of an LLC wide latitude to order their relationships, including the flexibility to limit or eliminate fiduciary duties. But, in the absence of a contrary provision in

---

(1) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors . . .; or

(2) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3) *The contract or transaction is fair as to the corporation as of the time as it is authorized,* approved or ratified, by the board of directors, a committee or the shareholders.

Del. C. Ann. tit. 8, § 144 (emphasis added); *see also Cede & Co. v. Technicolor*, 634 A.2d 345, 363 (Del. 1993) *modified on other grounds*, 636 A.2d 956 (Del. 1994).

[1533] *Id.* at 365.

[1534] *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 764 (Del. Ch. 1986); *see also Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) (holding that, "directors are required to demonstrate both their utmost good faith and the most scrupulous inherent fairness of transactions in which they possess a financial, business or other personal interest which does not devolve upon the corporation . . . generally.").

[1535] *See* § V.D.2.b(1) of this Report.

the LLC agreement, the manager of an LLC owes the traditional fiduciary duties of loyalty and

care to the members of the LLC."[1536]

       The Bankruptcy Court for the Southern District of New York recently recognized

that the DLLCA provides broad grounds for limiting the duties of members and managers to the

LLC and its beneficiaries, including creditors upon insolvency, when it explained:

> Section 18-1101 of the DLLCA . . . permits members or managers to
> adopt provisions eliminating or limiting "any and all liabilities for breach
> of contract and breach of duties (including fiduciary duties) of a member,
> manager or other person to a limited liability company or to another
> member or manager or to another person that is a party to or is otherwise
> bound by a limited liability company agreement" with the exception of
> liability for "any act or omission that constitutes a bad faith violation of
> the implied contractual covenant of good faith and fair dealing."[1537]

Even creditors may be "otherwise bound" by an LLC agreement that expressly waives fiduciary

duties as between the LLC's members.[1538]  The terms of the relevant LLC Agreements at issue in

the Chapter 11 Cases are discussed below.[1539]

### d.    Conclusions

       As discussed below, various individuals and entities may have breached their

respective duties to the Debtors in authorizing the Acquisition and the Post-Acquisition

Distributions.

---

[1536]  *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 Del. Ch. LEXIS 54 at *26 (Del. Ch. Apr. 20, 2009) (citing 6 Del. C. § 18-1101(e); *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999)).

[1537]  *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 146, n.13 (Bankr. S.D.N.Y. 2009) (quoting Del. C. Ann. tit. 6, § 18-1101(e)).

[1538]  *Id.* (citing *N. Am. Catholic Ed. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 100-02 (Del. 2007) ("[w]hen a corporation is insolvent . . . its creditors take the place of the shareholders as the residual beneficiaries;" and creditors have many opportunities to protect their rights, "among which are the protections afforded by their negotiated agreements, their security instruments, the implied covenant of good faith and fair dealing, fraudulent conveyance law, and bankruptcy law"); Mark M. Maloney and Michelle L. Carter, *Asserting Breach-of-fiduciary-duty Claims in the Context of Delaware LLCs*, 28 Am. Bankr. Inst. J. 7, 36, 86, 86 n.2 2009 ("By stepping into equityholders' shoes, creditors would be bound by the LLC agreement's provisions governing fiduciary duties, subject to the implied covenant of good faith and fair dealing, tit. 6 § 18-1101(c)," and, "the authors agree that a Delaware LLC can probably accept, adjust or deny fiduciary duties to creditors through its LLC agreement.")).

[1539]  *See* § V.D.2.d. of this Report.

### (1)     The Debtors' Fiduciaries

The Individuals serving as directors and officers of ESI owe fiduciary duties to ESI under Delaware law.[1540] ESI is majority owned by BHAC, which would also owe fiduciary duties to ESI under Delaware law as a majority shareholder.[1541] Additionally, since ESI was indirectly owned by BHAC, one of the Sellers, prior to the Acquisition, and by the Buyer following the Acquisition, a court may fairly conclude that each was a "controlling shareholder" of ESI as the result of their (i) stock ownership and/or (ii) actual control over ESI in connection with the Acquisition and Post-Acquisition Distributions, as applicable.[1542] If the Sellers or Buyer are determined to have been controlling shareholders of ESI, they would owe fiduciary duties directly to ESI.[1543] Moreover, Homestead was wholly-owned by one of the Sellers prior to the Acquisition and by the Buyer following the Acquisition; each of those entities would owe fiduciary duties to Homestead under Delaware law.

### (2)     Impact of Insolvency Determination

If Homestead is determined to have been solvent at the time of the Acquisition, and not rendered insolvent thereby, its fiduciaries would generally have been entitled to run Homestead for the benefit of its corporate parent. With respect to ESI, which was not wholly-owned, any insider transaction between ESI and a controlling or related entity having the effect of benefiting such entity at the expense of ESI's minority shareholders would be considered a self-dealing transaction subject to strict scrutiny, regardless of ESI's solvency.[1544]

---

[1540]   *See, e.g., Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000).

[1541]   *See, e.g., Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1113-14 (Del. 1994).

[1542]   *Id.*

[1543]   Additionally, it is possible that a court might "pierce the corporate veil" of ESI to find that ESI was operated as the mere instrumentality of the Sellers and/or Buyer. In that circumstance, the Sellers and/or Buyer would likely owe fiduciary duties directly to ESI as a controlling entity.

[1544]   The Examiner understands that the shares held by some, if not all of the minority shareholders of ESI were redeemed by ESI at the time of the Acquisition. It is not clear whether any minority interests in ESI were not redeemed or if the price paid for those minority shareholders' interests that were redeemed fairly approximated the valuation of those interests, relative to the benefit received by the Sellers for their own interests in ESI. To the extent that the Sellers received a benefit to the exclusion of minority shareholders, the transaction would likely fail the "intrinsic fairness" test applicable under Delaware law.

If either Homestead or ESI was rendered insolvent by the Acquisition, however, those entities' fiduciaries would have also owed duties to Homestead's and ESI's respective creditors.  As described above, the courts in Delaware test insolvency for purposes of determining when fiduciary duties are owed to creditors with evidence of either: "(1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or (2) an inability to meet maturing obligations as they fall due in the ordinary course of business."[1545]  Whether ESI or Homestead were rendered insolvent by the Acquisition under the deficiency of assets test is an open question; no independent valuation of the Debtors' assets and liabilities was done during the Investigation.  For the reasons explained in Section IV of this Report, however, the Acquisition left ESI and Homestead unable to meet their obligations as they fell due in the ordinary course of business.  If this test is met, ESI's and Homestead's respective fiduciaries would have owed duties to the creditors of those entities at the time of the Acquisition.

Further, based upon the tests performed by the Examiner set forth in Section IV of this Report, both ESI and Homestead were almost certainly insolvent as a result of each entity's inability to pay its debts at the time the post-Acquisition Distributions were issued.  Although the Examiner could not determine whether the assets of either ESI or Homestead fell below their respective liabilities at the time that the post-Acquisition Distributions were issued, the Examiner has concluded that neither entity was able to meet maturing obligations as they fell due at any time following the Acquisition.  As a result, the fiduciaries of both ESI and Homestead likely owed duties to creditors at the time the Post-Acquisition Distributions were issued. [1546]

---

[1545]  *See Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004).

[1546]  If either ESI or Homestead were insolvent at the time of the Acquisition or the payment of the Post-Acquisition Distributions, or were rendered insolvent thereby, their fiduciaries would have been required to act to protect the interests of those entities and their respective creditors.  *See In re Magnesium Corp. of Am.*, 399 B.R. at 773 ("There is no basis for the principle propounded by a few of the Defendants that the directors of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its parent corporation") (quoting *Claybrook v. Morris (In re Scott Acquisition Corp.)*, 344 B.R. 283, 289 (Bankr. D. Del. 2006)); *see also Collins v. Kohlberg & Co. (In re Sw. Supermarkets, LLC)*, 376 B.R. 281, 282-283 (Bankr. D. Ariz. 2007) ("Delaware law does impose fiduciary duties on the officers and directors of a wholly owned subsidiary that run directly to the subsidiary itself, and not only to its sole shareholder. . . .  It would be a startling and

### (3)    <u>Duty of Care</u>

Though the business judgment rule generally insulates fiduciaries from allegations of breaches of the duty of care, that rule would not likely apply to allegations of breach of the duty of care in connection with the Acquisition.  The Acquisition, by channeling the Debtors' funds up to the Sellers, was almost certainly a self-interested transaction.  Given the Sellers' ultimate ownership and control of the entire Company prior to the Acquisition, it is not unlikely that the vast majority of individual directors and managers of each of the Debtors were appointed directly and dominated by the Sellers, and those individuals may have lacked independence in authorizing the Acquisition.

Similarly, the Buyer may be the subject of breach of duty claims for forcing ESI and Homestead to issue the Post-Acquisition Distributions, which benefited the Buyer to the detriment of the other beneficiaries of ESI and Homestead.[1547]  These facts are similar to those alleged in *Musicland Holding Corp.*, wherein the court upheld claims for breaches of the duty of care where the directors of the debtor-subsidiary were alleged to have authorized a transaction that benefited the parent at the expense of the debtor.[1548]

Notwithstanding that breach of care claims might otherwise stand in these Chapter 11 Cases, it might be contended that exculpatory provisions in certain of the Debtors' organizational documents preclude liability for certain claims here.  As noted above, provisions exculpating directors and officers of a corporation from liability for breaches of the duty of care are enforceable under Delaware law.

Article VIII of the Certificate of Incorporation of ESI in effect prior to the Acquisition is entitled "Exculpation" and states that no director of ESI shall be liable for a breach

---

dramatic departure from settled law to conclude that officers and directors do not owe any fiduciary duty to the corporation they serve.").

[1547]   As explained in § IV.D.3. of this Report, the Examiner's financial advisors have determined that the Mortgaged Properties did not pass the Debt Yield covenants contained in the Loan Agreements even at Closing, and that any Post-Acquisition Distributions would have been made in violation of the terms of the Loan Agreements.  It is unclear whether the Debtors' fiduciaries even considered those covenants prior to authorizing the Post-Acquisition Distributions.

[1548]   *Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 BR 761, 789 (Bankr. S.D.N.Y. 2008).

of fiduciary duty to the extent permissible under the DGCL.[1549]  Based upon the authority cited above, this provision is likely enforceable to protect the directors of ESI against any claims for breach of the duty of due care, only.

Moreover, as discussed above, the members and managers of an LLC should be held to owe the same fiduciary duties as the directors of a corporation, unless the underlying LLC Agreement limits or eliminates those duties.  The Examiner's review of several of the Debtors' LLC Agreements, governing the periods both prior to and following the Acquisition, indicates that those agreements contain varying provisions purporting to limit the liability of the LLC Debtors' respective members.

Certain LLC Agreements state that the respective members "shall have no liability for the obligations or liabilities of the Company except to the extent provided in the [DLLCA]" and contain additional provisions that purport to indemnify the members for any action taken on behalf of the LLC.[1550]  The majority of the LLC Agreements reviewed by the Examiner, however, including the Homestead LLC Agreement, purport to exculpate members, and in certain cases, directors and officers, from liability for acting within the scope of authority, with the exception of acts amounting to gross negligence and willful misconduct."[1551]  Since acts falling below the level of gross negligence do not implicate Delaware's duty of care in any event, exculpatory clauses limiting liability for actions other than those amounting to gross negligence or willful misconduct would likely not eliminate any aspect of the duty of care for Homestead's

---

[1549]  Certificate of Incorporation of Extended Stay, Inc., Art. 8, dated May 5, 2004 (as amended).

[1550]  *See, e.g.,* LLC Agreement of Extended Stay Hotels, LLC, § 16, dated September 24, 2004.

[1551]  *See, e.g.,* Second Amended LLC Agreement of Homestead Village L.L.C., § 4.05, dated June 29, 2007.  This Agreement further incorporates a limitation on "Interested Party Transactions" – those between Homestead and its subsidiaries, on the one hand, and "any Member, Director, Officer or Affiliate of any Member, Director, Officer or Affiliate", on the other, without Member Consent.  *Id.* § 4.07.  *See also* LLC Agreement of BRE Homestead Village, LLC, § 3.2(c), dated November 20, 2001 (limiting liability except in instances of gross negligence or willful misconduct and denying indemnification rights for acts of negligence, willful misconduct, and "acts determined to be in contravention of this [LLC] Agreement or in breach of its fiduciary duties"); Second Amended LLC Agreement of HVM L.L.C., § 4.2, dated October 27, 2006 (same).

fiduciaries.[1552]  In addition, as discussed above, the DLLCA prohibits the disclaimer of the duty of good faith and fair dealing, which preserves aspects of both the duty of care and loyalty.

### (4) Duty of Loyalty

#### (a) The Acquisition and the Post-Acquisition Distributions

The Debtors' fiduciaries may have breached their duties of loyalty by authorizing the Acquisition.  As described above, a fiduciary will have breached this duty whenever it places its own interests ahead of those of the corporation and its beneficiaries.  Since ESI had minority shareholders, its fiduciaries would have owed a duty of loyalty to those shareholders whether or not ESI was solvent.  As explained in Section IV of this Report, the Examiner believes that the Acquisition rendered the Debtors unable to pay their debts as they matured and that their financial condition had deteriorated further at the time of the Post-Acquisition Distributions, such that their respective fiduciaries would have also owed duties to their creditors at those times.  Further, since the Acquisition involved transactions between parents and subsidiaries, a court would apply an "intrinsic fairness" analysis to determine whether the transaction was entirely fair to the Debtors, unless the parent received no benefit to the exclusion of minority shareholders or creditors, as applicable.[1553]

As described above, the Acquisition resulted in substantial transfers by ESI and Homestead to the Sellers, the Buyer, and third parties.  These transfers were possible only because the Sellers caused ESI and Homestead (and the rest of the Debtors) to shoulder a

---

[1552]  *See Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 146 (Bankr. S.D.N.Y. 2009) (citing *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000)).  Moreover, it is highly likely that an act falling within the exculpation provisions' exception for bad faith would constitute a breach of the duty of loyalty.  *See, e.g.*, *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 753-54 (Del. Ch. 2005) (explaining that, "[b]ad faith has been defined as authorizing a transaction for some purpose other than a genuine attempt to advance corporate welfare or when the transaction is known to constitute a violation of applicable positive law.  In other words, an action taken with the intent to harm the corporation is a disloyal act in bad faith.  A similar definition was used seven years earlier, when Chancellor Allen wrote that bad faith (or lack of good faith) is when a director acts in a manner unrelated to a pursuit of the corporation's best interests.  It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation.") (quotation marks, editing marks and footnotes omitted).

[1553]  *See supra* note 1505.

crushing debt that unsurprisingly proved impossible to repay. The Examiner has uncovered no benefit received by ESI or Homestead in return for these transfers, and the Acquisition is unlikely to pass the "entire fairness" test for that reason. Moreover, since the Individuals responsible to ESI and Homestead were likely dominated and controlled by the Sellers in authorizing the transfers in connection with the Acquisition, those Individuals may have breached their duties of loyalty to minority shareholders, in the case of ESI, and to creditors of both ESI and Homestead.[1554]

Similar arguments may be made with respect to the Post-Acquisition Distributions. Just as the Sellers dominated the Debtors in connection with the Acquisition, the Buyer dominated the Debtors at the time of the Post-Acquisition Distributions. Like the Acquisition, the Post-Acquisition Distributions did not serve to benefit the Debtors or their beneficiaries and, as self-interested transactions between related entities, these transactions would also likely fail the intrinsic fairness test. For these reasons, the fiduciaries of both ESI and Homestead, including the Buyer, may be liable for breaching their duties of loyalty in authorizing the Post-Acquisition Distributions.

**(b)**     **The Financial Circumstances That Led to the Filing of the Chapter 11 Cases**

As set forth in this Report, the Examiner has found that no prepetition restructuring plan that would absolve Mr. Lichtenstein of his guarantee obligations ever became binding, and has found no evidence that a "secret deal" or scheme existed to provide such a benefit to Mr. Lichtenstein to the detriment of the Debtors. If more fulsome discovery revealed evidence of a scheme to benefit Mr. Lichtenstein at the expense of any Debtor, or the Company in the aggregate, existing authority strongly suggests that a *prima facie* case of breach of the duty of loyalty would lie against Mr. Lichtenstein and any other individuals involved.

---

[1554] The Examiner does not know whether any Individuals benefited directly from the Acquisition.

(5) <u>**Damages**</u>

If a court determines that the Debtors' fiduciaries breached their duties in authorizing the Acquisition and/or the Post-Acquisition Distributions, the court would have broad authority in assessing damages. As explained above, courts do not adhere to strict damage principles in determining damages for breaches of duty, but instead penalize fiduciaries in order to discourage disloyalty.[1555] As a result, if the Debtors' fiduciaries are found to have breached their duties, they may be forced to disgorge any benefits received from the underlying transactions.[1556]

Additionally, if any transaction is determined to have been an "interested transaction" within the purview of section 144 of the DGCL, a court may void the transactions altogether. In particular, since the Acquisition involved transfers between entities with common ownership, the Debtors' fiduciaries would have the burden of proving that the transactions were entirely fair to the Debtors. The same is true for the Post-Acquisition Distributions. If the transactions were not entirely fair, a court would have statutory authority to invalidate the transactions and to recover any amounts transferred by the Debtors.[1557]

3. <u>**Aiding and Abetting a Breach of Fiduciary Duty**</u>

To the extent that any of the Debtors' fiduciaries breached their respective duties in authorizing the Acquisition, it may also be possible to hold other entities liable for aiding and abetting those breaches. This theory of liability is discussed here.

---

[1555] *Thorpe by Castleman v. CERBCO, Inc.*, 676 A. 2d 436, 445 (Del. 1996).

[1556] *See, e.g.*, *Cantor v. Perelman*, 414 F.3d 430, 435 (3d Cir. 2005).

[1557] Because Delaware's breach of fiduciary duty law applies here, the Examiner submits that Delaware law would also apply with respect to any "deepening insolvency" claim. Since Delaware does not recognize a tort of deepening insolvency, however, that cause of action is not discussed in this Report. *See Trenwick*, 906 A.2d at 174 ("[S]o long as directors are respectful of the corporation's obligation to honor the legal rights of its creditors, they should be free to pursue in good faith profit for the corporation's equityholders. Even when the firm is insolvent, directors are free to pursue value maximizing strategies, while recognizing that the firm's creditors have become its residual claimants and the advancement of their best interests has become the firm's principal objective.").

416

### a.    Choice-of-Law

The Examiner believes that New York choice-of-law principles will apply to any claim premised on aiding and abetting a breach of fiduciary duty, because of the apparent absence of any federal interest and the pendency of the Chapter 11 Cases in New York.[1558]  The applicable standard governing a claim for aiding and abetting a breach of fiduciary duty is substantially similar in each of South Carolina, Delaware, and New York, with one arguable difference discussed below in Section V.D.3.c.

The Bankruptcy Court for the Southern District of New York recently held that claims for aiding and abetting breaches of fiduciary duty are subject to "normal 'interest analysis' principles applicable in all tort cases . . . ."[1559]  As described above, the majority of the Debtors are organized in Delaware and list South Carolina as their principal place of business, although some operate principally out of New York; all were contractually under the explicit management of Mr. Lichtenstein, who is located in New York; and the Acquisition occurred in New York. The Examiner submits that New York law is likely to govern any aiding and abetting claims, based on the analysis set forth in Section V.C.1. of the Report.

### b.    Liability for Aiding and Abetting a Breach of Fiduciary Duty

"The elements for the cause of action of aiding and abetting a breach of fiduciary duty are: (1) a breach of a fiduciary duty owed to the plaintiff; (2) the defendant's knowing participation in the breach; and (3) damages.  'The gravamen of the claim is the defendant's knowing participation in the fiduciary's breach.'"[1560]

---

[1558]  *Bianco v. Erkins, (In re Gaston & Snow)*, 243 F.3d, 599, 601-02 (2d Cir. 2001).

[1559]  *Buchwald v. Renco Group, Inc. (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 742-43 (Bankr. S.D.N.Y. 2009) (holding further that, "claims for aiding and abetting breaches of fiduciary duty belong to the estate, just as claims for the underlying breaches do").  *But see BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 130 (S.D.N.Y. 1999) ("[A] claim of aiding and abetting a breach of fiduciary duty is also governed by the law of the state of incorporation").

[1560]  *Vortex Sports & Entm't, Inc. v. Ware*, 378 S.C. 197, 204 (S.C. Ct. App. 2008) (quoting *Future Group, II v. Nationsbank*, 324 S.C. 89, 99, 478 S.E.2d 45, 50 (1996)); *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) (stating that, under New York law, "[a] claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."); *cf. Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch. 1984) (explaining that, under Delaware law, "[i]t is well settled that a

The Bankruptcy Court for the Southern District of New York recently denied a motion to dismiss aiding and abetting claims asserted against a parent entity alleged to have caused the wholly-owned debtor's directors to transfer funds to the parent.[1561]  Having previously held that the plaintiff's claims against the debtor's fiduciaries for breach of duty were sufficiently pled, the court found that allegations that the parent entity "devised a plan", "with the knowing assistance" of the fiduciaries, to arrange transfers to itself from the debtor supported the claim that the parent "knowingly participated" in the fiduciaries' breaches of duty.[1562]

Courts have also upheld claims against lenders that have knowingly participated in a fiduciary's breach of duty by lending into an LBO.[1563]  Similar claims might also be asserted against other third parties, such as Professionals, that were aware of, and participated in a fiduciary's breach of duty in connection with an LBO.

### c. The *Wagoner* Rule and *In Pari Delicto*

It should be noted that, to the extent claims for aiding and abetting are alleged against third parties under New York law, such claims may be barred by the so-called "*Wagoner* Rule."[1564]  That rule, as developed by the Second Circuit, generally bars a trustee from pursuing third parties for injuries to the corporation arising from former management's misconduct on the basis of an *in pari delicto* defense.[1565]  The *Wagoner* Rule and the common law *in pari delicto*

---

third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship," and holding that a party may not benefit as the result of a fiduciary's breach that results in the third party receiving a better than arms-length deal).

[1561] *In re Musicland Holding Corp.*, 398 B.R. 761, 790 (Bankr. S.D.N.Y. 2008).

[1562] *Id.*

[1563] *See, e.g.*, *Aluminum Mills Corp. v. Citicorp North Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 892 (Bankr. N.D. Ill. 1991) (denying motion to dismiss claim for aiding and abetting breach of fiduciary duty against lender involved in leveraged buyout); *see also In re OODC, LLC*, 321 B.R. 128, 142 (Bankr. Del. 2005) (same).

[1564] *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991); *see also Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822 (2d Cir. 1997) (applying the *Wagoner* Rule and dismissing claims brought by a creditors' committee against a bank and law firm that were charged with aiding and abetting breaches of fiduciary duty); *Kirschner v. Grant Thornton LLP*, 2009 WL 996417, at *1 (S.D.N.Y. 2009) (applying the *Wagoner* Rule and holding that the trustee, standing in the shoes of the bankruptcy estate, could not pursue aiders and abettors because a debtor has no standing to sue to recover for a wrong in which he took part).

[1565] *See Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (holding under New York law that "[b]ecause management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the

---

418

defense have been characterized as "effectively identical,"[1566] except that *Wagoner* concerns the trustee's standing to assert certain claims, while *in pari delicto* is an equitable defense.[1567]

In a case "governed by New York law, the trustee [is] barred by *in pari delicto* from recovery for damage to the estate occasioned by alleged assistance of former management's wrongful conduct, unless facts supporting an applicable *Wagoner* Rule exception are found."[1568] Among such exceptions, "the *Wagoner* [R]ule does not limit a trustee's standing to bring causes of action – for breach of fiduciary duty, for example – against a corporation's own officers and directors."[1569] Thus, while the *Wagoner* Rule would not bar an Estate from bringing claims

---

corporation, the Wagoner rule bars a trustee from suing to recover for a wrong that he himself essentially took part in" (citations omitted)); *see generally Magnesium Corp. of Am.*, 399 B.R. at 761-69 (explaining *Wagoner* and its progeny, and finding that aiding and abetting and other claims asserted against various third parties were barred by *in pari delicto* defense under New York law from recovery for damage to the estate occasioned by alleged assistance of former management's wrongful conduct).

[1566] In South Carolina, the doctrine of *in pari delicto* generally "precludes one joint tort-feasor from seeking indemnity from another." *Myatt v. RHBT Fin. Corp.*, 370 S.C. 391, 395-97 (S.C. Ct. App. 2006). *See also Rock Hill Tel. Co. v. Globe Commc'ns, Inc.*, 363 S.C. 385, 389 n.2 (S.C. 2005) ("In general, there is no right to indemnity between joint tortfeasors."); *Atlantic Coast Line R. Co. v. Whetstone*, 243 S.C. 61, 68 (S.C. 1963) (holding that there generally is no right to indemnity between joint tortfeasors). South Carolina courts have not applied the doctrine of *in pari delicto* to the issue of whether a trustee in bankruptcy has standing to bring claims against third parties for aiding and abetting breaches of fiduciary duty, but the South Carolina Court of Appeals has held in at least one case that a party can assert the defense of *in pari delicto* against the receiver of a corporation that engaged in past wrongdoing. *Myatt*, 370 S.C at 397. With respect to Delaware law, the Delaware Chancery Court, analogizing suits by a trustee for the benefit of creditors to derivative suits on behalf of shareholders, has stated that "the doctrine of *in pari delicto* has never operated in Delaware as a bar to providing relief to the innocent by way of a derivative suit," and held that an action brought by a trustee on behalf of injured creditors was not barred by *in pari delicto*. *Trenwick*, 906 A.2d at 212.

[1567] *Global Crossing Estate Rep. v. Winnick*, 2006 WL 2212776, n.16 (S.D.N.Y., 2006) ("Other than the fact that the *Wagoner* rule is characterized as a standing rule, whereas "*in pari delicto*" is an equitable defense, no Second Circuit case suggests a distinction between the two rules, and even the district and bankruptcy court cases that suggest that one exists do not, for the most part, explain what it might be. In any event, in this Court's view, the *Wagoner* and "*in pari delicto*" rules are effectively identical.") (citing *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 709 (S.D.N.Y. 2001); *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP*, 212 B.R. 34, 44 (S.D.N.Y. 1997); *Official Comm. of Unsecured Creditors of Verestar, Inc. v. American Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 2006 WL 1620193, at *24-*27 (Bankr. S.D.N.Y. 2006); *In re Hampton Hotel Investors*, 289 B.R. 563, 574 n.18 (Bankr. S.D.N.Y. 2003); *In re Granite Partners, L.P.*, 194 B.R. 318, 328-31 (Bankr. S.D.N.Y. 1996); *cf. In re Promedicus Health Group*, LLP, 359 B.R. 45, 50 (Bankr. W.D.N.Y. 2006) (noting that while the *Wagoner* Rule and the *in pari delicto* doctrine have elements in common, they are not the same).

[1568] 399 B.R. at 764-65.

[1569] *Id.* at 764 (citing *Global Crossing Estate Rep. v. Winnick*, 2006 WL 2212776, at *15 ("Courts have held that the *Wagoner* and '*in pari delicto*' rules do not apply to claims against corporate insiders for breach of their fiduciary duties."); *In re IDI Constr. Co.*, 345 B.R. 60, 67 (Bankr. S.D.N.Y. 2006) ("The *Wagoner* Rule does not bar claims by a corporation against its own fiduciaries. Accordingly, it would not bar the IDI Estate from suing [the debtor's principals] to recover the unpaid loans or to recover damages under any other theory.");

against its own fiduciaries, the Estate would be barred from bringing claims against third parties for aiding and abetting a breach of duty unless an exception to the *Wagoner* Rule applies.

New York law recognizes an exception to the *Wagoner* Rule (known as the "Adverse Interest Exception"), which generally provides that management misconduct will not be imputed to the corporation if the officer acted "entirely in his own interests and adversely to the interests of the corporation."[1570] The Adverse Interest Exception will not apply, however, in instances where "the agent allegedly acting wrongfully is the debtor's sole shareholder, and is in substance the corporation itself," or "where a corporation has multiple managers or decision-makers, and *all* such relevant decision-makers participate in the alleged wrongdoing."[1571] Although certain of the potential breaches of fiduciary duty described in Section V.D.2 of this Report may implicate Adverse Interest Exception issues, the Examiner does not express a further view as to the applicability of the Adverse Interest Exception, or the *Wagoner* Rule generally, to the Estates' potential aiding and abetting claims.

### d. Conclusion

As discussed above, the Debtors' respective fiduciaries may have breached their duties to the Debtors by authorizing the Acquisition. Exculpation clauses in the Debtors' organizational documents limit director and manager fiduciary duties, but do not abrogate the duty of good faith and fair dealing that incorporates aspects of the fiduciary duties of loyalty and care. To the extent that a breach of duty by a fiduciary is established, other entities and individuals may also be held liable on an aiding and abetting theory for knowingly participating in those breaches. In particular, if the Sellers, as the ultimate controlling shareholders of ESI prior to the Acquisition, were not fiduciaries of ESI, but are found to have caused or influenced

---

*Grumman Olson Indus., Inc.,* 329 B.R. 411, 425 (Bankr. S.D.N.Y. 2005) ("[T]he *Wagoner* rule does not bar claims against corporate fiduciaries . . . .").

[1570] *Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.),* 529 F.3d 432 (2d Cir. 2008) (holding that the guilty manager must have totally abandoned his corporation's interests for the Adverse Interest Exception to apply), *aff'g in part and rev'g in part,* 311 B.R. 350 (S.D.N.Y. 2004).

[1571] 399 B.R. at 767 (emphasis in original).

ESI's fiduciaries to transfer funds to the Sellers in connection with the Acquisition, those entities may be liable for aiding and abetting a breach of duty.

It may also be possible to hold the Buyer and its controlling shareholders, as well as the various Lenders and Professionals involved in the Acquisition liable for aiding and abetting the Debtors' fiduciaries' breaches of duty. Although those entities likely did not have control over the fiduciaries at the time of the Acquisition, the relevant standard requires only "knowing participation" in the breach. Thus, if those entities knowingly participated in the breaches discussed above, they may also be liable under an aiding and abetting theory, subject to the limitations imposed by the *Wagoner* Rule and any *in pari delicto* defenses that may be relevant to such claims.

## 4. Unjust Enrichment

In addition to the breach of duty and aiding and abetting claims discussed above, the transactions comprising the Acquisition may also support a claim for unjust enrichment against those entities that received funds from the Debtors.

### a. Choice-of-Law

The Examiner believes that New York choice-of-law principles will apply to any unjust enrichment claim because of the apparent absence of any federal interest and the pendency of the chapter 11 cases in New York.[1572] It appears that there is a potentially material conflict between the unjust enrichment laws of New York, South Carolina, and Delaware.[1573]

The Bankruptcy Court will likely apply the law of the jurisdiction with the most significant contacts to any unjust enrichment claims.[1574] The "most significant contacts test"

---

[1572] *See In re Gaston & Snow*, 243 F.3d at 601-02.

[1573] *See infra* note 1578. In New York, "[t]he first step in any case presenting a potential choice-of-law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co.,* 81 N.Y.2d 219, 223 (N.Y. 1993). An actual conflict is present "[w]here the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). The potential conflict of law here is between the laws of Delaware and New York.

[1574] *See, e.g., In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139 (S.D.N.Y. 2008) (applying significant-contacts test to unjust enrichment claims); *M'Baye v. N.J. Sports Prod., Inc.,* 06 CV 3439 (DC), 2007 U.S. Dist. LEXIS 9101 (S.D.N.Y. Feb. 7, 2007) (same).

focuses on (1) the place of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the subject matter, and (5) the domicile or place of business of the contracting parties.

Here, the Examiner submits that the first three factors clearly favor the application of the law of New York, because the Acquisition Agreement that would underlie any unjust enrichment claims relating to the Acquisition was negotiated, executed, and performed in the state of New York.[1575] Further, the Examiner submits that the fourth factor also strongly favors the application of the law of New York, because the subject matter of the Acquisition Agreement – the Acquisition – took place in New York.[1576] The Examiner submits that importance of the domicile or place of business of the contracting parties is outweighed in significance by the other four factors, which all support the application of New York law in connection with any unjust enrichment claims. Accordingly, the Examiner believes that the law of the New York should govern any unjust enrichment claims.

### b.    New York Unjust Enrichment Law.

Under New York law, a claim for unjust enrichment is a quasi-contractual concept.[1577] Courts may infer the existence of an implied contract to prevent one person who has obtained a benefit from another from unjustly enriching himself at the other party's expense. An unjust enrichment claim under New York law must establish that (1) the defendant was enriched; (2) enrichment was at the plaintiff's expense; and (3) the defendant's retention of the benefit

---

[1575] *See supra* Report § V.C.1.

[1576] *See id.* (concluding that locus of Acquisition was New York).

[1577] *See also Great Am. Ins. Co. v. Mills,* 2008 U.S. Dist. LEXIS 42570, *33 (D.S.C. May 29, 2008) (holding that "[u]njust enrichment is an equitable doctrine, akin to restitution, which permits the recovery of that amount the defendant has been unjustly enriched at the expense of the plaintiff") (quoting *Ellis v. Smith Grading & Paving, Inc.*, 294 S.C. 470 (Ct. App. 1988)); *see also Niggell Assoc., Inc. v. Polo's of N. Myrtle Beach, Inc.,* 374 S.E.2d 507, 509 (S.C. App. 1988) (analogizing an unjust enrichment claim to that of restitution, and holding that the elements of such a claim are: "(1) that [the plaintiff] conferred a nongratuitous benefit on the defendant; (2) that the defendant realized some value from the benefit; and (3) that it would be inequitable for the defendant to retain the benefit without paying the plaintiff its value").

would be unjust.[1578]  The third element is satisfied when the circumstances are such that equity and good conscience require the defendant to make restitution.[1579]

There are limits to the reach of unjust enrichment.  For example, because unjust enrichment is a tool intended to fill a gap that the law of contract would otherwise address if a contract existed, a claim for unjust enrichment will be dismissed if there exists an express, enforceable contract that controls the parties' relationship.[1580]  Accordingly, in New York, a party cannot succeed on an unjust enrichment claim when "any benefit conferred on the defendants was triggered by a provision in [a] contract, the validity of which neither [the plaintiff] nor the defendants challenge".[1581]  Similarly, where the remedy sought is for a breach of obligations imposed by law, as opposed to obligations arising from the receipt of an unjustly retained benefit, a claim of unjust enrichment does not lie.[1582]  Finally, there is some authority for the

---

[1578] *Brody v. Brody*, 2009 U.S. Dist. LEXIS 17078, *15 (S.D.N.Y. Feb. 13, 2009) (citing *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 49 F. Supp. 2d 298, 301 (S.D.N.Y. 1999)).  In Delaware unjust enrichment is measured against five elements, which take into account essentially the same equitable analysis as that applied in New York: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 393 (Del. Ch. 1999).  Thus, it appears that Delaware, unlike New York, requires the plaintiff to plead that it has no other legal remedy available to obtain the relief it seeks.

[1579] *Gidatex*, 49 F. Supp. 2d at 301.

[1580] *See Goldman v. Met. Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005) (under New York law, equitable remedies are inappropriate when remedies at law are available under an existing contract); *Petrello v. White*, 412 F. Supp. 2d 215, 233 (E.D.N.Y. 2006) ("New York Courts and the Second Circuit have consistently held 'that the existence of a written agreement precludes a finding of unjust enrichment'"); *ID Biomedical Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) (applying Delaware law).

[1581] *Kipperman v. Onex Corp.*, 411 B.R. 805, 873 (N.D. Ga. 2009) (granting defendant's motion for summary judgment because all the benefits conferred that plaintiff sought to avoid were "triggered by a provision in contracts and, while plaintiff challenged whether these contracts violated statutory provisions against fraudulent transfers, plaintiff did not challenge the underlying validity of these contracts"); *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners (In re Fedders N. Am., Inc.),* 405 B.R. 527, 553 (Bankr. D. Del. 2009) (dismissing cause of action for unjust enrichment where each of the transfers plaintiff sought to recover were conferred in accordance with an express contract, the existence and underlying enforceability of which was not challenged).

[1582] *See Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 447 (1st Cir. 2000) (breach of obligations arising under section 524 of the Bankruptcy Code do not give rise to a claim for unjust enrichment); *Pacamor Bearings, Inc. v. Minebea Co., Ltd.*, 892 F. Supp. 347, 357 (D.N.H. 1995) (claims under the Lanham Act and state unfair competition statutes do not give rise to a claim for unjust enrichment).

application of an *in pari delicto* defense to claims against third parties, where those parties are alleged to have engaged in misconduct together with the Debtors.[1583]

### c.    Unjust Enrichment Actions in LBO Cases.

It is not uncommon for courts to allow actions for unjust enrichment in the context of leveraged buyouts to proceed in the face of a motion to dismiss.[1584]

For example, the court in *Healthco*[1585] recognized an unjust enrichment cause of action in connection with a failed leveraged buyout. The trustee in that case sought to recover monies paid to the selling shareholders of the target in a leveraged buyout on the basis of claims for breach of fiduciary duty and unjust enrichment. Explaining that "there is jurisdiction in equity to prevent unjust enrichment arising out of a breach of fiduciary obligations,"[1586] the court acknowledged the validity of the trustee's claims with respect to any amounts not otherwise recoverable as fraudulent conveyances or illegal distributions, because the trustee would have been left with no other remedy at law for recovering that portion of the shareholder distribution.[1587]

### d.    Conclusion

The Examiner believes that all of the elements of an unjust enrichment claim under New York law may well be satisfied here with respect to several potential defendants. The first element, that the defendant was enriched, is met for the Sellers, the Professionals, and the Buyer, all of which received a direct benefit from the Acquisition. Enrichment is demonstrated through the payments that the Sellers and the Professionals received through the Acquisition, and

---

[1583] *See In re Parmalat Sec. Litig.*, 659 F. Supp. 2d 504 (S.D.N.Y. 2009) (recognizing the *in pari delicto* defense broadly to various claims, including unjust enrichment claims). The *in pari delicto* defense is discussed in more detail in § V.D.3.c. of this Report.

[1584] *See, e.g., Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC f/k/a Optical Datacom, LLC)*, 321 B.R. 128, 145 (Bankr. D. Del. 2005) (upholding claims against various participants the trustee's allegations that involved in a leveraged buyout for being unjustly enriched by intentionally depleting the assets of the debtor through a series of fraudulent transfers).

[1585] *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 195 B.R. 971, 989 (Bankr. D. Mass. 1996).

[1586] *Id.*

[1587] However, because the trustee failed to plead that the available legal remedies were inadequate, as required under applicable law, the court dismissed the complaint with regard to the unjust enrichment cause of action, without prejudice, so that the trustee could amend his complaint to fix this "technical defect." *Id.* at 990.

the control and the payment of the Purchase Price that the Buyer enjoyed. The Debtors, on the other hand, experienced a significant depletion of their assets as the result of the Acquisition, in that they provided liens on all of their assets for no consideration and incurred approximately $1.7 billion in additional secured debt. Indeed, after applying loan proceeds to extant debt, the Debtors received nothing in exchange for assuming this additional secured debt. All of the monies paid to the Sellers and the Professionals came at the expense of the Debtors. It would, therefore, be unjust to allow these parties to benefit from the Acquisition under the circumstances present here.

Although New York law may prevent an unjust enrichment action against an entity with which the plaintiff entered into an express contract, the Debtors had no contract with the Sellers, Professionals or Buyer in connection with the Acquisition. Similarly, there is no contract under which ESI and Homestead were required to satisfy the Buyer's obligation to the Sellers. The Examiner is of the opinion that the satisfaction by ESI and Homestead of the Buyer's debt to the Sellers at the coordinated behest of both the Buyer and the Sellers presents a strong case for equity to step in and recognize an obligation owing to the Estates via a claim of unjust enrichment.

## 5.  Alter Ego Liability

Authority exists for imposing "alter ego" liability on a controlling party in certain circumstances, even where the evidence establishes only "indirect" control over a corporate entity. Whether grounds exist to "pierce the corporate veil" of any of the Debtors to hold liable the Sellers or the Buyer, as well as their respective owners warrants further investigation. The cases discussed below are instructive, however, in that they recognize that an indirect controlling entity may be held directly liable for causing a target involved in a leveraged buyout to make transfers to the entity, giving rise to direct claims by the target against the controlling entity.

For example, in *Buckhead America Corp.*,[1588] the court denied the defendants' motion to dismiss claims for alter ego liability asserted on behalf of the debtors' estates, where defendants were alleged to have controlled a corporation, a subsidiary entity, and that entity's wholly-owned subsidiary.  The court summarized the plaintiff's claims as follows:

> Where a subsidiary corporation (here DIA) is dominated and controlled by its parent company's parent (here Reliance Capital) or, as alleged here, by the parties that own and control the parent company's parent (*i.e.*, the parties owning and controlling Reliance Capital), and where that domination and control is used to cause the subsidiary to make transfers for the benefit of the controlling parties (to the detriment of the subsidiary) and to further the interests of the controlling parties (rather than the interests of the subsidiary), then the controlling parties are properly treated as the subsidiary's alter ego and may be held liable for the subsidiary's debts and obligations – *particularly debts associated with the transfers made for the controlling parties' benefit*.[1589]

The court explained that, "there may be sound policy reasons for rejecting defendants' position" that corporate formalities should nonetheless be observed in the face of these allegations, explaining as follows:

> It is conceded that if defendants directly owned and controlled DIA, then plaintiff's veil-piercing allegations would . . . support piercing the corporate veil between DIA and [defendants – the parties controlling the parent company of DIA's parent]. *Defendants contend, however, that such alter ego claims can be defeated and defendants can insulate themselves from liability by using corporate intermediaries and other complex business structures, thereby indirectly doing that which lawfully cannot be accomplished directly.  Not surprisingly, defendants offer no specific authority supporting their implicit suggestion that the law is susceptible to such manipulation.*[1590]

Similarly, in *Crowthers McCall Pattern*,[1591] a case relied upon by the court in *Buckhead*, the court denied a motion to dismiss an alter ego claim against an individual that indirectly controlled the debtor.  The plaintiff debtor in that case alleged "a series of transactions

---

[1588] *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 974-75 (D. Del. 1994).

[1589] *Id.* (emphasis added).

[1590] *Id.* at 975 (emphasis added).

[1591] *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1000-01 (S.D.N.Y. 1991).

involving Lewis and entities controlled by him which could support a finding that Lewis used TLC Pattern and Crowthers Pattern to enrich himself to the detriment of the corporations and their creditors."[1592]  The court explained:

> at the heart of the complaint is the claim that Lewis caused Crowthers Pattern to incur, without consideration, $35 million in debt in connection with the . . . LBO.  Although Crowthers Pattern received nothing in that transaction, Lewis received $52 million directly and an additional $3 million through TLC Holdings.  These allegations paint a portrait of a corporation that was *dominated* by Lewis and during the relevant time period *transacted business in a way that favored Lewis' interests rather than its own*.[1593]

### a. Conclusion

The control over ESI and Homestead, as well as the other Debtors, exercised by the Sellers and their shareholder before the Acquisition, and by the Buyer and its shareholders post-Acquisition, appears pervasive.  With one group or the other firmly in control of the Extended Stay empire, the Debtors became obligated on $1.7 billion dollars of additional debt.  Although this burden provided no benefit to the Debtors, the Sellers received a substantial sum of money, while the Buyer and the entities it controlled were relieved of paying the Purchase Price to the Sellers and obtained ownership and control of the Debtors.  Based upon the authority outlined above, the facts of this case may provide a basis for holding the Sellers and their shareholder and/or the Buyer and its shareholders directly liable for the Debtors' obligations.

### 6. Subrogation

Under the doctrine of subrogation, Homestead and ESI are entitled to a direct claim against the Buyer because, by the corporate acts that implemented the Acquisition, the Buyer and the Sellers caused Homestead and ESI to pay the Purchase Price to the Sellers, as well as the amounts paid to the Professionals, on behalf of the Buyer, the primary obligor under the Acquisition Agreement.

---

[1592]  *Id.* at 1002.
[1593]  *Id.* (emphasis added).

A party that pays the debt of another to a third party is entitled to all of the remedies of such third party creditor against the original obligor under the equitable doctrine of subrogation.[1594] As the highest court of New York has explained, this right broadly applies to any debt paid on another's behalf, provided that the payor is not a volunteer:

> Subrogation, an equitable doctrine taken from the civil war, is broad enough to include every instance in which one party pays a debt for which another is primarily answerable and which in equity and good conscience should have been discharged by the latter, so long as the payment was made either under compulsion or for the protection of some interest of the party making the payment, and in discharge of an existing liability.[1595]

Thus, where a payor is compelled to pay the obligation of another, or makes the payment to protect its own interests, the payor is not a volunteer and is subrogated to the rights of the payee.[1596] The concept of compulsion requires that the payor have had a "legal duty" to make the payment.[1597]

The Examiner believes that the payors, Homestead and ESI, were acting under "compulsion" when they paid the Purchase Price and the Professional fees that were owed by the Buyer under the Acquisition Agreement. Specifically, the Sellers and Buyer entered into

---

[1594] *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 137 (1962) ("there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed"); *In re Yale Express System, Inc.*, 362 F.2d 111, 114 (2d Cir. 1966) (holding that a guarantor retains a right of reimbursement against the principal which can be enforced to reduce the guarantor's exposure on account of the guaranty).

[1595] *Gerseta Corp. v. Equitable Trust Co.*, 241 N.Y. 418, 425-426 (1926) (emphasis added); *see also Broadway Houston Mack Dev. LLC v. Kohl*, 22 Misc. 3d 1001, 1008 (N.Y. Sup. Ct. 2008) ("The doctrine of subrogation encompasses situations where one party pays the debt of another 'under compulsion or for the protection of some interest.'" (citation omitted)).

[1596] *Horace Mann Ins. Co. v. Nationwide Mut. Inr. Co.*, 337 Fed Appx. 13, 14 (2d Cir. 2009) (under Connecticut law, "every instance in which [it], not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter") (citation omitted); *In re Bruce*, 158 F. 123, 129 (D.N.Y. 1907) ("Whenever one not a mere volunteer discharges the debt of another, he is entitled to all the remedies which the creditor possessed against the debtor") (citation omitted).

[1597] *See MacMillan, Inc. v. Fed. Ins. Co.*, 741 F. Supp. 1079, 1084-85 (S.D.N.Y. 1990) (complaint failed to include an allegation that the corporation was under any "legal compulsion," such as indemnification, to make payments on behalf of former directors and officers."); *Broadway*, 22 Misc. 3d at 1008-11 (court dismisses complaint on summary judgment because plaintiff failed to establish facts demonstrating it was legally compelled to pay subcontractors under a mortgage, cash collateral agreement or lease); *Restatement (Third) of Property, Mortgages* § 7.6 (1997) (the doctrine of subrogation requires that the payor make the payment to (i) protect his interest, (ii) satisfy a legal duty, (iii) out of fraud, duress or mistake, or (iv) satisfy a request by the obligor in exchange for a security interest).

contracts that required a series of corporate actions that compelled Homestead and ESI to pay the Purchase Price and fees owed by the Buyer to the Sellers and the Professionals. This control is evidenced, in part, by the fact that Mr. Lichtenstein executed the Loan Agreements on behalf of the various Debtors that provided funds needed to accomplish the Acquisition, and both the Buyer and the Sellers executed escrow instructions providing for the payment to the Sellers and the Professionals.

At least two courts have acknowledged that when a subsidiary guarantees the repayment of a loan to a parent corporation, the subsidiary is entitled to subrogate to the creditor's claim against such parent corporation.[1598] The Examiner submits that such a situation is analogous to the relationship between Homestead/ESI and the Buyer in the instant cases. Although Homestead and ESI did not guaranty the debts of the Buyer, they were *directed* to pay the debts of the Buyer, just like a guarantor is *directed* to pay the debt of an obligor in the event that such obligor cannot pay its debt.

Accordingly, the Examiner believes that the equitable doctrine of subrogation should apply to Homestead's and ESI's payment of the Purchase Price and fees owed by the Buyer to the Sellers and the Professionals. In equity and good conscience, those debts should have been discharged by the Buyer, not by Homestead and ESI. As such, the Examiner believes that Homestead and ESI, as holders of the Sellers' and Professionals' claims, should be entitled to direct remedies against the Buyer.

---

[1598] *See, e.g., Telefest, Inc. v. Vu-TV, Inc.*, 591 F. Supp. 1368, 1380 (D.N.J. 1984) (stating "[s]ubsidiary will receive a right to subrogation to the lender's claim against [p]arent" when the 'subsidiary guarantees the repayment of a loan to a parent corporation'") (quoting William H. Coquillette, *Guaranty of and Security for the Debt of a Parent Corporation by a Subsidiary Corporation*, 30 Case Western L. Rev. 433, 434 n.4 (1980)); *Goveart v. Capital Bank (In re Miami Gen. Hosp.)*, 124 B.R. 383, 394 (Bankr. S.D. Fla. 1991).

## VI.    SUMMARY OF FINDINGS AND CONCLUSIONS

The following is a summary of the findings made and conclusions reached by the Examiner with respect to the major issues addressed in this Report:

### Events Leading Up To The Bankruptcy

The Examiner found that with respect to the Acquisition, the Buyer, and perhaps other parties as well, failed to perform sufficient due diligence.  In addition, the structure of the financing that ultimately was used in the Acquisition was a poor fit for an operating business like Extended Stay.  The financing was problematic not only because of the sheer amount of leverage involved, but also because the mechanics of the Loan Agreements, most notably the Cash Management Agreements and the design of the Waterfall, were flawed and left the Debtors with very little margin for error.

Soon after the Acquisition, Extended Stay began experiencing a decline in demand as the economy moved toward a recession.  Extended Stay missed virtually all of its budgeted performance targets for post-Closing 2007.  At the same time, the rigid nature of the Cash Management Agreements and the budget process limited Extended Stay's flexibility to address the problems created by its declining cash flow and constrained liquidity.

During 2008, Extended Stay's performance continued to decline, as a series of unprecedented events, including the collapse of Bear and the Lehman Brothers bankruptcy, took place.  As Extended Stay's liquidity situation became even more acute, the Company retained legal and financial advisors to assist with a potential restructuring.  The restructuring efforts proceeded very slowly, at least initially, because the structure of the financing (a) made it difficult for Extended Stay and its advisors to identify and engage with the holders of the debt, (b) gave the holders themselves little incentive to negotiate before there was an actual default and payments were missed, and (c) created doubt as to whether the lenders that were willing to negotiate were the proper parties to do so.

In 2009, industry observers noted that the current reality for the hotel business was worse than most participants' worst-case scenarios.  Extended Stay was no exception, and its

performance continued to decline.  Meanwhile, Extended Stay presented restructuring proposals to certain of the holders of the Mortgage Debt and the Mezzanine Debt.

With respect to the Mezzanine Debt, little progress was made at first.  Among other problems, there were too many holders, with too many different agendas, resulting in a lack of cohesion among the various holders.  The Mezzanine Debt holders also believed, with some justification, that Extended Stay was not providing them with the level of transparency they believed was necessary to engage in meaningful negotiations.

In May of 2009, the Mezzanine Debt holders and Extended Stay came to terms on what became known as the CIL Transaction, which was to be implemented out of court, through the default and remedy provisions of the Loan Agreements.  Extended Stay was also working on a back-up plan at this time, in the form of an alternative deal with the holders of the Mortgage Debt.  Meanwhile, Extended Stay was approaching a critical period in June of 2009, when it would likely fail the Debt Yield Amortization Threshold, and run out of cash.

Ultimately, the implementation of the CIL transaction was prevented by litigation brought by holders of Mezzanine Debt that would have been wiped out by the CIL Transaction. Efforts made to settle with those holders of Mezzanine Debt, and to thereby revive the CIL Transaction, continued over the weekend of June 12-13, 2009, but ultimately failed. Accordingly,  Extended Stay had little choice but to file for chapter 11 on the Petition Date, before its cash resources were completely exhausted.  The Chapter 11 Cases were filed together with the Restructuring Term Sheet which, among other things, was intended to serve as the basis for a consensual plan of reorganization, and which arose from the back-up negotiations with the Mortgage Debt.

Based on the information obtained by the Examiner during the course of this Investigation, and subject to important qualifications set forth elsewhere in this Report, the Examiner does not believe that the Extended Stay Estates have viable claims against any party in connection with the events that took place between the Closing and the Petition Date with

respect to the restructuring negotiations and the filing of the Chapter 11 Cases. *See* Sections III.H-J of this Report.

## Solvency

The Examiner and his financial advisors performed various financial analyses to determine whether Extended Stay was solvent upon the Closing, and whether Extended Stay was solvent at the time of certain distributions/dividends made after the Closing. Based upon the analysis performed by his financial advisors, the Examiner determined that, as a result of the Acquisition, the Debtors were left with unreasonably small capital with which to operate their business. Similarly, the Examiner determined that, as a result of the Acquisition, the Debtors lacked the ability to pay their debts as they came due. Accordingly, the Examiner determined that Debtors failed to satisfy both the "cash flow" and "capital adequacy" tests for solvency.

In fact, the structure of the Cash Management Agreement, and the composition of the budgets thereunder, created a system that was fundamentally flawed, and incapable of properly managing the cash flows of an operating business enterprise such as Extended Stay. In addition, the significant increase in the amount of post-Acquisition debt, and the relatively insignificant amount of equity that was invested in connection with the Acquisition, placed an undue burden on the Debtors' operations, and did not allow for a reasonable amount of fluctuation in the Debtors' financial results. As a result, the Debtors' projections showed that, even at the time of the Closing, the Debtors would not have been able to satisfy the Debt Yield requirements needed in order to avoid onerous restrictions on their operating cash. *See* Section IV of this Report.

## Substantive Consolidation

The Examiner determined that the Debtors' Estates should be substantively consolidated. Among other things, the Examiner's review of the operations of the Debtors and certain of their non-Debtor affiliates revealed that many, if not all, of the factors considered by the courts of this Circuit to be persuasive evidence of a "lack of separate identity" are present here. These factors include the facts that: (1) the overwhelming majority of the Debtors'

creditors dealt with the Extended Stay entities as a single economic unit, and did not rely on their separate identities in extending credit; (2) there is no evidence that the Mortgage Lenders or the Mezzanine Lenders ever considered the creditworthiness of any individual Debtor when they extended credit under the Loan Agreements; and (3) the Debtors made little or no effort to maintain their separateness, with respect to both the other Debtors and certain non-Debtor affiliates, such as HVM.  *See* Section III.F. and V.B. of this Report.

### Fraudulent Transfer Claims

The Examiner concluded that the Estates can plead fraudulent transfer causes of action under New York law and the FDCPA.  The Debtors received virtually no consideration or value in connection with the Acquisition.  And, as discussed in Section IV of this Report, immediately after the Closing, the Debtors were insufficiently capitalized, and unable to pay their debts as they came due.  *See* Section IV of this Report.

Any fraudulent transfer claims asserted by or on behalf of the Estates in connection with the Acquisition will, however, face significant hurdles if Bankruptcy Code section 546(e) is found to be applicable to the leveraged buyout of privately held securities.  It should be noted, however, that these issues have not been ruled upon by the Second Circuit. Accordingly, and given the fact that the Extended Stay cases involve a relatively small number of creditors that hold very large claims, the option of having the Estates abandon their fraudulent transfer claims, so that such claims could be brought by individual creditors, may be considered. *See* Section V.C.4. of this Report.

### Improper Redemptions / Dividends / Distributions

The Examiner determined that certain dividends and distributions made by ESI and Homestead in connection with the Acquisition may be the proper subject of illegal distribution claims.  Claims may also exist in connection with the distributions authorized by ESI and Homestead after the Acquisition.  However, because the viability of such claims depends in large part on valuation issues that were beyond the scope of the Investigation, the question of

whether claims for illegal dividends and distributions could be successfully pled on behalf of the Estates requires further investigation.  *See* Section V.D.1. of this Report.

### **Breach of Duty Claims**

The Examiner concluded that by authorizing the Acquisition, certain of the Debtors' fiduciaries may have breached their various duties.  Similarly, the post-Acquisition distributions did not benefit the Debtors or their beneficiaries, and thus by authorizing such distributions, the fiduciaries of both ESI and Homestead, including the Buyer, may be liable for breaching their duties of loyalty.  Although the Debtors' organizational documents contain exculpation clauses that purport to disclaim various significant duties, by statute such clauses are ineffective to disclaim duties of good faith.  In addition, it may also be possible to hold the Buyer and its controlling shareholders, as well as other third parties involved in the Acquisition, liable for aiding and abetting any breaches of duty by the Debtors' fiduciaries.  However, claims against those entities may be subject to the limitations imposed by the *Wagoner* Rule and *in pari delicto* defenses.  *See* Sections V.D.2&3. of this Report.

### **Unjust Enrichment**

The Examiner concluded that the Estates may have unjust enrichment claims arising out of the Acquisition with respect to several potential defendants, including the Sellers, the Buyer, and the Professionals.  These parties were all enriched by the Acquisition, since they each received benefits through payments received, directly or indirectly, from money that was ultimately obtained through borrowing against the Debtors' assets.  These benefits came at the expense of the Debtors, who experienced a significant depletion of their assets as a result of the Acquisition.  However, some or all of these potential defendants may have viable defenses available to them under applicable law. *See* Section V.D.4. of this Report.

### **Alter Ego**

The control over ESI and Homestead, as well as the other Debtors, exercised by the Sellers and their owners <u>before</u> the Acquisition, and by the Buyer and its owners <u>after</u> the Acquisition, appears pervasive.  With one group or the other firmly in control of the Extended

Stay empire at all relevant times, the Debtors incurred $1.7 billion dollars of additional debt in connection with the Acquisition, which debt provided no benefit to the Debtors, but which did benefit both the Buyer and the Sellers.  Accordingly, the Examiner concluded that there may be a basis for holding the Sellers and their owners, and/or the Buyer and its owners, directly liable for certain of the Debtors' obligations.

### Subrogation

Under the doctrine of subrogation, ESI and Homestead are entitled direct claims against the Buyer.  This is so because, by virtue of the corporate acts that implemented the Acquisition, the Buyer caused ESI and Homestead to pay the Purchase Price to the Sellers, as well as other amounts that were paid to the Professionals, all on behalf of the Buyer.  However, only the Buyer had the obligation under the Acquisition Agreement to make such payments; ESI and Homestead had no such liability to the Sellers or to the Professionals.

Under the subrogation doctrine, a party that pays the debt of another to a third party is entitled to all of the remedies of such third party creditor against the original obligor, so long as the payor is not a "volunteer."  If a payor is compelled to pay the obligation of another, then the payor is not considered a volunteer.  Homestead and ESI cannot be volunteers for purposes of subrogation, because they were acting under "compulsion" when the Buyer caused them to satisfy the Buyer's obligations under the Acquisition Agreement to pay the Purchase Price and the Professional fees.  *See* Section V.D.6 of this Report.

*  *  *

Respectfully submitted,


*Ralph R. Mabey*
Examiner


By Examiner's Counsel:

Robert A. Greenfield
George C. Webster II
Eric D. Goldberg
H. Alexander Fisch
Margreta M. Morgulas

**Stutman, Treister & Glatt**
**Professional Corporation**
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Tel. (310) 228-5600

537960v2

# Appendix 1 – DEFINED TERMS

| DEFINED TERM | REFERENCE |
|---|---|
| 9.15% Notes | Senior subordinated notes issued in March 1998 by Extended Stay America, Inc. and due March 15, 2009, which were governed by that certain Indenture dated as of March 10, 1998, by and between Extended Stay America, Inc., as Issuer, and Manufacturers and Traders Trust Company, as Trustee, as may have been amended |
| 9.875% Notes | $300 million in principal amount of senior subordinated notes, which bear interest at the rate of 9-7/8% per annum, and were issued in June 2001 by Extended Stay America, Inc. and due June 15, 2011, which are governed by that certain Indenture dated as of June 27, 2001, by and between Extended Stay America, Inc., as Issuer, and Manufacturers and Traders Trust Company, as Trustee, as may have been amended, approximately $8.5 million of which were outstanding as of the Petition Date |
| 25% Note | DL-DW Note for $22 million accruing interest at 25% |
| A&M | Alvarez & Marsal, Financial Advisor to the Examiner |
| Acquisition | The acquisition of Extended Stay and BHAC in June 2007 by an investment consortium consisting of, among others, David Lichtenstein and Arbor Realty Trust, through DL-DW Holdings LLC, of Extended Stay, from Blackstone and certain of its affiliates |
| Acquisition Agreement | "Agreement of Purchase and Sale" dated as of April 17, 2007, among BHAC IV, LLC and BRE/HV Holdings L.L.C., as Sellers, and DL-DW Holdings LLC, as Buyer, as subsequently amended pursuant to that "First Amendment of Agreement of Purchase and Sale" dated as of May 31, 2007 and any other amendments " |
| ADR | Average Daily Rate, which equals room revenues divided by occupied room nights |
| Appointment Order | Order Signed on 9/24/2009 Directing the Appointment of an Examiner |
| Approved Annual Budget | As defined further in the Mortgage Loan Agreement, the Annual Budget approved by the Mortgage Lenders and the most junior of the Mezzanine Lenders |
| Approved Operating Expenses | Operating expenses as approved in the Approved Annual Budget |
| Arbor | Arbor Realty Trust |
| BHAC | BHAC Capital IV, L.L.C. |
| BRE/ESH | BRE/ESH Holdings LLC |
| Bankruptcy Code | 11 U.S.C. §§ 101-1532 |
| Bankruptcy Court | United States Bankruptcy Court for the Southern District of New York |
| Bear | Bear Stearns Commercial Mortgage, Inc. and its successors and assigns |
| Blackstone | The Blackstone Group, Inc. |
| BofA | Bank of America, N.A. |
| Boards | Board of Directors of DL-DW, Homestead, BHAC |
| Borrowers | The Mortgage Borrowers and the Mezzanine Borrowers |
| BS&C | Bear Stearns & Co., Inc. |
| Buyer | DL-DW |
| Cash Management Account | As defined in the Mortgage Loan Agreement, the account or accounts specified in the Mortgage Cash Management Agreement for the deposit of all proceeds from the Mortgage Properties |
| Cash Management Agreements | The Mortgage Cash Management Agreement and Mezzanine Cash Management Agreements dated June 11, 2007 |
| Cash Trap Event | As defined in the Mortgage Loan Agreement, the occurrence of any one of the following events: (a) an Event of Default under the Mortgage Loan Agreement or any Mezzanine Loan Agreement; (b) a Debt Yield Event; or (c) HMV's filing for bankruptcy |

| DEFINED TERM | REFERENCE |
| --- | --- |
| Cash Trap Event Period | As defined in the Mortgage Loan Agreement, the period commencing on the occurrence of a Cash Trap Event and continuing until the occurrence of the applicable Cash Trap Event Cure |
| Certificate Holders | Holders of the certificates representing a beneficial interest in the Trust |
| Chapter 11 Cases | Those cases under the Bankruptcy Code pending before the Bankruptcy Court identified by case numbers 09-13764 through and including 09-13833, and case numbers 10-10805 through and including 10-10809 |
| CIL Transaction | Agreement, reached on May 19, 2009, between Extended Stay and certain holders of the Mezzanine Debt regarding a consensual foreclosure of certain of Extended Stay's Mezzanine Debt |
| Citi GM | Citigroup Global Markets Inc. |
| Closing | The closing of the Acquisition |
| Committee | The Official Committee of Unsecured Creditors in the Chapter 11 Cases |
| Company | The operations of the consolidated company including DL-DW, Homestead, BHAC, HVM and all of their subsidiaries and pre-Acquisition counterparts or successors |
| Corporate Chart | The chart reflecting the corporate structure of the Company, as reflected in Exhibit V-A-1 to the Report |
| CMBS | Commercial mortgage backed securities issued in connection with the securitization of the mortgage debt |
| DL-DW | DL-DW Holdings, LLC |
| Debt | The Mortgage Debt and the Mezzanine Debt |
| Debt Service Coverage Ratio | Ratio EBITDA over interest expense |
| Debtor | Any Extended Stay entity that is the subject of a Chapter 11 Case |
| Debt Yield | Calculation of Net Operating Income less Replacement Reserves less Management, marketing, and franchising fees |
| Debt Yield Event | Occurs when the Debt Yield calculation is less than required amounts, thereby causing a Cash Trap Event |
| Debtors | The collective entities that are the subject of the Chapter 11 Cases, and each, a "Debtor" |
| DeLapp | Gary DeLapp, HVM's CEO, also, "Mr. DeLapp" |
| Earnest Money | Deposit made by Lightstone pursuant to the Acquisition Agreement in the amount of $85,000,000 plus any accrued interest thereon |
| EBIDTA | Earnings before interest, depreciation, taxes and amortization |
| Ebury | Ebury Finance Limited |
| ESI | Extended Stay, Inc. |
| Estates | The estates of the Debtors, and each, an "Estate" |
| Estimated Adjustment Amount | The adjustment amounts to the acquisition price shown on Schedule 1.6(b) attached to the Acquisition Agreement |
| Event of Default | An event of default as defined in the Mortgage Loan Agreement and/or the Mezzanine Loan Agreements |
| EVP | Executive Vice President |
| Examiner | Ralph R. Mabey |
| Examiner Motion | Amended Motion to Appoint Examiner Pursuant to Section 1104(c) of the Bankruptcy Code |
| Examiner's Professionals | ST&G and A&M |
| Examiner Work Plan | Examiner's work plan approved pursuant to the Work Plan and Approval Order |
| Extended Stay | Homestead, and each of its present subsidiary entities, excluding BHAC |
| Extended Stay Hotels | The properties held, owned and operated by ESI and Homestead, and their respective affiliates |
| Fed or Federal Reserve | Federal Reserve Bank of New York |

537960v2

| DEFINED TERM | REFERENCE |
|---|---|
| FF&E | Furniture, Fixtures and Equipment |
| FDCPA | Federal Debt Collection Procedure Act, 28 U.S.C. §§ 3301-3308 (2010) |
| FIN 46(R) | FASB Interpretation No. 46(R) "Consolidation of Variable Interest Entities" |
| Floor Bonds Agreement | Agreement between LCM, ABT-ESI LLC, Mericash Funding LLC, Princeton ESH LLC, DL-DW, and BHAC dated March 12, 2009 which assigned the Libor Floor Certificates to the 25% Note holders |
| Floor Bonds Reserve Account | Reserve account for excess cash income from Libor Floor Certificates benefiting BHAC Series A-1 Units |
| Fortress | Fortress Investment Group LLC |
| G&A Agreements | G&A Reimbursement Agreements between HVM and both Homestead Village Management and ESI. Such agreements govern all Extended Stay Debtor properties. |
| GAAP | As defined in the Mortgage Loan Agreement, generally accepted accounting principles in the United States of America as of the date of the applicable financial report |
| Gross Operating Revenue | As defined in Section 1.7 of the Management Agreements |
| Homestead | Homestead Village L.L.C. |
| Houston Properties | Two properties that were acquired after the Acquisition and managed by HVM. The two Houston Properties are owned by non-debtor entities outside of the corporate structure of DL-DW. The first property is located at 15385 Katy Freeway (property number 5050) and is owned by ESD 5050 Houston Katy. The second property is located at 13420 Southwest Freeway (property number 5051) and is owned by ESD #5051 Houston – Sugar Land LLC |
| HVM | HVM, L.L.C. |
| HVM Canada | HVM Canada Hotel Management ULC |
| HVM Manager | HVM Manager L.L.C. |
| HVS Appraisal | Self Contained Appraisal Report, Portfolio of 682 Extended-Stay Lodging Facilities & Other Real Estate in Various Locations dated May 30, 2007 |
| IASG | Integrated Analysis Solutions Group (HVM's Finance group headed by David Kim) |
| Indenture | Indenture dated as of June 27, 2001 (as supplemented, modified or amended thereafter, the Indenture), between Manufacturers and Traders Trust Company, as trustee, and Extended Stay America, Inc. |
| Individuals | The directors, officers, managers, managing members and/or certain employees of an Extended Stay entity |
| Intercreditor Agreement | Intercreditor Agreement, dated as of June 11, 2007, between the Mortgage Lenders and all of the Mezzanine Lenders |
| Investigation | As formally defined in the Work Plan and Approval Order, the mandated investigation to be performed by the Examiner and his advisors |
| IRS | Internal Revenue Service |
| Jefferies | *Jefferies* & Company, Inc., Bankruptcy-Court appointed financial advisor to the Creditors' Committee |
| Kim | David Kim, HVM's EVP of Finance |
| Lazard | Lazard Freres & Co. LLC, Bankruptcy-Court appointed financial advisors to the Debtors |
| LBO | Leveraged buyout |
| LCM | Lightstone Commercial Management |
| Lenders | The Mortgage Lenders and the Mezzanine Lenders |
| LIBOR | The London Interbanki Offered Rate index as further defined in the Mortgage Loan Agreement |
| LIBOR Floor Certificates | The LIBOR floor certificate derivative instruments formerly owned by DL- |

| DEFINED TERM | REFERENCE |
|---|---|
| | DW and transferred to certain third-parties in 2009 |
| Lichtenstein | David Lichtenstein |
| Lichtenstein Deposition | Deposition of David W. Lichtenstein dated January 20, 2010 |
| Lightstone | Lightstone Holdings LLC |
| LLC | Limited liability company |
| Loan Agreements | Collectively, the Mortgage Loan Agreement and the Mezzanine Loan Agreements |
| LTC | Loan-to-Cost ratio |
| LTV | Loan-to-Value ratio |
| Management Agreements | Management agreements between HVM and the various owners, operating lessees, and lessees (HVI(2)) of Extended Stay Hotels |
| Management Fee | Fee per the Management Agreements |
| Merrill Lynch | Merrill Lynch & Co., Inc. |
| Merrill Lynch Mortgage | Merrill Lynch Mortgage Lending, Inc. |
| Mezzanine B Lenders | The Mezzanine Lenders under the Mezzanine B Loan |
| Mezzanine B Loan | Tranche B of the Mezzanine Debt |
| Mezzanine Borrowers | ESH/Homestead Mezz L.L.C., ESA P Mezz L.L.C. and ESA Mezz L.L.C. (the "Mezzanine A Borrower"), ESH/Homestead Mezz 2 L.L.C., ESA P Mezz 2 L.L.C. and ESA Mezz 2 L.L.C. (the "Mezzanine B Borrower"), ESH/Homestead Mezz 3 L.L.C., ESA P Mezz 3 L.L.C. and ESA Mezz 3 L.L.C. (the "Mezzanine C Borrower"), ESH/Homestead Mezz 4 L.L.C., ESA P Mezz 4 L.L.C. and ESA Mezz 4 L.L.C. (the "Mezzanine D Borrower"), ESH/Homestead Mezz 5 L.L.C., ESA P Mezz 5 L.L.C. and ESA Mezz 5 L.L.C. (the "Mezzanine E Borrower"), ESH/Homestead Mezz 6 L.L.C., ESA P Mezz 6 L.L.C. and ESA Mezz 6 L.L.C. (the "Mezzanine F Borrower"), ESH/Homestead Mezz 7 L.L.C., ESA P Mezz 7 L.L.C. and ESA Mezz 7 L.L.C. (the "Mezzanine G Borrower"), ESH/Homestead Mezz 8 L.L.C., ESA P Mezz 8 L.L.C. and ESA Mezz 8 L.L.C. (the "Mezzanine H Borrower"), ESH/Homestead Mezz 9 L.L.C., ESA P Mezz 9 L.L.C. and ESA Mezz 9 L.L.C. (the "Mezzanine I Borrower"), ESH/Homestead Mezz 10 L.L.C., ESA P Mezz 10 L.L.C. and ESA Mezz 10 L.L.C. (the "Mezzanine J Borrower") |
| Mezzanine Cash Management Agreements | The Cash Management Agreements entered into in conjunction with the Mezzanine Loan Agreements |
| Mezzanine Debt | An aggregate principal amount of $3.3 billion in 10 mezzanine loan tranches |
| Mezzanine Debtors | The Mezzanine Borrowers plus Homestead, ESI, Extended Stay Hotels, L.L.C., ESA Business Trust, ESA Management L.L.C., and ESA P Portfolio Holdings, L.L.C. |
| Mezzanine Lenders | Wachovia, Bear, and BofA, and their respective successors and assigns |
| Mezzanine Loan Agreements | Series of Loan Agreements with the Mezzanine Lenders dated June 11, 2007, pursuant to which the Mezzanine Lenders extended ten tranches of financing to the Mezzanine Borrowers in the aggregate principal amount of approximately $3.3 billion |
| Mezzanine Loans | The loans made pursuant to the Mezzanine Loan Agreements, in the aggregate principal amount of $3.3 billion |
| MOR | Corporate Monthly Operating Report as filed with the Bankruptcy Court |

| DEFINED TERM | REFERENCE |
|---|---|
| Mortgage Borrowers | ESA 2005 Portfolio L.L.C., ESA 2005- San Jose L.L.C., ESA 2005-Waltham L.L.C., ESA Acquisition Properties L.L.C., ESA Alaska L.L.C., ESA Canada Properties Borrower L.L.C., ESA FL Properties L.L.C., ESA MD Borrower L.L.C., ESA MN Properties L.L.C., ESA P Portfolio L.L.C., ESA P Portfolio MD Borrower L.L.C., ESA P Portfolio PA Properties L.L.C., ESA P Portfolio TXNC Properties L.P., ESA PA Properties L.L.C., ESA Properties L.L.C., ESA TX Properties L.P., ESH/Homestead Portfolio L.L.C., ESH/HV Properties L.L.C., ESH/MSTX Property L.P., ESH/TN Properties L.L.C., ESH/TX Properties L.P. |
| Mortgage Cash Management Agreement | The Cash Management Agreement entered into in conjunction with the Mortgage Loan Agreement |
| Mortgage Debt | Mortgage loan in the principal amount of $4.1 billion |
| Mortgage Debtors | All of the Extended Stay Debtors with the exception of the Mezzanine Debtors |
| Mortgage Loan | The loan made pursuant to the Mortgage Loan Agreement, in the principal amount of $4.1 billion |
| Mortgaged Properties | 666 properties collateralizing the Mortgage Debt, comprised of 664 hotels, Company's headquarters in Spartanburg, SC, and a parcel of undeveloped land located in Minnesota, and other collateral, as set forth in the Mortgage Loan Agreement and related documents |
| Mortgage Lenders | Wachovia, Bear, and BofA, and their respective successors and assigns |
| Mortgage Loan Agreement | Loan Agreement, dated as of June 11, 2007 (as amended, restated, replaced, supplemented or otherwise modified from time to time), by and among the Mortgage Borrowers, ESA P Portfolio MD Trust and ESA MD Properties Business Trust, ESA Canada Trustee, Inc., ESA Canada Properties Trust, ESA P Portfolio Operating Lessee Inc., ESA 2005 Operating Lessee Inc., ESA Canada Operating Lessee Inc., and ESA Operating Lessee Inc., and the Mortgage Lenders |
| Non-Mezzanine Unsecured Debt | Trade vendors, utility providers, taxing authorities, and tort claimants who hold claims at the property owner, Mortgage Borrower, and/or operating lease levels, but not at the Mezzanine Borrower levels |
| Non-Recourse Carve-Out Guarantee | ESI, Homestead, Lightstone, and Lichtenstein are the guarantors of the non-recourse carve-out provisions of the Mortgage Debt |
| OCC | Occupancy percentage, which equals the aggregate nights stayed by all customers divided by available room nights |
| Offering Memorandum | Confidential Information Memorandum dated January 27, 2007 produced by Bear Stearns, Bank of America, The Blackstone Group and Merrill Lynch in connection with the Acquisition. |
| Petition Date | June 15, 2009 |
| Post-Acquisition Distributions | All corporate dividends/distributions paid by Homestead and ESI after, and not in connection with, the Acquisition |
| Preferred Equity Holders | Those entities or persons holding post-Acquisition equity in the Company that is preferred equity |
| Professionals | Recipients of fees that were paid in excess of amounts paid to retire pre-Acquisition debt and funds transferred to Sellers in connection with the Acquisition, including professional firms and advisors |
| Professional Fees | Fees paid to the Professionals in connection with the Acquisition. |
| Purchase Price | The price of $8,000,000,000 agreed to between the Buyer and Sellers in connection with the Acquisition |
| REIT | Real Estate Investment Trust |
| Report | Report of Ralph R. Mabey, As Examiner, filed March 12, 2010 |

| DEFINED TERM | REFERENCE |
|---|---|
| Restructuring Term Sheet | Non-binding term sheet attached as Exhibit "C" to the Teichman First Day Declaration |
| RevPAR | Revenue per available room, which demonstrates the revenue efficiency of a hotel and equals the product of OCC and ADR |
| Rogers | F. Joseph Rogers, HVM's EVP of Accounting and Finance |
| Rogers Deposition | Deposition of Fulton Joseph Rogers dated February 8, 2010 |
| Section | A section of the Report |
| Sellers | In connection with the Acquisition transaction, BHAC IV, L.L.C. and BRE.HV Holdings L.L.C., both Delaware limited liability companies, both affiliates of The Blackstone Group |
| Servicer | Wachovia Securities |
| Servicer Reports | Monthly reporting packages sent to Mortgage Lenders and Mezzanine Lenders pursuant to Section 5.1.11(c) of the Loan Agreements |
| Services Agreements | Services Agreements between HVM and both Homestead Village Management and ESI. Such agreements govern all Extended Stay Debtors' properties |
| Special Servicer | TriMont Real Estate Advisors, Inc. |
| Stapled Financing | The financing package described and attached to the Offering Memorandum, which was contemplated to be $6.8 billion |
| ST&G | Stutman, Trieste & Glatt, Professional Corporation, Counsel to the Examiner |
| Subordinated Notes | The 9.15% Notes and the 9.875% Notes |
| Teichman | Joseph Teichman, General Counsel of The Lightstone Group and a member of the Boards of Directors of certain of the Companies |
| Teichman First Day Declaration | Declaration of Joseph Teichman Pursuant to Rule 1007-2 of The Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications |
| TRS | Taxable REIT Subsidiaries |
| Trust | Vehicle holding the Mortgage Loan – governed by the Trust and Servicing Agreement |
| Trust and Servicing Agreement | Agreement between Wachovia Large Loan, Inc., as depositor, Wachovia Bank, National Association, as servicer and special servicer, and Wells Fargo Bank, N.A., as trustee, dated as of August 1, 2007 |
| UST | Office of the United States Trustee |
| Wachovia | Wachovia Bank, N.A. |
| Waterfall | The priority of cash allocations as required by the Cash Management Agreements |
| Weil | Weil Gotshal & Manges LLP, Bankruptcy-Court appointed reorganization counsel to the Debtors |
| Work Plan and Approval Order | Order Signed on 12/11/2009 Granting the Examiner's Motion for an Order Approving Preliminary Work Plan (as Amended) |
| Working Capital Reserve Account | Pursuant to Section 5.1.25 of the Mortgage Loan Agreement, an account established on the Closing Date in which Borrower was to deposit at least $50,000,000 |

Capitalized terms not otherwise defined above shall have the meaning ascribed to them in the Loan Agreements or the Bankruptcy Code.

# TABLE OF EXHIBITS

| Tab | Exhibit Reference | Exhibit Title |
|---|---|---|
| **I - A** | Exhibit I-A-1 | List of Debtors |
| **III - B** | Exhibit III-B-1 | Property Level Financials 2000-2007 |
| **III - D** | Exhibit III-D-1 | Disbursements Associated with the Final Settlement Statement |
| | Exhibit III-D-2 | Reconciliation of Fees for the FATICO Final Settlement Statement and Associated Disbursements |
| | Exhibit III-D-3 | First-In-First-Out Analysis of First American Closing Account |
| | Exhibit III-D-4 | Summary of Buyer Deposits and Seller Receipts |
| | Exhibit III-D-5 | Mortgage Loan Payoff Analysis |
| | Exhibit III-D-6 | Mezzanine Loan Payoff Analysis |
| | Exhibit III-D-7 | DL-DW Pro-Forma Opening Balance Sheet |
| **III - E** | Exhibit III-E-1 | List of Debtors by Board Member |
| | Exhibit III-E-2 | List of Board Members by Debtor |
| **III - F** | Exhibit III-F-1 | Summary of Vendor Contracting Sample Review |
| | Exhibit III-F-2 | General Ledger Accounting Databases |
| | Exhibit III-F-3 | Servicer Reports Pursuant to 5.1.11(c) of the Loan Agreements |
| **III - H** | Exhibit III-H-1 | 2007 Pro-Forma Budget |
| | Exhibit III-H-2 | Seasonal Impact on Room Revenue |
| | Exhibit III-H-3 | Room Revenue and Cash Available for Operations |
| | Exhibit III-H-4 | Rollforward of Working Capital and Operating Funds Held at DL-DW |
| | Exhibit III-H-5 | Trends in Operating Cash Balances |
| | Exhibit III-H-6 | Debt Yield Calculation as Provided to the Servicer |
| | Exhibit III-H-7 | Debt Yield Calculation as Prepared by A&M |
| **III - I** | Exhibit III-I-1 | 2008 Approved Annual Budget vs. 2008 Initial Budget and 2007 Actual |

# TABLE OF EXHIBITS

| Tab | Exhibit Reference | Exhibit Title |
|---|---|---|
| | Exhibit III-I-2 | 2008 Key Performance Metrics Summary |
| | Exhibit III-I-3 | Summary of Monthly Waterfall Distributions to the Company |
| | Exhibit III-I-4 | Summary of Thirteen Week Cash Flows |
| | Exhibit III-I-5 | 2008 Pro-Forma Budget |
| **III - J** | Exhibit III-J-1 | 2009 Key Performance Metrics Summary |
| | Exhibit III-J-2 | Monthly Accounts Payable Trends |
| **III - L** | Exhibit III-L-1 | Accounts Payable Creditor Analysis - HVM |
| | Exhibit III-L-2 | Accounts Payable Creditor Analysis - HVM Canada |
| | Exhibit III-L-3 | Summary of All Claims Filed |
| | Exhibit III-L-4 | Proof of Claims filed by the US Federal Government (IRS) |
| **IV - B** | Exhibit IV-B-1 | Calculation of Implied Acquisition TTM EBITDA Multiple |
| | Exhibit IV-B-2 | Calculation of Implied Acquisition Pro-Forma EBITDA Multiple |
| | Exhibit IV-B-3 | Summary of Market Transactions for the Hospitality Industry |
| | Exhibit IV-B-4 | Select Metrics for Comparable Companies Prepared by Citi GM |
| | Exhibit IV-B-5 | HVS Appraisal - Actual and Forecast Operational Results for 682 Properties |
| **IV - C** | Exhibit IV-C-1 | Summary of Projection Assumptions Related to the Acquisition |
| | Exhibit IV-C-1.1 | Summary of Projections Related to the Acquisition - 2007 Projected Financials |
| | Exhibit IV-C-1.2 | Summary of Projections Related to the Acquisition - 2008 Projected Financials |
| | Exhibit IV-C-1.3 | Summary of Projections Related to the Acquisition - 2009 Projected Financials |
| | Exhibit IV-C-2 | Summary of Base Management Projection Assumptions |
| | Exhibit IV-C-3 | Base Management Projections - 2007 through 2009 Cash Flows |
| | Exhibit IV-C-3.1 | Base Management Projections - 2007 through 2009 Property-Level EBITDA |

## TABLE OF EXHIBITS

| Tab | Exhibit Reference | Exhibit Title |
|-----|-------------------|---------------|
| | Exhibit IV-C-4 | Listing of Variables Used in the Base Management Projections and Sensitivity A&B |
| | Exhibit IV-C-5 | Sensitivity A Projections - 2007 through 2009 Cash Flows |
| | Exhibit IV-C-5.1 | Sensitivity A Projections - 2007 through 2009 Property-Level EBITDA |
| | Exhibit IV-C-6 | Sensitivity B Projections - 2007 through 2009 Cash Flows |
| | Exhibit IV-C-6.1 | Sensitivity B Projections - 2007 through 2009 Property-Level EBITDA |
| | Exhibit IV-C-7 | Capital Expenditure Assumption - Solvency Analysis |
| | Exhibit IV-C-8 | Summary of Monthly Net Cash Flows |
| | Exhibit IV-C-9 | Summary of Monthly Cash Balances |
| | Exhibit IV-C-10 | Summary of Other Revenues and Expenses - 2007 Approved Annual Budget |
| | Exhibit IV-C-11 | Occupancy Taxes as a Percentage of Room Revenues |
| **IV - D** | Exhibit IV-D-1 | Select Liquidity and Leverage Ratios for Hospitality REITs |
| **IV - E** | Exhibit IV-E-1.1 | Listing of Distributions - BHAC & DL-DW 2007 |
| | Exhibit IV-E-1.2 | Listing of Distributions - BHAC & DL-DW 2008 |
| | Exhibit IV-E-1.3 | Listing of Distributions - BHAC & DL-DW 2009 |
| | Exhibit IV-E-2 | Listing of Dividends, Distributions, and Transfers to Owners & Affiliates |
| **V - A** | Exhibit V-A-1 | Corporate Structure of Debtors |

537960v2