```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
In re:                              :   Chapter 11
                                    :
EXTENDED STAY INC., et al.,         :   Case No. 09-13764 (JMP)
                                    :
        Debtors.                    :   (Jointly Administered)
                                    :
------------------------------------x
                                    :
In re:                              :   Chapter 11
                                    :
ESH/MSTX GP L.L.C.,                 :   Case No. 10-10807 (JMP)
                                    :
        Debtor.                     :
                                    :
------------------------------------x
                                    :
In re:                              :   Chapter 11
                                    :
ESH/TXGP L.L.C.,                    :   Case No. 10-10808 (JMP)
                                    :
        Debtor.                     :
                                    :
------------------------------------x
                                    :
In re:                              :   Chapter 11
                                    :
ESA TXGP L.L.C.,                    :   Case No. 10-10806 (JMP)
                                    :
        Debtor.                     :
                                    :
------------------------------------x
                                    :
In re:                              :   Chapter 11
                                    :
ESA P Portfolio TXNC GP L.L.C.,     :   Case No. 10-10805 (JMP)
                                    :
        Debtor.                     :
                                    :
------------------------------------x
```

```
---------------------------------------x
                                       :
In re:                                 :   Chapter 11
                                       :
ESH/TN Member Inc.,                    :   Case No. 10-10809 (JMP)
                                       :
        Debtor.                        :
                                       :
---------------------------------------x
```

**OBJECTION OF ORIX CAPITAL MARKETS, LLC
TO DEBTORS' MOTIONS FOR APPROVAL OF BID PROCEDURES
AND TO HAVE THE MOTION HEARD ON SHORT NOTICE**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

ORIX Capital Markets, LLC ("ORIX"), by and through its undersigned counsel, hereby objects to the motions by Debtor seeking approval of proposed Bidding Procedures and for the Court to hear the motion on shortened notice (the "Motion"), and respectfully states as follows:

**Preliminary Statement**

1. ORIX is a certificateholder in the Mortgagee.[1] ORIX is a holder of Class B Certificates which, as of the Commencement Date, had outstanding principal in the approximate amount of $20,000,000, plus accrued interest.

---

[1] U.S. Bank National Association, as successor trustee in trust for the holders of Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH (the "Trust" or "Mortgagee") is the holder of the first mortgage (the "Mortgage") on virtually all of Debtors' assets.

2

2. Two issues go unexplained in the Debtors' Motion: (i) why the Debtors are in such a rush to have the auction and have the bidding procedures approved and (ii) why the Debtors insist on proposing plans which are patently unconfirmable. Debtors are proposing to liquidate all (or virtually all) of their assets which consist of, among other things, approximately 666 properties which are apparently worth around $3.5 billion. Despite the complexity of this task, Debtors are asking the Court to approve proposed Bidding Procedures on less than one week's notice to interested parties. Debtors also ask this Court to allow the auction to be scheduled on less than 30 days notice to interested bidders.

3. We are not dealing with fresh fruit or a company on the brink of running out of money. Providing interested parties with a reasonable opportunity to properly review and comment on what is likely the most important document in this case will not impose a substantial hardship on anyone and will not add any significant expense to this case.

4. Moreover, given the number of properties, the complexities involved and the purchase price being in the range of $3.5 billion, it does not seem appropriate to require prospective bidders to complete their due diligence,

3

properly formulate their bid, and secure their financing in less than 30 days. Realistically, there is no point to the proposed publication of notice less than 3 weeks before bids must be submitted and $150 million must be committed. It is simply beyond reason to believe that anyone who first learns of the auction in the newspaper could possible complete the process and be ready to bid on a multi-billion dollar asset on 19 days' notice.

     5.    The purpose of auction procedures should be to encourage participation and attract prospective bidders. That is how the highest and best price will be achieved. The shortened time frames and restrictive procedures will limit the bidding to those with the inside track and will depress the sales price. As such, based upon the time frames alone, the Motion should be denied.

     6.    Once again, Debtors, by seeking approval of a the proposed stalking horse bid, are putting forth a proposal (and encouraging others to submit bids) which have little to do with reorganizing the Debtors for the benefit of the creditors. The auction has been structured on the basis of the revised Starwood Investment Agreement. This proposal improperly seeks to restructure the Mortgagee, not the mortgage loan. Despite numerous prior filings questioning the basis for ignoring the Mortgagee and attempting to

distribute assets directly to certificateholders, Debtors again fail to explain how this is legally permissible. Until such an explanation is provided, it seems pointless to waste the time and incur the significant expense of moving forward with the auction or the proposed stalking horse bid.

7. As described more fully below, the Mortgagee is a REMIC Trust. The trust agreement is a Trust and Servicing Agreement (the "TSA") which sets forth the rights and obligations of the various parties to the Trust and the waterfall pursuant to which assets of the Trust are to be distributed.

8. While the Trust structure is somewhat complex, the relationship between the Trust and Debtors is quite simple – it is that of mortgagor and mortgagee. Debtors are borrowers under a $4.1 billion promissory note. The note is secured by, among other things, mortgages on virtually all of the real property and improvements owned by Debtors.

9. Should the Debtors propose a discounted payoff of the Note or seek to restructure the payment obligations under the Note, those are issues over which this Court would have authority. However, that is not what Debtors or the current proposed stalking horse bid by Centerbridge/Paulson are asking this Court to do. Instead, they are proposing to ignore and destroy the Trust and make distributions to

5

specific classes of certificateholders without regard to the certificateholders' rights under the TSA.

10. Debtors assert no legal basis for this plan because there is none. The Trust is not the debtor in bankruptcy. As such, the Trust structure can no more be ignored than the corporate structure of a national bank if a bank was the mortgagee. For example, if Citicorp were the mortgagee, the proposed stalking horse bid is just like proposing to make particular distributions to select shareholders of Citicorp rather than simply paying off or restructuring the mortgage. I do not believe anyone would argue that this Court has the authority to direct a non-debtor mortgagee how to distribute the proceeds of a mortgage payoff to its non-debtor shareholders, members, or, as in this case, certificateholders.

11. Accordingly, until Debtors can establish that there is the legal authority to restructure the Mortgagee rather than the Mortgage, it seems to be an incredible waste of time and money to allow this auction to go forward. There is only one party paying for all of this expense, the Mortgagee, since all of the Debtors' cash is the Mortgagee's cash collateral. As such, the Court should put a stop to this wasteful spending on non-confirmable plans as soon as possible.

## Argument

### Point I.

### There is No Benefit from or
### Need for the Shortened Time Frames

12. Debtors are proposing to sell virtually all of their assets pursuant to a complex proposal which is effectively a *sub rosa* plan of reorganization which is prohibited in this Circuit. See In re Chrysler LLC, 405 B.R. 84, 95-96 (Bankr. S.D.N.Y. 2009). Despite this, Debtors seek to have their proposed Bidding Procedures considered by the Court on less than one week's notice to interested parties.

13. Debtors are also proposing to require all interested bidders to complete their due diligence and submit their bids by May 17, 2010. If approved, this time frame would provide interested bidders with less than 30 days from the hearing (which itself is on shortened notice) to conduct due diligence, formulate their bid, and obtain financing for an estimated $3.5 billion purchase.

14. Further, Debtors propose to advertise the auction "by April 28, 2010." Thus, any prospective bidder who learns of the auction through the advertisement will have only 19 days to complete this complex process.

15. Debtors assert they are exercising their "business judgment" in proposing these Bid Procedures which

7

are designed to "foster an open and competitive process and secure the best terms for the benefit of all parties-in-interest." That is absolute nonsense. Rather, Debtors are proposing extremely restrictive Bidding Procedures which are designed to limit (if not eliminate) competitive bidding. Proposing that interested bidders have only 19 days to complete due diligence on 666 hotel properties and secure financing for a $3.5 billion acquisition is abusive on its face.

16. Debtors have not asserted a single reason why they believe it is necessary to rush through this auction process. We are not dealing with assets which are in danger of collapsing, spoiling or becoming worthless if a reasonable time period was provided to all interested parties. While there is certainly a need for expediency, Debtors have asserted no basis for proceeding at the supersonic speeds they have proposed.

17. Moreover, the proposed auction would gut virtually all of the protections the Bankruptcy Code provides to creditors and other interested parties. This auction of all of Debtors' assets is proposed to take place before a disclosure statement has been approved and before a plan of reorganization has been approved, in essence before the creditors have had a meaningful opportunity to be heard. As

8

Courts in this Circuit have stated on numerous occasions, "a debtor cannot enter into a transaction that 'would amount to a *sub rosa* plan of reorganization' or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization." In re Chrysler LLC, 405 B.R. at 95-96, *quoting and citing* Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 466 (2nd Cir. 2007) *citing* Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983).[2]

      18. In addition to the shortened time frames, Debtors seek to tie the hands of the Mortgagee by an oppressive provision which Debtors have labeled as a "liquidated damages" provision. By this provision, Debtors ask this Court to take the extraordinary step of prohibiting the Mortgagee from exercising its statutory and contractual rights or risk being stripped of 10% of its secured collateral. Debtor has cited no basis, legal or otherwise, for the propriety of such a provision.

---

[2] Unlike the situation in Chrysler and the other cases in which § 363(b) sales of substantially all of the assets of a debtor recently have been approved, Debtors do not assert any need to rush into a sale while eliminating the protections otherwise provided by a plan and disclosure statement. Most important, Debtors have sufficient liquidity to continue operating and do not allege any quickly deteriorating value or financial condition necessitating a quick sale.

19. Further, the provision is so ambiguous that it would leave the Mortgagee in fear of taking any actions to protect its rights. Would a motion to lift stay trigger the penalty? Would objections to a proposed disclosure statement or other motion by Debtors trigger the provision? What about a termination of Debtors' right to use cash collateral? How about a motion to appoint a Trustee?

20. While Debtors assert that this penalty provision will help bring finality to the auction process, there are other much less draconian ways of achieving the same result if that was truly their goal. Something as simply as an order prohibiting Debtors for entertaining other offers would do the trick without stripping the rights of the Mortgagee.

21. Besides, how does the loss of 10% of the Mortgagee's cash collateral serve to prevent a third-party from making a post-auction offer? In short, it does not. Instead, like the various expense reimbursements and commitment fees Debtors have attempted to impose in prior agreements, it is nothing more than a giveaway of the Mortgagee's cash collateral. Now, in addition to taking away Mortgagee's collateral, Debtors seek to take away Mortgagee's rights as well. The Court should not permit this to be done.

**Point II.**

**Any Plan Based Upon the
Current Bid Structure Cannot Be Confirmed**

22. As the Court is aware, the Mortgagee holds a $4.1 billion mortgage lien on virtually all of the Debtors' assets. While the proposed stalking horse bid and prior plans portray the Debtors' creditors as the numerous individual certificateholders, that is not accurate. Rather, the $4.1 billion obligation is evidenced by a single promissory note held by a single entity.

23. Despite this, Debtors are seeking approval of a stalking horse bid (a bid which establishes the blueprint for all other bids) which does not propose to make any payment to the Mortgagee. Instead, the propose stalking horse bid proposes to make distributions of cash, debt and/or equity to various certificateholders of the Mortgagee in a manner which would violate the terms of the TSA, including, among other provisions, violate the priority of payments set forth in the TSA.

24. In order to restructure the Mortgagee as the bid proposes and alter the priority of payments contained in the TSA, the TSA requires the affirmative vote of 100% of the affected certificateholders. In this regard, the TSA provides that while the TSA may be amended:

> no such amendment shall (i) reduce in any
> manner the amount of, delay the timing of
> or change the manner in which payments
> received on or with respect to the
> Mortgage Loan are required to be
> distributed with respect to any
> Certificate without the consent of the
> Certificateholder, [or] (ii) adversely
> affect in any material respect the
> interests of the Holders of a Class of the
> Certificates in a manner other than as set
> forth in (i) above without the consent of
> the Holders of such Class evidencing, in
> the aggregate, not less than 100% of the
> Voting Rights of such Class . . ..

25. Obtaining unanimity of every single impaired certificateholder will be impossible. Moreover, since ORIX objects and will not agree to a reduction in the value of its certificates and its entitlement to payment thereunder, the restructuring cannot be approved.[3]

26. In the absence of unanimous approval to restructure the Trust, Mortgagee will be required to vote against any plan of reorganization based upon the proposed stalking horse bid or any other bid similarly structured. Since that no vote is inevitable, it would be a tremendous

---

[3] In light of the valuations proposed by both Starwood and Centerbridge/Paulson, ORIX's certificates are fully secured. Despite this fully secured status, the proposed stalking horse bid would covert ORIX's fully secured certificates into unsecured debt and/or equity. In addition, the proposed stalking horse bid would fail to follow the priority of payments set forth in the TSA and would allow the holders of subordinate certificates to be compensated on par with (or more favorably than) ORIX and other certificateholders in the same class.

waste of time and resources by proceeding down this auction process proposed by Debtors.

27. Debtors will no doubt argue that there is no current plan on file and any such objections should not be considered at this time. However, the proposed stalking horse bid makes clear that an acceptable plan of reorganization is inextricably intertwined with the bid.

28. The proposed stalking horse bid requires that a plan be structured in a certain manner and allows the stalking horse bidder to be relieved of its bid obligations if a plan acceptable to the stalking horse bidder is not approved by the Court by a date certain. Under these circumstances, to allow consideration of the proposed stalking horse bid or allow an auction to move forward with this limitation on a bid would be incredibly wasteful.

29. Further, it is the Mortgagee that will bear the brunt of this waste of time and money since the only source of payment of all of the expenses of the estate is Mortgagee's cash collateral. Accordingly, there is no reason why approval of auction procedures cannot be delayed until a plan has been filed and the Court has at least held a hearing on a disclosure statement.

30. The proposed stalking horse bid also provides extraordinary benefits to Debtors' management and other

insiders of Debtors. Among other things, it proposes providing millions of dollars in cash payments to Lichtenstein and other officers, directors and managers of Debtors, including a $40 million payment purportedly to purchase HVM. While the current proposal does not provide for a release of Lichtenstein, it does provide for $10 million more than the original Centerbridge Plan proposed paying for HVM. Obviously, HVM is not worth 25% more under the current valuation. Instead, the extra $10 million is in exchange for dropping the improper request for a release. The propriety of this excessive payment also needs to be addressed by the Court before the auction process should move forward.

31. As the Court may recall, there is currently pending litigation over Guaranty Claims which may result in the recovery of $100 million from Lichtenstein and others. These claims and this significant recovery are now being undercut by the proposal to pay Lichtenstein $40 million from the Debtor. In essence, Debtors are proposing that Debtors's creditors fund $40 million of Lichtenstein's liabilities to those same creditors under his Guaranty.

32. Should the Court consider the proposed Bid Procedures and allow the auction to go forward with the unconfirmable proposed stalking horse bid, other provisions

of the proposed Bid Procedures should be changed. Among others, the Court should require the following provisions to be revised:

    a.    The time frames should be extended, as discussed above.

    b.    The so-called "Liquidated Damages" penalty provision should be eliminated in its entirety.

    c.    Centerbridge/Paulson should not receive the benefit of inside information in formulating their subsequent bids. The provisions which provide for such insider benefits should be eliminated, including the second to last paragraph of the section titled "Proposals" which provides for copies of bids to be provided only to the Creditors Committee, the Mortgagee and Centerbridge/Paulson.

    d.    The numerous provisions allowing Debtors unfettered discretion must be eliminated. Among other objectionable provisions are sections allowing Debtors to make additional or different rules concerning the auction process, Debtors' having the

> exclusive right to determine if a party may participate as a bidder in the auction, Debtors' right to limit attendance at the auction, and Debtors having sole right to determine the highest and best offers at and prior to the auction.

33. Quite simply, Debtors' prior "agreements" to sell Debtors' assets have proven that Debtors and their principals are hopelessly conflicted and are unable to act in the best interests of the creditors. They are looking out for themselves and trying to salvage for themselves money, equity and jobs at the expense of the creditors.

34. Both the Mortgagee (the largest creditor of the estate and the only party who will likely be paid anything in this estate) and the Creditors' Committee have objected to Debtors' prior attempts to sell the Debtors' assets. That is because these prior attempts were lacking in both substance and procedure. The current application shows the same self-interestedness and lack of concern for the creditors as the prior proposals. To allow Debtors to control the sale process and permit them so much discretion would be a disaster for the creditors.

35. While Debtors state they have "sound business reasons" for the immediate sale of substantially all of Debtors' assets pursuant to § 363(b), Debtors neither recite to nor satisfy any of the factors promulgated by the Second Circuit in <u>In re Lionel Corp.</u>, 722 F.2d 1063 (2nd Cir. 1983) and in subsequent decisions in this Circuit.

36. Accordingly, for the reasons set forth above, it is respectfully requested that Debtors' Motion to approve Bid Procedures should be denied, or, at a minimum, the motion to have a hearing on shortened notice should be denied and the hearing on the Bid Procedures should be re-scheduled on appropriate notice to all interested parties.

Dated: April 21, 2010

                            ARONAUER, RE & YUDELL, LLP

                            By:   /s/Kenneth S. Yudell
                                Kenneth S. Yudell,
                                 A Member of the Firm
                          444 Madison Avenue, 17th Floor
                          New York, NY 10022
                          Telephone: (212) 755-6000
                          Facsimile: (212) 755-6006
                          Email: kyudell@aryllp.com

                          *Attorneys for* ORIX Capital Markets, LLC