**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                         :

In re                                 :         **Chapter 11 Case No.**

                                           :

**EXTENDED STAY INC., et al.,**        :         **09-13764 (JMP)**

                                           :

          **Debtors.**                 :         **(Jointly Administered)**

                                           :
-------------------------------------------------------------------x

<div align="center">

**DISCLOSURE STATEMENT FOR THE**
**DEBTORS' FIFTH AMENDED PLAN OF REORGANIZATION**
<u>**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**</u>

</div>

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York, 10153
(212) 310-8000


Dated:  June 8, 2010

I.     INTRODUCTION ......................................................................................... 3

     A.    HOLDERS OF CLAIMS ENTITLED TO VOTE ............................ 4

     B.    VOTING PROCEDURES ................................................................ 5

     C.    CONFIRMATION HEARING ......................................................... 6

II.    SUMMARY OF PLAN ................................................................................ 6

III.   DEFINITIONS .......................................................................................... 13

IV.   GENERAL INFORMATION .................................................................... 23

     A.    OVERVIEW OF CHAPTER 11 .................................................. 23

     B.    CORPORATE STRUCTURE ...................................................... 23

     C.    BUSINESS BACKGROUND ...................................................... 24

           1.    General ............................................................................ 24

           2.    Description of the Chapter 11 Debtors' Business ............... 24

           3.    Management Services and Employees ............................... 25

           4.    Legal Proceedings and Claims ......................................... 26

     D.    SIGNIFICANT PREPETITION INDEBTEDNESS ..................... 26

           1.    Mortgage Loan Agreement ............................................... 27

           2.    Securitization of the Mortgage Debt ................................. 27

           3.    Mezzanine Loan Agreements ............................................ 28

           4.    B of A Mortgage Loan Agreement .................................... 28

           5.    Intercreditor Agreement ................................................... 29

           6.    Senior Subordinated Notes ............................................... 29

V.    KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES .......................................................................................... 29

     A.    DETERIORATION IN FINANCIAL PERFORMANCE ............... 29

     B.    THE RESTRUCTURING NEGOTIATIONS ................................ 30

VI.   THE CHAPTER 11 CASES ...................................................................... 30

     A.    FIRST DAY ORDERS ................................................................ 31

           1.    Case Administration Orders .............................................. 31

           2.    Critical Obligations ......................................................... 31

           3.    Financial Operations ........................................................ 31

           4.    Business Operations ......................................................... 32

     B.    USE OF CASH COLLATERAL ................................................. 32

           1.    The Cash Collateral Order ............................................... 32

           2.    Modification of the Cash Collateral Order ........................ 33

| | C. | CREDITORS' COMMITTEE | 34 |
|---|---|---|---|
| | D. | SCHEDULES, BAR DATE AND RULE 2015.3 REPORTS | 35 |
| | E. | APPOINTMENT OF AN EXAMINER | 35 |
| | F. | ADVERSARY PROCEEDINGS | 36 |
| | G. | HVM INCENTIVE PLAN | 38 |
| VII. | | THE PLAN OF REORGANIZATION | 39 |
| | A. | SUMMARY OF NEGOTIATIONS LEADING UP TO THE FILING OF THE PLAN | 39 |
| | B. | DEBTORS UNDER THE PLAN | 42 |
| | C. | PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS | 43 |
| | | 1. Payment of Allowed Administrative Expense Claims | 43 |
| | | 2. Compensation and Reimbursement Claims | 43 |
| | D. | CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS | 43 |
| | E. | TREATMENT OF CLAIMS AND EQUITY INTERESTS | 44 |
| | | 1. Class 1 | 44 |
| | | 2. Class 2 | 44 |
| | | 3. Class 3 | 45 |
| | | 4. Class 4A | 45 |
| | | 5. Class 4B | 46 |
| | | 6. Class 5 | 46 |
| | | 7. Class 6 | 47 |
| | | 8. Class 7 | 47 |
| | | 9. Class 8 | 47 |
| | | 10. Class 9 | 47 |
| | | 11. Class 10 | 47 |
| | | 12. Class 11 | 48 |
| | | 13. Class 12 | 48 |
| | | 14. Class 13 | 48 |
| | | 15. Class 14 | 48 |
| | | 16. Class 15 | 48 |
| | F. | ACCEPTANCE, REJECTION AND REVOCATION OR WITHDRAWAL OF THE PLAN | 49 |
| | | 1. Classes Entitled to Vote | 49 |
| | | 2. Acceptance by Class of Claims | 49 |

| | 3. | Nonconsensual Confirmation | 49 |
|---|---|---|---|
| | 4. | Revocation or Withdrawal | 49 |
| | 5. | Modification of the Plan | 50 |
| | 6. | Amendment of Plan Documents | 50 |
| | 7. | Removal of Debtors | 50 |
| G. | | TRANSACTIONS TO BE CONSUMMATED UNDER THE PLAN AND CERTAIN CORPORATE AND SECURITIES LAW MATTERS | 50 |
| | 1. | Transactions to be Consummated Under the Plan | 50 |
| | 2. | Securities Law Matters | 62 |
| H. | | TREATMENT OF DISPUTED CLAIMS | 63 |
| | 1. | Objections to Claims; Prosecution of Disputed Claims | 63 |
| | 2. | Distributions on Account of Disputed Claims | 64 |
| | 3. | Settlement of Claims | 64 |
| I. | | DISTRIBUTIONS | 65 |
| | 1. | Distributions under the Plan | 65 |
| | 2. | Timing of Distributions under the Plan | 65 |
| | 3. | Use of Cash Collateral | 65 |
| | 4. | Plan Administrator | 65 |
| | 5. | Record Date | 65 |
| | 6. | Manner of Payment under the Plan | 66 |
| | 7. | Hart-Scott-Rodino Compliance | 66 |
| | 8. | Fractional Distributions | 66 |
| | 9. | Distribution of Unclaimed Property | 66 |
| | 10. | Administrative/Priority Claims Reserve | 66 |
| J. | | CONDITIONS PRECEDENT | 67 |
| | 1. | Conditions Precedent to the Effective Date | 67 |
| | 2. | Effect of Failure of Conditions to Effective Date | 68 |
| K. | | EFFECT OF CONFIRMATION | 69 |
| | 1. | Vesting of Assets | 69 |
| | 2. | Title to Assets; Discharge of Liabilities | 69 |
| | 3. | Binding Effect | 69 |
| | 4. | Claims Extinguished | 70 |
| | 5. | Discharge of Claims and Termination of Equity Interests | 70 |
| | 6. | Injunction | 70 |

| | | | |
|---|---|---|---|
| | 7. | Term of Injunctions or Stays | 71 |
| | 8. | Injunction Against Interference With Plan of Reorganization | 71 |
| | 9. | Exculpation | 71 |
| | 10. | Releases | 71 |
| | 11. | Government Release | 72 |
| | 12. | Mortgage Facility Trust Claims | 72 |
| | 13. | Indemnification Obligations | 73 |
| | 14. | Retention of Causes of Action/Reservation of Rights | 73 |
| | 15. | Limitations on Exculpation and Releases of Representatives | 74 |
| L. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 74 |
| | 1. | Assumption of Executory Contracts and Unexpired Leases | 74 |
| | 2. | Rejection of Executory Contracts and Unexpired Leases | 75 |
| | 3. | Claims Arising from Rejection, Termination or Expiration | 75 |
| | 4. | Insurance Policies and Agreements | 75 |
| | 5. | Management Agreements | 75 |
| M. | | RETENTION OF JURISDICTION | 76 |
| VIII. | | FINANCIAL INFORMATION AND PROJECTIONS | 77 |
| A. | | HISTORICAL FINANCIAL INFORMATION | 77 |
| | 1. | General | 77 |
| | 2. | Selected Unaudited Historical Financial Information | 77 |
| B. | | CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS | 78 |
| | 1. | Responsibility for and Purpose of the Financial Projections | 78 |
| | 2. | Pro Forma Financial Projections | 78 |
| IX. | | CERTAIN FACTORS AFFECTING THE DEBTORS | 81 |
| A. | | CERTAIN BANKRUPTCY LAW CONSIDERATIONS | 81 |
| | 1. | Risk of Non-Confirmation of the Plan of Reorganization | 81 |
| | 2. | Non-Consensual Confirmation | 81 |
| | 3. | Risk of Delay in Confirmation of the Plan | 82 |
| | 4. | The Debtors Have No Duty to Update | 82 |
| | 5. | Risk of Non-Confirmation of the Plan | 82 |
| | 6. | Claims Estimates | 83 |
| B. | | ADDITIONAL FACTORS TO BE CONSIDERED | 83 |
| | 1. | Financial Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results Are Likely to Vary | 83 |

|  | 2. | No Representations Outside This Disclosure Statement Are Authorized | 84 |
|  | 3. | No Legal or Tax Advice Is Provided to You by This Disclosure Statement | 84 |
|  | 4. | No Admission Made | 84 |
| C. | | CERTAIN TAX MATTERS | 84 |

X. CONFIRMATION OF THE PLAN OF REORGANIZATION ................................. 84

| A. | | CONFIRMATION HEARING | 84 |
| B. | | REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION | 85 |
|  | 1. | Requirements of section 1129(a) of the Bankruptcy Code | 85 |
|  | 2. | Requirements of section 1129(b) of the Bankruptcy Code | 89 |

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .......................................................................................................... 90

| A. | | LIQUIDATION UNDER CHAPTER 7 | 90 |
| B. | | ALTERNATIVE PLAN OF REORGANIZATION | 90 |

XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .............. 91

| A. | | CONSEQUENCES TO THE DEBTORS | 91 |
|  | 1. | Cancellation of Debt | 93 |
|  | 2. | Potential Limitations on NOL Carryforwards and Other Tax Attributes | 94 |
|  | 3. | Alternative Minimum Tax | 95 |
|  | 4. | Transfer of Litigation Trust Assets to the Litigation Trust | 95 |
| B. | | DISTRIBUTIONS TO HOLDERS OF CERTAIN CLAIMS AND MORTGAGE CERTIFICATES | 96 |
|  | 1. | Mortgage Facility Claim and Mortgage Facility Deficiency Claim | 96 |
|  | 2. | Mezzanine Facilities Claim | 96 |
|  | 3. | Allowed ESA UD Mortgage Claim | 96 |
|  | 4. | General Unsecured Claims | 96 |
| C. | | CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS AND MORTGAGE CERTIFICATES | 96 |
|  | 1. | Consequences to Holders of Mortgage Certificates | 96 |
|  | 2. | Consequences to Holders of Mezzanine Facilities Claims and General Unsecured Claims | 97 |
|  | 3. | Consequences to the Holder of the Allowed ESA UD Mortgage Claim | 98 |

4.     Character of Gain or Loss and Installment Method of Reporting .........98

5.     Timing of Distributions .......................................................................99

6.     Accrued but Unpaid Interest ...............................................................99

7.     Ownership and Disposition of the New ESA UD Mortgage Note ........99

8.     Federal Income Tax Treatment of the Litigation Trust and Holders of Beneficial Interests........................................................... 101

9.     Federal Income Tax Treatment of the Mortgage Parties Indemnification Fund ...................................................................... 102

D.     INFORMATION REPORTING AND WITHHOLDING ............................. 102

XIII.    CONCLUSION ...................................................................................... 104

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE DEBTORS'[1] FIFTH AMENDED PLAN OF REORGANIZATION, DATED JUNE 8, 2010 (THE "***PLAN***"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN ***IN THEIR ENTIRETY*** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION IX OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT "A." PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

---

[1] Unless otherwise defined, capitalized terms utilized herein shall have the meanings ascribed to such terms in the Plan.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULT FOR ALL HOLDERS OF CLAIMS AND INTERESTS.  THE DEBTORS ALSO BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.

**THE DEBTORS STRONGLY URGE THEIR CREDITORS TO VOTE TO ACCEPT THE PLAN.**

**IRS CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# I.

## INTRODUCTION

The Debtors submit this Disclosure Statement pursuant to Section 1125 of Chapter 11 to the holders of Claims and Equity Interests in connection with (i) the solicitation of acceptances of the Plan filed by the Debtors with the Bankruptcy Court, and (ii) the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***") scheduled for **[_____, 2010] at 10:00 a.m. (New York Time)**.

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

(1)     The Plan (Exhibit "A");

(2)     Order of the Bankruptcy Court, dated [_____, 2010] (the "***Disclosure Statement Approval and Solicitation Order***"), approving, among other things, this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (attached hereto without exhibits) (Exhibit "B");

(3)     The Debtors' Projected Financial Information (Exhibit "C");

(4)     The Debtors' Liquidation Analysis (Exhibit "D");

(5)     Chart of the Chapter 11 Debtors' prepetition organizational structure (Exhibit "E");

(6)     Historical Financial Statements (Exhibit "F"); and

(7)     The Investment Agreement (Exhibit "G").

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

A Ballot for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement mailed to the holders of Claims that the Debtors believe may be entitled to vote to accept or reject the Plan.

On _____, 2010, after notice and a hearing, the Bankruptcy Court signed the Disclosure Statement Approval and Solicitation Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Approval and Solicitation Order, a copy of which is annexed hereto as Exhibit "B", sets forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan and the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting

instructions accompany each Ballot.  Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Approval and Solicitation Order and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Equity Interests.  No solicitation of votes to accept the Plan may be made except pursuant to Section 1125 of the Bankruptcy Code.

**A**.    HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan.  Classes of claims or equity interests in which the holders are unimpaired under a Chapter 11 plan are deemed to have accepted such plan and are not entitled to vote to accept or reject the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Section VIII.E of this Disclosure Statement.

Under the Plan, Claims in Class 2 (Mortgage Facility Claim), Class 3 (ESA UD Mortgage Claim), Class 4A (Mortgage Facility Deficiency Claim), Class 4B (Mezzanine Facilities Claims) and Class 5 (General Unsecured Claims) are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims may receive distributions under the Plan.  As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

Claims in Class 1 (Priority Claims), and Classes 7 to 14 (ESA MD Properties Trust Certificate, ESA MD Borrower Interests, ESA P Portfolio MD Trust Certificate, ESA P Portfolio MD Borrower Interests, ESA Canada Properties Interests, ESA Canada Properties Borrower Interests, ESH/TN Properties L.L.C. Membership Interests and ESH/ESA General Partnership Interests) of the Plan are unimpaired.  As a result, holders of Claims in those Classes are conclusively presumed to have accepted the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.  For a more detailed description of the requirements for confirmation of the Plan, see Section X.B of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code or both, in accordance with the provisions of the Plan.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the rejection of such plan by one or more impaired classes of claims or equity interests.  Under Section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section X.B of this Disclosure Statement.

Holders of Existing Equity (Class 6) and Other Existing Equity Interests (Class 15) will not receive any distribution under the Plan and are therefore deemed to have rejected the Plan.  With respect to the Classes that are deemed to have rejected the Plan, *i.e.*, Classes 6 and 15, the Debtors intend to request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code.

**THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASS 2 (MORTGAGE FACILITY CLAIM), CLASS 3 (ESA UD MORTGAGE CLAIM), CLASS 4A**

**(MORTGAGE FACILITY DEFICIENCY CLAIM), CLASS 4B (MEZZANINE FACILITIES CLAIMS) AND CLASS 5 (GENERAL UNSECURED CLAIMS) VOTE TO ACCEPT THE PLAN.**

The Debtors' legal advisor is Weil, Gotshal & Manges LLP, and their restructuring and financial advisor is Lazard.  They can be contacted at:

| | |
|---|---|
| Lazard Frères & Co. LLC | Weil, Gotshal & Manges LLP |
| 30 Rockefeller Plaza | 767 Fifth Avenue |
| New York, New York  10020 | New York, New York 10153 |
| U.S.A. | U.S.A. |
| Tel: (212) 632-6000 | Tel: (212) 310 8000 |
| Attn:   Ari Lefkovits | Attn:     Marcia L. Goldstein, Esq. |
|      Jeffrey Altman |        Jacqueline Marcus, Esq. |

B.      VOTING PROCEDURES

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims.  Ballots should be returned to the Debtors' solicitation agent in the Chapter 11 Cases at:

> Extended Stay Ballot Processing Center
> c/o Kurtzman Carson Consultants, LLC
> 2335 Alaska Avenue
> El Segundo, California 90245

**Do not return any other documents with your Ballot.**

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> BY NO LATER THAN 4:00 P.M. (NEW YORK TIME) ON _____, 2010.  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL BE COUNTED AS AN ACCEPTANCE.**

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

Pursuant to the Disclosure Statement Approval and Solicitation Order, the Bankruptcy Court set _____, 2010 as the record date for holders of Claims entitled to vote on the Plan. Accordingly, only holders of record as of the applicable record date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Kurtzman Carson Consultants, LLC at (866) 381-9100.

C.    CONFIRMATION HEARING

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **_____, 2010 at 10:00 a.m. (New York Time)** before the Honorable James M. Peck, Room 601, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton House, One Bowling Green, New York, New York 10004.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before **_____, 2010 at 4:00 p.m. (New York Time)** in the manner described below in Section X.A of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.

## SUMMARY OF PLAN

Although the Chapter 11 Debtors consist of 75 separate entities, the business that was intended to support this very complex capital structure is conducted primarily by 21 entities that are borrowers under the approximately $4.1 billion mortgage loan.  While the hotel business that formed the base of the capital structure remains fundamentally sound, in the current business environment, the operations of that business are simply insufficient to support the extensive capital structure layered above it.  In fact, based on current estimates, the value of the business is approximately half of the amount of outstanding debt.

Prior to and since commencing these Chapter 11 Cases, the Debtors have sought out various restructuring alternatives and potential plan sponsors and investors in order to formulate a consensual plan of reorganization that would maximize recoveries to all creditors and enable the Debtors to emerge from Chapter 11 as a competitive player in the hotel industry.  Those efforts resulted in the establishment of a Court-approved Auction for the Debtors and for sponsorship of the Debtors' Chapter 11 plan.  The Plan is the result of that Auction process and provides for the sale of the equity interests of the Reorganized Debtors and NewCo.  The Plan embodies the highest and best bid proposal submitted at the Auction and, thus, provides maximum recoveries and distributions to creditors who will receive the proceeds of such sale.

The Chapter 11 Debtors' foremost liability consists of the Mortgage Debt in the principal amount of approximately $4.1 billion.  The Mortgage Debt is secured by cross-collateralized and cross-defaulted first priority liens on the Mortgage Properties, and the other collateral, as set forth in the Loan Documents, including all of the cash proceeds generated from the Mortgage Properties.

Based on the Debtors' views as to the value of their estates and their projected cash flows, the Debtors concluded that they would be unable to reinstate or refinance the Mortgage Debt in full as doing so would leave the Debtors significantly over-leveraged and potentially unable to pay the attendant debt service.  Accordingly, the Debtors' initial restructuring efforts focused on negotiating a stand-alone chapter 11 plan that would provide the holder of the Mortgage Facility Claim with a recovery consisting of the debt and equity in reorganized Debtors.  However, as the Chapter 11 Cases progressed, it became apparent to the Debtors that they required a significant equity infusion in order to ensure that they have adequate cash to fund operations, to pay debt service and make necessary capital expenditures and investments in the Mortgage Properties and other assets so as to remain competitive in the hotel industry and succeed after emergence from Chapter 11.

Based on this need for additional capital, the Chapter 11 Debtors began to explore alternative transactions for restructuring, and engaged in discussions with various parties. In late November 2009, an investor group comprised of Centerbridge Partners, L.P. ("**Centerbridge**") and Paulson & Co. Inc. ("**Paulson**", and together with Centerbridge, the "**Original Sponsors**") began discussing a potential "new money" plan with the Chapter 11 Debtors, that would include a direct equity investment and a backstopped rights offering.  Such efforts culminated on February 19, 2010, with the filing of the Debtors' Motion Pursuant to Section 105 and 363(b) of the Bankruptcy Code Authorizing Debtors to Enter into Investment and Standby Purchase Agreement (the "**Original CB/P Approval Motion**") [Docket No. 768], which Original CB/P Approval Motion included as exhibits a Commitment Letter from the CB/P Investors, the related Investment and Standby Purchase Agreement (the "**Original CB/P Agreement**") and the Plan of Reorganization (the "**Original CB/P Plan**").

Shortly after the filing of the Original CB/P Approval Motion, the Chapter 11 Debtors received a proposal from a group comprised of affiliates of Starwood Capital Group Global, L.P., TPG Capital and Five Mile Capital Partners LLC (collectively, the "**Starwood Investors**").  The boards of directors of the Chapter 11 Debtors determined pursuant to the exercise of their fiduciary duties, that the Starwood Investors' proposal was a superior offer to the transactions contemplated by the Original CB/P Plan.  Thus, on March 15, 2010 the applicable Debtors terminated the Original CB/P Agreement and entered into the Starwood  Commitment Letter and the Starwood Investment Agreement, the terms of which were embodied in the Debtors' Third Amended and Restated Plan of Reorganization dated March 24, 2010 [Docket No. 877] (the "**Starwood Plan**").

Following the entry into the Starwood Commitment Letter and Starwood Investment Agreement, the Chapter 11 Debtors received a revised proposal from the Original Sponsors, which the boards of directors of the Chapter 11 Debtors determined pursuant to the exercise of their fiduciary duties, was a superior offer to the transactions contemplated by the Starwood Plan.  Thus, the applicable Debtors terminated the Starwood Commitment Letter and Starwood Investment Agreement and on April 2, 2010, entered into a new commitment letter with the Original Sponsors (the "**Amended CB/P Commitment Letter**") pursuant to which, the Original Sponsors, through the Investor committed to (i) comply with the terms of the Starwood Plan but without certain bid protection provisions, the management fee and the incentive compensation arrangement, and (ii) engage in the negotiation of, and participate in, a bidding and plan process which included an auction for the sponsorship of a plan of reorganization of the Debtors (the "**Auction**"), and in connection therewith provided a deposit of $150,000,000 which amount is being held in escrow.  Subsequently, Centerbridge Partners, L.P. and Paulson & Co. Inc. agreed to assign a portion of their commitment to sponsor the Plan to Blackstone Real Estate Partners VI L.P. on behalf of itself and its parallel funds and related alternative vehicles ("**BREP VI**," and together with the Original Sponsors, the "**Sponsors**").

Pursuant to the terms of the Amended CB/P Commitment Letter, the parties agreed to bidding procedures (the "**Bidding Procedures**") governing the Auction process which have been approved by the Bankruptcy Court. The Bidding Procedures allowed parties with a potential interest in the Debtors both notice and sufficient time to finalize diligence and submit fully-financed binding proposals by the conclusion of the bidding period.  The Bidding Procedures also allowed the Debtors sufficient time to assess and develop such proposals and discuss them with the advisors to the Creditors' Committee and the Mortgage Debt Parties.  The Bidding Procedures and Auction process were designed to encourage all parties to put their best proposal forward, bring finality to the Debtors' competitive plan process, and create a path towards confirmation of a plan that embodies the highest or best available recoveries to creditors.

In connection with the Bidding Procedures, other than the Sponsors, only one other bidder submitted a bid to the Debtors, the Starwood Investors. The Special Servicer also submitted a reservation of rights to credit bid. The Auction was held on May 27, 2010. At the Auction, the Sponsors and the Starwood Investors engaged in several rounds of bidding. The Special Servicer did not credit bid and has expressly waived its right to do so in connection with the Plan. The Sponsors' proposal was selected as the highest and best bid. The Sponsors' proposal was also supported by the Special Servicer and Operating Advisor, who agreed that it was highest and best. The Sponsors' proposal provided for the sale of the Debtors, free and clear of all claims, liens, encumbrances charges and other interests, to the Sponsors for cash and other consideration reflecting the aggregate purchase price of $3.925 billion. Following the Auction, the Investor and the Debtors entered into the Investment Agreement setting forth the terms of the investment and sale. The Auction represented the culmination of an extensive marketing process that gave every interested party a full and fair opportunity to conduct extensive due diligence and to bid, and the current Plan represents the highest and best offer for the equity of NewCo and the Reorganized Debtors.

As part of this investment and sale, the Investor will acquire the Debtors through the acquisition of 100% of the NewCo Common Interests in exchange for cash in the aggregate amount of $3,615,755,444.28 and the contribution of mortgage certificates held by the Investor and its members or Affiliates in the aggregate amount of $309,244,555.72 (subject to adjustment as set out in the Investment Agreement). Pursuant to the Plan, 100% of the equity interests in the Mortgage Borrowers and equity interests in certain other Chapter 11 Debtors will be cancelled and reissued to NewCo. The balance of the Debtors will be liquidated and dissolved as of the Effective Date. Thus, under the Plan, NewCo will be owned indirectly by the Sponsors, through the Investor or one or more other entities, and NewCo will own and control the Mortgage Properties and all other assets necessary to operate the Debtors' businesses. The purchase price to be paid by the Sponsors to the Debtors' estates will be used for distributions to creditors, less certain amounts to be used to, among other things, to fund the Litigation Trust, the Mortgage Parties Indemnification Fund and the purchase of control of the Debtors' management company, all as described below.

Pursuant to the terms of the Plan, the holder of the Mortgage Facility Claim will receive the Cash Distribution, the Investor Certificates and interests in the Litigation Trust to the extent it is a Litigation Trust Beneficiary. The holders of Mezzanine Facilities Claims and General Unsecured Claims will also receive interests in the Litigation Trust to the extent they are Litigation Trust Beneficiaries. The Cash Distribution generally consists of the Debtors' cash and cash equivalents as of the Effective Date, less the payment of Administrative Expense Claims and Priority Claims, plus a cash payment by the Sponsors, less certain deductions.

The Plan contemplates that the Trustee or the Special Servicer, as holders of the Mortgage Loan, will exercise voting rights with respect to the Mortgage Facility Claim and the Mortgage Facility Deficiency Claim. In conjunction with the Auction, the Special Servicer entered into a Plan Support Agreement pursuant to which the Special Servicer has agreed to vote its claims in Classes 2 and 4A to accept the Plan.

As noted above, the principal amount of the Mortgage Facility Claim is approximately $4.1 billion, which is more than the amount to be paid by the Investor under the Investment Agreement. Under the absolute priority rule, the holder of the Mortgage Facility Deficiency Claim and the holders of the Mezzanine Facilities Claim and General Unsecured Claims are not entitled to a recovery on account of their claims from the cash to be paid by the Sponsors. The only potential source for distribution to the holder of the Mortgage Facility Deficiency Claim and the holders of the Mezzanine Facilities Claim and General Unsecured Claims are recoveries resulting from avoidance actions and other causes of action that

the Debtors may have. The Plan provides for the establishment of a litigation trust for the benefit of Creditors that will receive and hold certain causes of action and claims of the Debtors. Thus the Plan provides that holders of Claims in Classes 4A, 4B and 5 will receive an interest in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries.

        In short, the Plan contemplates that proceeds from the investment and sale, together with the Debtors' cash on hand, will be sufficient and used to (i) fund the Administrative/Priority Claims Reserve, which will be used to pay all Allowed Administrative Expense Claims and Priority Claims (excluding only those claims of the type referred to in clause (c)(i) of the definition of "Allowed" incurred in the ordinary course of business and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date), and the fees and expenses of the Plan Administrator, (ii) fund the Mortgage Parties Indemnification Fund, (iii) fund the Litigation Trust, (iv) fund the wind-down of ESI, (v) pay for the purchase of control of HVM and its assets and (vi) make distributions to the holder of the Mortgage Facility Claim.

        The Plan further contemplates that all of the property of the Debtors, including the Mortgage Properties, transferred to or vesting in the Reorganized Debtors and/or NewCo shall vest in the Reorganized Debtors and/or NewCo free and clear of claims, liens, encumbrances, charges and other interests, including, without limitation, any and all claims, liens, encumbrances and any and all right, title, interests related thereto of governmental entities relating to any tax liabilities or similar liabilities. As a result of consummation of the Plan, provided it is in accordance with the Investment Agreement, and pursuant to the Plan, NewCo and the Reorganized Debtors shall not assume, incur or be responsible for any claims or liabilities of the Debtors or any of their affiliates, except for those claims of the type referred to in clause (c)(i) of the definition of "Allowed" incurred in the ordinary course of business and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, and neither the Reorganized Debtors, NewCo, the Investor, the Sponsors nor the Debt Financing Lenders shall be successors of the Debtors or ESI nor incur any successor or transferee liability of any kind, nature or character, including, without limitation, in relation to (1) the liabilities arising or resulting from or relating to the transactions contemplated by the Plan, and (2) any and all claims, liens, encumbrances, and any and all right, title, and interests related thereto, of governmental entities relating to any tax or similar liabilities.

        In connection with the restructuring, an essential component of the Sponsors' commitment to fund the Plan and purchase and invest in the reorganized Debtors, through the Investor, is the assurance that the reorganized Chapter 11 Debtors can continue their operations uninterrupted upon emergence from bankruptcy. All of the Mortgage Properties are managed by HVM, an entity that is affiliated with, but not owned by, the Chapter 11 Debtors. HVM Manager, an entity owned by David Lichtenstein, acts as the manager of HVM, with the right and authority to direct the operations of HVM. The ability of HVM to continue the operation of the Mortgage Properties depends upon the uninterrupted and continued access to the services provided by certain essential service providers to the Mortgage Properties. Therefore, it is essential to the Investor that HVM continue to provide its management services to the Reorganized Debtors. As such, in connection with the Plan and as contemplated by the Investment Agreement, the Investor and the Debtors have entered into the Membership Interest Purchase Agreement with David Lichtenstein, pursuant to which, on the Effective Date, in exchange for a $40,000,000 payment (which payment shall be funded out of the proceeds of the Investment), the Investor or one or more of its designees, which may be a third party, will acquire all of the outstanding equity of HVM Manager or, at the option of the Investor, HVM Manager will resign as manager of HVM and appoint one or more designees of the Investor, which may be a third party, as successor manager of

HVM and convey to such successor manager such assets of HVM Manager as designated by the Investor, which may be a third party. This acquisition and the related transactions are predicated on and subject to the Plan becoming effective and the implementation of the transactions contemplated by the Plan and the Investment Agreement. Thus, as a result of consummation of the transactions described herein, it is expected that HVM will continue to manage the business and properties of the Reorganized Debtors and NewCo pursuant to management agreements as described in Article V hereof.

The Debtors believe that the value they will realize from the Investment Agreement provides the highest and best offer available. The Debtors also believe the value will support a confirmable Plan that will maximize recoveries to their various creditor constituencies and bring a successful conclusion to the Chapter 11 Cases. Entry into the Investment Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors' estates and their creditors.

In the event that any class of Claims that is entitled to vote does not accept the Plan, the Chapter 11 Debtors will request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code and in such event, the Debtors reserve the right, with the consent of the Investor, and in certain cases the Special Servicer and the Operating Advisor, to make modifications to the Plan to the extent necessary to comply with the requirements of Section 1129(b) of the Bankruptcy Code.

Accordingly, the Debtors believe that:

• The Plan provides the best available result for the holders of Claims;

• With respect to each Impaired Class of Claims, the distributions under the Plan are not less than the amounts that would be received if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code; and

• Acceptance of the Plan is in the best interests of Holders of Claims.

Neither the Starwood Investors nor the Sponsors were willing to purchase and structure a proposed plan of reorganization that included ESI. The Chapter 11 Debtors believe that ESI's assets have minimal, if any, value. Consequently, and in view of all of the other advantages presented by the Plan, the Chapter 11 Debtors determined to proceed without including ESI in the Plan. The Chapter 11 Debtors and their professionals have not yet determined the most appropriate treatment of ESI and its creditors, although the Plan contemplates a settlement between ESI, on the one hand, and the Chapter 11 Debtors, on the other hand, pursuant to which, *inter alia:* (i) ESI would be released from its Guaranty of the Mortgage Loan and the Mezzanine Facilities, (ii) ESI would grant a release to certain parties as set forth in Section 10.10 of the Plan, (iii) the Chapter 11 Debtors and the Special Servicer would set aside $750,000 to be used to wind down ESI, and (iv) the creditors of ESI would be granted an interest in the Litigation Trust. The Plan contemplates that the Bankruptcy Court would approve the ESI Settlement at or before the Confirmation Hearing.

The following table briefly summarizes the classification and treatment of those Claims and Equity Interests classified under the Plan:

| Class | Type of Claim or Equity Interest | Treatment | Impaired/ Unimpaired | Entitled to Vote | Approx. Percentage Recovery |
|-------|----------------------------------|-----------|----------------------|------------------|------------------------------|
| 1 | Priority Claims | Each holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim, in full, in Cash, on the later of the Effective Date and as soon as practicable after the date such Priority Claim becomes Allowed. | Unimpaired | No | 100% |
| 2 | Mortgage Facility Claim | The holder of the Allowed Mortgage Facility Claim shall receive 100% of the Cash Distribution and the Investor Certificates on the Effective Date, with such Cash Distribution to be distributed in accordance with Section 6.3 of the Plan. The Investor Certificates will be cancelled without any distributions on account thereof. | Impaired | Yes | 100% |
| 3 | ESA UD Mortgage Claim | The holder of the Allowed ESA UD Mortgage Claim shall receive on the Distribution Date the New ESA UD Mortgage Note in full settlement, satisfaction, release and discharge of the Allowed ESA UD Mortgage Claim. | Impaired | Yes | 58.8% |
| 4A | Mortgage Facility Deficiency Claim/ | The holder of the Allowed Mortgage Facility Deficiency Claim shall receive an interest in the Litigation Trust to the extent that it is a Litigation Trust Beneficiary, which shall be distributed pursuant to Section 6.3 of the Plan, subject to the terms of the Intercreditor Agreement. | Impaired | Yes | Percentage recovery is condit- ioned on future events |
| 4B | Mezzanine Facilities Claims | The holders of the Allowed Mezzanine Facilities Claims shall receive interests in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries, which shall be distributed pursuant to Section 6.3 of the Plan, subject to the terms of the Intercreditor Agreement. | | | Percentage recovery is condit- ioned on future events |
| 5 | General Unsecured Claims | The holders of the General Unsecured Claims shall receive an interest in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries. | Impaired | Yes | Percentage recovery is condit- ioned on future events |
| 6 | Existing | No distribution shall be made under the | Impaired | No | 0% |

| | | | | | |
|---|---|---|---|---|---|
| | Equity | Plan from the Estates in respect of the Existing Equity. On the Effective Date, the certificates that previously evidenced ownership of Existing Equity shall be cancelled and shall be null and void, the holder(s) thereof shall no longer have any rights in respect of the Existing Equity, and such certificates shall not evidence any rights under the Plan. | | | |
| 7 | ESA MD Properties Trust Certificate | The holder of the ESA MD Properties Trust Certificate shall retain the ESA MD Properties Trust Certificate. | Unimpaired | No | 100% |
| 8 | ESA MD Borrower Interests | Each holder of ESA MD Borrower Interests shall retain its ESA MD Borrower Interests. | Unimpaired | No | 100% |
| 9 | ESA P Portfolio MD Trust Certificate | The holder of the ESA P MD Portfolio Trust Certificate shall retain the ESA P Portfolio Trust Certificate. | Unimpaired | No | 100% |
| 10 | ESA P Portfolio MD Borrower Interests | Each holder of ESA P Portfolio MD Borrower Interests shall retain its ESA P Portfolio MD Borrower Interests. | Unimpaired | No | 100% |
| 11 | ESA Canada Properties Interests | Each holder of ESA Canada Properties Interests shall retain its ESA Canada Properties Interests. | Unimpaired | No | 100% |
| 12 | ESA Canada Properties Borrower Interests | Each holder of ESA Canada Properties Borrower Interests shall retain its ESA Canada Properties Borrower Interests. | Unimpaired | No | 100% |
| 13 | ESH/TN Properties Membership Interests | The holder of the ESH/TN Properties Membership Interest shall retain its ESH/TN Properties Membership Interest. | Unimpaired | No | 100% |
| 14 | ESH/ESA General Partnership Interests | Each holder of ESH/ESA General Partnership Interests shall retain its ESH/ESA General Partnership Interests. | Unimpaired | No | 100% |
| 15 | Other Existing Equity Interests | No distribution shall be made under the Plan from the Estates in respect of the Other Existing Equity Interests. On the Effective Date, the certificates that previously evidenced ownership of the Other Existing Equity Interests shall be canceled and shall be null and void, the holders thereof shall no longer have any rights in respect of the Other Existing Equity Interests, and such certificates shall not evidence any rights | Impaired | No | 0% |

| | | under the Plan. | | | |
|---|---|---|---|---|---|

The preceding summaries of the material provisions of the Plan do not purport to be complete and are qualified in their entirety by reference to all of the provisions of the Plan, including all Exhibits thereto and the Plan Supplement, all documents described therein and the definitions therein of certain terms used above. For a more detailed description of the Plan, see Article VII. For detailed historical and projected financial information, see Article VIII.

## III.

## DEFINITIONS

**A. Defined Terms**. As used herein, the following terms shall have the respective meanings specified below. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

1.1 *1145 Securities* has the meaning set forth in Section VII.G of this Disclosure Statement.

1.2 *Acquisition* has the meaning set forth in Section IV.B of this Disclosure Statement.

1.3 *Adequate Protection Obligations* has the meaning set forth in Section VI.B.1 of this Disclosure Statement.

1.4 *Adequate Protection Payments* has the meaning set forth in the Cash Collateral Order.

1.5 *Adjusted EBITDA* has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.6 *ADR* has the meaning set forth in Section VIII.A of this Disclosure Statement.

1.7 *AHYDOs* has the meaning set forth in Section XII.C of this Disclosure Statement.

1.8 *Alternate Transaction* means any plan, proposal, offer, financing or transaction with one or more parties other than the Investor or its members or Affiliates, or any solicitation, discussions or negotiations with respect thereto.

1.9 *Amended CB/P Commitment Letter* has the meaning set forth in Section II of this Disclosure Statement.

1.10 *AMT* has the meaning set forth in Section XII.A of this Disclosure Statement.

1.11 *Arbor* means Arbor Realty Trust.

1.12 *Assumed Confirmation Date* has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.13    ***Auction***  has the meaning set forth in Section II of this Disclosure Statement.

1.14    ***Available Cash*** has the meaning ascribed to such term in the Final Order (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection and (C) Modifying the Automatic Stay, entered on July 23, 2009 and amended on December 15, 2009, Docket Nos. 205 and 634, respectively.

1.15    ***B of A***  means Bank of America, N. A.

1.16    ***B of A Action*** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.17    ***B of A Defendants*** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.18    ***B of A Mortgage Debt*** has the meaning set forth in Section IV.D of this Disclosure Statement.

1.19    ***B of A Mortgage Loan Agreement*** has the meaning set forth in Section IV.D of this Disclosure Statement.

1.20    ***B of A Plaintiffs*** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.21    ***B of A Prepetition Collateral*** has the meaning set forth in Section IV.D of this Disclosure Statement.

1.22    ***Bar Date***  has the meaning set forth in Section VI.D of this Disclosure Statement.

1.23    ***Bear Stearns***  means Bear Stearns Commercial Mortgage, Inc.

1.24    ***Best Interests Test***  has the meaning set forth in Section X.B of this Disclosure Statement.

1.25    ***BHAC IP Transfer Agreement*** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.26    ***Bidding Procedures*** has the meaning set forth in Section II of this Disclosure Statement

1.27    ***BREP VI***  has the meaning set forth in Section II of this Disclosure Statement.

1.28    ***Budget***  has the meaning set forth in Section VI.B.1 of this Disclosure Statement.

1.29    ***Business Plan*** has the meaning set forth in Section VI.G of this Disclosure Statement.

1.30    ***Cash Collateral Motion***  has the meaning set forth in Section VI.B.1 of this Disclosure Statement.

1.31	***Cash Management Account*** has the meaning set forth in the Cash Management Agreement.

1.32	***Cash Management Agreement*** means that certain agreement between, the Mortgage Borrowers, the Maryland Owner, the Canadian Owner, the Operating Lessee, HVM, Homestead, Wachovia, Bear Stearns and B of A (and their respective successors and assigns), dated as of June 11, 2007, as it may have been amended, restated, replaced, supplemented or otherwise modified from time to time.

1.33	***Cash Management Order*** has the meaning set forth in Section VI.A.3 of this Disclosure Statement.

1.34	***Centerbridge*** has the meaning set forth in Section II of this Disclosure Statement.

1.35	***Certificate Holders*** has the meaning set forth in Section IV.D.2 of this Disclosure Statement.

1.36	***Change in Control Agreements*** those change in control letter agreements dated as of September 30, 2008 between HVM and each of Kevin McDougall, Joseph Rogers, Robert Micklash, Daehum Kim and Gary DeLapp.

1.37	***Change of Recommendation*** means, (i) the Debtors or their boards of directors or other governing body or any committee thereof shall have withheld, withdrawn, qualified or modified (or resolved or proposed to withhold, withdraw, qualify or modify), in a manner adverse to the Investor, its approval or recommendation of the Investment Agreement or the Plan or the transactions contemplated thereby or (ii) the Debtors or their boards of directors or other governing body or any committee thereof shall have approved or recommended, or proposed to approve or recommend (including, without limitation, by filing any pleading or document with the Bankruptcy Court), any Alternate Transaction.

1.38	***Chapter 7*** means chapter 7 of the Bankruptcy Code.

1.39	***Chapter 11*** means chapter 11 of the Bankruptcy Code.

1.40	***Chapter 11 Debtors*** has the meaning set forth in Section VI of this Disclosure Statement.

1.41	***COD Income*** has the meaning set forth in Section XII.B of this Disclosure Statement.

1.42	***Confirmation Hearing*** has the meaning set forth in Section I of this Disclosure Statement.

1.43	***Critical Employees*** has the meaning set forth in Section VI.G of this Disclosure Statement.

1.44	***Critical Operating Expenses*** has the meaning set forth in Section VI.A.4 of this Disclosure Statement.

1.45	***DCF*** has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.46 ***Debt Yield Covenant*** has the meaning set forth in Section V.A of this Disclosure Statement.

1.47 ***Deferred Adequate Protection Amount*** has the meaning set forth in Section VI.B.2 of this Disclosure Statement.

1.48 ***Disclosure Statement Approval and Solicitation Order*** has the meaning set forth in Section I of this Disclosure Statement

1.49 ***Discount Rate*** has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.50 ***Disregarded Debtors*** has the meaning set forth in Section XII of this Disclosure Statement.

1.51 ***Distributable Equity Value*** has the meaning set forth in Section VIII.C.2 of this Disclosure Statement.

1.52 ***District Court*** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.53 ***EBITDA*** has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.54 ***ESA Mezz Entities*** means those entities set forth on Exhibit I hereto.

1.55 ***ESA P Mezz Entities*** means those entities set forth on Exhibit J hereto.

1.56 ***ESH/TN*** has the meaning set forth in Section XII.A of this Disclosure Statement.

1.57 ***Examiner*** has the meaning set forth in Section VI.E of this Disclosure Statement.

1.58 ***Examiner Motion*** has the meaning set forth in Section VI.E of this Disclosure Statement.

1.59 ***Examiner Order*** has the meaning set forth in Section VI.E of this Disclosure Statement.

1.60 ***Examiner's Report*** has the meaning set forth in Section VI.E of this Disclosure Statement.

1.61 ***Extended Stay*** means collectively, the debtors that are the subject of the Chapter 11 Cases.

1.62 ***Extended Stay DIP Lockbox*** has the meaning set forth in Section VI.A.3 of this Disclosure Statement.

1.63 ***Financial Projections*** has the meaning set forth in Section VIII.B.2 of this Disclosure Statement.

1.64    **First Day Declaration** means the Declaration of Joseph Teichman Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications.

1.65    **Five Mile Action** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.66    **Five Mile Defendants** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.67    **Five Mile Plaintiff** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.68    **Guarantor** has the meaning set forth in Section IV.D.1 of this Disclosure Statement.

1.69    **Homestead Licensees** has the meaning set forth in Section IV.B of this Disclosure Statement.

1.70    **Homestead Mezz Entities** means those entities set forth on Exhibit K hereto.

1.71    **HVM Canada** means HVM Canada Hotel Management ULC.

1.72    **HVM Incentive Program Motion** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.73    **HVM Manager Agreement** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.74    **Intercreditor Agreement** means the Intercreditor Agreement dated as of June 11, 2007 among the Mortgage Lenders and the Mezzanine Lenders.

1.75    **IRS** has the meaning set forth in Section XII.A of this Disclosure Statement.

1.76    **Lazard** means Lazard Frères & Co. LLC.

1.77    **Letter Agreements** has the meaning set forth in Section VI.G of this Disclosure Statement.

1.78    **Lichtenstein** means David Lichtenstein.

1.79    **Lightstone** means Lightstone Holdings LLC, a Delaware limited liability company.

1.80    **Line Trust Action** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.81    **Line Trust Defendants** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.82    ***Line Trust Plaintiffs*** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.83    ***Liquidation Analysis*** has the meaning set forth in Section X.B.1 of this Disclosure Statement.

1.84    ***Loan Documents*** means collectively, the Mortgage Loan Agreement, the Note, the Security Instruments, the Environmental Indemnity, the Assignment of Management Agreement, the Assignment of Franchise Agreement, the Subordination of ESA Note, the Guaranty, the Cash Management Agreement, the Interest Rate Cap Agreement, the Assignments of Interest Rate Cap Agreement, the Contribution Agreement, the Canadian Indemnity Guaranty, the Maryland Indemnity Guaranty, the Assignment of ESA Note, the Subordination of Aristocrat Notes, the Maryland Beneficiary Pledge Agreement, the Canadian Beneficiary Pledge Agreement, the Security Account Control Agreement, the Trademark Security Agreement (all as defined in the Mortgage Loan Agreement) and all other documents executed and/or delivered in connection with the Mortgage Loan, in each case, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

1.85    ***LTL*** has the meaning set forth in Section VIII.A of this Disclosure Statement.

1.86    ***M & T Indenture*** means the Indenture, dated as of June 27, 2001 between Manufacturers and Traders Trust Company, as trustee, and ESI, as same may be amended, modified or supplemented from time to time.

1.87    ***Maryland Owner*** means ESA P Portfolio MD Trust and ESA MD Properties Business Trust.

1.88    ***Mezzanine Borrowers*** means the borrowers under the Mezzanine Loan Agreements.

1.89    ***Mezzanine Debt*** has the meaning set forth in Section IV.D of this Disclosure Statement.

1.90    ***Mezzanine Lenders*** means Wachovia, Bear Stearns and B of A, as lenders, together with their successors and assigns.

1.91    ***Mezzanine Loan Agreements*** means collectively, the ten mezzanine loan agreements among the Mezzanine Lenders and the Mezzanine Borrowers.

1.92    ***Modification*** has the meaning set forth in Section VI.B.2 of this Disclosure Statement.

1.93    ***Mortgage Borrowers*** means ESA 2005 Portfolio L.L.C., ESA 2005- San Jose L.L.C., ESA 2005- Waltham L.L.C., ESA Acquisition Properties L.L.C., ESA Alaska L.L.C., ESA Canada Properties Borrower L.L.C., ESA FL Properties L.L.C., ESA MD Borrower L.L.C., ESA MN Properties L.L.C., ESA P Portfolio L.L.C., ESA P Portfolio MD Borrower L.L.C., ESA P Portfolio PA Properties L.L.C., ESA P  Portfolio TXNC Properties L.P., ESA PA Properties L.L.C., ESA Properties L.L.C., ESA TX Properties L.P., ESH/Homestead Portfolio L.L.C., ESH/HV Properties L.L.C., ESH/MSTX Property L.P., ESH/TN Properties L.L.C. and ESH/TX Properties L.P.

1.94    ***Mortgage Debt***  has the meaning set forth in Section IV.D of this Disclosure Statement.

1.95    ***Mortgage Lenders***  means Wachovia, Bear Stearns and B of A, as lenders together with their successors and assigns.

1.96    ***Mortgage Loan Agreement***  means the Loan Agreement dated as of June 11, 2007 (as amended, restated, replaced, supplemented or otherwise modified from time to time), by and among the Mortgage Borrowers, the Maryland Owner, the Operating Lessee and the Mortgage Lenders.

1.97    ***NFY***  has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.98    ***NOL***  has the meaning set forth in Section XII.A of this Disclosure Statement.

1.99    ***Operating Lessee***  means ESA Canada Trustee, Inc., ESA Canada Properties Trust, ESA P Portfolio Operating Lessee Inc., ESA 2005 Operating Lessee Inc., ESA Canada Operating Lessee Inc., and ESA Operating Lessee Inc.

1.100   ***Original CB/P Agreement***  has the meaning set forth in Section II of this Disclosure Statement.

1.101   ***Original CB/P Approval Motion*** has the meaning set forth in Section II of this Disclosure Statement.

1.102   ***Original CB/P Plan*** has the meaning set forth in Section II of this Disclosure Statement.

1.103   ***Original Debtor(s)***  has the meaning set forth in Section VI of this Disclosure Statement.

1.104   ***Original Sponsors*** has the meaning set forth in Section II of this Disclosure Statement.

1.105   ***Paulson*** has the meaning set forth in Section II of this Disclosure Statement.

1.106   ***Payment Date***  has the meaning set forth in Section VI.B.2 of this Disclosure Statement.

1.107   ***Peer Group***  has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.108   ***Plaintiffs*** has the meaning set forth in Section IV.C of this Disclosure Statement

1.109   ***Plan*** has the meaning set forth in Section I of this Disclosure Statement.

1.110   ***PPK*** has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.111   ***pre-change losses***  has the meaning set forth in Section XII.A of this Disclosure Statement.

1.112   ***Prepetition Collateral***  means the collateral set forth in the Loan Documents.

1.113 ***Projections*** has the meaning set forth in Section VIII.B.2 of this Disclosure Statement.

1.114 ***RBP 4*** has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.115 ***Regarded Corporate Debtors*** has the meaning set forth in Section XII.A of this Disclosure Statement.

1.116 ***Regarded Debtors*** has the meaning set forth in Section XII.A of this Disclosure Statement.

1.117 ***REIT*** means real estate investment trust within the meaning of Section 856 of the Tax Code.

1.118 ***Remaining Payments*** has the meaning set forth in Section VI.G of this Disclosure Statement.

1.119 ***Reorganization Value*** has the meaning set forth in Section VIII.C.1 of this Disclosure Statement.

1.120 ***Restricted Holders*** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.121 ***Restructuring Term Sheet*** has the meaning set forth in Section VII.A of this Disclosure Statement.

1.122 ***Revised HVM Incentive Program*** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.123 ***RevPAR*** has the meaning set forth in Section VIII.A of this Disclosure Statement.

1.124 ***Rule 2015.3 Report*** has the meaning set forth in Section VI.D of this Disclosure Statement.

1.125 ***Schedules*** has the meaning set forth in Section VI.D of this Disclosure Statement.

1.126 ***Sellers*** has the meaning set forth in Section IV.B of this Disclosure Statement.

1.127 ***Senior Executives*** has the meaning set forth in Section VI.G of this Disclosure Statement.

1.128 ***Senior Subordinated Notes*** has the meaning set forth in Section IV.D.6 of this Disclosure Statement..

1.129 ***Sponsors*** has the meaning set forth in Section II of this Disclosure Statement.

1.130 ***Starwood Investors*** has the meaning set forth in Section II of this Disclosure Statement.

1.131    **Starwood Plan** has the meaning set forth in Section II of this Disclosure Statement.

1.132    **State Court** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.133    **Subsequent Debtors** has the meaning set forth in Section VI of this Disclosure Statement.

1.134    **Subsidiary** of any Person means, with respect to such Person, any corporation, partnership, limited liability company, joint venture or other legal entity of which such Person (either alone or through or together with any other subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity or ownership interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies.

1.135    **Successor Trustee** has the meaning set forth in Section IV.D.2 of this Disclosure Statement.

1.136    **Tax Code** has the meaning set forth in Section XII of this Disclosure Statement.

1.137    **Tax Matters Partner** has the meaning set forth in Section XII.C of this Disclosure Statement.

1.138    **Testing Period** has the meaning set forth in Section XII.C of this Disclosure Statement.

1.139    **TIN** has the meaning set forth in Section XII.D of this Disclosure Statement.

1.140    **Transaction Value** has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.141    **TRS** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.142    **Trust** has the meaning set forth in Section IV.D.2 of this Disclosure Statement.

1.143    **Trust and Servicing Agreement** has the meaning set forth in Section IV.D.2 of this Disclosure Statement.

1.144    **UD Debtors** has the meaning set forth in Section IV.D of this Disclosure Statement.

1.145    **U.S. Trustee** has the meaning set forth in Section VI.C of this Disclosure Statement.

1.146    **Valuation Metrics** has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.147    **Wachovia** means Wachovia Bank, N.A.

**B.   Other Terms.**  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter.

**C.   Exhibits.**  All exhibits to the Disclosure Statement are annexed hereto.

# IV.
## GENERAL INFORMATION

A.       OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets. The commencement of a Chapter 11 reorganization case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the Commencement Date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession".

The consummation of a plan of reorganization is the principal objective of a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against a debtor are permitted to vote to accept or reject a plan of reorganization. Prior to soliciting acceptances of a proposed plan, however, Section 1125 of the Bankruptcy Code requires a debtor to prepare, and obtain bankruptcy court approval of, a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable hypothetical investors of the relevant classes to make an informed judgment regarding the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors to satisfy the requirements of Section 1125 of the Bankruptcy Code.

B.       CORPORATE STRUCTURE

The Chapter 11 Debtors are the entities that own and operate a portfolio of 666 hotels and one office building.

The chart attached hereto as Exhibit E illustrates that Extended Stay is organized into two segments, operating under different trademarks. In the ESI segment, non-debtor BHAC owns 100% of the common stock of ESI, which indirectly owns and operates 552 properties using the Extended Stay Hotels service mark, as well as the office building. BHAC owns the trademarks for the Extended Stay America, Studio Plus, Crossland, and Extended Stay Deluxe brands, along with minor variations of those names, and licenses such trademarks to certain of the Chapter 11 Debtors (the "***BHAC Licensees***") under a non-exclusive license agreement that expires in 2025 and entitles BHAC to a licensing fee of 0.2% of the BHAC Licensees' gross operating revenues. ESI currently has approximately 90 preferred stock investors. In the Homestead segment, non-debtor DL-DW owns Homestead. The Homestead segment owns and operates 114 hotels under the Homestead Studio Suites brand name, along with minor variations of that name, and until recently, operated one hotel in a non-debtor subsidiary under a short-term lease. Homestead also owns the trademarks associated with such brand names and licenses such trademarks to certain of the Chapter 11 Debtors (the "***Homestead Licensees***") under a non-exclusive license agreement that expires in 2025 and entitles Homestead to a license fee of 0.2% of the Homestead Licensees gross operating revenues.

The Homestead segment and the ESI segment are connected through a common owner, DL-DW, which was formed in June 2007, by an investment consortium consisting of, among others, Lichtenstein and Arbor, for the purpose of the acquisition of the combined business (the "***Acquisition***"), which included the hotels, the headquarters, and all of the Extended Stay brands from BHAC IV, L.L.C. and BRE/HV Holdings L.L.C. (collectively, the "***Sellers***"). As a result of the Acquisition, Lichtenstein and other parties own DL-DW, which, together with those other parties, directly or indirectly owns 100% of the interests in ESI and Homestead. Specifically, (a) Lightstone, together with BRE/ESH Holding LLC (an entity holding the residual investments of the Sellers) and other affiliates, owns DL-DW, which in turn owns Homestead, and (b) Homestead and affiliates of Lightstone and Arbor own BHAC, which in turn owns ESI. The Plan does not provide for any releases relating to any potential claims, causes of action, charges, suits or rights of recovery referenced in the Examiner's Report arising out of or relating to the Acquisition.

There are numerous special purpose entity subsidiaries owned by ESI and Homestead that own, either directly or indirectly, through lease or title, interests in the applicable hotel properties. Among such entities are ten levels of mezzanine entities, each of which was formed in association with the financing of the Acquisition, and each of which pledged its security interest in the equity of the entity beneath it to the Mezz Lenders; thus each mezzanine entity is the sole equity member of the mezzanine entity directly beneath it. In order to implement the mezzanine financing, two branches were established beneath ESI, the ESA Mezz Entities and the ESA P Mezz Entities. Similarly, the Homestead Mezz Entities were established beneath Homestead. In this fashion, (i) the ESA P Mezz Entities own, directly or indirectly, all of the equity interests in the ESA P special purpose entities, (ii) the ESA Mezz Entities own, directly or indirectly, all of the equity interests in the ESA Mezz special purpose entities, and (iii) the Homestead Mezz Entities own, directly or indirectly, all of the equity interests in the Homestead special purpose entities.

C.     BUSINESS BACKGROUND

1.     General

Extended Stay maintains its corporate headquarters in Spartanburg, South Carolina, and its properties extend across 44 states and 2 provinces in Canada. All of the Chapter 11 Debtors are incorporated in Delaware, with the exception of ESA Canada Operating Lessee Inc., which was incorporated in Canada.

2.     Description of the Chapter 11 Debtors' Business

Extended Stay operates in the extended-stay segment of the U.S. lodging industry (an extended-stay is defined as a stay of seven consecutive nights or longer). Extended Stay's hotels provide value-conscious travelers seeking longer-term stays, as well as daily or short-term stays, with an affordable and attractive alternative. The typical Extended Stay guest requires accommodations for significantly longer than is economical for a limited or full service hotel, but not long enough to justify incurring the expense and commitment associated with renting an apartment. Extended Stay achieves lower operating costs than traditional hotels by eliminating certain services in exchange for a lower per night price while also providing amenities such as an in-room kitchen, cable, housekeeping and laundry services.

Extended Stay believes that the extended-stay market can be divided into four general sectors: (i) the upscale sector; (ii) the mid-priced sector; (iii) the economy sector; and (iv) the budget

sector. Extended Stay is the largest owner and operator of mid-price extended stay hotels in the United States. These hotels generally operate at average daily rates between $30 and $70.

Extended Stay's carefully designed lodging accommodations primarily target business travelers on temporary assignment, undergoing relocation or in training, individuals relocating or purchasing a home, people with domestic situations and individuals with other short-term housing needs.

As a result of acquisitions and mergers, Extended Stay has a portfolio of approximately 666 properties and approximately 73,700 units. Extended Stay has fee ownership in substantially all of its properties with no third-party owners or franchisees. Extended Stay's properties are strategically proximate to major business demand generators in large metropolitan areas throughout the United States.

Extended Stay currently operates five hotel brands, including (i) Crossland Economy Studios, (ii) Extended Stay America, (iii) Extended Stay Deluxe, (iv) Homestead Studio Suites, and (v) StudioPLUS Deluxe Studios. Each of these brands is designed to appeal to value-conscious customers at different price points in their respective markets. All of Extended Stay's brands offer the same core components: a living/sleeping area, a fully equipped in-room kitchen, appliances, linens, a bathroom, unlimited local phone use, personalized voicemail, high speed internet access, housekeeping and guest laundry services.

3.      <u>Management Services and Employees</u>

Each Chapter 11 Debtor which owns one or more hotels in the United States has a contract in place with non-Debtor HVM, an entity that is affiliated with, but not owned by, the Extended Stay family of companies. HVM is owned by three individuals Gary DeLapp (President), Robert J. Micklash (Chief Operating Officer) and F. Joseph Rogers (Executive Vice President).

Gary A. DeLapp assumed his current position as President and CEO of HVM in May 2004, with the merger of Homestead Village and Extended Stay America. Previously, he had served as President and CEO of Homestead Village, a company that he joined as Vice President in 1996. Mr. DeLapp became Managing Director of Homestead Village in August 2000 and took the helm as President/CEO in November 2001. Prior to that, Mr. DeLapp was employed with Vista Host, Inc. from 1983 to 1996. Mr. DeLapp is a graduate of Florida State University.

Robert J. Micklash joined HVM as Chief Operating Officer in June 2008, following 11 years at Concord Hospitality Enterprises Company, a hotel management and development group based in Raleigh, N.C, where he most recently served as Chief Operating Officer. Prior to that, Mr. Micklash held senior management positions at Marriott International and Residence Inn Company. Overall he has nearly three decades of experience in the hospitality industry. Mr. Micklash received a bachelor of arts degree in hotel, restaurant and institutional management from Michigan State University in East Lansing, Michigan.

F. Joseph Rogers is the Executive Vice President, Finance of HVM. Prior to the merger of Homestead Village and Extended Stay America in May 2004, he held the position of Vice President and Controller of Homestead Village, which he joined in August 1996. Before joining Homestead, Mr. Rogers was Vice President of Security Capital Group Incorporated with responsibilities for financial reporting, forecasting and analysis from 1992 through 1996. Mr. Rogers has also had responsibilities for financial accounting, reporting and forecasting for the former Security Capital Pacific Incorporated and Security Capital Atlantic Incorporated, from their inceptions in December 1993 through June 1994. Mr.

Rogers received his B.B.A. in Accounting from the University of Oklahoma and is a Certified Public Accountant in the state of Texas.

HVM Manager (an entity owned by David Lichtenstein) acts as the non-member manager of HVM, with the rights and authority to direct the operations of HVM. HVM Canada is a subsidiary of HVM, and manages the three Canadian Extended Stay hotels. Currently, HVM operates as the hotel manager for 686 Extended Stay hotels, in addition to providing administrative functions. The management services provided by HVM and HVM Canada include the implementation of personnel policies and practices, the establishment of prices and room rates, maintenance, renovations, the negotiation and administration of contracts, the maintenance of books and records and the disbursement of mortgaged property revenues.

Currently, HVM employs approximately 9,000 employees in connection with the Debtors' hotels and facilities. There are approximately 7,646 hourly employees and 1,310 salaried employees. In Canada, there are approximately 68 full-time employees and 19 part-time employees. Substantially all of the Chapter 11 Debtors' operating expenses are incurred and paid by HVM, and reimbursed to HVM through the management fee and other arrangements between HVM and the Chapter 11 Debtors.

4.     Legal Proceedings and Claims

(a)     Prior to the Commencement Date, Extended Stay, Inc., ESA Management L.L.C., HVM L.L.C., ESA P Portfolio PA Properties L.L.C., ESA P Portfolio TXNC Properties L.P., ESA P Portfolio L.L.C., ESA P Portfolio MD Trust, ESA Properties L.L.C., ESA PA Properties L.L.C., ESA FL Properties L.L.C., ESA MN Properties L.L.C., ESA TX Properties L.P., and ESA MD Properties Business Trust (the "***Plaintiffs***") settled a series of product liability cases with a windows manufacturer and certain of its insurers over defects in windows installed at a number of hotels. The settlement included the entry of a consent judgment for approximately $30 million to be executed only against the proceeds available under the insurance policies issued by three non-settling insurers. The Plaintiffs, which include Debtor entities, pursued a garnishment action against the non-settling insurers. As of the date hereof, the lawsuit against the remaining three non-settling insurance companies has been settled with respect to one insurer and a bench trial to determine the other two insurance companies' obligations under their respective policies was held in June 2009 in Missouri in the Circuit Court of Osage County (Case No. 06OS- CC00027). Closing arguments in the bench trial were delivered on October 20, 2009 and the court took the matter under advisement. No ruling has been issued yet and no estimate of recovery is available at this time.

(b)     Other Pending Litigation.

The Chapter 11 Debtors are the subject of various claims and lawsuits in the ordinary course of business arising principally from personal injuries, collisions, and other casualties. Although the outcome of any individual claim or action cannot be predicted with certainty, the Debtors believe that any adverse outcome, individually or in the aggregate, would be substantially mitigated by applicable insurance and would not have a material adverse effect on the Debtors' financial position, results of operations or cash flows.

D.     SIGNIFICANT PREPETITION INDEBTEDNESS

In June 2007, Extended Stay was acquired by an investor consortium led by Lichtenstein. The Acquisition was financed through loans in an aggregate amount of $7.4 billion, which consisted of (i)

a mortgage loan in the principal amount of $4.1 billion (the "***Mortgage Debt***") and (ii) an aggregate of $3.3 billion in 10 mezzanine loans (the "***Mezzanine Debt***"). Later, B of A extended financing in the principal aggregate amount of $8.5 million (the "***B of A Mortgage Debt***") to debtors ESA UD and ESA Operating Lessee Inc. (the "***Operating Lessee***", and together with ESA UD, the "***UD Debtors***").

The instruments evidencing Extended Stay's significant indebtedness are described below. In addition, as of April 30, 2010, other than amounts owed to HVM, the Chapter 11 Debtors had unsecured prepetition debt of approximately $545,250 (on a consolidated basis, exclusive of any amounts owing in respect of any tax liabilities).

1.  Mortgage Loan Agreement

Pursuant to the Mortgage Loan Agreement and the other Loan Documents, the Mortgage Lenders made a loan in the amount of approximately $4.1 billion to the Mortgage Borrowers. Each of the Mortgage Borrowers is jointly and severally liable for the Mortgage Debt. Although the Mortgage Debt is non-recourse, there are certain non-recourse carve-outs under the Mortgage Loan Agreement. ESI, Homestead, Lightstone (an entity owned by Lichtenstein) and Lichtenstein are the guarantors (collectively, the "***Guarantor***") of the non- recourse carve-out provisions of the Mortgage Debt. Additionally, ESA P Portfolio MD Trust, ESA P Portfolio MD Beneficiary L.L.C., ESA MD Properties Business Trust and ESA MD Beneficiary L.L.C., collectively, guaranteed the obligations of ESA P Portfolio MD Borrower L.L.C. and ESA MD Borrower L.L.C. under the Mortgage Debt. ESA Canada Trustee Inc., ESA Canada Beneficiary Inc. and ESA Canada Properties Trust collectively, guarantied the obligations of ESA Canada Properties Borrower L.L.C. under the Mortgage Debt.

The Mortgage Debt is secured by cross-collateralized and cross-defaulted first priority liens on the 666 Mortgage Properties, comprised of 664 hotels, Extended Stay's headquarters building in Spartanburg, South Carolina, and a parcel of undeveloped land located in Minnesota, and the other collateral, as set forth in the Loan Documents, including all of the cash proceeds generated from the Mortgage Properties. The Mortgage Debt is also secured by first priority liens on the intellectual property held by each of BHAC and Homestead. As of the Commencement Date, the aggregate principal amount Mortgage Debt outstanding was approximately $4.1 billion.

2.  Securitization of the Mortgage Debt

Subsequent to the closing of the 2007 Acquisition, the Mortgage Lenders sold their interests in the Mortgage Debt, and received in exchange therefor certificates representing ownership of the beneficial interests in a vehicle (the "***Trust***") holding the Mortgage Debt and the collateral therefor. In turn, certain investors bought those interests (the "***Certificate Holders***") which represent beneficial interests in the Trust. The Trust is governed by the Trust and Servicing Agreement. The Certificate Holders own 100% of the beneficial interests in the Mortgage Debt. There are 18 principal balance classes of Certificates and, under the Trust and Servicing Agreement, distributions with respect to the Mortgage Debt are allocated to each class of Certificates based on their alphabetical (and, if applicable, numerical) designation, starting with Class A-1. The alphabetical (and numerical, if applicable) designation denotes the priority of the class of Certificates as among the other classes of Certificates.

After the Commencement Date, the administration of the Mortgage Debt was transferred to TriMont Real Estate Advisors Inc., which acted as Special Servicer until May 2010, when the Operating Advisor appointed CW Capital Asset Management LLC as Special Servicer. The Special Servicer has retained the following attorneys:

*Venable LLP*
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
Attn: Gregory A. Cross, Esq.

*Venable LLP*
Rockefeller Center, 25th Floor
1270 Avenue of the Americas
New York, New York 10020
Attn: Carollynn H.G. Callari, Esq.

In addition, U.S. Bank National Association was appointed as successor in interest to Wells Fargo Bank, N.A., as Trustee in Trust for Holders of Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH (the "***Successor Trustee***").

3.      Mezzanine Loan Agreements

The Mezzanine Borrowers are borrowers under ten different Mezzanine Loan Agreements with the Mezzanine Lenders, each dated June 11, 2007. As of the Commencement Date, the aggregate principal amount of approximately $3.3 billion was outstanding under the Mezzanine Loan Agreements.

Pursuant to the Mezzanine Loan Agreements, each Mezzanine Facility is secured by the applicable Pledge Agreement and the other Mezzanine Loan Documents. The Mezzanine Lenders do not have an interest in any of the Mortgage Properties nor any of the other collateral securing the Mortgage Debt, including the cash and proceeds generated from the Mortgage Properties. In addition, pursuant to the Intercreditor Agreement discussed below, the Mezzanine Lenders have agreed and acknowledged that they are not creditors of the Mortgage Borrowers with respect to the Mezzanine Facilities. Mezzanine A Borrower is the legal and beneficial owner of 100% of the issued and outstanding membership interests in certain of the Debtors, and has pledged all of its interests in those entities and certain other rights, and all proceeds of each, as security for the Mezzanine A Loan. Mezzanine B Borrower is the legal and beneficial owner of 100% of the issued and outstanding membership interests in Mezzanine A Borrower, and has pledged all of its membership interests in Mezzanine A Borrower, certain other rights, and all proceeds of each as security for the Mezzanine B Loan; and the same arrangement has been entered into by the Mezzanine C, D, E, F, G, H, I, and J Borrowers for each respective level of the Mezzanine Debt. Consequently, the Mezzanine J Loan is the most structurally subordinate of the Mezzanine Facilities.

4.      B of A Mortgage Loan Agreement

B of A extended the B of A Mortgage Debt to ESA UD, pursuant to that certain Loan Agreement dated as of February 14, 2008 (as amended, restated, replaced, supplemented or otherwise modified from time to time, together with the other documents executed in connection therewith, collectively, the "***B of A Mortgage Loan Agreement***"), by and among ESA UD, the Operating Lessee and B of A. The B of A Mortgage Debt is secured by all of the real and personal property interests of ESA UD in two hotels located in Wilkes-Barre, Pennsylvania and Findlay, Ohio (collectively, the "***B of A Prepetition Collateral***"). The B of A Prepetition Collateral is not collateral for the Mortgage Debt or the Mezzanine Debt. As of the Commencement Date, approximately $8.5 million was outstanding under the B of A Mortgage Loan Agreement. ESI is the guarantor of certain payment and performance obligations of the UD Debtors under the B of A Mortgage Loan Agreement.

5.    Intercreditor Agreement

The Mortgage Lenders and the Mezzanine Lenders have entered into an Intercreditor Agreement dated as of June 11, 2007 that governs certain of their respective rights and interests in the Mortgage Loan and the Mezzanine Facilities relating to, among other things, their rights and the exercise of remedies during an Event of Default (as defined in the Intercreditor Agreement) and in the event of a bankruptcy filing of their respective borrowers, and the payment subordination of the Mezzanine Loans to the payment in full of the Mortgage Loan, including related enforcement and turn-over provisions.

6.    Senior Subordinated Notes

Pursuant to the M & T Indenture, ESI authorized the issuance of up to $300 million in principal amount of Senior Subordinated Notes due June 15, 2011, which bear interest at the rate of 9-7/8% per annum (the "**Senior Subordinated Notes**").  Interest on the Senior Subordinated Notes is payable semiannually on June 15 and December 15 of each year.  As of the Commencement Date, approximately $8.5 million in principal amount of the Senior Subordinated Notes was outstanding, including accrued and unpaid interest.   The Plan does not deal with the amounts owed in respect of the Senior Subordinated Notes, because it does not deal with the assets or liabilities of ESI, and because the Plan is not a plan for the estate of ESI.

**V.**
KEY EVENTS LEADING TO THE
COMMENCEMENT OF THE CHAPTER 11 CASES

A.    DETERIORATION IN FINANCIAL PERFORMANCE

Beginning in late 2007 and continuing through 2008 and 2009, Extended Stay faced a liquidity crisis directly attributable to the impact of the deteriorating condition and instability of the financial markets and general economic conditions on the expected performance of the entire hospitality industry.  Taken together and in combination with Extended Stay's highly-leveraged financial structure, Extended Stay's overall financial performance was negatively impacted and resulted in Extended Stay being unable to meet certain financial covenants under its loan documents.  The decrease in Extended Stay's revenue, Extended Stay's inability to access certain cash receipts generated from its business, and the strictures of Extended Stay's cash management system resulted in Extended Stay facing certain operational challenges.  Ultimately, these challenges precipitated the commencement of the Chapter 11 Cases.

Essentially, the sole source of Extended Stay's revenue stream is the income received from guests who stay at the hotels.  Since just after the closing of the Acquisition in June 2007, Extended Stay has operated in a difficult financial environment, driven by reduced consumer and commercial spending and high fuel prices, which had a devastating impact on occupancy rates at Extended Stay hotels.  This was exacerbated by the unprecedented collapse of the financial markets and crisis in the credit markets that took place in the Fall of 2008.  Since the typical Extended Stay customer seeks a lengthy stay based on commercial relocation, the contraction of construction and new business development began to significantly and adversely affect Extended Stay's revenue stream.  The tightening credit markets, the reduction in construction activity and increased unemployment decreased the demand for Extended Stay accommodations, as fewer construction sites, consulting opportunities and travel plans came to fruition.

Inasmuch as construction workers comprise a sizable portion of Extended Stay's revenues, the deterioration in the housing industry which began in the Fall of 2007 had substantial and immediate effects on Extended Stay's revenues. The collapse of the financial markets in September 2008 exacerbated an already difficult situation.

As a result of Extended Stay's decreasing cash revenue, it was unable to comply with the debt yield covenant ("**Debt Yield Covenant**") in the Mortgage Loan Agreement and the Mezzanine Loan Agreements. In addition, because the Cash Management Agreement set forth a specific waterfall for use of funds, Extended Stay was unable to obtain ready access to its own cash. The combination of these factors, and the fact that receipts have been insufficient to fund the full cash flow distribution, as described in the Cash Management Agreement (including occupancy taxes, a necessary requisite for Extended Stay to operate its business), led to a situation in which it appeared that Extended Stay would not have access to sufficient liquidity to run its operations, both in the immediate future and on a long term going concern basis. Although the tranches of the Mortgage Loan that matured in June 2009 had extension terms, such terms required Extended Stay to make significant amortization payments beginning in June of 2009. Based on Extended Stay's cash flow projections and its need to make critical capital expenditures, Extended Stay was significantly over-leveraged and the projected cash flows could not continue to service over $7 billion in debt. As a result, Extended Stay and its professionals determined that a comprehensive restructuring of the entire capital structure was necessary to preserve and maximize value.

## B.     THE RESTRUCTURING NEGOTIATIONS

As a result of its liquidity concerns, Extended Stay began to consult with the necessary professionals to facilitate a discussion with the Certificate Holders and the Mezzanine Lenders regarding a potential restructuring of Extended Stay.

In connection with pursuing a restructuring or recapitalization of Extended Stay, Lazard was retained as an investment banker in September 2008. Since that time, Lazard has reviewed and analyzed Extended Stay's business, operations and financial projections, evaluated Extended Stay's potential debt capacity in light of its projected cash flows, assisted in the determination of a range of value for Extended Stay on a going concern basis, and participated and facilitated meetings and negotiations with the various advisors for the Certificate Holders and the Mezzanine Lenders.

As further detailed in the First Day Declaration, Extended Stay entered into negotiations with various constituencies, including the Certificate Holders and the Mezzanine Lenders, regarding a potential debt restructuring or potential forbearance, but ultimately reached a point in time where it would not have enough cash to sustain its normal operating expenses.

## VI.

## THE CHAPTER 11 CASES

On the Commencement Date, ESI and 69 of its affiliates (collectively, the "**Original Debtors**") each commenced with the Bankruptcy Court for the Southern District of New York a voluntary case under Chapter 11. On February 18, 2010, five additional Affiliates of Extended Stay (the "**Subsequent Debtors**" and, collectively, with the Original Debtors, the "**Chapter 11 Debtors**") each commenced with the Bankruptcy Court a voluntary case under Chapter 11.

A.    FIRST DAY ORDERS

On the Commencement Date, Extended Stay filed a series of motions seeking various relief from the Bankruptcy Court designed to minimize any disruption to Extended Stay's business operations and to facilitate Extended Stay's reorganization.

1.    Case Administration Orders

The Bankruptcy Court issued orders that, among other things: (i) authorized the joint administration of the Chapter 11 Cases, (ii) established certain notice and case management procedures, (iii) authorized the waiver of the requirement to file a list of creditors, (iv) authorized the retention of Kurtzman Carson Consultants LLC as claims and noticing agent, and (v) authorized an extension of time to file schedules and statements of assets of liabilities.[2]

Extended Stay is authorized to operate its business and manage its properties as debtors in possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code.

2.    Critical Obligations

Initially on an interim basis and, later, on a final basis, the Bankruptcy Court authorized Extended Stay to, among other things honor:

- its obligations under its insurance policies;

- its obligations for prepetition taxes; and

- its obligations under certain prepetition customer programs.

3.    Financial Operations

The Bankruptcy Court authorized Extended Stay, on an interim basis, and then after a final hearing, to continue to use its existing centralized cash management system, as modified, honor certain prepetition obligations related to the use of the cash management system, and maintain existing bank accounts and business forms (the "***Cash Management Order***").

Pursuant to the Cash Management Order, Extended Stay's banks were authorized to continue the automatic transfer on a daily basis of all available funds in or received in Extended Stay's local bank accounts to the Cash Management Account (as defined in the Cash Management Order) and Wachovia was authorized to transfer all funds in the Cash Management Account automatically into a new bank account at Wachovia (the "***Extended Stay DIP Lockbox***").  Pursuant to the Cash Collateral Order, the funds in the Extended Stay DIP Lockbox were required to be disbursed in accordance with the terms of the Cash Collateral Order.

---

[2] By motion dated February 22, 2010, the Chapter 11 Debtors sought an order of the Bankruptcy Court making substantially all of the orders entered with respect to the Original Debtors applicable to the Subsequent Debtors.  Such order was entered on March 16, 2010 [Docket No. 850].

4.    Business Operations

All Extended Stay hotels are managed by HVM, an entity that is affiliated with, but not owned by, the Extended Stay family of companies. HVM was set up as the manager for the Extended Stay hotels principally as an accommodation to the initial REIT structure of ESI, and to provide administrative services to the Extended Stay hotels. HVM, on behalf of Extended Stay, pays all property level expenses of the hotels, contracts with service providers and purchases all goods and materials utilized in the operation of the business. HVM currently employs approximately 9,000 employees in connection with the operation of the hotels.

The ability of HVM to continue the operation of the Extended Stay portfolio of hotels depends upon the uninterrupted, continued access to the services provided by certain essential service providers to Extended Stay's properties. Mindful of their fiduciary obligations to preserve and maximize the value of their estates, on the Commencement Date, Extended Stay sought authority to reimburse HVM for certain critical operating expenses, in order to effectuate the seamless transition to a business operating under Chapter 11 and to continue to provide uninterrupted services to the Extended Stay customer. The Bankruptcy Court authorized Extended Stay, on an interim basis, and then after a final hearing, to continue to reimburse HVM for the critical operating expenses incurred on Extended Stay's behalf prior to the Commencement Date. Examples of the categories included in the critical operating expenses included, but were not limited to (a) the salaries of approximately 9,000 employees, (b) utility payments, (c) repair and maintenance payments, (d) property taxes, (e) insurance payments, and (f) reservation and travel agent fees (collectively, the "***Critical Operating Expenses***"). Extended Stay also sought to continue to reimburse HVM for such Critical Operating Expenses throughout the pendency of the Chapter 11 Cases pursuant to the Cash Collateral Motion, Cash Collateral Order, and the Budget (as defined in the Cash Collateral Motion).

B.    USE OF CASH COLLATERAL

1.    The Cash Collateral Order

On the Commencement Date, Extended Stay filed a motion for an order (A) (i) Authorizing Use of Cash Collateral, (ii) Granting Adequate Protection, and (iii) Modifying the Automatic Stay, and (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "***Cash Collateral Motion***"). Given that Extended Stay's operations generated positive cash flow on an operating basis, Extended Stay did not negotiate for a debtor-in-possession loan, and instead, Extended Stay negotiated the continued use of cash collateral with the Ad Hoc Mortgage Lender Group (as defined in the Cash Collateral Motion). The cash collateral funds were expected to serve as the only cash resource during the administration of the Chapter 11 Cases and were used to advance funds to HVM with which to continue to operate Extended Stay's hotel business. The proposed interim Cash Collateral Order attached to the Cash Collateral Motion, as filed, reflected the terms agreed upon by Extended Stay and the Ad Hoc Mortgage Lender Group prior to the Commencement Date.

After the Commencement Date, the special servicing duties with respect to the Mortgage Debt were transferred from Wachovia as servicer to TriMont Real Estate Advisors Inc., the predecessor to the Special Servicer. U.S. Bank National Association was appointed the Successor Trustee. In light of theses changes, Extended Stay determined that it had to re-negotiate the terms of the proposed interim Cash Collateral Order with the Mortgage Debt Parties. Accordingly, on June 16, 2009, the Bankruptcy Court made a bench ruling authorizing the interim use of cash collateral, and on June 29, 2009, the Bankruptcy Court further authorized the second interim use of cash collateral. After the final hearing on the Cash Collateral Motion on July 17, 2009, the Bankruptcy Court entered the Final Order (A)

Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay, dated July 23, 2009 [Docket No. 205].

Pursuant to the Cash Collateral Order, Extended Stay is authorized to utilize cash collateral subject to the terms and conditions of the Cash Collateral Order, pursuant to a 13-week budget (as further amended, the "***Budget***").  As adequate protection for, and solely to the extent of, any diminution of the value of the Mortgage Debt Parties' interest in the Prepetition Collateral from and after the Commencement Date (the amount of any such diminution being referred to as the "***Adequate Protection Obligations***"), the Mortgage Debt Parties were granted the (a) Adequate Protection Liens; (b) Adequate Protection Superpriority Claims; and (c) Adequate Protection Payments (as defined and further set forth in the Cash Collateral Order).

2.    Modification of the Cash Collateral Order

Since the Commencement Date, Extended Stay has been providing payments of approximately $18 million per month to the Mortgage Debt Parties, as Adequate Protection Payments. However, in the fall of 2009, Extended Stay, together with its professionals, determined that due to the seasonality of Extended Stay's business and the fact that Extended Stay would soon be entering its slow season, Extended Stay might experience a tightening of liquidity without an adjustment to its obligation to make Adequate Protection Payments.  After subsequent discussions and negotiations with the Mortgage Debt Parties, Extended Stay filed its Motion for Order Approving Stipulation and Agreement between Extended Stay and the Mortgage Debt Parties Modifying Final Cash Collateral Order, dated November 17, 2009 [Docket No. 591] (the "***Modification***").

On December 15, 2009, the Bankruptcy Court approved the terms of the Stipulation, Agreement and Order between the Chapter 11 Debtors and the Mortgage Debt Parties Modifying Final Cash Collateral Order [Docket No. 634].  Pursuant to the Modification, the Adequate Protection Payments were modified as follows:

(a)    On the date that any interest payment is due under the Loan Documents (the "***Payment Date***"), Extended Stay's Adequate Protection Payment may be deferred, in whole or in part, if the amount of Extended Stay's Available Cash (as defined therein), as of the close of business one business day before the Payment Date is less than $22.5 million, after giving effect to the amount of the Adequate Protection Payment (the "***Deferred Adequate Protection Amount***").

(b)    If Extended Stay *does not* have sufficient Available Cash to make the Adequate Protection Payment in a particular month, then the amount deferred shall be added to the Deferred Adequate Protection Amount.  If the Mortgage Borrowers *do* have sufficient Available Cash to make the Adequate Protection Payment for that month, then Extended Stay shall pay the Mortgage Debt Parties any Available Cash of Extended Stay's that is in excess of $22.5 million, not to exceed the Adequate Protection Payment for that month plus the then outstanding Deferred Adequate Protection Amount.

As of the date hereof, the Chapter 11 Debtors have had sufficient cash each month to make the Adequate Protection Payments.

C.    CREDITORS' COMMITTEE

On June 24, 2009, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") pursuant to its authority under Section 1102 of the Bankruptcy Code, appointed the Creditors' Committee.

The current members of the Creditors' Committee are:[3]

Manufacturers and Traders Trust Company
25 South Charles Street- 16th Floor
Baltimore, Maryland 21201
Attn: Robert D. Brown, Administrative Vice President
Tel. No.  (410) 244-4238

Ashford Hospitality Finance L.P.
14185 Dallas Parkway, Suite 1100
Dallas, Texas 75254
Attn: David A. Brooks, Vice President
Tel. No. (972) 778-9207

Hospitality F LLC
c/o Greenberg Nicoletta & Stein
370 Lexington Avenue
New York, New York 10017
Attn: Sam Weiss, Member
Tel. No. (718) 384-0472

KeyBank National Association
127 Public Square
Mail Code OH-01-27-0844
Cleveland, Ohio   44114
Attn: Scott Childs, Vice President
Tel No. (216) 689-5989

Atlas Venture I, LLC
c/o E2M Partners, LLC
3401 Armstrong Avenue
Dallas, Texas    75205
Attn: Mark D. Van Kirk
Tel No. (214) 443-1924

The Creditors' Committee has the following Bankruptcy Court approved advisors:

---

[3] Bank of America, N.A. and Wachovia Bank were initially  members of the Creditors' Committee but subsequently resigned. On November 10, 2009, the U.S. Trustee filed the amended list of the members of the Creditors' Committee, which removed Bank of America, N.A. as a member of the Creditors' Committee. On January 25, 2010, the U.S. Trustee filed a second amended list of the members of the Creditors' Committee, which removed Wachovia Bank, N.A. as a member of the Creditors' Committee. On March 3, 2010, the U.S. Trustee filed a third amended list of the members of the Creditors' Committee, which added Atlas Venture I, LLC and KeyBank National Association as members of the Creditors' Committee.

| Attorneys | Financial Advisors |
|---|---|
| Hahn & Hessen LLP<br>488 Madison Avenue<br>New York, NY 10022<br>Attn: Mark T. Power, Esq., Mark S. Indelicato,<br>Esq., and Christopher Jarvinen, Esq. | Jefferies & Company, Inc.<br>520 Madison Avenue, 10th Floor<br>New York, NY 10022<br>Attn: Michael Henkin and David Losito |
| | |
| Hospitality Advisors | Information Agent |
| Jones Lang LaSalle Hotels<br>153 East 53rd Street, 33rd Floor<br>New York, NY 10022<br>Attn: Arthur Adler | BMC Group, Inc.<br>Information Agent<br>600 First Avenue, Suite 300<br>Seattle, WA 98104<br>Attn: Tinamarie Feil |

Since the appointment of the Creditors' Committee, Extended Stay has consulted with the Creditors' Committee concerning the administration of the Chapter 11 Cases. Extended Stay has informed the Creditors' Committee with respect to its operations and informed the Creditors' Committee of actions and transactions outside the ordinary course of business.

On August 12, 2009, the Bankruptcy Court entered the Stipulation and Agreed Order Between Extended Stay and the Official Committee of Unsecured Creditors of Extended Stay Inc., et al., Clarifying Its Requirement to Provide Access to Information Pursuant to 11 U.S.C. §§ 105(a), 1102(b)(3)(A) and 1103(c). Extended Stay has consulted with the Creditors' Committee regarding information requests, and has provided certain requested documents in response to various information requests by the Creditors' Committee.


D.    SCHEDULES, BAR DATE AND RULE 2015.3 REPORTS

On September 28, 2009, the Original Debtors filed their schedules of assets and liabilities, and statements of financial affairs (the "*Schedules*") [Docket Nos. 314-454]. The Subsequent Debtors filed their Schedules on March 4, 2010. On October 13, 2009 and April 13, 2010, Extended Stay filed its first and second Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Debtors' Estate Holds a Substantial or Controlling Interest pursuant to Bankruptcy Rule 2015.3 (the "*Rule 2015.3 Report*"). On November 19, 2009, the Bankruptcy Court entered an order establishing **Friday, January 15, 2010 at 5:00 p.m. (prevailing Eastern Time)** as the last date and time (the "*Bar Date*") for each person or entity (including without limitation, each individual, partnership, joint venture, corporation, estate, trust, and governmental unit (as defined in Section 101(27) of the Bankruptcy Code)) to file a proof of claim based upon prepetition claims against Extended Stay. A bar date has not yet been established for the Subsequent Debtors, because the Subsequent Debtors have no assets or liabilities. In accordance with the order establishing the Bar Date, Extended Stay mailed a notice of the Bar Date and a proof of Claim form to all known holders of Claims and, on November 25, 2009, published notice of the Bar Date in the Wall Street Journal.


E.    APPOINTMENT OF AN EXAMINER

On July 30, 2009, the U.S. Trustee filed the Motion for the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code [Docket No. 219] (the "*Examiner Motion*"). After subsequent discussions with Extended Stay, the Successor Trustee, the Creditors' Committee and other parties in interest regarding the relief requested in the Examiner Motion, the U.S. Trustee narrowed the

scope of the proposed examiner's duties. On September 28, 2009, Ralph R. Mabey was appointed as examiner in the Chapter 11 Cases (the "***Examiner***") and by order dated September 29, 2009 [Docket No. 455], the Court approved the appointment of the Examiner (the "***Examiner Order***").

By order dated December 11, 2009, the Bankruptcy Court approved the retention of Stutman, Treister & Glatt Professional Corporation as counsel for the Examiner, *nunc pro tunc* to September 24, 2009 [Docket No. 618]. By order dated December 11, 2009, the Bankruptcy Court approved the retention of Alvarez & Marsal Dispute Analysis Forensic Services, L.L.C. as financial advisor for the Examiner, *nunc pro tunc* to October 13, 2009 [Docket No. 619].

On December 11, 2009, the Bankruptcy Court entered the Order Granting the Examiner's Motion for an Order Approving the Examiner's Work Plan and Budget (as Amended) [Docket No. 616]. Since the appointment of the Examiner and its professionals, Extended Stay and the other parties in interest have negotiated confidentiality agreements, and responded to document requests and participated in numerous interviews and depositions. On April 8, 2010, the Examiner publicly filed his report [Docket No. 913] (the "***Examiner's Report***"). On May 25, 2010, the Examiner filed an Errata Sheet to the Examiner's Report [Docket No. 1011].

F.     ADVERSARY PROCEEDINGS

Since the Commencement Date, the Chapter 11 Debtors have been involved in three adversary proceedings in the Bankruptcy Court. Each proceeding is summarized briefly below.

The B of A Action

On June 16, 2009, B of A, Wachovia, and U.S. Bank National Association, as trustee for Maiden Lane Commercial Mortgage Backed Securities Trust 2008-1 (collectively, the "***B of A Plaintiffs***") initiated an action in the Supreme Court of the State of New York, County of New York (the "***State Court***") styled *Bank of America N.A., Wachovia Bank N.A., and U.S. Bank National Association, as Trustee for Maiden Lane Commercial Mortgage Backed Securities Trust 2008-1 v. Lightstone Holdings LLC and David Lichtenstein* (the "***B of A Action***") by filing a summons with notice, followed by a motion for summary judgment in lieu of complaint pursuant to Section 3213 of the New York Civil Practice Law and Rules, against Lightstone Holdings LLC and David Lichtenstein (collectively, the "***B of A Defendants***"). In their motion, the B of A Plaintiffs are seeking money damages against the B of A Defendants in excess of $100 million.

Initially, the B of A Defendants removed the B of A Action from the State Court to the United States District Court for the Southern District of New York (the "***District Court***"), which, in turn, referred the matter to the Bankruptcy Court, where the matter was docketed as adversary proceeding 09-01353 (JMP). In response, the B of A Plaintiffs sought an order remanding the B of A Action to the State Court. The Debtors and the B of A Defendants opposed the remand motion and the Debtors also moved to intervene in the adversary proceeding. By order dated October 7, 2009, the Bankruptcy Court remanded the B of A Action to the State Court, without ruling on the Debtors' motion to intervene [Docket No. 26].

On October 16, 2009, the B of A Defendants filed a notice of appeal of the order remanding the B of A Action to the State Court. The Debtors filed a notice of appeal on October 22, 2009. The appeals are fully-briefed and currently are pending before District Judge Laura Taylor Swain. The B of A Plaintiffs and the B of A Defendants have agreed to stay the proceedings in State Court until the District Court has decided the appeal of the remand action.

The Five Mile Action

On June 23, 2009 (and amended June 26, 2009), Five Mile Capital II SPE ESH LLC (the "***Five Mile Plaintiff***") initiated a suit, styled *Five Mile Capital II SPE ESH LLC v. Cerberus Capital Management L.P., Centerbridge Partners, L.P., The Blackstone Group, Inc. and GEM Capital Management, Inc.* (the "***Five Mile Action***") against Centerbridge Partners, L.P., Cerberus Capital Management, L.P., The Blackstone Group, Inc. and GEM Capital Management, Inc. (collectively, the "***Five Mile Defendants***") in the State Court.[4]  In the Five Mile Plaintiff's amended complaint, the Five Mile Plaintiff sought to hold the Five Mile Defendants liable for damages that allegedly resulted from the actions of the Five Mile Defendants in negotiating the terms of a restructuring with Extended Stay and to enjoin the Five Mile Defendants from conducting any further negotiations with the Chapter 11 Debtors.

Initially, the Five Mile Defendants removed the Five Mile Action from State Court to District Court, which, in turn, referred the matter to the Bankruptcy Court, where the matter was docketed as adversary proceeding 09-01367 (JMP).  In response, the Five Mile Plaintiff sought an order remanding the Five Mile Action to the State Court.  The Debtors and the Five Mile Defendants opposed the remand motion and the Debtors also moved to intervene in the adversary proceeding. On October 7, 2009, the Bankruptcy Court denied the Five Mile Plaintiff's motion to remand, and on October 8, 2009 the Bankruptcy Court granted the Debtors' motion to intervene in the Five Mile Action.  That same day, the Five Mile Plaintiff  filed a notice of appeal of the order denying the remand of the Five Mile Action and a separate notice of appeal of the order granting the Debtors' motion to intervene.  The appeals are fully briefed and  currently are pending before District Judge Laura Taylor Swain.

The Line Trust Action

On June 24, 2009, Line Trust Corporation Ltd. and Deuce Properties Ltd. (collectively, the "***Line Trust Plaintiffs***") initiated an action, styled *Line Trust Corporation Ltd. and Deuce Properties Ltd., v. David Lichtenstein, Lightstone Holdings LLC, Wells Fargo Bank, N.A., in its capacity as trustee, Wachovia Bank N.A., Bank of America, N.A., U.S. Bank National Association, Cerberus Capital Management, L.L.C., Centerbridge Partners, L.P., and John Does 1-20, being persons whose identities are presently unknown to the B of A Plaintiffs and who are acting as Supporting Holders of the Term Sheet proposed by Lichtenstein* (the "***Line Trust Action***") through the filing of a complaint in the State Court against David Lichtenstein, Lightstone Holdings LLC, Wells Fargo Bank, N.A., in its capacity as trustee, Wachovia Bank N.A., Bank of America, N.A., U.S. Bank National Association, Cerberus Capital Management, L.L.C., Centerbridge Partners, L.P., and John Does 1-20, being persons whose identities are presently unknown to the B of A Plaintiffs and who are acting as Supporting Holders of the Term Sheet proposed by Lichtenstein (the "***Line Trust Defendants***").  In their complaint, the Line Trust Plaintiffs alleged, *inter alia*, claims for breach of a guarantee agreement, breach of fiduciary duty and tortious interference with contractual relations among the Debtors' lenders.

Initially, certain Line Trust Defendants removed the Line Trust Action from State Court to District Court, which, in turn, referred the matter to the Bankruptcy Court, where the matter was docketed as adversary proceeding 09-01354 (JMP).  In response, the Line Trust Plaintiffs sought an order remanding the Line Trust Action to the State Court.  The Debtors and certain Line Trust Defendants opposed the remand motion and the Debtors also moved to intervene in the adversary proceeding.  On

---

[4] The Five Mile Plaintiff amended the Five Mile Action on June 26, 2009 to add defendants The Blackstone Group, Inc. and GEM Capital Management, Inc.

October 7, 2009, the Bankruptcy Court remanded the Line Trust Action to the State Court, without ruling on the Debtors' motion to intervene [Docket No. 47].

On October 16, 2009, October 22, 2009, and October 26, 2009, the Debtors and certain of the Line Trust Defendants filed notices of appeal of the order remanding the Line Trust Action to the District Court. The appeals are fully briefed and are currently pending before District Judge Laura Taylor Swain.

In addition, the Line Trust Plaintiffs filed a motion for summary judgment in State Court against Lightstone Holdings LLC and David Lichtenstein, and Lightstone Holdings LLC and David Lichtenstein filed papers in opposition to the motion. The Line Trust Plaintiffs filed their reply papers for the summary judgment motion on March 25, 2010. Other defendants have also filed motions to dismiss the Line Trust Action, which are fully-briefed. However, the State Court judge determined that he would not make a ruling on any of the Line Trust matters before him until the District Court has made a ruling on the appeals of the remand order.

G.    HVM INCENTIVE PLAN

Well in advance of the Commencement Date, in September 2008, HVM entered into agreements (the "***Letter Agreements***") with many of its key employees (the "***Critical Employees***"), which included senior management, 14 field supervisors, 40 regional directors of operations and various other executives responsible for the operations of the Extended Stay hotels.  Although the Letter Agreements were entered into in advance of the Commencement Date, they were entered into in contemplation of the financial restructuring of Extended Stay that was foreseeable at that time and in order to provide stability to Extended Stay's operations during an uncertain, but critical, period.  Pursuant to the Letter Agreements, each Critical Employee was entitled to a cash bonus equal to the specified amount set forth in its respective Letter Agreement, with one-third of the amount having been due (and paid) on December 31, 2008, and the remaining two-thirds due on September 30, 2009 (such remaining amounts, the "***Remaining Payments***").  As of the Commencement Date, the total Remaining Payments aggregated approximately $4.4 million.

Pursuant to the terms of the Cash Collateral Order, the Chapter 11 Debtors obtained authority to utilize Cash Collateral in accordance with the budget attached thereto.  However, approval of $4.5 million of payroll-related expenses in the Budget was deferred, subject to further discussions with the Successor Trustee and the Creditors' Committee.  On October 6, 2009, Extended Stay filed a motion seeking authorization to use the Extended Stay's Cash Collateral for payments regarding the HVM LLC Incentive Program [Docket No. 487] (the "***HVM Incentive Program Motion***") in order to ensure that prompt redress to the Court was available if the HVM Incentive Plan was not consented to by the Successor Trustee or the Creditors' Committee asserted an objection to the proposed budget modifications that would have been required in order to effectuate the HVM Incentive Program.  The U.S. Trustee and the Creditors' Committee filed objections to the HVM Incentive Program Motion [Docket Nos 502 and 530, respectively].

As a result of the U.S. Trustee's objection, Extended Stay and HVM, with the assistance of their respective advisors, restructured and modified the HVM Incentive Program (as amended, the "***Revised HVM Incentive Program***").  By the Order Authorizing Use of Cash Collateral for Payments Regarding HVM LLC Incentive Program for Non-Senior Management Critical Employees, dated October 29, 2009 [Docket No. 543], the Remaining Payments for Critical Employees, except for five senior executives (the "***Senior Executives***"), were approved.

Later, pursuant to the Second Order Authorizing the Use of Cash Collateral for Payments Regarding the Revised HVM LLC Incentive Program issued on November 12, 2009 the Bankruptcy Court approved the Revised HVM Incentive Program for the Senior Executives [Docket No 582].

Under the terms of the Revised HVM Incentive Program, substantially all of the payments to the Senior Executives were modified to be performance-based. The Revised HVM Incentive Program added another performance metric to the calculation of whether all the Critical Employees qualify for the Additional Payments and whether the Senior Executives qualify for the Quarterly Payments. The net effect of the third metric is that 50% of the calculation is based on the RevPar Index and 50% will be based on cost factors, divided equally between Controllable Costs Per Occupied Room and Corporate Overhead.

Pursuant to the terms of the Revised HVM Incentive Plan, 65% of the compensation proposed for the Critical Employees and 96% of the compensation proposed for the Senior Executives is triggered by certain performance-based metrics, assuming Extended Stay achieves its fourth revised business plan (the "**Business Plan**") and its peers perform as expected. These metrics are (i) the RevPAR Index Percentage Change, (ii) the change in Controllable Cost Per Occupied Room, and (iii) the Corporate Overhead performance. In addition, the Senior Executives are compensated for expediting the Chapter 11 Debtors' emergence from Chapter 11. Ultimately, after extensive negotiations and modifications, the terms of the Revised HVM Incentive Program were agreed to by the Chapter 11 Debtors, HVM, the Successor Trustee, the Trustee, the U.S. Trustee and the Creditors' Committee. Pursuant to the Second Order Authorizing Use of Cash Collateral for Payment Regarding the Revised HVM LLC Incentive Program, dated November 11, 2009 [Docket No. 582], the terms of the Revised HVM Incentive Plan were approved. Since the entry of the order, all of the Critical Employees entered into letter agreements that reflect the terms of the Revised HVM Incentive Plan. To date, approximately $1.2 million of the Remaining Payments have been distributed to the Critical Employees who are not Senior Executives, and approximately $4.4 million, representing the quarterly payments for the periods ending December 31, 2009 and March 31, 2010, have been paid to the Senior Executives.[5]

## VII.

## THE PLAN OF REORGANIZATION

A.     SUMMARY OF NEGOTIATIONS LEADING UP TO THE FILING OF THE PLAN

After stabilizing their business and addressing other immediate challenges of the bankruptcy filing, the Chapter 11 Debtors and their advisors turned to the challenge of the Chapter 11 Debtors' over-leveraged capital structure. The Chapter 11 Debtors initially attempted to proceed with negotiations designed to garner support for a plan of reorganization premised upon the terms set forth in the restructuring term sheet that accompanied the First Day Declaration (the "**Restructuring Term Sheet**"). The Chapter 11 Debtors also engaged in discussions with the predecessor to the Special Servicer as to plan alternatives. However, due to the continuing deterioration of the economy, in general, and the hotel business, in particular, as well as the Chapter 11 Debtors' substantial need for capital expenditures, it became apparent that new capital would be required for the Chapter 11 Debtors to emerge from bankruptcy with a feasible plan. Specifically, the Chapter 11 Debtors determined that they would need a substantial cash infusion to pay debt service and to continue the necessary investment in capital

---

[5] In addition, approximately $918,000 attributable to the stub period ending December 31, 2009 has been placed in escrow for the benefit of the Senior Executives.

improvements that will be necessary to the Chapter 11 Debtors' financial performance. As a result, the Chapter 11 Debtors determined that the Restructuring Term Sheet, which did not contemplate a cash investment, no longer provided a viable restructuring plan and, therefore, should no longer be pursued.

The Chapter 11 Debtors communicated their need for incremental capital to, and engaged in discussions with, various parties. Responding to the Chapter 11 Debtors' request, in late November 2009, the Original Sponsors began discussing with the Debtors a potential "new money" plan that would include a direct equity investment and a backstopped rights offering. Such discussions culminated on February 19, 2010 with the filing of the Original CB/P Approval Motion, which included as exhibits a Commitment Letter from the CB/P Investors, the Original CB/P Agreement and the Original CB/P Plan.

Shortly after the filing of the Original CB/P Approval Motion, the Debtors received a proposal from the Starwood Investors, which the boards of directors of the Debtors determined, pursuant to the exercise of their fiduciary duties, was a superior offer to the transactions contemplated by the Original CB/P Plan. Thus, the Chapter 11 Debtors terminated the Original CB/P Agreement and entered into the Starwood Commitment Letter and the Starwood Investment Agreement, and filed the related Plan.

Following the entry into of the Starwood Commitment Letter and Starwood Investment Agreement, the Chapter 11 Debtors received a revised proposal from the Original Sponsors, which the boards of directors of the Chapter 11 Debtors determined pursuant to the exercise of their fiduciary duties, was a superior offer to the transactions contemplated by the Starwood Plan. Thus, the applicable Debtors terminated the Starwood Commitment Letter and Starwood Investment Agreement and entered into the Amended CB/P Commitment Letter, pursuant to which, the Sponsors,[6] through the Investor committed to (i) comply with the terms of the Starwood Plan but without certain bid protection provisions, the management fee and the incentive compensation arrangement, and (ii) engage in the negotiation of, and participate in, a bidding and plan process which included the Auction, and in connection therewith provided a deposit of $150,000,000 which amount is being held in escrow.

Pursuant to the terms of the Amended CB/P Commitment Letter, the parties agreed to Bidding Procedures governing the Auction process. The Bidding Procedures allowed parties with a potential interest in the Debtors both notice and sufficient time to finalize diligence and submit fully-financed binding proposals by the conclusion of the bidding period. The Bidding Procedures also allowed the Debtors sufficient time to assess and develop such proposals and discuss them with the advisors to the Creditors' Committee and the Mortgage Debt Parties. The Bidding Procedures and Auction process were designed to encourage all parties to put their best proposal forward, bring finality to the Debtors' competitive plan process, and create a path towards confirmation of a plan that embodies the highest or best available recoveries to creditors.

The Auction was held on May 27, 2010 and after several rounds of bidding and a substantial improvement in terms, the Sponsors' proposal was selected as the highest and best bid. The Sponsors' proposal was also supported by the Special Servicer and Operating Advisor, who agreed that it was highest and best. The Sponsors' proposal provided for the sale of the Debtors free and clear of all claims, liens, encumbrances charges and other interests in exchange for cash and certain other consideration with an aggregate value of $3.925 billion. Following the Auction, the Investor and the Debtors entered into the Investment Agreement setting forth the terms of the investment. The Auction represented the culmination of an extensive marketing process that gave every interested party a full and

---

[6] As set forth above, the Original Sponsors agreed to assign a portion of their commitment to sponsor the Plan to BREP VI.

fair opportunity to conduct extensive due diligence and to bid, and the current Plan represents the highest and best offer for the equity of NewCo and the Reorganized Debtors. Contemporaneously upon the execution of the Investment Agreement, the Sponsors and the Special Servicer, Operating Advisor and Controlling Holder, as the parties that ultimately, either directly or indirectly, vote the Mortgage Facility Claim and the Mortgage Facility Deficiency Claim, entered into a Plan Support Agreement, pursuant to which the parties agreed to, among other things, support confirmation of the Plan and, as to the Special Servicer, vote to accept the Plan.

As part of this purchase and investment, the Investor will acquire 100% of the NewCo Common Interests in exchange for cash in the aggregate amount of $3,615,755,444.28 and the contribution of Mortgage Certificates held by the Investor and its members or Affiliates in the aggregate amount of $309,244,555.72 (subject to adjustment as set out in the Investment Agreement).

Pursuant to the terms of the Plan, the holder of the Mortgage Facility Claim will receive the Cash Distribution, the Investor Certificates and interests in the Litigation Trust to the extent it is a Litigation Trust Beneficiary. The holders of Mezzanine Facilities Claims and General Unsecured Claims will also receive interests in the Litigation Trust to the extent they are Litigation Trust Beneficiaries. The Cash Distribution generally consists of the Debtors' cash and cash equivalents as of the Effective Date, less the payment of Administrative Expense Claims and Priority Claims, plus a cash payment by the Sponsors, less certain deductions.

Pursuant to the Plan, the equity interests in the Mortgage Borrowers and certain other Chapter 11 Debtors will be cancelled and reissued to NewCo. The balance of the Debtors will be liquidated and dissolved as of the Effective Date. Thus, under the Plan, NewCo will be owned indirectly by the Sponsors, through the Investor or one or more other entities, and NewCo will own and control the Mortgage Properties and other assets necessary to operate the Debtors' businesses.

Pursuant to the Plan, proceeds from the investment and sale, together with the Debtors' cash on hand, will be sufficient and used to (i) fund the Administrative/Priority Claims Reserve, which will be used to pay all Allowed Administrative Expense Claims and Priority Claims (excluding only those claims of the type referred to in clause (c)(i) of the definition of "Allowed" incurring in the ordinary course of businesses and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date), and the fees and expenses of the Plan Administrator, (ii) fund the Mortgage Parties Indemnification Fund, (iii) fund the Litigation Trust, (iv) fund the wind-down of ESI, (v) pay for the purchase of control of HVM and its assets and (vi) make distributions to the holder of the Mortgage Facility Claim.

The Sponsors consist of Centerbridge, Paulson and BREP VI, each on behalf of various investment funds and accounts managed by them. Centerbridge was established in 2006 and currently has approximately $11 billion in capital under management across several funds. The firm is dedicated to partnering with world class management teams to invest across multiple stages of a company's life cycle and to employ various strategies to help companies achieve their operating and financial objectives. Centerbridge's limited partners include many of the world's most prominent financial institutions, university endowments, pension funds, and charitable trusts. Paulson is an SEC registered investment advisor with offices in New York, London and Hong Kong and approximately $32 billion of capital under management as of December 31, 2009. The firm was founded in 1994 by John Paulson who is the President and Portfolio Manager of Paulson. One of Paulson's areas of specialty is in providing capital to reorganizing companies to help them exit bankruptcy with less debt allowing them to grow and prosper. BREP VI is one in a series of real estate funds managed by predecessors or affiliates of Blackstone Real

Estate Associates VI L.P. The Blackstone real estate funds have made significant investments in lodging, major urban office buildings and a variety of real estate operating companies, and as of December 31, 2009, had $20.4 billion of assets under management. The Debtors have been advised that BREP VI is a separate and distinct entity from that of the Sellers and was not involved in the Acquisition.

The Plan further provides that all of the property of the Debtors, including the Mortgage Properties, transferred to or vesting in the Reorganized Debtors and/or NewCo shall vest in the Reorganized Debtors and/or NewCo free and clear of claims, liens, encumbrances, charges and other interests, including, without limitation, any and all claims, liens, encumbrances and any and all right, title, interests related thereto of governmental entities relating to any tax liabilities or similar liabilities. As a result of consummation of the Plan, provided it is in accordance with the Investment Agreement, and pursuant to the Plan, NewCo and the Reorganized Debtors shall not assume, incur or be responsible for any claims or liabilities of the Debtors or any of their affiliates, except for those claims of the type referred to in clause (c)(i) of the definition of "Allowed" incurred in the ordinary course of business and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, and neither the Reorganized Debtors, NewCo, the Investor, the Sponsors nor the Debt Financing Lenders shall be successors of the Debtors or ESI nor incur any successor or transferee liability of any kind, nature or character, including, without limitation, in relation to (1) the liabilities arising or resulting from or relating to the transactions contemplated by the Plan, and (2) any and all claims, liens, encumbrances, and any and all right, title, and interests related thereto, of governmental entities relating to any tax or similar liabilities.

As discussed in Article IV hereof, concurrently with the negotiations of the Investment Agreement and the Plan, in order to preserve the current operations and management of the Debtors' businesses, including the employment of HVM's 9,000 employees, ensure a seamless transition of the hotel properties and prevent any diminution in the value of the Debtors' estates, the Investor and Debtors have entered into the Membership Interest Purchase Agreement with David Lichtenstein, pursuant to which, on the Effective Date, in exchange for a $40,000,000 payment (which payment shall be funded out of the proceeds of the Investment), the Investor or one or more of its designees, which may be a third party, will acquire all of the outstanding equity of HVM Manager or, at the option of the Investor, HVM Manager will resign as manager of HVM and appoint one or more designees of the Investor, which may be a third party, as successor manager of HVM and convey to such successor manager such assets of HVM Manager as designated by the Investor. This acquisition and the related transactions are predicated on and subject to the Plan becoming effective and the implementation of the transactions contemplated by the Plan and the Investment Agreement.

B.    DEBTORS UNDER THE PLAN

Neither the Starwood Investors nor the Sponsors were willing to purchase and structure a proposed plan of reorganization for all of the Chapter 11 Debtors, including ESI. The Debtors believe that ESI's assets have minimal, if any, value. Consequently, and in view of all of the other advantages presented by the Plan, the Debtors determined to proceed without including ESI in the Plan, except to the extent of incorporation of the ESI Settlement. The Debtors and their professionals have not yet determined the most appropriate treatment of ESI, although the Plan provides for $750,000 to be set aside for the wind-down of ESI's estate.

C.    PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

1.    Payment of Allowed Administrative Expense Claims

The Allowed Amount of each Administrative Expense Claim that is Allowed as of the Effective Date shall be paid in full, in Cash, on the Effective Date from the Administrative/Priority Claims Reserve; provided, however, that (a) claims of the type specified in Section 1.7(c)(i) of the Plan, (b) any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and (c) any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, shall be assumed and paid by the Reorganized Debtors or NewCo, as applicable, in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.  Each holder of an Administrative Expense Claim of the type specified in Section 1.7(c)(ii) or Section 1.7(c)(iii) of the Plan shall be paid the Allowed Amount of such Administrative Expense Claim in full, in Cash, as soon as practicable after such Administrative Expense Claim is Allowed from the Administrative/Priority Claims Reserve.  In the event that there is any dispute as to whether an Allowed Administrative Expense Claim should be paid from the Administrative/Priority Claims Reserve or by the Reorganized Debtors or NewCo, as applicable, such dispute shall be resolved by the Bankruptcy Court.

2.    Compensation and Reimbursement Claims

The Bankruptcy Court shall fix in the Confirmation Order a date for the filing of, and a date to hear and determine, all applications for final allowances of compensation or reimbursement of expenses under section 330 of the Bankruptcy Code or applications for allowance of Administrative Expense Claims arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code.  The Allowed Amount of all Administrative Expense Claims arising under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code shall, in full satisfaction, settlement, discharge and release thereof, and in exchange therefore, be paid in full, in Cash, from the Administrative/Priority Claims Reserve (a) upon the later of (i) the Effective Date and (ii) the date upon which any such Administrative Expense Claim becomes Allowed or (b) at such later date or upon such other less favorable terms as may be mutually agreed upon between each such Administrative Expense Creditor and the Plan Administrator.

4.    Priority Tax Claims

Each holder of an Allowed Priority Tax Claim shall, in full satisfaction, settlement, discharge and release thereof, and in exchange therefore, be paid the Allowed Amount of its Allowed Priority Tax Claim from the Administrative/Priority Claims Reserve either (a) in full, in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law or (b) upon such other terms as may be mutually agreed upon between each holder of a Priority Tax Claim and Plan Administrator.

D.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| CLASS | DESIGNATION | STATUS | ENTITLED |
|-------|-------------|--------|----------|

|          |                                            |            | **TO VOTE?** |
|----------|--------------------------------------------|------------|--------------|
| Class 1  | Priority Claims                            | Unimpaired | No           |
| Class 2  | Mortgage Facility Claim                    | Impaired   | Yes          |
| Class 3  | ESA UD Mortgage Claim                      | Impaired   | Yes          |
| Class 4A | Mortgage Facility Deficiency Claim         | Impaired   | Yes          |
| Class 4B | Mezzanine Facilities Claims                | Impaired   | Yes          |
| Class 5  | General Unsecured Claims                   | Impaired   | Yes          |
| Class 6  | Existing Equity                            | Impaired   | No           |
| Class 7  | ESA MD Properties Trust Certificate        | Unimpaired | No           |
| Class 8  | ESA MD Borrower Interests                   | Unimpaired | No           |
| Class 9  | ESA P Portfolio MD Trust Certificate       | Unimpaired | No           |
| Class 10 | ESA P Portfolio MD Borrower Interests      | Unimpaired | No           |
| Class 11 | ESA Canada Properties Interests            | Unimpaired | No           |
| Class 12 | ESA Canada Properties Borrower Interests   | Unimpaired | No           |
| Class 13 | ESH/TN Properties L.L.C. Membership Interests | Unimpaired | No         |
| Class 14 | ESH/ESA General Partnership Interests      | Unimpaired | No           |
| Class 15 | Other Existing Equity Interests            | Impaired   | No           |

E.       TREATMENT OF CLAIMS AND EQUITY INTERESTS

    1.       <u>Class 1.  Priority Claims</u>

        (a)       *Classification*:  Class 1 consists of the Allowed Priority Claims.

        (b)       *Treatment*:  Each holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim from the Administrative/Priority Claims Reserve, in full, in Cash, on the later of the Effective Date and as soon as practicable after the date such Priority Claim becomes Allowed.

        (c)       *Voting*:  Class 1 is Unimpaired.  The holders of the Claims in Class 1 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

    2.       <u>Class 2.  Mortgage Facility Claim</u>

        (a)       *Classification and Allowance*:  Class 2 consists of the Allowed Mortgage Facility Claim which, together with the Mortgage Facility Deficiency Claim, shall be an Allowed Claim of at least $4,100,000,000.

        (b)       *Treatment*:  The holder of the Allowed Mortgage Facility Claim shall receive 100% of the Cash Distribution and the Investor Certificates on the Effective Date, with such Cash Distribution to be distributed in accordance with Section 6.3 of the Plan and the Investor Certificates will be cancelled without any distributions on account thereof.

(c)     *Non-Consensual Confirmation*:  In the event that Class 2 rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 of the Plan, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, such consents not to be unreasonably withheld, to offer different treatment to Class 2, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(d)     *Adequate Protection Payment:*  Nothing in the Plan shall affect the rights of the Mortgage Debt Parties to retain payments made by the Debtors in accordance with the Cash Collateral Order.

(e)     *Voting*:  Class 2 is Impaired.  The holder of the Claim in Class 2 is entitled to vote to accept or reject the Plan.

3.     Class 3.  ESA UD Mortgage Claim

(a)     *Classification*:  Class 3 consists of the Allowed ESA UD Mortgage Claim.

(b)     *Treatment*:  The holder of the Allowed ESA UD Mortgage Claim shall receive on the Distribution Date the New ESA UD Mortgage Note in full settlement, satisfaction, release and discharge of the Allowed ESA UD Mortgage Claim.

(c)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed ESA UD Mortgage Claim.

(d)     *Voting*:  Class 3 is Impaired.  The holder of the Claim in Class 3 is entitled to vote to accept or reject the Plan.

4.     Class 4A. Mortgage Facility Deficiency Claim

(a)     *Classification and Allowance*:  Class 4A consists of the Mortgage Facility Deficiency Claim which, together with the Mortgage Facility Claim, shall be an Allowed Claim of at least $4,100,000,000.

(b)     *Treatment*:  The holder of the Allowed Mortgage Facility Deficiency Claim shall receive an interest in the Litigation Trust to the extent that it is a Litigation Trust Beneficiary, which shall be distributed pursuant to Section 6.3 of the Plan, subject to the terms of the Intercreditor Agreement.

(c)     *Non-Consensual Confirmation*:  In the event that Class 4A rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 of the Plan , to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, such consents not to be unreasonably withheld, to offer different treatment to Class 4A, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(d)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mortgage Facility Deficiency Claim.

(e)     *Voting*:  Class 4A is Impaired.  The holder of the Claim in Class 4A is entitled to vote to accept or reject the Plan.

5.      Class 4B. Mezzanine Facilities Claims

(a)     *Classification*:  Class 4B consists of the Mezzanine Facilities Claims.

(b)     *Treatment*:  The holders of the Allowed Mezzanine Facilities Claims shall receive interests in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries, which shall be distributed pursuant to Section 6.3 of the Plan, subject to the terms of the Intercreditor Agreement.

(c)     *Non-Consensual Confirmation*:  In the event that Class 4B rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 of the Plan, to alter, amend or modify the Plan, with the consent of the Investor, each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), such consents not to be unreasonably withheld, to offer different treatment to Class 4B, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(d)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mezzanine Facilities Claims.

(e)     *Voting*:  Class 4B is Impaired.  The holders of the Claim in Class 4B are entitled to vote to accept or reject the Plan.  The Special Servicer has asserted that it is entitled to vote the Mezzanine Facilities Claims pursuant to the terms of the Intercreditor Agreement.

6.      Class 5.  General Unsecured Claims

(a)     *Classification*:  Class 5 consists of the General Unsecured Claims.

(b)     *Treatment*:  The holders of the General Unsecured Claims shall receive an interest in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries.

(c)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to Allowed General Unsecured Claims.

(d)     *Non-Consensual Confirmation*:  In the event that Class 5 rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 of the Plan, to alter, amend or modify the Plan, with the consent of the Investor, each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), such consents not to be unreasonably withheld, to offer different treatment to Class 5, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(e)     *Voting*:  Class 5 is Impaired.  The holders of the Claims in Class 5 are entitled to vote to accept or reject the Plan.

7.     Class 6.  Existing Equity

(a)     *Classification*:  Class 6 consists of the Existing Equity.

(b)     *Treatment*:  No distribution shall be made under the Plan from the Estates in respect of the Existing Equity.  On the Effective Date, the certificates that previously evidenced ownership of Existing Equity shall be cancelled and shall be null and void, the holder(s) thereof shall no longer have any rights in respect of the Existing Equity, and such certificates shall not evidence any rights under the Plan.

(c)     *Voting*:  Class 6 is Impaired.  The holders of Existing Equity in Class 6 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

8.     Class 7.  ESA MD Properties Trust Certificate

(a)     *Classification*:  Class 7 consists of the ESA MD Properties Trust Certificate.

(b)     *Treatment*:  The holder of the ESA MD Properties Trust Certificate shall retain the ESA MD Properties Trust Certificate.

(c)     *Voting*:  Class 7 is Unimpaired.  The holder of the Equity Interest in Class 7 is deemed to accept the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

9.     Class 8.  ESA MD Borrower Interests

(a)     *Classification*:  Class 8 consists of the ESA MD Borrower Interests.

(b)     *Treatment*:  Each holder of ESA MD Borrower Interests shall retain its ESA MD Borrower Interests.

(c)     *Voting*:  Class 8 is Unimpaired.  The holders of the Equity Interests in Class 8 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

10.     Class 9.  ESA P Portfolio MD Trust Certificate

(a)     *Classification*:  Class 9 consists of the ESA P Portfolio MD Trust Certificate.

(b)     *Treatment*:  The holder of the ESA P Portfolio MD Trust Certificate shall retain the ESA P Portfolio MD Trust Certificate.

(c)     *Voting*:  Class 9 is Unimpaired.  The holder of the Equity Interests in Class 9 is deemed to accept the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

11.     Class 10.  ESA P Portfolio MD Borrower Interests

(a)     *Classification*:  Class 10 consists of the ESA P Portfolio MD Borrower Interests.

(b)     *Treatment*:  Each holder of ESA P Portfolio MD Borrower Interests shall retain its ESA P Portfolio MD Borrower Interests.

(c)    *Voting*: Class 10 is Unimpaired. The holders of the Equity Interests in Class 10 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

12.    Class 11. ESA Canada Properties Interests

(a)    *Classification*: Class 11 consists of the ESA Canada Properties Interests.

(b)    *Treatment*: Each holder of ESA Canada Properties Interests shall retain its ESA Canada Properties Interests.

(c)    *Voting*: Class 11 is Unimpaired. The holders of the Equity Interests in Class 11 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

13.    Class 12. ESA Canada Properties Borrower Interests

(a)    *Classification*: Class 12 consists of the ESA Canada Properties Borrower Interests.

(b)    *Treatment*: Each holder of ESA Canada Properties Borrower Interests shall retain its ESA Canada Properties Borrower Interests.

(c)    *Voting*: Class 12 is Unimpaired. The holders of the Equity Interests in Class 12 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

14.    Class 13. ESH/TN Properties Membership Interest

(a)    *Classification*: Class 13 consists of the ESH/TN Properties Membership Interest.

(b)    *Treatment*: The holder of the ESH/TN Properties Membership Interest shall retain its ESH/TN Properties Membership Interest.

(c)    *Voting*: Class 13 is Unimpaired. The holder of the Equity Interest in Class 13 is deemed to accept the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

15.    Class 14. ESH/ESA General Partnership Interests

(a)    *Classification*: Class 14 consists of the ESH/ESA General Partnership Interests.

(b)    *Treatment*: Each holder of ESH/ESA General Partnership Interests shall retain its ESH/ESA General Partnership Interests.

(c)    *Voting*: Class 14 is Unimpaired. The holders of the Equity Interests in Class 14 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

16.    Class 15. Other Existing Equity Interests

(a)    *Classification*: Class 15 consists of the Other Existing Equity Interests.

(b)    *Treatment*: No distribution shall be made under the Plan from the Estates in respect of the Other Existing Equity Interests. On the Effective Date, the certificates that previously evidenced ownership of the Other Existing Equity Interests shall be cancelled and shall be null and void,

the holders thereof shall no longer have any rights in respect of the Other Existing Equity Interests, and such certificates shall not evidence any rights under the Plan.

(c)     *Voting*:  Class 15 is Impaired.  The holders of the Other Existing Equity Interests in Class 15 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

F.     ACCEPTANCE, REJECTION AND REVOCATION OR WITHDRAWAL OF THE PLAN

1.     <u>Classes Entitled to Vote</u>

Each holder of a Claim, as of the Record Date, in an Impaired Class, other than those Classes that are deemed to reject the Plan, shall be entitled to vote to accept or reject the Plan, in its sole and absolute discretion, subject to applicable law.

2.     <u>Acceptance by Class of Claims</u>

An Impaired Class of Claims shall be deemed to accept the Plan if (a) holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

3.     <u>Nonconsensual Confirmation</u>

In the event that any Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority required by section 1129(a) of the Bankruptcy Code, the Debtors, with the consent of the Investor and each of the Sponsors, reserve the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, or (b) alter, amend or modify the Plan in accordance with Section 13.1 of the Plan.  At the request of the Investor and each of the Sponsors, the Debtors shall exercise the right to seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code in the manner reasonably requested by the Investor and each of the Sponsors.

4.     <u>Revocation or Withdrawal</u>

(a)     Right to Revoke or Withdraw.  The Plan may be revoked or withdrawn prior to the Confirmation Date (i) by the Debtors (with the consent of the Special Servicer and the Operating Advisor, such consent not to be unreasonably withheld), in their discretion or at the direction of the Investor, in the event that the Investment Agreement is terminated in accordance with Section 13 thereof, and (ii) in  all other circumstances, by the Debtors (with the consent of the Special Servicer and the Operating Advisor, such consents not to be unreasonably withheld), with the consent of the Investor and each of the Sponsors, in their sole discretion.

(b)     Effect of Withdrawal or Revocation.  If the Plan is revoked or withdrawn prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims or defenses or any admission or statement against interest by any Debtor, the Creditors' Committee, the Investor, any Sponsor or any other Person or to prejudice in any manner the rights of the Debtors, the Creditors' Committee, the Investor, any Sponsor or any Person in any further proceedings involving any Debtor.

5.     <u>Modification of the Plan</u>

The Plan may be altered, amended or modified by the Debtors, in consultation with the Investor and each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), before or after the Confirmation Date, as provided in section 1127 of the Bankruptcy Code; *provided, however,* that no such alterations, amendments or modifications that are material shall be made without the consent of the Investor and each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), which consents shall not be unreasonably withheld. A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

6.     <u>Amendment of Plan Documents</u>

From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan and any documents attached to such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan shall be as provided in such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan and their respective attachments.

7.     <u>Removal of Debtors</u>

At the option of the Investor and each of the Sponsors, with the consent of the Debtors and the consent of the Special Servicer and the Operating Advisor, which consents shall not be unreasonably withheld, a Debtor may be removed from the Plan. In such event, the Plan will omit any treatment of the assets and liabilities of such Debtor, unless otherwise agreed. The removal of any Debtor from the Plan will not affect the Plan with respect to any other Debtor.

G.     TRANSACTIONS TO BE CONSUMMATED UNDER THE PLAN AND CERTAIN CORPORATE AND SECURITIES LAW MATTERS

1.     <u>Transactions to be Consummated Under the Plan</u>

(a)     **Substantive Consolidation**. The Plan is premised upon the substantive consolidation of the Debtors for all purposes related to the Plan, including, without limitation, for purposes of voting, confirmation and distribution. On and after the Effective Date, the Debtors and their Estates shall be deemed merged and (i) all assets and liabilities of the Debtors shall be treated for purposes of the Plan as though they were merged, (ii) all guarantees of the Debtors of payment, performance or collection of obligations of any other of the Debtors shall be eliminated and cancelled, (iii) all joint obligations of two or more of the Debtors and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, and (iv) any Claim filed against any of the Debtors shall be deemed filed against the consolidated Debtors and shall be one Claim against and a single obligation of the consolidated Debtors. The provisions of the Intercreditor Agreement shall remain in full force and effect notwithstanding any substantive consolidation of the Debtors pursuant to the Plan.

(b)     **Deemed Sale of Mortgage Properties**. Notwithstanding the vesting and retention of title of the Mortgage Properties in the Reorganized Debtors, the transfer of 100% of the New Debtor Equity of the Tier 1 Debtors to NewCo and the distribution of the Cash Distribution by the Reorganized Debtors to the holder of the Allowed Mortgage Facility Claim effected pursuant to the Plan shall be deemed the equivalent of a sale of the Mortgage Properties to NewCo after foreclosure or

acceptance of a deed in lieu of foreclosure by the Trustee or the Special Servicer, free and clear of all liens, claims, encumbrances and obligations.

(c) **Distributions to Holder of Allowed Mortgage Facility Claim**. The Cash Distribution shall be distributed by the Plan Administrator to the holder of the Allowed Mortgage Facility Claim on the Effective Date in accordance with Section 8.2 of the Plan, which shall then distribute the Cash Distribution to the holders of Mortgage Certificates in accordance with the priorities set forth in the Trust and Servicing Agreement. The Investor Certificates shall be distributed by the Plan Administrator to the holder of the Allowed Mortgage Facility Claim on the Effective Date in accordance with Section 8.2, of the Plan which shall then cancel the Investor Certificates in accordance with the provisions of the Trust and Servicing Agreement without any Distribution to be made on account of such Investor Certificates.

(d) **Creation of NewCo**.

A. *Certificate of Formation*. The NewCo Certificate of Formation shall be filed with the applicable Secretary of State on or before the Effective Date and shall, *inter alia*, include a provision prohibiting the issuance of non-voting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code. Pursuant to the Plan:

(1) NewCo Common Interests comprising 100% of the total issued NewCo Common Interests as of the Effective Date shall be issued to the Investor and its members or Affiliates designated pursuant to Section 2.3 of the Investment Agreement on the Effective Date; and

(2) Additional NewCo Common Interests, in an amount agreed upon by the Debtors, the Investor and each of the Sponsors, shall be reserved for issuance under the NewCo Management Incentive Plan.

If the Investor and the Sponsors determine, subject to the terms of the Investment Agreement and the Plan, that an alternate corporate or organizational structure, form or identity is appropriate, Section 6.4(a) of the Plan shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

B. *NewCo Operating Agreement*. The NewCo Operating Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms on the Effective Date.

(e) **Corporate Reorganization Actions**

On or as soon as practicable after the Effective Date, the Debtors and/or NewCo, as applicable, shall take such actions as may be or become necessary to effectuate the following, all of which shall be authorized and approved in all respects, in each case without further action being required under applicable law, regulation, order, or rule (including, without limitation, any action by the board of directors, stockholders, partners or members of any Debtor or members of NewCo):

A. the NewCo Certificate of Formation will be filed with the applicable Secretary of State effecting the formation of NewCo. At the option of the Investor and each of the Sponsors, the Debtors or NewCo may form additional subsidiaries owned in whole, or in part, by NewCo in order to effectuate the transactions contemplated hereunder;

B.      100% of the New Debtor Equity of the Tier 1 Debtors shall be issued to NewCo or a subsidiary of NewCo;

C.      the Equity Interests of each of the Tier 2 Debtors, the ESH/ESA General Partnership Interests and the ESH/TN Properties Membership Interests shall remain outstanding and Unimpaired;

D.      the Equity Interests of each of the Tier 3 Debtors shall be cancelled, extinguished and not re-issued.  The Tier 3 Debtors shall be deemed liquidated and dissolved by the Debtors for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided that, in its sole discretion, the Debtors may (but shall not be required to) file with the Office of the Secretary of State for the applicable state a certificate of dissolution; and

E.      the Restructuring Transactions shall be implemented.

If the Investor and the Sponsors determine, subject to the terms and conditions of the Investment Agreement and the Plan, that NewCo shall have an alternate corporate or organizational structure, form or identity, Section 6.7 of the Plan shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

(f)      **NewCo Management Incentive Plan**

On or after the Effective Date, NewCo shall implement the NewCo Management Incentive Plan, in form and substance reasonably acceptable to the Investor, with NewCo Common Interests being available for issuance thereunder, through a combination of the award of restricted membership interests and the granting of equity based awards, including, without limitation, restricted membership interests, deferred membership interests and options.  The NewCo Management Incentive Plan will be designed to provide additional compensation to HVM pursuant to and in connection with the management agreements between the TRSs of NewCo that are parties to such management agreements and HVM that are being assumed by, or assumed and assigned to, the TRSs (or one or more newly formed TRSs, wholly owned either directly or indirectly by NewCo, or designated by an existing Debtor that is a TRS) and modified on the Effective Date pursuant to Section 11.5 of the Plan to provide for, among other things, such issuance of the NewCo Common Interests as part of HVM's compensation thereunder.  HVM shall allocate the benefit of the NewCo Management Incentive Plan to the executive officers and senior management of HVM for their management services.  The identity of recipients, amount of grants and other terms including, without limitation, vesting, will be determined by the manager of HVM.

(g)      **Existing Debt Securities**

As of the Effective Date, all notes and any obligations of the Debtors under the Mortgage Facility or the Mezzanine Facilities shall be discharged and be of no further force or effect against the Debtors or the Mortgage Properties, and the holders thereof shall have no rights against the Debtors or the Mortgage Properties, except the right to receive the Distributions provided herein.  As of the Effective Date, the EA UD Mortgage Claim and the General Unsecured Claims, and the rights of the holders thereof thereunder, shall be cancelled and deemed null and void and of no further force and effect, and the holders thereof shall have no rights, and such notes, agreements, certificates and securities shall evidence no rights, except the right to receive the Distributions provided in the Plan.  It is understood, however, that (i) Section 6.5 of the Plan shall not affect any Guaranty Claims other than a Guaranty Claim against a

Debtor or ESI, and (ii) notwithstanding Section 6.11 of the Plan, the notes or certificates in respect of the Mortgage Facility and the Mezzanine Facilities shall not be surrendered and cancelled so as not to impair the pursuit of any Guaranty Claims other than a Guaranty Claim against a Debtor or ESI.

(h)     **Investment**

As consideration for the NewCo Common Interests to be issued pursuant to the Investment Agreement and the purchase of the business, assets and properties of the Debtors and to fund the distributions contemplated by the Plan, the Investor shall (i) cause NewCo to be provided with Cash in the aggregate amount of $3,615,755,444.28 (subject to adjustment as provided in Section 6.8 of the Plan), comprised of (a) a $1,815,755,444.28 (subject to adjustment as provided in Section 6.8 of the Plan) investment by the Investor, and (b) $1,800,000,000 from the proceeds of the Debt Financing Arrangements, and (ii) contribute to the Debtors the Investor Certificates (and waive the right to receive or retain any distribution on account of such Investor Certificates pursuant to the Plan) (collectively, the "***Investment***").  The amount of the Investor Certificates shall be calculated as of the Effective Date, and shall include the actual interest which would be payable on the Investor Certificates to the Effective Date absent the contribution and waiver provided in the Plan.  To the extent that the amount of the Investor Certificates differs from the amount set forth on Schedule 1.2 of the Investment Agreement as a result of the calculation of interest, the Cash portion of the Investment (and the aggregate Cash amount to be provided to NewCo by the Investor) shall be adjusted up or down accordingly on a dollar for dollar basis. The NewCo Common Interests that the Investor shall receive on the Effective Date as a result of the Investment will comprise 100% of the total issued and outstanding NewCo Common Interests as of the Effective Date.

On the Effective Date, the Investor will also contribute Cash to NewCo in the amount of the Reserve, as such term is defined in the Investment Agreement, which will cover one or more capital reserves, working capital reserves, transaction expenses and any other such reserves for the ongoing operations of NewCo.

(i)     **Additional Information Regarding the Investment Agreement**

The terms and conditions of the Investment are set forth in the Investment Agreement.

A.     *Expenses*

The Investment Agreement provides that in the event the Plan is not confirmed or consummated other than due to a material breach of the Investment Agreement by the Investor or its members and Affiliates as determined by final order of the Bankruptcy Court, the Investor and its members and Affiliates are entitled to reimbursement of all actual reasonable out-of-pocket costs, fees, expenses, disbursements and other charges paid by or due and payable by the Investor and/or its members and Affiliates including, without limitation, (i) fees, costs, expenses, disbursements and other charges of counsel to each of the Investor and its members and Affiliates, (ii) fees, costs, expenses, disbursements and other charges of any other professionals retained by the Investor and its members and Affiliates  in connection with or relating to the Investment Agreement, the Investment or the Plan, including, without limitation, in connection with the transactions contemplated thereby (including, without limitation, investigating, negotiating, documenting and completing such transactions and enforcing, attempting to enforce and preserving any rights or remedies contemplated hereunder and by the Chapter 11 Cases) or judicial and regulatory proceedings related to such transactions and the Chapter 11 Cases, including, without limitation, the fees and expenses of Fried, Frank, Harris, Shriver & Jacobson LLP and of Houlihan, Lokey, Howard & Zukin, Inc. pursuant to its engagement letter with the Sponsors and Gibson,

Dunn & Crutcher LLP, counsel to Paulson & Co. Inc., on behalf of certain investment funds and accounts managed by them and Simpson, Thacher & Bartlett LLP, counsel to BREP VI on behalf of itself and its parallel funds and related alternative vehicles and (iii) financing costs and related fees (collectively, the "***Expenses***"); provided, that, consistent with the Bidding Procedures, the maximum amount of the Expenses payable by the Company (the "***Maximum Expense Reimbursement Amount***") shall be up to twenty million ($20,000,000); <u>provided</u> further that, subject to the approval of the Bankruptcy Court, the Maximum Expense Reimbursement Amount shall be increased to thirty five million dollars ($35,000,000), it being understood that obtaining authorization for such increase shall not be a condition to closing nor shall a failure to obtain such authorization constitute a termination event under the Investment Agreement.

If the Plan is confirmed and consummated, the Debtors will not be responsible for the payment or reimbursement of the Sponsor Expenses and such amounts will not impact or reduce recoveries to creditors.  In the event the Plan is confirmed and consummated, the Sponsors will, directly or indirectly, be responsible for their own Expenses and transaction costs.

B.       *Closing Conditions and Termination Rights*

The obligation of the Investor to purchase the NewCo Common Interests and the Debtors' estates and business as set forth in the Investment Agreement will be conditioned upon satisfaction of certain conditions (each of which may be waived by the Investor), including, without limitation, the following:[7]

(a)       The structure of the transactions contemplated by the Investment Agreement and the structure and organization of NewCo on and after the Effective Date (including the implementation of any alternate structure, form or identity of NewCo and/or any of its Subsidiaries and the corresponding changes to the structure of Investment Transactions, determined by the Investor in accordance with Section 1.1 of the Investment Agreement, and the characterization for U.S. federal tax purposes of any entity as a partnership, a corporation, a real estate investment trust, a limited liability company or other entity); the utilization or preservation of any tax attributes or benefits of NewCo (including the tax basis at which NewCo holds the assets of the business); and the resolution of any tax issues or potential Liability (as such term is defined in the Investment Agreement), shall be reasonably acceptable to the Investor.  The treatment in the Confirmation Order of any current, contingent or potential liability in respect of taxes that would in any way affect NewCo or the Reorganized Debtors shall be approved by the Investor in its sole discretion.

(b)       As of the Effective Date, (i) NewCo, through itself or its Subsidiaries, shall have all right, title and interest to any and all equity or other ownership interests in the Debtors, (ii) at the Investor's election to be made in its sole and absolute discretion, (x) one or more designees of the Investor (which may include NewCo or its Subsidiaries or any other person) shall have all right, title and interest to any and all equity or other

---

[7] For a full list of closing conditions, see Section 13 of the Investment Agreement.

ownership interests in either or both of HVM and/or HVM Manager, (y) NewCo, through itself or its Subsidiaries, shall have all right, title and interest to any and all equity or other ownership interests in either or both of HVM and/or HVM Manager and/or (z) HVM Manager shall have resigned as manager of HVM and shall have appointed NewCo Manager as successor manager of HVM, (iii) NewCo or one or more designees of the Investor, through itself or its Subsidiaries, shall have all right, title and interest to all Company Intellectual Property and BHAC Intellectual Property, (iv) at the Investor's election, to be made in its sole and absolute discretion, NewCo or one or more designees of the Investor, through itself or its Subsidiaries, shall have all right, title and interest to any and all of the Business Assets (as such term is defined in the Investment Agreement), including without limitation all right, title and interest to any and all assets of either or both of HVM Manager and/or HVM (which may exclude human resource assets), free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind, except as provided in the Plan, and (v) the Debtors being acquired by the Investor shall have all right, title and interest to any and all proceeds received or entitled to be received by the prevailing plaintiffs in respect of the Windows Litigation, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind, except as provided in the Plan. Pursuant to the Membership Interest Purchase Agreement dated as of June 4, 2010 (the "**HVM Manager Agreement**"), the Debtors, the Investor and HVM Manager agreed on the terms for the transfer of HVM Manager or the appointment of Investor' designee as the manager of HVM. Thus, only part of this condition to the Investment Agreement will be satisfied on the Effective Date provided that the parties comply with their respective obligations under the HVM Manager Agreement. Further, there is a condition that the Debtors shall have entered into an Intellectual Property Transfer Agreement with respect to the BHAC IP or shall have otherwise received and obtained ownership of the BHAC IP free and clear of all claims, liens, encumbrances and obligations.

(c)     The Investor and its members and Affiliates shall have approved, which approval shall not be unreasonably withheld, prior to filing with the Bankruptcy Court any documents, amendments or supplements relating to the Plan and the Disclosure Statement (the "**Plan Documents**").

(d)     The Confirmation Order approving the Plan (including, without limitation, all Plan Documents) shall be in form and substance approved by the Investor and each of the Sponsors and shall be a Final Order.

(e)     The conditions to the occurrence of the Effective Date of the Plan shall have been satisfied or waived by the parties in accordance with the Plan.

(f)     To the extent such payments are due and payable, HVM shall pay any severance payments pursuant to the terms of the applicable Change in Control Agreements as in effect as of the date any such severance payments become due and payable, in the amounts set forth in the

Change in Control Letter; provided, that any such payments shall be made only to the extent that the applicable Change in Control Agreement is in effect and/or has not been superseded by any New Employment Agreement between the applicable employee and HVM. NewCo or the Debtors shall have resolved any other claims of former executive officers, or executive officers that were employed after the Commencement Date and that have resigned or been terminated from the Debtors prior to the Effective Date, on terms reasonably acceptable to the Investor or otherwise ordered by the Bankruptcy Court; provided, that, to the extent any such claims are to be resolved by the Debtors, any such resolution may only be effectuated with the prior consent of the Investor, which consent is not to be unreasonably withheld.

(g)     No Material Adverse Change shall have occurred.

The Investment Agreement also sets forth a timetable by which the Effective Date must occur. Upon the occurrence of any of the following events (each of which may be waived in writing by the Investor), the Investor may terminate the Investment Agreement by providing written notice of such termination to the Debtors and, as a consequence of such termination, the Debtors will be obligated to return the Deposit to the Investor, the Investor's commitment to purchase the NewCo Common Interests will terminate, and all of the Debtors' other obligations thereunder (other than their obligations to pay the reimbursable expenses and to satisfy their indemnification obligations set forth in the Investment Agreement) will be of no further force or effect [8]:

(a)     the commencement of the hearing on confirmation of the Plan does not occur prior to August 26, 2010;

(b)     the Confirmation Order, in form and substance acceptable to the Investor, has not been entered by the Bankruptcy Court on or before September 21, 2010;

(c)     the Effective Date does not occur on or before November 15, 2010;

(d)     the withdrawal, amendment, modification of, or the filing of a pleading seeking to amend or modify, the Plan, this Disclosure Statement or any document related to the Plan or Disclosure Statement (including, without limitation, any documents in the Plan Supplement, and any motion, notice, exhibit, appendix or order) by the Debtors, which withdrawal, amendment, modification or filing is inconsistent with the Investment Agreement, except as reasonably agreed in writing by the Investor;

(e)     the filing by the Debtors of any motion or other request for relief seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

---

[8] For a full list of termination rights, see Section 13 of the Investment Agreement. The Debtors have not listed those termination rights which are no longer applicable because the relevant milestone has been achieved.

(f)     the entry of an order by the Bankruptcy Court (a) dismissing any of the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) appointing a trustee pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; or (d) making a finding of fraud, dishonesty, or misconduct by any officer or director of NewCo, the Debtors, HVM or HVM Manager;

(g)     a breach by NewCo, the Debtors, HVM or HVM Manager of any of their obligations under the Investment Agreement that is not cured within three (3) Business Days after receipt of written notice thereof to the Investor;

(h)     one or more of the conditions precedent to occurrence of the Effective Date or to the obligations of the Investor set forth in the Investment Agreement becomes impossible to satisfy on or before the Effective Date;

(i)     the Debtors fail to comply with the provisions on the last page of the Bidding Procedures entitled "End of Auction Process"; and

(j)     at any time after the occurrence of a Material Adverse Change.

(j)     **Effectuating Documents and Further Transactions.**  On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to the Investor and each of the Sponsors as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Each of the officers of the Debtors, the Reorganized Debtors and NewCo is authorized, without the need for any further order or authority, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.  The Reorganized Debtors are authorized to execute all documents and enter into all agreements as may be necessary and appropriate in connection with the Debt Financing Arrangements.

(k)     **Allocation of Plan Distributions Between Principal and Interest.**  To the extent that any Allowed Mortgage Deficiency Facility Claim, Allowed Mezzanine Facility Claim, or Allowed General Unsecured Claim scheduled to receive a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim (as determined for federal income tax purposes) first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

(l)     **Surrender and Cancellation of Instruments.** Subject to Section 6.5 of the Plan, each holder of an instrument evidencing a Claim shall surrender such instrument to the Reorganized Debtors.  At the option of the Reorganized Debtors or NewCo, as applicable (in their reasonable discretion), no Distribution hereunder shall be made to or on behalf of any holder of such Claim unless and until such instrument is received or the unavailability of such instrument is reasonably established to the satisfaction of the Reorganized Debtors.  In accordance with section 1143 of the Bankruptcy Code, any such holder of such a Claim that fails to surrender or cause to be surrendered such instrument or to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Reorganized Debtors and, in the event that the Reorganized Debtors requests, fails to furnish a bond in form and substance

(including, without limitation, amount) reasonably satisfactory to the Reorganized Debtors shall be deemed to have forfeited all rights, claims, and interests and shall not participate in any Distribution under the Plan.

(m)  **Letters of Credit.** At or prior to the Effective Date, in the Debtors' discretion, with the consent of the Investor and each of the Sponsors, (a) the Existing Letters of Credit shall be terminated and any cash collateral provided thereunder shall be released to the entity that posted such collateral; and (b) the Reorganized Debtors shall provide any and all letters of credit and related cash collateral necessary to obtain and maintain in effect on or after the Effective Date all such forms of insurance as are customary to operate a business of the size and type of the Debtors; provided, however, that on or after the Effective Date the Investor shall reimburse the Reorganized Debtors for any cash collateral referred to in clause (b) without any impact on the Cash Distribution.

(n)  **BHAC IP Transfer Agreement and Homestead Intellectual Property.**

As noted above, BHAC, a non-debtor and owner of 100% of the common stock of ESI, which indirectly owns and operates 552 properties using the Extended Stay Hotels service mark, owns the trademarks for the Extended Stay America, Studio Plus, Crossland, and Extended Stay Deluxe brands, along with minor variations of those names. The BHAC IP is pledged as collateral for the Mortgage Debt. As part of the Chapter 11 Debtors' operations, BHAC has issued to each of the Mortgage Borrowers non-exclusive licenses to use the BHAC IP. It is critical for the continued operations of the Debtors that the Reorganized Debtors continue to have full, uninterrupted and undiluted use of the BHAC IP. Therefore, the Plan contemplates that all right, title and interest in and to the BHAC IP will ultimately be transferred to NewCo or its designee, which may be a third party, so that the BHAC IP remains in the exclusive control of the Reorganized Debtors on and after the Effective Date.

Pursuant to the proposed intellectual property transfer agreement (the "BHAC IP Transfer Agreement") with BHAC, on the Effective Date, BHAC shall transfer to NewCo or its designee, which may be a third party, the BHAC IP. In the event the Debtors and BHAC have not executed the BHAC IP Transfer Agreement prior to June 17, 2010 (unless otherwise agreed by the Investor), the Special Servicer shall commence proceedings to foreclose on the BHAC IP and on the Effective Date shall assign and transfer the BHAC IP to NewCo or its designee, which may be a third party, or at the Investor's option, the Debtors, for a portion of the consideration provided on account of the Mortgage Facility Claim as set forth in the Plan. Upon the receipt of the BHAC IP from BHAC or the Special Servicer, as applicable, the Reorganized Debtors shall transfer the BHAC IP to NewCo or its designee, which may be a third party.

NewCo or its designee, which may be a third party, will be acquiring Homestead, and will indirectly own the Homestead Intellectual Property. Such Homestead Intellectual Property may be transferred to NewCo or its designee, which may be a third party.

(o)  **Consistent Tax Reporting**

For federal income tax purposes, (i) the distributions described in Section 4.2 of the Plan shall be treated as a distribution to the holders of Mortgage Certificates following a sale of the Mortgage Properties (and all other assets deemed to be transferred to NewCo), (ii) the distribution described in Section 4.3 of the Plan shall be treated as a distribution of undivided interests in the assets of NewCo to the holder of the Allowed ESA UD Mortgage Claim followed by a sale of such assets for the New ESA UD Mortgage Note, and (iii) the distributions described in Sections 4.4, 4.5 and 4.6 of the Plan shall be

treated as described in Section 6.17(c) of the Plan. All parties will be required to report for all federal income tax purposes in a manner consistent with the characterization of the distributions described above.

As soon as possible after the Effective Date, and to the extent required by Section 1060 of the Internal Revenue Code, NewCo shall determine the aggregate value of the underlying assets of NewCo as of the Effective Date and the portions of such value that are allocable, respectively, to the New ESA UD Mortgage Note and the Investment. Such allocation will take into account the relative fair market values of the New ESA UD Mortgage Note and the Investment. NewCo will apprise, in writing, all parties of such aggregate valuation and allocation. The aggregate valuation and allocation shall be used consistently by all parties for all federal income tax purposes.

(p) **Issuance of NewCo Common Interests to Investor or Sponsor Affiliates**.

The Investor, the Sponsors or their Affiliates, in their respective sole discretion, may deliver a written schedule to the Debtors within ten (10) days after entry of the Confirmation Order to designate that some or all of the NewCo Common Interests to be issued to the Investor, the Sponsors or their Affiliates under the Plan be issued in the name of, and delivered to, one or more of their managed funds and/or respective affiliates, so long as such issuance and delivery is in compliance with federal and state securities laws and does not require NewCo to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended and the rules and regulations of the Securities and Exchange Commission thereunder.

In the event that the Investor, the Sponsors or their Affiliates make the designation pursuant to Section 6.15(a) of the Plan, the funds managed by the Investor, the Sponsors and/or their respective affiliates that are so designated shall have the rights, entitlements and benefit that would otherwise inure to the Investor, the Sponsors or their Affiliates in their capacity as a holder of the NewCo Common Interest as provided in the Plan, including those rights, entitlements and benefits of the Investor, the Sponsor or the Affiliate specified in Section 6.4(a)(i) above.

Each of the Loan REMIC, the Upper Tier REMIC, and the Lower Tier REMIC shall adopt a plan of liquidation immediately prior to the Effective Date (provided, however, that notwithstanding the liquidation of the Loan REMIC, the Lower Tier REMIC and the Upper Tier REMIC, the Mortgage Facility Trust shall not liquidate and shall remain in full force and effect until the termination of the Mortgage Parties Indemnification Fund).

(q) **Mortgage Parties Indemnification Fund.**

On the Effective Date, the Debtors shall transfer $20 million to the Special Servicer which shall hold such funds in a cash collateral account (the "Mortgage Parties Indemnification Fund") for the benefit of the Mortgage Debt Parties to satisfy any indemnification obligations of the Mortgage Facility Trust with respect to any post-Confirmation Date litigation commenced against the Mortgage Debt Parties regarding the voting on the Plan, distributions under the Plan and any other actions taken by the Mortgage Debt Parties in connection with the Plan, including the implementation thereof (the "Indemnified Litigation"). Unless the funds maintained in the Mortgage Parties Indemnification Fund are paid to the Mortgage Debt Parties in connection with any Indemnified Litigation, the Special Servicer (or such Person designated by the Special Servicer or the Successor Trustee) shall hold the Mortgage Parties Indemnification Fund in a cash collateral account for a period of six (6) years from the Effective Date of the Plan. Upon the later of termination of the six-year period or entry of a final, non-appealable judgment in any then-pending Indemnified Litigation, any and all cash remaining in the Mortgage Parties Indemnification Fund shall be distributed to the holder of the Allowed Mortgage Facility Claim, for

distribution to the first tranche of Mortgage Certificates that are held by holders that have not received payment in full under the Plan and, to the extent that there are sufficient funds remaining after payment in full of such tranche of Mortgage Certificate holders, to other Mortgage Certificate holders in accordance with the priorities set forth in the Trust and Servicing Agreement. Each Mortgage Debt Party may receive reimbursement for any fees that such Mortgage Debt Party has incurred in connection with any Indemnified Litigation by submitting invoices (with appropriate redactions for privilege) to the Special Servicer (or such Person designated by the Special Servicer), which shall pay such invoices from the funds maintained in the Mortgage Parties Indemnification Fund reasonably promptly after receipt of such invoices. In addition, the Special Servicer shall be entitled to reasonably prompt reimbursement for any fees that the Special Servicer incurs in connection with any Indemnified Litigation from the funds maintained in the Mortgage Parties Indemnification Fund.

For all United States federal income tax purposes, all parties shall treat the transfer of Cash to the Mortgage Parties Indemnification Fund as (1) a transfer of Cash (subject to any obligations relating to those assets) directly to the holders of Mortgage Certificates (in accordance with the priorities set forth in the Trust and Servicing Agreement), followed by (2) the transfer by the holders of Mortgage Certificates otherwise entitled to receive such Cash to the Mortgage Parties Indemnification Fund. Accordingly, the holders of Mortgage Certificates otherwise entitled to receive such Cash shall be treated for United States federal income tax purposes as the direct owners of their respective share of the Cash in the Mortgage Parties Indemnification Fund. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. The Special Servicer shall send annually to each holder of Mortgage Certificates that is treated as a direct owner of any portion of the Mortgage Parties Indemnification Fund a separate statement setting forth any income earned with respect to, or any expenditure made on behalf of, such portion of the Mortgage Parties Indemnification Fund as may be relevant for United States federal income tax purposes.

(r)     **Litigation Trust.**

On the Effective Date, the Debtors shall transfer the Litigation Trust Funding of $5,000,000 to the Litigation Trust, and the Debtors and the Litigation Trustee shall execute the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan. On the Effective Date, the Debtors shall be deemed to have automatically transferred to the Litigation Trust all of their right, title, and interest in and to all of the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Litigation Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Litigation Trust Beneficiaries as set forth in the Plan and the expenses of the Litigation Trust as provided in the Litigation Trust Agreement. Thereupon, the Debtors shall have no interest in the Litigation Trust Assets or the Litigation Trust. In connection with the vesting and transfer of the Litigation Trust Assets, including rights and causes of action, any attorney-client, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust shall vest in the Litigation Trust. The Debtors and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities. In the event of any conflict between the terms of Section 6.17 of the Plan and the Litigation Trust Agreement, the terms of the Litigation Trust Agreement shall govern.

The Litigation Trust shall be established for the sole purpose of liquidating and distributing the Litigation Trust Assets contributed to the Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

For all United States federal income tax purposes, all parties shall treat the transfer of the Litigation Trust Assets to the Litigation Trust as (1) a transfer of the Litigation Trust Assets (subject to any obligations relating to those assets) directly to the Litigation Trust Beneficiaries, followed by (2) the transfer by such beneficiaries to the Litigation Trust of the Litigation Trust Assets in exchange for an interest in the Litigation Trust. Accordingly, the Litigation Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

For tax reporting purposes:

(i) The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

(ii) The Litigation Trustee also shall annually send to each holder of an interest in the Litigation Trust a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for United States federal income tax purposes and will instruct all such holders to use such information in preparing their United States federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their United States federal income tax returns.

(iii) As soon as reasonably practicable after the Litigation Trust Assets are transferred to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets. Such valuation shall be made available from time to time to all parties to the Litigation Trust, to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(iv) Allocations of Litigation Trust taxable income or loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(v) The Litigation Trustee shall be responsible for payment, out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or its assets.

The Litigation Trustee, on behalf of the Litigation Trust, shall have the exclusive right, authority and discretion to institute, prosecute, abandon, settle or compromise any and all causes of action that constitute Litigation Trust Assets without the consent or approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided in the Plan or in the Litigation Trust Agreement. From and after the Effective Date, the Litigation Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the Litigation Trust, shall serve as a representative of the Debtors' Estates and shall retain and possess the sole and exclusive right to commence, pursue, settle, compromise or abandon, as appropriate, any and all causes of action, whether arising before of after the Petition Date, in any court or other tribunal.

From and after the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Litigation Trust, and any professionals retained by the Litigation Trust, except as otherwise provided in the Litigation Trust Agreement. The Litigation Trustee shall (i) pay to the holder of the Allowed Mortgage Facility Claim the Litigation Trust Funding Reimbursement out of the proceeds of the Litigation Trust Assets, and (ii) reimburse NewCo, the Reorganized Debtors, HVM and their officers, directors and managers for all reasonable costs and expenses incurred as a third party in connection with any cause of action or proceeding pursued by or otherwise involving the Litigation Trust and the Litigation Trust Assets or as a defendant in relation to a claim that has been released pursuant to the Plan.

The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom); provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

The Litigation Trustee is required to distribute to the Litigation Trust Beneficiaries on account of their interests in the Litigation Trust, at least annually, all unrestricted Cash on hand, less such amounts paid pursuant to Section 6.17(f) of the Plan.

      (s)      **ESI Settlement.**

The Mortgage Facility Trust holds a Guaranty Claim against ESI. ESI and the Special Servicer (subject to the consent of the Operating Advisor) shall enter into a settlement agreement (the "***ESI Settlement***"), subject to reasonable approval of the Investor and each of the Sponsors and Bankruptcy Court approval, pursuant to which, *inter alia:* (i) ESI would be released from its Guaranty of the Mortgage Loan and the Mezzanine Facilities, (ii) ESI would grant a release to certain parties as set forth in Section 10.10 of the Plan, (iii) the Chapter 11 Debtors and the Special Servicer would set aside $750,000 to be used to wind down ESI, and (iv) the creditors of ESI would be granted an interest in the Litigation Trust. The Plan contemplates that the Bankruptcy Court would approve the ESI Settlement at or before the Confirmation Hearing.

      2.      <u>Securities Law Matters</u>

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale, under a chapter 11 plan of reorganization, of a security of a debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to a debtor under a plan, if such securities are offered or sold in exchange for a claim against, or equity interest in, such debtor or affiliate or principally in such exchange and partly for cash. In reliance upon this exemption, to the extent the Litigation Trust Beneficiaries' interest in the Litigation Trust Assets is deemed to be a security (the "***1145 Securities***"), such 1145 Securities generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws. The terms of the Litigation Trust Beneficiaries' interest in the Litigation Trust Assets shall be as set forth in the Litigation Trust Agreement, including that such interests shall not be certificated and shall be subject to certain restrictions on transfer. Subject to the restrictions set forth in the Litigation Trust Agreement, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in Section 1145(b) of the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, Litigation Trust Beneficiaries are advised to consult with

their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is a control Person of the issuer of the securities as defined in Section 2(a)(11) of the Securities Act.

For Persons deemed to be "underwriters" who receive 1145 Securities pursuant to the Plan including control Person underwriters, as referred to in clause (d) above (the "***Restricted Holders***"), resales of such securities would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 or other applicable exemptions under the Securities Act.

Under certain circumstances, holders of 1145 Securities deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state and foreign securities laws. Generally, Rule 144 of the Securities Act provides that persons who hold securities received in a transaction not involving a public offering or who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions vary depending on whether the seller is a holder of restricted securities or a control Person of the issuer and whether the security to be sold is an equity security or a debt security. The conditions include required holding periods in certain cases, the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in certain cases, the requirement in certain cases that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that, in certain cases, notice of the resale be filed with the Securities and Exchange Commission. The Debtors cannot assure, however, that adequate current public information will exist with respect to any issuer of 1145 Securities and therefore, that the safe harbor provisions of Rule 144 of the Securities Act will be available.

Parties who believe they may be underwriters as defined in Section 1145 of the Bankruptcy Code and other Restricted Holders are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144 or other applicable exemptions.

H.     TREATMENT OF DISPUTED CLAIMS

1.     Objections to Claims; Prosecution of Disputed Claims

NewCo or the Reorganized Debtors shall object to the allowance of Claims filed with the Bankruptcy Court  with respect to which NewCo or the Reorganized Debtors, as applicable, dispute liability in whole or in part and for which they are responsible for payment as provided in Article II of the Plan. All objections that are filed and prosecuted by NewCo or the Reorganized Debtors as provided in the Plan shall be litigated to Final Order by NewCo or the Reorganized Debtors, or settled by NewCo or the Reorganized Debtors. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by NewCo or the Reorganized Debtors to Claims shall be served and filed no later than ninety (90) days after the Effective Date.

The Plan Administrator shall object to the allowance of Administrative Expense Claims or Priority Claims filed with the Bankruptcy Court with respect to which, on behalf of the Debtors, the Plan Administrator disputes liability in whole or in part and which is to be paid from the Administrative/Priority Claims Reserve as provided in Section 2.1 of the Plan. All objections that are filed and prosecuted by the Plan Administrator as provided in the Plan shall be litigated to Final Order by the Plan Administrator or settled by the Plan Administrator. Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections by the Plan Administrator to Administrative Expense Claims and Priority Claims shall be served and filed no later than sixty (60) days after the Effective Date.

The Litigation Trustee shall object to the allowance of General Unsecured Claims and Mezzanine Facilities Claims filed with the Bankruptcy Court with respect to which the Litigation Trustee disputes liability in whole or in part. All objections that are filed and prosecuted by the Litigation Trustee as provided herein shall be litigated to Final Order by the Litigation Trustee or settled by the Litigation Trustee. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by the Litigation Trustee to General Unsecured Claims and Mezzanine Facilities Claims shall be served and filed no later than ninety (90) days after the Effective Date.

2.      Distributions on Account of Disputed Claims

Notwithstanding Article II or Article IV of the Plan, a Distribution shall only be made by NewCo or the Reorganized Debtors, the Plan Administrator or the Litigation Trustee, as applicable, to the holder of a Disputed Claim when, and to the extent that, such Disputed Claim becomes Allowed. No interest shall be paid on account of Disputed Claims that later become Allowed except to the extent that payment of interest is required under section 506(b) of the Bankruptcy Code. No Distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 7.1 of the Plan. From time to time after the Effective Date, on each Distribution Date after a Disputed Claim becomes an Allowed Claim, NewCo or the Reorganized Debtors, the Plan Administrator, or the Litigation Trustee, as applicable, shall distribute to such holder the amount distributable to such Claim in accordance with the applicable sections of the Plan. To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed. To the extent that any funds remain reserved by NewCo or the Reorganized Debtors for payment of Allowed Claims after the final resolution of all Disputed Claims that are Administrative Expense Claims or Priority Claims (and all such Disputed Claims that are Administrative Expense Claims or Priority Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall revert to and be fully vested in NewCo or the Reorganized Debtors, as applicable. To the extent that any funds remain in the Administrative/Priority Claims Reserve after the final resolution of all Administrative Expense Claims or Priority Claims that are Disputed Claims (and all such Disputed Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall be paid to the holder of the Mortgage Facility Claim, for distribution to holders of Mortgage Certificates in accordance with Section 6.3 of the Plan. To the extent that any funds remain in the Litigation Trust after the final resolution of all General Unsecured Claims and Mezzanine Facilities Claims that are Disputed Claims (and all such Disputed Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall be paid to the Litigation Trust Beneficiaries.

3.      Settlement of Claims

At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors may settle any or all of the Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019. After the Effective Date, NewCo or the

Reorganized Debtors may, and shall have the exclusive right to, compromise and settle any Claims against them that they have agreed to pay or are required to pay pursuant to Section 2.1 of the Plan and claims they have against another Person or Entity, excluding the Litigation Trust Assets, without notice to or approval from the Bankruptcy Court.

## I.    DISTRIBUTIONS

### 1.    Distributions under the Plan

Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

### 2.    Timing of Distributions under the Plan

Except for Distributions made on the Initial Distribution Date, any Distribution to be made by any Debtor, the Plan Administrator, NewCo or the Reorganized Debtors pursuant to the Plan shall be deemed to have been timely made if made within ten (10) days after the time therefore specified in the Plan. No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

### 3.    Use of Cash Collateral

The Debtors will be entitled to use cash collateral consistent with the terms of the Cash Collateral Order through the Effective Date including, without limitation, the obligations to make adequate protection payments as provided in the Cash Collateral Order.

### 4.    Plan Administrator

Unless otherwise provided in the Plan, all distributions under the Plan shall be made by the Plan Administrator. All reasonable costs and expenses incurred by the Plan Administrator in carrying out its duties under the Plan shall be paid from the funds in the Administrative/Priority Claims Reserve, provided, however, that the Plan Administrator shall provide copies of its statements for services rendered to the Special Servicer. Any dispute regarding the payment of the fees and expenses of the Plan Administrator shall be determined by the Bankruptcy Court. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that the Plan Administrator is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be paid from the funds in the Administrative/Priority Claims Reserve.

### 5.    Record Date

As of the close of business on the Record Date, the various transfer and claims registers for each of the Classes of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims. The Debtors, the Plan Administrator, NewCo, and the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims occurring after the close of business on the Record Date. The Debtors and the Plan Administrator shall be entitled to recognize and deal hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Record Date, to the extent applicable.

6.     Manner of Payment under the Plan

Unless the Person receiving a payment agrees otherwise, any payment in Cash to be made by the Plan Administrator, or NewCo or the Reorganized Debtors shall be made, at the election of the Plan Administrator, or NewCo or the Reorganized Debtors (as the case may be), by check drawn on a domestic bank or by wire transfer from a domestic bank, provided that payments to the holder of the Allowed Mortgage Facility Claim shall be paid by wire transfer.

7.     Hart-Scott-Rodino Compliance

Any NewCo Common Interests to be distributed under the Plan to any Person required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Person shall have expired or been terminated.

8.     Fractional Distributions

Fractional dollars shall be rounded down to the nearest whole dollar.

9.     Distribution of Unclaimed Property

Any Distribution under the Plan that is unclaimed after one hundred eighty (180) days following the date such property is distributed shall be deemed not to have been made and shall be transferred to the Litigation Trust, free and clear of any claims or interests of any Entities, including, without express or implied limitation, any claims or interests of any governmental unit under escheat principles.  Nothing contained herein shall affect the discharge of the Claim with respect to which such Distribution was made, and the holder of such Claim shall be forever barred from enforcing such Claim against NewCo, the Reorganized Debtors or the Debtors, or the assets, estate, properties, or interests in property of the Debtors, NewCo or the Reorganized Debtors.

10.    Administrative/Priority Claims Reserve

On the Effective Date, the Plan Administrator shall establish the Administrative/Priority Claims Reserve.  The amount of the Administrative/Priority Claims Reserve shall be determined by the Debtors, subject to the reasonable consent of the Plan Administrator and the Special Servicer (with the consent of the Operating Advisor, such consent not to be unreasonably withheld), and shall be the sum of (a) estimated accrued and unpaid Administrative Expense Claims (excluding items of the type referred to in clause (c)(i) of the definition of "Allowed" in the Plan, any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date), including, without limitation, amounts due to professionals as compensation or reimbursement of expenses, (b) the estimated Priority Claims, and (c) the estimated costs and expenses of the Plan Administrator.  For purposes of determining the estimated accrued and unpaid Administrative Expense Claims, the Debtors shall include 110% of the amount reflected on the Debtors' books and records as being due and owing as Administrative Expenses (other than amounts owed to professionals and Priority Claims which shall be estimated at 100% of such amount).  The Administrative/Priority Claims Reserve shall be the sole source for payment of Administrative Expense Claims and Priority Claims, other than items of the type referred to in clause (c)(i) of the definition of "Allowed", any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a

result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date.

On the date that is seventy-five (75) days after the Effective Date, the Plan Administrator shall distribute to the holder of the Mortgage Facility Claim all funds remaining in the Administrative/Priority Claims Reserve other than (i) any amounts required to be reserved in connection with Administrative Expense Claims or Priority Claims that are Disputed Claims at such time, and (ii) a reasonable amount to be retained for payment of the fees and expenses of the Plan Administrator and the reasonable post-Effective Date fees and expenses of the Debtors' professionals in an amount to be agreed by the Special Servicer (with the reasonable consent of the Operating Advisor). Notwithstanding the release of the funds from the Administrative/Priority Claims Reserve or any provisions of the Plan, NewCo and the Reorganized Debtors shall incur no liability for and shall have no responsibility to pay any Administrative Expense Claim or Priority Claim, excluding the claims of the type specified in Section 1.7(c)(i) of the Plan and any payments relating to Change of Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, in accordance with Section 2.1 of the Plan.

J.     CONDITIONS PRECEDENT

1.     Conditions Precedent to the Effective Date

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)     the Bankruptcy Court shall have entered a Confirmation Order with respect to the Plan in form and substance approved by the Investor, each of the Sponsors and the Special Servicer (with the consent of the Operating Advisor), and such Confirmation Order shall be non-appealable, shall not have been appealed within fourteen (14) calendar days of entry or, if such Confirmation Order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such Confirmation Order;

(b)     all actions, documents, and agreements necessary to implement the Plan, including, without limitation, all actions, documents, and agreements necessary to implement the corporate reorganization described in Section 6.7 of the Plan, and the Investment described in Section 6.8 of the Plan, shall have been effected or executed;

(c)     the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are determined by the Debtors to be necessary to implement the Plan and that are required by law, regulation, or order;

(d)     the NewCo Certificate of Formation (and any certificates of formation for newly formed subsidiaries of NewCo, if any) shall have been filed with the applicable Secretary of State, and the NewCo Operating Agreement (and any operating agreements for newly formed subsidiaries of NewCo, if any) shall be in place;

(e)     the Mortgage Parties Indemnification Fund shall have been established and funded;

(f)     the Litigation Trust shall have been established and funded;

(g)     notice of the Plan and Disclosure Statement shall have been distributed to all known holders of Mortgage Certificates and publicly advertised in such a way as to provide fair and adequate notice to individual holders of Mortgage Certificates;

(h)     the Bankruptcy Court shall have approved the ESI Settlement at or prior to the Confirmation Date;

(i)     the transfer of the BHAC IP to NewCo or its designee, or at the Investor's option, the Debtors, shall have occurred; and

(j)     all of the conditions to closing that are contained in Section 11.1 of the Investment Agreement shall have been satisfied or waived.

The conditions precedent specified above, with the exception of Section 9.1(a) of the Plan, may be waived in whole or in part by the Debtors, with the prior consent of the Investor and each of the Sponsors, and with respect to Sections 9.1(e), 9.1(f), 9.1(g) and 9.1(h) only of the Plan, the Special Servicer. Subject to the foregoing, any such written waiver of a condition precedent set forth in Section 9.1 of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If the Debtors decide that one of the foregoing conditions cannot be satisfied, and the occurrence of such condition is not waived in writing by the Debtors with the prior consent of the Investor, each of the Sponsors and if applicable, the Special Servicer, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

2.      Effect of Failure of Conditions to Effective Date

If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 120 days after the Confirmation Date, or by such later date as is proposed by the Debtors (with the consent of the Investor and each of the Sponsors, which shall not be unreasonably withheld), then upon motion by the Debtors (after consultation with the Investor, each of the Sponsors and the Special Servicer) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions to consummation is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to Section 9.2 of the Plan, the Plan will be null and void in all respects, and (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, (iii) the obligations of the Investor and the Sponsors under the Investment Agreement will terminate, and (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors.

K.    EFFECT OF CONFIRMATION

    1.    Vesting of Assets

        Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors, including the Mortgage Properties, shall vest in the Reorganized Debtors and/or NewCo free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors and/or NewCo may operate the Debtors' business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.

    2.    Title to Assets; Discharge of Liabilities

        Except as otherwise provided in the Plan, on the Effective Date, title to all assets and properties and interests in property dealt with by the Plan shall vest in the Reorganized Debtors, NewCo, the Plan Administrator, the Administrative/Priority Claims Reserve, or the Litigation Trust, as provided in the Plan, free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors arising prior to the Effective Date, except as may be otherwise provided in the Plan.

        For purposes of clarity, as a result of consummation of the Plan, all of the property of the Debtors, including the Mortgage Properties, transferred to or vesting in the Reorganized Debtors and/or NewCo shall vest in the Reorganized Debtors and/or NewCo free and clear of claims, liens, encumbrances, charges and other interests, including, without limitation, any and all claims, liens, encumbrances and any and all right, title, interests related thereto of governmental entities relating to any tax liabilities or similar liabilities.  In addition, as a result of consummation of the Plan, provided it is in accordance with the Investment Agreement, and pursuant to the Plan, NewCo and the Reorganized Debtors shall not assume, incur or be responsible for any claims or liabilities of the Debtors or any of their affiliates, except for those claims of the type referred to in clause (c)(i) of the definition of "Allowed"  incurred in the ordinary course of business and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, and neither the Reorganized Debtors, NewCo, the Investor, the Sponsors nor the Debt Financing Lenders shall be successors of the Debtors or ESI nor incur any successor or transferee liability of any kind, nature or character, including, without limitation, in relation to (1) the liabilities arising or resulting from or relating to the transactions contemplated by the Plan, and (2) any and all claims, liens, encumbrances, and any and all right, title, and interests related thereto, of governmental entities relating to any tax or similar liabilities.

    3.    Binding Effect

        Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind the Debtors, the Reorganized Debtors, the Mortgage Debt Parties, the holders of the Mortgage Certificates, and any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

4.      Claims Extinguished

As of the Effective Date, any and all alter-ego or derivative claims accruing to the Debtors or Debtors in Possession against present or former officers, managers and directors of the Debtors who were officers, managers or directors of the Debtors at any time during the Chapter 11 Cases shall be extinguished whether or not then pending; provided, that nothing in Section 10.4 of the Plan shall be construed as a release of any Litigation Trust Assets.

5.      Discharge of Claims and Termination of Equity Interests

Except as provided the Plan, the rights afforded in the Plan and the payments and distributions to be made thereunder shall discharge all existing debts and Claims, and shall terminate all Equity Interests, of any kind, nature, or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Equity Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, NewCo, their respective successors or assignees, or any of their respective assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest, and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

6.      Injunction

**Except as otherwise expressly provided in the Plan, all Persons who have held, hold or may hold Claims or Equity Interests and all Persons who have held, hold or may hold claims or causes of action that have been released pursuant to Section 10.10 of the Plan or are subject to exculpation pursuant to Section 10.9 of the Plan, and all other parties in interest, including any participants in the Auction, along with their respective present or former employees, agents, officers, managers, directors, principals and Affiliates, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, or such released or exculpated claim or cause of action, against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, or (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Reorganized Debtors, NewCo, the Released Parties or against any of their respective property or assets, or any interest therein, with respect to any such Claim or Equity Interest, or such released or exculpated claim or cause of action.  Such injunction shall be included in the Confirmation Order and shall extend to any successors of the Debtors, the Reorganized Debtors, NewCo and the Released Parties and their respective properties and interest in properties.**

7.      Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, other than injunctions issued pursuant to the Plan (including injunctions under Section 10.6 of the Plan), shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

8.      Injunction Against Interference With Plan of Reorganization

**Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, including the holders of Mortgage Certificates, along with their respective present or former employees, agents, officers, managers, directors, principals and Affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

9.      Exculpation

Notwithstanding anything herein to the contrary, as of the Effective Date, none of (a) the Debtors or the Reorganized Debtors, (b) NewCo, (c) the Creditors' Committee and any subcommittee thereof, (d) BHAC (provided that BHAC has entered into the BHAC IP Transfer Agreement as provided in Section 6.13 of the Plan), (e) the accountants, financial advisors, investment bankers, agents and attorneys for the Debtors, (f) HVM, (g) HVM Manager, (h) the Special Servicer, (i) the Trustee, (j) the Operating Advisor, (k) the Controlling Holder, (l) HVM Manager Owner, (m) the Investor, (n) each Sponsor, (o) the Debt Financing Lenders and (p) any present or former director, manager, officer, member, equity holder (and their respective Affiliates), employee, agent, financial advisor, partner, Affiliate, attorney, other professional advisor or representative (and their respective Affiliates) of the persons or parties described in clauses (a) through (p) of Section 10.9 of the Plan or of their respective Affiliates (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, related to, or otherwise arising out of, the Chapter 11 Cases, the Auction, the formulation, negotiation, preparation, dissemination, implementation, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Trust and Servicing Agreement, the Mortgage Facility Trust, the Plan, the Disclosure Statement or, in each case, any contract, instrument, document or other agreement related thereto, including, without limitation, the Investment Agreement; provided, however, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence; provided, further, that each Released Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, that nothing in Section 10.9 of the Plan shall be construed as a release or exculpation for any Guaranty Claim other than a Guaranty Claim against a Debtor.

10.     Releases

As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d)

the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; (f) the provision of the Debt Financing Arrangements by the Debt Financing Lenders; (g) the substantial contribution of the Investor, each of the Sponsors and their Affiliates; and (h) the substantial contribution of the Special Servicer, the Trustee, the Operating Advisor and the Controlling Holder: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that votes not to accept the Plan; and (iv) each holder of a Mortgage Certificate, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; provided, that nothing in Section 10.10 of the Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, provided, further, that nothing in Section 10.10 of the Plan shall be construed as a release of any claims constituting Litigation Trust Assets.

11.     Government Release

Except with respect to the claims held by the United States Government or any of its agencies or any state and local authority, in their capacity as holder of either a Mortgage Certificate or a Mezzanine Facility Claim, nothing in the Plan or the Confirmation Order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties other than the Debtors and the Reorganized Debtors, nor shall anything in the Plan or Confirmation Order enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties other than the Debtors and the Reorganized Debtors for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, securities laws, environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Plan or Confirmation Order exculpate any of the Released Parties other than the Debtors and the Reorganized Debtors from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, securities laws, environmental laws or any criminal laws of the United States or any state and local authority.

12.     Mortgage Facility Trust Claims

The Mortgage Debt Parties have acted in accordance with the Trust and Servicing Agreement and the Mortgage Facility Trust throughout the Chapter 11 Cases, including, without limitation, in connection with the Auction, the Plan (including voting thereon) and the Disclosure Statement, and they have made a substantial contribution to the Estates and the Chapter 11 Cases.  The rights and authority of and contributions made by the Mortgage Debt Parties under the Trust and Servicing Agreement and the Mortgage Facility Trust have been and are integral to the Plan. Accordingly, from and after the Effective Date, all Persons, including the holders of Mortgage Certificates, shall be deemed to have released, and shall be enjoined from commencing any action or proceeding or asserting or pursuing, any claim or cause of action against the Mortgage Debt Parties for any act taken or omitted since the Commencement Date in connection with, related to, or otherwise arising out of the Chapter 11 Cases, the Auction, the formulation, negotiation, preparation, dissemination, implementation, confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan.

13.     Indemnification Obligations

(a)     Notwithstanding anything to the contrary herein, subject to the occurrence of the Effective Date, the obligations of the Debtors as provided in the Debtors' respective certificates of incorporation, bylaws, or other applicable organizational documents, other agreements or law as of the Commencement Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers who were officers or employees of such Debtors or their respective Affiliates at any time prior to the Effective Date, and who will be officers of the Debtors or NewCo from and after the Effective Date, against any claims, causes of action or obligations whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, shall survive confirmation of the Plan, remain unaffected thereby after the Effective Date and not be discharged, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Commencement Date.

(b)     As of the Effective Date, each Debtor's certificate of incorporation, bylaws or similar organizational documents or other agreement shall provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, officers who were officers of such Debtor or any of its respective Affiliates at any time prior to the Effective Date and who will continue to be officers or employees of the Debtors or NewCo from and after the Effective Date at least to the same extent as the bylaws of such Debtor in effect on the Commencement Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Debtors shall amend and/or restate its certificate of incorporation, bylaws or similar organizational document or other agreement before or after the Effective Date to terminate or materially adversely affect any of the Debtors' obligations or such officers' rights under Section 10.13(b) of the Plan.

(c)     Any Claim based on NewCo's or the Debtors' obligations set forth in Section 10.13 of the Plan shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

(d)     For avoidance of doubt, nothing in Section 10.13 of the Plan shall be construed as an indemnification for any Guaranty Claim.

14.     Retention of Causes of Action/Reservation of Rights

(a)     Except as provided in Section 6.17 and Section 10.10 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Reorganized Debtors or NewCo may have or which NewCo or the Reorganized Debtors may choose to assert on behalf of the Debtors' estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, NewCo, their officers, directors, managers or representatives and (ii) the turnover of any property of the Debtors' estates.

(b)     Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any

Claim left Unimpaired by the Plan. NewCo or the Reorganized Debtors, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Commencement Date fully as if the Bankruptcy Cases had not been commenced, and all of the legal and equitable rights of NewCo or the Reorganized Debtors, as applicable, respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Bankruptcy Cases had not been commenced.

(c)     Nothing in the Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, and all rights and defenses thereto are expressly reserved.

(d)     Nothing in the Plan shall be construed as a modification, release or waiver of the provisions of the Intercreditor Agreement, and the provisions of the Intercreditor Agreement shall remain in full force and effect, and all rights thereunder are expressly reserved

15.     <u>Limitations on Exculpation and Releases of Representatives</u>

Nothing in Section 10.9 or Section 10.10 of the Plan shall (a) be construed to release or exculpate any Person from, or require indemnification of any Person against losses arising from, the fraud, malpractice, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or ultra vires acts of such Person, or (b) limit the liability of the professionals of the Debtors, the Reorganized Debtors, NewCo or the Creditors' Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

L.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1.     <u>Assumption of Executory Contracts and Unexpired Leases</u>

Any executory contracts or unexpired leases listed in the relevant Exhibit to the Plan Supplement (which Exhibit shall contain those contracts or unexpired leases identified by the Investor, in its sole discretion, and shall include the BHAC IP License Agreements) or that have not been rejected by the Debtors with the approval of the Bankruptcy Court and that are not the subject of pending motions to reject on the Confirmation Date, shall be deemed to have been assumed by the applicable Debtor and assigned to NewCo or its designee, at Investor's option, as of the Effective Date, and the Plan shall constitute a motion to assume and assign such executory contracts and unexpired leases. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions and assignments pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption and assignment is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases. With respect to each such executory contract or unexpired lease assumed and assigned to NewCo, if applicable, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, the dollar amount required to cure any defaults of the applicable Debtor existing as of the Confirmation Date shall be conclusively presumed to be the amount set forth in an Exhibit to the Plan Supplement with respect to such executory contract or unexpired lease. Subject to the occurrence of the Effective Date, any such cure amount shall be treated as an Allowed Administrative Expense Claim under the Plan, and, upon payment of such Allowed Administrative Expense Claim, all defaults of the applicable Debtor existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

2. Rejection of Executory Contracts and Unexpired Leases

Any executory contracts or unexpired leases of any Debtor that are set forth in the relevant Exhibit to the Plan Supplement (which Exhibit shall contain those contracts and unexpired leases identified by the Investor, in its sole discretion) shall be deemed to have been rejected by the applicable Debtor, and the Plan shall constitute a motion to reject such executory contracts and unexpired leases, and NewCo and the Reorganized Debtors shall have no liability thereunder except as is specifically provided in the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.

3. Claims Arising from Rejection, Termination or Expiration

Claims created by the rejection of executory contracts or unexpired leases (including, without limitation, the rejection provided in Section 11.2 of the Plan) or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after (a) in the case of an executory contract or unexpired lease that was terminated or expired by its terms prior to the Confirmation Date, the Confirmation Date, (b) in the case of an executory contract or unexpired lease rejected by the Debtors, the entry of the order of the Bankruptcy Court authorizing such rejection, or (c) in the case of an executory contract or unexpired lease that is deemed rejected pursuant to Section 11.2 of the Plan, the Confirmation Date. Any rejection claim for which a proof of claim is not filed and served within the time provided herein will be forever barred from assertion and shall not be enforceable against the Debtors, their assets, properties, or interests in property, or the Reorganized Debtors or its estate, assets, properties, or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article VII of the Plan.

4. Insurance Policies and Agreements

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as executory contracts under the Plan of Reorganization and will be assumed by the applicable Reorganized Debtor and assigned to NewCo, at Investor's option, effective as of the Effective Date. Nothing contained in Section 11.4 of the Plan shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

5. Management Agreements

As of the Effective Date, (i) all existing management agreements between any Debtor that is a TRS and HVM, including any related administrative services agreements or G&A Reimbursement Agreements, will be assumed by such Debtors and (ii) all existing management agreements between any Debtor that is not a TRS and HVM will be assumed by such Debtor and assigned to a Debtor that is a TRS (or a newly formed TRS, wholly owned either directly or indirectly by NewCo, that is designated by an existing Debtor that is a TRS); provided that such management agreements to be assumed or assumed and assigned (a) shall be modified or amended by modified agreements that shall be included in the Plan Supplement, which terms shall be acceptable to Investor,

each Sponsor and HVM and (b) shall be assumed or assumed and assigned as modified or amended. Entry of the Confirmation Order, subject to and upon the occurrence of the Effective Date, shall constitute the approval, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, of the assumption or assumption and assignment, as applicable, of such agreements on the terms set forth in the Plan and Plan Supplement.

## M.    RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) to perform any of the following actions:

(a)    To hear and determine any and all motions or applications pending on the Confirmation Date for the assumption and/or assignment or rejection of executory contracts or unexpired leases to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear and determine any and all Claims resulting therefrom or from the expiration or termination prior to the Confirmation Date of any executory contract or unexpired lease;

(b)    To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by NewCo, the Reorganized Debtors or the Litigation Trustee after the Effective Date, including, without express or implied limitation, any claims to avoid any preferences, fraudulent transfers, or other voidable transfers, or otherwise to recover assets for the benefit of the Debtors' estates;

(c)    To hear and determine any objections to the allowance of Claims arising prior to the Effective Date, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow or disallow any Disputed Claim in whole or in part;

(d)    To hear and determine any disputes relating to the distributions to holders of Allowed Claims as provided in the Plan;

(e)    To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(f)    To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without express or implied limitation, the Confirmation Order;

(g)    To hear and determine all applications for allowances of compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan;

(h)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan (and all Exhibits to the Plan Supplement and Exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(i)    To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against any Debtor's Estate;

(j)     To determine such other matters that may be set forth in the Plan or the Confirmation Order, or that may arise in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(k)     To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtors, as Debtors or Debtors in Possession, may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any request for expedited determination under section 505(b)(2) of the Bankruptcy Code);

(l)     To hear and determine all questions and disputes arising out of or relating to the Investment Agreement, the BHAC IP Transfer Agreement, the Debt Financing Arrangements or any foreclosure proceedings pursuant to Section 6.13 of the Plan;

(m)     To hear and determine all disputes arising under the Trust and Servicing Agreement or relating to the implementation of the Plan by the Trustee, the Special Servicer, the Operating Advisor and the Controlling Holder; and

(n)     To enter an order or final decree closing the Chapter 11 Cases.

## VIII.

## FINANCIAL INFORMATION AND PROJECTIONS

A.     HISTORICAL FINANCIAL INFORMATION

1.     General

All historical financial information incorporated herein is unaudited and reflects only the Debtor entities that are included in the Plan of Reorganization and certain non-Debtor entities that will comprise NewCo. These entities include HVM, which is consolidated from a financial point of view, given the management arrangement among HVM and the Debtors and that HVM conducts substantially all of its business with the Debtors.  For additional commentary, the historical financial information should be read in conjunction with the audited and unaudited historical financial statements of DL-DW. However, since the DL-DW financial statements include entities not included in the Plan, the historical financial information incorporated herein and the DL-DW financial statements do not reconcile.

Extended Stay's operations were significantly impacted by the deterioration of the general economy and the resulting decline in demand for extended stay lodging in the second half of 2008.  The 666 Mortgage Properties experienced a revenue per available room ("*RevPAR*") decline of 19.5% in 2009, primarily driven by a 21% decline in average daily rate ("*ADR*").  Despite the implementation of significant cost savings measures at the property and corporate levels and the long term lodging ("*LTL*") strategy, Adjusted EBITDA declined by approximately 35% in 2009 for the Debtors.  Many of the cost savings implemented and the LTL strategy are temporary in nature, and anticipated to be reversed over the course of 2010.

2.     Selected Unaudited Historical Financial Information

The following table sets forth selected unaudited consolidated financial information for NewCo as of and for the fiscal year ended December 31, 2008 and 2009.

| Selected Financial Information | | |
|---|---|---|
| | Fiscal Year Ended December 31, | |
| | 2008 | 2009 |
| | (Dollars in Millions) | |
| **Income Statement Information** | | |
| Total revenues, excluding LTL | $1,001.6 | $791.7 |
| Total operating expenses, excl. D&A & LTL | (527.7) | (499.2) |
| Incremental LTL EBITDA | - | 14.5 |
| Adjuted EBITDA including LTL | 473.9 | 307.0 |
| Net income/(loss) | (880.9) | (468.5) |
| **Balance Sheet Information** | | |
| Total assets | $6,969.5 | $6,523.8 |
| Total liabilities | 7,537.9 | 7,564.5 |
| Total shareholders' equity/(deficit) | (568.4) | (1,040.7) |

**THE SELECTED FINANCIAL INFORMATION SHOULD BE READ IN CONJUNCTION WITH THE UNAUDITED HISTORICAL FINANCIALS CONTAINED IN EXHIBIT "F" AND THE UNAUDITED AND AUDITED HISTORICAL FINANCIAL STATEMENTS OF DL-DW AND HOMESTEAD. THE SELECTED FINANCIAL INFORMATION PRESENTED HEREIN REPRESENTS A HISTORICAL PERSPECTIVE OF THE DEBTOR AND NON-DEBTOR ENTITIES THAT ARE INCLUDED IN THE PLAN. AS SUCH, THE SELECTED FINANCIAL INFORMATION DOES NOT REFLECT THE HISTORICAL FINANCIALS OF DL-DW NOR HOMESTEAD.**

B.      CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS

     1.      Responsibility for and Purpose of the Financial Projections

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

     2.      Pro Forma Financial Projections

The Debtors believe that the Plan meets the Bankruptcy Code's feasibility requirement that Plan confirmation is not likely to be followed by liquidation, or the need for further financial reorganization of the Debtors or any successor under the Plan.

In connection with developing the Plan, and to assist each Holder of a Claim in determining whether to accept or reject the Plan, the Debtors have developed a set of financial projections (the "***Financial Projections***" or the "***Projections***"). The Financial Projections were created prior to the Auction, but have been updated only to the extent to reflect the terms of the Plan. The Financial Projections are set forth in Exhibit "C" attached hereto.

The Financial Projections are based on a number of significant assumptions as set forth in Exhibit "C", and while the Debtors have prepared the Financial Projections in good faith and believe the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such

assumptions will ultimately be realized. The Financial Projections should be read in conjunction with the qualifications contained herein and the risk factors described in the Disclosure Statement.

The Debtors do not, as a matter of course, publish their business plans and strategies or financial projections or anticipated financial position or results of operations. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or financial projections to holders of Claims after the Confirmation Date, or to include such information in documents required to be filed with the Securities and Exchange Commission (if any) or otherwise make such information public.

In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors with the assistance of Lazard to present the anticipated impact of the Plan and assume that the Plan will be implemented in accordance with its stated terms. The Financial Projections have been included by the Debtors strictly for purposes of complying with the confirmation requirement under section 1129(a)(11) of the Bankruptcy Code and have no impact on the actual terms of the Plan or the transactions contemplated therein. Nothing in the Financial Projections shall obligate or be construed to obligate NewCo or the Reorganized Debtors, or the Investor and the Sponsors as the 100% owners of NewCo and the Reorganized Debtors, to incur any of the liabilities contained in the Financial Projections (except as otherwise provided for in the Plan) or to operate the Reorganized Debtors in accordance with the Debtors' assumptions contained in the Financial Projections. NewCo and the Reorganized Debtors will operate in the ordinary course in accordance with their own business plan. Since the Financial Projections are based on forecasts of key economic variables such as economic growth rates and the resulting impact on demand for the Debtors' hotel rooms, future interest rates, capital market conditions, as well as key operational assumptions such as the Debtors' ability to maintain customer relationships, the ability to win new customer contracts on profitable terms, and the ability to manage costs and growth of the operations, the estimates and assumptions underlying the Financial Projections are inherently uncertain. Though considered reasonable by the Debtors as of the date hereof, the Financial Projections are subject to significant business, economic and competitive uncertainties. Accordingly, such Financial Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less favorable or more favorable than as set forth. The Financial Projections were substantially completed in June 2010, with certain operating projections completed in September 2009.

**THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD PUBLIC DISCLOSURE OR COMPLIANCE WITH PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH THE GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, PUBLISHED GUIDELINES OF THE SECURITIES AND EXCHANGE COMMISSION, THE RULES AND REGULATIONS PROMULGATED BY THE SECURITIES AND EXCHANGE COMMISSION REGARDING FINANCIAL PROJECTIONS, OR THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS REGARDING FINANCIAL PROJECTIONS OR FORECASTS. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS.**

**ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE FINANCIAL PROJECTIONS ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY CONSIDERABLY FROM THE FINANCIAL PROJECTIONS. CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY THE DEBTORS, THE DEBTORS' ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED RESULTS WILL BE ACHIEVED. IMPAIRED**

**CREDITORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FINANCIAL PROJECTIONS IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN OR SUBSCRIBE TO THE RIGHTS OFFERING.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION IX OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

The Financial Projections assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Debtors, (iii) there will be no change in generally accepted accounting principles in the United States that will have a material effect on the reported financial results of the Debtors, (iv) the application of "fresh start" accounting will not materially change the Debtors' revenue accounting procedures, and (v) there will be no material contingent or unliquidated litigation or indemnity Claims applicable to the Debtors.

To the extent that the assumptions inherent in the Financial Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and considered reasonable by the Debtors when taken as a whole, the assumptions and estimates underlying the Financial Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Debtors.  Accordingly, the Financial Projections are only an estimate and, therefore, necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Financial Projections will not be realized and that actual results will vary from the Financial Projections, which variations may be material and are likely to increase over time.  The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments.  Moreover, inasmuch as the Investor will own 100% of the NewCo Common Interests and have the ability to control the Debtors, the Reorganized Debtors may elect to operate the business according to a business plan that is materially different than the business plan underlying the Financial Projections.  No representations can be made as to the accuracy of the Financial Projections or the Debtors' ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors consider the Financial Projections to predict future performance reliably.  In light of the foregoing, in deciding whether to vote to accept or reject the Plan, holders of Claims are cautioned not to place undue reliance on the Financial Projections and such holders must make their own determination as to the reasonableness of such assumptions and the reliability of the Financial Projections.  The Financial Projections should be read together with the information, assumptions, qualifications and footnotes to tables containing the Financial Projections (which include projected statements of operations, projected balance sheets, and projected statements of cash flows) set forth herein and as set forth in Exhibit "C" to this Disclosure Statement and the historical financial information set forth in Section IX.A hereof.

The Financial Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan.  The Financial Projections should be read in conjunction with Article XI herein "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN" for a discussion of the risks related to the Plan.

The Financial Projections assume a Confirmation Date of June 30, 2010, and as required, the concepts of "fresh start" accounting will be applied for periods after the Effective Date.  These principles are contained in the American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code." Adoption of

"fresh start" accounting requires the determination of the reorganization value of the entity that emerges from bankruptcy. Reorganization value generally approximates fair value of the entity before considering liabilities.

The process of fair valuing assets as part of "fresh start" accounting may result in: (i) changes to the carrying value of assets and liabilities, including property, plant, and equipment or (ii) may result in the creation of new intangibles.

**SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.** The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. "Forward-looking statements" in the Financial Projections include the intent, belief or current expectations of the Debtors and members of their management team with respect to the timing of, completion of and scope of the Plan, the current strategic business plan, bank financing, and debt and equity market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based, which assumptions are based on their experience and perception of historical trends, current conditions, expected future developments and other factors they believe are appropriate in the circumstances. While the Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Important factors currently known to the Debtors' management that could cause actual results to differ materially from those contemplated by the forward-looking statements in the Financial Projections include, but are not limited to, adverse developments in the timing or results of the Debtors' strategic business plan (including the timeline to emerge from Chapter 11), the ability of the Debtors to retain and attract new customers and maintain favorable relationships with such customers, the Debtors' liquidity, the difficulty in controlling operating costs, the level and nature of any restructuring and other one-time charges, and the possible negative effects of a change in applicable legislation.

## IX.

### CERTAIN FACTORS AFFECTING THE DEBTORS

A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

1.    Risk of Non-Confirmation of the Plan of Reorganization

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

2.    Non-Consensual Confirmation

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with

respect to the dissenting impaired classes. See Section X, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION; Requirements for Confirmation of the Plan of Reorganization; Requirements of section 1129(b) of the Bankruptcy Code." If any Class of Claims does not accept the Plan, these requirements will have to be satisfied with respect to such Class. Because Classes 6 (Existing Equity) and 15 (Other Existing Equity Interests) are deemed to reject the Plan, these requirements must be satisfied with respect to such Classes. The Debtors believe that the Plan satisfies these requirements.

3. Risk of Delay in Confirmation of the Plan

Although the Debtors believe that they will be able to confirm the Plan prior to September 21, 2010, if they are not able to do so, or to obtain an extension of this deadline from the Investor, the Investor would have the right to terminate the Investment Agreement and collect the expense reimbursement as provided for therein.

4. The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

5. Risk of Non-Confirmation of the Plan

In order for the Debtors to emerge successfully from the Chapter 11 Cases as viable entities, the Debtors, like any other Chapter 11 debtors, must obtain approval of the Plan from their creditors and confirmation of the Plan through the Bankruptcy Court, and then successfully implement the Plan. The foregoing process requires the Debtors to (a) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement; (b) solicit and obtain creditor acceptances of the Plan; and (c) fulfill other statutory conditions with respect to the confirmation of the Plan.

The Debtors may or may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the Debtors will seek confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may nevertheless seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as long as at least one Impaired Class has accepted the Plan (determined without including the acceptance of any "insider" in such Impaired Class).

Even if the requisite acceptances of the Plan are received, or the Debtors are able to seek a "cramdown" confirmation, the Bankruptcy Court may not confirm the Plan as proposed. A holder of a Claim in a non-accepting Class could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that: (a) confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization of the Debtors; (b) the value of distributions to holders of Claims within an Impaired Class who do not accept the Plan will not be less than the value such holders would receive if the Debtors were liquidated under Chapter 7; and (c) in the event of a "cramdown" confirmation, the Plan "does not unfairly discriminate" and is "fair and equitable" with

respect to non-accepting Classes. The Bankruptcy Court may determine that the Plan does not satisfy one or more of these applicable requirements, in which case the Plan might not be confirmed by the Bankruptcy Court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize their businesses and what, if any, distributions holders of Claims and Equity Interests ultimately would receive with respect to their Claims or Equity Interests. In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan of reorganization with respect to the Debtors that is acceptable to the Bankruptcy Court and the holders of Claims and Equity Interests. Furthermore, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization, further disrupting the Debtors' reorganization efforts.

6. Claims Estimates

By order dated November 19, 2009, the Bankruptcy Court established a Bar Date of Friday, January 15, 2010 at 5:00 p.m. (Prevailing Eastern time) for the Original Debtors. No bar date has been set for the Subsequent Debtors. As of the date hereof, the Bar Date against the Original Debtors has passed. The Debtors and their professionals are reviewing and analyzing the proofs of claim received, and currently estimate that there are approximately $9,280,054,679.72 of claims asserted against the Original Debtors.[9]

B. ADDITIONAL FACTORS TO BE CONSIDERED

1. Financial Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results Are Likely to Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections including, without limitation, the Financial Projections, which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, including, without limitation, the Financial Projections, and the projections and estimates herein should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed. The Financial Projections reflect numerous assumptions concerning the anticipated future performance of the Debtors, some of which may not materialize. Such assumptions include, among other items, assumptions concerning the U.S. economy, the ability to make necessary capital expenditures, the ability to retain and grow the Debtors' customer base and control future operating expenses. The Debtors believe that the assumptions underlying the Financial Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections or the implementation of the Investor and Sponsors' business plan may affect the actual financial results of the Debtors. Therefore, the actual results achieved throughout the periods covered by the Financial Projections necessarily will vary from the projected results. Further, the Financial Projections have been included by the Debtors strictly for purposes of complying with the feasibility requirement of the Bankruptcy Code and have no impact on the actual terms of the Plan or the

---

[9] This estimate does not include: (i) Claims that have been filed as unliquidated or contingent, and (ii) Claims against the Subsequent Debtors as to which a bar date for filing Claims has not yet been set.

transactions contemplated therein. Nothing in the Financial Projections shall obligate or be construed to obligate NewCo or the Reorganized Debtors, or the Investor and the Sponsors as the 100% owners of NewCo and the Reorganized Debtors, to incur any of the liabilities contained in the Financial Projections (except as otherwise provided for in the Plan) or to operate the Reorganized Debtors in accordance with the Debtors' assumptions contained in the Financial Projections. The Investor and Sponsors have their own business plan for NewCo and the Reorganized Debtors which has not been incorporated into the Financial Projections. NewCo and the Reorganized Debtors will operate in the ordinary course in accordance with their own business plan.

2.      No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.      No Legal or Tax Advice Is Provided to You by This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or Equity Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is not intended to provide, nor should it be relied on for, legal, business or tax advice. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

4.      No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Equity Interests.


C.      CERTAIN TAX MATTERS

For a summary of certain federal income tax consequences of the Plan to holders of Claims and Equity Interests of the Debtors, see Section XII below, entitled "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN."

**X.**

CONFIRMATION OF THE PLAN OF REORGANIZATION

A.      CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. As set forth in the Disclosure Statement Approval and Solicitation Order, the Bankruptcy Court has scheduled the Confirmation Hearing for **[____] [____], 2010** at **[___] [(Prevailing Eastern Time)]**. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an

announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtors' estate(s) or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon the following parties so as to be received no later than **[___] [(Prevailing Eastern Time)]** on **[____] [____], 2010**:

| | |
|---|---|
| HVM LLC<br>100 Dunbar Street<br>Spartanburg, South Carolina 29306<br>Attn: Gary DeLapp<br><br>Extended Stay Inc.<br>c/o The Lightstone Group<br>1985 Cedar Bridge Avenue<br>Suite 1<br>Lakewood, New Jersey, 08701<br>Attn: Joseph Teichman, Esq.<br><br>Debtors | Hahn & Hessen LLP<br>488 Madison Avenue<br>New York, New York 10022<br>Attn: Mark T. Power, Esq., Mark T. Indelicato, Esq., Christopher Jarvinen, Esq.<br><br>Attorneys for the Creditors' Committee |
| Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn: Marcia L. Goldstein, Esq., Jacqueline Marcus, Esq.<br><br>Attorneys for Debtors and Debtors in Possession | Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, New York 10004<br>Attn: Brad Eric Scheler, Esq., Jennifer L. Rodburg, Esq.<br><br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>Attn: David M. Feldman, Esq.<br><br>Attorneys for Sponsors |
| | |

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

B.      REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION

1.      Requirements of section 1129(a) of the Bankruptcy Code

(a)      General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(1)      The Plan complies with the applicable provisions of the Bankruptcy Code.

(2)      The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(3)      The Plan has been proposed in good faith and not by any means proscribed by law.

(4)      Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5)      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, any affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

(6)      With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under Chapter 7.  See discussion of "Best Interests Test" below.

(7)      Except to the extent that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

(8)      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full in cash on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date, equal to the allowed amount of such claims.

(9)      At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(10)　　Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.

(11)　　The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits, if any.

(b)　　The Best Interests Test and the Debtors' Liquidation Analyses

Pursuant to section 1129(a)(7) of the Bankruptcy Code (often called the "**Best Interests Test**"), holders of Allowed Claims and Equity Interests must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Plan's assumed Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were to be liquidated under Chapter 7.

The first step in meeting the Best Interests Test is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets and properties in the context of a Chapter 7 case. The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the Chapter 7 case. The next step is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of Chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a Chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the Chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a Chapter 7 liquidation, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-Chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest.

The Debtors, with the assistance of their restructuring and financial advisors, have prepared a hypothetical liquidation analysis (the "**_Liquidation Analysis_**") which is annexed hereto as Exhibit "D".

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a Chapter 11 case, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) where applicable, the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that in a Chapter 7 case the holders of the Mortgage Facility Claim and the ESA UD Mortgage Claim would receive less than the distribution provided for under the Plan. Moreover, holders of the Mortgage Deficiency Claim, Mezzanine Facilities Claims, Unsecured Claims, Existing Equity and Other Equity Interests would receive no distributions at all. Consequently, confirmation of the Plan will provide each creditor of the Debtors with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under Chapter 7.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims in a Chapter 7 case would be the same or less than the value of distributions under the Plan because such distributions in a Chapter 7 case may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions. In the event litigation were necessary to resolve claims asserted in the Chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

**UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND THEIR MANAGEMENT. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.**

(c)     Feasibility

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed NewCo's ability to meet its financial obligations as contemplated thereunder. As part of this analysis, the Debtors have requested Lazard to review the Financial Projections prepared by the Debtors and contained in Article VIII above, entitled "FINANCIAL INFORMATION AND PROJECTIONS" and in Exhibit "C" to this Disclosure Statement. The Financial Projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court and the Effective Date of the Plan and its substantial consummation will take place on June 30, 2010. The Financial Projections include balance sheets, statements of operations and statements of cash flows. Based upon the Financial Projections, the Debtors believe NewCo will be able to make all payments required to be made pursuant to the Plan. The Financial Projections have been included by the

Debtors strictly for purposes of complying with the confirmation requirement under section 1129(a)(11) of the Bankruptcy Code and have no impact on the actual terms of the Plan or the transactions contemplated therein. Nothing in the Financial Projections shall obligate or be construed to obligate NewCo or the Reorganized Debtors, or the Investor and the Sponsors as the 100% owners of NewCo and the Reorganized Debtors, to incur any of the liabilities contained in the Financial Projections (except as otherwise provided for in the Plan) or to operate the Reorganized Debtors in accordance with the Debtors' assumptions contained in the Financial Projections. The Investor and Sponsors have their own business plan for NewCo and the Reorganized Debtors which has not been incorporated into the Financial Projections. NewCo and the Reorganized Debtors will operate in the ordinary course in accordance with their own business plan.

2. Requirements of section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

No Unfair Discrimination. This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

Fair and Equitable Test. This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- Secured Claims. Each holder of an impaired secured claim either (i) retains its liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Claims. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

- Equity Interests. Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding that Class 6 (Equity Interests) and Class 15 (Other Equity Interests) are deemed to reject the Plan, because as to Class 6 (Equity Interests) and Class 15 (Other Equity Interests), there is no class of equal priority receiving more favorable treatment and no

class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

## XI.

### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) liquidation of the Debtors under Chapter 7 and (ii) an alternative Chapter 11 plan of reorganization.

A.      LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have on the recovery of holders of claims and equity interests and the Debtors' liquidation analysis are set forth in Section X above, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION"; Requirements for Confirmation of the Plan of Reorganization; Consensual Confirmation; Best Interests Test."  The Debtors believe that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.  In a Chapter 7 liquidation, the Debtors believe that there would be no distribution to the holders of the Mortgage Deficiency Claim, the Mezzanine Facilities Claims, the Unsecured Claims or the holders of Equity Interests.

B.      ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different Chapter 11 plan of reorganization.  Such a plan of reorganization might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets under Chapter 11.  With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan.  The Debtors believe that the Plan, as described herein, enables creditors of the Debtors to realize the most value under the circumstances.  In a liquidation under Chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in Chapter 7.  Further, if a trustee were not appointed, because such appointment is not required in a Chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a Chapter 7 case.  Although preferable to a Chapter 7 liquidation, the Debtors believe that any alternative liquidation under Chapter 11 is a much less attractive alternative to creditors of the Debtors than the Plan because of the greater return provided by the Plan.

# XII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims and Mortgage Certificates. The following summary does not address the federal income tax consequences to (i) holders whose Claims are not impaired, (ii) holders of Claims and equity interests who are deemed to reject the Plan, (iii) the Investor or (iv) the Sponsors.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding an equity interest as part of an integrated constructive sale or straddle, holders of residual interests in a real estate mortgage investment conduit and equity investors in pass-through entities).

***Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim or Mortgage Certificate.***

***IRS Circular 230 Notice***: ***To ensure compliance with IRS Circular 230, holders of Claims and equity interests in the Debtors and Mortgage Certificates are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims and equity interests in the Debtors or Mortgage Certificates for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims and equity interests in the Debtors and Mortgage Certificates should seek advice based on their particular circumstances from an independent tax advisor.***

A.      CONSEQUENCES TO THE DEBTORS

Prior to the Effective Date, each of the Debtors other than the Regarded Debtors (as defined below) is treated as a "disregarded entity" for federal income tax purposes (the "**Disregarded Debtors**"). In general, for federal income tax purposes, items of income, gain, loss or deduction of a disregarded entity, and the related federal income tax consequences of such items, are the responsibility of the owner of the disregarded entity, not the disregarded entity itself. Accordingly, to the extent that the transactions contemplated by the Investment Agreement and the Plan would otherwise trigger federal

income tax consequences to a Disregarded Debtor, the Plan contemplates and the Debtors believe that the federal income tax consequences of such transactions will not be borne by any of the Disregarded Debtors, but instead will be borne by the deemed owners of the Disregarded Debtors, which for federal income tax purposes include ESI, DL-DW and ESA Canada Beneficiary Inc. As discussed below, since DL-DW is treated as a partnership for federal income tax purposes, its owners will ultimately bear their portion of the federal income tax consequences of the transactions contemplated by the Investment Agreement and the Plan. Nevertheless, it is conceivable that the IRS might attempt to hold NewCo or a Debtor liable for the federal income tax consequences of the transactions contemplated by the Investment Agreement and the Plan under a successor, transferee liability or similar theory. However, the Investment Agreement includes a closing condition that provides that the Confirmation Order approving the Plan shall be in a form and substance approved by the Investors and shall provide, in relevant part, that (i) except with respect to Administrative Expense Claims of the type specified in Section 1.7(c)(i) of the Plan as expressly provided for in Section 2.1 of the Plan, NewCo shall not be a successor to any of the Debtors in the Chapter 11 Cases by reason of any theory of law or equity, and (ii) NewCo and each of the Debtors shall not be a successor to ESI, and neither NewCo nor any of the Debtors shall have any successor or transferee liability of any kind, nature or character, including, without limitation, liabilities arising or resulting from or relating to the transactions contemplated by the Investment Agreement and the Plan (including all Plan Documents). A tax liability arising from the transactions contemplated by the Investment Agreement and the Plan should not constitute an Administrative Expense Claim of the type specified in Section 1.7(c)(i) of the Plan. Accordingly, the Plan contemplates and the Debtors believe that neither NewCo nor the Reorganized Debtors will be held liable for any tax liability of ESI, the Debtors or the owners of DL-DW as a result of the transactions contemplated by the Investment Agreement and the Plan.

ESA Canada Trustee Inc., ESA Canada Beneficiary Inc., ESA 2007 Operating Lessee Inc., ESA 2005 Operating Lessee Inc., ESA Operating Lessee Inc., ESA P Portfolio Operating Lessee Inc., ESA Canada Operating Lessee Inc. and ESH/TN Member Inc. are each treated as an association taxable as a corporation for federal income tax purposes (collectively, the "***Regarded Corporate Debtors***").

In addition, ESH/TN Properties LLC ("***ESH/TN***") is a Mortgage Borrower that is treated as a partnership for federal income tax purposes (together with the Regarded Corporate Debtors, the "***Regarded Debtors***"). In general, for federal income tax purposes, the partners of a partnership, and not the partnership itself, are subject to taxation under the Tax Code on items of income, gain, loss or deduction of the partnership. Thus, the federal income tax consequences of the Plan will not be borne by ESH/TN. ESH/TN Member Inc., which is taxed as a corporation for federal income tax purposes, is a 1% partner in ESH/TN. DL-DW, which is not a Debtor but which is also treated as a partnership for federal income tax purposes is deemed to own the remaining 99% interest in ESH/TN. The Plan contemplates that ownership of the underlying properties held by ESH/TN as a Mortgage Borrower will not change and such properties will continue to be deemed to be owned for federal income tax purposes by ESH/TN. Instead, under the Plan, the stock of ESH/TN Member Inc. will be cancelled and new shares of ESH/TN Member Inc. will be issued to NewCo. Under the Plan, the 99% interest in ESH/TN that is deemed to be held by DL-DW will be cancelled and a new 99% interest will be issued to NewCo. The tax treatment of these transactions is not clear. However, as discussed in Section A.1, except for any possible cancellation of indebtedness income ("***COD income***") relating to the 1% partnership interest in ESH/TN held by ESH/TN Member Inc., the federal income tax consequences of these transactions generally will be borne by DL-DW and its owners.

The Plan contemplates and the Debtors believe that, under the Plan, none of the Regarded Corporate Debtors (other than ESA Canada Beneficiary Inc. and ESH/TN Member Inc., as discussed in

Section A.1) will bear the federal income tax consequences of the transactions contemplated by the Investment Agreement and the Plan. Moreover, the Regarded Corporate Debtors have not filed and will not file a consolidated income tax return with ESI and thus should not have liability under Treasury Regulation Section 1.1502-6 for the tax consequences of the transactions contemplated by the Investment Agreement and the Plan. Nevertheless, as noted above, it is conceivable that the IRS might attempt to hold the Regarded Corporate Debtors liable for the federal income tax consequences of the transactions contemplated by the Investment Agreement and the Plan under a successor, transferee liability or similar theory. However, the Investment Agreement includes a closing condition that provides that the Confirmation Order approving the Plan shall be in a form and substance approved by the Investors and shall provide, in relevant part, that (i) except with respect to Administrative Expense Claims of the type specified in Section 1.7(c)(i) of the Plan as expressly provided for in Section 2.1 of the Plan, NewCo shall not be a successor to any of the Debtors in the Chapter 11 Cases by reason of any theory of law or equity, and (ii) NewCo and each of the Debtors shall not be a successor to ESI, and neither NewCo nor any of the Debtors shall have any successor or transferee liability of any kind, nature or character, including, without limitation, liabilities arising or resulting from or relating to the transactions contemplated by the Investment Agreement and the Plan (including all Plan Documents). A tax liability arising from the transactions contemplated by the Investment Agreement and the Plan should not constitute an Administrative Expense Claim of the type specified in Section 1.7(c)(i) of the Plan. Accordingly, the Plan contemplates and the Debtors believe that neither NewCo nor the Reorganized Debtors will be held liable for any tax liability of ESI, the Debtors or the owners of DL-DW as a result of the transactions contemplated by the Investment Agreement and the Plan.

1. <u>Cancellation of Debt</u>

In general, Section 108 of the Tax Code provides that a debtor in a bankruptcy case may exclude COD income arising pursuant to a confirmed chapter 11 plan, but must reduce certain of its tax attributes – such as net operating loss ("***NOL***") carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of COD income incurred pursuant to the plan. The amount of COD income incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD income incurred for federal income tax purposes. If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.

In contrast, the transfer of property to a creditor in satisfaction of nonrecourse debt secured by such property is treated as a sale or exchange transaction. In general, the amount of gain or loss that must be recognized by the debtor is equal to the difference between the amount of debt discharged and the adjusted tax basis of the property transferred to the creditor in satisfaction of such debt. Such gain or loss does not constitute COD income.

As noted above, ESA Canada Beneficiary Inc. and ESH/TN Member Inc. are Regarded Corporate Debtors. Although neither ESA Canada Beneficiary Inc. nor ESH/TN Member Inc. is a Mortgage Borrower, (i) ESA Canada Beneficiary Inc. is deemed to be a Mortgage Borrower for federal income tax purposes by virtue of its ownership of a Mortgage Borrower that is a Disregarded Debtor, and (ii) ESH/TN Member Inc., as a partner in a Mortgage Borrower, will bear the federal income tax consequences of the Plan to such Mortgage Borrower to the extent of its 1% partnership interest in such Mortgage Borrower. Under the Plan, the stock of ESA Canada Beneficiary Inc. and ESH/TN Member Inc. will be cancelled and new shares of stock of such Regarded Corporate Debtors will be issued to NewCo. For federal income tax purposes, ownership of the underlying properties held by the Mortgage Borrower will not change and such properties will continue to be deemed to be owned by ESA Canada

Beneficiary Inc and ESH/TN Member Inc. Under IRS Rev. Rul. 91-31, the cancellation of nonrecourse debt without a transfer of the underlying collateral generally results in COD income. Thus, it is expected that ESA Canada Beneficiary Inc. and ESH/TN Member Inc. will incur COD income as a result of the implementation of the Plan. Accordingly, as noted above, under Section 108 of the Tax Code, such COD income will be excluded from taxable income, but there will be corresponding reductions in the tax attributes of ESA Canada Beneficiary Inc. and ESH/TN Member Inc. Alternatively, the American Recovery and Reinvestment Act of 2009 permits ESA Canada Beneficiary Inc. and ESH/TN Member Inc. to elect to defer the inclusion of COD income resulting from the Plan, with the amount of COD income becoming includible in their income ratably over a five-taxable year period beginning in the fourth year after the COD income arises. The collateral tax consequences of making such election are complex. ESA Canada Beneficiary Inc. and ESH/TN Member Inc. are considering whether to make the deferral election in connection with its annual tax return preparation.

      2.     Potential Limitations on NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (including current year NOLs) of the Regarded Corporate Debtors allocable to periods prior to the Effective Date (collectively, "***pre-change losses***") will be subject to limitation if Section 382 of the Tax Code applies as a result of the changes in ownership described below. Any Section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from the COD income arising in connection with the Plan.

Under Section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. The consummation of the transactions contemplated by the Plan would constitute an "ownership change" of each of the Regarded Corporate Debtors for these purposes.

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 4.01% for ownership changes occurring in June 2010). As discussed above, this annual limitation often may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately after (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, or if certain shareholders claim worthless stock deductions and continue to hold their stock in the corporation at the end of the taxable year, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below. Generally, NOL carryforwards expire after 20 years.

Section 382 of the Tax Code also limits the deduction of certain "built-in" losses recognized subsequent to the date of the ownership change.  If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation.  Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.  In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless the actual value is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

An exception to the foregoing annual limitation rules generally applies where qualified creditors of a debtor corporation receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan.  This exception will not be applicable in respect of the Regarded Corporate Debtors.

3.      Alternative Minimum Tax

In general, a federal alternative minimum tax ("***AMT***") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets is reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

4.      Transfer of Litigation Trust Assets to the Litigation Trust

Pursuant to Section 6.17 of the Plan, on the Effective Date, the Debtors will transfer the Litigation Trust Assets  to the Litigation Trust on behalf of the respective claimants comprising the Litigation Trust Beneficiaries.  The transfer of assets by the Debtors pursuant to the Plan may result in the recognition of gain or income by the Debtors, depending in part on the value of such assets on the Effective Date and the Debtors' tax basis in such assets.  However, as noted above, the Plan contemplates and the Debtors believe that neither NewCo nor the Reorganized Debtors will be liable for any tax liability of ESI, the Debtors or the owners of DL-DW as a result of the transactions contemplated by the Investment Agreement and the Plan.

B.    DISTRIBUTIONS TO HOLDERS OF CERTAIN CLAIMS AND MORTGAGE
        CERTIFICATES

    1.    Mortgage Facility Claim and Mortgage Facility Deficiency Claim

        (a)    The holder of the Allowed Mortgage Facility Claim shall receive (i) 100% of the
Cash Distribution and the Investor Certificates on the Effective Date, with such Cash Distribution to be
distributed in accordance with the Trust and Servicing Agreement and the Investor Certificates will be
cancelled without any distributions on account thereof (ii) any Cash that may remain in the
Administrative/Priority Claims Reserve, as described in Section 8.10(b) of the Plan and (iii) the Cash
transferred to the Mortgage Parties Indemnification Fund (see Section C.9, "Federal Income Tax
Treatment of the Mortgage Parties Indemnification Fund").

        (b)    The holder of the Allowed Mortgage Facility Deficiency Claim shall receive
interests in the Litigation Trust to the extent that it is a Litigation Trust Beneficiary, which shall be
distributed in accordance with the Trust and Servicing Agreement, subject to the terms of the Intercreditor
Agreement.  See Section C.8 "Tax Treatment of Litigation Trust and Holders of Beneficial Interests."

    2.    Mezzanine Facilities Claim.

        The holders of the Mezzanine Facilities Claims shall receive interests in the Litigation
Trust to the extent that they are Litigation Trust Beneficiaries, which shall be distributed in accordance
with the Trust and Servicing Agreement, subject to the terms of the Intercreditor Agreement.  See Section
C.8 "Tax Treatment of Litigation Trust and Holders of Beneficial Interests."

    3.    Allowed ESA UD Mortgage Claim.

        Pursuant to the Plan, the holder of the Allowed ESA UD Mortgage Claim shall receive in
full settlement, satisfaction, release and discharge of its Claim, the New ESA UD Mortgage Note.

        For federal income tax purposes, and as described below, the distribution shall be treated
as a distribution of undivided interests in the assets of NewCo to the holder of the Allowed ESA UD
Mortgage Claim followed by a sale of such assets for the New ESA UD Mortgage Note.

    4.    General Unsecured Claims.

        The holders of the General Unsecured Claims shall receive interests in the Litigation
Trust to the extent that they are Litigation Trust Beneficiaries.  See Section C.8 "Tax Treatment of
Litigation Trust and Holders of Beneficial Interests."

C.    CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS AND MORTGAGE
        CERTIFICATES

    1.    Consequences to Holders of Mortgage Certificates

        Each holder of a Mortgage Certificate generally should recognize gain or loss in
connection with its receipt for federal income tax purposes of any Cash (including a holder's respective
share of (i) the Cash transferred to the Mortgage Parties Indemnification Fund (see Section C.9 "Federal
Income Tax Treatment of the Mortgage Parties Indemnification Fund") and (ii) any Cash released from

the Administrative/Priority Claims Reserve) and any other property (including any interest in the Litigation Trust) in an amount equal to the difference, if any, between (x) the sum of the amount of Cash and the fair market value of any other property received by the holder (other than any amount received in respect of accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Mortgage Certificate (other than any basis attributable to accrued but unpaid interest, see Section C.6 "Accrued but Unpaid Interest").

As discussed below in Section C.8, "Tax Treatment of Litigation Trust and Holders of Beneficial Interests," each holder of a Mortgage Certificate that receives a beneficial interest in the Litigation Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Litigation Trust Assets (consistent with its economic rights in the trust) in a taxable transaction. Pursuant to the Plan, the Litigation Trustee will in good faith value the assets transferred to the Litigation Trust, and all parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes.

A holder's share of any proceeds received by a Litigation Trust should not be included, for federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Litigation Trust.

A holder's tax basis in its respective share of the Litigation Trust Assets will equal the fair market value of such interest, and the holder's holding period generally will begin the day following the establishment of the Litigation Trust.

2.      Consequences to Holders of Mezzanine Facilities Claims and General Unsecured Claims

Each holder of a Mezzanine Facilities Claim or General Unsecured Claim generally should recognize gain or loss in connection with its receipt for federal income tax purposes of any interest in the Litigation Trust and in an amount equal to the difference, if any, between (x) the fair market value of any interest in the Litigation Trust received by the holder (other than any amount received in respect of accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest, see Section C.6 "Accrued but Unpaid Interest")

As discussed below in Section C.8, "Tax Treatment of Litigation Trust and Holders of Beneficial Interests," each holder of a Mezzanine Facilities Claim or General Unsecured Claim that receives a beneficial interest in the Litigation Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Litigation Trust Assets (consistent with its economic rights in the trust) in a taxable transaction. Pursuant to the Plan, the Litigation Trustee will in good faith value the assets transferred to the Litigation Trust, and all parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes.

A holder's share of any proceeds received by a Litigation Trust should not be included, for federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Litigation Trust.

A holder's tax basis in its respective share of the Litigation Trust Assets will equal the fair market value of such interest, and the holder's holding period generally will begin the day following the establishment of the Litigation Trust.

3.       <u>Consequences to the Holder of the Allowed ESA UD Mortgage Claim</u>

The holder of the Allowed ESA UD Mortgage Claim generally should recognize gain or loss in connection with its receipt for federal income tax purposes of an undivided interest in the underlying assets of NewCo in an amount equal to the difference between (x) the fair market value of the interest received in satisfaction of its Allowed ESA UD Mortgage Claim (other than any amount received in respect of accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Allowed ESA UD Mortgage Claim (other than any basis attributable to accrued but unpaid interest, see Section C.6 "Accrued but Unpaid Interest").

The deemed contribution for federal income tax purposes of the undivided interest in the assets of NewCo in exchange for the New ESA UD Mortgage Note will be treated as a taxable exchange in which gain or loss will be recognized. The holder of the ESA UD Mortgage Claim should recognize short-term gain in the taxable exchange in an amount equal to the excess, if any, of (i) the issue price (as determined for federal income tax purposes, as discussed below) of the New ESA UD Mortgage Note received by the holder, which, as discussed in Section C.7, would be equal to either the fair market value or the stated principal amount (which may exceed fair market value) of such note, over (ii) the fair market value of such holder's undivided interest in the assets of NewCo deemed exchanged therefor. See Section C.4 "Character of Gain or Loss and Installment Method of Reporting." If the issue price of the New ESA UD Mortgage Note received is equal to its fair market value, the holder of the Allowed ESA UD Mortgage Claim generally should have no gain in respect of the receipt of the New ESA UD Mortgage Note, as the holder should have received a fair market value tax basis in the interest deemed exchanged therefor.

As soon as possible after the Effective Date, and to the extent required by Section 1060 of the Tax Code, the board of NewCo will determine the aggregate value of the underlying assets of NewCo as of the Effective Date and the portion of such value allocable to the New ESA UD Mortgage Note. The board of NewCo will apprise the holder of the New ESA UD Mortgage Note, in writing, of such valuation. Pursuant to the Plan, all parties will be required to report consistently with the aggregate valuation and allocation for all federal income tax purposes.

The holder of the Allowed ESA UD Mortgage Claim should have a tax basis in its New ESA UD Mortgage Note equal to the issue price of such note. The holder's holding period for the New ESA UD Mortgage Note generally should begin the day following the Distribution Date.

4.       <u>Character of Gain or Loss and Installment Method of Reporting</u>

Where gain or loss is recognized by a holder of a Mortgage Certificate or Claim in respect of its Mortgage Certificate or Claim, as applicable, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Mortgage Certificate or Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Mortgage Certificate or Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction. Where gain is recognized by the holder of the ESA UD Mortgage Claim in respect of the deemed contribution of assets to NewCo, the character of such gain may be treated as short-term capital gain depending in part on the holder's personal circumstances. Such gain may be reported on the installment method of reporting, provided that all applicable requirements of Section 453 of the Tax Code are satisfied. Holders of Mortgage Certificates or Claims are urged to consult their tax advisors regarding the character of any gain recognized on any taxable contribution to NewCo.

5.    Timing of Distributions

Distributions to holders of Claims and certain distributions to holders of Mortgage Certificates will be made subsequent to the Effective Date (including, without limitation, any Cash remaining in the Administrative/Priority Claims Reserve pursuant to Section 8.10(b) of the Plan).  Under the Tax Code, a portion of any distribution received after the Effective Date may be treated as imputed interest depending on, among other things, whether the holder is an accrual or cash basis taxpayer.  In addition, it is possible that any loss and a portion of any gain realized by such holder may be deferred until such time as such holder has received its final distribution.  All holders of such Claims and Mortgage Certificates should consult their tax advisors as to the tax consequences of distributions subsequent to the Effective Date.

6.    Accrued but Unpaid Interest

Pursuant to the Plan, distributions to any holder of Allowed Claims will be allocated first to the principal amount of such Claims, as determined for federal income tax purposes, and thereafter, to the portion of such Claim, if any, representing accrued but unpaid interest or original issue discount ("*OID*").  However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

In general, to the extent that any consideration received pursuant to the Plan by a holder of a Claim or Mortgage Certificate is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.  Accordingly it is also unclear whether, by analogy, a holder of a claim of a non-corporate issuer would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

Each holder of a Mortgage Certificate or Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for federal income tax purposes.

7.    Ownership and Disposition of the New ESA UD Mortgage Note

The application of the OID provisions of the Tax Code, and the federal income tax treatment of stated interest, with respect to the New ESA UD Mortgage Note depends, in part, upon whether the "issue price" of the New ESA UD Mortgage Note is equal to its stated principal amount.  Pursuant to applicable Treasury Regulations, the "issue price" of the New ESA UD Mortgage Note depends, in part, upon whether it is traded on an "established market" during the sixty-day period ending thirty days after the Effective Date (the "***Testing Period***").  If the New ESA UD Mortgage Note is not traded on an "established market" during the Testing Period, the "issue price" of such non-traded instrument will depend on whether Section 1274(b)(3) of the Tax Code, as discussed below, applies to its issuance.

For this purpose, an "established market" includes, among other things, (i) a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers, or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price

quotations or actual prices of recent sales transactions, and (ii) the ready availability of price quotations from dealers, brokers or traders. If the New ESA UD Mortgage Note is traded on an established market during the Testing Period, the "issue price" will be equal to the fair market value of the New ESA UD Mortgage Note.

Pursuant to Section 1274(b)(3) of the Tax Code and applicable Treasury Regulations, if the New ESA UD Mortgage Note is not traded on an established market during the Testing Period, the "issue price" of the non-traded instrument will still be equal to its fair market value if the fair market value of the New ESA UD Mortgage Note has been established in a "recent sales transaction" within the meaning of such provisions. Neither the Tax Code nor the Treasury Regulations expound on the meaning of a recent sales transaction. With respect to the New ESA UD Mortgage Note, because, as stated above, (i) the holder of the such note should be treated as having first received undivided interests in the underlying assets of NewCo in a taxable transaction in which the determination of gain or loss will be based on the fair market value of such interests, and (ii) the fair market value of such interests will be required to be allocated to the New ESA UD Mortgage Note for purposes of determining gain or loss and tax basis upon the transfer of such interests to NewCo, the New ESA UD Mortgage Note might have an established fair market value by reason of recent sales transactions involving the undivided interests exchanged therefor. The determination whether to take such position on NewCo's tax return would be made by the management and board of NewCo. There is no assurance that the IRS would not take a contrary position.

If the New ESA UD Mortgage Note is not traded on an established market during the Testing Period and Section 1274(b)(3) of the Tax Code does not apply, the "issue price" of the New ESA UD Mortgage Note will be its stated principal amounts.

The holder of the New ESA UD Mortgage Note is urged to consult its tax advisor regarding the determination of the "issue price" of the New ESA UD Mortgage Note.

(i)     Interest and OID on the New ESA UD Mortgage Note

The holder of the New ESA UD Mortgage Note will be required to include stated interest on the New ESA UD Mortgage Note in income in accordance with the holder's regular method of accounting for federal income tax purposes to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is unconditionally payable in cash at least annually. The stated interest payable on the New ESA UD Mortgage Note is qualified stated interest.

If the issue price of the New ESA UD Mortgage Note is less than its stated principal amount, the excess of the note's stated principal amount over its issue price should generally be treated as OID under the Tax Code. The holder will be required to include in its gross income, as interest for federal income tax purposes, the portion of the OID (inclusive of all stated interest) that accrues while the holder held the note (including the day the note is acquired but excluding the day it is disposed of), regardless of such holder's normal method of tax accounting. Any OID will accrue over the term of the New ESA UD Mortgage Note based on the constant yield method (with the amount of OID attributable to each accrual period allocated ratably to each day in such period). Accordingly, a holder may be required to recognize income prior to the receipt of cash payments attributable to such income.

(ii)    Sale, Exchange or Redemption of New ESA UD Mortgage Note

Unless a non-recognition provision applies, a holder generally will recognize gain or loss upon the sale, exchange or redemption of the New ESA UD Mortgage Note equal to the difference, if

any, between the holder's adjusted tax basis and the amount realized on the sale, exchange or redemption. For this purpose, a holder's adjusted tax basis generally will equal the holder's initial tax basis, increased by the amount of any OID accrued (determined without adjustments) up through the date of the sale, exchange, or redemption, and decreased by the amount of any cash payments (other than qualified stated interest). Any gain or loss generally will be capital gain or loss.

8.  Federal Income Tax Treatment of the Litigation Trust and Holders of Beneficial Interests

(i) Classification of the Litigation Trust

The Litigation Trust created pursuant to the Plan is intended to qualify as a "liquidating trust" for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for federal income tax purposes as a "grantor trust" (i.e., a pass-through type entity). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes. The Litigation Trust will be structured to comply with the general criteria set forth in Revenue Procedure 94-45, 1994-2 C.B. 684. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties will be required to treat, for federal income tax purposes, the Litigation Trust as a grantor trust of which the Litigation Trust Beneficiaries are the owners and grantors. The following discussion assumes that the Litigation Trust will be so respected for federal income tax purposes. However, no opinion of counsel has been requested, and neither the Debtors nor the Litigation Trustee will seek a ruling from the IRS, concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of a Litigation Trust, the federal income tax consequences to the Litigation Trust, the Litigation Trust Beneficiaries and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Litigation Trust).

(ii) General Tax Reporting by the Litigation Trust and Beneficiaries

For all federal income tax purposes, all parties must treat the transfer of the Litigation Trust Assets to the Litigation Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Litigation Trust Assets are treated, for federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Claims receiving an interest in the Litigation Trust (with each holder receiving in a taxable transaction an undivided interest in such assets in accordance with its economic interests in such assets), followed by the transfer by the holders to the Litigation Trust of such assets in exchange for the interest in the Litigation Trust. Accordingly, all parties must treat the Litigation Trust as a grantor trust of which the holders of interests in the Litigation Trust are the owners and grantors, and treat the Litigation Trust Beneficiaries as the direct owners of an undivided interest in the Litigation Trust Assets, consistent with their economic interests therein, for all federal income tax purposes.

Allocations of taxable income or loss of the Litigation Trust will be allocated by reference to the manner in which an economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets.

All parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Litigation Trust Beneficiary will be treated as income or loss with respect to such Litigation Trust Beneficiary's undivided interest in the Litigation Trust Assets, and not as income or loss with respect to its prior Allowed Claim or Equity Interest. The character of any income and the character and ability to use any loss will depend on the particular situation of the Litigation Trust Beneficiary. The interests in the Litigation Trust will be subject to certain restrictions on transfer.

The federal income tax obligations of a holder with respect to its interest in the Litigation Trust are not dependent on the Litigation Trust distributing any cash or other proceeds. Thus, a holder may incur a federal income tax liability with respect to its allocable share of Litigation Trust income even if the Litigation Trust does not make a concurrent distribution to the holder. In general, a distribution of cash by the Litigation Trust will not be separately taxable to a Litigation Trust Beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Litigation Trust).

The Litigation Trustee will file with the IRS returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Litigation Trustee also will annually send to each holder of an interest in the Litigation Trust a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for federal income tax purposes and will instruct all such holders to use such information in preparing their federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their federal income tax returns.

9. <u>Federal Income Tax Treatment of the Mortgage Parties Indemnification Fund</u>.

For all federal income tax purposes, all parties will treat the transfer of Cash to the Mortgage Parties Indemnification Fund as (1) a taxable transfer of Cash (subject to any obligations relating to those assets) directly to the holders of Mortgage Certificates (in accordance with the priorities as set forth in the Trust and Servicing Agreement), followed by (2) the transfer by the holders of Mortgage Certificates otherwise entitled to receive such cash to the Mortgage Parties Indemnification Fund. Accordingly, the holders of Mortgage Certificates shall be treated for federal income tax purposes as the direct owners of their respective share of the Cash in the Mortgage Parties Indemnification Fund. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

The Special Servicer shall send annually to each holder of Mortgage Certificates that is treated as a direct owner of any portion of the Mortgage Parties Indemnification Fund a separate statement setting forth any income earned with respect to, or any expenditure made on behalf of, such portion of the Mortgage Parties Indemnification Fund as may be relevant for United States Federal Income Tax purposes.

D.     INFORMATION REPORTING AND WITHHOLDING

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "<u>backup withholding</u>" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder

(a) fails to furnish its social security number or other taxpayer identification number ("**TIN**"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

***The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.***

# XIII.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Classes 2, 3, 4A, 4B and 5 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than **4:00 p.m. (New York Time)** on **[_____], 2010.**

Dated: June ___, 2010

Respectfully submitted,

ESA PROPERTIES LLC
ESA 2005 PORTFOLIO LLC
ESA 2005- SAN JOSE LLC
ESA 2005- WALTHAM LLC
ESA ACQUISITION PROPERTIES LLC
ESA ALASKA LLC
ESA CANADA PROPERTIES BORROWER LLC
ESA FL PROPERTIES LLC
ESA MD BORROWER LLC
ESA MN PROPERTIES LLC
ESA P PORTFOLIO LLC
ESA P PORTFOLIO MD BORROWER LLC
ESA P PORTFOLIO PA PROPERTIES LLC
ESA P PORTFOLIO TXNC PROPERTIES LP
ESA PA PROPERTIES LLC
ESA TX PROPERTIES LP
ESH/HOMESTEAD PORTFOLIO LLC
ESH/HV PROPERTIES LLC
ESH/MSTX PROPERTY LP
ESH/TN PROPERTIES LLC
ESH/TX PROPERTIES LP
ESA MD BENEFICIARY LLC
ESA MD PROPERTIES BUSINESS TRUST
ESA P PORTFOLIO MD BENEFICIARY LLC
ESA P PORTFOLIO MD TRUST
ESA CANADA PROPERTIES TRUST
ESA CANADA TRUSTEE INC.
ESA CANADA BENEFICIARY INC.
ESA UD PROPERTIES LLC
ESA 2007 OPERATING LESSEE, INC.
ESA 2005 OPERATING LESSEE INC.
ESA OPERATING LESSEE INC.
ESA P PORTFOLIO OPERATING LESSEE INC.
ESA CANADA OPERATING LESSEE INC.

ESA P PORTFOLIO TXNC GP L.L.C.
ESA TXGP L.L.C.
ESH/MSTX GP L.L.C.
ESH/TXGP L.L.C.
ESH/TN MEMBER INC.
ESH/HOMESTEAD MEZZ L.L.C.
ESH/HOMESTEAD MEZZ 2 L.L.C.
ESH/HOMESTEAD MEZZ 3 L.L.C.
ESH/HOMESTEAD MEZZ 4 L.L.C.
ESH/HOMESTEAD MEZZ 5 L.L.C.
ESH/HOMESTEAD MEZZ 6 L.L.C.
ESH/HOMESTEAD MEZZ 7 L.L.C.
ESH/HOMESTEAD MEZZ 8 L.L.C.
ESH/HOMESTEAD MEZZ 9 L.L.C.
ESH/HOMESTEAD MEZZ 10 L.L.C.
ESA MEZZ L.L.C.
ESA MEZZ 2 L.L.C.
ESA MEZZ 3 L.L.C.
ESA MEZZ 4 L.L.C.
ESA MEZZ 5 L.L.C.
ESA MEZZ 6 L.L.C.
ESA MEZZ 7 L.L.C.
ESA MEZZ 8 L.L.C.
ESA MEZZ 9 L.L.C.
ESA MEZZ 10 L.L.C.
ESA P MEZZ L.L.C.
ESA P MEZZ 2 L.L.C.
ESA P MEZZ 3 L.L.C.
ESA P MEZZ 4 L.L.C.
ESA P MEZZ 5 L.L.C.
ESA P MEZZ 6 L.L.C.
ESA P MEZZ 7 L.L.C.
ESA P MEZZ 8 L.L.C.
ESA P MEZZ 9 L.L.C.
ESA P MEZZ 10 L.L.C.
HOMESTEAD VILLAGE L.L.C.
EXTENDED STAY HOTELS L.L.C.
ESA P PORTFOLIO HOLDINGS L.L.C.
ESA MANAGEMENT L.L.C.
ESA BUSINESS TRUST


By:_____
      Name:  David Lichtenstein
      Title:   President

**Exhibit A**

**The Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                                    :
**In re**                                                           :   **Chapter 11 Case No.**
                                                                    :
**EXTENDED STAY INC., et al.,**                                     :   **09-13764 (JMP)**
                                                                    :
**Debtors.**                                                        :   **(Jointly Administered)**
                                                                    :
-------------------------------------------------------------------x

## DEBTORS' FIFTH AMENDED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors
and Debtors in Possession

Dated: June 8, 2010

# TABLE OF CONTENTS

**Page**

ARTICLE I    DEFINITIONS ................................................................................................1

    A.    Defined Terms ..........................................................................................1

    1.1    Acquisition .....................................................................................1
    1.2    Administrative Expense Claim ......................................................1
    1.3    Administrative Expense Creditor ..................................................1
    1.4    Administrative Expense Objection Deadline..................................1
    1.5    Administrative/Priority Claims Reserve........................................1
    1.6    Affiliate .........................................................................................1
    1.7    Allowed .........................................................................................1
    1.8    Allowed Amount............................................................................2
    1.9    Auction ..........................................................................................3
    1.10    Ballot ............................................................................................3
    1.11    Bankruptcy Code ...........................................................................3
    1.12    Bankruptcy Court...........................................................................3
    1.13    Bankruptcy Rules ..........................................................................3
    1.14    BHAC.............................................................................................3
    1.15    BHAC IP ........................................................................................3
    1.16    BHAC License Agreements ...........................................................3
    1.17    BHAC IP Transfer Agreement.......................................................3
    1.18    Bidding Procedures Order ..............................................................3
    1.19    Business Day .................................................................................3
    1.20    Cash...............................................................................................3
    1.21    Cash Collateral Order ....................................................................3
    1.22    Cash Distribution ..........................................................................3
    1.23    Chapter 11 Cases...........................................................................4
    1.24    Claim.............................................................................................4
    1.25    Class..............................................................................................4
    1.26    Commencement Date .....................................................................4
    1.27    Confirmation Date..........................................................................4
    1.28    Confirmation Order........................................................................4
    1.29    Contingent Claim ..........................................................................4
    1.30    Controlling Holder ........................................................................4
    1.31    Creditor.........................................................................................4
    1.32    Creditor Representative .................................................................4
    1.33    Creditors' Committee ....................................................................4
    1.34    Debtors .........................................................................................4
    1.35    Debt Financing Arrangements ......................................................4
    1.36    Debt Financing Lenders ................................................................5
    1.37    Debtor in Possession ....................................................................5
    1.38    Disallowed Claim..........................................................................5
    1.39    Disclosure Statement ....................................................................5
    1.40    Disputed Claim .............................................................................5
    1.41    Distribution ...................................................................................5
    1.42    Distribution Date...........................................................................5
    1.43    DL-DW..........................................................................................5

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| 1.44 | Effective Date | 5 |
| 1.45 | Equity Interest | 5 |
| 1.46 | ESA Canada Properties Borrower Interests | 6 |
| 1.47 | ESA Canada Properties Interests | 6 |
| 1.48 | ESA MD Borrower Interests | 6 |
| 1.49 | ESA MD Properties Trust Certificate | 6 |
| 1.50 | ESA P Portfolio MD Borrower Interests | 6 |
| 1.51 | ESA P Portfolio MD Trust Certificate | 6 |
| 1.52 | ESA UD | 6 |
| 1.53 | ESA UD Mortgage Claim | 6 |
| 1.54 | ESA UD Mortgage Facility | 6 |
| 1.55 | ESH/ESA General Partnership Interests | 6 |
| 1.56 | ESH/TN Properties Membership Interest | 6 |
| 1.57 | ESI | 6 |
| 1.58 | ESI Settlement | 6 |
| 1.59 | ESI Settlement Order | 7 |
| 1.60 | Estate | 7 |
| 1.61 | Estimated Amount | 7 |
| 1.62 | Examiner's Report | 7 |
| 1.63 | Excess Cash | 7 |
| 1.64 | Existing Equity | 7 |
| 1.65 | Existing Letters of Credit | 7 |
| 1.66 | Final Distribution Date | 7 |
| 1.67 | Final Order | 7 |
| 1.68 | G&A Reimbursement Agreements | 7 |
| 1.69 | General Unsecured Claims | 8 |
| 1.70 | Guaranty | 8 |
| 1.71 | Guaranty Claim | 8 |
| 1.72 | Homestead | 8 |
| 1.73 | HVM | 8 |
| 1.74 | HVM Manager | 8 |
| 1.75 | HVM Manager Owner | 8 |
| 1.76 | Impaired | 8 |
| 1.77 | Indemnified Litigation | 8 |
| 1.78 | Initial Distribution Date | 8 |
| 1.79 | Intellectual Property | 8 |
| 1.80 | Intercreditor Agreement | 8 |
| 1.81 | Internal Revenue Code | 8 |
| 1.82 | Investment | 9 |
| 1.83 | Investment Agreement | 9 |
| 1.84 | Investor | 9 |
| 1.85 | Investor Certificates | 9 |
| 1.86 | IRS | 9 |
| 1.87 | Litigation Trust | 9 |
| 1.88 | Litigation Trust Agreement | 9 |
| 1.89 | Litigation Trust Assets | 9 |

| | | |
|---|---|---|
| 1.90 | Litigation Trust Beneficiaries | 9 |
| 1.91 | Litigation Trust Funding | 9 |
| 1.92 | Litigation Trust Funding Reimbursement | 9 |
| 1.93 | Litigation Trustee | 9 |
| 1.94 | Loan REMIC | 10 |
| 1.95 | Lower Tier REMIC | 10 |
| 1.96 | Master Servicer | 10 |
| 1.97 | Merrill Swap Agreement | 10 |
| 1.98 | Mezzanine Facilities | 10 |
| 1.99 | Mezzanine Facilities Claims | 10 |
| 1.100 | Mortgage Certificate | 10 |
| 1.101 | Mortgage Debt Parties | 10 |
| 1.102 | Mortgage Facility | 10 |
| 1.103 | Mortgage Facility Claim | 10 |
| 1.104 | Mortgage Facility Deficiency Claim | 11 |
| 1.105 | Mortgage Facility Trust | 11 |
| 1.106 | Mortgage Parties Indemnification Fund | 11 |
| 1.107 | Mortgage Properties | 11 |
| 1.108 | New Debtor Equity | 11 |
| 1.109 | New ESA UD Mortgage Facility | 11 |
| 1.110 | New ESA UD Mortgage Note | 11 |
| 1.111 | NewCo | 11 |
| 1.112 | NewCo Certificate of Formation | 11 |
| 1.113 | NewCo Common Interests | 11 |
| 1.114 | NewCo Manager | 11 |
| 1.115 | NewCo Management Incentive Plan | 11 |
| 1.116 | NewCo Operating Agreement | 11 |
| 1.117 | Operating Advisor | 11 |
| 1.118 | Other Existing Equity Interests | 12 |
| 1.119 | Person | 12 |
| 1.120 | Plan | 12 |
| 1.121 | Plan Administrator | 12 |
| 1.122 | Plan Documents | 12 |
| 1.123 | Plan Supplement | 12 |
| 1.124 | Priority Claim | 12 |
| 1.125 | Priority Tax Claim | 12 |
| 1.126 | Pro Rata Share | 12 |
| 1.127 | Real Estate Investment Trust | 12 |
| 1.128 | Real Estate Mortgage Investment Conduit (or REMIC) | 12 |
| 1.129 | Record Date | 13 |
| 1.130 | Released Parties | 13 |
| 1.131 | Reorganized Debtors | 13 |
| 1.132 | Restructuring Transaction(s) | 13 |
| 1.133 | Schedules | 13 |
| 1.134 | Secured Claim | 13 |
| 1.135 | Securities Act | 13 |

1.136    Special Servicer ....................................................................13
1.137    Sponsors ..............................................................................13
1.138    Successor Trustee.................................................................14
1.139    Swap Agreements .................................................................14
1.140    Tier 1 Debtors ......................................................................14
1.141    Tier 2 Debtors ......................................................................14
1.142    Tier 3 Debtors ......................................................................14
1.143    Treasury Regulations............................................................14
1.144    Trustee .................................................................................14
1.145    Trust and Servicing Agreement ...........................................14
1.146    TRS ......................................................................................14
1.147    Upper Tier REMIC ...............................................................14
1.148    Unimpaired ..........................................................................14
1.149    Unliquidated Claim ..............................................................14
1.150    Voting Deadline ...................................................................14
1.151    Wachovia Swap Agreement .................................................14

B.        Other Terms.........................................................................15

C.        Exhibits ................................................................................15

ARTICLE II      PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND
                PRIORITY TAX CLAIMS ..................................................15

2.1       Payment of Allowed Administrative Expense Claims ..........15
2.2       Compensation and Reimbursement Claims..........................15
2.3       Priority Tax Claims ..............................................................16

ARTICLE III     CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ....16

3.1       Summary ..............................................................................16

ARTICLE IV      TREATMENT OF CLAIMS AND EQUITY INTERESTS ...........17

4.1       Class 1 .................................................................................17
4.2       Class 2 .................................................................................17
4.3       Class 3 .................................................................................17
4.4       Class 4A ...............................................................................18
4.5       Class 4B................................................................................18
4.6       Class 5 .................................................................................19
4.7       Class 6 .................................................................................19
4.8       Class 7 .................................................................................19
4.9       Class 8 .................................................................................20
4.10      Class 9 .................................................................................20
4.11      Class 10 ...............................................................................20
4.12      Class 11 ...............................................................................20
4.13      Class 12 ...............................................................................20
4.14      Class 13 ...............................................................................21
4.15      Class 14 ...............................................................................21
4.16      Class 15 ...............................................................................21

ARTICLE V ACCEPTANCE, REJECTION, AND REVOCATION OR WITHDRAWAL OF THE PLAN ................................................................. 21

5.1 Classes Entitled to Vote ........................................................................ 21
5.2 Acceptance by Class of Claims .............................................................. 22
5.3 Nonconsensual Confirmation ................................................................ 22
5.4 Revocation or Withdrawal ..................................................................... 22
5.5 Amendment of Plan Documents ............................................................ 22
5.6 Removal of Debtors ............................................................................... 22

ARTICLE VI IMPLEMENTATION OF THE PLAN ........................................... 23

6.1 Substantive Consolidation ..................................................................... 23
6.2 Deemed Sale of Mortgage Properties .................................................... 23
6.3 Distributions to Holder of Allowed Mortgage Facility Claim ............ 23
6.4 Creation of NewCo ................................................................................ 23
6.5 Existing Debt Securities ........................................................................ 24
6.6 NewCo Management Incentive Plan ...................................................... 24
6.7 Corporate Reorganization Actions ........................................................ 24
6.8 Investment ............................................................................................. 25
6.9 Effectuating Documents and Further Transactions .............................. 26
6.10 Allocation of Plan Distributions Between Principal and Interest ........ 26
6.11 Surrender and Cancellation of Instruments .......................................... 26
6.12 Letters of Credit .................................................................................... 26
6.13 BHAC IP Transfer Agreement .............................................................. 26
6.14 Consistent Tax Reporting ...................................................................... 27
6.15 Issuance of NewCo Common Interests to Investor or Sponsor Affiliates ......... 27
6.16 Mortgage Parties Indemnification Fund ............................................... 28
6.17 Litigation Trust ..................................................................................... 28
6.18 ESI Settlement ....................................................................................... 30

ARTICLE VII TREATMENT OF DISPUTED CLAIMS ................................... 31

7.1 Objections to Claims; Prosecution of Disputed Claims ...................... 31
7.2 Distributions on Account of Disputed Claims ..................................... 31
7.3 Settlement of Claims ............................................................................. 32

ARTICLE VIII DISTRIBUTIONS ....................................................................... 32

8.1 Distributions under the Plan .................................................................. 32
8.2 Timing of Distributions under the Plan ................................................ 32
8.3 Use of Cash Collateral ........................................................................... 32
8.4 Plan Administrator ................................................................................. 32
8.5 Record Date ............................................................................................ 33
8.6 Manner of Payment under the Plan ....................................................... 33
8.7 Hart-Scott-Rodino Compliance ............................................................. 33
8.8 Fractional Distributions ......................................................................... 33
8.9 Distribution of Unclaimed Property ...................................................... 33
8.10 Administrative/Priority Claims Reserve ............................................... 33

ARTICLE IX    CONDITIONS PRECEDENT ........................................................................34

9.1    Conditions Precedent to the Effective Date ....................................................34
9.2    Effect of Failure of Conditions to Effective Date ...........................................35

ARTICLE X    EFFECT OF CONFIRMATION ...................................................................36

10.1    Vesting of Assets ...........................................................................................36
10.2    Title to Assets; Discharge of Liabilities ........................................................36
10.3    Binding Effect ................................................................................................36
10.4    Claims Extinguished ......................................................................................36
10.5    Discharge of Claims and Termination of Equity Interests ..............................36
10.6    Injunction ......................................................................................................37
10.7    Term of Injunctions or Stays .........................................................................37
10.8    Injunction Against Interference With Plan of Reorganization .........................37
10.9    Exculpation ....................................................................................................38
10.10    Releases ......................................................................................................38
10.11    Government Releases ...................................................................................39
10.12    Mortgage Facility Trust Claims ...................................................................39
10.13    Indemnification Obligations ........................................................................39
10.14    Retention of Causes of Action/Reservation of Rights ...................................40
10.15    Limitations on Exculpation and Releases of Representatives .........................40

ARTICLE XI    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....................41

11.1    Assumption of Executory Contracts and Unexpired Leases ............................41
11.2    Rejection of Executory Contracts and Unexpired Leases ...............................41
11.3    Claims Arising from Rejection, Termination or Expiration .............................41
11.4    Insurance Policies and Agreements ................................................................42
11.5    Management Agreements ...............................................................................42

ARTICLE XII    RETENTION OF JURISDICTION ............................................................42

ARTICLE XIII MISCELLANEOUS PROVISIONS ...........................................................44

13.1    Modification of the Plan ................................................................................44
13.2    Payment of Statutory Fees .............................................................................44
13.3    Rights of Action ............................................................................................44
13.4    Swap Agreements ..........................................................................................44
13.5    Dissolution of Creditors' Committee .............................................................44
13.6    Notices ..........................................................................................................44
13.7    Headings ........................................................................................................46
13.8    Severability ...................................................................................................46
13.9    Governing Law ..............................................................................................46
13.10    Plan Supplement /Exhibits/Schedules .........................................................46
13.11    Compliance with Tax Requirements .............................................................46
13.12    Exemption from Transfer Taxes ..................................................................47
13.13    Expedited Determination of Postpetition Taxes ...........................................47
13.14    Sections 1125 and 1126 of the Bankruptcy Code .........................................47
13.15    Time ............................................................................................................47

13.16   No Amendment, Modification or Waiver of Cash Collateral Order or
Other Documents ............................................................................................47

# EXHIBIT LIST

Exhibit A    –    Debtors

Exhibit B    –    BHAC License Agreements

Exhibit C    –    Tier 1 Debtors

Exhibit D    –    Tier 2 Debtors

Exhibit E    –    Tier 3 Debtors

Exhibit F    –    Existing Letters of Credit

Exhibit G    –    Mezzanine Facilities

**DEBTORS' FIFTH AMENDED PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

ESA Properties LLC and its affiliated debtors set forth on Exhibit A annexed hereto (the "Debtors") hereby propose the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

## ARTICLE I

## DEFINITIONS

**A.      Defined Terms.**

As used herein, the following terms shall have the respective meanings specified below:

1.1      ***Acquisition*** means the acquisition by DL-DW of the Debtors from BHAC IV, L.L.C. and BRE/HV Holdings L.L.C.

1.2      ***Administrative Expense Claim*** means any Claim constituting a cost or expense of administration in the Debtors' Chapter 11 Cases under section 503 of the Bankruptcy Code, including, without express or implied limitation, any actual and necessary costs and expenses of preserving the Estate of any Debtor, any expenses of professionals under sections 330 and 331 of the Bankruptcy Code, any actual and necessary costs and expenses of operating the businesses of any Debtor, any indebtedness or obligations incurred or assumed by any Debtor, as Debtor in Possession, in connection with the conduct of its business or for the acquisition or lease of property or the rendition of services, any allowed compensation or reimbursement of expenses under section 503(b)(2)-(6) of the Bankruptcy Code, any Claim of the Mortgage Debt Parties arising in respect of adequate protection payments under or in connection with the Cash Collateral Order, and any fees or charges assessed against any Estate under section 1930, chapter 123, title 28, United States Code.

1.3      ***Administrative Expense Creditor*** means any Creditor entitled to payment of an Administrative Expense Claim.

1.4      ***Administrative Expense Objection Deadline*** means the first Business Day that is thirty (30) days after the Effective Date, as such date may be extended from time to time by order of the Bankruptcy Court.

1.5      ***Administrative/Priority Claims Reserve*** means the reserve established pursuant to Section 8.10 of the Plan.

1.6      ***Affiliate*** means, as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person (for this purpose "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise).

1.7      ***Allowed*** means:

(a)     With respect to any Claim (other than an Administrative Expense Claim), proof of which was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Bankruptcy Court, (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, such Claim to the extent asserted in the proof of such Claim, or (ii) as to which an objection has been interposed, such Claim to the extent that it has been allowed in whole or in part by a Final Order.

(b)     With respect to any Claim (other than an Administrative Expense Claim), as to which no proof of claim was filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, such Claim to the extent that it has been listed in the Schedules as liquidated in amount and not disputed or contingent.

(c)     With respect to any Claim that is asserted to constitute an Administrative Expense Claim:

(i)     that represents an actual or necessary expense of preserving the Estate or operating the business of any Debtor, including for payment of goods, services, wages, or benefits or for credit extended to any Debtor, as a Debtor in Possession, any such Claim to the extent that such claim is reflected as a postpetition liability of any Debtor on such Debtor's books and records maintained in the ordinary course of business as of the Effective Date;

(ii)     in an action against any Debtor pending as of the Confirmation Date, any such Claim to the extent (x) it is allowed by a final order of a court of competent jurisdiction or by agreement between NewCo and the holder of such Administrative Expense Claim, and (y) if any Debtor disputes that such claim is a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code, to the extent the Bankruptcy Court determines by a Final Order that it constitutes a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code;

(iii)     any such Claim filed to the extent (x) no objection is interposed by the Administrative Expense Objection Deadline or (y) if an objection is interposed by the Administrative Expense Objection Deadline, is allowed in whole or in part by a Final Order and only to the extent that such allowed portion is deemed, pursuant to a Final Order, to constitute a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code; or

(iv)     that represents a Claim of a professional person employed under section 327, 328 or 1103 of the Bankruptcy Code that is required to apply to the Bankruptcy Court for the allowance of compensation and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code or an Administrative Expense Claim arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code, such Claim to the extent it is allowed by a Final Order.

1.8     ***Allowed Amount*** means the lesser of (a) the dollar amount of an Allowed Claim or (b) the Estimated Amount of such Claim.  Unless otherwise specified herein or by Final Order, the Allowed Amount of an Allowed Claim shall not include interest accruing on such Allowed Claim from and after the Commencement Date.

1.9     ***Auction*** has the meaning set forth in the Bidding Procedures Order.

1.10     ***Ballot*** means the form or forms distributed to holders of Impaired Claims on which the acceptance or rejection of the Plan is to be indicated.

1.11     ***Bankruptcy Code*** means the Bankruptcy Reform Act of 1978, as amended, and as codified in title 11 of the United States Code, as applicable to the Chapter 11 Cases.

1.12     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to section 157 of title 28 of the United States Code, the unit of such District Court constituted pursuant to section 151 of title 28 of the United States Code.

1.13     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases, including the Local Rules of the Bankruptcy Court.

1.14     ***BHAC*** means BHAC Capital IV, LLC, a Delaware limited liability company.

1.15     ***BHAC IP*** means the Intellectual Property owned or controlled by BHAC.

1.16     ***BHAC License Agreements*** means, collectively, the license agreements described on Exhibit B annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.17     ***BHAC IP Transfer Agreement*** shall have the meaning set forth in Section 6.13 hereof.

1.18     ***Bidding Procedures Order*** means that certain Order Pursuant to Sections 105(a), 363 and 503(b) of the Bankruptcy Code and Bankruptcy Rule 6004(h) Approving Bidding Procedures and Notice of the Auction Relating Thereto and Granting Related Relief, dated as of April 23, 2010 (Docket No. 975).

1.19     ***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.20     ***Cash*** means lawful currency of the United States of America.

1.21     ***Cash Collateral Order*** means that certain Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay, dated as of July 23, 2009 (Docket No. 205), including any and all modifications or amendments thereto.

1.22     ***Cash Distribution*** means the sum of (a) the Excess Cash, if any, and (b) the balance of the Investor Payment and the proceeds of the Debt Financing, each as defined in the Investment Agreement, after payment of (i) to the extent Excess Cash is a negative number, amounts, if any, required to fund the Administrative/Priority Claims Reserve, (ii) the Mortgage Parties Indemnification Fund, (iii) the Litigation Trust Funding, (iv) $750,000, which amount shall be used by the Debtors to fund the wind-down of ESI, (v) $40,000,000, which is the price to be paid for the purchase of control of HVM pursuant to the terms of the agreement dated June 4, 2010 with HVM Manager Owner, and (vi) Cash paid in connection with the acquisition of HVM or its assets, subject

to agreement on the amount by the Investors and the Special Servicer (with the consent of the Operating Advisor).  For the avoidance of doubt, to the extent that the amount referred to in clause (i) is a positive number, or any amount remains after the payment of any of the items referred to in clauses (ii) to (vi) hereof, such amount shall be added to the Cash Distribution.

1.23 ***Chapter 11 Cases*** means the cases under chapter 11 of the Bankruptcy Code commenced by ESI, the Debtors and certain of their Affiliates on June 15, 2009 and February 18, 2010 pending in the Bankruptcy Court as In re Extended Stay Inc., et al., Case No. 09-13764 (JMP) (Jointly Administered).

1.24 ***Claim*** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

1.25 ***Class*** means any group of Claims or Equity Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

1.26 ***Commencement Date*** means June 15, 2009 or February 18, 2010, as applicable to the particular Debtor.

1.27 ***Confirmation Date*** means the date on which the Confirmation Order has been entered on the docket by the Clerk of the Bankruptcy Court.

1.28 ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.29 ***Contingent Claim*** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening, or is triggered by, an event, which event has not yet occurred, happened, or been triggered, as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.30 ***Controlling Holder*** means Banc of America Securities LLC, Blue Ridge Investments, L.L.C., UBS Securities LLC, and BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse AG, in their capacity as the Controlling Holder under the Trust and Servicing Agreement, or any successor thereto.

1.31 ***Creditor*** means any Person that holds an Allowed Claim.

1.32 ***Creditor Representative*** means the member of the Creditors' Committee or other Person selected by the Creditors' Committee to participate in the management of the Litigation Trust.

1.33 ***Creditors' Committee*** means the Official Committee of Unsecured Creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

1.34 ***Debtors*** has the meaning set forth in the preamble hereof.

1.35 ***Debt Financing Arrangements*** means the new debt financing to be provided to NewCo and the Reorganized Debtors on the Effective Date pursuant to that certain Commitment

Letter dated May 27, 2010 among the Sponsors and the Debt Financing Lenders for a new senior secured loan on terms and conditions set forth therein, including the term sheet attached as Exhibit A thereto.

1.36    ***Debt Financing Lenders*** means JP Morgan Chase Bank, N.A. and Deutsche Bank Securities, Inc., together with their successors and assigns pursuant to assignments made in accordance with the applicable terms of the Debt Financing Arrangements, individually or collectively as the context may require, solely in their capacity as such.

1.37    ***Debtor in Possession*** means each Debtor in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

1.38    ***Disallowed Claim*** means a Claim or a portion of a Claim that is disallowed by an order of the Bankruptcy Court or such other court of competent jurisdiction.

1.39    ***Disclosure Statement*** means the disclosure statement related to the Plan filed with and approved by the Bankruptcy Court, as such disclosure statement may be amended, modified or supplemented.

1.40    ***Disputed Claim*** means any Claim (including any Administrative Expense Claim) against any Debtor, proof of which was timely and properly filed, which is disputed under the Plan or as to which the Debtors have interposed a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed.  A Claim that is disputed by the Debtors as to its amount only shall be deemed Allowed in the amount the Debtors admit owing, if any, and disputed as to the excess.

1.41    ***Distribution*** means the payment or distribution under the Plan of property or interests in property to the holders of Allowed Claims.

1.42    ***Distribution Date*** means each of (a) the Initial Distribution Date, (b) the first Business Day after the end of the months of March and September, commencing with the first such date to occur after the Effective Date, and (c) the Final Distribution Date.

1.43    ***DL-DW*** means DL-DW Holdings LLC.

1.44    ***Effective Date*** means a Business Day on or after the Confirmation Date selected by the Debtors, the Investor and each of the Sponsors on which (a) all of the conditions precedent to the effectiveness of the Plan specified in Section 9.1 have been satisfied or waived and (b) no stay of the Confirmation Order is in effect.

1.45    ***Equity Interest*** means the interests of any holder of an equity security of any of the Debtors represented by any issued and outstanding shares of common stock or preferred stock, or any membership interest, partnership interest or other instrument evidencing a present ownership interest in any of the Debtors, including any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.46　***ESA Canada Properties Borrower Interests*** means the limited liability company interests of ESA Canada Properties Borrower LLC, authorized pursuant to its limited liability company agreement, as in effect immediately prior to the Effective Date.

1.47　***ESA Canada Properties Interests*** means the shares of beneficial interest of ESA Canada Properties Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.48　***ESA MD Borrower Interests*** means the limited liability company interests of ESA MD Borrower LLC, authorized pursuant to its limited liability company agreement, as in effect immediately prior to the Effective Date.

1.49　***ESA MD Properties Trust Certificate*** means the certificate of ESA MD Properties Business Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.50　***ESA P Portfolio MD Borrower Interests*** means the limited liability company interests of ESA P Portfolio MD Borrower LLC, authorized pursuant to its limited liability company agreement, as in effect immediately prior to the Effective Date.

1.51　***ESA P Portfolio MD Trust Certificate*** means the certificate of ESA P Portfolio MD Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.52　***ESA UD*** means ESA UD Properties LLC, a Delaware limited liability company.

1.53　***ESA UD Mortgage Claim*** means the Claim of Bank of America, N.A. under the ESA UD Mortgage Facility.

1.54　***ESA UD Mortgage Facility*** means the Loan Agreement, dated February 14, 2008, among ESA UD, ESA 2007 Operating Lessee Inc. and Bank of America, N.A.

1.55　***ESH/ESA General Partnership Interests*** means the 1% general partnership interests in ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., and ESA P Portfolio TXNC Properties L.P., held by ESH/MSTX GP L.L.C., ESH/TXGP L.L.C., ESA TXGP L.L.C., and ESA P Portfolio TXNC GP L.L.C. respectively, as authorized pursuant to the limited partnership agreements of ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., and ESA P Portfolio TXNC Properties L.P., as in effect immediately prior to the Effective Date.

1.56　***ESH/TN Properties Membership Interest*** means the 1% membership interest in ESH/TN Properties L.L.C. held by ESH/TN Member Inc., authorized pursuant to the limited liability company agreement of ESH/TN Properties L.L.C., as in effect immediately prior to the Effective Date.

1.57　***ESI*** means Extended Stay Inc., a Delaware corporation.

1.58　***ESI Settlement*** has the meaning set forth in Section 6.18 hereof.

1.59    ***ESI Settlement Order*** means the order of the Bankruptcy Court approving the ESI Settlement.

1.60    ***Estate*** means the estate of each Debtor as created under section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

1.61    ***Estimated Amount*** means the estimated dollar value of an Unliquidated Claim, Disputed Claim or Contingent Claim pursuant to section 502(c) of the Bankruptcy Code or as otherwise agreed to between the holder of such Claim and the applicable Debtor or NewCo, or as otherwise determined by the Bankruptcy Court.

1.62    ***Examiner's Report***  means the report of Ralph R. Mabey, examiner in the Chapter 11 Cases, filed on April 8, 2010 [Docket No. 913].

1.63    ***Excess Cash***  means all cash and cash equivalents on the balance sheet of the Debtors as of the Effective Date but immediately prior to the Investment by the Investor, less amounts necessary to fund the Administrative/Priority Claims Reserve.

1.64    ***Existing Equity*** means the Equity Interest of each of the Debtors, other than the Tier 2 Debtors, authorized pursuant to its certificate of incorporation or other organizational documents, as in effect immediately prior to the Effective Date.

1.65    ***Existing Letters of Credit*** means, collectively, the letters of credit described on Exhibit F annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.66    ***Final Distribution Date*** means a date on or after the Initial Distribution Date and after all Disputed Claims have become either Allowed Claims or Disallowed Claims that is selected by NewCo in its discretion but, in any event, is no later than thirty (30) days thereafter, or such later date as the Bankruptcy Court may establish, upon request by NewCo, for cause shown.

1.67    ***Final Order*** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, which has not been reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

1.68    ***G&A Reimbursement Agreements*** means the G&A Reimbursement Agreements entered into between HVM and one or more of the Debtors, as the same have been amended from time to time.

1.69     ***General Unsecured Claims*** means any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Claim, a Secured Claim, the Mortgage Facility Deficiency Claim or a Mezzanine Facilities Claim.

1.70     ***Guaranty*** means the Guaranty Agreement, dated as of June 11, 2007, by Lightstone Holdings LLC, HVM Manager Owner, ESI and Homestead in respect of the obligations of the borrowers under the Mortgage Facility and the Mezzanine Facilities.

1.71     ***Guaranty Claim*** means any rights to the payment of damages, claims, causes of action, charges, suits, demands, defaults, rights of recovery, assessments, rights of set-off or rights of recoupment arising under or relating to the Guaranty (whether relating to the Mortgage Facility or the Mezzanine Facilities and whether paid prior to or following the Effective Date) as a result of the commencement of any of the Chapter 11 Cases.

1.72     ***Homestead*** means Homestead Village L.L.C., a Delaware limited liability company.

1.73     ***HVM*** means HVM L.L.C., a Delaware limited liability company.

1.74     ***HVM Manager*** means HVM Manager L.L.C., a Delaware limited liability company and the manager of HVM.

1.75     ***HVM Manager Owner*** means David Lichtenstein.

1.76     ***Impaired*** means, with respect to any Class of Claims or Equity Interests, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.77     ***Indemnified Litigation*** has the meaning set forth in Section 6.16 hereof.

1.78     ***Initial Distribution Date*** means a date after the Effective Date that is selected by NewCo in its discretion but, in any event, is no later than five (5) days after the Effective Date, or such later date as the Bankruptcy Court may establish upon request by NewCo, for cause shown.

1.79     ***Intellectual Property*** means, collectively, patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, domain names, copyrights, licenses and know-how (including, without limitation, trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures as well as other inventions, works of authorship, confidential information, technology, software and documentation, data and databases and websites) and any registrations or applications to register the foregoing.

1.80     ***Intercreditor Agreement*** means the Intercreditor Agreement dated as of June 11, 2007, by and among Wachovia Bank, N.A., Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A., and the holders of the Mezzanine Facilities Claims.

1.81     ***Internal Revenue Code*** means the Internal Revenue Code of 1986, as amended from time to time, and any applicable rulings, Treasury Regulations, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

1.82    ***Investment*** means the investment that is to be made by the Investor as further described in Section 6.8 hereof.

1.83    ***Investment Agreement*** means the agreement dated June 4, 2010 by and among the Debtors, HVM Manager, HVM and the Investor.

1.84    ***Investor*** means CP ESH Investors, LLC, a newly formed entity wholly owned by the Sponsors.

1.85    ***Investor Certificates*** means those Mortgage Certificates in the aggregate principal amount (inclusive of estimated interest that would accrue through August 15, 2010) of $309,244,555.72 in Classes B, CFX, CFL, D, E, G, H and J beneficially owned by the Investor or its members or Affiliates, the actual amount of such Mortgage Certificates to be calculated as provided in Section 1.2 of the Investment Agreement.

1.86    ***IRS*** means the United States Internal Revenue Service.

1.87    ***Litigation Trust*** means the trust established on the Effective Date in accordance with the Plan and the Litigation Trust Agreement, for the benefit of the Litigation Trust Beneficiaries.

1.88    ***Litigation Trust Agreement*** means the trust agreement that, among other things, establishes the Litigation Trust, and describes the powers, duties and responsibilities of the Litigation Trustee, the Creditor Representative and the Special Servicer, which trust agreement shall be substantially in the form filed in the Plan Supplement and shall be reasonably acceptable to the Creditors' Committee and the Special Servicer (in consultation with the Operating Advisor).

1.89    ***Litigation Trust Assets*** means (i) all claims and causes of action of the Debtors or the Debtors in Possession under sections 502(d), 542 through 551, and 553 of the Bankruptcy Code, and (ii) any other potential claims, causes of actions, charges, suits or rights of recovery referenced in the Examiner's Report arising out of or related to the Acquisition; provided, however, that the "Litigation Trust Assets" shall not include (a) the Windows Litigation (as such term is defined in the Investment Agreement), and (b) any claims, causes of action, suits or rights of recovery against the Debtors, the Reorganized Debtors, NewCo, HVM, the Operating Advisor, the Controlling Holder, the Trustee, or the Special Servicer.

1.90    ***Litigation Trust Beneficiaries*** means the Creditors entitled to the proceeds of the Litigation Trust Assets, as determined by Final Order.

1.91    ***Litigation Trust Funding*** means the sum of $5,000,000 to be provided by the Debtors on the Effective Date, to provide the initial funding for the Litigation Trust described in Section 6.17 hereof.

1.92    ***Litigation Trust Funding Reimbursement*** means the amount to be paid to the Special Servicer in cash from the first proceeds of the Litigation Trust Assets, as set forth in the Litigation Trust Agreement.

1.93    ***Litigation Trustee*** means the Person selected by mutual agreement of the Special Servicer (with the consent of the Operating Advisor, such consent not to be unreasonably withheld) and the Creditors' Committee, as designated in the Plan Supplement, or, after the Effective

Date, such other Person appointed by the mutual agreement of the Special Servicer and the Creditor Representative, or as otherwise determined by the Bankruptcy Court.

1.94 ***Loan REMIC*** has the meaning that is set forth in the Trust and Servicing Agreement.

1.95 ***Lower Tier REMIC*** has the meaning that is set forth in the Trust and Servicing Agreement.

1.96 ***Master Servicer*** means Wachovia Bank, National Association.

1.97 ***Merrill Swap Agreement*** means the Master Agreement, dated August 28, 2007, by and among Merrill Lynch Capital Services, Inc. and Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass Through Certificates, Series 2007-ESH Trust, and all Schedules thereto, including the Elections and Variables to the 1994 ISDA Credit Support Annex.

1.98 ***Mezzanine Facilities*** means, collectively, the mezzanine loan facilities described on Exhibit G annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.99 ***Mezzanine Facilities Claims*** means, collectively, the Claims arising under the Mezzanine Facilities.

1.100 ***Mortgage Certificate*** means a mortgage certificate that was issued in connection with the Mortgage Facility.

1.101 ***Mortgage Debt Parties*** means, collectively, (i) the Successor Trustee, (ii) the Trustee, (iii) the Special Servicer, (iv) the Master Servicer, (v) the Operating Advisor, (vi) the Controlling Holder, and (vii) the Mortgage Facility Trust, and with respect to any of the foregoing, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity, and any Person claiming by or through any of them, but excluding any insurer of any of the Debtors.  For the avoidance of doubt, this definition of "Mortgage Debt Parties" does not include TriMont Real Estate Advisors Inc. and any of its present and former Affiliates (whether by operation of law or otherwise), subsidiaries, current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity.

1.102 ***Mortgage Facility*** means the Mortgage Loan Agreement, dated as of June 11, 2007, by and among the Borrowers listed on Schedule 1.1(a) thereto and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A., as Lenders, as amended or modified from time to time and all documents entered into in connection therewith.

1.103 ***Mortgage Facility Claim*** means the Secured Claim of the Trustee under the Mortgage Facility.

1.104    ***Mortgage Facility Deficiency Claim*** means the Claim of the Trustee in respect of the Mortgage Facility, other than the Mortgage Facility Claim.

1.105    ***Mortgage Facility Trust*** means the trust created under the Trust and Servicing Agreement for the benefit of the holders of the Mortgage Certificates.

1.106    ***Mortgage Parties Indemnification Fund*** has the meaning set forth in Section 6.16 hereof.

1.107    ***Mortgage Properties*** means the collateral securing the Mortgage Facility.

1.108    ***New Debtor Equity*** means the common stock, preferred stock, limited liability company interests or limited or general partnership interests, as the case may be, of each of the Tier 1 Debtors, which is to be authorized and issued pursuant to the Plan.

1.109    ***New ESA UD Mortgage Facility*** means the new mortgage facility, in the principal amount of five million dollars ($5,000,000) memorialized in a loan agreement, substantially in the form to be set forth in the Plan Supplement, by and among ESA UD, as borrower, and the lender thereunder.

1.110    ***New ESA UD Mortgage Note*** means the note to be issued to ESA UD pursuant to the New ESA UD Mortgage Facility in the principal amount of five million dollars ($5,000,000), bearing interest at the rate of 5.0% per annum and due and payable 5 years from the Effective Date.

1.111    ***NewCo*** means a newly formed limited liability company, or such alternate corporate or other organizational entity that may be selected by the Investor and each of the Sponsors, to be organized as of the Effective Date in accordance with Section 6.7 hereof, or any successors in interest thereto, from and after the Effective Date.

1.112    ***NewCo Certificate of Formation*** means the Certificate of Formation of NewCo, substantially in the form to be set forth in the Plan Supplement.

1.113    ***NewCo Common Interests*** means the membership interests or, as applicable, other common equity interests, in NewCo, having a stated value of one-thousand dollars ($1,000) per membership interest, which are to be authorized and issued pursuant to the Plan.

1.114    ***NewCo Manager*** means a newly formed limited liability company owned and controlled by Persons affiliated with or designated by the Investor and appointed as the successor manager of HVM, which may be a third party.

1.115    ***NewCo Management Incentive Plan*** means the NewCo Management Incentive Plan, substantially in the form to be set forth in the Plan Supplement.

1.116    ***NewCo Operating Agreement*** means the Operating Agreement of NewCo, substantially in the form to be set forth in the Plan Supplement.

1.117    ***Operating Advisor*** means Banc of America Securities LLC, UBS Securities LLC and Cerberus Capital Management, L.P., in their capacity as the Operating Advisor appointed under the Trust and Servicing Agreement, and not individually, or any successor thereto.

1.118    ***Other Existing Equity Interests*** means the Equity Interests in ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., ESA P Portfolio TXNC Properties L.P. and ESH/TN Properties L.L.C., other than the ESH/ESA General Partnership Interests and the ESH/TN Properties Membership Interest.

1.119    ***Person*** means an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof, or any other entity (as defined in section 101(5) of the Bankruptcy Code) or group.

1.120    ***Plan*** means this plan of reorganization under chapter 11 of the Bankruptcy Code, including the Plan Documents, the Plan Supplement, and the Exhibits to the Plan annexed hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of this Plan, which amendments shall be reasonably acceptable to the Investor, each of the Sponsors and the Special Servicer (with the consent of the Operating Advisor, such consent not to be unreasonably withheld).

1.121    ***Plan Administrator*** means the Person selected by the Special Servicer (with the consent of the Operating Advisor, which consent shall not be unreasonably withheld), to make the Distributions required to be made by the Debtors or the Reorganized Debtors under the Plan, to file objections to Claims, to the extent provided in Section 7.1(b) of the Plan, and to deal with administrative and other matters pertaining to the closing of the Chapter 11 Cases.

1.122    ***Plan Documents*** means the documents to be executed, delivered, assumed, and/or performed in conjunction with the consummation of the Plan on the Effective Date.

1.123    ***Plan Supplement*** means the compilation of documents and forms of documents, schedules and exhibits, each in form and substance reasonably acceptable to the Investor and each of the Sponsors, to be filed on or before the date that is ten (10) days prior to the last day on which votes to accept or reject the plan are accepted and which may be amended from time to time until the Confirmation Date.

1.124    ***Priority Claim*** means any Claim to the extent such claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or Priority Tax Claim.

1.125    ***Priority Tax Claim*** means an unsecured Claim of a governmental unit of a kind specified in section 507(a)(8) of the Bankruptcy Code.

1.126    ***Pro Rata Share*** means with respect to Allowed Claims, the ratio (expressed as a percentage) of the amount of an Allowed Claim in a Class to the aggregate amount of all Allowed Claims in the same Class (or applicable Classes).

1.127    ***Real Estate Investment Trust*** means a real estate investment trust within the meaning of Section 856 of the Internal Revenue Code.

1.128    ***Real Estate Mortgage Investment Conduit (or REMIC)*** means a real estate mortgage investment conduit, within the meaning of Section 860D of the Internal Revenue Code, that directly or indirectly holds the Mortgage Facility.

1.129 ***Record Date*** means the date to be established by the Bankruptcy Court for purposes of determining those holders of allowed claims that are entitled to vote to accept or reject this Plan.

1.130 ***Released Parties*** means (a) the Debtors, (b) NewCo, (c) each member of the Creditors' Committee, (d) the Investor, (e) each Sponsor, (f) the Debt Financing Lenders, (g) BHAC (provided that BHAC has entered into the BHAC IP Transfer Agreement as provided in Section 6.13 herein), (h) HVM, (i) HVM Manager, (j) HVM Manager Owner, (k) the Special Servicer, (l) the Mortgage Debt Parties, (m) the Mortgage Facility Trust, (n) the Master Servicer, (o) the Trustee, (p) the Successor Trustee, (q) the Operating Advisor, (r) the Controlling Holder, (s) Lightstone Holdings LLC, (t) any present or former director, manager, officer, member, equity holder (and their respective Affiliates), employee, agent, financial advisor, partner, Affiliate, attorney, other professional advisor or representative (and their respective Affiliates) of the persons or parties described in clauses (a) through (t) hereof or of any Affiliate thereof, and (u) ESI and any of ESI's Affiliates or present or former directors or officers.

1.131 ***Reorganized Debtors*** means the Debtors, as reorganized as of the Effective Date in accordance with this Plan, and their successors.

1.132 ***Restructuring Transaction(s)*** means the creation or establishment or formation of an Affiliate of NewCo or a Reorganized Debtor, a dissolution or winding up of the corporate existence of a Debtor or the consolidation, merger, contribution of assets, or other transaction in which a Reorganized Debtor or non-Debtor Affiliate of a Debtor merges with or transfers some or substantially all of its assets and liabilities to NewCo or a Reorganized Debtor or its current or newly formed Affiliates, or any transaction related to the foregoing, on or following the Effective Date, as set forth in the Plan Supplement.

1.133 ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors with the Bankruptcy Court on September 28, 2009 and on March 4, 2010, as required by section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been and may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

1.134 ***Secured Claim*** means any Claim to the extent reflected in the Schedules or a proof of claim as a secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.135 ***Securities Act*** means the Securities Act of 1933, as amended.

1.136 ***Special Servicer*** means CWCapital Asset Management LLC, and any successor thereto, in its capacity as special servicer of the Successor Trustee.

1.137 ***Sponsors*** means Centerbridge Partners, L.P. and Paulson & Co. Inc, each on behalf of various investment funds and accounts managed by them, and Blackstone Real Estate Partners VI L.P. on behalf of itself and its parallel funds and related alternative vehicles, solely in their capacity as such.

1.138    **Successor Trustee** means U.S. Bank National Association, as successor in interest to Wells Fargo Bank, N.A., as Successor Trustee in Trust for holders of Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH.

1.139    **Swap Agreements** means, collectively, (a) the Merrill Swap Agreement, and (b) the Wachovia Swap Agreement.

1.140    **Tier 1 Debtors** means the Debtors set forth on Exhibit C hereof.

1.141    **Tier 2 Debtors** means the Debtors set forth on Exhibit D hereof.

1.142    **Tier 3 Debtors** means the Debtors set forth on Exhibit E hereof, which shall be liquidated and dissolved pursuant to this Plan.

1.143    **Treasury Regulations** means regulations (including temporary and proposed) promulgated under the Internal Revenue Code of 1986, as amended from time to time.

1.144    **Trustee** means Wells Fargo Bank, N.A., as Trustee in Trust for holders of Mortgage Certificates.

1.145    **Trust and Servicing Agreement** means the Trust and Servicing Agreement, dated as of August 1, 2007 (as amended or modified), originally entered into by and among Wachovia Large Loan, Inc., as Depositor, Wachovia Bank, National Association, as Servicer and Special Servicer, and Wells Fargo Bank, N.A., as Trustee relating to the issuance of the Mortgage Certificates and the servicing of the Mortgage Loan.

1.146    **TRS** means a taxable real estate investment trust subsidiary (within the meaning of Section 856(l) of the Internal Revenue Code) of the Debtors or the Reorganized Debtors.

1.147    **Upper Tier REMIC** has the meaning set forth in the Trust and Servicing Agreement.

1.148    **Unimpaired** means, with respect to a Class of Claims, a Claim that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

1.149    **Unliquidated Claim** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be estimated.

1.150    **Voting Deadline** means the deadline for voting on the Plan fixed by the Bankruptcy Court, or such later date fixed by the Debtors with the approval of the Investor and each of the Sponsors, such approval not to be unreasonably withheld.

1.151    **Wachovia Swap Agreement** means the Master Agreement, dated August 28, 2007, by and among Wachovia Bank, National Association, and Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass Through Certificates, Series 2007-ESH Trust, and all Schedules thereto, including the Elections and Variables to the 1994 ISDA Credit Support Annex.

## B.     Other Terms.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.

## C.     Exhibits.

All exhibits to the Plan are annexed hereto. All Plan Documents to be included in exhibits to the Plan Supplement shall be contained in a separate Plan Supplement exhibit volume, which shall be filed with the Clerk of the Bankruptcy Court not later than the date that is ten (10) days prior to the last date on which votes to accept or reject the Plan are accepted. Such Plan Supplement exhibit volume may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court. Such Plan Supplement exhibit volume shall also be available for download from the following website: http://www.kccllc.net/extendedstay. Holders of Claims may also obtain a copy of such Plan Supplement exhibit volume, once filed, from the Debtors by a written request sent to the following address:

<div align="center">

c/o HVM L.L.C.<br>
100 Dunbar Street,<br>
Spartanburg, South Carolina 29306<br>
Attn: Gary A. DeLapp, Esq.

</div>

## ARTICLE II

## PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS
## AND PRIORITY TAX CLAIMS

2.1     ***Payment of Allowed Administrative Expense Claims.*** The Allowed Amount of each Administrative Expense Claim that is Allowed as of the Effective Date shall be paid in full, in Cash, on the Effective Date from the Administrative/Priority Claims Reserve; provided, however, that (a) claims of the type specified in Section 1.7(c)(i) of the Plan, (b) any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and (c) any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, shall be assumed and paid by the Reorganized Debtors or NewCo, as applicable, in accordance with the terms and conditions of the particular transactions and any agreements relating thereto. Each holder of an Administrative Expense Claim of the type specified in Section 1.7(c)(ii) or Section 1.7(c)(iii) hereof shall be paid the Allowed Amount of such Administrative Expense Claim in full, in Cash, as soon as practicable after such Administrative Expense Claim is Allowed from the Administrative/Priority Claims Reserve. In the event that there is any dispute as to whether an Allowed Administrative Expense Claim should be paid from the Administrative/Priority Claims Reserve or by the Reorganized Debtors or NewCo, as applicable, such dispute shall be resolved by the Bankruptcy Court.

2.2     ***Compensation and Reimbursement Claims.*** The Bankruptcy Court shall fix in the Confirmation Order a date for the filing of, and a date to hear and determine, all applications

for final allowances of compensation or reimbursement of expenses under section 330 of the Bankruptcy Code or applications for allowance of Administrative Expense Claims arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code. The Allowed Amount of all Administrative Expense Claims arising under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code shall, in full satisfaction, settlement, discharge and release thereof, and in exchange therefore, be paid in full, in Cash, from the Administrative/Priority Claims Reserve (a) upon the later of (i) the Effective Date and (ii) the date upon which any such Administrative Expense Claim becomes Allowed or (b) at such later date or upon such other less favorable terms as may be mutually agreed upon between each such Administrative Expense Creditor and the Plan Administrator.

2.3 *Priority Tax Claims.* Each holder of an Allowed Priority Tax Claim shall, in full satisfaction, settlement, discharge and release thereof, and in exchange therefore, be paid the Allowed Amount of its Allowed Priority Tax Claim from the Administrative/Priority Claims Reserve either (a) in full, in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law or (b) upon such other terms as may be mutually agreed upon between each holder of a Priority Tax Claim and the Plan Administrator.

# ARTICLE III

# CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

3.1 *Summary.* The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| CLASS | DESIGNATION | STATUS | ENTITLED TO VOTE? |
|-------|-------------|--------|-------------------|
| Class 1 | Priority Claims | Unimpaired | No |
| Class 2 | Mortgage Facility Claim | Impaired | Yes |
| Class 3 | ESA UD Mortgage Claim | Impaired | Yes |
| Class 4A | Mortgage Facility Deficiency Claim | Impaired | Yes |
| Class 4B | Mezzanine Facilities Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Impaired | Yes |
| Class 6 | Existing Equity | Impaired | No |
| Class 7 | ESA MD Properties Trust Certificate | Unimpaired | No |
| Class 8 | ESA MD Borrower Interests | Unimpaired | No |
| Class 9 | ESA P Portfolio MD Trust Certificate | Unimpaired | No |
| Class 10 | ESA P Portfolio MD Borrower Interests | Unimpaired | No |
| Class 11 | ESA Canada Properties Interests | Unimpaired | No |
| Class 12 | ESA Canada Properties Borrower Interests | Unimpaired | No |
| Class 13 | ESH/TN Properties L.L.C. Membership Interests | Unimpaired | No |

| Class 14 | ESH/ESA General Partnership Interests | Unimpaired | No |
| Class 15 | Other Existing Equity Interests | Impaired | No |

## ARTICLE IV

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1     ***Class 1.***  Priority Claims.

(a)     *Classification*:  Class 1 consists of the Allowed Priority Claims.

(b)     *Treatment*:  Each holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim from the Administrative/Priority Claims Reserve, in full, in Cash, on the later of the Effective Date and as soon as practicable after the date such Priority Claim becomes Allowed.

(c)     *Voting*:  Class 1 is Unimpaired.  The holders of the Claims in Class 1 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.2     ***Class 2.***  Mortgage Facility Claim.

(a)     *Classification and Allowance*:  Class 2 consists of the Allowed Mortgage Facility Claim which, together with the Mortgage Facility Deficiency Claim, shall be an Allowed Claim of at least $4,100,000,000.

(b)     *Treatment*:   The holder of the Allowed Mortgage Facility Claim shall receive 100% of the Cash Distribution and the Investor Certificates on the Effective Date, with such Cash Distribution to be distributed in accordance with Section 6.3 hereof and the Investor Certificates will be cancelled without any distributions on account thereof.

(c)     *Non-Consensual Confirmation*:  In the event that Class 2 rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 hereof, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, such consents not to be unreasonably withheld, to offer different treatment to Class 2, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(d)     *Adequate Protection Payments*:  Nothing in this Plan shall affect the rights of the Mortgage Debt Parties to retain payments made by the Debtors in accordance with the Cash Collateral Order.

(e)     *Voting*:  Class 2 is Impaired.  The holder of the Claim in Class 2 is entitled to vote to accept or reject the Plan.

4.3     ***Class 3.***  ESA UD Mortgage Claim.

(a)     *Classification*:  Class 3 consists of the Allowed ESA UD Mortgage Claim.

(b)  *Treatment*:  The holder of the Allowed ESA UD Mortgage Claim shall receive on the Distribution Date the New ESA UD Mortgage Note in full settlement, satisfaction, release and discharge of the Allowed ESA UD Mortgage Claim.

(c)  *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed ESA UD Mortgage Claim.

(d)  *Voting*:  Class 3 is Impaired.  The holder of the Claim in Class 3 is entitled to vote to accept or reject the Plan.

4.4  ***Class 4A.***  Mortgage Facility Deficiency Claim.

(a)  *Classification and Allowance*:  Class 4A consists of the Mortgage Facility Deficiency Claim which, together with the Mortgage Facility Claim, shall be an Allowed Claim of at least $4,100,000,000.

(b)  *Treatment*:  The holder of the Allowed Mortgage Facility Deficiency Claim shall receive an interest in the Litigation Trust to the extent that it is a Litigation Trust Beneficiary, which shall be distributed pursuant to Section 6.3 hereof, subject to the terms of the Intercreditor Agreement.

(c)  *Non-Consensual Confirmation*:  In the event that Class 4A rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 hereof, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, such consents not to be unreasonably withheld, to offer different treatment to Class 4A, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(d)  *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mortgage Facility Deficiency Claim.

(e)  *Voting*:  Class 4A is Impaired.  The holder of the Claim in Class 4A is entitled to vote to accept or reject the Plan.

4.5  ***Class 4B.***  Mezzanine Facilities Claims.

(a)  *Classification*:  Class 4B consists of the Mezzanine Facilities Claims.

(b)  *Treatment*:  The holders of the Allowed Mezzanine Facilities Claims shall receive interests in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries, which shall be distributed pursuant to Section 6.3 hereof, subject to the terms of the Intercreditor Agreement.

(c)  *Non-Consensual Confirmation*:  In the event that Class 4B rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 hereof, to alter, amend or modify the Plan, with the consent of the Investor, each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), such consents not to be unreasonably withheld, to offer different treatment to Class 4B, to the extent that the Debtors determine that such

modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(d)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mezzanine Facilities Claims.

(e)     *Voting*:  Class 4B is Impaired.  The holders of the Claim in Class 4B are entitled to vote to accept or reject the Plan.

4.6     ***Class 5.***  General Unsecured Claims.

(a)     *Classification*:  Class 5 consists of the General Unsecured Claims.

(b)     *Treatment*:  The holders of the General Unsecured Claims shall receive an interest in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries.

(c)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to Allowed General Unsecured Claims.

(d)     *Non-Consensual Confirmation:*  In the event that Class 5 rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 hereof, to alter, amend or modify the Plan, with the consent of the Investor, each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), such consents not to be unreasonably withheld, to offer different treatment to Class 5, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(e)     *Voting*:  Class 5 is Impaired.  The holders of the Claims in Class 5 are entitled to vote to accept or reject the Plan.

4.7     ***Class 6.***  Existing Equity.

(a)     *Classification*:  Class 6 consists of the Existing Equity.

(b)     *Treatment*:  No distribution shall be made under the Plan from the Estates in respect of the Existing Equity.  On the Effective Date, the certificates that previously evidenced ownership of Existing Equity shall be cancelled and shall be null and void, the holder(s) thereof shall no longer have any rights in respect of the Existing Equity, and such certificates shall not evidence any rights under the Plan.

(c)     *Voting*:  Class 6 is Impaired.  The holders of Existing Equity in Class 6 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.8     ***Class 7.***  ESA MD Properties Trust Certificate.

(a)     *Classification*:  Class 7 consists of the ESA MD Properties Trust Certificate.

(b)     *Treatment*:  The holder of the ESA MD Properties Trust Certificate shall retain the ESA MD Properties Trust Certificate.

(c) *Voting*: Class 7 is Unimpaired. The holder of the Equity Interests in Class 7 is deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.9 ***Class 8.*** ESA MD Borrower Interests.

(a) *Classification*: Class 8 consists of the ESA MD Borrower Interests.

(b) *Treatment*: Each holder of ESA MD Borrower Interests shall retain its ESA MD Borrower Interests.

(c) *Voting*: Class 8 is Unimpaired. The holders of the Equity Interests in Class 8 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.10 ***Class 9.*** ESA P Portfolio MD Trust Certificate

(a) *Classification*: Class 9 consists of the ESA P MD Portfolio Trust Certificate.

(b) *Treatment*: The holder of the ESA P MD Portfolio Trust Certificate shall retain the ESA P Portfolio Trust Certificate.

(c) *Voting*: Class 9 is Unimpaired. The holder of the Equity Interests in Class 9 is deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.11 ***Class 10.*** ESA P Portfolio MD Borrower Interests

(a) *Classification*: Class 10 consists of the ESA P Portfolio MD Borrower Interests.

(b) *Treatment*: Each holder of ESA P Portfolio MD Borrower Interests shall retain its ESA P Portfolio MD Borrower Interests.

(c) *Voting*: Class 10 is Unimpaired. The holders of the Equity Interests in Class 10 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.12 ***Class 11.*** ESA Canada Properties Interests.

(a) *Classification*: Class 11 consists of the ESA Canada Properties Interests.

(b) *Treatment*: Each holder of ESA Canada Properties Interests shall retain its ESA Canada Properties Interests.

(c) *Voting*: Class 11 is Unimpaired. The holders of the Equity Interests in Class 11 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.13 ***Class 12.*** ESA Canada Properties Borrower Interests.

(a) *Classification*: Class 12 consists of the ESA Canada Properties Borrower Interests.

(b)     *Treatment*:  Each holder of ESA Canada Properties Borrower Interests shall retain its ESA Canada Properties Borrower Interests.

(c)     *Voting*:  Class 12 is Unimpaired.  The holders of the Equity Interests in Class 12 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.14     ***Class 13.***  ESH/TN Properties Membership Interest.

(a)     *Classification*:  Class 13 consists of the ESH/TN Properties Membership Interest.

(b)     *Treatment*:  The holder of the ESH/TN Properties Membership Interest shall retain its ESH/TN Properties Membership Interest.

(c)     *Voting*:  Class 13 is Unimpaired.  The holder of the Equity Interest in Class 13 is deemed to accept the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

4.15     ***Class 14.***  ESH/ESA General Partnership Interests.

(a)     *Classification*:  Class 14 consists of the ESH/ESA General Partnership Interests.

(b)     *Treatment*:  Each holder of ESH/ESA General Partnership Interests shall retain its ESH/ESA General Partnership Interests.

(c)     *Voting*:  Class 14 is Unimpaired.  The holders of the Equity Interests in Class 14 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.16     ***Class 15.***  Other Existing Equity Interests.

(a)     *Classification*:  Class 15 consists of the Other Existing Equity Interests.

(b)     *Treatment*:  No distribution shall be made under the Plan from the Estates in respect of the Other Existing Equity Interests.  On the Effective Date, the certificates that previously evidenced ownership of the Other Existing Equity Interests shall be cancelled and shall be null and void, the holders thereof shall no longer have any rights in respect of the Other Existing Equity Interests, and such certificates shall not evidence any rights under the Plan.

(c)     *Voting*:  Class 15 is Impaired.  The holders of the Other Existing Equity Interests in Class 15 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

## ARTICLE V

## ACCEPTANCE, REJECTION, AND REVOCATION
## OR WITHDRAWAL OF THE PLAN

5.1     ***Classes Entitled to Vote.***  Each holder of a Claim, as of the Record Date, in an Impaired Class, other than those Classes that are deemed to reject the Plan, shall be entitled to vote to accept or reject the Plan, in its sole and absolute discretion, subject to applicable law.

5.2    ***Acceptance by Class of Claims.***  An Impaired Class of Claims shall be deemed to accept the Plan if (a) holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

5.3    ***Nonconsensual Confirmation.***  In the event that any Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority required by section 1129(a) of the Bankruptcy Code, the Debtors, with the consent of the Investor and each of the Sponsors, reserve the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, or (b) alter, amend or modify the Plan in accordance with Section 13.1 hereof.  At the request of the Investor and each of the Sponsors, the Debtors shall exercise the right to seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code in the manner reasonably requested by the Investor and each of the Sponsors, provided that the value of the Investment contemplated by Section 6.8 hereof, in the event that Class 2 rejects the Plan, shall not be reduced without the Debtors' prior written consent.

5.4    ***Revocation or Withdrawal.***

(a)    *Right to Revoke or Withdraw.*  The Plan may be revoked or withdrawn prior to the Confirmation Date (i) by the Debtors (with the consent of the Special Servicer and the Operating Advisor, such consent not to be unreasonably withheld), in their discretion or at the discretion of the Investor, in the event that the Investment Agreement is terminated in accordance with Section 13 thereof, and (ii) in  all other circumstances, by the Debtors (with the consent of the Special Servicer and the Operating Advisor, such consent not to be unreasonably withheld), with the consent of the Investor and each of the Sponsors, in their sole discretion.

(b)    *Effect of Withdrawal or Revocation.*  If the Plan is revoked or withdrawn prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims or defenses or any admission or statement against interest by any Debtor, the Creditors' Committee, the Investor, any Sponsor or any other Person or to prejudice in any manner the rights of the Debtors, the Creditors' Committee, the Investor, any Sponsor or any Person in any further proceedings involving any Debtor.

5.5    ***Amendment of Plan Documents.***  From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan and any documents attached to such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan shall be as provided in such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan and their respective attachments.

5.6    ***Removal of Debtors.***  At the option of the Investor and each of the Sponsors, with the consent of the Debtors and the consent of the Special Servicer and the Operating Advisor, which consents shall not be unreasonably withheld, a Debtor may be removed from this Plan.  In such event, the Plan will omit any treatment of the assets and liabilities of such Debtor, unless otherwise agreed.  The removal of any Debtor from this Plan will not affect this Plan with respect to any other Debtor.

# ARTICLE VI

# IMPLEMENTATION OF THE PLAN

6.1 ***Substantive Consolidation.*** The Plan is premised upon the substantive consolidation of the Debtors for all purposes related to this Plan, including, without limitation, for purposes of voting, confirmation and distribution. On and after the Effective Date, the Debtors and their Estates shall be deemed merged and (i) all assets and liabilities of the Debtors shall be treated for purposes of the Plan as though they were merged, (ii) all guarantees of the Debtors of payment, performance or collection of obligations of any other of the Debtors shall be eliminated and cancelled, (iii) all joint obligations of two or more of the Debtors and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, and (iv) any Claim filed against any of the Debtors shall be deemed filed against the consolidated Debtors and shall be one Claim against and a single obligation of the consolidated Debtors. The provisions of the Intercreditor Agreement shall remain in full force and effect notwithstanding any substantive consolidation of the Debtors pursuant to the Plan.

6.2 ***Deemed Sale of Mortgage Properties.*** Notwithstanding the vesting and retention of title of the Mortgage Properties in the Reorganized Debtors, the transfer of 100% of the New Debtor Equity of the Tier 1 Debtors to NewCo and the distribution of the Cash Distribution by the Reorganized Debtors to the holder of the Allowed Mortgage Facility Claim effected pursuant to this Plan shall be deemed the equivalent of a sale of the Mortgage Properties to NewCo after foreclosure or acceptance of a deed in lieu of foreclosure by the Trustee or the Special Servicer, free and clear of all liens, claims, encumbrances and obligations.

6.3 ***Distributions to Holder of Allowed Mortgage Facility Claim.*** The Cash Distribution shall be distributed by the Plan Administrator to the holder of the Allowed Mortgage Facility Claim on the Effective Date in accordance with Section 8.2 which shall then distribute the Cash Distribution to the holders of Mortgage Certificates in accordance with the priority set forth in the Trust and Servicing Agreement. The Investor Certificates shall be distributed by the Plan Administrator to the holder of the Allowed Mortgage Facility Claim on the Effective Date in accordance with Section 8.2, which shall then cancel the Investor Certificates in accordance with the provisions of the Trust and Servicing Agreement without any Distribution to be made on account of such Investor Certificates.

6.4 ***Creation of NewCo.***

(a) *Certificate of Formation.* The NewCo Certificate of Formation shall be filed with the applicable Secretary of State on or before the Effective Date substantially in the form of the NewCo Certificate of Formation and shall, inter alia, include a provision prohibiting the issuance of non-voting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code. Pursuant to the Plan:

(i) NewCo Common Interests comprising 100% of the total issued NewCo Common Interests as of the Effective Date shall be issued to the Investor and its members or Affiliates designated pursuant to Section 2.3 of the Investment Agreement on the Effective Date; and

(ii)     Additional NewCo Common Interests, in an amount agreed upon by the Debtors, the Investor and each of the Sponsors, shall be reserved for issuance under the NewCo Management Incentive Plan.

If the Investor and the Sponsors determine, subject to the terms of the Investment Agreement and the Plan, that an alternate corporate or organizational structure, form or identity is appropriate, this Section 6.4(a) shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

(b)     *NewCo Operating Agreement*.  The NewCo Operating Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms on the Effective Date.

6.5     ***Existing Debt Securities.***  As of the Effective Date, all notes and any obligations of the Debtors under the Mortgage Facility or the Mezzanine Facilities shall be discharged and be of no further force or effect against the Debtors or the Mortgage Properties, and the holders thereof shall have no rights against the Debtors or the Mortgage Properties, except the right to receive the Distributions provided herein.  As of the Effective Date, the EA UD Mortgage Claim and the General Unsecured Claims, and the rights of the holders thereof thereunder, shall be cancelled and deemed null and void and of no further force and effect, and the holders thereof shall have no rights, and such notes, agreements, certificates and securities shall evidence no rights, except the right to receive the Distributions provided herein.  It is understood, however, that (i) this Section 6.5 shall not affect any Guaranty Claims other than a Guaranty Claim against a Debtor or ESI, and (ii) notwithstanding Section 6.11 hereof, the notes or certificates in respect of the Mortgage Facility and the Mezzanine Facilities shall not be surrendered and cancelled so as not to impair the pursuit of any Guaranty Claims other than a Guaranty Claim against a Debtor or ESI.

6.6     ***NewCo Management Incentive Plan.***  On or after the Effective Date, NewCo shall implement the NewCo Management Incentive Plan, in form and substance reasonably acceptable to the Investor, with NewCo Common Interests being available for issuance thereunder, through a combination of the award of restricted membership interests and the granting of equity based awards, including, without limitation, restricted membership interests, deferred membership interests and options.  The NewCo Management Incentive Plan will be designed to provide additional compensation to HVM pursuant to and in connection with the management agreements between the TRSs of NewCo that are parties to such management agreements and HVM that are being assumed by, or assumed and assigned to, the TRSs (or one or more newly formed TRSs, wholly owned either directly or indirectly by NewCo, or designated by an existing Debtor that is a TRS) and modified on the Effective Date pursuant to Section 11.5 hereof to provide for, among other things, such issuance of the NewCo Common Interests as part of HVM's compensation thereunder.  HVM shall allocate the benefit of the NewCo Management Incentive Plan to the executive officers and senior management of HVM for their management services.  The identity of recipients, amount of grants and other terms including, without limitation, vesting, will be determined by the manager of HVM.

6.7     ***Corporate Reorganization Actions.***  On or as soon as practicable after the Effective Date, the Debtors and/or NewCo, as applicable, shall take such actions as may be or become necessary to effectuate the following, all of which shall be authorized and approved in all respects, in each case without further action being required under applicable law, regulation, order, or rule (including, without limitation, any action by the board of directors, stockholders, partners or members of any Debtor or members of NewCo):

(a) the NewCo Certificate of Formation will be filed with the applicable Secretary of State effecting the formation of NewCo.  At the option of the Investor and each of the Sponsors, the Debtors or NewCo may form additional subsidiaries owned in whole, or in part, by NewCo in order to effectuate the transactions contemplated hereunder;

(b) 100% of the New Debtor Equity of the Tier 1 Debtors shall be issued to NewCo or a subsidiary of NewCo;

(c) the Equity Interests of each of the Tier 2 Debtors, the ESH/ESA General Partnership Interests and the ESH/TN Properties Membership Interests shall remain outstanding and Unimpaired;

(d) the Equity Interests of each of the Tier 3 Debtors shall be cancelled, extinguished and not re-issued.  The Tier 3 Debtors shall be deemed liquidated and dissolved by the Debtors for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided that, in its sole discretion, the Debtors may (but shall not be required to) file with the Office of the Secretary of State for the applicable state a certificate of dissolution; and

(e) the Restructuring Transactions shall be implemented.

If the Investor and the Sponsors determine, subject to the terms and conditions of the Investment Agreement and the Plan, that NewCo shall have an alternate corporate or organizational structure, form or identity, this Section 6.7 shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

6.8     **Investment.**

As consideration for the NewCo Common Interests to be issued pursuant to the Investment Agreement and the purchase of the business, assets and properties of the Debtors and to fund the distributions contemplated by the Plan, the Investor shall (i) cause NewCo to be provided with Cash in the aggregate amount of $3,615,755,444.28 (subject to adjustment as provided in this Section 6.8), comprised of (a) a $1,815,755,444.28 (subject to adjustment as provided in this Section 6.8) investment by the Investor, and (b) $1,800,000,000 from the proceeds of the Debt Financing Arrangements, and (ii) contribute to the Debtors the Investor Certificates (and waive the right to receive or retain any distribution on account of such Investor Certificates pursuant to the Plan) (collectively, the "Investment").  The amount of the Investor Certificates shall be calculated as of the Effective Date, and shall include the actual interest which would be payable on the Investor Certificates to the Effective Date that would have been payable absent the contribution and waiver provided herein.  To the extent that the amount of the Investor Certificates differs from the amount set forth on Schedule 1.2 of the Investment Agreement as a result of the calculation of interest, the Cash portion of the Investment (and the aggregate Cash amount to be provided to NewCo by the Investor) shall be adjusted up or down accordingly on a dollar for dollar basis.  The NewCo Common Interests that the Investor shall receive on the Effective Date as a result of the Investment will comprise 100% of the total issued and outstanding NewCo Common Interests as of the Effective Date.

On the Effective Date, the Investor will also contribute Cash to NewCo in the amount of the Reserve, as such term is defined in the Investment Agreement.

If the Investor and the Sponsors determine, subject to the terms and conditions of the Investment Agreement and Plan, that NewCo shall have an alternate corporate or organizational structure, form or identity, the structure of the Investment contemplated in this Section 6.8 shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

6.9     ***Effectuating Documents and Further Transactions.***  On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to the Investor and each of the Sponsors as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Each of the officers of the Debtors, the Reorganized Debtors and NewCo is authorized, without the need for any further order or authority, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.  The Reorganized Debtors are authorized to execute all documents and enter into all agreements as may be necessary and appropriate in connection with the Debt Financing Arrangements.

6.10     ***Allocation of Plan Distributions Between Principal and Interest.***  To the extent that any Allowed Mortgage Deficiency Facility Claim, Allowed Mezzanine Facility Claim, or Allowed General Unsecured Claim scheduled to receive a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim (as determined for federal income tax purposes) first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

6.11     ***Surrender and Cancellation of Instruments.***  Subject to Section 6.5 hereof, each holder of an instrument evidencing a Claim shall surrender such instrument to the Reorganized Debtors.  At the option of the Reorganized Debtors or NewCo, as applicable (in their reasonable discretion), no Distribution hereunder shall be made to or on behalf of any holder of such Claim unless and until such instrument is received or the unavailability of such instrument is reasonably established to the satisfaction of the Reorganized Debtors.  In accordance with section 1143 of the Bankruptcy Code, any such holder of such a Claim that fails to surrender or cause to be surrendered such instrument or to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Reorganized Debtors and, in the event that the Reorganized Debtors requests, fails to furnish a bond in form and substance (including, without limitation, amount) reasonably satisfactory to the Reorganized Debtors shall be deemed to have forfeited all rights, claims, and interests and shall not participate in any Distribution hereunder.

6.12     ***Letters of Credit.***  At or prior to the Effective Date, in the Debtors' discretion, with the consent of the Investor and each of the Sponsors, (a) the Existing Letters of Credit shall be terminated and any cash collateral provided thereunder shall be released to the entity that posted such collateral; and (b) the Reorganized Debtors shall provide any and all letters of credit and related cash collateral necessary to obtain and maintain in effect on or after the Effective Date all such forms of insurance as are customary to operate a business of the size and type of the Debtors; <u>provided</u>, <u>however</u>, that on or after the Effective Date the Investor shall reimburse the Reorganized Debtors for any cash collateral referred to in clause (b) without any impact on the Cash Distribution.

6.13     ***BHAC IP Transfer Agreement.***  Pursuant to the intellectual property transfer agreement (the "<u>BHAC IP Transfer Agreement</u>") with BHAC, on the Effective Date, BHAC shall transfer to NewCo or its designee, which may be a third party, the BHAC IP.  In the event the Debtors

and BHAC have not executed the BHAC IP Transfer Agreement prior to June 17, 2010 (unless otherwise agreed by the Investor), the Special Servicer shall commence proceedings to foreclose on the BHAC IP and on the Effective Date shall assign and transfer the BHAC IP to NewCo or its designee, which may be a third party, or at the Investor's option, the Debtors, for a portion of the consideration provided on account of the Mortgage Facility Claim as set forth herein. Upon the receipt of the BHAC IP from BHAC or the Special Servicer, as applicable, the Reorganized Debtors shall transfer the BHAC IP to NewCo or its designee, which may be a third party.

6.14 *Consistent Tax Reporting.*

(a) For federal income tax purposes, (i) the distributions described in Section 4.2 shall be treated as a distribution to the holders of Mortgage Certificates following a sale of the Mortgage Properties (and all other assets deemed to be transferred to NewCo), (ii) the distribution described in Section 4.3 shall be treated as a distribution of undivided interests in the assets of NewCo to the holder of the Allowed ESA UD Mortgage Claim followed by a sale of such assets for the New ESA UD Mortgage Note, and (iii) the distributions described in Sections 4.4, 4.5 and 4.6 shall be treated as described in Section 6.17(c). All parties will be required to report for all federal income tax purposes in a manner consistent with the characterization of the distributions described above.

(b) As soon as possible after the Effective Date, and to the extent required by Section 1060 of the Internal Revenue Code, NewCo shall determine the aggregate value of the underlying assets of NewCo as of the Effective Date and the portions of such value that are allocable, respectively, to the New ESA UD Mortgage Note and the Investment. Such allocation will take into account the relative fair market values of the New ESA UD Mortgage Note and the Investment. NewCo will apprise, in writing, all parties of such aggregate valuation and allocation. The aggregate valuation and allocation shall be used consistently by all parties for all federal income tax purposes.

6.15 *Issuance of NewCo Common Interests to Investor or Sponsor Affiliates.*

(a) The Investor, the Sponsors or their Affiliates, in their respective sole discretion, may deliver a written schedule to the Debtors within ten (10) days after entry of the Confirmation Order to designate that some or all of the NewCo Common Interests to be issued to the Investor, the Sponsors or their Affiliates under the Plan be issued in the name of, and delivered to, one or more of their managed funds and/or respective affiliates, so long as such issuance and delivery is in compliance with federal and state securities laws and does not require NewCo to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended and the rules and regulations of the Securities and Exchange Commission thereunder.

(b) In the event that the Investor, the Sponsors or their Affiliates make the designation pursuant to Section 6.15(a) above, the funds managed by the Investor, the Sponsors and/or their respective affiliates that are so designated shall have the rights, entitlements and benefit that would otherwise inure to the Investor, the Sponsors or their Affiliates in their capacity as a holder of the NewCo Common Interest as provided in the Plan, including those rights, entitlements and benefits of the Investor, the Sponsor or the Affiliate specified in Section 6.4(a)(i) above.

(c) Each of the Loan REMIC, the Upper Tier REMIC, and the Lower Tier REMIC shall adopt a plan of liquidation immediately prior to the Effective Date (provided, however, that notwithstanding the liquidation of the Loan REMIC, the Lower Tier REMIC and the Upper Tier

REMIC, the Mortgage Facility Trust shall not liquidate and shall remain in full force and effect until the termination of the Mortgage Parties Indemnification Fund.

6.16    ***Mortgage Parties Indemnification Fund.***

(a)    On the Effective Date, the Debtors shall transfer $20 million to the Special Servicer which shall hold such funds in a cash collateral account (the "Mortgage Parties Indemnification Fund") for the benefit of the Mortgage Debt Parties to satisfy any indemnification obligations of the Mortgage Facility Trust with respect to any post-Confirmation Date litigation commenced against the Mortgage Debt Parties regarding the voting on the Plan, distributions under the Plan and any other actions taken by the Mortgage Debt Parties in connection with the Plan, including the implementation thereof (the "Indemnified Litigation"). Unless the funds maintained in the Mortgage Parties Indemnification Fund are paid to the Mortgage Debt Parties in connection with any Indemnified Litigation, the Special Servicer (or such Person designated by the Special Servicer or the Successor Trustee) shall hold the Mortgage Parties Indemnification Fund in a cash collateral account for a period of six (6) years from the Effective Date of the Plan. Upon the later of termination of the six-year period or entry of a final, non-appealable judgment in any then-pending Indemnified Litigation, any and all cash remaining in the Mortgage Parties Indemnification Fund shall be distributed to the holder of the Allowed Mortgage Facility Claim, for distribution to the first tranche of Mortgage Certificates that are held by holders that have not received payment in full under this Plan and, to the extent that there are sufficient funds remaining after payment in full of such tranche of Mortgage Certificate holders, to other Mortgage Certificate holders in accordance with the priorities set forth in the Trust and Servicing Agreement. Each Mortgage Debt Party may receive reimbursement for any fees that such Mortgage Debt Party has incurred in connection with any Indemnified Litigation by submitting invoices (with appropriate redactions for privilege) to the Special Servicer (or such Person designated by the Special Servicer), which shall pay such invoices from the funds maintained in the Mortgage Parties Indemnification Fund reasonably promptly after receipt of such invoices. In addition, the Special Servicer shall be entitled to reasonably prompt reimbursement for any fees that the Special Servicer incurs in connection with any Indemnified Litigation from the funds maintained in the Mortgage Parties Indemnification Fund.

(b)    ***Federal Income Tax Treatment.*** For all United States federal income tax purposes, all parties shall treat the transfer of Cash to the Mortgage Parties Indemnification Fund as (1) a transfer of Cash (subject to any obligations relating to those assets) directly to the holders of Mortgage Certificates (in accordance with the priorities set forth in the Trust and Servicing Agreement), followed by (2) the transfer by the holders of Mortgage Certificates otherwise entitled to receive such Cash to the Mortgage Parties Indemnification Fund. Accordingly, the holders of Mortgage Certificates otherwise entitled to receive such Cash shall be treated for United States federal income tax purposes as the direct owners of their respective share of the Cash in the Mortgage Parties Indemnification Fund. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. The Special Servicer shall send annually to each holder of Mortgage Certificates that is treated as a direct owner of any portion of the Mortgage Parties Indemnification Fund a separate statement setting forth any income earned with respect to, or any expenditure made out of, such portion of the Mortgage Parties Indemnification Fund as may be relevant for United States federal income tax purposes.

6.17    ***Litigation Trust.***

(a)    ***Creation of Litigation Trust.*** On the Effective Date, the Debtors shall transfer the Litigation Trust Funding to the Litigation Trust and the Debtors and the Litigation Trustee shall

execute the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan. On the Effective Date, the Debtors shall be deemed to have automatically transferred to the Litigation Trust all of their right, title, and interest in and to all of the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Litigation Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Litigation Trust Beneficiaries as set forth in the Plan and the expenses of the Litigation Trust as provided in the Litigation Trust Agreement. Thereupon, the Debtors shall have no interest in the Litigation Trust Assets or the Litigation Trust. In connection with the vesting and transfer of the Litigation Trust Assets, including rights and causes of action, any attorney-client, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust shall vest in the Litigation Trust. The Debtors and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities. In the event of any conflict between the terms of this Section 6.17 and the Litigation Trust Agreement, the terms of the Litigation Trust Agreement shall govern.

(b)     *Purpose of the Litigation Trust.* The Litigation Trust shall be established for the sole purpose of liquidating and distributing the Litigation Trust Assets contributed to the Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(c)     *Federal Income Tax Treatment of Litigation Trust.* For all United States federal income tax purposes, all parties shall treat the transfer of the Litigation Trust Assets to the Litigation Trust as (1) a transfer of the Litigation Trust Assets (subject to any obligations relating to those assets) directly to the Litigation Trust Beneficiaries, followed by (2) the transfer by such beneficiaries to the Litigation Trust of the Litigation Trust Assets in exchange for an interest in the Litigation Trust. Accordingly, the Litigation Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(d)     *Tax Reporting.*

(i)     The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

(ii)     The Litigation Trustee also shall annually send to each holder of an interest in the Litigation Trust a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for United States federal income tax purposes and will instruct all such holders to use such information in preparing their United States federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their United States federal income tax returns.

(iii)     As soon as reasonably practicable after the Litigation Trust Assets are transferred to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets. Such valuation shall be made available from time to time to all parties to the Litigation Trust, to the extent relevant to such parties

for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(iv)    Allocations of Litigation Trust taxable income or loss of the Litigation Trust shall be allocated by reference to the manner in which an economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets.  The tax book value of the Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(v)    The Litigation Trustee shall be responsible for payment, out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or its assets.

(e)    *Litigation Trust Assets.* The Litigation Trustee, on behalf of the Litigation Trust, shall have the exclusive right, authority and discretion to institute, prosecute, abandon, settle or compromise any and all causes of action that constitute Litigation Trust Assets without the consent or approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided herein or in the Litigation Trust Agreement.  From and after the Effective Date, the Litigation Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the Litigation Trust, shall serve as a representative of the Debtors' Estates and shall retain and possess the sole and exclusive right to commence, pursue, settle, compromise or abandon, as appropriate, any and all causes of action, whether arising before of after the Petition Date, in any court or other tribunal.

(f)    *Litigation Trust Fees and Expenses.* From and after the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Litigation Trust, and any professionals retained by the Litigation Trust, except as otherwise provided in the Litigation Trust Agreement.  The Litigation Trustee shall (i) pay to the holder of the Allowed Mortgage Facility Claim the Litigation Trust Funding Reimbursement out of the proceeds of the Litigation Trust Assets, and (ii) reimburse NewCo, the Reorganized Debtors, HVM and their officers, directors and managers for all reasonable costs and expenses incurred as a third party in connection with any cause of action or proceeding pursued by or otherwise involving the Litigation Trust and the Litigation Trust Assets or as a defendant in relation to a claim that has been released pursuant to this Plan.

(g)    *Cash Investments.* The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom); provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

(h)    *Distribution of Litigation Trust Interests.* The Litigation Trustee is required to distribute to the Litigation Trust Beneficiaries on account of their interests in the Litigation Trust, at least annually, all unrestricted Cash on hand, less such amounts paid pursuant to Section 6.17(f).

6.18    **ESI Settlement.**  The Mortgage Facility Trust holds a Guaranty Claim against ESI.  ESI and the Special Servicer (subject to the consent of the Operating Advisor) shall

enter into a settlement agreement (the "ESI Settlement"), subject to reasonable approval of the Investor and each of the Sponsors and Bankruptcy Court approval, pursuant to which ESI shall consent to and grant the releases set forth in Section 10.10 of the Plan in exchange for a release of the Guaranty Claim and other consideration as more fully set forth in the ESI Settlement. ESI and the Debtors shall obtain Bankruptcy Court approval of the ESI Settlement at or prior to the Confirmation Date.

## ARTICLE VII

## TREATMENT OF DISPUTED CLAIMS

7.1 *Objections to Claims; Prosecution of Disputed Claims.*

(a) *NewCo or the Reorganized Debtors.* NewCo or the Reorganized Debtors shall object to the allowance of Claims filed with the Bankruptcy Court with respect to which NewCo or the Reorganized Debtors, as applicable, dispute liability in whole or in part and for which they are responsible for payment as provided in Article II. All objections that are filed and prosecuted by NewCo or the Reorganized Debtors as provided herein shall be litigated to Final Order by NewCo or the Reorganized Debtors or settled by NewCo or the Reorganized Debtors. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by NewCo or the Reorganized Debtors to Claims shall be served and filed no later than ninety (90) days after the Effective Date.

(b) *The Plan Administrator.* The Plan Administrator shall object to the allowance of Administrative Expense Claims or Priority Claims filed with the Bankruptcy Court with respect to which, on behalf of the Debtors, the Plan Administrator disputes liability in whole or in part and which is to be paid from the Administrative/Priority Claims Reserve as provided in Section 2.1. All objections that are filed and prosecuted by the Plan Administrator as provided herein shall be litigated to Final Order by the Plan Administrator or settled by the Plan Administrator. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by the Plan Administrator to Administrative Expense Claims and Priority Claims shall be served and filed no later than sixty (60) days after the Effective Date.

(c) *The Litigation Trustee.* The Litigation Trustee shall object to the allowance of General Unsecured Claims and Mezzanine Facilities Claims filed with the Bankruptcy Court with respect to which the Litigation Trustee disputes liability in whole or in part. All objections that are filed and prosecuted by the Litigation Trustee as provided herein shall be litigated to Final Order by the Litigation Trustee or settled by the Litigation Trustee. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by the Litigation Trustee to General Unsecured Claims and Mezzanine Facilities Claims shall be served and filed no later than ninety (90) days after the Effective Date

7.2 *Distributions on Account of Disputed Claims.* Notwithstanding Article II and Article IV hereof, a Distribution shall only be made by NewCo or the Reorganized Debtors, the Plan Administrator, or the Litigation Trustee, as applicable, to the holder of a Disputed Claim when, and to the extent that, such Disputed Claim becomes Allowed. No interest shall be paid on account of Disputed Claims that later become Allowed except to the extent that payment of interest is required under section 506(b) of the Bankruptcy Code. No Distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 7.1 hereof. From time to time after the Effective Date, on each Distribution Date after a Disputed Claim becomes an Allowed Claim, NewCo or the Reorganized Debtors, the Plan

Administrator, or the Litigation Trustee, as applicable, shall distribute to such holder the amount distributable to such Claim in accordance with the applicable sections of the Plan. To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed. To the extent that any funds remain reserved by NewCo or the Reorganized Debtors for payment of Allowed Claims after the final resolution of all Disputed Claims that are Administrative Expense Claims or Priority Claims (and all such Disputed Claims that are Administrative Expense Claims or Priority Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall revert to and be fully vested in NewCo or the Reorganized Debtors, as applicable. To the extent that any funds remain in the Administrative/Priority Claims Reserve after the final resolution of all Administrative Expense Claims or Priority Claims that are Disputed Claims (and all such Disputed Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall be paid to the holder of the Mortgage Facility Claim, for distribution to holders of Mortgage Certificates in accordance with Section 6.3 of the Plan. To the extent that any funds remain in the Litigation Trust after the final resolution of all General Unsecured Claims and Mezzanine Facilities Claims that are Disputed Claims (and all such Disputed Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall be paid to the Litigation Trust Beneficiaries.

7.3 **_Settlement of Claims._** At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in this Plan to the contrary, the Debtors may settle any or all of the Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019. After the Effective Date, NewCo or the Reorganized Debtors may, and shall have the exclusive right to, compromise and settle any Claims against them that they have agreed to pay or are required to pay pursuant to Section 2.1 and claims they have against another Person or Entity, excluding the Litigation Trust Assets, without notice to or approval from the Bankruptcy Court.

## ARTICLE VIII

## DISTRIBUTIONS

8.1 **_Distributions under the Plan._** Whenever any Distribution to be made under this Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

8.2 **_Timing of Distributions under the Plan._** Except for Distributions made on the Initial Distribution Date, any Distribution to be made by any Debtor or the Disbursing Agent, NewCo or the Reorganized Debtors pursuant to the Plan shall be deemed to have been timely made if made within ten (10) days after the time therefore specified in the Plan. No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

8.3 **_Use of Cash Collateral._** The Debtors will be entitled to use cash collateral consistent with the terms of the Cash Collateral Order through the Effective Date including, without limitation, the obligations to make adequate protection payments as provided in the Cash Collateral Order.

8.4 **_Plan Administrator._** Unless otherwise provided in the Plan, all distributions under the Plan shall be made by the Plan Administrator. All reasonable costs and expenses incurred

by the Plan Administrator in carrying out its duties under the Plan shall be paid from the funds in the Administrative/Priority Claims Reserve, provided, however, that the Plan Administrator shall provide copies of its statements for services rendered to the Special Servicer. Any dispute regarding the payment of the fees and expenses of the Plan Administrator shall be determined by the Bankruptcy Court. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that the Plan Administrator is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be paid from the funds in the Administrative/Priority Claims Reserve.

8.5 **Record Date.** As of the close of business on the Record Date, the various transfer and claims registers for each of the Classes of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims. The Debtors, the Plan Administrator, NewCo, and the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims occurring after the close of business on the Record Date. The Debtors and the Plan Administrator shall be entitled to recognize and deal hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Record Date, to the extent applicable.

8.6 **Manner of Payment under the Plan.** Unless the Person receiving a payment agrees otherwise, any payment in Cash to be made by the Plan Administrator, or NewCo or the Reorganized Debtors shall be made, at the election of the Plan Administrator, or NewCo or the Reorganized Debtors (as the case may be), by check drawn on a domestic bank or by wire transfer from a domestic bank, provided that payments to the holder of the Allowed Mortgage Facility Claim shall be paid by wire transfer .

8.7 **Hart-Scott-Rodino Compliance.** Any NewCo Common Interests to be distributed under the Plan to any Person required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Person shall have expired or been terminated.

8.8 **Fractional Distributions.** Fractional dollars shall be rounded down to the nearest whole dollar.

8.9 **Distribution of Unclaimed Property.** Any Distribution under the Plan that is unclaimed after one hundred eighty (180) days following the date such property is distributed shall be deemed not to have been made and shall be transferred to the Litigation Trust, free and clear of any claims or interests of any Entities, including, without express or implied limitation, any claims or interests of any governmental unit under escheat principles. Nothing contained herein shall affect the discharge of the Claim with respect to which such Distribution was made, and the holder of such Claim shall be forever barred from enforcing such Claim against NewCo, the Reorganized Debtors or the Debtors, or the assets, estate, properties, or interests in property of the Debtors, NewCo or the Reorganized Debtors.

8.10 **Administrative/Priority Claims Reserve.**

(a) *Establishment and Amount.* On the Effective Date, the Plan Administrator shall establish the Administrative/Priority Claims Reserve. The amount of the Administrative/Priority Claims Reserve shall be determined by the Debtors, subject to the reasonable consent of the Plan Administrator and the Special Servicer (with the consent of the Operating

Advisor, such consent not to be unreasonably withheld), and shall be the sum of (a) estimated accrued and unpaid Administrative Expense Claims (excluding items of the type referred to in clause (c)(i) of the definition of "Allowed" and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date), including, without limitation, amounts due to professionals as compensation or reimbursement of expenses, (b) the estimated Priority Claims, and (c) the estimated costs and expenses of the Plan Administrator. For purposes of determining the estimated accrued and unpaid Administrative Expense Claims, the Debtors shall include 110% of the amount reflected on the Debtors' books and records as being due and owing as Administrative Expenses (other than amounts owed to professionals and Priority Claims which shall be estimated at 100% of such amount). The Administrative/Priority Claims Reserve shall be the sole source for payment of Administrative Expense Claims and Priority Claims, other than items of the type referred to in clause (c)(i) of the definition of "Allowed", any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date.

(b)    *Release of Funds from Administrative/Priority Claims Reserve.*  On the date that is seventy-five (75) days after the Effective Date, the Plan Administrator shall distribute to the holder of the Mortgage Facility Claim all funds remaining in the Administrative/Priority Claims Reserve other than (i) any amounts required to be reserved in connection with Administrative Expense Claims or Priority Claims that are Disputed Claims at such time, and (ii) a reasonable amount to be retained for payment of the fees and expenses of the Plan Administrator and the reasonable post-Effective Date fees and expenses of the Debtors' professionals in an amount to be agreed by the Special Servicer (with the reasonable consent of the Operating Advisor). Notwithstanding the release of the funds from the Administrative/Priority Claims Reserve or any provisions of this Plan, NewCo and the Reorganized Debtors shall incur no liability for and shall have no responsibility to pay any Administrative Expense Claim or Priority Claim, excluding the claims of the type specified in Section 1.7(c)(i) of the Plan and any payments relating to Change of Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, in accordance with Section 2.1 of the Plan.

## ARTICLE IX

## CONDITIONS PRECEDENT

9.1    ***Conditions Precedent to the Effective Date.***  The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)    the Bankruptcy Court shall have entered a Confirmation Order with respect to the Plan in form and substance approved by the Investor, each of the Sponsors and the Special Servicer (with the consent of the Operating Advisor), and such Confirmation Order shall be non-appealable, shall not have been appealed within fourteen (14) calendar days of entry or, if such Confirmation Order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such Confirmation Order;

(b)    all actions, documents, and agreements necessary to implement the Plan, including, without limitation, all actions, documents, and agreements necessary to implement the

corporate reorganization described in Section 6.7, and the Investment described in Section 6.8, shall have been effected or executed;

(c)     the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are determined by the Debtors to be necessary to implement the Plan and that are required by law, regulation, or order;

(d)     the NewCo Certificate of Formation (and any certificates of formation for newly formed subsidiaries of NewCo, if any) shall have been filed with the applicable Secretary of State, and the NewCo Operating Agreement (and any operating agreements for newly formed subsidiaries of NewCo, if any) shall be in place;

(e)     the Mortgage Parties Indemnification Fund shall have been established and funded;

(f)     the Litigation Trust shall have been established and funded;

(g)     notice of the Plan and Disclosure Statement shall have been distributed to all known holders of Mortgage Certificates and publicly advertised in such a way as to provide fair and adequate notice to individual holders of Mortgage Certificates;

(h)     the Bankruptcy Court shall have approved the ESI Settlement at or prior to the Confirmation Date;

(i)     the transfer of the BHAC IP to NewCo or its designee, or at the Investor's option, the Debtors, shall have occurred; and

(j)     all of the conditions to closing that are contained in Section 11.1 of the Investment Agreement shall have been satisfied or waived.

The conditions precedent specified above, with the exception of Section 9.1(a), may be waived in whole or in part by the Debtors, with the prior consent of the Investor and each of the Sponsors, and with respect to Sections 9.1(e), 9.1(f), 9.1(g), and 9.1(h) only, the Special Servicer.  Subject to the foregoing, any such written waiver of a condition precedent set forth in this Section 9.1 may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors decide that one of the foregoing conditions cannot be satisfied, and the occurrence of such condition is not waived in writing by the Debtors with the prior consent of the Investor, each of the Sponsors and if applicable, the Special Servicer, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

9.2     **_Effect of Failure of Conditions to Effective Date._**  If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 120 days after the Confirmation Date, or by such later date as is proposed by the Debtors (with the consent of the Investor and each of the Sponsors, which shall not be unreasonably withheld), then upon motion by the Debtors (after consultation with the Investor, each of the Sponsors and the Special Servicer) made before the time that all of the

conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions to consummation is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to this Section 9.2, this Plan will be null and void in all respects, and (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, (iii) the obligations of the Investor and the Sponsors under the Investment Agreement will terminate, and (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors.

## ARTICLE X

## EFFECT OF CONFIRMATION

10.1 ***Vesting of Assets.*** Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors, including the Mortgage Properties, shall vest in the Reorganized Debtors and/or NewCo free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan. From and after the Effective Date, the Reorganized Debtors and/or NewCo may operate the Debtors' business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.

10.2 ***Title to Assets; Discharge of Liabilities.*** Except as otherwise provided in the Plan, on the Effective Date, title to all assets and properties and interests in property dealt with by the Plan shall vest in the Reorganized Debtors, NewCo, the Plan Administrator, the Administrative/Priority Claims Reserve, or the Litigation Trust, as provided in the Plan, free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors arising prior to the Effective Date, except as may be otherwise provided in the Plan.

10.3 ***Binding Effect.*** Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind the Debtors, the Reorganized Debtors, the Mortgage Debt Parties, the holders of the Mortgage Certificates, and any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

10.4 ***Claims Extinguished.*** As of the Effective Date, any and all alter-ego or derivative claims accruing to the Debtors or Debtors in Possession against present or former officers, managers and directors of the Debtors who were officers, managers or directors of the Debtors at any time during the Chapter 11 Cases shall be extinguished whether or not then pending; provided, that nothing in this Section 10.4 shall be construed as a release for any claims constituting Litigation Trust Assets.

10.5 ***Discharge of Claims and Termination of Equity Interests.*** Except as provided herein, the rights afforded in the Plan and the payments and distributions to be made

hereunder shall discharge all existing debts and Claims, and shall terminate all Equity Interests, of any kind, nature, or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided herein, upon the Effective Date, all existing Claims against the Debtors and Equity Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, NewCo, their respective successors or assignees, or any of their respective assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest, and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

10.6 **_Injunction._ Except as otherwise expressly provided in the Plan, all Persons who have held, hold or may hold Claims or Equity Interests and all Persons who have held, hold or may hold claims or causes of action that have been released pursuant to Section 10.10 hereof or are subject to exculpation pursuant to Section 10.9 hereof, and all other parties in interest, including any participants in the Auction, along with their respective present or former employees, agents, officers, managers, directors, principals and Affiliates, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, or such released or exculpated claim or cause of action, against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, or (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Reorganized Debtors, NewCo, the Released Parties or against any of their respective property or assets, or any interest therein, with respect to any such Claim or Equity Interest, or such released or exculpated claim or cause of action. Such injunction shall be included in the Confirmation Order and shall extend to any successors of the Debtors, the Reorganized Debtors, NewCo and the Released Parties and their respective properties and interest in properties.**

10.7 **_Term of Injunctions or Stays._** Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, other than injunctions issued pursuant to this Plan (including injunctions under Section 10.6), shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.8 **_Injunction Against Interference With Plan of Reorganization._ Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, including the holders of Mortgage Certificates, along with their respective present or former employees, agents, officers, managers, directors, principals and Affiliates shall be**

**enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

10.9 ***Exculpation.*** Notwithstanding anything herein to the contrary, as of the Effective Date, none of (a) the Debtors or the Reorganized Debtors, (b) NewCo, (c) the Creditors' Committee and any subcommittee thereof, (d) BHAC (provided that BHAC has entered into the BHAC IP Transfer Agreement as provided in Section 6.13 hereof), (e) the accountants, financial advisors, investment bankers, agents and attorneys for the Debtors, (f) HVM, (g) HVM Manager, (h) the Special Servicer, (i) the Trustee, (j) the Operating Advisor, (k) the Controlling Holder, (l) HVM Manager Owner, (m) the Investor, (n) each Sponsor, (o) the Debt Financing Lenders and (p) any present or former director, manager, officer, member, equity holder (and their respective Affiliates), employee, agent, financial advisor, partner, Affiliate, attorney, other professional advisor or representative (and their respective Affiliates) of the persons or parties described in clauses (a) through (p) of this Section 10.9 or of their respective Affiliates (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, related to, or otherwise arising out of, the Chapter 11 Cases, the Auction, the formulation, negotiation, preparation, dissemination, implementation, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Trust and Servicing Agreement, the Mortgage Facility Trust, the Plan, the Disclosure Statement or, in each case, any contract, instrument, document or other agreement related thereto, including, without limitation, the Investment Agreement; provided, however, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence; provided, further, that each Released Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, that nothing in this Section 10.9 shall be construed as a release or exculpation for any Guaranty Claim other than a Guaranty Claim against a Debtor.

10.10 ***Releases.*** As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; (f) the provision of the Debt Financing Arrangements by the Debt Financing Lenders; (g) the substantial contribution of the Investor, each of the Sponsors and their Affiliates; and (h) the substantial contribution of the Special Servicer, the Trustee, the Operating Advisor and the Controlling Holder: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that votes not to accept the Plan; and (iv) each holder of a Mortgage Certificate, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; provided, that nothing in this Section 10.10 shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, provided, further, that nothing in this Section 10.10 shall be construed as a release of any claims constituting Litigation Trust Assets.

10.11 ***Government Releases***.  Except with respect to the claims held by the United States Government or any of its agencies or any state and local authority, in their capacity as holder of either a Mortgage Certificate or a Mezzanine Facility Claim, nothing in the Plan or the Confirmation Order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties other than the Debtors and the Reorganized Debtors, nor shall anything in the Plan or Confirmation Order enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties other than the Debtors and the Reorganized Debtors for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, securities laws, environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Plan or Confirmation Order exculpate any of the Released Parties other than the Debtors and the Reorganized Debtors from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, securities laws, environmental laws or any criminal laws of the United States or any state and local authority.

10.12 ***Mortgage Facility Trust Claims***.  The Mortgage Debt Parties have acted in accordance with the Trust and Servicing Agreement and the Mortgage Facility Trust throughout the Chapter 11 Cases, including, without limitation, in connection with the Auction, the Plan (including voting thereon) and the Disclosure Statement, and they have made a substantial contribution to the Estate and the Chapter 11 Cases.  The rights and authority of and contributions made by the Mortgage Debt Parties under the Trust and Servicing Agreement and the Mortgage Facility Trust have been and are integral to the Plan.  Accordingly, from and after the Effective Date, all Persons, including the holders of Mortgage Certificates, shall be deemed to have released, and shall be enjoined from commencing any action or proceeding or asserting or pursuing, any claim or cause of action against the Mortgage Debt Parties for any act taken or omitted since the Commencement Date in connection with, related to, or otherwise arising out of the Chapter 11 Cases, the Auction, the formulation, negotiation, preparation, dissemination, implementation, confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan.

### 10.13 ***Indemnification Obligations.***

(a)  Notwithstanding anything to the contrary herein, subject to the occurrence of the Effective Date, the obligations of the Debtors as provided in the Debtors' respective certificates of incorporation, bylaws, or other applicable organizational documents, other agreements or law as of the Commencement Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers who were officers or employees of such Debtors or their respective Affiliates at any time prior to the Effective Date, and who will be officers of the Debtors or NewCo from and after the Effective Date, against any claims, causes of action or obligations whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, shall survive confirmation of the Plan, remain unaffected thereby after the Effective Date and not be discharged, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Commencement Date.

(b)  As of the Effective Date, each Debtor's certificate of incorporation, bylaws or similar organizational documents or other agreement shall provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and

expenses to, officers who were officers of such Debtor or any of its respective Affiliates at any time prior to the Effective Date and who will continue to be officers or employees of the Debtors or NewCo from and after the Effective Date at least to the same extent as the bylaws of such Debtor in effect on the Commencement Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Debtors shall amend and/or restate its certificate of incorporation, bylaws or similar organizational document or other agreement before or after the Effective Date to terminate or materially adversely affect any of the Debtors' obligations or such officers' rights under this Section 10.13(b).

(c)     Any Claim based on NewCo's or the Debtors' obligations set forth in this Section 10.13 shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

(d)     For avoidance of doubt, nothing in this Section 10.13 shall be construed as an indemnification for any Guaranty Claim.

10.14   ***Retention of Causes of Action/Reservation of Rights.***

(a)     Except as provided in Section 6.17 and Section 10.10 hereof, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Reorganized Debtors or NewCo may have or which NewCo or the Reorganized Debtors may choose to assert on behalf of the Debtors' estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, NewCo, their officers, directors, managers or representatives and (ii) the turnover of any property of the Debtors' estates.

(b)     Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan. NewCo or the Reorganized Debtors, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Commencement Date fully as if the Bankruptcy Cases had not been commenced, and all of the legal and equitable rights of NewCo or the Reorganized Debtors, as applicable, respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Bankruptcy Cases had not been commenced.

(c)     Nothing in this Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, and all rights and defenses thereto are expressly reserved.

(d)     Nothing in this Plan shall be construed as a modification, release or waiver of the provisions of the Intercreditor Agreement, and the provisions of the Intercreditor Agreement shall remain in full force and effect, and all rights thereunder are expressly reserved.

10.15   ***Limitations on Exculpation and Releases of Representatives.*** Nothing in Section 10.9 or Section 10.10 hereof shall (a) be construed to release or exculpate any Person from, or

require indemnification of any Person against losses arising from, the fraud, malpractice, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or ultra vires acts of such Person, or (b) limit the liability of the professionals of the Debtors, the Reorganized Debtors, NewCo or the Creditors' Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

<div align="center">

**ARTICLE XI**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

</div>

11.1    ***Assumption of Executory Contracts and Unexpired Leases.***  Any executory contracts or unexpired leases listed in the relevant Exhibit to the Plan Supplement (which Exhibit shall contain those contracts or unexpired leases identified by the Investor, in its sole discretion, and shall include the BHAC IP License Agreements) or that have not been rejected by the Debtors with the approval of the Bankruptcy Court and that are not the subject of pending motions to reject on the Confirmation Date, shall be deemed to have been assumed by the applicable Debtor and assigned to NewCo or its designee, at Investor's option, as of the Effective Date, and the Plan shall constitute a motion to assume and assign such executory contracts and unexpired leases.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions and assignments pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption and assignment is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases. With respect to each such executory contract or unexpired lease assumed and assigned to NewCo, if applicable, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, the dollar amount required to cure any defaults of the applicable Debtor existing as of the Confirmation Date shall be conclusively presumed to be the amount set forth in an Exhibit to the Plan Supplement with respect to such executory contract or unexpired lease.  Subject to the occurrence of the Effective Date, any such cure amount shall be treated as an Allowed Administrative Expense Claim under the Plan, and, upon payment of such Allowed Administrative Expense Claim, all defaults of the applicable Debtor existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

11.2    ***Rejection of Executory Contracts and Unexpired Leases.***  Any executory contracts or unexpired leases of any Debtor that are set forth in the relevant Exhibit to the Plan Supplement (which Exhibit shall contain those contracts and unexpired leases identified by the Investor, in its sole discretion) shall be deemed to have been rejected by the applicable Debtor, and the Plan shall constitute a motion to reject such executory contracts and unexpired leases, and NewCo and the Reorganized Debtors shall have no liability thereunder except as is specifically provided in the Plan.  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.

11.3    ***Claims Arising from Rejection, Termination or Expiration.***  Claims created by the rejection of executory contracts or unexpired leases (including, without limitation, the rejection provided in Section 11.2 hereof) or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after (a) in the case of an executory contract or unexpired lease that was terminated or expired by its terms prior to the Confirmation Date, the Confirmation

Date, (b) in the case of an executory contract or unexpired lease rejected by the Debtors, the entry of the order of the Bankruptcy Court authorizing such rejection, or (c) in the case of an executory contract or unexpired lease that is deemed rejected pursuant to Section 11.2 hereof, the Confirmation Date. Any rejection claim for which a proof of claim is not filed and served within the time provided herein will be forever barred from assertion and shall not be enforceable against the Debtors, their assets, properties, or interests in property, or the Reorganized Debtors or its estate, assets, properties, or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article VII of the Plan.

11.4 *Insurance Policies and Agreements.* Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as executory contracts under the Plan of Reorganization and will be assumed by the applicable Reorganized Debtor and assigned to NewCo, at Investor's option, effective as of the Effective Date. Nothing contained in this Section 11.4 shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

11.5 *Management Agreements.* As of the Effective Date, (i) all existing management agreements between any Debtor that is a TRS and HVM, including any related administrative services agreements or G&A Reimbursement Agreements, will be assumed by such Debtors and (ii) all existing management agreements between any Debtor that is not a TRS and HVM will be assumed by such Debtor and assigned to a Debtor that is a TRS (or a newly formed TRS, wholly owned either directly or indirectly by NewCo, that is designated by an existing Debtor that is a TRS); provided that such management agreements to be assumed or assumed and assigned (a) shall be modified or amended by modified agreements that shall be included in the Plan Supplement, which terms shall be acceptable to Investor, each Sponsor and HVM and (b) shall be assumed or assumed and assigned as modified or amended. Entry of the Confirmation Order, subject to and upon the occurrence of the Effective Date, shall constitute the approval, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, of the assumption or assumption and assignment, as applicable, of such agreements on the terms set forth in the Plan and Plan Supplement.

## ARTICLE XII

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) to perform any of the following actions:

12.1 To hear and determine any and all motions or applications pending on the Confirmation Date for the assumption and/or assignment or rejection of executory contracts or unexpired leases to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear and determine any and all Claims resulting therefrom or from the expiration or termination prior to the Confirmation Date of any executory contract or unexpired lease;

12.2 To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan,

may be instituted by NewCo or the Reorganized Debtors after the Effective Date, including, without express or implied limitation, any claims to avoid any preferences, fraudulent transfers, or other voidable transfers, or otherwise to recover assets for the benefit of the Debtors' estates;

12.3    To hear and determine any objections to the allowance of Claims arising prior to the Effective Date, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow or disallow any Disputed Claim in whole or in part;

12.4    To hear and determine any disputes relating to the distributions to holders of Allowed Claims as provided herein.

12.5    To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

12.6    To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without express or implied limitation, the Confirmation Order;

12.7    To hear and determine all applications for allowances of compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan;

12.8    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan (and all Exhibits to the Plan Supplement and Exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

12.9    To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against any Debtor's Estate;

12.10    To determine such other matters that may be set forth in the Plan or the Confirmation Order, or that may arise in connection with the Plan, the Disclosure Statement or the Confirmation Order;

12.11    To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtors, as Debtors or Debtors in Possession, may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any request for expedited determination under section 505(b)(2) of the Bankruptcy Code);

12.12    To hear and determine all questions and disputes arising out of or relating to the Investment Agreement, the BHAC IP Transfer Agreement, the Debt Financing Arrangements or any foreclosure proceedings pursuant to Section 6.13 hereof;

12.13    To hear and determine all disputes arising under the Trust and Servicing Agreement or relating to the implementation of this Plan by the Trustee, the Special Servicer, the Operating Advisor and the Controlling Holder; and

12.14    To enter an order or final decree closing the Chapter 11 Cases.

# ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1    ***Modification of the Plan.***  This Plan may be altered, amended or modified by the Debtors, in consultation with the Investor, each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), before or after the Confirmation Date, as provided in section 1127 of the Bankruptcy Code; provided, however, that no such alterations, amendments or modifications that are material shall be made without the consents of the Investor, each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), which consents shall not be unreasonably withheld.  A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

13.2    ***Payment of Statutory Fees.***  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, shall be paid by the Debtors on or before the Effective Date.

13.3    ***Rights of Action.***  Any rights, claims, or causes of action accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, other than the Litigation Trust Assets or rights, claims or causes of action released pursuant to Section 10.10, and (except as provided in Article VIII hereof) any rights to, claims or causes of action for recovery under any policies of insurance issued to or on behalf of the Debtors shall remain assets of the Debtors' estates and, on the Effective Date, shall be transferred to the Reorganized Debtors.  NewCo shall be deemed the appointed representative to, and may, pursue, litigate, and compromise and settle any such rights, claims, or causes of action, as appropriate, in accordance with what is in the best interests of and for the benefit of the Reorganized Debtors.

13.4    ***Swap Agreements.***  The distributions that are to be made pursuant to Article IV hereof shall be deemed to satisfy fully any rights that each Class may have in respect of the Swap Agreements.

13.5    ***Dissolution of Creditors' Committee.***  On the Effective Date, the Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Debtors' Chapter 11 Cases, and, except for the limited purpose of presenting final applications for fee and expenses, the Creditors' Committee shall be deemed dissolved; provided, however, (a) if the Effective Date occurs before the Confirmation Order becomes a Final Order, the Creditors' Committee may continue to exist and to serve for the purposes of pursuing any appeal of the Confirmation Order, and (b) if any adversary proceeding in which the Creditors' Committee is participating is pending as of the Effective Date, the Creditors' Committee may continue to exist for the limited purpose of litigating such adversary proceeding.

13.6    ***Notices.***  Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| If to the Debtors: | c/o HVM L.L.C. |
| | 100 Dunbar Street, |
| | Spartanburg, South Carolina  29306 |
| | Attn: Gary A. DeLapp |
| | Tel: (864) 573-1600 |
| | Fax: (864) 573-1665 |

*and*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn: Marcia L. Goldstein, Esq., Jacqueline Marcus, Esq.
Tel: (212) 310-8000
Fax: (212) 310-8007

| If to the Creditors' Committee: | Hahn & Hessen LLP |
| | 488 Madison Avenue |
| | New York, New York  10022 |
| | Attn: Mark T. Power, Esq., Mark T. Indelicato, Esq. |
| | Tel: (212) 478-7200 |
| | Fax: (212) 478-7400 |

| If to the Investor or the Sponsors: | Fried, Frank, Harris, Shriver & Jacobson LLP |
| | One New York Plaza |
| | New York, New York 10004 |
| | Attn: Brad Eric Scheler, Esq., Jennifer L. Rodburg, Esq. |
| | Tel: (212) 859-8000 |
| | Fax: (212) 859-4000 |

*and*

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attn: David M. Feldman, Esq.
Tel: (212) 351-4000
Fax: (212) 351-4035

*and*

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017-3954
Attn: Mark Thompson, Esq.
Tel: (212) 455-7355
Fax: (212) 455-2502

If to the Special Servicer:    CWCapital Asset Management LLC
             701 13th Street, NW, Suite 1000
             Washington, D.C. 20005
             Attn: Stephen Abelman
             Tel: (202) 715-9660
             Fax: (202) 715-9699

             *and*

             Venable LLC
             750 East Pratt Street, Suite 900
             Baltimore, MD 21202
             Attn: Gregory A. Cross
             Tel: (410) 244-7725
             Fax: (410) 244-7742

    13.7  ***Headings.*** The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

    13.8  ***Severability.*** If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors with the written consent of the Investor and each of the Sponsors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, unless agreed otherwise by the Debtors with the written consent of the Investor or each of the Sponsors, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

    13.9  ***Governing Law.*** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or by Delaware corporate, partnership or limited liability company law, the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

    13.10 ***Plan Supplement /Exhibits/Schedules.*** All exhibits and schedules to the Plan, including the Plan Supplement and the Exhibits to the Plan Supplement, are incorporated into and are a part of the Plan as set forth in full herein.

    13.11 ***Compliance with Tax Requirements.*** In connection with the Plan, the Debtors and the Disbursing Agent will comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities, and all distributions hereunder shall be subject to such withholding and reporting requirements.

13.12 ***Exemption from Transfer Taxes.*** Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any sales and use, stamp, real estate transfer, mortgage recording, or other similar tax.

13.13 ***Expedited Determination of Postpetition Taxes.*** The Debtors and the Reorganized Debtors are authorized (but not required) to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for all taxable periods (or portions thereof) from the Commencement Date through (and including) the Effective Date.

13.14 ***Sections 1125 and 1126 of the Bankruptcy Code.*** As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors, the members of the Creditors' Committee, the Investor, each Sponsor and each of their respective Affiliates, agents, directors, managers, officers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

13.15 ***Time.*** In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 as amended effective December 1, 2009 shall apply.

13.16 ***No Amendment, Modification or Waiver of Cash Collateral Order or Other Documents.*** Nothing contained in this Plan shall be deemed to be an amendment, modification or waiver of any term or provision of the Trust and Servicing Agreement, the Mortgage Facility, or the Cash Collateral Order.

Dated:  New York, New York
       June 8, 2010

Respectfully submitted,

ESA PROPERTIES LLC
ESA 2005 PORTFOLIO LLC
ESA 2005- SAN JOSE LLC
ESA 2005- WALTHAM LLC
ESA ACQUISITION PROPERTIES LLC
ESA ALASKA LLC
ESA CANADA PROPERTIES BORROWER LLC
ESA FL PROPERTIES LLC
ESA MD BORROWER LLC
ESA MN PROPERTIES LLC
ESA P PORTFOLIO LLC
ESA P PORTFOLIO MD BORROWER LLC
ESA P PORTFOLIO PA PROPERTIES LLC
ESA P PORTFOLIO TXNC PROPERTIES LP
ESA PA PROPERTIES LLC
ESA TX PROPERTIES LP
ESH/HOMESTEAD PORTFOLIO LLC
ESH/HV PROPERTIES LLC
ESH/MSTX PROPERTY LP
ESH/TN PROPERTIES LLC
ESH/TX PROPERTIES LP
ESA MD BENEFICIARY LLC
ESA MD PROPERTIES BUSINESS TRUST
ESA P PORTFOLIO MD BENEFICIARY LLC
ESA P PORTFOLIO MD TRUST
ESA CANADA PROPERTIES TRUST
ESA CANADA TRUSTEE INC.
ESA CANADA BENEFICIARY INC.
ESA UD PROPERTIES LLC
ESA 2007 OPERATING LESSEE, INC.
ESA 2005 OPERATING LESSEE INC.
ESA OPERATING LESSEE INC.
ESA P PORTFOLIO OPERATING LESSEE INC.
ESA CANADA OPERATING LESSEE INC.
ESA P PORTFOLIO TXNC GP L.L.C.
ESA TXGP L.L.C.
ESH/MSTX GP L.L.C.
ESH/TXGP L.L.C.
ESH/TN MEMBER INC.
ESH/HOMESTEAD MEZZ L.L.C.
ESH/HOMESTEAD MEZZ 2 L.L.C.
ESH/HOMESTEAD MEZZ 3 L.L.C.
ESH/HOMESTEAD MEZZ 4 L.L.C.
ESH/HOMESTEAD MEZZ 5 L.L.C.

ESH/HOMESTEAD MEZZ 6 L.L.C.
ESH/HOMESTEAD MEZZ 7 L.L.C.
ESH/HOMESTEAD MEZZ 8 L.L.C.
ESH/HOMESTEAD MEZZ 9 L.L.C.
ESH/HOMESTEAD MEZZ 10 L.L.C.
ESA MEZZ L.L.C.
ESA MEZZ 2 L.L.C.
ESA MEZZ 3 L.L.C.
ESA MEZZ 4 L.L.C.
ESA MEZZ 5 L.L.C.
ESA MEZZ 6 L.L.C.
ESA MEZZ 7 L.L.C.
ESA MEZZ 8 L.L.C.
ESA MEZZ 9 L.L.C.
ESA MEZZ 10 L.L.C.
ESA P MEZZ L.L.C.
ESA P MEZZ 2 L.L.C.
ESA P MEZZ 3 L.L.C.
ESA P MEZZ 4 L.L.C.
ESA P MEZZ 5 L.L.C.
ESA P MEZZ 6 L.L.C.
ESA P MEZZ 7 L.L.C.
ESA P MEZZ 8 L.L.C.
ESA P MEZZ 9 L.L.C.
ESA P MEZZ 10 L.L.C.
HOMESTEAD VILLAGE L.L.C.
EXTENDED STAY HOTELS L.L.C.
ESA P PORTFOLIO HOLDINGS L.L.C.
ESA MANAGEMENT L.L.C.
ESA BUSINESS TRUST

By:     /s/ David Lichtenstein
        Name:   David Lichtenstein
        Title:     President

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

**Exhibit A**

**Debtors**

|   | Entity | State of Organization |
|---|--------|------------------------|
| 1 | ESA Properties LLC | Delaware |
| 2 | ESA 2005 Portfolio LLC | Delaware |
| 3 | ESA 2005- San Jose LLC | Delaware |
| 4 | ESA 2005- Waltham LLC | Delaware |
| 5 | ESA Acquisition Properties LLC | Delaware |
| 6 | ESA Alaska LLC | Delaware |
| 7 | ESA Canada Properties Borrower LLC | Delaware |
| 8 | ESA FL Properties LLC | Delaware |
| 9 | ESA MD Borrower LLC | Delaware |
| 10 | ESA MN Properties LLC | Delaware |
| 11 | ESA P Portfolio LLC | Delaware |
| 12 | ESA P Portfolio MD Borrower LLC | Delaware |
| 13 | ESA P Portfolio PA Properties LLC | Delaware |
| 14 | ESA P Portfolio TXNC Properties LP | Delaware |
| 15 | ESA PA Properties LLC | Delaware |
| 16 | ESA TX Properties LP | Delaware |
| 17 | ESH/Homestead Portfolio LLC | Delaware |
| 18 | ESH/HV Properties LLC | Delaware |
| 19 | ESH/MSTX Property LP | Delaware |
| 20 | ESH/TN Properties LLC | Delaware |
| 21 | ESH/TX Properties LP | Delaware |
| 22 | ESA MD Beneficiary LLC | Delaware |

| | Entity | State of Organization |
|---|---|---|
| 23 | ESA MD Properties Business Trust | Delaware |
| 24 | ESA P Portfolio MD Beneficiary LLC | Delaware |
| 25 | ESA P Portfolio MD Trust | Delaware |
| 26 | ESA Canada Properties Trust | Delaware |
| 27 | ESA Canada Trustee Inc. | Delaware |
| 28 | ESA Canada Beneficiary Inc. | Delaware |
| 29 | ESA UD Properties LLC | Delaware |
| 30 | ESA 2007 Operating Lessee, Inc. | Delaware |
| 31 | ESA 2005 Operating Lessee Inc. | Delaware |
| 32 | ESA Operating Lessee Inc. | Delaware |
| 33 | ESA P Portfolio Operating Lessee Inc. | Delaware |
| 34 | ESA Canada Operating Lessee Inc. [Ontario Corp.] | Ontario, Canada |
| 35 | ESA P Portfolio TXNC GP L.L.C. | Delaware |
| 36 | ESA TXGP L.L.C. | Delaware |
| 37 | ESH/MSTX GP L.L.C. | Delaware |
| 38 | ESH/TXGP L.L.C. | Delaware |
| 39 | ESH/TN Member Inc. | Delaware |
| 40 | ESH/Homestead Mezz L.L.C. | Delaware |
| 41 | ESH/Homestead Mezz 2 L.L.C. | Delaware |
| 42 | ESH/Homestead Mezz 3 L.L.C. | Delaware |
| 43 | ESH/Homestead Mezz 4 L.L.C. | Delaware |
| 44 | ESH/Homestead Mezz 5 L.L.C. | Delaware |
| 45 | ESH/Homestead Mezz 6 L.L.C. | Delaware |
| 46 | ESH/Homestead Mezz 7 L.L.C. | Delaware |

| | **Entity** | **State of Organization** |
|----|-----------------------------|---------------------------|
| 47 | ESH/Homestead Mezz 8 L.L.C. | Delaware |
| 48 | ESH/Homestead Mezz 9 L.L.C. | Delaware |
| 49 | ESH/Homestead Mezz 10 L.L.C. | Delaware |
| 50 | ESA Mezz L.L.C. | Delaware |
| 51 | ESA Mezz 2 L.L.C. | Delaware |
| 52 | ESA Mezz 3 L.L.C. | Delaware |
| 53 | ESA Mezz 4 L.L.C. | Delaware |
| 54 | ESA Mezz 5 L.L.C. | Delaware |
| 55 | ESA Mezz 6 L.L.C. | Delaware |
| 56 | ESA Mezz 7 L.L.C. | Delaware |
| 57 | ESA Mezz 8 L.L.C. | Delaware |
| 58 | ESA Mezz 9 L.L.C. | Delaware |
| 59 | ESA Mezz 10 L.L.C. | Delaware |
| 60 | ESA P Mezz L.L.C. | Delaware |
| 61 | ESA P Mezz 2 L.L.C. | Delaware |
| 62 | ESA P Mezz 3 L.L.C. | Delaware |
| 63 | ESA P Mezz 4 L.L.C. | Delaware |
| 64 | ESA P Mezz 5 L.L.C. | Delaware |
| 65 | ESA P Mezz 6 L.L.C. | Delaware |
| 66 | ESA P Mezz 7 L.L.C. | Delaware |
| 67 | ESA P Mezz 8 L.L.C. | Delaware |
| 68 | ESA P Mezz 9 L.L.C. | Delaware |
| 69 | ESA P Mezz 10 L.L.C. | Delaware |
| 70 | Homestead Village L.L.C. | Delaware |

| | Entity | State of Organization |
|---|---|---|
| 71 | Extended Stay Hotels L.L.C. | Delaware |
| 72 | ESA P Portfolio Holdings L.L.P. | Delaware |
| 73 | ESA Management L.L.C. | Delaware |
| 74 | ESA Business Trust | Delaware |

<u>**Exhibit B**</u>

**BHAC License Agreements**

Amended and Restated Trademark License Agreement, dated as of July 11, 2005, between BHAC Capital IV, L.L.C. and ESA P Portfolio Operating Lessee Inc. (f/k/a BRE/ESA P Portfolio Operating Lessee Inc.)

Trademark License Agreement, dated as of July 12, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA Canada Operating Lessee Inc.

Trademark License Agreement, dated as of June 13, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of October 31, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA Canada Operating Lessee Inc.

Trademark License Agreement, dated as of October __, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of October 25, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of March 24, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of June 29, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of August 11, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of April __, 2007, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc. (as assigned by ESA 2005 Operating Lessee, Inc. (f/k/a BRE/ESA 2005 Operating Lessee, Inc.) to ESA 2007 Operating Lessee, Inc. pursuant to the Assignment and Assumption of Trademark License Agreement, dated as of June 11, 2007).

Trademark License Agreement, dated as of April __, 2007, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

**Exhibit C**

**Tier 1 Debtors**

ESA Properties LLC

ESA 2005 Portfolio LLC

ESA 2005- San Jose LLC

ESA 2005- Waltham LLC

ESA Acquisition Properties LLC

ESA Alaska LLC

ESA FL Properties LLC

ESA MN Properties LLC

ESA P Portfolio LLC

ESA P Portfolio PA Properties LLC

ESA PA Properties LLC

ESH/Homestead Portfolio LLC

ESH/HV Properties LLC

ESA MD Beneficiary LLC

ESA P Portfolio MD Beneficiary LLC

ESA Canada Trustee Inc.

ESA Canada Beneficiary Inc.

ESA UD Properties LLC

ESA 2007 Operating Lessee, Inc.

ESA 2005 Operating Lessee Inc.

ESA Operating Lessee Inc.

ESA P Portfolio Operating Lessee Inc.

ESA Canada Operating Lessee Inc.

ESA P Portfolio TXNC GP L.L.C.

1

ESA TXGP L.L.C.

ESH/MSTX GP L.L.C.

ESH/TXGP L.L.C.

ESH/TN Member Inc.

ESA P Portfolio TXNC Properties L.P.

ESA TX Properties L.P.

ESH/TN Properties L.L.C.

ESH/TX Properties L.P.

ESH/MSTX Property L.P.

**<u>Exhibit D</u>**

**Tier 2 Debtors**

ESA Canada Properties Borrower LLC

ESA Canada Properties Trust

ESA P Portfolio MD Borrower LLC

ESA P Portfolio MD Trust

ESA MD Borrower LLC

ESA MD Properties Business Trust

**Exhibit E**

**Tier 3 Debtors**

ESH/Homestead Mezz L.L.C.

ESH/Homestead Mezz 2 L.L.C.

ESH/Homestead Mezz 3 L.L.C.

ESH/Homestead Mezz 4 L.L.C.

ESH/Homestead Mezz 5 L.L.C.

ESH/Homestead Mezz 6 L.L.C.

ESH/Homestead Mezz 7 L.L.C.

ESH/Homestead Mezz 8 L.L.C.

ESH/Homestead Mezz 9 L.L.C.

ESH/Homestead Mezz 10 L.L.C.

ESA Mezz L.L.C.

ESA Mezz 2 L.L.C.

ESA Mezz 3 L.L.C.

ESA Mezz 4 L.L.C.

ESA Mezz 5 L.L.C.

ESA Mezz 6 L.L.C.

ESA Mezz 7 L.L.C.

ESA Mezz 8 L.L.C.

ESA Mezz 9 L.L.C.

ESA Mezz 10 L.L.C.

ESA P Mezz L.L.C.

ESA P Mezz 2 L.L.C.

ESA P Mezz 3 L.L.C.

ESA P Mezz 4 L.L.C.

ESA P Mezz 5 L.L.C.

ESA P Mezz 6 L.L.C.

ESA P Mezz 7 L.L.C.

ESA P Mezz 8 L.L.C.

ESA P Mezz 9 L.L.C.

ESA P Mezz 10 L.L.C.

Homestead Village L.L.C.

Extended Stay Hotels L.L.C.

ESA P Portfolio Holdings L.L.C.

ESA Management L.L.C.

ESA Business Trust

**<u>Exhibit F</u>**

**Existing Letters of Credit**

Irrevocable Letter of Credit Number S-17551, dated June 11, 2007, issued by Deutsche Bank to Zurich American Insurance Company, as beneficiary, in the amount of $1,100,000

Irrevocable Letter of Credit Number S-17552, dated June 11, 2007, issued by Deutsche Bank to Zurich American Insurance Company, as beneficiary, in the amount of $16,375,000

## Exhibit G

### Mezzanine Facilities

Mezzanine A Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz L.L.C., ESA P Mezz L.L.C., and ESA Mezz L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine B Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 2 L.L.C., ESA P Mezz 2 L.L.C., and ESA Mezz 2 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine C Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 3 L.L.C., ESA P Mezz 3 L.L.C., and ESA Mezz 3 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine D Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 4 L.L.C., ESA P Mezz 4 L.L.C., and ESA Mezz 4 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine E Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 5 L.L.C., ESA P Mezz 5 L.L.C., and ESA Mezz 5 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine F Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 6 L.L.C., ESA P Mezz 6 L.L.C., and ESA Mezz 6 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine G Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 7 L.L.C., ESA P Mezz 7 L.L.C., and ESA Mezz 7 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine H Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 8 L.L.C., ESA P Mezz 8 L.L.C., and ESA Mezz 8 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine I Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 9 L.L.C., ESA P Mezz 9 L.L.C., and ESA Mezz 9 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine J Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 10 L.L.C., ESA P Mezz 10 L.L.C., and ESA Mezz 10 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

## Exhibit B

## Disclosure Statement Approval and Solicitation Order

## [To be Provided]

## **Exhibit C**

## **Projected Financial Information**

**EXHIBIT C**

**NewCo**
*Financial Projections*

*Principal Assumptions*

The Projections are based on, and assume the successful implementation of, the Debtors' business plan. Both the Debtors' business plan and the Projections reflect numerous assumptions, including general business and economic conditions, as well as lodging industry trends, and other matters that, though considered reasonable by the Debtors in light of current circumstances, may not materialize and are inherently subject to significant business, economic and competitive uncertainties and contingencies which are beyond the Debtors' control. Additionally, the Projections assume the management of NewCo will perform according to certain expectations, which may not occur. **Therefore, although the Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period are likely to vary from the Projections. These variations may be material. Accordingly, no representation can be or is being made with respect to the accuracy of the Projections or the ability of NewCo to achieve the Projections and the Projections may not be relied upon as a guaranty or other assurance with respect to the actual results that will occur.** See Section IX of the Disclosure Statement for a discussion of certain factors that may affect the future financial performance of NewCo. The Projections also include assumptions as to the estimated value of NewCo, the fair value of its assets and its actual liabilities as of the Effective Date. NewCo will be required to make such estimates as of the Effective Date. Such determinations will be based upon the estimated fair values as of that date, which could be materially higher or lower than the values assumed in the estimates contained in the Projections. **In deciding whether to vote to accept or reject the Plan, holders of Claims entitled to vote must make their own determinations as to the reasonableness of the assumptions underlying, and the reliability of, the Projections.** See Section IX of the Disclosure Statement.

The Financial Projections have been included by the Debtors strictly for purposes of complying with the feasibility requirement of the Bankruptcy Code and have no impact on the actual terms of the Plan or the transactions contemplated therein. Nothing in the Financial Projections shall obligate or be construed to obligate NewCo or the Reorganized Debtors, or the Investor and the Sponsors as the 100% owners of NewCo and the Reorganized Debtors, to incur any of the liabilities contained in the Financial Projections (except as otherwise provided for in the Plan) or to operate the Reorganized Debtors in accordance with the Debtors' assumptions contained in the Financial Projections. The Investor and Sponsors have their own business plan for NewCo and the Reorganized Debtors which has not been incorporated into the Financial Projections. NewCo and the Reorganized Debtors will operate in the ordinary course in accordance with their own business plan.

Independent auditors have neither compiled nor examined the Projections to determine the reasonableness thereof and, accordingly, no independent auditors have expressed any opinion or other form of assurance with respect to them. Moreover, the Projections have not been prepared with a view toward compliance with guidelines established with respect to projections by the SEC or the American Institute of Certified Public Accountants ("AICPA"). The principal assumptions used in preparing the Projections are as follows:

(a) <u>Effective Date; Plan Terms</u>: Even though the Plan currently requires that the Confirmation Date occur on or before September 21, 2010, for purposes of these Projections, Confirmation of the Plan is assumed to occur during the second quarter of fiscal 2010 and the Effective Date is assumed to occur on June 30, 2010. The Projections also assume that:

(i) the total amount of Allowed Claims in each Class is the actual or estimated aggregate amount thereof set forth in Section II of the Disclosure Statement;

(ii) there are no material cure payments for the assumption of Executory Contracts and Unexpired Leases; and

(iii) the estimated total amount of Priority Tax Claims, Administrative Claims, and other reorganization expenses is approximately $40 million and includes, among other items:

legal, accounting, financial advisory and other professional fees associated with implementation of the Plan to be paid after the Effective Date.

See Section II of the Disclosure Statement for a brief summary of the principal provisions of the Plan.

(b)  **General Economic Conditions:** The Projections were prepared based on assumptions that the overall economy will grow throughout the Projection Period and that there will be no significant change in the markets in which the Debtors operate.

(c)  **Principal Operating and Financial Assumptions**

(i)  **Revenues:** NewCo's forward earnings projections assume the implementation of a $480 million capital spend program and are based on key revenue drivers for NewCo's three discrete rebranded portfolios.

(A)  Portfolios are based on planned post emergence brand consolidation and consist of Homestead Deluxe, Homestead Suites and Extended Stay America. These brands will focus on different core customers with different lengths of stay. Homestead Deluxe will focus on the upscale corporate transient customer, whereas Homestead will focus on corporate mid-scale extended stay customers and ESA will focus on the economy segment with longer stays.

(B)  Revenue projections were developed for each portfolio based on anticipated relative performance to the broader lodging market and the associated return on investment from anticipated capital spends. The implied ROI versus non-capital plan is approximately 25%.

(C)  Considering the amount of cumulative sector RevPAR decline combined with significant extended stay sector supply growth, the Projections anticipate NewCo's recovery to peak real RevPAR to be longer than in recent previous cycles.

(D)  The Projections assume a ten year cycle to return to 2007 peak real RevPAR. Real RevPAR is projected to have declined 29% from 2007 through 2009. The previous two cycles had declines of 10% and 15%, respectively and the 1999 cycle downturn was largely a result of short-term disruption and a modest economic decline. The key operating assumptions are[1]:

| Key Operating Assumptions | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009E | 2010E | 2011E | 2012E | 2013E | 2014E |
| Occupancy | 69.8% | 64.5% | 62.5% | 62.8% | 65.2% | 67.0% | 69.2% | 71.3% |
| *Change (bps)* | *151* | *(529)* | *(198)* | *24* | *239* | *189* | *219* | *206* |
| *% Change* | *2.2%* | *(7.6%)* | *(3.1%)* | *0.4%* | *3.8%* | *2.9%* | *3.3%* | *3.0%* |
| ADR | $56.01 | $56.60 | $46.08 | $44.34 | $45.47 | $47.70 | $50.78 | $54.08 |
| *% Change* | *2.0%* | *1.0%* | *(18.6%)* | *(3.8%)* | *2.5%* | *4.9%* | *6.5%* | *6.5%* |
| Nominal RevPAR | $39.10 | $36.51 | $28.81 | $27.83 | $29.62 | $31.98 | $35.16 | $38.56 |
| *% Change* | *4.2%* | *(6.6%)* | *(21.1%)* | *(3.4%)* | *6.5%* | *7.9%* | *9.9%* | *9.7%* |
| Real RevPAR (a) | $36.85 | $33.01 | $26.18 | $24.83 | $26.00 | $27.50 | $29.68 | $31.95 |
| *% Change* | *1.4%* | *(10.4%)* | *(20.7%)* | *(5.2%)* | *4.7%* | *5.8%* | *7.9%* | *7.6%* |

(a) Real RevPAR based on CPI inflation per Moody's Economy.com.

(E)  Although supply growth in the broader lodging sector is expected to be modest, extended-stay segment supply growth is expected to be substantial and to

---

[1] Operating assumptions for the Debtors' Revised Business Plan 4 ("RBP4"). 2009 data is projected as of the time of the forecasting. 2009 actual Nominal RevPAR was down 19.5% over 2008 as a result of the long term lodging ("LTL") program. Forecasts are based upon RBP4 2009 data, as 2009 actual does not represent a normalized business mix.

moderate the pace of recovery to peak RevPAR. For the three years preceding the 1991 and 2001 negative RevPAR periods, hotel industry supply grew by approximately 4%. US lodging supply growth for the three years preceding the current downturn has been a more modest 1.3% but the extended stay segment has grown at a significantly greater rate of 6.2%. Supply growth in the extended stay segment is expected to continue to outpace the broader lodging sector materially over the next two years, with projected growth of 4.6% and 1.5%, respectively.[2] Projections assume elevated supply growth, although lower than projected above, given the uncertainty in the financing market.

(F)     Despite the recent transition to a long term lodging ("LTL") strategy to bolster demand during the current downturn, NewCo's strategy going forward will remain focused on the core extended stay guests and revenue projections assume the same. As demand drivers for core extended stay lodging decreased, the Debtors transitioned to focus on guest stays greater than 30 days as an apartment alternative. As of December 2009, the LTL program comprised approximately 27% of available inventory. Additionally, percent of room nights attributable to guests staying more than 30 nights increased from approximately 43% in January 2008 to approximately 61% in December 2009. As demand for core extended stay returns in 2010, NewCo will transition back to the historical customer model and may encounter some disruption in operating performance as part of the transition, which is projected to be completed by 3Q 2010.

(G)     Other revenue, which includes telecom, guest laundry and vending and concessions, is shown net of applicable expenses and projected to grow at 2% per annum. Other revenue also includes forecasted net operating income for the Debtors' office property in Spartanburg, SC, which currently leases approximately 38,000 square feet to third-party tenants.

(ii)     Expenses: Non-controllable property level expense growth is based on inflation, whereas controllable property level expenses are adjusted based on property level demand. Controllable property level expenses use a 70%/30% fixed/variable assumption.

(A)     Property level fixed controllable and non-controllable expenses are assumed to grow at 2% per annum for 2010 and thereafter. The Business Plan reflects controllable costs per occupied room that are in-line with a long-term mix of lodging demand (more transient and less than 29 night stays) as compared to the current recessionary business model (LTL strategy). Controllable costs per occupied room declined 8.2% in 2009 to $18.06, primarily due to the decrease in staffing levels due to the Debtors' focus on LTL, which requires lower service levels. Assuming a normalized mix of business, these costs will be approximately $19.47 in 2010. Approximately 60% of controllable costs are labor related.

(B)     After adjusting for special items, corporate overhead and other recurring corporate expenses are per the budget for 2009, and then grown at 2.5% per annum thereafter. Restructuring costs in 2009, which have been adjusted for 2010, were approximately $33 million. Budgeted incremental marketing/advertising expense of $3.7 million in 2009 will increase to $11 million per year thereafter, which represents a more normalized spend in line with industry standards.

---

[2] Historical growth rates represent compounded annual growth rates per Smith Travel Research. Projected growth rates represent compounded annual growth rates per Lodging Econometrics.

(C)     In addition to the FF&E reserve of 4% of all revenue for 666 hotels, capital spending programs of $480 million are carried out from 2011 through 2013.

(iii)    <u>Balance Sheet Projections:</u>  In order to forecast change in net working capital and other non-current assets, certain balance sheet items are projected using assumptions consistent with historical Debtor trends.  Accounts receivable are projected using a collection period assumption while all other working capital items are projected as a percent of forecasted room revenue or using an annual growth rate.  Other non-current assets are projected as a percent of forecasted room revenue and other non-current liabilities are projected using an annual growth rate.

(iv)    <u>LTL Adjustment:</u>  NewCo intends to transition back to the historical customer model, as described in Section (c)(i)(F) of Exhibit C.  Operating projections for RBP4 assume no incremental EBITDA from the LTL customer model.  While RBP4 projections illustrate normalized operations, management expects to experience elevated EBITDA in 2010 before the LTL program is fully wound down.  Accordingly, the 2H2010 Statement of Operations shows an adjustment for incremental EBITDA from the LTL program to reflect fully management's operating expectations for 2010.  The cash balance at emergence reflects the incremental EBITDA above RBP4 projections from the LTL program for 1H2010.

(v)     <u>Depreciation:</u>  Depreciation expense is projected for four separate categories including existing PP&E, recurring capital expenditures, the $480 million capital plan and IT projects.  Each category assumes a unique allocation of capital to land, buildings/improvements, site improvements and FF&E/office equipment.  The allocation is based on historical trends and management's expectations for the make-up of future projects.  The following classes use straight-line depreciation over fixed time horizons: land (not depreciated), buildings/improvements (30 years), site improvements (20 years) and FF&E/office equipment (7 years).

(vi)    <u>Post-Reorganization Debt and Interest Expense</u>:  The Projections assume that, immediately after the Effective Date, NewCo's debt will consist of $1.8 billion of new Debt Financing and the $5.0 million New ESA UD Mortgage Facility.  The Debt Financing is assumed to carry a blended cash rate of 6.79%, which is based on estimated market terms, and is assumed to amortize over 30 years.  The Projections also assume financing costs of $36 million (200bps) associated with the Debt Financing, which amortize over five years.  Payments on the New ESA UD Mortgage Facility are fixed at a rate of 5.0% per annum.

(vii)   <u>Post-Reorganization Taxes</u>:  For illustrative purposes, the Projections assume NewCo is organized as an LLC.  Accordingly, no corporate income taxes are included in the Projections.

(d)    <u>Fresh-Start Reporting</u>:  The foregoing assumptions and resulting computations were made solely for purposes of preparing the Projections.  The AICPA has issued a Statement of Position on Financial Reporting by Entities in Reorganization Under the Bankruptcy Code (the "Reorganization SOP").  NewCo will be required to determine the amount by which its reorganization value as of the Effective Date exceeds, or is less than, the fair value of its assets as of the Effective Date.  Such determination will be based upon the fair values as of that time, which could be materially higher or lower than the values assumed in the foregoing computations, and may be based on a different methodology with respect to the determination of NewCo's value.  In all events, such valuation, as well as the determination of the fair value of NewCo's assets and the determination of its actual liabilities, will be made as of the Effective Date, and the differences between the amounts of any or all of the foregoing items as assumed in the Projections and the actual amounts thereof as of the Effective Date may be material.

The Projections have been prepared to reflect a simplified "fresh-start" presentation as of the Effective Date. The Projections reflect adjustments to property values using Reorganized Asset Value based on the Plan and the consolidation of certain intellectual property on NewCo's books and records. HVM is consolidated from a financial point of view in the Projections.

**Projections**

As indicated above, the projected consolidated financial statements of NewCo set forth below have been prepared based on the assumption that the Effective Date is June 30, 2010. Although the Debtors presently intend to seek to cause the Effective Date to occur as soon as practicable and the Investment Agreement requires the Effective Date to occur within fifteen days following entry of the Confirmation Order, there can be no assurance as to when the Effective Date actually will occur.

The projected consolidated financial statements set forth below include:

(a)     NewCo's projected pro forma balance sheet as of June 30, 2010, representing: (i) the projected consolidated financial position of NewCo as of June 30, 2010, but prior to the consummation of the transactions which the Plan contemplates will occur on the Effective Date; (ii) the projected adjustments to such projected consolidated financial position required to reflect Confirmation and the consummation of the transactions which the Plan contemplates will occur on the Effective Date (collectively, the "Emergence Adjustments"); and (iii) the projected consolidated financial position of NewCo as of June 30, 2010, after giving effect to the Emergence Adjustments. The Emergence Adjustments set forth in the columns captioned "Recapitalization" and "Fresh Start" reflect the assumed effects of the consummation of the transactions contemplated by the Plan. The various Emergence Adjustments are described in greater detail in the notes to NewCo's projected pro forma balance sheet.

(b)     NewCo's projected pro forma consolidated balance sheets representing the projected consolidated financial position of NewCo as of June 30, 2010, after giving effect to the consummation of the transactions which the Plan contemplates will occur on the Effective Date, and as of each of December 31, 2010, 2011, 2012, 2013, and 2014.

(c)     NewCo's projected pro forma consolidated statements of operations, representing the projected consolidated results of operations of NewCo for the six months ending December 31, 2010 and the fiscal years ending December 31, 2010, 2011, 2012, 2013, and 2014.

(d)     NewCo's projected pro forma consolidated statements of cash flows representing the projected consolidated cash flows of NewCo for the six months ending December 31, 2010 and the fiscal years ending December 31, 2010, 2011, 2012, 2013, and 2014.

# NEWCO
## PROJECTED PRO FORMA CONSOLIDATED BALANCE SHEET
### JUNE 30, 2010
(Unaudited)
(Dollars in Millions)

(Amounts may not add to totals due to rounding)

| NewCo Projected Pro Forma Consolidated Balance Sheet | | | |
|---|---|---|---|
| | June 30, 2010 | Emergence Adjustments | | June 30, 2010 |
| | Projected | Recapitalization | Fresh Start | Pro Forma |
| **Assets** | | | | |
| Current Assets | | | | |
| Cash and cash equivalents, unrestricted | $65.0 | $135.0 (a) | - | $200.0 |
| Restricted cash | 2.9 | 14.6 (b) | - | 17.5 |
| Accounts receivable, net of allowance for doubtful accounts | 17.3 | - | - | 17.3 |
| Other current assets | 26.9 | - | - | 26.9 |
| Due from DL-DW Holdings LLC, net of allowance of $19.6 | - | - (c) | - | - |
| Total current assets | 112.0 | 149.6 | - | 261.6 |
| | | | | |
| Property and equipment, net of accumulated depreciation | 6,180.0 | - | (2,230.8) (d) | 3,949.2 |
| Undeveloped land | 1.1 | - | - | 1.1 |
| Deferred financing costs, net of accumulated amortization | - | 36.0 (e) | - | 36.0 |
| Trademarks | 13.2 | 30.8 (f) | - | 44.0 |
| License of trademarks, net of accumulated amortization | 8.3 | (8.3) (f) | - | - |
| Under market trademark licenses, net of accumulated amortization | 11.6 | (11.6) (f) | - | - |
| Other intangible assets, net of accumulated amortization | 16.4 | (16.4) (g) | - | - |
| Other assets | 6.2 | - | - | 6.2 |
| | | | | |
| Total assets | $6,348.8 | $180.1 | ($2,230.8) | $4,298.1 |
| | | | | |
| **Liabilities and Members' Equity** | | | | |
| Current liabilities | | | | |
| Accounts payable and other accrued expenses | $51.3 | - | - | $51.3 |
| Accrued real estate taxes | 27.5 | - | - | 27.5 |
| Accrued interest payable | 8.7 | (8.7) (h) | - | - |
| Accrued professional fees | 15.0 | (15.0) (i) | - | - |
| Deferred revenue | 11.0 | - | - | 11.0 |
| Advance payable to BHAC Capital IV L.L.C., including accrued interest | 7.9 | (7.9) (j) | - | - |
| Notes payable to Extended Stay, Inc. | 13.7 | (13.7) (j) | - | - |
| Due to BHAC Capital IV L.L.C. | 1.3 | (1.3) (j) | - | - |
| Total current liabilities | 136.5 | (46.7) | - | 89.8 |
| | | | | |
| Mortgages payable | 4,108.3 | (4,108.3) (k) | - | - |
| Mezzanine loans | 3,295.5 | (3,295.5) (j) | - | - |
| New Debt Financing | - | 1,800.0 (l) | - | 1,800.0 |
| New ESA UD Mortgage Facility | - | 5.0 (m) | - | 5.0 |
| Other liabilities | 4.9 | - | - | 4.9 |
| Deferred income tax liability - noncurrent | 11.7 | (11.7) (n) | - | - |
| | | | | |
| Total liabilities | $7,556.9 | ($5,657.3) | - | $1,899.6 |
| | | | | |
| Members' equity/(deficit) | | | | |
| Additional Paid in Capital | 596.1 | 4,033.2 | (2,230.8) | 2,398.5 |
| Retained earnings | (1,804.2) | 1,804.2 | - | - |
| Total members' equity/(deficit) | ($1,208.1) | $5,837.4 | ($2,230.8) | $2,398.5 |
| | | | | |
| Total liabilities and members' equity/(deficit) | $6,348.8 | $180.1 | ($2,230.8) | $4,298.1 |

**THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "PRINCIPAL OPERATING AND FINANCIAL ASSUMPTIONS."**

## NOTES TO NEWCO
## PROJECTED PRO FORMA CONSOLIDATED BALANCE SHEET

Upon emergence from Chapter 11, the Debtors will be required to adopt Fresh Start Accounting in accordance with SOP 90-7, which requires the Debtors to revalue its assets and liabilities at their estimated fair value. Fresh start reporting reflects the value of the Debtors as defined in the Plan of Reorganization. Under fresh-start reporting, the Debtors' asset values are remeasured using fair value, and are allocated in conformity with Statement of Financial Accounting Standards No. 141, "Business Combinations" ("SFAS 141"). The excess of reorganization value over the fair value of net tangible and identifiable intangible assets and liabilities is recorded as goodwill in the accompanying statements. The foregoing estimates and assumptions are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors. Accordingly, the Debtors cannot provide assurance that the estimates, assumptions, and values reflected in the valuations will be realized, and actual results could vary materially. In accordance with SFAS 141, the preliminary allocation of the reorganization value is subject to additional adjustment within one year after emergence from bankruptcy to provide the Debtors time to complete the valuation of its assets and liabilities. Most assets and liabilities have been shown at book value, which in management's opinion approximates fair value, except where noted. All debt securities have been shown at face value.

(a) Cash adjustments include:

  (i) Funding of the Administrative/Priority Claims Reserve and distribution of Excess Cash, as described in the Plan.

  (ii) $200 million of estimated contribution from the Investor to cover any and all capital reserves, working capital reserves, transaction expenses and any other such reserves for the ongoing operations of NewCo.

(b) Represents payments related to the Revised HVM Incentive Program, which were previously held in a segregated account, and the replacement of the $17.5 million cash deposit to Zurich American Insurance Company to secure certain insurance-related letters of credit.

(c) Represents release of cash collateral held at DL-DW Holdings LLC as stipulated under the Plan.

(d) Represents impairment of Property and Equipment value as a result of the recapitalization.

(e) Represents estimated financing costs associated with new Debt Financing to be amortized over five years.

(f) Represents contribution of certain Intellectual Property assets to NewCo by BHAC. Assumes NewCo enters into BHAC IP Transfer Agreement per Section 6.13 of the Plan.

(g) Represents write off of other intangible assets as result of ch. 11 filing.

(h) Represents cancellation of accrued interest.

(i) Represents payment of estimated accrued professional fees upon emergence.

(j) Represents cancellation of pre-petition liability.

(k) Represents cancellation of pre-petition liability in exchange for the Cash Distribution.

(l) Represents the estimated new Debt Financing.

(m) Represents New ESA UD Mortgage Facility.

(n) Represents adjustment to liability upon reorganization into assumed illustrative LLC structure.

# NEWCO
## PROJECTED PRO FORMA CONSOLIDATED BALANCE SHEETS
### (Unaudited)
### (Dollars in Millions)

### (Amounts may not add to totals due to rounding)

| NewCo Projected Pro Forma Consolidated Balance Sheet | | | | | |
|---|---|---|---|---|---|
| | June 30, 2010 | December 31, | | | |
| | Pro Forma | 2010E | 2011E | 2012E | 2013E | 2014E |
| **Assets** | | | | | | |
| Current Assets | | | | | | |
| Cash and cash equivalents, unrestricted | $200.0 | $235.3 | $165.5 | $143.1 | $185.4 | $461.1 |
| Restricted cash | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 | 17.5 |
| Accounts receivable, net of allowance for doubtful accounts | 17.3 | 15.2 | 16.2 | 17.6 | 19.3 | 21.1 |
| Other current assets | 26.9 | 20.9 | 22.2 | 24.1 | 26.4 | 28.9 |
| Total current assets | 261.6 | 288.9 | 221.5 | 202.2 | 248.5 | 528.7 |
| Property and equipment, net of accumulated depreciation | 3,949.2 | 3,898.4 | 3,946.0 | 3,970.3 | 3,971.4 | 3,795.8 |
| Undeveloped land | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| Deferred financing costs, net of accumulated amortization | 36.0 | 32.4 | 25.2 | 18.0 | 10.8 | 3.6 |
| Trademarks | 44.0 | 44.0 | 44.0 | 44.0 | 44.0 | 44.0 |
| Other assets | 6.2 | 5.2 | 5.6 | 6.0 | 6.6 | 7.2 |
| Total assets | $4,298.1 | $4,270.1 | $4,243.3 | $4,241.7 | $4,282.5 | $4,380.4 |
| **Liabilities and Members' Equity** | | | | | | |
| Current liabilities | | | | | | |
| Accounts payable and other accrued expenses | $51.3 | $45.2 | $48.1 | $52.1 | $57.1 | $62.7 |
| Accrued real estate taxes | 27.5 | 26.3 | 27.1 | 27.9 | 28.8 | 29.7 |
| Deferred revenue | 11.0 | 11.2 | 11.7 | 12.1 | 12.6 | 13.2 |
| Total current liabilities | 89.8 | 82.8 | 86.9 | 92.2 | 98.6 | 105.5 |
| New Debt Financing | 1,800.0 | 1,790.9 | 1,771.6 | 1,750.9 | 1,728.7 | 1,704.9 |
| New ESA UD Mortgage Facility | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| Other liabilities | 4.9 | 5.0 | 5.2 | 5.4 | 5.6 | 5.8 |
| Total liabilities | $1,899.6 | $1,883.7 | $1,868.7 | $1,853.5 | $1,837.9 | $1,821.3 |
| Members' equity/(deficit) | | | | | | |
| Additional Paid in Capital | 2,398.5 | 2,398.5 | 2,398.5 | 2,398.5 | 2,398.5 | 2,398.5 |
| Retained earnings | - | (12.1) | (23.8) | (10.3) | 46.1 | 160.7 |
| Total members' equity/(deficit) | $2,398.5 | $2,386.4 | $2,374.6 | $2,388.2 | $2,444.6 | $2,559.1 |
| Total liabilities and members' equity/(deficit) | $4,298.1 | $4,270.1 | $4,243.3 | $4,241.7 | $4,282.5 | $4,380.4 |

**THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "PRINCIPAL OPERATING AND FINANCIAL ASSUMPTIONS."**

# NEWCO
## PROJECTED PRO FORMA CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited)
(Dollars in Millions)

(Amounts may not add to totals due to rounding)

| NewCo Projected Pro Forma Consolidated Statement of Operations | | | | |
|---|---|---|---|---|
| | | Fiscal Year Ended December 31, | | |
| | 2H 2010E | 2011E | 2012E | 2013E | 2014E |
| Revenues | | | | | |
| Rooms revenue | $383.6 | $796.9 | $862.5 | $945.7 | $1,037.2 |
| Other (net of expenses) | 0.2 | 0.5 | 0.4 | 0.4 | 0.4 |
| Total Revenues | $383.7 | $797.3 | $863.0 | $946.1 | $1,037.6 |
| | | | | | |
| Operating Expenses, excl. D&A | | | | | |
| Controllable property expenses | (172.9) | (339.4) | (350.3) | (361.6) | (373.3) |
| Non-controllable property expenses | (47.4) | (97.5) | (99.5) | (101.4) | (103.5) |
| Corporate overhead | (39.7) | (83.0) | (85.0) | (87.2) | (89.3) |
| Incremental marketing overhead | (5.5) | (11.0) | (11.0) | (11.0) | (11.0) |
| Total Operating Expenses, excl. D&A | ($265.5) | ($530.9) | ($545.8) | ($561.2) | ($577.1) |
| EBITDA excluding LTL | $118.2 | $266.4 | $317.2 | $384.9 | $460.5 |
| Incremental LTL EBITDA | 3.5 | - | - | - | - |
| EBITDA including LTL | $121.7 | $266.4 | $317.2 | $384.9 | $460.5 |
| | | | | | |
| Depreciation | (68.9) | (150.0) | (176.1) | (202.8) | (223.4) |
| Operating Income/(Loss) | $52.9 | $116.4 | $141.1 | $182.1 | $237.1 |
| | | | | | |
| Interest expense | (66.1) | (130.2) | (129.1) | (127.3) | (125.7) |
| Interest income | 1.1 | 2.0 | 1.5 | 1.6 | 3.2 |
| Net Income/(Loss) | ($12.1) | ($11.7) | $13.5 | $56.4 | $114.6 |

**THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "PRINCIPAL OPERATING AND FINANCIAL ASSUMPTIONS."**

# NEWCO
## PROJECTED PRO FORMA CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)
(Dollars in Millions)

(Amounts may not add to totals due to rounding)

| NewCo Projected Pro Forma Consolidated Statement of Cash Flows | | | | |
|---|---|---|---|---|
| | Fiscal Year Ended December 31, | | | |
| | 2H 2010E | 2011E | 2012E | 2013E | 2014E |

| | 2H 2010E | 2011E | 2012E | 2013E | 2014E |
|---|---|---|---|---|---|
| **Operating Activities** | | | | | |
| Net Income/(Loss) | ($12.1) | ($11.7) | $13.5 | $56.4 | $114.6 |
| Adjustments to reconcile net loss to operating cash | | | | | |
| Depreciation | 68.9 | 150.0 | 176.1 | 202.8 | 223.4 |
| Amortization of deferred financing costs | 3.6 | 7.2 | 7.2 | 7.2 | 7.2 |
| Change in net working capital | 1.1 | 1.8 | 2.1 | 2.3 | 2.5 |
| Net cash provided by (used in) operating activities | $61.4 | $147.3 | $198.9 | $268.8 | $347.7 |
| | | | | | |
| **Investing Activities** | | | | | |
| Capital expenditures | (15.5) | (192.1) | (194.8) | (198.1) | (41.8) |
| IT projects | (2.7) | (5.5) | (5.6) | (5.8) | (6.0) |
| Change in net other non-current assets | 1.1 | (0.1) | (0.2) | (0.4) | (0.4) |
| Net cash provided by (used in) investing activities | ($17.0) | ($197.7) | ($200.6) | ($204.3) | ($48.2) |
| | | | | | |
| **Financing Activities** | | | | | |
| Principal payments on loans | (9.1) | (19.4) | (20.7) | (22.2) | (23.8) |
| Net cash used in financing activities | ($9.1) | ($19.4) | ($20.7) | ($22.2) | ($23.8) |
| | | | | | |
| Net increase/(decrease) in cash and cash equivalents | $35.3 | ($69.8) | ($22.4) | $42.3 | $275.7 |
| | | | | | |
| Beginning cash and cash equivalents | 200.0 | 235.3 | 165.5 | 143.1 | 185.4 |
| Ending cash and equivalents | $235.3 | $165.5 | $143.1 | $185.4 | $461.1 |

**THE PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "PRINCIPAL OPERATING AND FINANCIAL ASSUMPTIONS."**

**<u>Exhibit D</u>**

**Liquidation Analysis**

**EXHIBIT D**

**Liquidation Analysis**

Pursuant to section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test", Holders of Allowed Claims and Allowed Equity Interests must either (a) accept the Plan, or (b) receive or retain under the Plan property of a value, as of the Plan's assumed Effective Date, that is not less than the value such non-accepting Holders would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan meets the "best interest of creditors" test as set forth in section 1129s(a)(7) of the Bankruptcy Code. All capitalized terms not defined in this Liquidation Analysis have the meanings ascribed to them in the Plan.

The Debtors believe that the holders of Allowed Claims in each impaired class will receive at least as much under the Plan as they would if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs that would be realized if the Debtors were to be liquidated in accordance with chapter 7 of the Bankruptcy Code.

**UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND ITS ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS, THEIR MANAGEMENT AND THEIR ADVISORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.**

The Liquidation Analysis was prepared by management of the Debtors, with the assistance of its professionals. Unless otherwise stated, the Liquidation Analysis is based on the consolidated balance sheet for the Debtors contemplated under the Plan (excluding ESA UD), and the ESA UD balance sheet as of December 31, 2009. ESA UD is considered separately within this analysis as the collateral of the ESA UD mortgage loan, the hotel properties in Findlay and Wilkes-Barre, PA, is separate and distinct from the collateral for the Mortgage Facility. The liquidation analysis is predicated on the assumption that the Debtors would commence a chapter 7 liquidation on June 30, 2010.

It is also assumed that the liquidation of the Debtors would commence under the direction of a Court-appointed trustee and would continue for a period of eight to eleven months, during which time all of the Debtors' major assets would be sold or conveyed to their respective lien holders, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors.

Management believes the hotel assets of the Debtors have greater value as a going concern than in an orderly wind-down, and that pursuit of a distressed sale of the entire portfolio or multiple sales of hotels in regional clusters on a going-concern basis rather than an orderly wind-down would yield the best recovery for creditors in a chapter 7 liquidation. Management and its professionals estimate the distressed sale of those businesses could be completed in six to nine months, plus a two month period to wind-down the estates and make distributions. Thus, the Liquidation Analysis assumes a distressed sale on a going-concern basis for these assets. Net proceeds from the sale of these businesses would be available for distribution to creditors of the Debtors. There can be no assurances that the actual value realized in a sale of these operations would yield the results as assumed in the Liquidation Analysis.

The Liquidation Analysis assumes that liquidation proceeds would be distributed in accordance with Bankruptcy Code section 726. If the Debtors were liquidated pursuant to chapter 7 proceedings, the value available to creditors would be reduced by the costs of the liquidation, which include the fees and expenses of the trustee appointed to manage the liquidation, the fees and expenses of other professionals retained by the trustee to assist with the liquidation, costs to wind down the Estates and a carveout for chapter 11 professional fees (per the final court approved cash collateral order).

The Liquidation Analysis necessarily contains an estimate of the amount of Claims that ultimately will become Allowed Claims. Estimates for various classes of Claims are based solely upon the Debtors' review of their books and records.

Liquidation would likely prompt certain other events to occur, including the rejection of remaining executory contracts and unexpired leases not assumed by the purchaser of the going-concern business. Such events would likely create a larger number of unsecured creditors and would subject the chapter 7 estates to additional damage claims for the rejection of those contracts under the Bankruptcy Code. Such claims would also increase the aggregate amount of unsecured claims against the Debtors, perhaps materially, and would dilute any potential recoveries to holders of other unsecured claims. No attempt has been made to estimate additional unsecured claims that may result from such events.

The Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing those actions.

# Estimated Proceeds Available for Distribution

**($ millions)**

| HYPOTHETICAL LIQUIDATION ANALYSIS - NON ESA UD DEBTORS | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Estimated Claims | | Estimated Recovery | | Estimated Recovery % | |
| | Note | Low | High | Low | High | Low | High |
| **Proceeds Available for Distribution:** | A | | | | | | |
| Hotel Portfolio | | | | $1,996.2 | $2,495.3 | | |
| Cash | | | | 64.8 | 64.8 | | |
| Cash Generated during Chapter 7 Proceeding | | | | 103.4 | 145.7 | | |
| **Total Proceeds Available for Distribution** | | | | **$2,164.4** | **$2,705.7** | | |
| **Less Chapter 7 Fees:** | | | | | | | |
| Trustee Fees | B | $39.9 | $49.9 | $39.9 | $49.9 | 100% | 100% |
| Transaction Fees | C | 39.9 | 49.9 | 39.9 | 49.9 | 100% | 100% |
| Chapter 7 Estate Professional Fees | B | 6.0 | 8.2 | 6.0 | 8.2 | 100% | 100% |
| Accrued Professional Fees and Other Items | B | 8.5 | 8.5 | 8.5 | 8.5 | 100% | 100% |
| Estimated Wind-down costs | B | 7.0 | 7.0 | 7.0 | 7.0 | 100% | 100% |
| **Net Proceeds Available for Distribution to Stakeholders** | | | | **$2,063.1** | **$2,582.2** | | |

| HYPOTHETICAL LIQUIDATION ANALYSIS - ESA UD DEBTORS | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Estimated Claims | | Estimated Recovery | | Estimated Recovery % | |
| | Note | Low | High | Low | High | Low | High |
| **Proceeds Available for Distribution:** | A | | | | | | |
| Hotel Portfolio | | | | $3.8 | $4.7 | | |
| Cash | | | | 0.2 | 0.2 | | |
| Cash Generated during Chapter 7 Proceeding | | | | 0.2 | 0.3 | | |
| **Total Proceeds Available for Distribution** | | | | **$4.2** | **$5.2** | | |
| **Less Chapter 7 Fees:** | | | | | | | |
| Trustee Fees | B | $0.1 | $0.1 | $0.1 | $0.1 | 100% | 100% |
| Transaction Fees | C | 0.1 | 0.1 | 0.1 | 0.1 | 100% | 100% |
| Chapter 7 Estate Professional Fees | B | 0.0 | 0.0 | 0.0 | 0.0 | 100% | 100% |
| Accrued Professional Fees and Other Items | B | 0.0 | 0.0 | 0.0 | 0.0 | 100% | 100% |
| Estimated Wind-down costs | B | 0.0 | 0.0 | 0.0 | 0.0 | 100% | 100% |
| **Net Proceeds Available for Distribution to Stakeholders** | | | | **$4.0** | **$5.0** | | |

# Estimated Distribution of Proceeds

**($ millions)**

| HYPOTHETICAL LIQUIDATION ANALYSIS - NON ESA UD DEBTORS | | | | | |
|---|---|---|---|---|---|

| | | | Low | High | | |
|---|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution to Stakeholders** | | | **$2,063.1** | **$2,582.2** | | |

| | Note | Estimated Claims | Estimated Recovery Low | Estimated Recovery High | Estimated Recovery % Low | Estimated Recovery % High |
|---|---|---|---|---|---|---|
| **Proceeds Available for Distribution to Secured Creditors** | | | $2,063.1 | $2,582.2 | | |
| **Less CMBS Mortgage Claim:** | D | | | | | |
| CMBS Mortgage Claim | | $3,886.3 | $2,063.1 | $2,582.2 | 53% | 66% |
| **Total CMBS Mortgage Claim** | | **$3,886.3** | **$2,063.1** | **$2,582.2** | | |
| **Proceeds Available for Distribution to Administrative and Priority Claims** | | | $0.0 | $0.0 | | |
| **Less Administrative & Priority Claims:** | E | | | | | |
| Administrative & Priority Claims | | $19.9 | $0.0 | $0.0 | | |
| **Total Administrative & Priority Claims** | | **$19.9** | **$0.0** | **$0.0** | 0% | 0% |
| **Proceeds Available for Distribution to Mezzanine Facilities Claims** | | | $0.0 | $0.0 | | |
| **Less Mezzanine Facilities Claims:** | F | | | | | |
| Mezzanine Facilities Claims | | $3,295.5 | $0.0 | $0.0 | | |
| **Total Mezzanine Facilities Claims** | | **$3,295.5** | **$0.0** | **$0.0** | 0% | 0% |
| **Proceeds Available for Distribution to Unsecured Claims** | | | $0.0 | $0.0 | | |
| **Less Unsecured Claims:** | G | | | | | |
| Unsecured Claims | | $30.8 | $0.0 | $0.0 | | |
| **Total Unsecured Claims** | | **$30.8** | **$0.0** | **$0.0** | 0% | 0% |
| **Proceeds Available for Distribution to Equity Interests** | | | $0.0 | $0.0 | | |

| HYPOTHETICAL LIQUIDATION ANALYSIS - ESA UD DEBTORS | | | | | |
|---|---|---|---|---|---|

| | | | Low | High | | |
|---|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution to Stakeholders** | | | **$4.0** | **$5.0** | | |

| | Note | Estimated Claims | Estimated Recovery Low | Estimated Recovery High | Estimated Recovery % Low | Estimated Recovery % High |
|---|---|---|---|---|---|---|
| **Proceeds Available for Distribution to Secured Creditors** | | | $4.0 | $5.0 | | |
| **Less ESA UD Mortgage Claim:** | D | | | | | |
| ESA UD Mortgage Claim | | $8.2 | $4.0 | $5.0 | 49% | 61% |
| **Total ESA UD Mortgage Claim** | | **$8.2** | **$4.0** | **$5.0** | | |
| **Proceeds Available for Distribution to Administrative and Priority Claims** | | | $0.0 | $0.0 | | |
| **Less Administrative & Priority Claims:** | E | | | | | |
| Administrative & Priority Claims | | $0.0 | $0.0 | $0.0 | | |
| **Total Administrative & Priority Claims** | | **$0.0** | **$0.0** | **$0.0** | NA | NA |
| **Proceeds Available for Distribution to Unsecured Claims** | | | $0.0 | $0.0 | | |
| **Less Unsecured Claims:** | G | | | | | |
| Unsecured Claims | | $0.0 | $0.0 | $0.0 | | |
| **Total Unsecured Claims** | | **$0.0** | **$0.0** | **$0.0** | NA | NA |
| **Proceeds Available for Distribution to Equity Interests** | | | **$0** | **$0** | | |

# NOTES TO LIQUIDATION ANALYSIS

*Note A – Proceeds Available for Distribution*

To maximize total liquidation value, the Liquidation Analysis assumes that the Debtors' hotel properties are sold as a going concern that would be effectuated through a distressed sale of the entire portfolio of hotels or through a series of sales of clusters of hotels, and that all post petition liabilities of the various hotels existing at the time are assumed by the respective purchasers. Given that the hotels would be sold pursuant to a forced sale for cash, the Debtors believe that an appropriate range of value for the hotel properties is approximately $2.0 billion in the low recovery scenario and $2.5 billion in the high recovery scenario, implying a 49% and 36%, respectively, discount to the amount of the Investment (as defined in the Plan). The ESA UD properties are estimated to have a value of $3.8 million and $4.7 million in the low recovery and high recovery case, respectively, which is calculated by applying a "value per key" implied by the discount of the Investment to the respective properties.

The Debtors are estimated to have cash on hand of $64.8 million for the non-ESA UD properties and $0.2 million for the ESA UD properties as of June 30, 2010, reflecting the Debtors' most recent estimates. Additionally, the Debtors are estimated to generate approximately $104 million to $146 million of cash, depending on the amount of time that the sale process requires.

For purposes of this Liquidation Analysis, it is assumed that the purchaser(s) of the various hotel properties will continue to use HVM as manager, honoring all pre-petition contracts by and between the debtors and HVM. Rejection of these contracts could significantly disrupt the operations of the hotel properties and result in a detrimental loss of value. HVM's familiarity with specific hotel properties and the various geographic markets in which they compete, and commanding knowledge of extended stay industry dynamics and trends is instrumental to the operations of the hotel properties. Additionally, HVM's support of financial, accounting, operating, booking and various other IT functions is necessary in order to continue seamless operations. Even if Debtor hotel assets were acquired by a hotel operator with a management team and the required infrastructure to operate these newly acquired assets, a transition period would be necessary in order to ensure integration of operations.

Rejection of these contracts could create a much larger number of unsecured creditors and could subject the chapter 7 estates to considerable additional claims for damages for breaches of those contracts or for the rejection of those contracts under the Bankruptcy Code. Such claims could also materially increase the amount of administrative, priority or general unsecured claims against the Debtors.

The estimated net proceeds available for distribution to the Debtors falls within a range from approximately $2.1 billion to $2.6 billion, with a mid-point estimate of $2.3 billion, with these estimated net proceeds from the sales available for distribution according to the absolute priority rule, pursuant to which no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity interest holder would receive any distribution until all creditors are paid in full.

For purposes of this Liquidation Analysis, all chapter 7 fees and expenses are allocated to the non-ESA UD and ESA UD properties on a pro-rata basis based on the value of the total proceeds available for distribution.

<u>*Note B – Trustee Fees & Wind Down Costs of Chapter 7 Estates*</u>

Compensation for the chapter 7 trustee will be limited to fee guidelines in Section 326(a) of the Bankruptcy Code. As the Debtors' principal assets, its hotel properties, will be sold as a going concern subject to a transaction fee, for purposes of this Liquidation Analysis, it is assumed that the trustee fees will be 2.0% of the gross proceeds from the sale of the hotel properties, or approximately $40 million and $50 million, in the low recovery and high recovery scenarios, respectively. It is also assumed that the buyer(s) will assume post-petition liabilities of the hotel properties existing at the time and the cost to operate the business during the sale process is assumed to be covered by the cash flows generated from hotel room receipts.

Once the sale is complete, certain corporate and administrative functions would be required to oversee the distribution of proceeds, and to maintain and close the accounting records for the estates, among other things. These wind-down costs are estimated to be $7 million in either scenario, which is based on a reduced run rate of corporate general and administrative expenses at HVM, the manager of the Debtors' business.

Chapter 7 professional fees include legal, financial and accounting fees expected to be incurred during the liquidation period and are estimated to be $750,000 per month throughout the case, for a total of $6 million during the eight month period of the low recovery scenario and a total of $8.25 million during the eleven month period of the high recovery scenario. In addition, the recovery available to creditors has been further reduced by $8.5 million for accrued chapter 11 professional fees and other expenses, the maximum amount allowable under the carve-out for such items in the Debtors' "Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay".

<u>*Note C – Transaction Fees*</u>

Transaction fees associated with the distressed sales of the Debtors' assets are assumed to be 2.0% of the gross proceeds from the sale of the hotel properties, or approximately $40 million and $50 million, in the low recovery and high recovery scenarios, respectively.

<u>*Note D – Secured Claims*</u>

Secured claims of the Non ESA UD Debtors consist entirely of the $4.1 billion Mortgage Debt. This amount has been reduced by approximately $214 million as the actual and expected adequate protection payments made during the course of the chapter 11 case are assumed to be re-characterized as principal payments upon conversion of the case to chapter 7, which will reduce the claim amount.

Secured claims of the ESA UD Debtors consist entirely of the $8.5 million ESA UD Mortgage Claim. This amount has been reduced by approximately $293,000 as the actual and expected

adequate protection payments made during the course of the chapter 11 case are assumed to be re-characterized as principal payments upon conversion of the case to chapter 7, which will reduce the claim amount.

## *Note E – Administrative and Priority Claims*

These claims include chapter 11 professionals fees in excess of the carveout, and post-petition corporate overhead and administrative related accrued claims estimates that would not be conveyed to the purchasers of the various hotel properties as part of a going concern sale. Administrative and priority claims are entitled to recovery before unsecured claims.

## *Note F – Mezzanine Facilities Claims*

Mezzanine Facilities Claims of the Debtors consist entirely of the $3.3 billion Mezzanine Facilities.

## *Note G – Unsecured Claims*

These claims reflect the estimated amounts of pre-petition liabilities and include notes payable to affiliates. Additionally, for purposes of this analysis, the balance sheet has been adjusted to remove a $12 million deferred income tax liability that is not subject to settlement in cash or any other consideration with any tax assessing authority.

**<u>Exhibit E</u>**

**Debtors' Prepetition Organizational Chart**



LEGEND
Operating Lease
Management Agreement
License Agreement
EXTENDEDSTAYHOTELS
Lightstone Holdings LLC
BRE/ESH Holdings LLC
Atmar Associates
Princeton ESH LLC
DL-DW Holdings LLC
Homestead Village L.L.C.
PGRT ESH Inc.
Polar Extended Stay (USA) L.P.
Arbor ESH II LLC
Gilda One LLC
Ron Invest LLC.
BHAC Capital IV, L.L.C.
90 Non-affiliated Shareholders
HVM Manager L.L.C.
Manager
HVM L.L.C.
Extended Stay Hotels L.L.C.
Extended Stay Inc.
HVM Canada Hotel Management ULC (Alberta)
ESA International, Inc.
ESA West, Inc.
ESA Business Trust
ESA Spartanburg, LLC (SC LC)
ESA Canada Operating Lessee Inc. [Ontario Corp.]
ES-NAV LLC
HVI (2) LLC
ESH/Homestead Mezz 10 L.L.C.
ESH/Homestead Mezz 9 L.L.C.
ESH/Homestead Mezz 8 L.L.C.
ESH/Homestead Mezz 7 L.L.C.
ESH/Homestead Mezz 6 L.L.C.
ESH/Homestead Mezz 5 L.L.C.
ESH/Homestead Mezz 4 L.L.C.
ESH/Homestead Mezz 3 L.L.C.
ESH/Homestead Mezz 2 L.L.C.
ESH/Homestead Mezz L.L.C.
ESA 2007 Operating Lessee Inc.
ESA UD Properties L.L.C.
ESA Management L.L.C.
ESA P Portfolio Holdings L.L.C.
ESA 2005 Holdings L.L.C.
ESA 2005-1031 L.L.C.
ESA MEZZ 10 L.L.C.
ESA Mezz 9 L.L.C.
ESA Mezz 8 L.L.C.
ESA Mezz 7 L.L.C.
ESA Mezz 6 L.L.C.
ESA Mezz 5 L.L.C.
ESA Mezz 4 L.L.C.
ESA Mezz 3 L.L.C.
ESA Mezz 2 L.L.C.
ESA Mezz L.L.C.
ESA P Mezz 10 L.L.C.
ESA P Mezz 9 L.L.C.
ESA P Mezz 8 L.L.C.
ESA P Mezz 7 L.L.C.
ESA P Mezz 6 L.L.C.
ESA P Mezz 5 L.L.C.
ESA P Mezz 4 L.L.C.
ESA P Mezz 3 L.L.C.
ESA P Mezz 2 L.L.C.
ESA P Mezz L.L.C.
ESH/MSTX GP L.L.C..
ESH/HV Properties L.L.C.
ESH/TXGP L.L.C.
ESH/Homestead Portfolio L.L.C.
ESH/TN Member Inc.
1% GP
1% GP
1%
ESH/MSTX Property L.P.
ESH/TX Properties L.P.
ESH/TN Properties L.L.C.
ESA Acquisition Properties L.L.C.
ESA Alaska L.L.C.
ESA MN Properties L.L.C.
ESA TXGP L.L.C.
ESA FL Properties L.L.C.
ESA MD Beneficiary L.L.C.
ESA PA Properties L.L.C.
ESA Properties L.L.C.
50%
50%
ESA 2005 Operating Lessee Inc.
1% GP
ESA TX Properties L.P.
ESA MD Properties Business Trust
ESA MD Borrower L.L.C.
ESA Operating Lessee Inc.
ESA P Portfolio PA Properties L.L.C.
ESA P Portfolio L.L.C.
ESA P Portfolio TXNC GP L.L.C.
1% GP
ESA P Portfolio TXNC Properties L.P.
ESA P Portfolio MD Beneficiary L.L.C.
ESA P Portfolio MD Trust
ESA P Portfolio MD Borrower L.L.C.
ESA P Portfolio Operating Lessee Inc..
ESA 2005-San Jose L.L.C.
ESA 2005-Waltham L.L.C.
ESA 2005 Portfolio L.L.C.
ESA Canada Trustee Inc.
ESA Canada Beneficiary Inc.
ESA Canada Properties Trust
ESA Canada Properties Borrower L.L.C.

## <u>Exhibit F</u>

## Historical Financial Information

**EXHIBIT F**

**NewCo**
*Unaudited Historical Financials*

  All historical financial information incorporated herein is unaudited and reflects only the Debtor and non-Debtor entities that are included in the Plan of Reorganization and will comprise NewCo. These entities include HVM, which is consolidated from a financial point of view, given that HVM conducts substantially all of its business with the Debtors and NewCo's ownership of the managing member of HVM.  For additional commentary, the historical financial information should be read in conjunction with the audited and unaudited historical financial statements of DL-DW and Homestead.  However, since the DL-DW and Homestead financial statements include entities not included in the Plan, the historical financial information incorporated herein and the DL-DW and Homestead financial statements do not reconcile.

# NEWCO
## UNAUDITED HISTORICAL CONSOLIDATED BALANCE SHEETS
(Unaudited)
(Dollars in Millions)

(Amounts may not add to totals due to rounding)

| NewCo Historical Consolidated Balance Sheet | | |
|---|---|---|
| | December 31, | |
| | 2008 | 2009 |
| **Assets** | | |
| Current Assets | | |
| Cash and cash equivalents, unrestricted | $20.3 | $78.0 |
| Restricted cash | 57.9 | - |
| Accounts receivable, net of allowance for doubtful accounts | 19.4 | 12.5 |
| Other current assets[a] | 27.1 | 28.6 |
| Due from HVI(2) LLC, HFI Acquisition Company LLC and ES-NAV LLC | 0.5 | 0.3 |
| Due from TLG Hotel Acquisitions LLC | - | 0.0 |
| Due from DL-DW Holdings LLC, net of allowance of $0 and $19.6, respectively | 29.4 | - |
| Total current assets | 154.5 | 119.4 |
| | | |
| Property and equipment, net of accumulated depreciation | 6,706.4 | 6,344.9 |
| Undeveloped land | 2.0 | 1.1 |
| Deferred financing costs, net of accumulated amortization | 35.7 | - |
| Trademarks | 15.0 | 13.2 |
| License of trademarks, net of accumulated amortization | 10.4 | 8.6 |
| Under market trademark licenses, net of accumulated amortization | 14.4 | 12.0 |
| Other intangible assets, net of accumulated amortization | 18.1 | 16.9 |
| Other assets | 13.0 | 7.7 |
| | | |
| Total assets | $6,969.5 | $6,523.8 |
| | | |
| **Liabilities and Shareholders' Equity** | | |
| Current liabilities | | |
| Accounts payable and other accrued expenses | $58.7 | $56.8 |
| Accrued real estate taxes | 23.6 | 25.8 |
| Accrued interest payable | 17.1 | 19.4 |
| Accrued professional fees | 0.9 | 9.5 |
| Deferred revenue | 3.7 | 9.0 |
| Advance payable to BHAC Capital IV L.L.C., including accrued interest | 7.9 | 7.9 |
| Notes payable to Extended Stay, Inc. | - | 13.7 |
| Due to BHAC Capital IV L.L.C. | 1.4 | 1.3 |
| Due to TLG Hotel Acquisitions LLC | 0.7 | - |
| Total current liabilities | 114.0 | 143.4 |
| | | |
| Mortgages payable | 4,108.3 | 4,108.3 |
| Mezzanine loans | 3,295.5 | 3,295.5 |
| Notes payable to Extended Stay, Inc. | 14.7 | - |
| Deferred income tax liability - noncurrent | - | 11.7 |
| Other liabilities | 5.5 | 5.6 |
| | | |
| Total liabilities | $7,537.9 | $7,564.5 |
| | | |
| Members' equity/(deficit) | | |
| Additional Paid in Capital | 596.1 | 596.1 |
| Retained earnings | (1,164.6) | (1,636.8) |
| Total members' equity/(deficit) | ($568.4) | ($1,040.7) |
| | | |
| Total liabilities and members' equity/(deficit) | $6,969.5 | $6,523.8 |

**THE UNAUDITED HISTORICAL FINANCIALS SHOULD BE READ IN CONJUNCTION WITH THE UNAUDITED AND AUDITED HISTORICAL FINANCIAL STATEMENTS OF DL-DW AND HOMESTEAD. THE UNAUDITED HISTORICAL FINANCIALS PRESENTED HEREIN REPRESENT HISTORICAL PERSPECTIVE OF THE DEBTOR AND NON-DEBTOR ENTITIES THAT ARE INCLUDED IN THE PLAN OF REORGANIZATION. AS SUCH, THE UNAUDITED HISTORICAL FINANCIALS DO NOT REFLECT THE HISTORICAL FINANCIALS OF DL-DW NOR HOMESTEAD.**

# NEWCO
## UNAUDITED HISTORICAL CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited)
(Dollars in Millions)

(Amounts may not add to totals due to rounding)

| NewCo Historical Consolidated Statement of Operations | | |
|---|---|---|
| | Fiscal Year Ended December 31, | |
| | 2008 | 2009 |
| **Revenues** | | |
| Rooms revenue, excluding LTL | $983.7 | $775.0 |
| Other (net of expenses) | 17.9 | 16.7 |
| Total Revenues, excluding LTL | $1,001.6 | $791.7 |
| | | |
| Operating Expenses, excl. depreciation & amortization | | |
| Property operating expenses, excluding LTL | (444.2) | (424.2) |
| Corporate overhead[b] | (83.5) | (75.0) |
| Total Operating Expenses, excl. depreciation, amortization & LTL | ($527.7) | ($499.2) |
| Adjusted EBITDA excluding LTL | $473.9 | $292.5 |
| Incremental LTL EBITDA[c] | - | 14.5 |
| Adjusted EBITDA including LTL | $473.9 | $307.0 |
| | | |
| Loss on disposition of property & equipment | (1.8) | (0.5) |
| Loss on lease termination | - | (10.0) |
| Allowance for receivable from DL-DW Holdings LLC | - | (19.6) |
| Impairment - trademark and trademark licenses | (6.9) | (4.5) |
| Impairment - long lived assets | (20.6) | (21.8) |
| Impairment - goodwill | (346.3) | - |
| Impairment - corporate customer relationships | (120.6) | - |
| Depreciation & amortization | (387.8) | (375.4) |
| Operating Income/(Loss) | ($410.2) | ($124.7) |
| | | |
| Interest expense | (469.4) | (283.4) |
| Loss on investments in debt securities and interest rate caps | (0.1) | (0.5) |
| Interest income | 1.5 | 0.3 |
| Tax expense - current | - | (0.7) |
| Tax expense - deferred | - | (11.7) |
| Reorganization Items | | |
| Professional fees - pre petition | (2.7) | (7.2) |
| Professional fees - post petition | - | (18.4) |
| Professional fees - post petition - year end GAAP accrual estimate | - | (2.9) |
| U.S. Trustee quarterly fees | - | (0.3) |
| Write off of deferred financing costs | - | (19.0) |
| Total reorganization items | ($2.7) | ($47.8) |
| Net Income/(Loss) | ($880.9) | ($468.5) |

**THE UNAUDITED HISTORICAL FINANCIALS SHOULD BE READ IN CONJUNCTION WITH THE UNAUDITED AND AUDITED HISTORICAL FINANCIAL STATEMENTS OF DL-DW AND HOMESTEAD.  THE UNAUDITED HISTORICAL FINANCIALS PRESENTED HEREIN REPRESENT HISTORICAL PERSPECTIVE OF THE DEBTOR AND NON-DEBTOR ENTITIES THAT ARE INCLUDED IN THE PLAN OF REORGANIZATION.  AS SUCH, THE UNAUDITED HISTORICAL FINANCIALS DO NOT REFLECT THE HISTORICAL FINANCIALS OF DL-DW NOR HOMESTEAD.**

# NEWCO
## UNAUDITED HISTORICAL CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)
(Dollars in Millions)

(Amounts may not add to totals due to rounding)

| NewCo Historical Consolidated Statement of Cash Flows | | |
| --- | --- | --- |
| | Fiscal Year Ended December 31, | |
| | 2008 | 2009 |
| **Operating Activities** | | |
| Net Income/(Loss) | ($880.9) | ($468.5) |
| Adjusments to reconcile net loss to operating cash | | |
| Depreciation | 387.8 | 375.4 |
| Impairment of long lived assets | 20.6 | 21.8 |
| Impairment of trademark and trademark licenses | 6.9 | 4.5 |
| Impairment of intangible assets | 120.6 | - |
| Impairment of goodwill | 346.3 | - |
| Amortization of deferred financing costs | 37.3 | 16.7 |
| Reorganization expense - write off of deferred financing costs | - | 19.0 |
| Loss on interest rate caps | 0.1 | 0.5 |
| Loss on disposals of property and equipment | 1.8 | 0.5 |
| Loss on lease termination | - | 10.0 |
| Allowance for receivable from DL-DW Holdings LLC | - | 19.6 |
| Change in assets and liabilities | 17.0 | 41.9 |
| Net cash provided by (used in) operating activities | $57.6 | $41.3 |
| **Investing Activities** | | |
| Capital expenditures | (57.6) | (32.6) |
| Increase/(decrease) in restricted and other cash | 27.6 | (14.8) |
| Change in net other non-current assets | 1.8 | (4.7) |
| Net cash provided by (used in) investing activities | ($28.1) | ($52.1) |
| **Financing Activities** | | |
| Purchase of interest rate cap agreements | - | (0.5) |
| Distributions to parent entities | (24.1) | (1.8) |
| Distributions - HVM L.L.C. | (4.3) | (1.9) |
| Proceeds from loans | 8.5 | - |
| Principal payments on loans | (0.2) | - |
| Financing costs | (0.3) | - |
| Net cash used in financing activities | ($20.3) | ($4.2) |
| Net increase/(decrease) in cash and cash equivalents | $9.2 | ($15.0) |
| Beginning cash and cash equivalents | 11.2 | 20.3 |
| Ending cash and equivalents | $20.3 | $5.4 |

**THE UNAUDITED HISTORICAL FINANCIALS SHOULD BE READ IN CONJUNCTION WITH THE UNAUDITED AND AUDITED HISTORICAL FINANCIAL STATEMENTS OF DL-DW AND HOMESTEAD. THE UNAUDITED HISTORICAL FINANCIALS PRESENTED HEREIN REPRESENT HISTORICAL PERSPECTIVE OF THE DEBTOR AND NON-DEBTOR ENTITIES THAT ARE INCLUDED IN THE PLAN OF REORGANIZATION. AS SUCH, THE UNAUDITED HISTORICAL FINANCIALS DO NOT REFLECT THE HISTORICAL FINANCIALS OF DL-DW NOR HOMESTEAD.**

**NOTES TO NEWCO**
**UNAUDITED HISTORICAL FINANCIALS**

(a)     2008 excludes $19K of prepaid D&O insurance for Extended Stay Inc.  2009 excludes $413K of prepaid D&O insurance for Extended Stay Inc.

(b)     2008 excludes $217K of D&O insurance expense for Extended Stay Inc.  2009 excludes $4.6MM of D&O insurance expense for Extended Stay Inc.

(c)     In order to bolster demand during the current economic downturn, the Company has pursued a long term lodging ("LTL") strategy.  This strategy focuses on guest stays longer than 60 days. This strategy significantly altered the Company's length of stay mix in the latter portion of 2009 and is expected to continue through 3Q 2010, as management winds down the program.  As of December 2009, LTL guest comprised approximately 27% of available rooms.  The Company has calculated an estimate of the incremental EBITDA attributable to this program, based on certain assumptions and given the variance in mix of stay realized versus the imbedded assumption used in the Company's business plan.  As further detailed in NewCo Financial Projections (Exhibit C), NewCo intends to transition back to the historical customer model.

**<u>Exhibit G</u>**


**Investment Agreement**

INVESTMENT AGREEMENT

by and among
Certain Affiliates and subsidiaries of EXTENDED STAY INC. listed on Schedule 1
and
HVM MANAGER L.L.C.
and
HVM L.L.C.
and
CP ESH INVESTORS, LLC
as Investor.

Dated as of June 4, 2010

# TABLE OF CONTENTS

Page

Section 1.    Investment ................................................................................................... 2
Section 2.    Issuance of the NewCo Common Interests ............................................ 3
Section 3.    Fees and Expenses ....................................................................................... 3
Section 4.    Representations and Warranties of the Debtors, HVM Manager and HVM .......... 4
Section 5.    Representations and Warranties of the Investor ..................................... 21
Section 6.    Covenants ..................................................................................................... 23
Section 7.    Intentionally Omitted ................................................................................ 29
Section 8.    Intentionally Omitted ................................................................................ 29
Section 9.    NewCo Management Incentive Plan ......................................................... 29
Section 10.   Public Statements ....................................................................................... 30
Section 11.   Conditions to Closing ................................................................................ 30
Section 12.   Closing ......................................................................................................... 35
Section 13.   Termination .................................................................................................. 36
Section 14.   Indemnification ........................................................................................... 38
Section 15.   No Survival .................................................................................................. 39
Section 16.   Notices .......................................................................................................... 39
Section 17.   Assignment .................................................................................................. 41
Section 18.   Legends ........................................................................................................ 41
Section 19.   Entire Agreement ........................................................................................ 42
Section 20.   Governing Law, Venue ............................................................................... 42
Section 21.   Waivers and Amendments ......................................................................... 42
Section 22.   Miscellaneous .............................................................................................. 43
Section 23.   Definitions .................................................................................................... 44

## Index of Defined Terms

| Term | Section | Page |
|---|---|---|
| Affiliate | 23 | 44 |
| Agreement | Introduction | 1 |
| Alternate Transaction | 23 | 44 |
| Auction | Recitals | 1 |
| Bankruptcy Code | Recitals | 1 |
| Bankruptcy Court | Recitals | 1 |
| Bankruptcy Rules | 4.1(c)(1) | 5 |
| BHAC | 23 | 44 |
| BHAC Intellectual Property | 4.1(o) | 12 |
| Bidding Procedures | Recitals | 1 |
| Business Assets | 4.1(q) | 13 |
| Business Day | 23 | 44 |
| Certificates | 1.2 | 2 |
| Change in Control Agreements | 4.1(s)(9) | 19 |
| Change in Control Letter | 4.1(s)(9) | 19 |
| Change of Recommendation | 23 | 44 |
| Chapter 11 Cases | Recitals | 1 |
| Closing | 3.3 | 4 |
| Commitment | Recitals | 1 |
| Company | 1.1 | 2 |
| Company Intellectual Property | 4.1(n) | 11 |
| Company Plans | 4.1(s)(1) | 16 |
| Confirmation Order | 2.3(b) | 3 |
| Debt Financing | 1.2 | 2 |
| Debtors | Introduction | 1 |
| DeLapp Employment Agreement | 4.1(s)(9) | 19 |
| Deposit | Recitals | 1 |
| Disclosure Schedules | 23 | 45 |
| Disclosure Statement | 4.1(h) | 8 |
| Disclosure Statement Approval and Solicitation Motion | 6.2 | 24 |
| Disclosure Statement Approval and Solicitation Order | 6.2 | 24 |
| Effective Date | Recitals | 1 |
| Environmental Laws | 4.1(r)(9) | 15 |
| ERISA | 4.1(s)(1) | 16 |
| ERISA Affiliate | 4.1(s)(2) | 16 |
| ESA | Introduction | 1 |
| Escrow Agreement | Recitals | 1 |
| Expenses | 3.1 | 4 |
| Facilities | 4.1(r)(9) | 15 |
| Financial Statements | 23 | 45 |
| Financing Commitment | Recitals | 1 |
| FIRPTA | 23 | 45 |
| Foreign Person Debtor | 11.1(x) | 35 |

| Term | Section | Page |
|------|---------|------|
| Former ESH REIT | 4.1(x) | 20 |
| Hazardous Substances | 4.1(r)(9) | 15 |
| HSR Act | 23 | 45 |
| HVM | Introduction | 1 |
| HVM Financial Statements | 23 | 45 |
| HVM Incentive Plan | 4.1(s)(9) | 19 |
| HVM Manager | Introduction | 1 |
| Indemnified Person | 14.1 | 38 |
| Indemnifying Party | 14.1 | 38 |
| Intellectual Property | 23 | 45 |
| Investment | 1.1 | 2 |
| Investment Consideration | 1.2 | 2 |
| Investor | Introduction | 1 |
| Investor Payment | 1.2 | 2 |
| Lenders | Recitals | 1 |
| Liability | 23 | 45 |
| Material Adverse Change | 23 | 45 |
| Material Contract | 23 | 45 |
| Maximum Expense Reimbursement | 3.1 | 4 |
| Monthly Financial Statements | 6.10 | 28 |
| Multiemployer Plan | 4.1(s)(2) | 16 |
| New Employment Agreements | 9.1 | 29 |
| NewCo | 1.1 | 2 |
| NewCo Common Interests | 1.1 | 2 |
| NewCo Management Incentive Plan | 9.2 | 29 |
| NewCo Manager | 23 | 46 |
| Owned Real Property | 4.1(q) | 13 |
| PCBs | 4.1(r)(9) | 15 |
| Person | 23 | 46 |
| Plan | Recitals | 1 |
| Plan Documents | 11.1(d) | 31 |
| Proceedings | 14.1 | 38 |
| Real Property Leases | 4.1(q) | 13 |
| Reserve | 1.3 | 3 |
| Revenue Report | 23 | 46 |
| Securities Act | 5.1(g) | 21 |
| Single-Employer Plan | 4.1(s)(2) | 16 |
| Sponsor(s) | Recitals | 1 |
| Subsidiary | 23 | 46 |
| Tax Code | 4.1(s)(2) | 16 |
| Transaction Agreements | 4.1(c)(1) | 5 |
| TRS | 9.1 | 29 |
| Windows Litigation | 4.1(l) | 10 |

This INVESTMENT AGREEMENT (this "<u>Agreement</u>"), dated as of June 4, 2010, is by and among certain Affiliates and subsidiaries of Extended Stay Inc. ("<u>ESA</u>") listed on Schedule 1 hereto (the "<u>Debtors</u>"), HVM Manager L.L.C. ("<u>HVM Manager</u>"), HVM L.L.C. ("<u>HVM</u>") and CP ESH Investors, LLC or its designees and assigns (the "<u>Investor</u>").

## RECITALS

WHEREAS, on June 15, 2009 and February 18, 2010, ESA, and certain of its Affiliates and subsidiaries commenced jointly administered cases (the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

WHEREAS, on April 6, 2010, the Investor, a newly formed entity wholly owned by Centerbridge Partners, L.P., Paulson & Co. Inc., each on behalf of various investment funds and accounts managed by them, and Blackstone Real Estate Partners VI L.P. on behalf of itself and its parallel funds and related alternative vehicles (collectively, the "<u>Sponsors</u>"), deposited $150,000,000 into escrow (the "<u>Deposit</u>"), pursuant to the terms of an escrow agreement with Citibank, N.A. as escrow agent (the "<u>Escrow Agreement</u>") in connection with the Sponsors' commitments contained herein and relating to the Plan (as defined below);

WHEREAS, on April 23, 2010 the Bankruptcy Court approved the bid procedures (the "<u>Bidding Procedures</u>") governing the auction (the "<u>Auction</u>") for sponsorship of the Debtors' plan of reorganization;

WHEREAS, on May 27, 2010, the Sponsors entered into a Commitment Letter with JPMorgan Chase Bank, N.A. and Deutsche Bank Securities, Inc. (together with their successors and assigns, the "<u>Lenders</u>") to provide a loan or loans to NewCo in connection with the acquisition by the Sponsors of certain affiliates and subsidiaries of the Debtors (the "<u>Commitment</u>").  Pursuant to the Commitment, the Sponsors and the Lenders agreed to enter into financing consistent with the terms of the Commitment and the term sheet attached as Exhibit A thereto (together, the "<u>Financing Commitment</u>");

WHEREAS, on May 28, 2010, the Investor, was declared the Successful Bidder (as such term is defined in the Bidding Procedures) at the Auction;

WHEREAS, the Debtors intend to propose and submit to the Bankruptcy Court for its approval a fifth amended and restated plan of reorganization that is consistent in all respects with this Agreement and with the draft plan attached hereto as **Exhibit A** (the "<u>Plan</u>"); and

WHEREAS, after giving effect to the transactions contemplated by this Agreement and the Plan, the Investor and its members and Affiliates shall collectively beneficially own 100% of the NewCo Common Interests (as defined in Section 1.1 hereof) outstanding immediately after the effective date of the Plan (the "<u>Effective Date</u>").

NOW THEREFORE, in consideration of the foregoing and the mutual covenants contained herein and for other good and valuable consideration, the parties hereto, intending to be legally bound hereby, agree as follows:

**Section 1.**     **Investment**.

    1.1.     Subject to the terms and conditions set forth in this Agreement and in reliance upon the representations, warranties and covenants set forth in this Agreement, on the Effective Date immediately subsequent to the making of the distributions pursuant to the Plan, the Investor shall purchase from a newly formed Delaware limited liability company ("<u>NewCo</u>"), and the Debtors shall cause NewCo to sell and issue to the Investor units of the NewCo common membership interests (the "<u>NewCo Common Interests</u>") representing 100.00% of the NewCo Common Interests outstanding immediately after the Effective Date (the "<u>Investment</u>"). It is further agreed and understood among the Debtors and the Investor that the corporate and organizational structure of NewCo and its Subsidiaries shall be as set forth herein and in the Plan and upon written consent of the Debtors, which consent shall not be unreasonably withheld, the Investor may determine to modify the corporate or organizational structure, form or identity of NewCo and/or any of its Subsidiaries. To the extent necessary to effectuate any such alternate structure, form or identity, any provisions in this Agreement relating to the structure, form or identity of NewCo and/or any of its Subsidiaries and the structure of the Investment contemplated below shall be changed accordingly. Subject to the Investor's right to modify the corporate or organizational structure (including, but not limited to, an organizational structure in which HVM and/or HVM Manager and their respective businesses and assets, are owned by NewCo), form or identity of NewCo and/or any of its Subsidiaries as provided in this Section 1.1, NewCo will be the direct or indirect parent company of the reorganized Debtors (and HVM and HVM Manager, only to the extent transferred to NewCo under the Plan) (NewCo, the Debtors, HVM Manager and HVM, collectively, the "<u>Company</u>") from and after the Effective Date.

    1.2.     As consideration for the NewCo Common Interests to be issued pursuant to the Investment and the purchase of the business, assets and properties of the Debtors and to fund the distributions contemplated by the Plan, the Investor shall (i) cause NewCo to be provided with cash in the aggregate amount of $3,615,755,444.28 (subject to adjustment as provided in this Section 1.2), comprised of (a) a $1,815,755,444.28 (subject to adjustment as provided in this Section 1.2) investment by the Investor (the "<u>Investor Payment</u>") and (b) $1,800,000,000.00 from the proceeds of new debt financing pursuant to the Financing Commitment or any alternative financing that the Investor may raise, as approved by the Debtors and the Special Servicer (as defined in the Plan) (with the consent of the Operating Advisor (as defined in the Plan)) (in their respective sole discretions (the "<u>Debt Financing</u>")) (it being understood that obtaining such approvals shall not be a condition to closing and that failure to receive such approvals shall not constitute a termination event) and (ii) contribute to the Debtors the certificates (the "<u>Certificates</u>") (and waive the right to receive or retain any distribution on account of such Certificates pursuant to the Plan) held by the Investor and its members or Affiliates in the amounts as set forth in Schedule 1.2a (together, the "<u>Investment Consideration</u>"). The amount of the Certificates shall be calculated as of the Effective Date and shall include the actual interest on the Certificates which would have been payable to the Effective Date absent the contribution and waiver provided for in this Agreement. To the extent that the amount of the Certificates differs from the amount set forth on Schedule 1.2 hereof as a result of the calculation of interest, the Investor Payment (and the aggregate cash amount to be provided to NewCo by the Investor) shall be adjusted up or down accordingly on a dollar for dollar basis. Each Sponsor shall be responsible, on a several, and not joint, basis, to cause the

Investor to pay its portion of the consideration set forth in Schedule 1.2 (subject to adjustment as set forth above) and contribute the Certificates as set forth on Schedule 1.2a (subject to adjustment as set forth above). The Investment Consideration shall be paid to NewCo (a) with respect to the Investor Payment, by wire transfer from the Investor of immediately available funds on the Effective Date, (b) with respect to the Debt Financing, by the Lenders on terms specified in the applicable loan documentation and (c) with respect to the Certificates, by the Investor by physical delivery of the Certificates with appropriate stock powers or any duly executed transfer documents that are necessary to effect the transfer of the Investor's interests in the Certificates to the Debtors, in each case on the Effective Date.

1.3.　　On the Effective Date, the Investor will contribute to NewCo up to $200,000,000 or such lesser amount required to establish feasibility to confirm the Plan under Section 1129 of the Bankruptcy Code (the "Reserve").  Such contribution will cover one or more capital reserves, working capital reserves, transaction expenses and any other such reserves for the ongoing operations of NewCo.

**Section 2.　　Issuance of the NewCo Common Interests**.

2.1.　　On the Effective Date, the Debtors shall issue or cause NewCo to issue to, or otherwise cause to be transferred to, the Investor, in each case free and clear of any claims, liens and encumbrances, 100% of the NewCo Common Interests then outstanding.

2.2.　　All NewCo Common Interests shall be delivered with any and all issue, stamp, transfer, sales and use, or similar taxes or duties payable, if any, in connection with such delivery having been duly paid by the Company.

2.3.　　Investor Designees.

(a)　　Notwithstanding anything to the contrary in this Agreement, the Investor, in its sole discretion, may designate that some or all of the NewCo Common Interests be issued in the name of, and delivered to, one or more of its members or Affiliates, so long as such issuance and delivery is in compliance with federal and state securities laws and in accordance with Section 2.3(b) herein.

(b)　　Within 10 days after entry of the order confirming the Plan (the "Confirmation Order"), the Investor shall deliver to the Company a schedule detailing the designations, if any, of the kind described in Section 2.3(a), which designations shall not be assignments for the purposes of Section 17 of this Agreement.

(c)　　In the event that the Investor makes the designation pursuant to this Section 2.3, the funds managed by the members or Affiliates of the Investor that are so designated shall have the rights, entitlements and benefits that would otherwise inure to the Investor in its capacity as a holder of the NewCo Common Interests as provided in the Plan.

**Section 3.　　Fees and Expenses**.

3.1.　　In the event the Plan is not confirmed or consummated other than due to a material breach of this Agreement by the Investor or its members and Affiliates as determined by

final order of the Bankruptcy Court, the Investor and its members and Affiliates are entitled to reimbursement of all actual reasonable out-of-pocket costs, fees, expenses, disbursements and other charges paid by or due and payable by the Investor and/or its members and Affiliates including, without limitation, (i) fees, costs, expenses, disbursements and other charges of counsel to each of the Investor and its members and Affiliates, (ii) fees, costs, expenses, disbursements and other charges of any other professionals retained by the Investor and its members and Affiliates in connection with or relating to this Agreement, the Investment or the Plan, including, without limitation, in connection with the transactions contemplated hereby (including, without limitation, investigating, negotiating, documenting and completing such transactions and enforcing, attempting to enforce and preserving any rights or remedies contemplated hereunder and by the Chapter 11 Cases) or judicial and regulatory proceedings related to such transactions and the Chapter 11 Cases, including, without limitation, the fees and expenses of Fried, Frank, Harris, Shriver & Jacobson LLP and Houlihan, Lokey, Howard & Zukin, Inc. pursuant to its engagement letter with the Sponsors and Gibson, Dunn & Crutcher LLP, counsel to Paulson & Co. Inc., on behalf of certain investment funds and accounts managed by them and Simpson, Thacher & Bartlett LLP, counsel to Blackstone Real Estate Partners VI L.P. on behalf of itself and its parallel funds and related alternative vehicles and (iii) financing costs and related fees (collectively, the "Expenses"); provided, that, consistent with the Bidding Procedures, the maximum amount of the Expenses payable by the Company (the "Maximum Expense Reimbursement Amount") shall be up to twenty million ($20,000,000); provided further that, subject to the approval of the Bankruptcy Court, the Maximum Expense Reimbursement Amount shall be increased to thirty five million dollars ($35,000,000), it being understood that obtaining authorization for such increase shall not be a condition to closing nor shall a failure to obtain such authorization constitute a termination event hereunder. The Investor shall be responsible for the fees, costs and expenses as set forth in Section 6.9.

3.2. The provision for the payment of the Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Investor would not have entered into this Agreement and such Expenses, subject to the entry of the Disclosure Statement Approval and Solicitation Order, shall constitute an allowed administrative expense of the Debtors under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

3.3. Except as provided in Section 22.4, the payment of the Expenses and return of the Deposit pursuant to Sections 13.5 and 13.6 shall be the sole and exclusive remedy available to the Investor in the event that the completion of the Investment and the consummation of the Plan (the "Closing") does not occur, provided, that this Section 3.3 shall not relieve the Company from any Liability arising from (a) other than the exercise of its rights under Section 13.4, any willful or intentional breach that has been the cause of or resulted in the failure of the Closing to occur; or (b) obligations of the Company arising under Section 14.

**Section 4.** **Representations and Warranties of the Debtors, HVM Manager and HVM**

4.1. The Debtors hereby jointly and severally represent and warrant to, and agree with, the Investor (solely as to the Debtors), and HVM Manager hereby severally and not jointly represents and warrants to, and agrees (solely with respect to itself), and HVM hereby severally

and not jointly represents and warrants to, and agrees (solely with respect to itself), with the Investor, that, except as set forth in the Disclosure Schedules:

(a)     Organization and Qualification. Each Company is duly organized, validly existing and in good standing under the laws of its state of incorporation or organization and has all requisite corporate or other organizational power and authority to carry on its business as it is currently conducted or as currently contemplated to be conducted after consummation of the transactions contemplated hereunder and under the Plan and to own, lease and operate its properties where such properties are now owned, leased or operated. Each of HVM Manager and HVM is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the conduct of its respective business makes such qualification necessary, except where the failure to be so qualified would not be reasonably likely to result in a Material Adverse Change.

(b)     NewCo.  NewCo will be a newly formed entity and, prior to the Effective Date, NewCo will not have engaged in any business and will not have owned or controlled any assets.

(c)     Corporate Power and Authority.

(1)     The Company has or, to the extent executed in the future, shall have when executed the requisite corporate or other organizational power and authority to enter into, execute and deliver this Agreement and each other agreement to which it shall be a party as contemplated by this Agreement or the Plan (together, the "Transaction Agreements") and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), respectively, to perform its obligations hereunder and thereunder, including, without limitation, as to NewCo and the issuance of NewCo Common Interests. The Company has taken or shall take all necessary corporate or other organizational action required for the due authorization, execution, delivery and performance by it of the Transaction Agreements, including, without limitation, as to NewCo and the issuance of NewCo Common Interests.

(2)     Prior to the execution by the Debtors and filing with the Bankruptcy Court of the Plan, the Debtors shall have the requisite corporate or other organizational power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rule 3020(e), to perform its obligations thereunder, and shall have taken by the Effective Date all necessary corporate

or other organizational actions required for the due authorization, execution, delivery and performance by it of the Plan.

(d)    <u>Execution and Delivery; Enforceability</u>.

(1)    Each Transaction Agreement has been, or prior to its execution and delivery shall be, duly and validly executed and delivered by each Company to the extent a party thereto, and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rule 6004(h), each such document shall constitute a valid and binding obligation of the Company, enforceable against the Company to the extent a party thereto in accordance with its terms.

(2)    The Plan shall be confirmed by the Bankruptcy Court and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rule 3020(e), shall constitute a valid and binding obligation of the Debtors, enforceable against the Debtors in accordance with its terms.

(3)    All of the NewCo Common Interests shall have been duly authorized for issuance prior to the Effective Date, and, when issued and distributed as set forth in the Plan and this Agreement, shall be validly issued, fully paid and non-assessable and free and clear of all taxes, liens, preemptive rights, rights of first refusal, subscription and similar rights; and none of the NewCo Common Interests shall have been issued in violation of the preemptive rights of any security holders of NewCo arising as a matter of law or under or pursuant to NewCo's Certificate of Formation, operating agreement or any other material agreement or instrument to which the Company or NewCo is a party or by which it is bound.

(e)    <u>No Conflict</u>. Subject to the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, the sale, issuance and delivery of the NewCo Common Interests to the Investor pursuant to the Investment and the execution and delivery (or, with respect to the Plan, the filing) by the Company of the Transaction Agreements and the Plan and compliance by the Company with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (including, without limitation, compliance by the Investor with its obligations hereunder and thereunder) (i) shall not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent to be specified in the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company is a party or by which the Company is bound or to which any of the property or assets of the Company is subject, (ii)

shall not result in any violation of the provisions of the certificate of incorporation or bylaws or similar governance documents of the Company, and (iii) shall not result in any violation of, or any termination or impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its properties.

(f)     Consents and Approvals. No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its properties is required for the sale, issuance and delivery of the NewCo Common Interests to the Investor pursuant to the Investment, the consummation of the Investment by the Company and, the execution and delivery by the Company of the Transaction Agreements or the Plan and performance of and compliance by the Company with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except (i) the entry of the Disclosure Statement Solicitation and Approval Order (as defined in Section 6.2 hereof) and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the filing with the applicable Secretary of State of the Certificate of Formation to be applicable to NewCo from and after the Effective Date and (iii) any notification or filing required under the HSR Act. No consent, approval or authorization of any Person (other than a court or governmental agency) is required in connection with the execution and delivery of the Transaction Agreements or the consummation by the Company of the transactions contemplated herein and therein.

(g)     Arm's Length. The Company acknowledges and agrees that the Investor is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the transactions contemplated hereby (including, without limitation, in connection with determining the terms of the Investment) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other Person or entity. Additionally, the Investor is not advising the Company or any other Person or entity as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. The Company shall consult with their own advisors concerning such matters and shall be responsible for making their own independent investigation and appraisal of the transactions contemplated hereby, and the Investor shall have no responsibility or Liability to the Company or its respective shareholders, directors, officers, employees, advisors or other representatives with respect thereto. Any review by the Investor of the Company, the transactions contemplated hereby or other matters relating to such transactions shall be performed solely for the benefit of the Investor and shall not be on behalf of the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives and shall not affect any of the representations or warranties contained herein or the remedies of the Investor with respect thereto.

(h)     No Undisclosed Liabilities. Except for Liabilities incurred in the ordinary course of business as to HVM Manager, HVM or the Debtors, in each case since September 30, 2009, the Company does not have any material Liabilities, whether individually or in the aggregate, whether absolute, accrued, contingent or otherwise, of a type required to be disclosed on a balance sheet prepared in accordance with GAAP, or any material off balance sheet Liabilities, except as set forth in (i) the schedules of assets and liabilities and statements of financial affairs filed by the Debtors with the Bankruptcy Court on September 28, 2009 and

March 4, 2010, (ii) the Debtors' monthly operating report filed with the Bankruptcy Court on May 17, 2010, (iii) the disclosure statement accompanying the Plan (the "<u>Disclosure Statement</u>"), (iv) the Financial Statements, (v) Schedule 4.1(h), or (vi) the HVM Financial Statements.

    (i)   <u>Absence of Certain Changes</u>. Except as set forth on Schedule 4.1(i)**,** since September 30, 2009, except for actions to be taken pursuant to the Transaction Agreements and the Plan:

    (1)   there has not been any material change in the capital stock or equity or other ownership interests or any material change in long-term debt of the Company or any material dividend or distribution of any kind declared, set aside for payment, paid or made by the Company on any class of capital stock;

    (2)   no event, fact or circumstance has occurred which has had or would reasonably be expected to give rise to, individually or in the aggregate, a Material Adverse Change;

    (3)   the Company has not entered into any contract, agreement or arrangement that will be in effect on the Effective Date and that (i) has, or that the Company reasonably expects to have, any future Liability or payments in excess of five million dollars ($5,000,000), (ii) is not terminable by the Company by notice of not more than ninety (90) days for a cost of less than one hundred thousand dollars ($100,000), and (iii) was not entered into in the ordinary course of business;

    (4)   the Company has not made any material changes with respect to accounting policies or procedures, except as required by law or changes in GAAP;

    (5)   the Company has not paid, discharged, waived, compromised, settled or otherwise satisfied any material legal proceeding, whether now pending or hereafter brought, (A) at a cost materially in excess of the amount accrued or reserved for it, (B) pursuant to terms that impose material adverse restrictions on the business of the Company as currently conducted or (C) on a basis that reveals a finding or an admission of a material violation of law by the Company;

    (6)   other than in the ordinary course of business, the Company has not (A) made, changed or revoked any material tax election, (B) entered into any settlement or compromise of any material tax Liability, (C) except as otherwise provided in Schedule 4.1(i)(6)(C), filed any amended tax return with respect to any material tax, (D) changed any annual tax accounting period, (E)

entered into any closing agreement relating to any material tax, (F) knowingly failed to claim a material tax refund for which it is entitled, or (G) made material changes to their tax accounting methods or principles;

(7)  the Company has not amended its organizational documents;

(8)  the Company has not waived any material right, claim or debt; and

(9)  the Company has not created any mortgage, pledge or lien with respect to any portion of its assets, other than in the ordinary course of business and relating to assets and obligations, in the aggregate, not in excess of ten million dollars ($10,000,000).

(j)  <u>Investment Company Act</u>. As of the date hereof, the Company is not and, after giving effect to the consummation of the Plan, including, without limitation, the sale of the NewCo Common Interests under the Plan and through the Investment, and the application of proceeds thereof, shall not be required to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Securities and Exchange Commission thereunder.

(k)  <u>Material Contracts</u>.

(1)  Except as otherwise provided herein and subject to the payment of any required cure costs as set forth on Schedule 4.1(k), on and as of the Effective Date, each Material Contract that shall survive the Chapter 11 Cases (i) shall be a legal, valid and binding obligation of the Company, to the extent a party thereto, and each other party thereto (subject to bankruptcy laws), (ii) to the knowledge of the Company, shall be in full force and effect and (iii) shall be enforceable against the Company, to the extent a party thereto, and each other party thereto (subject to bankruptcy laws) in accordance with its terms. Other than a breach or default that occurred as a result of the filing of the Chapter 11 Cases, with respect to each Material Contract, (x) the Company, to the extent a party thereto, is not in material default or breach of such Material Contract, and (y) there does not exist any event, condition or omission that would constitute such a default or breach, whether by lapse of time or notice or both. To the knowledge of the Company, no party to any Material Contract is in material breach or default of such Material Contract, has repudiated any material provision thereof or terminated any Material Contract.

(2)  Except as otherwise provided herein, the transfer of HVM to NewCo, the transfer of HVM Manager to NewCo or the appointment of NewCo Manager or its designee as successor

manager of HVM shall not cause a breach, default, cancellation or termination of, or give rise to a right to cancel or terminate, any Material Contract to which HVM Manager or HVM is a party.

(l)     Pending Litigations or Causes of Action. There is no action, suit, proceeding or investigation pending or, to the knowledge of the Company, threatened or affecting the Company or any of the properties, assets or businesses of the Company, which, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Change or which questions the validity of the sale of the NewCo Common Interests in accordance with this Agreement or any other action taken or to be taken by the Company pursuant to or in connection with this Agreement. With respect to each pending action, suit or proceeding in which any of the Debtors, HVM or HVM Manager is a prevailing plaintiff, including without limitation, that certain action entitled *Extended Stay Inc. et al v. American Automobile et al.,* (06OS-CC00027) (20th Judicial Circuit, Osage County) (the "Windows Litigation") and excluding the Litigation Trust Assets (as defined in the Plan), upon the Effective Date, the Debtors being acquired by the Investor shall have received or shall be entitled to receive all proceeds payable to each of the prevailing plaintiffs in respect of each of such pending actions, suits or proceedings, including, without limitation, any and all proceeds payable to any of the prevailing plaintiffs in respect of the Windows Litigation. Except as set forth on Schedule 4.1(l), in each pending action, suit or proceeding in which the Company is a defendant, all claims and potential judgments or settlements in connection with such actions, suits or proceedings are fully covered by insurance policies held by the Company and in which the Company is the beneficiary (subject to the terms and conditions of such policies, including, without limitation, applicable deductibles), and all such claims and potential judgments or settlements in connection with such actions, suits or proceedings are within the limits of such policies.

(m)     Labor Relations.

(1)     The Company is not party to, or bound by, any material collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization;

(2)     the Company is not the subject of any material proceeding asserting that it or any Subsidiary has committed an unfair labor practice or sex, age, race or other discrimination or seeking to compel it to bargain with any labor organization as to wages or conditions of employment;

(3)     there are no material current or, to the knowledge of the Company, threatened organizational activities or demands for recognition by a labor organization seeking to represent employees of the Company or any and no such activities have occurred during the past 12 months;

(4)     no material grievance, arbitration, litigation or complaint or, to the knowledge of the Company, investigations relating to labor or

employment matters is pending or, to the knowledge of the Company, threatened against the Company;

(5)    the Company has complied and is in compliance in all material respects with all applicable laws (domestic and foreign), agreements, contracts, and policies relating to employment, employment practices, wages, hours, and terms and conditions of employment and is not engaged in any material unfair labor practice as determined by the National Labor Relations Board (or any foreign equivalent);

(6)    the Company has complied in all material respects with its payment obligations to all employees of the Company in respect of all wages, salaries, commissions, bonuses, benefits and other compensation due and payable to such employees under any agreement, plan, program or any statute or other law; and

(7)    the Company has complied and is in compliance in all material respects with its obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 (and any similar state or local law) to the extent applicable, and all material other employee notification and bargaining obligations arising under any collective bargaining agreement or statute.

(n)    <u>Title to Intellectual Property</u>. The Company owns, or possesses valid and enforceable rights to use, all material Intellectual Property, including, without limitation, that which is set forth on Schedule 4.1(n), used in the conduct of their respective businesses as of the date of this Agreement (collectively, "<u>Company Intellectual Property</u>"). All applications to register and registrations of any Company Intellectual Property owned by the Company are listed in Schedule 4.1(n) and (i) are valid and in full force and effect; (ii) have not, except in accordance with the ordinary course practices of the Company lapsed, expired or been abandoned (provided that the foregoing will not be deemed a representation that any registration for any trademark will issue upon application therefor); (iii) are not the subject of any opposition or cancellation filed with the United States Patent and Trademark Office, domain name registrar or any other applicable Intellectual Property registry; and (iv) are exclusively owned by the Company. Upon the Effective Date, all of the rights, title and interests in and to the Company Intellectual Property shall be transferred to NewCo free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind, except as provided in the Plan. The consummation of the transactions contemplated hereby and by the Plan, including, without limitation, the transfer of the Company Intellectual Property to NewCo, shall not result in the loss or impairment of any rights to use such Company Intellectual Property or obligate the Company to grant any rights or pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by the Company absent the consummation of the transactions contemplated hereby and by the Plan. The Company has taken reasonable security measures to protect the confidentiality and value of its trade secrets (or other Company Intellectual Property for which the value is dependent upon its confidentiality), and, to the knowledge of the Company, no such information has been misappropriated or is the subject of an

unauthorized disclosure. The Company has not received any written notice in the past two (2) years that it is in default (or with the giving of notice or lapse of time or both, would be in default) under any contract relating to any Company Intellectual Property. To the knowledge of the Company, no Company Intellectual Property rights owned by the Company are being infringed by any other Person and the conduct of the business of the Company as conducted does not infringe, misappropriate, or otherwise violate in any respect any Intellectual Property rights of others. The Company has not received any written notice of any claim of infringement, misappropriation, or violation with any such rights of others in the past thirty (30) months. To the knowledge of the Company, the Company has required each third party contractor who has developed for the benefit of the Company any Company Intellectual Property to execute a consulting agreement assigning the intellectual property therein to the Company.

        (o)    <u>Intellectual Property of BHAC</u>. To the knowledge of the Company, BHAC owns, or possesses valid and enforceable rights to use, all material Intellectual Property, including, without limitation, that which is set forth on Schedule 4.1(o), used in the conduct of its businesses as currently conducted or as contemplated to be conducted (the "<u>BHAC Intellectual Property</u>"). To the knowledge of the Company, BHAC is the exclusive owner of all trademarks, service marks and trade names included in the BHAC Intellectual Property. To the knowledge of the Company, all applications to register and registrations of any BHAC Intellectual Property owned by BHAC are listed in Schedule 4.1(o) and (i) valid and in full force and effect; (ii) have not, except in accordance with the ordinary course practices of BHAC, lapsed, expired or been abandoned (provided the foregoing will not be deemed a representation that any registration for any trademark will issue upon an application therefor); and (iii) are not the subject of any opposition or cancellation filed with the United States Patent and Trademark Office, domain name registrar or any other applicable Intellectual Property registry. To the knowledge of the Company, the consummation of the transactions contemplated hereby and by the Plan, including, without limitation, the transfer of the BHAC Intellectual Property to NewCo, shall not result in the loss or impairment of any rights to use such BHAC Intellectual Property or obligate BHAC to grant any rights or pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by BHAC absent the consummation of the transactions contemplated hereby and by the Plan. To the knowledge of the Company, BHAC has taken reasonable security measures to protect the confidentiality and value of its trade secrets (or other BHAC Intellectual Property for which the value is dependent upon its confidentiality), and, no such information has been misappropriated or is the subject of an unauthorized disclosure. To the knowledge of the Company, BHAC has not received any written notice in the past two (2) years that they are in default (or with the giving of notice or lapse of time or both, would be in default) under any contract relating to any BHAC Intellectual Property. To the knowledge of Company, no BHAC Intellectual Property rights owned by BHAC are being infringed by any other Person. To the knowledge of Company, the conduct of the businesses of BHAC as conducted does not infringe, misappropriate, or otherwise violate in any material respect any Intellectual Property rights of others, and BHAC has not received any written notice of any claim of infringement, misappropriation, or violation with any such rights of others in the past thirty (30) months. To the knowledge of the Company, BHAC has required each third party contractor who has developed for the benefit of BHAC any BHAC Intellectual Property to execute a consulting agreement assigning the intellectual property therein to BHAC.

(p)     No Broker's Fees. Neither the Company nor any of its Subsidiaries is a party to any contract, agreement or understanding with any Person (other than this Agreement and the Company's agreement with Lazard Frères & Co. LLC, as approved by the Bankruptcy Court on July 23, 2009) that would give rise to a valid claim against the Company or any of its Subsidiaries or the Investor for a brokerage commission, finder's fee or like payment in connection with the Investment.

(q)     Title to Real and Personal Property. Schedule 4.1(q) contains a true, accurate and complete list of the addresses of all (i) real property owned by the Company as of the Effective Date (the "Owned Real Property"), and (ii) real property leased by the Company as of the Effective Date (the "Real Property Leases"). Except as provided on Schedule 4.1(q), the Company has good and marketable title to the Owned Real Property and good title to all other tangible and intangible properties owned by it, in each case, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind, other than the Mortgage Loan and the Permitted Encumbrances (as such term is defined in the loan agreement evidencing the Mortgage Loan). The relevant owner has title policies in place which are in full force and effect with respect to the Owned Real Property and the Real Property Leases and, to the best of the Company's knowledge, no claim has been made under any of the title policies. All of the Real Property Leases are in full force and effect and enforceable by the Company in accordance with their terms and no material default exists under any of the Real Property Leases. The Company has not received any notice of any claim of any sort that has been asserted by anyone adverse to the rights of the Company under any of the Real Property Leases, or affecting or questioning the rights of the Company to the continued possession of the leased or subleased property by under any such lease or sublease. None of the buildings and structures situated on or forming part of the Owned Real Property or the operation or maintenance thereof, encroaches on any property owned by others, and the Owned Real Property and the current uses thereof by the Company complies in all respects with applicable laws. Except as set forth on Schedule 4.1(q), no taking has been commenced or, to the knowledge of the Company, is contemplated with respect to all or any portion of, or for the relocation of roadways providing access to, any Owned Real Property or any real property subject to the Real Property Leases. There are no rights of first refusal with respect to a sale of, or purchase options with respect to, the Owned Real Property. Except as set forth on Schedule 4.1(q), there are no material space leases in effect with respect to the Owned Real Property. The assets of the Company (including the Owned Real Property, the Real Property Leases and other tangible and intangible assets of the Company, including, without limitation, all reservation systems and all other information technology of the Company (other than Intellectual Property)), include all of the properties, assets and rights (other than Intellectual Property) that are currently used in, or are material or necessary for, the conduct of the business of the Company as it is currently conducted (collectively, the "Business Assets"). Upon the Effective Date, all of the rights, title and interests in and to the Business Assets shall vest in the Company free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind, except as provided in the Plan.

(r)     Compliance with Environmental Laws. Except as provided on Schedule 4.1(r):

(1)    the Company is in compliance with all applicable Environmental Laws, except for such noncompliance as would not reasonably be expected to result in material liabilities under Environmental Laws;

(2)    except as would not reasonably be expected to result in the Company incurring material liabilities under Environmental Laws, the Company, has (a) received and is in compliance with all permits, licenses or other  approvals required of it under applicable Environmental Laws to conduct its business, (b) is not subject to any action to revoke, terminate, cancel, limit, amend or appeal any such permits, licenses or approvals, and (c) has paid all fees, assessments or expenses due under any such permits, licenses or approvals;

(3)    except as would not reasonably be expected to result in the Company incurring material liabilities under Environmental Laws, there are no pending nor, to the best of the Company's knowledge, threatened claims, notices, civil, criminal or administrative actions, suits, hearings, investigations, inquiries or proceedings with respect to the Facilities or the Company arising under any Environmental Law; and the Company has not received written notice from any governmental authority or any other third party of any actual or potential unresolved Liability for the investigation or remediation of any disposal or release of Hazardous Substances, or for any actual or alleged violation of Environmental Law; and there are no environmental liens on, and no deed or activity or use restrictions or notices applicable to, any of the Facilities;

(4)    except as would not reasonably be expected to result in the Company incurring material liabilities under Environmental Laws, there is no contamination of, and there have been no releases or threatened releases of or investigations or remediation regarding Hazardous Substances, and there are no underground storage tanks, at, on, under or within the Facilities or, to the best of the Company's knowledge, any real property formerly owned, leased or operated by the Company or, any predecessor of the Company's predecessors; and all methane and soil vapor mitigation systems installed at any of the Facilities are operating as designed and in accordance with applicable Environmental Laws;

(5)    to the best of the Company's knowledge, there are no facts, circumstances or conditions related to the Facilities or the Company that would be reasonably expected to result in the Company incurring material liabilities under Environmental Laws;

(6)    except as would not reasonably be expected to result in the Company incurring material liabilities under Environmental Laws,

the Company has not agreed to assume or accept responsibility for, by contract or otherwise, including, without limitation, any indemnity agreements applicable to any of the Facilities, any Liability with respect to any Facility or of any other Person under Environmental Laws;

(7)    the Company is not currently required to incur material capital expenditures to reach or maintain compliance with existing Environmental Laws;

(8)    neither the Company nor any of the Company's predecessors have manufactured, marketed, distributed, or sold asbestos or any products containing asbestos; nor is there any asbestos or asbestos-containing material at the Facilities requiring removal or abatement that would be reasonably likely to result in the Company incurring material liabilities under Environmental Laws; and

(9)    for purposes of this Section 4.1(r), the following terms shall have the meanings set forth herein: "<u>Environmental Laws</u>" means any law, statute, rule, regulation, ordinance, or legally binding guidance document relating to pollution, contamination, protection of the environment, human health or safety related to exposure to Hazardous Substances or the occupational health or safety of employees, including any common law cause of action, and all applicable judicial and administrative decisions, orders, directives and decrees; "<u>Facilities</u>" means all real property owned, leased, or operated by the Company and any buildings, facilities, fixed structures or equipment located on such real property; "<u>Hazardous Substances</u>" means any substance, material or waste that is regulated, classified, defined or otherwise characterized under or pursuant to Environmental Law as "hazardous," "toxic," "pollutant," "contaminant," "radioactive" or words of similar meaning including petroleum or any by-products or fractions thereof, any form of natural gas, lead, asbestos and asbestos-containing materials, polychlorinated biphenyls ("<u>PCBs</u>") and PCB-containing equipment, toxic mold, radon and other radioactive elements, and urea formaldehyde foam insulation.

(s)    <u>Compliance With ERISA</u>.

(1)    Correct and complete copies of the following documents, with respect to all written material domestic and foreign benefit and compensation plans, programs, contracts, commitments, practices, policies and arrangements, that have been established, maintained or contributed to (or with respect to which an obligation to contribute has been undertaken) or with respect to which any potential Liability is borne by the Company or HVM, including,

but not limited to, "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and deferred compensation, stock option, stock purchase, restricted stock, stock appreciation rights, stock based, incentive and bonus plans (the "Company Plans"), have been or shall be delivered or made available to the Investor by the Company and HVM, to the extent applicable: (i) all material Company Plan documents, together with all amendments and attachments thereto (including, in the case of any Company Plan not set forth in writing, a written description thereof); (ii) all material trust documents, declarations of trust and other documents establishing other funding arrangements, and all amendments thereto and the latest financial statements thereof; (iii) the most recent annual reports on IRS Form 5500 and all schedules thereto and the most recent actuarial reports; (iv) IRS Opinion Letter dated March 31, 2008; (v) summary plan descriptions and summaries of material modifications for the HVM 401(k) Plan and 125 Plan; and (vi) any notice to or from the IRS or any office or representative of the Department of Labor relating to compliance issues with respect to such Company Plans.

(2)     (A) Each Company Plan has been maintained, operated, and administered in compliance in all material respects with its own terms, ERISA, the Internal Revenue Code of 1986, as amended (the "Tax Code"), other applicable laws, and any applicable collective bargaining agreement; (B) each Company Plan that is intended to be a qualified plan under Section 401(a) of the Tax Code has received a favorable IRS Opinion Letter or has applied to the IRS for such favorable determination within the applicable remedial amendment period under Section 401(b) of the Tax Code, and the Company and HVM are not aware of any circumstances likely to result in the loss of the qualification of such Company Plan under Section 401(a) of the Tax Code; (C) no material Liability under Title IV of ERISA has been or is reasonably expected to be incurred by the Company or HVM with respect to any "single-employer plan," within the meaning of Section 4001(a)(15) of ERISA ("Single-Employer Plan") or "multiemployer plan" within the meaning of Section 3(37) of ERISA ("Multiemployer Plan") currently or within the past six years maintained or contributed to (or with respect to which an obligation to contribute has been undertaken) by the Company or HVM or any entity which is considered one employer with the Company or HVM under Section 4001 of ERISA or Section 414 of the Tax Code (an "ERISA Affiliate"); (D) neither the Company nor HVM have incurred any withdrawal Liability (including, without limitation, any contingent or secondary withdrawal Liability) with respect to a Multiemployer Plan under Subtitle E of

Title IV of ERISA (regardless of whether based on contributions of an ERISA Affiliate) that has not been satisfied in full and no condition or circumstance has existed that presents a risk of the occurrence of any withdrawal from or the partition, termination, reorganization or insolvency of any such Multiemployer Plan; (E) no "reportable event," within the meaning of Section 4043 of ERISA, for which notice would be required to be filed with the Pension Benefit Guaranty Corporation, has occurred or is expected to occur for any Company Plan or by any ERISA Affiliate; (F) all contributions required to be made under the terms of any Company Plan have been timely made or accrued for in accordance with GAAP in the financial statements of the Company and HVM as required under the terms of such Company Plan, applicable laws, and any applicable collective bargaining agreement; and (G) there has been no amendment to, announcement by the Company or HVM relating to, or change in employee participation or coverage under, any Company Plan which would materially increase the expense of maintaining such plan above the level of the expense incurred therefor for the most recent fiscal year.

(3)     (A) Neither any Company Plan nor any Single-Employer or Multiemployer Plan of an ERISA Affiliate has an "accumulated funding deficiency" (whether or not waived) within the meaning of Section 412 of the Tax Code or Section 302 of ERISA and neither the Company nor HVM nor any ERISA Affiliate has applied for or obtained a funding waiver; (B) the Company and HVM expect that required minimum contributions to any Company Plan under Section 412 of the Tax Code shall not be materially increased by application of Section 412(1) of the Tax Code; (C) neither the Company nor HVM has provided, or is required to provide, security to any Company Plan or to any Single-Employer or Multiemployer Plan of an ERISA Affiliate pursuant to Section 401(a)(29) of the Tax Code; and (D) neither the execution of this Agreement nor the consummation of the transactions contemplated hereby shall limit or restrict the right of the Company or HVM to merge, amend or terminate any of the Company Plans, all of which can be amended or terminated at any time, without consent from any other party and without material Liability other than for benefits accrued as of the date of such amendment or termination (other than charges incurred as a result of such termination).

(4)     There are no legal proceedings pending or, to the knowledge of the Company or HVM, threatened, on behalf of or against any Company Plan, the assets of any trust under any Company Plan, or the plan sponsor, plan administrator or any fiduciary of any Company Plan. No event has occurred and there currently exists no condition or set of circumstances in connection with which the

Company, HVM, or any of their respective Subsidiaries could be subject to any Liability (other than routine claims for benefits, ordinary administrative costs, funding for premiums, and other routine funding obligations) under the terms of any Company Plan, ERISA, the Tax Code or any other applicable law.

(5)     No fiduciary or party in interest of any Company Plan has participated in, engaged in or been a party to any transaction that is prohibited under Section 4975 of the Tax Code or Section 406 of ERISA and not exempt under Section 4975 of the Tax Code or Section 408 of ERISA, respectively, which could result in Liability to the Company. With respect to any Company Plan (i) neither the Company nor HVM nor any of their respective ERISA Affiliates has had asserted against it any claim for Taxes under Chapter 43 of Subtitle D of the Tax Code and Section 5000 of the Tax Code, or for penalties under ERISA Section 502(c), 502(i) or 502(1), nor, to the knowledge of the Company or HVM, is there a basis for any such claim, and (ii) no officer, director or employee of the Company, HVM or any of their respective Subsidiaries has committed a breach of any fiduciary responsibility or obligation imposed by Title I of ERISA.

(6)     No Company Plan that is a "welfare benefit plan" within the meaning of Section 3(1) of ERISA provides benefits to former employees of the Company, HVM, or their respective ERISA Affiliates, other than (i) pursuant to Section 4980B of the Code or any similar law, (ii) continuation of coverage until the end of the calendar month in which retirement occurs, (iii) upon conversion to an individual policy at the retiree's election and responsibility, or (iv) up to the credit balance as of the retirement date under a medical expense reimbursement account. The Company and HVM and their respective ERISA Affiliates have complied in all material respects with the provisions of Part 6 of Title I of ERISA and Sections 4980B, 9801, 9802, 9811 and 9812 of the Code.

(7)     Neither the execution or delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will, either alone or in conjunction with any other event, (i) except as provided in (9) below, result in any payment or benefit becoming due or payable, or required to be provided, to any director, employee or independent contractor of the Company, HVM, or any of their respective Subsidiaries, (ii) increase the amount or value of any benefit or compensation otherwise payable or required to be provided to any such director, employee or independent contractor, (iii) result in the acceleration of the time of payment, vesting or funding of any such benefit or compensation or (iv) result in any "excess parachute payment" within the

meaning of Section 280G of the Tax Code. The Company and HVM have taken all necessary steps to ensure that the receipt of any compensation, benefit or amounts that may be deemed to result in an "excess parachute payment" (within the meaning of Section 280G(b) of the Tax Code) to each Person who is a "disqualified individual" with respect to the Company, within the meaning of Section 280G(c) of the Tax Code, has been approved by stockholders in accordance with Section 280G(b)(5)(A)(ii) of the Tax Code.

(8)     The Company has no obligation for the payment to any person with respect to any tax liability under Section 409A of the Tax Code.

(9)     The Company has provided to the Investor, by letter dated March 15, 2010 (the "Change in Control Letter"), the correct amount of severance payments that would be payable if payments were due on June 30, 2010 under each of the change in control agreements set forth in Schedule 4.1(s)(9) of the Disclosure Schedules (the "Change in Control  Agreements"), and the employment agreement dated July 10, 2007 between HVM and Gary A. DeLapp (the "DeLapp Employment Agreement"), and any other severance policies applicable to those individuals with a Change in Control Agreement and/or employment agreement, in each case, subject to the assumptions set forth in such letter, and has also provided (A) base compensation, target bonus and, if applicable, member allocations, (B) estimated value of COBRA premiums for such individuals, and (C) any possible gross-up payment for Section 409A of the Tax Code. The Company has provided to the Investor an estimated calculation of the aggregate amount that would be payable under the revised HVM Incentive Plan, which was approved by the Bankruptcy Court by orders dated October 29, 2009 and November 12, 2009 (the "HVM Incentive Plan"), assuming that the Company performs at budget, and has also provided, based on and subject to the assumptions set forth therein, the individual amounts payable to each Senior Executive and President/CEO (as set forth in the Change in Control Letter) pursuant to the revised HVM Incentive Plan. No 280G gross-up payments will be due under any of the Change in Control Agreements, the DeLapp Employment Agreement, or in connection with any payments pursuant to the revised HVM Incentive Plan.

(t)     Insurance.  The Company has insurance covering its properties, operations, personnel and businesses, including, without limitation, business interruption insurance, which insurance is in amounts and insures against such losses and risks as are customary for companies whose businesses are similar to the Company's. The Company (i) has

not received written notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made to continue such insurance or (ii) does not have any reason to believe that it shall not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage at reasonable cost from similar insurers as may be necessary to continue its business.

(u)     <u>Alternate Transactions</u>. As of the date hereof, the Company is not a party to any binding commitment to pursue, implement or effectuate any Alternate Transaction.

(v)     <u>Affiliate Transactions</u>. Except as among any of the debtors in the Chapter 11 Cases and as set forth on Schedule 4.1(v), there are no contracts or other transactions between the Company, on the one hand, and any officer, director or Affiliate of the Company or any relative or spouse of such person, or any relative of such spouse, who has the same home as such person), on the other hand.

(w)     <u>Tax</u>. Except as provided in Schedule 4.1(w), for U.S. federal income tax purposes, each of the Debtors is a disregarded entity that is deemed to be owned by either Extended Stay Inc. or DL-DW Holdings LLC, and each of ESA and DL-DW Holdings LLC is an entity that is not a foreign person within the meaning of Treasury Regulation 1.1445-2(b)(2)(i). None of the Debtors otherwise eligible to join ESA in the filing of a consolidated return for federal income tax purposes has filed an Internal Revenue Service Form 1122 or otherwise authorized or consented to joining ESA in the filing of a consolidated return for federal income tax purposes pursuant to Treasury Regulation §1.1502-75(h).

(x)     <u>REIT Matters</u>. For the taxable years ending December 31, 2007 and 2008, ESA ("<u>Former ESH REIT</u>") was characterized as a "real estate investment trust" in all of its federal, state and local tax returns. The Former ESH REIT was never the subject of an audit or a challenge from the IRS or any state or local taxing authority where the treatment of the Former ESH REIT as a real estate investment trust was challenged or overturned, including but not limited to any challenge to the compliance with the requirements of subsections 856(c)(2) through 856(c)(6) for the relevant taxable years by the Former ESH REIT and of its real property (in each case subject to its then existing leases, contracts and debts).  At the time when Former ESH REIT took certain actions to make ESA ineligible to be characterized as a real estate investment trust effective as of January 1, 2009, such actions were not taken due to the inability of Former ESH REIT or its property to meet the requirements of subsections 856(c)(2) through 856(c)(6) of the Tax Code. To the knowledge of the Company, there is no reason why the transactions contemplated by this Agreement could not be effected so as to include the acquisition of all property (real and personal, tangible and intangible) held, for federal income tax purposes, directly by ESA by an entity that would meet the requirements of subsections 856(c)(2) through 856(c)(6) of the Tax Code for its taxable year ending in 2010. Substantially all of the real properties held by the Debtors constitute qualified lodging facilities within the meaning of section 856(d)(9)(D) of the Tax Code.

**Section 5.**     <u>**Representations and Warranties of the Investor**</u>.

5.1.     The Investor represents, warrants and agrees with the Company as set forth below. Each such representation, warranty and agreement is made as of the date hereof and the Effective Date.

(a)     <u>Incorporation</u>. The Investor has been duly organized and is a validly existing limited liability company, in good standing under the laws of the State of Delaware.

(b)     <u>Corporate Power and Authority</u>. The Investor has the requisite limited liability company power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c)     <u>Execution and Delivery</u>. This Agreement has been duly and validly executed and delivered by the Investor and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)     <u>Investment Intent</u>. The Investor is acquiring the NewCo Common Interests for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities laws, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities laws.

(e)     <u>Sophistication</u>. The Investor has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the NewCo Common Interests being acquired hereunder. The Investor understands and is able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding the NewCo Common Interests for an indefinite period of time).

(f)     <u>Financial Capability</u>. The Investor has delivered to the Debtors a true and correct redacted copy of the executed Financing Commitment from the Lenders, dated May 27, 2010, pursuant to which the Lenders have agreed, subject to the terms of the Financing Commitment, to provide or cause to be provided the debt amount set forth in Section 1.2 hereof. Additionally, the Investor will have at the Closing sufficient cash to enable it to pay the Investor Payment and all expenses incurred by the Investor and its members or Affiliates in connection with the transactions contemplated by this Agreement, and the Investor has furnished to the Company an executed commitment letter from the members or Affiliates of the Investor to provide financing to the Investor in an aggregate amount sufficient to pay the Investor Payment and all such expenses, subject to the conditions set forth in such commitment letter and in this Agreement.  In addition, the Investor will have at the Closing sufficient cash to enable it to fund the Reserve.

(g)     <u>Accredited Investor Status</u>. The Investor is an "accredited investor" as such term is defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended (the "<u>Securities Act</u>").

(h)     No Conflict. The execution and delivery by the Investor of each of the Transaction Agreements to which it is a party and the compliance by the Investor with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (i) shall not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor or any of its Subsidiaries is subject, (ii) shall not result in any violation of the provisions of the governance documents of the Investor, and (iii) shall not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Investor or any of its properties, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(i)     Consents and Approvals. No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Investor or any of its properties, other than the Bankruptcy Court, is required to be obtained or made by the Investor for the purchase of the NewCo Common Interests hereunder and the execution and delivery by the Investor of this Agreement or the Transaction Agreements to which it is a party and performance of and compliance by the Investor with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for any consent, approval, authorization, order, registration or qualification which, if not made or obtained, has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement, except for any notification or other filing requirements under the HSR Act.

(j)     Arm's-Length. The Investor acknowledges and agrees that the Company is acting solely in the capacity of an arm's-length contractual counterparty to the Investor with respect to the transactions contemplated hereby (including, without limitation, in connection with determining the terms of the Investment). Additionally, the Investor is not relying on the Company for any legal, tax, investment, accounting or regulatory advice, except as specifically set forth in this Agreement. The Investor shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby.

(k)     No Violation or Default; Compliance with Laws.  The Investor is not in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor is subject, individually or in the aggregate, that would

prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(l)  Certificate Ownership. The members of the Investor beneficially own on the date of this Agreement, the Certificates as set forth on Schedule 1.2a.

### Section 6.  Covenants.

From and after the date hereof, until the earlier of the Effective Date or the effective date of any termination pursuant to Section 13 hereof:

6.1.  Confirmation Order.  The Debtors shall file a Confirmation Order in form and substance approved by the Investor and each of the Sponsors approving the Plan (including, without limitation, all Plan Documents (as such term is defined in Section 11.1(d)) and which shall provide, among other things, that: (i) except with respect to the Litigation Trust Assets, the Administrative/Priority Claims Reserve, the Mortgage Parties Indemnification Fund (each as defined in the Plan) and any other wind down reserve or other fund established pursuant to the Plan, all right, title and interest in and to any and all assets, property, unexpired leases and executory contracts of every kind and nature to be sold, assigned, transferred or otherwise disposed of under the Plan shall be sold, assigned, transferred and disposed of free and clear of any and all claims, liens and encumbrances of any entity (as such term is defined in section 101(15) of the Bankruptcy Code) including, without limitation, (a) any and all claims, liens, encumbrances and any and all right, title and interests related thereto of government entities with respect to tax Liabilities and (b) any and all claims, liens, encumbrances and any and all right, title and interests related thereto arising or resulting from or relating to the transactions contemplated hereby and by the Plan (including, without limitation, all Plan Documents); (ii) the Investor and the Sponsors are each a good faith purchaser of the Company and its assets and property and are entitled to the protections afforded good faith purchasers under the Bankruptcy Code; (iii) except with respect to administrative expense claims of the type specified in Section 1.7(c)(i) of the Plan as expressly provided for in Section 2.1 of the Plan, NewCo shall not be a successor to any of the debtors in the Chapter 11 Cases by reason of any theory of law or equity; (iv) NewCo and each of the Debtors shall not be a successor to ESA and shall not have any successor or transferee Liability of any kind, nature or character, including, without limitation, Liabilities arising or resulting from or relating to the transactions contemplated hereby and by the Plan (including all Plan Documents); (v) the Company and the Investor are authorized to consummate the transactions contemplated herein and in the Plan and enter into, execute and deliver all necessary documents, including those required in connection with the Debt Financing; (vi) the Debt Financing (including, without limitation, any and all terms, conditions and covenants thereof) has been negotiated in good faith and at arm's-length among the borrower thereunder and the Lenders, and any credit extended or loans made to the Company by the Lenders has been extended, issued and made in good faith and for legitimate business purposes; (vii) the guarantees, mortgages, pledges, liens and other security interests, and all other consideration granted pursuant to or in connection with the Debt Financing are granted in good faith, for good and valuable consideration and for legitimate business purposes as an inducement to the Lenders to make the Debt Financing, and do not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance or re-characterization; and (viii) neither the Investor, the Lenders, nor any borrower, guarantor, pledgor, loan party or

owner, lessee or licensee of collateral under the Debt Financing that is not a Debtor shall have any successor or transferee liability of any kind, nature or character. At the request of the Investor and each of the Sponsors, the Debtors shall exercise the right to seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code in the manner reasonably requested by the Investor and each of its members.

6.2.    Disclosure Statement.  With respect to the motion filed by the Debtors, which the Debtors shall amend and modify to reflect the terms of this Agreement and the Plan, which amendment shall be reasonably acceptable to the Investor, and file with the Bankruptcy Court (as amended, the "Disclosure Statement Approval and Solicitation Motion"), seeking (i) to fix June 17, 2010 as the date for the hearing on the approval of the Disclosure Statement, and (ii) entry of an order (the "Disclosure Statement Approval and Solicitation Order") authorizing and approving, among other things, (A) the Disclosure Statement, (B) the Debtors' execution of the Agreement and the transactions contemplated in the Agreement, (C) the payment of the Expenses, including the increase in the Maximum Expense Reimbursement Amount provided for in Section 3.1 hereof it being understood that obtaining authorization for such increase shall not be a condition nor a termination event hereunder, and all other consideration and fees contemplated under the Agreement and (D) the indemnification provisions set forth in the Agreement, the Debtors shall use commercially reasonable efforts to (i) obtain a waiver of Bankruptcy Rule 6004(h) and request that the Disclosure Statement Approval and Solicitation Order be effective immediately upon its entry by the Bankruptcy Court, (ii) fully support the Disclosure Statement Approval and Solicitation Motion seeking the entry of the Disclosure Statement Approval and Solicitation Order, and any application seeking Bankruptcy Court approval and authorization to pay the Expenses as an administrative expense of the estate, (iii) obtain approval of the Disclosure Statement Approval and Solicitation Order as soon as practicable, (iv) cause the Disclosure Statement Approval and Solicitation Order to become a final order as soon as practicable and (v) defend any appeal of the Disclosure Statement Approval and Solicitation Order.

6.3.    Hearing on Confirmation. The Company shall use its commercially reasonable efforts to have the hearing on confirmation of the Plan scheduled as soon as possible after the Bankruptcy Court enters the order approving the Disclosure Statement.

6.4.    Conduct of Business. During the period from the date of this Agreement to the Effective Date (except as otherwise expressly provided by the terms of this Agreement, the Plan or any other order of the Bankruptcy Court entered on or prior to the date hereof in the Chapter 11 Cases), the Company shall carry on its businesses in the ordinary course and, to the extent consistent therewith, use its commercially reasonable efforts to preserve intact its current business organizations, keep available the services of its current officers and employees and preserve its relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company. Without limiting the generality of the foregoing, and except as otherwise expressly provided or permitted by this Agreement, the Plan or any other order of the Bankruptcy Court entered as of the date hereof in these Chapter 11 Cases, prior to the Effective Date, the Company shall not take any of the following actions without the prior written consent of the Investor, which consent shall not be unreasonably withheld, conditioned or delayed:

(a)     amend or modify its organizational documents;

(b)     (I) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock or equity or other ownership interests, (II) split, combine or reclassify any of its capital stock or equity or other ownership interests or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or equity or other ownership interests or (III) purchase, redeem or otherwise acquire any shares of capital stock or equity or other ownership interests of the Debtors or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities;

(c)     except for intercompany transactions and any financing activities which are consistent with the Company's existing financing, issue, deliver, grant, sell, pledge, dispose of or otherwise encumber any of its capital stock or any securities convertible into, or any rights, warrants or options to acquire, any such capital stock at less than fair market value;

(d)     acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the stock, or other ownership interests in, or substantial portion of assets of, or by any other manner, any business or any corporation, partnership, association, joint venture, limited liability company or other entity or division thereof except in the ordinary course of business;

(e)     sell, lease, mortgage, pledge, grant a lien, mortgage, pledge, security interest, charge, claim or other encumbrance of any kind or nature on or otherwise encumber or dispose of any of its properties or assets, except in the ordinary course of business consistent with past practice;

(f)     incur any indebtedness for borrowed money or guarantee any such indebtedness of another individual or entity, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Debtors, guarantee any debt securities of another individual or entity, enter into any "keep well" or other agreement to maintain any financial statement condition of another Person;

(g)     enter into any contract, agreement or arrangement that will be in effect on the Effective Date and that (i) has, or that the Company reasonably expects to have, any future Liability or payments in excess of five million dollars ($5,000,000) individually, or twenty-five million dollars ($25,000,000) in the aggregate, (ii) is not terminable by the Company by notice of not more than ninety (90) days for a cost of less than one hundred thousand dollars ($100,000), and (iii) was not entered into in the ordinary course of business;

(h)     (i) enter into, adopt, amend or terminate any employee benefit plan, (ii) increase in any manner the compensation or fringe benefits of any director or officer of the Company, except as contemplated by existing agreements, (iii) enter into, renew, for more than six (6) months on existing terms, (other than contracts, agreements, commitments or arrangements that by their terms renew automatically without action by either party) or terminate any contract, agreement, commitment or arrangement providing for the payment of compensation or benefits to any director or officer of the Company, or (iv) terminate the

employment of or hire any officer (other than to fill vacancies, with the consent of the Investor not to be unreasonably withheld) or director of the Company (other than termination for cause);

(i)      make any changes to existing accounting policies or adopt new accounting policies unless required by law or changes in GAAP;

(j)      (i) make, change or revoke any material tax election, (ii) enter into any settlement or compromise of any material tax Liability, (iii) except as otherwise provided in Schedule 6.4(j)(iii) with respect to a material tax refund, file any amended tax return with respect to any material tax, (iv) change any annual tax accounting period, (v) enter into any closing agreement relating to any material tax, (vi) knowingly fail to claim a material tax refund for which it is entitled, (vii) make material changes to their tax accounting methods or principles, or (viii) make any changes to the operation of its property (real and personal tangible and intangible) held, for federal income tax purposes, directly by ESA that would adversely affect the ability to meet the requirements of subsections 856(c)(2) through 856(c)(6) of the Tax Code or that would cause less than substantially all of the real properties held for federal income tax purposes, directly by ESA to constitute a qualified lodging facility within the meaning of section 856(d)(9)(D) of the Tax Code;

(k)      sell, assign, exclusively license, abandon or otherwise dispose of: (i) any registered Company Intellectual Property; (ii) any material unregistered trademark, service mark, trade name or domain name that is Company Intellectual Property; or (iii) except in the  ordinary course of business, any Company Intellectual Property other than that which is set forth in (i) or (ii) above;

(l)      file an Internal Revenue Service Form 1122 or otherwise authorize or consent to joining ESA in the filing of a consolidated return for federal income tax purposes pursuant to Treasury Regulation §1.1502-75(h); and

(m)      authorize any of, commit or agree to take any of, the foregoing actions.

6.5.    <u>Financing Assistance</u>.  In the period in between the date hereof and the Closing, upon request of the Investor or the Sponsors, the Company shall use commercially reasonable efforts, and shall use commercially reasonable efforts to cause its Affiliates and their representatives, to cooperate in connection with the arrangement and obtaining of the Debt Financing, including, (a) providing such information or documents reasonably requested by Investor, which are in the Company's possession or which are readily available to the Company without undertaking significant compilation or analysis, (b) providing reasonable access to the books and records of the Company, (c) as applicable, using commercially reasonable efforts to prepare, execute and/or deliver all customary documents reasonably necessary for obtaining the Debt Financing as may be reasonably requested by the Investor in connection with the Debt Financing, including, without limitation, mortgage, pledge and security documents, ground lessor estoppel certificates, tenant estoppel certificates, subordination, non-disturbance and attornment agreements, appraisals, title insurance policies, certificates of insurance, customary legal opinions, schedules, pay-offs letters and releases and other documentation reasonably requested by the Investor, and (d) upon reasonable advance notice by the Investor, participating in a reasonable number of meetings, drafting sessions, due diligence session and sessions with

rating agencies and lenders; <u>provided</u>, that, prior to the Closing, the Company shall not (A) be required to pay any fee in connection with the Debt Financing, (B) have any liability or obligation under any loan agreement or any related document or any other agreement or document related to the Debt Financing or (C) be required to incur any other liability or expense in connection with the Debt Financing unless reimbursed or reasonably satisfactorily indemnified by the Investor.

6.6.    <u>Further Assurances</u>. Subject to all terms and conditions of this Agreement, after the entry of the Confirmation Order, each party shall, at the request of any other party hereto and without further conditions or consideration, take such other actions as such other party may reasonably request in order to more effectively consummate the transactions contemplated hereby and in accordance with and subject to the terms and conditions of this Agreement and the Transaction Agreements, including, using commercially reasonable efforts to cause the satisfaction of all conditions to the other party's conditions to Closing and the Effective Date to occur that are in such party's control to occur. Without limiting the generality of the foregoing, the Company shall, and shall cause its officers, employees, agents and representatives to, use commercially reasonable efforts to obtain any third party consents as shall be required to be obtained in connection with the consummation of the transactions contemplated hereby and by the Plan.

6.7.    <u>Access to Information</u>. Subject to applicable law and existing confidentiality agreements between the parties, upon reasonable notice, the Company shall afford the Investor and its members and Affiliates, the Lenders, and each of their respective members, directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives, and reasonable access, throughout the period prior to the Effective Date, to its employees, consultants, properties, books, contracts and records and, during such period, the Company shall furnish promptly to the Investor and its members or Affiliates all information concerning its business, properties and personnel as may be reasonably requested by the Investor or its members or Affiliates. Unless otherwise agreed to by the Company and the Investor, any such examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law.

6.8.    <u>Notices</u>. Between the date hereof and the Closing, each party shall give prompt written notice to the other parties hereto (i) the occurrence, or failure to occur, of any event of which such party is aware which occurrence or failure would be likely to cause (a) any representation or warranty of such party contained in this Agreement to be untrue or inaccurate in any material respect, (b) any covenant of such party contained in this Agreement not to be satisfied or (c) any condition precedent contained in the Plan or this Agreement not to occur or become impossible to satisfy, (ii) receipt of any notice or other communication from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by this Agreement or the Transaction Agreements, (iii) any notice or other communication from any governmental entity in connection with the transactions contemplated by this Agreement or the Transaction Agreements, (iv) any action commenced, or, to the knowledge of such party, threatened, relating to or involving or otherwise affecting such party or the transactions contemplated by this Agreement or the Transaction Agreements, and (v)

any failure of any such party to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.

6.9. <u>Regulatory Filings</u>. If the Company or the Investor determines a filing is or may be required under applicable law in connection with the transactions contemplated hereunder, including, any filing or notification required under the HSR Act, the Company and the Investor shall use commercially reasonable efforts to promptly prepare and file all necessary documentation and to effect all applications that are necessary or advisable under applicable law with respect to the transactions contemplated hereunder so that any applicable waiting period shall have expired or been terminated as soon as practicable after the date hereof. The Investor shall use commercially reasonable efforts to cooperate with the Company in connection with any such filing. The Investor shall be responsible for payment of the applicable filing fee under the HSR Act, and each party shall be responsible for payment of its own respective costs and expenses (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.

6.10. <u>Financial Information</u>. For each month, beginning June 2010 until the Effective Date, the Company shall provide (i) upon written request of the Investor, to the Investor, an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders' equity and consolidated statements of cash flows for the month then ended within 30 days of the end of such month (the "<u>Monthly Financial Statements</u>") and (ii) to the Investor, a Revenue Report. The Monthly Financial Statements and Revenue Reports, except as indicated therein, shall be prepared in accordance with the Company's normal financial reporting practices. The Monthly Financial Statements shall fairly present in all material respects the financial position, results of operations and cash flows of the Company as of the dates indicated and for the periods specified.

6.11. <u>Support by Investor</u>. The Investor agrees that it shall not consent to, or otherwise directly or indirectly support any restructuring or reorganization plan for the Debtors that is inconsistent with this Agreement or the Plan.

6.12. <u>Change of Control Payments</u>. From and after the Effective Date, HVM shall pay any severance payments to the extent such payments are due and payable under the Change in Control Agreements in the amounts set forth in the Change in Control Letter; <u>provided,</u> that any such payments shall be made only to the extent that the applicable Change in Control Agreement is in effect and/or has not been superseded by any New Employment Agreement (as defined in Section 9.1) between the applicable employee and HVM, <u>provided, further,</u> that if HVM Manager resigns and appoints NewCo Manager as successor manager of HVM, (i) NewCo Manager agrees to cause HVM to pay any severance payments to the extent such payments are due and payable under the Change in Control Agreements in the amounts set forth in the Change in Control Letter; <u>provided,</u> that any such payments shall be made only to the extent that the applicable Change in Control Agreement is in effect and/or has not been superseded by any New Employment Agreement (as defined in Section 9.1) between the applicable employee and HVM and (ii) the amounts paid by HVM under the Change in Control Agreements shall be reimbursed through the Management Agreements or the G&A Reimbursement Agreements (as each term is defined in the Plan).

6.13.  Intentionally Omitted.

6.14.  Acquisition of HVM and HVM Manager.  Subject to clause (vi) of the definition of Cash Distribution set forth in the Plan, the Company hereby acknowledges and agrees that any and all amounts to be paid to the holders of equity or other ownership interests in either or both of HVM Manager and/or HVM to cause the conditions set forth in Sections 11.1(c)(ii) and (c)(iv) to be satisfied shall be paid from the Investment Consideration, including, without limitation, pursuant to that certain Membership Interest Purchase Agreement by and between David Lichtenstein, the Debtors and the Investor, dated as of the date hereof.

**Section 7.  Intentionally Omitted**.

**Section 8.  Intentionally Omitted**.

**Section 9.  NewCo Management Incentive Plan**.

9.1.  In connection with the implementation of the Plan and the restructuring transactions contemplated thereby, it is currently contemplated that HVM will be the management company for the reorganized Debtors' properties through taxable Subsidiaries (each, a "TRS") of NewCo from and after the Effective Date. The current management agreements with HVM will be assumed by, or assumed and assigned to, the TRS (or one or more newly formed Subsidiaries, wholly owned either directly or indirectly by NewCo, or designated by an existing Debtor that is a TRS) and modified on the Effective Date pursuant to Section 11.5 of the Plan. On the Effective Date, HVM shall enter into new employment agreements and other compensation arrangements, which shall be reasonably acceptable to the Investor, with the executive officers and senior management for HVM, who shall be reasonably acceptable to the Investor, relating to, among other things, compensation, benefits, and supplemental retirement benefits, which agreements shall be mutually agreed to by the Investor and current management (the "New Employment Agreements").

9.2.  On and after the Effective Date, NewCo shall implement a new management incentive plan, in form and substance reasonably acceptable to the Investor, with NewCo Common Interests being available for issuance thereunder, through a combination of the award of restricted membership interests and granting of equity based awards, including, without limitation, restricted membership interests, deferred membership interests and options (the "NewCo Management Incentive Plan"). The NewCo Management Incentive Plan will be designed to provide additional compensation to HVM pursuant to and in connection with the management agreements between the TRSs of NewCo that are parties to such management agreements and HVM that are being assumed by, or assumed and assigned to, the TRSs (or one or more newly formed TRSs, wholly owned either directly or indirectly by NewCo, or designated by an existing Debtor that is a TRS) and modified on the Effective Date pursuant to Section 11.5 of the Plan to provide for, among other things, such issuance of the NewCo Common Interests as part of HVM's compensation thereunder.  HVM shall allocate the benefit of the NewCo Management Incentive Plan to the executive officers and senior management of HVM for their management services.  The identity of recipients, amount of grants and other terms including, without limitation, vesting, will be determined by the manager of HVM.

9.3.    It is understood that the New Employment Agreements and the NewCo Management Incentive Plan will be structured to provide incentive compensation that aligns the interests of management with those of the holders of NewCo Common Interests, either by creating an incentive compensation structure tied to the returns on the NewCo Common Interests or through an alternate structure mutually agreeable to the Company, management and the Investor.  It is further understood that compliance with or satisfaction of this Section 9 shall not be a condition to the consummation of the transactions contemplated hereby.

**Section 10.    Public Statements**.

10.1.    Neither the Company nor the Investor shall issue any public announcement, statement or other disclosure with respect to this Agreement or the transactions contemplated herein without the prior consent of the other parties hereto, which consent shall not be unreasonably withheld or delayed, other than to the extent required by law, the Bankruptcy Code or Bankruptcy Rules, or as otherwise ordered by the Bankruptcy Court.

**Section 11.    Conditions to Closing**.

11.1.    The obligations of the Investor hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction prior to the Effective Date of each of the following conditions:

(a)    Organizational Documents. All organizational documents of NewCo shall be in form and substance reasonably acceptable to the Investor.

(b)    Organizational Structure. The structure of the transactions contemplated by this Agreement and the structure and organization of the Company on and after the Effective Date (including the implementation of any alternate structure, form or identity of NewCo and/or any of its Subsidiaries and the corresponding changes to the structure of the Investment, determined by the Investor in accordance with Section 1.1 hereof, and the characterization for U.S. federal income tax purposes of any entity as a partnership, a corporation, a real estate investment trust, a limited liability company or other entity); the utilization or preservation of any tax attributes or benefits of the Company (including the tax basis at which the Company holds the Business Assets); and the resolution of any tax issues or potential Liability, shall be reasonably acceptable to the Investor. The treatment in the Confirmation Order of any current, contingent or potential Liability in respect of taxes that would in any way affect NewCo or the Reorganized Debtors shall be approved by the Investor in its sole discretion.

(c)    Business Operations. As of the Effective Date (i) NewCo, through itself or its Subsidiaries, shall have all right, title and interest to any and all equity or other ownership interests in the Debtors, (ii) at the Investor's election to be made in its sole and absolute discretion, (x) one or more designees of the Investor (which may include NewCo or its Subsidiaries or any other Person) shall have all right, title and interest to any and all equity or other ownership interests in either or both of HVM and/or HVM Manager, (y) NewCo, through itself or its Subsidiaries, shall have all right, title and interest to any and all equity or other ownership interests in either or both of HVM Manager and/or HVM, and/or (z) HVM Manager shall have resigned as manager of HVM and shall have appointed NewCo Manager as successor

manager of HVM, (iii) NewCo or one or more designees of the Investor, through itself or its Subsidiaries, shall have all right, title and interest to all Company Intellectual Property and BHAC Intellectual Property, (iv) at the Investor's election to be made in its sole and absolute discretion, NewCo or one or more designees of the Investor, through itself or its Subsidiaries, shall have all right, title and interest to any and all of the Business Assets, including, without limitation, all right, title and interest to any and all assets of either or both of HVM Manager and/or HVM (which may exclude human resources assets), free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind, except as provided in the Plan, and (v) the Debtors being acquired by the Investor shall have all right, title and interest to any and all proceeds received or entitled to be received by the prevailing plaintiffs in respect of the Windows Litigation, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind, except as provided in the Plan.

(d)    Approval of Plan Documents. The Investor and its members and Affiliates shall have approved, which approval shall not to be unreasonably withheld, prior to filing with the Bankruptcy Court any documents, amendments or supplements relating to the Plan and Disclosure Statement (collectively, the "Plan Documents").

(e)    Plan. The Company shall have complied in all material respects with the terms and conditions of the Plan that are to be performed by the Company prior to the Effective Date.

(f)    Alternate Transaction. The Debtors shall not have entered into any binding commitments with respect to an Alternate Transaction.

(g)    Change of Recommendation. There shall not have been a Change of Recommendation.

(h)    Confirmation Order.

(1)    The Confirmation Order, in form and substance approved by the Investor and each of the Sponsors, approving the Plan (including, without limitation, all Plan Documents) shall provide, among other things, that: (i) except with respect to the Litigation Trust Assets, the Administrative/Priority Claims Reserve, the Mortgage Parties Indemnification Fund (each as defined in the Plan) and any other wind down reserve or other fund established pursuant to the Plan, all right, title and interest in and to any and all assets, property, unexpired leases and executory contracts of every kind and nature to be sold, assigned, transferred or otherwise disposed of under the Plan shall be sold, assigned, transferred and disposed of free and clear of any and all claims, liens and encumbrances of any entity (as such term is defined in section 101(15) of the Bankruptcy Code) including, without limitation, (a) any and all claims, liens, encumbrances and any and all right, title and interests related thereto of government entities with respect to tax Liabilities and (b) any and all claims, liens, encumbrances and any and all right,

title and interests related thereto arising or resulting from or relating to the transactions contemplated hereby and by the Plan (including, without limitation, all Plan Documents); (ii) the Investor and the Sponsors are each a good faith purchaser of the Company and its assets and property and are entitled to the protections afforded good faith purchasers under the Bankruptcy Code; (iii) except with respect to administrative expense claims of the type specified in Section 1.7(c)(i) of the Plan as expressly provided for in Section 2.1 of the Plan, NewCo shall not be a successor to any of the debtors in the Chapter 11 Cases by reason of any theory of law or equity; (iv) NewCo and each of the Debtors shall not be a successor to ESA and shall not have any successor or transferee Liability of any kind, nature or character, including, without limitation, Liabilities arising or resulting from or relating to the transactions contemplated hereby and by the Plan (including all Plan Documents); (v) the Company and the Investor are authorized to consummate the transactions contemplated herein and in the Plan and enter into, execute and deliver all necessary documents, including those required in connection with the Debt Financing; (vi) the Debt Financing (including, without limitation, any and all terms, conditions and covenants thereof) has been negotiated in good faith and at arm's-length among the borrower thereunder and the Lenders, and any credit extended or loans made to the Company by the Lenders has been extended, issued and made in good faith and for legitimate business purposes; and (vii) the guarantees, mortgages, pledges, liens and other security interests, and all other consideration granted pursuant to or in connection with the Debt Financing are granted in good faith, for good and valuable consideration and for legitimate business purposes as an inducement to the Lenders to make the Debt Financing, and do not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance or re-characterization; and (viii) neither the Investor, the Lenders, nor any borrower, guarantor, pledgor, loan party or owner, lessee or licensee of collateral under the Debt Financing that is not a Debtor shall have any successor or transferee liability of any kind, nature or character; and

(2)     The Confirmation Order shall be a Final Order (as such term is defined in the Plan).

(i)     <u>Intentionally Omitted.</u>

(j)     <u>Conditions to Effective Date</u>. The conditions to the occurrence of the Effective Date of the Plan shall have been satisfied or waived by the Company and the Investor in accordance with the Plan.

(k)     Intentionally Omitted.

(l)     Consents. All other material governmental and third party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement and the Plan shall have been made or received and remain in effect.

(m)     No Legal Impediment to Issuance. No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan, the Investment or the transactions contemplated by this Agreement or the Plan.

(n)     Representations and Warranties. Except as provided in Sections 4.1(h), (i) and (x) hereof, the representations and warranties of the Debtors, HVM Manager and HVM contained in Section 4 hereof shall be true and correct (without giving effect to any limitations as to materiality or Material Adverse Change set forth therein) as of the date hereof and at and as of the Effective Date with the same force and effect as if made at and as of such date (or, in the case of representations and warranties made as of a specific date, as of such date), except to the extent that any failure of such representations and warranties, individually or in the aggregate, to be true and correct has not caused, and would not reasonably be expected to cause, a Material Adverse Change. The representations and warranties contained in Section 4.1(x) hereof shall be true and correct as of the date hereof and at and as of the Effective Date with the same force and effect as if made at and as of such date (or, in the case of representations and warranties made as of a specific date, as of such date), except to the extent that any failure of such representations and warranties, individually or in the aggregate, to be true and correct has not had, and would not reasonably be expected to have, a material adverse effect on the ability of NewCo or any one or more of its Subsidiaries to be characterized as a real estate investment trust on and after the Effective Date. The representations and warranties contained in Sections 4.1(h) and (i) shall be true and correct as of the date hereof and at and as of the Effective Date with the same force and effect as if made at and as of such date (or, in the case of representations and warranties made as of a specific date, as of such date).

(o)     Covenants. The Company and the Investor shall have performed and complied with all of their covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including, without limitation, in any Transaction Agreement) in all material respects through the Effective Date.

(p)     Company Liabilities. On and as of the Effective Date, the Company shall have no Liabilities, other than those incurred in the ordinary course of business not to exceed, individually or in the aggregate, forty million dollars ($40,000,000), whether absolute, accrued, contingent or otherwise, except as contemplated by the Plan, set forth in the Disclosure Statement or set forth in the HVM Financial Statements.

(q)     Management Compensation. To the extent such payments are due and payable, HVM shall pay any severance payments pursuant to the terms of the applicable Change in Control Agreements as in effect as of the date any such severance payments become due and

payable, in the amounts set forth in the Change in Control Letter; provided, that any such payments shall be made only to the extent that the applicable Change in Control Agreement is in effect and/or has not been superseded by any New Employment Agreement between the applicable employee and HVM. NewCo or the Debtors shall have resolved any other claims of former executive officers of the Debtors, or executive officers that were employed by the Debtors after the Commencement Date and that have resigned from or been terminated by the Company prior to the Effective Date, on terms reasonably acceptable to the Investor or otherwise ordered by the Bankruptcy Court; provided, that, to the extent any claims under this Section 11.1(q) are to be resolved by the Debtors, any such resolution may only be effectuated with the prior consent of the Investor, which consent is not to be unreasonably withheld.

(r) Intentionally Omitted.

(s) Regulatory Filing. Any filing required under applicable law in connection with the transactions contemplated hereunder and all necessary documentation or applications required in connection with any such filing shall have been filed by the Company and any applicable waiting period shall have expired or been terminated.

(t) Intentionally Omitted.

(u) Other Plan Related Documents. All motions and other documents to be filed with the Bankruptcy Court in connection with this Agreement, the Plan, the Investment, the sale of the NewCo Common Interests and payment of the fees contemplated hereunder and under the Plan will be in form and substance reasonably acceptable to the Investor.

(v) BHAC Intellectual Property. With respect to the BHAC Intellectual Property that will be transferred to NewCo on the Effective Date, as of the Effective Date, (1) all material applications to register and registrations of the BHAC Intellectual Property that were, prior to such transfer, owned by BHAC (i) are valid and in full force and effect, (ii) have not, except in accordance with the ordinary course practices of BHAC, lapsed, expired or been abandoned (provided that the foregoing will not be deemed a representation that any registration for any trademark will issue upon an application therefor), and (iii) are not the subject of any opposition or cancellation filed with the United States Patent and Trademark Office, domain name registrar or any other applicable Intellectual Property registry; (2) BHAC has taken reasonable security measures to protect the confidentiality and value of its trade secrets (or other BHAC Intellectual Property for which the value is dependent upon its confidentiality) and no such information has been misappropriated or is the subject of an unauthorized disclosure; (3) BHAC has not received any written notice in the prior two (2) years that it is in material default (or with the giving of notice or lapse of time or both, would be in default) under any contract relating to the BHAC Intellectual Property; (4) no BHAC Intellectual Property rights that were, prior to such transfer, owned by BHAC are being infringed by any other Person; and (5) BHAC has not received any written notice of any claim of infringement, misappropriation, or violation with any such rights of others in the prior thirty (30) months. The consummation of the transactions contemplated hereby and by the Plan, including, without limitation, the transfer of any BHAC Intellectual Property to NewCo, shall not result in the material loss or impairment of any rights to use the BHAC Intellectual Property or obligate NewCo to pay any royalties or other

amounts to any third party in excess of the amounts that would have been payable by BHAC absent the consummation of the transactions contemplated hereby and by the Plan.

(w) Material Adverse Change. No Material Adverse Change shall have occurred from the date hereof to the Effective Date.

(x) Compliance with FIRPTA. The Debtors shall have delivered to NewCo a non- foreign affidavit from their regarded owner, as applicable, (which for the avoidance of doubt is either Extended Stay, Inc. or DL-DW Holdings LLC), dated as of Closing, sworn under penalty of perjury, in form and substance required under Treasury Regulations issued pursuant to Tax Code Section 1445, stating that, for U.S. federal income tax purposes, it is (i) not a disregarded entity; (ii) a transferor of Business Assets pursuant to the Plan; and (iii) not a "foreign person" as defined in Tax Code Section 1445. Each Debtor that is a Foreign Person Debtor shall have provided an affidavit dated as of Closing, sworn under penalties of perjury, that the interests, if any, transferred by the Foreign Person Debtor pursuant to the Plan are not U.S. real property interests within the meaning of Tax Code Section 897(c) and Treasury Regulation 1.897-1(c). For purposes of this Section, "Foreign Person Debtor" means any Debtor that is a "foreign person" within the meaning of Treasury Regulation Section 1.1445-2(b)(2)(i) and that is deemed for US tax purposes to be a transferor of property under the Plan.

11.2. All or any of the conditions set forth in this Section 11 may be waived in writing, in whole or in part by the Investor in its sole discretion.

**Section 12.   Closing.**

12.1.   The Closing shall take place at the offices of Weil, Gotshal & Manges LLP, in New York, New York, on the Effective Date, provided that all of the conditions to the closing contained in Section 11 have been satisfied or waived by the Company or the Investor (as applicable) and provided that this Agreement has not been terminated in accordance with Section 13, or at such other location or such other date as may be mutually agreed by the Company and the Investor. The Closing shall be deemed to be effective as of 12:01 a.m. on the Effective Date and all documents and instruments shall be deemed to have been delivered simultaneously at such time.

12.2.   At the Closing, the Company shall deliver to the Investor the following:

(a) A certificate or certificates representing the number of shares of NewCo Common Interests issued to the Investor and its members and Affiliates designated under Section 2.3 pursuant to Section 1 hereof; and

(b) A certificate of an officer of the Company to the effect that all of the conditions set forth in Section 11.1 have been fulfilled or waived and that the Company has complied with all of the covenants contained in this Agreement in all material respects.

12.3.   At the Closing, the Investor shall deliver or cause to be delivered to the Company the following:

(a)     Payment of the Investor Payment and the proceeds of the Debt Financing and contribution of the Certificates, provided, that the Deposit shall be applied against the Investor Payment as set forth and in accordance with the Escrow Agreement and Bidding Procedures; and

(b)     A certificate of the Investor to the effect that the representations and warranties of the Investor contained in this Agreement are true and correct in all material respects on and as of the Effective Date, with the same effect as if made on the Effective Date.

## Section 13.     **Termination**.

13.1.     Automatic Termination. This Agreement shall automatically terminate if any court of competent jurisdiction or other competent governmental or regulatory authority issues a final nonappealable order making illegal or otherwise restricting, preventing, or prohibiting the transactions set forth in this Agreement or the Plan in a manner that cannot be reasonably remedied by the Debtors or the Investor.

13.2.     Termination by Mutual Consent. This Agreement may be terminated at any time prior to the Effective Date upon the mutual written consent of the Company (with the consent of the Special Servicer and the Operating Advisor (each as defined in the Plan) such consent not to be unreasonably withheld) and the Investor.

13.3.     Termination by the Investor. Prior to the Effective Date, the Investor may terminate this Agreement upon written notice to the Company of the occurrence of any of the following events, at which time the commitment of the Investor to purchase the NewCo Common Interests under Section 1.2 as set forth in this Agreement shall terminate and all of the obligations of the Company (other than the obligations of the Company to pay the Expenses and to satisfy their indemnification obligations set forth in this Agreement) shall be of no further force or effect:

(a)     the hearing on the Disclosure Statement does not occur on June 17, 2010 (or such later time if extended in writing by the Investor);

(b)     the Bankruptcy Court fails to enter the Disclosure Statement and Solicitation Approval Order on or before June 22, 2010;

(c)     the commencement of the hearing on confirmation of the Plan does not occur on or prior to August 26, 2010 (or such later time if extended in writing by the Investor);

(d)     the Confirmation Order, has not been entered by the Bankruptcy Court on or before September 21, 2010;

(e)     the Effective Date does not occur on or before November 15, 2010;

(f)     the withdrawal, amendment, modification of, or the filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement or any document related to the Plan or Disclosure Statement (including, without limitation, any documents in the supplement to the Plan, any motion, notice, exhibit, appendix or order) by the Company, which withdrawal,

amendment, modification or filing is inconsistent with this Agreement, except as reasonably agreed to in writing by the Investor;

(g)        the filing by the Company of any motion or other request for relief seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(h)        the entry of an order by the Bankruptcy Court (a) dismissing any of the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) appointing a trustee pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; or (d) making a finding of fraud, dishonesty, or misconduct by any officer or director of the Company;

(i)        a breach by the Company of any of its obligations under this Agreement that is not cured within three (3) Business Days after receipt of written notice thereof to the Investor;

(j)        one or more of the conditions precedent to occurrence of the Effective Date or to the obligations of the Investor set forth in this Agreement becomes impossible to satisfy on or before the Effective Date;

(k)        the Debtors fail to comply with the provisions on the last page of the Bidding Procedures entitled "End of Auction Process"; and

(l)        at any time after the occurrence of a Material Adverse Change.

13.4.    <u>Termination by the Company</u>. The Company may terminate this Agreement upon written notice to the Investor at any time prior to the Effective Date, after a material breach of this Agreement by the Investor (unless any entity that is part of the Company is then in material breach of this Agreement), which breach is not cured within three (3) Business Days following the receipt by the Investor of notice of such breach, at which time the commitment of the Investor to purchase the NewCo Common Interests as set forth in this Agreement shall terminate and all of the obligations of the Company shall be of no further force or effect, except as set forth in Sections 13.5 and 13.6.  In the event this Agreement is terminated by the Company in accordance with this Section 13.4 due to a material breach by the Investor as determined by a final order of the Bankruptcy Court, as set forth and in accordance with the Escrow Agreement and the Bidding Procedures, the Company, in addition to its other rights and remedies, shall be entitled to retain the Deposit.

13.5.    <u>Consequences of Termination</u>.  In the event this Agreement is terminated other than pursuant to Section 13.4, in addition to the payment of the Expenses as set forth above, the Investor shall be entitled to the return of the Deposit, all as set forth in and in accordance with the Escrow Agreement and Bidding Procedures.   If the Agreement is terminated pursuant to the terms of Sections 13.1, 13.2 or 13.3, this Agreement shall forthwith become void and there shall be no further obligations on the part of the Company or the Investor, except for the obligations of the Company to return the Deposit and pay the Expenses and to satisfy its indemnification obligations as set forth in this Agreement, which shall survive termination of this Agreement and

shall remain in full force and effect, _provided_, that the Company shall have no such obligation in the event that the Agreement is terminated pursuant to Section 13.4 prior to any other termination (except for the obligations of the Company to satisfy its indemnification obligations provided in Section 14 hereof relating to any Proceedings (as defined in Section 14.1 hereof) asserted or commenced by a third party as a result of or arising out of or relating to this Agreement, the Investment or the Plan); _provided, further_ that nothing in this Section 13.5 shall relieve any party from Liability for any willful breach of this Agreement.

13.6.     Payments Upon Termination. Upon termination of this Agreement pursuant to this Section 13, payment of all amounts due under this Agreement pursuant to Section 3 hereof shall be made no later than the close of business on the next Business Day following the date of such termination, except for amounts owing by the Company to the Investor for the reimbursement of Expenses for which the Investor has not then made a request, payment of which amounts shall be made not later than five (5) Business Days following the Investor's request.

## Section 14.     Indemnification.

14.1.     The Debtors (the "Indemnifying Party") shall indemnify and hold harmless the Investor and its partners, members, managers and equity holders, their members and partners, and the respective officers, employees, Affiliates, advisors, agents, attorneys, financial advisors, accountants, consultants of each such entity (each an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, which any such Person or entity may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to this Agreement, the Investment or the Plan, the transactions contemplated thereby, the use of proceeds thereunder or any related transaction or any claim, litigation, investigation or proceeding ("Proceedings") relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and reimburse each of such Indemnified Persons within ten (10) days of demand for any legal or other expenses reasonably incurred in connection with any of the foregoing; _provided, however,_ that the foregoing indemnity shall not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the bad faith, willful misconduct or gross negligence of such Indemnified Person. Notwithstanding any other provision of this Agreement, no Indemnifying Party shall be liable to an Indemnified Person for any special, indirect, consequential or punitive damages in connection with its activities related to this Agreement, the Plan or the transactions contemplated hereby, it being understood and agreed that the Indemnifying Party shall only be liable to an Indemnified Person for special, indirect, consequential or punitive damages that are incurred or suffered by a third party and that form a part of a claim by a third party against the Indemnified Person. The terms set forth in this paragraph survive termination of this Agreement.

14.2.     Promptly after receipt by an Indemnified Person of notice of the commencement of any Proceedings with respect to which the Indemnified Person may be entitled to indemnification hereunder, such Indemnified Person shall, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided that (i) the omission to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have hereunder except to the

extent it has been materially prejudiced by such failure and (ii) the omission to so notify the Indemnifying Party shall not relieve it from any Liability that it may have to an Indemnified Person otherwise than on account of this Section 14. In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party shall be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person; provided, that if the defendants in any such Proceedings include both such Indemnified Person and the Indemnifying Party and such Indemnified Person shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of different and/or additional legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel in any jurisdiction, approved by the Investor, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

14.3.    The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld), effect any settlement of any pending or threatened Proceedings in respect of which indemnity has been sought hereunder by such Indemnified Person unless (i) such settlement relates solely to monetary damages for which the Indemnifying Party shall be responsible and includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all Liability on the claims that are the subject matter of such Proceedings and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

**Section 15.     No Survival**.

15.1.    The representations and warranties of the Company and the Investor contained in this Agreement or in any certificate delivered hereunder shall not survive the Closing hereunder.

**Section 16.     Notices**.

16.1.    All notices, communications and deliveries required or permitted by this Agreement shall be made in writing signed by the party making the same, shall specify the Section of this Agreement pursuant to which it is given or being made and shall be deemed given or made (a) on the date delivered if delivered by telecopy or other standard form of written

telecommunication *(e.g.* e-mail) and confirmed by receipt of electronic confirmation or other evidence of receipt, (b) on the date delivered, if delivered in person, (c) on the third (3rd) Business Day after it is mailed if mailed by registered or certified mail (return receipt requested) (with postage and other fees prepaid) or (d) on the day after it is delivered, prepaid, by an overnight express delivery service that confirms to the sender delivery on such day, as follows:

      (1)     if to the Investor, at:

            Centerbridge Partners, L.P.
            375 Park Avenue, 12th floor
            New York, NY 10152
            Attn:   Vivek Melwani
                     William Rahm

            Email: vmelwani@centerbridge.com
                     wrahm@centerbridge.com

            - and-

            Paulson & Co. Inc.
            1251 Avenue of the Americas, 50th floor
            New York, NY 10020
            Attn: Daniel Kamensky
            Email: daniel.kamensky@paulsonco.com

            -and-

            Blackstone Real Estate Partners VI L.P.
            345 Park Avenue, 32nd Floor
            New York, NY 10154
            Attn: A.J. Agarwal
            Email: agarwal@Blackstone.com

      with a copy to (which shall not constitute notice):

            Fried, Frank, Harris, Shriver & Jacobson LLP
            One New York Plaza
            New York, NY 10004
            Attn: Jennifer Rodburg, Esq.
            Email: jennifer.rodburg@friedfrank.com

            -and-

            Gibson, Dunn & Crutcher LLP
            200 Park Avenue
            New York, NY 10166-0193
            Attn: David M. Feldman, Esq.

Email: dfeldman@gibsondunn.com

-and-

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017-3954
Attn: Mark Thompson, Esq.
Email: mthompson@stblaw.com

(2)  if to the Company, at:

c/o HVM L.L.C.
100 Dunbar Street
Spartanburg, SC 29306
Attn: Gary A. DeLapp
Email: gdelapp@extendedstay.com

with a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn: Jacqueline Marcus, Esq.
Email: jacqueline.marcus@weil.com

**Section 17.**  **Assignment**.

17.1.  This Agreement shall be binding upon, and shall inure to the benefit of and be enforceable by, the parties hereto and their respective successors and assigns. This Agreement is not assignable, in whole or in part; provided, however, that the Investor may assign all or any portion of its obligations hereunder to one or more financial institutions or investment funds reasonably acceptable to the Company; provided, that the Company's consent shall not be required for such an assignment to a member or an Affiliate of the Investor. Upon any assignment, other than an assignment with the Company's consent, the obligations of the Investor in respect of the portion of its obligations so assigned shall not terminate.

**Section 18.**  **Legends**.

18.1.  An appropriate restrictive legend shall be placed on the certificate or certificates representing the NewCo Common Interests issued pursuant to this Agreement in a form substantially similar to the legend set forth below:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SAID

LAWS OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS THEREOF, AND EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF AN OPERATING AGREEMENT WITH THE COMPANY, A COPY OF WHICH IS AVAILABLE FOR INSPECTION AT THE OFFICES OF THE COMPANY."

**Section 19.** **Entire Agreement**.

19.1.    Prior Negotiations; Entire Agreement. This Agreement, including, without limitation, the agreements and documents accompanying this Agreement or attached as exhibits to and the documents and instruments referred to in this Agreement, constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties shall continue in full force and effect.

**Section 20.** **Governing Law, Venue**.

20.1.    THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK. THE INVESTOR HEREBY IRREVOCABLY SUBMITS TO THE *EXCLUSIVE* JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVES ANY OBJECTION BASED ON *FORUM NON CONVENIENS*. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

**Section 21.** **Waivers and Amendments**.

21.1.    This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by all the parties or, in the case of a waiver, by the party waiving compliance, and subject, to the extent required, to the approval of the Bankruptcy Court. No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor shall any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity. Notwithstanding anything to the contrary in this Agreement, no amendment that increases the Investor's obligations with respect to the Investment shall be effective against the Investor without the Investor's consent.

**Section 22.**    **Miscellaneous**.

22.1.    Counterparts. This Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other party (including, without limitation, via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

22.2.    Headings. The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning of this Agreement.

22.3.    Severability. If any provision of this Agreement or the application thereof to any Person or circumstances is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to Persons or circumstances other than those as to which it has been held invalid, void or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effectuate the original intent of the parties.

22.4.    Specific Performance. The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions without the necessity of posting bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

22.5.    Joint and Several Obligations.

(a)    The agreements, representations, warranties, covenants and obligations of the Debtors under this Agreement are, in all respects, joint and several as among the Debtors; the agreements, representations, warranties, covenants and obligations of HVM Manager under this Agreement are, in all respects, several and not joint; and the agreements, representations, warranties, covenants and obligations of HVM under this Agreement are, in all respects, several and not joint.

(b)    If the Investor does not perform the Sponsors' obligations in accordance with this Agreement, each Sponsor will be responsible for and shall perform its ratable portion of such obligations, as provided on Schedule 1.2, on a several, and not joint, basis.

22.6.    Interpretation and Construction. This Agreement has been freely and fairly negotiated among the parties hereto. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement. Unless the context requires otherwise, any agreements, documents,

instruments or laws defined or referred to in this Agreement will be deemed to mean or refer to such agreements, documents, instruments or laws as from time to time amended, modified or supplemented, including, without limitation, (a) in the case of agreements, documents or instruments, by waiver or consent and (b) in the case of laws, by succession of comparable successor statutes. All references in this Agreement to any particular law will be deemed to refer also to any rules and regulations promulgated under that law. The words "include," "includes" and "including" will be deemed to be followed by "without limitation." The word "or" is used in the inclusive sense of "and/or" unless the context requires otherwise. References to a Person are also to its permitted successors and assigns. Pronouns in masculine, feminine and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context requires otherwise. When a reference in this Agreement is made to an Article, Section, Exhibit, Annex or Schedule, such reference is to an Article or Section of, or Exhibit, Annex or Schedule to, this Agreement unless otherwise indicated. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. For all purposes of this Agreement, "Debtors" shall include the reorganized Debtors and the Investor's "members and/or Affiliates" shall include the Sponsors.

**Section 23.  <u>Definitions</u>**.

"<u>Affiliate</u>" shall mean, as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person (for this purpose "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise).

"<u>Alternate Transaction</u>" means any plan, proposal, offer, financing or transaction with one or more parties other than the Investor, or any solicitation, discussions or negotiations with respect thereto.

"<u>BHAC</u>" means BHAC Capital IV LLC.

"<u>Business Day</u>" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close.

"<u>Change of Recommendation</u>" means, (i) the Company or its board of directors or other governing body or any committee thereof shall have withheld, withdrawn, qualified or modified (or resolved or proposed to withhold, withdraw, qualify or modify), in a manner adverse to the Investor, its approval or recommendation of this Agreement or the Plan or the transactions contemplated hereby or thereby or (ii) the Company or its board of directors or other governing body or any committee thereof shall have approved or recommended, or proposed to approve or recommend (including, without limitation, by filing any pleading or document with the Bankruptcy Court), any Alternate Transaction.

"Disclosure Schedules" means all schedules to this Agreement, inclusive of Schedule 4.1(c)-Schedule 4.1(w).

"Financial Statements" means, as they relate to the Company only, the consolidating balance sheet of Homestead Village L.L.C. and its Subsidiaries as of December 31, 2009 and the related consolidated statements of income and cash flows for the year then ended.

"FIRPTA" means the Foreign Investment in Real Property Tax Act of 1980.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1974, as amended.

"HVM Financial Statements" means the balance sheet and statement of operations of HVM as of December 31, 2009, as referenced in the Financial Statements.

"Intellectual Property" means, collectively, patents, trademarks, service marks, trade names, trademark registrations, service mark registrations, domain names, copyrights, licenses and know-how (including, without limitation, trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures, as well as other inventions, works of authorship, confidential information, technology, software and documentation, data and databases, and web sites), and any registrations or applications to register the foregoing.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for taxes, including, without limitation, taxes arising as a result of the transactions contemplated by this Agreement or the Plan.

"Material Adverse Change" means any one or more changes, events, occurrences or effects, which individually or together with any other changes, events, occurrences or effects, have or result in, or would reasonably be expected to have or result in, any material adverse change to or effect on the business, results of operations, liabilities, finances, properties, assets or condition (financial or otherwise) of the Company or the ability of the Company to perform its obligation set forth in this Agreement and the Plan, in each case except for any such change, event or effect (a) resulting from any changes in any applicable law, or in generally accepted accounting principles, which take effect after the date hereof; (b) resulting from the announcement or performance of this Agreement or the transactions contemplated hereby (provided that this exception neither is intended nor shall it prevent or affect any determination that one or more changes, events, occurrences or effects resulting from the compliance by the Company with the requirements of the first sentence of Section 6.4 of this Agreement has resulted in or contributed to a Material Adverse Change); (c) resulting from any act or omission of the Company taken at the written direction of the Investor; or (d) resulting from the filing of the Chapter 11 Cases.

"Material Contract" means those contracts, agreements or arrangements (i) which are material to the business, results of operations, liabilities, finances, properties, assets or condition (financial or otherwise) of the Company or the ability of the Company to perform its obligation

set forth in this Agreement and the Plan, or (ii) the loss, termination, repudiation or breach of which would cause, or would reasonably be expected to cause, a Material Adverse Change, including, without limitation, those contracts listed on Schedule 4.1(k) hereto.

"NewCo Manager" means a newly formed Delaware limited liability company owned and controlled by Persons affiliated with or designated by the Investor and appointed as the successor manager of HVM.

"Person" means an individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, any other business entity, or a government entity (or any department, agency, or political subdivision thereof).

"Revenue Report" means a report delivered within ten (10) days after the last business day of every month comparing (a) the Company's actual revenue for the just concluded month to the forecasted revenue for that month that is contained in the detail underlying the financial forecast set forth in the Disclosure Statement and (b) the Company's actual revenue for the trailing three month period to the forecasted revenue for the trailing three month period that is contained in the detail underlying the financial forecast set forth in the Disclosure Statement.

"Subsidiary" of any Person means, with respect to such Person, any corporation, partnership, limited liability company, joint venture or other legal entity of which such Person (either alone or through or together with any other subsidiary), owns, directly or indirectly, more than 50.00% of the stock or other equity or ownership interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies.

*[Remainder of this page intentionally left blank.]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of the date first above written.

**CP ESH INVESTORS, LLC**

By: _____
Name: Mark Gallogly
Title: Managing Principal

ESA PROPERTIES LLC
ESA 2005 PORTFOLIO LLC
ESA 2005- SAN JOSE LLC
ESA 2005- WALTHAM LLC
ESA ACQUISITION PROPERTIES LLC
ESA ALASKA LLC
ESA CANADA PROPERTIES BORROWER LLC
ESA FL PROPERTIES LLC
ESA MD BORROWER LLC
ESA MN PROPERTIES LLC
ESA P PORTFOLIO LLC
ESA P PORTFOLIO MD BORROWER LLC
ESA P PORTFOLIO PA PROPERTIES LLC
ESA P PORTFOLIO TXNC PROPERTIES LP
ESA PA PROPERTIES LLC
ESA TX PROPERTIES LP
ESA BUSINESS TRUST
ESA MANAGEMENT L.L.C.
ESA MD BENEFICIARY LLC
ESA MD PROPERTIES BUSINESS TRUST
ESA MEZZ L.L.C.
ESA MEZZ 2 L.L.C.
ESA MEZZ 3 L.L.C.
ESA MEZZ 4 L.L.C.
ESA MEZZ 5 L.L.C.
ESA MEZZ 6 L.L.C.
ESA MEZZ 7 L.L.C.
ESA MEZZ 8 L.L.C.
ESA MEZZ 9 L.L.C.
ESA MEZZ 10 L.L.C.
ESA P MEZZ L.L.C.
ESA P MEZZ 2 L.L.C.
ESA P MEZZ 3 L.L.C.
ESA P MEZZ 4 L.L.C.
ESA P MEZZ 5 L.L.C.
ESA P MEZZ 6 L.L.C.
ESA P MEZZ 7 L.L.C.
ESA P MEZZ 8 L.L.C.
ESA P MEZZ 9 L.L.C.
ESA P MEZZ 10 L.L.C.
ESA P PORTFOLIO MD BENEFICIARY LLC
ESA P PORTFOLIO MD TRUST
ESA CANADA PROPERTIES TRUST
ESA CANADA TRUSTEE INC.
ESA CANADA BENEFICIARY INC.
ESA UD PROPERTIES LLC

ESA 2007 OPERATING LESSEE, INC.
ESA 2005 OPERATING LESSEE INC.
ESA OPERATING LESSEE INC.
ESA P PORTFOLIO HOLDINGS L.L.C.
ESA P PORTFOLIO OPERATING LESSEE INC.
ESA CANADA OPERATING LESSEE INC. [ONTARIO CORP.]
ESA P PORTFOLIO TXNC GP L.L.C.
ESA TXGP L.L.C.
ESH/HOMESTEAD MEZZ L.L.C.
ESH/HOMESTEAD MEZZ 2 L.L.C.
ESH/HOMESTEAD MEZZ 3 L.L.C.
ESH/HOMESTEAD MEZZ 4 L.L.C.
ESH/HOMESTEAD MEZZ 5 L.L.C.
ESH/HOMESTEAD MEZZ 6 L.L.C.
ESH/HOMESTEAD MEZZ 7 L.L.C.
ESH/HOMESTEAD MEZZ 8 L.L.C.
ESH/HOMESTEAD MEZZ 9 L.L.C.
ESH/HOMESTEAD MEZZ 10 L.L.C.
ESH/HOMESTEAD PORTFOLIO LLC
ESH/HV PROPERTIES LLC
ESH/MSTX PROPERTY LP
ESH/TN PROPERTIES LLC
ESH/TX PROPERTIES LP
ESH/MSTX GP L.L.C.
ESH/TXGP L.L.C.
ESH/TN MEMBER INC.
EXTENDED STAY HOTELS L.L.C.
HOMESTEAD VILLAGE L.L.C.

By: _____
    Name: David Lichtenstein
    Title:  President

HVM MANAGER L.L.C.

By: _____
    Name: David Lichtenstein
    Title:   Sole Member

HVM L.L.C.

By: _____
    Name: David Lichtenstein
    Title:   Sole Member

## **Exhibit H**

### **ESA Mezz Entities**

ESA Mezz L.L.C.

ESA Mezz 2 L.L.C.

ESA Mezz 3 L.L.C.

ESA Mezz 4 L.L.C.

ESA Mezz 5 L.L.C.

ESA Mezz 6 L.L.C.

ESA Mezz 7 L.L.C.

ESA Mezz 8 L.L.C.

ESA Mezz 9 L.L.C.

ESA Mezz 10 L.L.C.

## **Exhibit I**

### **ESA P Mezz Entities**

ESA P Mezz L.L.C.

ESA P Mezz 2 L.L.C.

ESA P Mezz 3 L.L.C.

ESA P Mezz 4 L.L.C.

ESA P Mezz 5 L.L.C.

ESA P Mezz 6 L.L.C.

ESA P Mezz 7 L.L.C.

ESA P Mezz 8 L.L.C.

ESA P Mezz 9 L.L.C.

ESA P Mezz 10 L.L.C.

## Exhibit J

## Homestead Mezz Entities

ESH/Homestead Mezz L.L.C.

ESH/Homestead Mezz 2 L.L.C.

ESH/Homestead Mezz 3 L.L.C.

ESH/Homestead Mezz 4 L.L.C.

ESH/Homestead Mezz 5 L.L.C.

ESH/Homestead Mezz 6 L.L.C.

ESH/Homestead Mezz 7 L.L.C.

ESH/Homestead Mezz 8 L.L.C.

ESH/Homestead Mezz 9 L.L.C.

ESH/Homestead Mezz 10 L.L.C.