WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Jacqueline Marcus

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11 Case No.
                                          :
EXTENDED STAY INC., et al.,               :        09-13764 (JMP)
                                          :
             Debtors.                     :        (Jointly Administered)
                                          :
-------------------------------------------------------------x
```

**DEBTORS' SUPPLEMENT TO MOTION FOR AN ORDER**
**(I) PURSUANT TO SECTIONS 105 AND 363(b) OF THE BANKRUPTCY CODE**
**APPROVING INVESTMENT AND STANDBY PURCHASE AGREEMENT WITH**
**SUCCESSFUL BIDDER, (II) APPROVING PROPOSED DISCLOSURE STATEMENT**
**REFLECTING THE SUCCESSFUL BID, (III) ESTABLISHING SOLICITATION AND**
**VOTING PROCEDURES, (IV) SCHEDULING A CONFIRMATION HEARING, (V)**
**ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR**
**CONFIRMATION OF THE DEBTORS' PROPOSED PLAN OF REORGANIZATION,**
**(VI) APPROVING RIGHTS CERTIFICATE AND ELECTION FORM, AND**
**(VII) DIRECTING THE MORTGAGE DEBT PARTIES TO COOPERATE**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

    ESA Properties LLC and seventy-three of its debtor affiliates, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[1]

submit this supplement (the "Supplement") to the Debtors' motion for an order (i) pursuant to

sections 105 and 363(b) of the Bankruptcy Code approving the Investment and Standby Purchase

---

[1] A list of the Debtors submitting this Motion, along with the last four digits of such Debtor's federal tax
identification number, is attached hereto as "Exhibit A."

Agreement with Successful Bidder,[2] (ii) approving the Disclosure Statement for the Debtors' Fourth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated April 23, 2010 [Docket No. 979] (the "Fourth Disclosure Statement") relating to the Debtors' Fourth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated April 23, 2010 [Docket No. 978] (the "Fourth Plan"), (iii) establishing solicitation and voting procedures, (iv) scheduling a confirmation hearing, (v) establishing notice and objection procedures in respect of confirmation of the Fourth Plan, (vi) approving the Rights Certificate to be used for purposes of the Rights Offering and the Election Form, and (vii) directing the Mortgage Debt Parties to cooperate with the solicitation procedures, dated April 30, 2010 [Docket No. 987] (the "Disclosure Statement Approval Motion") and respectfully represent:

## **Background**

1.      On April 30, 2010, the Debtors filed the Disclosure Statement Approval Motion seeking approval and authority to enter into an Investment and Standby Purchase Agreement and other plan-related documents with the Successful Bidder.  In accordance with the Order Pursuant to Sections 105(a) and 503(b) of the Bankruptcy Code and Bankruptcy Rule 6004(h) Approving Bidding Procedures and Notice of Auction Relating Thereto and Granting Related Relief, dated April 23, 2010 [Docket No. 975] (the "Bidding Procedures Order"), if no qualified bids other than the C/P Offer were received, the Auction would not have taken place and the Debtors would have sought approval of an Investment and Standby Purchase Agreement and other related plan documents premised on the C/P Offer (collectively, the "Prior Plan Documents").

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Approval Motion (as hereafter defined).

2.      However, the Debtors received a qualified offer other than the C/P Offer in accordance with the deadlines and terms set forth in the Bidding Procedures Order and accordingly, the Debtors commenced an auction on May 27, 2010 (the "Auction") to select a plan sponsor in accordance with the procedures set forth in and approved by the Bidding Procedures Order (the "Bidding Procedures").  On May 28, 2010, the Debtors declared the C/P/B Investors (as defined below) as the Successful Bidder and the C/P/B Investors' Successful Bid as the highest and best offer.  Subsequently, the Debtors, the C/P/B Investors and other parties-in-interest negotiated and finalized the documentation reflecting the Successful Bid.  These documents include, among others, the Investment Agreement dated as of June 4, 2010 (the "Investment Agreement"), the Debtors' Fifth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 [Docket No. 1027] (the "Plan"), a form of which is attached to the Investment Agreement, and the Disclosure Statement for the Debtors' Fifth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 [Docket No. 1028] (the "Disclosure Statement").  The Debtors have filed contemporaneously herewith the Disclosure Statement and the Plan.  For the convenience of the Court and other parties in interest, copies of the Plan and the Disclosure Statement (without the exhibits), which have been blacklined against the Fourth Plan and the Fourth Disclosure Statement are annexed hereto as "Exhibit B" and "Exhibit C," respectively.  In addition, a copy of the Investment Agreement is annexed as "Exhibit G" to the Disclosure Statement.  Copies of the revised ballots and notices which reflect the terms of the Successful Bid are also annexed hereto and to the Disclosure Statement.

3.      In the Disclosure Statement Approval Motion, to the extent that the terms of the Successful Bid were ultimately different than the terms of the C/P Offer, the Debtors

reserved the right to file a further revised plan and disclosure statement which reflected the terms

of the Successful Bid and to seek approval of the revised disclosure statement.  Additionally, the

Debtors sought in the Disclosure Statement Approval Motion approval of the reimbursement of

certain expenses to the Successful Bidder up to the amount of $20 million in the event that the

Auction occurred and a plan was not confirmed or consummated, other than due to a breach by

the Successful Bidder.

    4.  By this Supplement, the Debtors seek to modify the relief requested in the

Disclosure Statement Approval Motion to reflect the terms of the Successful Bid.  The

Successful Bid provides for what is, essentially, an all cash purchase of the Debtors.  Under the

Successful Bid, the C/P/B Investors offered to pay approximately $3.925 billion in cash and to

contribute certificates representing interests in the $4.1 billion mortgage loan for the equity of

the Debtors.  The amount to be paid by the C/P/B Investors will be distributed to creditors in

accordance with the Plan.  Therefore, among other changes to the C/P Offer originally proposed,

the Successful Bid eliminates the rights offering, cash election, and the debt/equity election.  In

addition, as part of the Successful Bid, the Debtors have agreed to an increase to $35 million of

the cap on reimbursement of certain expenses to the Successful Bidder, subject to the approval of

the Court and certain circumstances as further set forth in the Investment Agreement.

    5.  Consistent with the Bidding Procedures, the Debtors intend to proceed

with a hearing to consider approval of the relief requested in the Disclosure Statement Approval

Motion, as modified by this Supplement, including: (i) authorization for the Debtors to execute

the Investment Agreement reflecting the terms of the Successful Bid and pay the Expenses, as

modified herein, (ii) a determination that the Disclosure Statement filed contains "adequate

information" and should be approved, and (iii) approval of certain solicitation, voting and

scheduling procedures related to confirmation of the Plan. To the extent that the relief requested

in the Disclosure Statement Approval Motion is not modified by this Supplement, the Disclosure

Statement Approval Motion is incorporated herein by reference.

6.     To reflect the terms of the successful bid, the Debtors attach hereto a

revised order (the "Proposed Order"), revised ballots for voting on the Plan, revised notices of

non-voting status and of the confirmation hearing, and the Disclosure Statement and the Plan.

Summarized below are the exhibits attached to this Supplement:

| Exhibit | Document |
|---|---|
| Exhibit A to the Supplement | List of Debtors |
| Exhibit B to the Supplement | Copy of the Plan Blacklined Against the Fourth Plan |
| Exhibit C to the Supplement | Copy of the Disclosure Statement (without Exhibits) Blacklined Against the Fourth Disclosure Statement |
| Exhibit D to the Supplement | Proposed Order |
| Exhibit 1 to the Proposed Order | Disclosure Statement |
| Exhibit A to the Disclosure Statement | Plan |
| *Notices of Non-Voting Status* | |
| Exhibit 2 to the Proposed Order | Notice to Unimpaired Class |
| Exhibit 3 to the Proposed Order | Notice to Impaired Classes |
| *Ballots* | |
| Exhibit 4 to the Proposed Order | Form Mortgage Facility Claim Ballot |
| Exhibit 5 to the Proposed Order | Form ESA UD Mortgage Claim Ballot |
| Exhibit 6 to the Proposed Order | Form Mortgage Facility Deficiency Claim Ballot |
| Exhibit 7 to the Proposed Order | Form Mezzanine Facilities Claims Ballot |
| Exhibit 8 to the Proposed Order | Form General Unsecured Claims Ballot |
| *Notice of Hearing* | |
| Exhibit 9 to the Proposed Order | Notice of the Confirmation Hearing |

**The Successful Bid**

7.     After several rounds of bidding at the Auction, the Debtors determined

that the offer made by CP ESH Investors, LLC, a newly formed entity owned by a consortium of

investors consisting of Centerbridge Partners L.P., Paulson & Co. Inc., each on behalf of various investment funds and accounts managed by them, and Blackstone Real Estate Partners VI L.P., on behalf of itself and its parallel funds and related alternative vehicles (collectively, the "C/P/B Investors") was the best and highest offer to be the plan sponsor. The C/P/B Investors' proposal was also supported by the Special Servicer and the Operating Advisor, who agreed that it was the highest and best offer. As part of the revised investment set forth in the Successful Bid, the C/P/B Investors will pay cash in the aggregate amount of $3,615,755,444.28 and contribute mortgage certificates held by the C/P/B Investors and its members or Affiliates in the aggregate amount of $309,244,555.72 (subject to adjustment as set forth in the Investment Agreement). The Debtors are confident that the Investment Agreement embodying the Successful Bid is the highest and best bid submitted at the Auction and, thus, provides maximum recoveries and distributions to creditors.

### Changes from the Existing Plan Documents

8.     As a result of the terms of the Successful Bid, there have been certain changes to the Solicitation Packages, as summarized below.

***Elimination of Rights Offering, Cash Out Election and Debt/Equity Election***

9.     The Plan Documents reflect an all cash investment by the C/P/B Investors which, pursuant to the Plan, will be distributed directly to the Special Servicer, for subsequent distribution to holders of mortgage certificates pursuant to the priorities set forth in the TSA. Accordingly, the Rights Offering, the Cash Out Election and the Debt/Equity Election referenced in the Disclosure Statement Approval Motion are no longer necessary to effectuate the Plan and have been eliminated.

***Bifurcation of Class 4***

10.     In the Prior Plan Documents, Class 4 consisted of both the Mortgage Facility Deficiency Claim and Mezzanine Facilities Claims.  In the Plan Documents, Class 4 has been bifurcated into Class 4A, the Mortgage Facility Deficiency Claim, and Class 4B, the Mezzanine Facilities Claims.  Class 4A and Class 4B constitute Voting Classes and the Ballots have been modified so that there are now separate ballots for the holders of claims in Classes 4A and 4B.

***Request for Increase in Cap for Reimbursement of Expenses***

11.     In addition, the Disclosure Statement Approval Motion had previously requested approval of reimbursement of all actual reasonable out-of-pocket costs, fees, expenses, disbursements and other charges paid by or due and payable by the C/P/B Investors (collectively, and as further defined in the Investment Agreement for the Successful Bid, the "Expense Cap"), in an amount up to $20 million.  It was an element and a condition of the C/P/B Investors' Successful Bid that the amount of the Expense Cap be increased to $35 million.  The Mortgage Debt Parties have consented to the increase in the Expense Cap.  Given the all-around successful outcome of the Auction, the consent of both the Debtors and the Mortgage Debt Parties, and the benefits bestowed upon the Debtors and their estates and creditors, the increase of the Expense Cap to $35 million is in the best interests of the estates and is fair and reasonable under the circumstances.  Accordingly, and in light of the substantial improvement in the terms of the C/B/P Investors' Successful Bid over the Pre-Auction Successful Bid, the Debtors, in the sound exercise of their business judgment, respectfully request that the Expense Cap be increased to $35 million.

## Notice

12.     The Debtors have served notice of this Supplement in accordance with the procedures set forth in the order entered on July 17, 2009 governing case management and administrative procedures for these cases [Docket No. 176] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the attorneys for the Mortgage Debt Parties; and (iv) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

13.     Other than as described above, no previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court enter the Proposed Order and grant the Debtors such other and further relief as it deems just and proper.

Dated: June 8, 2010
       New York, New York

/s/ Jacqueline Marcus_____
Marcia L. Goldstein
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## Exhibit A

| Debtor | Last Four Digits of Federal Tax I.D. Number |
|---|---|
| ESA P Portfolio L.L.C. f/k/a BRE/ESA P Portfolio L.L.C. | 7190 |
| ESA 2005 Portfolio L.L.C. f/k/a BRE/ESA 2005 Portfolio L.L.C. | 8617 |
| ESA 2005-San Jose L.L.C. f/k/a BRE/ESA 2005-San Jose L.L.C. | 1317 |
| ESA 2005-Waltham L.L.C. f/k/a BRE/ESA 2005-Waltham L.L.C. | 1418 |
| ESA Acquisition Properties L.L.C. f/k/a BRE/ESA Acquisition Properties L.L.C. | 8149 |
| ESA Alaska L.L.C. f/k/a BRE/ESA Alaska L.L.C. | 8213 |
| ESA Canada Properties Borrower L.L.C. f/k/a BRE/ESA Canada Properties Borrower L.L.C. | 7476 |
| ESA FL Properties L.L.C. f/k/a BRE/ESA FL Properties L.L.C. | 7687 |
| ESA MD Borrower L.L.C. f/k/a BRE/ESA MD Borrower L.L.C. | 8839 |
| ESA MN Properties L.L.C. f/k/a BRE/ESA MN Properties L.L.C. | 0648 |
| ESA P Portfolio MD Borrower L.L.C. f/k/a BRE/ESA P Portfolio MD Borrower L.L.C. | 7448 |
| ESA P Portfolio PA Properties L.L.C. f/k/a BRE/ESA P Portfolio PA Properties L.L.C. | 6306 |
| ESA P Portfolio TXNC Properties L.P. f/k/a BRE/ESA P Portfolio TXNC Properties L.P. | 7378 |
| ESA PA Properties L.L.C. f/k/a BRE/ESA PA Properties L.L.C. | 7652 |
| ESA Properties L.L.C. f/k/a BRE/ESA Properties L.L.C. | 1249 |
| ESA TX Properties L.P. f/k/a BRE/ESA TX Properties L.P. | 1295 |
| ESH/Homestead Portfolio L.L.C. f/k/a BRE/Homestead Portfolio L.L.C. | 9049 |
| ESH/HV Properties L.L.C. f/k/a BRE/HV Properties L.L.C. | 8927 |
| ESH/MSTX Property L.P. f/k/a BRE/MSTX Property L.P. | 5862 |
| ESH/TN Properties L.L.C. f/k/a BRE/TN Properties L.L.C. | 5781 |

| Debtor | Last Four Digits of Federal Tax I.D. Number |
|---|---|
| ESH/TX Properties L.P. f/k/a BRE/TX Properties L.P. | 6964 |
| ESH/Homestead Mezz L.L.C. f/k/a BRE/Homestead Mezz L.L.C. | 9883 |
| ESA P Mezz L.L.C. f/k/a BRE/ESA P Mezz L.L.C. | 7467 |
| ESA Mezz L.L.C. f/k/a BRE/ESA Mezz L.L.C. | 0767 |
| ESH/Homestead Mezz 2 L.L.C. f/k/a BRE/Homestead Mezz 2 L.L.C. | 9903 |
| ESA P Mezz 2 L.L.C. f/k/a BRE/ESA P Mezz 2 L.L.C. | 7480 |
| ESA Mezz 2 L.L.C. f/k/a BRE/ESA Mezz 2 L.L.C. | 0866 |
| ESH/Homestead Mezz 3 L.L.C. f/k/a BRE/Homestead Mezz 3 L.L.C. | 9936 |
| ESA P Mezz 3 L.L.C. f/k/a BRE/ESA P Mezz 3 L.L.C. | 8977 |
| ESA Mezz 3 L.L.C. f/k/a BRE/ESA Mezz 3 L.L.C. | 0929 |
| ESH/Homestead Mezz 4 L.L.C. f/k/a BRE/Homestead Mezz 4 L.L.C. | 9953 |
| ESA P Mezz 4 L.L.C. f/k/a BRE/ESA P Mezz 4 L.L.C. | 8997 |
| ESA Mezz 4 L.L.C. f/k/a BRE/ESA Mezz 4 L.L.C. | 0964 |
| ESH/Homestead Mezz 5 L.L.C. f/k/a BRE/Homestead Mezz 5 L.L.C. | 9613 |
| ESA P Mezz 5 L.L.C. f/k/a BRE/ESA P Mezz 5 L.L.C. | 9186 |
| ESA Mezz 5 L.L.C. f/k/a BRE/ESA Mezz 5 L.L.C. | 1006 |
| ESH/Homestead Mezz 6 L.L.C. f/k/a BRE/Homestead Mezz 6 L.L.C. | 9667 |
| ESA P Mezz 6 L.L.C. f/k/a BRE/ESA P Mezz 6 L.L.C. | 9247 |
| ESA Mezz 6 L.L.C. f/k/a BRE/ESA Mezz 6 L.L.C. | 8995 |
| ESH/Homestead Mezz 7 L.L.C. f/k/a BRE/Homestead Mezz 7 L.L.C. | 9722 |
| ESA P Mezz 7 L.L.C. f/k/a BRE/ESA P Mezz 7 L.L.C. | 9349 |
| ESA Mezz 7 L.L.C. f/k/a BRE/ESA Mezz 7 L.L.C. | 9065 |
| ESH/Homestead Mezz 8 L.L.C. f/k/a BRE/Homestead Mezz 8 L.L.C. | 9779 |
| ESA P Mezz 8 L.L.C. | 9402 |

| Debtor | Last Four Digits of Federal Tax I.D. Number |
|---|---|
| ESA Mezz 8 L.L.C.<br>f/k/a BRE/ESA Mezz 8 L.L.C. | 9117 |
| ESH/Homestead Mezz 9 L.L.C.<br>f/k/a BRE/Homestead Mezz 9 L.L.C. | 1011 |
| ESA P Mezz 9 L.L.C. | 0281 |
| ESA Mezz 9 L.L.C. | 0923 |
| ESH/Homestead Mezz 10 L.L.C.<br>f/k/a BRE/Homestead Mezz 10 L.L.C. | 1063 |
| ESA P Mezz 10 L.L.C. | 0224 |
| ESA Mezz 10 L.L.C. | 0175 |
| Homestead Village L.L.C.<br>f/k/a BRE/Homestead Village L.L.C. | 8930 |
| ESA MD Beneficiary L.L.C.<br>f/k/a BRE/ESA MD Beneficiary L.L.C. | 7038 |
| ESA P Portfolio MD Trust<br>f/k/a BRE/ESA P Portfolio MD Trust | 8258 |
| ESA MD Properties Business Trust<br>f/k/a BRE/ESA MD Properties Business Trust | 6992 |
| ESA P Portfolio MD Beneficiary L.L.C.<br>f/k/a BRE/ESA P Portfolio MD Beneficiary L.L.C. | 8432 |
| ESA Canada Properties Trust<br>f/k/a BRE/ESA Canada Properties Trust | 2314 |
| ESA Canada Trustee Inc.<br>f/k/a BRE/ESA Canada Trustee Inc. | 2861 |
| ESA Canada Beneficiary Inc.<br>f/k/a BRE/ESA Canada Beneficiary Inc. | 7543 |
| ESA UD Properties L.L.C. | 7075 |
| ESA 2007 Operating Lessee Inc.<br>f/k/a BRE/ESA 2007 Operating Lessee Inc. | 9408 |
| ESA 2005 Operating Lessee Inc.<br>f/k/a BRE/ESA 2005 Operating Lessee Inc. | 8471 |
| ESA Operating Lessee Inc.<br>f/k/a BRE/ESA Operating Lessee Inc. | 4369 |
| ESA P Portfolio Operating Lessee Inc.<br>f/k/a BRE/ESA P Portfolio Operating Lessee Inc. | 7433 |
| ESA Business Trust<br>f/k/a BRE/ESA Business Trust | 8078 |
| ESA Management L.L.C. | 9101 |
| ESA P Portfolio Holdings L.L.C.<br>f/k/a BRE/ESA P Portfolio Holdings L.L.C. | 8432 |
| ESA Canada Operating Lessee Inc.<br>f/k/a BRE/ESA Canada Operating Lessee Inc. | 8838 |
| Extended Stay Hotels L.L.C. | 7438 |
| ESH/MSTX GP L.L.C.<br>f/k/a BRE/MSTX GP L.L.C. | 5876 |

| Debtor | Last Four Digits of Federal Tax I.D. Number |
| --- | --- |
| ESH/TXGP L.L.C.<br>f/k/a BRE/TXGP L.L.C. | 6936 |
| ESA TXGP L.L.C.<br>f/k/a BRE/ESA TXGP L.L.C. | 1199 |
| ESA P Portfolio TXNC GP L.L.C.<br>f/k/a BRE/ESA P Portfolio TXNC GP L.L.C. | 7210 |
| ESH/TN Member Inc.<br>f/k/a BRE/TN Member Inc. | 8365 |

**Exhibit B**

**Copy of the Plan Blacklined Against the Fourth Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

|  |  |
|---|---|
| | : |
| **In re** | : **Chapter 11 Case No.** |
| | : |
| **EXTENDED STAY INC., et al.,** | : **09-13764 (JMP)** |
| | : |
| **Debtors.** | : **(Jointly Administered)** |
| | : |

-------------------------------------------------------------------x


**DEBTORS' ~~FOURTH~~FIFTH AMENDED PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**


WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors
and Debtors in Possession

Dated: ~~April 23,~~June 8, 2010

**TABLE OF CONTENTS**

**Page**

ARTICLE I     DEFINITIONS ..................................................................................................... 1

    A.     Defined Terms ........................................................................................ 1

1.1     Acquisition ...................................................................................................... 1
1.2     Administrative ~~Bar Date Order~~Expense Claim .......................................... 1
1.3     Administrative Expense ~~Claim~~Creditor ..................................................... 1
1.4     Administrative Expense ~~Creditor~~Objection Deadline ................................ 1
1.5     Administrative ~~Expense Objection Deadline~~/Priority Claims Reserve ............... 1
1.6     Affiliate .......................................................................................................... 1
1.7     Allowed .......................................................................................................... 1
1.8     Allowed Amount............................................................................................. 2
1.9     Auction ........................................................................................................... 3
1.10     Ballot ............................................................................................................. 3
     ~~1.10     Bankruptcy Code~~ .................................................................... 3

1.11     Bankruptcy ~~Court~~Code ............................................................................. 3
1.12     Bankruptcy Court .......................................................................................... 3
1.13     Bankruptcy Rules .......................................................................................... 3
     ~~1.13     BHAC~~ .................................................................................... 3

1.14     BHAC ~~IP~~ .................................................................................................. 3
1.15     BHAC IP ......................................................................................................... 3
1.16     BHAC License Agreements ......................................................................... 3
~~1.16~~1.17     ............................................................................ BHAC IP Transfer Agreement 3
     ~~1.17     BREA~~ .................................................................................... 3

1.18     Bidding Procedures Order ............................................................................ 3
1.19     Business Day ................................................................................................. 3
     ~~1.19     Cash~~ ....................................................................................... 3

1.20     Cash 3
1.21     Cash Collateral Order .................................................................................. 3
     ~~1.21     Certificates~~ ........................................................................... 3

1.22     Cash Distribution .......................................................................................... 3
1.23     Chapter 11 Cases.......................................................................... ~~31.23 Claim~~ 4
1.24     ~~Class~~Claim................................................................................................. 4
1.25     Class ~~A1 Mortgage Certificates~~ ............................................................... 4

1.26     ~~Class A1 – F Mortgage Certificates~~ ......................................................... 4
     ~~1.27     Class A2 Mortgage Certificates~~ .......................................... 4
     ~~1.28     Class A3 Mortgage Certificates~~ ................................ 4Commencement Date 4

1.27     Confirmation Date.......................................................................................... 4
1.28     Confirmation Order........................................................................................ 4
1.29     ~~Class A4 Cash Paydown~~Contingent Claim ............................................... 4

1.30     ~~Class A4 Mortgage Certificates~~ ................................................ 4Controlling Holder 4

1.31 ~~Class B Mortgage Certificates~~Creditor ................................................................4

1.32 ~~Class B - H Debt/Equity Election~~ ....................................................................... 4

    ~~1.33~~    ~~Class B - H Election Date~~ ...................................................4Creditor Representative 4

1.33 Creditors' Committee ........................................................................................ 4

1.34 ~~Class B - H Elections~~ .............................................................................5Debtors 4

    ~~1.35~~    ~~Class B - H Equity Cashout Option~~ ...................................................5

    ~~1.36~~    ~~Class B - H Equity Cashout Option Election~~ .....................................5

    ~~1.37~~    ~~Class B - H Mortgage Certificates~~ ....................................................5

1.35 Debt Financing Arrangements ........................................................................... 4

1.36 Debt Financing Lenders .................................................................................... 5

1.37 Debtor in Possession ......................................................................................... 5

1.38 ~~Class B - H Mortgage Debt~~Disallowed Claim .................................................5

1.39 ~~Class B - K Mortgage Certificates~~ ....................................................................... 5

    ~~1.40~~    ~~Class C Mortgage Certificates~~ ..........................................................5

    ~~1.41~~    ~~Class D Mortgage Certificates~~ ..........................................................5

    ~~1.42~~    ~~Class E Mortgage Certificates~~ ...................................................5Disclosure Statement 5

1.40 Disputed Claim ................................................................................................. 5

1.41 Distribution ...................................................................................................... 5

1.42 Distribution Date .............................................................................................. 5

1.43 ~~Class F Mortgage Certificates~~DL-DW ............................................................5

1.44 ~~Class G Alternate Note Balance~~ .......................................................................... 5

    ~~1.45~~    ~~Class G Alternate Note Proportion~~ ...................................................5

    ~~1.46~~    ~~Class G Mortgage Certificates~~ ..........................................................5

    ~~1.47~~    ~~Class H Mortgage Certificates~~ ..........................................................6

    ~~1.48~~    ~~Class J Mortgage Certificates~~ ...........................................................6

    ~~1.49~~    ~~Class K Mortgage Certificates~~ ..........................................................6

    ~~1.50~~    ~~Class L Mortgage Certificates~~ ...........................................................6

    ~~1.51~~    ~~Class M Mortgage Certificates~~ ...................................................6Effective Date 5

1.45 Equity Interest .................................................................................................. 5

1.46 ESA Canada Properties Borrower Interests ....................................................... 6

1.47 ESA Canada Properties Interests ...................................................................... 6

1.48 ESA MD Borrower Interests ............................................................................. 6

1.49 ESA MD Properties Trust Certificate ............................................................... 6

1.50 ESA P Portfolio MD Borrower Interests ........................................................... 6

1.51 ESA P Portfolio MD Trust Certificate .............................................................. 6

1.52  ~~Commencement Date~~ESA UD ................................................................................6

1.53  ~~Confirmation Date~~ESA UD Mortgage Claim ...................................................6

1.54  ~~Confirmation Order.................................................................6~~ESA UD Mortgage Facility 6

1.55  ~~Contingent Claim~~ ............................................................................................6

    ~~1.56     Creditor~~ ...............................................................................................6

    ~~1.57     Creditors' Committee~~ ........................................................................6

    ~~1.58     Debtors~~ ...............................................................................................6

    ~~1.59     Debtor in Possession~~ .........................................................................6

    ~~1.60     Disallowed Claim~~ ..............................................................................6

    ~~1.61     Disbursing Agent~~ ..............................................................................6

    ~~1.62     Disclosure Statement~~ ........................................................................6

    ~~1.63     Disputed Claim~~ ..................................................................................7

    ~~1.64     Distribution~~ ........................................................................................7

    ~~1.65     Distribution Date~~ ...............................................................................7

    ~~1.66     Effective Date~~ ....................................................................................7

    ~~1.67     Election Form~~ ....................................................................................7

    ~~1.68     Election Period~~ ..................................................................................7

    ~~1.69     Equity Interest~~ ...................................................................................7

    ~~1.70     ESA Canada Properties Borrower Interests~~ ......................................7

    ~~1.71     ESA Canada Properties Interests~~ .....................................................7

    ~~1.72     ESA MD Borrower Interests~~ ............................................................7

    ~~1.73     ESA MD Properties Trust Certificate~~ ..............................................8

    ~~1.74     ESA P Portfolio MD Borrower Interests~~ ..........................................8

    ~~1.75     ESA P Portfolio MD Trust Certificate~~ .............................................8

    ~~1.76     ESA UD~~ ..............................................................................................8

    ~~1.77     ESA UD Mortgage Claim~~ .................................................................8

    ~~1.78     ESA UD Mortgage Facility~~ ..............................................................8

    ~~1.79     Escrow Account .................................................................8~~1.80 ESH/ESA Gener

~~1.81~~1.56 .......................................................... ESH/TN Properties Membership Interest ~~8~~6

    ~~1.82     ESI~~ .......................................................................................................8

1.57     ESI ...............................................................................................................6

1.58     ESI Settlement .............................................................................................6

1.59     ESI Settlement Order ..................................................................................7

TABLE OF CONTENTS
(continued)

Page

1.83 1.60 ...................................................................................... Estate 8 7
1.84 1.61 ........................................................................... Estimated Amount 8 7
1.85 1.62 ............................................................................ Examiner's Report 8 7
1.86 1.63 ................................................................... Excess Equity 9 Cash 7
1.87 1.64 ............................................................................. Existing Equity 9 7
1.88 1.65 ...................................................................... Existing Letters of Credit 9 7
1.89 Expiration Date 9
1.90 1.66 .................................................................... Final Distribution Date 9 7
1.91 1.67 ................................................................................... Final Order 9 7
1.92 1.68 ....................................................... G&A Reimbursement Agreements 9 7
1.93 1.69 ........................................................... General Unsecured Claims 9 8
1.94 1.70 ..................................................................................... Guaranty 9 8
1.95 1.71 ........................................................................... Guaranty Claim 10 8
1.96 1.72 .............................................................................. Homestead 10 8
1.97 1.73 ............................................................................................ HVM 10 8
1.98 1.74 .................................................................................... HVM Manager 10 8
1.99 1.75 ......................................................................... HVM Manager Owner 10 8
1.100 1.76 ..................................................................................... Impaired 10 8
1.77     Indemnified Litigation ..................................................................... 8
1.101 1.78 .............................................................. Initial Distribution Date 10 8
1.102 1.79 ................................................................................ Intellectual Property 10 8
1.80     Intercreditor Agreement ................................................................ 8
1.103 1.81 ...................................................................... Internal Revenue Code 8
1.82     Investment ............................................................................................ 9
1.83     Investment Agreement ...................................................................... 9
1.84     Investor ............................................................................................... 9
1.85     Investor Certificates ........................................................................... 9
1.86     IRS ..................................................................................................... 9
1.87     Litigation Trust ................................................................................... 9
1.88     Litigation Trust Agreement ................................................................ 9
1.89     Litigation Trust Assets ....................................................................... 9
1.90     Litigation Trust Beneficiaries ............................................................ 9
1.91     Litigation Trust Funding ..................................................................... 9
1.92     Litigation Trust Funding Reimbursement .......................................... 9
1.93     Litigation Trustee .............................................................................. 9
1.94     Loan REMIC ...................................................................................... 10
1.95     Lower Tier REMIC .............................................................................. 10
1.96     Master Servicer ................................................................................. 10
1.97     Merrill Swap Agreement .................................................................... 10
1.98     Mezzanine Facilities .......................................................................... 10
1.99     Mezzanine Facilities Claims .............................................................. 10
1.100   Mortgage Certificate ......................................................................... 10
1.101   Mortgage Debt Parties ...................................................................... 10
1.102   Mortgage Facility ............................................................................... 10
1.103   Mortgage Facility Claim .................................................................... 10

1.104 Investment ........................................................................ 10

1.105 Investment and Standby Purchase Agreement ................. 10

1.106 Investor ............................................................................. 10

1.107 Investor Certificates ......................................................... 10

1.104 Mortgage Facility Deficiency Claim ................................. 11

1.105 Mortgage Facility Trust ..................................................... 11

1.106 Mortgage Parties Indemnification Fund ............................ 11

1.107 Mortgage Properties ......................................................... 11

1.108 IRS ...................................................... 10 New Debtor Equity 11

1.109 M1 Mezzanine New ESA UD Mortgage Facility Claims ....... 11

1.110 M2 Mezzanine Facility Claims New ESA UD Mortgage Note ... 11

1.111 M3 Mezzanine Facility Claims NewCo ............................... 11

1.112 M4 Mezzanine Facility Claims ........................................... 11

1.113 M5 Mezzanine Facility Claims ........................................... 11

1.114 M6 Mezzanine Facility Claims ........................................... 11

1.115 M7 Mezzanine Facility Claims ........................................... 11

1.116 M8 Mezzanine Facility Claims ........................................... 11

1.117 M9 Mezzanine Facility Claims ........................................... 11

1.118 M10 Mezzanine Facility Claims ......................................... 12

1.119 Merrill Swap Agreement .................................................... 12

1.120 Mezzanine Facilities .......................................................... 12

1.121 Mezzanine Facilities Claims .............................................. 12

1.122 Mortgage Certificate .......................................................... 12

1.123 Mortgage Facility ............................................................... 12

1.124 Mortgage Facility Claim ..................................................... 12

1.125 Mortgage Facility Deficiency Claim ................................... 12

1.126 New Alternate Mortgage Loan ........................................... 12

1.127 New Alternate Notes ........................................................... 13

1.128 New B—H Rights ................................................................. 13

1.129 New Class A1 Mortgage Notes .......................................... 13

1.130 New Class A2 Mortgage Notes .......................................... 13

1.131 New Class A3 Mortgage Notes .......................................... 13

1.132 New Class A4 Mortgage Notes .......................................... 13

1.133 New Class B Mortgage Notes ............................................ 13

1.134   New Class B - H Mortgage Notes ................................................................. 13

1.135   New Class C Mortgage Notes ...................................................................... 13

1.136   New Class D Mortgage Notes ...................................................................... 13

1.137   New Class E Mortgage Notes ....................................................................... 13

1.138   New Class F Mortgage Notes ....................................................................... 13

1.139   New Class G Mortgage Notes ...................................................................... 13

1.140   New Class H Mortgage Notes ...................................................................... 13

1.141   New Debt Securities .................................................................................... 14

1.142   New Debtor Equity ..................................................................................... 14

1.143   New Equity Securities ................................................................................. 14

1.144   New ESA UD Mortgage Facility ................................................................. 14

1.145   New ESA UD Mortgage Note ..................................................................... 14

1.146   New J - K Rights ......................................................................................... 14

1.147   New Money Equity Investment .................................................................... 14

1.148   New Money Equity Waterfall ...................................................................... 14

1.149   New Mortgage Loan .................................................................................... 14

1.150   New Mortgage Notes ................................................................................... 15

1.151   New Securities ............................................................................................. 15

1.152   New Warrants .............................................................................................. 15

1.153   NewCo ......................................................................................................... 15

1.154   NewCo Board of Managers .................................................................. 151.155 NewCo Certifica

1.1561.113 ........................................................... NewCo Common Interests 1511

1.1571.114 ............................................................................... NewCo Manager 1611

1.1581.115 ......................................... NewCo Management Incentive Plan 1611

1.1591.116 ...................................................... NewCo Operating Agreement 1611

1.117   Operating Advisor .......................................................................... 11

1.1601.118 ............................................................... Other Existing Equity Interests 1612

1.1611.119 ................................................................................................. Person 1612

1.1621.120 ...................................................................................................... Plan 1612

1.121   Plan Administrator ......................................................................... 11

1.1631.122 .................................................................................. Plan Documents 1612

1.1641.123 ................................................................................. Plan Supplement 1612

1.1651.124 ..................................................................................... Priority Claim 1612

1.1661.125 .............................................................................. Priority Tax Claim 1612

1.1671.126 ................................................................................... Pro Rata Share 1612

1.168   Purchase Notice ....................................................................................... 16

TABLE OF CONTENTS
(continued)

Page

1.1691.127 ................................................................ Real Estate Investment Trust 1712

1.128    Real Estate Mortgage Investment Conduit (or REMIC) ............................... 12

1.1701.129 ...................................................................................Record Date 1713

    1.171    Registration Rights Agreement ................................................. 17

1.1721.130 ...............................................................................Released Parties 1713

    1.173    Reorganized Debtors ........................................................... 17

    1.174    Rights .......................................................................... 17

    1.175    Rights Certificate ............................................................ 17

    1.176    Rights Holder ................................................................. 17

    1.177    Rights Offering ............................................................... 17

    1.178    Rights Offering Amount ....................................................... 17

    1.179    Rights Offering Payment Date ................................................ 17

    1.180    Rights Offering Participant ................................................. 18

    1.181    Rollover Equity ............................................................... 18

    1.182    Rollover Equity Waterfall ................................................... 18

    1.183    Satisfaction Notice .......................................................... 18

1.131    Reorganized Debtors ............................................................. 13

1.132    Restructuring Transaction(s) .................................................... 13

1.1841.133 .........................................................................................Schedules 1813

1.1851.134 ................................................................................Secured Claim 1813

1.1861.135 ..................................................................................Securities Act 1813

1.1871.136 ................................................................................Special Servicer 1813

1.1881.137 ...........................................................................................Sponsors 1813

    1.189    Sub-Equity .................................................................... 18

    1.190    Sub-Equity Class 2 ........................................................... 18

    1.191    Sub-Equity Class 3 ........................................................... 19

    1.192    Sub-Equity Class 4 ........................................................... 19

    1.193    Sub-Equity Class 5 ........................................................... 19

    1.194    Sub-Equity Class 6 ........................................................... 19

    1.195    Sub-Equity Class 7 ........................................................... 19

    1.196    Sub-Equity Class 8 ........................................................... 19

    1.197    Sub-Equity Class 9 ........................................................... 19

    1.198    Sub-Equity Class 10 .......................................................... 20

    1.199    Sub-Equity Class 11 .......................................................... 20

    1.200    Sub-Equity Class 12 .......................................................... 20

1.201   Sub-Equity Class 13 .................................................................. 20

1.202   Sub-Equity Class 14 .................................................................. 20

1.203   Sub-Equity Class 15 .................................................................. 20

1.204   Sub-Equity Class 16 .................................................................. 20

1.205   Sub-Equity Class 17 .................................................................. 20

1.206   Subscription Agent .................................................................... 21

1.207   Subscription Commencement Date ............................................. 21

1.208   Subscription Price ...................................................................... 21

1.2091.138 ................................................................. Successor Trustee 2114

1.2101.139 ............................................................... Swap Agreements 2114

1.2111.140 ...................................................................... Tier 1 Debtors 2114

1.2121.141 ...................................................................... Tier 2 Debtors 2114

1.213   Tier 3 Debtors ........................................................................... 21

1.214   Tranche A .................................................................................. 21

1.215   Tranche B .................................................................................. 21

1.216   Tranche C .................................................................................. 21

1.217   Tranche D .................................................................................. 21

1.218   Tranche E .................................................................................. 22

1.219   Tranche F .................................................................................. 22

1.220   Tranche G .................................................................................. 22

1.221   Tranche H .................................................................................. 22

1.222   Tranche I .................................................................................... 22

1.223   Tranche J .................................................................................... 22

1.224   Tranche K .................................................................................. 22

1.142   Tier 3 Debtors ........................................................................... 14

1.2251.143 ............................................................... Treasury Regulations 2214

1.2261.144 .............................................................................. Trustee 2214

1.145   Trust and Servicing Agreement ................................................ 14

1.146   TRS ............................................................................................ 14

1.147   Upper Tier REMIC ................................................................... 14

1.2271.148 ......................................................................... Unimpaired 2214

1.2281.149 ............................................................... Unliquidated Claim 2214

1.229   Unsubscribed Rights .................................................................. 22

1.2301.150 ..................................................................... Voting Deadline 2314

1.2311.151 ....................................................... Wachovia Swap Agreement 2314

B.      Other Terms ............................................................................... 2315

| | | | |
|---|---|---|---|
| C. | Exhibits | ........................................................................................ | ~~23~~15 |
| ARTICLE II | PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS | ........................................................................................ | ~~23~~15 |
| 2.1 | Payment of Allowed Administrative Expense Claims | ................................ | ~~23~~15 |
| 2.2 | Compensation and Reimbursement Claims | ............................................ | ~~24~~15 |
| 2.3 | Priority Tax Claims | ........................................................................... | ~~24~~16 |
| ARTICLE III | CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS | ................ | ~~24~~16 |
| 3.1 | Summary | ......................................................................................... | ~~24~~16 |
| ARTICLE IV | TREATMENT OF CLAIMS AND EQUITY INTERESTS | ........................ | ~~25~~17 |
| 4.1 | Class 1 | ............................................................................................ | ~~25~~17 |
| 4.2 | Class 2 | ............................................................................................ | ~~25~~17 |
| 4.3 | Class 3 | ............................................................................................ | ~~26~~17 |
| 4.4 | Class 4 ~~26~~A | ................................................................................... | 18 |
| 4.5 | Class ~~5~~ | ........................................................................................... | ~~27~~4B 18 |
| 4.6 | Class ~~6~~ | ........................................................................................... | ~~27~~5 19 |
| 4.7 | Class ~~7~~ | ........................................................................................... | ~~28~~6 19 |
| 4.8 | Class ~~8~~ | ........................................................................................... | ~~28~~7 19 |
| 4.9 | Class ~~9~~ | ........................................................................................... | ~~28~~8 20 |
| 4.10 | Class ~~10~~ | ......................................................................................... | ~~28~~9 20 |
| 4.11 | Class ~~11~~ | ......................................................................................... | ~~29~~10 20 |
| 4.12 | Class ~~12~~ | ......................................................................................... | ~~29~~11 20 |
| 4.13 | Class ~~13~~ | ......................................................................................... | ~~29~~12 20 |
| 4.14 | Class ~~14~~ | ......................................................................................... | ~~29~~13 21 |
| 4.15 | Class 14 | .......................................................................................... | 21 |
| 4.16 | Class 15 | ......................................................................................... | ~~29~~21 |
| ARTICLE V | ACCEPTANCE, REJECTION, AND REVOCATION OR WITHDRAWAL OF THE PLAN | ........................................................... | ~~30~~21 |
| 5.1 | Classes Entitled to Vote | ................................................................... | ~~30~~21 |
| 5.2 | Acceptance by Class of Claims | .......................................................... | ~~30~~22 |
| 5.3 | Nonconsensual Confirmation | ............................................................. | ~~30~~22 |
| 5.4 | Revocation or Withdrawal | ................................................................. | ~~30~~22 |
| 5.5 | Amendment of Plan Documents | .......................................................... | ~~31~~22 |
| 5.6 | Removal of Debtors | .......................................................................... | ~~31~~22 |
| ARTICLE VI | IMPLEMENTATION OF THE PLAN | ................................................. | ~~31~~23 |
| 6.1 | Substantive Consolidation | ................................................................. | ~~31~~23 |
| ~~6.2~~ | ~~Distribution of New Securities~~ | .......................................................... | ~~31~~ |
| 6.2 | Deemed Sale of Mortgage Properties | .................................................. | 23 |
| 6.3 | Distributions to Holder of Allowed Mortgage Facility Claim | ................. | 23 |
| 6.4 | Creation of NewCo | .......................................................................... | ~~34~~23 |
| ~~6.4~~ | ~~Cancellation of~~ 6.5 Existing Debt Securities | ..................................... | ~~36~~24 |
| ~~6.5~~ | ~~Management of NewCo~~ | ................................................................... | ~~36~~ |

6.6     NewCo Management Incentive Plan ........................................................ ~~36~~24
6.7     Corporate Reorganization Actions ........................................................ ~~37~~24
6.8     Investment ........................................................................................ ~~37~~25
6.9     ~~Rights Offering~~ .......................................................................... ~~38~~

    ~~6.10      Class B – H Elections~~ .......................................................... ~~41~~6.11 Effectuating Doc

~~6.12~~6.10 ............................ Allocation of Plan Distributions Between Principal and Interest ~~43~~26
~~6.13~~6.11 ............................................................ Surrender and Cancellation of Instruments ~~43~~26
~~6.14~~6.12 ............................................................................................ Letters of Credit ~~44~~26
~~6.15~~6.13 ............................................................................ BHAC IP Transfer Agreement ~~44~~26
~~6.16~~6.14 ...................................................................................... Consistent Tax Reporting ~~44~~27
~~6.17~~6.15 ............ Issuance of NewCo Common Interests to Investor or Sponsor Affiliates ~~45~~27
    ~~6.18      Allowed Mortgage Facility Claim~~ .......................................... ~~45~~

6.16     Mortgage Parties Indemnification Fund ................................................ 28
6.17     Litigation Trust ................................................................................ 28
6.18     ESI Settlement ................................................................................ 30

ARTICLE VII     TREATMENT OF DISPUTED CLAIMS ................................................ ~~45~~31

7.1     Objections to Claims; Prosecution of Disputed Claims ............................ ~~45~~31
7.2     Distributions on Account of Disputed Claims ........................................ ~~45~~31
7.3     Settlement of Claims .......................................................................... 32

ARTICLE VIII     DISTRIBUTIONS ...................................................................... ~~46~~32

8.1     Distributions under the Plan ................................................................ ~~46~~32
8.2     Timing of Distributions under the Plan ................................................ ~~46~~32
    ~~8.3      Distributions with Respect to Mortgage Facility Deficiency Claim, Mezzanine Facility Claims, and General Unsecured Claims~~ .......................................................... ~~46~~

    ~~8.4      Distributions with Respect to The Mortgage Facility Claim~~ ............... ~~46~~

8.3     Use of Cash Collateral ........................................................................ 32
8.4     Plan Administrator ............................................................................ 32
8.5     ~~Calculations Subject to Adjustment~~ ...................................................... ~~46~~
    ~~8.6      Disbursing Agent~~ .................................................................. ~~47~~8.7 Record Date

~~8.8~~8.6     Manner of Payment under the Plan ........................................................ ~~47~~33
~~8.9~~8.7     Hart-Scott-Rodino Compliance ............................................................ ~~47~~33
~~8.10~~8.8     Fractional ~~NewCo Common Interests or Other~~ Distributions. .................. ~~47~~33
~~8.11~~8.9     Distribution of Unclaimed Property ...................................................... ~~47~~33
8.10     Administrative/Priority Claims Reserve ................................................ 33

ARTICLE IX     CONDITIONS PRECEDENT ........................................................ ~~47~~34

9.1     Conditions Precedent to the Effective Date ............................................ ~~48~~34
9.2     Effect of Failure of Conditions to Effective Date .................................. ~~48~~35

ARTICLE X     EFFECT OF CONFIRMATION ...................................................... ~~49~~36

10.1     Vesting of Assets ............................................................................ ~~49~~36

10.2    Title to Assets; Discharge of Liabilities ........................................................ ~~49~~36

10.3    Binding Effect.................................................................................................... ~~49~~36

10.4    Claims Extinguished ......................................................................................... ~~49~~36

10.5    Discharge of Claims and Termination of Equity Interests ............................. ~~49~~36

10.6    Injunction.......................................................................................................... ~~50~~37

10.7    Term of Injunctions or Stays ........................................................................... ~~50~~37

10.8    Injunction Against Interference With Plan of Reorganization........................ ~~50~~37

10.9    Exculpation ....................................................................................................... ~~50~~38

10.10   Releases ............................................................................................................ ~~51~~38

10.11   Government Releases ........................................................................................ 39

10.12   Mortgage Facility Trust Claims ....................................................................... 39

10.13   Indemnification Obligations ............................................................................ ~~51~~39

~~10.12   Avoidance Actions~~ ........................................................................ ~~52~~

~~10.13~~10.14 ...................................... Retention of Causes of Action/Reservation of Rights ~~52~~40

~~10.14~~10.15 .......................... Limitations on Exculpation and Releases of Representatives ~~53~~40

ARTICLE XI   EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................... ~~53~~41

11.1    Assumption of Executory Contracts and Unexpired Leases.......................... ~~53~~41

11.2    Rejection of Executory Contracts and Unexpired Leases ............................. ~~53~~41

11.3    Claims Arising from Rejection, Termination or Expiration ......................... ~~53~~41

11.4    Insurance Policies and Agreements................................................................. ~~54~~42

11.5    Management Agreements ................................................................................. ~~54~~42

ARTICLE XII  RETENTION OF JURISDICTION ................................................................ ~~54~~42

ARTICLE XIII MISCELLANEOUS PROVISIONS ............................................................... ~~55~~44

13.1    Modification of the Plan .................................................................................. ~~56~~44

13.2    Payment of Statutory Fees .............................................................................. ~~56~~44

13.3    Rights of Action ............................................................................................... ~~56~~44

13.4    ~~Subordination Agreements~~ ........................................................... ~~56~~13.5 Swap Agreemen

~~13.6~~13.5 ....................................................................Dissolution of Creditors' Committee ~~56~~44

~~13.7~~13.6 ......................................................................................................Notices ~~56~~44

~~13.8~~13.7 ...................................................................................................... Headings ~~57~~46

~~13.9~~13.8 .................................................................................................... Severability ~~57~~46

~~13.10~~13.9 ..............................................................................................Governing Law ~~58~~46

~~13.11~~13.10 ............................................................... Plan Supplement /Exhibits/Schedules ~~58~~46

~~13.12~~13.11 ............................................................... Compliance with Tax Requirements ~~58~~46

~~13.13~~13.12 ...........................................................................Exemption from Transfer Taxes ~~58~~47

~~13.14~~13.13 ...........................................................Expedited Determination of Postpetition Taxes ~~58~~47

~~13.15~~13.14 ..........................................Sections 1125 and 1126 of the Bankruptcy Code ~~58~~47

~~13.16   Time~~ .............................................................................................................. ~~59~~

13.15   Time ................................................................................................................... 47

13.16   No Amendment, Modification or Waiver of Cash Collateral Order or
Other Documents .............................................................................................. 47

## EXHIBIT LIST

| | | |
|---|---|---|
| Exhibit A | – | Debtors |
| Exhibit B | – | BHAC License Agreements |
| Exhibit C | – | Tier 1 Debtors |
| Exhibit D | – | Tier 2 Debtors |
| Exhibit E | – | Tier 3 Debtors |
| Exhibit F | – | Existing Letters of Credit |
| Exhibit G | – | Mezzanine Facilities |
| Exhibit H | – | New Mortgage Notes |
| Exhibit I | – | New Money Equity Waterfall and Rollover Equity Waterfall (Consensual Plan) |
| Exhibit J | – | New Money Equity Waterfall (Non-Consensual Plan) |

**DEBTORS' ~~FOURTH~~ FIFTH AMENDED PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

ESA Properties LLC and its affiliated debtors set forth on Exhibit A annexed hereto (the "<u>Debtors</u>") hereby propose the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

**ARTICLE I**

**DEFINITIONS**

A.    **Defined Terms.**

As used herein, the following terms shall have the respective meanings specified below:

1.1    ***Acquisition*** means the acquisition by DL-DW of the Debtors from BHAC IV, L.L.C. and BRE/HV Holdings L.L.C.

~~1.2    *Administrative Bar Date Order* means an order of the Bankruptcy Court setting a deadline for the filing of certain Administrative Expense Claims.~~

1.2    ~~1.3~~ ***Administrative Expense Claim*** means any Claim constituting a cost or expense of administration in the Debtors' Chapter 11 Cases under section 503 of the Bankruptcy Code, including, without express or implied limitation, any actual and necessary costs and expenses of preserving the Estate of any Debtor, any expenses of professionals under sections 330 and 331 of the Bankruptcy Code, any actual and necessary costs and expenses of operating the businesses of any Debtor, any indebtedness or obligations incurred or assumed by any Debtor, as Debtor in Possession, in connection with the conduct of its business or for the acquisition or lease of property or the rendition of services, any allowed compensation or reimbursement of expenses under section 503(b)(2)-(6) of the Bankruptcy Code, <u>any Claim of the Mortgage Debt Parties arising in respect of adequate protection payments under or in connection with the Cash Collateral Order,</u> and any fees or charges assessed against any Estate under section 1930, chapter 123, title 28, United States Code.

1.3    ~~1.4~~ ***Administrative Expense Creditor*** means any Creditor entitled to payment of an Administrative Expense Claim.

1.4    ~~1.5~~ ***Administrative Expense Objection Deadline*** means the first Business Day that is thirty (30) days after the Effective Date, as such date may be extended from time to time by order of the Bankruptcy Court.

1.5    ***Administrative/Priority Claims Reserve*** means the reserve established pursuant to Section 8.10 of the Plan.

1.6    ***Affiliate*** means, as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person (for this purpose "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise).

1.7     ***Allowed*** means:

(a)     With respect to any Claim (other than an Administrative Expense Claim), proof of which was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Bankruptcy Court, (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, such Claim to the extent asserted in the proof of such Claim, or (ii) as to which an objection has been interposed, such Claim to the extent that it has been allowed in whole or in part by a Final Order.

(b)     With respect to any Claim (other than an Administrative Expense Claim), as to which no proof of claim was filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, such Claim to the extent that it has been listed in the Schedules as liquidated in amount and not disputed or contingent.

(c)     With respect to any Claim that is asserted to constitute an Administrative Expense Claim:

(i)     that represents an actual or necessary expense of preserving the Estate or operating the business of any Debtor, including for payment of goods, services, wages, or benefits or for credit extended to any Debtor, as a Debtor in Possession, any such Claim to the extent that such claim is reflected as a postpetition liability of any Debtor on such Debtor's books and records maintained in the ordinary course of business as of the Effective Date;

(ii)     in an action against any Debtor pending as of the Confirmation Date or not required to be filed against any Debtor pursuant to the Administrative Bar Date Order, any such Claim to the extent (x) it is allowed by a final order of a court of competent jurisdiction or by agreement between NewCo and the holder of such Administrative Expense Claim, and (y) if any Debtor disputes that such claim is a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code, to the extent the Bankruptcy Court determines by a Final Order that it constitutes a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code;

(iii)     timely filed in accordance with the Administrative Bar Date Order, any such Claim filed to the extent (x) no objection is interposed by the Administrative Expense Objection Deadline or (y) if an objection is interposed by the Administrative Expense Objection Deadline, is allowed in whole or in part by a Final Order and only to the extent that such allowed portion is deemed, pursuant to a Final Order, to constitute a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code; or

(iv)     that represents a Claim of a professional person employed under section 327, 328 or 1103 of the Bankruptcy Code that is required to apply to the Bankruptcy Court for the allowance of compensation and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code or an Administrative Expense Claim arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code, such Claim to the extent it is allowed by a Final Order.

1.8    ***Allowed Amount*** means the lesser of (a) the dollar amount of an Allowed Claim or (b) the Estimated Amount of such Claim.  Unless otherwise specified herein or by Final Order, the Allowed Amount of an Allowed Claim shall not include interest accruing on such Allowed Claim from and after the Commencement Date.

1.9    ***Auction*** has the meaning set forth in the Bidding Procedures Order.

1.10    1.9 ***Ballot***  means the form or forms distributed to holders of Impaired Claims on which the acceptance or rejection of the Plan is to be indicated.

1.11    1.10 ***Bankruptcy Code*** means the Bankruptcy Reform Act of 1978, as amended, and as codified in title 11 of the United States Code, as applicable to the Chapter 11 Cases.

1.12    1.11 ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to section 157 of title 28 of the United States Code, the unit of such District Court constituted pursuant to section 151 of title 28 of the United States Code.

1.13    1.12 ***Bankruptcy Rules***  means the Federal Rules of Bankruptcy Procedure, as amended, as applicable to the Chapter 11 Cases, including the Local Rules of the Bankruptcy Court.

1.14    1.13 ***BHAC*** means BHAC Capital IV, LLC, a Delaware limited liability company.

1.15    1.14 ***BHAC IP*** means the Intellectual Property owned or controlled by BHAC.

1.16    1.15 ***BHAC License Agreements*** means, collectively, the license agreements described on Exhibit B annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.17    1.16 ***BHAC IP Transfer Agreement*** shall have the meaning set forth in Section 6.15 6.13 hereof.

1.17    ***BREA*** means Blackstone Real Estate Associates VI L.P., in its capacity as general partner on behalf of Blackstone Real Estate Partners VI L.P. and its parallel funds and related alternative vehicles.

1.18    ***Bidding Procedures Order*** means that certain Order Pursuant to Sections 105(a), 363 and 503(b) of the Bankruptcy Code and Bankruptcy Rule 6004(h) Approving Bidding Procedures and Notice of the Auction Relating Thereto and Granting Related Relief, dated as of April 23, 2010 (Docket No. 975).

1.19    1.18 ***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.20    1.19 ***Cash*** means lawful currency of the United States of America.

1.21 1.20 **Cash Collateral Order** means that certain Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay, dated as of July 23, 2009 (Docket No. 205), including any and all modifications or amendments thereto.

1.21 **Certificates** means the Certificates issued under the Mortgage Facility.

1.22 **Cash Distribution** means the sum of (a) the Excess Cash, if any, and (b) the balance of the Investor Payment and the proceeds of the Debt Financing, each as defined in the Investment Agreement, after payment of (i) to the extent Excess Cash is a negative number, amounts, if any, required to fund the Administrative/Priority Claims Reserve, (ii) the Mortgage Parties Indemnification Fund, (iii) the Litigation Trust Funding, (iv) $750,000, which amount shall be used by the Debtors to fund the wind-down of ESI, (v) $40,000,000, which is the price to be paid for the purchase of control of HVM pursuant to the terms of the agreement dated June 4, 2010 with HVM Manager Owner, and (vi) Cash paid in connection with the acquisition of HVM or its assets, subject to agreement on the amount by the Investors and the Special Servicer (with the consent of the Operating Advisor). For the avoidance of doubt, to the extent that the amount referred to in clause (i) is a positive number, or any amount remains after the payment of any of the items referred to in clauses (ii) to (vi) hereof, such amount shall be added to the Cash Distribution.

1.23 1.22 **Chapter 11 Cases** means (a) the cases under chapter 11 of the Bankruptcy Code commenced by ESI, the Debtors and certain of their Affiliates on June 15, 2009 and February 18, 2010 pending in the Bankruptcy Court as In re Extended Stay Inc., et al., Case No. 09-13764 (JMP) (Jointly Administered).

1.24 1.23 **Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

1.25 1.24 **Class** means any group of Claims or Equity Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

1.25 **Class A1 Mortgage Certificates** means the Class A1 Certificates issued under the Mortgage Facility.

1.26 **Class A1 - F Mortgage Certificates** means the Class A1 Mortgage Certificates, the Class A2 Mortgage Certificates, the Class A3 Mortgage Certificates, the Class A4 Mortgage Certificates, the Class B Mortgage Certificates, the Class C Mortgage Certificates, the Class D Mortgage Certificates, the Class E Mortgage Certificates and the Class F Mortgage Certificates.

1.27 **Class A2 Mortgage Certificates** means the Class A2 Certificates issued under the Mortgage Facility.

1.28 **Class A3 Mortgage Certificates** means the Class A3 Certificates issued under the Mortgage Facility.

1.29 **Class A4 Cash Paydown** means two hundred million dollars ($200,000,000) to be paid to the holders of the Class A4 Mortgage Certificates, each of whom shall receive its respective Pro Rata Share of such two hundred million dollars ($200,000,000).

1.30    ***Class A4 Mortgage Certificates*** means the Class A4 Certificates issued under the Mortgage Facility.

1.31    ***Class B Mortgage Certificates*** means the Class B Certificates issued under the Mortgage Facility.

1.32    ***Class B - H Debt/Equity Election*** means the election of a holder of a Class B - H Mortgage Certificate to receive a distribution under the Plan on account of its Class B - H Mortgage Certificate other than as follows: (a) its Pro Rata Share of the Rollover Equity in satisfaction of 50% of such holder's Class B - H Mortgage Certificates and (b) its Pro Rata Share of the New Class B - H Mortgage Notes in satisfaction of 50% of such holder's Class B - H Mortgage Certificates; provided, however, that in the event such an election is made, such revised allocation of the distribution of the Rollover Equity and the New Class B - H Mortgage Notes to the holders of the Class B - H Mortgage Certificates shall be as agreed to between the Debtors, the Investor and each of the Sponsors within ten (10) days after the Voting Deadline and if such agreement cannot be reached, each holder of a Class B - H Mortgage Certificates shall receive (y) its Pro Rata Share of the Rollover Equity in satisfaction of 50% of such holder's Class B - H Mortgage Certificates and (z) its Pro Rata Share of the New Class B - H Mortgage Notes in satisfaction of 50% of such holder's Class B - H Mortgage Certificate, and provided further, that, in the aggregate, 50% of the Class B - H Mortgage Debt will have been satisfied by the New Class B - H Mortgage Notes and 50% of the Class B - H Mortgage Debt will have been satisfied by the Rollover Equity, subject to Section 4.2(d) hereof.

1.33    ***Class B - H Election Date*** means the date that is five (5) Business Days after the Voting Deadline, or such later date fixed by the Debtors with the approval of the Investor and each of the Sponsors, such approval not to be unreasonably withheld.

1.34    ***Class B - H Elections*** means the Class B - H Debt/Equity Election and the Class B - H Equity Cashout Option Election.

1.35    ***Class B - H Equity Cashout Option*** means the purchase, on the Effective Date, of Class B - H Certificates, at a 30% discount to the accreted amount thereof estimated as of June 30, 2010, in the aggregate amount of up to two hundred, fifty-five million, four hundred thousand dollars ($255,400,000), assuming that all of the holders thereof elect to receive cash in lieu of the Rollover Equity, by the Investor (or one or more of the Investor's members or their respective affiliates) directly from the holders of the Class B - H Certificates.

1.36    ***Class B - H Equity Cashout Option Election*** means the election for the holders of Class B - H Certificates set forth in Section 4.2(d) hereof to receive the Class B - H Equity Cashout Option in lieu of the Rollover Equity.

1.37    ***Class B - H Mortgage Certificates*** means the Class B Mortgage Certificates, the Class C Mortgage Certificates, the Class D Mortgage Certificates, the Class E Mortgage Certificates, the Class F Mortgage Certificates, the Class G Mortgage Certificates and the Class H Mortgage Certificates.

1.38    ***Class B - H Mortgage Debt*** means the amount due and owing, in the aggregate, to the holders of the Class B - H Mortgage Certificates under the Mortgage Facility.

1.39    ***Class B - K Mortgage Certificates*** means the Class B Mortgage Certificates, the Class C Mortgage Certificates, the Class D Mortgage Certificates, the Class E Mortgage

~~Certificates, the Class F Mortgage Certificates, the Class G Mortgage Certificates, the Class H Mortgage Certificates, the Class J Mortgage Certificates and the Class K Mortgage Certificates.~~

~~1.40    *Class C Mortgage Certificates* means the Class C Certificates issued under the Mortgage Facility.~~

~~1.41    *Class D Mortgage Certificates* means the Class D Certificates issued under the Mortgage Facility.~~

~~1.42    *Class E Mortgage Certificates* means the Class E Certificates issued under the Mortgage Facility.~~

~~1.43    *Class F Mortgage Certificates* means the Class F Certificates issued under the Mortgage Facility.~~

~~1.44    *Class G Alternate Note Balance* means the amount of New Alternate Notes to be allocated to holders of the Class G Mortgage Certificates, which shall be equal to the principal amount of the New Alternate Mortgage Loan minus the face amount of the Class A1 - F Mortgage Certificates.~~

~~1.45    *Class G Alternate Note Proportion* means the Class G Alternate Note Balance as a percent of the New Alternate Mortgage Loan.~~

~~1.46    *Class G Mortgage Certificates* means the Class G Certificates issued under the Mortgage Facility.~~

~~1.47    *Class H Mortgage Certificates* means the Class H Certificates issued under the Mortgage Facility.~~

~~1.48    *Class J Mortgage Certificates* means the Class J Certificates issued under the Mortgage Facility.~~

~~1.49    *Class K Mortgage Certificates* means the Class K Certificates issued under the Mortgage Facility.~~

~~1.50    *Class L Mortgage Certificates* means the Class L Certificates issued under the Mortgage Facility.~~

~~1.51    *Class M Mortgage Certificates* means the Class M Certificates issued under the Mortgage Facility.~~

1.26    ~~1.52~~ **Commencement Date** means June 15, 2009 or February 18, 2010, as applicable to the particular Debtor.

1.27    ~~1.53~~ **Confirmation Date** means the date on which the Confirmation Order has been entered on the docket by the Clerk of the Bankruptcy Court.

1.28    ~~1.54~~ **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.29 1.55 **Contingent Claim** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening, or is triggered by, an event, which event has not yet occurred, happened, or been triggered, as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.30 *Controlling Holder* means Banc of America Securities LLC, Blue Ridge Investments, L.L.C., UBS Securities LLC, and BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse AG, in their capacity as the Controlling Holder under the Trust and Servicing Agreement, or any successor thereto.

1.31 1.56 **Creditor** means any Person that holds an Allowed Claim.

1.32 *Creditor Representative* means the member of the Creditors' Committee or other Person selected by the Creditors' Committee to participate in the management of the Litigation Trust.

1.33 1.57 **Creditors' Committee** means the Official Committee of Unsecured Creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

1.34 1.58 **Debtors** has the meaning set forth in the preamble hereof.

1.35 *Debt Financing Arrangements* means the new debt financing to be provided to NewCo and the Reorganized Debtors on the Effective Date pursuant to that certain Commitment Letter dated May 27, 2010 among the Sponsors and the Debt Financing Lenders for a new senior secured loan on terms and conditions set forth therein, including the term sheet attached as Exhibit A thereto.

1.36 *Debt Financing Lenders* means JP Morgan Chase Bank, N.A. and Deutsche Bank Securities, Inc., together with their successors and assigns pursuant to assignments made in accordance with the applicable terms of the Debt Financing Arrangements, individually or collectively as the context may require, solely in their capacity as such.

1.37 1.59 **Debtor in Possession** means each Debtor in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

1.38 1.60 **Disallowed Claim** means a Claim or a portion of a Claim that is disallowed by an order of the Bankruptcy Court or such other court of competent jurisdiction.

1.61 *Disbursing Agent* means any Person in its capacity as a disbursing agent under Section 8.6 hereof.

1.39 1.62 **Disclosure Statement** means the disclosure statement related to the Plan filed with and approved by the Bankruptcy Court, as such disclosure statement may be amended, modified or supplemented.

1.40 1.63 **Disputed Claim** means any Claim (including any Administrative Expense Claim) against any Debtor, proof of which was timely and properly filed, which is disputed under the Plan or as to which the Debtors have interposed a timely objection and/or request for

estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed. A Claim that is disputed by the Debtors as to its amount only shall be deemed Allowed in the amount the Debtors admit owing, if any, and disputed as to the excess.

1.41    ~~1.64~~ *Distribution* means the payment or distribution under the Plan of property or interests in property to the holders of Allowed Claims.

1.42    ~~1.65~~ *Distribution Date* means each of (a) the Initial Distribution Date, (b) the first Business Day after the end of the months of March and September, commencing with the first such date to occur after the Effective Date, and (c) the Final Distribution Date.

1.43    *DL-DW* means DL-DW Holdings LLC.

1.44    ~~1.66~~ *Effective Date* means a Business Day on or after the Confirmation Date selected by the Debtors, the Investor and each of the Sponsors on which (a) all of the conditions precedent to the effectiveness of the Plan specified in Section 9.1 have been satisfied or waived and (b) no stay of the Confirmation Order is in effect.

~~1.67    *Election Form* means the form that the holder of a Class B - H Mortgage Certificate shall be required to complete and return to the Subscription Agent if such holder wishes to make the Class B - H Equity Cashout Option Election or wishes to make the Class B - H Debt/Equity Election.~~

~~1.68    *Election Period* means the period during which the Class B - H Equity Cashout Option Election and Class B - H Debt/Equity Election may be exercised.~~

1.45    ~~1.69~~ *Equity Interest* means the interests of any holder of an equity security of any of the Debtors represented by any issued and outstanding shares of common stock or preferred stock, or any membership interest, partnership interest or other instrument evidencing a present ownership interest in any of the Debtors, including any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.46    ~~1.70~~ *ESA Canada Properties Borrower Interests* means the limited liability company interests of ESA Canada Properties Borrower LLC, authorized pursuant to its limited liability company agreement, as in effect immediately prior to the Effective Date.

1.47    ~~1.71~~ *ESA Canada Properties Interests* means the shares of beneficial interest of ESA Canada Properties Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.48    ~~1.72~~ *ESA MD Borrower Interests* means the limited liability company interests of ESA MD Borrower LLC, authorized pursuant to its limited liability company agreement, as in effect immediately prior to the Effective Date.

1.49    ~~1.73~~ *ESA MD Properties Trust Certificate* means the certificate of ESA MD Properties Business Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.50     1.74 **ESA P Portfolio MD Borrower Interests** means the limited liability company interests of ESA P Portfolio MD Borrower LLC, authorized pursuant to its limited liability company agreement, as in effect immediately prior to the Effective Date.

1.51     1.75 **ESA P Portfolio MD Trust Certificate** means the certificate of ESA P Portfolio MD Trust, authorized pursuant to its trust agreement, as in effect immediately prior to the Effective Date.

1.52     1.76 **ESA UD** means ESA UD Properties LLC, a Delaware limited liability company.

1.53     1.77 **ESA UD Mortgage Claim** means the Claim of Bank of America, N.A. under the ESA UD Mortgage Facility.

1.54     1.78 **ESA UD Mortgage Facility** means the Loan Agreement, dated February 14, 2008, among ESA UD, ESA 2007 Operating Lessee Inc. and Bank of America, N.A.

1.79     ~~**Escrow Account** means the bank account to be established by the Debtors for the purpose of holding all amounts paid by Rights Offering Participants in connection with the exercise of the Rights pursuant to the Rights Offering.~~

1.55     1.80 **ESH/ESA General Partnership Interests** means the 1% general partnership interests in ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., and ESA P Portfolio TXNC Properties L.P., held by ESH/MSTX GP L.L.C., ESH/TXGP L.L.C., ESA TXGP L.L.C., and ESA P Portfolio TXNC GP L.L.C. respectively, as authorized pursuant to the limited partnership agreements of ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., and ESA P Portfolio TXNC Properties L.P., as in effect immediately prior to the Effective Date.

1.56     1.81 **ESH/TN Properties Membership Interest** means the 1% membership interest in ESH/TN Properties L.L.C. held by ESH/TN Member Inc., authorized pursuant to the limited liability company agreement of ESH/TN Properties L.L.C., as in effect immediately prior to the Effective Date.

1.57     1.82 **ESI** means Extended Stay Inc., a Delaware corporation.

1.58     *ESI Settlement* has the meaning set forth in Section 6.18 hereof.

1.59     *ESI Settlement Order* means the order of the Bankruptcy Court approving the ESI Settlement.

1.60     1.83 **Estate** means the estate of each Debtor as created under section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

1.61     1.84 **Estimated Amount** means the estimated dollar value of an Unliquidated Claim, Disputed Claim or Contingent Claim pursuant to section 502(c) of the Bankruptcy Code or as otherwise agreed to between the holder of such Claim and the applicable Debtor or NewCo, or as otherwise determined by the Bankruptcy Court.

1.62 1.85 ***Examiner's Report*** means the report of Ralph R. Mabey, examiner in the Chapter 11 Cases, filed on April 8, 2010 [Docket No. 913].

1.63 1.86 ***Excess Equity*** ***Cash*** means, in the event that any holders of Class B - H Mortgage Certificates do not elect to receive 50% of their distribution in Rollover Equity, the right of the other holders of Class B - H Mortgage Certificates to elect to receive a greater portion of their distribution in Rollover Equity up to the amount of any such then remaining Rollover Equity, subject to proration. means all cash and cash equivalents on the balance sheet of the Debtors as of the Effective Date but immediately prior to the Investment by the Investor, less amounts necessary to fund the Administrative/Priority Claims Reserve.

1.64 1.87 ***Existing Equity*** means the Equity Interest of each of the Debtors, other than the Tier 2 Debtors, authorized pursuant to its certificate of incorporation or other organizational documents, as in effect immediately prior to the Effective Date.

1.65 1.88 ***Existing Letters of Credit*** means, collectively, the letters of credit described on Exhibit F annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.89 ***Expiration Date*** means the date that is five (5) Business Days after the Voting Deadline, which date shall be the deadline for accepting the Rights Offering as specified in the Ballot and the Rights Certificate, as such date may be extended from time to time by the Debtors with the approval of the Investor and each of the Sponsors, such approval not to be unreasonably withheld.

1.66 1.90 ***Final Distribution Date*** means a date on or after the Initial Distribution Date and after all Disputed Claims have become either Allowed Claims or Disallowed Claims that is selected by NewCo in its discretion but, in any event, is no later than thirty (30) days thereafter, or such later date as the Bankruptcy Court may establish, upon request by NewCo, for cause shown.

1.67 1.91 ***Final Order*** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, which has not been reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

1.68 1.92 ***G&A Reimbursement Agreements*** means the G&A Reimbursement Agreements entered into between HVM and one or more of the Debtors, as the same have been amended from time to time.

1.69 1.93 ***General Unsecured Claims*** means any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Claim, a Secured Claim, the Mortgage Facility Deficiency Claim or a Mezzanine Facilities Claim.

1.70    1.94 **_Guaranty_** means the Guaranty Agreement, dated as of June 11, 2007, by Lightstone Holdings LLC, HVM Manager Owner, ESI and Homestead in respect of the obligations of the borrowers under the Mortgage Facility and the Mezzanine Facilities.

1.71    1.95 **_Guaranty Claim_** means any rights to the payment of damages, claims, causes of action, charges, suits, demands, defaults, rights of recovery, assessments, rights of set-off or rights of recoupment arising under or relating to the Guaranty (whether relating to the Mortgage Facility or the Mezzanine Facilities and whether paid prior to or following the Effective Date) as a result of the commencement of any of the Chapter 11 Cases.

1.72    1.96 **_Homestead_** means Homestead Village L.L.C., a Delaware limited liability company.

1.73    1.97 **_HVM_** means HVM L.L.C., a Delaware limited liability company.

1.74    1.98 **_HVM Manager_** means HVM Manager L.L.C., a Delaware limited liability company and the manager of HVM.

1.75    1.99 **_HVM Manager Owner_** means David Lichtenstein.

1.76    1.100 **_Impaired_** means, with respect to any Class of Claims or Equity Interests, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.77    **_Indemnified Litigation_** has the meaning set forth in Section 6.16 hereof.

1.78    1.101 **_Initial Distribution Date_** means a date after the Effective Date that is selected by NewCo in its discretion but, in any event, is no later than five (5) days after the Effective Date, or such later date as the Bankruptcy Court may establish upon request by NewCo, for cause shown.

1.79    1.102 **_Intellectual Property_** means, collectively, patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, domain names, copyrights, licenses and know-how (including, without limitation, trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures as well as other inventions, works of authorship, confidential information, technology, software and documentation, data and databases and websites) and any registrations or applications to register the foregoing.

1.80    **_Intercreditor Agreement_** means the Intercreditor Agreement dated as of June 11, 2007, by and among Wachovia Bank, N.A., Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A., and the holders of the Mezzanine Facilities Claims.

1.81    1.103 **_Internal Revenue Code_** means the Internal Revenue Code of 1986, as amended from time to time, and any applicable rulings, Treasury Regulations, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

1.82    1.104 **_Investment_** means the investment that is to be made by the Investor as further described in Section 6.8 hereof.

1.83 ~~1.105~~ ***Investment*** ~~*and Standby Purchase*~~ ***Agreement*** means the agreement dated ~~————————~~,June 4, 2010 by and among the Debtors, HVM Manager, HVM and the Investor.

1.84 ~~1.106~~ ***Investor*** means CP ESH Investors, ~~L.L.C.~~LLC, a newly formed entity wholly owned by the Sponsors.

1.85 ~~1.107~~ ***Investor Certificates*** means those ~~Certificates~~Mortgage Certificates in the aggregate principal amount (inclusive of estimated interest that would accrue through August 15, 2010) of $309,244,555.72 in Classes B, CFX, CFL, D, E, G, H and J beneficially owned by the Investor or its members or Affiliates, the actual amount of such Mortgage Certificates to be calculated as provided in Section 1.2 of the Investment Agreement.

1.86 ~~1.108~~ ***IRS*** means the United States Internal Revenue Service.

~~1.109 *M1 Mezzanine Facility Claims* means the Claims arising under Mezzanine A Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz L.L.C., ESA P Mezz L.L.C., and ESA Mezz L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.~~

~~1.110 *M2 Mezzanine Facility Claims* means the Claims arising under Mezzanine B Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 2 L.L.C., ESA P Mezz 2 L.L.C., and ESA Mezz 2 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.~~

~~1.111 *M3 Mezzanine Facility Claims* means the Claims arising under Mezzanine C Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 3 L.L.C., ESA P Mezz 3 L.L.C., and ESA Mezz 3 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.~~

~~1.112 *M4 Mezzanine Facility Claims* means the Claims arising under Mezzanine D Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 4 L.L.C., ESA P Mezz 4 L.L.C., and ESA Mezz 4 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.~~

~~1.113 *M5 Mezzanine Facility Claims* means the Claims arising under Mezzanine E Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 5 L.L.C., ESA P Mezz 5 L.L.C., and ESA Mezz 5 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.~~

~~1.114 *M6 Mezzanine Facility Claims* means the Claims arising under Mezzanine F Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 6 L.L.C., ESA P Mezz 6 L.L.C., and ESA Mezz 6 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.~~

1.115   *M7 Mezzanine Facility Claims* means the Claims arising under Mezzanine G Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 7 L.L.C., ESA P Mezz 7 L.L.C., and ESA Mezz 7 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.116   *M8 Mezzanine Facility Claims* means the Claims arising under Mezzanine H Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 8 L.L.C., ESA P Mezz 8 L.L.C., and ESA Mezz 8 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.117   *M9 Mezzanine Facility Claims* means the Claims arising under Mezzanine I Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 9 L.L.C., ESA P Mezz 9 L.L.C., and ESA Mezz 9 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.118   *M10 Mezzanine Facility Claims* means the Claims arising under Mezzanine J Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 10 L.L.C., ESA P Mezz 10 L.L.C., and ESA Mezz 10 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders.

1.87   *Litigation Trust* means the trust established on the Effective Date in accordance with the Plan and the Litigation Trust Agreement, for the benefit of the Litigation Trust Beneficiaries.

1.88   *Litigation Trust Agreement* means the trust agreement that, among other things, establishes the Litigation Trust, and describes the powers, duties and responsibilities of the Litigation Trustee, the Creditor Representative and the Special Servicer, which trust agreement shall be substantially in the form filed in the Plan Supplement and shall be reasonably acceptable to the Creditors' Committee and the Special Servicer (in consultation with the Operating Advisor).

1.89   *Litigation Trust Assets* means (i) all claims and causes of action of the Debtors or the Debtors in Possession under sections 502(d), 542 through 551, and 553 of the Bankruptcy Code, and (ii) any other potential claims, causes of actions, charges, suits or rights of recovery referenced in the Examiner's Report arising out of or related to the Acquisition; provided, however, that the "Litigation Trust Assets" shall not include (a) the Windows Litigation (as such term is defined in the Investment Agreement), and (b) any claims, causes of action, suits or rights of recovery against the Debtors, the Reorganized Debtors, NewCo, HVM, the Operating Advisor, the Controlling Holder, the Trustee, or the Special Servicer.

1.90   *Litigation Trust Beneficiaries* means the Creditors entitled to the proceeds of the Litigation Trust Assets, as determined by Final Order.

1.91   *Litigation Trust Funding* means the sum of $5,000,000 to be provided by the Debtors on the Effective Date, to provide the initial funding for the Litigation Trust described in Section 6.17 hereof.

1.92 ***Litigation Trust Funding Reimbursement*** means the amount to be paid to the Special Servicer in cash from the first proceeds of the Litigation Trust Assets, as set forth in the Litigation Trust Agreement.

1.93 ***Litigation Trustee*** means the Person selected by mutual agreement of the Special Servicer (with the consent of the Operating Advisor, such consent not to be unreasonably withheld) and the Creditors' Committee, as designated in the Plan Supplement, or, after the Effective Date, such other Person appointed by the mutual agreement of the Special Servicer and the Creditor Representative, or as otherwise determined by the Bankruptcy Court.

1.94 ***Loan REMIC*** has the meaning that is set forth in the Trust and Servicing Agreement.

1.95 ***Lower Tier REMIC*** has the meaning that is set forth in the Trust and Servicing Agreement.

1.96 ***Master Servicer*** means Wachovia Bank, National Association.

1.97 ~~1.119~~ ***Merrill Swap Agreement*** means the Master Agreement, dated August 28, 2007, by and among Merrill Lynch Capital Services, Inc. and Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass Through Certificates, Series 2007-ESH Trust, and all Schedules thereto, including the Elections and Variables to the 1994 ISDA Credit Support Annex.

1.98 ~~1.120~~ ***Mezzanine Facilities*** means, collectively, the mezzanine loan facilities described on Exhibit G annexed hereto, all as amended or modified from time to time, and all documents entered into in connection therewith.

1.99 ~~1.121~~ ***Mezzanine Facilities Claims*** means, ~~collective~~collectively, the Claims arising under the Mezzanine Facilities.

1.100 ~~1.122~~ ***Mortgage Certificate*** means a mortgage certificate that was issued in connection with the Mortgage Facility.

1.101 ***Mortgage Debt Parties*** means, collectively, (i) the Successor Trustee, (ii) the Trustee, (iii) the Special Servicer, (iv) the Master Servicer, (v) the Operating Advisor, (vi) the Controlling Holder, and (vii) the Mortgage Facility Trust, and with respect to any of the foregoing, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity, and any Person claiming by or through any of them, but excluding any insurer of any of the Debtors. For the avoidance of doubt, this definition of "Mortgage Debt Parties" does not include TriMont Real Estate Advisors Inc. and any of its present and former Affiliates (whether by operation of law or otherwise), subsidiaries, current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity.

1.102 1.123 ***Mortgage Facility*** means the Mortgage Loan Agreement, dated as of June 11, 2007, by and among the Borrowers listed on Schedule 1.1(a) thereto and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A., as Lenders, as amended or modified from time to time and all documents entered into in connection therewith.

1.103 1.124 ***Mortgage Facility Claim*** means the Secured Claim of the Trustee under the Mortgage Facility.

1.104 1.125 ***Mortgage Facility Deficiency Claim*** means the Claim of the Trustee in respect of the Mortgage Facility, ~~as calculated pursuant to Section 6.18 hereof~~other than the Mortgage Facility Claim.

~~1.126 *New Alternate Mortgage Loan* means the amended and restated Mortgage Loan Agreement, substantially in the form to be set forth in the Plan Supplement, pursuant to which the New Alternate Notes shall be issued, which must be reasonably acceptable to the Investor and each of the Sponsors and shall include reasonable modifications to the existing loan documents that (a) are generally consistent with (i) current valuations of the properties (including, but not limited to, the impact of valuations on release provisions) and (ii) the Plan and the Disclosure Statement, (b) permit the Reorganized Debtors to prepay all or any portion of the New Alternate Mortgage Loan, at any time and from time to time, without any penalty or premium and without any defeasance requirement, (c) do not require any guarantee from or recourse liability to the Investor's members or affiliates other than NewCo with respect to recourse carve-out liability, (d) do not contain any mandatory prepayment requirements, event of default provisions, rights of redemption or any other restrictions or rights to change the material terms of the loan in a manner adverse to the Reorganized Debtors in the event of any change in control or sale of all or substantially all assets in connection with the purchaser assuming and after the purchaser assumes the New Alternate Mortgage Loan, and (e) are no less favorable to the Reorganized Debtors than the existing loan documents, subject to Exhibit H hereto.~~

~~1.127 *New Alternate Notes* means the new notes to be issued pursuant to the New Alternate Mortgage Loan to the holder of the Allowed Mortgage Facility Claim pursuant to Section 4.2(b)(ii) hereof in the event that Class 2 rejects the Plan.~~

~~1.128 *New B—H Rights*~~

1.105 ***Mortgage Facility Trust*** means ~~Rights which may be used by~~the trust created under the Trust and Servicing Agreement for the benefit of the holders of ~~Class B—H~~the Mortgage Certificates ~~to subscribe for NewCo Common Interests that have an aggregate Subscription Price of one hundred, eighty-eight million dollars ($188,000,000)~~.

~~1.129 *New Class A1 Mortgage Notes* means the A1 notes issued pursuant to Tranche A of the New Mortgage Loan.~~

~~1.130 *New Class A2 Mortgage Notes* means the A2 notes issued pursuant to Tranche B of the New Mortgage Loan.~~

~~1.131 *New Class A3 Mortgage Notes* means the A3 notes issued pursuant to Tranche C of the New Mortgage Loan.~~

1.132    ***New Class A4 Mortgage Notes*** means the A4 notes issued pursuant to Tranche D of the New Mortgage Loan.

1.133    ***New Class B Mortgage Notes*** means the B notes issued pursuant to Tranche E of the New Mortgage Loan.

1.134    ***New Class B - H Mortgage Notes*** means the New Class B Mortgage Notes, the New Class C Mortgage Notes, the New Class D Mortgage Notes, the New Class E Mortgage Notes, the New Class F Mortgage Notes, the New Class G Mortgage Notes and the New Class H Mortgage Notes.

1.135    ***New Class C Mortgage Notes*** means the C notes issued pursuant to Tranche F of the New Mortgage Loan.

1.136    ***New Class D Mortgage Notes*** means the D notes issued pursuant to Tranche G of the New Mortgage Loan.

1.137    ***New Class E Mortgage Notes*** means the E notes issued pursuant to Tranche H of the New Mortgage Loan.

1.138    ***New Class F Mortgage Notes*** means the F notes issued pursuant to Tranche I of the New Mortgage Loan.

1.139    ***New Class G Mortgage Notes*** means the G notes issued pursuant to Tranche J of the New Mortgage Loan.

1.140    ***New Class H Mortgage Notes*** means the H notes issued pursuant to Tranche K of the New Mortgage Loan.

1.141    ***New Debt Securities*** means, collectively, the New Class A1 Mortgage Notes, the New Class A2 Mortgage Notes, the New Class A3 Mortgage Notes, the New Class A4 Mortgage Notes, the New Class B Mortgage Notes, the New Class C Mortgage Notes, the New Class D Mortgage Notes, the New Class E Mortgage Notes, the New Class F Mortgage Notes, the New Class G Mortgage Notes and the New Class H Mortgage Notes.

1.106    ***Mortgage Parties Indemnification Fund*** has the meaning set forth in Section 6.16 hereof.

1.107    ***Mortgage Properties*** means the collateral securing the Mortgage Facility.

1.108    1.142 ***New Debtor Equity*** means the common stock, preferred stock, limited liability company interests or limited or general partnership interests, as the case may be, of each of the Tier 1 Debtors, other than the Tier 2 Debtors, the Tier 3 Debtors, the ESH/ESA General Partnership Interests and the ESH/TN Properties Membership Interests, which is to be authorized and issued pursuant to the Plan.

1.143    ***New Equity Securities*** means, collectively, the NewCo Common Interests, the Sub-Equity and the New Warrants.

1.109 1.144 *New ESA UD Mortgage Facility* means the new mortgage facility, in the principal amount of five million dollars ($5,000,000) memorialized in a loan agreement, substantially in the form to be set forth in the Plan Supplement, by and among ESA UD, as borrower, and the lender thereunder.

1.110 1.145 *New ESA UD Mortgage Note* means the note to be issued to ESA UD pursuant to the New ESA UD Mortgage Facility in the principal amount of five million dollars ($5,000,000), bearing interest at the rate of 5.0% per annum and due and payable 5 years from the Effective Date.

1.146 *New J - K Rights* means the Rights which may be used by holders of Class J - K Mortgage Certificates to subscribe for NewCo Common Interests that have an aggregate Subscription Price of twelve million dollars ($12,000,000).

1.147 *New Money Equity Investment* means (a) in a consensual plan, the up to six-hundred fifty million dollars ($650,000,000) in equity commitments to be made by the Investor into NewCo on the Effective Date consisting of (i) the four-hundred fifty million dollar ($450,000,000) equity investment to be made by the Investor in NewCo (subject to an increase pursuant to clause (ii)) plus (ii) the Investor's commitment to backstop an offering of up to two-hundred million dollars ($200,000,000) of the Rights Offering (subject to Section 6.9(I) hereof, in which event the amount of the Investment shall be increased so that the total amount of the New Money Equity Investment is six-hundred fifty million dollars ($650,000,000)) and on account of which the Investor will be entitled to the distributions pursuant to the New Money Equity Waterfall, and (b) in a non-consensual plan, the four- hundred million dollars ($400,000,000) in equity commitments and the contribution of the Investor Certificates to be made by the Investor in NewCo on the Effective Date and on account of which the Investor will be entitled to the distributions pursuant to the New Money Equity Waterfall.

1.148 *New Money Equity Waterfall* shall have the meaning set forth on Exhibit I to the Plan in the event of a consensual plan and shall have the meaning set forth on Exhibit J to the Plan in the event of a non-consensual plan.

1.149 *New Mortgage Loan* means the amended and restated Mortgage Facility comprising Tranche A, Tranche B, Tranche C, Tranche D, Tranche E, Tranche F, Tranche G, Tranche H, Tranche I, Tranche J, and Tranche K, in the aggregate principal amount of two billion, eight-hundred eighteen million, one hundred eighty four thousand, two-hundred forty three dollars ($2,818,184,243), subject to adjustment pursuant to Section 8.5 hereof, after the Class A4 Cash Paydown, in the amounts and bearing the rates of interest set forth on Exhibit I hereof, subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes, as memorialized in the amended and restated Mortgage Loan Agreement by and among existing borrowers under the Mortgage Loan Facility, as borrower, and the lenders thereunder, which shall be substantially in the form to be set forth in the Plan Supplement, which must be reasonably acceptable to the Investor and each of the Sponsors and shall include reasonable modifications to the existing loan documents that (a) are generally consistent with (i) current valuations of the properties (including, but not limited to, the impact of valuations on release provisions) and (ii) the Plan and the Disclosure Statement, (b) permit the Reorganized Debtors to prepay all or any portion of the New Mortgage Loan, at any time and from time to time, without any penalty or premium and without any defeasance requirement, (c) do not require any guarantee from or recourse liability to the Investor's members or affiliates, (d) do not contain any mandatory prepayment requirements, event of default provisions, rights of redemption or any other restrictions or

~~rights to change the material terms of the loan in a manner adverse to the Reorganized Debtors in the event of any change in control or sale of all or substantially all assets in connection with the purchaser assuming and after the purchaser assumes the New Mortgage Loan, and (e) are no less favorable to the Reorganized Debtors than the existing loan documents, subject to Exhibit H hereto.~~

~~1.150 *New Mortgage Notes* means the New Class A1 Mortgage Notes, the New Class A2 Mortgage Notes, the New Class A3 Mortgage Notes, the New Class A4 Mortgage Notes, New Class B Mortgage Notes, the New Class C Mortgage Notes, the New Class D Mortgage Notes, the New Class E Mortgage Notes, New Class F Mortgage Notes, the New Class G Mortgage Notes and the New Class H Mortgage Notes.~~

~~1.151 *New Securities* means, collectively, New Equity Securities and New Debt Securities.~~

~~1.152 *New Warrants* means the warrants to acquire NewCo Common Interests, substantially in the form to be set forth in the Plan Supplement, and as further described in Section 6.3 and Section 6.15 hereof.~~

1.111 ~~1.153~~ *NewCo* means a newly formed limited liability company, or such alternate corporate or other organizational entity that may be selected by the Investor and each of the Sponsors, to be organized as of the Effective Date in accordance with Section 6.7 hereof, or any successors in interest thereto, from and after the Effective Date.

~~1.154 *NewCo Board of Managers* means the board of managers or other governing body of NewCo, as it may exist from time to time.~~

1.112 ~~1.155~~ *NewCo Certificate of Formation* means the Certificate of Formation of NewCo, substantially in the form to be set forth in the Plan Supplement.

1.113 ~~1.156~~ *NewCo Common Interests* means the membership interests or, as applicable, other common equity interests, in NewCo, having a stated value of one-thousand dollars ($1,000) per membership interest, which are to be authorized and issued pursuant to the Plan.

1.114 ~~1.157~~ *NewCo Manager* means a newly formed limited liability company owned and controlled by Persons affiliated with or designated by the Investor and appointed as the successor manager of HVM, which may be a third party.

1.115 ~~1.158~~ *NewCo Management Incentive Plan* means the NewCo Management Incentive Plan, substantially in the form to be set forth in the Plan Supplement.

1.116 ~~1.159~~ *NewCo Operating Agreement* means the Operating Agreement of NewCo, substantially in the form to be set forth in the Plan Supplement.

1.117 *Operating Advisor* means Banc of America Securities LLC, UBS Securities LLC and Cerberus Capital Management, L.P., in their capacity as the Operating Advisor appointed under the Trust and Servicing Agreement, and not individually, or any successor thereto.

1.118 ~~1.160~~ *Other Existing Equity Interests* means the Equity Interests in ESH/MSTX Property L.P., ESH/TX Properties L.P., ESA TX Properties L.P., ESA P Portfolio

TXNC Properties L.P. and ESH/TN Properties L.L.C., other than the ESH/ESA General Partnership Interests and the ESH/TN Properties Membership Interest.

1.119 ~~1.161~~ ***Person*** means an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof, or any other entity (as defined in section 101(5) of the Bankruptcy Code) or group.

1.120 ~~1.162~~ ***Plan*** means this plan of reorganization under chapter 11 of the Bankruptcy Code, including the Plan Documents, the Plan Supplement, and the Exhibits to the Plan annexed hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of this Plan, which amendments shall be reasonably acceptable to the Investor ~~and~~, each of the Sponsors and the Special Servicer (with the consent of the Operating Advisor, such consent not to be unreasonably withheld).

1.121 ***Plan Administrator*** means the Person selected by the Special Servicer (with the consent of the Operating Advisor, which consent shall not be unreasonably withheld), to make the Distributions required to be made by the Debtors or the Reorganized Debtors under the Plan, to file objections to Claims, to the extent provided in Section 7.1(b) of the Plan, and to deal with administrative and other matters pertaining to the closing of the Chapter 11 Cases.

1.122 ~~1.163~~ ***Plan Documents*** means the documents to be executed, delivered, assumed, and/or performed in conjunction with the consummation of the Plan on the Effective Date.

1.123 ~~1.164~~ ***Plan Supplement*** means the compilation of documents and forms of documents, schedules and exhibits, each in form and substance reasonably acceptable to the Investor and each of the Sponsors, to be filed on or before the date that is ten (10) days prior to the last day on which votes to accept or reject the plan are accepted and which may be amended from time to time until the Confirmation Date.

1.124 ~~1.165~~ ***Priority Claim*** means any Claim to the extent such claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or Priority Tax Claim.

1.125 ~~1.166~~ ***Priority Tax Claim*** means an unsecured Claim of a governmental unit of a kind specified in section 507(a)(8) of the Bankruptcy Code.

1.126 ~~1.167~~ ***Pro Rata Share*** means ~~(a)~~ with respect to Allowed Claims, the ratio (expressed as a percentage) of the amount of an Allowed Claim in a Class ~~(or, with respect to any New Securities received by more than one Class, the applicable Classes)~~ to the aggregate amount of all Allowed Claims in the same Class (or applicable Classes)~~, and (b) with respect to the Certificates, the ratio (expressed as a percentage) of the amount of a Certificate in a Class of Certificates to the aggregate amount of all Certificates in the same Class of Certificates.~~

~~1.168 *Purchase Notice* has the meaning set forth in Section 6.9(g) hereof.~~

1.127 ~~1.169~~ ***Real Estate Investment Trust*** means a real estate investment trust within the meaning of Section 856 of the Internal Revenue Code.

1.128   ***Real Estate Mortgage Investment Conduit (or REMIC)*** means a real estate mortgage investment conduit, within the meaning of Section 860D of the Internal Revenue Code, that directly or indirectly holds the Mortgage Facility.

1.129   ~~1.170~~ ***Record Date*** means the date to be established by the Bankruptcy Court for purposes of determining those holders of allowed claims that are entitled to vote to accept or reject this Plan.

~~1.171   *Registration Rights Agreement* means the registration rights agreement to be entered into by NewCo and the Investor and included in the Plan Supplement, as such agreement may be amended from time to time in accordance with its terms.~~

1.130   ~~1.172~~ ***Released Parties*** means (a) the Debtors, (b) NewCo, (c) each member of the Creditors' Committee, (d) the Investor, (e) each Sponsor, (f) the Debt Financing Lenders, (g) BHAC (provided that BHAC has entered into the BHAC IP Transfer Agreement as provided in Section ~~6.15~~6.13 herein), ~~(g)~~ HVM, ~~(h)~~ HVM ~~Manager,~~ (i) HVM Manager, (j) HVM Manager Owner, (~~j~~k) the Special Servicer, (~~k~~l) the Mortgage Debt Parties, (m) the Mortgage Facility Trust, (n) the Master Servicer, (o) the Trustee, (~~l~~p) the Successor Trustee, (~~m~~q) the Operating Advisor, (r) the Controlling Holder, (s) Lightstone Holdings LLC~~and~~, (~~n~~t) any present or former director, manager, officer, member, equity holder (and their respective Affiliates), employee, agent, financial advisor, partner, Affiliate, attorney, other professional advisor or representative (and their respective Affiliates) of the persons or parties described in clauses (a) through (~~m~~t) hereof or of any Affiliate thereof, and (u) ESI and any of ESI's Affiliates or present or former directors or officers.

1.131   ~~1.173~~ ***Reorganized Debtors*** means the Debtors, as reorganized as of the Effective Date in accordance with this Plan, and their successors.

~~1.174   *Rights* means the non-transferable subscription rights of Rights Holders to purchase NewCo Common Interests in connection with the Rights Offering on the terms and subject to the conditions set forth in Section 6.9 hereof.~~

~~1.175   *Rights Certificate* means a certificate representing the Rights, which certificate shall provide (a) a place whereby each Rights Offering Participant may indicate its commitment to exercise all or a portion of its Rights, and (b) instructions for the exercise of the Rights.~~

~~1.176   *Rights Holder* means a holder of a Class B – K Mortgage Certificate as of the Subscription Commencement Date.~~

~~1.177   *Rights Offering* means the offering of Rights to the holders of Class B – K Mortgage Certificates to purchase NewCo Common Interests at the Subscription Price and for an aggregate purchase price equal to the Rights Offering Amount as further described in Section 6.9 hereof.~~

~~1.178   *Rights Offering Amount* means up to two hundred million dollars ($200,000,000), subject to Section 6.9(l).~~

~~1.179   *Rights Offering Payment Date* means the date and time by which payments in connection with the Rights Offering must be made, which date shall be no later than the Expiration Date; provided that the Investor, the Sponsors and each of their respective Affiliates shall make any~~

~~and all payments in connection with the Rights Offering, including, the exercise of the Rights and the purchase of the Unsubscribed Rights, on the Effective Date.~~

~~1.180   *Rights Offering Participant* means a Rights Holder which exercises Rights in connection with the Rights Offering.~~

~~1.181   *Rollover Equity* means 38.11% of the issued and outstanding NewCo Common Interests, with such NewCo Common Interests to be issued to the holders of the Class B-H Mortgage Certificates and to be entitled to distributions in accordance with the Rollover Equity Waterfall.~~

~~1.182   *Rollover Equity Waterfall* the shall have the meaning set forth on Exhibit I to the Plan.~~

~~1.183   *Satisfaction Notice* has the meaning set forth in Section 6.9(g) hereof.~~

1.132   *Restructuring Transaction(s)* means the creation or establishment or formation of an Affiliate of NewCo or a Reorganized Debtor, a dissolution or winding up of the corporate existence of a Debtor or the consolidation, merger, contribution of assets, or other transaction in which a Reorganized Debtor or non-Debtor Affiliate of a Debtor merges with or transfers some or substantially all of its assets and liabilities to NewCo or a Reorganized Debtor or its current or newly formed Affiliates, or any transaction related to the foregoing, on or following the Effective Date, as set forth in the Plan Supplement.

1.133   ~~1.184~~*Schedules* means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors with the Bankruptcy Court on September 28, 2009 and on March 4, 2010, as required by section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been and may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

1.134   ~~1.185~~*Secured Claim* means any Claim to the extent reflected in the Schedules or a proof of claim as a secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.135   ~~1.186~~*Securities Act* means the Securities Act of 1933, as amended.

1.136   ~~1.187~~*Special Servicer* means ~~TriMont Real Estate Advisors, Inc., or~~CWCapital Asset Management LLC, and any successor thereto, in its capacity as special servicer of the Successor Trustee.

1.137   ~~1.188~~*Sponsors* means Centerbridge Partners, L.P. and Paulson & Co. Inc., each on behalf of various investment funds and accounts managed by them~~and BREA.~~

~~1.189   *Sub-Equity* means, in a consensual plan, Sub-Equity Class 2, Sub-Equity Class 3, Sub-Equity Class 4, Sub-Equity Class 5, Sub-Equity Class 6, Sub-Equity Class 7, Sub-Equity Class 8, Sub-Equity Class 9, Sub-Equity Class 10, Sub-Equity Class 11, Sub-Equity Class 12, Sub-Equity Class 13, Sub-Equity Class 14 and Sub-Equity Class 15, and in a non-consensual plan, Sub-Equity Class 2, Sub-Equity Class 3, Sub-Equity Class 4, Sub-Equity Class 5, Sub-Equity Class 6,~~

Sub-Equity Class 7, Sub-Equity Class 8, Sub-Equity Class 9, Sub-Equity Class 10, Sub-Equity Class 11, Sub-Equity Class 12, Sub-Equity Class 13, Sub-Equity Class 14, Sub-Equity Class 15, Sub-Equity Class 16 and Sub-Equity Class 17.

1.190    ***Sub-Equity Class 2*** means the equity distributions in the aggregate amount of up to one hundred million dollars ($100,000,000) distributed by NewCo to the holders of Class J Mortgage Certificates in a consensual plan, and in the aggregate amount of up to one hundred thirty-one million forty thousand dollars ($131,040,000) to the Class G Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.191    ***Sub-Equity Class 3*** means the equity distributions in the aggregate amount of up to two hundred fourteen million dollars ($214,000,000) distributed by NewCo to the holders of Class K Mortgage Certificates in a consensual plan, and in the aggregate amount of up to one hundred thirty million four hundred forty thousand dollars ($130,440,000) to the Class H Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.192    ***Sub-Equity Class 4*** means the equity distributions in the aggregate amount of up to two hundred million dollars ($200,000,000) distributed by NewCo to the holders of Class L Mortgage Certificates in a consensual plan, and in the aggregate amount of up to one hundred million dollars ($100,000,000) to the Class J Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.193    ***Sub-Equity Class 5*** means the equity distributions in the aggregate amount of up to one hundred million dollars ($100,000,000) distributed by NewCo to the holders of Class M Mortgage Certificates in a consensual plan, and in the aggregate amount of up to two hundred fourteen million dollars ($214,000,000) to the Class K Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.194    ***Sub-Equity Class 6*** means the equity distributions in the aggregate amount of up to three hundred million dollars ($300,000,000) distributed by NewCo to the holders of M1 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to two hundred million dollars ($200,000,000) to the Class L Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.195    ***Sub-Equity Class 7*** means the equity distributions in the aggregate amount of up to four hundred million dollars ($400,000,000) distributed by NewCo to the holders of M2 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to one hundred million dollars ($100,000,000) to the Class M Mortgage Certificates in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.196    ***Sub-Equity Class 8*** means the equity distributions in the aggregate amount of up to four hundred million dollars ($400,000,000) distributed by NewCo to the holders of M3 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to three hundred million dollars ($300,000,000) to the M1 Mezzanine Claims in a non-consensual plan, which is entitled to the

distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.197    *Sub-Equity Class 9* means the equity distributions in the aggregate amount of up to four hundred million dollars ($400,000,000) distributed by NewCo to the holders of M4 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four hundred million dollars ($400,000,000) to the M2 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.198    *Sub-Equity Class 10* means the equity distributions in the aggregate amount of up to four hundred million dollars ($400,000,000) distributed by NewCo to the holders of M5 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four hundred million dollars ($400,000,000) to the M3 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.199    *Sub-Equity Class 11* means the equity distributions in the aggregate amount of up to four hundred million dollars ($400,000,000) distributed by NewCo to the holders of M6 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four hundred million dollars ($400,000,000) to the M4 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.200    *Sub-Equity Class 12* means the equity distributions in the aggregate amount of up to four hundred million dollars ($400,000,000) distributed by NewCo to the holders of M7 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four hundred million dollars ($400,000,000) to the M5 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.201    *Sub-Equity Class 13* means the equity distributions in the aggregate amount of up to two hundred million dollars ($200,000,000) distributed by NewCo to the holders of M8 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four hundred million dollars ($400,000,000) to the M6 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.202    *Sub-Equity Class 14* means the equity distributions in the aggregate amount of up to two hundred million dollars ($200,000,000) distributed by NewCo to the holders of M9 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to four hundred million dollars ($400,000,000) to the M7 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.203    *Sub-Equity Class 15* means the equity distributions in the aggregate amount of up to one hundred ninety-five million four hundred fifty-five thousand five hundred and forty dollars ($195,455,540) distributed by NewCo to the holders of M10 Mezzanine Claims in a consensual plan, and in the aggregate amount of up to two hundred million dollars ($200,000,000) to

the M8 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall and the Rollover Equity Waterfall, as applicable.

1.204   *Sub-Equity Class 16* means the equity distributions in the aggregate amount of up to two-hundred million dollars ($200,000,000) distributed by NewCo to the holders of M9 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall; provided that the Sub-Equity Class 16 shall not be issued in the event a consensual plan is confirmed.

1.205   *Sub-Equity Class 17* means the equity distributions in the aggregate amount of up to one-hundred-ninety-five-million-four-hundred-fifty-five-thousand-five-hundred-and-forty dollars ($195,455,540) distributed by NewCo to the holders of M10 Mezzanine Claims in a non-consensual plan, which is entitled to the distributions pursuant to the New Money Equity Waterfall; provided that this Sub-Equity Class 17 shall not be issued in the event a consensual plan is confirmed.

1.206   *Subscription Agent* means any entity reasonably acceptable to the Debtors, the Investor and each of the Sponsors that is selected to act as the Debtors' agent in connection with the Rights Offering and the Class B – H Elections.

1.207   *Subscription Commencement Date* means the date on which (a) Rights Certificates are first mailed to Rights Holders, and (b) Election Forms are first mailed to the holders of Class B – H Mortgage Certificates.

1.208   *Subscription Price* means the price per NewCo Common Interest to be determined by dividing two-hundred million dollars ($200,000,000), subject to adjustment pursuant to Section 6.9(1) hereof, by the aggregate number of NewCo Common Interests to be issued in connection with the Rights Offering (including the Unsubscribed Rights), and Blackstone Real Estate Partners VI L.P. on behalf of itself and its parallel funds and related alternative vehicles, solely in their capacity as such.

1.138   1.209 *Successor Trustee* means U.S. Bank National Association, as successor in interest to Wells Fargo Bank, N.A., as Successor Trustee in Trust for holders of Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH.

1.139   1.210 *Swap Agreements* means, collectively, (a) the Merrill Swap Agreement, and (b) the Wachovia Swap Agreement.

1.140   1.211 *Tier 1 Debtors* means the Debtors set forth on Exhibit C hereof.

1.141   1.212 *Tier 2 Debtors* means the Debtors set forth on Exhibit D hereof.

1.142   1.213 *Tier 3 Debtors* means the Debtors set forth on Exhibit E hereof, which shall be liquidated and dissolved pursuant to this Plan.

1.214   *Tranche A* means Tranche A of the New Mortgage Loan, in the principal amount of five-hundred-fifty-million, three-hundred-eight-two-thousand and seventy-two dollars ($550,382,072), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.215     *Tranche B* means Tranche B of the New Mortgage Loan, in the principal amount of four hundred million, nine hundred forty five thousand and seventy five dollars ($400,945,750), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.216     *Tranche C* means Tranche C of the New Mortgage Loan, in the principal amount of eight hundred one million, nine hundred eight thousand and one hundred sixty seven dollars ($801,908,167), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.217     *Tranche D.* means Tranche D of the New Mortgage Loan, in the principal amount of five hundred ninety four million, sixty-one thousand and two-hundred thirty four dollars ($594,061,234), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.218     *Tranche E* means Tranche E of the New Mortgage Loan, in the principal amount of sixty-five million, six-hundred twenty-six thousand dollars ($65,626,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.219     *Tranche F* means Tranche F of the New Mortgage Loan, in the principal amount of ninety-three million, two hundred forty one thousand dollars ($93,241,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.220     *Tranche G* means Tranche G of the New Mortgage Loan, in the principal amount of fifty-six million, four-hundred seventy-eight thousand dollars ($56,478,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.221     *Tranche H* means Tranche H of the New Mortgage Loan, in the principal amount of fifty-nine million, nine-hundred sixty-eight thousand dollars ($59,968,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.222     *Tranche I* means Tranche I of the New Mortgage Loan, in the principal amount of sixty-three million, one-hundred thirty-three thousand dollars ($63,133,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.223     *Tranche J* means Tranche J of the New Mortgage Loan, in the principal amount of sixty-six million, three-hundred seven thousand dollars ($66,307,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.224     *Tranche K* means Tranche K of the New Mortgage Loan, in the principal amount of sixty-six million, one-hundred thirty-four thousand dollars ($66,134,000), subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes.

1.143 1.225 *Treasury Regulations* means regulations (including temporary and proposed) promulgated under the Internal Revenue Code of 1986, as amended from time to time.

1.144 1.226 *Trustee* means Wells Fargo Bank, N.A., as Trustee in Trust for holders of certificates under the Mortgage Facility Certificates.

1.145 *Trust and Servicing Agreement* means the Trust and Servicing Agreement, dated as of August 1, 2007 (as amended or modified), originally entered into by and among Wachovia Large Loan, Inc., as Depositor, Wachovia Bank, National Association, as Servicer and Special Servicer, and Wells Fargo Bank, N.A., as Trustee relating to the issuance of the Mortgage Certificates and the servicing of the Mortgage Loan.

1.146 *TRS* means a taxable real estate investment trust subsidiary (within the meaning of Section 856(l) of the Internal Revenue Code) of the Debtors or the Reorganized Debtors.

1.147 *Upper Tier REMIC* has the meaning set forth in the Trust and Servicing Agreement.

1.148 1.227 *Unimpaired* means, with respect to a Class of Claims, a Claim that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

1.149 1.228 *Unliquidated Claim* means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be estimated.

1.229 *Unsubscribed Rights* means those NewCo Common Interests offered in connection with the Rights Offering that are not validly subscribed for pursuant to the Rights Offering prior to the Expiration Date or for which payment has not been received by the Subscription Agent by the Rights Offering Payment Date.

1.150 1.230 *Voting Deadline* means the deadline for voting on the Plan fixed by the Bankruptcy Court, or such later date fixed by the Debtors with the approval of the Investor and each of the Sponsors, such approval not to be unreasonably withheld.

1.151 1.231 *Wachovia Swap Agreement* means the Master Agreement, dated August 28, 2007, by and among Wachovia Bank, National Association, and Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass Through Certificates, Series 2007-ESH Trust, and all Schedules thereto, including the Elections and Variables to the 1994 ISDA Credit Support Annex.

## B. Other Terms.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.

### C. Exhibits.

All exhibits to the Plan are annexed hereto. All Plan Documents to be included in exhibits to the Plan Supplement shall be contained in a separate Plan Supplement ~~Exhibit Volume~~exhibit volume, which shall be filed with the Clerk of the Bankruptcy Court not later than the date that is ten (10) days prior to the last date on which votes to accept or reject the Plan are accepted. Such Plan Supplement ~~Exhibit Volume~~exhibit volume may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court. Such Plan Supplement ~~Exhibit Volume~~exhibit volume shall also be available for download from the following website: http://www.kccllc.net/extendedstay. Holders of Claims may also obtain a copy of such Plan Supplement ~~Exhibit Volume~~exhibit volume, once filed, from the Debtors by a written request sent to the following address:

c/o HVM L.L.C.
100 Dunbar Street,
Spartanburg, South Carolina 29306
Attn: Gary A. DeLapp, Esq.

**ARTICLE II**

**PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS
AND PRIORITY TAX CLAIMS**

2.1  ***Payment of Allowed Administrative Expense Claims.*** The Allowed Amount of each Administrative Expense Claim that is Allowed as of the Effective Date shall be paid in full, in Cash, on the Effective Date from the Administrative/Priority Claims Reserve; provided, however, that ~~Administrative Expense Claims~~(a) claims of the type specified in Section ~~1.6(c)(i) hereof~~1.7(c)(i) of the Plan, (b) any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and (c) any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, shall be assumed and paid by the Reorganized Debtors or NewCo, as applicable, in accordance with the terms and conditions of the particular transactions and any agreements relating thereto. Each holder of an Administrative Expense Claim of the type specified in Section ~~1.6~~1.7(c)(ii) or Section ~~1.6~~1.7(c)(iii) hereof shall be paid the Allowed Amount of such Administrative Expense Claim in full, in Cash, as soon as practicable after such Administrative Expense Claim is Allowed from the Administrative/Priority Claims Reserve. In the event that there is any dispute as to whether an Allowed Administrative Expense Claim should be paid from the Administrative/Priority Claims Reserve or by the Reorganized Debtors or NewCo, as applicable, such dispute shall be resolved by the Bankruptcy Court.

2.2  ***Compensation and Reimbursement Claims.*** The Bankruptcy Court shall fix in the Confirmation Order a date for the filing of, and a date to hear and determine, all applications for final allowances of compensation or reimbursement of expenses under section 330 of the Bankruptcy Code or applications for allowance of Administrative Expense Claims arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code. The Allowed Amount of all Administrative Expense Claims arising under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code shall, in full satisfaction, settlement, discharge and release thereof, and in exchange therefore, be paid in full, in Cash, from the Administrative/Priority Claims Reserve (a) upon the later of (i) the Effective Date and (ii) the date upon which any such Administrative Expense Claim becomes Allowed or (b) at such later date or

upon such other ~~less favorable~~ terms as may be mutually agreed upon between each such Administrative Expense Creditor and the ~~Reorganized Debtors or NewCo, as applicable~~Plan Administrator.

       2.3     ***Priority Tax Claims.***  Each holder of an Allowed Priority Tax Claim shall, in full satisfaction, settlement, discharge and release thereof, and in exchange therefore, be paid the Allowed Amount of its Allowed Priority Tax Claim from the Administrative/Priority Claims Reserve either (a) in full, in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law or (b) upon such other terms as may be mutually agreed upon between each holder of a Priority Tax Claim and the ~~Reorganized Debtors or NewCo, as applicable~~Plan Administrator.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

       3.1     ***Summary.***  The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| CLASS | DESIGNATION | STATUS | ENTITLED TO VOTE? |
|---|---|---|---|
| Class 1 | Priority Claims | Unimpaired | No |
| Class 2 | Mortgage Facility Claim | Impaired | Yes |
| Class 3 | ESA UD Mortgage Claim | Impaired | Yes |
| Class 4A | Mortgage Facility Deficiency Claim ~~and the Mezzanine Facilities Claims~~ | Impaired | Yes |
| Class 4B | Mezzanine Facilities Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Impaired | Yes |
| Class 6 | Existing Equity | Impaired | No |
| Class 7 | ESA MD Properties Trust Certificate | Unimpaired | No |
| Class 8 | ESA MD Borrower Interests | Unimpaired | No |
| Class 9 | ESA P Portfolio MD Trust Certificate | Unimpaired | No |
| Class 10 | ESA P Portfolio MD Borrower Interests | Unimpaired | No |
| Class 11 | ESA Canada Properties Interests | Unimpaired | No |
| Class 12 | ESA Canada Properties Borrower Interests | Unimpaired | No |
| Class 13 | ESH/TN Properties L.L.C. Membership Interests | Unimpaired | No |
| Class 14 | ESH/ESA General Partnership Interests | Unimpaired | No |
| Class 15 | Other Existing Equity Interests | Impaired | No |

**ARTICLE IV**

**TREATMENT OF CLAIMS AND EQUITY INTERESTS**

4.1     ***Class 1.***  Priority Claims.

(a)     *Classification*:  Class 1 consists of the Allowed Priority Claims.

(b)     *Treatment*:  Each holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim from the Administrative/Priority Claims Reserve, in full, in Cash, on the later of the Effective Date and as soon as practicable after the date such Priority Claim becomes Allowed.

(c)     *Voting*:  Class 1 is Unimpaired.  The holders of the Claims in Class 1 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.2     ***Class 2.***  Mortgage Facility Claim.

(a)     *Classification and Allowance*:  Class 2 consists of the Allowed Mortgage Facility Claim, which, together with the Mortgage Facility Deficiency Claim, shall be an Allowed Claim of at least $4,100,000,000.

(b)     *Treatment*:

~~(i)      *Treatment If Class 2 Accepts Plan*.  In the event that Class 2 accepts the Plan, the~~The holder of the Allowed Mortgage Facility Claim shall receive ~~the following~~100% of the Cash Distribution and the Investor Certificates on the Effective Date, with such Cash Distribution to be distributed in accordance with Section ~~6.2 hereof:  (i) 100% of the Rights, (ii) on the Initial Distribution Date, 100% of the New Class A1 Mortgage Notes, 100% of the New Class A2 Mortgage Notes, 100% of the New Class A3 Mortgage Notes, 100% of the New Class A4 Mortgage Notes, 100% of the New Class B Mortgage Notes, 100% of the New Class C Mortgage Notes, 100% of the New Class D Mortgage Notes, 100% of the New Class E Mortgage Notes, 100% of the New Class F Mortgage Notes, 100% of the New Class G Mortgage Notes, 100% of the New Class H Mortgage Notes, (iii) 100% of the Class A4 Cash Paydown, (iv) the Rollover Equity, or in lieu of the Rollover Equity, the Class B - H Equity Cashout Option and (v) 100% of the Sub-Equity Class 2, 100% of the Sub-Equity Class 3, 100% of the Sub-Equity Class 4 and 100% of the Sub-Equity Class 5.~~  6.3 hereof and the Investor Certificates will be cancelled without any distributions on account thereof.

(c)     ~~(ii) *Treatment If Class 2 Rejects the Plan*~~*Non-Consensual Confirmation*:  In the event that Class 2 rejects the Plan, the ~~holder of the Allowed Mortgage Facility Claim shall receive, on the Distribution Date, the New Alternate Notes in an aggregate principal amount not to exceed three billion, three hundred million dollars ($3,300,000,000), which represents the value of the collateral securing the Allowed Mortgage Facility Claim, and which New Alternate Notes shall bear interest at the rate of 5.34% per annum or such lower rate as shall be fixed by the Bankruptcy Court, and shall have a final maturity date that is seven (7) years after the Initial Distribution Date. Notwithstanding the foregoing, in the event that the~~ Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code ~~pursuant to this Section 4.2(b)(ii)~~, and, in such

event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 hereof, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, such consents not to be unreasonably withheld, to offer different treatment to Class 2, ~~including, without limitation, offering different forms of consideration such as notes, equity warrants or sub-equity to Class 2, to the extent that such forms of consideration~~ to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code. ~~The Rights Offering shall be cancelled if Class 2 rejects the Plan.~~

~~(c)       *Class B - H Debt/Equity Election*.  Each holder of a Class B - H Mortgage Certificate may exercise the Class B - H Debt/Equity Election, provided that on the Effective Date, 50% of the Class B - H Mortgage Debt will have been satisfied by the New Class B - H Mortgage Notes and 50% of the Class B - H Mortgage Debt will have been satisfied by the Rollover Equity, subject to Section 4.2(d) below.  In the event that any holder of a Class B - H Mortgage Certificate elects to receive less than 50% of its consideration in Rollover Equity, then the other holders of Class B - H Mortgage Certificates shall have the right to elect to receive their Pro Rata Share of the Excess Equity.  In the event that Class 2 rejects the Plan, the Class B-H Debt/Equity Election will be cancelled and extinguished.~~

(d)       ~~*Class B - H Equity Cashout Option Election for Class B — H Mortgage Certificates*.  At the election of any holder of a Class B - H Mortgage Certificate, such holder shall receive, in lieu of the Rollover Equity that such holder is entitled to receive, the Class B - H Equity Cashout Option.  In the event that Class 2 rejects the Plan, the Class B - H Equity Cashout Option will be cancelled and extinguished.~~ *Adequate Protection Payments*:  Nothing in this Plan shall affect the rights of the Mortgage Debt Parties to retain payments made by the Debtors in accordance with the Cash Collateral Order.

~~(e)       *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mortgage Facility Claim.~~

(e)       ~~(f)~~ *Voting*:  Class 2 is Impaired.  The holder of the Claim in Class 2 is entitled to vote to accept or reject the Plan.

4.3       **Class 3.**  ESA UD Mortgage Claim.

(a)       *Classification*:  Class 3 consists of the Allowed ESA UD Mortgage Claim.

(b)       *Treatment*:  The holder of the Allowed ESA UD Mortgage Claim shall receive on the Distribution Date the New ESA UD Mortgage Note in full settlement, satisfaction, release and discharge of the Allowed ESA UD Mortgage Claim.

(c)       *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed ESA UD Mortgage Claim.

(d)       *Voting*:  Class 3 is Impaired.  The holder of the Claim in Class 3 is entitled to vote to accept or reject the Plan.

4.4       **Class ~~4.~~4A.**  Mortgage Facility Deficiency Claim ~~and Mezzanine Facilities Claims~~.

(a)      *Classification  and Allowance*:  Class 4~~A~~ consists of the Mortgage Facility Deficiency Claim ~~and Mezzanine Facilities Claims.~~ which, together with the Mortgage Facility Claim, shall be an Allowed Claim of at least $4,100,000,000.

~~(b)      *Treatment*:~~

(b)      ~~(i) *Treatment if Class 2 Accepts the Plan*.  If Class 2 accepts the Plan, the holders~~ *Treatment*:  The holder of the Allowed Mortgage Facility Deficiency Claim ~~(which amount shall be allowed pursuant to Section 6.18 hereof) and the Allowed Mezzanine Facilities Claims shall receive the following~~ shall receive an interest in the Litigation Trust to the extent that it is a Litigation Trust Beneficiary, which shall be distributed pursuant to Section ~~6.2 hereof, 100% of the Sub-Equity Class 6, 100% of the Sub-Equity Class 7, 100% of the Sub-Equity Class 8, 100% of the Sub-Equity Class 9, 100% of the Sub-Equity Class 10, 100% of the Sub-Equity Class 11, 100% of the Sub-Equity Class 12, 100% of the Sub-Equity Class 13, 100% of the Sub-Equity Class 14 and 100% of the Sub-Equity Class 15.~~ 6.3 hereof, subject to the terms of the Intercreditor Agreement.

(c)      ~~(ii) *Treatment if Class 2 Rejects the Plan*.  If~~ *Non-Consensual Confirmation*:  In the event that Class ~~2 rejects the Plan, the holders of the Allowed Mortgage Facility Deficiency Claim (which shall be valued pursuant to Section 6.18 hereof) and the Allowed Mezzanine Facilities Claims shall receive 100% of the Sub-Equity, *provided* that such distribution complies with~~ 4A rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in ~~the event that such distribution does not comply with section 1129(b) of the Bankruptcy Code~~ such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 hereof, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, such consents not to be unreasonably withheld, to offer different treatment to Class ~~4~~4A, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(d)      ~~(c)~~ *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mortgage Facility Deficiency Claim.

(e)      ~~(d)~~ *Voting*:  Class 4~~A~~ is Impaired.  The holder of the Claim in Class 4~~A~~ is entitled to vote to accept or reject the Plan.

4.5      ***Class 4B.***  Mezzanine Facilities Claims.

(a)      *Classification*:  Class 4B consists of the Mezzanine Facilities Claims.

(b)      *Treatment*:  The holders of the Allowed Mezzanine Facilities Claims shall receive interests in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries, which shall be distributed pursuant to Section 6.3 hereof, subject to the terms of the Intercreditor Agreement.

(c)      *Non-Consensual Confirmation*:  In the event that Class 4B rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 hereof, to alter, amend or modify the Plan, with the consent of the Investor, each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), such consents not to be unreasonably withheld, to offer different treatment to Class 4B, to the extent that the Debtors determine that such

modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(d)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mezzanine Facilities Claims.

(e)     *Voting*:  Class 4B is Impaired.  The holders of the Claim in Class 4B are entitled to vote to accept or reject the Plan.

4.6     ~~4.5~~ **Class 5.**  General Unsecured Claims.

(a)     *Classification*:  Class 5 consists of the General Unsecured Claims.

(b)     *Treatment*:  ~~No distribution shall be made under the Plan with respect to~~The holders of the General Unsecured Claims~~; provided, however, that in order to facilitate a consensual Plan, if Class 5 votes to accept the Plan, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of five hundred thousand dollars ($500,000)~~ shall receive an interest in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries.

(c)     *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to Allowed General Unsecured Claims.

(d)     *Non-Consensual Confirmation:*  In the event that Class 5 rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 hereof, to alter, amend or modify the Plan, with the consent of the Investor, each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), such consents not to be unreasonably withheld, to offer different treatment to Class 5, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(e)     ~~(d)~~ *Voting*:  Class 5 is Impaired.  The holders of the Claims in Class 5 are entitled to vote to accept or reject the Plan.

4.7     ~~4.6~~ **Class 6.**  Existing Equity.

(a)     *Classification*:  Class 6 consists of the Existing Equity.

(b)     *Treatment*:  No distribution shall be made under the Plan from the Estates in respect of the Existing Equity.  On the Effective Date, the certificates that previously evidenced ownership of Existing Equity shall be cancelled and shall be null and void, the holder(s) thereof shall no longer have any rights in respect of the Existing Equity, and such certificates shall not evidence any rights under the Plan.

(c)     *Voting*:  Class 6 is Impaired.  The holders of Existing Equity in Class 6 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.8     ~~4.7~~ **Class 7.**  ESA MD Properties Trust Certificate.

(a)     *Classification*:  Class 7 consists of the ESA MD Properties Trust Certificate.

(b)  *Treatment*:  The holder of the ESA MD Properties Trust Certificate shall retain the ESA MD Properties Trust Certificate.

(c)  *Voting*:  Class 7 is Unimpaired.  The holder of the Equity Interests in Class 7 is deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.9  4.8 *Class 8.*  ESA MD Borrower Interests.

(a)  *Classification*:  Class 8 consists of the ESA MD Borrower Interests.

(b)  *Treatment*:  Each holder of ESA MD Borrower Interests shall retain its ESA MD Borrower Interests.

(c)  *Voting*:  Class 8 is Unimpaired.  The holders of the Equity Interests in Class 8 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.10  4.9 *Class 9.*  ESA P Portfolio MD Trust Certificate

(a)  *Classification*:  Class 9 consists of the ESA P MD Portfolio Trust Certificate.

(b)  *Treatment*:  The holder of the ESA P MD Portfolio Trust Certificate shall retain the ESA P Portfolio Trust Certificate.

(c)  *Voting*:  Class 9 is Unimpaired.  The holder of the Equity Interests in Class 9 is deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.11  4.10 *Class 10.*  ESA P Portfolio MD Borrower Interests

(a)  *Classification*:  Class 10 consists of the ESA P Portfolio MD Borrower Interests.

(b)  *Treatment*:  Each holder of ESA P Portfolio MD Borrower Interests shall retain its ESA P Portfolio MD Borrower Interests.

(c)  *Voting*:  Class 10 is Unimpaired.  The holders of the Equity Interests in Class 10 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.12  4.11 *Class 11.*  ESA Canada Properties Interests.

(a)  *Classification*:  Class 11 consists of the ESA Canada Properties Interests.

(b)  *Treatment*:  Each holder of ESA Canada Properties Interests shall retain its ESA Canada Properties Interests.

(c)  *Voting*:  Class 11 is Unimpaired.  The holders of the Equity Interests in Class 11 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.13  4.12 *Class 12.*  ESA Canada Properties Borrower Interests.

(a)     *Classification*:  Class 12 consists of the ESA Canada Properties Borrower Interests.

(b)     *Treatment*:  Each holder of ESA Canada Properties Borrower Interests shall retain its ESA Canada Properties Borrower Interests.

(c)     *Voting*:  Class 12 is Unimpaired.  The holders of the Equity Interests in Class 12 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.14     4.13  *Class 13.*  ESH/TN Properties Membership Interest.

(a)     *Classification*:  Class 13 consists of the ESH/TN Properties Membership Interest.

(b)     *Treatment*:  The holder of the ESH/TN Properties Membership Interest shall retain its ESH/TN Properties Membership Interest.

(c)     *Voting*:  Class 13 is Unimpaired.  The holder of the Equity Interest in Class 13 is deemed to accept the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

4.15     4.14  *Class 14.*  ESH/ESA General Partnership Interests.

(a)     *Classification*:  Class 14 consists of the ESH/ESA General Partnership Interests.

(b)     *Treatment*:  Each holder of ESH/ESA General Partnership Interests shall retain its ESH/ESA General Partnership Interests.

(c)     *Voting*:  Class 14 is Unimpaired.  The holders of the Equity Interests in Class 14 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

4.16     4.15  *Class 15.*  Other Existing Equity Interests.

(a)     *Classification*:  Class 15 consists of the Other Existing Equity Interests.

(b)     *Treatment*:  No distribution shall be made under the Plan from the Estates in respect of the Other Existing Equity Interests.  On the Effective Date, the certificates that previously evidenced ownership of the Other Existing Equity Interests shall be cancelled and shall be null and void, the holders thereof shall no longer have any rights in respect of the Other Existing Equity Interests, and such certificates shall not evidence any rights under the Plan.

(c)     *Voting*:  Class 15 is Impaired.  The holders of the Other Existing Equity Interests in Class 15 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**ARTICLE V**

**ACCEPTANCE, REJECTION, AND REVOCATION
OR WITHDRAWAL OF THE PLAN**

5.1     *Classes Entitled to Vote.*  Each holder of a Claim, as of the Record Date, in an Impaired Class, other than those Classes that are deemed to reject the Plan, shall be entitled to vote to accept or reject the Plan, in its sole and absolute discretion, subject to applicable law.

5.2     *Acceptance by Class of Claims.*  An Impaired Class of Claims shall be deemed to accept the Plan if (a) holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

5.3     *Nonconsensual Confirmation.*  In the event that any Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority required by section 1129(a) of the Bankruptcy Code, the Debtors, with the consent of the Investor and each of the Sponsors, reserve the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, or (b) alter, amend or modify the Plan in accordance with Section 13.1 hereof.  At the request of the Investor and each of the Sponsors, the Debtors shall exercise the right to seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code in the manner reasonably requested by the ~~Investors~~Investor and each of the Sponsors, provided that the value of the Investment contemplated by Section 6.8 hereof, in the event that Class 2 rejects the Plan, shall not be reduced without the Debtors' prior written consent.

5.4     *Revocation or Withdrawal.*

(a)     *Right to Revoke or Withdraw.*  The Plan may be revoked or withdrawn prior to the Confirmation Date (i) by the Debtors (with the consent of the Special Servicer and the Operating Advisor, such consent not to be unreasonably withheld), in their ~~sole~~ discretion or at the discretion of the Investor, in the event that the Investment ~~and Standby Purchase~~ Agreement is terminated in accordance with Section ~~15~~13 thereof, and (ii) in  all other circumstances, by the Debtors (with the consent of the Special Servicer and the Operating Advisor, such consent not to be unreasonably withheld), with the consent of the Investor and each of the Sponsors, in their sole discretion.

(b)     *Effect of Withdrawal or Revocation.*  If the Plan is revoked or withdrawn prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims or defenses or any admission or statement against interest by any Debtor, the Creditors' Committee, the Investor, any Sponsor or any other Person or to prejudice in any manner the rights of the Debtors, the Creditors' Committee, the Investor, any Sponsor or any Person in any further proceedings involving any Debtor.

5.5     *Amendment of Plan Documents.*  From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan and any documents attached to such Plan Supplement, Exhibits to the

Plan Supplement and Exhibits to the Plan shall be as provided in such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan and their respective attachments.

       5.6    ***Removal of Debtors.***  At the option of the Investor and each of the Sponsors, with the consent of the Debtors, ~~which consent~~ and the consent of the Special Servicer and the Operating Advisor, which consents shall not be unreasonably withheld, a Debtor may be removed from this Plan.  In such event, the Plan will omit any treatment of the assets and liabilities of such Debtor, unless otherwise agreed.  The removal of any Debtor from this Plan will not affect this Plan with respect to any other Debtor.

## ARTICLE VI

## IMPLEMENTATION OF THE PLAN

       6.1    ***Substantive Consolidation.***  The Plan is premised upon the substantive consolidation of the Debtors for all purposes related to this Plan, including, without limitation, for purposes of voting, confirmation and distribution.  On and after the Effective Date, the Debtors and their Estates shall be deemed merged and (i) all assets and liabilities of the Debtors shall be treated for purposes of the Plan as though they were merged, (ii) all guarantees of the Debtors of payment, performance or collection of obligations of any other of the Debtors shall be eliminated and cancelled, (iii) all joint obligations of two or more of the Debtors and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, and (iv) any Claim filed against any of the Debtors shall be deemed filed against the consolidated Debtors and shall be one Claim against and a single obligation of the consolidated Debtors.  The provisions of the Intercreditor Agreement shall remain in full force and effect notwithstanding any substantive consolidation of the Debtors pursuant to the Plan.

       6.2    ***~~Distribution of New Securities.~~  Deemed Sale of Mortgage Properties.***  Notwithstanding the vesting and retention of title of the Mortgage Properties in the Reorganized Debtors, the transfer of 100% of the New Debtor Equity of the Tier 1 Debtors to NewCo and the distribution of the Cash Distribution by the Reorganized Debtors to the holder of the Allowed Mortgage Facility Claim effected pursuant to this Plan shall be deemed the equivalent of a sale of the Mortgage Properties to NewCo after foreclosure or acceptance of a deed in lieu of foreclosure by the Trustee or the Special Servicer, free and clear of all liens, claims, encumbrances and obligations. ~~The New Securities shall be distributed by the holder of the Mortgage Facility Claim (to the holders of Certificates) as follows:~~

       ~~(a)    If Class 2 votes to accept the Plan, and Class 2 is, therefore, entitled to the treatment set forth in Section 4.2(b)(i) hereof, the New Securities shall be distributed by the holder of the Mortgage Facility Claim (to the holders of Certificates) as follows:~~

          ~~(i)    *Holders of Class A1 Mortgage Certificates*.  Each holder of a Class A1 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A1 Mortgage Notes.~~

          ~~(ii)    *Holders of Class A2 Mortgage Certificates*.  Each holder of a Class A2 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A2 Mortgage Notes.~~

(iii) *Holders of Class A3 Mortgage Certificates*. Each holder of a Class A3 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A3 Mortgage Notes.

(iv) *Holders of Class A4 Mortgage Certificates*. Each holder of a Class A4 Mortgage Certificate shall receive on the Initial Distribution Date (x) its Pro Rata Share of the Class A4 Cash Paydown and (y) its Pro Rata Share of the New Class A4 Mortgage Notes.

(v) *Holders of Class B - H Mortgage Certificates*. Each holder of a Class B - H Mortgage Certificate, shall receive (x) on the Initial Distribution Date, its Pro Rata Share of the New Class B - H Mortgage Notes, subject to the Class B - H Debt/Equity Election, (y) on the Initial Distribution Date, its Pro Rata Share of the Rollover Equity or, in lieu thereof, the Class B - H Equity Cashout Option and subject to the Class B - H Debt/Equity Election, and (z) New B - H Rights (calculated as such holder's Pro Rata Share of the percentage of NewCo Common Interests that is to be distributed to the Class of Mortgage Certificates of which such holder is a member pursuant to the Plan).

(vi) *Holders of Class J Mortgage Certificates*. Each holder of a Class J Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 2 and the New J - K Rights (calculated as such holder's Pro Rata Share of the Mortgage Certificates held by the holders of Class J Mortgage Certificates and Class K Mortgage Certificates combined).

(vii) *Holders of Class K Mortgage Certificates*. Each holder of a Class K Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 3 and the New J - K Rights (calculated as such holder's Pro Rata Share of the Mortgage Certificates held by the holders of Class J Mortgage Certificates and Class K Mortgage Certificates combined).

(viii) *Holders of Class L Mortgage Certificates*. Each holder of a Class L Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 4.

(ix) *Holders of Class M Mortgage Certificates*. Each holder of a Class M Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 5.

(b) If Class 2 votes to reject the Plan, and Class 2 is, therefore, entitled to the treatment set forth in Section 4.2(b)(ii) herein, the New Alternate Notes shall be distributed by the holder of the Mortgage Facility Claim to the holders of the Class A1 - F Mortgage Certificates (including NewCo as holder of the Investor Certificates) and the holders of the Class G Mortgage Certificates as follows:

(i) *Holders of Class A1 - F Mortgage Certificates*. Each holder of a Class A1 - F Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the New Alternate Notes (calculated as such holder's Pro Rata Share of the aggregate principal amount of the Class A1 - F Mortgage Certificates).

(ii)    *Holders of Class G Mortgage Certificates*.  Each holder of a Class G Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Class G Alternate Note Proportion of the New Alternate Notes.

(c)    If Class 2 votes to accept the Plan, in accordance with Section 4.4(b)(i) hereof, Class 4 receives certain of the Sub-Equity which shall be distributed by NewCo or the Reorganized Debtors as follows:

(i)    *Holders of M1 Mezzanine Facility Claims*.  Each holder of an M1 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 6.

(ii)    *Holders of M2 Mezzanine Facility Claims*.  Each holder of an M2 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 7.

(iii)    *Holders of M3 Mezzanine Facility Claims*.  Each holder of an M3 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 8.

(iv)    *Holders of M4 Mezzanine Facility Claims*.  Each holder of an M4 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 9.

(v)    *Holders of M5 Mezzanine Facility Claims*.  Each holder of an M5 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 10.

(vi)    *Holders of M6 Mezzanine Facility Claims*.  Each holder of an M6 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 11.

(vii)    *Holders of M7 Mezzanine Facility Claims*.  Each holder of an M7 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 12.

(viii)    *Holders of M8 Mezzanine Facility Claims*.  Each holder of an M8 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 13.

(ix)    *Holders of M9 Mezzanine Facility Claims*.  Each holder of an M9 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 14.

(x)    *Holders of M10 Mezzanine Facility Claims*.  Each holder of an M10 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 15.

(d)    If Class 2 votes to reject the Plan, in accordance with Section 4.4(b)(ii) hereof, Class 4 receives 100% of the Sub-Equity which shall be distributed by the holder of the Mortgage Facility Deficiency Claim (to holders of Certificates) and by NewCo or the Reorganized Debtors (to holders of Mezzanine Facilities Claims) as follows:

(i)     *Holders of Class G Mortgage Certificates*.  Each holder of a Class G Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 2.

(ii)     *Holders of Class H Mortgage Certificates*.  Each holder of a Class H Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 3.

(iii)     *Holders of Class J Mortgage Certificates*.  Each holder of a Class J Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 4.

(iv)     *Holders of Class K Mortgage Certificates*.  Each holder of a Class K Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 5.

(v)     *Holders of Class L Mortgage Certificates*.  Each holder of a Class L Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 6.

(vi)     *Holders of Class M Mortgage Certificates*.  Each holder of a Class M Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 7.

(vii)     *Holders of M1 Mezzanine Facility Claims*.  Each holder of an M1 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 8.

(viii)     *Holders of M2 Mezzanine Facility Claims*.  Each holder of an M2 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 9.

(ix)     *Holders of M3 Mezzanine Facility Claims*.  Each holder of an M3 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 10.

(x)     *Holders of M4 Mezzanine Facility Claims*.  Each holder of an M4 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 11.

(xi)     *Holders of M5 Mezzanine Facility Claims*.  Each holder of an M5 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 12.

(xii)     *Holders of M6 Mezzanine Facility Claims*.  Each holder of an M6 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 13.

(xiii)     *Holders of M7 Mezzanine Facility Claims*.  Each holder of an M7 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 14.

(xiv)     *Holders of M8 Mezzanine Facility Claims*.  Each holder of an M8 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 15.

(xv)  *Holders of M9 Mezzanine Facility Claims.*  Each holder of an M9 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 16.

(xvi)  *Holders of M10 Mezzanine Facility Claims.*  Each holder of an M10 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 17.

6.3  ***Distributions to Holder of Allowed Mortgage Facility Claim.***  The Cash Distribution shall be distributed by the Plan Administrator to the holder of the Allowed Mortgage Facility Claim on the Effective Date in accordance with Section 8.2 which shall then distribute the Cash Distribution to the holders of Mortgage Certificates in accordance with the priority set forth in the Trust and Servicing Agreement.  The Investor Certificates shall be distributed by the Plan Administrator to the holder of the Allowed Mortgage Facility Claim on the Effective Date in accordance with Section 8.2, which shall then cancel the Investor Certificates in accordance with the provisions of the Trust and Servicing Agreement without any Distribution to be made on account of such Investor Certificates.

6.4  6.3 *Creation of NewCo.*

(a)  *Certificate of Formation.*  The NewCo Certificate of Formation shall be filed with the applicable Secretary of State on or before the Effective Date substantially in the form of the NewCo Certificate of Formation and shall, inter alia, include a provision prohibiting the issuance of non-voting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code.  Pursuant to the Plan:

(i)  Provided that Class 2 accepts the Plan, NewCo Common Interests comprising 42.85% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the New Warrants have been exercised as of the Effective Date) shall be issued to the Investor on the Effective Date immediately after the consummation of the issuance described in clause (iv) below.  In the event that Class 2 rejects the Plan, NewCo Common Interests comprising 100% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the New Warrants have been exercised as of the Effective Date) shall be issued to the Investor and its members or Affiliates designated pursuant to Section 2.3 of the Investment Agreement on the Effective Date immediately after consummation of the issuance described in (iv) below; and

(ii)  Provided that Class 2 accepts the Plan, NewCo Common Interests representing 19.04% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the New Warrants have been exercised as of the Effective Date) shall be issued in connection with the Rights Offering on the Effective Date immediately after the consummation of the issuance described in clause (iv) below.  In the event that Class 2 rejects the Plan, the Rights Offering shall be terminated, canceled or otherwise not effectuated and all Rights and any exercise of any Right shall be canceled and be null and void and no NewCo Common Interests shall be issued in connection with the Rights Offering;

(iii)  Provided that Class 2 accepts the Plan, NewCo Common Interests representing 38.11% of the total issued NewCo Common Interests as of the Effective

~~Date (assuming that none of the New Warrants have been exercised as of the Effective Date) shall be issued to the holders of the Class B – H Mortgage Certificates as Rollover Equity in accordance with the Plan. In the event that any holders of the Class B – H Mortgage Certificates exercise the Class B – H Equity Cashout Option, the corresponding NewCo Common Interests shall be issued to the Investor. In the event that Class 2 rejects the Plan, except for NewCo Common Interests issued to the Investor on account of the Investment, no NewCo Common Interests shall be issued to holders of Class B – H Mortgage Certificates;~~

(ii)    ~~(iv)~~Additional NewCo Common Interests, in an amount agreed upon by the Debtors, the Investor and each of the Sponsors, shall be reserved for issuance under the NewCo Management Incentive Plan~~, and~~

~~(v)    As provided in Section 6.15 hereof, in the event BHAC and NewCo enter into a BHAC IP Transfer Agreement, New Warrants to acquire NewCo Common Interests shall be allocated to BHAC, with such NewCo Common Interests representing 2.5% of the issued and outstanding NewCo Common Interests as of the Effective Date~~.

If the Investor and the Sponsors determine, ~~in their sole and absolute discretion~~subject to the terms of the Investment Agreement and the Plan, that an alternate corporate or organizational structure, form or identity is appropriate, this Section ~~6.3~~6.4(a) shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

(b)    *NewCo Operating Agreement*. The NewCo Operating Agreement~~shall be adopted substantially in the form to be included in the Plan Supplement and~~ shall be deemed to become valid, binding and enforceable in accordance with its terms on the Effective Date.~~ Each holder of NewCo Common Interests shall be bound by the terms of the NewCo Operating Agreement without the need for execution by any party thereto other than NewCo.~~

~~(c)    *Registration Rights*. Pursuant to the terms of the Registration Rights Agreement, which shall be substantially in the form to be included in the Plan Supplement, the Investor shall be entitled to certain registration rights as set forth therein.~~

6.5    ~~6.4~~ ~~*Cancellation of*~~ *Existing Debt Securities.* As of the Effective Date, all notes~~, agreements, certificates and securities evidencing the Mortgage Facility, the Class A1 Mortgage Certificates, Class A2 Mortgage Certificates, Class A3 Mortgage Certificates, Class A4 Mortgage Certificates, the Class B – M Mortgage Certificates~~ and any obligations of the Debtors under the Mortgage Facility or the Mezzanine Facilities shall be discharged and be of no further force or effect against the Debtors or the Mortgage Properties, and the holders thereof shall have no rights against the Debtors or the Mortgage Properties, except the right to receive the Distributions provided herein. As of the Effective Date, the EA UD Mortgage Claim~~, the Mezzanine Facilities~~, and the General Unsecured Claims, and the rights of the holders thereof thereunder, shall be cancelled and deemed null and void and of no further force and effect, and the holders thereof shall have no rights, and such notes, agreements, certificates and securities shall evidence no rights, except the right to receive the Distributions provided herein.

~~6.5    *Management of NewCo*. As of the Effective Date, the NewCo Board of Managers shall be a seven (7) member board and shall be comprised as follows: (a) the chief executive officer of NewCo, (b) five (5) members designated by the Investor and its members and~~

~~Affiliates, and (c) one (1) independent member reasonably acceptable to the Investor and its members and Affiliates, each of whom will have one vote on all matters to be voted on by the NewCo Board of Managers. Each of the members of such NewCo Board of Managers shall be identified in the Plan Supplement and shall serve in accordance with the NewCo Certificate of Formation and the NewCo Operating Agreement. After the Effective Date, members of the NewCo Board of Managers shall serve and be selected pursuant to the terms of the NewCo Operating Agreement, which shall provide, among other things, that so long as the Investor and its members and Affiliates continue to hold at least 25.00% of the NewCo Common Interests issued to it on the Effective Date, the Investor shall continue to have the right to elect five (5) members of the NewCo Board of Managers. The NewCo Operating Agreement shall further provide, among other things, that the management of NewCo shall be vested exclusively in the NewCo Board of Managers, which shall have all of the rights, powers and authority to manage and control all matters concerning NewCo, including, without limitation, the business, affairs, transactions, existence and governance (other than the composition of the NewCo Board of Managers) of NewCo. The officers of NewCo shall be identified in the Plan Supplement and shall serve in accordance with the NewCo Certificate of Formation, the NewCo Operating Agreement, Section 11.5 hereof and the requirements of applicable nonbankruptcy law.~~ It is understood, however, that (i) this Section 6.5 shall not affect any Guaranty Claims other than a Guaranty Claim against a Debtor or ESI, and (ii) notwithstanding Section 6.11 hereof, the notes or certificates in respect of the Mortgage Facility and the Mezzanine Facilities shall not be surrendered and cancelled so as not to impair the pursuit of any Guaranty Claims other than a Guaranty Claim against a Debtor or ESI.

6.6    *NewCo Management Incentive Plan.*  On ~~and~~or after the Effective Date, NewCo shall implement the NewCo Management Incentive Plan, in form and substance reasonably acceptable to the Investor ~~and each of the Sponsors, which shall provide for cash distributions to participants therein based upon a waterfall to be determined by the NewCo Board of Managers. The identity of recipients, the cash distribution waterfall and all other terms shall be determined by the NewCo Board of Managers.~~, with NewCo Common Interests being available for issuance thereunder, through a combination of the award of restricted membership interests and the granting of equity based awards, including, without limitation, restricted membership interests, deferred membership interests and options.  The NewCo Management Incentive Plan will be designed to provide additional compensation to HVM ~~for their management services. Alternatively, NewCo or one of its affiliates may seek to provide incentives to HVM by providing additional performance-based compensation to HVM~~ pursuant to and in connection with the management agreements ~~with~~between the TRSs of NewCo that are parties to such management agreements and HVM that are being assumed by, or assumed and assigned to, ~~NewCo~~ the TRSs (or one or more newly formed ~~subsidiaries (which newly formed subsidiaries, are~~TRSs, wholly owned either directly or indirectly by NewCo, or designated by an existing Debtor that is a ~~Real Estate Investment Trust subsidiary~~TRS) and modified on the Effective Date pursuant to ~~the terms of the Plan~~Section 11.5 hereof to provide for, among other things, such ~~payments~~issuance of the NewCo Common Interests as part of HVM's compensation thereunder.  HVM shall allocate the benefit of the NewCo Management Incentive Plan to the executive officers and senior management of HVM ~~for their management services.~~ The identity of recipients, amount of grants and other terms including, without limitation, vesting, will be determined by the manager of HVM.

6.7    *Corporate Reorganization Actions.*  On or as soon as practicable after the Effective Date, the Debtors and/or NewCo, as applicable, shall take such actions as may be or become necessary to effectuate the following, all of which shall be authorized and approved in all respects, in each case without further action being required under applicable law, regulation, order, or rule

(including, without limitation, Any action by the board of directors, stockholders, partners or members of any Debtor or members of NewCo):

(a)     the NewCo Certificate of Formation will be filed with the applicable Secretary of State effecting the formation of NewCo.  At the option of the Investor and each of the Sponsors, the Debtors or NewCo may form additional subsidiaries owned in whole, or in part, by NewCo in order to effectuate the transactions contemplated hereunder;

(b)     100% of the New Debtor Equity of the Tier 1 Debtors shall be issued to NewCo or a subsidiary of NewCo;

(c)     the Equity Interests of each of the Tier 2 Debtors, the ESH/ESA General Partnership Interests and the ESH/TN Properties Membership Interests shall remain outstanding and Unimpaired; ~~and~~

(d)     the Equity Interests of each of the Tier 3 Debtors shall be ~~canceled~~cancelled, extinguished and not re-issued.  The Tier 3 Debtors shall be deemed liquidated and dissolved by the Debtors for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided that, in its sole discretion, the Debtors may (but shall not be required to) file with the Office of the Secretary of State for the applicable state a certificate of dissolution~~.~~; and

(e)     the Restructuring Transactions shall be implemented.

If the Investor and the Sponsors determine, ~~in their sole and absolute discretion,~~ subject to the terms and conditions of the Investment ~~and Standby Purchase~~ Agreement and the Plan, that NewCo shall have an alternate corporate or organizational structure, form or identity, this Section 6.7 shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

6.8     ***Investment.***

~~If Class 2 accepts the Plan, on the Effective Date immediately after the consumation of the issuance described in Section 6.3(a)(iii) hereof, and subject to the terms of, and adjustments contained in Sections 2.2 and 3.4 of the Investment and Standby Purchase Agreement, the Investor shall purchase~~As consideration for the NewCo Common Interests ~~from NewCo as set forth in the Investment and Standby Purchase Agreement for Cash in the aggregate amount of four hundred fifty million dollars ($450,000,000), subject to increase after giving effect to Section 6.9(l) hereof so that the total amount of the Investment is in the maximum aggregate amount of six hundred fifty million dollars ($650,000,000).  Assuming that none of the New Warrants have been exercised as of the Effective Date, the NewCo Common Interests that the Investor shall receive on the Effective Date as a result of the Investment will comprise approximately 42.85% of the total issued and outstanding NewCo Common Interests as of the Effective Date (the "Investment"), with such amount of NewCo Common Interests to be increased by the amount of NewCo Common Interests that are acquired by the Investor through the Class B – II Equity Cashout Option and the Rights Offering.If Class 2 does not accept the Plan, on the Effective Date, immediately after the consumation of the issuance described in Section 6.3(a)(iii) hereof, and subject to the terms of the Investment and Standby Purchase Agreement, Investor shall (i) purchase NewCo Common Interests from NewCo for~~to be issued pursuant to the Investment Agreement and the purchase of the business, assets and properties of the Debtors and to fund the distributions contemplated by the Plan, the Investor shall (i)

cause NewCo to be provided with Cash in the aggregate amount of ~~four hundred million dollars ($400,000,000)~~ $3,615,755,444.28 (subject to adjustment as provided in this Section 6.8), comprised of (a) a $1,815,755,444.28 (subject to adjustment as provided in this Section 6.8) investment by the Investor, and (b) $1,800,000,000 from the proceeds of the Debt Financing Arrangements, and (ii) contribute to ~~NewCo~~ the Debtors the Investor Certificates ~~held as of the Effective Date subject to the terms of Section 3.4 of the Investment and Standby Purchase Agreement~~ (and waive the right to receive or retain any distribution on account of such Investor Certificates pursuant to the Plan) (collectively, the "Investment").  The amount of the Investor Certificates shall be calculated as of the Effective Date, and shall include the actual interest which would be payable on the Investor Certificates to the Effective Date that would have been payable absent the contribution and waiver provided herein.  To the extent that the amount of the Investor Certificates differs from the amount set forth on Schedule 1.2 of the Investment Agreement as a result of the calculation of interest, the Cash portion of the Investment (and the aggregate Cash amount to be provided to NewCo by the Investor) shall be adjusted up or down accordingly on a dollar for dollar basis.  The NewCo Common Interests that the Investor shall receive on the Effective Date as a result of the Investment will comprise 100% of the total issued and outstanding NewCo Common Interests as of the Effective Date.

~~If~~ On the Effective Date, the Investor will also contribute Cash to NewCo in the amount of the Reserve, as such term is defined in the Investment Agreement.

If the Investor and the Sponsors determine ~~in their sole and absolute discretion~~, subject to the terms and conditions of the Investment Agreement and Plan, that NewCo shall have an alternate corporate or organizational structure, form or identity, the structure of the Investment contemplated in this Section 6.8 shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

~~6.9    *Rights Offering*.~~

~~(a)    *The Rights*.  Each Rights Holder, including the Sponsors, shall have the right to purchase one NewCo Common Interest for each Right that the Rights Holder holds, at a purchase price that is equal to the Subscription Price.  Rights Holders have the right, but not the obligation, to participate in the Rights Offering as provided herein.  The number of NewCo Common Interests distributed to the Rights Holders will be rounded down to the nearest whole number.  No fractional NewCo Common Interests will be issued in respect of fractional Rights and holders of fractional Rights will not be entitled to receive any Cash in lieu thereof.  There shall be no over-subscription rights provided in connection with the Rights Offering.~~

~~(b)    *Subscription Period*.  The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Expiration Date.  Each Rights Holder intending to participate in the Rights Offering must affirmatively elect to exercise its Rights, in whole or in part, on or prior to the Expiration Date.  On the Effective Date, all Unsubscribed Rights shall be acquired by the Investor in accordance with and~~ ~~subject to the terms and conditions contained in the Investment and Standby Purchase Agreement and this Plan, and any exercise of such Rights after the Expiration Date (other than the purchase of NewCo Common Interests by the Investor pursuant to the Investment and Standby Purchase Agreement) shall be null and void and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Expiration Date, regardless of when the documents relating to such exercise were sent.~~

~~(c)    *Subscription Price*.  Each Rights Offering Participant choosing to exercise its Rights, in whole or in part, shall pay the aggregate Subscription Price for the NewCo Common~~

Interests that such Rights Offering Participant is to acquire pursuant to the exercise of the Rights not later than the Rights Offering Payment Date. If the Effective Date does not occur, the Subscription Price that each Rights Offering Participant has paid shall be refunded to such Rights Offering Participant without payment of any interest.

(d)     *Exercise of Rights*.  In order to exercise the Rights, each Rights Holder must: (i) return a duly completed and executed Rights Certificate to the Subscription Agent on or before the Expiration Date in which the Rights Holder represents that it is (x) a "qualified institutional buyer" as such term is defined in Rule 144A under the Securities Act, (y) an "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act, or (z) a non-US person purchasing under Regulation S under the Securities Act, and (ii) pay to the Subscription Agent (on behalf of the Debtors) on or before the Rights Offering Payment Date such Rights Holder's aggregate Subscription Price in accordance with the wire instructions set forth on the Rights Certificate or by bank or cashier's check delivered to the Subscription Agent as specified in the Rights Certificate.  If the Subscription Agent for any reason does not receive from a given Rights Holder (i) a duly completed and executed Rights Certificate on or prior to the Expiration Date, and (ii) immediately available funds in an amount equal to such holder's aggregate Subscription Price on or prior to the Rights Offering Payment Date, such Rights Holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering and any NewCo Common Interests that such Rights Holder could have purchased upon its valid exercise of the Rights shall be deemed to be Unsubscribed Rights.  The payments made in accordance with the Rights Offering shall be deposited and held by the Subscription Agent in the Escrow Account, which account will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date.  The Subscription Agent shall not use such funds for any other purpose or release such funds to the Debtors prior to such date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance.

Each Rights Offering Participant may exercise all or any portion of such holder's Rights pursuant to the instructions set forth in the Rights Certificate, but the exercise of any Rights shall be irrevocable and shall obligate the exercising Rights Offering Participant to purchase the applicable NewCo Common Interests and to pay the aggregate Subscription Price for such NewCo Common Interests on or prior to the Rights Offering Payment Date.  In order to facilitate the exercise of the Rights, on the Subscription Commencement Date, a Rights Certificate will be mailed to each Rights Holder together with appropriate instructions for the proper completion, due execution and timely delivery of the Rights Certificate.  Each Rights Offering Participant exercising its Rights shall agree to support and not take any action to oppose or delay confirmation and implementation of the Plan.

(e)     *Rights Offering Procedures*.  Notwithstanding anything contained herein to the contrary, the Debtors, the Investor and the Sponsors may mutually agree, without the consent of any Rights Holder, to modify the procedures relating to the Rights Offering or adopt such additional detailed procedures consistent with the provisions of this Section 6.9 to administer more efficiently the exercise of the Rights.

(f)     *Transfer Restriction; Revocation*.  The Rights are not transferable by any Rights Holder, subject to Section 6.17 hereof.  Any transfer or attempted transfer by a Rights Holder, subject to Section 6.17 hereof, will be null and void, and no purported transferee will be treated as the holder of, or permitted to exercise, any Rights.  Once a Rights Offering Participant has properly exercised its Rights, such exercise will not be permitted to be revoked.

(g)    *Rights Offering Backstop*.    Subject to the terms and conditions in the Investment and Standby Purchase Agreement, the Investor has agreed to subscribe for and purchase on the Effective Date, at the aggregate Subscription Price therefor, its allocated percentage of Unsubscribed Rights as set forth in the Investment and Standby Purchase Agreement as of the Effective Date.   The Debtors shall notify or cause the Subscription Agent to notify the Investor, on each Friday during the period from the Subscription Commencement Date to the Expiration Date (and any extensions thereof) and on each business day during the five (5) business days prior to the Expiration Date (and any extensions thereof), or more frequently if requested by the Investor, of the aggregate number of Rights known by the Debtors or the Subscription Agent to have been validly exercised as of the close of business on the preceding business day or the most recent practicable time before such request, as the case may be.   Within one (1) business day after the Expiration Date and in any event no later than four (4) Business Days prior to the Effective Date, the Debtors and the Subscription Agent shall give the Investor by e-mail a certificate by an executive officer of the Debtors in .pdf format setting forth either (i) in the event that there are Unsubscribed Rights, (x) a true and accurate calculation of the number of NewCo Common Interests elected to be purchased by the Rights Offering Participants pursuant to validly exercised Rights and the aggregate Subscription Price therefor, and (y) a true and accurate calculation of the number of Unsubscribed Rights, and the aggregate Subscription Price attributable to such Unsubscribed Rights (a "Purchase Notice") or (ii) in the absence of any Unsubscribed Rights, the fact that there are no Unsubscribed Rights and that the Investor's obligation to purchase any Unsubscribed Rights is terminated (a "Satisfaction Notice"). The Debtors shall provide the Investor with a certification by the Subscription Agent of the Unsubscribed Rights and a written backup to the determination of the Unsubscribed Rights as any Investor may reasonably request.   The Investor shall pay to the Subscription Agent, by wire transfer in immediately available funds on or prior to the Effective Date, Cash in an amount equal to the aggregate Subscription Price attributable to the amount of Unsubscribed Rights.   On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(ii) and Section 6.3(a)(iii) hereof, the Investor will purchase only such number of Unsubscribed Rights as are listed in the Purchase Notice, without prejudice to the rights of the Investor to later seek an upward or downward adjustment if the number of Unsubscribed Rights in such Purchase Notice is inaccurate.

(h)    *Distribution of the NewCo Common Interests*.   On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(iii) hereof, the Subscription Agent shall (i) distribute the NewCo Common Interests to each Rights Offering Participant that has properly exercised its Rights and paid the aggregate Subscription Price for the NewCo Common Interests that such Rights Offering Participant has agreed to purchase, and (ii) distribute the Unsubscribed Rights, if any, to the Investor.   All NewCo Common Interests shall be delivered with any and all issue, stamp, transfer, sales and use, or similar taxes or duties payable, if any, in connection with such delivery having been duly paid by NewCo.   If the exercise of a Right would result in the issuance of a fractional NewCo Common Interest, then the number of NewCo Common Interests to be issued in respect of such Right will be rounded down to the closest whole NewCo Common Interest.   Any unissued fractional NewCo Common Interests underlying a Right, whether caused by the rounding or a Rights Offering Participant's choice not to exercise its Rights in full, will become Unsubscribed Rights to be acquired by the Investor on the Effective Date.

(i)    *Validity of Exercise of Rights*.   All questions concerning the timeliness, viability, form and eligibility of any exercise of Rights shall be determined by the Subscription Agent as directed by the Debtors with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld.   Subject to the foregoing, the Subscription Agent's good faith determinations shall be final and binding.   The Subscription Agent as directed by the Debtors

with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Rights, provided, however, that without limiting any other circumstances that could give rise to the Investor's or the Sponsor's right to withhold consent to any waiver, permission or rejection specified above, it will be deemed reasonable for the Investor to withhold consent to any such waiver, permission or rejection that adversely affects the interests of the Investor or the Sponsors. Rights Certificates shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Subscription Agent determines as directed by the Debtors with the written consent of the Investor and each of the Sponsors, such consent not to be unreasonably withheld. The Subscription Agent will use commercially reasonable efforts to give notice to any Rights Offering Participants regarding any defect or irregularity in connection with any purported exercise of Rights by such participant and, may permit such defect or irregularity to be cured within such time as the Subscription Agent determines as directed by the Debtors with the written consent of the Investor and each of the Sponsors, such consent not to be unreasonably withheld; provided, however, that neither the Debtors, the Investor, the Sponsors nor the Subscription Agent shall incur any liability for failure to give such notification. Within five (5) days after the Expiration Date, the Subscription Agent shall file with the Bankruptcy Court a report regarding the results of the Rights Offering including a list identifying all those Rights Certificates deemed rejected due to defect or irregularity.

(j)     *Cancellation of Rights Offering*.  In the event that Class 2 does not accept the Plan and the Rights Offering is terminated, canceled or otherwise not effectuated, all Rights and any exercise of any Right shall be canceled and be null and void and there shall be no obligation to honor any such purported exercise.  In such event, (i) the aggregate Subscription Price paid by any Rights Offering Participant shall be refunded to such Rights Offering Participant without payment of interest and (ii) the Investor's commitment to subscribe for and purchase on the Effective Date the Unsubscribed Rights shall terminate and be null and void.

(k)     *Alteration of Rights Offering*.  If the Investor and the Sponsors determine, in their sole and absolute discretion that NewCo shall have an alternate corporate or organizational structure, form or identity, the structure of the Rights Offering contemplated in this Section 6.9 shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

(l)     *Adjustment of Rights Offering Amount*.  The amount of the Rights Offering shall be reduced to the extent necessary to ensure that the Investor, including its members and its members' Affiliates, shall own not less than 51% of the NewCo Common Interests after giving effect to the Investment and the Rights Offering.  In the event of such reduction, any excess Subscription Price shall be refunded without payment of interest.

6.10    *Class B – H Elections.*

(a)     *The Class B – H Elections*. The holders of Class B – H Mortgage Certificates shall have the right, but not the obligation, to elect the Class B – H Equity Cashout Option Election, as further described in Section 4.2(d) hereof.  The holders of Class B – H Mortgage Certificates shall also have the right, but not the obligation, to exercise the Class B – H Debt/Equity Election as further described in Section 4.2(e) hereof.

(b)     *Election Period*.  The Election Period shall commence on the Subscription Commencement Date and shall expire on the Class B – H Election Date.  The holder of a Class B – H Mortgage Certificate who intends to make the Class B – H Equity Cashout Option Election must

affirmatively make the Class B – H Equity Cashout Option Election, in whole or in part, on or prior to the Class B – H Election Date. Each holder of a Class B – H Mortgage Certificate will receive, in full and final satisfaction of its Certificate, 50% of its distribution in Rollover Equity and 50% of its distribution in New B – H Mortgage Notes, pursuant to Sections 4.2(c) and 6.2 hereof, unless such holder of a Class B – H Mortgage Certificate has exercised its respective Class B – H Debt/Equity Election in accordance with this Section 6.10 and subject to the limitations set forth in the Plan. Any exercise of the Class B – H Elections after the Class B – H Election Date shall be null and void, and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Class B – H Election Date, regardless of when the documents relating to such exercise were sent.

(c)     *Exercise of the Class B – H Elections*.  In order to exercise the Class B – H Elections, each holder of a Class B – H Mortgage Certificate must return duly completed Election Forms to the Subscription Agent on or before the Class B – H Election Date. If the Subscription Agent for any reason does not receive a given holder's duly completed Election Form on or prior to the applicable Class B – H Election Date, such holder shall be deemed to have relinquished and waived its right to participate in the Class B – H Equity Cashout Option Election or the Class B – H Debt/Equity Election, as applicable. The exercise of any Class B – H Election shall be irrevocable, subject to the proration requirements of the Class B – H Debt/Equity Election, and shall obligate the exercising holder of a Class B – H Mortgage Certificate to receive its distribution as reflected in such Class B – H Equity Cashout Option Election or the Class B – H Debt/Equity Election. In order to facilitate the exercise of the Class B – H Elections, on the Subscription Commencement Date, Election Forms will be mailed to each holder of Class B – H Mortgage Certificates together with appropriate instructions for the proper completion, due execution and timely delivery of the Election Forms. Each holder of a Class B – H Mortgage Certificate exercising one or more of its Class B – H Elections shall agree to support and not take any action to oppose or delay confirmation and implementation of the Plan.

(d)     *Class B – H Elections Procedures*.  Notwithstanding anything contained herein to the contrary, the Debtors, the Investor and the Sponsors may mutually agree, without the consent of any holder of a Class B – H Mortgage Certificate, to modify the procedures relating to the Class B – H Elections or adopt such additional detailed procedures consistent with the provisions of Section 4.2(e) and this Section 6.10 to administer more efficiently the exercise of the Class B – H Elections.

(e)     *Transfer Restriction*.  The Class B – H Elections are not transferable by any holder of a Class B – H Mortgage Certificate. Any transfer or attempted transfer by a holder of a Class B – H Mortgage Certificate will be null and void, and no purported transferee will be treated as the holder of, or permitted to exercise, the Class B – H Elections.

(f)     *Distribution of the Class B – H Equity Cashout Option and the Class B – H Debt/Equity Option*.  On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(iii) hereof, the Investor shall fund and the Subscription Agent shall distribute cash to each holder of a Class B – H Mortgage Certificate that has properly exercised its Class B – H Equity Cashout Option Election in accordance with Section 4.2(d) hereof and this Section 6.10 and shall issue such Rollover Equity that would have otherwise been distributed to such Holder of a Class B – H Mortgage Certificate to the Investor or its members or members' affiliates, as appropriate. In addition, on the Effective Date and after the consummation of the issuance described in Section 6.3(a)(iii) hereof, the Subscription Agent shall distribute to the holders of the Class B – H Certificates

the New B – H Mortgage Notes and the Rollover Equity in accordance with the Class B – H Debt/Equity Elections and subject to Sections 4.2(e) and 6.2 hereof.

(g) *Validity of Exercise of Class B – H Elections.* All questions concerning the timeliness, viability, form and eligibility of any exercise of the Class B – H Elections shall be determined by the Subscription Agent as directed by the Debtors with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld. Subject to the foregoing, the Subscription Agent's good faith determinations shall be final and binding. The Subscription Agent as directed by the Debtors with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Class B – H Elections, provided, however, that without limiting any other circumstances that could give rise to the Investor's or any Sponsors' right to withhold consent to any waiver, permission or rejection specified above, it will be deemed reasonable for Investor and each Sponsor to withhold consent to any such waiver, permission or rejection that adversely affects the interests of the Investor or the Sponsor. Election Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Subscription Agent determines as directed by the Debtors with the written consent of the Investor and each Sponsor, such consent not to be unreasonably withheld. The Subscription Agent will use commercially reasonable efforts to give notice to any holder of a Class B – H Mortgage Certificate regarding any defect or irregularity in connection with any purported exercise of the Class B – H Elections by such participant and, may permit such defect or irregularity to be cured within such time as the Subscription Agent, with the consent of the Debtors, the Investor and each Sponsor, may determine in good faith to be appropriate; provided, however, that neither the Debtors, the Investor, the Sponsors nor the Subscription Agent shall incur any liability for failure to give such notification. Within five (5) days after the Class B – H Election Date, the Subscription Agent shall file with the Bankruptcy Court a report regarding the results of the Class B – H Elections including a list identifying all those Election Forms deemed rejected due to defect or irregularity.

6.9 ~~6.11~~ *Effectuating Documents and Further Transactions.* On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to the Investor and each of the Sponsors as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Each of the officers of the Debtors, the Reorganized Debtors and NewCo is authorized without the need for any further order or authority, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan. The Reorganized Debtors are authorized to execute all documents and enter into all agreements as may be necessary and appropriate in connection with the Debt Financing Arrangements.

6.10 ~~6.12~~ *Allocation of Plan Distributions Between Principal and Interest.* To the extent that any Allowed Mortgage Deficiency Facility Claim, Allowed Mezzanine Facility Claim, or Allowed General Unsecured Claim scheduled to receive a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim (as determined for federal income tax purposes) first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

6.11 6.13 **Surrender and Cancellation of Instruments.** Each Subject to Section 6.5 hereof, each holder of an instrument evidencing a Claim shall surrender such instrument to the Reorganized Debtors or, in the case of the holders of any Mortgage Certificates, to the Trustee, and the Trustee shall distribute or cause to be distributed to the holder thereof the appropriate Distribution (if any) provided hereunder. At the option of the Reorganized Debtors or NewCo, as applicable (in their sole and absolute reasonable discretion), no Distribution hereunder shall be made to or on behalf of any holder of such Claim unless and until such instrument is received or the unavailability of such instrument is reasonably established to the satisfaction of the Reorganized Debtors. In accordance with section 1143 of the Bankruptcy Code, any such holder of such a Claim that fails to surrender or cause to be surrendered such instrument or to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Reorganized Debtors and, in the event that the Reorganized Debtors requests, fails to furnish a bond in form and substance (including, without limitation, amount) reasonably satisfactory to the Reorganized Debtors shall be deemed to have forfeited all rights, claims, and interests and shall not participate in any Distribution hereunder.

6.12 6.14 **Letters of Credit.** At or prior to the Effective Date, in the Debtors' discretion, with the consent of the Investor and each of the Sponsors, (a) the Existing Letters of Credit shall be terminated and any cash collateral provided thereunder shall be released to the entity that posted such collateral; and (b) the Reorganized Debtors shall provide any and all letters of credit and related cash collateral necessary to obtain and maintain in effect on or after the Effective Date all such forms of insurance as are customary to operate a business of the size and type of the Debtors; provided, however, that on or after the Effective Date the Investor shall reimburse the Reorganized Debtors for any cash collateral referred to in clause (b) without any impact on the Cash Distribution.

6.13 6.15 **BHAC IP Transfer Agreement.** The Investor or NewCo shall seek to enter into an Pursuant to the intellectual property transfer agreement (the "BHAC IP Transfer Agreement") with BHAC, pursuant to which, on the Effective Date, BHAC shall transfer to NewCo or its designee, which may be a third party, the BHAC IP in consideration for the issuance to BHAC of the New Warrants. The initial exercise price of each New Warrant shall be $1,150.00 per NewCo Common Interest, with such exercise price compounding annually at a rate of 20.0% per annum, subject to adjustment for dilution as to be provided in the agreements governing the New Warrants. In the event the Investor or NewCo. In the event the Debtors and BHAC do have not reach agreement on the terms of executed the BHAC IP Transfer Agreement prior to the Effective Date, BHAC shall not be entitled to receive the New Warrants, the BHAC License Agreements shall be assumed by the applicable debtors in accordance with Section 11.1 hereof, and the holder of the Mortgage Facility Claim shall transfer, assign and contribute June 17, 2010 (unless otherwise agreed by the Investor), the Special Servicer shall commence proceedings to foreclose on the BHAC IP and on the Effective Date shall assign and transfer the BHAC IP to NewCo or its designee, which may be a third party, its security interest in and all rights and remedies with respect to the BHAC IP and NewCo or its designee, which may be a third party, shall exercise all such rights and remedies with respect to the BHAC IP in order to foreclose on the BHAC IP and effectuate the transfer of or at the Investor's option, the Debtors, for a portion of the consideration provided on account of the Mortgage Facility Claim as set forth herein. Upon the receipt of the BHAC IP from BHAC or the Special Servicer, as applicable, the Reorganized Debtors shall transfer the BHAC IP to NewCo or its designee, which may be a third party.

6.14 6.16 **Consistent Tax Reporting.**

(a) For federal income tax purposes, (i) the distributions described in Section 4.2 shall be treated as a distribution of undivided interests in the assets of NewCo to the holder of the

Allowed Mortgage Facility Claim, immediately followed by a distribution of such assets to the holders of the Mortgage Certificates in complete liquidation of the holder of the Allowed Mortgage Facility Claim, followed by a contribution of such assets to NewCo by the holders of the Mortgage Certificates receiving NewCo Common Interests, a sale of such assets to NewCo by the holders of Mortgage Certificates receiving New Debt Securities and a part contribution/part sale of such assets to NewCo by the holders of Mortgage Certificates receiving both NewCo Common Interests and other property, and Mortgage Certificates following a sale of the Mortgage Properties (and all other assets deemed to be transferred to NewCo), (ii) the distribution described in Section 4.3 shall be treated as a distribution of undivided interests in the assets of NewCo to the holder of the Allowed ESA UD Mortgage Claim followed by a sale of such assets to NewCo for the New ESA UD Mortgage Note, and (iii) the distributions described in Sections 4.4, 4.5 and 4.6 shall be treated as described in Section 6.17(c). All parties will be required to report for all federal income tax purposes in a manner consistent with the characterization of the distributions described above.

(b)     As soon as possible after the Effective Date, and to the extent required by Section 1060 of the Internal Revenue Code, the NewCo Board of Managers shall determine the aggregate value of the underlying assets of NewCo as of the Effective Date and the portions of such value that are allocable, respectively, to the New ESA UD Mortgage Note and the various classes of New Equity Securities and New Debt Securities Investment. Such allocation will take into account the relative fair market values of the New Equity Securities, New Debt Securities and the New ESA UD Mortgage Note and the Investment. The NewCo Board of Managers will apprise, in writing, all parties of such aggregate valuation and allocation. The aggregate valuation and allocation shall be used consistently by all parties (including NewCo, the holders of Mortgage Certificates and the holder of the Allowed ESA UD Mortgage Claim) for all federal income tax purposes.

6.15    6.17 *Issuance of NewCo Common Interests to Investor or Sponsor Affiliates.*

(a)     The Investor, the Sponsors or their Affiliates, in their respective sole discretion, may deliver a written schedule to the Debtors within ten (10) days after entry of the Confirmation Order to designate that some or all of the NewCo Common Interests to be issued to the Investor, the Sponsors or their Affiliates under the Plan be issued in the name of, and delivered to, one or more of their managed funds and/or respective affiliates, so long as such issuance and delivery is in compliance with federal and state securities laws and does not require NewCo to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended and the rules and regulations of the Securities and Exchange Commission thereunder.

(b)     In the event that the Investor, the Sponsors or their Affiliates make the designation pursuant to Section 6.17 6.15(a) above, the funds managed by the Investors Investor, the Sponsors and/or their respective affiliates that are so designated shall have the rights, entitlements and benefit that would otherwise inure to the Investor, the Sponsors or their Affiliates in their capacity as a holder of the NewCo Common Interest as provided in the Plan, including those rights, entitlements and benefits of the Investor, the Sponsor or the Affiliate specified in Sections 6.3 Section 6.4(a)(i), 6.3(c) and 6.5 above.

(c)     Each of the Loan REMIC, the Upper Tier REMIC, and the Lower Tier REMIC shall adopt a plan of liquidation immediately prior to the Effective Date (provided, however, that notwithstanding the liquidation of the Loan REMIC, the Lower Tier REMIC and the Upper Tier

REMIC, the Mortgage Facility Trust shall not liquidate and shall remain in full force and effect until the termination of the Mortgage Parties Indemnification Fund.

### 6.16    *Mortgage Parties Indemnification Fund.*

(a)    On the Effective Date, the Debtors shall transfer $20 million to the Special Servicer which shall hold such funds in a cash collateral account (the "Mortgage Parties Indemnification Fund") for the benefit of the Mortgage Debt Parties to satisfy any indemnification obligations of the Mortgage Facility Trust with respect to any post-Confirmation Date litigation commenced against the Mortgage Debt Parties regarding the voting on the Plan, distributions under the Plan and any other actions taken by the Mortgage Debt Parties in connection with the Plan, including the implementation thereof (the "Indemnified Litigation").  Unless the funds maintained in the Mortgage Parties Indemnification Fund are paid to the Mortgage Debt Parties in connection with any Indemnified Litigation, the Special Servicer (or such Person designated by the Special Servicer or the Successor Trustee) shall hold the Mortgage Parties Indemnification Fund in a cash collateral account for a period of six (6) years from the Effective Date of the Plan.  Upon the later of termination of the six-year period or entry of a final, non-appealable judgment in any then-pending Indemnified Litigation, any and all cash remaining in the Mortgage Parties Indemnification Fund shall be distributed to the holder of the Allowed Mortgage Facility Claim, for distribution to the first tranche of Mortgage Certificates that are held by holders that have not received payment in full under this Plan and, to the extent that there are sufficient funds remaining after payment in full of such tranche of Mortgage Certificate holders, to other Mortgage Certificate holders in accordance with the priorities set forth in the Trust and Servicing Agreement.  Each Mortgage Debt Party may receive reimbursement for any fees that such Mortgage Debt Party has incurred in connection with any Indemnified Litigation by submitting invoices (with appropriate redactions for privilege) to the Special Servicer (or such Person designated by the Special Servicer), which shall pay such invoices from the funds maintained in the Mortgage Parties Indemnification Fund reasonably promptly after receipt of such invoices.  In addition, the Special Servicer shall be entitled to reasonably prompt reimbursement for any fees that the Special Servicer incurs in connection with any Indemnified Litigation from the funds maintained in the Mortgage Parties Indemnification Fund.

(b)    *Federal Income Tax Treatment.*  For all United States federal income tax purposes, all parties shall treat the transfer of Cash to the Mortgage Parties Indemnification Fund as (1) a transfer of Cash (subject to any obligations relating to those assets) directly to the holders of Mortgage Certificates (in accordance with the priorities set forth in the Trust and Servicing Agreement), followed by (2) the transfer by the holders of Mortgage Certificates otherwise entitled to receive such Cash to the Mortgage Parties Indemnification Fund.  Accordingly, the holders of Mortgage Certificates otherwise entitled to receive such Cash shall be treated for United States federal income tax purposes as the direct owners of their respective share of the Cash in the Mortgage Parties Indemnification Fund.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.  The Special Servicer shall send annually to each holder of Mortgage Certificates that is treated as a direct owner of any portion of the Mortgage Parties Indemnification Fund a separate statement setting forth any income earned with respect to, or any expenditure made out of, such portion of the Mortgage Parties Indemnification Fund as may be relevant for United States federal income tax purposes.

### 6.17    *Litigation Trust.*

(a)    *Creation of Litigation Trust.* On the Effective Date, the Debtors shall transfer the Litigation Trust Funding to the Litigation Trust and the Debtors and the Litigation Trustee shall

execute the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan. On the Effective Date, the Debtors shall be deemed to have automatically transferred to the Litigation Trust all of their right, title, and interest in and to all of the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Litigation Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Litigation Trust Beneficiaries as set forth in the Plan and the expenses of the Litigation Trust as provided in the Litigation Trust Agreement. Thereupon, the Debtors shall have no interest in the Litigation Trust Assets or the Litigation Trust. In connection with the vesting and transfer of the Litigation Trust Assets, including rights and causes of action, any attorney-client, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust shall vest in the Litigation Trust. The Debtors and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities. In the event of any conflict between the terms of this Section 6.17 and the Litigation Trust Agreement, the terms of the Litigation Trust Agreement shall govern.

(b)     *Purpose of the Litigation Trust.* The Litigation Trust shall be established for the sole purpose of liquidating and distributing the Litigation Trust Assets contributed to the Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(c)     *Federal Income Tax Treatment of Litigation Trust.* For all United States federal income tax purposes, all parties shall treat the transfer of the Litigation Trust Assets to the Litigation Trust as (1) a transfer of the Litigation Trust Assets (subject to any obligations relating to those assets) directly to the Litigation Trust Beneficiaries, followed by (2) the transfer by such beneficiaries to the Litigation Trust of the Litigation Trust Assets in exchange for an interest in the Litigation Trust. Accordingly, the Litigation Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(d)     *Tax Reporting.*

(i)     The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

(ii)     The Litigation Trustee also shall annually send to each holder of an interest in the Litigation Trust a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for United States federal income tax purposes and will instruct all such holders to use such information in preparing their United States federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their United States federal income tax returns.

(iii)     As soon as reasonably practicable after the Litigation Trust Assets are transferred to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets. Such valuation shall be made available from time to time to all parties to the Litigation Trust, to the extent relevant to such parties

for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(iv)    Allocations of Litigation Trust taxable income or loss of the Litigation Trust shall be allocated by reference to the manner in which an economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets.  The tax book value of the Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(v)    The Litigation Trustee shall be responsible for payment, out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or its assets.

(e)    *Litigation Trust Assets.* The Litigation Trustee, on behalf of the Litigation Trust, shall have the exclusive right, authority and discretion to institute, prosecute, abandon, settle or compromise any and all causes of action that constitute Litigation Trust Assets without the consent or approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided herein or in the Litigation Trust Agreement.  From and after the Effective Date, the Litigation Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the Litigation Trust, shall serve as a representative of the Debtors' Estates and shall retain and possess the sole and exclusive right to commence, pursue, settle, compromise or abandon, as appropriate, any and all causes of action, whether arising before of after the Petition Date, in any court or other tribunal.

(f)    *Litigation Trust Fees and Expenses.* From and after the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Litigation Trust, and any professionals retained by the Litigation Trust, except as otherwise provided in the Litigation Trust Agreement.  The Litigation Trustee shall (i) pay to the holder of the Allowed Mortgage Facility Claim the Litigation Trust Funding Reimbursement out of the proceeds of the Litigation Trust Assets, and (ii) reimburse NewCo, the Reorganized Debtors, HVM and their officers, directors and managers for all reasonable costs and expenses incurred as a third party in connection with any cause of action or proceeding pursued by or otherwise involving the Litigation Trust and the Litigation Trust Assets or as a defendant in relation to a claim that has been released pursuant to this Plan.

(g)    *Cash Investments.* The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom); provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

(h)    *Distribution of Litigation Trust Interests.* The Litigation Trustee is required to distribute to the Litigation Trust Beneficiaries on account of their interests in the Litigation Trust, at least annually, all unrestricted Cash on hand, less such amounts paid pursuant to Section 6.17(f).

6.18    ~~*Allowed Mortgage Facility Claim.*~~  **ESI Settlement.**  The Mortgage Facility Trust holds a Guaranty Claim against ESI.  ESI and the Special Servicer (subject to the consent of the

Operating Advisor) shall enter into a settlement agreement (the "ESI Settlement"), subject to reasonable approval of the Investor and each of the Sponsors and Bankruptcy Court approval, pursuant to which ESI shall consent to and grant the releases set forth in Section 10.10 of the Plan in exchange for a release of the Guaranty Claim and other consideration as more fully set forth in the ESI Settlement.  ESI and the Debtors shall obtain Bankruptcy Court approval of the ESI Settlement at or prior to the Confirmation Date. ~~In the event that Class 2 votes in favor of the Plan, all Claims in respect of the Mortgage Facility shall be satisfied in full by the treatment of Class 2, as set forth in Section 4.2(b)(i) of the Plan, and the holder of such Claim shall be deemed to have consented to the allowance of the Mortgage Facility Deficiency Claim at $0.  In the event that Class 2 rejects the Plan, the Allowed Mortgage Facility Deficiency Claim shall be equal to the principal, accrued interest, fees and costs due and owing on account of the Mortgage Facility as of the Commencement Date, less the amounts of the New Alternate Notes and any payments made on account of the Mortgage Facility during the Chapter 11 cases, including, without limitation, adequate protection payments, fees, costs or expenses.~~

# ARTICLE VII

## TREATMENT OF DISPUTED CLAIMS

### 7.1    *Objections to Claims; Prosecution of Disputed Claims.*

(a)    *NewCo or the Reorganized Debtors.*  NewCo or the Reorganized Debtors shall object to the allowance of Claims filed with the Bankruptcy Court  with respect to which NewCo or the Reorganized Debtors, as applicable, dispute liability in whole or in part and for which they are responsible for payment as provided in Article II.   All objections that are filed and prosecuted by NewCo or the Reorganized Debtors as provided herein shall be litigated to Final Order by NewCo or the Reorganized Debtors, ~~as applicable~~ or settled by NewCo or the Reorganized Debtors.  Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by NewCo or the Reorganized Debtors to Claims shall be served and filed no later than ninety (90) days after the Effective Date.

(b)    *The Plan Administrator.*  The Plan Administrator shall object to the allowance of Administrative Expense Claims or Priority Claims filed with the Bankruptcy Court with respect to which, on behalf of the Debtors, the Plan Administrator disputes liability in whole or in part and which is to be paid from the Administrative/Priority Claims Reserve as provided in Section 2.1.  All objections that are filed and prosecuted by the Plan Administrator as provided herein shall be litigated to Final Order by the Plan Administrator or settled by the Plan Administrator.  Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by the Plan Administrator to Administrative Expense Claims and Priority Claims shall be served and filed no later than sixty (60) days after the Effective Date.

(c)    *The Litigation Trustee.*  The Litigation Trustee shall object to the allowance of General Unsecured Claims and Mezzanine Facilities Claims filed with the Bankruptcy Court with respect to which the Litigation Trustee disputes liability in whole or in part.  All objections that are filed and prosecuted by the Litigation Trustee as provided herein shall be litigated to Final Order by the Litigation Trustee or settled by the Litigation Trustee.  Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by the Litigation Trustee to General Unsecured Claims and Mezzanine Facilities Claims shall be served and filed no later than ninety (90) days after the Effective Date

7.2 **_Distributions on Account of Disputed Claims._** Notwithstanding Article II and Article IV hereof, a Distribution shall only be made by NewCo or the Reorganized Debtors, the Plan Administrator, or the Litigation Trustee, as applicable, to the holder of a Disputed Claim when, and to the extent that, such Disputed Claim becomes Allowed. No interest shall be paid on account of Disputed Claims that later become Allowed except to the extent that payment of interest is required under section 506(b) of the Bankruptcy Code. No Distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 7.1 hereof. From time to time after the Effective Date, on each Distribution Date after a Disputed Claim becomes an Allowed Claim, NewCo or the Reorganized Debtors, the Plan Administrator, or the Litigation Trustee, as applicable, shall distribute to such holder the amount distributable to such Claim in accordance with the applicable sections of the Plan. To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed. To the extent that any funds remain reserved by NewCo or the Reorganized Debtors for payment of Allowed Claims after the final resolution of all Disputed Claims that are Administrative Expense Claims or Priority Claims (and all such Disputed ~~Claim~~Claims that are Administrative Expense Claims or Priority Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall revert to and be fully vested in NewCo or the Reorganized Debtors, as applicable. To the extent that any funds remain in the Administrative/Priority Claims Reserve after the final resolution of all Administrative Expense Claims or Priority Claims that are Disputed Claims (and all such Disputed Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall be paid to the holder of the Mortgage Facility Claim, for distribution to holders of Mortgage Certificates in accordance with Section 6.3 of the Plan. To the extent that any funds remain in the Litigation Trust after the final resolution of all General Unsecured Claims and Mezzanine Facilities Claims that are Disputed Claims (and all such Disputed Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall be paid to the Litigation Trust Beneficiaries.

7.3 **_Settlement of Claims._** At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in this Plan to the contrary, the Debtors may settle any or all of the Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019. After the Effective Date, NewCo or the Reorganized Debtors may, and shall have the exclusive right to, compromise and settle any Claims against them that they have agreed to pay or are required to pay pursuant to Section 2.1 and claims they have against another Person or Entity, excluding the Litigation Trust Assets, without notice to or approval from the Bankruptcy Court.

# ARTICLE VIII

# DISTRIBUTIONS

8.1 **_Distributions under the Plan._** Whenever any Distribution to be made under this Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

8.2 **_Timing of Distributions under the Plan._** Except for Distributions made on the Initial Distribution Date, any Distribution to be made by any Debtor or the Disbursing Agent, NewCo or the Reorganized Debtors pursuant to the Plan shall be deemed to have been timely made if made within ten (10) days after the time therefore specified in the Plan. No interest shall accrue or be

paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

8.3 ~~*Distributions with Respect to Mortgage Facility Deficiency Claim, Mezzanine Facility Claims, and General Unsecured Claims.*~~ *Use of Cash Collateral.* ~~Distributions with respect to Classes 4 and 5 shall only be made on each Distribution Date; provided, however, that, if a Claim in Class 4 or 5 becomes Allowed subsequent to the Initial Distribution Date, NewCo or the Reorganized Debtors may, in its sole discretion, make a Distribution with respect to such Claim prior to a Distribution Date. For purposes of treatment and Distribution under the Plan, all General Unsecured Claims held by a Creditor shall be aggregated and treated as a single Claim. At the written request of the Disbursing Agent, any Creditor holding multiple General Unsecured Claims shall provide to the Disbursing Agent a single address to which any Distributions shall be sent. At the written request of any Creditor holding multiple General Unsecured Claims made to the Disbursing Agent within thirty (30) days prior to a Distribution Date, such Creditor shall receive an itemized statement of the General Unsecured Claims for which the Distribution is being made.~~

~~8.4 *Distributions with Respect to The Mortgage Facility Claim.*~~ The ~~amount of the New Debt Securities, New Equity Securities, and/or Rights to which any holder of Certificates is entitled shall be determined based upon such holder's share of principal and accrued interest on the Certificates as of the Confirmation Date. As a result, although the Debtors will still~~ Debtors will be entitled to use cash collateral consistent with the terms of the Cash Collateral Order~~, they shall be relieved of the obligation to make Adequate Protection Payments (as defined~~ through the Effective Date including, without limitation, the obligations to make adequate protection payments as provided in the Cash Collateral Order~~), if any, as of the Confirmation Date~~.

~~8.5 *Calculations Subject to Adjustment.* The allocation of the New Debt Securities, New Equity Securities, and/or Rights to various Classes and subclasses of Claims under the Plan is based on a projected Confirmation Date of June 30, 2010, and is subject to adjustment based on the actual Confirmation Date.~~

~~8.6 *Disbursing Agent.*~~

8.4 *Plan Administrator.* Unless otherwise provided ~~herein~~in the Plan, all distributions under the Plan shall be made by the ~~Reorganized Debtors or NewCo, as applicable, as Disbursing Agent or such other entity designated by NewCo or the Reorganized Debtors with the written consent of the Investor and each of the Sponsors. The Disbursing Agent~~Plan Administrator. All reasonable costs and expenses incurred by the Plan Administrator in carrying out its duties under the Plan shall be paid from the funds in the Administrative/Priority Claims Reserve, provided, however, that the Plan Administrator shall provide copies of its statements for services rendered to the Special Servicer. Any dispute regarding the payment of the fees and expenses of the Plan Administrator shall be determined by the Bankruptcy Court. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that ~~a Disbursing Agent~~the Plan Administrator is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be ~~borne by NewCo or the Reorganized Debtors, as applicable~~paid from the funds in the Administrative/Priority Claims Reserve.

8.5 ~~8.7~~ *Record Date.* As of the close of business on the Record Date, the various transfer and claims registers for each of the Classes of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record holders

of any of the Claims. The Debtors ~~and~~, the Plan Administrator, NewCo ~~or~~, and the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims occurring after the close of business on the Record Date. The Debtors and the ~~Disbursing Agent~~Plan Administrator shall be entitled to recognize and deal hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Record Date, to the extent applicable.

8.6    ~~8.8~~ *Manner of Payment under the Plan.*  Unless the Person receiving a payment agrees otherwise, any payment in Cash to be made by the ~~Debtors,~~Plan Administrator, or NewCo or the Reorganized Debtors shall be made, at the election of the ~~Debtors,~~Plan Administrator, or NewCo or the Reorganized Debtors (as the case may be), by check drawn on a domestic bank or by wire transfer from a domestic bank, provided that payments to the holder of the Allowed Mortgage Facility Claim shall be paid by wire transfer.

8.7    ~~8.9~~ *Hart-Scott-Rodino Compliance.*  Any NewCo Common Interests to be distributed under the Plan to any Person required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Person shall have expired or been terminated.

8.8    ~~8.10~~ *Fractional ~~NewCo Common Interests or Other~~ Distributions.*  ~~Notwithstanding anything to the contrary contained herein, no fractional NewCo Common Interests shall be distributed, and no Cash payments of fractions of cents will be made.~~ Fractional dollars shall be rounded down to the nearest whole dollar. ~~Fractional NewCo Common Interests shall be rounded down to the nearest whole unit. No Cash will be paid in lieu of such fractional NewCo Common Interests or dollars.~~

8.9    ~~8.11~~ *Distribution of Unclaimed Property.*  Any Distribution under the Plan that is unclaimed after one hundred eighty (180) days following the date such property is distributed shall be deemed not to have been made and shall be transferred to ~~NewCo or the Reorganized Debtors, as applicable~~the Litigation Trust, free and clear of any claims or interests of any Entities, including, without express or implied limitation, any claims or interests of any governmental unit under escheat principles. Nothing contained herein shall affect the discharge of the Claim with respect to which such Distribution was made, and the holder of such Claim shall be forever barred from enforcing such Claim against NewCo, the Reorganized Debtors or the Debtors, or the assets, estate, properties, or interests in property of the Debtors, NewCo or the Reorganized Debtors.

8.10    *Administrative/Priority Claims Reserve.*

(a)    *Establishment and Amount.*  On the Effective Date, the Plan Administrator shall establish the Administrative/Priority Claims Reserve. The amount of the Administrative/Priority Claims Reserve shall be determined by the Debtors, subject to the reasonable consent of the Plan Administrator and the Special Servicer (with the consent of the Operating Advisor, such consent not to be unreasonably withheld), and shall be the sum of (a) estimated accrued and unpaid Administrative Expense Claims (excluding items of the type referred to in clause (c)(i) of the definition of "Allowed" and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date), including, without limitation, amounts due to professionals as compensation or reimbursement of expenses, (b) the estimated Priority Claims, and (c) the estimated costs and expenses of the Plan Administrator. For purposes of determining the estimated accrued and unpaid Administrative

Expense Claims, the Debtors shall include 110% of the amount reflected on the Debtors' books and records as being due and owing as Administrative Expenses (other than amounts owed to professionals and Priority Claims which shall be estimated at 100% of such amount). The Administrative/Priority Claims Reserve shall be the sole source for payment of Administrative Expense Claims and Priority Claims, other than items of the type referred to in clause (c)(i) of the definition of "Allowed", any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date.

(b)        *Release of Funds from Administrative/Priority Claims Reserve.*  On the date that is seventy-five (75) days after the Effective Date, the Plan Administrator shall distribute to the holder of the Mortgage Facility Claim all funds remaining in the Administrative/Priority Claims Reserve other than (i) any amounts required to be reserved in connection with Administrative Expense Claims or Priority Claims that are Disputed Claims at such time, and (ii) a reasonable amount to be retained for payment of the fees and expenses of the Plan Administrator and the reasonable post-Effective Date fees and expenses of the Debtors' professionals in an amount to be agreed by the Special Servicer (with the reasonable consent of the Operating Advisor). Notwithstanding the release of the funds from the Administrative/Priority Claims Reserve or any provisions of this Plan, NewCo and the Reorganized Debtors shall incur no liability for and shall have no responsibility to pay any Administrative Expense Claim or Priority Claim, excluding the claims of the type specified in Section 1.7(c)(i) of the Plan and any payments relating to Change of Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, in accordance with Section 2.1 of the Plan.

# ARTICLE IX

## CONDITIONS PRECEDENT

9.1        ***Conditions Precedent to the Effective Date.***  The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)        the Bankruptcy Court shall have entered a Confirmation Order with respect to the Plan in form and substance approved by the Investor ~~and~~, each of the Sponsors and the Special Servicer (with the consent of the Operating Advisor), and such Confirmation Order shall be non-appealable, shall not have been appealed within fourteen (14) calendar days of entry or, if such Confirmation Order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such Confirmation Order;

(b)        all actions, documents, and agreements necessary to implement the Plan, including, without limitation, all actions, documents, and agreements necessary to implement ~~the New Mortgage Notes,~~ the corporate reorganization described in Section 6.7, and the Investment described in Section 6.8, ~~and the Rights Offering described in Section 6.9,~~ shall have been effected or executed;

(c)        the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are determined by the Debtors to be necessary to implement the Plan and that are required by law, regulation, or order;

(d)     the NewCo Certificate of Formation (and any certificates of formation for newly formed subsidiaries of NewCo, if any) shall have been filed with the applicable Secretary of State, and the NewCo Operating Agreement (and any operating agreements for newly formed subsidiaries of NewCo, if any) shall be in place;

(e)     the Registration Rights Agreement shall be in full force and effect; andthe Mortgage Parties Indemnification Fund shall have been established and funded;

(f)     the Litigation Trust shall have been established and funded;

(g)     notice of the Plan and Disclosure Statement shall have been distributed to all known holders of Mortgage Certificates and publicly advertised in such a way as to provide fair and adequate notice to individual holders of Mortgage Certificates;

(h)     the Bankruptcy Court shall have approved the ESI Settlement at or prior to the Confirmation Date;

(i)     the transfer of the BHAC IP to NewCo or its designee, or at the Investor's option, the Debtors, shall have occurred; and

(j)     (f) all of the conditions to closing that are contained in Section 13.111.1 of the Investment and Standby Purchase Agreement shall have been satisfied or waived.

The conditions precedent specified above, with the exception of Section 9.1(a), may be waived in whole or in part by the Debtors, with the prior consent of the Investor and each of the Sponsors, and with respect to Sections 9.1(e), 9.1(f), 9.1(g), and 9.1(h) only, the Special Servicer.  Subject to the foregoing, any such written waiver of a condition precedent set forth in this Section 9.1 may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors decide that one of the foregoing conditions cannot be satisfied, and the occurrence of such condition is not waived in writing by the Debtors with the prior consent of the Investor and, each of the Sponsors and if applicable, the Special Servicer, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

9.2     **_Effect of Failure of Conditions to Effective Date._**  If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 120 days after the Confirmation Date, or by such later date as is proposed by the Debtors (with the consent of the Investor and each of the Sponsors, which shall not be unreasonably withheld), then upon motion by the Debtors (after consultation with the Investor and, each of the Sponsors and the Special Servicer) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions to consummation is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to this Section 9.2, this Plan will be null and void in all respects, and (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day

immediately preceding the Confirmation Date as though the Confirmation Date never occurred, (iii) the obligations of the Investor and the Sponsors under the Investment and Standby Purchase Agreement will terminate, and (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors.

## ARTICLE X

## EFFECT OF CONFIRMATION

10.1    ***Vesting of Assets.***  Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors, including the Mortgage Properties, shall vest in the Reorganized Debtors and/or NewCo free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors and/or NewCo may operate the Debtors' business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.

10.2    ***Title to Assets; Discharge of Liabilities.***  Except as otherwise provided in the Plan, on the Effective Date, title to all assets and properties and interests in property dealt with by the Plan shall vest in the Reorganized Debtors or NewCo, NewCo, the Plan Administrator, the Administrative/Priority Claims Reserve, or the Litigation Trust, as provided in the Plan, free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors arising prior to the Effective Date, except as may be otherwise provided in the Plan.

10.3    ***Binding Effect.***  Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind the Debtors, the Reorganized Debtors, the Mortgage Debt Parties, the holders of the Mortgage Certificates, and any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

10.4    ***Claims Extinguished.***  As of the Effective Date, any and all alter-ego or derivative claims accruing to the Debtors or Debtors in Possession against present or former officers, managers and directors of the Debtors who were officers, managers or directors of the Debtors at any time during the Chapter 11 Cases shall be extinguished whether or not then pending; provided, that nothing in this Section 10.4 shall be construed as a release for any claims constituting Litigation Trust Assets.

10.5    ***Discharge of Claims and Termination of Equity Interests.***  Except as provided herein, the rights afforded in the Plan and the payments and distributions to be made hereunder shall discharge all existing debts and Claims, and shall terminate all Equity Interests, of any kind, nature, or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided herein, upon the Effective Date, all existing Claims against the Debtors and Equity Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, NewCo, their respective successors or assignees, or any of their respective assets or properties, any

other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest, and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

10.6 ***Injunction.*** **Except as otherwise expressly provided in the Plan, all Persons who have held, hold or may hold Claims or Equity Interests** ~~including Claims and Equity Interests~~**and all Persons who have held, hold or may hold claims or causes of action that have been released pursuant to Section 10.10 hereof or are subject to exculpation pursuant to Section 10.9 hereof, and all other parties in interest, including any participants in the Auction, along with their respective present or former employees, agents, officers, managers, directors, principals and Affiliates, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, or such released or exculpated claim or cause of action, against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, NewCo or the Released Parties** ~~or against the property or interests in property of the Debtors, the Reorganized Debtors, NewCo or the Released Parties~~ **or any of their respective property or assets or any interest therein, or (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Reorganized Debtors, NewCo, the Released Parties or against the**~~the~~**any of their respective property or** ~~interests in property of the Debtors, the Reorganized Debtors NewCo or the Released Parties~~**assets, or any interest therein, with respect to any such Claim or Equity Interest, or such released or exculpated claim or cause of action. Such injunction shall be included in the Confirmation Order and shall extend to any successors of the Debtors, the Reorganized Debtors, NewCo and the Released Parties and their respective properties and interest in properties.**

10.7 ***Term of Injunctions or Stays.*** Unless otherwise provided, all injunctions or stays arising under or entered during the ~~Bankruptcy~~Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, other than injunctions issued pursuant to this Plan (including injunctions under Section 10.6), shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.8 ***Injunction Against Interference With Plan of Reorganization.*** **Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, including the holders of Mortgage Certificates, along with their respective present or former employees, agents, officers, managers, directors, principals and Affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

10.9 ***Exculpation.*** Notwithstanding anything herein to the contrary, as of the Effective Date, none of (a) the Debtors or the Reorganized Debtors, (b) NewCo, (c) the Creditors' Committee and any subcommittee thereof, (d) BHAC (provided that BHAC has entered into the

BHAC IP Transfer Agreement as provided in Section ~~6.15~~6.13 hereof), (e) the accountants, financial advisors, investment bankers, agents and attorneys for the Debtors, (f) HVM, (g) HVM Manager, (h) the Special Servicer, (i) the Trustee, (j) the Operating Advisor, (k) the Controlling Holder, (l) HVM Manager Owner, (~~k~~m) the Investor, (~~l~~n) each Sponsor, (o) the Debt Financing Lenders and (~~m~~p) any present or former director, manager, officer, member, equity holder (and their respective Affiliates), employee, agent, financial advisor, partner, Affiliate, attorney, other professional advisor or representative (and their respective Affiliates) of the persons or parties described in clauses (a) through (~~m~~p) of this Section 10.9 or of their respective Affiliates (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, related to, or otherwise arising out of, the ~~Bankruptcy~~Chapter 11 Cases, the Auction, the formulation, negotiation, preparation, dissemination, implementation, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the ~~Bankruptcy Cases~~Chapter 11 Cases, the Trust and Servicing Agreement, the Mortgage Facility Trust, the Plan, the Disclosure Statement or, in each case, any contract, instrument, document or other agreement related thereto, including, without limitation, the Investment ~~and Standby Purchase~~ Agreement; provided, however, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence ~~and provided further~~; provided, further, that each Released Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, that nothing in this Section 10.9 shall be construed as a release or exculpation for any Guaranty Claim other than a Guaranty Claim against ~~Homestead~~a Debtor.

10.10 **Releases.** As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner;~~ and~~ (f) the provision of the Debt Financing Arrangements by the Debt Financing Lenders; (g) the substantial contribution of the Investor, each of the Sponsors and their Affiliates; and (h) the substantial contribution of the Special Servicer, the Trustee, the Operating Advisor and the Controlling Holder: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; ~~and~~ (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that ~~does~~votes not ~~vote~~ to accept the Plan; and (iv) each holder of a Mortgage Certificate, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; provided, that nothing in this Section 10.10 shall be construed as a release ~~for~~of any Guaranty Claim other than a Guaranty Claim against ~~Homestead~~a Debtor, provided, further, that nothing in this Section 10.10 shall be construed as a release ~~for any potential claims, causes of action, charges, suits or rights of recovery referenced in the Examiner's Report arising out of or related to the Acquisition~~of any claims constituting Litigation Trust Assets.

10.11 **Government Releases.** Except with respect to the claims held by the United States Government or any of its agencies or any state and local authority, in their capacity as holder of

either a Mortgage Certificate or a Mezzanine Facility Claim, nothing in the Plan or the Confirmation Order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties other than the Debtors and the Reorganized Debtors, nor shall anything in the Plan or Confirmation Order enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties other than the Debtors and the Reorganized Debtors for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, securities laws, environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Plan or Confirmation Order exculpate any of the Released Parties other than the Debtors and the Reorganized Debtors from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, securities laws, environmental laws or any criminal laws of the United States or any state and local authority.

10.12 ***Mortgage Facility Trust Claims.*** The Mortgage Debt Parties have acted in accordance with the Trust and Servicing Agreement and the Mortgage Facility Trust throughout the Chapter 11 Cases, including, without limitation, in connection with the Auction, the Plan (including voting thereon) and the Disclosure Statement, and they have made a substantial contribution to the Estate and the Chapter 11 Cases. The rights and authority of and contributions made by the Mortgage Debt Parties under the Trust and Servicing Agreement and the Mortgage Facility Trust have been and are integral to the Plan. Accordingly, from and after the Effective Date, all Persons, including the holders of Mortgage Certificates, shall be deemed to have released, and shall be enjoined from commencing any action or proceeding or asserting or pursuing, any claim or cause of action against the Mortgage Debt Parties for any act taken or omitted since the Commencement Date in connection with, related to, or otherwise arising out of the Chapter 11 Cases, the Auction, the formulation, negotiation, preparation, dissemination, implementation, confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan.

10.13 ~~10.11~~ ***Indemnification Obligations.***

(a)     Notwithstanding anything to the contrary herein, subject to the occurrence of the Effective Date, the obligations of the Debtors as provided in the Debtors' respective certificates of incorporation, bylaws, or other applicable organizational documents, other agreements or law as of the Commencement Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers who were officers or employees of such Debtors or their respective Affiliates at any time prior to the Effective Date, and who will be officers of the Debtors or NewCo from and after the Effective Date, against any claims, causes of action or obligations whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, shall survive confirmation of the Plan, remain unaffected thereby after the Effective Date and not be discharged, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Commencement Date.

(b)     As of the Effective Date, each Debtor's certificate of incorporation, bylaws or similar organizational documents or other agreement shall provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, officers who were officers of such Debtor or any of its respective Affiliates at any time prior to the Effective Date and who will continue to be officers or employees of the Debtors or

NewCo from and after the Effective Date at least to the same extent as the bylaws of such Debtor in effect on the Commencement Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Debtors shall amend and/or restate its certificate of incorporation, bylaws or similar organizational document or other agreement before or after the Effective Date to terminate or materially adversely affect any of the Debtors' obligations or such officers' rights under this Section ~~10.11~~10.13(b).

(c)     Any Claim based on NewCo's or the Debtors' obligations set forth in this Section ~~10.11~~10.13 shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

(d)     For avoidance of doubt, nothing in this Section ~~10.11~~10.13 shall be construed as an indemnification for any Guaranty Claim.

~~10.12     *Avoidance Actions.*   Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, NewCo or the Reorganized Debtors, as applicable, shall have the right to prosecute any avoidance or equitable subordination or recovery actions under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession. The proceeds of any such avoidance actions shall be paid to NewCo or the Reorganized Debtors, as applicable.~~

10.14   ~~10.13~~*Retention of Causes of Action/Reservation of Rights.*

(a)     Except as provided in Section 6.17 and Section 10.10 hereof, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Reorganized Debtors or NewCo may have or which NewCo or the Reorganized Debtors may choose to assert on behalf of the Debtors' estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, NewCo, their officers, directors, managers or representatives and (ii) the turnover of any property of the Debtors' estates.

(b)     Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan.  NewCo or the Reorganized Debtors, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Commencement Date fully as if the Bankruptcy Cases had not been commenced, and all of the legal and equitable rights of NewCo or the Reorganized Debtors, as applicable, respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Bankruptcy Cases had not been commenced.

(c)     Nothing in this Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, and all rights and defenses thereto are expressly reserved.

(d)     Nothing in this Plan shall be construed as a modification, release or waiver of the provisions of the Intercreditor Agreement, and the provisions of the Intercreditor Agreement shall remain in full force and effect, and all rights thereunder are expressly reserved.

10.15   10.14 *Limitations on Exculpation and Releases of Representatives.*
Nothing in Section 10.9 or Section 10.10 hereof shall (a) be construed to release or exculpate any Person from, or require indemnification of any Person against losses arising from, the fraud, malpractice, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or ultra vires acts of such Person, or (b) limit the liability of the professionals of the Debtors, the Reorganized Debtors, NewCo or the Creditors' Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

# ARTICLE XI

# EXECUTORY CONTRACTS AND UNEXPIRED LEASES

11.1     ***Assumption of Executory Contracts and Unexpired Leases.***  Any executory contracts or unexpired leases listed in the relevant Exhibit to the Plan Supplement (which Exhibit shall contain those contracts or unexpired leases identified by the Investor, in its sole discretion, and shall include the BHAC IP License Agreements) or that have not been rejected by the Debtors with the approval of the Bankruptcy Court and that are not the subject of pending motions to reject on the Confirmation Date, shall be deemed to have been assumed by the applicable Debtor and assigned to NewCo or its designee, at Investor's option, as of the Effective Date, and the Plan shall constitute a motion to assume and assign such executory contracts and unexpired leases.   Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions and assignments pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption and assignment is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases. With respect to each such executory contract or unexpired lease assumed and assigned to NewCo, if applicable, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, the dollar amount required to cure any defaults of the applicable Debtor existing as of the Confirmation Date shall be conclusively presumed to be the amount set forth in an Exhibit to the Plan Supplement with respect to such executory contract or unexpired lease.   Subject to the occurrence of the Effective Date, any such cure amount shall be treated as an Allowed Administrative Expense Claim under the Plan, and, upon payment of such Allowed Administrative Expense Claim, all defaults of the applicable Debtor existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

11.2     ***Rejection of Executory Contracts and Unexpired Leases.***  Any executory contracts or unexpired leases of any Debtor that are set forth in the relevant Exhibit to the Plan Supplement (which Exhibit shall contain those contracts and unexpired leases identified by the Investor, in its sole discretion) shall be deemed to have been rejected by the applicable Debtor, and the Plan shall constitute a motion to reject such executory contracts and unexpired leases, and NewCo and the Reorganized Debtors shall have no liability thereunder except as is specifically provided in the Plan.  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.

11.3    ***Claims Arising from Rejection, Termination or Expiration.***  Claims created by the rejection of executory contracts or unexpired leases (including, without limitation, the rejection provided in Section 11.2 hereof) or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after (a) in the case of an executory contract or unexpired lease that was terminated or expired by its terms prior to the Confirmation Date, the Confirmation Date, (b) in the case of an executory contract or unexpired lease rejected by the Debtors, the entry of the order of the Bankruptcy Court authorizing such rejection, or (c) in the case of an executory contract or unexpired lease that is deemed rejected pursuant to Section 11.2 hereof, the Confirmation Date.  Any rejection claim for which a proof of claim is not filed and served within the time provided herein will be forever barred from assertion and shall not be enforceable against the Debtors, their assets, properties, or interests in property, or the Reorganized Debtors or its estate, assets, properties, or interests in property.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of ~~ARTICLE~~Article VII of the Plan.

11.4    ***Insurance Policies and Agreements.***  Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as executory contracts under the Plan of Reorganization and will be assumed by the applicable Reorganized Debtor and assigned to NewCo, at Investor's option, effective as of the Effective Date. Nothing contained in this Section 11.4 shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

11.5    ***Management Agreements*** **.**  As of the Effective Date, (i) all existing management agreements between any Debtor that is a TRS and HVM, including any related administrative services agreements or G&A Reimbursement Agreements, will be assumed by such ~~Debtor or~~Debtors and (ii) all existing management agreements between any Debtor that is not a TRS and HVM will be assumed by such Debtor and assigned to ~~NewCo, one of its subsidiaries, or a third party~~a Debtor that is a TRS (or a newly formed TRS, wholly owned either directly or indirectly by NewCo, that is designated by an existing Debtor that is a TRS); provided that such management agreements to be assumed or assumed and assigned (~~i~~a) shall be modified or amended by modified agreements that shall be included in the Plan Supplement, which terms shall be acceptable to Investor, each Sponsor and HVM and (~~ii~~b) shall be assumed or assumed and assigned as modified or amended. Entry of the Confirmation Order, subject to and upon the occurrence of the Effective Date, shall constitute the approval, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, of the assumption or assumption and assignment, as applicable, of such agreements on the terms set forth in the Plan and Plan Supplement.

## ARTICLE XII

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) to perform any of the following actions:

12.1 12.1 To hear and determine any and all motions or applications pending on the Confirmation Date for the assumption and/or assignment or rejection of executory contracts or unexpired leases to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear and determine any and all Claims resulting therefrom or from the expiration or termination prior to the Confirmation Date of any executory contract or unexpired lease;

12.2 12.2 To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by NewCo or the Reorganized Debtors after the Effective Date, including, without express or implied limitation, any claims to avoid any preferences, fraudulent transfers, or other voidable transfers, or otherwise to recover assets for the benefit of the Debtors' estates;

12.3 12.3 To hear and determine any objections to the allowance of Claims arising prior to the Effective Date, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow or disallow any Disputed Claim in whole or in part;

12.4 12.4 To hear and determine any disputes relating to the distributions to holders of Allowed Claims as provided herein.

12.5 12.5 To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

12.6 12.6 To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without express or implied limitation, the Confirmation Order;

12.7 12.7 To hear and determine all applications for allowances of compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan;

12.8 12.8 To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan (and all Exhibits to the Plan Supplement and Exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

12.9 12.9 To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against any Debtor's Estate;

12.10 12.10 To determine such other matters that may be set forth in the Plan or the Confirmation Order, or that may arise in connection with the Plan, the Disclosure Statement or the Confirmation Order;

12.11 12.11 To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtors, as Debtors or Debtors in Possession, may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any request for expedited determination under section 505(b)(2) of the Bankruptcy Code);

12.12 12.12 To hear and determine all questions and disputes arising out of or relating to the Investment Standby and Purchase Agreement, the Rights Offering or the BHAC IP Transfer Agreement, the Debt Financing Arrangements or any foreclosure proceedings pursuant to Section 6.13 hereof; and

12.13 To hear and determine all disputes arising under the Trust and Servicing Agreement or relating to the implementation of this Plan by the Trustee, the Special Servicer, the Operating Advisor and the Controlling Holder; and

12.13 12.14 To enter an order or final decree closing the Chapter 11 Cases.

# ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1     ***Modification of the Plan.***  This Plan may be altered, amended or modified by the Debtors, in consultation with the Investor and, each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), before or after the Confirmation Date, as provided in section 1127 of the Bankruptcy Code; provided, however, that no such alterations, amendments or modifications that are material shall be made without the consent consents of the Investor and, each of the Sponsors, which and the Special Servicer (in consultation with the Operating Advisor), which consents shall not be unreasonably withheld.  A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

13.2     ***Payment of Statutory Fees.***  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, shall be paid by the Debtors on or before the Effective Date.

13.3     ***Rights of Action.***  Any rights, claims, or causes of action accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including, without express or implied limitation, any avoidance or recovery actions under sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code other than the Litigation Trust Assets or rights, claims or causes of action released pursuant to Section 10.10, and (except as provided in Article XIII VIII hereof) any rights to, claims or causes of action for recovery under any policies of insurance issued to or on behalf of the Debtors shall remain assets of the Debtors' estates and, on the Effective Date, shall be transferred to the Reorganized Debtors.  NewCo shall be deemed the appointed representative to, and may, pursue, litigate, and compromise and settle any such rights, claims, or causes of action, as appropriate, in accordance with what is in the best interests of and for the benefit of the Reorganized Debtors.

13.4     ***Subordination Agreements.***  The distributions under the Plan take into account the relative priority of the Claims in each Class in connection with any contractual subordination provisions relating thereto.  On the Effective Date, all Creditors shall be deemed to have waived any and all contractual subordination rights which they may have with respect to such distribution and the Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Creditors from enforcing or attempting to enforce any such rights with respect to the distributions under the Plan.

13.4    13.5 *Swap Agreements.*  The distributions that are to be made pursuant to Article IV hereof shall be deemed to satisfy fully any rights that each Class may have in respect of the Swap Agreements.

13.5    13.6 *Dissolution of Creditors' Committee.*  On the Effective Date, the Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Debtors' Chapter 11 Cases, and, except for the limited purpose of presenting final applications for fee and expenses, the Creditors' Committee shall be deemed dissolved; provided, however, (a) if the Effective Date occurs before the Confirmation Order becomes a Final Order, the Creditors' Committee may continue to exist and to serve for the purposes of pursuing any appeal of the Confirmation Order, and (b) if any adversary proceeding in which the Creditors' Committee is participating is pending as of the Effective Date, the Creditors' Committee may continue to exist for the limited purpose of litigating such adversary proceeding.

13.6    13.7 *Notices.*  Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors:                      c/o HVM L.L.C.
                                        100 Dunbar Street,
                                        Spartanburg, South Carolina  29306
                                        Attn: Gary A. DeLapp
                                        Tel: (864) 573-1600
                                        Fax: (864) 573-1665

                                        *and*

                                        Weil, Gotshal & Manges LLP
                                        767 Fifth Avenue
                                        New York, New York  10153
                                        Attn: Marcia L. Goldstein, Esq., Jacqueline Marcus, Esq.
                                        Tel: (212) 310-8000
                                        Fax: (212) 310-8007

If to the Creditors' Committee:         Hahn & Hessen LLP
                                        488 Madison Avenue
                                        New York, New York  10022
                                        Attn: Mark T. Power, Esq., Mark T. Indelicato, Esq.
                                        Tel: (212) 478-7200
                                        Fax: (212) 478-7400

If to the Investor or the Sponsors:     Fried, Frank, Harris, Shriver & Jacobson LLP
                                        One New York Plaza
                                        New York, New York 10004
                                        Attn: Brad Eric Scheler, Esq., Jennifer L. Rodburg, Esq.
                                        Tel: (212) 859-8000
                                        Fax: (212) 859-4000

*and*

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attn: David M. Feldman, Esq.
Tel: (212) 351-4000
Fax: (212) 351-4035

*and*

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017-3954
Attn: Mark Thompson, Esq.
Tel: (212) 455-7555
Fax: (212) 455-2502


If to the Special Servicer:        CWCapital Asset Management LLC
701 13th Street, NW, Suite 1000
Washington, D.C. 20005
Attn: Stephen Abelman
Tel: (202) 715-9660
Fax: (202) 715-9699

*and*

Venable LLC
750 East Pratt Street, Suite 900
Baltimore, MD 21202
Attn: Gregory A. Cross
Tel: (410) 244-7725
Fax: (410) 244-7742


13.7   ~~13.8~~ **Headings.** The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

13.8   ~~13.9~~ **Severability.** If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors with the written consent of the Investor and each of the Sponsors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, unless agreed otherwise by the Debtors with the written consent of the Investor or each of the Sponsors, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no

C:\NRPORTBL\US_ACTIVE\~~43417008\01~~\~~44287.0004~~\PETHERBR\43412119_12.DOC                71

way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.9   ~~13.10~~ *Governing Law.*  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or by Delaware corporate, partnership or limited liability company law, the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

13.10   ~~13.11~~ *Plan Supplement /Exhibits/Schedules.*  All exhibits and schedules to the Plan, including the Plan Supplement and the Exhibits to the Plan Supplement, are incorporated into and are a part of the Plan as set forth in full herein.

13.11   ~~13.12~~ *Compliance with Tax Requirements.*  In connection with the Plan, the Debtors and the Disbursing Agent will comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities, and all distributions hereunder shall be subject to such withholding and reporting requirements.

13.12   ~~13.13~~ *Exemption from Transfer Taxes.*  Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any sales and use, stamp, real estate transfer, mortgage recording, or other similar tax.

13.13   ~~13.14~~ *Expedited Determination of Postpetition Taxes.*  The Debtors and the Reorganized Debtors are authorized (but not required) to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for all taxable periods (or portions thereof) from the Commencement Date through (and including) the Effective Date.

13.14   ~~13.15~~ *Sections 1125 and 1126 of the Bankruptcy Code.*  As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors, the members of the Creditors' Committee, the Investor, each Sponsor and each of their respective Affiliates, agents, directors, managers, officers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

13.15 ~~13.16~~ ***Time.***  In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 as amended effective December 1, 2009 shall apply.

13.16 ***No Amendment, Modification or Waiver of Cash Collateral Order or Other Documents.***  Nothing contained in this Plan shall be deemed to be an amendment, modification or waiver of any term or provision of the Trust and Servicing Agreement, the Mortgage Facility, or the Cash Collateral Order.

Dated:  New York, New York
~~April 23,~~ June 8, 2010

Respectfully submitted,

ESA PROPERTIES LLC
ESA 2005 PORTFOLIO LLC
ESA 2005- SAN JOSE LLC
ESA 2005- WALTHAM LLC
ESA ACQUISITION PROPERTIES LLC
ESA ALASKA LLC
ESA CANADA PROPERTIES BORROWER LLC
ESA FL PROPERTIES LLC
ESA MD BORROWER LLC
ESA MN PROPERTIES LLC
ESA P PORTFOLIO LLC
ESA P PORTFOLIO MD BORROWER LLC
ESA P PORTFOLIO PA PROPERTIES LLC
ESA P PORTFOLIO TXNC PROPERTIES LP
ESA PA PROPERTIES LLC
ESA TX PROPERTIES LP
ESH/HOMESTEAD PORTFOLIO LLC
ESH/HV PROPERTIES LLC
ESH/MSTX PROPERTY LP
ESH/TN PROPERTIES LLC
ESH/TX PROPERTIES LP
ESA MD BENEFICIARY LLC
ESA MD PROPERTIES BUSINESS TRUST
ESA P PORTFOLIO MD BENEFICIARY LLC
ESA P PORTFOLIO MD TRUST
ESA CANADA PROPERTIES TRUST
ESA CANADA TRUSTEE INC.
ESA CANADA BENEFICIARY INC.
ESA UD PROPERTIES LLC
ESA 2007 OPERATING LESSEE, INC.
ESA 2005 OPERATING LESSEE INC.
ESA OPERATING LESSEE INC.
ESA P PORTFOLIO OPERATING LESSEE INC.
ESA CANADA OPERATING LESSEE INC.
ESA P PORTFOLIO TXNC GP L.L.C.
ESA TXGP L.L.C.
ESH/MSTX GP L.L.C.
ESH/TXGP L.L.C.
ESH/TN MEMBER INC.
ESH/HOMESTEAD MEZZ L.L.C.
ESH/HOMESTEAD MEZZ 2 L.L.C.
ESH/HOMESTEAD MEZZ 3 L.L.C.
ESH/HOMESTEAD MEZZ 4 L.L.C.
ESH/HOMESTEAD MEZZ 5 L.L.C.

ESH/HOMESTEAD MEZZ 6 L.L.C.
ESH/HOMESTEAD MEZZ 7 L.L.C.
ESH/HOMESTEAD MEZZ 8 L.L.C.
ESH/HOMESTEAD MEZZ 9 L.L.C.
ESH/HOMESTEAD MEZZ 10 L.L.C.
ESA MEZZ L.L.C.
ESA MEZZ 2 L.L.C.
ESA MEZZ 3 L.L.C.
ESA MEZZ 4 L.L.C.
ESA MEZZ 5 L.L.C.
ESA MEZZ 6 L.L.C.
ESA MEZZ 7 L.L.C.
ESA MEZZ 8 L.L.C.
ESA MEZZ 9 L.L.C.
ESA MEZZ 10 L.L.C.
ESA P MEZZ L.L.C.
ESA P MEZZ 2 L.L.C.
ESA P MEZZ 3 L.L.C.
ESA P MEZZ 4 L.L.C.
ESA P MEZZ 5 L.L.C.
ESA P MEZZ 6 L.L.C.
ESA P MEZZ 7 L.L.C.
ESA P MEZZ 8 L.L.C.
ESA P MEZZ 9 L.L.C.
ESA P MEZZ 10 L.L.C.
HOMESTEAD VILLAGE L.L.C.
EXTENDED STAY HOTELS L.L.C.
ESA P PORTFOLIO HOLDINGS L.L.C.
ESA MANAGEMENT L.L.C.
ESA BUSINESS TRUST

By:      /s/ David Lichtenstein
         Name:   David Lichtenstein
         Title:   President

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

**Exhibit A**

**Debtors**

| | **Entity** | **State of Organization** |
|---|---|---|
| 1 | ESA Properties LLC | Delaware |
| 2 | ESA 2005 Portfolio LLC | Delaware |
| 3 | ESA 2005- San Jose LLC | Delaware |
| 4 | ESA 2005- Waltham LLC | Delaware |
| 5 | ESA Acquisition Properties LLC | Delaware |
| 6 | ESA Alaska LLC | Delaware |
| 7 | ESA Canada Properties Borrower LLC | Delaware |
| 8 | ESA FL Properties LLC | Delaware |
| 9 | ESA MD Borrower LLC | Delaware |
| 10 | ESA MN Properties LLC | Delaware |
| 11 | ESA P Portfolio LLC | Delaware |
| 12 | ESA P Portfolio MD Borrower LLC | Delaware |
| 13 | ESA P Portfolio PA Properties LLC | Delaware |
| 14 | ESA P Portfolio TXNC Properties LP | Delaware |
| 15 | ESA PA Properties LLC | Delaware |
| 16 | ESA TX Properties LP | Delaware |
| 17 | ESH/Homestead Portfolio LLC | Delaware |
| 18 | ESH/HV Properties LLC | Delaware |
| 19 | ESH/MSTX Property LP | Delaware |
| 20 | ESH/TN Properties LLC | Delaware |
| 21 | ESH/TX Properties LP | Delaware |
| 22 | ESA MD Beneficiary LLC | Delaware |

| | Entity | State of Organization |
|---|---|---|
| 23 | ESA MD Properties Business Trust | Delaware |
| 24 | ESA P Portfolio MD Beneficiary LLC | Delaware |
| 25 | ESA P Portfolio MD Trust | Delaware |
| 26 | ESA Canada Properties Trust | Delaware |
| 27 | ESA Canada Trustee Inc. | Delaware |
| 28 | ESA Canada Beneficiary Inc. | Delaware |
| 29 | ESA UD Properties LLC | Delaware |
| 30 | ESA 2007 Operating Lessee, Inc. | Delaware |
| 31 | ESA 2005 Operating Lessee Inc. | Delaware |
| 32 | ESA Operating Lessee Inc. | Delaware |
| 33 | ESA P Portfolio Operating Lessee Inc. | Delaware |
| 34 | ESA Canada Operating Lessee Inc. [Ontario Corp.] | Ontario, Canada |
| 35 | ESA P Portfolio TXNC GP L.L.C. | Delaware |
| 36 | ESA TXGP L.L.C. | Delaware |
| 37 | ESH/MSTX GP L.L.C. | Delaware |
| 38 | ESH/TXGP L.L.C. | Delaware |
| 39 | ESH/TN Member Inc. | Delaware |
| 40 | ESH/Homestead Mezz L.L.C. | Delaware |
| 41 | ESH/Homestead Mezz 2 L.L.C. | Delaware |
| 42 | ESH/Homestead Mezz 3 L.L.C. | Delaware |
| 43 | ESH/Homestead Mezz 4 L.L.C. | Delaware |
| 44 | ESH/Homestead Mezz 5 L.L.C. | Delaware |
| 45 | ESH/Homestead Mezz 6 L.L.C. | Delaware |
| 46 | ESH/Homestead Mezz 7 L.L.C. | Delaware |

| | Entity | State of Organization |
|---|---|---|
| 47 | ESH/Homestead Mezz 8 L.L.C. | Delaware |
| 48 | ESH/Homestead Mezz 9 L.L.C. | Delaware |
| 49 | ESH/Homestead Mezz 10 L.L.C. | Delaware |
| 50 | ESA Mezz L.L.C. | Delaware |
| 51 | ESA Mezz 2 L.L.C. | Delaware |
| 52 | ESA Mezz 3 L.L.C. | Delaware |
| 53 | ESA Mezz 4 L.L.C. | Delaware |
| 54 | ESA Mezz 5 L.L.C. | Delaware |
| 55 | ESA Mezz 6 L.L.C. | Delaware |
| 56 | ESA Mezz 7 L.L.C. | Delaware |
| 57 | ESA Mezz 8 L.L.C. | Delaware |
| 58 | ESA Mezz 9 L.L.C. | Delaware |
| 59 | ESA Mezz 10 L.L.C. | Delaware |
| 60 | ESA P Mezz L.L.C. | Delaware |
| 61 | ESA P Mezz 2 L.L.C. | Delaware |
| 62 | ESA P Mezz 3 L.L.C. | Delaware |
| 63 | ESA P Mezz 4 L.L.C. | Delaware |
| 64 | ESA P Mezz 5 L.L.C. | Delaware |
| 65 | ESA P Mezz 6 L.L.C. | Delaware |
| 66 | ESA P Mezz 7 L.L.C. | Delaware |
| 67 | ESA P Mezz 8 L.L.C. | Delaware |
| 68 | ESA P Mezz 9 L.L.C. | Delaware |
| 69 | ESA P Mezz 10 L.L.C. | Delaware |
| 70 | Homestead Village L.L.C. | Delaware |

| | Entity | State of Organization |
|---|---|---|
| 71 | Extended Stay Hotels L.L.C. | Delaware |
| 72 | ESA P Portfolio Holdings L.L.P. | Delaware |
| 73 | ESA Management L.L.C. | Delaware |
| 74 | ESA Business Trust | Delaware |

## Exhibit B

### BHAC License Agreements

Amended and Restated Trademark License Agreement, dated as of July 11, 2005, between BHAC Capital IV, L.L.C. and ESA P Portfolio Operating Lessee Inc. (f/k/a BRE/ESA P Portfolio Operating Lessee Inc.)

Trademark License Agreement, dated as of July 12, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA Canada Operating Lessee Inc.

Trademark License Agreement, dated as of June 13, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of October 31, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA Canada Operating Lessee Inc.

Trademark License Agreement, dated as of October __, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of October 25, 2005, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of March 24, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of June 29, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of August 11, 2006, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

Trademark License Agreement, dated as of April __, 2007, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc. (as assigned by ESA 2005 Operating Lessee, Inc. (f/k/a BRE/ESA 2005 Operating Lessee, Inc.) to ESA 2007 Operating Lessee, Inc. pursuant to the Assignment and Assumption of Trademark License Agreement, dated as of June 11, 2007).

Trademark License Agreement, dated as of April __, 2007, between BHAC Capital IV, L.L.C. and BRE/ESA 2005 Operating Lessee Inc.

**Exhibit C**

**Tier 1 Debtors**

ESA Properties LLC

ESA 2005 Portfolio LLC

ESA 2005- San Jose LLC

ESA 2005- Waltham LLC

ESA Acquisition Properties LLC

ESA Alaska LLC

ESA FL Properties LLC

ESA MN Properties LLC

ESA P Portfolio LLC

ESA P Portfolio PA Properties LLC

ESA PA Properties LLC

ESH/Homestead Portfolio LLC

ESH/HV Properties LLC

ESA MD Beneficiary LLC

ESA P Portfolio MD Beneficiary LLC

ESA Canada Trustee Inc.

ESA Canada Beneficiary Inc.

ESA UD Properties LLC

ESA 2007 Operating Lessee, Inc.

ESA 2005 Operating Lessee Inc.

ESA Operating Lessee Inc.

ESA P Portfolio Operating Lessee Inc.

ESA Canada Operating Lessee Inc.

ESA P Portfolio TXNC GP L.L.C.

ESA TXGP L.L.C.

ESH/MSTX GP L.L.C.

ESH/TXGP L.L.C.

ESH/TN Member Inc.

ESA P Portfolio TXNC Properties L.P.

ESA TX Properties L.P.

ESH/TN Properties L.L.C.

ESH/TX Properties L.P.

ESH/MSTX Property L.P.

**<u>Exhibit D</u>**

**Tier 2 Debtors**

ESA Canada Properties Borrower LLC

ESA Canada Properties Trust

ESA P Portfolio MD Borrower LLC

ESA P Portfolio MD Trust

ESA MD Borrower LLC

ESA MD Properties Business Trust

## Exhibit E

**Tier 3 Debtors**

ESH/Homestead Mezz L.L.C.

ESH/Homestead Mezz 2 L.L.C.

ESH/Homestead Mezz 3 L.L.C.

ESH/Homestead Mezz 4 L.L.C.

ESH/Homestead Mezz 5 L.L.C.

ESH/Homestead Mezz 6 L.L.C.

ESH/Homestead Mezz 7 L.L.C.

ESH/Homestead Mezz 8 L.L.C.

ESH/Homestead Mezz 9 L.L.C.

ESH/Homestead Mezz 10 L.L.C.

ESA Mezz L.L.C.

ESA Mezz 2 L.L.C.

ESA Mezz 3 L.L.C.

ESA Mezz 4 L.L.C.

ESA Mezz 5 L.L.C.

ESA Mezz 6 L.L.C.

ESA Mezz 7 L.L.C.

ESA Mezz 8 L.L.C.

ESA Mezz 9 L.L.C.

ESA Mezz 10 L.L.C.

ESA P Mezz L.L.C.

ESA P Mezz 2 L.L.C.

ESA P Mezz 3 L.L.C.

ESA P Mezz 4 L.L.C.

ESA P Mezz 5 L.L.C.

ESA P Mezz 6 L.L.C.

ESA P Mezz 7 L.L.C.

ESA P Mezz 8 L.L.C.

ESA P Mezz 9 L.L.C.

ESA P Mezz 10 L.L.C.

Homestead Village L.L.C.

Extended Stay Hotels L.L.C.

ESA P Portfolio Holdings L.L.C.

ESA Management L.L.C.

ESA Business Trust

<u>**Exhibit F**</u>

**Existing Letters of Credit**

Irrevocable Letter of Credit Number S-17551, dated June 11, 2007, issued by Deutsche Bank to Zurich American Insurance Company, as beneficiary, in the amount of $1,100,000

Irrevocable Letter of Credit Number S-17552, dated June 11, 2007, issued by Deutsche Bank to Zurich American Insurance Company, as beneficiary, in the amount of $16,375,000

## Exhibit G

## Mezzanine Facilities

Mezzanine A Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz L.L.C., ESA P Mezz L.L.C., and ESA Mezz L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine B Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 2 L.L.C., ESA P Mezz 2 L.L.C., and ESA Mezz 2 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine C Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 3 L.L.C., ESA P Mezz 3 L.L.C., and ESA Mezz 3 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine D Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 4 L.L.C., ESA P Mezz 4 L.L.C., and ESA Mezz 4 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine E Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 5 L.L.C., ESA P Mezz 5 L.L.C., and ESA Mezz 5 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine F Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 6 L.L.C., ESA P Mezz 6 L.L.C., and ESA Mezz 6 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine G Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 7 L.L.C., ESA P Mezz 7 L.L.C., and ESA Mezz 7 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine H Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 8 L.L.C., ESA P Mezz 8 L.L.C., and ESA Mezz 8 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine I Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 9 L.L.C., ESA P Mezz 9 L.L.C., and ESA Mezz 9 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

Mezzanine J Loan Agreement, dated as of June 11, 2007, by and among ESH/Homestead Mezz 10 L.L.C., ESA P Mezz 10 L.L.C., and ESA Mezz 10 L.L.C., as Borrowers, and Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc., Bank of America, N.A., and Ebury Finance Limited, as Lenders

## Exhibit H

## New Mortgage Notes[*]

| Tranche | Amount | Rate (Years 1-5) | Rate (Year 6) | Rate (Year 7) |
|---------|--------|------------------|---------------|---------------|
| Certificate A1/ Tranche A | $550.382 million | L + 1.205450% | L + 1.705450% | L + 2.205450% |
| Certificate A2/ Tranche B | $400.946 million | 6.679950% | 7.179950% | 7.679950% |
| Certificate A3/ Tranche C | $801.908 million | 7.229950% | 7.729950% | 8.229950% |
| Certificate A4/ Tranche D | $594.061 million | 7.729950% cash 1.5% PIK | 8.229950% cash 1.5% PIK | 8.72995% cash 1.5% PIK |
| Certificate B /Tranche E | $65.626 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate C/Tranche F | $93.241 million | 6.500000% | 6.500000% | 6.500000% |

---

[*] Projected as of 6/30/10; subject to change based on Confirmation Date.

**Assumes 50% rollover of debt held by the holders of the Class B-H Certificate Mortgage Certificates and takes into account the $200,000,000 Class A4 Cash Paydown.

***New Mortgage Loan has an initial five year maturity with two, one year extension options at NewCo's election.  Please note higher cash-pay rates in year six and year seven.  Also, PIK of 150 bps for holders of Class A4 Mortgage Certificates would continue in year six and year seven for avoidance of doubt.

| | | | | |
|---|---|---|---|---|
| Certificate D/Tranche G | $56.478 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate E/Tranche H | $59.968 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate F/Tranche I | $63.133 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate G/Tranche J | $66.307 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate H/Tranche K | $66.134 million | 6.500000% | 6.500000% | 6.500000% |

**Exhibit I**

**New Money Equity Waterfall and Rollover Equity Waterfall (Consensual Plan)**

The New Money Equity Waterfall and the Rollover Equity Waterfall will be entitled to distributions from net cash flow and/or capital events based on the respective equity ownership percentages for the New Money Equity Investment, which is approximately 61.9%, and the Rollover Equity, which is approximately 38.1%; provided, however, that any NewCo Common Interests that are issued upon the exercise of the New Warrants (which shall have an initial aggregate exercise price of $32,225,502.00) shall dilute, on a pari passu basis, the New Money Equity Investment and the Rollover Equity under both the New Money Equity Waterfall and the Rollover Equity Waterfall. Distributions among the Sub-Equity will follow a waterfall so that each Class of Sub-Equity gets paid the stated value of its contributed claim before a more junior Sub-Equity Class receives a distribution, consistent with the existing priority of payments.

*New Money Equity Waterfall*

Pursuant to the New Money Equity Waterfall, the New Money Equity Investment, and Sub-Equity shall be entitled to distributions from net cash flow and/or capital events (collectively, "NCF") as follows:

*Tier 1*: 100% of NCF to New Money Equity Investment until New Money Equity Investment has received a 12% IRR on $765 million;

*Tier 2*: 95% of NCF to New Money Equity Investment and 5% to Sub-Equity, until New Money Equity Investment has received a 15% IRR on $765 million;

*Tier 3*: 85% of NCF to New Money Equity Investment and 15% to Sub-Equity, until New Money Equity Investment has received a 20% IRR on $765 million;

- *Tier 4*: 80% of NCF to New Money Equity Investment and 20% to Sub-Equity, until New Money Equity Investment has received a 25% IRR on $765 million;

- *Tier 5*: 70% of NCF to New Money Equity Investment and 30% to Sub-Equity, until total distributions to the Sub-Equity equals the outstanding principal balance of Sub-Equity claims (excluding accrued and unpaid interest, costs, fees and expenses); and

- *Tier 6*: thereafter, 100% of NCF to New Money Equity Investment.

*Rollover Equity Waterfall*

Pursuant to the Rollover Equity Waterfall, Rollover Equity and Sub-Equity shall be entitled to distributions of NCF:

- *Tier 1*: 100% of NCF to Rollover Equity until Rollover Equity has received a 12% IRR (return of and on Rollover Equity of $471 million);

- *Tier 2*: 95% of NCF to Rollover Equity, 5% to Sub-Equity, until Rollover Equity has received a 15% IRR;

- *Tier 3*: 85% of NCF to Rollover Equity, 15% to Sub-Equity, until Rollover Equity has received a 20% IRR;

- *Tier 4*: 80% of NCF to Rollover Equity, 20% to Sub-Equity, until Rollover Equity has received a 25% IRR;

- *Tier 5*: 70% of NCF to Rollover Equity, 30% to Sub-Equity, until total distributions to Sub-Equity equals the outstanding principal balance of Sub-Equity claims (excluding accrued and unpaid interest, costs, fees and expenses); and

- *Tier 6*: thereafter, 100% of NCF to Rollover Equity.

**Exhibit J**

**New Money Equity Waterfall (Non-Consensual Plan)**

The New Money Equity Waterfall will be entitled to distributions from net cash flow and/or capital events based on the 100% equity ownership for the New Money Equity Investment; provided, however, that any NewCo Common Interests that are issued upon the exercise of the New Warrants (which shall have an initial aggregate exercise price of $11,500,000.00) shall dilute, on a pari passu basis, the New Money Equity Investment under the New Money Equity Waterfall. Distributions among the Sub-Equity will follow a waterfall so that each Class of Sub-Equity gets paid the stated value of its contributed claim before a more junior Sub-Equity Class receives a distribution, consistent with the existing priority of payments.

Pursuant to the New Money Equity Waterfall, the New Money Equity Investment and Sub-Equity shall be entitled to distributions from net cash flow and/or capital events (collectively, "NCF") as follows:

*Tier 1*: 100% of NCF to New Money Equity Investment until New Money Equity Investment has received a 15% IRR (return of and on New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time);

*Tier 2*: 90% of NCF to New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time and 10% to Sub-Equity, until New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time has received a 20% IRR;

*Tier 3*: 87.5% of NCF to New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time and 12.5% to Sub-Equity, until New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time has received a 25% IRR;

*Tier 4*: 85% of NCF to New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time and 15% to Sub-Equity, until total distributions to the Sub-Equity equals the outstanding principal balance of Sub-Equity claims (excluding accrued and unpaid interest, costs, fees and expenses); and

*Tier 5*: thereafter, 100% of NCF to New Money Equity Investment of $400 million plus any additional capital contributions made by the Sponsors from time to time.

Document comparison by Workshare Professional on Tuesday, June 08, 2010 8:42:51 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://USDMS/US_ACTIVE/43417008/1 |
| Description | #43417008v1<US_ACTIVE> - Fourth Amended Plan - as filed 4.23.10 |
| Document 2 ID | interwovenSite://USDMS/US_ACTIVE/43412119/12 |
| Description | #43412119v12<US_ACTIVE> - Plan - 6.4.10 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 857 |
| Deletions | 1357 |
| Moved from | 24 |
| Moved to | 24 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 2262 |

**Exhibit C**

**Copy of the Disclosure Statement (Without Exhibits)**
**Blacklined Against the Fourth Disclosure Statement**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 Case No. |
| | : | |
| EXTENDED STAY INC., et al., | : | 09-13764 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------------x

**DISCLOSURE STATEMENT FOR THE
DEBTORS' ~~FOURTH~~FIFTH AMENDED PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York, 10153
(212) 310-8000

Dated: ~~April 23,~~ June 8, 2010

i

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION | .................................................................... 3 |
| | A. | HOLDERS OF CLAIMS ENTITLED TO VOTE | ............................................ 4 |
| | B. | VOTING PROCEDURES | .......................................................... 5 |
| | C. | CONFIRMATION HEARING | ..................................................... 6 |
| II. | | SUMMARY OF PLAN | ............................................................ 6 |
| III. | | DEFINITIONS | ................................................................ ~~15~~13 |
| IV. | | GENERAL INFORMATION | ....................................................... ~~26~~23 |
| | A. | OVERVIEW OF CHAPTER 11 | ................................................... ~~26~~23 |
| | B. | CORPORATE STRUCTURE | ...................................................... ~~26~~23 |
| | C. | BUSINESS BACKGROUND | ...................................................... ~~27~~24 |
| | | 1. General | .............................................................. ~~27~~24 |
| | | 2. Description of the Chapter 11 Debtors' Business | .......................... ~~27~~24 |
| | | 3. Management Services and Employees | ...................................... ~~28~~25 |
| | | 4. Legal Proceedings and Claims | ........................................... ~~29~~26 |
| | D. | SIGNIFICANT PREPETITION INDEBTEDNESS | ..................................... ~~29~~26 |
| | | 1. Mortgage Loan Agreement | ............................................... ~~30~~27 |
| | | 2. Securitization of the Mortgage Debt | ..................................... ~~30~~27 |
| | | 3. Mezzanine Loan Agreements | ............................................. ~~31~~28 |
| | | 4. B of A Mortgage Loan Agreement | ........................................ ~~31~~28 |
| | | 5. Intercreditor Agreement | ............................................... ~~32~~29 |
| | | 6. Senior Subordinated Notes | ............................................. ~~32~~29 |
| V. | | KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES | ........... ~~32~~29 |
| | A. | DETERIORATION IN FINANCIAL PERFORMANCE | .................................. ~~32~~29 |
| | B. | THE RESTRUCTURING NEGOTIATIONS | ........................................... ~~33~~30 |
| VI. | | THE CHAPTER 11 CASES | ...................................................... ~~33~~30 |
| | A. | FIRST DAY ORDERS | .......................................................... ~~34~~31 |
| | | 1. Case Administration Orders | ............................................. ~~34~~31 |
| | | 2. Critical Obligations | ................................................... ~~34~~31 |
| | | 3. Financial Operations | ................................................... ~~34~~31 |
| | | 4. Business Operations | .................................................... ~~35~~32 |
| | B. | USE OF CASH COLLATERAL | .................................................... ~~35~~32 |
| | | 1. The Cash Collateral Order | .............................................. ~~35~~32 |
| | | 2. Modification of the Cash Collateral Order | ............................... ~~36~~33 |

C. CREDITORS' COMMITTEE ........................................................ 3734

D. SCHEDULES, BAR DATE AND RULE 2015.3 REPORTS ...................... 3835

E. APPOINTMENT OF AN EXAMINER ......................................... 3835

F. ADVERSARY PROCEEDINGS ................................................ 3936

G. HVM INCENTIVE PLAN ..................................................... 4138

VII. THE PLAN OF REORGANIZATION ................................................ 4239

A. SUMMARY OF NEGOTIATIONS LEADING UP TO THE FILING OF THE PLAN .................................................................. 4239

B. DEBTORS UNDER THE PLAN ................................................ 4542

C. PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS ................................................... 4543

1. Payment of Allowed Administrative Expense Claims .................. 4543

2. Compensation and Reimbursement Claims ........................... 43

D. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................ 4543

E. TREATMENT OF CLAIMS AND EQUITY INTERESTS ..................... 4644

1. Class 1 .......................................................... 4644

2. Class 2 .......................................................... 4644

3. Class 3 .......................................................... 4745

4. Class 4 48A ...................................................... 45

5. Class 5 ........................................................ 484B. 46

6. Class 6 ........................................................ 495 46

7. Class 7 ........................................................ 496 47

8. Class 8 ........................................................ 497 47

9. Class 9 ........................................................ 498 47

10. Class 10 ...................................................... 509 47

11. Class 11 ...................................................... 5010 47

12. Class 12 ...................................................... 5011 48

13. Class 13 ...................................................... 5012 48

14. Class 14 ...................................................... 5013 48

15. Class 14 ...................................................... 48

16. Class 15 ...................................................... 5148

F. ACCEPTANCE, REJECTION AND REVOCATION OR WITHDRAWAL OF THE PLAN ............................................. 5149

1. Classes Entitled to Vote ......................................... 5149

2. Acceptance by Class of Claims .................................... 5149

iii

| | | | |
|---|---|---|---|
| | 3. | Nonconsensual Confirmation | ~~51~~49 |
| | 4. | Revocation or Withdrawal | ~~51~~49 |
| | 5. | Modification of the Plan | ~~52~~50 |
| | 6. | Amendment of Plan Documents | ~~52~~50 |
| | 7. | Removal of Debtors | ~~52~~50 |
| G. | | TRANSACTIONS TO BE CONSUMMATED UNDER THE PLAN AND CERTAIN CORPORATE AND SECURITIES LAW MATTERS | ~~52~~50 |
| | 1. | Transactions to be Consummated Under the Plan | ~~52~~50 |
| | 2. | Securities Law Matters | ~~77~~62 |
| H. | | TREATMENT OF DISPUTED CLAIMS | ~~79~~63 |
| | 1. | Objections to Claims; Prosecution of Disputed Claims | ~~79~~63 |
| | 2. | Distributions on Account of Disputed Claims | ~~79~~64 |
| | 3. | Settlement of Claims | 64 |
| I. | | DISTRIBUTIONS | ~~80~~65 |
| | 1. | Distributions under the Plan | ~~80~~65 |
| | 2. | Timing of Distributions under the Plan | ~~80~~65 |
| | ~~3.~~ | ~~Distributions with Respect to Mezzanine Facility Claims, General Unsecured Claims and Mortgage Facility Deficiency Claim~~ | ~~80~~ |
| | ~~4.~~ | ~~Distributions with Respect to the Mortgage Facility Claim~~ | ~~80~~ |
| | 3. | Use of Cash Collateral | 65 |
| | 4. | Plan Administrator | 65 |
| | 5. | ~~Calculations Subject to Adjustment~~ | ~~80~~ |
| | ~~6.~~ | ~~Disbursing Agent~~ | ~~80~~ Record Date |
| | ~~8.~~ 6. | Manner of Payment under the Plan | ~~81~~66 |
| | ~~9.~~ 7. | Hart-Scott-Rodino Compliance | ~~81~~66 |
| | ~~10.~~ 8. | Fractional ~~NewCo Common Interests or Other~~ Distributions | ~~81~~66 |
| | ~~11.~~ 9. | Distribution of Unclaimed Property | ~~81~~66 |
| | 10. | Administrative/Priority Claims Reserve | 66 |
| J. | | CONDITIONS PRECEDENT | ~~82~~67 |
| | 1. | Conditions Precedent to the Effective Date | ~~82~~67 |
| | 2. | Effect of Failure of Conditions to Effective Date | ~~83~~68 |
| K. | | EFFECT OF CONFIRMATION | ~~83~~69 |
| | 1. | Vesting of Assets | ~~83~~69 |
| | 2. | Title to Assets; Discharge of Liabilities | ~~83~~69 |

3.  Binding Effect ..................................................... ~~83~~69

4.  Claims Extinguished................................................ ~~84~~70

5.  Discharge of Claims and Termination of Equity Interests............... ~~84~~70

6.  Injunction ......................................................... ~~84~~70

7.  Term of Injunctions or Stays ....................................... ~~84~~71

8.  Injunction Against Interference With Plan of Reorganization .......... ~~85~~71

9.  Exculpation ........................................................ ~~85~~71

10.  Releases ......................................................... ~~85~~71

11.  Government Release ............................................... 72

12.  Mortgage Facility Trust Claims ................................... 72

13.  Indemnification Obligations ...................................... ~~86~~73

~~12.  Avoidance Actions ................................................ 86~~

~~13.~~ 14. Retention of Causes of Action/Reservation of Rights ................ ~~87~~73

~~14.~~ 15. Limitations on Exculpation and Releases of Representatives ........... ~~87~~74

L.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES................... ~~87~~74

1.  Assumption of Executory Contracts and Unexpired Leases ........... ~~87~~74

2.  Rejection of Executory Contracts and Unexpired Leases............... ~~88~~75

3.  Claims Arising from Rejection, Termination or Expiration ........... ~~88~~75

4.  Insurance Policies and Agreements................................. ~~88~~75

5.  Management Agreements ......................................... ~~88~~75

M.  RETENTION OF JURISDICTION .................................... ~~89~~76

VIII. FINANCIAL INFORMATION, AND PROJECTIONS ~~AND VALUATION ANALYSIS~~ ......................................................... ~~90~~77

A.  HISTORICAL FINANCIAL INFORMATION ......................... ~~90~~77

1.  General............................................................ ~~90~~77

2.  Selected Unaudited Historical Financial Information .................... ~~90~~77

B.  CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS ..................................................... ~~91~~78

1.  Responsibility for and Purpose of the Financial Projections .......... ~~91~~78

2.  Pro Forma Financial Projections .................................. ~~91~~78

~~C.  VALUATION .................................................... 94~~

~~1.  Overview .................................................... 94~~

~~2.  Enterprise Valuation Methodology ............................. 97~~

~~3.  Other Assets/ Liabilities Valuation ........................... 101~~

IX. CERTAIN FACTORS AFFECTING THE DEBTORS ....................... ~~102~~81

A.      CERTAIN BANKRUPTCY LAW CONSIDERATIONS .......................... ~~102~~81

     1.      Risk of Non-Confirmation of the Plan of Reorganization ............. ~~102~~81

     2.      Non-Consensual Confirmation .................................................... ~~102~~81

     3.      Risk of Delay in Confirmation of the Plan ................................... ~~102~~82

     4.      The Debtors Have No Duty to Update .......................................... ~~103~~82

     5.      Risk of Non-Confirmation of the Plan ......................................... ~~103~~82

     6.      Claims Estimates ....................................................................... ~~104~~83

B.      ADDITIONAL FACTORS TO BE CONSIDERED ................................ ~~104~~83

     1.      Financial Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results Are Likely to Vary ............. ~~104~~83

     2.      No Representations Outside This Disclosure Statement Are Authorized ................................................................................ ~~104~~84

     3.      No Legal or Tax Advice Is Provided to You by This Disclosure Statement ................................................................................ ~~104~~84

     4.      No Admission Made ................................................................... ~~105~~84

     ~~5.      A Liquid Trading Market for the NewCo Common Interests, Sub-Equity and Common Warrants is Unlikely to Develop ............... 105~~

     ~~6.      Business Factors and Competitive Conditions .................................... 105~~

     ~~7.      Seasonality ................................................................................ 105~~

     ~~8.      Competition ............................................................................... 106~~

     ~~9.      Operating Risks ......................................................................... 106~~

     ~~10.      National and Regional Conditions ................................................. 107~~

     ~~11.      Property Damage ....................................................................... 107~~

     ~~12.      Technology ............................................................................... 107~~

     ~~13.      Third-Party Internet Services ....................................................... 108~~

     ~~14.      Customer and Internal Data .......................................................... 108~~

     ~~15.      Privacy Laws ............................................................................ 108~~

     ~~16.      Employees ............................................................................... 109~~

     ~~17.      Continuing Leverage and Ability to Service Debt .............................. 109~~

C.      CERTAIN TAX MATTERS .................................................................. ~~109~~84

X.      CONFIRMATION OF THE PLAN OF REORGANIZATION ............................. ~~109~~84

A.      CONFIRMATION HEARING ............................................................... ~~109~~84

B.      REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION .......................................................................... ~~110~~85

     1.      Requirements of section 1129(a) of the Bankruptcy Code ............. ~~110~~85

|  | 2. | Requirements of section 1129(b) of the Bankruptcy Code............. | ~~113~~89 |

XI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN............................................................................................................. ~~114~~90

    A.    LIQUIDATION UNDER CHAPTER 7 .................................................... ~~114~~90

    B.    ALTERNATIVE PLAN OF REORGANIZATION ................................. ~~115~~90

XII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN......... ~~115~~91

    A.    CONSEQUENCES TO THE DEBTORS ............................................... ~~116~~91

        1.    Cancellation of Debt................................................................. ~~117~~93

        2.    Potential Limitations on NOL Carryforwards and Other Tax Attributes ................................................................................. ~~118~~94

        3.    Alternative Minimum Tax ........................................................ ~~119~~95

        4.    Transfer of Litigation Trust Assets to the Litigation Trust ................. 95

    B.    DISTRIBUTIONS TO HOLDERS OF CERTAIN CLAIMS AND MORTGAGE CERTIFICATES ........................................................... ~~120~~96

        1.    Mortgage Facility Claim, and Mortgage Facility Deficiency Claim ~~and Mezzanine Facilities Claims~~ ........................................ ~~120~~ 96

        2.    ~~Allowed ESA UD Mortgage~~Mezzanine Facilities Claim~~125~~ ............. 96

        3.    Allowed ESA UD Mortgage Claim........................................................ 96

        4.    General Unsecured Claims ....................................................... ~~125~~96

    C.    CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS AND MORTGAGE CERTIFICATES ........................................................... ~~125~~96

        1.    Consequences to Holders of ~~Class A1–A4~~ Mortgage Certificates... ~~125~~96

        2.    Consequences to Holders of ~~Class B–H Mortgage Certificates125~~Mezzanine Facilities Cla

        3.    Consequences to ~~Holders~~the Holder of ~~Class J–M~~the Allowed ESA UD Mortgage ~~Certificates..............................................126~~Claim 98

        4.    ~~Consequences to Holders of Mezzanine Facilities Claims~~ ................ ~~127~~

        5.    ~~Consequences to the Holder of the Allowed ESA UD Mortgage Claim~~ .............................................................................. ~~127~~

        6.    ~~Consequences to Holders of General Unsecured Claims~~.................... ~~127~~

        7.    ~~Valuation~~................................................................................ ~~127~~

        8.    Character of Gain or Loss and Installment Method of Reporting ... ~~128~~98

        5.    Timing of Distributions .......................................................... 99

        6.    Accrued but Unpaid Interest ................................................... 99

        7.    Ownership and Disposition of the New ESA UD Mortgage Note ........ 99

8.      Federal Income Tax Treatment of the Litigation Trust and Holders of Beneficial Interests .......................................................101

9.      Initial Tax Basis .......................................................................128

10.     Accrued but Unpaid Interest ..................................................12811. Ownership and I

12.     Ownership and Disposition of NewCo Common Interests and Sub-Equity ..............................................................................131

13.     Tax Treatment of Rights ..........................................................133

       D.     INFORMATION REPORTING AND WITHHOLDING .......................133102

XIII.   CONCLUSION ...............................................................................135104

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE DEBTORS'[1] ~~FOURTH~~FIFTH AMENDED ~~AND RESTATED~~ PLAN OF REORGANIZATION, DATED ~~APRIL 23,~~JUNE 8, 2010 (THE "***PLAN***"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN ***IN THEIR ENTIRETY*** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION IX OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT "A." PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

---

[1] Unless otherwise defined, capitalized terms utilized herein shall have the meanings ascribed to such terms in the Plan.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULT FOR ALL HOLDERS OF CLAIMS AND INTERESTS.  THE DEBTORS ALSO BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.

**THE DEBTORS STRONGLY URGE THEIR CREDITORS TO VOTE TO ACCEPT THE PLAN.**

**IRS CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# I.

## INTRODUCTION

The Debtors submit this Disclosure Statement pursuant to Section 1125 of Chapter 11 to the holders of Claims and Equity Interests in connection with (i) the solicitation of acceptances of the Plan filed by the Debtors with the Bankruptcy Court, and (ii) the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***") scheduled for **[_____, 2010] at 10:00 a.m. (New York Time)**.

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

(1)       The Plan (Exhibit "A");

(2)       Order of the Bankruptcy Court, dated [_____, 2010] (the "***Disclosure Statement Approval and Solicitation Order***"), approving, among other things, this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (attached hereto without exhibits) (Exhibit "B");

(3)       The Debtors' Projected Financial Information (Exhibit "C");

(4)       The Debtors' Liquidation Analysis (Exhibit "D");

(5)       Chart of the Chapter 11 Debtors' prepetition organizational structure (Exhibit "E");

(6)       Historical Financial Statements (Exhibit "F"); and

(7)       The Investment ~~and Standby Purchase~~ Agreement (Exhibit "G").

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

A Ballot for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement mailed to the holders of Claims that the Debtors believe may be entitled to vote to accept or reject the Plan.

On _____, 2010, after notice and a hearing, the Bankruptcy Court signed the Disclosure Statement Approval and Solicitation Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Approval and Solicitation Order, a copy of which is annexed hereto as Exhibit "B", sets forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan ~~, the procedures and instructions for certain elections and rights to be provided to certain creditors,~~ and the record date for

voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Approval and Solicitation Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests. No solicitation of votes to accept the Plan may be made except pursuant to Section 1125 of the Bankruptcy Code.

**A**.        HOLDERS OF CLAIMS ENTITLED TO VOTE

            Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan. Classes of claims or equity interests in which the holders are unimpaired under a Chapter 11 plan are deemed to have accepted such plan and are not entitled to vote to accept or reject the plan. For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Section VIII.E of this Disclosure Statement.

            Under the Plan, Claims in Class 2 (Mortgage Facility Claim), Class 3 (ESA UD Mortgage Claim), Class 4A (Mortgage Facility Deficiency Claim and ), Class 4B (Mezzanine Facilities Claims) and Class 5 (General Unsecured Claims) are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims may receive distributions under the Plan. As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

            Claims in Class 1 (Priority Claims), and Classes 7 to 14 (ESA MD Properties Trust Certificate, ESA MD Borrower Interests, ESA P Portfolio MD Trust Certificate, ESA P Portfolio MD Borrower Interests, ESA Canada Properties Interests, ESA Canada Properties Borrower Interests, ESH/TN Properties L.L.C. Membership Interests and ESH/ESA General Partnership Interests) of the Plan are unimpaired. As a result, holders of Claims in those Classes are conclusively presumed to have accepted the Plan.

            The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Section X.B of this Disclosure Statement.

            If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code or both, in accordance with the provisions of the Plan. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the rejection of such plan by one or more impaired classes of claims or equity interests. Under Section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section X.B of this Disclosure Statement.

            Holders of Existing Equity (Class 6) and Other Existing Equity Interests (Class 15) will not receive any distribution under the Plan and are therefore deemed to have rejected the Plan. With respect to the Classes that are deemed to have rejected the Plan, *i.e.*, Classes 6 and 15, the Debtors intend to request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code.

**THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASS 2 (MORTGAGE FACILITY CLAIM), CLASS 3 (ESA UD MORTGAGE CLAIM), CLASS 4A (MORTGAGE FACILITY DEFICIENCY CLAIM ~~AND~~ ), CLASS 4B (MEZZANINE FACILITIES CLAIMS) AND CLASS 5 (GENERAL UNSECURED CLAIMS) VOTE TO ACCEPT THE PLAN.**

The Debtors' legal advisor is Weil, Gotshal & Manges LLP, and their restructuring and financial advisor is Lazard. They can be contacted at:

| | |
|---|---|
| Lazard Frères & Co. LLC | Weil, Gotshal & Manges LLP |
| 30 Rockefeller Plaza | 767 Fifth Avenue |
| New York, New York 10020 | New York, New York 10153 |
| U.S.A. | U.S.A. |
| Tel: (212) 632-6000 | Tel: (212) 310 8000 |
| Attn: Ari Lefkovits | Attn: Marcia L. Goldstein, Esq. |
| Jeffrey Altman | Jacqueline Marcus, Esq. |

B.     VOTING PROCEDURES

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. ~~With respect to the holders of Class B-H Mortgage Certificates, a form is enclosed for making certain elections under the Plan.~~ If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims. Ballots should be returned to the Debtors' solicitation agent in the Chapter 11 Cases at:

> Extended Stay Ballot Processing Center
> c/o Kurtzman Carson Consultants, LLC
> 2335 Alaska Avenue
> El Segundo, California 90245

**Do not return any other documents with your Ballot ~~other than the Rights Certificate in the event you are exercising your Rights (which applies to holders of Class B – K Mortgage Certificates) and/or the Election Form if you are making an election under the Class B – H Equity Cashout Option Election and/or the Class B – H Debt/Equity Election. Each Rights Offering Participant subscribing in the Rights Offering shall, pursuant to its exercise of the Rights, agree to support and not take any action to oppose or delay confirmation and implementation of the Plan. Each holder of a Class B – H Mortgage Certificate exercising one or more of its Class B – H Elections shall agree to support and not take any action to oppose or delay confirmation and implementation of the Plan~~.**

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> BY NO LATER THAN 4:00 P.M. (NEW YORK TIME) ON _____, 2010. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL BE COUNTED AS AN ACCEPTANCE.**

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote

unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

Pursuant to the Disclosure Statement Approval and Solicitation Order, the Bankruptcy Court set _____, 2010 as the record date for holders of Claims entitled to vote on the Plan. Accordingly, only holders of record as of the applicable record date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan. ~~In addition, pursuant to the Disclosure Statement Approval and Solicitation Order, the Bankruptcy Court directed the Trustee to assist the Debtors in distributing Rights Certificates and Election Forms to the holders of Certificates entitled thereto under the Plan.~~

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Kurtzman Carson Consultants, LLC at (866) 381-9100.

C.  CONFIRMATION HEARING

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2010 at 10:00 a.m. (New York Time) before the Honorable James M. Peck, Room 601, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton House, One Bowling Green, New York, New York 10004. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before _____, 2010 at 4:00 p.m. (New York Time) in the manner described below in Section X.A of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

**II.**

SUMMARY OF PLAN

Although the Chapter 11 Debtors consist of 75 separate entities, the business that was intended to support this very complex capital structure is conducted primarily by 21 entities that are borrowers under ~~a~~the approximately $4.1 billion mortgage loan. While the hotel business that formed the base of the capital structure remains fundamentally sound, in the current business environment, the operations of that business are simply insufficient to support the extensive capital structure layered above it. In fact, based on current estimates, the value of the business is ~~less than~~approximately half of the amount of outstanding debt.

Prior to and since commencing these Chapter 11 Cases, the ~~Chapter 11~~ Debtors have sought ~~a consensual restructuring of their balance sheets so as to be able~~out various restructuring alternatives and potential plan sponsors and investors in order to formulate a consensual plan of reorganization that would maximize recoveries to all creditors and enable the Debtors to emerge from Chapter 11 ~~with an appropriate capital structure and a resolution of their liquidity issues. This would allow the Chapter 11 Debtors to provide the best possible recoveries to their creditors and remain~~as a competitive player in the hotel industry. ~~To that end, the fundamental premise of the Chapter 11 Debtors' negotiations has been a substantial restructuring of their capital structure. Indeed, the Restructuring Term Sheet that was attached to the Declaration of Joseph Teichman pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in support of First-Day Motions and~~

6

~~Applications, which was filed on the Commencement Date, included a dramatic reduction of the Chapter 11 Debtors' indebtedness.~~ Those efforts resulted in the establishment of a Court-approved Auction for the Debtors and for sponsorship of the Debtors' Chapter 11 plan.  The Plan is the result of that Auction process and provides for the sale of the equity interests of the Reorganized Debtors and NewCo.  The Plan embodies the highest and best bid proposal submitted at the Auction and, thus, provides maximum recoveries and distributions to creditors who will receive the proceeds of such sale.

The Chapter 11 Debtors' foremost liability consists of the Mortgage Debt in the principal amount of approximately $4.1 billion.   The Mortgage Debt is secured by cross-collateralized and cross-defaulted first priority liens on the ~~Mortgaged~~ Mortgage Properties, and the other collateral, as set forth in the Loan Documents, including all of the cash proceeds generated from the ~~Mortgaged Properties.  As set forth in Article VIII hereof, the going concern value of the Debtors, absent a significant capital infusion, is significantly less than the outstanding amount of Mortgage Debt.  The Debtors estimate the enterprise value of their business operations is between $2.8 and $3.6 billion.  The Debtors' valuation estimates  are based on their own financial projections (as described in Article IX hereof) and work and analysis of Lazard, their financial advisor.~~ Mortgage Properties.

Based on the ~~valuation of the~~ Debtors' views as to the value of their estates and their projected cash flows, the Debtors concluded that they would be unable to reinstate or refinance the Mortgage Debt in full as doing so would leave the Debtors significantly over-leveraged and potentially unable to pay the attendant debt service.  Accordingly, the Debtors' initial restructuring efforts focused on negotiating a stand-alone chapter 11 plan that would provide the holder of the Mortgage Facility Claim with a recovery consisting of the debt and equity in reorganized Debtors.  However, as the Chapter 11 Cases progressed, it became apparent to the Debtors that they required a significant equity infusion in order to ensure that they have adequate cash to fund operations, to pay debt service and make necessary capital expenditures and investments in the ~~Mortgaged~~ Mortgage Properties and other assets so as to remain competitive in the hotel industry and succeed after emergence from Chapter 11.

Based on this need for additional capital, the Chapter 11 Debtors began to explore alternative transactions for restructuring, and engaged in discussions with various parties. In late November 2009, an investor group comprised of Centerbridge Partners, L.P. ("**Centerbridge**") and Paulson & Co. Inc. ("**Paulson**", and together with Centerbridge, the "**Original Sponsors**") began discussing a potential "new money" plan with the Chapter 11 Debtors, that would include a direct equity investment and a backstopped rights offering.  Such efforts culminated on February 19, 2010, with the filing of the Debtors' Motion Pursuant to Section 105 and 363(b) of the Bankruptcy Code Authorizing Debtors to Enter into Investment and Standby Purchase Agreement (the "**Original CB/P Approval Motion**") [Docket No. 768], which Original CB/P Approval Motion included as exhibits a Commitment Letter from the CB/P Investors, the related Investment and Standby Purchase Agreement (the "**Original CB/P Agreement**") and the Plan of Reorganization (the "**Original CB/P Plan**").

Shortly after the filing of the Original CB/P Approval Motion, the Chapter 11 Debtors received a proposal from a group comprised of affiliates of Starwood Capital Group Global, L.P., TPG Capital and Five Mile Capital Partners LLC (collectively, the "**Starwood Investors**").  The boards of directors of the Chapter 11 Debtors determined pursuant to the exercise of their fiduciary duties, that the Starwood Investors' proposal was a superior offer to the transactions contemplated by the Original CB/P Plan.  Thus, on March 15, 2010 the applicable Debtors terminated the Original CB/P Agreement and entered into the Starwood  Commitment Letter and the Starwood Investment Agreement, the terms of which were embodied in the Debtors' Third Amended and Restated Plan of Reorganization dated March 24, 2010 [Docket No. 877] (the "**Starwood Plan**").

Following the entry into of the Starwood Commitment Letter and Starwood Investment Agreement, the Chapter 11 Debtors received a revised proposal from the Original Sponsors, which the boards of directors of the Chapter 11 Debtors determined pursuant to the exercise of their fiduciary duties, was a superior offer to the transactions contemplated by the Starwood Plan. Thus, the applicable Debtors terminated the Starwood Commitment Letter and Starwood Investment Agreement and on April 2, 2010, entered into a new commitment letter with the Original Sponsors (the "***Amended CB/P Commitment Letter***") pursuant to which, the Original Sponsors, through the Investor committed to (i) comply with the terms of the Starwood Plan but without certain bid protection provisions, the management fee and the incentive compensation arrangement, and (ii) engage in the negotiation of, and participate in, a bidding and plan process which included an auction for the sponsorship of a plan of reorganization of the Debtors (the "***Auction***"), and in connection therewith provided a deposit of $150,000,000 which amount is being held in escrow. Subsequently, Centerbridge Partners, L.P. and Paulson & Co. Inc. agreed to assign a portion of their commitment to sponsor the Plan to ~~Blackstone Real Estate Associates VI L.P. in its capacity as general partner on behalf of~~ Blackstone Real Estate Partners VI L.P. on behalf of itself and its parallel funds and related alternative vehicles ("***~~BREA~~BREP VI***" and together with the Original Sponsors, the "***Sponsors***").

Pursuant to the terms of the Amended CB/P Commitment Letter, the parties agreed to bidding procedures (the "***Bidding Procedures***") governing the Auction process which have been approved by the Bankruptcy Court. The Bidding Procedures allowed parties with a potential interest in the Debtors both notice and sufficient time to finalize diligence and submit fully-financed binding proposals by the conclusion of the bidding period. The Bidding Procedures also allowed the Debtors sufficient time to assess and develop such proposals and discuss them with the advisors to the Creditors' Committee and the Mortgage Debt Parties. The Bidding Procedures and Auction process were designed to encourage all parties to put their best proposal forward, bring finality to the Debtors' competitive plan process, and create a path towards confirmation of a plan that embodies the highest or best available recoveries to creditors.

[In connection with the Bidding Procedures, other than the Sponsors, only one other bidder submitted a bid to the Debtors, the Starwood Investors. The Special Servicer also submitted a reservation of rights to credit bid. The Auction was held on May 27, ~~2010 and the~~2010. At the Auction, the Sponsors and the Starwood Investors engaged in several rounds of bidding. The Special Servicer did not credit bid and has expressly waived its right to do so in connection with the Plan. The Sponsors' proposal was selected as the highest ~~or best bid~~and best bid. The Sponsors' proposal was also supported by the Special Servicer and Operating Advisor, who agreed that it was highest and best. The Sponsors' proposal provided for the sale of the Debtors, free and clear of all claims, liens, encumbrances charges and other interests, to the Sponsors for cash and other consideration reflecting the aggregate purchase price of $3.925 billion. Following the Auction, the Investor and the Debtors entered into the Investment ~~and Standby Purchase~~ Agreement setting forth the terms of the investment and sale. The Auction represented the culmination of an extensive marketing process that gave every interested party a full and fair opportunity to conduct extensive due diligence and to bid, and the current Plan represents the highest ~~or~~and best offer ~~the~~for the equity of NewCo and the Reorganized Debtors ~~obtained.]~~.

As part of this investment~~, assuming Class 2 accepts the Plan~~ and sale, the Investor will acquire ~~approximately 42.85~~the Debtors through the acquisition of 100% of the NewCo Common Interests in exchange for cash in the aggregate amount of $3,615,755,444.28 and the contribution of mortgage certificates held by the Investor and its members or Affiliates in the aggregate amount of $309,244,555.72 ~~(assuming that none of the New Warrants described below have been exercised as of the Effective Date, and subject to adjustment in connection with the Class B – H Equity Cashout Option and the Rights Offering also described below) for a cash contribution of $450,000,000. The Investor will also~~

~~backstop a Rights Offering that will generate additional proceeds of up to $200,000,000, and commit an additional amount of up to $255,400,000 to provide a cash alternative for holders of Certificates in Classes B-H, who elect to receive cash in lieu of their equity distribution under the Plan~~subject to adjustment as set out in the Investment Agreement). Pursuant to the ~~terms of the Plan, the holder of the Mortgage Facility Claim will receive a combination of cash, New Mortgage Notes and equity in NewCo, the value of which reflects the enterprise value of the Chapter 11 Debtors' estates. Specifically, the Plan provides that the holder of the Mortgage Facility Claim will receive the New Mortgage Notes in the aggregate principal amount of $2,818,184,243 and NewCo Common Interests representing 38.11% of the issued and outstanding NewCo Common Interests (subject to certain adjustments as set forth in Sections 6.3 and 6.15 of the Plan), with each NewCo Common Interest having a stated value of $1,000. In addition, the holder of the Mortgage Facility Claim will receive 100% of the Rights to be issued pursuant to a Rights Offering for 19.04% of the NewCo Common Interests (subject to certain adjustments as set forth in Sections 6.3 and 6.15 of the Plan) that will generate proceeds of up to $200,000,000. Pursuant to the Plan, the equity interests in the Mortgage Borrowers and~~ Plan, 100% of the equity interests in the Mortgage Borrowers and equity interests in certain other Chapter 11 Debtors will be cancelled and reissued to NewCo. The balance of the Debtors will be liquidated and dissolved as of the Effective Date. Thus, under the Plan, NewCo will be owned indirectly by the Sponsors, through the Investor or one or more other entities~~, and holders of certain classes of Mortgage Certificates, as well as those who participate in the Rights Offering~~, and NewCo will own and control the ~~Mortgaged~~Mortgage Properties and all other assets necessary to operate the Debtors' businesses. ~~Although the~~ Plan contemplates that the ~~Trustee or the Special Servicer will exercise voting rights with respect to the Mortgage Facility Claim and the Mortgage Facility Deficiency Claim, the Plan sets forth the distribution and allocation of the treatment provided on account of the Mortgage Facility Claim to the Certificate Holders. This distribution scheme reflects and respects the relative priorities among the various classes of Mortgage Certificates and thus provides a fair and equitable distribution of the value of the Debtors' estates to the Certificate Holders~~The purchase price to be paid by the Sponsors to the Debtors' estates will be used for distributions to creditors, less certain amounts to be used to, among other things, to fund the Litigation Trust, the Mortgage Parties Indemnification Fund and the purchase of control of the Debtors' management company, all as described below.

~~For the holders of Class B - H Mortgage Certificates who do not want to receive 50% of their distribution in the form of debt and 50% of their distribution in the form of Rollover Equity as proposed by the Plan, such holders may exercise the Class B - H Debt/Equity Election and elect to receive, for example, all of their distributions in the form of debt, all of their distributions in the form of Rollover Equity or some percentage distributions of debt or Rollover Equity different from 50/50. To the extent possible, these Class B - H Debt/Equity Elections will be implemented in accordance with the Plan. In the event such an election is made, such revised allocation of the distribution of the Rollover Equity and the New Class B - H Mortgage Notes to the holders of the Class B - H Mortgage Certificates shall be as agreed to between the Debtors, the Investor and each of the Sponsors within ten (10) days after the Voting Deadline and if such agreement cannot be reached, each holder of a Class B - H Mortgage Certificate shall receive (i) its Pro Rata Share of the Rollover Equity in satisfaction of 50% of such holder's Class B - H Mortgage Certificates and (ii) its Pro Rata Share of the New Class B - H Mortgage Notes in satisfaction of 50% of such holder's Class B - H Mortgage Certificate, and provided, that, in the aggregate, 50% of the Class B - H Mortgage Debt will have been satisfied by the New Class B - H Mortgage Notes and 50% of the Class B - H Mortgage Debt will have been satisfied by the Rollover Equity, subject to Section 4.2(d) of the Plan. In the event a holder of a Class B - H Mortgage Certificate does not make such an election, such holder will receive (a) its Pro Rata Share of the Rollover Equity in satisfaction of 50% of such holder's Class B - H Mortgage Certificates and (b) its Pro Rata Share of the New Class B - H Mortgage Notes in satisfaction of 50% of such holder's Class B - H Mortgage Certificates.~~

For the holders of Class B – H Mortgage Certificates who would prefer to receive cash in lieu of Rollover Equity under the Plan, the Plan also provides that the Investor may purchase on the Effective Date, Rollover Equity directly from the holders of such Class B – H Mortgage Certificates, at a 30% discount to the accreted amount thereof estimated as of June 30, 2010, in the aggregate amount of up to $255,400,000 (assuming that all of the holders thereof elect to receive cash in lieu of the Rollover Equity).

As noted above, the amount of the Mortgage Facility Claim is approximately $4.1 billion, yet the entire enterprise value of the Debtors' estates is approximately $3.2 billion. Thus, based on the value of the collateral securing the Mortgage Facility Claim, a portion of the Mortgage Facility Claim is unsecured and the Plan provides for a separate classification for such Mortgage Facility Deficiency Claim. However, also based on the enterprise value of the Debtors' estates, under the absolute priority rule, the holders of the Mortgage Facility Deficiency Claim and the Mezzanine Facilities Claim are not entitled to a recovery on account of their claims. Rather, the entire stand-alone value of the Debtors' assets is being provided to the holder of the Mortgage Facility Claim on account of its secured claim. Although the holders of the Mortgage Facility Deficiency Claim and Mezzanine Facilities Claims are not entitled to receive any distribution under the Bankruptcy Code, in order to facilitate a consensual Plan and an expeditious exit from Chapter 11, the Investor has agreed to allocate value from its Investment, on the terms set forth in the Plan, in order to provide a distribution to the holders of the Mortgage Facility Deficiency Claim and Mezzanine Facilities Claims in accordance with the Plan, whether under a consensual or a non-consensual confirmation process.

Similar to the unsecured Mortgage Facility Deficiency Claim and the Mezzanine Facilities Claims, based on the enterprise value of the Debtors, under the absolute priority rule, the holders of General Unsecured Claims would not be entitled to a recovery on account of their claims. However, in order to facilitate a consensual Plan and expeditious exit from Chapter 11, and given the identity of the creditors in Class 5, the nature and projected amount of their claims, and their potential continuing relationships with NewCo and the reorganized Debtors, provided that the class of General Unsecured Claims votes to accept that Plan, the Investors have agreed to allocate value from their Investment, on the terms set forth in the Plan, in order to provide a distribution to the holders of General Unsecured Claims. As such, if Class 5 votes to accept the Plan, the holders of General Unsecured Claims will receive their Pro Rata Share of $500,000.

Pursuant to the terms of the Plan, the holder of the Mortgage Facility Claim will receive the Cash Distribution, the Investor Certificates and interests in the Litigation Trust to the extent it is a Litigation Trust Beneficiary. The holders of Mezzanine Facilities Claims and General Unsecured Claims will also receive interests in the Litigation Trust to the extent they are Litigation Trust Beneficiaries. The Cash Distribution generally consists of the Debtors' cash and cash equivalents as of the Effective Date, less the payment of Administrative Expense Claims and Priority Claims, plus a cash payment by the Sponsors, less certain deductions.

The Plan contemplates that the Trustee or the Special Servicer, as holders of the Mortgage Loan, will exercise voting rights with respect to the Mortgage Facility Claim and the Mortgage Facility Deficiency Claim. In conjunction with the Auction, the Special Servicer entered into a Plan Support Agreement pursuant to which the Special Servicer has agreed to vote its claims in Classes 2 and 4A to accept the Plan.

As noted above, the principal amount of the Mortgage Facility Claim is approximately $4.1 billion, which is more than the amount to be paid by the Investor under the Investment Agreement. Under the absolute priority rule, the holder of the Mortgage Facility Deficiency Claim and the holders of

the Mezzanine Facilities Claim and General Unsecured Claims are not entitled to a recovery on account of their claims from the cash to be paid by the Sponsors. The only potential source for distribution to the holder of the Mortgage Facility Deficiency Claim and the holders of the Mezzanine Facilities Claim and General Unsecured Claims are recoveries resulting from avoidance actions and other causes of action that the Debtors may have. The Plan provides for the establishment of a litigation trust for the benefit of Creditors that will receive and hold certain causes of action and claims of the Debtors.  Thus the Plan provides that holders of Claims in Classes 4A, 4B and 5 will receive an interest in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries.

In short, the Plan contemplates that proceeds from the investment and sale, together with the Debtors' cash on hand, will be sufficient and used to (i) fund the Administrative/Priority Claims Reserve, which will be used to pay all Allowed Administrative Expense Claims and Priority Claims (excluding only those claims of the type referred to in clause (c)(i) of the definition of "Allowed" incurred in the ordinary course of business and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date), and the fees and expenses of the Plan Administrator, (ii) fund the Mortgage Parties Indemnification Fund, (iii) fund the Litigation Trust, (iv) fund the wind-down of ESI, (v) pay for the purchase of control of HVM and its assets and (vi) make distributions to the holder of the Mortgage Facility Claim.

The Plan further contemplates that all of the property of the Debtors, including the Mortgage Properties, transferred to or vesting in the Reorganized Debtors and/or NewCo shall vest in the Reorganized Debtors and/or NewCo free and clear of claims, liens, encumbrances, charges and other interests, including, without limitation, any and all claims, liens, encumbrances and any and all right, title, interests related thereto of governmental entities relating to any tax liabilities or similar liabilities.  As a result of consummation of the Plan, provided it is in accordance with the Investment Agreement, and pursuant to the Plan, NewCo and the Reorganized Debtors shall not assume, incur or be responsible for any claims or liabilities of the Debtors or any of their affiliates, except for those claims of the type referred to in clause (c)(i) of the definition of "Allowed"  incurred in the ordinary course of business and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, and neither the Reorganized Debtors, NewCo, the Investor, the Sponsors nor the Debt Financing Lenders shall be successors of the Debtors or ESI nor incur any successor or transferee liability of any kind, nature or character, including, without limitation, in relation to (1) the liabilities arising or resulting from or relating to the transactions contemplated by the Plan, and (2) any and all claims, liens, encumbrances, and any and all right, title, and interests related thereto, of governmental entities relating to any tax or similar liabilities.

In connection with the restructuring, an essential component of the Sponsors' commitment to fund the Plan and purchase and invest in the reorganized Debtors, through the Investor, is the assurance that the reorganized Chapter 11 Debtors can continue their operations uninterrupted upon emergence from bankruptcy.  All of the ~~Mortgaged~~Mortgage Properties are managed by HVM, an entity that is affiliated with, but not owned by, the Chapter 11 Debtors.  HVM Manager, an entity owned by David Lichtenstein, acts as the manager of HVM, with the right and authority to direct the operations of HVM.  The ability of HVM to continue the operation of the ~~Mortgaged~~Mortgage Properties depends upon the uninterrupted and continued access to the services provided by certain essential service providers to the ~~Mortgaged~~Mortgage Properties.  Therefore, it is essential to the Investor that HVM continue to provide its management services to the Reorganized Debtors.  As such, in connection with the Plan and as contemplated by the Investment ~~and Standby Purchase~~ Agreement, the Investor and the Debtors have entered into the Membership Interest Purchase Agreement with David Lichtenstein, pursuant to which, on

the Effective Date, in exchange for a $40,000,000 payment (which payment shall be funded out of the proceeds of the Investment), the Investor or one or more of its designees, which may be a third party, will acquire all of the outstanding equity of HVM Manager or, at the option of the Investor, HVM Manager will resign as manager of HVM and appoint one or more designees of the Investor, which may be a third party, as successor manager of HVM and convey to such successor manager such assets of HVM Manager as designated by the Investor, which may be a third party. This acquisition and the related transactions are predicated on and subject to the Plan becoming effective and the implementation of the transactions contemplated by the Plan and the Investment ~~and Standby Purchase~~ Agreement. Thus, as a result of consummation of the transactions described herein, it is expected that HVM will continue to manage the business and properties of the Reorganized Debtors and NewCo pursuant to management agreements as described in Article V hereof.

The Debtors believe that the ~~Plan and related transactions will maximize value for all creditors. In addition, under the Plan, unsecured creditors (including, the Mortgage Facility Deficiency Claim and Mezzanine Facilities Claims) will have an opportunity to participate in value being contributed by the Investors in order to facilitate a consensual and expeditious reorganization. Therefore, the Debtors believe the Plan will provide meaningful recoveries to all constituents and will ensure the Chapter 11 Debtors' successful emergence from Chapter 11.~~

~~In the event that the holder of the Mortgage Facility Claim does not share the Debtors' views with respect to the treatment of its Claim, and Class 2 does not accept the Plan, the Chapter 11 Debtors will request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code. In the event of confirmation pursuant to Section 1129(b) of the Bankruptcy Code, the Plan contemplates an alternate treatment pursuant to which (i) the holder of the Mortgage Facility Claim will receive the New Alternate Notes in the aggregate amount not to exceed $3,300,000,000, (ii) the holder of the Allowed Mortgage Facility Deficiency Claim and the holders of the Allowed Mezzanine Facilities Claims will receive 100% of the Sub-Equity and (iii) the Investor will acquire 100% of the NewCo Common Interests for a cash contribution of $400,000,000 (subject to the distribution of the Sub-Equity under the Plan) and the contribution of the Certificates held by the Investor as of the Effective Date. The Debtors believe that such treatment of the Mortgage Facility Claim satisfies the requirements of Section 1129(b) of the Bankruptcy Code, which provides, in relevant part, that a plan is fair and equitable with respect to a secured claim if (i) the holders of such claim retain the liens securing such claims to the extent of the allowed amount of such claim; and (ii) each holder of a claim of such class receives, on account of such claim, deferred cash payments totaling at least the allowed amount of such claim, with a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. As set forth in the Plan, in the event of confirmation pursuant Section 1129(b), the holder of the Mortgage Facility Claim will retain its lien on the Mortgaged Properties and any other collateral for the Mortgage Loan. In addition, based on the value of the Mortgaged Properties as discussed in Article VIII hereof, the holder of the Mortgage Facility Claim is receiving, on account of the Mortgage Facility Claim, deferred cash payments totaling at least the value of the Mortgaged Properties. Based on the financial projections and projected cash flow of the Reorganized Debtors and NewCo contained in Article VIII hereof, the New Alternate Notes not only reflect the maximum value of the Mortgage Facility lender's interest in the Debtors' interest in the Mortgage Properties, but reflect the maximum leverage that could be sustained and serviced by the Reorganized Debtors and NewCo. Accordingly, the New Alternate Notes satisfy the requirements of the Section 1129(b) of the Bankruptcy Code and the Plan may be confirmed pursuant to Section 1129(b) of the Bankruptcy Code~~<u>value they will realize from the Investment Agreement provides the highest and best offer available. The Debtors also believe the value will support a confirmable Plan that will maximize recoveries to their various creditor</u>

constituencies and bring a successful conclusion to the Chapter 11 Cases. Entry into the Investment Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors' estates and their creditors.

In the event that any class of Claims that is entitled to vote does not accept the Plan, the Chapter 11 Debtors will request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code and in such event, the Debtors reserve the right, with the consent of the Investor, and in certain cases the Special Servicer and the Operating Advisor, to make modifications to the Plan to the extent necessary to comply with the requirements of Section 1129(b) of the Bankruptcy Code.

Accordingly, the Debtors believe that:

• The Plan provides the best available result for the holders of Claims;

• With respect to each Impaired Class of Claims, the distributions under the Plan are not less than the amounts that would be received if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code; and

• Acceptance of the Plan is in the best interests of Holders of Claims.

Neither the Starwood Investors nor the Sponsors were willing to purchase and structure a proposed plan of reorganization that included ESI. The Chapter 11 Debtors believe that ESI's assets have minimal, if any, value. Consequently, and in view of all of the other advantages presented by the Plan, the Chapter 11 Debtors determined to proceed without including ESI in the Plan. The Chapter 11 Debtors and their professionals have not yet determined the most appropriate treatment of ESI and its creditors, although the Plan contemplates a settlement between ESI, on the one hand, and the Chapter 11 Debtors, on the other hand, pursuant to which, *inter alia:* (i) ESI would be released from its Guaranty of the Mortgage Loan and the Mezzanine Facilities, (ii) ESI would grant a release to certain parties as set forth in Section 10.10 of the Plan, (iii) the Chapter 11 Debtors and the Special Servicer would set aside $750,000 to be used to wind down ESI, and (iv) the creditors of ESI would be granted an interest in the Litigation Trust. The Plan contemplates that the Bankruptcy Court would approve the ESI Settlement at or before the Confirmation Hearing.

The following table briefly summarizes the classification and treatment of those Claims and Equity Interests classified under the Plan:

| Class | Type of Claim or Equity Interest | Treatment | Impaired/ Unimpaired | Entitled to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 1 | Priority Claims | Each holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim, in full, in Cash, on the later of the Effective Date and as soon as practicable after the date such Priority Claim becomes Allowed. | Unimpaired | No | 100% |
| 2 | Mortgage Facility Claim | ~~In the event that Class 2 accepts the Plan, the~~ The holder of the Allowed Mortgage Facility Claim shall receive ~~the following~~ 100% of the Cash Distribution and the Investor Certificates on the Effective Date, with such Cash Distribution to be distributed in accordance with Section ~~6.2~~ of the Plan: ~~(i) 100% of the Rights, (ii) on the Initial Distribution Date, 100% of the New Class A1 Mortgage Notes, 100% of the New Class A2 Mortgage Notes, 100% of the New Class A3 Mortgage Notes, 100% of the New Class A4 Mortgage Notes, 100% of the New Class B Mortgage Notes, 100% of the New Class C Mortgage Notes, 100% of the New Class D Mortgage Notes, 100% of the New Class E Mortgage Notes, 100% of the New Class F Mortgage Notes, 100% of the New Class G Mortgage Notes, 100% of the New Class H Mortgage Notes, (iii) 100% of the Class A4 Cash Paydown, (iv) 100% of the Rollover Equity, or in lieu of the Rollover Equity, the Class B - H Equity Cashout Option and (v) 100% of the Sub-Equity Class 2, 100% of the Sub-Equity Class 3, 100% of the Sub-Equity Class 4 and 100% of the Sub-Equity Class 5.~~ <br><br> ~~In the event that Class 2 rejects the Plan, the holder of the Allowed Mortgage Facility Claim shall receive, on the Initial Distribution Date, the New Alternate Notes in an aggregate principal amount not to exceed three billion, three hundred million dollars ($3,300,000,000), and which New Alternate Notes shall bear interest at the rate~~ | Impaired | Yes | 100% |

of 5.34% per annum or such lower rate as shall be fixed by the Bankruptcy Court, and shall have a final maturity date that is seven (7) years after the Initial Distribution Date. Notwithstanding the foregoing, in the event that the Debtors seek to confirm the Plan under section 1129(b) of the Bankruptcy Code pursuant to Section 4.2(b)(ii) of the Plan, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 of the Plan, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, to offer different treatment to Class 2, including, without limitation, offering different forms of consideration such as notes, equity warrants or sub-equity to Class 2, to the extent that such forms of consideration comply with the requirements of section 1129(b) of the Bankruptcy Code. The Rights Offering shall be cancelled if Class 2 rejects the Plan. 6.3 of the Plan. The Investor Certificates will be cancelled without any distributions on account thereof.

| 3 | ESA UD Mortgage Claim | The holder of the Allowed ESA UD Mortgage Claim shall receive on the ~~Initial~~ Distribution Date the New ESA UD Mortgage Note in full settlement, satisfaction, release and discharge of the Allowed ESA UD Mortgage Claim. | Impaired | Yes | 58.8% |
|---|---|---|---|---|---|
| 4~~A~~ | Mortgage Facility Deficiency Claim/ ~~Mezzanine Facilities Claims~~ | ~~If Class 2 accepts~~The holder of the ~~Plan, the holders of the~~ Allowed Mortgage Facility Deficiency Claim ~~and the Allowed Mezzanine Facilities Claims shall receive the following: 100% of the Sub-Equity Class 6, 100% of the Sub-Equity Class 7, 100% of the Sub-Equity Class 8, 100% of the Sub-Equity Class 9, 100% of the Sub-Equity Class 10, 100% of the Sub-Equity Class 11, 100% of the Sub-Equity Class 12, 100% of the Sub-Equity Class 13, 100% of the Sub-Equity Class 14 and 100% of the Sub-Equity Class 15.~~<br><br>~~If Class 2 rejects the Plan, the holders of the Allowed Mortgage Facility Deficiency Claim and the Allowed Mezzanine Facilities Claims shall receive 100% of the Sub-Equity, provided that such distribution complies with section 1129(b) of the Bankruptcy Code and,~~shall receive an interest in the ~~event that such distribution does not comply with section 1129(b) of the Bankruptcy Code, the Chapter 11 Debtors reserve the right, pursuant to Sections 5.3 and 13.1 of the Plan, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, to offer different treatment to Class 4.~~Litigation Trust to the extent that it is a Litigation Trust Beneficiary, which shall be distributed pursuant to Section 6.3 of the Plan, subject to the terms of the Intercreditor Agreement. | Impaired | Yes | Percentage recovery is condit-ioned on future ~~capital~~ events ~~as set forth in Exhibits I and J to the Plan.~~ |
| 4B | Mezzanine Facilities Claims | The holders of the Allowed Mezzanine Facilities Claims shall receive interests in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries, which shall be distributed pursuant to Section 6.3 of the Plan, subject to the terms of the Intercreditor Agreement. | | | Percentage recovery is condit-ioned on future events |
| 5 | General Unsecured Claims | ~~No distribution shall be made under the Plan in respect~~The holders of the General Unsecured Claims~~; provided, however, that in order to facilitate a consensual Plan, if~~ | Impaired | Yes | ~~83.3% if the Plan~~Percentage |

| | | | | | |
|---|---|---|---|---|---|
| | | ~~Class 5 accepts the Plan, each holder of an Allowed General Unsecured Claim~~ shall receive ~~its Pro Rata Share $500,000~~ <span style="color:blue">an interest in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries.</span> | | | <span style="color:blue">recovery</span> is <span style="color:red">accepted by Class 5, otherwise 0%</span><span style="color:blue">conditioned on future events</span> |
| 6 | Existing Equity | No distribution shall be made under the Plan from the Estates in respect of the Existing Equity.  On the Effective Date, the certificates that previously evidenced ownership of Existing Equity shall be ~~canceled~~<span style="color:blue">cancelled</span> and shall be null and void, the holder(s) thereof shall no longer have any rights in respect of the Existing Equity, and such certificates shall not evidence any rights under the Plan. | Impaired | No | 0% |
| 7 | ESA MD Properties Trust Certificate | The holder of the ESA MD Properties Trust Certificate shall retain the ESA MD Properties Trust Certificate. | Unimpaired | No | 100% |
| 8 | ESA MD Borrower Interests | Each holder of ESA MD Borrower Interests shall retain its ESA MD Borrower Interests. | Unimpaired | No | 100% |
| 9 | ESA P Portfolio MD Trust Certificate | The holder of the ESA P MD Portfolio Trust Certificate shall retain the ESA P Portfolio Trust Certificate. | Unimpaired | No | 100% |
| 10 | ESA P Portfolio MD Borrower Interests | Each holder of ESA P Portfolio MD Borrower Interests shall retain its ESA P Portfolio MD Borrower Interests. | Unimpaired | No | 100% |
| 11 | ESA Canada Properties Interests | Each holder of ESA Canada Properties Interests shall retain its ESA Canada Properties Interests. | Unimpaired | No | 100% |
| 12 | ESA Canada Properties Borrower Interests | Each holder of ESA Canada Properties Borrower Interests shall retain its ESA Canada Properties Borrower Interests. | Unimpaired | No | 100% |
| 13 | ESH/TN Properties Membership Interests | The holder of the ESH/TN Properties Membership Interest shall retain its ESH/TN Properties Membership Interest. | Unimpaired | No | 100% |
| 14 | ESH/ESA General Partnership Interests | Each holder of ESH/ESA General Partnership Interests shall retain its ESH/ESA General Partnership Interests. | Unimpaired | No | 100% |
| 15 | Other | No distribution shall be made under the | Impaired | No | 0% |

| | Existing Equity Interests | Plan from the Estates in respect of the Other Existing Equity Interests.  On the Effective Date, the certificates that previously evidenced ownership of the Other Existing Equity Interests shall be canceled and shall be null and void, the holders thereof shall no longer have any rights in respect of the Other Existing Equity Interests, and such certificates shall not evidence any rights under the Plan. | | | |

The preceding summaries of the material provisions of the Plan do not purport to be complete and are qualified in their entirety by reference to all of the provisions of the Plan, including all Exhibits thereto and the Plan Supplement, all documents described therein and the definitions therein of certain terms used above.  For a more detailed description of the Plan, see Article VII.   For detailed historical and projected financial information and valuation estimates, see Article VIII.

### III.

### DEFINITIONS

**A.  Defined Terms**.  As used herein, the following terms shall have the respective meanings specified below. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

1.1     ***1145 Securities*** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.2     ***Acquisition***  has the meaning set forth in Section IV.B of this Disclosure Statement.

1.3     ***Adequate Protection Obligations*** has the meaning set forth in Section VI.B.1 of this Disclosure Statement.

1.4     ***Adequate Protection Payments***  has the meaning set forth in the Cash Collateral Order.

1.5     ***Adjusted EBITDA***  has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.6     ***ADR***  has the meaning set forth in Section VIII.A of this Disclosure Statement.

1.7     ***AHYDOs***  has the meaning set forth in Section XII.C of this Disclosure Statement.

1.8     ***Alternate Transaction***  means any plan, proposal, offer, financing or transaction with one or more parties other than the Investor or its members or Affiliates, or any solicitation, discussions or negotiations with respect thereto.

1.9     ***Amended CB/P Commitment Letter*** has the meaning set forth in Section II of this Disclosure Statement.

1.10     ***AMT*** has the meaning set forth in Section XII.A of this Disclosure Statement.

1.11     ***Arbor*** means Arbor Realty Trust.

1.12     ***Assumed Confirmation Date*** has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.13     ***Auction*** has the meaning set forth in Section II of this Disclosure Statement.

1.14     ***Available Cash*** has the meaning ascribed to such term in the Final Order (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection and (C) Modifying the Automatic Stay, entered on July 23, 2009 and amended on December 15, 2009, Docket Nos. 205 and 634, respectively.

1.15     ***B of A*** means Bank of America, N. A.

1.16     ***B of A Action*** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.17     ***B of A Defendants*** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.18     ***B of A Mortgage Debt*** has the meaning set forth in Section IV.D of this Disclosure Statement.

1.19     ***B of A Mortgage Loan Agreement*** has the meaning set forth in Section IV.D of this Disclosure Statement.

1.20     ***B of A Plaintiffs*** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.21     ***B of A Prepetition Collateral*** has the meaning set forth in Section IV.D of this Disclosure Statement.

1.22     ***Bar Date*** has the meaning set forth in Section VI.D of this Disclosure Statement.

1.23     ***Bear Stearns*** means Bear Stearns Commercial Mortgage, Inc.

1.24     ***Best Interests Test*** has the meaning set forth in Section X.B of this Disclosure Statement.

1.25     ***BHAC IP Transfer Agreement*** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.26     ***Bidding Procedures*** has the meaning set forth in Section II of this Disclosure Statement

1.27 ~~*BREA*~~ ***BREP VI*** has the meaning set forth in Section II of this Disclosure Statement.

~~1.28 *BREP Funds* has the meaning set forth in Section VII.A of this Disclosure Statement.~~

1.28 ~~1.29~~ ***Budget*** has the meaning set forth in Section VI.B.1 of this Disclosure Statement.

1.29 ~~1.30~~ ***Business Plan*** has the meaning set forth in Section VI.G of this Disclosure Statement.

1.30 ~~1.31~~ ***Cash Collateral Motion*** has the meaning set forth in Section VI.B.1 of this Disclosure Statement.

1.31 ~~1.32~~ ***Cash Management Account*** has the meaning set forth in the Cash Management Agreement.

1.32 ~~1.33~~ ***Cash Management Agreement*** means that certain agreement between, the Mortgage Borrowers, the Maryland Owner, the Canadian Owner, the Operating Lessee, HVM, Homestead, Wachovia, Bear Stearns and B of A (and their respective successors and assigns), dated as of June 11, 2007, as it may have been amended, restated, replaced, supplemented or otherwise modified from time to time.

1.33 ~~1.34~~ ***Cash Management Order*** has the meaning set forth in Section VI.A.3 of this Disclosure Statement.

1.34 ***Centerbridge*** has the meaning set forth in Section II of this Disclosure Statement.

1.35 ***Certificate Holders*** has the meaning set forth in Section IV.D.2 of this Disclosure Statement.

~~1.36 *Centerbridge* has the meaning set forth in Section II of this Disclosure Statement.~~

1.36 ~~1.37~~ ***Change in Control Agreements*** those change in control letter agreements dated as of September 30, 2008 between HVM and each of ~~[~~Kevin McDougall,~~]~~ Joseph Rogers, Robert Micklash, Daehum Kim and Gary DeLapp.

1.37 ~~1.38~~ ***Change of Recommendation*** means, (i) the Debtors or their boards of directors or other governing body or any committee thereof shall have withheld, withdrawn, qualified or modified (or resolved or proposed to withhold, withdraw, qualify or modify), in a manner adverse to the Investor, its approval or recommendation of the Investment ~~and Standby Purchase~~ Agreement or the Plan or the transactions contemplated thereby or (ii) the Debtors or their boards of directors or other governing body or any committee thereof shall have approved or recommended, or proposed to approve or recommend (including, without limitation, by filing any pleading or document with the Bankruptcy Court), any Alternate Transaction.

1.38 ~~1.39~~ ***Chapter 7*** means chapter 7 of the Bankruptcy Code.

1.39 ~~1.40~~ ***Chapter 11*** means chapter 11 of the Bankruptcy Code.

1.40 ~~1.41~~ ***Chapter 11 Debtors*** has the meaning set forth in Section VI of this Disclosure Statement.

~~***Class J-M Mortgage Certificate*** has the meaning set forth in Section XII.C of this Disclosure Statement.~~

1.41 ~~1.42~~ ***COD Income*** has the meaning set forth in Section XII.B of this Disclosure Statement.

1.42 ~~1.43~~ ***Confirmation Hearing*** has the meaning set forth in Section I of this Disclosure Statement.

1.43 ~~1.44~~ ***Critical Employees*** has the meaning set forth in Section VI.G of this Disclosure Statement.

1.44 ~~1.45~~ ***Critical Operating Expenses*** has the meaning set forth in Section VI.A.4 of this Disclosure Statement.

1.45 ~~1.46~~ ***DCF*** has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.46 ~~1.47~~ ***Debt Yield Covenant*** has the meaning set forth in Section V.A of this Disclosure Statement.

1.47 ~~1.48~~ ***Deferred Adequate Protection Amount*** has the meaning set forth in Section VI.B.2 of this Disclosure Statement.

1.48 ***Disclosure Statement Approval and Solicitation Order*** has the meaning set forth in Section I of this Disclosure Statement

1.49 ***Discount Rate*** has the meaning set forth in Section VIII.C of this Disclosure Statement.

~~1.50 ***Disclosure Statement Approval and Solicitation Order*** has the meaning set forth in Section I of this Disclosure Statement~~

1.50 ~~1.51~~ ***Disregarded Debtors*** has the meaning set forth in Section XII of this Disclosure Statement.

1.51 ~~1.52~~ ***Distributable Equity Value*** has the meaning set forth in Section VIII.C.2 of this Disclosure Statement.

1.52 ~~1.53~~ ***District Court*** has the meaning set forth in Section VI.F of this Disclosure Statement.

~~1.54 ***DL-DW*** means DL-DW Holdings LLC.~~

1.53 ~~1.55~~ ***EBITDA*** has the meaning set forth in Section VIII.C of this Disclosure Statement.

~~1.56    *Enterprise Value*  has the meaning set forth in Section VIII.C of this Disclosure Statement.~~

1.54    ~~1.57~~ *ESA Mezz Entities*   means those entities set forth on Exhibit I hereto.

1.55    ~~1.58~~ *ESA P Mezz Entities*   means those entities set forth on Exhibit J hereto.

1.56    ~~1.59~~ *ESH/TN*  has the meaning set forth in Section XII.A of this Disclosure Statement.

1.57    ~~1.60~~ *Examiner*  has the meaning set forth in Section VI.E of this Disclosure Statement.

1.58    ~~1.61~~ *Examiner Motion*  has the meaning set forth in Section VI.E of this Disclosure Statement.

1.59    ~~1.62~~ *Examiner Order*  has the meaning set forth in Section VI.E of this Disclosure Statement.

1.60    *Examiner's Report*  has the meaning set forth in Section VI.E of this Disclosure Statement.

1.61    ~~1.63~~ *Extended Stay*  means collectively, the debtors that are the subject of the Chapter 11 Cases.

1.62    ~~1.64~~ *Extended Stay DIP Lockbox*  has the meaning set forth in Section VI.A.3 of this Disclosure Statement.

1.63    ~~1.65~~ *Financial Projections*  has the meaning set forth in Section VIII.B.2 of this Disclosure Statement.

1.64    ~~1.66~~ *First Day Declaration*  means the Declaration of Joseph Teichman Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications.

1.65    ~~1.67~~ *Five Mile Action*  has the meaning set forth in Section VI.F of this Disclosure Statement.

1.66    ~~1.68~~ *Five Mile Defendants*  has the meaning set forth in Section VI.F of this Disclosure Statement.

1.67    ~~1.69~~ *Five Mile Plaintiff*  has the meaning set forth in Section VI.F of this Disclosure Statement.

1.68    ~~1.70~~ *Guarantor*  has the meaning set forth in Section IV.D.1 of this Disclosure Statement.

1.69    ~~1.71~~ *Homestead Licensees*  has the meaning set forth in Section IV.B of this Disclosure Statement.

1.70 ~~1.72~~ ***Homestead Mezz Entities*** means those entities set forth on Exhibit K hereto.

1.71 ~~1.73~~ ***HVM Canada*** means HVM Canada Hotel Management ULC.

1.72 ~~1.74~~ ***HVM Incentive Program Motion*** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.73 ~~1.75~~ ***HVM Manager Agreement*** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.74 ~~1.76~~ ***Intercreditor Agreement*** means the Intercreditor Agreement dated as of June 11, 2007 among the Mortgage Lenders and the Mezzanine Lenders.

~~1.77 *Investor Securities* has the meaning set forth in Section VII.G of this Disclosure Statement.~~

1.75 ~~1.78~~ ***IRS*** has the meaning set forth in Section XII.A of this Disclosure Statement.

1.76 ~~1.79~~ ***Lazard*** means Lazard Frères & Co. LLC.

1.77 ~~1.80~~ ***Letter Agreements*** has the meaning set forth in Section VI.G of this Disclosure Statement.

1.78 ~~1.81~~ ***Lichtenstein*** means David Lichtenstein.

1.79 ~~1.82~~ ***Lightstone*** means Lightstone Holdings LLC, a Delaware limited liability company.

1.80 ~~1.83~~ ***Line Trust Action*** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.81 ~~1.84~~ ***Line Trust Defendants*** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.82 ~~1.85~~ ***Line Trust Plaintiffs*** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.83 ~~1.86~~ ***Liquidation Analysis*** has the meaning set forth in Section X.B.1 of this Disclosure Statement.

1.84 ~~1.87~~ ***Loan Documents*** means collectively, the Mortgage Loan Agreement, the Note, the Security Instruments, the Environmental Indemnity, the Assignment of Management Agreement, the Assignment of Franchise Agreement, the Subordination of ESA Note, the Guaranty, the Cash Management Agreement, the Interest Rate Cap Agreement, the Assignments of Interest Rate Cap Agreement, the Contribution Agreement, the Canadian Indemnity Guaranty, the Maryland Indemnity Guaranty, the Assignment of ESA Note, the Subordination of Aristocrat Notes, the Maryland Beneficiary Pledge Agreement, the Canadian Beneficiary Pledge Agreement, the Security Account Control Agreement, the Trademark Security Agreement (all as defined in the Mortgage Loan Agreement) and all

other documents executed and/or delivered in connection with the Mortgage Loan, in each case, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

1.85 ~~1.88~~ *LTL* has the meaning set forth in Section VIII.A of this Disclosure Statement.

1.86 ~~1.89~~ *M & T Indenture* means the Indenture, dated as of June 27, 2001 between Manufacturers and Traders Trust Company, as trustee, and ESI, as same may be amended, modified or supplemented from time to time.

1.87 ~~1.90~~ *Maryland Owner* means ESA P Portfolio MD Trust and ESA MD Properties Business Trust.

1.88 ~~1.91~~ *Mezzanine Borrowers* means the borrowers under the Mezzanine Loan Agreements.

1.89 ~~1.92~~ *Mezzanine Debt* has the meaning set forth in Section IV.D of this Disclosure Statement.

1.90 ~~1.93~~ *Mezzanine Lenders* means Wachovia, Bear Stearns and B of A, as lenders, together with their successors and assigns.

1.91 ~~1.94~~ *Mezzanine Loan Agreements* means collectively, the ten mezzanine loan agreements among the Mezzanine Lenders and the Mezzanine Borrowers.

~~1.95 *Minimum Investor Equity Threshold* has the meaning set forth in Section VII.G of this Disclosure Statement.~~

~~1.96 *Minimum Ownership Cutback* has the meaning set forth in Section VII.G of this Disclosure Statement.~~

1.92 ~~1.97~~ *Modification* has the meaning set forth in Section VI.B.2 of this Disclosure Statement.

~~1.98 *Money Equity Value* has the meaning set forth in Section VIII.C of this Disclosure Statement.~~

1.93 ~~1.99~~ *Mortgage Borrowers* means ESA 2005 Portfolio L.L.C., ESA 2005- San Jose L.L.C., ESA 2005- Waltham L.L.C., ESA Acquisition Properties L.L.C., ESA Alaska L.L.C., ESA Canada Properties Borrower L.L.C., ESA FL Properties L.L.C., ESA MD Borrower L.L.C., ESA MN Properties L.L.C., ESA P Portfolio L.L.C., ESA P Portfolio MD Borrower L.L.C., ESA P Portfolio PA Properties L.L.C., ESA P Portfolio TXNC Properties L.P., ESA PA Properties L.L.C., ESA Properties L.L.C., ESA TX Properties L.P., ESH/Homestead Portfolio L.L.C., ESH/HV Properties L.L.C., ESH/MSTX Property L.P., ESH/TN Properties L.L.C. and ESH/TX Properties L.P.

1.94 ~~1.100~~ *Mortgage Debt* has the meaning set forth in Section IV.D of this Disclosure Statement.

~~1.101 *Mortgage Debt Parties* has the meaning set forth in Section IV.D.2 of this Disclosure Statement.~~

1.95    1.102 *Mortgage Lenders*  means Wachovia, Bear Stearns and B of A, as lenders together with their successors and assigns.

1.96    1.103 *Mortgage Loan Agreement*  means the Loan Agreement dated as of June 11, 2007 (as amended, restated, replaced, supplemented or otherwise modified from time to time), by and among the Mortgage Borrowers, the Maryland Owner, the Operating Lessee and the Mortgage Lenders.

1.104    *Mortgaged Properties*  has the meaning set forth in Section IV.D.1 of this Disclosure Statement.

1.105    *New Collateral*  has the meaning set forth in Section VII.G of this Disclosure Statement.

1.106    *New Securities* has the meaning set forth in Section VII.G of this Disclosure Statement.

1.97    1.107 *NFY*  has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.98    1.108 *NOL*  has the meaning set forth in Section XII.A of this Disclosure Statement.

1.99    1.109 *Operating Lessee*  means ESA Canada Trustee, Inc., ESA Canada Properties Trust, ESA P Portfolio Operating Lessee Inc., ESA 2005 Operating Lessee Inc., ESA Canada Operating Lessee Inc., and ESA Operating Lessee Inc.

1.100    1.110 *Original CB/P Agreement*  has the meaning set forth in Section II of this Disclosure Statement.

1.101    1.111 *Original CB/P Approval Motion* has the meaning set forth in Section II of this Disclosure Statement.

1.102    1.112 *Original CB/P Plan* has the meaning set forth in Section II of this Disclosure Statement.

1.103    1.113 *Original Debtor(s)*  has the meaning set forth in Section VI of this Disclosure Statement.

1.104    1.114 *Original Sponsors* has the meaning set forth in Section II of this Disclosure Statement.

1.105    1.115 *Paulson* has the meaning set forth in Section II of this Disclosure Statement.

1.106    1.116 *Payment Date*  has the meaning set forth in Section VI.B.2 of this Disclosure Statement.

1.107    1.117 *Peer Group*  has the meaning set forth in Section VIII.C of this Disclosure Statement.

<u>1.108</u> ~~1.118~~ *Plaintiffs* has the meaning set forth in Section IV.C of this Disclosure Statement

<u>1.109</u> ~~1.119~~ *Plan* has the meaning set forth in Section I of this Disclosure Statement.

~~1.120 *Post-Money Equity Value* has the meaning set forth in Section VIII.C of this Disclosure Statement.~~

<u>1.110</u> ~~1.121~~ *PPK* has the meaning set forth in Section VIII.C of this Disclosure Statement.

<u>1.111</u> ~~1.122~~ *pre-change losses* has the meaning set forth in Section XII.A of this Disclosure Statement.

<u>1.112</u> ~~1.123~~ *Prepetition Collateral* means the collateral set forth in the Loan Documents.

<u>1.113</u> ~~1.124~~ *Projections* has the meaning set forth in Section VIII.~~C of this Disclosure Statement.~~

~~1.125 *Purchase Notice* has the meaning set forth in Section VII.G~~<u>B.2</u> of this Disclosure Statement.

<u>1.114</u> ~~1.126~~ *RBP 4* has the meaning set forth in Section VIII.C of this Disclosure Statement.

<u>1.115</u> ~~1.127~~ *Regarded Corporate Debtors* has the meaning set forth in Section XII.A of this Disclosure Statement.

<u>1.116</u> ~~1.128~~ *Regarded Debtors* has the meaning set forth in Section XII.A of this Disclosure Statement.

<u>1.117</u> ~~1.129~~ *REIT* means real estate investment trust within the meaning of Section 856 of the Tax Code.

<u>1.118</u> ~~1.130~~ *Remaining Payments* has the meaning set forth in Section VI.G of this Disclosure Statement.

<u>1.119</u> ~~1.131~~ *Reorganization Value* has the meaning set forth in Section VIII.C.1 of this Disclosure Statement.

~~1.132 *Reorganized Asset Value* has the meaning set forth in Section VIII.C.1of this Disclosure Statement.~~

<u>1.120</u> ~~1.133~~ *Restricted Holders* has the meaning set forth in Section VII.G of this Disclosure Statement.

<u>1.121</u> ~~1.134~~ *Restructuring Term Sheet* has the meaning set forth in Section VII.A of this Disclosure Statement.

1.122 1.135 **_Revised HVM Incentive Program_** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.123 1.136 **_RevPAR_** has the meaning set forth in Section VIII.A of this Disclosure Statement.

1.124 1.137 **_Rule 2015.3 Report_** has the meaning set forth in Section VI.D of this Disclosure Statement.

1.138 **_Satisfaction Notice_** has the meaning set forth in Section VI.D of this Disclosure Statement.

1.125 1.139 **_Schedules_** has the meaning set forth in Section VI.D of this Disclosure Statement.

1.126 1.140 **_Sellers_** has the meaning set forth in Section IV.B of this Disclosure Statement.

1.127 1.141 **_Senior Executives_** has the meaning set forth in Section VI.G of this Disclosure Statement.

1.128 1.142 **_Senior Subordinated Notes_** has the meaning set forth in Section IV.D.6 of this Disclosure Statement..

1.129 1.143 **_Sponsors_** has the meaning set forth in Section II of this Disclosure Statement.

1.130 1.144 **_Starwood Investors_** has the meaning set forth in Section II of this Disclosure Statement.

1.131 1.145 **_Starwood Plan_** has the meaning set forth in Section II of this Disclosure Statement.

1.132 1.146 **_State Court_** has the meaning set forth in Section VI.F of this Disclosure Statement.

1.133 1.147 **_Subsequent Debtors_** has the meaning set forth in Section VI of this Disclosure Statement.

1.134 **_Subsidiary_** of any Person means, with respect to such Person, any corporation, partnership, limited liability company, joint venture or other legal entity of which such Person (either alone or through or together with any other subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity or ownership interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies.

1.135 1.148 **_Successor Trustee_** has the meaning set forth in Section IV.D.2 of this Disclosure Statement.

1.136 1.149 **_Tax Code_** has the meaning set forth in Section XII of this Disclosure Statement.

1.137 1.150 ***Tax Matters Partner*** has the meaning set forth in Section XII.C of this Disclosure Statement.

1.138 1.151 ***Testing Period*** has the meaning set forth in Section XII.C of this Disclosure Statement.

1.139 1.152 ***TIN*** has the meaning set forth in Section XII.D of this Disclosure Statement.

1.140 1.153 ***Transaction Value*** has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.141 1.154 ***TRS*** has the meaning set forth in Section VII.G of this Disclosure Statement.

1.142 1.155 ***Trust*** has the meaning set forth in Section IV.D.2 of this Disclosure Statement.

1.143 1.156 ***Trust and Servicing Agreement*** has the meaning set forth in Section IV.D.2 of this Disclosure Statement.

1.144 1.157 ***UD Debtors*** has the meaning set forth in Section IV.D of this Disclosure Statement.

1.145 1.158 ***U.S. Trustee*** has the meaning set forth in Section VI.C of this Disclosure Statement.

1.146 1.159 ***Valuation Metrics*** has the meaning set forth in Section VIII.C of this Disclosure Statement.

1.147 1.160 ***Wachovia*** means Wachovia Bank, N.A.

~~1.161 *Warrant Agent* has the meaning set forth in Section VII.G of this Disclosure Statement.~~

**B. Other Terms.** Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter.

**C. Exhibits.** All exhibits to the Disclosure Statement are annexed hereto.

**IV.**
**GENERAL INFORMATION**

A.     OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.  The commencement of a Chapter 11 reorganization case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the Commencement Date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession".

The consummation of a plan of reorganization is the principal objective of a Chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor.  Confirmation of a plan of reorganization by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against a debtor are permitted to vote to accept or reject a plan of reorganization.  Prior to soliciting acceptances of a proposed plan, however, Section 1125 of the Bankruptcy Code requires a debtor to prepare, and obtain bankruptcy court approval of, a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable hypothetical investors of the relevant classes to make an informed judgment regarding the plan.  The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors to satisfy the requirements of Section 1125 of the Bankruptcy Code.

B.     CORPORATE STRUCTURE

The Chapter 11 Debtors are the entities that own and operate a portfolio of 666 hotels and one office building.

The chart attached hereto as Exhibit E illustrates that Extended Stay is organized into two segments, operating under different trademarks.  In the ESI segment, non-debtor BHAC owns 100% of the common stock of ESI, which indirectly owns and operates 552 properties using the Extended Stay Hotels service mark, as well as the office building.  BHAC owns the trademarks for the Extended Stay America, Studio Plus, Crossland, and Extended Stay Deluxe brands, along with minor variations of those names, and licenses such trademarks to certain of the Chapter 11 Debtors (the "***BHAC Licensees***") under a non-exclusive license agreement that expires in 2025 and entitles BHAC to a licensing fee of 0.2% of the BHAC Licensees' gross operating revenues.  ESI currently has approximately 90 preferred stock investors.  In the Homestead segment, non-debtor DL-DW owns Homestead.  The Homestead segment owns and operates 114 hotels under the Homestead Studio Suites brand name, along with minor variations of that name, and ~~operates~~until recently, operated one hotel in a non-debtor subsidiary under a short-term lease. Homestead also owns the trademarks associated with such brand names and licenses such trademarks to certain of the Chapter 11 Debtors (the "***Homestead Licensees***") under a non-exclusive license agreement that expires in 2025 and entitles Homestead to a license fee of 0.2% of the Homestead Licensees gross operating revenues.

The Homestead segment and the ESI segment are connected through a common owner, DL-DW, which was formed in June 2007, by an investment consortium consisting of, among others, Lichtenstein and Arbor, for the purpose of the acquisition of the combined business (the "*Acquisition*"), which included the hotels, the headquarters, and all of the Extended Stay brands from BHAC IV, L.L.C. and BRE/HV Holdings L.L.C. (collectively, the "*Sellers*"). As a result of the Acquisition, Lichtenstein and other parties own DL-DW, which, together with those other parties, directly or indirectly owns 100% of the interests in ESI and Homestead. Specifically, (a) Lightstone, together with BRE/ESH Holding LLC (an entity holding the residual investments of the Sellers) and other affiliates, owns DL-DW, which in turn owns Homestead, and (b) Homestead and affiliates of Lightstone and Arbor own BHAC, which in turn owns ESI. The Plan does not provide for any releases relating to any potential claims, causes of action, charges, suits or rights of recovery referenced in the Examiner's Report arising out of or relating to the Acquisition.

There are numerous special purpose entity subsidiaries owned by ESI and Homestead that own, either directly or indirectly, through lease or title, interests in the applicable hotel properties. Among such entities are ten levels of mezzanine entities, each of which was formed in association with the financing of the Acquisition, and each of which pledged its security interest in the equity of the entity beneath it to the Mezz Lenders; thus each mezzanine entity is the sole equity member of the mezzanine entity directly beneath it. In order to implement the mezzanine financing, two branches were established beneath ESI, the ESA Mezz Entities and the ESA P Mezz Entities. Similarly, the Homestead Mezz Entities were established beneath Homestead. In this fashion, (i) the ESA P Mezz Entities own, directly or indirectly, all of the equity interests in the ESA P special purpose entities, (ii) the ESA Mezz Entities own, directly or indirectly, all of the equity interests in the ESA Mezz special purpose entities, and (iii) the Homestead Mezz Entities own, directly or indirectly, all of the equity interests in the Homestead special purpose entities.

C.    BUSINESS BACKGROUND

1.    General

Extended Stay maintains its corporate headquarters in Spartanburg, South Carolina, and its properties extend across 44 states and 2 provinces in Canada. All of the Chapter 11 Debtors are incorporated in Delaware, with the exception of ESA Canada Operating Lessee Inc., which was incorporated in Canada.

2.    Description of the Chapter 11 Debtors' Business

Extended Stay operates in the extended-stay segment of the U.S. lodging industry (an extended-stay is defined as a stay of seven consecutive nights or longer). Extended Stay's hotels provide value-conscious travelers seeking longer-term stays, as well as daily or short-term stays, with an affordable and attractive alternative. The typical Extended Stay guest requires accommodations for significantly longer than is economical for a limited or full service hotel, but not long enough to justify incurring the expense and commitment associated with renting an apartment. Extended Stay achieves lower operating costs than traditional hotels by eliminating certain services in exchange for a lower per night price while also providing amenities such as an in-room kitchen, cable, housekeeping and laundry services.

Extended Stay believes that the extended-stay market can be divided into four general sectors: (i) the upscale sector; (ii) the mid-priced sector; (iii) the economy sector; and (iv) the budget

sector. Extended Stay is the largest owner and operator of mid-price extended stay hotels in the United States. These hotels generally operate at average daily rates between $30 and $70.

Extended Stay's carefully designed lodging accommodations primarily target business travelers on temporary assignment, undergoing relocation or in training, individuals relocating or purchasing a home, people with domestic situations and individuals with other short-term housing needs.

As a result of acquisitions and mergers, Extended Stay has a portfolio of approximately 666 properties and approximately 73,700 units. Extended Stay has fee ownership in substantially all of its properties with no third-party owners or franchisees. Extended Stay's properties are strategically proximate to major business demand generators in large metropolitan areas throughout the United States.

Extended Stay currently operates five hotel brands, including (i) Crossland Economy Studios, (ii) Extended Stay America, (iii) Extended Stay Deluxe, (iv) Homestead Studio Suites, and (v) StudioPLUS Deluxe Studios. Each of these brands is designed to appeal to value-conscious customers at different price points in their respective markets. All of Extended Stay's brands offer the same core components: a living/sleeping area, a fully equipped in-room kitchen, appliances, linens, a bathroom, unlimited local phone use, personalized voicemail, high speed internet access, housekeeping and guest laundry services.

3.      Management Services and Employees

Each Chapter 11 Debtor which owns one or more hotels in the United States has a contract in place with non-Debtor HVM, an entity that is affiliated with, but not owned by, the Extended Stay family of companies. HVM is owned by three individuals Gary DeLapp (President), Robert J. Micklash (Chief Operating Officer) and F. Joseph Rogers (Executive Vice President).

Gary A. DeLapp assumed his current position as President and CEO of HVM in May 2004, with the merger of Homestead Village and Extended Stay America. Previously, he had served as President and CEO of Homestead Village, a company that he joined as Vice President in 1996. Mr. DeLapp became Managing Director of Homestead Village in August 2000 and took the helm as President/CEO in November 2001. Prior to that, Mr. DeLapp was employed with Vista Host, Inc. from 1983 to 1996. Mr. DeLapp is a graduate of Florida State University.

Robert J. Micklash joined HVM as Chief Operating Officer in June 2008, following 11 years at Concord Hospitality Enterprises Company, a hotel management and development group based in Raleigh, N.C, where he most recently served as Chief Operating Officer. Prior to that, Mr. Micklash held senior management positions at Marriott International and Residence Inn Company. Overall he has nearly three decades of experience in the hospitality industry. Mr. Micklash received a bachelor of arts degree in hotel, restaurant and institutional management from Michigan State University in East Lansing, Michigan.

F. Joseph Rogers is the Executive Vice President, Finance of HVM. Prior to the merger of Homestead Village and Extended Stay America in May 2004, he held the position of Vice President and Controller of Homestead Village, which he joined in August 1996. Before joining Homestead, Mr. Rogers was Vice President of Security Capital Group Incorporated with responsibilities for financial reporting, forecasting and analysis from 1992 through 1996. Mr. Rogers has also had responsibilities for financial accounting, reporting and forecasting for the former Security Capital Pacific Incorporated and Security Capital Atlantic Incorporated, from their inceptions in December 1993 through June 1994. Mr.

Rogers received his B.B.A. in Accounting from the University of Oklahoma and is a Certified Public Accountant in the state of Texas.

HVM Manager (an entity owned by David Lichtenstein) acts as the non-member manager of HVM, with the rights and authority to direct the operations of HVM. HVM Canada is a subsidiary of HVM, and manages the three Canadian Extended Stay hotels. Currently, HVM operates as the hotel manager for 686 Extended Stay hotels, in addition to providing administrative functions. The management services provided by HVM and HVM Canada include the implementation of personnel policies and practices, the establishment of prices and room rates, maintenance, renovations, the negotiation and administration of contracts, the maintenance of books and records and the disbursement of mortgaged property revenues.

Currently, HVM employs approximately 9,000 employees in connection with the Debtors' hotels and facilities. There are approximately 7,646 hourly employees and 1,310 salaried employees. In Canada, there are approximately 68 full-time employees and 19 part-time employees. Substantially all of the Chapter 11 Debtors' operating expenses are incurred and paid by HVM, and reimbursed to HVM through the management fee and other arrangements between HVM and the Chapter 11 Debtors.

4.  Legal Proceedings and Claims

(a)  Prior to the Commencement Date, Extended Stay, Inc., ESA Management L.L.C., HVM L.L.C., ESA P Portfolio PA Properties L.L.C., ESA P Portfolio TXNC Properties L.P., ESA P Portfolio L.L.C., ESA P Portfolio MD Trust, ESA Properties L.L.C., ESA PA Properties L.L.C., ESA FL Properties L.L.C., ESA MN Properties L.L.C., ESA TX Properties L.P., and ESA MD Properties Business Trust (the "***Plaintiffs***") settled a series of product liability cases with a windows manufacturer and certain of its insurers over defects in windows installed at a number of hotels. The settlement included the entry of a consent judgment for approximately $30 million to be executed only against the proceeds available under the insurance policies issued by three non-settling insurers. The Plaintiffs, which include Debtor entities, pursued a garnishment action against the non-settling insurers. As of the date hereof, the lawsuit against the remaining three non-settling insurance companies has been settled with respect to one insurer and a bench trial to determine the other two insurance companies' obligations under their respective policies was held in June 2009 in Missouri in the Circuit Court of Osage County (Case No. 06OS- CC00027). Closing arguments in the bench trial were delivered on October 20, 2009 and the court took the matter under advisement. No ruling has been issued yet and no estimate of recovery is available at this time.

(b)  Other Pending Litigation.

The Chapter 11 Debtors are the subject of various claims and lawsuits in the ordinary course of business arising principally from personal injuries, collisions, and other casualties. Although the outcome of any individual claim or action cannot be predicted with certainty, the Debtors believe that any adverse outcome, individually or in the aggregate, would be substantially mitigated by applicable insurance and would not have a material adverse effect on the Debtors' financial position, results of operations or cash flows.

D.  SIGNIFICANT PREPETITION INDEBTEDNESS

In June 2007, Extended Stay was acquired by an investor consortium led by Lichtenstein. The Acquisition was financed through loans in an aggregate amount of $7.4 billion, which consisted of (i)

a mortgage loan in the principal amount of $4.1 billion (the "***Mortgage Debt***") and (ii) an aggregate of $3.3 billion in 10 mezzanine loans (the "***Mezzanine Debt***").  ~~In addition~~Later, B of A extended financing in the principal aggregate amount of $8.5 million (the "***B of A Mortgage Debt***") to debtors ESA UD and ESA Operating Lessee Inc. (the "***Operating Lessee***",  and together with ESA UD, the "***UD Debtors***").

The instruments evidencing Extended Stay's significant indebtedness are described below.  In addition, as of ~~December 31, 2009,~~April 30, 2010, other than amounts owed to HVM, the Chapter 11 Debtors had unsecured prepetition debt of approximately $~~560,000 (~~545,250 (on a consolidated basis, exclusive of any amounts owing in respect of any tax liabilities).

1.    Mortgage Loan Agreement

Pursuant to the Mortgage Loan Agreement and the other Loan Documents, the Mortgage Lenders made a loan in the amount of approximately $4.1 billion to the Mortgage Borrowers.  Each of the Mortgage Borrowers is jointly and severally liable for the Mortgage Debt.  Although the Mortgage Debt is non-recourse, there are certain non-recourse carve-outs under the Mortgage Loan Agreement.  ESI, Homestead, Lightstone (an entity owned by Lichtenstein) and Lichtenstein are the guarantors (collectively, the "***Guarantor***") of the non- recourse carve-out provisions of the Mortgage Debt.  Additionally, ESA P Portfolio MD Trust, ESA P Portfolio MD Beneficiary L.L.C., ESA MD Properties Business Trust and ESA MD Beneficiary L.L.C., collectively, guaranteed the obligations of ESA P Portfolio MD Borrower L.L.C. and ESA MD Borrower L.L.C. under the Mortgage Debt.  ESA Canada Trustee Inc., ESA Canada Beneficiary Inc. and ESA Canada Properties Trust collectively, guarantied the obligations of ESA Canada Properties Borrower L.L.C. under the Mortgage Debt.

The Mortgage Debt is secured by cross-collateralized and cross-defaulted first priority liens on ~~666 properties (collectively, the "***Mortgaged~~the 666 Mortgage*** Properties~~")~~, comprised of 664 hotels, Extended Stay's headquarters building in Spartanburg, South Carolina, and a parcel of undeveloped land located in Minnesota, and the other collateral, as set forth in the Loan Documents, including all of the cash proceeds generated from the ~~Mortgaged~~Mortgage Properties.  The Mortgage Debt is also secured by first priority liens on the intellectual property held by each of BHAC and Homestead.  As of the Commencement Date, the aggregate principal amount Mortgage Debt outstanding was approximately $4.1 billion.

2.    Securitization of the Mortgage Debt

Subsequent to the closing of the 2007 Acquisition, the Mortgage Lenders sold their interests in the Mortgage Debt, and received in exchange therefor certificates representing ownership of the beneficial interests in a vehicle (the "***Trust***") holding the Mortgage Debt and the collateral therefor.  In turn, certain investors bought those interests (the "***Certificate Holders***") which represent beneficial interests in the Trust.  The Trust is governed by the Trust and Servicing Agreement~~, an agreement between Wachovia Large Loan, Inc., as depositor, Wachovia Bank, as servicer and special servicer, and Wells Fargo Bank, N.A., as trustee (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "***Trust and Servicing Agreement***"), dated as of August 1, 2007~~.  The Certificate Holders own 100% of the beneficial interests in the Mortgage Debt.  There are 18 principal balance classes of Certificates and, under the Trust and Servicing Agreement, distributions with respect to the Mortgage Debt are allocated to each class of Certificates based on their alphabetical (and, if applicable, numerical) designation, starting with Class A-1.  The alphabetical (and numerical, if applicable) designation denotes the priority of the class of Certificates as among the other classes of Certificates.

After the Commencement Date, the administration of the Mortgage Debt was transferred to ~~the Special Servicer~~ TriMont Real Estate Advisors Inc., which acted as Special Servicer until May 2010, when the Operating Advisor appointed CW Capital Asset Management LLC as Special Servicer. The Special Servicer has retained the following attorneys:

> *Venable LLP*
> 750 East Pratt Street, Suite 900
> Baltimore, Maryland 21202
> Attn: Gregory A. Cross, Esq.

> *Venable LLP*
> Rockefeller Center, 25th Floor
> 1270 Avenue of the Americas
> New York, New York 10020
> Attn: Carollynn H.G. Callari, Esq.

In addition, U.S. Bank National Association was appointed as successor in interest to Wells Fargo Bank, N.A., as Trustee in Trust for Holders of Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH (the "***Successor Trustee***~~," and together with the trust created under the Trust and Servicing Agreement, dated as of August 1, 2007, the~~ "***Mortgage Debt Parties***"). The Successor Trustee has retained the following attorneys:

> ~~*McKenna Long & Aldridge LLP*~~
> ~~230 Park Avenue, Suite 1700~~
> ~~New York, New York 10169~~
> ~~Attn: Christopher F. Graham, Esq.~~

> ~~303 Peachtree Street, NE~~
> ~~Suite 5300~~
> ~~Atlanta, GA 30308-3265~~
> ~~Attn: Gary Marsh, Esq.~~

> ~~*Latham & Watkins LLP*~~
> ~~885 Third Avenue~~
> ~~New York, New York 10022~~Attn: Mitchell A. Seider, Esq. and Keith A. Simon, Esq")

3.      Mezzanine Loan Agreements

The Mezzanine Borrowers are borrowers under ten different Mezzanine Loan Agreements with the Mezzanine Lenders, each dated June 11, 2007. As of the Commencement Date, the aggregate principal amount of approximately $3.3 billion was outstanding under the Mezzanine Loan Agreements.

Pursuant to the Mezzanine Loan Agreements, each Mezzanine Facility is secured by the applicable Pledge Agreement and the other Mezzanine Loan Documents. The Mezzanine Lenders do not have an interest in any of the ~~Mortgaged~~Mortgage Properties nor any of the other collateral securing the Mortgage Debt, including the cash and proceeds generated from the ~~Mortgaged~~Mortgage Properties. In addition, pursuant to the Intercreditor Agreement discussed below, the Mezzanine Lenders have agreed and acknowledged that they are not creditors of the Mortgage Borrowers with respect to the Mezzanine Facilities. Mezzanine A Borrower is the legal and beneficial owner of 100% of the issued and

outstanding membership interests in certain of the Debtors, and has pledged all of its interests in those entities and certain other rights, and all proceeds of each, as security for the Mezzanine A Loan. Mezzanine B Borrower is the legal and beneficial owner of 100% of the issued and outstanding membership interests in Mezzanine A Borrower, and has pledged all of its membership interests in Mezzanine A Borrower, certain other rights, and all proceeds of each as security for the Mezzanine B Loan; and the same arrangement has been entered into by the Mezzanine C, D, E, F, G, H, I, and J Borrowers for each respective level of the Mezzanine Debt.  Consequently, the Mezzanine J Loan is the most structurally subordinate of the Mezzanine Facilities.

4.    B of A Mortgage Loan Agreement

B of A extended the B of A Mortgage Debt to ESA UD, pursuant to that certain Loan Agreement dated as of February 14, 2008 (as amended, restated, replaced, supplemented or otherwise modified from time to time, together with the other documents executed in connection therewith, collectively, the "***B of A Mortgage Loan Agreement***"), by and among ESA UD, the Operating Lessee and B of A.  The B of A Mortgage Debt is secured by all of the real and personal property interests of ESA UD in two hotels located in Wilkes-Barre, Pennsylvania and Findlay, Ohio (collectively, the "***B of A Prepetition Collateral***").  The B of A Prepetition Collateral is not collateral for the Mortgage Debt or the Mezzanine Debt.  As of the Commencement Date, approximately $8.5 million was outstanding under the B of A Mortgage Loan Agreement.  ESI is the guarantor of certain payment and performance obligations of the UD Debtors the under the B of A Mortgage Loan Agreement.

5.    Intercreditor Agreement

The Mortgage Lenders and the Mezzanine Lenders have entered into an Intercreditor Agreement dated as of June 11, 2007 that governs certain of their respective rights and interests in the Mortgage Loan and the Mezzanine Facilities relating to, among other things, their rights and the exercise of remedies during an Event of Default (as defined in the Intercreditor Agreement) and in the event of a bankruptcy filing of their respective borrowers, and the payment subordination of the Mezzanine Loans to the payment in full of the Mortgage Loan, including related enforcement and turn-over provisions.

6.    Senior Subordinated Notes

Pursuant to the M & T Indenture, ESI authorized the issuance of up to $300 million in principal amount of Senior Subordinated Notes due June 15, 2011, which bear interest at the rate of 9-7/8% per annum (the "***Senior Subordinated Notes***").  Interest on the Senior Subordinated Notes is payable semiannually on June 15 and December 15 of each year.  As of the Commencement Date, approximately $8.5 million in principal amount of the Senior Subordinated Notes was outstanding, including accrued and unpaid interest.   The Plan does not deal with the amounts owed in respect of the Senior Subordinated Notes, because it does not deal with the assets or liabilities of ESI, and because the Plan is not a plan for the estate of ESI.

**V.**
KEY EVENTS LEADING TO THE
COMMENCEMENT OF THE CHAPTER 11 CASES

A.    DETERIORATION IN FINANCIAL PERFORMANCE

Beginning in late 2007 and continuing through 2008 and 2009, Extended Stay faced a liquidity crisis directly attributable to the impact of the deteriorating condition and instability of the

financial markets and general economic conditions on the expected performance of the entire hospitality industry. Taken together and in combination with Extended Stay's highly-leveraged financial structure, Extended Stay's overall financial performance was negatively impacted and resulted in Extended Stay being unable to meet certain financial covenants under its loan documents. The decrease in Extended Stay's revenue, Extended Stay's inability to access certain cash receipts generated from its business, and the strictures of Extended Stay's cash management system resulted in Extended Stay facing certain operational challenges. Ultimately, these challenges precipitated the commencement of the Chapter 11 Cases.

Essentially, the sole source of Extended Stay's revenue stream is the income received from guests who stay at the hotels. Since just after the closing of the Acquisition in June 2007, Extended Stay has operated in a difficult financial environment, driven by reduced consumer and commercial spending and high fuel prices, which had a devastating impact on occupancy rates at Extended Stay hotels. This was exacerbated by the unprecedented collapse of the financial markets and crisis in the credit markets that took place in the Fall of 2008. Since the typical Extended Stay customer seeks a lengthy stay based on commercial relocation, the contraction of construction and new business development began to significantly and adversely affect Extended Stay's revenue stream. The tightening credit markets, the reduction in construction activity and increased unemployment decreased the demand for Extended Stay accommodations, as fewer construction sites, consulting opportunities and travel plans came to fruition.

Inasmuch as construction workers comprise a sizable portion of Extended Stay's revenues, the deterioration in the housing industry which began in the Fall of 2007 had substantial and immediate effects on Extended Stay's revenues. The collapse of the financial markets in September 2008 exacerbated an already difficult situation.

As a result of Extended Stay's decreasing cash revenue, it was unable to comply with the debt yield covenant ("**Debt Yield Covenant**") in the Mortgage Loan Agreement and the Mezzanine Loan Agreements. In addition, because the Cash Management Agreement set forth a specific waterfall for use of funds, Extended Stay was unable to obtain ~~free~~ready access to its own cash. The combination of these factors, and the fact that receipts have been insufficient to fund the full cash flow distribution, as described in the Cash Management Agreement (including occupancy taxes, a necessary requisite for Extended Stay to operate its business), led to a situation in which it appeared that Extended Stay would not have access to sufficient liquidity to run its operations, both in the immediate future and on a long term going concern basis. Although the tranches of the Mortgage Loan that matured in June 2009 had extension terms, such terms required Extended Stay to make significant amortization payments beginning in June of 2009. Based on Extended Stay's cash flow projections and its need to make critical capital expenditures, Extended Stay was significantly over-leveraged and the projected cash flows could not continue to service over $7 billion in debt. As a result, Extended Stay and its professionals determined that a comprehensive restructuring of the entire capital structure was necessary to preserve and maximize value.

B.      THE RESTRUCTURING NEGOTIATIONS

As a result of its liquidity concerns, Extended Stay began to consult with the necessary professionals to facilitate a discussion with the Certificate Holders and the Mezzanine Lenders regarding a potential restructuring of Extended Stay.

In connection with pursuing a restructuring or recapitalization of Extended Stay, Lazard was retained as an investment banker in September 2008. Since that time, Lazard has reviewed and

analyzed Extended Stay's business, operations and financial projections, evaluated Extended Stay's potential debt capacity in light of its projected cash flows, assisted in the determination of a range of value for Extended Stay on a going concern basis, and participated and facilitated meetings and negotiations with the various advisors for the Certificate Holders and the Mezzanine Lenders.

As further detailed in the First Day Declaration, Extended Stay entered into negotiations with various constituencies, including the Certificate Holders and the Mezzanine Lenders, regarding a potential debt restructuring or potential forbearance, but ultimately reached a point in time where it would not have enough cash to sustain its normal operating expenses.

## VI.

## THE CHAPTER 11 CASES

On the Commencement Date, ESI and 69 of its affiliates (collectively, the "***Original Debtors***") each commenced with the Bankruptcy Court for the Southern District of New York a voluntary case under Chapter 11. On February 18, 2010, five additional Affiliates of Extended Stay (the "***Subsequent Debtors***" and, collectively, with the Original Debtors, the "***Chapter 11 Debtors***") each commenced with the Bankruptcy Court a voluntary case under Chapter 11.

A.     FIRST DAY ORDERS

On the Commencement Date, Extended Stay filed a series of motions seeking various relief from the Bankruptcy Court designed to minimize any disruption to Extended Stay's business operations and to facilitate Extended Stay's reorganization.

1.     Case Administration Orders

The Bankruptcy Court issued orders that, among other things: (i) authorized the joint administration of the Chapter 11 Cases, (ii) established certain notice and case management procedures, (iii) authorized the waiver of the requirement to file a list of creditors, (iv) authorized the retention of Kurtzman Carson Consultants LLC as claims and noticing agent, and (v) authorized an extension of time to file schedules and statements of assets of liabilities.[2]

Extended Stay is authorized to operate its business and manage its properties as debtors in possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code.

2.     Critical Obligations

Initially on an interim basis and, later, on a final basis, the Bankruptcy Court authorized Extended Stay to, among other things honor:

- its obligations under its insurance policies;

---

[2] By motion dated February 22, 2010, the Chapter 11 Debtors sought an order of the Bankruptcy Court making substantially all of the orders entered with respect to the Original Debtors applicable to the Subsequent Debtors. Such order was entered on March 16, 2010 [Docket No. 850].

- its obligations for prepetition taxes; and

- its obligations under certain prepetition customer programs.

3.      Financial Operations

The Bankruptcy Court authorized Extended Stay, on an interim basis, and then after a final hearing, to continue to use its existing centralized cash management system, as modified, honor certain prepetition obligations related to the use of the cash management system, and maintain existing bank accounts and business forms (the "***Cash Management Order***").

Pursuant to the Cash Management Order, Extended Stay's banks were authorized to continue the automatic transfer on a daily basis of all available funds in or received in Extended Stay's local bank accounts to the Cash Management Account (as defined in the Cash Management Order) and Wachovia was authorized to transfer all funds in the Cash Management Account automatically into a new bank account at Wachovia (the "***Extended Stay DIP Lockbox***").  Pursuant to the Cash Collateral Order, the funds in the Extended Stay DIP Lockbox were required to be disbursed in accordance with the terms of the Cash Collateral Order.

4.      Business Operations

All Extended Stay hotels are managed by HVM, an entity that is affiliated with, but not owned by, the Extended Stay family of companies.  HVM was set up as the manager for the Extended Stay hotels principally as an accommodation to the initial REIT structure of ESI, and to provide administrative services to the Extended Stay hotels.  HVM, on behalf of Extended Stay, pays all property level expenses of the hotels, contracts with service providers and purchases all goods and materials utilized in the operation of the business.  HVM currently employs approximately 9,000 employees in connection with the operation of the hotels.

The ability of HVM to continue the operation of the Extended Stay portfolio of hotels depends upon the uninterrupted, continued access to the services provided by certain essential service providers to Extended Stay's properties.  Mindful of their fiduciary obligations to preserve and maximize the value of their estates, on the Commencement Date, Extended Stay sought authority to reimburse HVM for certain critical operating expenses, in order to effectuate the seamless transition to a business operating under Chapter 11 and to continue to provide uninterrupted services to the Extended Stay customer.  The Bankruptcy Court authorized Extended Stay, on an interim basis, and then after a final hearing, to continue to reimburse HVM for the critical operating expenses incurred on Extended Stay's behalf prior to the Commencement Date.  Examples of the categories included in the critical operating expenses included, but were not limited to (a) the salaries of approximately 9,000 employees, (b) utility payments, (c) repair and maintenance payments, (d) property taxes, (e) insurance payments, and (f) reservation and travel agent fees (collectively, the "***Critical Operating Expenses***").  Extended Stay also sought to continue to reimburse HVM for such Critical Operating Expenses throughout the pendency of the Chapter 11 Cases pursuant to the Cash Collateral Motion, Cash Collateral Order, and the Budget (as defined in the Cash Collateral Motion).

B.      USE OF CASH COLLATERAL

1.      The Cash Collateral Order

On the Commencement Date, Extended Stay filed a motion for an order (A) (i) Authorizing Use of Cash Collateral, (ii) Granting Adequate Protection, and (iii) Modifying the Automatic Stay, and (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "**Cash Collateral Motion**").  Given that Extended Stay's operations generated positive cash flow on an operating basis, Extended Stay did not negotiate for a debtor-in-possession loan, and instead, Extended Stay negotiated the continued use of cash collateral with the Ad Hoc Mortgage Lender Group (as defined in the Cash Collateral Motion).  The cash collateral funds were expected to serve as the only cash resource during the administration of the Chapter 11 Cases and were used to advance funds to HVM with which to continue to operate Extended Stay's hotel business.  The proposed interim Cash Collateral Order attached to the Cash Collateral Motion, as filed, reflected the terms agreed upon by Extended Stay and the Ad Hoc Mortgage Lender Group prior to the Commencement Date.

After the Commencement Date, the special servicing duties with respect to the Mortgage Debt were transferred from Wachovia as servicer to TriMont Real Estate Advisors Inc., the predecessor to the Special Servicer.  U.S. Bank National Association was appointed the Successor Trustee.  In light of theses changes, Extended Stay determined that it had to re-negotiate the terms of the proposed interim Cash Collateral Order with the Mortgage Debt Parties.  Accordingly, on June 16, 2009, the Bankruptcy Court made a bench ruling authorizing the interim use of cash collateral, and on June 29, 2009, the Bankruptcy Court further authorized the second interim use of cash collateral.  After the final hearing on the Cash Collateral Motion on July 17, 2009, the Bankruptcy Court entered the Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay, dated July 23, 2009 [Docket No. 205].

Pursuant to the Cash Collateral Order, Extended Stay is authorized to utilize cash collateral subject to the terms and conditions of the Cash Collateral Order, pursuant to a 13-week budget (as further amended, the "**Budget**").  As adequate protection for, and solely to the extent of, any diminution of the value of the Mortgage Debt Parties' interest in the Prepetition Collateral from and after the Commencement Date (the amount of any such diminution being referred to as the "**Adequate Protection Obligations**"), the Mortgage Debt Parties were granted the (a) Adequate Protection Liens; (b) Adequate Protection Superpriority Claims; and (c) Adequate Protection Payments (as defined and further set forth in the Cash Collateral Order).

2.      Modification of the Cash Collateral Order

Since the Commencement Date, Extended Stay has been providing payments of approximately $18 million per month to the Mortgage Debt Parties, as Adequate Protection Payments.  However, in the fall of 2009, Extended Stay, together with its professionals, determined that due to the seasonality of Extended Stay's business and the fact that Extended Stay would soon be entering its slow season, Extended Stay might experience a tightening of liquidity without an adjustment to its obligation to make Adequate Protection Payments.  After subsequent discussions and negotiations with the Mortgage Debt Parties, Extended Stay filed its Motion for Order Approving Stipulation and Agreement between Extended Stay and the Mortgage Debt Parties Modifying Final Cash Collateral Order, dated November 17, 2009 [Docket No. 591] (the "**Modification**").

On December 15, 2009, the Bankruptcy Court approved the terms of the Stipulation, Agreement and Order between the Chapter 11 Debtors and the Mortgage Debt Parties Modifying Final

Cash Collateral Order [Docket No. 634]. Pursuant to the Modification, the Adequate Protection Payments were modified as follows:

(a)     On the date that any interest payment is due under the Loan Documents (the "***Payment Date***"), Extended Stay's Adequate Protection Payment may be deferred, in whole or in part, if the amount of Extended Stay's Available Cash (as defined therein), as of the close of business one business day before the Payment Date is less than $22.5 million, after giving effect to the amount of the Adequate Protection Payment (the "***Deferred Adequate Protection Amount***").

(b)     If Extended Stay *does not* have sufficient Available Cash to make the Adequate Protection Payment in a particular month, then the amount deferred shall be added to the Deferred Adequate Protection Amount. If the Mortgage Borrowers *do* have sufficient Available Cash to make the Adequate Protection Payment for that month, then Extended Stay shall pay the Mortgage Debt Parties any Available Cash of Extended Stay's that is in excess of $22.5 million, not to exceed the Adequate Protection Payment for that month plus the then outstanding Deferred Adequate Protection Amount.

As of the date hereof, the Chapter 11 Debtors have had sufficient cash each month to make the Adequate Protection Payments.

C.     CREDITORS' COMMITTEE

On June 24, 2009, the United States Trustee for the Southern District of New York (the "***U.S. Trustee***") pursuant to its authority under Section 1102 of the Bankruptcy Code, appointed the Creditors' Committee.

The current members of the Creditors' Committee are:[3]

Manufacturers and Traders Trust Company
25 South Charles Street- 16th Floor
Baltimore, Maryland 21201
Attn: Robert D. Brown, Administrative Vice President
Tel. No. (410) 244-4238

Ashford Hospitality Finance L.P.
14185 Dallas Parkway, Suite 1100
Dallas, Texas 75254
Attn: David A. Brooks, Vice President
Tel. No. (972) 778-9207

Hospitality F LLC
c/o Greenberg Nicoletta & Stein
370 Lexington Avenue
New York, New York 10017

---

[3] Bank of America, N.A. and Wachovia Bank were initially members of the Creditors' Committee but subsequently resigned. On November 10, 2009, the U.S. Trustee filed the amended list of the members of the Creditors' Committee, which removed Bank of America, N.A. as a member of the Creditors' Committee. On January 25, 2010, the U.S. Trustee filed a second amended list of the members of the Creditors' Committee, which removed Wachovia Bank, N.A. as a member of the Creditors' Committee. On March 3, 2010, the U.S. Trustee filed a third amended list of the members of the Creditors' Committee, which added Atlas Venture I, LLC and KeyBank National Association as members of the Creditors' Committee.

Attn: Sam Weiss, Member
Tel. No. (718) 384-0472

KeyBank National Association
127 Public Square
Mail Code OH-01-27-0844
Cleveland, Ohio   44114
Attn: Scott Childs, Vice President
Tel No. (216) 689-5989

Atlas Venture I, LLC
c/o E2M Partners, LLC
3401 Armstrong Avenue
Dallas, Texas   75205
Attn: Mark D. Van Kirk
Tel No. (214) 443-1924

The Creditors' Committee has the following Bankruptcy Court approved advisors:

| Attorneys | Financial Advisors |
|---|---|
| Hahn & Hessen LLP<br>488 Madison Avenue<br>New York, NY 10022<br>Attn:  Mark T. Power, Esq., Mark S. Indelicato, Esq., and Christopher Jarvinen, Esq. | Jefferies & Company, Inc.<br>520 Madison Avenue, 10th Floor<br>New York, NY 10022<br>Attn: Michael Henkin and David Losito |
|  |  |
| Hospitality Advisors | Information Agent |
| Jones Lang LaSalle Hotels<br>153 East 53rd Street, 33rd Floor<br>New York, NY 10022<br>Attn: Arthur Adler | BMC Group, Inc.<br>Information Agent<br>600 First Avenue, Suite 300<br>Seattle, WA 98104<br>Attn: Tinamarie Feil |

Since the appointment of the Creditors' Committee, Extended Stay has consulted with the Creditors' Committee concerning the administration of the Chapter 11 Cases.  Extended Stay has informed the Creditors' Committee with respect to its operations and informed the Creditors' Committee of actions and transactions outside the ordinary course of business.

On August 12, 2009, the Bankruptcy Court entered the Stipulation and Agreed Order Between Extended Stay and the Official Committee of Unsecured Creditors of Extended Stay Inc., et al., Clarifying Its Requirement to Provide Access to Information Pursuant to 11 U.S.C. §§ 105(a), 1102(b)(3)(A) and 1103(c).  Extended Stay has consulted with the Creditors' Committee regarding information requests, and has provided certain requested documents in response to various information requests by the Creditors' Committee.

D.      SCHEDULES, BAR DATE AND RULE 2015.3 REPORTS

On September 28, 2009, the Original Debtors filed their schedules of assets and liabilities, and statements of financial affairs (the "***Schedules***") [Docket Nos. 314-454]. The Subsequent

Debtors filed their Schedules on March 4, 2010. On October 13, ~~2009~~ 2009 and April 13, 2010, Extended Stay filed its first and second Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Debtors' Estate Holds a Substantial or Controlling Interest pursuant to Bankruptcy Rule 2015.3 (the "**Rule 2015.3 Report**"). On November 19, 2009, the Bankruptcy Court entered an order establishing **Friday, January 15, 2010 at 5:00 p.m. (prevailing Eastern Time)** as the last date and time (the "**Bar Date**") for each person or entity (including without limitation, each individual, partnership, joint venture, corporation, estate, trust, and governmental unit (as defined in Section 101(27) of the Bankruptcy Code)) to file a proof of claim based upon prepetition claims against Extended Stay. A bar date has not yet been established for the Subsequent Debtors, because the Subsequent Debtors have no assets or liabilities. In accordance with the order establishing the Bar Date, Extended Stay mailed a notice of the Bar Date and a proof of Claim form to all known holders of Claims and, on November 25, 2009, published notice of the Bar Date in the Wall Street Journal.

E.      APPOINTMENT OF AN EXAMINER

On July 30, 2009, the U.S. Trustee filed the Motion for the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code [Docket No. 219] (the "**Examiner Motion**"). After subsequent discussions with Extended Stay, the Successor Trustee, the Creditors' Committee and other parties in interest regarding the relief requested in the Examiner Motion, the U.S. Trustee narrowed the scope of the proposed examiner's duties. On September 28, 2009, Ralph R. Mabey was appointed as examiner in the Chapter 11 Cases (the "**Examiner**") and by order dated September 29, 2009 [Docket No. 455], the Court approved the appointment of the Examiner (the "**Examiner Order**").

By order dated December 11, 2009, the Bankruptcy Court approved the retention of Stutman, Treister & Glatt Professional Corporation as counsel for the Examiner, *nunc pro tunc* to September 24, 2009 [Docket No. 618]. By order dated December 11, 2009, the Bankruptcy Court approved the retention of Alvarez & Marsal Dispute Analysis Forensic Services, L.L.C. as financial advisor for the Examiner, *nunc pro tunc* to October 13, 2009 [Docket No. 619].

On December 11, 2009, the Bankruptcy Court entered the Order Granting the Examiner's Motion for an Order Approving the Examiner's Work Plan and Budget (as Amended) [Docket No. 616]. Since the appointment of the Examiner and its professionals, Extended Stay and the other parties in interest have negotiated confidentiality agreements, and responded to document requests and participated in numerous interviews and depositions. ~~The deadline for the Examiner to file its report which was originally February 19, 2010, but was extended by order of the Bankruptcy Court to March 12, 2010.~~ On April 8, 2010, the Examiner publicly filed his report [Docket No. 913] (the "**Examiner's Report**"). On May 25, 2010, the Examiner filed an Errata Sheet to the Examiner's Report [Docket No. 1011].

F.      ADVERSARY PROCEEDINGS

Since the Commencement Date, the Chapter 11 Debtors have been involved in three adversary proceedings in the Bankruptcy Court. Each proceeding is summarized briefly below.

The B of A Action

On June 16, 2009, B of A, Wachovia, and U.S. Bank National Association, as trustee for Maiden Lane Commercial Mortgage Backed Securities Trust 2008-1 (collectively, the "**B of A Plaintiffs**") initiated an action in the Supreme Court of the State of New York, County of New York (the "**State Court**") styled *Bank of America N.A., Wachovia Bank N.A., and U.S. Bank National Association, as Trustee for Maiden Lane Commercial Mortgage Backed Securities Trust 2008-1 v. Lightstone*

*Holdings LLC and David Lichtenstein* (the "***B of A Action***") by filing a summons with notice, followed by a motion for summary judgment in lieu of complaint pursuant to Section 3213 of the New York Civil Practice Law and Rules, against Lightstone Holdings LLC and David Lichtenstein (collectively, the "***B of A Defendants***"). ~~Debt II ESH, L.P. and Debt-U ESH, L.P., which are Affiliates of Starwood Capital, are plaintiffs in this litigation.~~ In their motion, the B of A Plaintiffs are seeking money damages against the B of A Defendants in excess of $100 million.

Initially, the B of A Defendants removed the B of A Action from the State Court to the United States District Court for the Southern District of New York (the "***District Court***"), which, in turn, referred the matter to the Bankruptcy Court, where the matter was docketed as adversary proceeding 09-01353 (JMP). In response, the B of A Plaintiffs sought an order remanding the B of A Action to the State Court. The Debtors and the B of A Defendants opposed the remand motion and the Debtors also moved to intervene in the adversary proceeding. By order dated October 7, 2009, the Bankruptcy Court remanded the B of A Action to the State Court, without ruling on the Debtors' motion to intervene [Docket No. 26].

On October 16, 2009, the B of A Defendants filed a notice of appeal of the order remanding the B of A Action to the State Court. The Debtors filed a notice of appeal on October 22, 2009. The appeals are fully-briefed and currently are pending before District Judge Laura Taylor Swain. The B of A Plaintiffs and the B of A Defendants have agreed to stay the proceedings in State Court until the District Court has decided the appeal of the remand action.

The Five Mile Action

On June 23, 2009 (and amended June 26, 2009), Five Mile Capital II SPE ESH LLC (the "***Five Mile Plaintiff***") initiated a suit, styled *Five Mile Capital II SPE ESH LLC v. Cerberus Capital Management L.P., Centerbridge Partners, L.P., The Blackstone Group, Inc. and GEM Capital Management, Inc.* (the "***Five Mile Action***") against Centerbridge Partners, L.P., Cerberus Capital Management, L.P., The Blackstone Group, Inc. and GEM Capital Management, Inc. (collectively, the "***Five Mile Defendants***") in the State Court.[4] In the Five Mile Plaintiff's amended complaint, the Five Mile Plaintiff sought to hold the Five Mile Defendants liable for damages that allegedly resulted from the actions of the Five Mile Defendants in negotiating the terms of a restructuring with Extended Stay and to enjoin the Five Mile Defendants from conducting any further negotiations with the Chapter 11 Debtors.

Initially, the Five Mile Defendants removed the Five Mile Action from State Court to District Court, which, in turn, referred the matter to the Bankruptcy Court, where the matter was docketed as adversary proceeding 09-01367 (JMP). In response, the Five Mile Plaintiff sought an order remanding the Five Mile Action to the State Court. The Debtors and the Five Mile Defendants opposed the remand motion and the Debtors also moved to intervene in the adversary proceeding. On October 7, 2009, the Bankruptcy Court denied the Five Mile Plaintiff's motion to remand, and on October 8, 2009 the Bankruptcy Court granted the Debtors' motion to intervene in the Five Mile Action. That same day, the Five Mile Plaintiff filed a notice of appeal of the order denying the remand of the Five Mile Action and a separate notice of appeal of the order granting the Debtors' motion to intervene. The appeals are fully briefed and currently are pending before District Judge Laura Taylor Swain.

The Line Trust Action

---

[4] The Five Mile Plaintiff amended the Five Mile Action on June 26, 2009 to add defendants The Blackstone Group, Inc. and GEM Capital Management, Inc.

On June 24, 2009, Line Trust Corporation Ltd. and Deuce Properties Ltd. (collectively, the "**Line Trust Plaintiffs**") initiated an action, styled *Line Trust Corporation Ltd. and Deuce Properties Ltd., v. David Lichtenstein, Lightstone Holdings LLC, Wells Fargo Bank, N.A., in its capacity as trustee, Wachovia Bank N.A., Bank of America, N.A., U.S. Bank National Association, Cerberus Capital Management, L.L.C., Centerbridge Partners, L.P., and John Does 1-20, being persons whose identities are presently unknown to the B of A Plaintiffs and who are acting as Supporting Holders of the Term Sheet proposed by Lichtenstein* (the "**Line Trust Action**") through the filing of a complaint in the State Court against David Lichtenstein, Lightstone Holdings LLC, Wells Fargo Bank, N.A., in its capacity as trustee, Wachovia Bank N.A., Bank of America, N.A., U.S. Bank National Association, Cerberus Capital Management, L.L.C., Centerbridge Partners, L.P., and John Does 1-20, being persons whose identities are presently unknown to the B of A Plaintiffs and who are acting as Supporting Holders of the Term Sheet proposed by Lichtenstein (the "**Line Trust Defendants**").  In their complaint, the Line Trust Plaintiffs alleged, *inter alia*, claims for breach of a guarantee agreement, breach of fiduciary duty and tortious interference with contractual relations among the Debtors' lenders.

Initially, certain Line Trust Defendants removed the Line Trust Action from State Court to District Court, which, in turn, referred the matter to the Bankruptcy Court, where the matter was docketed as adversary proceeding 09-01354 (JMP).  In response, the Line Trust Plaintiffs sought an order remanding the Line Trust Action to the State Court.  The Debtors and certain Line Trust Defendants opposed the remand motion and the Debtors also moved to intervene in the adversary proceeding.  On October 7, 2009, the Bankruptcy Court remanded the Line Trust Action to the State Court, without ruling on the Debtors' motion to intervene [Docket No. 47].

On October 16, 2009, October 22, 2009, and October 26, 2009, the Debtors and certain of the Line Trust Defendants filed notices of appeal of the order remanding the Line Trust Action to the District Court.  The appeals are fully briefed and are currently pending before District Judge Laura Taylor Swain.

In addition, the Line Trust Plaintiffs filed a motion for summary judgment in State Court against Lightstone Holdings LLC and David Lichtenstein, and Lightstone Holdings LLC and David Lichtenstein filed papers in opposition to the motion.  The Line Trust Plaintiffs filed their reply papers for the summary judgment motion on March 25, 2010.  Other defendants have also filed motions to dismiss the Line Trust Action, which are fully-briefed.  However, the State Court judge ~~recently~~ determined that he would not make a ruling on any of the Line Trust matters before him until the District Court has made a ruling on the appeals of the remand order.  ~~The State Court judge has scheduled a status conference for June 30, 2010.~~

G.     HVM INCENTIVE PLAN

Well in advance of the Commencement Date, in September 2008, HVM entered into agreements (the "**Letter Agreements**") with many of its key employees (the "**Critical Employees**"), which included senior management, 14 field supervisors, 40 regional directors of operations and various other executives responsible for the operations of the Extended Stay hotels.   Although the Letter Agreements were entered into in advance of the Commencement Date, they were entered into in contemplation of the financial restructuring of Extended Stay that was foreseeable at that time and in order to provide stability to Extended Stay's operations during an uncertain, but critical, period.  Pursuant to the Letter Agreements, each Critical Employee was entitled to a cash bonus equal to the specified amount set forth in its respective Letter Agreement, with one-third of the amount having been due (and paid) on December 31, 2008, and the remaining two-thirds due on September 30, 2009 (such remaining amounts, the

"**Remaining Payments**").  As of the Commencement Date, the total Remaining Payments aggregated approximately $4.4 million.

Pursuant to the terms of the Cash Collateral Order, the Chapter 11 Debtors obtained authority to utilize Cash Collateral in accordance with the budget attached thereto.  However, approval of $4.5 million of payroll-related expenses in the Budget was deferred, subject to further discussions with the Successor Trustee, the Special Servicer and the Creditors' Committee.  On October 6, 2009, Extended Stay filed a motion seeking authorization to use the Extended Stay's Cash Collateral for payments regarding the HVM LLC Incentive Program [Docket No. 487] (the "**HVM Incentive Program Motion**") in order to ensure that prompt redress to the Court was available if the HVM Incentive Plan was not consented to by the ~~Special Servicer~~Successor Trustee or the Creditors' Committee asserted an objection to the proposed budget modifications that would have been required in order to effectuate the HVM Incentive Program.  The U.S. Trustee and the Creditors' Committee filed objections to the HVM Incentive Program Motion [Docket Nos 502 and 530, respectively].

As a result of the U.S. Trustee's objection, Extended Stay and HVM, with the assistance of their respective advisors, restructured and modified the HVM Incentive Program (as amended, the "**Revised HVM Incentive Program**").  By the Order Authorizing Use of Cash Collateral for Payments Regarding HVM LLC Incentive Program for Non-Senior Management Critical Employees, dated October 29, 2009 [Docket No. 543], the Remaining Payments for Critical Employees, except for five senior executives (the "**Senior Executives**"), were approved.

Later, pursuant to the Second Order Authorizing the Use of Cash Collateral for Payments Regarding the Revised HVM LLC Incentive Program issued on November 12, 2009 the Bankruptcy Court approved the Revised HVM Incentive Program for the Senior Executives [Docket No 582].

Under the terms of the Revised HVM Incentive Program, substantially all of the payments to the Senior Executives were modified to be performance-based.  The Revised HVM Incentive Program added another performance metric to the calculation of whether all the Critical Employees qualify for the Additional Payments and whether the Senior Executives qualify for the Quarterly Payments.  The net effect of the third metric is that 50% of the calculation is based on the RevPar Index and 50% will be based on cost factors, divided equally between Controllable Costs Per Occupied Room and Corporate Overhead.

Pursuant to the terms of the Revised HVM Incentive Plan, 65% of the compensation proposed for the Critical Employees and 96% of the compensation proposed for the Senior Executives is triggered by certain performance-based metrics, assuming Extended Stay achieves its fourth revised business plan (the "**Business Plan**") and its peers perform as expected.  These metrics are (i) the RevPAR Index Percentage Change, (ii) the change in Controllable Cost Per Occupied Room, and (iii) the Corporate Overhead performance.  In addition, the Senior Executives are compensated for expediting the Chapter 11 Debtors' emergence from Chapter 11.  Ultimately, after extensive negotiations and modifications, the terms of the Revised HVM Incentive Program were agreed to by the Chapter 11 Debtors, HVM, the ~~Special Servicer~~Successor Trustee, the Trustee, the U.S. Trustee and the Creditors' Committee.  Pursuant to the Second Order Authorizing Use of Cash Collateral for Payment Regarding the Revised HVM Incentive Program, dated November 11, 2009 [Docket No. 582], the terms of the Revised HVM Incentive Plan were approved.  Since the entry of the order, all of the Critical Employees entered into letter agreements that reflect the terms of the Revised HVM Incentive Plan.  To date, approximately $1.2 million of the Remaining Payments have been distributed to the Critical Employees who are not Senior Executives, and approximately $~~2.1~~4.4 million, representing the quarterly

~~payment~~payments for the ~~period~~periods ending December 31, ~~2009, has~~2009 and March 31, 2010, have been paid to the Senior Executives.[5]

**VII.**

THE PLAN OF REORGANIZATION

A.     SUMMARY OF NEGOTIATIONS LEADING UP TO THE FILING OF THE PLAN

After stabilizing their business and addressing other immediate challenges of the bankruptcy filing, the Chapter 11 Debtors and their advisors turned to the challenge of the Chapter 11 Debtors' over-leveraged capital structure.  The Chapter 11 Debtors initially attempted to proceed with negotiations designed to garner support for a plan of reorganization premised upon the terms set forth in the restructuring term sheet that accompanied the First Day Declaration (the "***Restructuring Term Sheet***").  The Chapter 11 Debtors also engaged in discussions with the predecessor to the Special Servicer as to plan alternatives.  However, due to the continuing deterioration of the economy, in general, and the hotel business, in particular, as well as the Chapter 11 Debtors' substantial need for capital expenditures, it became apparent that new capital would be required for the Chapter 11 Debtors to emerge from bankruptcy with a feasible plan.  Specifically, the Chapter 11 Debtors determined that they would need a substantial cash infusion to pay debt service and to continue the necessary investment in capital improvements that will be necessary to the Chapter 11 Debtors' financial performance.  As a result, the Chapter 11 Debtors determined that the Restructuring Term Sheet, which did not contemplate a cash investment, no longer provided a viable restructuring plan and, therefore, should no longer be pursued.

The Chapter 11 Debtors communicated their need for incremental capital to, and engaged in discussions with, various parties.  Responding to the Chapter 11 Debtors' request, in late November 2009, the Original Sponsors began discussing with the Debtors a potential "new money" plan that would include a direct equity investment and a backstopped rights offering.  Such discussions culminated on February 19, 2010 with the filing of the Original CB/P Approval Motion, which included as exhibits a Commitment Letter from the CB/P Investors, the Original CB/P ~~Investment and Standby Purchase~~ Agreement and the Original CB/P Plan.

Shortly after the filing of the Original CB/P Approval Motion, the Debtors received a proposal from the Starwood Investors, which the boards of directors of the Debtors determined, pursuant to the exercise of their fiduciary duties, was a superior offer to the transactions contemplated by the Original CB/P Plan. Thus, the Chapter 11 Debtors terminated the Original CB/P Agreement and entered into the Starwood Commitment Letter and the Starwood Investment Agreement, and filed the related Plan.

Following the entry into of the Starwood Commitment Letter and Starwood Investment Agreement, the Chapter 11 Debtors received a revised proposal from the Original Sponsors, which the boards of directors of the Chapter 11 Debtors determined pursuant to the exercise of their fiduciary duties, was a superior offer to the transactions contemplated by the Starwood Plan.  Thus, the applicable Debtors terminated the Starwood Commitment Letter and Starwood Investment Agreement and entered into the

---

[5] In addition, approximately $918,000 attributable to the stub period ending December 31, 2009 has been placed in escrow for the benefit of the Senior Executives.

Amended CB/P Commitment Letter, pursuant to which, the Sponsors,[6] through the Investor committed to (i) comply with the terms of the Starwood Plan but without certain bid protection provisions, the management fee and the incentive compensation arrangement, and (ii) engage in the negotiation of, and participate in, a bidding and plan process which included the Auction, and in connection therewith provided a deposit of $150,000,000 which amount is being held in escrow.

Pursuant to the terms of the Amended CB/P Commitment Letter, the parties agreed to Bidding Procedures governing the Auction process. The Bidding Procedures allowed parties with a potential interest in the Debtors both notice and sufficient time to finalize diligence and submit fully-financed binding proposals by the conclusion of the bidding period. The Bidding Procedures also allowed the Debtors sufficient time to assess and develop such proposals and discuss them with the advisors to the Creditors' Committee and the Mortgage Debt Parties. The Bidding Procedures and Auction process were designed to encourage all parties to put their best proposal forward, bring finality to the Debtors' competitive plan process, and create a path towards confirmation of a plan that embodies the highest or best available recoveries to creditors.

The Auction was held on May 27, 2010 and after several rounds of bidding and a substantial improvement in terms, the Sponsors' proposal was selected as the highest ~~or best bid~~and best bid. The Sponsors' proposal was also supported by the Special Servicer and Operating Advisor, who agreed that it was highest and best. The Sponsors' proposal provided for the sale of the Debtors free and clear of all claims, liens, encumbrances charges and other interests in exchange for cash and certain other consideration with an aggregate value of $3.925 billion. Following the Auction, the Investor and the Debtors entered into the Investment ~~and Standby Purchase~~ Agreement setting forth the terms of the investment. The Auction represented the culmination of an extensive marketing process that gave every interested party a full and fair opportunity to conduct extensive due diligence and to bid, and the current Plan represents the highest ~~or best offer the Debtors obtained~~and best offer for the equity of NewCo and the Reorganized Debtors. Contemporaneously upon the execution of the Investment Agreement, the Sponsors and the Special Servicer, Operating Advisor and Controlling Holder, as the parties that ultimately, either directly or indirectly, vote the Mortgage Facility Claim and the Mortgage Facility Deficiency Claim, entered into a Plan Support Agreement, pursuant to which the parties agreed to, among other things, support confirmation of the Plan and, as to the Special Servicer, vote to accept the Plan.

As part of this ~~investment, assuming Class 2 accepts the Plan, the Investor will acquire approximately 42.85% of the NewCo Common Interests (assuming that none of the New Warrants described below have been exercised as of the Effective Date, and subject to adjustment in connection with the Class B - H Equity Cashout Option and the Rights Offering also described below), for a cash contribution of $450,000,000. The Investor will also backstop a Rights Offering that will generate additional proceeds of up to $200,000,000, and commit an additional amount of up to $255,400,000 to provide a cash alternative for holders of Certificates in Classes B - H, who elect to receive cash in lieu of their equity distribution under the Plan. Assuming that all Rights are exercised in the Rights Offering, the Investor and its Affiliates would hold 61.0% in the aggregate (including the NewCo Common Interests received in exchange for the $450,000,000 equity investment to be made by the Investor in NewCo and the Rollover Equity and the NewCo Common Interest associated with the Rights issued to those Sponsors holding Class B - K Mortgage Certificates), Rights Offering Participants would hold 13.2% and other~~

---

[6] As set forth above, the Original Sponsors agreed to assign a portion of their commitment to sponsor the Plan to ~~BREA~~BREP VI.

holders of Rollover Equity would hold 25.8% of the outstanding NewCo Common Interests following the Effective Date. In the event that no Rights were exercised, the Investor and its Affiliates would hold 74.2% of the outstanding NewCo Common Interests in the aggregate (including the NewCo Common Interests received in exchange for the $450,000,000 equity investment to be made by the Investor in NewCo, the NewCo Common Interests received in exchange for the backstop of the Rights Offering and the Rollover Equity received by the those Sponsors holding Class B – K Mortgage Certificates) and the other holders of Rollover Equity would hold 25.8% following the Effective Date purchase and investment, the Investor will acquire 100% of the NewCo Common Interests in exchange for cash in the aggregate amount of $3,615,755,444.28 and the contribution of Mortgage Certificates held by the Investor and its members or Affiliates in the aggregate amount of $309,244,555.72 (subject to adjustment as set out in the Investment Agreement).

Pursuant to the terms of the Plan, the holder of the Mortgage Facility Claim will receive the Cash Distribution, the Investor Certificates and interests in the Litigation Trust to the extent it is a Litigation Trust Beneficiary. The holders of Mezzanine Facilities Claims and General Unsecured Claims will also receive interests in the Litigation Trust to the extent they are Litigation Trust Beneficiaries. The Cash Distribution generally consists of the Debtors' cash and cash equivalents as of the Effective Date, less the payment of Administrative Expense Claims and Priority Claims, plus a cash payment by the Sponsors, less certain deductions.

Pursuant to the Plan, the equity interests in the Mortgage Borrowers and certain other Chapter 11 Debtors will be cancelled and reissued to NewCo. The balance of the Debtors will be liquidated and dissolved as of the Effective Date. Thus, under the Plan, NewCo will be owned indirectly by the Sponsors, through the Investor or one or more other entities, and NewCo will own and control the Mortgage Properties and other assets necessary to operate the Debtors' businesses.

Pursuant to the Plan, proceeds from the investment and sale, together with the Debtors' cash on hand, will be sufficient and used to (i) fund the Administrative/Priority Claims Reserve, which will be used to pay all Allowed Administrative Expense Claims and Priority Claims (excluding only those claims of the type referred to in clause (c)(i) of the definition of "Allowed" incurring in the ordinary course of businesses and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date), and the fees and expenses of the Plan Administrator, (ii) fund the Mortgage Parties Indemnification Fund, (iii) fund the Litigation Trust, (iv) fund the wind-down of ESI, (v) pay for the purchase of control of HVM and its assets and (vi) make distributions to the holder of the Mortgage Facility Claim.

The Sponsors consist of Centerbridge and, Paulson and BREP VI, each on behalf of various investment funds and accounts managed by them, and BREA. Centerbridge was established in 2006 and currently has approximately $11 billion in capital under management across several funds. The firm is dedicated to partnering with world class management teams to invest across multiple stages of a company's life cycle and to employ various strategies to help companies achieve their operating and financial objectives. Centerbridge's limited partners include many of the world's most prominent financial institutions, university endowments, pension funds, and charitable trusts. Paulson is an SEC registered investment advisor with offices in New York, London and Hong Kong and approximately $32 billion of capital under management as of December 31, 2009. The firm was founded in 1994 by John Paulson who is the President and Portfolio Manager of Paulson. One of Paulson's areas of specialty is in providing capital to reorganizing companies to help them exit bankruptcy with less debt allowing them to grow and prosper. BREA is a general partner of Blackstone Real Estate Partners VI L.P., BREP VI is one in a series of  real estate funds managed by predecessors or affiliates of BREA. Blackstone Real Estate

Associates VI L.P.  The Blackstone real estate funds have made significant investments in lodging, major urban office buildings and a variety of real estate operating companies, and as of December 31, 2009, had $20.4 billion of assets under management.  The Debtors have been advised that ~~BREA~~BREP VI is a separate and distinct entity from that of the Sellers and was not involved in the Acquisition.

The Plan further provides that all of the property of the Debtors, including the Mortgage Properties, transferred to or vesting in the Reorganized Debtors and/or NewCo shall vest in the Reorganized Debtors and/or NewCo free and clear of claims, liens, encumbrances, charges and other interests, including, without limitation, any and all claims, liens, encumbrances and any and all right, title, interests related thereto of governmental entities relating to any tax liabilities or similar liabilities.  As a result of consummation of the Plan, provided it is in accordance with the Investment Agreement, and pursuant to the Plan,  NewCo and the Reorganized Debtors shall not assume, incur or be responsible for any claims or liabilities of the Debtors or any of their affiliates, except for those claims of the type referred to in clause (c)(i) of the definition of "Allowed"  incurred in the ordinary course of business and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, and neither the Reorganized Debtors, NewCo, the Investor, the Sponsors nor the Debt Financing Lenders shall be successors of the Debtors or ESI nor incur any successor or transferee liability of any kind, nature or character, including, without limitation, in relation to (1) the liabilities arising or resulting from or relating to the transactions contemplated by the Plan, and (2) any and all claims, liens, encumbrances, and any and all right, title, and interests related thereto, of governmental entities relating to any tax or similar liabilities.

As discussed in Article IV hereof, concurrently with the negotiations of the Investment ~~and Standby Purchase~~ Agreement and the Plan, in order to preserve the current operations and management of the Debtors' businesses, including the employment of HVM's 9,000 employees, ensure a seamless transition of the hotel properties and prevent any diminution in the value of the Debtors' estates, the Investor and Debtors have entered into the Membership Interest Purchase Agreement with David Lichtenstein, pursuant to which, on the Effective Date, in exchange for a $40,000,000 payment (which payment shall be funded out of the proceeds of the Investment), the Investor or one or more of its designees, which may be a third party, will acquire all of the outstanding equity of HVM Manager or, at the option of the Investor, HVM Manager will resign as manager of HVM and appoint one or more designees of the Investor, which may be a third party, as successor manager of HVM and convey to such successor manager  such assets of HVM Manager as designated by the Investor.  This acquisition and the related transactions are predicated on and subject to the Plan becoming effective and the implementation of the transactions contemplated by the Plan and the Investment ~~and Standby Purchase~~ Agreement.

B.      DEBTORS UNDER THE PLAN

Neither the Starwood Investors nor the Sponsors were willing to purchase and structure a proposed plan of reorganization for all of the Chapter 11 Debtors, including ESI.  The Debtors believe that ESI's assets have minimal, if any, value.  Consequently, and in view of all of the other advantages presented by the Plan, the Debtors determined to proceed without including ESI in the Plan, except to the extent of incorporation of the ESI Settlement.  The Debtors and their professionals have not yet determined the most appropriate treatment of ESI ~~and its creditors~~, although the Plan provides for $750,000 to be set aside for the wind-down of ESI's estate.

## C.  PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

### 1.  Payment of Allowed Administrative Expense Claims

The Allowed Amount of each Administrative Expense Claim that is Allowed as of the Effective Date shall be paid in full, in Cash, on the Effective Date from the Administrative/Priority Claims Reserve; provided~~,~~ , however~~,~~ that ~~Administrative Expense Claims~~(a) claims of the type specified in Section ~~1.6~~1.7(c)(i) of the Plan, (b) any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and (c) any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, shall be assumed and paid by the Reorganized Debtors or NewCo, as applicable, in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.  Each holder of an Administrative Expense Claim of the type specified in Section ~~1.6~~1.7(c)(ii) or Section ~~1.6~~1.7(c)(iii) of the Plan shall be paid the Allowed Amount of such Administrative Expense Claim in full, in Cash, as soon as practicable after such Administrative Expense Claim is Allowed from the Administrative/Priority Claims Reserve.  In the event that there is any dispute as to whether an Allowed Administrative Expense Claim should be paid from the Administrative/Priority Claims Reserve or by the Reorganized Debtors or NewCo, as applicable, such dispute shall be resolved by the Bankruptcy Court.

### 2.  ~~2.~~  Compensation and Reimbursement Claims

The Bankruptcy Court shall fix in the Confirmation Order a date for the filing of, and a date to hear and determine, all applications for final allowances of compensation or reimbursement of expenses under section 330 of the Bankruptcy Code or applications for allowance of Administrative Expense Claims arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code.  The Allowed Amount of all Administrative Expense Claims arising under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code shall in full satisfaction, settlement, discharge and release thereof, and in exchange therefore, be paid in full, in Cash, from the Adminstrative/Priority Claims Reserve (a) upon the later of (i) the Effective Date and (ii) the date upon which any such Administrative Expense Claim becomes Allowed or (b) at such later date or upon such other less favorable terms as may be mutually agreed upon between each such Administrative Expense Creditor and the ~~Reorganized Debtors or NewCo, as applicable.~~Plan Administrator.

### ~~3.~~4.  Priority Tax Claims

Each holder of an Allowed Priority Tax Claim shall, in full satisfaction, settlement, discharge and release thereof, and in exchange therefore, be paid the Allowed Amount of its Allowed Priority Tax Claim from the Administrative/Priority Claims Reserve either (a) in full, in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law or (b) upon such other terms as may be mutually agreed upon between each holder of a Priority Tax Claim and ~~the Reorganized Debtors or NewCo, as applicable~~Plan Administrator.

## D.  CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| CLASS | DESIGNATION | STATUS | ENTITLED |
|-------|-------------|--------|----------|

| | | | **TO VOTE?** |
|---|---|---|---|
| Class 1 | Priority Claims | Unimpaired | No |
| Class 2 | Mortgage Facility Claim | Impaired | Yes |
| Class 3 | ESA UD Mortgage Claim | Impaired | Yes |
| Class 4A | Mortgage Facility Deficiency Claim ~~and Mezzanine Facilities Claims~~ | Impaired | Yes |
| Class 4B | Mezzanine Facilities Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Impaired | Yes |
| Class 6 | Existing Equity | Impaired | No |
| Class 7 | ESA MD Properties Trust Certificate | Unimpaired | No |
| Class 8 | ESA MD Borrower Interests | Unimpaired | No |
| Class 9 | ESA P Portfolio MD Trust Certificate | Unimpaired | No |
| Class 10 | ESA P Portfolio MD Borrower Interests | Unimpaired | No |
| Class 11 | ESA Canada Properties Interests | Unimpaired | No |
| Class 12 | ESA Canada Properties Borrower Interests | Unimpaired | No |
| Class 13 | ESH/TN Properties L.L.C. Membership Interests | Unimpaired | No |
| Class 14 | ESH/ESA General Partnership Interests | Unimpaired | No |
| Class 15 | Other Existing Equity Interests | Impaired | No |

E.      TREATMENT OF CLAIMS AND EQUITY INTERESTS

1.      Class 1.  Priority Claims

(a)      *Classification*:  Class 1 consists of the Allowed Priority Claims.

(b)      *Treatment*:  Each holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim from the Administrative/Priority Claims Reserve, in full, in Cash, on the later of the Effective Date and as soon as practicable after the date such Priority Claim becomes Allowed.

(c)      *Voting*:  Class 1 is Unimpaired.  The holders of the Claims in Class 1 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

2.      Class 2.  Mortgage Facility Claim

(a)      *Classification and Allowance*:  Class 2 consists of the Allowed Mortgage Facility Claim ~~.~~ which, together with the Mortgage Facility Deficiency Claim, shall be an Allowed Claim of at least $4,100,000,000.

(b)      *Treatment*: ~~(i)   In the event that Class 2 accepts the Plan, the~~ The holder of the Allowed Mortgage Facility Claim shall receive ~~the following~~ 100% of the Cash Distribution and the Investor Certificates on the Effective Date, with such Cash Distribution to be distributed in accordance with Section ~~6.2~~ 6.3 of the Plan ~~: (i) 100% of the Rights, (ii) on the Initial Distribution Date, 100% of the~~

~~New Class A1 Mortgage Notes, 100% of the New Class A2 Mortgage Notes, 100% of the New Class A3 Mortgage Notes, 100% of the New Class A4 Mortgage Notes, 100% of the New Class B Mortgage Notes, 100% of the New Class C Mortgage Notes, 100% of the New Class D Mortgage Notes, 100% of the New Class E Mortgage Notes, 100% of the New Class F Mortgage Notes, 100% of the New Class G Mortgage Notes, 100% of the New Class H Mortgage Notes, (iii) 100% of the Class A4 Cash Paydown, (iv) 100% of the Rollover Equity, or in lieu of the Rollover Equity, the Class B - H Equity Cashout Option and (v) 100% of the Sub-Equity Class 2, 100% of the Sub-Equity Class 3, 100% of the Sub-Equity Class 4 and 100% of the Sub-Equity Class 5.~~ <u>and the Investor Certificates will be cancelled without any distributions on account thereof.</u>

(c)    ~~(ii)~~ <u>*Non-Consensual Confirmation*</u>:  In the event that Class 2 rejects the Plan, the ~~holder of the Allowed Mortgage Facility Claim shall receive, on the Initial Distribution Date, the New Alternate Notes in an aggregate principal amount not to exceed three billion, three hundred million dollars ($3,300,000,000), and which New Alternate Notes shall bear interest at the rate of 5.34% per annum or such lower rate as shall be fixed by the Bankruptcy Court, and shall have a final maturity date that is seven (7) years after the Initial Distribution Date.  Notwithstanding the foregoing, in the event that the~~ Debtors <u>reserve the right to</u> seek to confirm the Plan under section 1129(b) of the Bankruptcy Code ~~pursuant to Section 4.2(b)(ii) of the Plan~~<u>, and, in such event,</u> the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 of the Plan, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, <u>such consents not to be unreasonably withheld,</u> to offer different treatment to Class 2, ~~including, without limitation, offering different forms of consideration such as notes, equity warrants or sub-equity to Class 2, to the extent that such forms of consideration~~<u>to the extent that the Debtors determine that such modifications are necessary to</u> comply with the requirements of section 1129(b) of the Bankruptcy Code.  ~~The Rights Offering shall be canceled if Class 2 rejects the Plan.~~

~~(c)    *Class B - H Debt/Equity Election*.  Each holder of a Class B - H Mortgage Certificate may exercise the Class B - H Debt/Equity Election, *provided that* on the Effective Date, 50% of the Class B - H Mortgage Debt will have been satisfied by the New Class B - H Mortgage Notes and 50% of the Class B - H Mortgage Debt will have been satisfied by the Rollover Equity, subject to Section 4.2(d) of the Plan.  In the event that any holder of a Class B - H Mortgage Certificate elects to receive less than 50% of its consideration in Rollover Equity, then the other holders of Class B - H Mortgage Certificates shall have the right to elect to receive their Pro Rata Share of the Excess Equity.  In the event that Class 2 rejects the Plan, the Class B - H Debt/Equity Election will be canceled and extinguished.~~

(d)    ~~*Class B - H Equity Cashout Option Election for Class B - H Mortgage Certificates*.  At the election of any holder of a Class B - H Mortgage Certificate, such holder shall receive, in lieu of the Rollover Equity that such holder is entitled to receive, the Class B - H Equity Cashout Option.  In the event that Class 2 rejects the Plan, the Class B - H Equity Cashout Option will be canceled and extinguished.~~<u>*Adequate Protection Payment:*  Nothing in the Plan shall affect the rights of the Mortgage Debt Parties to retain payments made by the Debtors in accordance with the Cash Collateral Order.</u>

~~(e)    *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mortgage Facility Claim.~~

<u>(e)</u>    ~~(f)~~    *Voting*:  Class 2 is Impaired.  The holder of the Claim in Class 2 is entitled to vote to accept or reject the Plan.

3.       Class 3.  ESA UD Mortgage Claim

(a)       *Classification*:  Class 3 consists of the Allowed ESA UD Mortgage Claim.

(b)       *Treatment*:  The holder of the Allowed ESA UD Mortgage Claim shall receive on the Distribution Date the New ESA UD Mortgage Note in full settlement, satisfaction, release and discharge of the Allowed ESA UD Mortgage Claim.

(c)       *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed ESA UD Mortgage Claim.

(d)       *Voting*:  Class 3 is Impaired.  The holder of the Claim in Class 3 is entitled to vote to accept or reject the Plan.

4.       Class 4A. Mortgage Facility Deficiency Claim

(a)       *Classification and Allowance*:  Class 4A consists of the Mortgage Facility Deficiency Claim which, together with the Mortgage Facility Claim, shall be an Allowed Claim of at least $4,100,000,000.

(b)       *Treatment*:  The holder of the Allowed Mortgage Facility Deficiency Claim shall receive an interest in the Litigation Trust to the extent that it is a Litigation Trust Beneficiary, which shall be distributed pursuant to Section 6.3 of the Plan, subject to the terms of the Intercreditor Agreement.

(c)       *Non-Consensual Confirmation*:  In the event that Class 4A rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 of the Plan , to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, such consents not to be unreasonably withheld, to offer different treatment to Class 4A, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(d)       *Interest*:  Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed Mortgage Facility Deficiency Claim.

(e)       *Voting*:  Class 4A is Impaired.  The holder of the Claim in Class 4A is entitled to vote to accept or reject the Plan.

5.       4. Class 4. Mortgage Facility Deficiency Claim and the 4B. Mezzanine Facilities Claims

(a)       *Classification*:  Class 4B consists of the Mortgage Facility Deficiency Claim and the Mezzanine Facilities Claims.

(b)       *Treatment*:(i)    *Treatment if Class 2 Accepts the Plan*.  If Class 2 accepts the Plan, the The holders of the Allowed Mortgage Facility Deficiency Claim (which amount shall be allowed pursuant to Section 6.18 of the Plan) and the Allowed Mezzanine Facilities Claims shall receive the following interests in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries, which shall be distributed pursuant to Section 6.2 of the Plan, 100% of the Sub-Equity Class 6, 100% of the Sub-Equity Class 7, 100% of the Sub-Equity Class 8, 100% of the Sub-Equity Class 9, 100% of the Sub-Equity Class 10, 100% of the Sub-Equity Class 11, 100% of the Sub-Equity Class 12, 100% of the

~~Sub-Equity Class 13, 100% of the Sub-Equity Class 14 and 100% of the Sub-Equity Class 15.~~6.3 of the Plan, subject to the terms of the Intercreditor Agreement.

(c) ~~(ii)~~ *~~Treatment if Class 2 Rejects the Plan.~~* ~~If~~*Non-Consensual Confirmation*: In the event that Class ~~2 rejects the Plan, the holders of the Allowed Mortgage Facility Deficiency Claim (which shall be valued pursuant to Section 6.18 of the Plan) and the Allowed Mezzanine Facilities Claims shall receive 100% of the Sub-Equity,~~ *provided that* ~~such distribution complies with~~4B rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in ~~the event that such distribution does not comply with~~ ~~section 1129(b) of the Bankruptcy Code~~such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 of the Plan, to alter, amend or modify the Plan, with the consent of the Investor ~~and~~, each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), such consents not to be unreasonably withheld, to offer different treatment to Class ~~4~~4B, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(d) ~~(c)~~ *Interest*: Interest shall neither accrue nor be payable from and after the Commencement Date with respect to the Allowed ~~Mortgage Facility Deficiency Claim~~Mezzanine Facilities Claims.

(e) ~~(d)~~ *Voting*: Class 4B is Impaired. The ~~holder~~holders of the Claim in Class ~~4 is~~B are entitled to vote to accept or reject the Plan. The Special Servicer has asserted that it is entitled to vote the Mezzanine Facilities Claims pursuant to the terms of the Intercreditor Agreement.

6. ~~5.~~ Class 5. General Unsecured Claims

(a) *Classification*: Class 5 consists of the General Unsecured Claims.

(b) *Treatment*: ~~No distribution shall be made under the Plan with respect to~~The holders of the General Unsecured Claims~~; provided, however, that in order to facilitate a consensual Plan, if Class 5 votes to accept the Plan, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of five hundred thousand dollars ($500,000)~~ shall receive an interest in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries.

(c) *Interest*: Interest shall neither accrue nor be payable from and after the Commencement Date with respect to Allowed General Unsecured Claims.

(d) *Non-Consensual Confirmation*: In the event that Class 5 rejects the Plan, the Debtors reserve the right to seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, and, in such event, the Debtors reserve the right, pursuant to Sections 5.3 and 13.1 of the Plan, to alter, amend or modify the Plan, with the consent of the Investor, each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), such consents not to be unreasonably withheld, to offer different treatment to Class 5, to the extent that the Debtors determine that such modifications are necessary to comply with the requirements of section 1129(b) of the Bankruptcy Code.

(e) ~~(d)~~ *Voting*: Class 5 is Impaired. The holders of the Claims in Class 5 are entitled to vote to accept or reject the Plan.

7. ~~6.~~ Class 6. Existing Equity

(a) *Classification*: Class 6 consists of the Existing Equity.

(b)     *Treatment*:  No distribution shall be made under the Plan from the ~~Debtors'~~ ~~estate~~Estates in respect of the Existing Equity.  On the Effective Date, the certificates that previously evidenced ownership of Existing Equity shall be ~~canceled~~cancelled and shall be null and void, the holder(s) thereof shall no longer have any rights in respect of the Existing Equity, and such certificates shall not evidence any rights under the Plan.

(c)     *Voting*:  Class 6 is Impaired.  The holders of Existing Equity in Class 6 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

8.     ~~7.~~Class 7.  ESA MD Properties Trust Certificate

(a)     *Classification*:  Class 7 consists of the ESA MD Properties Trust Certificate.

(b)     *Treatment*:  The holder of the ESA MD Properties Trust Certificate shall retain the ESA MD Properties Trust Certificate.

(c)     *Voting*:  Class 7 is Unimpaired.  The holder of the Equity Interest in Class 7 is deemed to accept the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

9.     ~~8.~~Class 8.  ESA MD Borrower Interests

(a)     *Classification*:  Class 8 consists of the ESA MD Borrower Interests.

(b)     *Treatment*:  Each holder of ESA MD Borrower Interests shall retain its ESA MD Borrower Interests.

(c)     *Voting*:  Class 8 is Unimpaired.  The holders of the Equity Interests in Class 8 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

10.     ~~9.~~Class 9.  ESA P Portfolio MD Trust Certificate

(a)     *Classification*:  Class 9 consists of the ESA P Portfolio MD Trust Certificate.

(b)     *Treatment*:  The holder of the ESA P Portfolio MD Trust Certificate shall retain the ESA P Portfolio MD Trust Certificate.

(c)     *Voting*:  Class 9 is Unimpaired.  The holder of the Equity Interests in Class 9 is deemed to accept the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

11.     ~~10.~~Class 10.  ESA P Portfolio MD Borrower Interests

(a)     *Classification*:  Class 10 consists of the ESA P Portfolio MD Borrower Interests.

(b)     *Treatment*:  Each holder of ESA P Portfolio MD Borrower Interests shall retain its ESA P Portfolio MD Borrower Interests.

(c)     *Voting*:  Class 10 is Unimpaired.  The holders of the Equity Interests in Class 10 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**12.** ~~11.~~ Class 11.  ESA Canada Properties Interests

      (a)    *Classification*:  Class 11 consists of the ESA Canada Properties Interests.

      (b)    *Treatment*:  Each holder of ESA Canada Properties Interests shall retain its ESA Canada Properties Interests.

      (c)    *Voting*:  Class 11 is Unimpaired.  The holders of the Equity Interests in Class 11 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**13.** ~~12.~~ Class 12.  ESA Canada Properties Borrower Interests

      (a)    *Classification*:  Class 12 consists of the ESA Canada Properties Borrower Interests.

      (b)    *Treatment*:  Each holder of ESA Canada Properties Borrower Interests shall retain its ESA Canada Properties Borrower Interests.

      (c)    *Voting*:  Class 12 is Unimpaired.  The holders of the Equity Interests in Class 12 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**14.** ~~13.~~ Class 13.  ESH/TN Properties Membership Interest

      (a)    *Classification*:  Class 13 consists of the ESH/TN Properties Membership Interest.

      (b)    *Treatment*:  The holder of the ESH/TN Properties Membership Interest shall retain its ESH/TN Properties Membership Interest.

      (c)    *Voting*:  Class 13 is Unimpaired.  The holder of the Equity Interest in Class 13 is deemed to accept the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

**15.** ~~14.~~ Class 14.  ESH/ESA General Partnership Interests

      (a)    *Classification*:  Class 14 consists of the ESH/ESA General Partnership Interests.

      (b)    *Treatment*:  Each holder of ESH/ESA General Partnership Interests shall retain its ESH/ESA General Partnership Interests.

      (c)    *Voting*:  Class 14 is Unimpaired.  The holders of the Equity Interests in Class 14 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**16.** ~~15.~~ Class 15.  Other Existing Equity Interests

      (a)    *Classification*:  Class 15 consists of the Other Existing Equity Interests.

      (b)    *Treatment*:  No distribution shall be made under the Plan from the Estates in respect of the Other Existing Equity Interests.  On the Effective Date, the certificates that previously evidenced ownership of the Other Existing Equity Interests shall be ~~canceled~~cancelled and shall be null and void, the holders thereof shall no longer have any rights in respect of the Other Existing Equity Interests, and such certificates shall not evidence any rights under the Plan.

(c)	*Voting*: Class 15 is Impaired.  The holders of the Other Existing Equity Interests in Class 15 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

F.	ACCEPTANCE, REJECTION AND REVOCATION OR WITHDRAWAL OF THE PLAN

1.	Classes Entitled to Vote

Each holder of a Claim, as of the Record Date, in an Impaired Class, other than those Classes that are deemed to reject the Plan, shall be entitled to vote to accept or reject the Plan, in its sole and absolute discretion, subject to applicable law.

2.	Acceptance by Class of Claims

An Impaired Class of Claims shall be deemed to accept the Plan if (a) holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

3.	Nonconsensual Confirmation

In the event that any Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority required by section 1129(a) of the Bankruptcy Code, the Debtors, with the consent of the Investor and each of the Sponsors, reserve the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, or (b) alter, amend or modify the Plan in accordance with Section 13.1 of the Plan.  At the request of the Investor and each of the Sponsors, the Debtors shall exercise the right to seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code in the manner reasonably requested by the ~~Investors~~Investor and each of the Sponsors,~~ *provided,* that the value of the Investment contemplated by Section 6.8 of the Plan, in the event that Class 2 rejects the Plan, shall not be reduced without the Debtors' prior written consent~~.

4.	Revocation or Withdrawal

(a)	Right to Revoke or Withdraw.  The Plan may be revoked or withdrawn prior to the Confirmation Date (i) by the Debtors (with the consent of the Special Servicer and the Operating Advisor, such consent not to be unreasonably withheld), in their ~~sole~~ discretion or at the direction of the Investor, in the event that the Investment ~~and Standby Purchase~~ Agreement is terminated in accordance with Section ~~15~~13 thereof, and (ii) in  all other circumstances, by the Debtors (with the consent of the Special Servicer and the Operating Advisor, such consents not to be unreasonably withheld), with the consent of the Investor and each of the Sponsors, in their sole discretion.

(b)	Effect of Withdrawal or Revocation.  If the Plan is revoked or withdrawn prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims or defenses or any admission or statement against interest by any Debtor, the Creditors' Committee, the Investor, any Sponsor or any other Person or to prejudice in any manner the rights of the Debtors, the Creditors' Committee, the Investor, any Sponsor or any Person in any further proceedings involving any Debtor.

5.      Modification of the Plan

The Plan may be altered, amended or modified by the Debtors, in consultation with the Investor and each of the Sponsors and the Special Servicer (in consultation with the Operating Advisor), before or after the Confirmation Date, as provided in section 1127 of the Bankruptcy Code; *provided, however,* that no such alterations, amendments or modifications that are material shall be made without the consent of the Investor and each of the Sponsors, which consent and the Special Servicer (in consultation with the Operating Advisor), which consents shall not be unreasonably withheld. A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

6.      Amendment of Plan Documents

From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan and any documents attached to such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan shall be as provided in such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan and their respective attachments.

7.      Removal of Debtors

At the option of the Investor and each of the Sponsors, with the consent of the Debtors, which and the consent of the Special Servicer and the Operating Advisor, which consents shall not be unreasonably withheld, a Debtor may be removed from thisthe Plan. In such event, the Plan will omit any treatment of the assets and liabilities of such Debtor, unless otherwise agreed. The removal of any Debtor from thisthe Plan will not affect thisthe Plan with respect to any other Debtor.

G.      TRANSACTIONS TO BE CONSUMMATED UNDER THE PLAN AND CERTAIN CORPORATE AND SECURITIES LAW MATTERS

1.      Transactions to be Consummated Under the Plan

(a)      **Substantive Consolidation.** The Plan is premised upon the substantive consolidation of the Debtors for all purposes related theretoto the Plan, including, without limitation, for purposes of voting, confirmation and distribution. On and after the Effective Date, the Debtors and their Estates shall be deemed merged and (i) all assets and liabilities of the Debtors shall be treated for purposes of the Plan as though they were merged, (ii) all guarantees of the Debtors of payment, performance or collection of obligations of any other of the Debtors shall be eliminated and canceledcancelled, (iii) all joint obligations of two or more of the Debtors and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, and (iv) any Claim filed against any of the Debtors shall be deemed filed against the consolidated Debtors and shall be one Claim against and a single obligation of the consolidated Debtors. The provisions of the Intercreditor Agreement shall remain in full force and effect notwithstanding any substantive consolidation of the Debtors pursuant to the Plan.

(b)      Distribution of New SecuritiesDeemed Sale of Mortgage Properties. Notwithstanding the vesting and retention of title of the Mortgage Properties in the Reorganized Debtors, the transfer of 100% of the New Debtor Equity of the Tier 1 Debtors to NewCo and the distribution of the Cash Distribution by the Reorganized Debtors to the holder of the Allowed Mortgage Facility Claim

effected pursuant to the Plan shall be deemed the equivalent of a sale of the Mortgage Properties to NewCo after foreclosure or acceptance of a deed in lieu of foreclosure by the Trustee or the Special Servicer, free and clear of all liens, claims, encumbrances and obligations.

A. If Class 2 votes to accept the Plan, and Class 2 is, therefore, entitled to the treatment set forth in Section 4.2(b)(i) of the Plan, the New Securities shall be distributed by the holder of the Mortgage Facility Claim (to the holders of Certificates) as follows:

(1) Holders of Class A1 Mortgage Certificates. Each holder of a Class A1 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A1 Mortgage Notes.

(2) Holders of Class A2 Mortgage Certificates. Each holder of a Class A2 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A2 Mortgage Notes.

(3) Holders of Class A3 Mortgage Certificates. Each holder of a Class A3 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A3 Mortgage Notes.

(4) Holders of Class A4 Mortgage Certificates. Each holder of a Class A4 Mortgage Certificate shall receive on the Initial Distribution Date (x) its Pro Rata Share of the Class A4 Cash Paydown and (y) its Pro Rata Share of the New Class A4 Mortgage Notes.

(5) Holders of Class B - H Mortgage Certificates. Each holder of a Class B - H Mortgage Certificate, shall receive (x) on the Initial Distribution Date, its Pro Rata Share of the New Class B - H Mortgage Notes, subject to the Class B - H Debt/Equity Election, (y) on the Initial Distribution Date, its Pro Rata Share of the Rollover Equity or, in lieu thereof, the Class B - H Equity Cashout Option and subject to the Class B - H Debt/Equity Election, and (z) New B - H Rights (calculated as such holder's Pro Rata Share of the percentage of NewCo Common Interests that is to be distributed to the Class of Mortgage Certificates of which such holder is a member pursuant to the Plan).

(6) Holders of Class J Mortgage Certificates. Each holder of a Class J Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 2 and the New J - K Rights (calculated as such holder's Pro Rata Share of the Mortgage Certificates held by the holders of Class J Mortgage Certificates and Class K Mortgage Certificates combined).

(7) Holders of Class K Mortgage Certificates. Each holder of a Class K Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 3 and the New J - K Rights (calculated as such holder's Pro Rata Share of the Mortgage Certificates held by the holders of Class J Mortgage Certificates and Class K Mortgage Certificates combined).

(8) Holders of Class L Mortgage Certificates. Each holder of a Class L Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 4.

(9)     Holders of Class M Mortgage Certificates.  Each holder of a Class M Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 5.

B.     If Class 2 votes to reject the Plan, and Class 2 is, therefore, entitled to the treatment set forth in Section 4.2(b)(ii) of the Plan, the New Alternate Notes shall be distributed by the holder of the Mortgage Facility Claim to the holders of the Class A1 - F Mortgage Certificates (including NewCo as holder of the Investor Certificates) and the holders of the Class G Mortgage Certificates as follows:

(1)     Holders of Class A1 - F Mortgage Certificates.  Each holder of a Class A1 - F Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the New Alternate Notes (calculated as such holder's Pro Rata Share of the aggregate principal amount of the Class A1 - F Mortgage Certificates).

(2)     Holders of Class G Mortgage Certificates.  Each holder of a Class G Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Class G Alternate Note Proportion of the New Alternate Notes.

C.     If Class 2 votes to accept the Plan, in accordance with Section 4.4(b)(i) of the Plan, Class 4 shall receive certain of the Sub-Equity, which shall be distributed by NewCo or the Reorganized Debtors as follows:

(1)     Holders of M1 Mezzanine Facility Claims.  Each holder of an M1 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 6.

(2)     Holders of M2 Mezzanine Facility Claims.  Each holder of an M2 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 7.

(3)     Holders of M3 Mezzanine Facility Claims.  Each holder of an M3 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 8.

(4)     Holders of M4 Mezzanine Facility Claims.  Each holder of an M4 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 9.

(5)     Holders of M5 Mezzanine Facility Claims.  Each holder of an M5 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 10.

(6)     Holders of M6 Mezzanine Facility Claims.  Each holder of an M6 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 11.

(7)     Holders of M7 Mezzanine Facility Claims.  Each holder of an M7 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 12.

(8)     Holders of M8 Mezzanine Facility Claims.  Each holder of an M8 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 13.

(9)     Holders of M9 Mezzanine Facility Claims.  Each holder of an M9 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 14.

(10)    Holders of M10 Mezzanine Facility Claims.  Each holder of an M10 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 15.

D.    If Class 2 votes to reject the Plan, in accordance with Section 4.4(b)(ii) of the Plan, Class 4 shall receive 100% of the Sub-Equity which shall be distributed by the holder of the Mortgage Facility Deficiency Claim (to holders of Certificates) and by NewCo or the Reorganized Debtors (to holders of Mezzanine Facility Claims) as follows:

(1)    Holders of Class G Mortgage Certificates.  Each holder of a Class G Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 2.

(2)    Holders of Class H Mortgage Certificates.  Each holder of a Class H Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 3.

(3)    Holders of Class J Mortgage Certificates.  Each holder of a Class J Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 4.

(4)    Holders of Class K Mortgage Certificates.  Each holder of a Class K Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 5.

(5)    Holders of Class L Mortgage Certificates.  Each holder of a Class L Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 6.

(6)    Holders of Class M Mortgage Certificates.  Each holder of a Class M Mortgage Certificate shall receive its Pro Rata Share of the Sub-Equity Class 7.

(7)    Holders of M1 Mezzanine Facility Claims.  Each holder of an M1 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 8.

(8)    Holders of M2 Mezzanine Facility Claims.  Each holder of an M2 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 9.

(9)    Holders of M3 Mezzanine Facility Claims.  Each holder of an M3 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 10.

(10)    Holders of M4 Mezzanine Facility Claims.  Each holder of an M4 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 11.

(11)    Holders of M5 Mezzanine Facility Claims.  Each holder of an M5 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 12.

(12)    Holders of M6 Mezzanine Facility Claims.  Each holder of an M6 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 13.

(13)    Holders of M7 Mezzanine Facility Claims.  Each holder of an M7 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 14.

(14)    Holders of M8 Mezzanine Facility Claims.  Each holder of an M8 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 15.

(15)   Holders of M9 Mezzanine Facility Claims.  Each holder of an M9 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 16.

(16)   Holders of M10 Mezzanine Facility Claims.  Each holder of an M10 Mezzanine Facility Claim shall receive its Pro Rata Share of the Sub-Equity Class 17.

(c)   **Distributions to Holder of Allowed Mortgage Facility Claim**.  The Cash Distribution shall be distributed by the Plan Administrator to the holder of the Allowed Mortgage Facility Claim on the Effective Date in accordance with Section 8.2 of the Plan, which shall then distribute the Cash Distribution to the holders of Mortgage Certificates in accordance with the priorities set forth in the Trust and Servicing Agreement.  The Investor Certificates shall be distributed by the Plan Administrator to the holder of the Allowed Mortgage Facility Claim on the Effective Date in accordance with Section 8.2, of the Plan which shall then cancel the Investor Certificates in accordance with the provisions of the Trust and Servicing Agreement without any Distribution to be made on account of such Investor Certificates.

(d)   (c) Creation of NewCo.

A.   *Certificate of Formation*. The NewCo Certificate of Formation shall be filed with the applicable Secretary of State on or before the Effective Date substantially in the form of the NewCo Certificate of Formation and shall, *inter alia*, include a provision prohibiting the issuance of non-voting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code.  Pursuant to the Plan:

(1)   Provided that Class 2 accepts the Plan, NewCo Common Interests comprising 42.85% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the New Warrants have been exercised as of the Effective Date) shall be issued to the Investor on the Effective Date immediately after the consummation of the issuance described in clause (4) below.   In the event that Class 2 rejects the Plan, NewCo Common Interests comprising 100% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the New Warrants have been exercised as of the Effective Date) shall be issued to the Investor and its members or Affiliates designated pursuant to Section 2.3 of the Investment Agreement on the Effective Date immediately after consummation of the issuance described in (4) below; and

(2)   Provided that Class 2 accepts the Plan, NewCo Common Interests representing 19.04% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the New Warrants have been exercised as of the Effective Date) shall be issued in connection with the Rights Offering on the Effective Date immediately after the consummation of the issuance described in clause (4) below.  In the event that Class 2 rejects the Plan, the Rights Offering shall be terminated, canceled or otherwise not effectuated and all Rights and any exercise of any Right shall be canceled and be null and void and no NewCo Common Interests shall be issued in connection with the Rights Offering;

(3)   Provided that Class 2 accepts the Plan, NewCo Common Interests representing 38.11% of the total issued NewCo Common Interests as of the Effective Date (assuming that none of the New Warrants have been exercised as of the Effective Date) shall be issued to the holders of the Class B - II Mortgage Certificates as

Rollover Equity in accordance with the Plan. In the event that any holders of the Class B - H Mortgage Certificates exercise the Class B - H Equity Cashout Option, the corresponding NewCo Common Interests shall be issued to the Investor. In the event that Class 2 rejects the Plan, except for NewCo Common Interests issued to the Investor on account of the Investment, no NewCo Common Interests shall be issued to holders of Class B - H Mortgage Certificates;

(2) (4) Additional NewCo Common Interests, in an amount agreed upon by the Debtors, the Investor and each of the Sponsors, shall be reserved for issuance under the NewCo Management Incentive Plan; and

(5) As provided in Section 6.15 of the Plan, in the event BHAC and NewCo enter into a BHAC IP Transfer Agreement, New Warrants to acquire NewCo Common Interests shall be allocated to BHAC, with such NewCo Common Interests representing 2.5% of the issued and outstanding NewCo Common Interests as of the Effective Date.

If the Investor and the Sponsors determine, in their sole and absolute discretion subject to the terms of the Investment Agreement and the Plan, that an alternate corporate or organizational structure, form or identity is appropriate, Section 6.3 6.4(a) of the Plan shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

B. *NewCo Operating Agreement*. The NewCo Operating Agreement shall be adopted substantially in the form to be included in the Plan Supplement and shall be deemed to become valid, binding and enforceable in accordance with its terms on the Effective Date. Each holder of NewCo Common Interests shall be bound by the terms of the NewCo Operating Agreement without the need for execution by any party thereto other than NewCo.

C. *Registration Rights*. Pursuant to the terms of the Registration Rights Agreement, which shall be substantially in the form to be included in the Plan Supplement, the Investor shall be entitled to certain registration rights as set forth therein.

(e) (d) **Corporate Reorganization Actions**

On or as soon as practicable after the Effective Date, the Debtors and/or NewCo, as applicable, shall take such actions as may be or become necessary to effectuate the following, all of which shall be authorized and approved in all respects, in each case without further action being required under applicable law, regulation, order, or rule (including, without limitation, any action by the board of directors, stockholders, partners or members of any Debtor or members of NewCo):

A. the NewCo Certificate of Formation will be filed with the applicable Secretary of State of the State effecting the formation of NewCo. At the option of the Investor and each of the Sponsors, the Debtors or NewCo may form additional subsidiaries owned in whole, or in part, by NewCo in order to effectuate the transactions contemplated hereunder;

B. 100% of the New Debtor Equity of the Tier 1 Debtors shall be issued to NewCo or a subsidiary of NewCo; and

C. the Equity Interests of each of the Tier 2 Debtors, the ESH/ESA General Partnership Interests and the ESH/TN Properties Membership Interests shall remain outstanding and Unimpaired; ~~and~~

D. the Equity Interests of each of the Tier 3 Debtors shall be ~~canceled~~cancelled, extinguished and not re-issued. The Tier 3 Debtors shall be deemed liquidated and dissolved by the Debtors for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided that, in its sole discretion, the Debtors may (but shall not be required to) file with the Office of the Secretary of State for the applicable state a certificate of dissolution; and

E. the Restructuring Transactions shall be implemented.

If the Investor and the Sponsors determine, ~~in their sole and absolute discretion,~~ subject to the terms and conditions of the Investment ~~and Standby Purchase~~ Agreement and the Plan, that NewCo shall have an alternate corporate or organizational structure, form or identity, Section 6.7 of the Plan shall be changed to the extent necessary to effectuate any such alternate structure, form or identity. ~~A chart setting forth the Debtors' post-petition organizational structure contemplated by the Plan, shall be included in the Plan Supplement.~~

~~(e)     Management of NewCo~~

~~As of the Effective Date, the NewCo Board of Managers shall be a seven (7) member board and shall be comprised as follows: (a) five (5) members designated by the Investor and its members and Affiliates, (b) one (1) independent member reasonably acceptable to the Investor and its members and Affiliates, and (c) the chief executive officer of NewCo, as determined by the Investor, each of whom will have one vote on all matters to be voted on by the NewCo Board of Managers. Each of the members of such NewCo Board of Managers shall be identified in the Plan Supplement and shall serve in accordance with the NewCo Certificate of Formation and the NewCo Operating Agreement. After the Effective Date, members of the NewCo Board of Managers shall serve and be selected pursuant to the terms of the NewCo Operating Agreement, which shall provide, among other things, that so long as the Investor and its members and Affiliates continue to hold at least 25.00% of the NewCo Common Interests issued to it on the Effective Date, the Investor shall continue to have the right to elect five (5) members of the NewCo Board of Managers. The NewCo Operating Agreement shall further provide, among other things, that the management of NewCo shall be vested exclusively in the NewCo Board of Managers, which shall have all of the rights, powers and authority to manage and control all matters concerning NewCo, including, without limitation, the business, affairs, transactions, existence and governance (other than the composition of the NewCo Board of Managers) of NewCo. The officers of NewCo shall be identified in the Plan Supplement and shall serve in accordance with the NewCo Certificate of Formation, the NewCo Operating Agreement, Section 11.5 of the Plan and the requirements of applicable nonbankruptcy law.~~

(f)     **NewCo Management Incentive Plan**

On ~~and~~or after the Effective Date, NewCo shall implement the NewCo Management Incentive Plan, in form and substance reasonably acceptable to the Investor ~~and each of the Sponsors, which shall provide for cash distributions to participants therein based upon a waterfall to be determined by the NewCo Board of Managers. The identity of recipients, the cash distribution waterfall and all other terms shall be determined by the NewCo Board of Managers.~~, with NewCo Common Interests being available for issuance thereunder, through a combination of the award of restricted membership interests

and the granting of equity based awards, including, without limitation, restricted membership interests, deferred membership interests and options. The NewCo Management Incentive Plan will be designed to provide additional compensation to HVM for its management services. Alternatively, NewCo or one of its affiliates may seek to provide incentives to HVM by providing additional performance-based compensation to HVM pursuant to and in connection with the management agreements with between the TRSs of NewCo that are parties to such management agreements and HVM that are being assumed by, or assumed and assigned to, NewCo the TRSs (or one or more newly formed subsidiaries (which newly formed subsidiaries, are TRSs, wholly owned either directly or indirectly by NewCo, or designated by an existing Debtor that is a Real Estate Investment Trust subsidiary TRS) and modified on the Effective Date pursuant to the terms Section 11.5 of the Plan to provide for, among other things, such payments issuance of the NewCo Common Interests as part of HVM's compensation thereunder. HVM shall allocate the benefit of the NewCo Management Incentive Plan to the executive officers and senior management of HVM for their management services. The identity of recipients, amount of grants and other terms including, without limitation, vesting, will be determined by the manager of HVM.

(g) ~~Cancellation of~~ Existing Debt Securities

As of the Effective Date, all notes, ~~agreements, certificates and securities evidencing the Mortgage Facility, the Class A1 Mortgage Certificates, Class A2 Mortgage Certificates, Class A3 Mortgage Certificates, Class A4 Mortgage Certificates, the Class B – M Mortgage Certificates~~ and any obligations of the Debtors under the Mortgage Facility or the Mezzanine Facilities shall be discharged and be of no further force or effect against the Debtors or the Mortgage Properties, and the holders thereof shall have no rights against the Debtors or the Mortgage Properties, except the right to receive the Distributions provided herein. As of the Effective Date, the EA UD Mortgage Claim, ~~the Mezzanine Facilities,~~ and the General Unsecured Claims, and the rights of the holders thereof thereunder, shall be ~~canceled~~cancelled and deemed null and void and of no further force and effect, and the holders thereof shall have no rights, and such notes, agreements, certificates and securities shall evidence no rights, except the right to receive the Distributions provided in the Plan. It is understood, however, that (i) Section 6.5 of the Plan shall not affect any Guaranty Claims other than a Guaranty Claim against a Debtor or ESI, and (ii) notwithstanding Section 6.11 of the Plan, the notes or certificates in respect of the Mortgage Facility and the Mezzanine Facilities shall not be surrendered and cancelled so as not to impair the pursuit of any Guaranty Claims other than a Guaranty Claim against a Debtor or ESI.

~~(h)~~ ~~Terms of the New Debt~~

~~A.~~ ~~New Mortgage Loan~~

~~Pursuant to the Plan, the Trustee for the Trust established pursuant to the Trust and Servicing Agreement, as lender of the Mortgage Debt, will be entitled to receive, among other distributions as discussed herein, and subject to certain elections described in the Plan, the New Mortgage Loan for distribution to Certificate holders, which principal amount is subject to adjustment based on the Confirmation Date. The amended and restated Mortgage Facility comprising Tranche A, Tranche B, Tranche C, Tranche D, Tranche E, Tranche F, Tranche G, Tranche H, Tranche I, Tranche J and Tranche K, in the aggregate principal amount of $2,818,184,243, subject to adjustment pursuant to Section 8.5 of the Plan, after the Class A4 Cash Paydown, in the amounts and bearing the rates of interest set forth on Exhibit I of the Plan, subject to adjustment based on the application of adequate protection payments to the principal amount of the New Mortgage Notes, as memorialized in the amended and restated Mortgage Loan Agreement by and among existing borrowers under the Mortgage Loan, and the lenders thereunder, which shall be substantially in the form to be set forth in the Plan Supplement, which must be reasonably acceptable to the Investor and each of the Sponsors and shall include reasonable modifications to the~~

existing loan documents that (a) are generally consistent with (i) current valuations of the properties (including, but not limited to, the impact of valuations on release provisions) and (ii) the Plan and this Disclosure Statement, (b) permit the Reorganized Debtors to prepay all or any portion of the New Mortgage Loan, at any time and from time to time, without any penalty or premium and without any defeasance requirement, (c) do not require any guarantee from or recourse liability to the Investor's members or affiliates, (d) do not contain any mandatory prepayment requirements, event of default provisions, rights of redemption or any other restrictions or rights to change the material terms of the loan in a manner adverse to the Reorganized Debtors in the event of any change-in-control or sale of all or substantially all assets in connection with the purchaser assuming and after the purchaser assumes the New Mortgage Loan, and (e) are no less favorable to the Reorganized Debtors than the existing loan documents, subject to Exhibit H to the Plan.  Interest on the New Mortgage Loan shall be payable in Cash other than the PIK interest owed to the holders of the Class A4 Mortgage Certificates, at the rates set forth below:

| Tranche | Amount | Rate (Years 1-5) | Rate (Year 6) | Rate (Year 7) |
|---|---|---|---|---|
| Certificate A1/ Tranche A | $550.382 million | L + 1.205450% | L + 1.705450% | L + 2.205450% |
| Certificate A2/ Tranche B | $400.946 million | 6.679950% | 7.179950% | 7.679950% |
| Certificate A3/ Tranche C | $801.908 million | 7.229950% | 7.729950% | 8.229950% |
| Certificate A4/ Tranche D | $594.061 million | 7.729950% cash 1.5% PIK | 8.229950% cash 1.5% PIK | 8.72995% cash 1.5% PIK |
| Certificate B /Tranche E | $65.626 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate C/Tranche F | $93.241 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate D/Tranche G | $56.478 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate E/Tranche H | $59.968 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate F/Tranche I | $63.133 million | 6.500000% | 6.500000% | 6.500000% |
| Certificate | $66.307 | 6.500000% | 6.500000% | 6.500000% |

| G/Tranche J | million | | | |
| Certificate H/Tranche K | $66.134 million | 6.500000% | 6.500000% | 6.500000% |

The principal amount of the New Mortgage Loan distributable to the Trustee will be adjusted downward to take into account Adequate Protection Payments made to the Trustee during the Chapter 11 Cases that were used by the Trustee to make principal payments to certain senior classes of Certificates and adjusted based on the actual Confirmation Date. The New Mortgage Loan will be a senior obligation of the Borrowers and will rank senior in right of payment to all of the future subordinated indebtedness of the Borrowers. Further, among the various tranches, Tranche A shall be the most senior in priority and Tranche L the most junior.

The Borrowers' obligations under the New Mortgage Loan will be secured by a first priority security interest, and a collateral package consistent with that under the Mortgage Loan Agreement and other Loan Documents (the "*New Collateral*").

(i)      **Class B-H Elections**

A.      *The Class B – H Elections*. The holders of Class B – H Mortgage Certificates shall have the right, but not the obligation, to elect the Class B – H Equity Cashout Option Election, as further described in Section 4.2(d) of the Plan. The holders of Class B – H Mortgage Certificates shall also have the right, but not the obligation, to exercise the Class B – H Debt/Equity Election as further described in Section 4.2(e) of the Plan.

B.      *Election Period*. The Election Period shall commence on the Subscription Commencement Date and shall expire on the Class B – H Election Date. The holder of a Class B – H Mortgage Certificate who intends to make the Class B – H Equity Cashout Option Election must affirmatively make the Class B – H Equity Cashout Option Election, in whole or in part, on or prior to the Class B – H Election Date. Each holder of a Class B – H Mortgage Certificate will receive, in full and final satisfaction of its Certificate, 50% of its distribution in Rollover Equity and 50% of its distribution in New B – H Mortgage Notes, pursuant to Sections 4.2(e) and 6.2 of the Plan, unless such holder of a Class B – H Mortgage Certificate has exercised its respective Class B – H Debt/Equity Election in accordance with Section 6.10 of the Plan and subject to the limitations set forth in the Plan. Any exercise of the Class B – H Elections after the Class B – H Election Date shall be null and void, and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Class B – H Election Date, regardless of when the documents relating to such exercise were sent.

C.      *Exercise of the Class B – H Elections*. In order to exercise the Class B – H Elections, each holder of a Class B – H Mortgage Certificate must return duly completed Election Forms to the Subscription Agent on or before the Class B – H Election Date. If the Subscription Agent for any reason does not receive a given holder's duly completed Election Form on or prior to the applicable Class B – H Election Date, such holder shall be deemed to have relinquished and waived its right to participate in the Class B – H Equity Cashout Option Election or the Class B – H Debt/Equity Election, as applicable. The exercise of any Class B – H Election shall be irrevocable, subject to the proration requirements of the

Class B – H Debt/Equity Election, and shall obligate the exercising holder of a Class B – H Mortgage Certificate to receive its distribution as reflected in such Class B – H Equity Cashout Option Election or the Class B – H Debt/Equity Election. In order to facilitate the exercise of the Class B – H Elections, on the Subscription Commencement Date, Election Forms will be mailed to each holder of Class B – H Mortgage Certificates together with appropriate instructions for the proper completion, due execution and timely delivery of the Election Forms. Each holder of a Class B – H Mortgage Certificate exercising one or more of its Class B – H Elections shall agree to support and not take any action to oppose or delay confirmation and implementation of the Plan. In the event a holder of a Class B – H Mortgage Certificate does not make such an election, such holder will receive (a) its Pro Rata Share of the Rollover Equity in satisfaction of 50% of such holder's Class B – H Mortgage Certificates and (b) its Pro Rata Share of the New Class B – H Mortgage Notes in satisfaction of 50% of such holder's Class B – H Mortgage Certificates. In the event the Class B – H Debt/Equity Election is made, such revised allocation of the distribution of the Rollover Equity and the New Class B – H Mortgage Notes to the holders of the Class B – H Mortgage Certificates shall be as agreed to between the Debtors, the Investor and each of the Sponsors within ten (10) days after the Voting Deadline and if such agreement cannot be reached, each holder of a Class B – H Mortgage Certificates shall receive (y) its Pro Rata Share of the Rollover Equity in satisfaction of 50% of such holder's Class B – H Mortgage Certificates and (z) its Pro Rata Share of the New Class B – H Mortgage Notes in satisfaction of 50% of such holder's Class B – H Mortgage Certificate, and *provided further,* that, in the aggregate, 50% of the Class B – H Mortgage Debt will have been satisfied by the New Class B – H Mortgage Notes and 50% of the Class B – H Mortgage Debt will have been satisfied by the Rollover Equity, subject to Section 4.2(d) of the Plan.

D. *Class B – H Elections Procedures*. Notwithstanding anything contained herein to the contrary, the Debtors, the Investor and the Sponsors may mutually agree, without the consent of any holder of a Class B – H Mortgage Certificate, to modify the procedures relating to the Class B – H Elections or adopt such additional detailed procedures consistent with the provisions of Section 4.2(e) and Section 6.10 of the Plan to administer more efficiently the exercise of the Class B – H Elections.

E. *Transfer Restriction*. The Class B – H Elections are not transferable by any holder of a Class B – H Mortgage Certificate. Any transfer or attempted transfer by a holder of a Class B – H Mortgage Certificate will be null and void, and no purported transferee will be treated as the holder of, or permitted to exercise, the Class B – H Elections.

F. *Distribution of the Class B – H Equity Cashout Option and the Class B – H Debt/Equity Option*. On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(iii) of the Plan, the Investor shall fund and the Subscription Agent shall distribute cash to each holder of a Class B – H Mortgage Certificate that has properly exercised its Class B – H Equity Cashout Option Election in accordance with Section 4.2(d) and Section 6.10 of the Plan and shall issue such Rollover Equity that would have otherwise been distributed to such Holder of a Class B – H Mortgage Certificate to the Investor or its members or members' affiliates, as appropriate. In addition, on the Effective Date and after the consummation of the issuance described in Section 6.3(a)(iii) of the Plan, the Subscription Agent shall distribute to the holders of the Class B – H Certificates the New B – H Mortgage Notes and the Rollover Equity in accordance with the Class B – H Debt/Equity Elections and subject to Sections 4.2(e) and 6.2 of the Plan.

G.     *Validity of Exercise of Class B – H Elections*.  All questions concerning the timeliness, viability, form and eligibility of any exercise of the Class B – H Elections shall be determined by the Subscription Agent as directed by the Debtors with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld.  Subject to the foregoing, the Subscription Agent's good faith determinations shall be final and binding.  The Subscription Agent as directed by the Debtors with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Class B – H Elections, provided, however, that without limiting any other circumstances that could give rise to the Investor's or any Sponsors' right to withhold consent to any waiver, permission or rejection specified above, it will be deemed reasonable for Investor and each Sponsor to withhold consent to any such waiver, permission or rejection that adversely affects the interests of the Investor or the Sponsor.  Election Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Subscription Agent determines as directed by the Debtors with the written consent of the Investor and each Sponsor, such consent not to be unreasonably withheld.  The Subscription Agent will use commercially reasonable efforts to give notice to any holder of a Class B – H Mortgage Certificate regarding any defect or irregularity in connection with any purported exercise of the Class B – H Elections by such participant and, may permit such defect or irregularity to be cured within such time as the Subscription Agent, with the consent of the Debtors, the Investor and each Sponsor, may determine in good faith to be appropriate; provided, however, that neither the Debtors, the Investor, the Sponsors, nor the Subscription Agent shall incur any liability for failure to give such notification.  Within five (5) days after the Class B – H Election Date, the Subscription Agent shall file with the Bankruptcy Court a report regarding the results of the Class B – H Elections, including a list identifying all those Election Forms deemed rejected due to defect or irregularity.

(j)     **Terms of New Warrants**

Pursuant to the terms of the Plan and as further discussed in clause (s) below, NewCo shall seek to enter into the BHAC IP Transfer Agreement with BHAC, pursuant to which, on or immediately following the Effective Date, BHAC shall transfer to NewCo the BHAC IP in consideration for the issuance to BHAC of New Warrants.  The New Warrants will, among other things, (i) entitle BHAC to acquire a total of 2.5% of the issued and outstanding NewCo Common Interests as of the Effective Date, (ii) be exercisable for the period beginning the day after the Effective Date and ending on the fifth (5th) anniversary of the Effective Date, (iii) have an initial aggregate exercise price equal to $32,225,502 in the event the Plan is confirmed pursuant to Section 5.2 thereof, or $11,500,000 in the event the Plan is confirmed pursuant to Section 5.3 thereof, in each case, which initial aggregate exercise shall increase by 20% per year, subject to adjustment for dilution as provided in the agreements governing the New Warrants and (iv) be exercisable on a cashless basis.

The New Warrants will each be evidenced by a warrant certificate and will be subject to the terms and conditions of the New Warrants and the New Warrant Agreement to be included in the Plan Supplement.  New Warrants may be exercised at any time prior to 5:00 p.m., New York time, on the expiration date listed on the applicable warrant certificate.  A holder of New Warrants may exercise such warrants by surrendering the applicable warrant certificate, with the form of election to purchase properly completed and executed, together with payment of the applicable exercise price as specified in the New-

Warrants, at the office of a new warrant agent to be designated, which may be NewCo (the "***Warrant Agent***"). In the event that upon any exercise of New Warrants, the number of warrants exercised shall be less than the total number of New Warrants evidenced thereby, the Borrowers shall issue to the holder thereof or his assignee a new warrant certificate evidencing the number of New Warrants not exercised.

Warrant certificates when surrendered at the office of the Warrant Agent (with respect to New Warrants) by the registered holder thereof in person or by legal representative or attorney duly authorized in writing, may be exchanged in the manner and subject to the limitations provided in the New Warrants, but without payment of any service charge, for another certificate or certificates of like tenor evidencing in the aggregate a like number of New Warrants.

Upon due presentation for registration of transfer of a warrant certificate at the office of the Warrant Agent, a new warrant certificate or certificates shall be issued to the transferee(s) in exchange for such certificate(s), subject to the limitations provided in the applicable New Warrant, without charge except for any tax or governmental charge imposed in connection therewith.

The Warrant Agent may deem and treat the registered holder(s) of New Warrants as the absolute owner(s) of a warrant certificate (notwithstanding any notation of ownership or other writing thereon), for the purpose of any exercise thereof, of any distribution to the holder(s) thereof or for any other purpose, and neither the Warrant Agent nor the Borrowers shall be affected by any notice to the contrary. Neither the New Warrants nor the related warrant certificates entitle any holder thereof to any rights as a member of NewCo.

(k) **Terms of the NewCo Common Interests**

The Rollover Equity, the NewCo Common Interests issued in connection with the Rights Offering and all other NewCo Common Interests (other than the Sub-Equity) will have the same rights, preferences, privileges, interests and attributes, and will be subject to the same limitations. Holders of NewCo Common Interests will be entitled, with respect to each NewCo Common Interest held, to one vote with respect to each matter on which holders of NewCo Common Interests are entitled to vote pursuant to the Operating Agreement.

Other than with respect to the holders of Sub-Equity, these holders of the NewCo Common Interests will be entitled to receive such distributions in Cash, stock, evidence of indebtedness or property of NewCo as may be declared from time to time by the Board of Managers of NewCo out of funds legally available therefor and, upon any liquidation, dissolution or winding up of affairs, will be entitled to participate pro rata (at the same rate per NewCo Common Interest) in all distributions to such holders of NewCo Common Interests, subject, however, to the terms set forth in Exhibits I and J to the Plan.

(h) (l) **Investment**

If Class 2 accepts the Plan, on the Effective Date immediately after the consummation of the issuance described in Section 6.3(a)(iii) of the Plan, and subject to the terms of, and adjustments contained in Sections 2.2 and 3.4 of the Investment and Standby Purchase Agreement, the Investor shall purchase the NewCo Common Interests from NewCo as set forth in the Investment and Standby Purchase Agreement for Cash in the aggregate amount of four-hundred fifty million dollars ($450,000,000), subject to increase after giving effect to Section 6.9(l) of the Plan so that the total aggregate amount of the Investment is six-hundred fifty million dollars ($650,000,000). Assuming that none of the New Warrants have been exercised as of the Effective Date, the NewCo Common Interests that the Investor shall receive

~~on the Effective Date as a result of the Investment will comprise approximately 42.85% of the total issued and outstanding NewCo Common Interests as of the Effective Date, with such amount of~~

As consideration for the NewCo Common Interests to be ~~increased by the amount of NewCo Common Interests that are acquired by the Investor through the Class B – H Equity Cashout Option and the Rights Offering.~~

~~If Class 2 does not accept the Plan, on the Effective Date, immediately after the consummation of the issuance described in Section 6.3(a)(iii) of the Plan, and subject to the terms of the Investment and Standby Purchase Agreement, Investor shall (i) purchase NewCo Common Interests from NewCo for Cash in the aggregate amount of four hundred million dollars ($400,000,000) and (ii) contribute to NewCo the Investor Certificates held as of the Effective Date subject to the terms of Section 3.4 of the Investment and Standby Purchase Agreement~~issued pursuant to the Investment Agreement and the purchase of the business, assets and properties of the Debtors and to fund the distributions contemplated by the Plan, the Investor shall (i) cause NewCo to be provided with Cash in the aggregate amount of $3,615,755,444.28 (subject to adjustment as provided in Section 6.8 of the Plan), comprised of (a) a $1,815,755,444.28 (subject to adjustment as provided in Section 6.8 of the Plan) investment by the Investor, and (b) $1,800,000,000 from the proceeds of the Debt Financing Arrangements, and (ii) contribute to the Debtors the Investor Certificates (and waive the right to receive or retain any distribution on account of such Investor Certificates pursuant to the Plan) (collectively, the "***Investment***").  The amount of the Investor Certificates shall be calculated as of the Effective Date, and shall include the actual interest which would be payable on the Investor Certificates to the Effective Date absent the contribution and waiver provided in the Plan.  To the extent that the amount of the Investor Certificates differs from the amount set forth on Schedule 1.2 of the Investment Agreement as a result of the calculation of interest, the Cash portion of the Investment (and the aggregate Cash amount to be provided to NewCo by the Investor) shall be adjusted up or down accordingly on a dollar for dollar basis.  The NewCo Common Interests that Investor shall receive on the Effective Date as a result of the Investment will comprise 100% of the total issued and outstanding NewCo Common Interests as of the Effective Date ~~(subject to the distribution of the Sub-Equity under the Plan)~~.

~~If the Investor and the Sponsors determine in their sole and absolute discretion that NewCo shall have an alternate corporate or organizational structure, form or identity, the structure of the Investment contemplated in Section 6.8 of the Plan shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.~~

~~(m)       **Rights Offering**~~

~~In addition to the Investment, the Plan contemplates the contribution of up to $200,000,000 of new equity capital to NewCo, in exchange for approximately 19.04% of the NewCo Common Interests (subject to certain adjustments) in the form of a Rights Offering being made available to holders of Class B-K Mortgage Certificates.  The Rights Offering will be backstopped by the Investor, which has committed to purchase all NewCo Common Interests offered in the Rights Offering that are not otherwise subscribed for.  The terms of the Rights Offering are set forth below and in Section 6.8 of the Plan.~~

~~A.       *The Rights*.  Each Rights Holder, including the Sponsors, shall have the right to purchase one NewCo Common Interest for each Right that the Rights Holder holds, at a purchase price that is equal to the Subscription Price.  Rights Holders have the right, but not the obligation, to participate in the Rights Offering as provided herein.  The number of NewCo Common Interests distributed to the Rights Holders will be rounded down to the~~

nearest whole number. No fractional NewCo Common Interests will be issued in respect of fractional Rights and holders of fractional Rights will not be entitled to receive any Cash in lieu thereof. There shall be no over-subscription rights provided in connection with the Rights Offering.

B. *Subscription Period*. The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Expiration Date. Each Rights Holder intending to participate in the Rights Offering must affirmatively elect to exercise its Rights, in whole or in part, on or prior to the Expiration Date. On the Effective Date, all Unsubscribed Rights shall be acquired by the Investor in accordance with and subject to the terms and conditions contained in the Investment and Standby Purchase Agreement and the Plan, and any exercise of such Rights after the Expiration Date (other than the purchase of NewCo Common Interests by the Investor pursuant to the Investment and Standby Purchase Agreement) shall be null and void and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Expiration Date, regardless of when the documents relating to such exercise were sent.

C. *Subscription Price*. Each Rights Offering Participant choosing to exercise its Rights, in whole or in part, shall pay the aggregate Subscription Price for the NewCo Common Interests that such Rights Offering Participant is to acquire pursuant to the exercise of the Rights not later than the Rights Offering Payment Date. If the Effective Date does not occur, the Subscription Price that each Rights Offering Participant has paid shall be refunded to such Rights Offering Participant without payment of any interest.

D. *Exercise of Rights*. In order to exercise the Rights, each Rights Holder must: (i) return a duly completed and executed Rights Certificate to the Subscription Agent on or before the Expiration Date in which the Rights Holder represents that it is (x) a "qualified institutional buyer" as such term is defined in Rule 144A under the Securities Act, (y) an "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act, or (z) a non-US person purchasing under Regulation S under the Securities Act, and (ii) pay to the Subscription Agent (on behalf of the Debtors) on or before the Rights Offering Payment Date such Rights Holder's aggregate Subscription Price in accordance with the wire instructions set forth on the Rights Certificate or by bank or cashier's check delivered to the Subscription Agent as specified in the Rights Certificate. If the Subscription Agent for any reason does not receive from a given Rights Holder (i) a duly completed and executed Rights Certificate on or prior to the Expiration Date, and (ii) immediately available funds in an amount equal to such holder's aggregate Subscription Price on or prior to the Rights Offering Payment Date, such Rights Holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering and any NewCo Common Interests that such Rights Holder could have purchased upon its valid exercise of the Rights shall be deemed to be Unsubscribed Rights. The payments made in accordance with the Rights Offering shall be deposited and held by the Subscription Agent in the Escrow Account, which account will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date. The Subscription Agent shall not use such funds for any other purpose or release such funds to the Debtors prior to such date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance.

Each Rights Offering Participant may exercise all or any portion of such holder's Rights pursuant to the instructions set forth in the Rights Certificate, but the exercise of any Rights shall be irrevocable and shall obligate the exercising Rights Offering Participant to purchase the applicable NewCo Common Interests and to pay the aggregate Subscription Price for such NewCo Common Interests on or prior to the Rights Offering Payment Date. In order to facilitate the exercise of the Rights, on the Subscription Commencement Date, a Rights Certificate will be mailed to each Rights Holder together with appropriate instructions for the proper completion, due execution and timely delivery of the Rights Certificate. Each Rights Offering Participant exercising its Rights shall agree to support and not take any action to oppose or delay confirmation and implementation of the Plan.

E. *Rights Offering Procedures*. Notwithstanding anything contained in the Plan to the contrary, the Debtors, the Investor and the Sponsors may mutually agree, without the consent of any Rights Holder, to modify the procedures relating to the Rights Offering or adopt such additional detailed procedures consistent with the provisions of Section 6.9 of the Plan to administer more efficiently the exercise of the Rights.

F. *Transfer Restriction; Revocation*. The Rights are not transferable by any Rights Holder, subject to Section 6.17 of the Plan. Any transfer or attempted transfer by a Rights Holder, subject to Section 6.17 of the Plan, will be null and void, and no purported transferee will be treated as the holder of, or permitted to exercise, any Rights. Once a Rights Offering Participant has properly exercised its Rights, such exercise will not be permitted to be revoked.

G. *Rights Offering Backstop*. Subject to the terms and conditions in the Investment and Standby Purchase Agreement, the Investor has agreed to subscribe for and purchase on the Effective Date, at the aggregate Subscription Price therefor, its allocated percentage of Unsubscribed Rights as set forth in the Investment and Standby Purchase Agreement as of the Effective Date. The Debtors shall notify or cause the Subscription Agent to notify the Investor, on each Friday during the period from the Subscription Commencement Date to the Expiration Date (and any extensions thereof) and on each business day during the five (5) business days prior to the Expiration Date (and any extensions thereof), or more frequently if requested by the Investor, of the aggregate number of Rights known by the Debtors or the Subscription Agent to have been validly exercised as of the close of business on the preceding business day or the most recent practicable time before such request, as the case may be. Within one (1) business day after the Expiration Date and in any event no later than four (4) Business Days prior to the Effective Date, the Debtors and the Subscription Agent shall give the Investor by e-mail a certificate by an executive officer of the Debtors in .pdf format setting forth either (i) in the event that there are Unsubscribed Rights, (x) a true and accurate calculation of the number of NewCo Common Interests elected to be purchased by the Rights Offering Participants pursuant to validly exercised Rights and the aggregate Subscription Price therefor, and (y) a true and accurate calculation of the number of Unsubscribed Rights, and the aggregate Subscription Price attributable to such Unsubscribed Rights (a "***Purchase Notice***") or (ii) in the absence of any Unsubscribed Rights, the fact that there are no Unsubscribed Rights and that the Investor's obligation to purchase any Unsubscribed Rights is terminated (a "***Satisfaction Notice***"). The Debtors shall provide the Investor with a certification by the Subscription Agent of the Unsubscribed Rights and a written backup to the determination of the Unsubscribed Rights as any Investor

may reasonably request. The Investor shall pay to the Subscription Agent, by wire transfer in immediately available funds on or prior to the Effective Date, Cash in an amount equal to the aggregate Subscription Price attributable to the amount of Unsubscribed Rights. On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(ii) and Section 6.3(a)(iii) of the Plan, the Investor will purchase only such number of Unsubscribed Rights as are listed in the Purchase Notice, without prejudice to the rights of the Investor to later seek an upward or downward adjustment if the number of Unsubscribed Rights in such Purchase Notice is inaccurate.

H. *Distribution of the NewCo Common Interests*. On the Effective Date and after the consummation of the issuance described in Section 6.3(a)(iii) of the Plan, the Subscription Agent shall (i) distribute the NewCo Common Interests to each Rights Offering Participant that has properly exercised its Rights and paid the aggregate Subscription Price for the NewCo Common Interests that such Rights Offering Participant has agreed to purchase, and (ii) distribute the Unsubscribed Rights, if any, to the Investor. All NewCo Common Interests shall be delivered with any and all issue, stamp, transfer, sales and use, or similar taxes or duties payable, if any, in connection with such delivery having been duly paid by NewCo. Any unissued fractional NewCo Common Interests underlying a Right, whether caused by the rounding or a Rights Offering Participant's choice not to exercise its Rights in full, will become Unsubscribed Rights to be acquired by the Investor on the Effective Date. If the exercise of a Right would result in the issuance of a fractional NewCo Common Interest, then the number of NewCo Common Interests to be issued in respect of such Right will be rounded down to the closest whole NewCo Common Interest. Any unissued fractional NewCo Common Interests underlying a Right, whether caused by the rounding or a Rights Offering Participant's choice not to exercise its Rights in full, will become Unsubscribed Rights to be acquired by the Investor on the Effective Date.

I. *Validity of Exercise of Rights*. All questions concerning the timeliness, viability, form and eligibility of any exercise of Rights shall be determined by the Subscription Agent as directed by the Debtors with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld. Subject to the foregoing, the Subscription Agent's good faith determinations shall be final and binding. The Subscription Agent as directed by the Debtors with the written consent of the Investor and each of the Sponsors, which consent shall not be unreasonably withheld, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Rights, *provided, however*, that without limiting any other circumstances that could give rise to the Investor's or the Sponsor's right to withhold consent to any waiver, permission or rejection specified above, it will be deemed reasonable for the Investor to withhold consent to any such waiver, permission or rejection that adversely affects the interests of the Investor or the Sponsors. Rights Certificates shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Subscription Agent determines as directed by the Debtors with the written consent of the Investor and each of the Sponsors, such consent not to be unreasonably withheld. The Subscription Agent will use commercially reasonable efforts to give notice to any Rights Offering Participants regarding any defect or irregularity in connection with any purported exercise of Rights by such participant and, may permit such defect or irregularity to be cured within such time as the Subscription Agent determines as directed by the Debtors with the written consent of the Investor and each of the Sponsors, such

consent not to be unreasonably withheld; *provided, however,* that neither the Debtors, the Investor, the Sponsors nor the Subscription Agent shall incur any liability for failure to give such notification.  Within five (5) days after the Expiration Date, the Subscription Agent shall file with the Bankruptcy Court a report regarding the results of the Rights Offering including a list identifying all those Rights Certificates deemed rejected due to defect or irregularity.

J.      *Cancellation of Rights Offering.*  In the event that Class 2 does not accept the Plan and the Rights Offering is terminated, canceled or otherwise not effectuated, all Rights and any exercise of any Right shall be canceled and be null and void and there shall be no obligation to honor any such purported exercise.  In such event, (i) the aggregate Subscription Price paid by any Rights Offering Participant shall be refunded to such Rights Offering Participant without payment of interest and (ii) the Investor's commitment to subscribe for and purchase on the Effective Date the Unsubscribed Rights shall terminate and be null and void.

K.      *Alteration of Rights Offering.*  If the Investor and the Sponsors determine, in their sole and absolute discretion that NewCo shall have an alternate corporate or organizational structure, form or identity, the structure of the Rights Offering contemplated in Section 6.9 of the Plan shall be changed to the extent necessary to effectuate any such alternate structure, form or identity.

L.      *Adjustment of Rights Offering Amount.*  The amount of the Rights Offering shall be reduced to the extent necessary to ensure that the Investor, including its members and its members' Affiliates, shall own not less than 51% of the NewCo Common Interests after giving effect to the Investment and the Rights Offering.  In the event of such reduction, any excess Subscription Price shall be refunded without payment of interest.

M.      *Minimum Ownership Cutback*

        Pursuant to the Investment and Standby Purchase Agreement, the Investor and its members and Affiliates must collectively hold a minimum percentage of the outstanding NewCo Common Interests, as of the Effective Date (the "***Minimum Investor Equity Threshold***"), equal to 51% of the NewCo Common Interests outstanding immediately following the Effective Date.

        To effect the Minimum Investor Equity Threshold, the number of NewCo Common Interests with respect to which the Debtors will accept subscriptions is subject to reduction (the "***Minimum Ownership Cutback***") in order to provide the Investor and its members and Affiliates, collectively, with a minimum ownership of the NewCo Common Interests outstanding on the Effective Date equal to the Minimum Starwood Equity Threshold.

        Any NewCo Common Interests excluded from the Rights due to the Minimum Ownership Cutback will instead be considered part of the Investor Securities.  The exact amount of the Minimum Ownership Cutback will be determined by the Debtors with consent of the Investor and each of the Sponsors, and each Rights Offering Participant will be notified of its respective allocation of units pursuant to the Rights Offering on the Effective Date.  The Minimum Ownership Cutback will be made pro rata among the Rights Offering Participants other than the Investor and the Sponsors.

        On the Effective Date, the Investor will also contribute Cash to NewCo in the amount of the Reserve, as such term is defined in the Investment Agreement, which will cover one or more capital

reserves, working capital reserves, transaction expenses and any other such reserves for the ongoing operations of NewCo.

(i) ~~(n)~~ **Additional Information Regarding the Investment ~~and Standby Purchase~~ Agreement**

The terms and conditions of the Investment ~~and backstop commitment~~ are set forth in the Investment ~~and Standby Purchase~~ Agreement.

A. *Expenses*

The Investment ~~and Standby Purchase~~ Agreement provides that ~~upon entry of the Disclosure Statement Approval and Solicitation Order~~ in the event the Plan is not confirmed or consummated other than due to a material breach of the Investment Agreement by the Investor or its members and Affiliates as determined by final order of the Bankruptcy Court, the Investor and its members and Affiliates are entitled to reimbursement of all actual~~,~~ reasonable out-of-pocket costs, fees, expenses, disbursements and other charges paid by or due and payable by the ~~Investors (collectively, the "Expenses")~~Investor and/or its members and Affiliates including, without limitation, (i) fees, costs, expenses, disbursements and other charges of counsel to each of the Investor and its members and Affiliates, (ii) fees, costs, expenses, disbursements and other charges of any other professionals retained by the Investor and its members and Affiliates  in connection with or relating to the Investment ~~and Standby Purchase~~ Agreement, the Investment~~, the Rights Offering~~ or the Plan, including, without limitation, in connection with the transactions contemplated ~~hereby~~thereby (including, without limitation, investigating, negotiating, documenting and completing such transactions and enforcing, attempting to enforce and preserving any rights or remedies contemplated hereunder and by the Chapter 11 Cases)~~,~~ or judicial and regulatory proceedings related to such transactions and the Chapter 11 Cases, including, without limitation, the fees and expenses of Fried, Frank, Harris, Shriver & Jacobson LLP and of Houlihan, Lokey, Howard & Zukin, Inc. pursuant to its engagement letter with the Sponsors and Gibson, Dunn & Crutcher LLP, counsel to Paulson & Co. Inc., on behalf of certain investment funds and accounts managed by them and Simpson, Thacher & Bartlett LLP, counsel to BREP VI on behalf of itself and its parallel funds and related alternative vehicles and (iii) financing costs and related fees~~; provided, that in the event the Plan is not confirmed or consummated other than due to a material breach of the Investment and Standby Purchase Agreement by the Investor or its members and Affiliates as determined by final order of the Bankruptcy Court~~ (collectively, the "***Expenses***"); provided, that, consistent with the Bidding Procedures, the maximum amount of the Expenses payable by the Company (the "***Maximum Expense Reimbursement Amount***") shall be up to twenty million ($20,000,000)~~; provided further that, subject to the approval of the Bankruptcy Court, the Maximum Expense Reimbursement Amount shall be increased to thirty five million dollars ($35,000,000),~~ it being understood that ~~in accordance with the Bidding Procedures, in the event the Investor is not the Successful Bidder (as such term is defined in the Bidding Procedures) selected by the Debtors at the close of the Auction but is determined to be the Successful Bidder by the Bankruptcy Court, then this proviso shall only apply if and when the Investor is determined to be the Successful Bidder by final order of the Bankruptcy Court); provided further that the Expenses shall not be payable in the event the Investment and Standby Purchase Agreement is terminated by the Company based upon the Investor's material breach of the Investment and Standby Purchase Agreement as determined by final order of the Bankruptcy Court. In the event the Investment Agreement is terminated by the Company due to a breach by the Investor, the Company shall be entitled to retain the deposit provided by the Investor which is currently being held in escrow pursuant to the terms of an escrow agreement, in accordance with the Bidding Procedures and the related escrow agreement entered into by the Investor.  In the event the Plan is confirmed or consummated with the Investor, the deposit shall be applied to the cash amount payable by the Investor under the Investment and Standby Purchase~~

Agreement. In the event the Investment and Standby Purchase Agreement is terminated other than as a result of the Investor's breach, the Investor shall be entitled to the return of the deposit, all as set forth in the bidding procedures and escrow agreement entered into by the Investor. obtaining authorization for such increase shall not be a condition to closing nor shall a failure to obtain such authorization constitute a termination event under the Investment Agreement.

Thus, there is a risk that if the Plan is not confirmed by July 22, 2010 or if certain other conditions have not been satisfied, then the Investor would have the right to terminate the Investment and Standby Purchase Agreement, and the Debtors' estates would be liable to pay the Expenses.

If the Plan is confirmed and consummated, the Debtors will not be responsible for the payment or reimbursement of the Sponsor Expenses and such amounts will not impact or reduce recoveries to creditors. In the event the Plan is confirmed and consummated, the Sponsors will, directly or indirectly, be responsible for their own Expenses and transaction costs.

B.    *Closing Conditions and Termination Rights*

The obligation of the Investor to purchase the NewCo Common Interests and the Debtors' estates and business as set forth in the Investment and Standby Purchase Agreement will be conditioned upon satisfaction of certain conditions (each of which may be waived by the Investor), including, without limitation, the following:[7]

(a)    The structure of the transactions contemplated by the Investment and Standby Purchase Agreement and the structure and organization of NewCo on and after the Effective Date (including the implementation of any alternate structure, form or identity of NewCo and/or any of its Subsidiaries and the corresponding changes to the structure of the Rights Offering and Investment Transactions, determined by the Investor in accordance with Section 1.1 of the Investment and Standby Purchase Agreement, and the characterization for U.S. federal tax purposes of any entity as a partnership, a corporation, a real estate investment trust, a limited liability company or other entity); the utilization or preservation of any tax attributes or benefits of NewCo (including the tax basis at which NewCo holds the assets of the business); and the resolution of any tax issues or potential liability Liability (as such term is defined in the Investment Agreement), shall be reasonably acceptable to the Investor. The treatment in the Confirmation Order of any current, contingent or potential liability in the Confirmation Order shall be acceptable to respect of taxes that would in any way affect NewCo or the Reorganized Debtors shall be approved by the Investor in its sole and absolute discretion.

(b)    As of the Effective Date, (i) NewCo, through itself or its Subsidiaries, shall have all right, title and interest to any and all equity or other ownership interests in the Debtors, (ii) at the Investor's election to be made in its sole and absolute discretion, (x) one or more designees of the Investor (which may include NewCo or its subsidiaries Subsidiaries or any other person) shall have all right, title and interest to any and all

---

[7] For a full list of closing conditions, see Section 13 of the Investment and Standby Purchase Agreement.

equity or other ownership interests in either or both of HVM and/or HVM Manager, (y) NewCo, through itself or its Subsidiaries, shall have all right, title and interest to any and all equity or other ownership interests in either or both of HVM and/or HVM Manager and/or (z) HVM Manager shall have resigned as manager of HVM and shall have appointed NewCo Manager as successor manager of HVM, (iii) NewCo or one or more designees of the Investor, through itself or its Subsidiaries, shall have all right, title and interest to all Company Intellectual Property and BHAC Intellectual Property, (iv) at the Investor's election, to be made in its sole and absolute discretion, NewCo or one or more designees of the Investor, through itself or its Subsidiaries, shall have all right, title and interest to any and all of the ~~business assets~~Business Assets (as such term is defined in the Investment Agreement), including without limitation all right, title and interest to any and all assets of either or both of HVM Manager and/or HVM (which may exclude human resource assets), free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind, except as provided in the Plan, and (v) the Debtors being acquired by the Investor shall have all right, title and interest to any and all proceeds received or entitled to be received by the prevailing plaintiffs in respect of the Windows Litigation, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind, except as provided in the Plan. Pursuant to the Membership Interest Purchase Agreement dated as of ~~_____,~~June 4, 2010 (the "***HVM Manager Agreement***"), the Debtors, the Investor and HVM Manager agreed on the terms for the transfer of HVM Manager or the appointment of Investor' designee as the manager of HVM. Thus, only part of this condition to the Investment ~~and Standby Purchase~~ Agreement will be satisfied on the Effective Date provided that the parties comply with their respective obligations under the HVM Manager Agreement. Further, there is a condition that the Debtors shall have entered into an Intellectual Property Transfer Agreement with respect to the BHAC IP ~~(see Section VII.F )~~or shall have otherwise received and obtained ownership of the BHAC IP free and clear of all claims, liens, encumbrances and obligations.

(c)     The Investor and its members and Affiliates shall have approved, which approval shall not ~~to be unreasonably withheld, prior to filing with the Bankruptcy Court: (i) this Disclosure Statement; (ii) the Disclosure Statement Approval and Solicitation Order (iii) a Confirmation Order that is consistent in all material respects with the provisions of the Plan and the Investment and Standby Purchase Agreement; and (iv) any amendments or supplements to any of the foregoing, including, without limitation, the New Mortgage Loan and the New Alternate Mortgage Loan, which shall include reasonable modifications to the existing loan documents that (A) are generally consistent with (I) current valuations of the properties (including, but not limited to the impact of valuations on release provisions) and (II) the Plan, taking into account, among other things, the reputation and expertise of the Investor and its members and Affiliates (including but not limited to the elimination of recourse carve~~

78

outs with respect to voluntary bankruptcy) and their proposed business plan for NewCo, (B) are no less favorable to the Debtors than the existing loan documents, (C) do not require a guarantee from the Investor's members or Affiliates (other than from NewCo) and (D) permit the Debtors to prepay all or any portion of the New Mortgage Loan or the New Alternate Mortgage Loan (as the case may be), at any time and from time to time, without any penalty or premium and without any defeasance requirement.  As of the date hereof, the Investor has already approved this Disclosure Statement and the Disclosure Statement and Solicitation Order.  As a result, the only operative conditions in this category are the Investor's approval of the Confirmation Order and of the terms of the New Mortgage Loan and any amendments of the Plan, the Disclosure Statement or certain other documents.  The Debtors fully expect that they will be able to satisfy these conditions. be unreasonably withheld, prior to filing with the Bankruptcy Court any documents, amendments or supplements relating to the Plan and the Disclosure Statement (the "***Plan Documents***").

(d)     The Confirmation Order approving the Plan (including, without limitation, all Plan Documents) shall be in form and substance approved by the Investor and ~~its members and Affiliates~~each of the Sponsors and shall be a Final Order.

(e)     The conditions to the occurrence of the Effective Date of the Plan shall have been satisfied or waived by the parties in accordance with the Plan.

(f)     To the extent such payments are due and payable, ~~NewCo Manager~~HVM shall ~~cause HVM to~~ pay any severance payments pursuant to the terms of the applicable Change in Control Agreements as in effect as of the date any such severance payments become due and payable, in the amounts set forth in the Change in Control Letter; provided, that any such payments shall be made only to the extent that the applicable Change in Control Agreement is in effect and/or has not been superseded by any New Employment Agreement between the applicable employee and ~~NewCo or~~ HVM.  NewCo or the Debtors shall have resolved any other claims of former executive officers, or executive officers that were employed after the Commencement Date and that have resigned or been terminated from the Debtors prior to the Effective Date, on terms reasonably acceptable to the Investor or otherwise ordered by the Bankruptcy Court; provided, that, to the extent any such claims are to be resolved by the Debtors, any such resolution may only be effectuated with the prior consent of the Investor, which consent is not to be unreasonably withheld.

(g)     No Material Adverse Change shall have occurred.

(h)     In order to ensure that a substantial portion of the funds invested by the Investor are available to be used by NewCo to operate the business, fund capital expenses, and pay debt service under the New Debt Securities, the Investor and the Debtors negotiated a closing condition that provides

79

for a certain cash balance on the Effective Date in the consensual or cram-down scenarios, whichever is applicable. In the event the Committed Proceeds equal (i) six hundred fifty million dollars ($650,000,000), as of the Effective Date, the Cash Balance of NewCo shall not be less than four hundred thirty-two million dollars ($432,000,000), (ii) four hundred million dollars ($400,000,000), as of the Effective Date, the Cash Balance of NewCo shall not be less than three hundred eighty two million dollars ($382,000,000).

(i) Due to the Investor's concern that NewCo be a viable entity that will be able to service its debt as of the Effective Date, the Investment and Standby Purchase Agreement contains parameters for the principal amount of and interest rate of the New Mortgage Loan and the New Alternate Mortgage that would be issued to the Certificate Holders. The principal amount of the New Mortgage Loan shall be in the aggregate principal amount of two billion, eight hundred eighteen million one hundred eighty-four thousand two hundred forty-three dollars ($2,818,184,243) (subject to adjustment as provided in the footnote to Exhibit I to the Plan), the term thereof shall be as set forth in the Plan, the interest rate thereon shall be fixed or floating as set forth in Exhibit H to the Plan, the New Mortgage Loan shall be pre-payable in whole or in part, at any time and from time to time, without penalty or premium and without any defeasance requirement, and the New Mortgage Loan shall not contain any mandatory prepayment requirements, event of default provisions, rights of redemption or any other restrictions or rights to change the material terms of the loan in a manner adverse to the Debtors in the event of any change-in-control or sale of all or substantially all assets in connection with the purchaser assuming and after the purchaser assumes the New Mortgage Loan. In the event that the Plan is confirmed under Section 1129(b) of the Bankruptcy Code, the New Mortgage Loan shall not be issued pursuant to the Plan, but rather, the New Alternate Mortgage Loan shall be issued pursuant to the Plan, and the principal amount of the New Alternate Mortgage Loan shall not be in excess of $3,300,000,000, the term thereof shall be seven years, and the interest rate thereon shall be a fixed rate and shall not exceed 5.34%. The New Alternate Mortgage Loan shall be pre-payable in whole or in part, at any time and from time to time, without penalty or premium and without any defeasance requirement, and the New Alternate Mortgage Loan shall not contain any mandatory prepayment requirements, event of default provisions, rights of redemption or any other restrictions or rights to change the material terms of the loan in a manner adverse to the Debtors in the event of any change-in-control or sale of all or substantially all assets in connection with the purchaser assuming and after the purchaser assumes the New Alternate Mortgage Loan. In addition, the New Mortgage Loan and the New Alternate Mortgage Loan shall be subject to the provisions set forth in Sections [1.146] and [1.122] of the Plan.

The Investment and Standby Purchase Agreement also sets forth a timetable by which the Effective Date must occur. The commitment of the Investor Upon the occurrence of any of the following events (each of which may be waived in writing by the Investor), the Investor may terminate the

Investment Agreement by providing written notice of such termination to the Debtors and, as a consequence of such termination, the Debtors will be obligated to return the Deposit to the Investor, the Investor's commitment to purchase the NewCo Common Interests will terminate, and all of the Debtors' other obligations of the Debtors thereunder (other than the their obligations of the Debtors to pay the reimbursable expenses and to satisfy their indemnification obligations set forth in the Investment and Standby Purchase Agreement) will be of no further force or effect, at the election of and upon the giving of written notice of termination by the Investor, in the event that any of the following occurs, each of which may be waived in writing by the Investor [8]:

    (a)    the commencement of the hearing on confirmation of the Plan does not occur prior to the earlier of (i) the first available date provided by the Bankruptcy Court or (ii) July 22, August 26, 2010;

    (b)    the Confirmation Order, in form and substance acceptable to the Investor, has not been entered by the Bankruptcy Court within three (3) Business Day following the hearing on confirmation of the Plan on or before September 21, 2010;

    (c)    the Effective Date does not occur on the fifteenth (15th) day following entry of the Confirmation Order by the Bankruptcy Court or before November 15, 2010;

    (d)    the withdrawal, amendment, modification of, or the filing of a pleading seeking to amend or modify, the Plan, this Disclosure Statement or any document related to the Plan or Disclosure Statement (including, without limitation, the New Mortgage Loan, any documents in the Plan Supplement, and any motion, notice, exhibit, appendix or order) by the Debtors, which withdrawal, amendment, modification or filing is inconsistent with the Investment and Standby Purchase Agreement, except as reasonably agreed in writing by the Investor;

    (e)    the filing by the Debtors of any motion or other request for relief seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

    (f)    the entry of an order by the Bankruptcy Court (a) dismissing any of the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) appointing a trustee pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; or (d) making a finding of fraud, dishonesty, or misconduct by any officer or director of NewCo, the Debtors, HVM or HVM Manager;

    (g)    a breach by NewCo, the Debtors, HVM or HVM Manager of any of their obligations under the Investment and Standby Purchase Agreement that

---

[8] For a full list of termination rights, see Section 13.1 13 of the Investment and Standby Purchase Agreement. The Debtors have not listed those termination rights which are no longer applicable because the relevant milestone has been achieved.

is not cured within three (3) Business Days after receipt of written notice thereof to the Investor;

(h)     one or more of the conditions precedent to occurrence of the Effective Date or to the obligations of the Investor set forth in the Investment ~~and Standby Purchase~~ Agreement becomes impossible to satisfy on or before the Effective Date;

(i)     the Debtors fail to comply with the provisions on the last page of the Bidding Procedures entitled "End of Auction Process"; and

(j)     ~~(i)~~ at any time after the occurrence of a Material Adverse Change.

(j)     ~~(o)~~ **Effectuating Documents and Further Transactions.**  On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to the Investor and each of the Sponsors as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Each of the officers of the Debtors, the Reorganized Debtors and NewCo is authorized, without the need for any further order or authority, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.  The Reorganized Debtors are authorized to execute all documents and enter into all agreements as may be necessary and appropriate in connection with the Debt Financing Arrangements.

(k)     ~~(p)~~ **Allocation of Plan Distributions Between Principal and Interest.**  To the extent that any Allowed Mortgage Deficiency Facility Claim, Allowed Mezzanine Facility Claim, or Allowed General Unsecured Claim scheduled to receive a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim (as determined for federal income tax purposes) first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

(l)     ~~(q)~~ **Surrender and Cancellation of Instruments.** ~~Each~~Subject to Section 6.5 of the Plan, each holder of an instrument evidencing a Claim shall surrender such instrument to the Reorganized Debtors ~~or, in the case of the holders of any Mortgage Certificates, to the Trustee, and the Trustee shall distribute or cause to be distributed to the holder thereof the appropriate Distribution (if any) provided under the Plan~~.  At the option of the Reorganized Debtors or NewCo, as applicable (in their ~~sole and absolute~~reasonable discretion), no Distribution hereunder shall be made to or on behalf of any holder of such Claim unless and until such instrument is received or the unavailability of such instrument is reasonably established to the satisfaction of the Reorganized Debtors.  In accordance with section 1143 of the Bankruptcy Code, any such holder of such a Claim that fails to surrender or cause to be surrendered such instrument or to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Reorganized Debtors and, in the event that the Reorganized Debtors requests, fails to furnish a bond in form and substance (including, without limitation, amount) reasonably satisfactory to the Reorganized Debtors shall be deemed to have forfeited all rights, claims, and interests and shall not participate in any Distribution under the Plan.

(m)     ~~(r)~~ **Letters of Credit.**  At or prior to the Effective Date, in the Debtors' discretion, with the consent of the Investor and each of the Sponsors, (a) the Existing Letters of Credit shall be terminated and any cash collateral provided thereunder shall be released to the entity that posted such

collateral; and (b) the Reorganized Debtors shall provide any and all letters of credit and related cash collateral necessary to obtain and maintain in effect on or after the Effective Date all such forms of insurance as are customary to operate a business of the size and type of the Debtors; provided, however, that on or after the Effective Date the Investor shall reimburse the Reorganized Debtors for any cash collateral referred to in clause (b) without any impact on the Cash Distribution.

### (n) ~~(s)~~ BHAC IP Transfer Agreement and Homestead Intellectual Property.

As noted above, BHAC, a non-debtor and owner of 100% of the common stock of ESI, which indirectly owns and operates 552 properties using the Extended Stay Hotels service mark, owns the trademarks for the Extended Stay America, Studio Plus, Crossland, and Extended Stay Deluxe brands, along with minor variations of those names. The BHAC IP is pledged as collateral for the Mortgage Debt. As part of the Chapter 11 Debtors' operations, BHAC has issued to each of the Mortgage Borrowers non-exclusive licenses to use the BHAC IP. It is critical for the continued operations of the Debtors that the Reorganized Debtors continue to have full, uninterrupted and undiluted use of the BHAC IP. Therefore, the Plan contemplates that all right, title and interest in and to the BHAC IP will ultimately be transferred to NewCo or its designee, which may be a third party, so that the BHAC IP remains in the exclusive control of the Reorganized Debtors on and after the Effective Date.

~~The going-concern valuation of the Debtors provided for in Article IX contemplates that the BHAC IP remains in the exclusive control of the Debtors' enterprise. As such, under the Plan, the holder of the Mortgage Facility Claim is to realize the full value of its security interest in the BHAC IP because such value is imbedded in the value of the debt and securities being distributed to the holder of the Mortgage Facility Claim. In addition, the New Mortgage Loan will be secured by first priority security interests in the BHAC IP.~~

~~If NewCo were unable to obtain exclusive control over and use of the BHAC IP, the enterprise value of the Debtors would significantly decrease as there would be no assurances that the Reorganized Debtors would be able to operate using the necessary trademarks or that competitors and third parties would not be able to obtain the use of such trademarks, thereby diluting the value of the BHAC IP to NewCo. As such, the enterprise value of the Debtors would be lower, resulting in less value being available for distributions to the holder of the Mortgage Facility Claim. As a result, in the event the BHAC IP is not transferred to NewCo, the recoveries to the holder of the Mortgage Facility Claim would decrease. In order to effectuate the consensual and expeditious transfer of the BHAC IP to NewCo, under the Plan, the Investor or NewCo shall seek to enter into an~~Pursuant to the proposed intellectual property transfer agreement (the "BHAC IP Transfer Agreement") with BHAC, ~~pursuant to which,~~ on the Effective Date, BHAC shall transfer to NewCo or its designee, which may be a third party, the BHAC IP ~~in consideration for the issuance to BHAC of the New Warrants. The initial aggregate exercise price shall be $1,150.00 per NewCo Common Interest, with such exercise price compounding annually at a rate of 20.0% per annum, subject to adjustment for dilution as to be provided in the agreements governing the New Warrants. In the event the Investor or NewCo.~~ In the event the Debtors and BHAC ~~do~~have not ~~reach agreement on the terms of~~executed the BHAC IP Transfer Agreement prior to ~~the Effective Date, BHAC shall not be entitled to receive the New Warrants, the BHAC License Agreements shall be assumed by the applicable debtors in accordance with Section 11.1 of the Plan, and the holder of the Mortgage Facility Claim shall transfer, assign and contribute~~June 17, 2010 (unless otherwise agreed by the Investor), the Special Servicer shall commence proceedings to foreclose on the BHAC IP and on the Effective Date shall assign and transfer the BHAC IP to NewCo or its designee, which may be a third party, ~~its security interest in and all rights and remedies with respect to the BHAC IP and NewCo or its designee, which may be a third party, shall exercise all such rights and remedies with respect to the BHAC IP in order to foreclose on the BHAC IP and effectuate the transfer of~~or at the

Investor's option, the Debtors, for a portion of the consideration provided on account of the Mortgage Facility Claim as set forth in the Plan.  Upon the receipt of the BHAC IP from BHAC or the Special Servicer, as applicable, the Reorganized Debtors shall transfer the BHAC IP to NewCo or its designee, which may be a third party.

NewCo or its designee, which may be a third party, will be acquiring Homestead, and will indirectly own the Homestead Intellectual Property. Such Homestead Intellectual Property may be transferred to NewCo or its designee, which may be a third party.

### (o)   ~~(t)~~ Consistent Tax Reporting

For federal income tax purposes, (i) the distributions described in Section 4.2 of the Plan shall be treated as a distribution ~~of undivided interests in the assets of NewCo to the holder of the Allowed Mortgage Facility Claim, immediately followed by a distribution of such assets~~ to the holders of ~~the Mortgage Certificates in complete liquidation of the holder of the Allowed Mortgage Facility Claim, followed by a contribution of such assets to NewCo by the holders of the Mortgage Certificates receiving NewCo Common Interests or Sub-Equity, a sale of such assets to NewCo by the holders of Mortgage Certificates receiving only New Debt Securities and a part contribution/part sale of such assets to NewCo by the holders of Mortgage Certificates receiving both NewCo Common Interests and other property, and~~Mortgage Certificates following a sale of the Mortgage Properties (and all other assets deemed to be transferred to NewCo), (ii) the distribution described in Section 4.3 of the Plan shall be treated as a distribution of undivided interests in the assets of NewCo to the holder of the Allowed ESA UD Mortgage Claim followed by a sale of such assets ~~to NewCo~~ for the New ESA UD Mortgage Note, and (iii) the distributions described in Sections 4.4, 4.5 and 4.6 of the Plan shall be treated as described in Section 6.17(c) of the Plan.  All parties will be required to report for all federal income tax purposes in a manner consistent with the characterization of the distributions described above.

As soon as possible after the Effective Date, and to the extent required by Section 1060 of the Internal Revenue Code, ~~the~~ NewCo ~~Board of Managers~~ shall determine the aggregate value of the underlying assets of NewCo as of the Effective Date and the portions of such value that are allocable, respectively, to the New ESA UD Mortgage Note and the ~~various classes of New Equity Securities and New Debt Securities~~Investment.  Such allocation will take into account the relative fair market values of the New ~~Equity Securities, New Debt Securities and the New~~ ESA UD Mortgage Note and the Investment.  ~~The~~ NewCo ~~Board of Managers~~ will apprise, in writing, all parties of such aggregate valuation and allocation.  The aggregate valuation and allocation shall be used consistently by all parties ~~(including NewCo, the holders of Mortgage Certificates and the holder of the Allowed ESA UD Mortgage Claim)~~ for all federal income tax purposes.

### (p)   ~~(u)~~ Issuance of NewCo Common Interests to Investor **or Sponsor** Affiliates.

The Investor, the Sponsors or their Affiliates, in their respective sole discretion, may deliver a written schedule to the Debtors within ten (10) days after entry of the Confirmation Order to designate that some or all of the NewCo Common Interests to be issued to the Investor, the Sponsors or their Affiliates under the Plan be issued in the name of, and delivered to, one or more of their managed funds and/or respective affiliates, so long as such issuance and delivery is in compliance with federal and state securities laws and does not require NewCo to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended and the rules and regulations of the Securities and Exchange Commission thereunder.

In the event that the Investor, the Sponsors or their Affiliates make the designation pursuant to Section ~~6.17~~6.15(a) of the Plan, the funds managed by the Investor, the Sponsors and/or their respective affiliates that are so designated shall have the rights, entitlements and ~~benefits~~benefit that would otherwise inure to the Investor, the Sponsors or their Affiliates in their capacity as a holder of the NewCo Common Interest as provided in the Plan, including those rights, entitlements and benefits of the Investor, the Sponsor or the Affiliate specified in ~~Sections 6.3~~Section 6.4(a)(i), ~~6.3(c) and 6.5 of the Plan~~ above.

~~(u)      **Allowed Mortgage Facility Claim.** In the event that Class 2 votes in favor of the Plan, all Claims in respect of the Mortgage Facility shall be satisfied in full by the treatment of Class 2, as set forth in Section 4.2(b)(i) of the Plan, and the holder of such Claim shall be deemed to have consented to the allowance of the Mortgage Facility Deficiency Claim at $0. In the event that Class 2 rejects the Plan, the Allowed Mortgage Facility Deficiency Claim shall be equal to the principal, accrued interest, fees and costs due and owing on account of the Mortgage Facility as of the Commencement Date, less the amounts of the New Alternate Notes and any payments made on account of the Mortgage Facility during the Chapter 11 cases, including, without limitation, adequate protection payments, fees, costs or expenses~~

Each of the Loan REMIC, the Upper Tier REMIC, and the Lower Tier REMIC shall adopt a plan of liquidation immediately prior to the Effective Date (provided, however, that notwithstanding the liquidation of the Loan REMIC, the Lower Tier REMIC and the Upper Tier REMIC, the Mortgage Facility Trust shall not liquidate and shall remain in full force and effect until the termination of the Mortgage Parties Indemnification Fund).

(q)      **Mortgage Parties Indemnification Fund.**

On the Effective Date, the Debtors shall transfer $20 million to the Special Servicer which shall hold such funds in a cash collateral account (the "Mortgage Parties Indemnification Fund") for the benefit of the Mortgage Debt Parties to satisfy any indemnification obligations of the Mortgage Facility Trust with respect to any post-Confirmation Date litigation commenced against the Mortgage Debt Parties regarding the voting on the Plan, distributions under the Plan and any other actions taken by the Mortgage Debt Parties in connection with the Plan, including the implementation thereof (the "Indemnified Litigation"). Unless the funds maintained in the Mortgage Parties Indemnification Fund are paid to the Mortgage Debt Parties in connection with any Indemnified Litigation, the Special Servicer (or such Person designated by the Special Servicer or the Successor Trustee) shall hold the Mortgage Parties Indemnification Fund in a cash collateral account for a period of six (6) years from the Effective Date of the Plan. Upon the later of termination of the six-year period or entry of a final, non-appealable judgment in any then-pending Indemnified Litigation, any and all cash remaining in the Mortgage Parties Indemnification Fund shall be distributed to the holder of the Allowed Mortgage Facility Claim, for distribution to the first tranche of Mortgage Certificates that are held by holders that have not received payment in full under the Plan and, to the extent that there are sufficient funds remaining after payment in full of such tranche of Mortgage Certificate holders, to other Mortgage Certificate holders in accordance with the priorities set forth in the Trust and Servicing Agreement. Each Mortgage Debt Party may receive reimbursement for any fees that such Mortgage Debt Party has incurred in connection with any Indemnified Litigation by submitting invoices (with appropriate redactions for privilege) to the Special Servicer (or such Person designated by the Special Servicer), which shall pay such invoices from the funds maintained in the Mortgage Parties Indemnification Fund reasonably promptly after receipt of such invoices. In addition, the Special Servicer shall be entitled to reasonably prompt reimbursement for any fees that the Special Servicer incurs in connection with any Indemnified Litigation from the funds maintained in the Mortgage Parties Indemnification Fund.

For all United States federal income tax purposes, all parties shall treat the transfer of Cash to the Mortgage Parties Indemnification Fund as (1) a transfer of Cash (subject to any obligations relating to those assets) directly to the holders of Mortgage Certificates (in accordance with the priorities set forth in the Trust and Servicing Agreement), followed by (2) the transfer by the holders of Mortgage Certificates otherwise entitled to receive such Cash to the Mortgage Parties Indemnification Fund. Accordingly, the holders of Mortgage Certificates otherwise entitled to receive such Cash shall be treated for United States federal income tax purposes as the direct owners of their respective share of the Cash in the Mortgage Parties Indemnification Fund. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. The Special Servicer shall send annually to each holder of Mortgage Certificates that is treated as a direct owner of any portion of the Mortgage Parties Indemnification Fund a separate statement setting forth any income earned with respect to, or any expenditure made on behalf of, such portion of the Mortgage Parties Indemnification Fund as may be relevant for United States federal income tax purposes.

(r) **Litigation Trust.**

On the Effective Date, the Debtors shall transfer the Litigation Trust Funding of $5,000,000 to the Litigation Trust, and the Debtors and the Litigation Trustee shall execute the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan. On the Effective Date, the Debtors shall be deemed to have automatically transferred to the Litigation Trust all of their right, title, and interest in and to all of the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Litigation Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Litigation Trust Beneficiaries as set forth in the Plan and the expenses of the Litigation Trust as provided in the Litigation Trust Agreement. Thereupon, the Debtors shall have no interest in the Litigation Trust Assets or the Litigation Trust. In connection with the vesting and transfer of the Litigation Trust Assets, including rights and causes of action, any attorney-client, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust shall vest in the Litigation Trust. The Debtors and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities. In the event of any conflict between the terms of Section 6.17 of the Plan and the Litigation Trust Agreement, the terms of the Litigation Trust Agreement shall govern.

The Litigation Trust shall be established for the sole purpose of liquidating and distributing the Litigation Trust Assets contributed to the Litigation Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

For all United States federal income tax purposes, all parties shall treat the transfer of the Litigation Trust Assets to the Litigation Trust as (1) a transfer of the Litigation Trust Assets (subject to any obligations relating to those assets) directly to the Litigation Trust Beneficiaries, followed by (2) the transfer by such beneficiaries to the Litigation Trust of the Litigation Trust Assets in exchange for an interest in the Litigation Trust. Accordingly, the Litigation Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

For tax reporting purposes:

(i) The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

(ii) The Litigation Trustee also shall annually send to each holder of an interest in the Litigation Trust a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for United States federal income tax purposes and will instruct all such holders to use such information in preparing their United States federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their United States federal income tax returns.

(iii) As soon as reasonably practicable after the Litigation Trust Assets are transferred to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets. Such valuation shall be made available from time to time to all parties to the Litigation Trust, to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(iv) Allocations of Litigation Trust taxable income or loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(v) The Litigation Trustee shall be responsible for payment, out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or its assets.

The Litigation Trustee, on behalf of the Litigation Trust, shall have the exclusive right, authority and discretion to institute, prosecute, abandon, settle or compromise any and all causes of action that constitute Litigation Trust Assets without the consent or approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided in the Plan or in the Litigation Trust Agreement. From and after the Effective Date, the Litigation Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the Litigation Trust, shall serve as a representative of the Debtors' Estates and shall retain and possess the sole and exclusive right to commence, pursue, settle, compromise or abandon, as appropriate, any and all causes of action, whether arising before or after the Petition Date, in any court or other tribunal.

From and after the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Litigation Trust, and any professionals retained by the Litigation Trust, except as otherwise provided in the Litigation Trust Agreement. The Litigation Trustee shall (i) pay to the holder of the Allowed Mortgage Facility Claim the Litigation Trust Funding Reimbursement out of the proceeds of the Litigation Trust Assets, and (ii) reimburse NewCo, the Reorganized Debtors, HVM and their officers, directors and managers for all reasonable costs and expenses incurred as a third party in connection with any cause of action or proceeding pursued by or otherwise involving the Litigation Trust and the Litigation Trust Assets or as a defendant in relation to a claim that has been released pursuant to the Plan.

The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom); provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

The Litigation Trustee is required to distribute to the Litigation Trust Beneficiaries on account of their interests in the Litigation Trust, at least annually, all unrestricted Cash on hand, less such amounts paid pursuant to Section 6.17(f) of the Plan.

(s)    **ESI Settlement.**

The Mortgage Facility Trust holds a Guaranty Claim against ESI.  ESI and the Special Servicer (subject to the consent of the Operating Advisor) shall enter into a settlement agreement (the "***ESI Settlement***"), subject to reasonable approval of the Investor and each of the Sponsors and Bankruptcy Court approval, pursuant to which, *inter alia:* (i) ESI would be released from its Guaranty of the Mortgage Loan and the Mezzanine Facilities, (ii) ESI would grant a release to certain parties as set forth in Section 10.10 of the Plan, (iii) the Chapter 11 Debtors and the Special Servicer would set aside $750,000 to be used to wind down ESI, and (iv) the creditors of ESI would be granted an interest in the Litigation Trust. The Plan contemplates that the Bankruptcy Court would approve the ESI Settlement at or before the Confirmation Hearing.

2.    Securities Law Matters

(a)    **New Securities and Rights Offering**

Pursuant to the Plan, NewCo will issue NewCo Common Interests, Sub-Equity, the New Warrants and the Rights. In order to subscribe for the Rights, the subscriber must represent that it is (A) a "qualified institutional buyer" as such term is defined in Rule 144A under the Securities Act, (B) an "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act, or (C) a non-US person purchasing under Regulation S under the Securities Act and provide the other representations, warranties and affirmations required in the Rights Certificate or as set forth in the Rights Offering Procedures.

(b)    **Transfer and Securities Law Restrictions**

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale, under a chapter 11 plan of reorganization, of a security of a debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to a debtor under a plan, if such securities are offered or sold in exchange for a claim against, or equity interest in, such debtor or affiliate or principally in such exchange and partly for cash.  In reliance upon this exemption, to the NewCo Common Interests, the Sub-Equity and the Rights extent the Litigation Trust Beneficiaries' interest in the Litigation Trust Assets is deemed to be a security (the "***1145 Securities***") to be issued to holders of claims against the Debtors, such 1145 Securities generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws. Accordingly The terms of the Litigation Trust Beneficiaries' interest in the Litigation Trust Assets shall be as set forth in the Litigation Trust Agreement, including that such interests shall not be certificated and shall be subject to certain restrictions on transfer. Subject to the restrictions set forth in the Litigation Trust Agreement, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in Section 1145(b) of the Bankruptcy Code.  In addition,

such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, ~~recipients of new securities issued under the Plan~~ Litigation Trust Beneficiaries are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is a control Person of the issuer of the securities as defined in Section 2(a)(11) of the Securities Act.

~~The Debtors believe that (i) the Unsubscribed Interests issued pursuant to the Investment and Standby Purchase Agreement and NewCo Common Interests issued to the Investor pursuant to the Plan (collectively, the "*Investor Securities*") and (ii) the New Warrants and the NewCo Common Interests issuable upon exercise of the New Warrants (collectively, the "*New Securities*") will be exempt from the registration requirements of the Securities Act, pursuant to Section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.~~

For Persons deemed to be "underwriters" who receive 1145 Securities pursuant to the Plan including control Person underwriters, as referred to in clause (d) above ~~and Persons who receive Investor Securities or New Securities (collectively, (~~the "*Restricted Holders*"), resales of such securities would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 or other applicable exemptions under the Securities Act.

Under certain circumstances, holders of 1145 Securities deemed to be "underwriters" ~~or holders of the Investor Securities or New Securities~~ may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state and foreign securities laws. Generally, Rule 144 of the Securities Act provides that persons who hold securities received in a transaction not involving a public offering or who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions vary depending on whether the seller is a holder of restricted securities or a control Person of the issuer and whether the security to be sold is an equity security or a debt security. The conditions include required holding periods in certain cases, the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in certain cases, the requirement in certain cases that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that, in certain cases, notice of the resale be filed with the Securities and Exchange Commission. The Debtors cannot assure, however, that adequate current public information will exist with respect to any issuer of 1145 Securities and therefore, that the safe harbor provisions of Rule 144 of the Securities Act will be available. ~~Pursuant to the Plan, certificates evidencing 1145 Securities received by Restricted Holders and the Investor Securities and the New Warrants will bear a legend substantially in the form below:~~

~~THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR TRANSFERRED IN THE~~

ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SAID LAWS OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS THEREOF.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF NEWCO, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

Parties who believe they may be underwriters as defined in Section 1145 of the Bankruptcy Code and other Restricted Holders are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144 or other applicable exemptions.

(c) **Registration Rights Agreement**

Pursuant to the terms of the Registration Rights Agreement, which shall be substantially in the form to be included in the Plan Supplement, the Investor shall be entitled to certain registration rights as set forth therein.

(d) **Listing**

As of the Effective Date, neither the NewCo Common Interests nor the New Warrants will be listed for trading on any stock exchange or trading system and the Debtors will not file any reports with the SEC. Consequently, the trading liquidity of the NewCo Common Interests and New Warrants will be limited as of the Effective Date. The future liquidity of the trading markets for NewCo Common Interests and New Warrants will depend, among other things, upon the number of holders of such securities, whether such securities become listed for trading on an exchange or trading system at some future time and whether the Debtors begin to file annual and quarterly reports with the SEC.

H. TREATMENT OF DISPUTED CLAIMS

1. Objections to Claims; Prosecution of Disputed Claims

NewCo or the Reorganized Debtors shall object to the allowance of Claims filed with the Bankruptcy Court with respect to which NewCo or the Reorganized Debtors, as applicable, shall object to the allowance of Claims filed with the Bankruptcy Court with respect to which NewCo or the Reorganized Debtors, as applicable, dispute liability in whole or in part and for which they are responsible for payment as provided in Article II of the Plan. All objections that are filed and prosecuted by NewCo as provided herein or the Reorganized Debtors as provided in the Plan shall be litigated to Final Order by NewCo or the Reorganized Debtors, or settled by NewCo or the Reorganized Debtors. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by NewCo or the Reorganized Debtors to Claims shall be served and filed no later than ninety (90) days after the Effective Date.

The Plan Administrator shall object to the allowance of Administrative Expense Claims or Priority Claims filed with the Bankruptcy Court with respect to which, on behalf of the Debtors, the Plan Administrator disputes liability in whole or in part and which is to be paid from the Administrative/Priority Claims Reserve as provided in Section 2.1 of the Plan. All objections that are

filed and prosecuted by the Plan Administrator as provided in the Plan shall be litigated to Final Order by NewCo or the Reorganized Debtors, as applicablethe Plan Administrator or settled by the Plan Administrator.  Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections by NewCo or the Reorganized Debtors, as applicable, tothe Plan Administrator to Administrative Expense Claims and Priority Claims shall be served and filed no later than sixty (60) days after the Effective Date.

        The Litigation Trustee shall object to the allowance of General Unsecured Claims and Mezzanine Facilities Claims filed with the Bankruptcy Court with respect to which the Litigation Trustee disputes liability in whole or in part.  All objections that are filed and prosecuted by the Litigation Trustee as provided herein shall be litigated to Final Order by the Litigation Trustee or settled by the Litigation Trustee.  Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by the Litigation Trustee to General Unsecured Claims and Mezzanine Facilities Claims shall be served and filed no later than ninety (90) days after the Effective Date.

    2.    <u>Distributions on Account of Disputed Claims</u>

        Notwithstanding Article II or Article IV of the Plan, a Distribution shall only be made by NewCo or the Reorganized Debtors, the Plan Administrator or the Litigation Trustee, as applicable, to the holder of a Disputed Claim when, and to the extent that, such Disputed Claim becomes Allowed.  No interest shall be paid on account of Disputed Claims that later become Allowed except to the extent that payment of interest is required under section 506(b) of the Bankruptcy Code.  No Distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 7.1 of the Plan.  From time to time after the Effective Date, on each Distribution Date after a Disputed Claim becomes an Allowed Claim, NewCo or the Reorganized Debtors, the Plan Administrator, or the Litigation Trustee, as applicable, shall distribute to such holder the amount distributable to such holder of such Claim in accordance with the applicable sections of the Plan.  To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed.  To the extent that any funds remain reserved by NewCo or the Reorganized Debtors for payment of Allowed Claims after the final resolution of all Disputed Claims that are Administrative Expense Claims or Priority Claims (and all such Disputed ClaimClaims that are Administrative Expense Claims or Priority Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall revert to and be fully vested in NewCo or the Reorganized Debtors, as applicable.  To the extent that any funds remain in the Administrative/Priority Claims Reserve after the final resolution of all Administrative Expense Claims or Priority Claims that are Disputed Claims (and all such Disputed Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall be paid to the holder of the Mortgage Facility Claim, for distribution to holders of Mortgage Certificates in accordance with Section 6.3 of the Plan.  To the extent that any funds remain in the Litigation Trust after the final resolution of all General Unsecured Claims and Mezzanine Facilities Claims that are Disputed Claims (and all such Disputed Claims that are subsequently Allowed are fully satisfied in accordance with the terms of the Plan), such funds shall be paid to the Litigation Trust Beneficiaries.

    3.    <u>Settlement of Claims</u>

        At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors may settle any or all of the Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.  After the Effective Date, NewCo or the Reorganized Debtors may, and shall have the exclusive right to, compromise and settle any Claims against them that they have agreed to pay or are required to pay pursuant to Section 2.1 of the Plan and

claims they have against another Person or Entity, excluding the Litigation Trust Assets, without notice to or approval from the Bankruptcy Court.

I.      DISTRIBUTIONS

    1.    <u>Distributions under the Plan</u>

        Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

    2.    <u>Timing of Distributions under the Plan</u>

        Except for Distributions made on the Initial Distribution Date, any Distribution to be made by any Debtor, the ~~Disbursing Agent~~Plan Administrator, NewCo or the Reorganized Debtors pursuant to the Plan shall be deemed to have been timely made if made within ten (10) days after the time therefore specified in the Plan.  No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

    3.    ~~Distributions with Respect to Mezzanine Facility Claims, General Unsecured Claims and Mortgage Facility Deficiency Claim~~Use of Cash Collateral

        The Debtors will be entitled to use cash collateral consistent with the terms of the Cash Collateral Order through the Effective Date including, without limitation, the obligations to make adequate protection payments as provided in the Cash Collateral Order.

    4.    <u>Plan Administrator</u>

        ~~Distributions with respect to Classes 4 and 5~~Unless otherwise provided in the Plan, all distributions under the Plan shall ~~only be made on each Distribution Date; *provided, however,* that, if a Claim in Class 4 or 5 becomes Allowed subsequent to the Initial Distribution Date, NewCo or the Reorganized Debtors may, in its sole discretion, make a Distribution with respect to such Claim prior to a Distribution Date.  For purposes of treatment and Distribution under the Plan, all General Unsecured Claims held by a Creditor shall be aggregated and treated as a single Claim.  At the written request of the Disbursing Agent, any Creditor holding multiple General Unsecured Claims shall provide to the Disbursing Agent a single address to which any Distributions shall be sent.  At the written request of any Creditor holding multiple General Unsecured Claims made to the Disbursing Agent within thirty (30) days prior to a Distribution Date, such Creditor shall receive an itemized statement of the General Unsecured Claims for which the Distribution is being made.~~

    ~~4.    Distributions with Respect to the Mortgage Facility Claim.~~

        ~~The amount of the New Debt Securities, New Equity Securities, and/or Rights to which any holder of Certificates is entitled shall be determined based upon such holder's share of principal and accrued interest on the Certificates as of the Confirmation Date.  As a result, although the Debtors will still be entitled to use cash collateral consistent with the terms of the Cash Collateral Order, they shall be relieved of the obligation to make Adequate Protection Payments (as defined in the Cash Collateral Order), if any, as of the Confirmation Date.~~

5.      Calculations Subject to Adjustment

The allocation of the New Debt Securities, New Equity Securities, and/or Rights to various Classes and subclasses of Claims under the Plan is based on a projected Confirmation Date of June 30, 2010, and is subject to adjustment based on the actual Confirmation Date.

6.      Disbursing Agent Unless otherwise provided therein, all distributions under the Plan shall be made by the Reorganized Debtors or NewCo, as applicable, as Disbursing Agent or such other entity designated by NewCo or the Reorganized Debtors with the written consent of the Investor and each of the Sponsors.  The Disbursing Agent be made by the Plan Administrator.  All reasonable costs and expenses incurred by the Plan Administrator in carrying out its duties under the Plan shall be paid from the funds in the Administrative/Priority Claims Reserve, provided, however, that the Plan Administrator shall provide copies of its statements for services rendered to the Special Servicer.  Any dispute regarding the payment of the fees and expenses of the Plan Administrator shall be determined by the Bankruptcy Court.  The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent the Plan Administrator is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by NewCo or the Reorganized Debtors, as applicable. paid from the funds in the Administrative/Priority Claims Reserve.

5.      7. Record Date

As of the close of business on the Record Date, the various transfer and claims registers for each of the Classes of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims.  The Debtors and, the Plan Administrator, NewCo or, and the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims occurring after the close of business on the Record Date.  The Debtors and the Disbursing Agent Plan Administrator shall be entitled to recognize and deal hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Record Date, to the extent applicable.

6.      8. Manner of Payment under the Plan

Unless the Person receiving a payment agrees otherwise, any payment in Cash to be made by the Debtors, Plan Administrator, or NewCo or the Reorganized Debtors, as applicable,, shall be made, at the election of the Debtors, Plan Administrator, or NewCo or the Reorganized Debtors, (as applicable the case may be), by check drawn on a domestic bank or by wire transfer from a domestic bank, provided that payments to the holder of the Allowed Mortgage Facility Claim shall be paid by wire transfer.

7.      9. Hart-Scott-Rodino Compliance

Any NewCo Common Interests to be distributed under the Plan to any Person required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Person shall have expired or been terminated.

8.   ~~10.~~ Fractional ~~NewCo Common Interests or Other~~ Distributions

~~Notwithstanding anything to the contrary contained herein, no fractional NewCo Common Interests shall be distributed, and no Cash payments of fractions of cents will be made.~~ Fractional dollars shall be rounded down to the nearest whole dollar. ~~Fractional NewCo Common Interests shall be rounded down to the nearest whole unit. No Cash will be paid in lieu of such fractional NewCo Common Interests or dollars.~~

9.   ~~11.~~ Distribution of Unclaimed Property

Any Distribution under the Plan that is unclaimed after one hundred eighty (180) days following the date such property is distributed shall be deemed not to have been made and shall be transferred to ~~NewCo or the Reorganized Debtors, as applicable~~ the Litigation Trust, free and clear of any claims or interests of any Entities, including, without express or implied limitation, any claims or interests of any governmental unit under escheat principles. Nothing contained herein shall affect the discharge of the Claim with respect to which such Distribution was made, and the holder of such Claim shall be forever barred from enforcing such Claim against NewCo ~~or,~~ the Reorganized Debtors or the Debtors, or the assets, estate, properties, or interests in property of the Debtors, NewCo or the Reorganized Debtors.

10.   Administrative/Priority Claims Reserve

On the Effective Date, the Plan Administrator shall establish the Administrative/Priority Claims Reserve. The amount of the Administrative/Priority Claims Reserve shall be determined by the Debtors, subject to the reasonable consent of the Plan Administrator and the Special Servicer (with the consent of the Operating Advisor, such consent not to be unreasonably withheld), and shall be the sum of (a) estimated accrued and unpaid Administrative Expense Claims (excluding items of the type referred to in clause (c)(i) of the definition of "Allowed" in the Plan, any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date), including, without limitation, amounts due to professionals as compensation or reimbursement of expenses, (b) the estimated Priority Claims, and (c) the estimated costs and expenses of the Plan Administrator. For purposes of determining the estimated accrued and unpaid Administrative Expense Claims, the Debtors shall include 110% of the amount reflected on the Debtors' books and records as being due and owing as Administrative Expenses (other than amounts owed to professionals and Priority Claims which shall be estimated at 100% of such amount). The Administrative/Priority Claims Reserve shall be the sole source for payment of Administrative Expense Claims and Priority Claims, other than items of the type referred to in clause (c)(i) of the definition of "Allowed", any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date.

On the date that is seventy-five (75) days after the Effective Date, the Plan Administrator shall distribute to the holder of the Mortgage Facility Claim all funds remaining in the Administrative/Priority Claims Reserve other than (i) any amounts required to be reserved in connection with Administrative Expense Claims or Priority Claims that are Disputed Claims at such time, and (ii) a reasonable amount to be retained for payment of the fees and expenses of the Plan Administrator and the reasonable post-Effective Date fees and expenses of the Debtors' professionals in an amount to be agreed by the Special Servicer (with the reasonable consent of the Operating Advisor). Notwithstanding the release of the funds from the Administrative/Priority Claims Reserve or any provisions of the Plan, NewCo and the Reorganized Debtors shall incur no liability for and shall have no responsibility to pay

any Administrative Expense Claim or Priority Claim, excluding the claims of the type specified in Section 1.7(c)(i) of the Plan and any payments relating to Change of Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, in accordance with Section 2.1 of the Plan.

J.  CONDITIONS PRECEDENT

1.  <u>Conditions Precedent to the Effective Date</u>

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)  the Bankruptcy Court shall have entered a Confirmation Order with respect to the Plan in form and substance approved by the Investor ~~and,~~ each of the Sponsors and the Special Servicer (with the consent of the Operating Advisor), and such Confirmation Order shall be non-appealable, shall not have been appealed within fourteen (14) calendar days of entry or, if such Confirmation Order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such Confirmation Order;

(b)  all actions, documents, and agreements necessary to implement the Plan, including, without limitation, all actions, documents, and agreements necessary to implement the ~~New Mortgage Notes, the~~ corporate reorganization described in Section 6.7 of the Plan, and the Investment described in Section 6.8 of the Plan, ~~and the Rights Offering described in Section 6.9 of the Plan,~~ shall have been effected or executed; ~~the NewCo Certificate of Formation shall have been filed with the applicable Secretary of State and the NewCo Operating Agreement shall be in place;~~

(c)  the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are determined by the Debtors to be necessary to implement the Plan and that are required by law, regulation, or order;

(d)  the NewCo Certificate of Formation (and any certificates of formation for newly formed subsidiaries of NewCo, if any) shall have been filed with the applicable Secretary of State ~~of the State of Delaware~~, and the NewCo Operating Agreement (and any operating agreements for newly formed subsidiaries of NewCo, if any) shall be in place;

~~(e)  the Registration Rights Agreement shall be in full force and effect; and~~

(e)  the Mortgage Parties Indemnification Fund shall have been established and funded;

(f)  the Litigation Trust shall have been established and funded;

(g)  notice of the Plan and Disclosure Statement shall have been distributed to all known holders of Mortgage Certificates and publicly advertised in such a way as to provide fair and adequate notice to individual holders of Mortgage Certificates;

(h)  the Bankruptcy Court shall have approved the ESI Settlement at or prior to the Confirmation Date;

(i)     the transfer of the BHAC IP to NewCo or its designee, or at the Investor's option, the Debtors, shall have occurred; and

(j)     (f)     all of the conditions to closing that are contained in Section 13.111.1 of the Investment and Standby Purchase Agreement shall have been satisfied or waived.

The conditions precedent specified above, with the exception of Section 9.1(a) of the Plan, may be waived in whole or in part by the Debtors, with the prior consent of the Investor and each of the Sponsors, and with respect to Sections 9.1(e), 9.1(f), 9.1(g) and 9.1(h) only of the Plan, the Special Servicer.  Subject to the foregoing, any such written waiver of a condition precedent set forth in Section 9.1 of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors decide that one of the foregoing conditions cannot be satisfied, and the occurrence of such condition is not waived in writing by the Debtors with the prior consent of the Investor and, each of the Sponsors and if applicable, the Special Servicer, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

2.     Effect of Failure of Conditions to Effective Date

If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 120 days after the Confirmation Date, or by such later date as is proposed by the Debtors (with the consent of the Investor and each of the Sponsors, which shall not be unreasonably withheld), then upon motion by the Debtors (after consultation with the Investor and, each of the Sponsors and the Special Servicer) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions to consummation is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to Section 9.2 of the Plan, the Plan will be null and void in all respects, and (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, (iii) the obligations of the Investor and the Sponsors under the Investment and Standby Purchase Agreement will terminate, and (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors.

K.     EFFECT OF CONFIRMATION

1.     Vesting of Assets

Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors, including the Mortgage Properties, shall vest in the Reorganized Debtors and/or NewCo free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors and/or NewCo may operate the Debtors' business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy

Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.

      2.        <u>Title to Assets; Discharge of Liabilities</u>

Except as otherwise provided in the Plan, on the Effective Date, title to all assets and properties and interests in property dealt with by the Plan shall vest in the Reorganized Debtors ~~or NewCo~~, NewCo, the Plan Administrator, the Administrative/Priority Claims Reserve, or the Litigation Trust, as provided in the Plan, free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors arising prior to the Effective Date, except as may be otherwise provided in the Plan.

For purposes of clarity, as a result of consummation of the Plan, all of the property of the Debtors, including the Mortgage Properties, transferred to or vesting in the Reorganized Debtors and/or NewCo shall vest in the Reorganized Debtors and/or NewCo free and clear of claims, liens, encumbrances, charges and other interests, including, without limitation, any and all claims, liens, encumbrances and any and all right, title, interests related thereto of governmental entities relating to any tax liabilities or similar liabilities.  In addition, as a result of consummation of the Plan, provided it is in accordance with the Investment Agreement, and pursuant to the Plan, NewCo and the Reorganized Debtors shall not assume, incur or be responsible for the Plan claims or liabilities of the Debtors or any of their affiliates, except for those claims of the type referred to in clause (c)(i) of the definition of "Allowed"  incurred in the ordinary course of business and any payments relating to Change in Control Agreements referred to in the Investment Agreement arising as a result of the occurrence of the Effective Date, and any severance payments that the Investor consents to or directs the Debtors to pay prior to the Effective Date, and neither the Reorganized Debtors, NewCo, the Investor, the Sponsors nor the Debt Financing Lenders shall be successors of the Debtors or ESI nor incur any successor or transferee liability of any kind, nature or character, including, without limitation, in relation to (1) the liabilities arising or resulting from or relating to the transactions contemplated by the Plan, and (2) any and all claims, liens, encumbrances, and any and all right, title, and interests related thereto, of governmental entities relating to any tax or similar liabilities.

      3.        <u>Binding Effect</u>

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind the Debtors, the Reorganized Debtors, the Mortgage Debt Parties, the holders of the Mortgage Certificates, and any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

      4.        <u>Claims Extinguished</u>

As of the Effective Date, any and all alter-ego or derivative claims accruing to the Debtors or Debtors in Possession against present or former officers, managers and directors of the Debtors who were officers, managers or directors of the Debtors at any time during the Chapter 11 Cases shall be extinguished whether or not then pending; provided, that nothing in Section 10.4 of the Plan shall be construed as a release of any Litigation Trust Assets.

5.      Discharge of Claims and Termination of Equity Interests

Except as provided ~~in~~ the Plan, the rights afforded in the Plan and the payments and distributions to be made thereunder shall discharge all existing debts and Claims, and shall terminate all Equity Interests, of any kind, nature, or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Equity Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, NewCo, their respective successors or assignees, or any of their respective assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest, and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

6.      Injunction

**Except as otherwise expressly provided in the Plan, all Persons who have held, hold or may hold Claims or Equity Interests** ~~including Claims and Equity Interests~~**and all Persons who have held, hold or may hold claims or causes of action that have been released pursuant to Section 10.10 of the Plan or are subject to exculpation pursuant to Section 10.9 of the Plan, and all other parties in interest, including any participants in the Auction, along with their respective present and former employees, agents, officers, managers, directors, principals and Affiliates, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, or such released or exculpated claim or cause of action, against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, NewCo or the Released Parties** ~~, or against the property or interests in property of the Debtors, the Reorganized Debtors, NewCo or the Released Parties~~ **or any of their respective property or assets or any interest therein, or (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Reorganized Debtors, NewCo, the Released Parties or against** ~~the~~**any of their respective property or** ~~interests in property of the Debtors, the Reorganized Debtors, NewCo or the Released Parties~~**assets, or any interest therein, with respect to any such Claim or Equity Interest, or such released or exculpated claim or cause of action.  Such injunction shall be included in the Confirmation Order and shall extend to any successors of the Debtors, the Reorganized Debtors, NewCo and the Released Parties and their respective properties and interest in properties.**

7.      Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays arising under or entered during the ~~Bankruptcy~~Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, other than injunctions issued pursuant to the Plan (including

injunctions under Section 10.6 of the Plan), shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

8.     <u>Injunction Against Interference With Plan of Reorganization</u>

**Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, <u>including the holders of Mortgage Certificates,</u> along with their respective present or former employees, agents, officers, managers, directors, principals and Affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

9.     <u>Exculpation</u>

Notwithstanding anything herein to the contrary, as of the Effective Date, none of (a) the Debtors or the Reorganized Debtors, (b) NewCo, (c) the Creditors' Committee and any subcommittee thereof, (d) BHAC (provided that BHAC has entered into the BHAC IP Transfer Agreement as provided in Section ~~6.15~~6.13 of the Plan), (e) the accountants, financial advisors, investment bankers, agents and attorneys for the Debtors, (f) HVM, (g) HVM Manager, (h) the Special Servicer, (i) the Trustee, (j) <u>the Operating Advisor, (k) the Controlling Holder, (l) </u>HVM Manager Owner, (~~k~~m) the Investor, (~~l~~n) each Sponsor,<u> (o) the Debt Financing Lenders</u> and (~~m~~p) any present or former director, manager, officer, member, equity holder (and their respective Affiliates), employee, agent, financial advisor, partner, Affiliate, attorney, other professional advisor or representative (and their respective Affiliates) of the persons or parties described in clauses (a) through (~~l~~p) of Section 10.9 of the Plan or of their respective Affiliates (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, <u>related to,</u> or <u>otherwise </u>arising out of, the ~~Bankruptcy~~<u>Chapter 11</u> Cases, <u>the Auction,</u> the formulation, <u>negotiation, preparation,</u> dissemination, <u>implementation,</u> confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the ~~Bankruptcy Cases~~<u>Chapter 11 Cases, the Trust and Servicing Agreement, the Mortgage Facility Trust</u>, the Plan, the Disclosure Statement or<u>, in each case,</u> any contract, instrument, document or other agreement related thereto, including, without limitation, the Investment ~~and Standby Purchase~~ Agreement; provided, however, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence ~~and *provided further*~~<u>; provided, further, that each Released Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further,</u> that nothing in Section 10.9 of the Plan shall be construed as a release or exculpation for any Guaranty Claim~~,~~ other than a Guaranty Claim against ~~Homestead~~<u>a Debtor</u>.

10.     <u>Releases</u>

As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; ~~and~~ (f) the <u>provision of the Debt Financing Arrangements by the Debt Financing Lenders; (g) the</u> substantial contribution of the Investor, each of the Sponsors and their Affiliates<u>; and (h) the substantial contribution of the Special Servicer, the Trustee, the Operating Advisor and the Controlling Holder</u>: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes

to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; ~~and~~ (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that ~~does~~votes not ~~vote~~ to accept the Plan; and (iv) each holder of a Mortgage Certificate, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; provided, that nothing in Section 10.10 of the Plan shall be construed as a release ~~for~~of any Guaranty Claim, other than a Guaranty Claim against ~~Homestead;~~a Debtor, provided, further, that nothing in Section 10.10 of the Plan shall be construed as a release ~~for~~of any ~~potential claims, causes of action, charges, suits or rights of recovery referenced in the Examiner's Report arising out of or related to the Acquisition~~claims constituting Litigation Trust Assets.

11. Government Release

Except with respect to the claims held by the United States Government or any of its agencies or any state and local authority, in their capacity as holder of either a Mortgage Certificate or a Mezzanine Facility Claim, nothing in the Plan or the Confirmation Order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties other than the Debtors and the Reorganized Debtors, nor shall anything in the Plan or Confirmation Order enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties other than the Debtors and the Reorganized Debtors for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, securities laws, environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Plan or Confirmation Order exculpate any of the Released Parties other than the Debtors and the Reorganized Debtors from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, securities laws, environmental laws or any criminal laws of the United States or any state and local authority.

12. Mortgage Facility Trust Claims

The Mortgage Debt Parties have acted in accordance with the Trust and Servicing Agreement and the Mortgage Facility Trust throughout the Chapter 11 Cases, including, without limitation, in connection with the Auction, the Plan (including voting thereon) and the Disclosure Statement, and they have made a substantial contribution to the Estates and the Chapter 11 Cases. The rights and authority of and contributions made by the Mortgage Debt Parties under the Trust and Servicing Agreement and the Mortgage Facility Trust have been and are integral to the Plan. Accordingly, from and after the Effective Date, all Persons, including the holders of Mortgage Certificates, shall be deemed to have released, and shall be enjoined from commencing any action or proceeding or asserting or pursuing, any claim or cause of action against the Mortgage Debt Parties for any act taken or omitted since the Commencement Date in connection with, related to, or otherwise arising out of the Chapter 11 Cases, the Auction, the formulation, negotiation, preparation, dissemination, implementation, confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan.

13.    11.  Indemnification Obligations

(a)    Notwithstanding anything to the contrary herein, subject to the occurrence of the Effective Date, the obligations of the Debtors as provided in the Debtors' respective certificates of incorporation, bylaws, or other applicable organizational documents, other agreements or law as of the Commencement Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers who were officers or employees of such Debtors or their respective Affiliates at any time prior to the Effective Date, and who will be officers of the Debtors or NewCo from and after the Effective Date, against any claims, causes of action or obligations whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, shall survive confirmation of the Plan, remain unaffected thereby after the Effective Date and not be discharged, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Commencement Date.

(b)    As of the Effective Date, each Debtor's certificate of incorporation, bylaws or similar organizational documents or other agreement shall provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, officers who were officers of such Debtor or any of its respective Affiliates at any time prior to the Effective Date and who will continue to be officers or employees of the Debtors or NewCo from and after the Effective Date at least to the same extent as the bylaws of such Debtor in effect on the Commencement Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Debtors shall amend and/or restate its certificate of incorporation, bylaws or similar organizational document or other agreement before or after the Effective Date to terminate or materially adversely affect any of the Debtors' obligations or such officers' rights under Section 10.11 10.13(b) of the Plan.

(c)    Any Claim based on NewCo's or the Debtors' obligations set forth in Section 10.11 10.13 of the Plan shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

(d)    (d)    For avoidance of doubt, nothing in Section 10.11 10.13 of the Plan shall be construed as an indemnification for any Guaranty Claim.

12.    Avoidance Actions

Other than any releases granted in the Plan, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, NewCo or the Reorganized Debtors, as applicable, shall have the right to prosecute any avoidance or equitable subordination or recovery actions under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.  The proceeds of any such avoidance actions shall be paid to NewCo or the Reorganized Debtors, as applicable.

14.    13.  Retention of Causes of Action/Reservation of Rights

(a)    Except as provided in Section 6.17 and Section 10.10 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Reorganized Debtors or NewCo may have or which NewCo or the Reorganized Debtors may choose to assert on behalf of the Debtors' estates under any

provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, NewCo, their officers, directors, managers or representatives and (ii) the turnover of any property of the Debtors' estates.

        (b)    Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan.  NewCo or the Reorganized Debtors, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Commencement Date fully as if the Bankruptcy Cases had not been commenced, and all of the legal and equitable rights of NewCo or the Reorganized Debtors, as applicable, respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Bankruptcy Cases had not been commenced.

        (c)    Nothing in the Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, and all rights and defenses thereto are expressly reserved.

        (d)    Nothing in the Plan shall be construed as a modification, release or waiver of the provisions of the Intercreditor Agreement, and the provisions of the Intercreditor Agreement shall remain in full force and effect, and all rights thereunder are expressly reserved

        15.    14. Limitations on Exculpation and Releases of Representatives

        Nothing in Section 10.9 or Section 10.10 of the Plan shall (a) be construed to release or exculpate any Person from, or require indemnification of any Person against losses arising from, the fraud, malpractice, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or ultra vires acts of such Person, or (b) limit the liability of the professionals of the Debtors, the Reorganized Debtors, NewCo or the Creditors' Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

L.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES

    1.    Assumption of Executory Contracts and Unexpired Leases

        Any executory contracts or unexpired leases listed in the relevant Exhibit to the Plan Supplement (which Exhibit shall contain those contracts or unexpired leases identified by the Investor, in its sole discretion, and shall include the BHAC IP License Agreements) or that have not been rejected by the Debtors with the approval of the Bankruptcy Court and that are not the subject of pending motions to reject on the Confirmation Date, shall be deemed to have been assumed by the applicable Debtor and assigned to NewCo or its designee, at the Investor's option, as of the Effective Date, and the Plan shall constitute a motion to assume and assign such executory contracts and unexpired leases.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions and assignments pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption and assignment is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.  With respect to each such executory contract or unexpired lease assumed and assigned to NewCo, if applicable, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, the dollar amount required to cure any defaults of the applicable

Debtor existing as of the Confirmation Date shall be conclusively presumed to be the amount set forth in an Exhibit to the Plan Supplement with respect to such executory contract or unexpired lease. Subject to the occurrence of the Effective Date, any such cure amount shall be treated as an Allowed Administrative Expense Claim under the Plan, and, upon payment of such Allowed Administrative Expense Claim, all defaults of the applicable Debtor existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

2.    Rejection of Executory Contracts and Unexpired Leases

Any executory contracts or unexpired leases of any Debtor that are set forth in the relevant Exhibit to the Plan Supplement (which Exhibit shall contain those contracts and unexpired leases identified by the Investor, in its sole discretion) shall be deemed to have been rejected by the applicable Debtor, and the Plan shall constitute a motion to reject such executory contracts and unexpired leases, and NewCo ~~or~~and the Reorganized Debtors shall have no liability thereunder except as is specifically provided in the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.

3.    Claims Arising from Rejection, Termination or Expiration

Claims created by the rejection of executory contracts or unexpired leases (including, without limitation, the rejection provided in Section 11.2 of the Plan) or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after (a) in the case of an executory contract or unexpired lease that was terminated or expired by its terms prior to the Confirmation Date, the Confirmation Date, (b) in the case of an executory contract or unexpired lease rejected by the Debtors, the entry of the order of the Bankruptcy Court authorizing such rejection, or (c) in the case of an executory contract or unexpired lease that is deemed rejected pursuant to Section 11.2 of the Plan, the Confirmation Date. Any rejection claim for which a proof of claim is not filed and served within the time provided herein will be forever barred from assertion and shall not be enforceable against the Debtors, their assets, properties, or interests in property, ~~NewCo~~ or the Reorganized Debtors or its estate, assets, properties, or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of ~~ARTICLE~~Article VII of the Plan.

4.    Insurance Policies and Agreements

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as executory contracts under the Plan of Reorganization and will be assumed by the applicable Reorganized Debtor and assigned to NewCo, at Investor's option, effective as of the Effective Date~~.~~. Nothing contained in Section 11.4 of the Plan shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

5.      Management Agreements

As of the Effective Date, (i) all existing management agreements between any Debtor that is a TRS and HVM, including any related administrative services agreements or G&A Reimbursement Agreements, will be assumed by such ~~Debtor, or at the Investor's option, assumed or assigned to NewCo or one of its subsidiaries or a third party~~Debtors and (ii) all existing management agreements between any Debtor that is not a TRS and HVM will be assumed by such Debtor and assigned to a Debtor that is a TRS (or a newly formed TRS, wholly owned either directly or indirectly by NewCo, that is designated by an existing Debtor that is a TRS); provided that such management agreements to be assumed or assumed and assigned (~~i~~a) shall be modified or amended by modified agreements that shall be included in the Plan Supplement, which terms shall be acceptable to ~~the~~ Investor, each Sponsor and HVM and (~~ii~~b) shall be assumed or assumed and assigned as modified or amended. Entry of the Confirmation Order, subject to and upon the occurrence of the Effective Date, shall constitute the approval, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, of the assumption or assumption and assignment, as applicable, of such agreements on the terms set forth in the Plan and Plan Supplement.

M.      RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) to perform any of the following actions:

(a)      To hear and determine any and all motions or applications pending on the Confirmation Date for the assumption and/or assignment or rejection of executory contracts or unexpired leases to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear and determine any and all Claims resulting therefrom or from the expiration or termination prior to the Confirmation Date of any executory contract or unexpired lease;

(b)      To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by NewCo ~~or,~~ the Reorganized Debtors~~, as applicable,~~ or the Litigation Trustee after the Effective Date, including, without express or implied limitation, any claims to avoid any preferences, fraudulent transfers, or other voidable transfers, or otherwise to recover assets for the benefit of the Debtors' estates;

(c)      To hear and determine any objections to the allowance of Claims arising prior to the Effective Date, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow or disallow any Disputed Claim in whole or in part;

(d)      To hear and determine any disputes relating to the distributions to holders of Allowed Claims as provided in the Plan;

(e)      To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(f)      To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without express or implied limitation, the Confirmation Order;

(g)     To hear and determine all applications for allowances of compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan;

(h)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan (and all Exhibits to the Plan Supplement and Exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(i)     To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against any Debtor's Estate;

(j)     To determine such other matters that may be set forth in the Plan or the Confirmation Order, or that may arise in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(k)     To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtors, as Debtors or Debtors in Possession, may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any request for expedited determination under section 505(b)(2) of the Bankruptcy Code);

(l)     To hear and determine all questions and disputes arising out of or relating to the Investment ~~and Standby Purchase~~ Agreement, ~~the Rights Offering or~~ the BHAC IP Transfer Agreement, the Debt Financing Arrangements or any foreclosure proceedings pursuant to Section 6.13 of the Plan;

(m)     To hear and determine all disputes arising under the Trust and Servicing Agreement or relating to the implementation of the Plan by the Trustee, the Special Servicer, the Operating Advisor and the Controlling Holder; and

(n)     ~~(m)~~ To enter an order or final decree closing the Chapter 11 Cases.

**VIII.**

FINANCIAL INFORMATION, AND PROJECTIONS ~~AND VALUATION ANALYSIS~~

A.     HISTORICAL FINANCIAL INFORMATION

1.     General

All historical financial information incorporated herein is unaudited and reflects only the Debtor entities that are included in the Plan of Reorganization and certain non-Debtor entities that will comprise NewCo. These entities include HVM, which is consolidated from a financial point of view, given the management arrangement among HVM and the Debtors and that HVM conducts substantially all of its business with the Debtors. For additional commentary, the historical financial information should be read in conjunction with the audited and unaudited historical financial statements of DL-DW. However, since the DL-DW financial statements include entities not included in the Plan, the historical financial information incorporated herein and the DL-DW financial statements do not reconcile.

Extended Stay's operations were significantly impacted by the deterioration of the general economy and the resulting decline in demand for extended stay lodging in the second half of 2008. The 666 ~~Mortgaged~~Mortgage Properties experienced a revenue per available room ("***RevPAR***")

decline of 19.5% in 2009, primarily driven by a 21% decline in average daily rate ("**ADR**").  Despite the implementation of significant cost savings measures at the property and corporate levels and the long term lodging ("**LTL**") strategy, Adjusted EBITDA declined by approximately 35% in 2009 for the Debtors.  Many of the cost savings implemented and the LTL strategy are temporary in nature, and anticipated to be reversed over the course of 2010.

2.      <u>Selected Unaudited Historical Financial Information</u>

The following table sets forth selected unaudited consolidated financial information for NewCo as of and for the fiscal year ended December 31, 2008 and 2009.

| Selected Financial Information | | |
|---|---|---|
| | **Fiscal Year Ended December 31,** | |
| | **2008** | **2009** |
| | (Dollars in Millions) | |
| **Income Statement Information** | | |
| Total revenues, excluding LTL | $1,001.6 | $791.7 |
| Total operating expenses, excl. D&A & LTL | (527.7) | (499.2) |
| Incremental LTL EBITDA | - | 14.5 |
| Adjusted EBITDA including LTL | 473.9 | 307.0 |
| Net income/(loss) | (880.9) | (468.5) |
| | | |
| **Balance Sheet Information** | | |
| Total assets | $6,969.5 | $6,523.8 |
| Total liabilities | 7,537.9 | 7,564.5 |
| Total shareholders' equity/(deficit) | (568.4) | (1,040.7) |

**THE SELECTED FINANCIAL INFORMATION SHOULD BE READ IN CONJUNCTION WITH THE UNAUDITED HISTORICAL FINANCIALS CONTAINED IN EXHIBIT "F" AND THE UNAUDITED AND AUDITED HISTORICAL FINANCIAL STATEMENTS OF DL-DW AND HOMESTEAD.  THE SELECTED FINANCIAL INFORMATION PRESENTED HEREIN REPRESENTS A HISTORICAL PERSPECTIVE OF THE DEBTOR AND NON-DEBTOR ENTITIES THAT ARE INCLUDED IN THE PLAN.  AS SUCH, THE SELECTED FINANCIAL INFORMATION DOES NOT REFLECT THE HISTORICAL FINANCIALS OF DL-DW NOR HOMESTEAD.**

B.      CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS

1.      <u>Responsibility for and Purpose of the Financial Projections</u>

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.  In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

2.        Pro Forma Financial Projections

         The Debtors believe that the Plan meets the Bankruptcy Code's feasibility requirement that Plan confirmation is not likely to be followed by liquidation, or the need for further financial reorganization of the Debtors or any successor under the Plan.

         In connection with developing the Plan, and to assist each Holder of a Claim in determining whether to accept or reject the Plan, the Debtors have developed a set of financial projections (the "***Financial Projections***") or the "***Projections***").  The Financial Projections were created prior to the Auction, but have been updated only to the extent to reflect the terms of the Plan. The Financial Projections are set forth in Exhibit "C" attached hereto.

         The Financial Projections are based on a number of significant assumptions as set forth in Exhibit "C", and while the Debtors have prepared the Financial Projections in good faith and believe the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will ultimately be realized.  The Financial Projections should be read in conjunction with the qualifications contained herein and the risk factors described in the Disclosure Statement.

         The Debtors do not, as a matter of course, publish their business plans and strategies or financial projections or anticipated financial position or results of operations.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or financial projections to holders of Claims after the Confirmation Date, or to include such information in documents required to be filed with the Securities and Exchange Commission (if any) or otherwise make such information public.

         In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors with the assistance of Lazard to present the anticipated impact of the Plan. The Financial Projections and assume that the Plan will be implemented in accordance with its stated terms.  The Financial Projections have been included by the Debtors strictly for purposes of complying with the confirmation requirement under section 1129(a)(11) of the Bankruptcy Code and have no impact on the actual terms of the Plan or the transactions contemplated therein.  Nothing in the Financial Projections shall obligate or be construed to obligate NewCo or the Reorganized Debtors, or the Investor and the Sponsors as the 100% owners of NewCo and the Reorganized Debtors, to incur any of the liabilities contained in the Financial Projections (except as otherwise provided for in the Plan) or to operate the Reorganized Debtors in accordance with the Debtors' assumptions contained in the Financial Projections.  NewCo and the Reorganized Debtors will operate in the ordinary course in accordance with their own business plan.  Since the Financial Projections are based on forecasts of key economic variables such as economic growth rates and the resulting impact on demand for the Debtors' hotel rooms, future interest rates, capital market conditions, as well as key operational assumptions such as the Debtors' ability to maintain customer relationships, the ability to win new customer contracts on profitable terms, and the ability to manage costs and growth of the operations, the estimates and assumptions underlying the Financial Projections are inherently uncertain.  Though considered reasonable by the Debtors as of the date hereof, the Financial Projections are subject to significant business, economic and competitive uncertainties.  Accordingly, such Financial Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less favorable or more favorable than as set forth.  The Financial Projections were substantially completed in MarchJune 2010, with certain operating projections completed in September 2009.

         **THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD PUBLIC DISCLOSURE OR COMPLIANCE WITH PRACTICES RECOGNIZED TO**

**BE IN ACCORDANCE WITH THE GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, PUBLISHED GUIDELINES OF THE SECURITIES AND EXCHANGE COMMISSION, THE RULES AND REGULATIONS PROMULGATED BY THE SECURITIES AND EXCHANGE COMMISSION REGARDING FINANCIAL PROJECTIONS, OR THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS REGARDING FINANCIAL PROJECTIONS OR FORECASTS. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS.**

**ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE FINANCIAL PROJECTIONS ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY CONSIDERABLY FROM THE FINANCIAL PROJECTIONS. CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY THE DEBTORS, THE DEBTORS' ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED RESULTS WILL BE ACHIEVED. IMPAIRED CREDITORS ~~AND RIGHTS HOLDERS~~ ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FINANCIAL PROJECTIONS IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN OR SUBSCRIBE TO THE RIGHTS OFFERING. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION IX OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

The Financial Projections assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Debtors, (iii) there will be no change in generally accepted accounting principles in the United States that will have a material effect on the reported financial results of the Debtors, (iv) the application of "fresh start" accounting will not materially change the Debtors' revenue accounting procedures, and (v) there will be no material contingent or unliquidated litigation or indemnity Claims applicable to the Debtors.

To the extent that the assumptions inherent in the Financial Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and considered reasonable by the Debtors when taken as a whole, the assumptions and estimates underlying the Financial Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Debtors. Accordingly, the Financial Projections are only an estimate and, therefore, necessarily speculative in nature. It can be expected that some or all of the assumptions in the Financial Projections will not be realized and that actual results will vary from the Financial Projections, which variations may be material and are likely to increase over time. The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. Moreover, inasmuch as the Investor will own 100% of the NewCo Common Interests and have the ability to control the Debtors, the Reorganized Debtors may elect to operate the business according to a business plan that is materially different than the business plan underlying the Financial Projections. No representations can be made as to the accuracy of the Financial Projections or the Debtors' ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors consider the Financial Projections to predict future performance reliably. In light of the foregoing, in deciding whether to vote to accept or reject the Plan, holders of Claims are cautioned not to place undue reliance on the Financial Projections and such holders must make their own determination as to the reasonableness

of such assumptions and the reliability of the Financial Projections.  The Financial Projections should be read together with the information, assumptions, qualifications and footnotes to tables containing the Financial Projections (which include projected statements of operations, projected balance sheets, and projected statements of cash flows) set forth herein and as set forth in Exhibit "C" to this Disclosure Statement and the historical financial information set forth in Section IX.A hereof.

The Financial Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan.  The Financial Projections should be read in conjunction with Article XI herein "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN" for a discussion of the risks related to the Plan.

The Financial Projections assume a Confirmation Date of June 30, 2010, and as required, the concepts of "fresh start" accounting will be applied for periods after the Effective Date.  These principles are contained in the American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code." Adoption of "fresh start" accounting requires the determination of the reorganization value of the entity that emerges from bankruptcy.  Reorganization value generally approximates fair value of the entity before considering liabilities.

The process of fair valuing assets as part of "fresh start" accounting may result in: (i) changes to the carrying value of assets and liabilities, including property, plant, and equipment or (ii) may result in the creation of new intangibles.

**SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.**  The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.  "Forward-looking statements" in the Financial Projections include the intent, belief or current expectations of the Debtors and members of their management team with respect to the timing of, completion of and scope of the Plan, the current strategic business plan, bank financing, and debt and equity market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based, which assumptions are based on their experience and perception of historical trends, current conditions, expected future developments and other factors they believe are appropriate in the circumstances.  While the Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.  Important factors currently known to the Debtors' management that could cause actual results to differ materially from those contemplated by the forward-looking statements in the Financial Projections include, but are not limited to, adverse developments in the timing or results of the Debtors' strategic business plan (including the timeline to emerge from Chapter 11), the ability of the Debtors to retain and attract new customers and maintain favorable relationships with such customers, the Debtors' liquidity, the difficulty in controlling operating costs, the level and nature of any restructuring and other one-time charges, and the possible negative effects of a change in applicable legislation.

C.      ~~VALUATION~~

~~THE VALUATION INFORMATION CONTAINED IN THIS SECTION WITH REGARD TO THE DEBTORS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL~~

**MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.**

1.    Overview

The Debtors have been advised by their investment banker, Lazard, with respect to the estimated range of values of NewCo as of the date of this Disclosure Statement. This valuation analysis has been used to determine the value of distributions to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder. The first step of the valuation analysis was to estimate the value of NewCo's operations on a going concern basis (the "***Enterprise Value***"). The estimated total value available for distribution to holders of Allowed Claims (the "***Reorganization Value***") consists of the Enterprise Value and net other assets, as described in Section 3 below. The valuation analysis assumes that the Confirmation Date takes place on June 30, 2010 (the "***Assumed Confirmation Date***") and is based on projections provided by the Debtors' management ("***Projections***") for the 664 hotels and the office building in Spartanburg, SC that serve as collateral for the Mortgage Facility and the 2 ESA UD hotels. The Projections assume that intellectual property will be owned by NewCo and that HVM is consolidated from a financial point of view, given the management arrangement among HVM and the Debtors for purposes of the Projections.

Based on the Projections, and solely for purposes of the Plan, Lazard estimates the Enterprise Value of NewCo to be approximately $2.838 to $3.610 billion, with a mid-point estimate of $3.224 billion, as of the Assumed Confirmation Date. For purposes of this valuation, Lazard assumes no material changes that would affect value occur between the date of the Disclosure Statement and the Assumed Confirmation Date. Adding cash that NewCo is projected to have following completion of the transactions contemplated under the Plan, which includes $650 million of cash from the Investment and Rights Offering less the $200 million Class A4 Cash Paydown and estimated reorganization and related costs, provides the asset value of NewCo after reorganization (the "***Reorganized Asset Value***"). Reducing Reorganized Asset Value by the estimated debt balance of approximately $2.823 billion, projected as of the Assumed Confirmation Date, implies the value for NewCo equity (the "***Post-Money Equity Value***"). Estimated recoveries across a range of performance and capital event scenarios were used to calculate an estimated value of the Sub-Equity on a present value basis. The range of Post-Money Equity Value and a Black-Scholes analysis were used to calculate a range of estimated value of the New Warrants. The implied equity value available to existing Certificate holders is calculated by giving effect to the estimated value of the Sub-Equity, New Warrants and management fee, and the share of NewCo Common Interests allocated to the Investors as a result of the Investment and Rights Offering, excluding the impact of the Investors existing Certificates (the "***Distributable Equity Value***"). These values do not give effect to the impact of any shares issued upon exercise of any other warrants, restricted shares or any shares issued upon exercise of options that may be granted in the future, whether under the NewCo Management Incentive Plan or otherwise.

For purposes of evaluating Reorganization Value in the event that Class 2 does not consent to the Plan, the Debtors and Lazard reviewed the enterprise value of NewCo excluding HVM, which is neither an asset of the Debtors nor collateral of the secured creditors of the Debtors. On this basis, the Reorganization Value is estimated to be approximately $2.781 – $3.552 billion, with a mid-point estimate of $3.167 billion. The creation of a new management company and associated business interruption, as well as having a restrictive, non-exclusive and non-transferable license to the intellectual property relating to the Company's current brands, is assumed to impose an incremental cost on NewCo.

The estimates of Enterprise Value, Reorganization Value, Reorganized Asset Value, Pre-Money Equity Value, Post-Money Equity Value and Distributable Equity Value (collectively, the

"~~*Valuation Metrics*~~") ~~do not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan. The following table presents a summary of the estimated Valuation Metrics ranges and Valuation Metrics based on contemplated Enterprise Value of the Plan of $3.494 billion, which is the basis for distributable value assuming Class 2 consents to the Plan. The $3.898 billion Reorganized Asset Value based on the Plan represents a premium to the $3.628 billion mid-point of the Reorganized Asset Value estimate.~~

~~THE ASSUMED RANGES OF ESTIMATED VALUATION METRICS, AS OF THE ASSUMED CONFIRMATION DATE OF JUNE 30, 2010, REFLECT WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD NOR THE DEBTORS HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATES.~~

~~Lazard assumed that the Projections prepared by the management of the Debtors were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of NewCo. The estimated Valuation Metrics ranges assume NewCo will achieve its Projections in all material respects, including revenue and EBITDA growth and improvements in EBITDA margins, earnings and cash flow as projected. If the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on the Valuation Metrics. Conversely, if the business performs at levels above those set forth in the Projections, such performance may have materially positive impact on the Valuation Metrics.~~

~~In estimating the Valuation Metrics, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, which data were prepared and provided to Lazard by the Debtors' third party manager, HVM, and which relate to NewCo's business and its prospects; (c) met with and discussed the Debtors' operations and future prospects with HVM; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of NewCo; (e) considered certain economic and industry information relevant to the operating business; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of NewCo's business, operating assets and liabilities and NewCo's business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and HVM.~~

~~In addition, Lazard did not independently verify the Projections in connection with preparing estimates of the Valuation Metrics, and no independent valuations or appraisals of the Debtors or NewCo were sought or obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to holders of Allowed Claims thereunder.~~

~~The estimated Valuation Metrics of NewCo do not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to and does not express any view as to what the market value of NewCo's securities would be when issued pursuant to the Plan or their future market values. The estimated Valuation Metrics of NewCo set forth herein do not constitute an opinion as to fairness from a financial~~

point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

The estimates of the Valuation Metrics reflect the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Valuation Metrics ranges of NewCo set forth herein are not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Debtors, HVM, NewCo, Lazard, nor any other person assumes responsibility for any differences between the estimated Valuation Metrics ranges and such actual outcomes. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of NewCo, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by pre-petition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in NewCo's industry and economic conditions generally, and other factors that generally influence the prices of securities.

The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimated Valuation Metrics set forth herein are not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, none of the Debtors, Lazard or any other person assumes responsibility for their accuracy. Depending on the results of the Debtors' operations or changes in the financial markets, valuation estimates as of the Effective Date may differ from those disclosed herein.

2.     Enterprise Valuation Methodology

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Enterprise Values for NewCo. In performing the financial analyses described below and certain other relevant procedures, Lazard reviewed all significant assumptions with HVM on behalf of the Debtors. Lazard's valuation analysis must be considered as a whole. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to Enterprise Value.

(a)     **Discounted Cash Flow Analysis**

The discounted cash flow ("**DCF**") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted-average cost of capital (the "**Discount Rate**"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The enterprise value of the firm is determined by calculating the present value of NewCo's unlevered free cash flows based on the Projections plus an estimate for the value of the firm beyond the Projection Period known as the terminal value. The terminal value is derived by evaluating two (2) approaches: 1) applying a range of normalized multiples to NewCo's projected EBITDA in the final year of the Projection Period, discounted back to the assumed date of emergence by the Discount Rate; and 2) dividing the projected

unlevered free cash flow in the year following the final projected year by the Discount Rate minus a range of perpetual growth rates, discounted back to the assumed date of emergence by the Discount Rate.

The cost of equity and the cost of debt for NewCo were used to estimate the Discount Rate, assuming a targeted long-term debt-to-total capitalization ratio based on an assumed range of NewCo's pro forma capitalization and the average leverage ratio of the Peer Group (as defined below). The cost of equity was calculated based on the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard estimated what would be NewCo's blended cost of debt based on current capital markets conditions and the financing costs for comparable companies with leverage similar to NewCo's target capital structure. The terminal multiple was determined using an EBITDA multiple range derived from the median forward EBITDA multiple for the hotel sector since 2000.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of NewCo, which in turn affect its cost of capital and terminal multiples. Lazard calculated the DCF valuation on a range of Discount Rates, terminal value EBITDA multiples and perpetuity growth rates as indicated below:

| Discounted Cash Flow Analysis Assumptions | | |
| --- | --- | --- |
| Discount Rate | Terminal Multiple | Perpetuity Growth Rate |
| 13.0% – 15.0% | 8.0x – 10.0x | 2.5% – 3.5% |

In applying the above methodology, Lazard utilized management's detailed Projections to derive unlevered free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as capital expenditures. For purposes of the DCF, NewCo is assumed not to be a taxpayer. These cash flows, along with the terminal value, are discounted back to the Assumed Confirmation Date using the range of Discount Rates described above to arrive at a range of Enterprise Values.

(b)      **Comparable Company Analysis**

The comparable company valuation analysis estimates value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding consolidated net debt and pro rata share of unconsolidated net debt for such company at book value and minority interest. Those enterprise values are commonly expressed as multiples of various measures of operating statistics, including earnings before interest, taxes, depreciation and amortization ("***EBITDA***") and for asset owners, by dividing Enterprise Value by owned keys to determine Price per Key ("***PPK***") and subsequently dividing PPK by last twelve months' RevPAR to derive implied PPK/RevPAR. In addition, each of the selected public company's operational performance, operating margins, profitability, leverage and business trends were examined. Based on these analyses, financial multiples and ratios are calculated to apply to NewCo's actual and projected operational performance.

A key factor to this approach is the selection of companies with relatively similar assets and operational characteristics to NewCo. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, types of assets, exposure to similar markets, age of asset, business risks, growth prospects, maturity of businesses, location, market presence and size and scale of operations. The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size and the availability of meaningful market-based information. No company is identical to NewCo with respect to either its assets or operations; therefore, valuation conclusions cannot be drawn solely from quantitative results. Furthermore, the nature of NewCo's business as both a hotel owner and operator further limits the universe of potential comparable companies.

Lazard selected the following publicly traded companies (the "*Peer Group*") on the basis of general comparability to NewCo in one or more of the factors described above: Ashford Hospitality Trust, FelCor Lodging Trust, Hersha Hospitality, Hospitality Properties Trust, Supertel Hospitality and Choice Hotels.

Lazard calculated market multiples for the Peer Group based on 2009, 2010 and 2011 estimated EBITDA by dividing the enterprise value of each comparable company, by the actual 2009 and projected 2010 and 2011 EBITDA, as per the consensus of equity research analysts, as adjusted for non-recurring items. In determining the applicable EBITDA multiple ranges, Lazard considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue and EBITDA results, historical enterprise value/EBITDA trading multiples, EBITDA margins, financial distress impacting trading values, size, growth and similarity in business lines. Based on this analysis, the selected EBITDA multiple ranges for 2009, 2010 and 2011 EBITDA and PPK/RevPAR are set forth in the tables below.

| Enterprise Value/EBITDA Multiple | | |
|---|---|---|
| Low | High | Peer Median |
| 2009E 12.0x | 14.0x | 13.5x |
| 2010E 12.5x | 14.5x | 13.7x |
| 2011E 11.0x | 13.0x | 12.5x |

| PPK/RevPAR | | |
|---|---|---|
| Low | High | Peer Median |
| 1.2x | 1.6x | 1.4x |

The range of EBITDA multiples described above were then applied to NewCo's actual 2009 and projected 2010 and 2011 income from operations before depreciation and amortization, impairment charges, and other non-recurring items, such as special charges and incremental EBITDA from the LTL program, as further described in clause (d) below, ("*Adjusted EBITDA*") to determine a range of Enterprise Values.

(c)    **Precedent Transactions Analysis**

The precedent transactions valuation analysis is based on the enterprise values of companies involved in public merger and acquisition transactions that have asset, operational and financial characteristics similar to NewCo. Under this methodology, the enterprise value of such

companies is determined by an analysis of the consideration paid and the net debt assumed in the merger or acquisition transaction. As in a comparable company valuation analysis, those enterprise values are commonly expressed as multiples of various measures of operating statistics, such as EBITDA, and PPK/RevPAR. Lazard reviewed industry-wide valuation multiples, considering prices paid as a multiple of EBITDA and PPK/RevPAR, for hotel asset owners with similar portfolios as NewCo. The derived multiples are then applied to the NewCo's operating statistics to determine the Enterprise Value or value to a potential strategic buyer.

Unlike the comparable company analysis, the enterprise valuation derived using this methodology reflects a "control" premium (i.e., a premium paid to purchase a majority or controlling position in the assets of a company). In addition, other factors not directly related to a company's business operations can affect a valuation based on precedent transactions, including: (a) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (e.g., a buyer may pay an additional premium for reasons that are not solely related to competitive bidding); (b) the market environment is not identical for transactions occurring at different periods of time; and (c) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no precedent merger or acquisition used in any analysis will be identical to the target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations, and prospects of each target. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis. Furthermore, the data available for all the precedent transactions may have discrepancies due to varying sources of information. As described above, the precedent transactions analysis explains other aspects of value besides the inherent value of a company. As a result of the significant limitations as to the usefulness of this methodology, reliance on only this methodology could create a misleading or incomplete conclusion as to Enterprise Value.

In deriving a range of Enterprise Values for NewCo under this methodology, Lazard calculated multiples of total transaction value ("*Transaction Value*") to the next fiscal year ("*NFY*") EBITDA of the acquired companies and applied these multiples to the 2010E Adjusted EBITDA for NewCo.

Lazard evaluated various merger and acquisition transactions that have occurred in the hotel industry over the last seven years for asset owners. Many of the transactions that have occurred over the past seven years have been executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace. These considerations greatly reduce the relevance of the precedent transaction analysis.

Lazard calculated multiples of the target companies by dividing the disclosed purchase price of the target's equity, plus any debt assumed as part of the transaction less any cash on the target's balance sheet, by estimated NFY EBITDA. Based on this calculation and the qualitative factors described above, Lazard selected the EBITDA multiple ranges set forth in the table below:

| Enterprise Value/EBITDA Multiple | | |
| --- | --- | --- |
| Low | High | Peer Median |

| NFY | 9.5x | 12.5x | 11.0x |
| --- | --- | --- | --- |
| | **PPK/RevPAR** | | |
| Low | High | | Peer Median |
| 1.3x | 1.7x | | 1.6x |

(d)     **Incremental LTL EBITDA**

In order to bolster demand during the current economic downturn, the Company has pursued the LTL strategy.  This strategy focuses on guest stays longer than 60 days.  This strategy significantly altered the Company's length of stay mix in the latter portion of 2009 and is expected to continue through 3Q 2010, as management winds down the program.  While management does not specifically track revenue and expenses related to this program, for valuation purposes, the Company has calculated an estimate of the incremental EBITDA attributable to this program in 2009 actuals and 2010 projections.  This methodology is based on the Company's revenue outperformance as compared to its Revised Business Plan 4 ("***RBP 4***") in 4Q 2010, which contemplated a normalized mix of business.  The Company also adjusted expenses using an assumption that the Company incurs limited incremental operating expenses as a result of the LTL guests.  The incremental EBITDA from this program is not considered to be recurring and is adjusted from EBITDA accordingly for the comparable company analysis and precedent transaction analysis.

The Company anticipates incremental cash flow from the LTL program beyond the Assumed Confirmation Date to be approximately $3 million.  This cash flow is not otherwise incorporated in the comparable company analysis or precedent transaction analysis.  Accordingly, this cash balance has been added to the value derived from each of these analyses in order to estimate Enterprise Value.

3.     Other Assets/ Liabilities Valuation

The DCF, comparable company and precedent transaction analyses described above reflect the value of NewCo's operating business on a going concern basis.  Upon emergence, NewCo will also have certain other assets and liabilities that impact estimated total value available for distribution to holders of Allowed Claims.  The value of these assets and liabilities is estimated to be approximately $2 million.  Reorganization Value is calculated by reducing estimated Enterprise Value by the value of the other assets and liabilities.

The projected NewCo working capital balances at the Assumed Confirmation Date represent standard working capital accounts necessary to operate a business of this type, adjusted for seasonality as necessary.  All valuation methodologies described in Section 2 implicitly incorporate working capital into the going concern valuation.  As a result, no incremental value adjustment is made for net working capital of NewCo.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD.  THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY

DESCRIPTION.  IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS.  THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDING OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.  ACTUAL MARKET PRICES OF SUCH SECURITIES ALSO MAY BE AFFECTED BY THE ISSUER'S HISTORY IN CHAPTER 11, CONDITIONS AFFECTING COMPETITORS OR THE INDUSTRY IN WHICH THE ISSUER PARTICIPATES GENERALLY, OR BY OTHER FACTORS NOT POSSIBLE TO PREDICT.  ACCORDINGLY, THE VALUATION METRICS DO NOT NECESSARILY REFLECT, AND SHOULD NOT BE CONSTRUED AS REFLECTING, VALUES THAT WILL, OR ARE LIKELY TO, BE ATTAINED FOR THE NEWCO COMMON INTERESTS OR THE SUB-EQUITY IN THE PUBLIC OR PRIVATE MARKETS.  THE POST-MONEY EQUITY VALUE INDICATED IN THIS ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE.  SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.  INDEED, THERE CAN BE NO ASSURANCE THAT A TRADING MARKET WILL DEVELOP FOR THE NEWCO COMMON INTERESTS OR THE SUB-EQUITY, PARTICULARLY SINCE THE NEWCO COMMON INTERESTS WILL NOT BE PUBLICLY TRADED.

## IX.

### CERTAIN FACTORS AFFECTING THE DEBTORS

A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

1.    Risk of Non-Confirmation of the Plan of Reorganization

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

2.    Non-Consensual Confirmation

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  See Section X, entitled "CONFIRMATION OF THE PLAN

OF REORGANIZATION; Requirements for Confirmation of the Plan of Reorganization; Requirements of section 1129(b) of the Bankruptcy Code." If any Class of Claims does not accept the Plan, these requirements will have to be satisfied with respect to such Class. Because Classes 6 (Existing Equity) and 15 (Other Existing Equity Interests) are deemed to reject the Plan, these requirements must be satisfied with respect to such Classes. The Debtors believe that the Plan satisfies these requirements.

       3.    <u>Risk of Delay in Confirmation of the Plan</u>

           Although the Debtors believe that they will be able to confirm the Plan prior to ~~July 22,~~September 21, 2010, if they are not able to do so, or to obtain an extension of this deadline from the Investor, the Investor would have the right to terminate the Investment ~~and Standby Purchase~~ Agreement and collect the expense reimbursement as provided for therein.

       4.    <u>The Debtors Have No Duty to Update</u>

           The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

       5.    <u>Risk of Non-Confirmation of the Plan</u>

           In order for the Debtors to emerge successfully from the Chapter 11 Cases as viable entities, the Debtors, like any other Chapter 11 debtors, must obtain approval of the Plan from their creditors and confirmation of the Plan through the Bankruptcy Court, and then successfully implement the Plan. The foregoing process requires the Debtors to (a) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement; (b) solicit and obtain creditor acceptances of the Plan; and (c) fulfill other statutory conditions with respect to the confirmation of the Plan.

           The Debtors may or may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the Debtors will seek confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may nevertheless seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as long as at least one Impaired Class has accepted the Plan (determined without including the acceptance of any "insider" in such Impaired Class).

           Even if the requisite acceptances of the Plan are received, or the Debtors are able to seek a "cramdown" confirmation, the Bankruptcy Court may not confirm the Plan as proposed. A holder of a Claim in a non-accepting Class could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that: (a) confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization of the Debtors; (b) the value of distributions to holders of Claims within an Impaired Class who do not accept the Plan will not be less than the value such holders would receive if the Debtors were liquidated under Chapter 7; and (c) in the event of a "cramdown" confirmation, the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to non-accepting Classes. The Bankruptcy Court may determine that the Plan does not satisfy one

or more of these applicable requirements, in which case the Plan might not be confirmed by the Bankruptcy Court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize their businesses and what, if any, distributions holders of Claims and Equity Interests ultimately would receive with respect to their Claims or Equity Interests. In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan of reorganization with respect to the Debtors that is acceptable to the Bankruptcy Court and the holders of Claims and Equity Interests. Furthermore, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization, further disrupting the Debtors' reorganization efforts.

6. Claims Estimates

By order dated November 19, 2009, the Bankruptcy Court established a Bar Date of Friday, January 15, 2010 at 5:00 p.m. (Prevailing Eastern time) for the Original Debtors. No bar date has been set for the Subsequent Debtors. As of the date hereof, the Bar Date against the Original Debtors has passed. The Debtors and their professionals are reviewing and analyzing the proofs of claim received, and currently estimate that there are approximately $~~3,507,732,377.84~~9,280,054,679.72 of claims asserted against the Original Debtors.[9]

B. ADDITIONAL FACTORS TO BE CONSIDERED

1. Financial Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results Are Likely to Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections including, without limitation, the Financial Projections, which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, including, without limitation, the Financial Projections, and the projections and estimates herein should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed. The ~~fundamental premise of the Plan is the reduction of the Debtors' debt levels and the implementation and realization of the Debtors' business plan, as reflected in the~~ Financial Projections~~, which~~ reflect numerous assumptions concerning the anticipated future performance of the Debtors, some of which may not materialize. Such assumptions include, among other items, assumptions concerning the U.S. economy, the ability to make necessary capital expenditures, the ability to retain and grow the Debtors' customer base and control future operating expenses. The Debtors believe that the assumptions underlying the Financial Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections or the implementation of the Investor and Sponsors' business plan may affect the actual financial results of the Debtors. Therefore, the actual results achieved throughout the periods covered by the Financial Projections necessarily will vary from the projected results~~, and such variations may be material and adverse~~. Further, the Financial Projections have been included by the Debtors strictly for purposes of

_____

[9] This estimate does not include: (i) Claims that have been filed as unliquidated or contingent, and (ii) Claims against the Subsequent Debtors as to which a bar date for filing Claims has not yet been set.

complying with the feasibility requirement of the Bankruptcy Code and have no impact on the actual terms of the Plan or the transactions contemplated therein.  Nothing in the Financial Projections shall obligate or be construed to obligate NewCo or the Reorganized Debtors, or the Investor and the Sponsors as the 100% owners of NewCo and the Reorganized Debtors, to incur any of the liabilities contained in the Financial Projections (except as otherwise provided for in the Plan) or to operate the Reorganized Debtors in accordance with the Debtors' assumptions contained in the Financial Projections.  The Investor and Sponsors have their own business plan for NewCo and the Reorganized Debtors which has not been incorporated into the Financial Projections.  NewCo and the Reorganized Debtors will operate in the ordinary course in accordance with their own business plan.

2.      No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.      No Legal or Tax Advice Is Provided to You by This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each holder of a Claim or Equity Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is not intended to provide, nor should it be relied on for, legal, business or tax advice.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

4.      No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Equity Interests.

5.      A Liquid Trading Market for the NewCo Common Interests, Sub-Equity and Common Warrants is Unlikely to Develop

A liquid trading market for the NewCo Common Interests, Sub-Equity and New Warrants is unlikely to develop.  As of the Effective Date, neither the NewCo Common Interests, the Sub-Equity nor the New Warrants will be listed for trading on any stock exchange or trading system and the Debtors will not file any reports with the SEC.  Consequently, the trading liquidity of the NewCo Common Interests, the Sub-Equity and New Warrants will be limited as of the Effective Date.  The future liquidity of the trading markets for NewCo Common Interests, Sub-Equity and New Warrants will depend, among other things, upon the number of holders of such securities, whether such securities become listed for trading on an exchange or trading system at some future time and whether the Debtors begin to file annual and quarterly reports with the SEC.

6.      Business Factors and Competitive Conditions

(a)      General Economic Conditions

In the Financial Projections, the Debtors have assumed that the general economic conditions of the United States economy will improve over the next several years. The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, the housing market, consumer spending, war, terrorism and other such factors. Any one of these or other economic factors could have a significant impact on the operating performance of the Debtors. There is no guarantee that economic conditions will improve in the near term.

(b)       Implementation of Business Plan

The Debtors believe that they will succeed in implementing and executing their business plan and financial restructuring. However, there are risks that the goals of the Debtors' going forward business plan and financial restructuring strategy will not be achieved. In such event, the Debtors may be unable to refinance maturing debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings.

7.       Seasonality

The Debtors' principal sources of revenue are revenues generated by their properties. The Debtors' experience seasonal revenue patterns similar to those of the lodging industry in general. This seasonality can be expected to cause quarterly fluctuations in the Debtors' revenues, profit margins and net income.

8.       Competition

The lodging industry is highly competitive, which may impact the Debtors' ability to compete successfully for customers with other hotel properties. The Debtors generally operate in markets that contain numerous competitors. Each of the Debtors' hotel brands competes with major hotel chains in national and international venues and with independent companies in regional markets. The Debtors' ability to remain competitive and to attract and retain business and leisure travelers depends on the Debtors' success in distinguishing the quality, value, and efficiency of the Debtors' lodging products and services from those offered by others and their access to capital to be used for capital expenditures. If the Debtors are unable to compete successfully in these areas, this could limit the Debtors' operating margins, diminish the Debtors' market share, and reduce their earnings.

9.       Operating Risks

The Debtors are subject to the range of operating risks common to the hotel, and corporate apartment industries. The profitability of the hotels that the Debtors own may be adversely affected by a number of factors, including:

(a)       the availability of and demand for hotel rooms;

(b)       international, national, and regional economic and geopolitical conditions;

(c)       the impact of war, actual or threatened terrorist activity and heightened travel security measures instituted in response to war, terrorist activity or threats;

(d)       the desirability of particular locations and changes in travel patterns;

121

(e)     the state of the housing and construction industries;

(f)     travelers' fears of exposure to contagious diseases, such as Avian Flu, Severe Acute Respiratory Syndrome and H1N1 Flu;

(g)     the occurrence of natural disasters, such as earthquakes, tsunamis, and hurricanes;

(h)     taxes and government regulations that influence or determine wages, prices, interest rates, construction procedures, and costs;

(i)     the costs and administrative burdens associated with compliance with applicable laws and regulations, including, among others, privacy, marketing and sales, licensing, labor, employment, immigration and environmental laws, and regulations applicable under the Office of Foreign Asset Control and the Foreign Corrupt Practices Act;

(j)     the availability and cost of capital to allow NewCo to fund investments;

(k)     regional and national development of competing properties; specifically, the continued development in the extended stay segment which has already undergone the sharpest increase in supply over the past few years relative to other segments of the industry;

(l)     increases in wages and other labor costs, energy, healthcare, insurance, transportation and fuel, and other expenses central to the conduct of the Debtors' business or the cost of travel for the Debtors' customers, including recent increases in energy costs and any resulting increase in travel costs or decrease in airline capacity;

(m)     organized labor activities, which could cause the diversion of business from hotels involved in labor negotiations, loss of group business, and/or increased labor costs; and

(n)     foreign currency exchange fluctuations.

Any one or more of these factors could limit or reduce the demand or the prices that the Debtors' hotels are able to obtain for hotel rooms and corporate apartments or could increase their costs and therefore reduce the profit of NewCo's lodging businesses. Even where such factors do not reduce demand, property-level profit margins may suffer if NewCo is unable to fully recover increased operating costs from its guests. Similarly, NewCo's revenue could be impacted by weak property-level revenue or profitability.

10.     National and Regional Conditions

The Debtors' lodging operations are subject to national and regional conditions. Because the Debtors conduct their business on a national platform, the Debtors' activities are susceptible to changes in the performance of regional and national economies. In recent years, the Debtors' business has been hurt by decreases in travel resulting from recent economic conditions and the heightened travel security measures that have resulted from the threat of further terrorism.  In addition, the Debtors' performance is substantially dependent upon the construction and housing industries.  NewCo's future economic performance is similarly subject to the economic environment in the United States and Canada, which has become increasingly uncertain with recent failures and near failures of a number of large

financial service companies, the current worldwide recession, the resulting unknown pace of business travel, and the occurrence of any future incidents in the United States and Canada.

11.    Property Damage

The Debtors have comprehensive property and liability insurance policies with coverage features and insured limits that the Debtors believe are customary. Market forces beyond the Debtors' control may nonetheless limit the scope of insurance coverage that NewCo can obtain and their ability to obtain coverage at reasonable rates. Certain types of losses, generally of a catastrophic nature, such as earthquakes, hurricanes and floods, or terrorist acts, may be uninsurable or too expensive to justify obtaining insurance. As a result, the Debtors may not be successful in obtaining insurance without increases in cost or decreases in coverage levels. In addition, in the event of a substantial loss, the insurance coverage the Debtors carry may not be sufficient to pay the full market value or replacement cost of the Debtors' lost investment or in some cases could result in certain losses being totally uninsured. As a result, the Debtors could lose some or all of the capital they have invested in a property, as well as the anticipated future revenue from the property, and the Debtors could remain obligated for guarantees, debt, or other financial obligations related to the property.

12.    Technology

A failure to keep pace with developments in technology could impair NewCo's operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for the Debtors' reservation, revenue management and property management systems, the Suite Offers email program, and other technologies the Debtors make available to their guests. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis. If NewCo is unable to do so as quickly as their competitors or within budgeted costs and time frames, their business could suffer. The Debtors also may not achieve the benefits that they anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair the Debtors' operating results.

13.    Third Party Internet Services

An increase in the use of third-party Internet services to book online hotel reservations could adversely impact NewCo's revenues. Some of the Debtors' hotel rooms are booked through Internet travel intermediaries, such as Expedia.com®, Travelocity.com ®, and Orbitz.com®, as well as lesser-known online travel service providers. These intermediaries initially focused on leisure travel, but now also provide offerings for corporate travel and group meetings. Although the Debtors' Lowest Internet Price Guarantee has greatly reduced the ability of intermediaries to undercut the published rates at the Debtors' hotels, intermediaries continue to use a variety of aggressive online marketing methods to attract customers, including the purchase, by certain companies, of trademarked online keywords such as "Extended Stay" from Internet search engines such as Google® and Yahoo ® to steer customers toward their Web sites (a practice currently being challenged by various trademark owners in federal court). Although the Debtors have successfully limited these practices through contracts with key online intermediaries, the number of intermediaries and related companies that drive traffic to intermediaries' Web sites is too large to permit them to eliminate this risk entirely. NewCo's business and profitability could be harmed if online intermediaries succeed in significantly shifting loyalties from the Debtors' lodging brands to their travel services, diverting bookings away from ExtendedStayHotels.com or, through their fees, increasing the overall cost of internet bookings for the Debtors' hotels.

14.     Customer and Internal Data

        Failure to maintain the integrity of internal or customer data could result in faulty business decisions, damage of reputation and/or subject the Debtors to costs, fines or lawsuits. The Debtors' businesses require collection and retention of large volumes of internal and customer data, including credit card numbers and other personally identifiable information of the Debtors' customers as they are entered into, processed by, summarized by, and reported by the Debtors' various information systems and those of their service providers. The Debtors also maintain personally identifiable information about their employees. The integrity and protection of that customer, employee, and company data is critical to the Debtors. If that data is inaccurate or incomplete, the Debtors could make poor decisions. The Debtors' customers and employees also have a high expectation that the Debtors will adequately protect their personal information, and the regulatory environment surrounding information security and privacy is increasingly demanding, both in the United States and Canada. A significant theft, loss or fraudulent use of customer, employee or company data could adversely impact the Debtors' reputation and could result in remedial and other expenses, fines and litigation.

15.     Privacy Laws

        Changes in privacy law could adversely affect the Debtors' ability to market their products effectively. The Debtors rely on a variety of direct marketing techniques, including telemarketing, email marketing, and postal mailings. Any further restrictions in laws such as the Telemarketing Sales Rule, CANSPAM Act, and various U.S. state laws, or new federal laws, regarding marketing and solicitation or international data protection laws that govern these activities could adversely affect the continuing effectiveness of telemarketing, email, and postal mailing techniques and could force further changes in the Debtors' marketing strategy. If this occurs, the Debtors may not be able to develop adequate alternative marketing strategies, which could impact the amount of bookings made by the Debtors' customers.  The Debtors also obtain access to potential customers from travel service providers or other companies with which the Debtors have substantial relationships and market to some individuals on these lists directly or by including the Debtors' marketing message in the other company's marketing materials. If access to these lists was prohibited or otherwise restricted, the Debtors' ability to develop new customers, and introduce them to the Debtors' hotels could be impaired.

16.     Employees

        If HVM cannot attract and retain talented associates to manage and provide services to NewCo, NewCo's business could suffer.  HVM competes with other companies both within and outside of HVM's and NewCo's industry for talented personnel. If HVM is not able to recruit, train, develop and retain sufficient numbers of talented associates, NewCo and HVM could experience increased associate turnover, decreased guest satisfaction, low morale, inefficiency or internal control failures. Insufficient numbers of talented associates could also limit HVM's ability to grow and expand NewCo's business.

17.     Continuing Leverage and Ability to Service Debt

        Although the consummation of the Plan will significantly reduce NewCo's debt service obligations, NewCo will remain significantly leveraged. The Debtors believe that, following consummation of the Plan, NewCo will be able to meet its anticipated future operating expenses, capital expenditures and debt service obligations. However, NewCo's ability to meet both its debt service obligations and carry out capital spending that is important to its growth and productivity will depend on a number of factors, including future operating performance and ability to achieve the business plan.

~~These factors will be affected by general economic, financial, competitive, regulatory, business and other factors beyond NewCo's control.~~

C.    CERTAIN TAX MATTERS

For a summary of certain federal income tax consequences of the Plan to holders of Claims and Equity Interests of the Debtors, see Section XII below, entitled "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN."

# X.

## CONFIRMATION OF THE PLAN OF REORGANIZATION

A.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Approval and Solicitation Order, the Bankruptcy Court has scheduled the Confirmation Hearing for **[____] [____], 2010** at **[___] [(Prevailing Eastern Time)]**.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtors' estate(s) or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon the following parties so as to be received no later than **[___] [(Prevailing Eastern Time)]** on **[____] [____], 2010**:

| | |
|---|---|
| HVM LLC<br>100 Dunbar Street<br>Spartanburg, South Carolina 29306<br>Attn: ~~Kevin McDougall, Esq~~ Gary DeLapp<br><br>Extended Stay Inc.<br>c/o The Lightstone Group<br>1985 Cedar Bridge Avenue<br>Suite 1<br>Lakewood, New Jersey, 08701<br>Attn: Joseph Teichman, Esq.<br><br>Debtors | Hahn & Hessen LLP<br>488 Madison Avenue<br>New York, New York  10022<br>Attn: Mark T. Power, Esq., Mark T. Indelicato, Esq., Christopher Jarvinen, Esq.<br><br>Attorneys for the Creditors' Committee |
| Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn: Marcia L. Goldstein, Esq., Jacqueline Marcus, Esq. | Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, New York  10004<br>Attn:  Brad Eric Scheler, Esq., Jennifer L. Rodburg, Esq.<br><br>Gibson, Dunn & Crutcher LLP |

| | |
|---|---|
| Attorneys for Debtors and Debtors in Possession | 200 Park Avenue<br>New York, NY 10166-0193<br>Attn: David M. Feldman, Esq.<br><br>Attorneys for Sponsors |
| | |

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.  REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION**

1.  Requirements of section 1129(a) of the Bankruptcy Code

(a)  General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(1)  The Plan complies with the applicable provisions of the Bankruptcy Code.

(2)  The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(3)  The Plan has been proposed in good faith and not by any means proscribed by law.

(4)  Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5)  The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, any affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

(6)  With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a

value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under Chapter 7. See discussion of "Best Interests Test" below.

(7)     Except to the extent that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

(8)     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full in cash on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date, equal to the allowed amount of such claims.

(9)     At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(10)     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.

(11)     The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits, if any.

(b)     The Best Interests Test and the Debtors' Liquidation Analyses

Pursuant to section 1129(a)(7) of the Bankruptcy Code (often called the "***Best Interests Test***"), holders of Allowed Claims and Equity Interests must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Plan's assumed Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were to be liquidated under Chapter 7.

The first step in meeting the Best Interests Test is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets and properties in the context of a Chapter 7 case. The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the Chapter 7 case. The next step is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of Chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a Chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the Chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed.  Moreover, in a Chapter 7 liquidation, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-Chapter 11 priority and unsecured claims.  Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest.

The Debtors, with the assistance of their restructuring and financial advisors, have prepared a hypothetical liquidation analysis (the "***Liquidation Analysis***") which is annexed hereto as Exhibit "D".

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a Chapter 11 case, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) where applicable, the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that in a Chapter 7 case the holders of the Mortgage Facility Claim  and the ESA UD Mortgage Claim would receive less than the distribution provided for under the Plan.  Moreover, holders of the Mortgage Deficiency Claim, Mezzanine Facilities Claims, Unsecured Claims, Existing Equity and Other Equity Interests would receive no distributions at all.  Consequently, confirmation of the Plan will provide each creditor of the Debtors with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under Chapter 7.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims in a Chapter 7 case would be the same or less than the value of distributions under the Plan because such distributions in a Chapter 7 case may not occur for a substantial period of time.  In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions.  In the event litigation were necessary to resolve claims asserted in the Chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

**UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND THEIR MANAGEMENT.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES**

**REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.**

       (c)     Feasibility

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed NewCo's ability to meet its financial obligations as contemplated thereunder. As part of this analysis, the Debtors have requested Lazard to review the Financial Projections prepared by the Debtors and contained in ~~Section~~Article VIII above, entitled "FINANCIAL INFORMATION AND PROJECTIONS ~~AND VALUATION ANALYSIS,~~" and in Exhibit "C" to this Disclosure Statement. The Financial Projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court and the Effective Date of the Plan and its substantial consummation will take place on June 30, 2010. The Financial Projections include balance sheets, statements of operations and statements of cash flows. Based upon the Financial Projections, the Debtors believe NewCo will be able to make all payments required to be made pursuant to the Plan. The Financial Projections have been included by the Debtors strictly for purposes of complying with the confirmation requirement under section 1129(a)(11) of the Bankruptcy Code and have no impact on the actual terms of the Plan or the transactions contemplated therein. Nothing in the Financial Projections shall obligate or be construed to obligate NewCo or the Reorganized Debtors, or the Investor and the Sponsors as the 100% owners of NewCo and the Reorganized Debtors, to incur any of the liabilities contained in the Financial Projections (except as otherwise provided for in the Plan) or to operate the Reorganized Debtors in accordance with the Debtors' assumptions contained in the Financial Projections. The Investor and Sponsors have their own business plan for NewCo and the Reorganized Debtors which has not been incorporated into the Financial Projections. NewCo and the Reorganized Debtors will operate in the ordinary course in accordance with their own business plan.

      2.     Requirements of section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

<u>No Unfair Discrimination</u>. This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

<u>Fair and Equitable Test</u>. This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- <u>Secured Claims</u>. Each holder of an impaired secured claim either (i) retains its liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Claims.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

- Equity Interests.  Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding that Class 6 (Equity Interests) and Class 15 (Other Equity Interests) are deemed to reject the Plan, because as to Class 6 (Equity Interests) and Class 15 (Other Equity Interests), there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

## XI.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) liquidation of the Debtors under Chapter 7 and (ii) an alternative Chapter 11 plan of reorganization.

A.      LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have on the recovery of holders of claims and equity interests and the Debtors' liquidation analysis are set forth in Section X above, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION"; Requirements for Confirmation of the Plan of Reorganization; Consensual Confirmation; Best Interests Test."  The Debtors believe that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.  In a Chapter 7 liquidation, the Debtors believe that there would be no distribution to the holders of the Mortgage Deficiency Claim, the Mezzanine Facilities Claims, the Unsecured Claims or the holders of Equity Interests.

B.      ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different Chapter 11 plan of reorganization.  Such a plan of reorganization might involve either a reorganization

and continuation of the Debtors' business or an orderly liquidation of their assets under Chapter 11. With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables creditors of the Debtors to realize the most value under the circumstances. In a liquidation under Chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in Chapter 7. Further, if a trustee were not appointed, because such appointment is not required in a Chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a Chapter 7 case. Although preferable to a Chapter 7 liquidation, the Debtors believe that any alternative liquidation under Chapter 11 is a much less attractive alternative to creditors of the Debtors than the Plan because of the greater return provided by the Plan.

## XII.

### CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims and Mortgage Certificates. The following summary does not address the federal income tax consequences to (i) holders whose Claims are not impaired, (ii) holders of Claims and equity interests who are deemed to reject the Plan or, (iii) the Investor or (iv) the Sponsors.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "*Tax Code*"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "*IRS*"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding an equity interest as part of an integrated constructive sale or straddle, holders of residual interests in a real estate mortgage investment conduit and equity investors in pass-through entities).

*Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim or Mortgage Certificate.*

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims and equity interests in the Debtors and Mortgage Certificates are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims and equity interests in the Debtors or Mortgage Certificates for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors*

*of the transactions or matters addressed herein; and (c) holders of Claims and equity interests in the Debtors and Mortgage Certificates should seek advice based on their particular circumstances from an independent tax advisor.*

A.        CONSEQUENCES TO THE DEBTORS

Prior to the Effective Date, each of the Debtors other than the Regarded Debtors (as defined below) is treated as a "disregarded entity" for federal income tax purposes (the "***Disregarded Debtors***").  In general, for federal income tax purposes, items of income, gain, loss or deduction of a disregarded entity, and the related federal income tax consequences of such items, are the responsibility of the owner of the disregarded entity, not the disregarded entity itself. Accordingly, to the extent that the transactions contemplated by the Investment Agreement and the Plan would otherwise trigger federal income tax consequences to a Disregarded Debtor, the Plan contemplates and the Debtors believe that the federal income tax consequences of the Plansuch transactions will not be borne by any of the Disregarded Debtors, but instead will be borne by the deemed owners of the Disregarded Debtors, which for federal income tax purposes include ESI, DL-DW Holdings LLC and ESA Canada Beneficiary Inc.  As discussed below, since DL-DW Holdings LLC is treated as a partnership for federal income tax purposes, its owners will ultimately bear their portion of the federal income tax consequences of the transactions contemplated by the Investment Agreement and the Plan.  Nevertheless, it is conceivable that the IRS might attempt to hold NewCo or a Debtor liable for the federal income tax consequences of the transactions contemplated underby the Investment and Standby Purchase Agreement and the Plan under a successor, transferee liability or similar theory. However, the Investment and Standby Purchase Agreement includes a closing condition that provides that the Confirmation Order approving the Plan shall be in a form and substance approved by the Investors and shall provide, in relevant part, that (i) except with respect to Administrative Expense Claims of the type specified in Section 1.7(c)(i) of the Plan as expressly provided for in Section 2.1 of the Plan, NewCo shall not be a successor to any of the Debtors in the Chapter 11 Cases by reason of any theory of law or equity, and (ii) NewCo and each of the Debtors shall not be a successor to ESI, and neither NewCo nor any of the Debtors shall have any successor or transferee liability of any kind, nature or character, including, without limitation, liabilities arising or resulting from or relating to the transactions contemplated underby the Investment and Standby Purchase Agreement and the Plan (including all Plan Documents).  A tax liability arising from the transactions contemplated by the Investment Agreement and the Plan should not constitute an Administrative Expense Claim of the type specified in Section 1.7(c)(i) of the Plan.  Accordingly, the Plan contemplates and the Debtors believe that neither NewCo nor the Reorganized Debtors will be held liable for any tax liability of ESI, the Debtors or the owners of DL-DW as a result of the transactions contemplated by the Investment Agreement and the Plan.

ESA Canada Trustee Inc., ESA Canada Beneficiary Inc., ESA 2007 Operating Lessee Inc., ESA 2005 Operating Lessee Inc., ESA Operating Lessee Inc., ESA P Portfolio Operating Lessee Inc., ESA Canada Operating Lessee Inc. and ESH/TN Member Inc. are each treated as an association taxable as a corporation for federal income tax purposes (collectively, the "***Regarded Corporate Debtors***").

In addition, ESH/TN Properties LLC ("***ESH/TN***") is a Mortgage Borrower that is treated as a partnership for federal income tax purposes (together with the Regarded Corporate Debtors, the "***Regarded Debtors***").  In general, for federal income tax purposes, the partners of a partnership, and not the partnership itself, are subject to taxation under the Tax Code on items of income, gain, loss or deduction of the partnership.  Thus, the federal income tax consequences of the Plan will not be borne by ESH/TN.  ESH/TN Member Inc., which is taxed as a corporation for federal income tax purposes, is a 1% partner in ESH/TN.  DL-DW Holdings LLC, which is not a Debtor but which is also treated as a

partnership for federal income tax purposes is deemed to own the remaining 99% interest in ESH/TN. The Plan contemplates that ownership of the underlying properties held by ESH/TN as a Mortgage Borrower will not change and such properties will continue to be deemed to be owned for federal income tax purposes by ESH/TN. Instead, under the Plan, the stock of ESH/TN Member Inc. will be ~~canceled~~cancelled and new shares of ESH/TN Member Inc. will be issued to NewCo. Under the Plan, the 99% interest in ESH/TN that is deemed to be held by DL-DW ~~Holdings LLC~~ will be ~~canceled~~cancelled and a new 99% interest will be issued to NewCo. The tax treatment of these transactions is not clear. However, as discussed in Section A.1, except for any possible cancellation of indebtedness income ("**COD income**") relating to the 1% partnership interest in ESH/TN held by ESH/TN Member Inc., the federal income tax consequences of these transactions generally will be borne by DL-DW ~~Holdings LLC~~ and its owners.

The Plan contemplates and the Debtors believe that, under the Plan, none of the Regarded Corporate Debtors (other than ESA Canada Beneficiary Inc. and ESH/TN Member Inc., as discussed in Section A.1) will bear the federal income tax consequences of the transactions contemplated ~~under~~by the Investment ~~and Standby Purchase~~ Agreement and the Plan. Moreover, the Regarded Corporate Debtors have not filed and will not file a consolidated income tax return with ESI and thus should not have liability under Treasury Regulation Section 1.1502-6 for the tax consequences of the transactions contemplated ~~under~~by the Investment ~~and Standby Purchase~~ Agreement and the Plan. Nevertheless, as noted above, it is conceivable that the IRS might attempt to hold the Regarded Corporate Debtors liable for the federal income tax consequences of the transactions contemplated by the Investment Agreement and the Plan under a successor, transferee liability or similar theory. However, the Investment ~~and Standby Purchase~~ Agreement includes a closing condition that provides that the Confirmation Order approving the Plan shall be in a form and substance approved by the Investors and shall provide, in relevant part, that (i) except with respect to Administrative Expense Claims of the type specified in Section 1.7(c)(i) of the Plan as expressly provided for in Section 2.1 of the Plan, NewCo shall not be a successor to any of the Debtors in the Chapter 11 Cases by reason of any theory of law or equity, and (ii) NewCo and each of the Debtors shall not be a successor to ESI, and neither NewCo nor any of the Debtors shall have any successor or transferee liability of any kind, nature or character, including, without limitation, liabilities arising or resulting from or relating to the transactions contemplated ~~under~~by the Investment ~~and Standby Purchase~~ Agreement and the Plan (including all Plan Documents). A tax liability arising from the transactions contemplated by the Investment Agreement and the Plan should not constitute an Administrative Expense Claim of the type specified in Section 1.7(c)(i) of the Plan. Accordingly, the Plan contemplates and the Debtors believe that neither NewCo nor the Reorganized Debtors will be held liable for any tax liability of ESI, the Debtors or the owners of DL-DW as a result of the transactions contemplated by the Investment Agreement and the Plan.

1.     Cancellation of Debt

In general, Section 108 of the Tax Code provides that a debtor in a bankruptcy case may exclude COD income arising pursuant to a confirmed chapter 11 plan, but must reduce certain of its tax attributes – such as net operating loss ("**NOL**") carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of COD income incurred pursuant to the plan. The amount of COD income incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD income incurred for federal income tax purposes. If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.

In contrast, the transfer of property to a creditor in satisfaction of nonrecourse debt secured by such property is treated as a sale or exchange transaction. In general, the amount of gain or loss that must be recognized by the debtor is equal to the difference between the amount of debt discharged and the adjusted tax basis of the property transferred to the creditor in satisfaction of such debt. Such gain or loss does not constitute COD income.

As noted above, ESA Canada Beneficiary Inc. and ESH/TN Member Inc. are Regarded Corporate Debtors. Although neither ESA Canada Beneficiary Inc. nor ESH/TN Member Inc. is a Mortgage Borrower, (i) ESA Canada Beneficiary Inc. is deemed to be a Mortgage Borrower for federal income tax purposes by virtue of its ownership of a Mortgage Borrower that is a Disregarded Debtor, and (ii) ESH/TN Member Inc., as a partner in a Mortgage Borrower, will bear the federal income tax consequences of the Plan to such Mortgage Borrower to the extent of its 1% partnership interest in such Mortgage Borrower. Under the Plan, the stock of ESA Canada Beneficiary Inc. and ESH/TN Member Inc. will be ~~canceled~~cancelled and new shares of stock of such Regarded Corporate Debtors will be issued to NewCo. For federal income tax purposes, ownership of the underlying properties held by the Mortgage Borrower will not change and such properties will continue to be deemed to be owned by ESA Canada Beneficiary Inc. and ESH/TN Member Inc. Under IRS Rev. Rul. 91-31, the cancellation of nonrecourse debt without a transfer of the underlying collateral generally results in COD income. Thus, it is expected that ESA Canada Beneficiary Inc. and ESH/TN Member Inc. will incur COD income as a result of the implementation of the Plan. Accordingly, as noted above, under Section 108 of the Tax Code, such COD income will be excluded from taxable income, but there will be corresponding reductions in the tax attributes of ESA Canada Beneficiary Inc. and ESH/TN Member Inc. Alternatively, the American Recovery and Reinvestment Act of 2009 permits ESA Canada Beneficiary Inc. and ESH/TN Member Inc. to elect to defer the inclusion of COD income resulting from the Plan, with the amount of COD income becoming includible in their income ratably over a five-taxable year period beginning in the fourth year after the COD income arises. The collateral tax consequences of making such election are complex. ESA Canada Beneficiary Inc. and ESH/TN Member Inc. are considering whether to make the deferral election in connection with its annual tax return preparation.

2.    Potential Limitations on NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (including current year NOLs) of the Regarded Corporate Debtors allocable to periods prior to the Effective Date (collectively, "***pre-change losses***") will be subject to limitation if Section 382 of the Tax Code applies as a result of the changes in ownership described below. Any Section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from the COD income arising in connection with the Plan.

Under Section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. The consummation of the transactions contemplated by the Plan would constitute an "ownership change" of each of the Regarded Corporate Debtors for these purposes.

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., ~~4.03~~4.01% for ownership changes occurring in ~~March~~June 2010). As discussed below, this annual limitation often may be increased in the event the corporation has an overall "built-in" gain in its assets at

the time of the ownership change. For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately after (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, or if certain shareholders claim worthless stock deductions and continue to hold their stock in the corporation at the end of the taxable year, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below. Generally, NOL carryforwards expire after 20 years.

Section 382 of the Tax Code also limits the deduction of certain "built-in" losses recognized subsequent to the date of the ownership change. If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation. Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless the actual value is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

An exception to the foregoing annual limitation rules generally applies where qualified creditors of a debtor corporation receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. This exception will not be applicable in respect of the Regarded Corporate Debtors.

3.    Alternative Minimum Tax

In general, a federal alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets is reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

4. Transfer of Litigation Trust Assets to the Litigation Trust

Pursuant to Section 6.17 of the Plan, on the Effective Date, the Debtors will transfer the Litigation Trust Assets to the Litigation Trust on behalf of the respective claimants comprising the Litigation Trust Beneficiaries. The transfer of assets by the Debtors pursuant to the Plan may result in the recognition of gain or income by the Debtors, depending in part on the value of such assets on the Effective Date and the Debtors' tax basis in such assets. However, as noted above, the Plan contemplates and the Debtors believe that neither NewCo nor the Reorganized Debtors will be liable for any tax liability of ESI, the Debtors or the owners of DL-DW as a result of the transactions contemplated by the Investment Agreement and the Plan.

B. DISTRIBUTIONS TO HOLDERS OF CERTAIN CLAIMS AND MORTGAGE CERTIFICATES

1. Mortgage Facility Claim and Mortgage Facility Deficiency Claim, Mortgage Facility Deficiency Claim and Mezzanine Facilities Claims

(a) In the event that Class 2 accepts the Plan:

(a) A. The holder of the Allowed Mortgage Facility Claim shall receive the following: (i) 100% of the Rights, (ii) on the Initial Distribution Date, 100% of the New Class A1 Mortgage Notes, 100% of the New Class A2 Mortgage Notes, 100% of the New Class A3 Mortgage Notes, 100% of the New Class A4 Mortgage Notes and 100% of the New Class B-H Mortgage Notes, (iii) 100% of (i) 100% of the Cash Distribution and the Investor Certificates on the Effective Date, with such Cash Distribution to be distributed in accordance with the Trust and Servicing Agreement and the Investor Certificates will be cancelled without any distributions on account thereof (ii) any Cash that may remain in the Administrative/Priority Claims Reserve, as described in Section 8.10(b) of the Plan and (iii) the Class A4 Cash Paydown, (iv) 100% of the Rollover Equity, or in lieu of the Rollover Equity, the Class B-H Equity Cashout Option and (v) 100% of the Sub-Equity Class 2, 100% of the Sub-Equity Class 3, 100% of the Sub-Equity Class 4 and 100% of the Sub-Equity Class 5. Cash transferred to the Mortgage Parties Indemnification Fund (see Section C.9, "Federal Income Tax Treatment of the Mortgage Parties Indemnification Fund").

B. The holders of the Allowed Mezzanine Facilities Claims shall receive the following: 100% of the Sub-Equity Class 6, 100% of the Sub-Equity Class 7, 100% of the Sub-Equity Class 8, 100% of the Sub-Equity Class 9, 100% of the Sub-Equity Class 10, 100% of the Sub-Equity Class 11, 100% of the Sub-Equity Class 12, 100% of the Sub-Equity Class 13, 100% of the Sub-Equity Class 14 and 100% of the Sub-Equity Class 15.

C. Class B-H Debt/Equity Election. Each holder of a Class B-H Mortgage Certificate may exercise the Class B-H Debt/Equity Election, provided that on the Effective Date, 50% of the Class B-H Mortgage Debt will have been satisfied by the New Class B-H Mortgage Notes and 50% of the Class B-H Mortgage Debt will have been satisfied by the Rollover Equity, subject to the immediately succeeding paragraph. In the event that any holder of a Class B-H Mortgage Certificate elects to receive less than 50% of its consideration in Rollover Equity, then the other holders of Class B-H Mortgage

Certificates shall have the right to elect to receive their Pro Rata Share of the Excess Equity. In the event that Class 2 rejects the Plan, the Class B-H Debt/Equity Election will be canceled and extinguished.

D. *Class B - H Equity Cashout Option Election for Class B - H Mortgage Certificates.* At the election of any holder of a Class B - H Mortgage Certificate, such holder shall receive, in lieu of the Rollover Equity that such holder is entitled to receive, the Class B - H Equity Cashout Option. In the event that Class 2 rejects the Plan, the Class B - H Equity Cashout Option will be canceled and extinguished.

E. The New Securities and, if applicable, Cash shall be distributed by the holder of the Mortgage Facility Claim (to holders of Mortgage Certificates) and by the Reorganized Debtors (to holders of Mezzanine Facilities Claims) as follows:

(1) *Holders of Class A1 Mortgage Certificates.* Each holder of a Class A1 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A1 Mortgage Notes.

(2) *Holders of Class A2 Mortgage Certificates.* Each holder of a Class A2 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A2 Mortgage Notes.

(3) *Holders of Class A3 Mortgage Certificates.* Each holder of a Class A3 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the New Class A3 Mortgage Notes.

(4) *Holders of Class A4 Mortgage Certificates.* Each holder of a Class A4 Mortgage Certificate shall receive on the Initial Distribution Date its Pro Rata Share of the Class A4 Cash Paydown and the New Class A4 Mortgage Notes.

(5) *Holders of Class B - H Mortgage Certificates.* Each holder of a Class B - H Mortgage Certificate, shall receive (x) on the Initial Distribution Date, its Pro Rata Share of the New Class B - H Mortgage Notes, subject to the Class B - H Debt/Equity Election, (y) on the Initial Distribution Date, its Pro Rata Share of the Rollover Equity or, in lieu thereof, the Class B - H Equity Cashout Option and subject to the Class B - H Debt/Equity Election, and (z) the New B - H Rights (calculated as such holder's Pro Rata Share of the percentage of NewCo Common Interests that is to be distributed to the Class of Mortgage Certificates of which such holder is a member pursuant to the Plan).

(6) *Holders of Class J Mortgage Certificates.* Each holder of a Class J Mortgage Certificate shall receive (x) on the Initial Distribution Date its Pro Rata Share of the Sub-Equity Class 2 and (y) its Pro Rata Share of the New J - K Rights (calculated as such holder's Pro Rata Share of the Mortgage Certificates held by the holders of Class J Mortgage Certificates and Class K Mortgage Certificates combined).

(7) *Holders of Class K Mortgage Certificates.* Each holder of a Class K Mortgage Certificate shall receive (x) on the Initial Distribution Date its Pro Rata Share of the Sub-Equity Class 3 and (y) its Pro Rata Share of the New J - K Rights

137

(calculated as such holder's Pro Rata Share of the Mortgage Certificates held by the holders of Class J Mortgage Certificates and Class K Mortgage Certificates combined).

(8)     *Holders of Class L Mortgage Certificates.*  Each holder of a Class L Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 4.

(9)     *Holders of Class M Mortgage Certificates.*  Each holder of a Class M Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 5.

(10)    *Holders of M1 Mezzanine Facilities Claims.*  Each holder of an M1 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 6.

(11)    *Holders of M2 Mezzanine Facilities Claims.*  Each holder of an M2 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 7.

(12)    *Holders of M3 Mezzanine Facilities Claims.*  Each holder of an M3 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 8.

(13)    *Holders of M4 Mezzanine Facilities Claims.*  Each holder of an M4 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 9.

(14)    *Holders of M5 Mezzanine Facilities Claims.*  Each holder of an M5 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 10.

(15)    *Holders of M6 Mezzanine Facilities Claims.*  Each holder of an M6 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 11.

(16)    *Holders of M7 Mezzanine Facilities Claims.*  Each holder of an M7 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 12.

(17)    *Holders of M8 Mezzanine Facilities Claims.*  Each holder of an M8 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 13.

(18)    *Holders of M9 Mezzanine Facilities Claims.*  Each holder of an M9 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 14.

(19) *Holders of M10 Mezzanine Facilities Claims.* Each holder of an M10 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 15.

(b) In the event that Class 2 rejects the Plan: The holder of the Allowed Mortgage Facility Deficiency Claim shall receive interests in the Litigation Trust to the extent that it is a Litigation Trust Beneficiary, which shall be distributed in accordance with the Trust and Servicing Agreement, subject to the terms of the Intercreditor Agreement. See Section C.8 "Tax Treatment of Litigation Trust and Holders of Beneficial Interests."

A. The holder of the Allowed Mortgage Facility Claim shall receive, on the Initial Distribution Date, the New Alternate Notes in an aggregate principal amount not to exceed three billion, three hundred million dollars ($3,300,000,000) and which New Alternate Notes shall bear interest at the rate of 5.34% per annum or such lower rate as shall be fixed by the Bankruptcy Court, and shall have a final maturity date that is seven (7) years after the Initial Distribution Date. Notwithstanding the foregoing, in the event that the Debtors seek to confirm the Plan under section 1129(b) of the Bankruptcy Code pursuant to Section 4.2(b)(ii) of the Plan, the Debtors reserved the right, pursuant to Sections 5.3 and 13.1 of the Plan, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, to offer different treatment to Class 2, including, without limitation, offering different forms of consideration such as notes, equity warrants or sub-equity to Class 2, to the extent that such forms of consideration comply with the requirements of section 1129(b) of the Bankruptcy Code. The Rights Offering shall be canceled if Class 2 rejects the Plan.

B. The holder of the Allowed Mortgage Facility Deficiency Claim and the holders of the Allowed Mezzanine Facilities Claims shall receive, on the Initial Distribution Date, 100% of the Sub-Equity, *provided that* such distribution complies with section 1129(b) of the Bankruptcy Code and, in the event that such distribution does not comply with section 1129(b) of the Bankruptcy Code, the Debtors reserved the right, pursuant to Sections 5.3 and 13.1 of the Plan, to alter, amend or modify the Plan, with the consent of the Investor and each of the Sponsors, to offer different treatment to Class 4.

C. The New Securities shall be distributed by the holder of the Mortgage Facility Claim and the Mortgage Facility Deficiency Claim (to holders of Mortgage Certificates) and by the Reorganized Debtors (to holders of Mezzanine Facilities Claims) as follows:

(1) *Holders of Class A1 – F Mortgage Certificates.* Each holder of a Class A1 – F Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the New Alternate Notes (calculated as such holder's Pro Rata Share of the aggregate principal amount of the Class A1 – F Mortgage Certificates).

(2) *Holders of Class G Mortgage Certificates.* Each holder of a Class G Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Class G Alternate Note Proportion of the New Alternate Notes and the Sub-Equity Class 2.

(3) *Holders of Class H Mortgage Certificates.* Each holder of a Class H Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 3.

(4)    *Holders of Class J Mortgage Certificates.*  Each holder of a Class J Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 4.

(5)    *Holders of Class K Mortgage Certificates.*  Each holder of a Class K Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 5.

(6)    *Holders of Class L Mortgage Certificates.*  Each holder of a Class L Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 6.

(7)    *Holders of Class M Mortgage Certificates.*  Each holder of a Class M Mortgage Certificate shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 7.

(8)    *Holders of M1 Mezzanine Facilities Claims.*  Each holder of an M1 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 8.

(9)    *Holders of M2 Mezzanine Facilities Claims.*  Each holder of an M2 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 9.

(10)    *Holders of M3 Mezzanine Facilities Claims.*  Each holder of an M3 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 10.

(11)    *Holders of M4 Mezzanine Facilities Claims.*  Each holder of an M4 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 11.

(12)    *Holders of M5 Mezzanine Facilities Claims.*  Each holder of an M5 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 12.

(13)    *Holders of M6 Mezzanine Facilities Claims.*  Each holder of an M6 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 13.

(14)    *Holders of M7 Mezzanine Facilities Claims.*  Each holder of an M7 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 14.

(15)    *Holders of M8 Mezzanine Facilities Claims.*  Each holder of an M8 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 15.

(16)    *Holders of M9 Mezzanine Facilities Claims.*  Each holder of an M9 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 16.

(17)    *Holders of M10 Mezzanine Facilities Claims.*  Each holder of an M10 Mezzanine Facilities Claim shall receive, on the Initial Distribution Date, its Pro Rata Share of the Sub-Equity Class 17.

(c)    For federal income tax purposes, and as described below, the distribution of the New Securities shall be treated as a distribution of undivided interests in the assets of NewCo to (i) the holder of the Mortgage Facility Claim and Mortgage Facility Deficiency Claim, immediately followed by a distribution of such assets to the holders of the Mortgage Certificates in complete liquidation of the holder of the Mortgage Facility Claim and Mortgage Facility Deficiency Claim, and (ii) the holders of Mezzanine Facilities Claims, followed by a contribution of such assets to NewCo by the holders of Mezzanine Facilities Claims and Mortgage Certificates receiving solely NewCo equity, a sale of such assets to NewCo by the holders of Mortgage Certificates receiving only New Debt Securities and a part contribution/part sale of such assets to NewCo by the holders of Mortgage Certificates receiving both NewCo equity and other property.  Pursuant to the Plan, all parties will be required to report for all federal income tax purposes in a manner consistent with the characterization of the distributions described above.

2.    Mezzanine Facilities Claim.

The holders of the Mezzanine Facilities Claims shall receive interests in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries, which shall be distributed in accordance with the Trust and Servicing Agreement, subject to the terms of the Intercreditor Agreement.  See Section C.8 "Tax Treatment of Litigation Trust and Holders of Beneficial Interests."

3.    2. Allowed ESA UD Mortgage Claim.

Pursuant to the Plan, the holder of the Allowed ESA UD Mortgage Claim shall receive on the Initial Distribution Date, in complete in full settlement, satisfaction, release and discharge of its Claim, the New ESA UD Mortgage Note.

For federal income tax purposes, and as described below, the distribution shall be treated as a distribution of undivided interests in the assets of NewCo to the holder of the Allowed ESA UD Mortgage Claim followed by a sale of such assets to NewCo for the New ESA UD Mortgage Note.

4.    3. General Unsecured Claims.

Pursuant to the Plan, if Class 5 votes to accept the Plan, each holder of an Allowed General Unsecured Claim shall receive on the Distribution Date its Pro Rata Share of five hundred thousand dollars ($500,000). The holders of the General Unsecured Claims shall receive interests in the Litigation Trust to the extent that they are Litigation Trust Beneficiaries.  See Section C.8 "Tax Treatment of Litigation Trust and Holders of Beneficial Interests."

C.    CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS AND MORTGAGE CERTIFICATES

1.    Consequences to Holders of ~~Class A1-A4~~ Mortgage Certificates

Each holder of a ~~Class A1-A4~~ Mortgage Certificate generally should recognize gain or loss in connection with its receipt for federal income tax purposes of ~~an undivided interest in the underlying assets of NewCo, and, if applicable, Cash,~~ any Cash (including a holder's respective share of (i) the Cash transferred to the Mortgage Parties Indemnification Fund (see Section C.9 "Federal Income Tax Treatment of the Mortgage Parties Indemnification Fund") and (ii) any Cash released from the Administrative/Priority Claims Reserve) and any other property (including any interest in the Litigation Trust) in an amount equal to the difference, if any, between (x) the sum of the amount of Cash and the fair market value of ~~the interest, and, if applicable, Cash,  received in satisfaction of its Mortgage Certificate~~ any other property received by the holder (other than any amount received in respect of accrued but unpaid interest~~) (see Section C.7 "**Valuation**"~~) and (y) the holder's adjusted tax basis in its Mortgage Certificate (other than any basis attributable to accrued but unpaid interest, see Section C.~~10~~6 "Accrued but Unpaid Interest").

~~The deemed contribution  for federal income tax purposes of the undivided interest in the assets of NewCo to NewCo for the applicable New Debt Securities will be treated as a taxable exchange in which gain or loss will be recognized.  A holder of a Class A1-A4 Mortgage Certificate should recognize short-term gain in the taxable exchange in an amount equal to the excess, if any, of (i) the issue price (as determined for federal income tax purposes, as discussed below) of the applicable New Debt Securities received by the holder, which, as discussed in Section C.11, would be equal to either the fair market value or the stated principal amount (which may exceed fair market value) of such notes, over (ii) the fair market value of such holder's undivided interest in the assets of NewCo deemed exchanged therefor.  See Section C.8 "Character of Gain or Loss and Installment Method of Reporting".  If the issue price of the applicable New Debt Securities received is equal to its fair market value, a holder of a Class A1-A4 Mortgage Certificate generally should have no gain in respect of the receipt of the applicable New Debt Securities, as the holder should have received a fair market value tax basis in the interest deemed exchanged therefor~~

As discussed below in Section C.8, "Tax Treatment of Litigation Trust and Holders of Beneficial Interests," each holder of a Mortgage Certificate that receives a beneficial interest in the Litigation Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of,  its respective share of the Litigation Trust Assets (consistent with its economic rights in the trust) in a taxable transaction.  Pursuant to the Plan, the Litigation Trustee will in good faith value the assets transferred to the Litigation Trust, and all parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes.

A holder's share of any proceeds received by a Litigation Trust should not be included, for federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Litigation Trust.

A holder's tax basis in its respective share of the Litigation Trust Assets will equal the fair market value of such interest, and the holder's holding period generally will begin the day following the establishment of the Litigation Trust.

2.     Consequences to Holders of ~~Class B-H Mortgage Certificates~~Mezzanine Facilities Claims and General Unsecured Claims

Each holder of a ~~Class B-H Mortgage Certificate~~Mezzanine Facilities Claim or General Unsecured Claim generally should recognize gain or loss in connection with its receipt for federal income tax purposes of ~~an undivided~~any interest in the ~~underlying assets of NewCo and, if applicable, Cash~~Litigation Trust and in an amount equal to the difference, if any, between (x) ~~the sum of~~ the fair market value of ~~the interest and, if applicable, cash, received in satisfaction of its Mortgage Certificate~~any interest in the Litigation Trust received by the holder (other than any amount received in respect of accrued but unpaid interest~~) (see Section C.7 "Valuation")~~ and (y) the holder's adjusted tax basis in its ~~Mortgage Certificate~~Claim (other than any basis attributable to accrued but unpaid interest, see Section C.~~10~~6 "Accrued but Unpaid Interest")

~~The deemed contribution for federal income tax purposes of the undivided interest in the assets of NewCo to NewCo will be treated in part as a tax-free contribution under Section 721 of the Tax Code to the extent NewCo equity is received, and will be treated in part as a taxable exchange in which gain or loss will be recognized to the extent New Debt Securities, and possibly New B-G Rights (see Section C.14 "Tax Treatment of Rights") are received. A holder of a Class B-H Mortgage Certificate should recognize short-term gain in the taxable exchange in an amount equal to the excess, if any, of (i) the sum of the issue price (as determined for federal income tax purposes, as discussed below) of the portion of the applicable New Debt Securities received by the holder, which, as discussed in Section C.11, would be equal to either the fair market value or the stated principal amount (which may exceed fair market value) of such notes and possibly the fair market value of the New B-H Rights received, over (ii) the fair market value of such holder's undivided interest in the assets of NewCo deemed exchanged therefor.  See Section C.8 "Character of Gain or Loss and Installment Method of Reporting."  If the issue price of the applicable New Debt Securities received are equal to their fair market value, a holder of a Class B-H Mortgage Certificate generally should have no gain in respect of the receipt of the New Debt Securities and New B-H Rights, as the holder should have received a fair market value tax basis in the interest deemed exchanged therefor.~~

~~3.     Consequences to Holders of Class J-M Mortgage Certificates~~

~~Each holder of a Class J Mortgage Certificate Class K Mortgage Certificate, Class L Mortgage Certificate, Class M Mortgage Certificate (collectively a "*Class J-M Mortgage Certificate*") generally should recognize gain or loss in connection with its receipt for~~As discussed below in Section C.8, "Tax Treatment of Litigation Trust and Holders of Beneficial Interests," each holder of a Mezzanine Facilities Claim or General Unsecured Claim that receives a beneficial interest in the Litigation Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Litigation Trust Assets (consistent with its economic rights in the trust) in a taxable transaction.  Pursuant to the Plan, the Litigation Trustee will in good faith value the assets transferred to the Litigation Trust, and all parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes ~~of an undivided~~.

A holder's share of any proceeds received by a Litigation Trust should not be included, for federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of ~~NewCo in an amount equal to the difference between (x)~~the Litigation Trust.

A holder's tax basis in its respective share of the Litigation Trust Assets will equal the fair market value of ~~the interest received in satisfaction of its Mortgage Certificate (other than any amount~~

143

~~received in respect of accrued but unpaid interest) (see Section C.7 "Valuation") and (y) the holder's adjusted tax basis in its Mortgage Certificate (other than any basis attributable to accrued but unpaid interest, see Section C.10 "Accrued but Unpaid Interest")~~such interest, and the holder's holding period generally will begin the day following the establishment of the Litigation Trust.

~~The deemed contribution for federal income tax purposes of the undivided interest in the assets of NewCo to NewCo will be treated in part as a tax-free contribution under Section 721 of the Tax Code to the extent NewCo equity is received, and may be treated in part as a taxable exchange in which gain or loss will be recognized to the extent New J-K Rights (see Section C.13 "Tax Treatment of Rights"), are received.~~

~~If the receipt of New J-K Rights is treated as a taxable exchange, a holder of a Class J Mortgage Certificate or Class K Mortgage Certificate will recognize short-term gain in the taxable exchange in an amount equal to the excess, if any, of (i) the fair market value of New J-K Rights received over (ii) the fair market value of such holder's undivided interest in the assets of NewCo deemed exchanged therefor. See Section C.8 "Character of Gain or Loss and Installment Method of Reporting." A holder of a Class J Mortgage Certificate or Class K Mortgage Certificate generally should have no gain in respect of the receipt of the New J-K Rights, as the holder should have received a fair market value tax basis in the interest deemed exchanged therefor.~~

~~4.     Consequences to Holders of Mezzanine Facilities Claims~~

~~Each holder of a Mezzanine Facilities Claim generally should recognize gain or loss in connection with its receipt for federal income tax purposes of an undivided interest in the underlying assets of NewCo in an amount equal to the difference between (x) the fair market value of the interest received in satisfaction of its Mezzanine Facilities Claim (other than any amount received in respect of accrued but unpaid interest) (see Section C.7 "Valuation") and (y) the holder's adjusted tax basis in its Mezzanine Facilities Claim (other than any basis attributable to accrued but unpaid interest, see Section C.10 "Accrued but Unpaid Interest").~~

~~The deemed contribution for federal income tax purposes of the undivided interest in the assets of NewCo to NewCo for NewCo equity will be treated as a tax-free contribution under Section 721 of the Tax Code.~~

3.     ~~5.~~Consequences to the Holder of the Allowed ESA UD Mortgage Claim

The holder of the Allowed ESA UD Mortgage Claim generally should recognize gain or loss in connection with its receipt for federal income tax purposes of an undivided interest in the underlying assets of NewCo in an amount equal to the difference between (x) the fair market value of the interest received in satisfaction of its Allowed ESA UD Mortgage Claim (other than any amount received in respect of accrued but unpaid interest~~) (see Section C.7 "Valuation"~~) and (y) the holder's adjusted tax basis in its Allowed ESA UD Mortgage Claim (other than any basis attributable to accrued but unpaid interest, see Section C.~~10~~6 "Accrued but Unpaid Interest").

The deemed contribution for federal income tax purposes of the undivided interest in the assets of NewCo ~~to NewCo~~in exchange for the New ESA UD Mortgage Note will be treated as a taxable exchange in which gain or loss will be recognized.  The holder of the ESA UD Mortgage Claim should recognize short-term gain in the taxable exchange in an amount equal to the excess, if any, of (i) the issue price (as determined for federal income tax purposes, as discussed below) of the New ESA UD Mortgage Note received by the holder, which, as discussed in Section C.~~11,~~7, would be equal to either the fair

market value or the stated principal amount (which may exceed fair market value) of such note, over (ii) the fair market value of such holder's undivided interest in the assets of NewCo deemed exchanged therefor.  See Section C.~~8~~4 "Character of Gain or Loss and Installment Method of Reporting." If the issue price of the New ESA UD Mortgage Note received is equal to its fair market value, the holder of the Allowed ESA UD Mortgage Claim generally should have no gain in respect of the receipt of the New ESA UD Mortgage Note, as the holder should have received a fair market value tax basis in the interest deemed exchanged therefor.

~~6.        Consequences to Holders of General Unsecured Claims~~

~~Each holder of a General Unsecured Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of cash received (other than any cash received in respect of a Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in the Claim exchanged therefor (other than any basis attributable to accrued but unpaid interest, see Section C.10 "Accrued but Unpaid Interest").~~

~~7.        Valuation~~

As soon as possible after the Effective Date, and to the extent required by Section 1060 of the Tax Code, the board of NewCo will determine the aggregate value of the underlying assets of NewCo as of the Effective Date and the ~~portions~~portion of such value ~~which are~~ allocable~~, respectively, to the various classes of the New Equity Securities, New Debt Securities, the New ESA UD Mortgage Note and possibly the Rights.  Such allocation will take into account the relative fair market values of the New Equity Securities, New Debt Securities, New ESA UD Mortgage Note and Rights, if any__ to the New ESA UD Mortgage Note__.  The board of NewCo will apprise __the holder of the New ESA UD Mortgage Note__, in writing, ~~all parties~~ of such ~~aggregate~~ valuation ~~and allocation~~.  Pursuant to the Plan, all parties ~~(including NewCo, the holder of the Mortgage Facility Claim and the Mortgage Facility Deficiency Claim, and the holders of the Mezzanine Facilities Claims and the holder of the Allowed ESA UD Mortgage Claim)~~ will be required to report consistently with the aggregate valuation and allocation for all federal income tax purposes.

__The holder of the Allowed ESA UD Mortgage Claim should have a tax basis in its New ESA UD Mortgage Note equal to the issue price of such note.  The holder's holding period for the New ESA UD Mortgage Note generally should begin the day following the Distribution Date.__

__4.__        ~~8.~~ Character of Gain or Loss and Installment Method of Reporting

Where gain or loss is recognized by a holder of a Mortgage Certificate or Claim in respect of its Mortgage Certificate or Claim, as applicable, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Mortgage Certificate or Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Mortgage Certificate or Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.  Where gain is recognized by ~~a~~the holder of ~~a Mortgage Certificate, Mezzanine Facilities Claim or~~ the ESA UD Mortgage Claim in respect of the deemed contribution of assets to NewCo, the character of such gain may be treated as short-term capital gain depending in part on the holder's personal circumstances.  Such gain may be reported on the installment method of reporting, provided that all applicable requirements of Section 453 of the Tax Code are satisfied. Holders of Mortgage Certificates or Claims are urged to consult their tax advisors regarding the character of any gain recognized on any taxable contribution to NewCo.

9. Initial Tax Basis

A holder's initial tax basis in the NewCo equity received should equal the fair market value of the NewCo equity (as such value should be equal to the fair market value tax basis of the holder's undivided interest in the underlying assets of NewCo treated as contributed therefor), increased for the portion of NewCo's liabilities that is allocated to the holder. A holder's tax basis in its portion of the New Debt Securities or New ESA UD Mortgage Note received should equal the issue price of such loans. A holder's holding period for any New Equity Securities, New Debt Securities, and/or the New ESA UD Mortgage Note, as applicable, generally should begin the day following the Effective Date.

5. Timing of Distributions

Distributions to holders of Claims and certain distributions to holders of Mortgage Certificates will be made subsequent to the Effective Date (including, without limitation, any Cash remaining in the Administrative/Priority Claims Reserve pursuant to Section 8.10(b) of the Plan). Under the Tax Code, a portion of any distribution received after the Effective Date may be treated as imputed interest depending on, among other things, whether the holder is an accrual or cash basis taxpayer. In addition, it is possible that any loss and a portion of any gain realized by such holder may be deferred until such time as such holder has received its final distribution. All holders of such Claims and Mortgage Certificates should consult their tax advisors as to the tax consequences of distributions subsequent to the Effective Date.

6. ~~10.~~ Accrued but Unpaid Interest

Pursuant to the Plan, distributions to any holder of Allowed Claims will be allocated first to the principal amount of such Claims, as determined for federal income tax purposes, and thereafter, to the portion of such Claim, if any, representing accrued but unpaid interest or original issue discount ("**_OID_**"). However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

In general, to the extent that any consideration received pursuant to the Plan by a holder of a Claim or Mortgage Certificate is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly it is also unclear whether, by analogy, a holder of a claim of a non-corporate issuer would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

Each holder of a Mortgage Certificate or Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for federal income tax purposes.

7. ~~11.~~ Ownership and Disposition of the New ~~Debt Securities and New~~ ESA UD Mortgage Note

The application of the OID provisions of the Tax Code, and the federal income tax treatment of stated interest, with respect to the ~~New Debt Securities and~~ New ESA UD Mortgage Note

depends, in part, upon whether the ~~respective~~ "issue ~~price~~price" of ~~such New Debt Securities and~~the New ESA UD Mortgage Note ~~are~~is equal to ~~their~~its stated principal amount. Pursuant to applicable Treasury Regulations, the ~~respective~~ "issue ~~prices~~price" of the New ~~Debt Securities and New~~ ESA UD Mortgage Note ~~depend~~depends, in part, upon whether ~~they are~~it is traded on an "established market" during the sixty-day period ending thirty days after the Effective Date (the "***Testing Period***"). If ~~the New Debt Securities and~~ the New ESA UD Mortgage Note ~~are~~is not traded on an "established market" during the Testing Period, the "issue price" of such non-traded instrument will depend on whether Section 1274(b)(3) of the Tax Code, as discussed below, applies to its issuance.

For this purpose, an "established market" includes, among other things, (i) a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers, or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions, and (ii) the ready availability of price quotations from dealers, brokers or traders. If the New ~~Debt Securities or the New~~ ESA UD Mortgage Note ~~are~~is traded on an established market during the Testing Period, the "issue price" will be equal to the fair market value of the New ~~Debt Securities or the New~~ ESA UD Mortgage Note~~, respectively, as the case may be~~.

Pursuant to Section 1274(b)(3) of the Tax Code and applicable Treasury Regulations, if the New ~~Debt Securities or New~~ ESA UD Mortgage Note ~~are~~is not traded on an established market during the Testing Period, the "issue price" of ~~such~~the non-traded instrument will still be equal to its fair market value if the fair market value of ~~such instrument~~the New ESA UD Mortgage Note has been established in a "recent sales transaction" within the meaning of such provisions. Neither the Tax Code nor the Treasury Regulations expound on the meaning of a recent sales transaction. With respect to the ~~New Debt Securities and~~ New ESA UD Mortgage Note, because, as stated above, (i) the ~~holders~~holder of the ~~such notes~~note should be treated as having first received undivided interests in the underlying assets of NewCo in a taxable transaction in which the determination of gain or loss will be based on the fair market value of such interests, and (ii) the fair market value of such interests will be required to be allocated ~~among the New Debt Securities, the New Equity Securities and~~to the New ESA UD Mortgage Note~~, and possibly Rights~~ for purposes of determining gain or loss and tax basis upon the transfer of such interests to NewCo, the ~~New Debt Securities~~ESA UD Mortgage Note might have an established fair market value by reason of recent sales transactions involving the undivided interests exchanged therefor. The determination whether to take such position on NewCo's tax return would be made by the management and board of NewCo. There is no assurance that the IRS would not take a contrary position.

If the ~~New Debt Securities and~~ New ESA UD Mortgage Note ~~are~~is not traded on an established market during the Testing Period and Section 1274(b)(3) of the Tax Code does not apply, the "issue price" of the New ~~Debt Securities and New~~ ESA UD Mortgage Note will be ~~their respective~~its stated principal amounts.

~~Each~~The holder of ~~a Claim or Mortgage Certificate that receives either New Debt Securities or~~ the New ESA UD Mortgage Note is urged to consult its tax advisor regarding the determination of the "issue price" of the New ~~Debt Securities and New~~ ESA UD Mortgage Note~~, as applicable~~.

     (i)     Interest and OID on the New ~~Debt Securities and New~~ ESA UD Mortgage Note

~~A~~The holder of ~~New Debt Securities or~~ the New ESA UD Mortgage Note will be required to include stated interest on the New ~~Debt Securities or New~~ ESA UD Mortgage Note in income in accordance with the holder's regular method of accounting for federal income tax purposes to the

extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is unconditionally payable in cash at least annually. The stated interest payable on the New ~~Debt Securities is qualified stated interest. Because the terms of the New~~ ESA UD Mortgage Note ~~have not been finalized, it is unclear whether the interest payable on the New ESA UD Mortgage Note will be~~is qualified stated interest.

If the issue price of ~~any of the New Debt Securities or~~ the New ESA UD Mortgage Note is less than its stated principal amount, the excess of the note's stated principal amount over its issue price should generally be treated as OID under the Tax Code. ~~Each~~The holder will be required to include in its gross income, as interest for federal income tax purposes, the portion of the OID (inclusive of all stated interest) that accrues while the holder held the note (including the day the note is acquired but excluding the day it is disposed of), regardless of such holder's normal method of tax accounting. Any OID will accrue over the term of ~~the New Debt Securities or~~ the New ESA UD Mortgage Note~~, as applicable,~~ based on the constant yield method (with the amount of OID attributable to each accrual period allocated ratably to each day in such period). Accordingly, a holder may be required to recognize income prior to the receipt of cash payments attributable to such income.

~~(ii) Application of AHYDO Provisions of the Tax Code~~

~~Any OID on the New Debt Securities or the New ESA UD Mortgage Note generally would be amortizable by NewCo utilizing the constant yield method, and deductible as interest, unless the New Debt Securities or the New ESA UD Mortgage Note are treated as applicable high yield discount obligations ("*AHYDOs*") within the meaning of Section 163(e)(5) of the Tax Code. Although section 163(e)(5) of the Tax Code by its terms applies only to corporate issuers, the Treasury Regulations under the partnership provisions of the Tax Code state that the AHYDO rules also apply to debt instruments issued by partnerships to the extent that the partnership has corporate partners. The determination of whether the AHYDO rules will apply is complex. If the AHYDO rules were to apply to any of the New Debt Securities or the New ESA UD Mortgage Note, the interest deduction otherwise allowable to a direct or indirect corporate member of NewCo with respect to amortizing OID would, at a minimum, be deferred until such OID is actually paid in cash, and may be disallowed in part. The portion of any interest deduction that will be disallowed is that portion that is equal to the fraction, the numerator of which is equal to the "disqualified yield" (*i.e.*, the excess of the yield to maturity of the New Debt Securities or the New ESA UD Mortgage Note over the sum of the applicable federal rate for the calendar month in which the Effective Date occurs plus six percentage points) and the denominator of which is equal to the total yield to maturity of the New Debt Security or New ESA UD Mortgage Note. The income of a corporate holder of a New Debt Security or the New ESA UD Mortgage Note with respect to the disqualified yield, if any, should be treated as a dividend for purposes of the dividends received deduction to the extent the corporate member has sufficient earnings and profits such that a similar distribution in respect of stock would have been treated as a dividend for federal income tax purposes. Presumably, a corporate holder's entitlement to a dividends-received deduction is subject to the normal holding period and taxable income requirements and other limitations applicable to dividends received deductions. (iii)~~ Sale, Exchange or Redemption of New ~~Debt Securities or New~~ ESA UD Mortgage Note

Unless a non-recognition provision applies, a holder generally will recognize gain or loss upon the sale, exchange or redemption of ~~the New Debt Securities or~~ the New ESA UD Mortgage Note equal to the difference, if any, between the holder's adjusted tax basis and the amount realized on the sale, exchange or redemption. For this purpose, a holder's adjusted tax basis generally will equal the holder's initial tax basis, increased by the amount of any OID accrued (determined without adjustments) up

through the date of the sale, exchange, or redemption, and decreased by the amount of any cash payments (other than qualified stated interest).  Any gain or loss generally will be capital gain or loss.

12.      Ownership and Disposition of NewCo Common Interests and Sub-Equity

Under current Treasury Regulations, a domestic entity that has two or more members and that is not organized as a corporation under federal or state law will generally be classified as a partnership for federal income tax purposes, unless it elects to be treated as a corporation.  Thus, subject to the discussion of "publicly traded partnerships" below, and subject to the discussion regarding a possible election to be treated as a corporation after the Effective Date, NewCo will be treated as a partnership for federal income tax purposes.

Under the "publicly traded partnership" provisions of the Tax Code, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation.  It is unclear whether the NewCo Common Interests will be treated as publicly traded, though if NewCo operates its business in a similar manner to that of the Debtors prior to the Chapter 11 Cases, NewCo may meet the qualifying income test such that NewCo will not be treated as a corporation even if its interests are considered to be publicly traded.  The NewCo Operating Agreement will prohibit the transfer of NewCo Common Interests if such transfer would jeopardize the status of NewCo as a partnership for federal income tax purposes (prior to an actual conversion for federal income tax purposes to corporate status).  The NewCo Operating Agreement will provide that, upon the decision of the board of NewCo, NewCo will (i) make an election to be treated as a corporation for United States federal and applicable

8.      Federal Income Tax Treatment of the Litigation Trust and Holders of Beneficial Interests

(i)      Classification of the Litigation Trust

The Litigation Trust created pursuant to the Plan is intended to qualify as a "liquidating trust" for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity, but rather is treated for federal income tax purposes as a "grantor trust" (i.e., a pass-through type entity).  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes.  The Litigation Trust will be structured to comply with the general criteria set forth in Revenue Procedure 94-45, 1994-2 C.B. 684.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties will be required to treat, for federal income tax purposes, the Litigation Trust as a grantor trust of which the Litigation Trust Beneficiaries are the owners and grantors.  The following discussion assumes that the Litigation Trust will be so respected for federal income tax purposes.  However, no opinion of counsel has been requested, and neither the Debtors nor the Litigation Trustee will seek a ruling from the IRS, concerning the tax status of the Litigation Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  If the IRS were to challenge successfully the classification of a Litigation Trust, the federal income tax consequences to the Litigation Trust, the Litigation Trust Beneficiaries and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Litigation Trust).

(ii)      General Tax Reporting by the Litigation Trust and Beneficiaries

For all federal income tax purposes, all parties must treat the transfer of the Litigation Trust Assets to the Litigation Trust in accordance with the terms of the Plan.  Pursuant to the Plan, the Litigation Trust Assets are treated, for federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Claims receiving an

interest in the Litigation Trust (with each holder receiving in a taxable transaction an undivided interest in such assets in accordance with its economic interests in such assets), followed by the transfer by the holders to the Litigation Trust of such assets in exchange for the interest in the Litigation Trust. Accordingly, all parties must treat the Litigation Trust as a grantor trust of which the holders of interests in the Litigation Trust are the owners and grantors, and treat the Litigation Trust Beneficiaries as the direct owners of an undivided interest in the Litigation Trust Assets, consistent with their economic interests therein, for all federal income tax purposes.

Allocations of taxable income or loss of the Litigation Trust will be allocated by reference to the manner in which an economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets. All parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Litigation Trust Beneficiary will be treated as income or loss with respect to such Litigation Trust Beneficiary's undivided interest in the Litigation Trust Assets, and not as income or loss with respect to its prior Allowed Claim or Equity Interest. The character of any income and the character and ability to use any loss will depend on the particular situation of the Litigation Trust Beneficiary. The interests in the Litigation Trust will be subject to certain restrictions on transfer.

The federal income tax obligations of a holder with respect to its interest in the Litigation Trust are not dependent on the Litigation Trust distributing any cash or other proceeds. Thus, a holder may incur a federal income tax liability with respect to its allocable share of Litigation Trust income even if the Litigation Trust does not make a concurrent distribution to the holder. In general, a distribution of cash by the Litigation Trust will not be separately taxable to a Litigation Trust Beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Litigation Trust).

The Litigation Trustee will file with the IRS returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Litigation Trustee also will annually send to each holder of an interest in the Litigation Trust a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for federal income tax purposes and will instruct all such holders to use such information in preparing their federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their federal income tax returns.

9. Federal Income Tax Treatment of the Mortgage Parties Indemnification Fund.

For all federal income tax purposes, all parties will treat the transfer of Cash to the Mortgage Parties Indemnification Fund as (1) a taxable transfer of Cash (subject to any obligations relating to those assets) directly to the holders of Mortgage Certificates (in accordance with the priorities as set forth in the Trust and Servicing Agreement), followed by (2) the transfer by the holders of

Mortgage Certificates otherwise entitled to receive such cash to the Mortgage Parties Indemnification Fund. Accordingly, the holders of Mortgage Certificates shall be treated for federal income tax purposes as the direct owners of their respective share of the Cash in the Mortgage Parties Indemnification Fund. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes or (ii) convert into a corporation by filing a certificate of conversion with the requisite Secretary of State, in each case to be effective after the Effective Date. After the Effective Date, each owner would be required to cooperate fully with any such election or conversion, including through the execution of any necessary or appropriate forms. This discussion does not address any tax consequences resulting from any such election or conversion, and each holder of a Mortgage Certificate or Claim is urged to consult its own tax advisor regarding such tax consequences.

This discussion of the federal income tax consequences of the Plan assumes that NewCo will be treated as a partnership for federal income tax purposes.

As a partnership, NewCo itself will not be subject to federal income tax. Instead, NewCo will file an annual partnership information return with the IRS which will report the results of NewCo's operations. Each NewCo member will be required to report on its federal income tax return, and will be subject to tax in respect of, its distributive share of each item of NewCo's income, gain, loss, deduction and credit for each taxable year of NewCo ending with or within the member's taxable year. Each item generally will have the same character as if the member had realized the item directly. Members will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from NewCo for such taxable year, and thus may incur income tax liabilities in excess of any distributions from NewCo. For purposes of calculating NewCo's items of income, gain, loss and deduction, upon the implementation of the Plan, because, as described in Sections B.1-5, the holders of Claims and Mortgage Certificates will be deemed to have (i) sold assets of NewCo to NewCo in a taxable transaction and/or (ii) contributed property with a fair market value basis to NewCo in a transaction providing for a carryover basis to NewCo, NewCo should have a new cost tax basis and holding period in the underlying assets of NewCo.

A member will be allowed to deduct its allocable share of NewCo losses (if any) only to the extent of such member's adjusted tax basis (discussed below) in its membership interest at the end of the taxable year in which the losses occur. In addition, various other limitations in the Tax Code may significantly limit a member's ability to deduct its allocable share of deductions and losses of NewCo against other income.

NewCo will provide each member with the necessary information to report its allocable share of NewCo's tax items for federal income tax purposes. However, no assurance can be given that NewCo will be able to provide such information prior to the initial due date of the members' federal income tax return and the members may therefore be required to apply to the IRS for an extension of time to file their tax returns.

The NewCo Operating Agreement will generally provide that the members will elect one member to be the "*Tax Matters Partner*" for NewCo, as such term is defined in Section 6231(a)(7) of the Tax Code. The Tax Matters Partner will have considerable authority under the Tax Code and the NewCo Operating Agreement to make decisions affecting the tax treatment and procedural rights of all members. The Tax Matters Partners of NewCo will likely decide how items will be reported on NewCo's federal income tax returns, and all members will be required under the Tax Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that the income tax returns of NewCo are audited by the IRS, the tax treatment of NewCo income and

deductions generally will be determined at the NewCo level in a single proceeding, rather than in individual audits of the members.

A member generally will not recognize gain or loss on the receipt of a distribution of cash or property from NewCo (provided that the member is not treated as exchanging such member's share of NewCo's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the Tax Code, and together "ordinary income items") for other partnership property). A member, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from NewCo (including any constructive distribution of money resulting from a reduction of the member's share of the indebtedness of NewCo) to the extent such cash or the fair market value of such marketable securities distributed exceeds such member's adjusted tax basis in its membership interest. Such distribution would be treated as gain from the sale or exchange of a membership interest.

A member will recognize gain on the complete liquidation of its membership interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of certain marketable securities are treated as distributions of money for purposes of determining gain. Any gain recognized by a member on the receipt of a distribution from the partnership generally will be capital gain, but may be taxable as ordinary income, either in whole or in part, under certain circumstances. No loss can be recognized on a distribution in liquidation of a membership interest, unless the member receives no property other than money and ordinary income items.

A member's adjusted tax basis in its membership interest generally will be equal to such member's initial tax basis, increased by the sum of (i) any additional capital contribution such member makes to NewCo, (ii) the member's allocable share of the income of NewCo, and (iii) increases in the member's allocable share of the indebtedness of NewCo, and reduced, but not below zero, by the sum of (iv) the member's allocable share of the losses of NewCo, and (v) the amount of money or the adjusted tax basis of property distributed to such member, including constructive distributions of money resulting from reductions in such member's allocable share of the indebtedness of NewCo.

A sale of all or part of a member's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such member's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent that the proceeds of the sale are attributable to a member's allocable share of certain ordinary income items of NewCo and such proceeds exceed the member's adjusted tax basis attributable to such ordinary income items. A member's ability to deduct any loss recognized on the sale of its membership interest will depend on the member's own circumstances and may be restricted under the Tax Code.

13.     Tax Treatment of Rights

The characterization of the New B-H Rights and New J-K Rights for federal income tax purposes is uncertain.

Because the subscription rights are exercisable prior to the Effective Date, it is possible that a holder that exercises its subscription rights may be treated as receiving in respect of its Allowed Claim for federal income tax purposes additional NewCo Common Interests with a value equal to the value of such rights, rather than being treated as receiving and thereafter exercising the rights. A holder of a New B-H Right or New J-K Right (however characterized) generally will not recognize gain or loss upon the exercise of such right, and a holder's tax basis in the NewCo Common Interests received upon

exercise of a such subscription right will be equal to the sum of (i) the amount paid for the NewCo Common Interests and (ii) the holder's tax basis, if any, in the subscription right due to the receipt of such right in partial satisfaction of its Claim. A holder's holding period in the NewCo Common Interests received upon exercise of a subscription right generally should commence the day following the Effective Date.

In contrast, it is uncertain whether a holder that does not exercise a subscription right should be treated as receiving anything of additional value in respect of its Claim, or should be treated as receiving a right that lapsed. In the latter event, the holder generally would recognize a loss equal to its tax basis in the subscription right, if any. In general, such gain or loss would be a capital gain or loss, and would be a short-term or long-term gain or loss depending on its holding period. .

The Special Servicer shall send annually to each holder of Mortgage Certificates that is treated as a direct owner of any portion of the Mortgage Parties Indemnification Fund a separate statement setting forth any income earned with respect to, or any expenditure made on behalf of, such portion of the Mortgage Parties Indemnification Fund as may be relevant for United States Federal Income Tax purposes.

D.    INFORMATION REPORTING AND WITHHOLDING

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("*TIN*"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.*

**XIII.**

CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Classes 2, 3, 4A, 4B and 5 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than **4:00 p.m. (New York Time)** on **[_____], 2010], 2010.**

Dated: April 23, June ___, 2010

Respectfully submitted,

ESA PROPERTIES LLC
ESA 2005 PORTFOLIO LLC
ESA 2005- SAN JOSE LLC
ESA 2005- WALTHAM LLC
ESA ACQUISITION PROPERTIES LLC
ESA ALASKA LLC
ESA CANADA PROPERTIES BORROWER LLC
ESA FL PROPERTIES LLC
ESA MD BORROWER LLC
ESA MN PROPERTIES LLC
ESA P PORTFOLIO LLC
ESA P PORTFOLIO MD BORROWER LLC
ESA P PORTFOLIO PA PROPERTIES LLC
ESA P PORTFOLIO TXNC PROPERTIES LP
ESA PA PROPERTIES LLC
ESA TX PROPERTIES LP
ESH/HOMESTEAD PORTFOLIO LLC
ESH/HV PROPERTIES LLC
ESH/MSTX PROPERTY LP
ESH/TN PROPERTIES LLC
ESH/TX PROPERTIES LP
ESA MD BENEFICIARY LLC
ESA MD PROPERTIES BUSINESS TRUST
ESA P PORTFOLIO MD BENEFICIARY LLC
ESA P PORTFOLIO MD TRUST
ESA CANADA PROPERTIES TRUST
ESA CANADA TRUSTEE INC.
ESA CANADA BENEFICIARY INC.
ESA UD PROPERTIES LLC
ESA 2007 OPERATING LESSEE, INC.
ESA 2005 OPERATING LESSEE INC.
ESA OPERATING LESSEE INC.
ESA P PORTFOLIO OPERATING LESSEE INC.
ESA CANADA OPERATING LESSEE INC.

ESA P PORTFOLIO TXNC GP L.L.C.
ESA TXGP L.L.C.
ESH/MSTX GP L.L.C.
ESH/TXGP L.L.C.
ESH/TN MEMBER INC.
ESH/HOMESTEAD MEZZ L.L.C.
ESH/HOMESTEAD MEZZ 2 L.L.C.
ESH/HOMESTEAD MEZZ 3 L.L.C.
ESH/HOMESTEAD MEZZ 4 L.L.C.
ESH/HOMESTEAD MEZZ 5 L.L.C.
ESH/HOMESTEAD MEZZ 6 L.L.C.
ESH/HOMESTEAD MEZZ 7 L.L.C.
ESH/HOMESTEAD MEZZ 8 L.L.C.
ESH/HOMESTEAD MEZZ 9 L.L.C.
ESH/HOMESTEAD MEZZ 10 L.L.C.
ESA MEZZ L.L.C.
ESA MEZZ 2 L.L.C.
ESA MEZZ 3 L.L.C.
ESA MEZZ 4 L.L.C.
ESA MEZZ 5 L.L.C.
ESA MEZZ 6 L.L.C.
ESA MEZZ 7 L.L.C.
ESA MEZZ 8 L.L.C.
ESA MEZZ 9 L.L.C.
ESA MEZZ 10 L.L.C.
ESA P MEZZ L.L.C.
ESA P MEZZ 2 L.L.C.
ESA P MEZZ 3 L.L.C.
ESA P MEZZ 4 L.L.C.
ESA P MEZZ 5 L.L.C.
ESA P MEZZ 6 L.L.C.
ESA P MEZZ 7 L.L.C.
ESA P MEZZ 8 L.L.C.
ESA P MEZZ 9 L.L.C.
ESA P MEZZ 10 L.L.C.
HOMESTEAD VILLAGE L.L.C.
EXTENDED STAY HOTELS L.L.C.
ESA P PORTFOLIO HOLDINGS L.L.C.
ESA MANAGEMENT L.L.C.
ESA BUSINESS TRUST


By:_____
        Name:   David Lichtenstein
        Title:    President

**<u>Exhibit A</u>**

**The Plan**

**<u>Exhibit B</u>**

**Disclosure Statement Approval and Solicitation Order**

**[To be Provided]**

**<u>Exhibit C</u>**

**Projected Financial Information**

**<u>Exhibit D</u>**

**Liquidation Analysis**

## Exhibit E

## Debtors' Prepetition Organizational Chart

<u>**Exhibit F**</u>

**Historical Financial Information**

## Exhibit G

**Investment ~~and Standby Purchase~~ Agreement**

**<u>Exhibit H</u>**

**ESA Mezz Entities**

ESA Mezz L.L.C.

ESA Mezz 2 L.L.C.

ESA Mezz 3 L.L.C.

ESA Mezz 4 L.L.C.

ESA Mezz 5 L.L.C.

ESA Mezz 6 L.L.C.

ESA Mezz 7 L.L.C.

ESA Mezz 8 L.L.C.

ESA Mezz 9 L.L.C.

ESA Mezz 10 L.L.C.

**<u>Exhibit I</u>**

**ESA P Mezz Entities**

ESA P Mezz L.L.C.

ESA P Mezz 2 L.L.C.

ESA P Mezz 3 L.L.C.

ESA P Mezz 4 L.L.C.

ESA P Mezz 5 L.L.C.

ESA P Mezz 6 L.L.C.

ESA P Mezz 7 L.L.C.

ESA P Mezz 8 L.L.C.

ESA P Mezz 9 L.L.C.

ESA P Mezz 10 L.L.C.

## Exhibit J

## Homestead Mezz Entities

ESH/Homestead Mezz L.L.C.

ESH/Homestead Mezz 2 L.L.C.

ESH/Homestead Mezz 3 L.L.C.

ESH/Homestead Mezz 4 L.L.C.

ESH/Homestead Mezz 5 L.L.C.

ESH/Homestead Mezz 6 L.L.C.

ESH/Homestead Mezz 7 L.L.C.

ESH/Homestead Mezz 8 L.L.C.

ESH/Homestead Mezz 9 L.L.C.

ESH/Homestead Mezz 10 L.L.C.

Document comparison by Workshare Professional on Tuesday, June 08, 2010
9:09:46 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://USDMS/US_ACTIVE/43358033/8 |
| Description | #43358033v8<US_ACTIVE> - ESH Disclosure Statement to 4th AR Plan (CB/P) |
| Document 2 ID | interwovenSite://USDMS/US_ACTIVE/43411435/10 |
| Description | #43411435v10<US_ACTIVE> - ESH Disclosure Statement to 5th AR Plan (June 2010) |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 781 |
| Deletions | 1301 |
| Moved from | 31 |
| Moved to | 31 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 2144 |

**<u>Exhibit D</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
                                          :

In re                                 :         **Chapter 11 Case No.**
                                          :

**EXTENDED STAY INC., et al.,**     :         **09-13764 (JMP)**
                                          :

       **Debtors.**                  :         **(Jointly Administered)**
                                          :

-----------------------------------------------------------x

**ORDER (I) PURSUANT TO SECTIONS 105 AND 363(b)**
**OF THE BANKRUPTCY CODE APPROVING INVESTMENT AGREEMENT**
**WITH SUCCESSFUL BIDDER, (II) APPROVING PROPOSED**
**DISCLOSURE STATEMENT REFLECTING THE SUCCESSFUL BID,**
**(III) ESTABLISHING SOLICITATION AND VOTING PROCEDURES,**
**(IV) SCHEDULING A CONFIRMATION HEARING, AND (V) ESTABLISHING**
**NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION**
**OF THE DEBTORS' PROPOSED PLAN OF REORGANIZATION**

Upon the motion dated April 30, 2010 (the "Motion"),[1] of ESA Properties LLC

and seventy-three of its debtor affiliates, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors") for entry of an order, pursuant to

sections 105, 363(b), 502, 1125, 1126 and 1128 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 3017, 3018, 3020, 9013, 9014 and 9021 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 3017-1, 3018-1, 3020-1,

9013-1 and 9021-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the

Southern District of New York (the "Local Rules"), (I) pursuant to sections 105 and 363(b) of

the Bankruptcy Code approving Investment and Standby Purchase Agreement with Successful

Bidder; (II) approving the Disclosure Statement for the Debtors' Fourth Amended Plan of

Reorganization Under Chapter 11 of the Bankruptcy Code, dated April 23, 2010 [Docket No.

979] (the "Fourth Disclosure Statement") relating to the Debtors' Fourth Amended Plan of

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Motion.

Reorganization Under Chapter 11 of the Bankruptcy Code, dated April 23, 2010 [Docket No. 978] (the "Fourth Plan"), (iii) establishing solicitation and voting procedures, (iv) scheduling a confirmation hearing, (v) establishing notice and objection procedures in respect of confirmation of the Fourth Plan, (vi) approving the Rights Certificate to be used for purposes of the Rights Offering and the Election Form, and (vii) directing the Mortgage Debt Parties (as defined below) to cooperate with the solicitation procedures, all as more fully described in the Motion; the supplement to the Motion, dated June 8, 2010 (the "Supplement"), the Disclosure Statement for the Debtors' Fifth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 [Docket No. 1028] (the "Disclosure Statement") relating to the Debtors' Fifth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 [Docket No. 1027], which is attached to the Disclosure Statement as "Exhibit A" (the "Plan"); and the Court having reviewed the Motion, the Disclosure Statement, and the Supplement, it is hereby found and determined as follows:

A. **Jurisdiction and Venue.** The Court has jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.). Consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B. **Notice of the Motion and the Disclosure Statement Hearing.** The Debtors provided due and proper notice of the Motion, the objection deadline for the Motion, as well as the hearing to consider the Motion, in accordance with the Court's case management order and Bankruptcy Rule 2002(b), and no other or further notice is necessary.

C.     **Successful Bid.**  The Successful Bid by the C/P/B Investors is the highest or otherwise best offer for the Debtors' estates and their creditors available to the Debtors as a result of the Auction.

D.     **Investment Agreement.**  Entry into the Investment Agreement reflecting the terms of the Successful Bid is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates and their creditors.

E.     **Expenses.**  The Expenses constitute an actual and necessary cost of preserving the Debtors' estates and the increase in the Expense Cap is justified by the circumstances

F.     **Adequate Information.**  The Disclosure Statement, attached hereto as "Exhibit 1," contains adequate information within the meaning of section 1125 of the Bankruptcy Code and no further information is necessary.  The Disclosure Statement (including all applicable exhibits thereto) provides holders of Claims, holders of Equity Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article X of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

G.     **Fair and Equitable Voting Procedures.**  The procedures, set forth below, for the solicitation and tabulation of votes to accept or reject the Plan, form an integral and indivisible part of this Order, provide for a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code.

H.     **Non-Voting Creditors and Interests Holders.**  Claims in Class 1 are unimpaired (the "Unimpaired Claims"), and Interests in Classes 7, 8, 9, 10, 11, 12, 13, and 14 are unimpaired (the "Unimpaired Interests") and, accordingly, holders of such Unimpaired Claims

and Unimpaired Interests are conclusively presumed to accept the Plan and not entitled to vote on account of such claims or interests (the "Non-Voting Unimpaired Classes"). Interests in Class 6 and Class 15 under the Plan (the "Non-Voting Impaired Classes") will not receive or retain any property under the Plan and, accordingly, holders of such interests are impaired, are deemed to reject the Plan and are, therefore, not entitled to vote on account of such interests (together with Non-Voting Unimpaired Creditors, the "Non-Voting Creditors and Interest Holders").

        I.     **Voting Creditors.** Claims in Class 2, Class 3, Class 4A, Class 4B and Class 5 are impaired and the holders of such claims are entitled to vote on account of such claims (collectively, "Voting Creditors"); provided that: (a) as of the Record Date, the outstanding amount of such claim is greater than zero ($0.00); (b) as of the Record Date, the claim has not been disallowed, expunged, disqualified, or suspended; and (c) such claim is not subject to an objection or request for estimation by the Voting Objection Deadline. Further, creditors that are not scheduled in the Debtors' Schedules or do not timely file a proof of claim by the Bar Date are not entitled to vote. If the Debtors did not schedule a Government Unit's claim and the Government Unit did not file a proof of claim by the Record Date, such Government Unit is not entitled to vote.

        J.     **Solicitation Packages.** The proposed distribution and contents of the Solicitation Packages comply with Bankruptcy Rules 2002 and 3017 and constitute sufficient notice to all interested parties of the Record Date, Voting Deadline, Plan Objection Deadline, Confirmation Hearing, and all related matters.

        K.     **Notices of Non-Voting Status.** The Notices of Non-Voting Status, substantially in the forms annexed hereto as "Exhibit 2" and "Exhibit 3," comply with the

Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and provide adequate notice to Non-Voting Creditors and Interest Holders of their non-voting status and no further notice is necessary.

L.     **Ballots.**  The forms of the ballots substantially in the forms annexed hereto as "<u>Exhibit 4</u>," "<u>Exhibit 5</u>," "<u>Exhibit 6</u>," "<u>Exhibit 7</u>," and "<u>Exhibit 8</u>" (collectively, the "<u>Ballots</u>"), including all voting instructions provided therein, are consistent with Official Form No. 14, address the particular needs of these chapter 11 cases, and provide adequate information and instructions for each individual entitled to vote to accept or reject the Plan and no further information or instructions are necessary.

M.     **The Voting Deadline.**  The solicitation period and Voting Deadline, set forth below, during which the Debtors may solicit acceptances to the Plan is a reasonable and sufficient period of time for Voting Creditors to make an informed decision whether to accept or reject the Plan and timely return Ballots evidencing such decision.

N.     **Confirmation Notice and Objection Procedures.**  The procedures, set forth below, regarding notice to all parties in interest of the time, date, and place of the hearing to consider confirmation of the Plan (the "<u>Confirmation Hearing</u>") constitute good and sufficient notice to all interested parties and no further notice is necessary.

**THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

**Approval of Entry into the Plan Related Documents**

(1)     The Plan Debtors are authorized to enter into the Investment Agreement reflecting the terms of the Successful Bid, and to take all actions necessary to perform the obligations thereunder.

**Approval of the Expense Reimbursement and Indemnity**

(2)     The Plan Debtors are authorized to reimburse the Expenses of the C/P/B

Investors, including, without limitation, financing costs and fees, paid by or due and payable by the C/P/B Investors on the terms and subject to the conditions set forth in the Investment Agreement, _provided_, that in the event that the Plan is not confirmed or consummated other than due to a breach by the C/P/B Investors the Expenses shall be capped at $35,000,000.

(3)     The Debtors' obligations to pay the Expenses, if any, shall constitute allowed administrative expenses of the Debtors' estates pursuant to section 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

(4)     Consistent with the Investment Agreement and in accordance with the terms of the Investment Agreement, the Debtors shall be authorized to indemnify the C/P/B Investors and their representatives from losses, claims, damages, liabilities and expenses relating to, _inter alia_, the Investment Agreement and the Plan, other than any such claims that result from the bad faith, willful misconduct or gross negligence of such parties, and the provisions of the Investment Agreement relating to such indemnity obligation is expressly approved.

**Approval of the Disclosure Statement**

(5)     The Disclosure Statement, attached hereto as "Exhibit 1," is APPROVED.

(6)     All objections to the Disclosure Statement that have not been withdrawn or resolved as provided for in the record of the Confirmation Hearing are overruled.

**Temporary Allowance of Claims**

(7)     Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a claim, and without prejudice to the rights of the Debtors in any other context, each claim within a class of claims entitled to vote to accept or reject the Plan is temporarily allowed in an amount equal to the amount of such claim as set forth in the Schedules subject to the following exceptions (unless expressly waived by the

Debtors):

     a.       If a claim is deemed allowed under the Plan, such claim is allowed for voting purposes in the deemed allowed amount set forth in the Plan;

     b.       If a proof of claim was timely filed in an amount that is liquidated, non-contingent, and undisputed, such claim is temporarily allowed in the amount set forth on the proof of claim, unless such claim is disputed as set forth in subparagraph (f) below;

     c.       If a claim for which a proof of claim has been timely filed is wholly contingent, unliquidated, disputed, unknown, or undetermined such claim is accorded one vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution, unless such claim is disputed as set forth in subparagraph (f) below;

     d.       If a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim is temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

     e.       If a claim is listed in the Schedules or on a timely filed proof of claim as contingent, unliquidated, or disputed in part, such claim is temporarily allowed in the amount that is liquidated, non-contingent, and undisputed for voting purposes only, and not for purposes of allowance or distribution, unless such claim is disputed as set forth in subparagraph (f) below;

     f.       If the Debtors have filed an objection or request for estimation as to a claim on or before June 21, 2010, such claim is temporarily disallowed (to the extent provided in the objection or request) for voting purposes only and not for purposes of allowance or distribution, except as ordered by the Court before the Voting Deadline; and

     g.       Unless temporarily allowed for voting purposes by the Court, if a proof of claim asserts a claim that is not in U.S. dollars, such claim will be treated as unliquidated and allowed for voting purposes only in the amount of $1.00.

     (8)       If any creditor seeks to challenge the allowance of its claim for voting purposes, the creditor shall file with this Court (with a copy to Chambers) a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such claim for voting purposes in a different amount on or before June 25, 2010. Upon the filing of any such motion, the creditor's

Ballot shall not be counted unless temporarily allowed by an order of this Court entered prior to, or concurrent with, entry of an order confirming the Plan.

**Voting Record Date**

(9)     The Record Date is set as June 17, 2010.  Only holders of Claims as of the Record Date shall be entitled to vote to accept or reject the Plan.

**Solicitation Packages**

(10)     The Solicitation Packages are APPROVED.

(11)     Within five (5) business days of the date of entry of this Order, or as soon as reasonably practicable thereafter, the Debtors shall mail, or cause to be mailed, the Solicitation Packages, as described below, to those parties entitled to receive notice of the Confirmation Hearing as provided in the Court's case management order as well as Bankruptcy Rule 2002.

(12)     Solicitation Packages shall contain:

(a)     Notice of the Confirmation Hearing; AND

(b)     to Voting Creditors;

(a)     this Order (without attachments);

(b)     the Disclosure Statement (which shall contain a copy of the Plan); and

(c)     a Ballot; <u>or</u>

(c)     to Non-Voting Creditors or Interest Holders, a Notice of Non-Voting Status.

(13)     The Debtors are not required to distribute copies of the Plan or Disclosure Statement to holders of claims against or interests in the Debtors within a class under the Plan that is deemed to accept or reject the Plan under section 1126(f) or (g) of the Bankruptcy Code, unless a party makes a specific request to the Debtors in writing for the same.

(14)    The Debtors are authorized, but not required, to send the Solicitation Packages in a CD-ROM format instead of printed hard copies; provided that the Debtors provide printed hard copies upon the request of those Voting Creditors that received a CD-ROM.

(15)    The Debtors are excused from mailing Solicitation Packages or any other materials related to voting or confirmation of the Plan to those entities listed at such addresses from which the Debtors have received previous notices returned as undeliverable by the United States Postal Service, unless the Debtors are provided with accurate addresses for such entities before the Solicitation Date.  Failure to mail Solicitation Packages or any other materials related to voting or confirmation of the Plan to such entities will not constitute inadequate notice of the Confirmation Hearing or the Voting Deadline (as defined below) and shall not constitute a violation of Bankruptcy Rule 3017(d).

(16)    The Debtors are authorized to distribute the Solicitation Packages without the Plan Supplement and are directed to file the Plan Supplement with the Court by July 1, 2010 and serve the Plan Supplement on (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel to the Official Committee of Unsecured Creditors; (c) counsel to the Special Servicer and Successor Trustee; and (d) the Securities and Exchange Commission. After it is filed, the Plan Supplement will be available for review at www.kccllc.net/extendedstay.

(17)    The Debtors are authorized to make non-substantive changes to the Disclosure Statement, the Plan, and related materials without further order of the Court, provided that such changes are consistent with the Investment Agreement.

**Notices of Non-Voting Status**

(18)    The Notices of Non-Voting Status, attached hereto as "<u>Exhibit 2</u>" and

"Exhibit 3," are APPROVED, and the Debtors are authorized to send such notices to the holders of Claims and Interests in the Non-Voting Unimpaired Classes and the Non-Voting Impaired Classes, respectively.

**Ballots**

(19)    The form of Ballots, attached hereto as "Exhibit 4," "Exhibit 5," "Exhibit 6," "Exhibit 7," and "Exhibit 8" are APPROVED.

(20)    The Debtors shall send the Mortgage Claim Ballot to the holder of the Mortgage Facility Claim in Class 2.

(21)    The Debtors shall send the ESA UD Mortgage Claim Ballot to the holder of the ESA UD Mortgage Claim in Class 3.

(22)    The Debtors shall send the Mortgage Facility Deficiency Ballot to the holder of the Mortgage Facility Deficiency Claim in Class 4A.

(23)    The Debtors shall send the Mezzanine Facilities Claim Ballot to the holders of the Mezzanine Facilities Claims in Class 4B.

(24)    The Debtors shall send the General Unsecured Claims Ballot to the holders of the General Unsecured Claims in Class 5.

**The Voting Deadline**

(25)    The Voting Deadline is July 7, 2010 at 4:00 p.m. (Eastern Standard Time).

(26)    To be counted, a Ballot must be properly executed, completed, and delivered to KCC by first-class mail, overnight courier, or personal delivery such that the Ballot is actually received by KCC by the Voting Deadline.

**Tabulation Procedures**

(27)    The following tabulation procedures are APPROVED:

a.    if a creditor casts more than one Ballot voting the same claim(s) before the

Voting Deadline, the last Ballot received before the Voting Deadline shall be deemed to reflect the voter's intent, and thus, shall supersede any prior Ballots;

b.    if a creditor casts a Ballot that is properly completed, executed, and timely returned to KCC but (i) does not indicate either an acceptance or rejection of the Plan, or (ii) indicates both an acceptance and a rejection of the Plan, the Ballot shall be deemed to reflect the voter's intent to accept the Plan;

c.    the following Ballots shall not be counted:

    (i)    in the absence of any written extension of the Voting Deadline granted by the Debtors, with the consent of the Successful Bidder, any Ballot received after the Voting Deadline;

    (ii)    any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

    (iii)    any Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan;

    (iv)    any unsigned Ballot; or

    (v)    any Ballot transmitted to KCC by facsimile, telecopy, other means of electronic transmission, or any means other than those expressly approved herein;

d.    if a party that is entitled to vote has more than one claim within the same class against one or more of the Debtors based upon different transactions, said party shall be entitled to one vote for numerosity purposes in the aggregate dollar amount of all of said claims;

e.    notwithstanding anything to the contrary contained herein, any creditor who has scheduled, filed or purchased (i) duplicate claims (whether against the same or multiple Debtors) or (ii) claims against multiple Debtors arising from the same transaction (e.g., guarantee claims or claims for joint or several liability), shall be provided with only one Solicitation Package and one ballot and be permitted to vote only a single claim for numerosity purposes in a dollar amount based upon its claim against one of the Debtors, regardless of whether the Debtors have objected to such duplicate claims.

(28)    With respect to transfers of claims filed pursuant to Bankruptcy

Rule 3001, the holder of a claim as of the Record Date shall be the transferor of such claim and

entitled to cast the ballot with respect to that claim unless the documentation evidencing such

transfer was docketed by the Court on or before twenty-one (21) days prior to the Record Date and no timely objection with respect to such transfer was filed by the transferor.

(29)    KCC is authorized (but is not required to) contact parties that submit incomplete or otherwise deficient ballots to cure such deficiencies.  The Debtors are authorized, with the consent of the C/P/B Investors (which consent shall not be unreasonably withheld), to waive any such deficiencies in their discretion based upon the facts and circumstances in connection therewith.

**Confirmation Hearing**

(30)    The Confirmation Hearing is scheduled for July 20, 2010 at 10:00 a.m. (Eastern Standard Time); provided, however, that the Confirmation Hearing may be adjourned or continued from time to time by the Court or the Debtors without further notice to any other party other than by announcing such adjournment in open Court or by indication in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Court

(31)    The Notice of the Confirmation Hearing, attached hereto as "Exhibit 9" is APPROVED.

**Plan Confirmation Objections**

(32)    The Plan Objection Deadline, by which parties in interest may, object or respond to confirmation of the Plan shall be July 13, 2010 at 4:00 p.m. (Eastern Standard Time).

(33)    Objections and responses, if any, to confirmation of the Plan, must (a) be in writing, (b) conform to the Bankruptcy Rules, the Local Rules, and any case management orders in these chapter 11 cases, (c) set forth the name of the objecting party, the nature and amount of claims or interests held or asserted by the objecting party against the Debtors' estates or property, and (d) provide the basis for the objection and the specific grounds therefor.

(34)    Registered users of the Bankruptcy Court's case filing system must

electronically file their objections and responses.  All other parties in interest must file their objections and responses on a 3.5 inch floppy disk or flash drive, preferably in Portable Document Format (PDF), Microsoft Word or any other Windows-based word processing format (with a hard copy delivered directly to the Chambers of the Honorable James M. Peck), in accordance with General Order M-242.

(35)    Any objections or responses must also be served upon and received by the Notice Parties no later than the Plan Objection Deadline.

(36)    The Debtors may file and serve replies or an omnibus reply to any such objections no later than 12:00 p.m. (Eastern Standard Time) two (2) business days prior to the Confirmation Hearing.

**Miscellaneous**

(37)    The Debtors are authorized, in their sole discretion, to take or refrain from taking any action necessary or appropriate to implement the terms of and the relief granted in this Order without seeking further order of the Court.

(38)    Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry.

(39)    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: June __, 2010
        New York, New York


                                    _____
                                    THE HONORABLE JAMES M. PECK
                                    UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Proposed Disclosure Statement**

**[Refer to Docket No. 1028]**

**<u>Exhibit 2</u>**

**Notice of Non-Voting Status – Unimpaired Classes**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile : (212) 310-8007
Marcia L. Goldstein
Jacqueline Marcus

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                      :
In re                                 :     Chapter 11 Case No.
                                      :
EXTENDED STAY INC., et al.,           :     09-13764 (JMP)
                                      :
              Debtors.                :     (Jointly Administered)
                                      :
-------------------------------------------------------------x
```

<u>**NOTICE OF NON-VOTING STATUS –UNIMPAIRED CLASSES**</u>

       **PLEASE TAKE NOTICE THAT** on June [\_\_], 2010, the United States Bankruptcy Court for the Southern District of New York approved the Disclosure Statement for the Debtors' Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 (as it may be further amended or modified, the "<u>Disclosure Statement</u>"), filed by ESA Properties LLC and seventy-three of its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>"), for use by the Debtors in soliciting acceptances or rejections of the Debtors' Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 (as it may be further amended or modified, the "<u>Plan</u>"), from holders of impaired claims who are (or may be) entitled to receive distributions under the Plan.

       **UNDER THE TERMS OF THE PLAN, YOUR CLAIM(S) AGAINST THE DEBTORS OR INTEREST(S) IN THE DEBTORS ARE NOT IMPAIRED AND, THEREFORE, PURSUANT TO SECTION 1126(f) OF TITLE 11 OF THE UNITED STATES CODE, YOU ARE (I) DEEMED TO HAVE ACCEPTED THE PLAN AND (II) NOT ENTITLED TO VOTE ON THE PLAN.  IF YOU HAVE ANY QUESTIONS ABOUT THE STATUS OF YOUR CLAIM(S) OR INTEREST(S), OR YOU WANT TO REQUEST A COPY OF THE PLAN AND THE DISCLOSURE STATEMENT, YOU SHOULD CONTACT THE DEBTORS' VOTING AGENT, KURTZMAN CARSON CONSULTANTS, LLC:  2335 ALASKA AVENUE, EL SEGUNDO, CALIFORNIA 90245, OR BY TELEPHONE AT (866) 381-9100.  COPIES OF THE PLAN AND DISCLOSURE STATEMENT CAN ALSO BE ACCESSED ONLINE AT <u>WWW.KCCLLC.NET/EXTENDEDSTAY</u>.**

       **PLEASE TAKE FURTHER NOTICE THAT the "Releases" in Article X, section 10.10 of the Plan, <u>which binds those Holders of Claims or Equity Interests that VOTE TO ACCEPT the</u>**

**Plan, that are DEEMED TO ACCEPT the Plan, that ABSTAIN from voting on the Plan, and to the fullest extent permissible under the applicable law (or as such law may be extended or integrated after the Effective Date) each holder of Claims or Equity Interests that VOTES NOT TO ACCEPT the Plan**, provides, among other things, the following:

As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; (f) the provision of the Debt Financing Arrangements by the Debt Financing Lenders; (g) the substantial contribution of the Investor, each of the Sponsors and their Affiliates; and (h) the substantial contribution of the Special Servicer, the Trustee, the Operating Advisor and the Controlling Holder: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that votes not to accept the Plan; and (iv) each holder of a Mortgage Certificate, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; **provided**, that nothing in Section 10.10 of the Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, **provided**, **further**, that nothing in Section 10.10 of the Plan shall be construed as a release of any claims constituting Litigation Trust Assets.

Dated: [__], 2010
     New York, New York


WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## **Exhibit 3**

## **Notice of Non-Voting Status – Impaired Classes**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile : (212) 310-8007
Marcia L. Goldstein
Jacqueline Marcus

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                                            :
In re                                                       :       **Chapter 11 Case No.**
                                                            :
**EXTENDED STAY INC., et al.,**                             :       **09-13764 (JMP)**
                                                            :
            Debtors.                                        :       **(Jointly Administered)**
                                                            :
------------------------------------------------------------x

<u>**NOTICE OF NON-VOTING STATUS --IMPAIRED CLASSES**</u>

       **PLEASE TAKE NOTICE THAT** on June [__], 2010, the United States Bankruptcy Court for the Southern District of New York approved the Disclosure Statement for the Debtors' Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 (as it may be further amended or modified, the "<u>Disclosure Statement</u>"), filed by ESA Properties LLC and seventy-three of its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>"), for use by the Debtors in soliciting acceptances or rejections of the Debtors' Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 (as it may be further amended or modified, the "<u>Plan</u>"), from holders of impaired claims who are (or may be) entitled to receive distributions under the Plan.

       **UNDER THE TERMS OF THE PLAN, YOU ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY ON ACCOUNT OF YOUR INTEREST(S) IN THE DEBTORS. THEREFORE, PURSUANT TO SECTION 1126(g) OF TITLE 11 OF THE UNITED STATES CODE, YOU ARE (I) DEEMED TO HAVE REJECTED THE PLAN AND (II) NOT ENTITLED TO VOTE ON THE PLAN. IF YOU HAVE ANY QUESTIONS ABOUT THE STATUS OF YOUR CLAIM(S) OR INTEREST(S), OR YOU WANT TO REQUEST A COPY OF THE PLAN AND THE DISCLOSURE STATEMENT, YOU SHOULD CONTACT THE DEBTORS' VOTING AGENT, KURTZMAN CARSON CONSULTANTS, LLC: 2335 ALASKA AVENUE, EL SEGUNDO, CALIFORNIA 90245, OR BY TELEPHONE AT (866) 381-9100. COPIES OF THE PLAN AND DISCLOSURE STATEMENT CAN ALSO BE ACCESSED ONLINE AT <u>WWW.KCCLLC.NET/EXTENDEDSTAY</u>.**

       **PLEASE TAKE FURTHER NOTICE THAT** the "Releases" in Article X, section 10.10 of the Plan, <u>which binds those Holders of Claims or Equity Interests that VOTE TO ACCEPT the</u>

**Plan, that are DEEMED TO ACCEPT the Plan, that ABSTAIN from voting on the Plan, and to the fullest extent permissible under the applicable law (or as such law may be extended or integrated after the Effective Date) each holder of a Claim or Equity Interest that VOTES NOT TO ACCEPT the Plan**, provides, among other things, the following:

As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; (f) the provision of the Debt Financing Arrangements by the Debt Financing Lenders; (g) the substantial contribution of the Investor, each of the Sponsors and their Affiliates; and (h) the substantial contribution of the Special Servicer, the Trustee, the Operating Advisor and the Controlling Holder: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that votes not to accept the Plan; and (iv) each holder of a Mortgage Certificate, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; provided, that nothing in Section 10.10 of the Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, provided, further, that nothing in Section 10.10 of the Plan shall be construed as a release of any claims constituting Litigation Trust Assets.

Dated: [___], 2010
      New York, New York

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## <u>Exhibit 4</u>

## Form Mortgage Facility Claim Ballot

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
              :

In re            :   Chapter 11 Case No.
              :

**EXTENDED STAY INC., et al.,**   :   **09-13764 (JMP)**
              :

Debtors.        :   (Jointly Administered)
              :

------------------------------------------------------------x

### BALLOT FOR CLASS 2
### (MORTGAGE FACILITY CLAIM)

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

**THIS BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED TO THE VOTING AGENT SO IT IS ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. (PREVAILING EASTERN TIME) ON JULY 7, 2010 (THE "VOTING DEADLINE") BY THE VOTING AGENT**

---

Name of Debtor Entities and Case Numbers

| Debtor | Case No. | Debtor | Case No. |
|---|---|---|---|
| ESA Properties L.L.C. | 09-13815 | ESH/HV Properties L.L.C. | 09-13786 |
| ESA P Portfolio L.L.C. | 09-13765 | ESH/MSTX Property L.P. | 09-13790 |
| ESA 2005 Portfolio L.L.C. | 09-13767 | ESH/TN Properties L.L.C. | 09-13793 |
| ESA 2005-San Jose L.L.C. | 09-13770 | ESH/TX Properties L.P. | 09-13802 |
| ESA 2005-Waltham L.L.C. | 09-13773 | ESA MD Beneficiary L.L.C. | 09-13768 |
| ESA Acquisition Properties L.L.C. | 09-13775 | ESA P Portfolio MD Trust | 09-13769 |
| ESA Alaska L.L.C. | 09-13780 | ESA MD Properties Business Trust | 09-13771 |
| ESA Canada Properties Borrower L.L.C. | 09-13785 | ESA P Portfolio MD Beneficiary L.L.C. | 09-13772 |
| ESA FL Properties L.L.C. | 09-13791 | ESA Canada Properties Trust | 09-13774 |
| ESA MD Borrower L.L.C. | 09-13794 | ESA Canada Trustee Inc. | 09-13776 |
| ESA MN Properties L.L.C. | 09-13798 | ESA Canada Beneficiary Inc. | 09-13779 |
| ESA P Portfolio MD Borrower L.L.C. | 09-13803 | ESA UD Properties L.L.C. | 09-13782 |
| ESA P Portfolio PA Properties L.L.C. | 09-13807 | ESA 2007 Operating Lessee Inc. | 09-13783 |
| ESA P Portfolio TXNC Properties L.P. | 09-13809 | ESA 2005 Operating Lessee Inc. | 09-13787 |
| ESA PA Properties L.L.C. | 09-13811 | ESA Operating Lessee Inc. | 09-13789 |

| ESA TX Properties L.P. | 09-13818 | ESA P Portfolio Operating Lessee Inc. | 09-13795 |
|---|---|---|---|
| ESH/Homestead Portfolio L.L.C. | 09-13778 | ESA Canada Operating Lessee Inc. | 09-13804 |
| ESA Portfolio TXNC GP L.L.C. | 10-10805 | ESA TXGP L.L.C. | 10-10806 |
| ESH/MSTX GP L.L.C. | 10-10807 | ESH/TXGP L.L.C. | 10-10808 |
| ESH/TN Member Inc. | 10-10809 | Homestead Village L.L.C. | 09-13766 |
| Extended Stay Hotels L.L.C. | 09-13808 | ESA Management L.L.C. | 09-13799 |
| ESA Business Trust | 09-13797 | ESA P Portfolio L.L.C. | 09-13765 |
| ESH/Homestead Mezz L.L.C. | 09-13805 | ESA P Mezz L.L.C. | 09-13813 |
| ESA Mezz L.L.C. | 09-13816 | ESH/Homestead Mezz 2 L.L.C. | 09-13819 |
| ESA P Mezz 2 L.L.C. | 09-13820 | ESA Mezz 2 L.L.C. | 09-13823 |
| ESH/Homestead Mezz 3 L.L.C. | 09-13826 | ESA P Mezz 3 L.L.C. | 09-13828 |
| ESA Mezz 3 L.L.C. | 09-13830 | ESH/Homestead Mezz 4 L.L.C. | 09-13831 |
| ESA P Mezz 4 L.L.C. | 09-13832 | ESA Mezz 4 L.L.C. | 09-13833 |
| ESH/Homestead Mezz 5 L.L.C. | 09-13777 | ESA P Mezz 5 L.L.C. | 09-13781 |
| ESA Mezz 5 L.L.C. | 09-13784 | ESH/Homestead Mezz 6 L.L.C. | 09-13788 |
| ESA P Mezz 6 L.L.C. | 09-13792 | ESA Mezz 6 L.L.C. | 09-13796 |
| ESH/Homestead Mezz 7 L.L.C. | 09-13801 | ESA P Mezz 7 L.L.C. | 09-13806 |
| ESA Mezz 7 L.L.C. | 09-13810 | ESH/Homestead Mezz 8 L.L.C. | 09-13812 |
| ESA P Mezz 8 L.L.C. | 09-13814 | ESA Mezz 8 L.L.C. | 09-13817 |
| ESH/Homestead Mezz 9 L.L.C. | 09-13821 | ESA P Mezz 9 L.L.C. | 09-13822 |
| ESA Mezz 9 L.L.C. | 09-13824 | ESH/Homestead Mezz 10 L.L.C. | 09-13825 |
| ESA P Mezz 10 L.L.C. | 09-13827 | ESA Mezz 10 L.L.C. | 09-13829 |

     The debtors and debtors in possession in the above-referenced chapter 11 cases (collectively, the "Debtors") are soliciting votes with respect to the Debtors' Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 (as it may be amended, the "Plan"), from the holders of certain impaired claims against the Debtors.  All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to such terms in the Plan.  If you have any questions on how to properly complete this Ballot, please call Kurtzman Carson Consultants, LLC (the "Voting Agent") at (866) 381-9100.

     This Ballot is to be used for voting by the holder of the Mortgage Facility Claim.  In order for your vote to be counted, the Ballot must be properly completed, signed, and returned to the Voting Agent so that it is actually received by the Voting Agent at Extended Stay Ballot Processing Center, c/o Kurtzman Carson Consultants, LLC , 2335 Alaska Avenue, El Segundo, California 90245, by no later than 4:00 p.m. (prevailing Eastern Time) on July 7, 2010 (the "Voting Deadline"), unless such time is extended in writing by the Debtors, with the consent of the Investor (as defined in the Plan).

     Please note, that, although the Bankruptcy Court entered an order (the "Disclosure Statement Order") approving, among other things, the Disclosure Statement (as defined below) as containing adequate information pursuant to section 1125 of the Bankruptcy Code, the Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan.  The Plan is attached as "Exhibit A" to the Disclosure Statement relating to the Plan, a copy of which is included on the CD-ROM accompanying this Ballot.

     **Your rights are described in the Disclosure Statement, so it is important that you review the Disclosure Statement and each exhibit thereto, including the Plan, before you complete, execute and return this Ballot.  You also may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.**

PLEASE COMPLETE THE FOLLOWING:

ITEM 1. **Amount of Mortgage Facility Claim.** For purposes of voting to accept or reject the Plan, the undersigned holds the Mortgage Facility Claim against the Debtors in the amount set forth below.

Amount: $_____

ITEM 2. **Vote on the Plan.** The undersigned holder of the Mortgage Facility Claim in the amount set forth in Item 1 above hereby votes to:

Check one box:  ☐  ACCEPT (vote FOR) the Plan

☐  REJECT (vote AGAINST) the Plan

## IMPORTANT INFORMATION REGARDING THE RELEASING PARTY RELEASE

Following Confirmation, subject to Article IX of the Plan, the Plan will be Consummated on the Effective Date. Among other things, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article X will become effective. It is important to read the provisions contained in Article X of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly.

**Specifically, the "Releases" in Article X, section 10.10 of the Plan, which binds those Holders of Claims or Equity Interests that VOTE TO ACCEPT the Plan, that are DEEMED TO ACCEPT the Plan, that ABSTAIN from voting on the Plan, and to the fullest extent permissible under the applicable law (or as such law may be extended or integrated after the Effective Date) each holder of a Claim or Equity Interest that VOTES NOT TO ACCEPT the Plan, provides, among other things, the following:**

**As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; (f) the provision of the Debt Financing Arrangements by the Debt Financing Lenders; (g) the substantial contribution of the Investor, each of the Sponsors and their Affiliates; and (h) the substantial contribution of the Special Servicer, the Trustee, the Operating Advisor and the Controlling Holder: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that votes not to accept the Plan; and (iv) each holder of a Mortgage Certificate, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; provided, that nothing in Section 10.10 of the Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, provided, further, that nothing in Section 10.10 of the Plan shall be construed as a release of any claims constituting Litigation Trust Assets.**

ITEM 3. **Acknowledgements and Certification.** By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Disclosure Statement for the Debtors' Fifth Amended Joint Plan of Reorganization, dated June 8, 2010 (as it may be amended, the "Disclosure Statement"), including all exhibits thereto. The undersigned certifies that (i) it is the holder of the Mortgage Facility Claim identified in Item 1

above and (ii) it has full power and authority to vote to accept or reject the Plan. The undersigned further acknowledges that the Debtors' solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for the solicitation of votes to accept or reject the Plan contained therein.

Print or Type Name of Claimant: _____

Social Security or Federal Tax I.D. No. of Claimant: _____

Signature: _____

Name of Signatory (if different than claimant): _____

If by Authorized Agent, Title of Agent: _____

Street Address: _____

City, State and Zip Code: _____

Telephone Number: _____

Date Completed: _____

**VOTING INSTRUCTIONS FOR COMPLETING THE BALLOT
FOR HOLDERS OF CLASS 2 (MORTGAGE FACILITY CLAIM)**

1.   This Ballot is submitted to you to solicit your vote to accept or reject the Plan.  **PLEASE READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.   The Plan will be accepted by Class 2 if it is accepted by the holders of two-thirds in amount and more than one-half in number of Claims in Class 2 voting on the Plan.  In the event that Class 2 rejects the Plan, the Bankruptcy Court may nevertheless confirm the Plan and thereby make it binding on you if the Bankruptcy Court finds that the Plan does not unfairly discriminate against, and accords fair and equitable treatment to, the holders of Claims in Class 2 and all other Classes of Claims rejecting the Plan, and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Plan is confirmed by the Bankruptcy Court, all holders of Claims against and Equity Interests in the Debtors (including those holders who abstain from voting or reject the Plan, and those holders who are not entitled to vote on the Plan) will be bound by the confirmed Plan and the transactions contemplated thereby.

3.   **To have your vote counted, you must complete, sign, and return this Ballot to the Voting Agent so that it is <u>received</u> by the Voting Agent by no later than 4:00 p.m. (prevailing Eastern Time) on July 7, 2010 (the "<u>Voting Deadline</u>"), unless such time is extended in writing by the Debtors, with the consent of the Investor.**  Ballots must be delivered either by mail with the enclosed envelope <u>or</u> by hand delivery or overnight courier to the Voting Agent at the following address:

KURTZMAN CARSON CONSULTANTS, LLC
ATTN: EXTENDED STAY BALLOTING PROCESSING CENTER
2335 ALASKA AVENUE
EL SEGUNDO, CALIFORNIA 90245

**Ballots will not be accepted by telecopy, facsimile, or other electronic means of transmission.**

4.   To properly complete the Ballot, you must follow the procedures described below:

   **a.   make sure that the information contained in Item 1 is correct;**

   **b.   if you have a Claim in Class 2, cast one vote to accept or reject the Plan by checking the appropriate box in Item 2;**

   **c.   if you are completing this Ballot on behalf of another person or entity, indicate your relationship with such person or entity and the capacity in which you are signing and submit satisfactory evidence of your authority to so act (<u>e.g.</u>, a power of attorney or a certified copy of board resolutions authorizing you to so act);**

   **d.   if you also hold Claims in a Class other than Class 2, you may receive more than one Ballot, labeled for a different Class of Claims.  Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on that Ballot;**

   **e.   if you believe that you have received the wrong Ballot, please contact the Voting Agent immediately;**

   **f.   provide your name and mailing address;**

   **g.   sign and date your Ballot; and**

**h.** return your Ballot using the enclosed pre-addressed return envelope.

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT, OR IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DEBTORS' VOTING AGENT, KURTZMAN CARSON CONSULTANTS, LLC AT (866) 381-9100. COPIES OF THE PLAN AND DISCLOSURE STATEMENT CAN BE ACCESSED ON KURTZMAN CARSON CONSULTANT LLC'S WEBSITE AT: HTTP://WWW.KCCLLC.NET/EXTENDEDSTAY. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT.

**Exhibit 5**

**Form ESA UD Mortgage Claim Ballot**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                  :

In re                           :       **Chapter 11 Case No.**
                                    :

**EXTENDED STAY INC., et al.,**    :       **09-13764 (JMP)**
                                    :

        **Debtors.**                 :       **(Jointly Administered)**
                                    :

---------------------------------------------------------x

# BALLOT FOR CLASS 3
## (ESA UD MORTGAGE CLAIM)

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS BEFORE
COMPLETING THIS BALLOT**

**THIS BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED TO THE
VOTING AGENT SO IT IS ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M.
(PREVAILING EASTERN TIME) ON JULY 7, 2010 (THE "VOTING DEADLINE") BY
THE VOTING AGENT**

---

Name of Debtor Entities and Case Numbers

| Debtor | Case No. | Debtor | Case No. |
|---|---|---|---|
| ESA Properties L.L.C. | 09-13815 | ESH/HV Properties L.L.C. | 09-13786 |
| ESA P Portfolio L.L.C. | 09-13765 | ESH/MSTX Property L.P. | 09-13790 |
| ESA 2005 Portfolio L.L.C. | 09-13767 | ESH/TN Properties L.L.C. | 09-13793 |
| ESA 2005-San Jose L.L.C. | 09-13770 | ESH/TX Properties L.P. | 09-13802 |
| ESA 2005-Waltham L.L.C. | 09-13773 | ESA MD Beneficiary L.L.C. | 09-13768 |
| ESA Acquisition Properties L.L.C. | 09-13775 | ESA P Portfolio MD Trust | 09-13769 |
| ESA Alaska L.L.C. | 09-13780 | ESA MD Properties Business Trust | 09-13771 |
| ESA Canada Properties Borrower L.L.C. | 09-13785 | ESA P Portfolio MD Beneficiary L.L.C. | 09-13772 |
| ESA FL Properties L.L.C. | 09-13791 | ESA Canada Properties Trust | 09-13774 |
| ESA MD Borrower L.L.C. | 09-13794 | ESA Canada Trustee Inc. | 09-13776 |
| ESA MN Properties L.L.C. | 09-13798 | ESA Canada Beneficiary Inc. | 09-13779 |
| ESA P Portfolio MD Borrower L.L.C. | 09-13803 | ESA UD Properties L.L.C. | 09-13782 |
| ESA P Portfolio PA Properties L.L.C. | 09-13807 | ESA 2007 Operating Lessee Inc. | 09-13783 |
| ESA P Portfolio TXNC Properties L.P. | 09-13809 | ESA 2005 Operating Lessee Inc. | 09-13787 |
| ESA PA Properties L.L.C. | 09-13811 | ESA Operating Lessee Inc. | 09-13789 |

| ESA TX Properties L.P. | 09-13818 | ESA P Portfolio Operating Lessee Inc. | 09-13795 |
|---|---|---|---|
| ESH/Homestead Portfolio L.L.C. | 09-13778 | ESA Canada Operating Lessee Inc. | 09-13804 |
| ESA Portfolio TXNC GP L.L.C. | 10-10805 | ESA TXGP L.L.C. | 10-10806 |
| ESH/MSTX GP L.L.C. | 10-10807 | ESH/TXGP L.L.C. | 10-10808 |
| ESH/TN Member Inc. | 10-10809 | Homestead Village L.L.C. | 09-13766 |
| Extended Stay Hotels L.L.C. | 09-13808 | ESA Management L.L.C. | 09-13799 |
| ESA Business Trust | 09-13797 | ESA P Portfolio L.L.C. | 09-13765 |
| ESH/Homestead Mezz L.L.C. | 09-13805 | ESA P Mezz L.L.C. | 09-13813 |
| ESA Mezz L.L.C. | 09-13816 | ESH/Homestead Mezz 2 L.L.C. | 09-13819 |
| ESA P Mezz 2 L.L.C. | 09-13820 | ESA Mezz 2 L.L.C. | 09-13823 |
| ESH/Homestead Mezz 3 L.L.C. | 09-13826 | ESA P Mezz 3 L.L.C. | 09-13828 |
| ESA Mezz 3 L.L.C. | 09-13830 | ESH/Homestead Mezz 4 L.L.C. | 09-13831 |
| ESA P Mezz 4 L.L.C. | 09-13832 | ESA Mezz 4 L.L.C. | 09-13833 |
| ESH/Homestead Mezz 5 L.L.C. | 09-13777 | ESA P Mezz 5 L.L.C. | 09-13781 |
| ESA Mezz 5 L.L.C. | 09-13784 | ESH/Homestead Mezz 6 L.L.C. | 09-13788 |
| ESA P Mezz 6 L.L.C. | 09-13792 | ESA Mezz 6 L.L.C. | 09-13796 |
| ESH/Homestead Mezz 7 L.L.C. | 09-13801 | ESA P Mezz 7 L.L.C. | 09-13806 |
| ESA Mezz 7 L.L.C. | 09-13810 | ESH/Homestead Mezz 8 L.L.C. | 09-13812 |
| ESA P Mezz 8 L.L.C. | 09-13814 | ESA Mezz 8 L.L.C. | 09-13817 |
| ESH/Homestead Mezz 9 L.L.C. | 09-13821 | ESA P Mezz 9 L.L.C. | 09-13822 |
| ESA Mezz 9 L.L.C. | 09-13824 | ESH/Homestead Mezz 10 L.L.C. | 09-13825 |
| ESA P Mezz 10 L.L.C. | 09-13827 | ESA Mezz 10 L.L.C. | 09-13829 |

The debtors and debtors in possession in the above-referenced chapter 11 cases (collectively, the "Debtors") are soliciting votes with respect to the Debtors' Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 (as it may be amended, the "Plan"), from the holders of certain impaired claims against the Debtors. All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to such terms in the Plan. If you have any questions on how to properly complete this Ballot, please call Kurtzman Carson Consultants, LLC (the "Voting Agent") at (866) 381-9100.

This Ballot is to be used for voting by the holder of the ESA UD Mortgage Claim. In order for your vote to be counted, the Ballot must be properly completed, signed, and returned to the Voting Agent so that it is actually received by the Voting Agent at Extended Stay Ballot Processing Center, c/o Kurtzman Carson Consultants, LLC , 2335 Alaska Avenue, El Segundo, California 90245, by no later than 4:00 p.m. (prevailing Eastern Time) on July 7, 2010 (the "Voting Deadline"), unless such time is extended in writing by the Debtors, with the consent of the Investor.

Please note, that, although the Bankruptcy Court entered an order (the "Disclosure Statement Order") approving, among other things, the Disclosure Statement (as defined below) as containing adequate information pursuant to section 1125 of the Bankruptcy Code, the Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan. The Plan is attached as "Exhibit A" to the Disclosure Statement relating to the Plan, a copy of which is included on the CD-ROM accompanying this Ballot.

**Your rights are described in the Disclosure Statement, so it is important that you review the Disclosure Statement and each exhibit thereto, including the Plan, before you complete, execute and return this Ballot. You also may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.**

PLEASE COMPLETE THE FOLLOWING:

ITEM 1.  **Amount of ESA UD Mortgage Claim.**  For purposes of voting to accept or reject the Plan, the undersigned holds an ESA UD Mortgage Claim against the Debtors in the amount set forth below.

Amount: $_____

ITEM 2.  **Vote on the Plan.**  The undersigned holder of an ESA UD Mortgage Claim in the amount set forth in Item 1 above hereby votes to:

Check one box:          ☐        ACCEPT (vote FOR) the Plan

                        ☐        REJECT (vote AGAINST) the Plan

**IMPORTANT INFORMATION REGARDING THE RELEASING PARTY RELEASE**

Following Confirmation, subject to Article IX of the Plan, the Plan will be Consummated on the Effective Date.  Among other things, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article X will become effective.  It is important to read the provisions contained in Article X of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly.

**Specifically, the "Releases" in Article X, section 10.10 of the Plan, which binds those Holders of Claims or Equity Interests that VOTE TO ACCEPT the Plan, that are DEEMED TO ACCEPT the Plan, that ABSTAIN from voting on the Plan, and to the fullest extent permissible under the applicable law (or as such law may be extended or integrated after the Effective Date) each holder of a Claim or Equity Interest that VOTES NOT TO ACCEPT the Plan, provides, among other things, the following:**

**As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; (f) the provision of the Debt Financing Arrangements by the Debt Financing Lenders; (g) the substantial contribution of the Investor, each of the Sponsors and their Affiliates; and (h) the substantial contribution of the Special Servicer, the Trustee, the Operating Advisor and the Controlling Holder: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that votes not to accept the Plan; and (iv) each holder of a Mortgage Certificate, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; provided, that nothing in Section 10.10 of the Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, provided, further, that nothing in Section 10.10 of the Plan shall be construed as a release of any claims constituting Litigation Trust Assets.**

ITEM 3.  **Acknowledgements and Certification.**  By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Disclosure Statement for the Debtors' Fifth Amended

Joint Plan of Reorganization, dated June 8, 2010 (as it may be amended, the "<u>Disclosure Statement</u>"), including all exhibits thereto.  The undersigned certifies that (i) it is the holder of the ESA UD Mortgage Claim identified in Item 1 above and (ii) it has full power and authority to vote to accept or reject the Plan.  The undersigned further acknowledges that the Debtors' solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for the solicitation of votes to accept or reject the Plan contained therein.

| | |
|---|---|
| Print or Type Name of Claimant: | _____ |
| Social Security or Federal Tax I.D. No. of Claimant: | _____ |
| Signature: | _____ |
| Name of Signatory (if different than claimant): | _____ |
| If by Authorized Agent, Title of Agent: | _____ |
| Street Address: | _____ |
| City, State and Zip Code: | _____ |
| Telephone Number: | _____ |
| Date Completed: | _____ |

**VOTING INSTRUCTIONS FOR COMPLETING THE BALLOT
FOR HOLDERS OF CLASS 3 (ESA UD MORTGAGE CLAIM)**

1.  This Ballot is submitted to you to solicit your vote to accept or reject the Plan.  **PLEASE READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan will be accepted by Class 3 if it is accepted by the holders of two-thirds in amount and more than one-half in number of Claims in Class 3 voting on the Plan.  In the event that Class 3 rejects the Plan, the Bankruptcy Court may nevertheless confirm the Plan and thereby make it binding on you if the Bankruptcy Court finds that the Plan does not unfairly discriminate against, and accords fair and equitable treatment to, the holders of Claims in Class 3 and all other Classes of Claims rejecting the Plan, and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Plan is confirmed by the Bankruptcy Court, all holders of Claims against and Equity Interests in the Debtors (including those holders who abstain from voting or reject the Plan, and those holders who are not entitled to vote on the Plan) will be bound by the confirmed Plan and the transactions contemplated thereby.

3.  **To have your vote counted, you must complete, sign, and return this Ballot to the Voting Agent so that it is <u>received</u> by the Voting Agent by no later than 4:00 p.m. (prevailing Eastern Time) on July 7, 2010 (the "<u>Voting Deadline</u>"), unless such time is extended in writing by the Debtors, with the consent of the Investor.**  Ballots must be delivered either by mail with the enclosed envelope <u>or</u> by hand delivery or overnight courier to the Voting Agent at the following address:

    KURTZMAN CARSON CONSULTANTS, LLC
    ATTN: EXTENDED STAY BALLOTING PROCESSING CENTER
    2335 ALASKA AVENUE
    EL SEGUNDO, CALIFORNIA 90245

**Ballots will not be accepted by telecopy, facsimile, or other electronic means of transmission.**

4.  To properly complete the Ballot, you must follow the procedures described below:

    a.  **make sure that the information contained in Item 1 is correct;**

    b.  **if you have a Claim in Class 3, cast one vote to accept or reject the Plan by checking the appropriate box in Item 2;**

    c.  **if you are completing this Ballot on behalf of another person or entity, indicate your relationship with such person or entity and the capacity in which you are signing and submit satisfactory evidence of your authority to so act (<u>e.g.</u>, a power of attorney or a certified copy of board resolutions authorizing you to so act);**

    d.  **if you also hold Claims in a Class other than Class 3, you may receive more than one Ballot, labeled for a different Class of Claims.  Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on that Ballot;**

    e.  **if you believe that you have received the wrong Ballot, please contact the Voting Agent immediately;**

    f.  **provide your name and mailing address;**

    g.  **sign and date your Ballot; and**

      **h.**   **return your Ballot using the enclosed pre-addressed return envelope.**

      IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT, OR IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DEBTORS' VOTING AGENT, KURTZMAN CARSON CONSULTANTS, LLC AT (866) 381-9100.  COPIES OF THE PLAN AND DISCLOSURE STATEMENT CAN BE ACCESSED ON KURTZMAN CARSON CONSULTANT LLC'S WEBSITE AT: HTTP://WWW.KCCLLC.NET/EXTENDEDSTAY.  PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT.

## Exhibit 6

**Form Mortgage Facility Deficiency Claim Ballot**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                              :
In re                                         :          Chapter 11 Case No.
                                              :
EXTENDED STAY INC., et al.,                   :          09-13764 (JMP)
                                              :
                    Debtors.                  :          (Jointly Administered)
                                              :
------------------------------------------------------------x

**BALLOT FOR CLASS 4A**
**(MORTGAGE FACILITY DEFICIENCY CLAIM)**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS BEFORE
COMPLETING THIS BALLOT**

**THIS BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED TO THE
VOTING AGENT SO IT IS ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M.
(PREVAILING EASTERN TIME) ON JULY 7, 2010 (THE "VOTING DEADLINE") BY
THE VOTING AGENT**

---

Name of Debtor Entities and Case Numbers

| Debtor | Case No. | Debtor | Case No. |
|--------|----------|--------|----------|
| ESA Properties L.L.C. | 09-13815 | ESH/HV Properties L.L.C. | 09-13786 |
| ESA P Portfolio L.L.C. | 09-13765 | ESH/MSTX Property L.P. | 09-13790 |
| ESA 2005 Portfolio L.L.C. | 09-13767 | ESH/TN Properties L.L.C. | 09-13793 |
| ESA 2005-San Jose L.L.C. | 09-13770 | ESH/TX Properties L.P. | 09-13802 |
| ESA 2005-Waltham L.L.C. | 09-13773 | ESA MD Beneficiary L.L.C. | 09-13768 |
| ESA Acquisition Properties L.L.C. | 09-13775 | ESA P Portfolio MD Trust | 09-13769 |
| ESA Alaska L.L.C. | 09-13780 | ESA MD Properties Business Trust | 09-13771 |
| ESA Canada Properties Borrower L.L.C. | 09-13785 | ESA P Portfolio MD Beneficiary L.L.C. | 09-13772 |
| ESA FL Properties L.L.C. | 09-13791 | ESA Canada Properties Trust | 09-13774 |
| ESA MD Borrower L.L.C. | 09-13794 | ESA Canada Trustee Inc. | 09-13776 |
| ESA MN Properties L.L.C. | 09-13798 | ESA Canada Beneficiary Inc. | 09-13779 |
| ESA P Portfolio MD Borrower L.L.C. | 09-13803 | ESA UD Properties L.L.C. | 09-13782 |
| ESA P Portfolio PA Properties L.L.C. | 09-13807 | ESA 2007 Operating Lessee Inc. | 09-13783 |
| ESA P Portfolio TXNC Properties L.P. | 09-13809 | ESA 2005 Operating Lessee Inc. | 09-13787 |

| ESA PA Properties L.L.C. | 09-13811 | ESA Operating Lessee Inc. | 09-13789 |
|---|---|---|---|
| ESA TX Properties L.P. | 09-13818 | ESA P Portfolio Operating Lessee Inc. | 09-13795 |
| ESH/Homestead Portfolio L.L.C. | 09-13778 | ESA Canada Operating Lessee Inc. | 09-13804 |
| ESA Portfolio TXNC GP L.L.C. | 10-10805 | ESA TXGP L.L.C. | 10-10806 |
| ESH/MSTX GP L.L.C. | 10-10807 | ESH/TXGP L.L.C. | 10-10808 |
| ESH/TN Member Inc. | 10-10809 | Homestead Village L.L.C. | 09-13766 |
| Extended Stay Hotels L.L.C. | 09-13808 | ESA Management L.L.C. | 09-13799 |
| ESA Business Trust | 09-13797 | ESA P Portfolio L.L.C. | 09-13765 |
| ESH/Homestead Mezz L.L.C. | 09-13805 | ESA P Mezz L.L.C. | 09-13813 |
| ESA Mezz L.L.C. | 09-13816 | ESH/Homestead Mezz 2 L.L.C. | 09-13819 |
| ESA P Mezz 2 L.L.C. | 09-13820 | ESA Mezz 2 L.L.C. | 09-13823 |
| ESH/Homestead Mezz 3 L.L.C. | 09-13826 | ESA P Mezz 3 L.L.C. | 09-13828 |
| ESA Mezz 3 L.L.C. | 09-13830 | ESH/Homestead Mezz 4 L.L.C. | 09-13831 |
| ESA P Mezz 4 L.L.C. | 09-13832 | ESA Mezz 4 L.L.C. | 09-13833 |
| ESH/Homestead Mezz 5 L.L.C. | 09-13777 | ESA P Mezz 5 L.L.C. | 09-13781 |
| ESA Mezz 5 L.L.C. | 09-13784 | ESH/Homestead Mezz 6 L.L.C. | 09-13788 |
| ESA P Mezz 6 L.L.C. | 09-13792 | ESA Mezz 6 L.L.C. | 09-13796 |
| ESH/Homestead Mezz 7 L.L.C. | 09-13801 | ESA P Mezz 7 L.L.C. | 09-13806 |
| ESA Mezz 7 L.L.C. | 09-13810 | ESH/Homestead Mezz 8 L.L.C. | 09-13812 |
| ESA P Mezz 8 L.L.C. | 09-13814 | ESA Mezz 8 L.L.C. | 09-13817 |
| ESH/Homestead Mezz 9 L.L.C. | 09-13821 | ESA P Mezz 9 L.L.C. | 09-13822 |
| ESA Mezz 9 L.L.C. | 09-13824 | ESH/Homestead Mezz 10 L.L.C. | 09-13825 |
| ESA P Mezz 10 L.L.C. | 09-13827 | ESA Mezz 10 L.L.C. | 09-13829 |

The debtors and debtors in possession in the above-referenced chapter 11 cases (collectively, the "Debtors") are soliciting votes with respect to the Debtors' Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 (as it may be amended, the "Plan"), from the holders of certain impaired claims against the Debtors. All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to such terms in the Plan. If you have any questions on how to properly complete this Ballot, please call Kurtzman Carson Consultants, LLC (the "Voting Agent") at (866) 381-9100.

This Ballot is to be used for voting by the holder of the Mortgage Facility Deficiency Claim. In order for your vote to be counted, the Ballot must be properly completed, signed, and returned to the Voting Agent so that it is actually received by the Voting Agent at Extended Stay Ballot Processing Center, c/o Kurtzman Carson Consultants, LLC , 2335 Alaska Avenue, El Segundo, California 90245, by no later than 4:00 p.m. (prevailing Eastern Time) on July 7, 2010 (the "Voting Deadline"), unless such time is extended in writing by the Debtors, with the consent of the Investor.

Please note, that, although the Bankruptcy Court entered an order (the "Disclosure Statement Order") approving, among other things, the Disclosure Statement (as defined below) as containing adequate information pursuant to section 1125 of the Bankruptcy Code, the Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan. The Plan is attached as "Exhibit A" to the Disclosure Statement relating to the Plan, a copy of which is included on the CD-ROM accompanying this Ballot.

**Your rights are described in the Disclosure Statement, so it is important that you review the Disclosure Statement and each exhibit thereto, including the Plan, before you complete, execute and return this Ballot. You also may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.**

PLEASE COMPLETE THE FOLLOWING:

ITEM 1. **Amount of Mortgage Facility Deficiency Claim.** For purposes of voting to accept or reject the Plan, the undersigned holds the Mortgage Facility Deficiency Claim against the Debtors in the amount set forth below.

Amount: $_____

ITEM 2. **Vote on the Plan.** The undersigned holder of the Mortgage Facility Deficiency Claim in the amount set forth in Item 1 above hereby votes to:

Check one box:  ☐  ACCEPT (vote FOR) the Plan

☐  REJECT (vote AGAINST) the Plan

## IMPORTANT INFORMATION REGARDING THE RELEASING PARTY RELEASE

Following Confirmation, subject to Article IX of the Plan, the Plan will be Consummated on the Effective Date. Among other things, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article X will become effective. It is important to read the provisions contained in Article X of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly.

**Specifically, the "Releases" in Article X, section 10.10 of the Plan, <u>which binds those Holders of Claims or Equity Interests that VOTE TO ACCEPT the Plan, that are DEEMED TO ACCEPT the Plan, that ABSTAIN from voting on the Plan, and to the fullest extent permissible under the applicable law (or as such law may be extended or integrated after the Effective Date) each holder of a Claim or Equity Interest that VOTES NOT TO ACCEPT the Plan</u>, provides, among other things, the following:**

**As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; (f) the provision of the Debt Financing Arrangements by the Debt Financing Lenders; (g) the substantial contribution of the Investor, each of the Sponsors and their Affiliates; and (h) the substantial contribution of the Special Servicer, the Trustee, the Operating Advisor and the Controlling Holder: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that votes not to accept the Plan; and (iv) each holder of a Mortgage Certificate, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; <u>provided</u>, that nothing in Section 10.10 of the Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, <u>provided</u>, <u>further</u>, that nothing in Section 10.10 of the Plan shall be construed as a release of any claims constituting Litigation Trust Assets.**

ITEM 3. **Acknowledgements and Certification.** By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Disclosure Statement for the Debtors' Fifth Amended Joint Plan of Reorganization, dated June 8, 2010 (as it may be amended, the "<u>Disclosure Statement</u>"), including all exhibits thereto. The undersigned certifies that (i) it is the holder of the Mortgage Facility Deficiency Claim

identified in Item 1 above and (ii) it has full power and authority to vote to accept or reject the Plan.  The undersigned further acknowledges that the Debtors' solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for the solicitation of votes to accept or reject the Plan contained therein.

Print or Type Name of Claimant: _____

Social Security or Federal Tax I.D. No. of Claimant: _____

Signature: _____

Name of Signatory (if different than claimant): _____

If by Authorized Agent, Title of Agent: _____

Street Address: _____

City, State and Zip Code: _____

Telephone Number: _____

Date Completed: _____

**VOTING INSTRUCTIONS FOR COMPLETING THE BALLOT**
**FOR HOLDERS OF CLASS 4A (MORTGAGE FACILITY DEFICIENCY CLAIM)**

1.  This Ballot is submitted to you to solicit your vote to accept or reject the Plan. **PLEASE READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan will be accepted by Class 4A if it is accepted by the holders of two-thirds in amount and more than one-half in number of Claims in Class 4A voting on the Plan. In the event that Class 4A rejects the Plan, the Bankruptcy Court may nevertheless confirm the Plan and thereby make it binding on you if the Bankruptcy Court finds that the Plan does not unfairly discriminate against, and accords fair and equitable treatment to, the holders of Claims in Class 4A and all other Classes of Claims rejecting the Plan, and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, all holders of Claims against and Equity Interests in the Debtors (including those holders who abstain from voting or reject the Plan, and those holders who are not entitled to vote on the Plan) will be bound by the confirmed Plan and the transactions contemplated thereby.

3.  **To have your vote counted, you must complete, sign, and return this Ballot to the Voting Agent so that it is <u>received</u> by the Voting Agent by no later than 4:00 p.m. (prevailing Eastern Time) on July 7, 2010 (the "<u>Voting Deadline</u>"), unless such time is extended in writing by the Debtors, with the consent of the Investor.** Ballots must be delivered either by mail with the enclosed envelope <u>or</u> by hand delivery or overnight courier to the Voting Agent at the following address:

    KURTZMAN CARSON CONSULTANTS, LLC
    ATTN: EXTENDED STAY BALLOTING PROCESSING CENTER
    2335 ALASKA AVENUE
    EL SEGUNDO, CALIFORNIA 90245

**Ballots will not be accepted by telecopy, facsimile, or other electronic means of transmission.**

4.  To properly complete the Ballot, you must follow the procedures described below:

    a.  **make sure that the information contained in Item 1 is correct;**

    b.  **if you have a Claim in Class 4A, cast one vote to accept or reject the Plan by checking the appropriate box in Item 2;**

    c.  **if you are completing this Ballot on behalf of another person or entity, indicate your relationship with such person or entity and the capacity in which you are signing and submit satisfactory evidence of your authority to so act (<u>e.g.</u>, a power of attorney or a certified copy of board resolutions authorizing you to so act);**

    d.  **if you also hold Claims in a Class other than Class 4A, you may receive more than one Ballot, labeled for a different Class of Claims. Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on that Ballot;**

    e.  **if you believe that you have received the wrong Ballot, please contact the Voting Agent immediately;**

    f.  **provide your name and mailing address;**

    g.  **sign and date your Ballot; and**

**h.** **return your Ballot using the enclosed pre-addressed return envelope.**

      IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT, OR IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DEBTORS' VOTING AGENT, KURTZMAN CARSON CONSULTANTS, LLC AT (866) 381-9100.  COPIES OF THE PLAN AND DISCLOSURE STATEMENT CAN BE ACCESSED ON KURTZMAN CARSON CONSULTANT LLC'S WEBSITE AT: HTTP://WWW.KCCLLC.NET/EXTENDEDSTAY.  PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT.

**<u>Exhibit 7</u>**

**Form Mezzanine Facilities Claim Ballot**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                          :
In re                                     :          Chapter 11 Case No.
                                          :
EXTENDED STAY INC., <u>et al.</u>,        :          09-13764 (JMP)
                                          :
            Debtors.                      :          (Jointly Administered)
                                          :
------------------------------------------------------------x

### BALLOT FOR CLASS 4B
### <u>(MEZZANINE FACILITIES CLAIM)</u>

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

**THIS BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED TO THE VOTING AGENT SO IT IS ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. (PREVAILING EASTERN TIME) ON JULY 7, 2010 (THE "<u>VOTING DEADLINE</u>") BY THE VOTING AGENT**

---

<u>Name of Debtor Entities and Case Numbers</u>

| Debtor | Case No. | Debtor | Case No. |
|---|---|---|---|
| ESA Properties L.L.C. | 09-13815 | ESH/HV Properties L.L.C. | 09-13786 |
| ESA P Portfolio L.L.C. | 09-13765 | ESH/MSTX Property L.P. | 09-13790 |
| ESA 2005 Portfolio L.L.C. | 09-13767 | ESH/TN Properties L.L.C. | 09-13793 |
| ESA 2005-San Jose L.L.C. | 09-13770 | ESH/TX Properties L.P. | 09-13802 |
| ESA 2005-Waltham L.L.C. | 09-13773 | ESA MD Beneficiary L.L.C. | 09-13768 |
| ESA Acquisition Properties L.L.C. | 09-13775 | ESA P Portfolio MD Trust | 09-13769 |
| ESA Alaska L.L.C. | 09-13780 | ESA MD Properties Business Trust | 09-13771 |
| ESA Canada Properties Borrower L.L.C. | 09-13785 | ESA P Portfolio MD Beneficiary L.L.C. | 09-13772 |
| ESA FL Properties L.L.C. | 09-13791 | ESA Canada Properties Trust | 09-13774 |
| ESA MD Borrower L.L.C. | 09-13794 | ESA Canada Trustee Inc. | 09-13776 |
| ESA MN Properties L.L.C. | 09-13798 | ESA Canada Beneficiary Inc. | 09-13779 |
| ESA P Portfolio MD Borrower L.L.C. | 09-13803 | ESA UD Properties L.L.C. | 09-13782 |
| ESA P Portfolio PA Properties L.L.C. | 09-13807 | ESA 2007 Operating Lessee Inc. | 09-13783 |
| ESA P Portfolio TXNC Properties L.P. | 09-13809 | ESA 2005 Operating Lessee Inc. | 09-13787 |

| ESA PA Properties L.L.C. | 09-13811 | ESA Operating Lessee Inc. | 09-13789 |
|---|---|---|---|
| ESA TX Properties L.P. | 09-13818 | ESA P Portfolio Operating Lessee Inc. | 09-13795 |
| ESH/Homestead Portfolio L.L.C. | 09-13778 | ESA Canada Operating Lessee Inc. | 09-13804 |
| ESA Portfolio TXNC GP L.L.C. | 10-10805 | ESA TXGP L.L.C. | 10-10806 |
| ESH/MSTX GP L.L.C. | 10-10807 | ESH/TXGP L.L.C. | 10-10808 |
| ESH/TN Member Inc. | 10-10809 | Homestead Village L.L.C. | 09-13766 |
| Extended Stay Hotels L.L.C. | 09-13808 | ESA Management L.L.C. | 09-13799 |
| ESA Business Trust | 09-13797 | ESA P Portfolio L.L.C. | 09-13765 |
| ESH/Homestead Mezz L.L.C. | 09-13805 | ESA P Mezz L.L.C. | 09-13813 |
| ESA Mezz L.L.C. | 09-13816 | ESH/Homestead Mezz 2 L.L.C. | 09-13819 |
| ESA P Mezz 2 L.L.C. | 09-13820 | ESA Mezz 2 L.L.C. | 09-13823 |
| ESH/Homestead Mezz 3 L.L.C. | 09-13826 | ESA P Mezz 3 L.L.C. | 09-13828 |
| ESA Mezz 3 L.L.C. | 09-13830 | ESH/Homestead Mezz 4 L.L.C. | 09-13831 |
| ESA P Mezz 4 L.L.C. | 09-13832 | ESA Mezz 4 L.L.C. | 09-13833 |
| ESH/Homestead Mezz 5 L.L.C. | 09-13777 | ESA P Mezz 5 L.L.C. | 09-13781 |
| ESA Mezz 5 L.L.C. | 09-13784 | ESH/Homestead Mezz 6 L.L.C. | 09-13788 |
| ESA P Mezz 6 L.L.C. | 09-13792 | ESA Mezz 6 L.L.C. | 09-13796 |
| ESH/Homestead Mezz 7 L.L.C. | 09-13801 | ESA P Mezz 7 L.L.C. | 09-13806 |
| ESA Mezz 7 L.L.C. | 09-13810 | ESH/Homestead Mezz 8 L.L.C. | 09-13812 |
| ESA P Mezz 8 L.L.C. | 09-13814 | ESA Mezz 8 L.L.C. | 09-13817 |
| ESH/Homestead Mezz 9 L.L.C. | 09-13821 | ESA P Mezz 9 L.L.C. | 09-13822 |
| ESA Mezz 9 L.L.C. | 09-13824 | ESH/Homestead Mezz 10 L.L.C. | 09-13825 |
| ESA P Mezz 10 L.L.C. | 09-13827 | ESA Mezz 10 L.L.C. | 09-13829 |

The debtors and debtors in possession in the above-referenced chapter 11 cases (collectively, the "Debtors") are soliciting votes with respect to the Debtors' Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 (as it may be amended, the "Plan"), from the holders of certain impaired claims against the Debtors. All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to such terms in the Plan. If you have any questions on how to properly complete this Ballot, please call Kurtzman Carson Consultants, LLC (the "Voting Agent") at (866) 381-9100.

This Ballot is to be used for voting by the holders of Mezzanine Facilities Claims. In order for your vote to be counted, the Ballot must be properly completed, signed, and returned to the Voting Agent so that it is actually received by the Voting Agent at Extended Stay Ballot Processing Center, c/o Kurtzman Carson Consultants, LLC , 2335 Alaska Avenue, El Segundo, California 90245, by no later than 4:00 p.m. (prevailing Eastern Time) on July 7, 2010 (the "Voting Deadline"), unless such time is extended in writing by the Debtors, with the consent of the Investor.

Please note, that, although the Bankruptcy Court entered an order (the "Disclosure Statement Order") approving, among other things, the Disclosure Statement (as defined below) as containing adequate information pursuant to section 1125 of the Bankruptcy Code, the Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan. The Plan is attached as "Exhibit A" to the Disclosure Statement relating to the Plan, a copy of which is included on the CD-ROM accompanying this Ballot.

**Your rights are described in the Disclosure Statement, so it is important that you review the Disclosure Statement and each exhibit thereto, including the Plan, before you complete, execute and return this Ballot. You also may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.**

PLEASE COMPLETE THE FOLLOWING:

ITEM 1.  **Amount of Mezzanine Facilities Claim.**  For purposes of voting to accept or reject the Plan, the undersigned holds a Mezzanine Facilities Claim against the Debtors in the amount set forth below.

> Amount: $_____

ITEM 2.  **Vote on the Plan.**  The undersigned holder of a Mezzanine Facilities Claim in the amount set forth in Item 1 above hereby votes to:

Check one box:         ☐         ACCEPT (vote FOR) the Plan

                       ☐         REJECT (vote AGAINST) the Plan

**<u>IMPORTANT INFORMATION REGARDING THE RELEASING PARTY RELEASE</u>**

Following Confirmation, subject to Article IX of the Plan, the Plan will be Consummated on the Effective Date.  Among other things, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article X will become effective.  It is important to read the provisions contained in Article X of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly.

**Specifically, the "Releases" in Article X, section 10.10 of the Plan, <u>which binds those Holders of Claims or Equity Interests that VOTE TO ACCEPT the Plan, that are DEEMED TO ACCEPT the Plan, that ABSTAIN from voting on the Plan, and to the fullest extent permissible under the applicable law (or as such law may be extended or integrated after the Effective Date) each holder of a Claim or Equity Interest that VOTES NOT TO ACCEPT the Plan</u>, provides, among other things, the following:**

**As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; (f) the provision of the Debt Financing Arrangements by the Debt Financing Lenders; (g) the substantial contribution of the Investor, each of the Sponsors and their Affiliates; and (h) the substantial contribution of the Special Servicer, the Trustee, the Operating Advisor and the Controlling Holder: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that votes not to accept the Plan; and (iv) each holder of a Mortgage Certificate, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; <u>provided</u>, that nothing in Section 10.10 of the Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, <u>provided</u>, <u>further</u>, that nothing in Section 10.10 of the Plan shall be construed as a release of any claims constituting Litigation Trust Assets.**

ITEM 3.  **Acknowledgements and Certification.**  By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Disclosure Statement for the Debtors' Fifth Amended Joint Plan of Reorganization, dated June 8, 2010 (as it may be amended, the "<u>Disclosure Statement</u>"), including all exhibits thereto.  The undersigned certifies that (i) it is the holder of a Mezzanine Facilities Claim identified in Item 1 above and (ii) it has full power and authority to vote to accept or reject the Plan.  The undersigned further

acknowledges that the Debtors' solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for the solicitation of votes to accept or reject the Plan contained therein.

Print or Type Name of Claimant: _____

Social Security or Federal Tax I.D. No. of Claimant: _____

Signature: _____

Name of Signatory (if different than claimant): _____

If by Authorized Agent, Title of Agent: _____

Street Address: _____

City, State and Zip Code: _____

Telephone Number: _____

Date Completed: _____

**VOTING INSTRUCTIONS FOR COMPLETING THE BALLOT**
**FOR HOLDERS OF CLASS 4B (MEZZANINE FACILITIES CLAIMS)**

5.    This Ballot is submitted to you to solicit your vote to accept or reject the Plan. **PLEASE READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

6.    The Plan will be accepted by Class 4B if it is accepted by the holders of two-thirds in amount and more than one-half in number of Claims in Class 4B voting on the Plan. In the event that Class 4B rejects the Plan, the Bankruptcy Court may nevertheless confirm the Plan and thereby make it binding on you if the Bankruptcy Court finds that the Plan does not unfairly discriminate against, and accords fair and equitable treatment to, the holders of Claims in Class 4B and all other Classes of Claims rejecting the Plan, and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, all holders of Claims against and Equity Interests in the Debtors (including those holders who abstain from voting or reject the Plan, and those holders who are not entitled to vote on the Plan) will be bound by the confirmed Plan and the transactions contemplated thereby.

7.    **To have your vote counted, you must complete, sign, and return this Ballot to the Voting Agent so that it is <u>received</u> by the Voting Agent by no later than 4:00 p.m. (prevailing Eastern Time) on July 7, 2010 (the "<u>Voting Deadline</u>"), unless such time is extended in writing by the Debtors, with the consent of the Investor.** Ballots must be delivered either by mail with the enclosed envelope <u>or</u> by hand delivery or overnight courier to the Voting Agent at the following address:

KURTZMAN CARSON CONSULTANTS, LLC
ATTN: EXTENDED STAY BALLOTING PROCESSING CENTER
2335 ALASKA AVENUE
EL SEGUNDO, CALIFORNIA 90245

**Ballots will not be accepted by telecopy, facsimile, or other electronic means of transmission.**

8.    To properly complete the Ballot, you must follow the procedures described below:

      a.   **make sure that the information contained in Item 1 is correct;**

      b.   **if you have a Claim in Class 4B, cast one vote to accept or reject the Plan by checking the appropriate box in Item 2;**

      c.   **if you are completing this Ballot on behalf of another person or entity, indicate your relationship with such person or entity and the capacity in which you are signing and submit satisfactory evidence of your authority to so act (<u>e.g.</u>, a power of attorney or a certified copy of board resolutions authorizing you to so act);**

      d.   **if you also hold Claims in a Class other than Class 4B, you may receive more than one Ballot, labeled for a different Class of Claims. Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on that Ballot;**

      e.   **if you believe that you have received the wrong Ballot, please contact the Voting Agent immediately;**

      f.   **provide your name and mailing address;**

      g.   **sign and date your Ballot; and**

**h.** **return your Ballot using the enclosed pre-addressed return envelope.**

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT, OR IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DEBTORS' VOTING AGENT, KURTZMAN CARSON CONSULTANTS, LLC AT (866) 381-9100.  COPIES OF THE PLAN AND DISCLOSURE STATEMENT CAN BE ACCESSED ON KURTZMAN CARSON CONSULTANT LLC'S WEBSITE AT: HTTP://WWW.KCCLLC.NET/EXTENDEDSTAY.  PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT.

# **Exhibit 8**

## **Form General Unsecured Claim Ballot**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                           :

In re                              :          Chapter 11 Case No.
                                           :

EXTENDED STAY INC., <u>et al.</u>,      :          09-13764 (JMP)
                                         :

        Debtors.                 :          (Jointly Administered)
                                         :

------------------------------------------------------------x

## BALLOT FOR CLASS 5
## <u>(GENERAL UNSECURED CLAIM)</u>

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

**THIS BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED TO THE VOTING AGENT SO IT IS ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. (PREVAILING EASTERN TIME) ON JULY 7, 2010 (THE "<u>VOTING DEADLINE</u>") BY THE VOTING AGENT**

---

<u>Name of Debtor Entities and Case Numbers</u>

| Debtor | Case No. | Debtor | Case No. |
|---|---|---|---|
| ESA Properties L.L.C. | 09-13815 | ESH/HV Properties L.L.C. | 09-13786 |
| ESA P Portfolio L.L.C. | 09-13765 | ESH/MSTX Property L.P. | 09-13790 |
| ESA 2005 Portfolio L.L.C. | 09-13767 | ESH/TN Properties L.L.C. | 09-13793 |
| ESA 2005-San Jose L.L.C. | 09-13770 | ESH/TX Properties L.P. | 09-13802 |
| ESA 2005-Waltham L.L.C. | 09-13773 | ESA MD Beneficiary L.L.C. | 09-13768 |
| ESA Acquisition Properties L.L.C. | 09-13775 | ESA P Portfolio MD Trust | 09-13769 |
| ESA Alaska L.L.C. | 09-13780 | ESA MD Properties Business Trust | 09-13771 |
| ESA Canada Properties Borrower L.L.C. | 09-13785 | ESA P Portfolio MD Beneficiary L.L.C. | 09-13772 |
| ESA FL Properties L.L.C. | 09-13791 | ESA Canada Properties Trust | 09-13774 |
| ESA MD Borrower L.L.C. | 09-13794 | ESA Canada Trustee Inc. | 09-13776 |
| ESA MN Properties L.L.C. | 09-13798 | ESA Canada Beneficiary Inc. | 09-13779 |
| ESA P Portfolio MD Borrower L.L.C. | 09-13803 | ESA UD Properties L.L.C. | 09-13782 |
| ESA P Portfolio PA Properties L.L.C. | 09-13807 | ESA 2007 Operating Lessee Inc. | 09-13783 |
| ESA P Portfolio TXNC Properties L.P. | 09-13809 | ESA 2005 Operating Lessee Inc. | 09-13787 |

| | | | |
|---|---|---|---|
| ESA PA Properties L.L.C. | 09-13811 | ESA Operating Lessee Inc. | 09-13789 |
| ESA TX Properties L.P. | 09-13818 | ESA P Portfolio Operating Lessee Inc. | 09-13795 |
| ESH/Homestead Portfolio L.L.C. | 09-13778 | ESA Canada Operating Lessee Inc. | 09-13804 |
| ESA Portfolio TXNC GP L.L.C. | 10-10805 | ESA TXGP L.L.C. | 10-10806 |
| ESH/MSTX GP L.L.C. | 10-10807 | ESH/TXGP L.L.C. | 10-10808 |
| ESH/TN Member Inc. | 10-10809 | Homestead Village L.L.C. | 09-13766 |
| Extended Stay Hotels L.L.C. | 09-13808 | ESA Management L.L.C. | 09-13799 |
| ESA Business Trust | 09-13797 | ESA P Portfolio L.L.C. | 09-13765 |
| ESH/Homestead Mezz L.L.C. | 09-13805 | ESA P Mezz L.L.C. | 09-13813 |
| ESA Mezz L.L.C. | 09-13816 | ESH/Homestead Mezz 2 L.L.C. | 09-13819 |
| ESA P Mezz 2 L.L.C. | 09-13820 | ESA Mezz 2 L.L.C. | 09-13823 |
| ESH/Homestead Mezz 3 L.L.C. | 09-13826 | ESA P Mezz 3 L.L.C. | 09-13828 |
| ESA Mezz 3 L.L.C. | 09-13830 | ESH/Homestead Mezz 4 L.L.C. | 09-13831 |
| ESA P Mezz 4 L.L.C. | 09-13832 | ESA Mezz 4 L.L.C. | 09-13833 |
| ESH/Homestead Mezz 5 L.L.C. | 09-13777 | ESA P Mezz 5 L.L.C. | 09-13781 |
| ESA Mezz 5 L.L.C. | 09-13784 | ESH/Homestead Mezz 6 L.L.C. | 09-13788 |
| ESA P Mezz 6 L.L.C. | 09-13792 | ESA Mezz 6 L.L.C. | 09-13796 |
| ESH/Homestead Mezz 7 L.L.C. | 09-13801 | ESA P Mezz 7 L.L.C. | 09-13806 |
| ESA Mezz 7 L.L.C. | 09-13810 | ESH/Homestead Mezz 8 L.L.C. | 09-13812 |
| ESA P Mezz 8 L.L.C. | 09-13814 | ESA Mezz 8 L.L.C. | 09-13817 |
| ESH/Homestead Mezz 9 L.L.C. | 09-13821 | ESA P Mezz 9 L.L.C. | 09-13822 |
| ESA Mezz 9 L.L.C. | 09-13824 | ESH/Homestead Mezz 10 L.L.C. | 09-13825 |
| ESA P Mezz 10 L.L.C. | 09-13827 | ESA Mezz 10 L.L.C. | 09-13829 |

The debtors and debtors in possession in the above-referenced chapter 11 cases (collectively, the "Debtors") are soliciting votes with respect to the Debtors' Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 8, 2010 (as it may be amended, the "Plan"), from the holders of certain impaired claims against the Debtors. All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to such terms in the Plan. If you have any questions on how to properly complete this Ballot, please call Kurtzman Carson Consultants, LLC (the "Voting Agent") at (866) 381-9100.

This Ballot is to be used for voting by the holders of General Unsecured Claims. In order for your vote to be counted, the Ballot must be properly completed, signed, and returned to the Voting Agent so that it is actually received by the Voting Agent at Extended Stay Ballot Processing Center, c/o Kurtzman Carson Consultants, LLC , 2335 Alaska Avenue, El Segundo, California 90245, by no later than 4:00 p.m. (prevailing Eastern Time) on July 7, 2010 (the "Voting Deadline"), unless such time is extended in writing by the Debtors, with the consent of the Investor.

Please note, that, although the Bankruptcy Court entered an order (the "Disclosure Statement Order") approving, among other things, the Disclosure Statement (as defined below) as containing adequate information pursuant to section 1125 of the Bankruptcy Code, the Bankruptcy Court's approval of the Disclosure Statement does not indicate approval of the Plan. The Plan is attached as "Exhibit A" to the Disclosure Statement relating to the Plan, a copy of which is included on the CD-ROM accompanying this Ballot.

**Your rights are described in the Disclosure Statement, so it is important that you review the Disclosure Statement and each exhibit thereto, including the Plan, before you complete, execute and return this Ballot. You also may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.**

PLEASE COMPLETE THE FOLLOWING:

ITEM 1. **Amount of Unsecured Claim.** For purposes of voting to accept or reject the Plan, the undersigned holds a General Unsecured Claim against the Debtors in the amount set forth below.

Amount: $\$_____$

ITEM 2. **Vote on the Plan.** The undersigned holder of a General Unsecured Claim in the amount set forth in Item 1 above hereby votes to:

<u>Check one box</u>:     ☐     <u>ACCEPT</u> (vote FOR) the Plan

☐     <u>REJECT</u> (vote AGAINST) the Plan

**<u>IMPORTANT INFORMATION REGARDING THE RELEASING PARTY RELEASE</u>**

Following Confirmation, subject to Article IX of the Plan, the Plan will be Consummated on the Effective Date. Among other things, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article X will become effective. It is important to read the provisions contained in Article X of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly.

**Specifically, the "Releases" in Article X, section 10.10 of the Plan, <u>which binds those Holders of Claims or Equity Interests that VOTE TO ACCEPT the Plan, that are DEEMED TO ACCEPT the Plan, that ABSTAIN from voting on the Plan, and to the fullest extent permissible under the applicable law (or as such law may be extended or integrated after the Effective Date) each holder of a Claim or Equity Interest that VOTES NOT TO ACCEPT the Plan</u>, provides, among other things, the following:**

**As of the Effective Date, and in consideration of (a) the services provided by the present and former directors, managers, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; (b) the services of the Creditors' Committee and their Affiliates; (c) the services provided by HVM; (d) the services provided by HVM Manager; (e) the services of, and assets contributed by, HVM Manager Owner; (f) the provision of the Debt Financing Arrangements by the Debt Financing Lenders; (g) the substantial contribution of the Investor, each of the Sponsors and their Affiliates; and (h) the substantial contribution of the Special Servicer, the Trustee, the Operating Advisor and the Controlling Holder: (i) the Debtors, the Reorganized Debtors or NewCo; (ii) each holder of a Claim or Equity Interest that votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan; (iii) to the fullest extent permissible under applicable law (as such law may be extended or integrated after the Effective Date), each holder of a Claim or Equity Interest that votes not to accept the Plan; and (iv) each holder of a Mortgage Certificate, shall release unconditionally and forever each Released Party from any and all Claims, demands, causes of action and the like, relating to the Debtors or their Affiliates, advisors, officers, managers, directors and holders of Equity Interests existing as of the Effective Date or thereafter arising from any act, omission, event or other occurrence that occurred on or prior to the Effective Date; <u>provided</u>, that nothing in Section 10.10 of the Plan shall be construed as a release of any Guaranty Claim other than a Guaranty Claim against a Debtor, <u>provided</u>, <u>further</u>, that nothing in Section 10.10 of the Plan shall be construed as a release of any claims constituting Litigation Trust Assets.**

ITEM 3. **Acknowledgements and Certification.** By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Disclosure Statement for the Debtors' Fifth Amended Joint Plan of Reorganization, dated June 8, 2010 (as it may be amended, the "<u>Disclosure Statement</u>"), including all

exhibits thereto. The undersigned certifies that (i) it is the holder of the General Unsecured Claim identified in Item 1 above and (ii) it has full power and authority to vote to accept or reject the Plan. The undersigned further acknowledges that the Debtors' solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for the solicitation of votes to accept or reject the Plan contained therein.

Print or Type Name of Claimant: _____

Social Security or Federal Tax I.D. No. of Claimant: _____

Signature: _____

Name of Signatory (if different than claimant): _____

If by Authorized Agent, Title of Agent: _____

Street Address: _____

City, State and Zip Code: _____

Telephone Number: _____

Date Completed: _____

**VOTING INSTRUCTIONS FOR COMPLETING THE BALLOT**
**FOR HOLDERS OF CLASS 5 (GENERAL UNSECURED CLAIMS)**

1.  This Ballot is submitted to you to solicit your vote to accept or reject the Plan.  **PLEASE READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan will be accepted by Class 5 if it is accepted by the holders of two-thirds in amount and more than one-half in number of Claims in Class 5 voting on the Plan.  In the event that Class 5 rejects the Plan, the Bankruptcy Court may nevertheless confirm the Plan and thereby make it binding on you if the Bankruptcy Court finds that the Plan does not unfairly discriminate against, and accords fair and equitable treatment to, the holders of Claims in Class 5 and all other Classes of Claims rejecting the Plan, and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Plan is confirmed by the Bankruptcy Court, all holders of Claims against and Equity Interests in the Debtors (including those holders who abstain from voting or reject the Plan, and those holders who are not entitled to vote on the Plan) will be bound by the confirmed Plan and the transactions contemplated thereby.

3.  **To have your vote counted, you must complete, sign, and return this Ballot to the Voting Agent so that it is <u>received</u> by the Voting Agent by no later than 4:00 p.m. (prevailing Eastern Time) on July 7, 2010 (the "<u>Voting Deadline</u>"), unless such time is extended in writing by the Debtors, with the consent of the Investor.**  Ballots must be delivered either by mail with the enclosed envelope <u>or</u> by hand delivery or overnight courier to the Voting Agent at the following address:

    KURTZMAN CARSON CONSULTANTS, LLC<br>
    ATTN: EXTENDED STAY BALLOTING PROCESSING CENTER<br>
    2335 ALASKA AVENUE<br>
    EL SEGUNDO, CALIFORNIA 90245

    **Ballots will not be accepted by telecopy, facsimile, or other electronic means of transmission.**

4.  To properly complete the Ballot, you must follow the procedures described below:

    a.  **make sure that the information contained in Item 1 is correct;**

    b.  **if you have a Claim in Class 5, cast one vote to accept or reject the Plan by checking the appropriate box in Item 2;**

    c.  **if you are completing this Ballot on behalf of another person or entity, indicate your relationship with such person or entity and the capacity in which you are signing and submit satisfactory evidence of your authority to so act (<u>e.g.</u>, a power of attorney or a certified copy of board resolutions authorizing you to so act);**

    d.  **if you also hold Claims in a Class other than Class 5, you may receive more than one Ballot, labeled for a different Class of Claims.  Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on that Ballot;**

    e.  **if you believe that you have received the wrong Ballot, please contact the Voting Agent immediately;**

    f.  **provide your name and mailing address;**

    g.  **sign and date your Ballot; and**

**h.** **return your Ballot using the enclosed pre-addressed return envelope.**

        IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT, OR IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DEBTORS' VOTING AGENT, KURTZMAN CARSON CONSULTANTS, LLC AT (866) 381-9100.  COPIES OF THE PLAN AND DISCLOSURE STATEMENT CAN BE ACCESSED ON KURTZMAN CARSON CONSULTANT LLC'S WEBSITE AT: HTTP://WWW.KCCLLC.NET/EXTENDEDSTAY.  PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT.

## __Exhibit 9__

## Notice of the Confirmation Hearing

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein
Jacqueline Marcus

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                           :

**In re**                          :        **Chapter 11 Case No.**
                           :

**EXTENDED STAY INC., et al.,**    :        **09-13764 (JMP)**
                           :

        **Debtors.**           :        **(Jointly Administered)**
                           :
------------------------------------------------------------x

**TO ALL PARTIES IN INTEREST IN THE FOLLOWING CHAPTER 11 CASES:**

| Debtor | Case No. | Debtor | Case No. |
|---|---|---|---|
| ESA Properties L.L.C. | 09-13815 | ESH/HV Properties L.L.C. | 09-13786 |
| ESA P Portfolio L.L.C. | 09-13765 | ESH/MSTX Property L.P. | 09-13790 |
| ESA 2005 Portfolio L.L.C. | 09-13767 | ESH/TN Properties L.L.C. | 09-13793 |
| ESA 2005-San Jose L.L.C. | 09-13770 | ESH/TX Properties L.P. | 09-13802 |
| ESA 2005-Waltham L.L.C. | 09-13773 | ESA MD Beneficiary L.L.C. | 09-13768 |
| ESA Acquisition Properties L.L.C. | 09-13775 | ESA P Portfolio MD Trust | 09-13769 |
| ESA Alaska L.L.C. | 09-13780 | ESA MD Properties Business Trust | 09-13771 |
| ESA Canada Properties Borrower L.L.C. | 09-13785 | ESA P Portfolio MD Beneficiary L.L.C. | 09-13772 |
| ESA FL Properties L.L.C. | 09-13791 | ESA Canada Properties Trust | 09-13774 |
| ESA MD Borrower L.L.C. | 09-13794 | ESA Canada Trustee Inc. | 09-13776 |
| ESA MN Properties L.L.C. | 09-13798 | ESA Canada Beneficiary Inc. | 09-13779 |
| ESA P Portfolio MD Borrower L.L.C. | 09-13803 | ESA UD Properties L.L.C. | 09-13782 |
| ESA P Portfolio PA Properties L.L.C. | 09-13807 | ESA 2007 Operating Lessee Inc. | 09-13783 |
| ESA P Portfolio TXNC Properties L.P. | 09-13809 | ESA 2005 Operating Lessee Inc. | 09-13787 |
| ESA PA Properties L.L.C. | 09-13811 | ESA Operating Lessee Inc. | 09-13789 |
| ESA TX Properties L.P. | 09-13818 | ESA P Portfolio Operating Lessee Inc. | 09-13795 |
| ESH/Homestead Portfolio | 09-13778 | ESA Canada Operating Lessee Inc. | 09-13804 |

| | | | |
|---|---|---|---|
| L.L.C. | | | |
| ESA Portfolio TXNC GP L.L.C. | 10-10805 | ESA TXGP L.L.C. | 10-10806 |
| ESH/MSTX GP L.L.C. | 10-10807 | ESH/TXGP L.L.C. | 10-10808 |
| ESH/TN Member Inc. | 10-10809 | Homestead Village L.L.C. | 09-13766 |
| Extended Stay Hotels L.L.C. | 09-13808 | ESA Management L.L.C. | 09-13799 |
| ESA Business Trust | 09-13797 | ESA P Portfolio L.L.C. | 09-13765 |
| ESH/Homestead Mezz L.L.C. | 09-13805 | ESA P Mezz L.L.C. | 09-13813 |
| ESA Mezz L.L.C. | 09-13816 | ESH/Homestead Mezz 2 L.L.C. | 09-13819 |
| ESA P Mezz 2 L.L.C. | 09-13820 | ESA Mezz 2 L.L.C. | 09-13823 |
| ESH/Homestead Mezz 3 L.L.C. | 09-13826 | ESA P Mezz 3 L.L.C. | 09-13828 |
| ESA Mezz 3 L.L.C. | 09-13830 | ESH/Homestead Mezz 4 L.L.C. | 09-13831 |
| ESA P Mezz 4 L.L.C. | 09-13832 | ESA Mezz 4 L.L.C. | 09-13833 |
| ESH/Homestead Mezz 5 L.L.C. | 09-13777 | ESA P Mezz 5 L.L.C. | 09-13781 |
| ESA Mezz 5 L.L.C. | 09-13784 | ESH/Homestead Mezz 6 L.L.C. | 09-13788 |
| ESA P Mezz 6 L.L.C. | 09-13792 | ESA Mezz 6 L.L.C. | 09-13796 |
| ESH/Homestead Mezz 7 L.L.C. | 09-13801 | ESA P Mezz 7 L.L.C. | 09-13806 |
| ESA Mezz 7 L.L.C. | 09-13810 | ESH/Homestead Mezz 8 L.L.C. | 09-13812 |
| ESA P Mezz 8 L.L.C. | 09-13814 | ESA Mezz 8 L.L.C. | 09-13817 |
| ESH/Homestead Mezz 9 L.L.C. | 09-13821 | ESA P Mezz 9 L.L.C. | 09-13822 |
| ESA Mezz 9 L.L.C. | 09-13824 | ESH/Homestead Mezz 10 L.L.C. | 09-13825 |
| ESA P Mezz 10 L.L.C. | 09-13827 | ESA Mezz 10 L.L.C. | 09-13829 |

**PLEASE TAKE NOTICE:**

The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") shall hold a hearing (the "Confirmation Hearing") to consider the confirmation of the Debtors' Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan"), dated June 8, 2010, filed by ESA Properties LLC and seventy-three of its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors" or "Extended Stay") on **July 20, 2010 at 10:00 a.m. (Eastern Standard Time)**, before the Honorable James M. Peck, United States Bankruptcy Judge, in Room 601 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Debtors in open court of the adjourned date(s) at the Confirmation Hearing or any continued hearing. The Debtors may modify the Plan, if necessary, prior to, during, or as a result of the Confirmation Hearing in accordance with the terms of the Plan without further notice.

Objections or responses to confirmation of the Plan, if any, must (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Southern District of New York; and (c) set forth the name of the objecting party, the basis for the objection, and the specific grounds therefore.

All objections and responses to the confirmation of the Plan must be filed with the Court no later than **July 13, 2010 at 4:00 p.m. (Eastern Standard Time)** (the "Objection Deadline"). In accordance with General Order M-242, registered users of the Court's case filing system must electronically file their objections and responses. All other parties in interest must file their objections and responses on a 3.5 inch floppy disk (preferably in Portable Disk Format

(PDF), WordPerfect, or any other Windows-based word processing format) and deliver a hard copy to the Chambers of Judge James M. Peck.

All objections and responses must be served, **so as to be received** no later than the Objection Deadline, upon the following parties: (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Marcia L. Goldstein, Esq. and Jacqueline Marcus, Esq., attorneys for the Debtors; (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Paul Schwartzberg, Esq.; (iii) Hahn & Hessen LLP, 488 Madison Avenue, New York, New York 10022, Attn: Mark T. Power, Esq., Attn: Mark T. Indelicato, Esq. and Christopher Jarvinen, Esq., attorneys for the Official Committee of Unsecured Creditors; (iv) McKenna Long & Aldridge LLP, 303 Peachtree Street, NE Suite 5300, Atlanta, Georgia 30308, Attn: Gary W. Marsh, Esq., and Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attn: Mitchell Seider, Esq. and Keith Simon, Esq., attorneys for the Special Servicer and the Successor Trustee; (v) Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004, Attn: Brad Eric Scheler, Esq. and Jennifer L. Rodburg, Esq., attorneys for Centerbridge Partners, L.P., and Paulson & Co. Inc.; (vi) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166, Attn: David M. Feldman, Esq., attorneys for Paulson & Co. Inc.; and (vii) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017-3954, Attn: Mark Thompson, Esq., attorneys for Blackstone Real Estate Associates VI L.P.

**Additional Information**.  For more information about the solicitation procedures, please contact Kurtzman Carson Consultants, LLC ("KCC"), the Debtors' solicitation agent, at **(866) 381-9100**.  To obtain a copy of the Plan, or any related documents, please contact KCC or visit the Debtors' website at http://www.kccllc.net/extendedstay or the Court's website at http://www.nysb.uscourts.gov.  To access documents on the Court's website, you will need a PACER password and login, which you can obtain at http://www.pacer.psc.uscourts.gov.

**The Plan contains an injunction which prevents, among other things, any holder of a claim or equity interest or any other party in interest in the Debtors' chapter 11 cases from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such claim or equity interest, or such released or exculpated claim or cause of action, against the Debtors, the Reorganized Debtors, NewCo or the Released Parties (as defined in the Plan) or any of their respective property or assets or any interest therein, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, NewCo or the Released Parties or any of their respective property or assets or any interest therein, or (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Reorganized Debtors, NewCo, the Released Parties or against any of their respective property or assets, or any interest therein, with respect to any such claim or equity interest,**

**or such released or exculpated claim or cause of action. Such injunction shall extend to any successors of the Debtors, the Reorganized Debtors, NewCo and the Released Parties and their respective properties and interests in properties.**

Dated: [\_\_], 2010
      New York, New York

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession