GREENBERG TRAURIG, LLP
Bruce R. Zirinsky, Esq.                  Nancy A. Peterman, Esq.
Nathan A. Haynes, Esq.                   77 West Wacker Drive
MetLife Building                         Suite 3100
200 Park Avenue                          Chicago IL 60601
New York, New York 10166                 Telephone: (312) 456-8400
Telephone: (212) 801-9200                Facsimile: (312) 456-8435
Facsimile: (212) 801-6400                Email: petermann@gtlaw.com
Email: zirinskyb@gtlaw.com
Email: haynesn@gltaw.com

*Attorneys for Debt-U ESH L.P. and Debt II ESH, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x
                                         :
**In re:**                               :     **Chapter 11**
                                         :
**EXTENDED STAY INC., et al.,**          :     **Case No. 09-13764 (JMP)**
                                         :
                       **Debtors.**      :     **(Jointly Administered)**
                                         :
------------------------------------------------------------- x


## STARWOOD'S OBJECTION TO DEBTORS' MOTION TO APPROVE INVESTMENT AGREEMENT AND DISCLOSURE STATEMENT

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

        Debt-U ESH, L.P. and Debt II ESH, L.P., affiliates of Starwood Capital Group

Global, L.P. and creditors in the above-captioned Chapter 11 cases (collectively, "Starwood"), by

and through their undersigned counsel, hereby file this objection (the "Objection") with respect

to the *Debtors' Motion for an Order (I) Approving Proposed Disclosure Statement, (II)*

*Establishing Solicitation and Voting Procedures, (III) Scheduling a Confirmation Hearing, (IV)*

*Establishing Notice and Objection Procedures for Confirmation of the Debtors' Proposed Plan*

*of Reorganization, (V) Approving the Rights Certificate and Unsecured Notes Election Form,*

*and (VI) Directing the Mortgage Debt Parties to Cooperate* [Docket No. 808] and the supplement thereto [Docket No. 1029] (together, the "Motion"), and respectfully state as follows:

## PRELIMINARY STATEMENT[1]

1.       The Debtors' Motion, seeking approval of Centerbridge/Paulson's $3.925 billion cash bid as the highest and best offer at the Auction and approval of the Disclosure Statement soliciting acceptances of the Centerbridge/Paulson plan incorporating this bid (the "C/P Plan"), should be denied.

2.       The C/P Plan substantially undervalues the Debtors' estates and was driven by a process dictated by senior secured creditors to maximize cash in a liquidation sale rather than a process that would realize the highest and best value for all creditors.

3.        Starwood firmly believes that the reorganization value of the Debtors' estates significantly exceeds the value ascribed by the C/P Plan, and that any chapter 11 plan in these cases should reflect that value.  Starwood is prepared to file such a plan, which they believe will have the support of the Official Committee of Unsecured Creditors (the "Committee").

4.       These chapter 11 cases were filed in June 2009, in the midst of the worst financial crisis since the Great Depression and at a time when values of real estate and hospitality companies were severely depressed.

5.       Since that time, and particularly during the past six months, the markets have stabilized, the economy has begun its recovery and asset and business valuations have begun to normalize.   The capital markets have seen a significant recovery and valuations of hotel

---

[1] Capitalized terms not otherwise defined in the Preliminary Statement have the meaning ascribed to them *infra*, below.

companies have recovered substantially. These valuations need to be reflected in any credible reorganization of the Debtors.

6. Moreover, consistent with the broader industry lodging trends, the Debtors' operating performance has improved considerably from 2009 trough levels. For April 2010, the last month of available data, occupancy at the 664 properties that constitute collateral for the Mortgage Loan increased to 74.6% versus 62.8% for April 2009. Similarly, for the month ended April 2010, revenue per available room for the 664 collateral properties increased 5.3% year-over-year versus month ended April 2009, and property EBITDA increased 9.3% year-over-year versus month ended April 2009. Through April 2010 year-to-date, total revenue at the 664 collateral properties is $259.6 million, 12.9% ahead of the Debtors' business plan dated October 2009, and property EBITDA at the 664 collateral properties is $122.1 million, 27.7% ahead of the Debtors' business plan dated October 2009.[2]

7. That valuations higher than those provided by the C/P Plan are achievable for these Debtors has been indicated by Citigroup Global Markets Inc. ("Citi"). It is Citi's view that based on projections provided by Starwood Capital and an analysis of where comparable public companies currently trade, the total market capitalization of the Debtors, on a fully distributed basis, if they were publicly traded today, should be in a range of approximately $4.8 billion to $5.2 billion.

8. Incredibly, if allowed to go forward, under the C/P Plan, Centerbridge/Paulson will acquire 100% of the Debtors' new equity for a payment of $3.925 billion in cash, all of which will be paid to secured creditors under the Mortgage Loan. Unsecured creditors, holding claims in excess of $3 billion, will receive no payment or distribution other than an interest in a

---

[2] Sources for this paragraph: Fin 664 Trend 0410.xls; ESH Corporate Model - 664 Only - $480MM - 10.1.2009.xls.

Litigation Trust.  Notably, even junior certificate holders under the Mortgage Loan will receive no distribution.

9.      This draconian outcome is the result of the recent flawed Auction.  The Auction improperly deflated recoveries to creditors because of the Special Servicer's requirement that it could only agree to support an all or substantially all cash chapter 11 plan.  This effectively "chilled" the bidding.  Moreover, the Operating Advisor controlled the Auction, but the Operating Advisor only represented the interests of the Class A-4 Mortgage Certificate Holders, who were paid in full once the bids exceeded $2.542  billion.  Under the TSA, the Class A-4 Mortgage Certificate Holders were deemed the controlling class or "fulcrum" class, based upon an out-of-date appraisal conducted nearly a year ago under very different market conditions.  As demonstrated by the flawed Auction process which netted values easily sufficient to satisfy the class, the Class A-4 Mortgage Certificate Holders are not the "fulcrum" class and should not have been controlling the Auction process.

10.      Moreover, the Operating Advisor, representing the Class A-4 Mortgage Certificate Holders, took the position that it controlled the Special Servicer's vote on any plan and, therefore, any bid at the Auction had to be acceptable to the Operating Advisor.  In fact, approximately two weeks prior to the Auction, presumably to implement its strategy to control the Auction and to remove any independent fiduciary, the Operating Advisor replaced the Special Servicer.  In implementing its strategy to ensure payment of the Class A-4 Mortgage Certificate Holders in cash, during the course of the Auction, bidders were informed by the Special Servicer and Operating Advisor that they needed to submit all cash, not structured, bids.  This dictate expressly contradicted those provisions of the Bidding Procedures establishing a valuation

mechanism by which cash and non-cash bids could be considered and valued at the Auction.  The dictate chilled the bidding and ultimately ensured that value was not maximized.

11.     The Disclosure Statement cannot be approved because the C/P Plan it supports is unconfirmable: (i) the C/P Plan unfairly discriminates and is not fair and equitable pursuant to section 1129 because it does not accurately capture the value in the estates, and (ii) the C/P Plan was not proposed in good faith because of the infirmities in the Auction upon which it is premised.

12.     The Disclosure Statement does not contain adequate information to permit creditors to make an informed decision in voting on the plan.  The Disclosure Statement fails to accurately describe the Auction process and the bid-chilling effect the Special Servicer and Operating Advisor had upon the bidding.   It also lacks disclosure concerning the improved operating performance and higher valuation of the Debtors and the market in general, and fails to apprise creditors that if the C/P Plan is not confirmed other and better alternatives are available to maximize recoveries.   As more fully described herein, the Disclosure Statement is also critically deficient in providing other material information including any agreements between Centerbridge/Paulson, creditors and other parties providing for their support of the C/P Plan.

13.     Starwood is prepared to file an alternative plan which they believe will be supported by the Committee.  Under a Starwood plan, the Mortgage Loan will be unimpaired, Starwood will inject substantial new cash equity in the Debtors, and unsecured creditors will receive equity, warrants, the opportunity to subscribe to new equity on the same terms as Starwood, a Litigation Trust, and other consideration.  As a result, the value of the Debtors will be maximized, the Mortgage Loan will be made whole, and unsecured creditors will participate as equity holders in the Reorganized Debtors.

14.     The Starwood plan will also remove what has been the principal impediment to a successful reorganization -- the threatened veto of a plan by the Special Servicer, who has held other creditors and the Debtors hostage since the commencement of these cases.

15.     Starwood shortly will be filing a motion to terminate the Debtors' exclusive period to file a plan. No disclosure statement of the Debtors should be approved until that motion has been determined as it would be manifestly unfair for the C/P Plan to be considered by unsecured creditors without having the right to consider the Starwood plan at the same time. Similarly, the Court should have the opportunity to evaluate the two competing plans at the same time before confirming any plan. There will be no prejudice to the Debtors because Centerbridge/Paulson are committed to the C/P Plan as long as confirmation occurs on or before September 21, 2010 and the plan becomes effective on or before November 15, 2010.

16.     For all of the reasons set forth herein, the Court should deny the Motion, finding that the C/P Plan does not represent the highest and best value for the Debtors' estates and should deny approval of the Disclosure Statement. If the Court is inclined to permit the C/P Plan to go forward, the Court should not approve any disclosure statement with respect to the C/P Plan until a Starwood plan has been filed and supplemental disclosure with respect to such plan has been approved for dissemination to creditors.

## BACKGROUND

### The Bankruptcy Cases and Events Leading to the Auction

17.     On June 15, 2009 or February 18, 2010, as applicable to the particular debtor, Extended Stay, Inc. and its affiliated debtors (the "Debtors") filed chapter 11 petitions and commenced these cases. Contemporaneously with the June 15, 2009 chapter 11 petitions, the Debtors filed a restructuring term sheet setting forth the parameters of a chapter 11 plan of reorganization.

18.     In September 2009, as a result of widespread dissatisfaction among the creditor body with the Debtors' restructuring term sheet and the direction of the Debtors' chapter 11 cases, Starwood developed an alternative proposal with the objective of maximizing recoveries for all Certificate Holders and other creditors.

19.     During this period, the Debtors were in negotiations with Centerbridge Partners, L.P. ("Centerbridge") and Paulson & Co., Inc. ("Paulson," and together with Centerbridge, "Centerbridge/Paulson") regarding the terms of a plan of reorganization, pursuant to which Centerbridge/Paulson would provide a cash component and certain non-cash elements.

20.     On April 2, 2010, the Debtors entered into a commitment letter with Centerbridge/Paulson (the "CB/P Commitment Letter"), pursuant to which Centerbridge/Paulson was to sponsor a plan of reorganization for the Debtors, subject to competing bids and an auction (the "Auction").

**The Mortgage Debt and Control of the Special Servicer, Operating Advisor and Controlling Holder**

21.     Certain of the Debtors are borrowers (the "Mortgage Borrowers") under that certain Loan Agreement, dated as of June 11, 2007 (as amended, the "Mortgage Loan Agreement"), pursuant to which the mortgage lenders thereunder agreed to provide senior secured financing to the Mortgage Borrowers. As of June 15, 2009, the outstanding principal amount under the Mortgage Loan Agreement was approximately $4.1 billion (the "Mortgage Debt"). Subsequent to the closing date of the Mortgage Loan Agreement, the original mortgage lenders sold and assigned their interests in the Mortgage Debt, which was then deposited into a trust (the "Trust") created under that certain Trust and Servicing Agreement, dated as of August 1, 2007 (the "TSA"). The Trust issued commercial mortgage pass-through certificates (the "Certificates") representing all of the beneficial interests in the assets held by the Trust to certain

initial purchasers, who subsequently sold Certificates to various investors (the current holders of such Certificates, the "Certificate Holders").

22. Under the TSA, the "controlling interest" is determined by using 90% of the value of an appraisal, which is required to be performed following the filing of the bankruptcy. *See* TSA, Section 1.1. Pursuant to this process, an appraisal was conducted on August 26, 2009, approximately ten months ago, which placed the value of the company at approximately $2.8 billion (the "Appraisal"). This Appraisal established the Class A-4 mortgage certificate holders (the "Class A-4 Mortgage Certificate Holders") as the "Controlling Holder" of the Mortgage Debt. The Class A-4 Mortgage Certificate Holders were estimated by the Debtors and their advisors immediately prior to the auction to be owed approximately $796 million by August 15, 2010 and upon payment of approximately $2.542 billion of the Mortgage Debt, would be paid in full. Pursuant to the TSA, a majority of the Controlling Holders may appoint an operating advisor (the "Operating Advisor"). At some point prior to the Auction, a majority of the Controlling Holders appointed the Operating Advisor. Approximately two weeks prior to the Auction, in accordance with the TSA, the Operating Advisor exercised its authority under the TSA to replace TriMont Real Estate Advisors, Inc. as Special Servicer with CWCapital Asset Management LLC (the "Special Servicer").

**The Auction and the Special Servicer's Directive**

23. Pursuant to the terms of the CB/P Commitment Letter, the Debtors proposed bidding procedures (the "Bidding Procedures") governing the Auction process. After a lengthy hearing, on April 22, 2010, this Court entered an order approving the Bidding Procedures. In accordance with the Bidding Procedures, the Debtors developed, in consultation with the Committee, Starwood, Centerbridge/Paulson, and other interested parties who requested the right

to participate, the methodology (the "<u>Valuation Methodology</u>") to be used by the Debtors in connection with valuing all the bids, including the methodologies to be used for valuing total consideration and converting any non-cash portion of any such bids to a cash equivalent. This Valuation Methodology was not agreed upon by all parties involved in the process, including the Committee and Starwood.

24.     In accordance with the Bidding Procedures, Starwood submitted a bid that was determined to be a qualified bid under the Bidding Procedures, as did Centerbridge/Paulson, each of which contained non-cash components that were subject to the Valuation Methodology. The Starwood bid was determined by the Debtors to be higher and better than the Centerbridge/Paulson proposal as the parties came into the Auction.

25.     The Auction was held on May 27, 2010. The Special Servicer reserved its right to credit bid, and Starwood and Centerbridge/Paulson each submitted several topping bids that included non-cash components. After a series of competitive bids, the Special Servicer and Operating Advisor informed the bidders that only cash bids would be accepted. Neither the Debtors nor their advisors contested the Special Servicer's direction, and accordingly from that point on only cash bids were submitted. While Starwood submitted several cash bids, Starwood did not believe that a cash bid was appropriate to maximize value for the estates and the creditors. Notably, as the values of the bids exceeded $2.542 billion, the Controlling Holder's claims (<u>i.e.</u>, the Class A-4 Mortgage Certificates) were fully satisfied, and it had no further economic interest in the balance of the Auction.

26.     Ultimately, Centerbridge/Paulson was selected as the winning all-cash bidder. Following the Auction, the Debtors entered into an Investment and Standby Purchase Agreement setting forth the terms of the investment with Centerbridge/Paulson and on June 8, 2010, filed

the C/P Plan incorporating the winning bid and the disclosure statement with respect thereto (the "Disclosure Statement").  The hearing on approval of the Disclosure Statement is scheduled for Thursday, June 17, 2010 (the "Disclosure Statement Hearing").

**THE COURT SHOULD DENY THE DEBTORS' MOTION TO APPROVE
THE CENTERBRIDGE/PAULSON BID AND THE DISCLOSURE STATEMENT**

**I.      The Court Should Deny The Designation of Centerbridge/Paulson as Winning
Bidder of the Auction**

27.      "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtor's] duty with respect to [asset] sales is to obtain the highest price or greatest overall benefit possible for the estate."  *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 658 (S.D.N.Y. 1992).  Here, in order to ensure that value is maximized for the benefit of all creditors, the Centerbridge/Paulson bid should not be approved as the highest and best bid.

28.      As discussed herein, Starwood is prepared to jointly propose with the Committee a Starwood plan that provides the opportunity for unsecured creditors to share in the value of the Reorganized Debtors, as compared to the C/P Plan that does not provide such opportunity and is the result of a flawed auction process at a deflated value.  Creditors should be given an opportunity to vote on each of the plans and select the plan that they believe results in the highest and best recovery.

29.      Moreover, the Special Servicer and the Operating Advisor improperly controlled the Auction.  The Class A-4 Mortgage Certificate Holders were designated as the Controlling Holder based upon the Appraisal completed ten months ago in the midst of the severe economic downturn.  Since that time, the Debtors' industry has normalized, and the Debtors are exceeding their own projections.  As noted, for April 2010, the last month of available data, occupancy at

the 664 properties that constitute collateral for the Mortgage Loan increased to 74.6% versus 62.8% for April 2009. Similarly, for the month ended April 2010, revenue per available room for the 664 collateral properties increased 5.3% year-over-year versus month ended April 2009, and property EBITDA increased 9.3% year-over-year versus month ended April 2009. Through April 2010 year-to-date, total revenue at the 664 collateral properties is $259.6 million, 12.9% ahead of the Debtors' business plan dated October 2009, and property EBITDA at the 664 collateral properties is $122.1 million, 27.7% ahead of the Debtors' business plan dated October 2009.[3]

30.     Moreover, since the appraisal the Debtors' industry has seen a significant recovery. As demonstrated by the data below, since the date of the appraisal, the hospitality industry has seen a significant improvement in value:

|  | 9/17/09 [4] | 6/10/10 |
|---|---|---|
| DJIA | 9,783.92 | 10,172.53 |
| **Company** | **Closing Price** | **Closing Price** |
| Starwood Hotels | $34.18 | $47.72 |
| Marriott | $26.91 | $33.41 |
| Host Hotels | $11.81 | $14.84 |
| Wyndham | $15.75 | $23.22 |

As further evidence that the Appraisal is stale, even the bids submitted at the Auction were well above the value established by the Appraisal. Thus, the Auction was flawed by granting control to the Operating Advisor and Controlling Holders, a group that (a) was in the money regardless of the bid submitted; (b) did not have any further economic incentive to maximize value for the estates to direct recovery to other creditors once the bids exceeded $2.542 billion; and (c) was only concerned with being cashed out regardless of the impact on other creditors.

---

[3] Sources for this paragraph: Fin 664 Trend 0410.xls; ESH Corporate Model - 664 Only - $480MM - 10.1.2009.xls.
[4] September 17, 2009 was the first interest distribution date immediately following the appraisal.

31.     As demonstrated by market indicators, the Debtors' improved performance and Starwood's willingness to propose a better plan, the Debtors' value exceeds $3.925 billion and that value is not being captured for the creditors.   Providing creditors with equity would allow them to participate in the upside of the Reorganized Debtors' value, as opposed to the C/P Plan's proposal that all such benefits inure solely to Centerbridge/Paulson.   In addition, if the Debtors were to pursue other exit strategies, such as an IPO, the Debtors' value may range from $4.8 billion to $5.2 billion, estimates which are supported by Citi.   Therefore, by requiring the submission of cash-only bids, the Special Servicer and Operating Advisor ensured that the bids at the Auction would not reflect the highest and best value, and ensured that creditors would not receive the maximum recoveries justified by the value of the Debtors' business.

32.     Based upon the foregoing, the Court should not authorize the designation of Centerbridge/Paulson as the highest and best bidder at the Auction, and the Debtors should not be permitted to proceed with the C/P Plan.

## II.  The Disclosure Statement Should Not Be Approved

### A.  The Disclosure Statement Should Not be Approved Because the C/P Plan is Not Confirmable On Its Face

33.     Regardless of whether the Disclosure Statement includes adequate information, the Court has the authority to deny approval of a disclosure statement when it supports a plan that is unconfirmable on its face.  *In re United States Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986); *In re Century Inv. Fund VIII Ltd. P'ship.,* 114 B.R. 1003 (Bankr. E.D. Wis. 1990).  A court may consider substantive plan issues at the disclosure statement hearing if the defect renders the plan unconfirmable upon its

face.  *See, e.g., In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("It has become

standard Chapter 11 practice that when an objection raises substantive plan issues that are

normally addressed at confirmation, it is proper to consider and rule upon such issues prior to

confirmation, where the proposed plan is arguably unconfirmable on its face.") (internal

questions omitted); *In re Market Square Inn, Inc.*, 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994)

("Where it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to

refuse the approval of the disclosure statement."); *In re Dakota Rail, Inc.*, 104 B.R. 138, 145

(Bankr. D. Minn. 1989) (denying approval of "facially defective disclosure statement" describing

infeasible plan); *In re S.E.T. Income Props, III*, 83 B.R. 791, 794 (Bankr. N.D. Okla. 1988)

(denying approval of disclosure statement because "the disclosure statement . . . demonstrates

that the debtor's proposed plan of reorganization is not feasible.").   Thus, if the disclosure

statement describes a plan that is so "'fatally flawed' that confirmation is 'impossible,' the court

should exercise its discretion to refuse to consider the adequacy of disclosures."  *In re E. Me.*

*Elec. Coop., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991) (citing *In re Cardinal Congregate I*,

121 B.R. 760, 764 (Bankr. S.D. Ohio 1990)).  *See also In re Allied Gaming Mgmt., Inc.*, 209 B.R.

201, 202 (Bankr. W.D. La. 1997) ("[N]otwithstanding adequate disclosure of information

required by section 1125(b), a disclosure statement should not be approved if the proposed plan,

as a matter of law, cannot be confirmed.")  As explained by the court in *In re Allied Gaming*

*Mgmt.:*

> As the approval of the adequacy of a disclosure statement is an
> absolute prerequisite to soliciting acceptances or rejections of a
> plan of reorganization, a plan is in limbo until such approval is
> obtained . . . notwithstanding adequate disclosure of information
> required by section 1125(b), a disclosure statement should not be
> approved if the proposed plan, as a matter of law, cannot be
> confirmed.  The reasoning behind such holding is obvious -- the
> estate should not be burdened (both in terms of time and expense)

with going through the printing, mailing, noticing, balloting and other exercises in the confirmation process where inability to attain confirmation is a *fait accompli*.

*In re Allied Gaming Mgmt.,* 209 B.R. at 202 (internal citations omitted). *See also In re Beyond.com Corp.,* 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (refusing to approve a disclosure statement because the underlying plan was "patently unconfirmable"); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 301 (Bankr. D. Mass. 2002).

34.     Here, the C/P Plan is unconfirmable on its face for at least two reasons:  The C/P Plan unfairly discriminates and will fail the "fair and equitable" standard for confirmation under section 1129 of the Bankruptcy Code.   Similarly, the C/P Plan will fail the "good faith" requirements of section 1129 of the Bankruptcy Code.

### 1.     The C/P Plan Is Not Confirmable Because It Unfairly Discriminates and is Not Fair and Equitable

35.     The C/P Plan cannot be confirmed on its face because it unfairly discriminates and is not fair and equitable.  Where an impaired class of creditors rejects a plan, the plan cannot unfairly discriminate and must be "fair and equitable" as required by section 1129 of the Bankruptcy Code in order to be confirmable.  *Coltex Loop Cent. Three Partners, L.P. v. BT/SAP Pool C Assocs. L.P. (In re Coltex Loop Cent. Three Partners, L.P.)*, 138 F.3d 39, 42 (2d Cir. 1998).   "In order to satisfy the overall requirement of § 1129(b)(1) that a plan be 'fair and equitable,' the plan must literally be fair and equitable."  *In re Renegade Holdings, Inc.*, 2010 Bankr. LEXIS 1212, at *67 (Bankr. M.D.N.C. April 16, 2010).

36.     As described above, the Debtors' assets are worth much more than the "winning bid" at the Auction, which was unnecessarily deflated by an artificial limitation created by the Special Servicer's cash-only directive.   Under a more fair process as had been originally contemplated by the Bidding Procedures, the Debtors would have achieved a bid worth much

more than $3.925 billion.  As noted, the enterprise value of the Debtors could equal as much as $4.8 billion to $5.2 billion if the Debtors pursued an IPO or other option.  Based upon this valuation, the Debtors' assets are worth far more than the face amount of the Mortgage Debt, and the Mezzanine Lenders will likely object to the Plan, since they are unfairly deprived of the opportunity to share in the value of the Reorganized Debtors.  This excess value is not being distributed to the Mezzanine Lenders, and thus the C/P Plan unfairly discriminates and fails to meet the fair and equitable requirements to cram down a dissenting creditor class.

37.      The C/P Plan, which uses an artificially deflated valuation to discriminate and deprive the Mezzanine Lenders of their right to a fair and equitable treatment under the Plan, is fundamentally unfair and inequitable.

### 2.      The C/P Plan Is Not Confirmable Because It Does Not Meet the Good Faith Requirement

38.      Section 1129(a)(3) of the Bankruptcy Code provides that a court may only confirm a plan if "the plan has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. §1129(a)(3).  The Second Circuit has construed the standard as requiring a showing that "the plan [was] proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."  *In re Granite Broad. Corp.*, 369 B.R. 120, 128-29 (Bankr. S.D.N.Y. 2007) (*citing Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988)).  "For purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000).  "Most courts agree that the determination of whether a debtor's plan has been proposed in good faith requires a factual inquiry of the totality of the circumstances."  *In re Pierce County Hous. Auth.*, 414 B.R. 702, 720 (Bankr. W.D. Wash. 2009).  Relevant factors

include, among other things, ". . . whether a plan's terms or the *process* used to seek its confirmation was fundamentally fair." *Id.* (emphasis added).

39.     The C/P Plan fails to satisfy this good faith requirement because the Auction, and thus the plan that arose from the Auction, were driven by the concerns of one group of holders, who structured the Auction to foreclose other plan structures that would have provided more value to other creditors. Under the TSA, the Operating Advisor and the Controlling Holder exert control over the Special Servicer and in turn, the Special Servicer has significant leverage over the Debtors as the sole entity representing $4.1 billion in Mortgage Debt and the sole entity casting a vote in favor or against any plan impairing the Mortgage Debt.

40.     As set forth above, the Operating Advisor and the Controlling Holder (i.e., the Class A-4 Certificate Holders) had no incentive to push to maximize value at the Auction once the values of the bids exceeded $2.542 billion cash. Moreover, the Operating Advisor and Controlling Holder should never have been given so much influence over the Auction because, given the difference in the Appraisal conducted ten months ago compared to the values generated at the flawed Auction, the value of the Debtors had increased substantially and other creditors - particularly the Mezzanine Lenders - should have been given a voice at the Auction. It is not fair to devise a plan to serve the interests of only one group of holders which exerts unfair leverage over the entire plan process. The C/P Plan serves the interests of the Controlling Holder, but had non-cash bids been allowed, a plan could have been structured so as to maximize value to the estates and create a greater recovery for all creditors.

41.     This undue influence by the Controlling Holder through the Operating Advisor and Special Servicer, tainted the Auction process and is wholly inconsistent with the very core of the objectives and purposes of the Bankruptcy Code - namely, the principles of maximizing the

value of the estate properties and of protecting the interests of all creditors fairly and equitably. The C/P Plan, arising from a process that is inconsistent with the objectives and purposes of the Bankruptcy Code and fundamentally unfair, cannot meet the good faith requirement of section 1129(a)(3) and therefore, is not confirmable on its face.

## B. The Disclosure Statement Should Not Be Approved Because It Does Not Provide Adequate Information

42.    Section 1125(b) of the Bankruptcy Code conditions a debtor's solicitation of votes on a proposed chapter 11 plan on the bankruptcy court's determination that the disclosure statement contains "adequate information."   The Bankruptcy Code defines "adequate information" as

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of claims or interests in the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 99-100 (Bankr. D. Del. 1999) (disclosure statement must contain information that is reasonably practicable to permit an informed judgment by holders of claims or interests entitled to vote on the plan); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("At the 'heart' of the chapter 11 process is the requirement that holders of claims in impaired classes be furnished a proper disclosure statement 'that would enable a hypothetical reasonable investor . . . to make an informed judgment about the plan.'") (quoting H.R. Rep. No. 95-595, at 408-09 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6364-65); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution").

43.     A disclosure statement accompanying a chapter 11 plan is designed to provide sufficient information to creditors *in each particular class* to permit them to decide whether to vote for or against the proposed plan.  *See* 11 U.S.C. § 1125(a)(1).  "Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated."  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 362 (3d Cir. 1996).  The disclosure statement "plays a pivotal role in the give and take among creditors and between creditors and the debtor that leads to a confirmed negotiated plan of reorganization by requiring adequate disclosure to the parties so they can make their own decisions on the plan's acceptability."  *Nelson v. Dalkon Shield Claimants Trust* (*In re A.H. Robins Co., Inc.*), 216 B.R. 175, 180 (E.D. Va. 1997), *aff'd,* 163 F.3d 598 (4th Cir. 1998); *In re Stanley Hotel, Inc.*, 13 B.R. 926, 930 (Bankr. D. Colo. 1981) (noting that creditors need material information to make an "informed choice" with respect to acceptance or rejection of a plan).  Given the foregoing, the Court cannot approve the Disclosure Statement because it fails to adequately disclose certain material information, including that which is described below.

> 1.     **The Disclosure Statement Should Not be Approved Because It Fails to Disclose to Creditors the Possibility of Other Plans Creating More Value**

44.     As discussed herein, the all-cash "winning" bid forced by the Special Servicer, the Operating Advisor and Controlling Holder does not maximize value for the estates and the creditors.  Rather, the Debtors are worth more on a structured bid basis or through a different exit strategy.  Starwood believes the value of the Debtors exceeds $3.925 billion, and in fact is sufficient to exceed the secured debt.  Starwood is prepared to move forward on a Starwood plan that would provide unsecured creditors with the ability to share in the value of the Reorganized Debtors.  In addition, as a further example of the value of the Debtors, if the Debtors went public

through an IPO they may be worth $4.8 billion to $5.2 billion, which would provide significant value to creditors beyond the $4.1 billion Mortgage Debt. The Disclosure Statement should include this information and indicate that, if the C/P Plan fails, another plan, including a Starwood plan, could be proposed that provides more value to the creditors. Alternatively, this Court could allow solicitation of votes on a Starwood plan and the C/P Plan simultaneously once the Starwood plan is filed and the disclosure with respect thereto approved. Ultimately, the creditors should not be led to believe that their only option is to accept the depressed valuation imposed by the cash auction process.

        2.      **The Disclosure Statement Should Not be Approved Because It Does Not Disclose Recovery to Creditors**

45.     The Disclosure Statement fails to provide creditors with adequate information within the meaning of section 1125(a)(1) of the Bankruptcy Code regarding how much value will actually be distributed under the C/P Plan. As part of the C/P Plan, numerous entities are entitled to payouts before payments to creditors pursuant to the terms of the C/P Plan. For example, the Disclosure Statement and C/P Plan includes (i) a $20 million indemnification fund, (ii) $5,000,000 of funding for a litigation trust, (iv) $750,000 to fund the wind-down of ESI, (v) $40,000,000 for the purchase of control of HVM L.L.C., and (vi) other undisclosed amounts to be paid to acquire the BHAC IP and settle with ESI, which amounts and terms should be disclosed to all creditors. Despite the fact that these payouts are to be made before money is distributed to creditors under the C/P Plan and there are likely other costs to be paid, neither the Disclosure Statement nor the C/P Plan provides sufficient information to enable creditors to ascertain payment amounts or recovery percentages. The Disclosure Statement does not clarify how far down the Mortgage Debt stack the purchase price will reach. Therefore, creditors are left with no means of determining whether, or by what amount, they will be paid for their claims

under the C/P Plan. Without information on payments and recovery, the Disclosure Statement is of limited use to creditors.

> ### 2. The Disclosure Statement Should Not be Approved Because It Fails to Disclose Terms of the Special Servicer Plan Support Agreement

46. Though the Disclosure Statement makes clear that the Special Servicer entered into a plan support agreement in connection with the winning bid at the Auction, the Disclosure Statement discloses only that "In conjunction with the Auction, the Special Servicer entered into a [p]lan [s]upport [a]greement pursuant to which the Special Servicer has agreed to vote its claims in Classes 2 and 4A to accept the [C/P] Plan." Disclosure Statement, p. 8. The Disclosure Statement provides no other details or terms of the support agreement. The Disclosure Statement should be modified to include a detailed description of the obligations to both parties under the plan support agreement and to annex the document itself as an exhibit.

> ### C. The Disclosure Statement Hearing Should Be Adjourned Because the Debtors Have Violated the Time Periods Under the Bankruptcy Rules for Notice

47. Bankruptcy Rule 3017(a) provides that "the court shall hold a hearing on at least twenty-five days notice to consider the disclosure statement . . . ." Fed. R. Bankr. P. 3017(c). Additionally, Bankruptcy Rule 2002(b) requires twenty-five days' notice of any hearing to consider approval of a disclosure statement or confirmation of a plan of reorganization. Fed. R. Bankr. P. 2002(b).

48. In this case, the Debtors filed the entirely new C/P Plan, consisting of the winning C/P bid, on Tuesday, June 8, 2010. The Disclosure Statement Hearing is scheduled for Thursday, June 17, 2010. The schedule left all parties with only 9 days to review and respond to these extremely complex and lengthy documents. This time is insufficient per the Bankruptcy Rules,

and accordingly, the Disclosure Statement hearing should be adjourned until at least July 5, 2010, to allow for proper notice.

## CONCLUSION

49.     The Court should deny approval of the Disclosure Statement and refuse to designate Centerbridge/Paulson as highest and best bidder at the Auction because (i) the recent Auction did not maximize values for the Debtors' estates; (ii) the C/P Plan is unconfirmable because it does not meet the fair and equitable and good faith standards for confirmation and (iii) the Disclosure Statement provides inadequate disclosure with regard to recoveries under the C/P Plan, agreements entered into under the C/P Plan, and alternatives to the C/P Plan. Moreover, the Debtors have violated the time periods set under the Bankruptcy Code for consideration of the Disclosure Statement, and thus the Disclosure Statement Hearing should be adjourned. Most importantly, a Starwood plan would provide a better outcome for all creditors in these cases. Accordingly, for all of the reasons set forth herein, the Court should deny the Motion.

WHEREFORE Starwood, Debt-U, and Debt II respectfully request that the Court enter an order (i) denying the Motion; (ii) determining that the Centerbridge/Paulson bid was not the highest and best bid at the Auction; and (iii) granting such further relief as is just and proper.

Dated: June 14, 2010          GREENBERG TRAURIG, LLP
New York, New York

By: */s/ Bruce R. Zirinsky*_____
    Bruce R. Zirinsky, Esq.
    Nathan A. Haynes, Esq.
    MetLife Building
    200 Park Avenue
    New York, New York 10166
    Telephone: (212) 801-9200
    Facsimile: (212) 801-6400
    Email: zirinskyb@gtlaw.com
         haynesn@gtlaw.com

*and*

Nancy A. Peterman, Esq.
77 West Wacker Drive
Suite 3100
Chicago IL 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
Email: petermann@gtlaw.com

*Attorneys for Debt-U ESH, L.P. and Debt II ESH, L.P.*