**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Marc D. Powers
mpowers@bakerlaw.com
Matthew R. Goldman
mgoldman@bakerlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| EXTENDED STAY, INC. *et al.*, | No. 09-13764 (JMP) |
| Debtors. | (Jointly Administered) |
| WALKER, TRUESDELL, ROTH & ASSOCIATES, as Trustee for and on behalf of the EXTENDED STAY LITIGATION TRUST, | |
| HOBART TRUESDELL, as Trustee for and on behalf of the Extended Stay Litigation Trust, and | Adv. Pro. No. _____ |
| THE EXTENDED STAY LITIGATION TRUST, | |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| THE BLACKSTONE GROUP, L.P., BLACKSTONE HOLDINGS I L.P., BLACKSTONE HOLDINGS II L.P., BLACKSTONE HOLDINGS III L.P., BLACKSTONE HOLDINGS IV L.P., BLACKSTONE HOLDINGS V L.P., BLACKSTONE HOLDINGS I/II GP INC., | |

BLACKSTONE HOLDINGS III GP L.L.C.,
BLACKSTONE HOLDINGS IV GP L.L.C.,
BLACKSTONE HOLDINGS V GP L.P.,
BLACKSTONE REAL ESTATE
PARTNERS IV L.P., BLACKSTONE
CAPITAL PARTNERS IV L.P., BHAC IV,
LLC, BRE/HV HOLDINGS, LLC,
BLACKSTONE HOSPITALITY
ACQUISITIONS, LLC,  PRIME
HOSPITALITY, LLC, DL-DW HOLDINGS,
LLC,  CITIGROUP GLOBAL MARKETS,
INC., BANK OF AMERICA, N.A., and
DOES 1 through 100, inclusive,

Defendants.

Plaintiffs, Walker, Truesdell, Roth & Associates, as Trustee for and on behalf of the Extended Stay Litigation Trust (the "Trust"), Hobart Truesdell, as Trustee for and on behalf of the Trust (collectively, the "Trustee") and the Trust, by the undersigned counsel, hereby file this Complaint, and allege as follows:

## NATURE OF ACTION

1.     The Plaintiffs bring this action to avoid transfers made in connection with the disastrous leveraged buyout (the "LBO") of the Extended Stay, Inc. and Homestead Village LLC family of companies (collectively, the "Company," and including the bankrupt debtor entities identified below) consummated on or about June 11, 2007, to recover damages for securities fraud, and to enforce subrogation rights.   The LBO, which was tainted from start to finish, caused the Company to lose billions of dollars in value between the closing of the LBO and the Company's bankruptcy filings on June 15, 2009 (the "Filing Date"), approximately two years later.   The LBO transaction was the cause of the Company ultimately filing for chapter 11 bankruptcy relief.

2.     The Company, a member of the hotel industry, was a profitable business prior to

the LBO. After the LBO, however, the Company was burdened with a devastating additional debt load without any corresponding increase in assets. It was rendered insolvent to enrich a small group of individuals and entities at the expense of the Company's preexisting and future non-LBO creditors. The Company's preexisting equity holders, all of which were entities affiliated with The Blackstone Group L.P. were paid handsomely for their equity interests using Company assets, while the Debtors were left with crushing debt. In addition to the debt burden, the Company faced increased severe restrictions on its ability to use and control its own cash flow because of the new terms imposed by the LBO debt. The end result was that the Company no longer had the liquidity to survive, even in a more ordinary economy than the one that it was shortly about to face.

3. The Company was exploited by the Sellers and the Buyer and used as a mechanism for assuming the massive debt that would fund the LBO so the Sellers and Buyers would profit at the Company's expense. The approximately $8 billion dollar purchase price was funded almost entirely by debt the Company was forced to incur. The purportedly arms-length transaction was anything but, as the grossly inflated purchase price was engineered by the Blackstone-affiliated Sellers looking to maximize their profits, working in concert with a Buyer that assumed little to no risk of loss. In short, the purchase price that enriched the Sellers was far from justifiable.

4. Blackstone and its related entities siphoned approximately $2.1 billion in value from the Debtors to Blackstone, rendering them insolvent, undercapitalized and unable to survive, and DL-DW Holdings, LLC purchased the equity in the Company from Blackstone by in essence using property of the Debtors to pay the price, rather than using its own funds.

5. The Company also paid millions to professionals and lenders for their work in

connection with the consummation of the LBO transaction. For none of these payments did the Company receive value or a benefit.

6. Blackstone knew the Company was going to be rendered insolvent by the LBO transaction. The Information Memorandum (defined below) it prepared for the Company, with the assistance of its professional and agents, included figures and projections for growth rates that were patently unreasonable—and belied by the actual performance of the Company at the time. Upon information and belief, it is highly likely that Blackstone was well-positioned to, and did, anticipate the downturn in advance of the LBO.

7. The LBO's failure was foreseeable from the start. Indeed, each of the three rating agencies that looked at the deal came to the same conclusion: that the total capitalization of the LBO substantially exceeded the value of the Company's assets. The Company was never, post-LBO, able to meet the financial standards necessary to prevent the lenders from sequestering all cash flow beyond certain specifically budgeted items, which budgeted items did not include even the minimum actual requirements for continuing to operate the business and to timely pay known Company obligations. The only person who had been willing to bid on the Company at the ostensibly required price was itself a substantially leveraged entity, and one whose principals had little experience in either the hotel industry or in the rarified world of multi-billion-dollar syndicated transactions. The deal had everything to do with the excesses of the financial marketplace in the last part of the boom years, and nothing to do with the Company's actual financial worth.

8. The conduct of the Defendants left the Extended Stay entities hopelessly insolvent, inadequately capitalized and not able to pay their debts – even by future borrowing. Meanwhile, billions of dollars were diverted to or for the benefit of the Defendants in the form of

transfers of cash and/or the transfer of liens and pledges in property. The cost of the Defendants' misconduct and their own gains were ultimately born by the Extended Stay entities' creditors. The company predictably filed for bankruptcy approximately two years after the LBO transaction closed.

9.     Through this action, the Trust, established to bring claims against those responsible for the Company's demise as well as those who profited from it, and Trustee seek to recover damages caused by the Defendants and to avoid and recover the value of fraudulent transfers and obligations that were made to or for the benefit of the Defendants.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 157(a) and 1334(b) because the claims asserted arise in, arise under, and are related to the chapter 11 case, *In re Extended Stay, Inc., et al.*, 09-13764 (JMP), pending in the United States Bankruptcy Court for the Southern District of New York.

11.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil litigation action arises under the laws of the United States.

12.     Venue is proper pursuant to 28 U.S.C. §§ 1408, 1409, 1391(a)(2), 1391(a)(3), and 1391(b)(2)-(3) because this adversary proceeding arises under and in connection with cases pending under title 11 of the United States Code.

13.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A).

14.     Some of the claims asserted herein arise under section 17(a) of the Securities Act of 1933 (the "Securities Act"), and section l0(b) of the Securities Exchange Act of 1934 (the "Securities Exchange Act"), 15 U.S.C. §§ 78j and 77q, and SEC Rule 10b-5, 17 C.F.R. §

240.10b, promulgated thereunder by the SEC, as well as under the laws of the state of New York. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, section 22 of the Securities Act, section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and pursuant to the supplemental jurisdiction of this Court, 28 U.S.C. § 1367.

15.    In respect of those claims, venue is also proper in the Southern District of New York pursuant to section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud and other wrongdoing and/or their effects have occurred within the Southern District of New York, and many of the named Defendants reside in and/or maintain principal executive offices in the Southern District of New York.

16.    In connection with the acts and omissions alleged in this Complaint, the named Defendants, directly or indirectly, used the mail and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**THE PARTIES**

**A.    The Extended Stay Litigation Trust, the Trustee and the Debtors**

17.    **The Extended Stay Litigation Trust** is a post-confirmation litigation trust established by the Extended Stay Litigation Trust Agreement, dated as of October 8, 2010 (the "Litigation Trust Agreement") in the United States Bankruptcy Court for the Southern District of New York, Case No. 09-13764 (JMP) (the "Bankruptcy Court"). The Trust Agreement was executed as part of the Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of June 8, 2010 and confirmed on or about July 20, 2010 (the "Plan") in the chapter 11 bankruptcy case of *In re Extended Stay, Inc. et al.* (the "Chapter 11 Cases").

18.     The Trust was established for the benefit of the creditors of the Debtors (collectively, the "Litigation Trust Beneficiaries").  Pursuant to the Plan and the Bankruptcy Court Order approving the Plan, the Trust has title to all assets described in Section 1.89 of the Plan, as well as all assets transferred to the Trust pursuant to the "ESI Settlement Agreement," incorporated into the Plan.  These assets include, but are not limited to, any potential claims, causes of actions, charges, suits or rights of recovery of the Debtors and ESI (as defined below) referenced in the Examiner's Report of Ralph R. Mabey, examiner in the Chapter 11 Cases, filed with the Bankruptcy Court on April 8, 2010 (the "Litigation Trust Assets").  In that Examiner's Report, the examiner set forth his assertions of the facts leading up to the Chapter 11 Cases and causes of action that could be asserted against various parties arising therefrom, including the causes of action asserted against the Defendants herein.

19.     Claims against certain specified entities in named capacities are excluded from the Litigation Trust Assets as a result of settlement embodied in the Plan.  Nonetheless, the claims transferred to the Litigation Trust are protected against impairment by, among other things, paragraph 75 of the Confirmation Order, which provides

> 75. Nothing in the Plan, this Order, the ESI Settlement or the ESI Settlement Order will have the effect of impairing, enhancing, or altering either (i) the rights, remedies or defenses (or the enforceability thereof) of any defendant with respect to any rights, remedies, claims, causes of action (or interests therein) that are transferred to the Litigation Trust, or (ii) the rights, remedies, claims or causes of action (or interests therein) of any Debtor or ESI that are so transferred; it being understood that the effect of the Plan, this Order, the ESI Settlement and the ESI Settlement Order is to be "litigation neutral" with respect to all such rights, remedies, defenses, claims and causes of action.

20.     **Hobart Truesdell and Walker, Truesdell Roth & Associates** (collectively, the "Trustee" as defined above) were duly appointed as the Trustee of the Trust in accordance with

and pursuant to the Trust Agreement and the Bankruptcy Court Order confirming the Plan. The Trustee and the Trust are authorized to commence all claims and causes of action formerly owned by the Debtors, which have now been indefeasibly vested in the Trust, including all causes of action asserted herein. The Trustee and the Trust exercise all pertinent rights of the Debtors that may be relevant to this Complaint. The Trustee likewise has standing to assert all claims and causes of action set forth herein as a representative of the Debtors, pursuant to the Plan and the ESI Settlement Agreement, and section 1123(b)(3)(B) of the Bankruptcy Code, to the extent that as to any causes of action herein failed to be transferred to the Litigation Trust because of an enforceable restriction on transferability under applicable non-bankruptcy law, and brings this cause of action in that capacity to the extent of any such failure to transfer.

21.     The Trustee's principal place of business is located at 380 Lexington Avenue, Suite 1014, New York, New York 10168. The Trustees were appointed as Trustees of the Trust in New York County, effective as of October 8, 2010.

22.     For purposes of this Complaint, the following entities are the "Debtors:" ESA 2005 Operating Lessee Inc.; ESA 2005 Portfolio L.L.C.; ESA 2005-San Jose L.L.C.; ESA 2005-Waltham L.L.C.; ESA 2007 Operating Lessee Inc.; ESA Acquisition Properties L.L.C.; ESA Alaska L.L.C.; ESA Business Trust; ESA Canada Beneficiary Inc.; ESA Canada Operating Lessee Inc.; ESA Canada Properties Borrower L.L.C.; ESA Canada Properties Trust; ESA Canada Trustee Inc.; ESA FL Properties L.L.C.; ESA Management L.L.C.; ESA MD Beneficiary L.L.C.; ESA MD Borrower L.L.C.; ESA MD Properties Business Trust; ESA Mezz 10 L.L.C.; ESA Mezz 2 L.L.C.; ESA Mezz 3 L.L.C.; ESA Mezz 4 L.L.C.; ESA Mezz 5 L.L.C.; ESA Mezz 6 L.L.C.; ESA Mezz 7 L.L.C.; ESA Mezz 8 L.L.C.; ESA Mezz 9 L.L.C.; ESA Mezz L.L.C.; ESA MN Properties L.L.C.; ESA Operating Lessee Inc.; ESA P Mezz 10 L.L.C.; ESA P

Mezz 2 L.L.C.; ESA P Mezz 3 L.L.C.; ESA P Mezz 4 L.L.C.; ESA P Mezz 5 L.L.C.; ESA P Mezz 6 L.L.C.; ESA P Mezz 7 L.L.C.; ESA P Mezz 8 L.L.C.; ESA P Mezz 9 L.L.C.; ESA P Mezz L.L.C.; ESA P Portfolio Holdings L.L.C.; ESA P Portfolio L.L.C.; ESA P Portfolio MD Beneficiary L.L.C. ; ESA P Portfolio MD Borrower L.L.C.; ESA P Portfolio MD Trust; ESA P Portfolio Operating Lessee Inc.; ESA P Portfolio PA Properties L.L.C.; ESA P Portfolio TXNC GP L.L.C.; ESA P Portfolio TXNC Properties L.P.; ESA PA Properties L.L.C.; ESA Properties L.L.C.; ESA TX Properties L.P.; ESA TXGP L.L.C.; ESA UD Properties L.L.C.; ESH/Homestead Mezz 10 L.L.C.; ESH/Homestead Mezz 2 L.L.C.; ESH/Homestead Mezz 3 L.L.C.; ESH/Homestead Mezz 4 L.L.C.; ESH/Homestead Mezz 5 L.L.C.; ESH/Homestead Mezz 6 L.L.C.; ESH/Homestead Mezz 7 L.L.C.; ESH/Homestead Mezz 8 L.L.C.; ESH/Homestead Mezz 9 L.L.C.; ESH/Homestead Mezz L.L.C.; ESH/Homestead Portfolio L.L.C.; ESH/HV Properties L.L.C.; ESH/MSTX GP L.L.C.; ESH/MSTX Property L.P.; ESH/TN Member Inc.; ESH/TN Properties L.L.C.; ESH/TX Properties L.P.; ESH/TXGP L.L.C.; Extended Stay Hotels L.L.C.; Extended Stay, Inc.; and Homestead Village L.L.C.  Because the Plan covered all Debtors other than Extended Stay, Inc., the Debtors, with the exclusion of Extended Stay, Inc., are referred to as the "Plan Debtors."  All of the Debtors filed for bankruptcy on June 15, 2009, except the following Debtors who filed on February 18, 2010: ESH/MSTX GP L.L.C., ESH/TXGP L.L.C., ESA TXGP L.L.C., ESA P Portfolio TXNC GP L.L.C., and ESH/TN Member Inc.

     23.    Two of the Debtors are of particular significance.  Extended Stay, Inc. ("ESI") is a Delaware corporation and a Debtor in the Chapter 11 Cases.  A majority of the Debtors' pre- and post-LBO corporate organization was comprised of entities indirectly or directly owned by ESI, including, without limitation, all or substantially all of the real estate investment trust ("REIT")

portion of the Debtors' businesses. Post-LBO, BHAC Capital IV, LLC ("BHAC Capital") was the direct majority owner of ESI. At all times relevant to this Complaint, ESI was managed by a board of directors that was comprised exclusively of insiders. Those directors were affiliated with direct or indirect equity holders of ESI.

24.      Homestead Village, L.L.C. ("Homestead") is a Delaware limited liability company and is a Debtor in the Chapter 11 Cases. The portion of the Debtors' pre- and post-LBO corporate organization that was not within the ESI corporate chain was comprised of entities indirectly or directly owned by Homestead. Beginning shortly after the LBO, Homestead was also an owner (although not the sole owner) of BHAC Capital and, therefore, an indirect owner of ESI. At all times relevant to this Complaint, Homestead was managed by a corporate-style board of directors, had no independent outside directors, and was managed by insiders.

**B.      The Sellers and Blackstone Entity Defendants**

25.      **The Blackstone Group, L.P.** (individually, and in its capacity as a successor-in-interest to and direct or indirect parent of entities and funds within its pre-IPO Real Estate or Corporate Private Equity operations, "Blackstone Group" or "Blackstone") was, upon information and belief, the direct or indirect owner and controlling entity of the nominal sellers in the LBO, a successor in interest to the Blackstone affiliates that were the direct or indirect owners or controlling entities of the nominal sellers in the LBO and an entity that derived a substantial benefit in connection with its IPO as a result of the LBO.

26.      From and after no later than approximately June 18, 2007, Blackstone Group was also the indirect owner of a substantial "rollover equity" interest in the post-LBO Debtors. Blackstone Group is a publicly traded limited partnership, organized under the laws of the State of Delaware. As of March 31, 2011, according to recent SEC filings, Blackstone Group had

managed assets of approximately $150 billion. Blackstone Group's principal place of business is located at 345 Park Avenue, New York, New York 10154.

27.     At all times relevant to this Complaint, Blackstone's business was organized into four business segments: Corporate Private Equity, Marketable Alternative Asset Management, Financial Advisory Services and Real Estate. Upon information and belief, at all times relevant to this Complaint, Blackstone's pre-LBO investment in the Debtors was managed and controlled by a combination of Senior Managing Directors in Blackstone's Real Estate and Corporate Private Equity business segments. Prior to Blackstone's June 21, 2007 IPO, Blackstone Group's entire business consisted of separately owned predecessor entities controlled directly or indirectly by Blackstone's founders, Stephen Schwarzman and Peter Peterson, and Blackstone's Senior Managing Directors.

28.     On or around March 5, 2004, two Blackstone investment funds, Blackstone Real Estate Partners IV ("BREP IV") and Blackstone Capital Partners IV ("BCP IV" and, together with BREP IV, "BREP/BCP IV"), on their own behalves and on behalf of or through certain entities owned or controlled by BREP/BCP IV, purchased Extended Stay America, Inc. Extended Stay America, Inc. was, at that time, a publicly traded corporation. In connection with the acquisition, Extended Stay America, Inc. and, upon information and belief, other related entities, were "taken private" by Blackstone and were merged into certain other Blackstone entities, including, BHAC Capital IV, LLC and BHAC Capital Acquisition IV, Inc.

29.     At all times relevant to this Complaint, the Blackstone Real Estate Group managed and controlled around six general real estate opportunity funds. Upon information and belief, BREP IV was such a fund at the time of the LBO and was the primary fund within which the pre-LBO Debtors and their immediate controlling Blackstone entities (as described below)

were organized. After the LBO and Blackstone's IPO, certain Blackstone SEC filings reference the Blackstone entity that nominally owned Blackstone's "rollover equity" in the post-LBO Debtors as being a part of the "BREP IV" fund.

30.     No later than June 18, 2007, Blackstone Group and its affiliates reorganized their corporate structure in preparation for Blackstone's IPO (the "Blackstone IPO Restructuring"). The Blackstone IPO Restructuring had been planned months before it was actually implemented. Blackstone ultimately went public on June 21, 2007. These initiatives had been started prior to the LBO's closing and were completed within weeks of the LBO's closing.

31.     Upon information and belief, at all relevant times prior to the Blackstone IPO Restructuring, ESI and Homestead, and their respective subsidiaries and affiliates, including the pre-LBO Debtors, were nominally owned and controlled, directly or indirectly, by numerous Blackstone affiliated entities or funds, including BREP/BCP IV. Upon information and belief, certain of Blackstone's Senior Managing Directors managed or controlled, for Blackstone's benefit, all aspects of Blackstone's pre-IPO and pre-LBO investment in the Debtors through one or more nominally owned and controlled Blackstone affiliated entities, funds and predecessors-in-interest, including BREP/BCP IV.

32.     In connection with the Blackstone IPO Restructuring and IPO, Blackstone carried out a series of other reorganization transactions. Blackstone's then-existing owners "contributed" to Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P. and Blackstone Holdings V L.P. (collectively "Blackstone Holdings," identified as Defendants below) each of the operating entities included in Blackstone Group's historical combined financial statements. Upon information and belief, BREP IV, BCP IV and any other funds or Blackstone affiliated entities that may have directly or indirectly

managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to one or more of the Blackstone Holdings entities.

33.     In connection with the Blackstone IPO Restructuring, four additional entities were established as the immediate parent entities of Blackstone Holdings (collectively, the "Blackstone Disregarded Entities"): Blackstone Holdings I/II GP Inc. (the immediate parent of Blackstone Holdings I L.P. and Blackstone Holdings II L.P.), Blackstone Holdings III GP L.L.C. (the immediate parent of Blackstone Holdings III L.P.), Blackstone Holdings IV GP L.P. (the immediate parent of Blackstone Holdings IV L.P.) and Blackstone Holdings V GP L.P. (the immediate parent of Blackstone Holdings V L.P.).

34.     The Blackstone Group L.P. owns 100% of the equity of the Blackstone Disregarded Entities.  As of the time of the Blackstone IPO, The Blackstone Group L.P. owned no less than approximately 22% of Blackstone Holdings through the Blackstone Disregarded Entities.  As of the time of the Blackstone IPO, certain Blackstone Senior Managing Directors owned no less than approximately 78% of Blackstone Holdings.

35.     After the Blackstone went public, Blackstone's organizational structure was as set forth in the chart attached hereto as Exhibit A and incorporated herein by reference.  Upon information and belief, at all times relevant to this Complaint, the BREP IV and BCP IV funds and their respective affiliated entities were included in the "Operating Entities" identified at the bottom of the post-IPO Blackstone organizational chart set forth in Exhibit A.  Upon information and belief, the post-IPO Blackstone organizational chart set forth in Exhibit A accurately and generally depicts Blackstone's organizational structure as of the date of this Complaint.

36.     In essence, as a result of the Blackstone IPO Restructuring, Blackstone was reorganized as a holding partnership.  Blackstone, through the Blackstone Disregarded Entities,

holds equity interests in Blackstone Holdings, which in turn owns all Blackstone operating entities. Through the Blackstone Disregarded Entities, Blackstone Group is the sole general partner of all Blackstone Holdings partnerships and, accordingly, operates and controls all business and affairs of Blackstone Holdings and, indirectly, all operating subsidiaries in the Blackstone business enterprise.

37.　　After the Blackstone IPO Restructuring and the IPO, management fees, transaction fees, carried interest, incentive fees and other fees received by any subsidiary entities or funds of Blackstone Group and Blackstone Holdings, including BREP IV, BCP IV and BRE.ESH (as defined below – the Blackstone entity that nominally held Blackstone's so-called "rollover equity" in the post-LBO Debtor enterprise), inured primarily to Blackstone Group's benefit and to the benefit of various Blackstone Senior Managing Directors.

38.　　At all times relevant to this Complaint, a "real estate investment committee" at the top of Blackstone's Real Estate Group business segment was responsible for reviewing, analyzing and approving all aspects of the LBO. Upon information and belief, at all times relevant to this Complaint, that real estate investment committee consisted in substantial part of certain Senior Managing Directors in Blackstone's Real Estate and Private Equity operations. As described below, those Senior Managing Directors orchestrated the LBO for Blackstone's benefit.

39.　　At all times relevant to this Complaint, Blackstone Group directly or indirectly controlled or participated in, through Blackstone Group Senior Managing Directors and other principals placed into positions of authority within the Debtors' corporate organization, all major business decisions made by or on behalf of the Debtors, including the decision to enter into and implement the LBO.

40.     **Blackstone Holdings I L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings I L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements. Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings I L.P., a subsidiary of Blackstone. Blackstone Holdings I L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

41.     **Blackstone Holdings II L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings II L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements. Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings II L.P., a subsidiary of Blackstone. Blackstone Holdings II L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

42.     **Blackstone Holdings III L.P.** is a Delaware limited partnership and one of the

Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO. Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings III L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements. Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings III L.P., a subsidiary of Blackstone. Blackstone Holdings III L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

43. **Blackstone Holdings IV L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO. Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings IV L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements. Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings IV L.P., a subsidiary of Blackstone. Upon information and belief, Blackstone Holdings IV L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

44. **Blackstone Holdings V L.P.** is, upon information and belief, a limited

partnership organized under the laws of Quebec or Canada, and is one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO. Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings V L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements. Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings V L.P., a subsidiary of Blackstone. Upon information and belief, Blackstone Holdings V L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

45. **Blackstone Holdings I/II GP Inc.** is a Delaware corporation and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO. Upon information and belief, Blackstone Holdings I/II GP Inc.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

46. **Blackstone Holdings III GP L.L.C.** is a Delaware limited liability company and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO. Upon information and belief, Blackstone Holdings III GP L.L.C.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

47. **Blackstone Holdings IV GP L.P.** is a Delaware limited partnership and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO. Upon information and belief, Blackstone Holdings IV GP L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

48.     **Blackstone Holdings V GP L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, Blackstone Holdings V GP L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

49.     **Blackstone Real Estate Partners IV L.P.** is, or was at all times relevant to this Complaint, a limited partnership organized under the laws of the State of Delaware.  Blackstone Real Estate Partners IV L.P.'s principal place of business is, or was at all times relevant to this Complaint, located at 345 Park Avenue, New York, New York 10154.

50.     **Blackstone Capital Partners IV L.P.** is, or was at all times relevant to this Complaint, a limited partnership organized under the laws of the State of Delaware.  Blackstone Real Estate Partners IV L.P.'s principal place of business is, or was at all times relevant to this Complaint, located at 345 Park Avenue, New York, New York 10154.

51.     **BHAC IV, LLC** ("BHAC IV") was a seller in the LBO.  At the time of the LBO, BHAC IV was an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  BHAC IV received distributions in connection with the LBO as a nominal seller in the LBO.  BHAC IV is a limited liability company organized under the laws of the State of Delaware and remains an affiliate of Blackstone Group.  Upon information and belief, BHAC IV is a shell entity that conducts no operations.  BHAC IV's principal place of business is located at 345 Park Avenue, New York, New York 10154.

52.     **BRE/HV Holdings, LLC** ("BRE/HV") was a seller in the LBO.  At the time of the LBO, BRE/HV was an affiliate of Blackstone Group.  BRE/HV received distributions in connection with the LBO as a nominal seller in the LBO.  BRE/HV is a limited liability company

organized under the laws of the State of Delaware and was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group. Upon information and belief, BRE/HV is a shell entity that conducts no operations. BRE/HV's principal place of business is located at 345 Park Avenue, New York, New York 10154.

53. **Blackstone Hospitality Acquisitions, LLC** ("Blackstone Hospitality") was an affiliate of the sellers in the LBO. Although it was not itself a "seller" in connection with the LBO, Blackstone Hospitality received significant distributions of cash proceeds in connection with the LBO. Blackstone Hospitality is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, Blackstone Hospitality is a shell entity that conducts no operations, but rather is (or at least was) used by Blackstone Group in connection with certain acquisition activities carried out by Blackstone Group in the hospitality industry. Upon information and belief, Blackstone Hospitality was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group. Blackstone Hospitality's principal place of business is located at 102 Townsend Drive, Weimar, Texas 78962.

54. **Prime Hospitality, LLC** ("Prime") was an affiliate of the sellers in the LBO and Blackstone Group. Prime was, upon information and belief, a seller of certain assets in connection with the LBO. Prime is a limited liability company organized under the laws of the State of Delaware. Prime received distributions in connection with the LBO. While those distributions were related, upon information and belief, to a Gwinnett County hotel previously owned by Prime that was being included as an asset in the LBO, the LBO Purchase Agreement contained the provisio that "Neither Company [ESI or Homestead] nor any Subsidiary shall be responsible for the payment of any fees or purchase price in connection with" the conveyance. (LBO Purchase Agreement, Section 5.13.) Upon information and belief, Prime was and remains

an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group. Prime's principal place of business is located at 700 Route 46 East, Fairfield, New Jersey 07004 or 16850 Bear Valley Road, Victorville, California 92395.

55.     BHAC IV and BRE/HV are sometimes referred to herein as the "Sellers." The Sellers together with Blackstone Hospitality and Prime are sometimes collectively referred to in this Complaint as the "Blackstone Seller Entity Defendants." Blackstone Group, Blackstone Holdings, the Blackstone Disregarded Entities, BREP IV and BCP IV are sometimes collectively referred to in this Complaint as the "Blackstone Parent Entity Defendants." The Blackstone Seller Entity Defendants together with the Blackstone Parent Entity Defendants are sometimes collectively referred to in this Complaint as the "Blackstone Pre-LBO Entity Defendants." At all times relevant to the Complaint, the Blackstone Seller Entity Defendants were owned, controlled or dominated in all respects by Blackstone Group, the Blackstone Parent Entity Defendants or Blackstone Group predecessors-in-interest and affiliates, and all business dealings by each of those entities were conducted solely for the benefit of Blackstone Group and to the detriment of the Debtors and their creditors.

## C.     The Professional Defendants

56.     **Bank of America, N.A.** ("Bank of America") is a national banking association with its principal place of business at 100 N. Tryon Street, Charlotte, North Carolina 28225. Bank of America provided services to the Sellers in connection with the LBO and was paid with Debtor funds.

57.     **Citigroup Global Markets, Inc.** ("Citigroup") is a corporation organized under the laws of the State of Delaware with its principal place of business at 388 Greenwich Street, 17th Floor, New York, New York 10013. Citigroup provided services to the Buyer in connection with the LBO and was paid with Debtor funds.

**D.      The Buyer Defendant**

58.      **DL-DW Holdings, LLC** ("DL-DW" or "Buyer") was the nominal buyer of the Sellers' membership interests in BHAC IV and BRE/HV in the LBO.  DL-DW is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022.  DL-DW was formed for the purpose of carrying out the LBO and, all times relevant to this Complaint, was owned or controlled by David Lichtenstein ("Lichtenstein") who, at all times relevant to this Complaint, was the Chairman of the Board of Directors and Chief Executive Officer and President of the Debtor entities.  Following the closing of the LBO, DL-DW was the sole direct member of Homestead and exercised at least indirect ownership or control over BHAC Capital, the majority shareholder of ESI, and ESI.

59.      The true names and capacities of Defendants, sued as DOES 1 through 100, inclusive, are presently unknown to the Plaintiffs.  The Plaintiffs, therefore, sue those Defendants under such fictitious names.  When their true names and capacities are ascertained, leave will be asked to amend this Complaint by inserting the same.  The Plaintiffs are informed and therefore believe that each of the fictitiously named Defendants received certain of the transfers that are the subject of this complaint or are the entities for whose benefit the transfers were made, and are responsible for the return of them.  Each reference in this Complaint to Defendant or Defendants refers also to all Defendants sued under fictitious names.

## FACTS COMMON TO ALL COUNTS

**A.      The Debtors Were Profitable Prior to the LBO**

60.      Prior to the LBO, the Debtors owned the leading mid-priced extended-stay hotel business in the United States, with 684 hotels located in 44 states.  Prior to the LBO, the Debtors were profitable and able to pay their debts in the ordinary course of business.  The Debtors'

financial performance from 2005 through the date of the LBO was generally positive. The Debtors' business was encumbered by secured debt totaling approximately $3.3 billion and mezzanine debt totaling approximately $2.1 billion. The Debtors also owed approximately $39 million to certain subordinated noteholders.

61.    Prior to the LBO, the Debtors' corporate organization was similar to their organization after the LBO. All or substantially all of the Debtors' entities and operations ran through either the Homestead or ESI corporate ownership chain, as described above. Homestead and ESI were directly and nominally owned by BRE/HV and BHAC IV, respectively. BRE/HV and BHAC IV were, in turn, directly or indirectly owned and controlled by Blackstone Group (or Blackstone Group's predecessors-in-interest, as described above), their ultimate parent and the ultimate parent of all pre-LBO entities related to the pre-LBO Debtors and relevant to this Complaint.

62.    By the end of 2006, the Debtors' portfolio of hotels had an average age of approximately 7.5 years, though many of the hotels were around nine years old and were showing signs of significant wear and tear. In January 2007, the Information Memorandum, was prepared to provide information to a limited number of parties regarding a possible acquisition of "Extended Stay Hotels" (the "Information Memorandum," as described and discussed more fully below). The Information Memorandum was created by Blackstone Group, Bear Stearns & Co., Inc., Banc of America Securities LLC and Merrill Lynch & Co., Inc., and characterized the hotels' condition as "excellent." But it was or ought to have been clear to Blackstone, the Blackstone Parent Entity Defendants, the Sellers, the Debtors' pre-LBO management and others involved in the LBO that substantial capital expenditures would be needed in the near future.

63.    Pre-LBO, the Debtors' hotel properties were managed by HVM, L.L.C.

("HVM"). The Debtors' hotels were then operated under six different brand names, although Blackstone had begun re-branding the portfolio to change all of the properties to one of three names: ExtendedStay Deluxe, ExtendedStay America, or ExtendedStay Economy. Around one-third of the portfolio remained to be re-branded at the time Blackstone commenced efforts to sell the pre-LBO Debtors. At the time, the cost to conclude the re-branding was expected to be substantial, although those costs were never provided for in the post-LBO budgets.

64.     While economic trends in the hospitality industry generally had been positive in the years leading up to the LBO, certain of those trends reversed in late-2006 and continued to decline in early-2007. This led some analysts to project a downturn in the hospitality industry as a whole for the near-term. In certain key industry performance metrics at the time, the Debtors lagged behind their competitors during 2006.

65.     It was or ought to have been clear to the Blackstone Parent Entity Defendants, the Sellers and others involved in preparing to market the LBO that (i) the Debtors' financial performance was declining in early 2007 as part of industry and economic trends that had begun in 2006, (ii) those trends were likely to continue after the LBO concluded, and (iii) the Debtors were already lagging behind their competitors.

**B.     Blackstone Decides to Sell the Debtors**

> **1.     Blackstone Prepares and Circulates an Information Memorandum that Contains Intentionally Misleading Financial Information and Projections Designed to Sell the Debtors Prior to Blackstone's IPO**

66.     Blackstone commenced its marketing effort by preparing the Information Memorandum for a sale of ownership of the Debtors as part of "Extended Stay Hotels." Upon information and belief, preparation of the Information Memorandum began during the latter half of 2006. The timing of Blackstone's decision to sell the Debtors was driven in part, upon information and belief, by Blackstone's initial public offering, or IPO, which was imminent at

the time.  The Information Memorandum prepared and circulated by Blackstone to assist with disposing of the Debtors contained materially false and misleading statements.

67.     Blackstone filed its IPO registration statement with the SEC on or around March 22, 2007.  Blackstone ultimately went public on June 21, 2007, eleven days after the LBO closed.  Upon information and belief, Blackstone wanted to carry out the sale of the Company prior to the IPO and stood to enhance its IPO valuation.

68.     The Information Memorandum represented that it was prepared from information furnished by the Debtors and from publicly available sources.  However, upon information and belief, Blackstone Group with the assistance of its professionals and advisors (i) created or compiled the financial information and projections in the Information Memorandum, (ii) prepared the non-financial, narrative content of the Information Memorandum, and (iii) was responsible for distribution of the Information Memorandum to potential buyers.

69.     The Information Memorandum contained an overview of the Debtors, and the reasons why Blackstone Group claimed the Debtors were a good investment opportunity for buyers.  The Information Memorandum represented that Extended Stay would increase revenues through re-branding, marketing and acquisition initiatives.  Blackstone and the others involved in the marketing of the Debtors knew or should have known at all relevant times that these initiatives could be successful only if the Debtors were left with sufficient capital and liquidity after the transaction to implement them.

70.     Prior to the LBO, the Debtors' capital expenditures generally fell into two categories.  The first category was maintenance associated with 444 hotels that were initially branded as "Homestead" or "Extended Stay America."  As to those 444 hotels, the five year historical investment in maintenance capital expenditures averaged approximately 4.3% of

revenues, or $145.3 million in the aggregate from 2002 to 2006. The second category was capital upgrades for the Debtors' remaining 238 hotels – branded as StudioPlus, Crossland, Wellesley and others. As to those 238 hotels, capital expenditures totaled approximately $129.6 million from 2004 to 2006. Total capital expenditures as a percentage of revenues were, in fact, approximately 10.2% for 2006 and 8.3% for 2005, both of which were significantly higher than the 4.5% projected capital expenditure levels that were set forth in the Blackstone Information Memorandum. Indeed, actual capital expenditures for the period from January 2007 through June 10, 2007, the eve of the LBO, were approximately 5.3% of revenues, higher than that projected by the Information Memorandum.

71.    The Information Memorandum contained materially misleading projections regarding the Debtors' future financial performance. The Information Memorandum projected total revenue and property-level EBITDA growth rates of approximately 9.84% and 13.35%, respectively. However, Blackstone knew or should have known that the Debtors' actual financial performance at the time was, and was expected to be in light of performance trends in late-2006 and early-2007, well below the projections set forth in the Information Memorandum.

72.    Upon information and belief, all of this information was available to the Defendants involved in the transaction prior to the LBO's closing. At the time, the Debtors used Smith Travel Research ("STR") reports to benchmark their aggregate financial performance against the Debtors' chosen competitive set. On a weekly basis, the Debtors reported their hotel activity to STR. STR then provided the Debtors with weekly trend reports that displayed up to six years of monthly performance data for the Debtors and their competitors.

73.    The STR reports, and other weekly financial reports shared with the Blackstone Pre-LBO Entity Defendants, included detailed analyses regarding the Debtors' basic financial

performance metrics, including occupancy rates (or "OCC:" the quotient of the total number of nights stayed by all customers divided by the total available room nights), average daily rate ("ADR:" the quotient of total room revenues divided by occupied room nights (which provides the "room rate" for all occupied rooms)), revenue per available room ("RevPAR:" the product of OCC and ADR, which shows the revenue efficiency of a hotel), demand (the total of all room nights stayed by all hotel customers), and supply (the product of total available rooms and the number of total days in a year). The STR reports also measured each hotel property's performance, and the aggregated performance of the chosen competitive set with indices and rankings. In light of these, and other reports, the Blackstone Pre-LBO Entity Defendants knew or should have known that the projections they were presenting in the Information Memorandum were unachievable and, therefore, misleading.

74. The projections contained in the Information Memorandum also improperly accounted for significant operating expenses, upon information and belief, so as to "hide" those expenses and make the operating hotels appear to be more profitable than they actually were. Among other things, the Information Memorandum inappropriately placed a significant amount of property-related expenses, including occupancy taxes, "above the line" at the corporate level. This had the practical effect of overstating the net operating income of the hotel properties. Since the lenders were prepared to lend based upon the property-level financial performance of the hotels, the effect of this misstatement was to increase the available debt in the LBO to amounts which would be impossible for the Debtors to service.

75. Likewise, the growth projections in the Information Memorandum were ostensibly based upon the post-LBO Debtors having adequate capital and liquidity to complete the re-branding, marketing and other initiatives that had been commenced by Blackstone prior to

the LBO, as detailed in the Information Memorandum. However, based upon information available at the time, the Blackstone Pre-LBO Entity Defendants (i) knew or should have known that the numbers contained in the Information Memorandum were inaccurate, (ii) nevertheless intended that prospective buyers rely upon those misleading numbers, and (iii) knew or should have foreseen that, given the artificially increased debt to be imposed upon the Debtors in connection with the transaction (including the increased debt attributable to overstatement of net operating income, as described above), the post-LBO Debtors would not have sufficient capital or liquidity to carry out these strategies.

76.     The Blackstone Pre-LBO Entity Defendants and the Debtors' senior management knew or should have known that the Information Memorandum contained false and misleading financial information, as well as false, misleading, and unachievable projections.

**2.      The Stapled Financing Package Attached to the Information Memorandum Anticipated a Much Smaller Debt Load than the LBO Ultimately Imposed**

77.     Blackstone had arranged for so-called "stapled financing" through several lenders (collectively, the "Stapled Financing Lenders") in connection with the LBO. "Stapled" financing refers to a financing package that is "stapled" to an offering memorandum and is available to a buyer for a specific transaction. Among other things, the stapled financing typically indicates the expected debt capacity of the business being sold, and how much equity the buyer will need to provide to obtain the stapled financing.

78.     The Stapled Financing Lenders were prepared to finance up to $6.8 billion of the purchase price for a transaction. The stapled financing provided that the loan-to-value ratio could not exceed 87.5% when combined with the assumption of certain capital lease obligations of $200 million. As described more fully below, the loan-to-value ratio following the eventual LBO's closing was at least 95%, substantially more than that contemplated by the stapled

financing attached to the Information Memorandum. This additional debt was fatal to the Debtors' continued profitable existence.

### 3. Lichtenstein "Wins" an Accelerated Bidding Process After Woefully Inadequate Due Diligence

79.     Blackstone coordinated the distribution of the misleading Information Memorandum to approximately 150 potential buyers. Lightstone Holdings, LLC, The Lightstone Group, LLC, and Lightstone Commercial Management (collectively "Lightstone") and an affiliate of Arbor Commercial Mortgage, LLC ("Arbor"), among others, signed confidentiality agreements in February 2007, permitting them access to due diligence information.

80.     Around that same time, Blackstone informed potential purchasers that written, non-binding indications of interest had to be submitted within an accelerated time frame. Upon information and belief, Blackstone accelerated the time frame for bid submission (versus a typical time frame for a transaction of the LBO's size and complexity) in an attempt to coordinate the LBO closing with the launch of Blackstone's IPO planned for June 2007.

81.     Citigroup or an affiliate of Citigroup was at the time engaged, or about to be engaged, as one of two Global Coordinators on Blackstone's IPO, at the same time as it was acting as the Buyer's advisor for the LBO. This engagement meant Citigroup would share with Morgan Stanley the largest split of the approximately $170 million of fees associated with the IPO, as well as have the ability to purchase a significant number of Blackstone IPO shares on "insider" terms. Citigroup had a vested interest in the success of the Blackstone IPO. Upon information and belief, Citigroup and some or all of Blackstone's other professionals sought to optimally position Blackstone prior to its going public, and to do so by, among other things, announcing around the time of the IPO, the consummation of a large, marquee sale of the

"Extended Stay Hotels family of companies," for which Blackstone stood to reap substantial gains above its original equity investment.

82.     Upon information and belief, Citigroup and Blackstone were therefore highly motivated to identify a buyer willing to pay a significant premium to the then-current value of the Company.  Fortunately for Citigroup and Blackstone, there was a client in Citigroup's client base that would serve as the "mark:"  Lichtenstein.

83.     Citigroup brought Lichtenstein into the deal in or around February 2007. Thereafter, Citigroup was instrumental in encouraging Lichtenstein to embark on the LBO, and was instrumental in keeping Lichtenstein in the deal.  Citigroup assured Lichtenstein that it had previously underwritten the properties to be acquired in the LBO, that the deal was "substantiated" by an appraisal, and that Citigroup's team had already vetted the deal.  Indeed, when Lichtenstein commissioned an independent valuation of the Company which contradicted the information and projections in the Information Memorandum, Citigroup dismissed that valuation and questioned Lichtenstein's judgment in relying on a relatively obscure source over the collective "wisdom" of Citigroup and the other financial institutions involved in the deal. Lichtenstein, ultimately, did not care, as the LBO was to be done using funds borrowed by the Debtors, and Lichtenstein and his affiliates were going to put little cash into the deal.

84.     On or around March 1, 2007, Blackstone received four indications of interest, including one from Lichtenstein that proposed to pay $7.6 billion.  Subsequently, the field was narrowed further to the two parties willing and able to consider concluding a transaction within a short time frame imposed by Blackstone.  On March 25, 2007, Blackstone and its advisors demanded that definitive proposals for a transaction be submitted by the remaining potential buyers by no later than April 11, 2007.

85.     On April 12, 2007, Lightstone formally offered to purchase 100% of the membership interests of one or more of the Sellers for $8 billion, net of the assumption of certain capital lease obligations.  This was the only definitive proposal Blackstone received.  Blackstone quickly accepted Lightstone's proposal.

86.     On or around April 17, 2007, DL-DW and the Sellers executed a definitive acquisition agreement (the "Acquisition Agreement").  Under the terms of the Acquisition Agreement, BHAC agreed to sell to DL-DW 100% of BHAC's membership interests in BHAC Capital, the parent company of ESI.  Under the terms of the same Acquisition Agreement, BRE/HV agreed to sell to DL-DW 100% of BRE/HV's membership interests in BRE/Homestead Village L.L.C. ("BRE/Homestead").  Upon information and belief, BRE/Homestead was the pre-LBO name of Debtor Homestead.  Upon information and belief, Lichtenstein and/or Lightstone changed the entity name from "BRE/Homestead Village L.L.C." to "Homestead Village, LLC" on or shortly after the LBO closing.

87.     Lightstone proposed to finance the overwhelming majority of the purchase price with debt of $7.4 billion and, at best, cash of only $400 million into the deal.  This cash component was used to pay Blackstone and closing costs.  The amount was therefore woefully insufficient to support the artificially inflated purchase price and the future needs of the now highly leveraged company.  An additional equity amount of $200 million was "rollover equity" provided to BRE.ESH for Blackstone's benefit.  That interest did not represent any new cash or other value for the Debtors.  The $200 million of Blackstone "rollover equity" in the "new" Debtors was included because it was the only way to reach the $8 billion purchase price insisted upon by Blackstone.

88.     Notwithstanding the dangerous debt levels of the proposed LBO, the sale was

nevertheless structured to allow the Buyer's insiders to siphon value from the post-LBO Debtors regardless of their performance. One of Lichtenstein's affiliated entities was to reap substantial "asset management" fees post-LBO, even though HVM was to continue managing all aspects of the Debtors' day-to-day business. The sale proposed a cash management system that would allow post-LBO equity holders to receive improper distributions from the Debtors even if the Debtors' financial condition deteriorated. And, the Buyer obtained ownership of the Debtors while putting in little cash.

89.     Blackstone, at best, turned a blind eye to the post-LBO structure because Blackstone was eager to strip out $1.9 billion cash from the Debtors while maintaining a post-LBO equity interest that Blackstone would receive in the LBO in exchange for nothing. Counsel advising the Debtors in the transaction was simultaneously representing Blackstone Group and Blackstone Group affiliates in the same transaction.

90.     The financial institutions advocating and knowingly participating in the transaction sought the significant fees they would receive in connection with financing the transaction. Those financial institutions were also planning to simply sell the debt as soon as the LBO closed, and thereafter have no risk for the failure they knew or should have known was likely to occur.

91.     Moreover, upon information and belief, the financial institutions agreeing to fund the LBO had long-standing relationships with Blackstone and sought to curry favor with Blackstone so as to cement possible roles in Blackstone's IPO and possible future transactions Blackstone might carry out with respect to its portfolio companies. Indeed, affiliates of Wachovia (as defined below) and Bank of America, among others, each were involved in Blackstone's IPO.

92.     Three rating agencies, Fitch Ratings ("Fitch"), Standard & Poor's ("S&P") and Moody's Investors Service ("Moody's"), issued presale reports relating to the securitization of the $4.1 billion of senior secured debt.  In these reports, each of the rating agencies noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets.

93.     Specifically, Fitch, S&P, and Moody's concluded that the LBO total was, respectively, 141.6%, 153.4% and 158.4% of the value of the Company's underlying assets.  In fact, these three rating agencies approximated the loan-to-value of the senior secured debt alone to be in the range of 78.4% and 87.8% of the value of the Company's underlying assets.

94.     These three rating agencies also estimated the implied value of the Company to be substantially <u>less</u> than the approximately $8 billion purchase price.  According to these third-party rating agencies, the $8 billion purchase price exceeded the Company's actual value by approximately $3 billion.

95.     Upon information and belief, the parties involved in negotiating, documenting and closing the LBO knew or should have known of the rating agencies' likely determinations well in advance of the LBO's closing.

96.     Lichtenstein later aptly summarized the improper conduct of the various parties involved in formulating the LBO and their attitudes about what was about to be done to the Debtors and their creditors:

> at the end of the day, nobody put a gun to my head and said sign the documents. But it was like a lot of— it was - it was a brew that was cooked with a lot of people's help. Like the banks just said it's not - you know, blow the damn stuff out. It's - we really don't care, just sell the paper as fast as you can. Citibank just said pay us as many fees as you can. And I said I'm getting 95, 99 percent financing. Okay? So it was a combination; there were a lot of people who [erred] here.

97.     In short, no one involved at the time was looking out for the Debtors' interests.

**4.      The LBO Debt Increases Prior to Closing**

98.     The initial Acquisition Agreement required that most of the pre-LBO debt be satisfied by DL-DW at closing of the LBO, including two sets of subordinated notes owed by ESI at the time.  One set, known as the "9.15% Notes," was due on March 15, 2008 (only nine months later) and totaled approximately $31 million.  The second set, known as the "9.875% Notes," was due in June 2011 and totaled approximately $8.2 million.

99.     However, on May 31, 2007, on the eve of the LBO's closing, the parties entered into an Amendment to the Acquisition Agreement in which they removed entirely any obligation to ensure that the outstanding subordinated notes were paid off as part of the LBO.  Thus, when the LBO closed, no funds were escrowed to pay those notes, the notes remained unsatisfied and were reflected on the June 11, 2007 balance sheet of the "new" Debtors as assumed obligations.

100.    Although Lightstone's April 12, 2007 LBO proposal had contemplated that certain capital lease obligations would be assumed by the Buyer in the LBO, and that the post-LBO Debtors ultimately would purchase the hotel properties to which the capital lease related, this, similarly, did not happen.  As a result, and as described more fully below, the landlord under that capital lease declared defaults under that lease within a few days after the LBO closed.

**C.     The LBO Closes, Blackstone Receives Approximately $2.1 Billion of Value and the Debtors Receive Nothing But Substantial Additional Debt and a New Owner With No Hotel Industry Experience**

**1.     The Debtors' Post-LBO Corporate and Debt Structure Generally**

101.    The LBO closed on June 11, 2007 at the law offices of Blackstone and the pre-LBO Debtors' counsel, Simpson Thacher & Bartlett LLP, both located in New York, New York.

102.    In connection with the closing of the LBO and the terms of the Acquisition Agreement, on or about June 11, 2007, BHAC and DL-DW executed an agreement under which BHAC transferred all of its limited liability membership interests in BHAC Capital to DL-DW.

103.    Also on June 11, 2007, and also in connection with the closing of the LBO and

the terms of the Acquisition Agreement, BRE/HV and DL-DW executed an agreement under which BRE/HV transferred all of its limited liability membership interests in BRE/Homestead (later renamed Homestead), to DL-DW.

104.    On or around June 29, 2007, the Debtors' ownership structure was "restructured," as had been contemplated previously by the Buyer.  Pursuant to that planned "restructuring," DL-DW's direct membership interests in BHAC Capital were transferred to Homestead.   In addition, several of the LBO Buyer Entity Defendants invested in BHAC Capital and, therefore, received a percentage of BHAC Capital's membership interests, resulting in DL-DW's and, indirectly, Homestead's membership interests in BHAC Capital, being reduced.   Upon information and belief, the new investors in BHAC Capital paid less than fair consideration or reasonably equivalent value for their membership interests in that entity.

105.    A chart showing the Debtors' corporate organizational structure following the restructuring described in the preceding paragraph is attached as Exhibit B and incorporated herein by reference.   Upon information and belief, the corporate organizational structure described in Exhibit B hereto existed until the Debtors eventually (and inevitably) filed bankruptcy beginning on June 15, 2009.

106.    The Debtor's post-LBO debt structure can be summarized as follows: (a) a mortgage loan in the amount of $4.1 billion, secured by encumbrances on the mortgaged properties; and (b) ten tranches of mezzanine loans, in an aggregate amount of $3.3 billion, each tranche owed by an indirect owner of the operating hotels secured by the equity in the borrower beneath that owner. The debt structure was designed to permit the securitization of the mortgage loan by the mortgage lenders' sale of so-called "CMBS" (commercial mortgage backed securities) to third parties, many of which currently are Litigation Trust Beneficiaries.

### a. The Mortgage Loan Structure

107. The mortgage loan agreement was between the mortgage lenders and 21 mortgage borrowers, as summarized on the chart attached hereto as Exhibit C and incorporated herein by reference. All but three of the mortgage borrowers owned properties. The parent entities of the three non property-owning mortgage borrowers were also parties to, but not borrowers under, the mortgage loan agreement. In addition, four Debtor operating lessee entities were parties to, but not borrowers under, the mortgage loan agreement. The mortgage borrowers signed a single consolidated mortgage note in the amount of $4.1 billion, and the mortgage borrowers were jointly and severally liable for the mortgage debt.

108. Each of the 18 property-owning mortgage borrowers and property owners secured the mortgage loan by first-priority encumbrances on their respective properties. The mortgage lenders, however, did not begin perfecting their mortgage liens with appropriate filings until June 22, 2007, and continuing thereafter through at least July 2007. The mortgage loan agreement, mortgage note, and related security instruments were cross-collateralized and cross-defaulted. Therefore, upon information and belief, although the entities that actually owned the Debtors' hotel properties were not all borrowers under the new mortgage loan agreements, all properties owned by any of the Debtors were nevertheless directly pledged as collateral for the mortgage loans. Upon information and belief, the entities that owned the hotel properties received none of the mortgage loan proceeds and, like the rest of the Debtors, received no value from the LBO.

### b. The Mezzanine Loan Structure

109. Ten mezzanine loan agreements, labeled A to J, were executed in connection with the LBO. The total mezzanine debt borrowed in the LBO was approximately $3.3 billion. Each mezzanine loan agreement was between the applicable mezzanine lender and three equal-level mezzanine entities, one from each of the three ownership chains, as reflected on the chart

attached as Exhibit D and incorporated herein by reference.  Each of the 10 mezzanine loans (collectively, the "Mezzanine Loans") was structured as follows.  A set of three mezzanine borrowers signed a single consolidated mezzanine note in the amount of that particular mezzanine loan.  Each of the three mezzanine borrowers was jointly and severally liable under that mezzanine note and mezzanine loan agreement.  Each of the three mezzanine borrowers was "the legal and beneficial owner of all direct interests in" the entity beneath it (which, except for the Mezzanine A borrowers, was always a mezzanine borrower in the next level of mezzanine loan).

110.   Each mezzanine borrower entered into a pledge and security agreement in connection with the LBO granting the mezzanine lender a first priority security interest in its equity interests in the borrower directly beneath it in its respective ownership chain, in an account that would be used to hold payment funds, and in certain proceeds.  The mezzanine borrowers were essentially shell entities that simply held equity interests in other shell entities (except for the lowest level of mezzanine borrowers – the Mezzanine A borrowers – who were shell entities that, with limited exceptions, directly owned the Mortgage Borrower entities, i.e., the entities in which the hotel real estate and related operating assets actually resided).  The mezzanine borrower entities (collectively, the "Mezzanine Borrowers") served no practical purpose other than to facilitate the existence of multiple levels of mezzanine loans.

111.   Although the Mezzanine Loans did not directly encumber the mortgaged hotels and the hotels' owner entities were not borrowers under the Mezzanine Loans, the mezzanine loan structure indirectly and improperly gave the mezzanine lenders subordinate interests in the hotels.  The Mezzanine Loan structure (i) caused or allowed the mezzanine lenders to be paid directly from the proceeds of the operating hotels out of the Cash Management Account (as

defined and described below), (ii) required the most junior mezzanine lender's approval of the Debtors' proposed annual budget even though the most junior mezzanine lender was not a lender to the mortgage borrowers, (iii) required the Mezzanine Borrowers to repay the Mezzanine Loans before any mortgaged properties could be released, and (iv) provided that, if any mortgage borrower paid more than its allocable share of the mortgage loan, such mortgage borrower could not exercise its contribution rights against other mortgage borrowers unless the Mezzanine Loans were paid in full. Moreover, as alleged below, debt service on the Mezzanine Loans was set up to be paid from the Cash Management Account before certain critical operating expenses.

112. As described above, the rating agencies reviewing the LBO, even prior to its consummation, concluded that the Debtors' value was woefully insufficient to support the mezzanine loans on the date the LBO closed.

c. **The Cash Management Account**

113. The LBO imposed requirements that all cash generated by the hotels would be swept and used to pay debt service on both the new mortgage loans and the new Mezzanine Loans, even though the entities that owned the hotels were neither borrowers nor obligors under the Mezzanine Loans. Those requirements were reflected in the main cash management agreement ("Cash Management Agreement") executed in connection with the LBO that established a "Cash Management Account." That Cash Management Account was in the name of "ESP P Portfolio LLC [a Debtor] for the Benefit of Wachovia Bank" ("Wachovia"). The Cash Management Account was located at Wachovia at all times relevant to this Complaint.

114. The mortgage lenders were granted a first priority security interest in the Cash Management Account. The mortgage borrowers, property owners, operating lessees, and HVM, as the Debtors' management company, were required to deposit all rents, receipts payable, and all other amounts received in connection with the hotels' operations into applicable property and

clearing accounts, which were to be swept daily into the single, commingled Cash Management Account. Distribution of funds from the Cash Management Account was governed by the Cash Management Agreement.

115. The mezzanine loan agreements acknowledged that the Cash Management Account was controlled by the mortgage lenders. Provided no event of default had occurred, the mortgage lenders were to apply all funds in the Cash Management Account in accordance with the Cash Management Agreement. Although the mezzanine lenders had no direct interest in the hotels, the mezzanine lenders were nevertheless paid directly with funds from the commingled Cash Management Account, which contained cash assets of the operating hotels only. The funds did not belong to the Mezzanine Borrowers (as described below). The mezzanine lenders were nevertheless paid with those funds, prior to the payment of critical hotel operating expenses.

116. The Cash Management Agreement contained detailed requirements regarding the flow of funds through the cash management system. Numerous subaccounts of the Cash Management Account (each a "Subaccount") were maintained by the agent for the mortgage lenders on a ledger-entry basis. All such Subaccounts were merely book entries, and all the funds were commingled in the single Cash Management Account at all times relevant to this Complaint. On each business day, the agent for the mortgage lenders was required to apply all funds on deposit in the Cash Management Account in the amounts and according to the priorities set forth in the Cash Management Agreement. A chart showing the flow of funds through the Debtors' post-LBO cash management system is attached as Exhibit E and incorporated by reference.

### d. Pertinent Guarantee Obligations of the Debtors' Insiders

117. Lichtenstein, Lightstone, ESI and Homestead (collectively, the "Guarantors") executed guarantees in favor of the respective lenders, guaranteeing certain of the respective

borrowers' obligations under the mortgage loan and each mezzanine loan. The Guarantors were liable under the guarantees to the extent of the lenders' damages arising out of various "bad boy" circumstances, including: (a) the borrowers' breach of any of the special purpose entity/separateness covenants (described below); and (b) the borrowers' filing for bankruptcy. To the extent the Guarantors' obligations were triggered by a borrower's bankruptcy filing, the Guarantors' aggregate liability was capped at $100 million.

### e.    Blackstone's Improper Receipt of Loan Proceeds

118.    At closing, the Sellers, who were owned, controlled, managed or dominated by Blackstone Group at the time, instructed that the funds borrowed by the Debtors in the LBO were to be used to retire certain, but not all, existing debt and pay the Sellers' fees and expenses associated with the transaction. After retiring some, but not all, of the existing pre-LBO debt and paying the Sellers' fees and expenses associated with the LBO, the Sellers, which were Blackstone affiliates, received cash totaling nearly $1.9 billion (apart from Blackstone's rollover equity interest), as follows:

### Blackstone Entities' Cash Receipts

| | | |
|---|---|---|
| BHAC IV, LLC | Purchase Price payable to Seller | $1,282,764,450 |
| Blackstone Hospitality Acquisitions LLC | Purchase Price payable to Seller | $489,546,290 |
| Prime Hospitality LLC | Balance of the Gwinnett purchase price after payment of debt costs and closing costs | $4,110,604 |
| BHAC IV, LLC | Earnest Money Deposit payable to Seller | $85,611,012 |
| **Blackstone Entities' Cash Receipts** | **Total** | **$1,862,032,356** |

The reference above to cash receipts by Prime for the Gwinnett purchase price relates to a hotel that was owned by a Blackstone affiliate. The Gwinnett hotel was included in the hotels sold to

the Buyer.  The closing of the Gwinnett property sale occurred simultaneously with the closing of the LBO.  In addition, even though Blackstone Hospitality was not a seller under the Acquisition Agreement, it received over $489 million of loan proceeds.

119.    The borrower Debtors were not required under the Acquisition Agreement to pay the purchase price to the Sellers.  That was the Buyer's responsibility.  Moreover, as described below, under the loan agreements the Debtors appear to have been *prohibited* from using loan proceeds for that purpose, even though everyone knew that the money being borrowed by the Debtors was the only source of funding for the LBO purchase price.  Nevertheless, all Defendants caused the Debtors to improperly pay the purchase price on the Buyer's behalf with substantial borrowings the Debtors were obligated to repay.  Upon information and belief, the Debtors then were caused to improperly, and in violation of the loan agreements, distribute these funds to the Blackstone Pre-LBO Entity Defendants even though they no longer owned the Company.

120.    In addition to the payments made to the Blackstone Pre-LBO Entity Defendants described above, the Debtors used borrowed funds to pay a total of no less than approximately $150 million of fees and other amounts to the lenders, professionals and advisors involved in the deal.  Those fees included lender loan and underwriting fees, so-called "hedge costs," property specific escrowed amounts, which included taxes, insurance, escrow fees, an interest payment due at closing, environmental fees and holdbacks, certain reserves, title-related expenses and the professionals' fees incurred by all involved parties.

> **f.    The Debtors Become Encumbered by Substantial Additional Debt for Blackstone's Benefit**

121.    All but $200 million of the $1.9 billion in payments to the Blackstone Group entities identified above came from loans made to the Debtors that they were unable to repay,

and that rendered them insolvent and undercapitalized at closing. The total post-LBO mortgage debt borne by the Debtors (for Blackstone's benefit) increased over pre-LBO levels by $749.4 million and the total mezzanine debt increased over pre-LBO levels by $905.3 million.

122. After the LBO, the Debtors were overleveraged as a result of being subject to a significantly greater amount of debt than they were immediately prior to the LBO. Virtually all of the Debtors' assets were over-leveraged. The Debtors' debt load was significantly higher than that typical for hospitality REITs at the time. Given these facts, the Defendants involved in the transaction or with the Debtors at the time knew or should have known that the Debtors would have no cash for necessary operating, marketing, maintenance, capital improvements and other expenditures, and no ability to secure additional loans or liquidity to meet their ongoing needs.

123. The borrowing capacity of the Debtors post-LBO was almost non-existent. Although the Debtors did maintain a working capital reserve of approximately $50 million, a pre-LBO line of credit in the amount of up to $105 million that previously provided for hotel acquisition funding was not available post-LBO. Moreover, there were no provisions in the limited liability company agreements for DL-DW or BHAC to make additional capital calls from any investors after the LBO's closing, nor were there any commitments for capital infusions in the loan agreements. Therefore, the liquidity needed for capital expenditures, maintenance, upgrades, re-branding and expansion (all of which were critical if the Debtors were to have any chance whatsoever to achieve the financial performance "projected" by Blackstone in the Information Memorandum) was likely, and foreseeably, unavailable.

124. The parties involved in the LBO attempted to justify their conduct with an appraisal of the Debtors' assets, performed by HVS International ("HVS"), which purported to value the Debtors' assets at approximately $8 billion. That HVS appraisal was flawed for the

following reasons, among others: the projected total revenue growth was overstated; the appraisal improperly assumed that the Debtors' room expense rate would continue to decrease; EBITDA growth was unreasonably projected; the appraisal assumed financing, which was much less expensive than actually incurred in the LBO; and the appraisal's projected capital expenditures were dramatically underestimated.

125.     As a result of the foregoing, among other errors, the value of the mortgage properties contained in the HVS appraisal was grossly overstated.  The parties involved in the LBO knew or should have known the HVS appraisal was flawed, resulted in a purported "fair value" of the mortgaged properties that was artificially inflated by billions of dollars and, therefore, could not be relied upon.  Upon information and belief, many of the key assumptions made by HVS were provided to HVS by the Blackstone Pre-LBO Entity Defendants in order to allow the values set forth in the HVS appraisal to be inflated.

126.     In short, the Blackstone Pre-LBO Entity Defendants, as equity holders in the pre-LBO Debtors, took all the cash they could get, while the Debtors and their estates were left insolvent, and the Debtors' new owners prepared to pay themselves hundreds of millions of dollars of desperately needed cash.  Both group knew that the LBO was structured to fail.

**2.      The Company Ignores the Separateness of Its Related Entities and the Requirements of the LBO Loan Documents**

**a.      The Loan Proceeds' Uses Were Restricted, But The Parties Ignored The Restrictions and Paid Loan Proceeds Directly to the Sellers**

127.     The mortgage loan agreement restricted the use of proceeds from the new mortgage loans, as follows:

> [B]orrower shall use the proceeds of the Loan solely to (a) repay or discharge any existing loans relating to the Properties, (b) pay all past-due Basic Carrying Costs, if any, with respect to the Properties, (c) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, (d) pay costs and

expenses incurred in connection with the closing of the Loan, as approved by Lender, (e) fund any working capital requirements of the Properties and (f) distribute the balance, if any, to borrower.

128.    The authorized uses, therefore, did not include making payments to the Sellers and other Blackstone affiliates that received sale proceeds, as described above.  Notwithstanding this provision, the mortgage loan proceeds were not received by any mortgage borrower.  On information and belief, to the contrary, all mortgage loan proceeds were deposited into an escrow account held at JPMorgan Chase Bank in the name of "First American Title Insurance Company of New York Preferred Division Escrow" (the "First American Escrow Account"), and a substantial portion of the mortgage loan proceeds was paid out directly to one or more of the Blackstone Pre-LBO Entity Defendants in violation of the restrictions contained in the mortgage loan agreement, as described above and in the chart attached hereto as Exhibit F, and taken from the Examiner's Report.

129.    The mezzanine loan agreements also restricted the use of proceeds from the new debt resulting from the LBO.  The mezzanine loan agreements provided that the mezzanine loan proceeds were to be paid first to the more senior mezzanine borrower, then, ultimately, provided to the mortgage borrowers as equity contributions:

> Borrower shall use the proceeds of the Loan solely to (a) make an equity contribution to Mortgage Borrower [through Senior Mezzanine Borrower] in order to cause Mortgage Borrower to use such amounts for any use permitted pursuant to Section 2.1.5 of the Mortgage Loan Agreement, (b) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender and (c) distribute the balance, if any, to Borrower.

130.    Notwithstanding these provisions, the Mezzanine Loan proceeds were not received by any Mezzanine Borrower and were never contributed, by equity contributions or otherwise, to the mortgage borrowers through any senior Mezzanine Borrower.  To the contrary,

all Mezzanine Loan proceeds were, like the mortgage loan proceeds, deposited into the First American Escrow Account and, as with the mortgage loan proceeds, a substantial portion was paid out directly to one or more of the Blackstone Pre-LBO Entity Defendants, as described above, in violation of the restrictions contained in the mezzanine loan agreements.

### b. Formalities Regarding the Post-LBO Debtors' Separateness and Accounting Are Violated

131. The applicable loan agreements contained extensive "special purpose entity" and separateness representations and other covenants, requiring, among other things, that each mortgage borrower, operating lessee entity and property owning entity would (i) not make any loans or advances to any person; (ii) pay debts from its assets as such debts become due; (iii) do all things necessary to observe organizational formalities; (iv) maintain all of its books, records, financial statements, and bank accounts separate from those of any other person; (v) except as expressly permitted under the applicable loan agreement or the Cash Management Agreement, not commingle assets; (vi) not guarantee or become obligated for the debts of any other person; (vii) not pledge assets for the benefit of any other person other than with respect to the applicable mortgage or mezzanine loans; (viii) remain solvent and maintain adequate capital in light of its contemplated business operations; (ix) maintain a sufficient number of employees in light of its contemplated business operations and pay the salaries of its own employees from its own funds; (x) not assume or incur any liabilities except the mortgage and mezzanine loans, certain other specified liabilities not germane to this Complaint, and "liabilities incurred in the ordinary course of business," subject to certain liability caps, which liabilities would not be more than 60 days past the date incurred; and (xi) maintain its assets and liabilities in such a manner that it would not be costly or difficult to segregate, ascertain or identify its individual assets and liabilities from those of any other person.

132.     These requirements, however, were disregarded.  For example, after the closing, an opening balance sheet for DL-DW showed the impact of the LBO on DL-DW and the appropriate allocation of the price paid for the LBO. The mortgage and mezzanine debt was recorded at the ESI and Homestead accounting database levels, as opposed to being recorded by each legal entity mortgage borrower or mezzanine borrower.  Similarly, the subsidiaries' assets and liabilities, including hotel property and equipment, were recorded at the ESI and Homestead database level, rather than being recorded at the individual entity level and treated as owned by that entity.  In short, the Company ignored the fiction of legal separateness of its entities.

133.     If the Debtors had established and maintained separate books for each of the individual mortgage borrowers and mezzanine borrowers as of the LBO, then the accounting by the mortgage borrowers and mezzanine borrowers should have reflected:

- The mortgage debt and the related proceeds - at each legal entity level for the individual mortgage borrowers - allocated based on the release amounts included in the mortgage loan agreement; and

- The mezzanine debt and the related proceeds - at the legal entity level for the individual mezzanine borrowers - allocated based on the sum of the allocated release amounts included in the mortgage loan agreement for the mortgage borrowers directly below the relevant mezzanine borrower.

134.     The Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements.  The Debtors were treated internally at all relevant times as part of one company.  The Debtors had common officers and directors, and had no separate governance. The Debtors conducted all material board of directors meetings on a consolidated basis for the so-called "Extended Stay Hotels family of companies," which included the Debtors' direct equity owners.  In addition:

- The daily business and affairs of each of the Debtors were managed and controlled by HVM Manager, of which Lichtenstein was the sole member;

- The Debtors' operations were integrated and interdependent and each of the Debtors was run in the interest of the Buyer and the Debtors' ultimate equity owners;

- With few exceptions, all of the Debtors were wholly-owned by the Buyer;

- The Debtors did not have specific general ledger codes in their accounting system to track specific accounting activity for the mezzanine borrowers;

- None of the mortgage borrower entities or mezzanine borrower entities kept their own books and records, and adequate records of complete accounting activity related to each legal entity were not maintained;

- Debt to the mortgage and mezzanine lenders was recorded only at the ESI and Homestead levels, debt service was paid only from the Debtors' consolidated Cash Management Account, and the Debtors failed to properly record any financial or accounting activities (including debt service) relating to the mezzanine or mortgage loans;

- The Debtors' expenses were generally funded from the consolidated Cash Management Account and a single working capital reserve account;

- The Debtors failed to observe corporate formalities for intercompany transfers, which generally were not properly recorded;

- The mortgage borrowers were jointly and severally liable on the mortgage debt, and yet paid the mezzanine debt for which the mortgage borrowers had no liability;

- Mezzanine borrower entities were prevented from enforcing contribution rights against other Debtors until after all of the mezzanine debt and mortgage debt had been paid in full;

- The Debtors made substantial payments for the benefit of insiders;

- The Debtors failed to pay debts as they came due in the ordinary course, with certain liabilities being greater than 60 days outstanding at all relevant times from and after the date the LBO closed; and

- The Debtors were insolvent and undercapitalized on the date the LBO closed and at all relevant times thereafter.

**D.  Debt Yield and Financial Covenants Are Violated The Day The LBO Closed, and Key Differences Between the Debtors' Pre- and Post-LBO Debt Structures Cause Immediate Financial Distress**

**1.  The Significance of a Debt Yield Event**

135. The Debtors' loan agreements provided for severe consequences if a "Debt Yield Event" occurred. The loan agreements defined "Debt Yield" roughly as a fraction: (a) the numerator of which was net operating income less (i) assumed management, marketing, and franchise fees equal to 4% gross income, (ii) replacement reserve fund contributions equal to 4% gross income, and (iii) income generated by leased properties; and (b) the denominator of which was the combined total outstanding principal balances on the mortgage and mezzanine loans. In essence, the Debt Yield calculation was intended to provide an indication of the amount of cash generated by the mortgaged properties compared to the level of debt associated with those properties, and to measure the debtors' ability to generate enough cash to service the LBO debt.

136. The Debtors' failure to meet specific Debt Yield benchmarks under the LBO loan agreements would cause the Debtors to have insufficient cash to pay their obligations as follows:

(1) A so-called "Debt Yield Event" triggered a "Cash Trap Event." This meant that excess cash from operations (after taxes, reserves, and debt service) was "trapped" as additional collateral for the lenders. The cash was not available to pay costs of operations outside of the annual budget approved by the lenders under the Cash Management Agreement, including capital expenditures beyond a small reserve. The annual budget did not allow for the payment of crucial expenses such as occupancy taxes, reserves and management fees, among other things;

(2) If the Debt Yield fell below the so-called "Debt Yield Amortization Threshold," then the borrowers had to make substantial amortization payments to the lenders beginning on June 12, 2009; and

(3) No equity distributions could be made (except to holders of Series A-1 preferred equity in BHAC Capital) by either the mortgage borrowers, the property owner entities, the operating lessee entities, or the mezzanine borrowers unless the Debt Yield equaled or exceeded 7.75%.

137. A Cash Trap Event, triggering a "Cash Trap Event Period," occurred upon: (a) an event of default under the mortgage loan agreement or any mezzanine loan agreement; (b) a Debt Yield Event; or (c) HVM's filing for bankruptcy. A Cash Trap Event could be cured under certain circumstances, including, if it was caused by a Debt Yield Event, the mortgage

borrowers' achievement of certain Debt Yield numbers for six (6) consecutive months.

138.    On June 30, 2007, the Debt Yield was only 7.09%. Therefore, the Debt Yield was less than 7.5% immediately after the date the LBO closed, and there was, in substance if not form, a continuous Cash Trap Event Period within the meaning of the mortgage loan agreement. For the first six months after the LBO's closing (including the day the LBO closed), the only reason there was no technical Cash Trap Event Period was because a Debt Yield Event had no consequences under the pertinent loan agreements until the seventh payment date, scheduled to occur in January 2008. The Debt Yield percentage, however, was required to be reported to the Debtors' lenders on as monthly basis, including during the first six months after the LBO closed. But the Buyer and its principals did not report the Debt Yield percentage to the lenders as should have been done. Upon information and belief, this failure to report was intentional and allowed improper distributions to continue to be made to equity holders.

139.    The Debt Yield Event percentage would become even more difficult to achieve over time, as the required percentage was scheduled to grow from 7.5% (on the seventh payment date) to 8.1% (on the LBO loans' maturity date if certain options to extend the loans had been exercised by the Debtors). In short, the Debtors immediately failed the Debt Yield test under the LBO loan documents on the date the LBO closed, were unlikely to meet the test when it was first scheduled to formally occur in January 2008, and the Buyer and its principals knew or should have known it.

### 2.    The Post-LBO Debt Structure Improperly Restricts the Debtors' Cash

140.    Two significant differences between the pre- and post-LBO Cash Management Agreement and related agreements placed the Debtors at even graver risk of failure. First, the pre-LBO cash management agreement provided that management fees were higher in priority on the so-called "waterfall" than debt service on the mezzanine loans, and thus management fees

would be paid before mezzanine loan debt service if there were insufficient funds to pay both. The post-LBO Cash Management Agreement provided just the opposite: mezzanine loan debt service was higher in priority than management fees, and was paid first if there were insufficient funds to pay both. This severely threatened the post-LBO Debtors' ability to maintain operations.

141. Management fees are not discretionary expenses for a hotel chain. Most of the hotels were indirectly owned by ESI, which was a REIT. A REIT is required to have an outside management company operate its hotels. However, management fees could be paid only if cash was available after debt service under the post-LBO structure. Therefore, any cash difficulties, and especially a Cash Trap Event, made it likely the Debtors would be unable to pay critical management fees and costs necessary to keep the Debtors' hotels open. If those fees and costs were not paid, the Debtors' hotels would close and the Debtors' entire business would abruptly shut down, causing waste and destruction of the Debtors' hotels' value. Nevertheless, the Blackstone Pre-LBO Entity Defendants, DL-DW, and the Buyer's principals agreed to terms placing the Debtors, and their creditors, improperly at risk.

142. The post-LBO Cash Management Agreement trapped 100% of excess cash flow during every Cash Trap Event Period, and defined excess cash flow in such a way as to trap the Debtors' cash prior to the payment of critical operating expenses. The pre-LBO Cash Management Agreement provided for a similar formula, but the excess cash flow concept was different: the cash trap occurred only after critical operating expenses were paid. Therefore, the post-LBO Debtors were placed in an untenable financial position to further the interests of the Defendants that were the Debtors' pre- and post-LBO owners, insiders or insiders' affiliates.

143. Under the pre-LBO mortgage loan agreement, in proposing each annual budget,

the borrowers needed to obtain the approval of only the servicer for the mortgage loan. Post-LBO, in proposing an annual budget, the borrowers were required to obtain the approval of both the mortgage lenders (and after securitization of the CMBS, the servicer for the debt certificate holders) and the most junior mezzanine lender. This requirement placed the Debtors' need for cash to operate subordinate to the profit return for the junior mezzanine lenders, a situation which quite predictably caused great harm to the Debtors and their estates.

144. All of these problems were or should have been foreseen by the Defendants involved in the LBO.

**3. The Debtors Immediately Violate Covenants Regarding The Payment of Ordinary Course Debts**

145. The mortgage and mezzanine loan agreements contained extensive financial reporting covenants, which included: (i) within 60 days after the end of each fiscal year, each borrower had to furnish its respective lender with certain annual financial statements audited by a "Big Four" accounting firm and prepared according to GAAP, along with an Officer's Certificate certifying whether there was an event of default under the applicable loan agreement and if so, what it was, how long it had existed, and what actions had been taken to remedy it; (ii) within 20 days after each month, each borrower had to furnish its respective lender an occupancy report, monthly and year-to-date operating statements, a calculation of the Debt Yield on the last day of the month and the amount of all operating rent due for the month; (iii) within 30 days after each quarter and each month, each borrower had to furnish its respective lender with an officer's certificate stating that the monthly financials provided were accurate, that the representations and warranties with respect to certain special purpose entity requirements were correct and that ordinary course of business liabilities had not exceeded certain amounts and had been paid within 60 days of the date they were incurred; and (iv) within 30 days before the start of each

fiscal year, the mortgage borrowers and property owner entities had to submit a proposed annual budget, which was subject to the written approval of the mortgage lenders and the "Most Junior Mezzanine Lender." Until the proposed annual budget was approved by that lender, the most recent "Approved Annual Budget" applied.

146. Several of these covenants were ignored or violated. For example, no monthly Debt Yield reports were prepared or furnished during 2007 following the LBO, and the first such report was not prepared until January 2008. Also, F. Joseph Rogers ("Rogers"), the Assistant Secretary or Vice President of the Debtors, routinely submitted officer's certificates certifying each month after the LBO closed that ordinary course liabilities had not exceeded certain amounts and had been paid within 60 days of their incurrence. In fact, there were ordinary course liabilities outstanding for longer than 60 days on the date the LBO closed and each month thereafter until the Debtors' eventual bankruptcy filing. Each of these events was an event of default under the loan agreements. In short, the Debtors were in technical default of their obligations the day the LBO closed.

**E.     The Lenders Make Demands of Lichtenstein to Facilitate the Sale of Loan Certificates**

**1.     The Lenders Experience Difficulty Selling the LBO Debt**

147. The lenders that had committed to finance the LBO had always intended to sell most or all of the mortgage and mezzanine debt to third parties. Those efforts, however, were unsuccessful. As of the LBO's closing on June 11, 2007, the banks that financed the LBO held all or substantially all of the mezzanine and mortgage debt.

148. Immediately after the LBO closed, the mortgage lenders marketed the CMBS for sale. At the beginning of those efforts, the market was active. However, the market quickly softened, starting no later than late-July or early-August 2007. As a result, the banks were forced

to take more aggressive steps to sell the CMBS debt including, for example, as early as August 2007, discounting the CMBS debt.

149.    The mezzanine debt also was not selling, and was being discounted by the mezzanine lenders.  The mezzanine lenders began offering to provide buyers of the mezzanine debt with financing ("repo financing") to help buyers purchase the debt.

150.    In addition to offering incentives to potential buyers of the CMBS and mezzanine debt, the lenders made certain demands on Lichtenstein and Lightstone regarding actions that the lenders claimed were needed to make the CMBS and mezzanine debt more marketable.

### 2.    The Lenders Demand that Lightstone Stop Efforts to Sell Preferred Equity

151.    Before the LBO had closed, in May 2007 Lichtenstein was in discussions with certain entities regarding a sale of a substantial piece of equity in the post-LBO Debtors.  Among others, Centerbridge Partners, L.P. ("Centerbridge") was supposedly interested in purchasing equity, and was discussing with  Lichtenstein the need to relieve the Debtors from a $200 million junior tranche of LBO debt.  Other potential investors being solicited on the Buyer's behalf at the time commented to  Lichtenstein or Lichtenstein's advisors that the proposed LBO was "too levered," that it "wouldn't take much to wipe them out," and thus declined interest. Unsurprisingly, those pre-LBO discussions did not result in a sale of preferred equity. Nevertheless, the LBO proceeded.

152.    After the LBO closed, Lichtenstein continued efforts to sell equity.  However, the lenders demanded that Lichtenstein cease those efforts because it was interfering with the lenders' efforts to sell their debt.  Upon information and belief, Lichtenstein complied with the lenders' demands, and ceased efforts to sell equity shortly after the LBO closed.

153.    In or around August 2007, in connection with the securitization of the mortgage loan that resulted from the LBO, Banc of America Securities LLC, together with three other

banks, offered Commercial Mortgage Pass-Through Certificates in the amount of the $4.1 billion mortgage loan to institutional third-parties through a Confidential Offering Memorandum, dated August 17, 2007 (the "Mortgage Loan Issuance Offering Memorandum").

154.    Although the Mortgage Loan Issuance Offering Memorandum noted the ratings of the mortgage loan debt by Fitch, S&P, and Moody's as between BB and AAA, noticeably absent from the Mortgage Loan Issuance Offering Memorandum was any reference to the fact that, as described above, these rating agencies' July 2007 reports noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets. According to S&P's and Fitch's July 2007 reports, they expressly valued the Company at $4.82 billion and $5.23 billion, respectively – over $3 billion less than the $8 billion purchase price.

155.    Moreover, the Mortgage Loan Issuance Offering Memorandum cited the results of the HVS appraisal, which the Sellers, the Buyer, participating lenders, and others involved in the LBO, as discussed above, knew or should have known was flawed, and which was based upon assumptions provided to HVS by the Blackstone Pre-LBO Entity Defendants in order to inflate the values in the HVS appraisal.

**3.    The Alleged HPT Capital Lease is Declared in Default and the Lenders Demand that Lichtenstein "Resolve The Defaults or Else" to Facilitate the Banks' Efforts to Sell Their Paper**

156.    Prior to the LBO, HVI(2) Incorporated ("HVI"), an entity under the Debtors' corporate umbrella, entered into a lease agreement ("HPT Lease"), pursuant to which HPT HSD Properties Trust ("HPT HSD") leased eighteen hotels to HVI. The HPT Lease ran through December 31, 2015, subject to renewal options. HVI was required by the HPT Lease to, among other things, (i) maintain certain specified net worth, and (ii) adhere to certain requirements if a change of control, such as the LBO, was to be effected.

157.    Immediately after the LBO closed, HPT HSD alleged that Lightstone had failed to

comply with one or more of these requirements. The Blackstone Pre-LBO Entity Defendants, the Buyer, and their respective principals were or should have been well aware of this issue prior to the LBO's closing.

158. One week after the LBO closed, on June 18, 2007, HPT HSD issued a notice of default under the HPT Lease and terminated the lease. That same day, HPT HSD issued a press release announcing the alleged defaults and that it had terminated the lease. This default was foreseeable prior to the LBO, caused great concern among the Debtors' lenders and caused the lenders to place further demands upon the Debtors.

159. Shortly thereafter, HPT HSD offered Lichtenstein the option to purchase the properties that were subject to the HPT Lease. To resolve the dispute, and to address the lenders' demands, on or around July 26, 2007, HFI Acquisitions Company LLC ("HFI"), an affiliate of Lichtenstein, purchased 17 of the 18 leased hotel properties under the HPT Lease for approximately $192 million. Approximately $170.5 million of the $192 million used in the HPT HSD transaction came from new mortgage and mezzanine loans to HFI from certain of the Debtors' lenders. In connection with the transaction, HFI was assigned all of HPT HSD's rights under the HPT Lease, including HPT HSD's rights in a $15.96 million security deposit. Upon information and belief, one or more of the Debtors had an interest in those funds. Also, Homestead guaranteed a portion of the rent under the HPT Lease and posted cash collateral for that guaranty totaling approximately $10 million. Upon information and belief, Blackstone Hospitality was also released from its obligations under a letter of credit that Blackstone Hospitality had, prior to the LBO, posted as security for rent and other obligations owed under the HPT Lease.

160. After the HFI transaction closed, HFI subsequently leased the purchased hotel

properties to one or more of the Debtors.  Upon information and belief, this enabled Lichtenstein, as the owner of HFI, to receive additional payments from the Debtors in the form of rents on those hotels.

### 4.    DL-DW's Acquisition of the "LIBOR Floor Certificates"

161.    Because the mortgage lenders were having so much difficulty selling their debt, Wachovia and the borrower Debtors entered into a letter agreement amendment, dated August 31, 2007, that amended the mortgage loan agreement and the mezzanine loan agreements.  The amendment adjusted provisions relating to the application of the proceeds from prepayments of the mortgage and mezzanine loans to make the debt more palatable to potential buyers.  In exchange for the Debtor borrowers' consent to the amendment, the lenders agreed to issue to the borrowers (or their designees) Class X-A and X-B certificates from the securitization (collectively, the "LIBOR Floor Certificates").  The LIBOR Floor Certificates were investment grade (AAA) and represented the right to receive a payment stream, derived from the mortgage loan payments, of the difference between the LIBOR "floor" amount, on the one hand, and actual LIBOR on the other hand.  Therefore, whenever LIBOR dropped below the floor, part of the money paid by the borrower Debtors on the mortgage debt would be paid over, in turn, to the holder of the LIBOR Floor Certificates.

162.    On November 2, 2007, the LIBOR Floor Certificates were issued, in physical form, and transferred directly to DL-DW, one of the ultimate equity owners of the Debtors, rather than to the Debtor borrowers making concessions and providing all payments under the loan agreements.  Upon information and belief, no value was provided by DL-DW to the borrowers in exchange for these certificates and no accounting entries were made to reflect that property rightfully belonging to the Debtor borrowers was being diverted to DL-DW.  At the time, the LIBOR Floor Certificates were valued at no less than approximately $25 million.

163. As LIBOR began dropping throughout 2008 and 2009, the LIBOR Floor Certificates became increasingly valuable to DL-DW because the amount of the "floor" was higher than the actual LIBOR-based loan payments. This value, however, should have belonged to the Debtors, not DL-DW, because the Debtors were the obligors under the mortgage and mezzanine agreements and were the parties who contracted to receive the certificates. The LIBOR Floor Certificates' issuance to DL-DW was an improper transfer of the Debtors' value to the Debtors' equity owners.

**F.    The Debtors' Post-LBO Performance Continues to be Predictably Dismal, But Substantial Distributions Are Nevertheless Made to Equity Holders**

**1.    2007 Post-LBO Financial Performance**

164. Immediately after the LBO, the Debtors' financial performance continued to decline, performance metrics set forth in its budgets were missed, and the Debtors encountered significant (and predictable) economic problems. The Debtors' senior management received regular financial and other reports on both a weekly and monthly basis (depending on the nature of the reports) after the LBO and therefore knew or should have known of relevant, material events relating to the Debtors' performance and inevitable downward spiral.

**a.    2007 Financial Results**

165. The Debtors' 2007 post-LBO revenues were approximately $623 million, below the pro-forma budget of approximately $655 million prepared in connection with the LBO. The 2007 post-LBO EBITDA was approximately $327 million (or a 52% margin), as compared to a pro-forma budget EBITDA of $364 million (or a 56% margin). During the second half of 2007, the Debtors experienced a continuing reduction in room demand, and the monthly ADR, OCC, and RevPAR were at or below budget in every month following the LBO in 2007. Revenue growth reversed in the second half of 2007, and the Debtors missed projections for room revenue

and property-level EBITDA in each of the last three quarters of 2007.

166.    The Debtors' performance relative to its selected competitive peer group reflected that, while the Debtors' occupancy rate was higher than those of some of their peers, the Debtors' revenue and room rate (as evidenced by RevPAR and ADR at the time) was below its peers by a significant amount: 10% to 22%.

167.    In addition to regular industry reports, the Debtors' management received weekly reports showing how the Debtors' deteriorating performance compared to the Debtors' peer group in the second half of 2007.  During the November 15, 2007 board of directors meeting for the Debtors, it was reported that during the third quarter, certain metrics were below budget: RevPAR was below budget by 3% and property-level EBITDA was below budget by 5.7% year to date through September; RevPAR was below budget by 5.9% and property-level EBITDA was below budget by 10.5% for the third quarter 2007.  The Debtors' principals were thus aware that the Debtors' performance was not only below their peer group, but was also below internal targets.

168.    However, at a November 15, 2007 board meeting of the "Extended Stay Hotels family of companies," David Kim ("Kim"), Executive Vice President and Chief Investment Officer of the "Extended Stay Hotels family of companies," including Homestead and ESI, "anticipated" double digit corporate EBITDA growth for 2008 and 2009, driven by anticipated RevPAR growth of more than 7% in both years, based on the Debtors' "re-branding" strategy. This re-branding strategy, however, was based upon having substantial funds available to spend on brand strategy initiatives in the first quarter of 2008.  However, the projected Debt Yield calculations for the fourth quarter of 2007 and the first two quarters of 2008 were expected at that time to be below the minimum requirement under the LBO loan agreements.  Funding for

re-branding was not likely to be available because the Debt Yield calculations would in turn trigger a Cash Trap Event, depriving the Debtors of the much needed cash.

169. In addition, the Debtors' financial projections at the time reflected negative cash flows for the fourth quarter of 2007 and the first quarter of 2008. These projected results should have alerted anyone looking at them with an unjaundiced eye that the optimistic growth "anticipated" by Kim was not going to occur in the short term, nor was the cash going to be available to fund the rebranding expenditures from operations.

170. The Debtors' actual performance in late 2007 was below budgeted ADR, was not strong enough to mitigate the decline in OCC (also below budget at the time), and was adversely impacting the Debtors' liquidity situation.

### b. Critical Capital Expenditures Are Not Funded

171. In 2007, prior to the LBO, the Company spent approximately $67.1 million on capital expenditures. However, during the post-LBO period, the Debtors did not (and, indeed, could not) fund any of the incremental capital expenditures critical to the Debtors' achievement of the inflated projections discussed in Blackstone's January 2007 Information Memorandum. In fact, the Debtors were changing the pre-LBO re-branding strategy and re-branding their hotels under the Homestead name rather than the Extended Stay brand, contrary to the recommended strategy stated in Blackstone's Information Memorandum, and this new re-branding strategy was not going smoothly.

### c. Late-2007: A Cash Trap Event is Imminent

172. In a November 2007 board meeting, the Debtors' principals finally acknowledged the Debt Yield Event and the pending Cash Trap Event as imminent issues. Senior management knew or should have known the Debtors would likely fail the Debt Yield Test where it was to be reported on January 12, 2008. The anticipated Debt Yield was below the required monthly Debt

Yield from the fourth quarter 2007 through the second quarter 2008.

173. The Debtors submitted a proposed 2008 budget for approval by the lenders in early-December 2007. This budget reflected an increase in the overall property-level expenses. The budget submitted also included significant anticipated future costs related to non-recurring, discretionary capital expenditures associated with the Debtors' proposed re-branding strategy. Due to the anticipated Debt Yield Event and the pending Cash Trap Event that would be triggered in early 2008, the budget sought to ensure that all costs would be covered through funds available in the "waterfall" described above and on the attached Exhibit E (the "Waterfall") through the 2008 budget submitted for lender approval.

        **d.**      **2008 Budget Negotiations: The Debtors Unsuccessfully Attempt to Gain Access to Cash They Should Have Had From the Closing of the Loans**

174. In November 2007, the proposed annual budget for 2008 was due. HVM prepared annual and monthly financial budgets for the Debtors, which were required to be approved by certain of the Debtors' lenders. If the proposed annual budget was not approved by the lenders, then the most recently approved annual budget governed the Debtors' operations. This, however, meant that the Debtors' cash was subject to the flawed Waterfall, and the Debtors were on the verge of a Cash Trap Event. Any cash remaining after the Waterfall was funded would not be provided to the Debtors. During a Cash Trap Event Period, excess cash that could have been transferred to the Debtors for operating expenses would be held by the lenders as additional collateral, leaving the Debtors unable to pay crucial operating expenses.

175. The 2007 approved annual budget had been created prior to the LBO. That budget had certain flaws that all parties should have known about. However, the post-LBO Company had not been provided with the 2007 annual budget being used at the time. That 2007 approved annual budget (i) did not include trust fund occupancy taxes (which totaled

approximately $6-8 million, or approximately 9.2% of room revenues, per month, and were collected by the Debtors and held in trust for taxing authorities), and (ii) did not allow for payment of necessary corporate overhead costs (e.g., reservation services, travel agent commissions and certain management fees), all of which were critical to the Debtors' ongoing operations because excess cash was to be trapped, and none of which could be paid once there was a Cash Trap Event Period.

176.    In November 2007, when it became apparent that trust fund occupancy taxes were being swept into the Cash Management Account for application in accordance with the Waterfall,  Rogers asked the lenders to treat those taxes as pass-through amounts, and to have the amounts distributed back to the Debtors for payment to applicable governmental authorities.  The lenders responded that the occupancy taxes would have to be handled through the Debtors' working capital account. In other words, the occupancy taxes collected would come into the lender's cash collateral, but no disbursements would be made to pay them. Upon information and belief, these were "trust fund" obligations, meaning that they were not the Debtors' property. That money belonged to various governments.  The taxes were collected by the Debtors and held "in trust" for the benefit of taxing authorities.  The lenders, however, knowingly expropriated the government's funds, held all cash and placed the Debtors in the position of wrongfully converting the government's funds to pay their lenders, all of which was pursuant to the agreements and documents executed in connection with the LBO.

177.    Corporate overhead represented approximately 16% of the total property and corporate expenses of the Debtors in late 2007.  Without any changes to the budget for 2008, the Debtors were about to experience significant cash flow constraints during a Cash Trap Event Period, which, under the pertinent loan agreements, would last for a minimum of six months.

Further, during a Cash Trap Event Period, the Debtors would have had to fund corporate overhead and occupancy taxes from working capital, if any was available, as those expenses would not be paid through the Waterfall. These facts and circumstances were, or should have been, known to the Debtors and their principals by late 2007, at the latest.

e.    **Despite the Debtors' Financial Distress, Improper Distributions Are Made to Equity Holders in 2007**

178.    The mortgage loan agreement provided that the Debt Yield, measured on a quarterly basis, had to be greater than 7.75% for equity distributions to be made. But other agreements entered into in connection with the LBO provided that the holders of Series A-1 preferred equity in the Debtors would receive their equity distributions regardless of the Debtors' financial condition, and regardless of whether those distributions were in violation of applicable law.

179.    Upon information and belief, although the first Debt Yield calculation should have been completed and reported in July 2007, and monthly thereafter, no such calculation was reported to the lenders at any point in 2007. Had the Debtors' management performed an appropriate Debt Yield calculation in July 2007, that calculation would have shown that, immediately following the LBO's closing, the Debt Yield was 7.09%, compared to a requirement of 7.5% needed to avoid a Cash Trap Event in early 2008 and 7.75% for any equity distributions to be permitted. The first calculation of the Debt Yield performed and reported to the lenders was in January 2008 for the 12 month period ending December 31, 2007. Foreseeably, the Debtors did not meet the minimum requirement of 7.75%.

180.    Notwithstanding the Debt Yield failure, the lack of any surplus, the Debtors' insolvency, and the future financial and operational declines that were or should have been foreseen by those running the Debtors at the time, the Debtors, directly or indirectly through

affiliated entities, made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure totaling $8,835,000 to equity holders other than the A-1 Series Unit holders from June 11, 2007 through December 31, 2007:

**2007 Dividends or Distributions to A-2 and A-3 Series Units**

| Recipient | Date Paid | Amount |
|---|---|---|
| **Series A-2 Units** | | |
| PGRT ESH Inc. | 7/30/2007 | $1,067,000 |
| PGRT ESH Inc. | 8/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 9/27/2007 | $1,000,000 |
| PGRT ESH Inc. | 10/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 11/29/2007 | $1,000,000 |
| PGRT ESH Inc. | 12/28/2007 | $1,033,000 |
| **2007 A-2 Total** | | **$6,167,000** |
| | | |
| **Series A-3 Units** | | |
| Lightstone Holdings LLC | 8/31/2007 | $2,668,000 |
| **2007 A-3 Total** | | **$2,668,000** |

181.    In addition, during 2007 after the LBO closed, the Debtors made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure to the A-1 Series equity holders, totaling approximately $13.1 million, in violation of the loan agreements and applicable law:

| RECIPIENT | DATE PAID | AMOUNT |
|---|---|---|
| Arbor Commercial Mortgage LLC | 6/11/2007 | $233,333.33 |
| Polar Extended Stay USA L.P. | 7/13/2007 | $44,444.44 |
| Princeton ESH, LLC | 7/13/2007 | $44,444.44 |
| Arbor Commercial Mortgage LLC | 7/13/2007 | $1,661,111.11 |
| Polar Extended Stay USA L.P. | 7/26/2007 | $18,888.89 |
| Princeton ESH, LLC | 7/26/2007 | $18,888.89 |
| Arbor Commercial Mortgage LLC | 7/26/2007 | $358,888.89 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | $713,333.33 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | $20,000.00 |
| Polar Extended Stay USA L.P. | 8/15/2007 | $93,333.33 |
| Princeton ESH, LLC | 8/15/2007 | $93,333.33 |
| Arbor Commercial Mortgage LLC* | 8/15/2007 | $1,250,000.00 |
| Arbor Commercial Mortgage LLC | 9/17/2007 | $713,333.33 |

| | | |
|---|---|---|
| Polar Extended Stay USA L.P. | 9/17/2007 | $103,333.33 |
| Princeton ESH, LLC | 9/17/2007 | $103,333.33 |
| Arbor Commercial Mortgage LLC* | 9/17/2007 | $1,250,000.00 |
| Arbor Commercial Mortgage LLC | 10/15/2007 | $450,000.00 |
| Glida One LLC | 10/15/2007 | $550,000.00 |
| Polar Extended Stay USA L.P. | 10/15/2007 | $100,000.00 |
| Princeton ESH, LLC | 10/15/2007 | $100,000.00 |
| Arbor Commercial Mortgage LLC* | 10/15/2007 | $900,000.00 |
| Arbor Commercial Mortgage LLC | 11/15/2007 | $495,000.00 |
| Glida One LLC | 11/15/2007 | $568,333.33 |
| Polar Extended Stay USA L.P. | 11/13/2007 | $103,333.33 |
| Princeton ESH, LLC | 11/15/2007 | $103,333.33 |
| Arbor Commercial Mortgage LLC* | 11/15/2007 | $900,000.00 |
| Arbor Commercial Mortgage LLC | 12/17/2007 | $450,000.00 |
| Glida One LLC | 12/17/2007 | $550,000.00 |
| Polar Extended Stay USA L.P. | 12/17/2007 | $100,000.00 |
| Princeton ESH, LLC | 12/17/2007 | $100,000.00 |
| Arbor Commercial Mortgage LLC* | 12/17/2007 | $900,000.00 |
| **2007 A-1 Total** | | **$13,089,999.96** |

Transfers marked with an asterisk above were sent to Arbor Commercial Mortgage LLC from the Cash Management Account, by ESA P Portfolio Operating Lessee Inc. fbo BHAC Capital IV, LLC.

182. Also, (i) on July 17, 2007, DL-DW received a wire transfer from an LBO closing account totaling approximately $77,366,984, which amount, upon information and belief, represented an apparent "overfunding" of an LBO closing account, and (ii) on October 17, 2007, a post-LBO "purchase price adjustment" resulted in a $2,342,000 payment from Blackstone to DL-DW. Notwithstanding the fact that the LBO purchase price had been funded and paid on behalf of DL-DW with borrowings by the Debtors, these funds were improperly distributed to equity holders instead of being turned over to the Debtors. Upon information and belief, these amounts constituted additional improper value that was siphoned from the Debtors for DL-DW's

and Lichtenstein's benefit at times when the Debtors were insolvent, inadequately capitalized and without adequate surplus.

### 2. The Debtors' Condition Further Deteriorates Throughout 2008, But Prohibited Equity Distributions Continue

#### a. 2008 Debt Yield Test and Formal Cash Trap Event

183. The first Debt Yield calculation reported to the lenders was provided to the lenders on January 21, 2008 for the period ending December 31, 2007. As alleged above, since the calculation reflected that the Debtors did not meet the minimum Debt Yield of 7.5% at that time, both a Debt Yield Event and a Cash Trap Event were triggered. Therefore, as of February 2008, any unallocated cash available after the Waterfall had been satisfied on a monthly basis was "trapped" by the lenders in a restricted cash collateral account. The fact that cash was now "trapped" put significant strain on the Debtors, and required the use of over $27 million from a working capital reserve account in order to keep the Debtors temporarily afloat.

184. In addition, in November 2007, the Debtors' projections reflected that the Debt Yield could not be maintained above the cure amount of 7.6% for a period of six months in order to eliminate the Cash Trap and reinstate the opportunity to receive any unallocated cash available after the Waterfall had been satisfied on a monthly basis.

#### b. March 2008: The 9.15% Notes Become Due

185. On March 15, 2008, the 9.15% Notes matured and the principal balance of $30.9 million, together with accrued interest of approximately $1.4 million, came due. The Debtors failed to pay those amounts when due, and a default was declared by the trustee for the noteholders, on March 24, 2008.

186. On April 16, 2008, DL-DW secured a $22 million "loan" from affiliated investors in the Debtors. All of the affiliated investors were insiders of the Debtors. This new $22 million

loan, together with additional funds from DL-DW, were used to pay off the matured 9.15% Notes. But the new insider loan came with onerous terms: it was guaranteed by BHAC Capital, secured by the valuable LIBOR Floor Certificates owned by DL-DW, which should have been property of the Debtors. Though the "loan" was therefore well collateralized, it nevertheless accrued interest at an annual rate of 25%. The "loan" was to mature on May 1, 2011 (the "25% Note"). The following table is a summary of the insider "lenders" and participation in the 25% Note.

**Insiders' Interests in the 25% Note**

| Lender | Affiliate Relation | Participation | Amount |
|---|---|---|---|
| ABT-ESI LLC | Arbor | Lead Lender / Servicer | $5,225,000 |
| Park Avenue Funding LLC | Lichtenstein | Co-Lender | $11,000,000 |
| Princeton ESH LLC | Princeton | Co-Lender | $550,000 |
| Mericash Funding LLC | Joseph Chetrit | Co-Lender | $5,225,000 |
| **Total** | | | **$22,000,000** |

187. Arbor, Lichtenstein, Princeton and Chetrit structured this transaction as a "loan" with onerous terms to benefit themselves to the Debtors' detriment, even though they should have put the funds into the Debtors as equity at the time the LBO closed so as to pay off the 9.15% Notes at that time, as had been originally contemplated.

188. Concurrently with the execution of the 25% Note on April 16, 2008, the Debtors paid off the $31 million outstanding principal balance of the 9.15% Notes, together with the accrued interest of approximately $1.7 million and $100,000 of professional fees. The total payments of approximately $33 million were made using (a) the proceeds from the 25% Note of $22 million; plus (b) approximately $10.6 million of additional funds from DL-DW. The Debtors accounted for activities related to the repayment of the 9.15% Notes and the securing of

the 25% Note by recording the $22 million as additional "paid in capital" on the Debtors' books, with a corresponding intercompany note payable to DL-DW of approximately $10.6 million.

189.    DL-DW pledged the LIBOR Floor Certificates to the lenders of the 25% Note. The income generated from the LIBOR Floor Certificates went directly to make all interest and principal payments on the 25% Note, rather than DL-DW making payments separately. The maximum monthly principal repayment under the 25% Note was $416,666. Because cash income from the LIBOR Floor Certificates was greater than the principal and interest payments due (or even allowable) on the 25% Note, the excess income from the LIBOR Floor Certificates was deposited into a reserve bank account for the benefit of BHAC Capital Series A-1 Unitholders ("Floor Bonds Reserve Account"). As of December 31, 2008, $3.3 million of the principal on the 25% Note had been repaid in this fashion, leaving a remaining principal balance outstanding of $18.7 million, and an additional $3.6 million had been paid during 2008 as interest. Despite these payments, the Floor Bonds Reserve Account contained a balance of $2.1 million as of December 31, 2008.

### c.    The Debtors' Proposed 2008 Annual Budget

190.    The Debtors had submitted a proposed 2008 annual budget for approval by the lenders in early December of 2007. The pertinent lenders objected to certain aspects of that proposed annual budget, including (a) certain revenue projections in light of the then-current economic climate and poor outlook for the industry; (b) proposed one-time capital expenditure expenses or corporate overhead costs that did not constitute property-level operating expenses; and (c) other costs that were not explained by the Debtors. The Debtors then conducted discussions with the lenders regarding the objections.

191.    While those discussions were ongoing, the lenders continued to use the 2007 approved annual budget when administering the Waterfall throughout early 2008. This created

additional financial strain on the Debtors, as funding for certain operating costs was not available through the Waterfall (*e.g.*, reservation system, occupancy taxes, as described above), and the amounts disbursed were to the Debtors were lower than what was needed at the time to pay operating expenses.

192.    On April 16, 2008, certain issues relating to the 2008 annual budget were resolved.  As a result, the Debtors received some of the cash to which they should have been entitled dating back to January 1, 2008.  However, no provision was made to repair the damage caused to the Debtors during the latter half of 2007, when the Debtors were forced to operate under the 2007 approved annual budget of which the Debtors had never been provided a copy. Thus, the Debtors' cash problems were far from solved, and the Debtors and their principals knew or should have known it.  In fact, on May 1, 2008, after the 2008 annual budget had been approved, Lichtenstein himself remarked that vendor payments were being delayed and that "... its demoralizing for the staff to have to be dodging vendors and local tax authorities who want their payments."

193.    On April 15, 2008, in exchange for the concessions granted by the lenders to facilitate budgeting of operating expenses, an amendment to the mortgage loan agreement was executed (the "Mortgage Loan Second Amendment").  The Mortgage Loan Second Amendment was between the same parties to the mortgage loan, except that by that time the original mortgage lenders had transferred their interest to Wachovia Bank Commercial Mortgage Trust in connection with the post-LBO securitization of the mortgage loan debt through CMBS.

194.    The Mortgage Loan Second Amendment added a new Section 5.2.14 to the original mortgage loan agreement, which contained extensive restrictions on the mortgage borrowers' use of income, cash, fees, proceeds, property or revenue from the mortgaged hotels

(including disbursements to the mortgage borrowers of excess cash flow under the Cash Management Agreement) ("Restricted Excess Cash Flow"). The new Section 5.2.14 prohibited the mortgage borrowers' distribution of Restricted Excess Cash Flow except in limited circumstances.

195.    The Debtors finally retained both Weil, Gotshal & Manges ("Weil") and Lazard Freres ("Lazard") in or around early 2008 as restructuring and insolvency professionals to assist with efforts to restructure the Debtors' suffocating LBO debt structure.

> **d.    As Events Unfold, the Debtors' Financial Condition Worsens and Liquidity Problems Become More Acute**

196.    The softening of room demand experienced by the Debtors in 2007 continued into early 2008. OCC decreased again, the extended-stay industry as a whole generally experienced ADR increase in the first half of 2008. However, overall supply in the industry increased at rates far exceeding only modest increases in demand. The 2008 approved annual budget was not finalized until April 2008, and the Debtors were operating in a Cash Trap Event Period. All of these factors, among others, had a severe impact on the Debtors' liquidity.

197.    In the first quarter of 2008, liquidity became more constrained. In January of 2008, the Debtors were required to transfer $8.1 million from their main operating account to the Cash Management Account to cover a shortfall in the Waterfall and ensure that certain obligations were met, including interest payments on the Mezzanine Loans. Consequently, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2008 decreased to $42.0 million from $52.4 million as of December 31, 2007.

198.    In the second quarter of 2008, OCC and RevPAR declined further. An "Audit Update" included in the May 15, 2008 board of directors package noted that: (a) debt waivers were required; and (b) significant liquidity concerns had to be addressed for audit issuance. In

addition, a cash flow forecast prepared by the Debtors predicted that the effect of LIBOR rates would significantly impact liquidity, such that cash at year end was projected to range from $19.5 million to $49.8 million, at best, depending on the LIBOR rates assumed.

199.     In fact, the Debtors' principals knew or should have known that the Debtors could be completely out of cash as soon as January 2009.  The Company also anticipated that it would not meet certain Debt Yield amortization avoidance thresholds by June 2009, thereby triggering a requirement that the Debtors make amortization payments to the lenders, estimated at $51 million for 2009.  This increase in anticipated cash needs when the Debtors' financial condition was rapidly declining caused the Debtors serious concern, as (i) all cash flows were subject to a Cash Trap and the Debtors were not projected to achieve a Debt Yield cure in 2008 or 2009, (ii) the Debtors would have difficulty obtaining an unqualified audit opinion at the end of 2008, which could result in a default under the pertinent LBO loan agreements, and (iii) approval of the 2009 proposed annual budget posed critical challenges given the questions raised by certain of the lenders with respect to the annual budget in late-2007 and early-2008.

200.     In the third quarter of 2008, RevPAR decreased again, and was lower than the Debtors' budget for that time.  In the fourth quarter of 2008, ADR and OCC continued to decline, and RevPAR performance was far off of budgeted projections. As a result, fourth quarter 2008 revenue and property-level EBITDA performance had double-digit declines over the prior year.   By the end of 2008, the Debtors' total revenue and EBITDA had also dramatically declined.

201.     As a result of these financial difficulties, the Debtors' liquidity continued to deteriorate, and by December 31, 2008 the general ledger balance of cash available to fund operations had slipped to $26.5 million.

### e.   Dividends and Distributions to Equity Holders Continue in 2008, Despite the Debtors' Financial Distress

202.   Notwithstanding the Debtors' precipitous financial and operational declines, the Debtors, directly or indirectly through affiliated entities, made the following substantial cash distributions directly, or indirectly through other entities in the Debtors' corporate structure, to equity holders or equity holders' affiliates, in violation of the loan agreements and applicable law:

### 2008 Improper Equity and Related Distributions

| RECIPIENT | DATE PAID | AMOUNT |
|---|---|---|
| Arbor Commercial Mortgage LLC & Ron Invest LLC | 1/15/2008 | $262,500.00 |
| Glida One LLC | 1/15/2008 | $473,611.11 |
| Polar Extended Stay USA L.P. | 1/15/2008 | $86,111.11 |
| Princeton ESH, LLC | 1/15/2008 | $86,111.11 |
| Arbor Commercial Mortgage LLC | 1/11/2008 | $900,000.00 |
| Arbor Commercial Mortgage LLC | 2/20/2008 | $1,808,333.33 |
| Arbor Commercial Mortgage LLC | 3/17/2008 | $241,865.08 |
| Ron Invest LLC | 3/17/2008 | $42,063.49 |
| Glida One LLC | 3/17/2008 | $115,674.61 |
| Polar Extended Stay USA L.P. | 3/17/2008 | $21,031.75 |
| Princeton ESH, LLC | 3/17/2008 | $21,031.75 |
| Arbor Commercial Mortgage LLC | 3/12/2008 | $684,523.81 |
| Ron Invest LLC | 3/12/2008 | $119,047.62 |
| Glida One LLC | 3/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 3/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 3/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 4/15/2008 | $305,753.97 |
| Ron Invest LLC | 4/15/2008 | $53,174.60 |
| Glida One LLC | 4/15/2008 | $146,230.16 |
| Polar Extended Stay USA L.P. | 4/15/2008 | $26,587.30 |
| Princeton ESH, LLC | 4/15/2008 | $26,587.30 |
| Arbor Commercial Mortgage LLC | 4/11/2008 | $684,523.81 |
| Ron Invest LLC | 4/11/2008 | $119,047.62 |
| Glida One LLC | 4/11/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 4/11/2008 | $59,523.81 |
| Princeton ESH, LLC | 4/11/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 5/15/2008 | $500,000.00 |
| Arbor Commercial Mortgage LLC | 5/12/2008 | $684,523.81 |
| Ron Invest LLC | 5/12/2008 | $119,047.62 |
| Glida One LLC | 5/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 5/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 5/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | $27,418.63 |
| Ron Invest LLC | 6/16/2008 | $4,768.45 |

| | | |
|---|---|---|
| Glida One LLC | 6/16/2008 | $13,113.26 |
| Polar Extended Stay USA L.P. | 6/16/2008 | $2,384.23 |
| Princeton ESH, LLC | 6/16/2008 | $2,384.23 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | $508,264.53 |
| Arbor Commercial Mortgage LLC | 6/12/2008 | $684,523.81 |
| Ron Invest LLC | 6/12/2008 | $119,047.62 |
| Glida One LLC | 6/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 6/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 6/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 7/15/2008 | $500,000.00 |
| Arbor Commercial Mortgage LLC | 7/11/2008 | $684,523.81 |
| Ron Invest LLC | 7/11/2008 | $119,047.62 |
| Glida One LLC | 7/11/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 7/11/2008 | $59,523.81 |
| Princeton ESH, LLC | 7/11/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 8/15/2008 | $558,333.33 |
| Arbor Commercial Mortgage LLC | 8/12/2008 | $684,523.81 |
| Ron Invest LLC | 8/12/2008 | $119,047.62 |
| Glida One LLC | 8/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 8/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 8/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 9/15/2008 | $558,333.33 |
| Arbor Commercial Mortgage LLC | 9/12/2008 | $684,523.81 |
| Ron Invest LLC | 9/12/2008 | $119,047.62 |
| Glida One LLC | 9/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 9/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 9/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 10/15/2008 | $500,000.00 |
| Arbor Commercial Mortgage LLC | 10/10/2008 | $684,523.81 |
| Ron Invest LLC | 10/10/2008 | $119,047.62 |
| Glida One LLC | 10/10/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 10/10/2008 | $59,523.81 |
| Princeton ESH, LLC | 10/10/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 11/17/2008 | $558,333.33 |
| Arbor Commercial Mortgage LLC | 11/12/2008 | $684,523.81 |
| Ron Invest LLC | 11/12/2008 | $119,047.62 |
| Glida One LLC | 11/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 11/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 11/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 12/18/2008 | $1,750,000.00 |
| **2008 A-1 Total** | | **$21,349,999.99** |

203.    In early December of 2008, the Debtors submitted for the lenders' approval a proposed 2009 annual budget that assumed a significant decline in room revenues, and property-level EBITDA. At this point, the Debtors were simply trying to "stay[] alive for another few weeks," as Lichtenstein later stated. At a board meeting held on December 16, 2008, Chetrit suggested that there be "staff reduction[s] of hours . . . and that staff should be asked for a 20%

reduction to make a significant impact upon cash flow." Upon information and belief, this suggestion was made, *inter alia*, in order to increase cash available to continue improper distributions to equity holders, including entities owned or controlled by Chetrit, all to the detriment of the Debtors.

204.    Although the Debtors passed a resolution stopping equity distributions in late-2008 in light of the financial and liquidity crises, improper distributions to equity actually continued even after that resolution from a so-called "Preferred Equity Holder Reserve Account" that had been created at the LBO's closing and was "security" for certain equity holders. The Preferred Equity Holder Reserve Account was funded with $20 million of the Debtors' funds at the LBO's closing, and certain equity holders could instruct that distributions be made from that reserve account to them. If the account was used for such distributions, then BHAC Capital, using the Debtors' cash, was required to replenish the reserve back up to $20 million. The following table represents the distributions from the preferred equity reserve account to an Arbor affiliate *following* the November 13, 2008 board of directors meeting at which equity distributions were resolved to be stopped:

**<u>Summary of Improper Distributions from the Preferred Equity Reserve Account</u>**

| | | |
|---|---|---|
| 12/18/2008 | Arbor Commercial Mortgage LLC | $1,750,000 |
| 1/20/2009 | Arbor Commercial Mortgage LLC | $1,808,333 |
| 2/20/2009 | Arbor Commercial Mortgage LLC | $1,808,333 |
| 3/11/2009 | Arbor Commercial Mortgage LLC | $15,178,971 |
| **Total** | | **$20,545,637** |

Eventually, in March 2009, as the Debtors continued their downward spiral, the Preferred Equity Reserve Account was liquidated and the balance was wired to the A-1 Series unit holders, as

shown above.

205.     From the LBO's closing through the date the Preferred Equity Reserve Account was liquidated and given to the A-1 series unit holders, a total of no less than $100 million was improperly distributed to equity holders during periods of tremendous financial and liquidity stress.

206.     In addition to those amounts, upon information and belief, Lightstone Holdings LLC received so-called "asset management fees" throughout that same period totaling approximately $1 million per year.  This occurred even though Lightstone Holdings LLC was not the Debtors' management company and HVM managed all aspects of the Debtors' daily operations.

207.     Before the LBO's closing, HVM and HVM Canada provided the operational, management, and administrative functions for all of the Extended Stay hotels. After the LBO's closing, all Extended Stay hotels continued to be managed by HVM, except for three properties in Canada, which were operated by HVM Canada.  HVM's management fee arrangement was different from the industry practice, and provided significantly higher management fees than those typically seen in the industry.  In spite of the substantial fees being paid to HVM and HVM's management of all aspects of the Debtors' day-to-day business, Lightstone Holdings LLC  (i.e., Lichtenstein) received management fees after the LBO totaling approximately $1 million per year, for doing nothing.  Moreover, HVM was managed by an entity known as "HVM Manager," which was itself owned and managed by Lichtenstein, HVM Manager's sole member.

**3.     2009 Post-LBO Performance through the Bankruptcy Filing Date**

**a.     Shortfalls in the Waterfall Are Experienced**

208.     Conditions worsened in the latter part of 2008 in part as a result of the Great

Recession. Moreover, as a result of declining performance in December 2008 and January 2009, the receipts transferred to the Waterfall were not sufficient to cover the interest due on the mezzanine debt in January 2009. Consequently, the Debtors were forced to transfer $5.9 million from their main operating account to the Cash Management Account to cover the shortfall. Only $19 million was distributed from the Cash Management Account to the Debtors for budgeted operating expenses in January 2009. This was the lowest monthly amount distributed to the Debtors since the LBO's closing. From mid December 2008 to late March 2009, the Debtors were forced to fund occupancy taxes and other expenses totaling approximately $20 million out of a cash reserve account.

### b. Insider Obligations Are Paid In Full

209. In February 2009, the Debtors' advisors issued a memorandum to the Debtors' independent directors regarding the deteriorating liquidity situation, and on March 11, 2009, the boards of directors of DL-DW, BHAC Capital, Homestead, and ESI met to discuss the insider 25% Note. Joseph Teichman ("Teichman"), the Secretary and General Counsel of the Debtors, inexplicably informed the Boards that the 25% Note needed to be refinanced, even though it was not scheduled to mature until May 1, 2011, and thus should not have been considered a pressing issue at the time, and proposed that the 25% Note be paid off by transferring the LIBOR Floor Certificates (which had been stolen from the Debtors by DL-DW) to the holders of the 25% Note. That same day, the boards approved this proposed transaction.

210. On March 12, 2009, one day later, the so-called "Floor Bonds Agreement" was executed, pursuant to which the LIBOR Floor Certificates were assigned to ABT-ESI LLC, as lead lender under the insider 25% Note. In connection with that agreement, all insider note interests (including those held by Lightstone Commercial Management, as successor by transfer to the interests originally possessed by Park Avenue Funding LLC) were contributed by the other

25% Note lenders to ABT-ESI LLC. ABT-ESI LLC was simultaneously restructured so that each of the other lenders became owners of ABT-ESI LLC in proportion to their respective rights and interests in the 25% Note. Similarly, as part of the deal, the Series A-1 equity holders waived their rights to the $4,817,986 balance of the so-called "Floor Bonds Reserve Account," and the entire balance was required to be wire transferred to an account designated by Lightstone Commercial, which was to receive a Form 1099 in respect of this distribution.

211. At the time the Floor Bonds Agreement was executed, the outstanding principal balance on the 25% Note was $17,416,674. The Floor Bonds Reserve Account then contained a balance of $4,817,986. The LIBOR Floor Certificates, which had apparently brought in at least $13 million in less than a year, were assigned an artificial value of $17,416,674, exactly equal to the balance of the 25% Note. Upon information and belief, the actual value of the LIBOR Floor Certificates was significantly greater.

212. The LIBOR Floor Certificates were therefore transferred to pay the 25% Note, and the Floor Bonds Reserve Account was emptied to make a separate payment to Lightstone Commercial. In short, the valuable LIBOR Floor Certificates that should have belonged to the Debtors were transferred to DL-DW for no consideration, and then to insiders as ostensible repayment for the $22 million loan to DL-DW. The remaining accumulated proceeds of the LIBOR Floor Certificates that had not been previously transferred to the insiders as payments on the $22 million loan, were diverted to insider Lightstone Commercial. Insiders were thus paid richly as the Debtors moved toward their inevitable bankruptcy. As described more fully below, bankruptcy was delayed for just over ninety days after the 25% Note was paid off, thus allowing the ninety-day preference period under the federal Bankruptcy Code to expire.

    c.    **2009: Performance Worsens**

213. During the first and second quarters of 2009, the Debtors experienced steep

declines in ADR, OCC, room revenue and property-level EBITDA.  As a result, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2009 decreased to only approximately $16.2 million, from approximately $26.5 million as of December 31, 2008.

214.    In the second quarter of 2009, the Debtors continued capital expenditure freezes and instituted hiring freezes related to all full-time and part-time personnel. As the liquidity situation worsened, the Debtors' officers and directors at the time discussed actions to conserve cash. For example, in April of 2009, the board of directors of the "Extended Stay Hotels family of companies" discussed that vendor payments were being stretched to conserve cash. On April 30, 2009 the Debtors' outstanding accounts payable balance over 60 days old of $1.3 million was more than 10% of the total accounts payable balance of approximately $11 million, the highest percentage since the LBO.

215.    By no later than May 14, 2009, the board was aware that the Debtors might not have enough unrestricted cash to fund operations through the end of May 2009.  Further, the Debtors' declining cash position was expected to be exacerbated by the pending amortization triggered by the anticipated breach of the Debt Yield amortization threshold covenant, as described above.  These additional payments would have to be funded through the Cash Management Account beginning with the June 13, 2009 Waterfall cycle. Although restructuring alternatives were discussed by the board, none identified how, in the absence of a restructuring or bankruptcy, the Debtors might obtain the funds needed to make the upcoming Debt Yield amortization payments, which would total over $50 million for the remainder of 2009.

216.    As of May 31, 2009, the general ledger cash balance available to fund operating expenses had dropped to approximately $4.6 million, down from approximately $26.5 million as

of December 31, 2008. In addition, the Debtors were incurring extensive restructuring expenses. In June 2009, as a result of the severe liquidity situation and the imminent amortization payments, the Debtors were projected to completely deplete liquidity by the end of June 2009, and would be unable to meet payroll of approximately $9 million on Tuesday, June 19, 2009.

## G.  The Failed Workout Negotiations

### 1.  Initial Mortgage Debt Workout Negotiations

217.  Immediately after the November 13, 2008 meeting of the Debtors' board of directors, Lazard began attempts to engage the Debtors' mortgage debt certificate holders (the "Certificate Holders") in workout discussions. Those discussions were far too little, far too late, as the Debtors were telling third parties – e.g., Centerbridge – even prior to the November 13, 2008 board meeting that the debtors had to have a restructuring plan in place by the end of 2008.

218.  In connection with early-2009 restructuring efforts, meetings were held with Centerbridge, its financial advisor, Houlihan Lokey ("Houlihan"), and Centerbridge's counsel, Fried Frank Harris Shriver & Jacobson LLP ("Fried Frank"), each of which were representing some of the Certificate Holders. In January 2009, the Debtors agreed to pay certain fees and expenses incurred by Fried Frank and Houlihan.

219.  In late-January 2009, Fried Frank presented a restructuring proposal ("Fried Frank January Proposal") to the Debtors that contemplated a comprehensive restructuring of the Debtors in connection with a chapter 11 bankruptcy filing. With respect to Lichtenstein's guarantees, the Fried Frank January Proposal provided that the parties were to discuss the satisfaction of his obligations in connection with a chapter 11 filing and that there was a possibility for a limited recourse indemnity in the form of the issuance of common stock to Lichtenstein in the post-chapter 11 corporate entity.

220.  Throughout the first quarter of 2009, the Debtors exchanged restructuring

proposals with their various lender groups. Those proposals generally proposed to (i) give the beneficial owners of the LBO mortgage debt a combination of reduced secured debt plus a mezzanine portion, (ii) give the mezzanine debt holders equity in exchange for their debt, and (iii) replace existing equity with reorganized equity and warrants; and (4) grant existing equity holders releases and indemnities from all guarantees. Further, the Debtors' proposals generally assumed the reinstatement of the existing capital lease (involving the properties owned by Lichtenstein), and the negotiation of a satisfactory cash collateral agreement that provided sufficient cash to fund the Debtors' 2009 business plan (whether in or out of chapter 11). Although the Debtors' proposals sought substantial concessions from, in essence, the Certificate Holders that were the beneficiaries of the debt, most of those persons were never provided with the proposals themselves.

### 2. Mezzanine Debt Negotiations

221. In February 2009, Lazard sent a restructuring proposal (the "February 2009 Mezzanine Proposal") to Fortress Investment Group, LLC, direct or indirect owner of the junior-most tranche of the mezzanine debt, and others. Under the February 2009 Mezzanine Proposal, the Debtors proposed to (1) reinstate the $4.1 billion mortgage loan on its existing terms, (2) replace the $3.3 billion in mezzanine debt with a combination of mezzanine debt and equity; (3) replace existing equity with a combination of mezzanine debt and equity; and (4) grant equity holders releases from all existing guarantees, including Lichtenstein, from personal guarantees. The February 2009 Mezzanine Proposal required approval of 100% of the mezzanine lenders. As with the January 2009 proposals to the mortgage holders, Lazard never received a formal response.

### 3. "Conveyance-in-Lieu" Transaction Negotiations and the Trade Payables Default

222.     In late January and early February 2009, the Company began discussions with a subset of the senior mezzanine lenders (collectively, the "Mezz B-E Lenders"). These lenders together held, at a minimum, all of the mezzanine debt in tranches B-E, totaling approximately $1.6 billion of the total $3.3 billion of mezzanine debt.  After exchanging several draft term sheets, on April 20, 2009, Lichtenstein and Ivan Kaufman of Arbor Realty Trust, Inc., among others, met with representatives of the Mezz B-E Lenders regarding what would later come to be commonly referred to as the "CIL Transaction." Over the course of the next few weeks, several drafts of the documents governing the CIL Transaction were exchanged.  On May 14, 2009, the Debtors' board of directors voted in favor of the resolution approving execution of an agreement permitting the consummation of the CIL Transaction.

223.     On May 19, 2009, an "agreement" by and between certain mezzanine borrowers and lenders, and Lichtenstein, Lightstone, Homestead, and ESI as guarantors, was executed, providing, among other things, that the parties would, upon the occurrence of certain necessary conditions precedent, consummate the CIL Transaction. At a meeting of the board of the Debtors held the next day,  Lichtenstein represented that the deal was "far superior for the Company than any deal that was available with the mortgage lenders."

224.     Also on May 19, 2009, the lenders ("Mezzanine B Lenders") under the mezzanine B loan ("Mezzanine B Loan") declared an event of default because a Debtor borrower had failed to maintain its special purpose entity status by failing to pay, within the permissible time period prescribed in the Mezzanine B Loan, approximately $3.5 million in trade payables ("Trade Payables Default").  The Mezzanine B Lenders alleged that the borrower under the Mezzanine B Loan failed to comply with the requirement that ordinary course of liabilities not be permitted to remain unpaid longer than sixty (60) days past the date they were incurred with respect to the

$3.5 million in trade payables. The Trade Payables Default was the death knell to any attempts to consummate the CIL Transaction, and the Debtors' directors or officers at the time knew it.

225. After the LBO closed in June 2007, there always had been payables that were greater than 60 days outstanding. Thus, there likely had been a continuing Trade Payables Default since the closing of the LBO. On a monthly basis, however, Rogers signed certificates certifying that the representations and warranties of the borrower under the Mezzanine B Loan (and all of the other Mezzanine Loans and the mortgage loan) were true and correct as of the date of the certificate. These monthly certificates were inaccurate in light of the Trade Payables Default and the fact that such a default had been ongoing since the day the LBO closed.

226. Actions were then instituted by third parties in two separate courts seeking to enjoin the consummation of the CIL Transaction. Temporary restraining orders were entered in each action that brought a halt to attempts to consummate the CIL Transaction.

227. On May 12, 2009, Centerbridge and others contacted Wachovia about the following defaults under the mortgage loan agreement: (i) the debtors' failure to deliver timely audited financial statements, (ii) the debtors' failure to deliver a fully compliant monthly officer's certificate, (iii) the Debtors' failure to obtain an unqualified opinion of a "Big Four" accounting firm, and (iv) the Debtors' failure to maintain SPE status. These defaults were incurable, so the Debtors' directors or officers at the time therefore knew or should have known that the Debtors could not exercise an option to extend the mortgage loan in June 2009 provided for in the mortgage loan agreement and could not continue to operate without a chapter 11 filing. Nevertheless, they delayed filing bankruptcy.

228. On May 15, 2009, Lazard received a restructuring proposal from, among others, Centerbridge. Drafts of that proposal were exchanged through the remainder of May and into

June 2009. Throughout this time, Centerbridge, among others, continued to put pressure on the Debtors to file for chapter 11 protection and to cease efforts to carry out the CIL Transaction.

**G.    The Debtors File for Chapter 11 Protection Two Years and Four Days After the LBO's Closing, Just Over Ninety Days After Paying Off Insider Debt, and a Group of Investors Including Blackstone "Re-Acquires" the Debtors for $3.9 Billion**

229.    Shortly after the June 11, 2009 two-year anniversary of the closing of the LBO, and after months of failed workout negotiations, the Debtors had to report whether the Debt Yield for 2009 was below the Debt Yield amortization threshold. If so, the borrowers were going to be liable for the payment of additional monthly amortization payments estimated to total as much as $51 million for the remainder of 2009. Given the Debtors' cash flow at the time, those amortization payments could not be made.

230.    In addition, a significant interest payment was due to be made to the mezzanine lenders as soon as Friday, June 12, 2009. If that payment was made, then (i) the Debtors would be unable to survive the upcoming week, when payroll was due, and (ii) the Debtors would not have access to those funds as cash collateral in a chapter 11 case.

231.    The only way to avoid these issues was to file for chapter 11 bankruptcy protection. However, the first group of the Debtors' chapter 11 cases were filed on Monday, June 15, 2009, two years and four days after the LBO closed on June 11, 2007, and ninety-three days after paying off the insider 25% Notes in full.

232.    Upon information and belief, at least part of senior management's motivation in 2009 for delaying the inevitable bankruptcy filings was to (i) do so after the statute of limitations under 11 U.S.C. § 548 expired and the ninety day preference look-back period ran, and (ii) give equity holders as much time as possible to consummate a restructuring transaction that preserved at least some of their equity in the Debtors and, more importantly, extricated equity holders from their significant guarantee obligations under the LBO debt.

233. Ironically, during the Debtors' bankruptcy cases, a group of investors including Blackstone "re-acquired" the Debtors for $3.9 billion, substantially less than the total amount of crushing debt the Debtors were caused to incur in the LBO for Blackstone's benefit prior to the bankruptcy. The post-bankruptcy transaction involving Blackstone was announced on or about April 2, 2010 and was subsequently approved by the Bankruptcy Court as part of the Debtors' Plan, on July 20, 2010.

## THE TRANSFERS

### A. Transfers and Obligations at Issue

234. The following are the transfers that this Complaint seeks to avoid.

#### 1. The Seller Transfers

235. At the closing of the LBO, approximately $2.1 billion of the $7.4 billion borrowed by the Debtors was paid to or for the benefit of the Sellers, almost $1.9 billion in cash to three entities: BHAC IV, Blackstone Hospitality, and Prime (the "Seller Cash Transfers"). Of that $1.9 billion, BHAC IV received approximately $1,368,375,462, Blackstone Hospitality received approximately $489,546,290, and Prime received approximately $4,110,604. In addition, the Sellers received equity in the new entities valued at $200,000,000 (the "Seller Equity Rollover," and collectively with the Seller Cash Transfers, the "Seller Transfers"). The Seller Transfers did not come from an account held in the name of the Debtor borrowers, but instead were made from the First American Escrow Account, where the proceeds of the LBO loan funds were deposited. The Debtors did not receive any direct or indirect benefit in exchange for the Seller Transfers. The Seller Transfers were also for the benefit of the Buyer, the sole obligor on the Purchase Agreement obligations.

#### 2. Transfers to the Professionals

236. **The Bank of America Transfer**. Of the $7.4 billion borrowed by the Debtors as

part of the LBO transaction, approximately $3,971,658 was transferred to Bank of America from the First American Escrow Account in the form of servicer fees, for which the Debtors received no direct or indirect benefits (the "Bank of America Transfer"), and which transfer, upon information and belief, paid an obligation incurred by the Sellers and was, in any event, directed by the Sellers to be paid out of the LBO proceeds to which they would not otherwise have been entitled.

237.    **The Citigroup Transfer**.  Of the $7.4 billion borrowed by the Debtors as part of the LBO transaction, approximately $6,350,000 was transferred to Citigroup from the First American escrow account in the form of fees, for which the Debtors received no direct or indirect benefits (the "Citigroup Transfer"), and which, upon information and belief, paid an obligation incurred by the Buyer.

238.    Bank of America and Citigroup are collectively referred to herein as the "Professionals."  The Bank of America Transfer and the Citigroup Transfer are collectively referred to as the "Professional Transfers."  All Professional Transfers were incurred for the benefit of the Sellers and/or the Buyers.

239.    In addition to the foregoing, the Trustee seeks to avoid any other LBO transfer to or for the benefit of Buyer or the pre-LBO equity interests or their related entities that is not expressly set out herein.

**B.    The Transfers Were Fraudulent Transfers**

240.    The LBO transactions, including the Seller Transfers and the Professional Transfers, (collectively, the "LBO Transfers" or the "Transfers") were made with the actual intent to hinder, delay or defraud some or all of the Debtors' then existing or future creditors, and are, therefore, subject to avoidance and recovery under §§ 544, 548, 550 and 551 of the Bankruptcy Code, and §§ 276, and 278-279 of the New York Debtor & Creditor Law.  They also

meet the criteria for constructive fraudulent transfers under §§ 544, 548, 550 and 551 of the Bankruptcy Code, §§ 273-275 and 278-279 of the New York Debtor & Creditor Law, and § 3304(a) & (b) of the Federal Debt Collection Procedure Act.

241.     The LBO was designed to use the assets of the Debtors to make payments to or for the benefit of the Sellers at the risk and expense of the creditors of the Debtors.   These creditors included, but were not limited to, the lenders under the pre-existing bond issues of ESI. The highly complex structure of the LBO was expressly designed to make it as difficult as possible for any such creditors to make recoveries from the participants in the LBO in the likely event of the eventual financial collapse of Debtors.

242.     All of the participants in the initial LBO knew, or should have known, that the transaction would leave the Debtors insolvent or with unreasonably small usable capital.   The cash flow projections of the Debtors that were necessary to prevent Cash Trap Events (and eventual amortization payments) were dependant on growth and on actions, such as the rebranding initiative, that were dependant on more capital than was actually accessible by Debtors.   The initial budget lacked such basic categories as payment of trust fund taxes and placed payment of mezzanine debt ahead of payment of the management fees on which the Debtors depended for every facet of their existence.   There was no provision for repayment of bond debt that would soon fall due and no reasonable prospect of obtaining additional loans for that purpose due to the high leverage.   The Debtors were deprived of a line of credit that previously had been available to smooth over cash flow issues.   The deal proceeded based upon greed alone.

243.     However bad the initial budget was, once a Cash Trap Event occurred, the Debtors would be so starved of cash that a financial plan that relied on achieving growth

projections could be nothing more than fantasy. Thereafter, however, unless the Debtors could grow their way out of the Cash Trap Event by meeting the necessary financial criteria for six months, the cash situation would become even worse because they would be obligated to make principal reduction payments on both the mortgage and mezzanine loans. Nonetheless, once the LBO concluded, Debtors could not meet the criteria necessary to avoid a Cash Trap Event, and were never able to meet it again. They were only temporarily saved by delayed reporting. Although equity distributions continued, cash was actually "trapped" beginning February of 2008, which put a significant strain on the Debtors. Defendants were on notice, *i.e.*, knew or should have known, that the LBO transaction would and did render the Debtors insolvent. At a minimum, Defendants were reckless in not knowing, or reasonably should have known that the transfers described above were fraudulent.

244. The Debtors received nothing of value in exchange for the $749.4 million in increased mortgage debt and the $905.3 million in increased mezzanine debt that they incurred as a result of the LBO. They exchanged their existing owner for another who had little or no experience in the hotel business and offered no prospect of any sort of benefits that could ever be likely to enhance the balance sheet. The debt that they paid off was replaced with additional debt that was not only higher in amount, but was under more onerous restrictions that were likely to (and did) prevent adequate cash flow to keep the business operating as it should. In short, the LBO was an unmitigated disaster for the Debtors for reasons that should have been obvious to all.

## COUNT I

*Avoidance and Recovery of Actual Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 276, 276-a and 278 and/or 279 of the New York Debtor & Creditor Law against the Blackstone Seller Entity Defendants and the Buyer*

245. The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

246. At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

247. The Seller Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

248. The Sellers and/or the Buyer caused the Debtors to make the Seller Transfers, with the actual intent to hinder, delay or defraud some or all of the Debtors' then existing or future creditors.

249. The Seller Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Buyer and Seller, pursuant to §§ 276, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code. The Seller Transfers were for the benefit of Buyer, the sole obligor on the Purchase Agreement obligations and are, therefore, avoidable and recoverable as to the Blackstone Seller Entity Defendants and the Buyer.

250. Each of the Seller Transfers was received with actual intent to hinder, delay or defraud creditors of some or all of the Debtors at the time of each of the Seller Transfers, and/or future creditors of the Debtors.

251. As a result of the foregoing, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set

aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries; and (d) recovering attorneys' fees from the Blackstone Seller Entity Defendants and the Buyer.

**COUNT II**

***Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551
of the Bankruptcy Code and §§ 273 and 278 and/or 279 of the New York Debtor &
Creditor Law against the Blackstone Seller Entity Defendants and the Buyer***

252.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

253.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

254.    The Seller Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

255.    The Debtors did not receive fair consideration for the Seller Transfers.

256.    The Debtors were insolvent at the time they made the Seller Transfers or, in the alternative, the Debtors became insolvent as a result of the Seller Transfers.

257.    The Seller Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Buyer and Seller, pursuant to §§ 273, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.  The Seller Transfers were for the benefit of Buyer, the sole obligor on the Purchase Agreement obligations and are, therefore, avoidable and recoverable as to the Blackstone Seller Entity Defendants and the Buyer.

258.    As a result of the foregoing, pursuant to §§ 273, 278, and/or 279 of the New York

Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

**COUNT III**

***Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551
of the Bankruptcy Code and §§ 274 and 278 and/or 279 of the New York Debtor &
Creditor Law against the Blackstone Seller Entity Defendants and the Buyer***

259.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

260.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

261.    The Seller Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

262.    The Debtors did not receive fair consideration for the Seller Transfers.

263.    At the time the Debtors made the Seller Transfers, the Debtors were engaged, or were about to engage in a business or transaction for which the property remaining in their hands, after the Seller Transfers, was an unreasonably small capital.

264.    The Seller Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Buyer and Seller, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.  The Seller Transfers were for the benefit of Buyer, the sole obligor on the Purchase Agreement obligations

and are, therefore, avoidable and recoverable as to the Blackstone Seller Entity Defendants and the Buyer.

265.    As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

## COUNT IV

*Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 275 and 278 and/or 279 of the New York Debtor & Creditor Law against the Blackstone Seller Entity Defendants and the Buyer*

266.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

267.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

268.    The Seller Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

269.    The Debtors did not receive fair consideration for the Seller Transfers.

270.    At the time the Debtors made the Seller Transfers, the Debtors had incurred, were intending to incur, or believed that they would incur debts beyond their ability to pay them as the debts matured.

271.    The Seller Transfers constitute a fraudulent transfer avoidable and recoverable by

the Trustee, from the Buyer and Seller, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code. The Seller Transfers were for the benefit of Buyer, the sole obligor on the Purchase Agreement obligations and are, therefore, avoidable and recoverable as to the Blackstone Seller Entity Defendants and the Buyer.

272. As a result of the foregoing, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

**COUNT V**
*Violations of the Federal Debt Collection Procedure Act under 28 U.S.C. §§ 3304(a) & (b) and §§ 544, 550 and 551 of the Bankruptcy Code against the Blackstone Seller Entity Defendants and the Buyer*

273. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

274. The Seller Transfers were made by the Debtors, after the Debtors incurred a debt owed to the United States insofar as the Internal Revenue Service has a claim against the Debtors for miscellaneous penalties.

275. The Internal Revenue Service has claims against ESI for miscellaneous penalties, ESA Management LLC for miscellaneous penalties, ESA Operating Lessee Inc. for corporate income taxes, and ESA P Portfolio Operating Lessee Inc. for corporate income taxes.

276. The Seller Transfers were in violation of the Federal Debt Collection Procedure Act §§ 3304(a) insofar as the Debtors received less than a reasonably equivalent value in

exchange for the Seller Transfers, and the Debtors were or became or insolvent as a result of the Seller Transfers.

277. The Seller Transfers were in violation of the Federal Debt Collection Procedure Act §§ 3304(b) insofar as the Debtors received less than a reasonably equivalent value in exchange for the Seller Transfers, and the Debtors either:

a. Were engaged or about to engage in a business or transaction that left the Debtors with unreasonably small assets; or

b. Intended to incur or believed or reasonably should have believed that the Debtors would incur debts beyond the Debtors' ability to pay as they came due.

278. The Seller Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Buyer and Seller, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act. The Seller Transfers were for the benefit of Buyer, the sole obligor on the Purchase Agreement obligations and are, therefore, avoidable and recoverable as to the Blackstone Seller Entity Defendants and the Buyer.

279. As a result of the foregoing, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act, the Trustee is entitled to a judgment against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; and (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

## COUNT VI
### *Avoidance and Recovery of Actual Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 276, 276-a and 278 and/or 279 of the New York Debtor & Creditor Law against the Professionals, Sellers and the Buyer*

280.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

281.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

282.     The Professional Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

283.     The Sellers and/or the Buyer caused the Debtors to make the Professional Transfers, with the actual intent to hinder, delay or defraud some or all of the Debtors' then existing or future creditors.

284.     The Professional Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Professionals, Sellers and the Buyer, pursuant to §§ 276, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

285.     Each of the Professional Transfers was received with actual intent to hinder, delay or defraud creditors of some or all of the Debtors at the time each of the Professional Transfers, and/or future creditors of the Debtors.

286.     The Professional Transfers were for the benefit of Sellers or the Buyer.

287.     As a result of the foregoing, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set

aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals and the Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries; and (d) recovering attorneys' fees from the Professionals and the Sellers and the Buyer.

## COUNT VII
### *Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 273 and 278 and/or 279 of the New York Debtor & Creditor Law against the Professionals, Sellers and the Buyer*

288.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

289.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

290.    The Professional Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

291.    The Debtors did not receive fair consideration for the Professional Transfers.

292.    The Debtors were insolvent at the time they made the Professional Transfers or, in the alternative, the Debtors became insolvent as a result of the Professional Transfers.

293.    The Professional Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Professionals, Sellers and the Buyer, pursuant to §§ 273, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

294.    The Professional Transfers were for the benefit of Sellers or the Buyer.

295.    As a result of the foregoing, pursuant to §§ 273, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is

entitled to a judgment against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

**COUNT VIII**

***Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551***
***of the Bankruptcy Code and §§ 274 and 278 and/or 279 of the New York Debtor &***
***Creditor Law against the Professionals, Sellers and the Buyer***

296.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

297.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

298.     The Professional Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

299.     The Debtors did not receive fair consideration for the Professional Transfers.

300.     At the time the Debtors made the Professional Transfers, the Debtors were engaged, or were about to engage in a business or transaction for which the property remaining in their hands, after the Professional Transfers, was an unreasonably small capital.

301.     The Professional Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Professionals, Sellers and the Buyer, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

302.     The Professional Transfers were for the benefit of Sellers or the Buyer.

303. As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers, and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

## COUNT IX

### Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 275 and 278 and/or 279 of the New York Debtor & Creditor Law against the Professionals, Sellers and the Buyer

304. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

305. At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

306. The Professional Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

307. The Debtors did not receive fair consideration for the Professional Transfers.

308. At the time the Debtors made the Professional Transfers, the Debtors had incurred, were intending to incur, or believed that they would incur debts beyond their ability to pay them as the debts matured.

309. The Professional Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Professionals, Sellers or the Buyer, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the

Bankruptcy Code.

310.     The Professional Transfers were for the benefit of Sellers or the Buyer.

311.     As a result of the foregoing, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

### COUNT X

***Violations of the Federal Debt Collection Procedure Act under 28 U.S.C. §§ 3304(a) & (b) and §§ 544, 550 and 551 of the Bankruptcy Code against Professionals, Sellers and the Buyer***

312.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

313.     The Professional Transfers was made by the Debtors, after the Debtors incurred a debt owed to the United States insofar as the Internal Revenue Service has a claim against the Debtors for miscellaneous penalties.

314.     The Internal Revenue Service has claims against ESI for miscellaneous penalties, ESA Management LLC for miscellaneous penalties, ESA Operating Lessee Inc. for corporate income taxes, and ESA P Portfolio Operating Lessee Inc. for corporate income taxes.

315.     The Professional Transfers were in violation of the Federal Debt Collection Procedure Act §§ 3304(a) insofar as the Debtors received less than a reasonably equivalent value in exchange for the Professional Transfers, and the Debtors were or became or insolvent as a result of the Professional Transfers.

316.     The Professional Transfers were in violation of the Federal Debt Collection

Procedure Act §§ 3304(b) insofar as the Debtors received less than a reasonably equivalent value in exchange for the Professional Transfers, and the Debtors either:

      c.    Were engaged or about to engage in a business or transaction that left the Debtors with unreasonably small assets; or

      d.    Intended to incur or believed or reasonably should have believed that the Debtors would incur debts beyond the Debtors' ability to pay as they came due.

317.    The Professional Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Professionals, Sellers or the Buyer, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act.

318.    The Professional Transfers were for the benefit of Sellers or the Buyer.

319.    As a result of the foregoing, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act, the Trustee is entitled to a judgment against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; and (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

## COUNT XI
### *Subrogation to the Rights of the Sellers against the Buyer*

320.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

321.    Pursuant to the Purchase Agreement between the Buyer and Sellers, the Buyer was required to pay approximately $1.9 billion in cash to the Sellers (or at their direction) above the amounts being used to retire pre-existing debt, and additionally to pay the Buyer's and

Sellers' Professional fees (collectively, the "Purchase Contractual Obligations").

322. In fact, the Purchase Contractual Obligations were paid for by the Debtors, under compulsion, owing to the control exercised over them by the Sellers and, post-LBO, the Buyer, from proceeds of the mortgage loans and mezzanine loans as to which they became borrowers.

323. The control compelled Debtors to act solely in the interests of the Sellers and the Buyer and not in their own interests.

324. Debtors were not obligees of the Purchase Contractual Obligations.

325. Accordingly, Debtors should be subrogated to the rights of the Sellers, against the Buyer, under the Purchase Agreement.

## COUNT XII
### *Disallowance of Claims under § 502(d) of the Bankruptcy Code against the Blackstone Seller Entity Defendants, Buyer and Professionals*

326. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

327. The Blackstone Seller Entity Defendants, Buyer and Professionals are transferees of one or more transfers avoidable under §§ 544, 547 or 548 of the Bankruptcy Code, or are entities from which property is recoverable under § 550 of the Bankruptcy Code, and have not paid the amount or turned over the property for which they are liable.

328. As a result of the foregoing, pursuant to § 502(d) of the Bankruptcy Code, the Trustee is entitled to disallow any filed or scheduled claims of the Defendants.

## COUNT XIII
### *Securities Violations under § 10(b) of the Securities Exchange Act and Rule 10b-5 against the Blackstone Pre-LBO Entity Defendants and DL-DW*

329. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

330. The Trustee asserts this Count against the Blackstone Pre-LBO Entity Defendants and DL-DW for violations of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

331. As alleged herein, the Blackstone Pre-LBO Entity Defendants and DL-DW, individually, directly and indirectly, in connection with the purchase or sale of securities, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal the Debtors' true anticipated financial condition prior to, during, and in connection with the LBO, and post-LBO. The Blackstone Pre-LBO Entity Defendants and DL-DW employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct that were intended to reap financial windfalls from the sale of the Debtors, while these defendants knew or recklessly ignored the fact that the LBO they created would render the Debtors insolvent, and thereafter result in bankruptcy.

332. The main purpose of the scheme to defraud was to denude the assets of the Debtors and provide for the Blackstone Pre-LBO Entity Defendants to obtain $1.9 billion in value from the Acquisition and for DL-DW and its affiliates to reap hundreds of millions of distributions post-LBO.

333. The Blackstone Pre-LBO Entity Defendants and DL-DW acted with scienter, in that they either had actual knowledge of the effect of the LBO given the reports by the ratings agencies and the actual performances of the Debtors in early 2007, or acted with reckless disregard for the truth.

334. The Blackstone Pre-LBO Entity Defendants and DL-DW had the opportunity and motive to commit the wrongful acts alleged herein. The Blackstone Pre-LBO Entity Defendants, by virtue of their positions controlled the Information Memorandum, press releases, public

filings, communications with potential buyers and other statements issued by the Debtors in relation to the LBO transaction.

335.    The Blackstone Pre-LBO Entity Defendants and DL-DW are liable as direct participants in the wrongs complained of herein.

336.    The acts and practices of the Blackstone Pre-LBO Entity Defendants and DL-DW were intentional or reckless and done for the purposes of enriching themselves and concealing the Debtors' true operating and financial condition.

337.    The acts and practices of the Blackstone Pre-LBO Entity Defendants and DL-DW were the proximate cause of the LBO, and hence of the Debtors' injury.

338.    The Debtors were or became insolvent as a result of the LBO transaction, and the bankruptcy estate suffered damages in an amount to be proven at trial, but not less than $2.1 billion.

339.    As a result of the foregoing, pursuant to § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, the Trustee is entitled to a judgment against the Blackstone Pre-LBO Entity Defendants and DL-DW for compensatory damages and any damages pursuant to violations of the Securities Exchange Act.

### COUNT XIV
*Securities Violations under § 17(a) of the Securities Act*
*against the Blackstone Pre-LBO Entity Defendants*

340.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

341.    The Trustee asserts this Count against the Blackstone Pre-LBO Entity Defendants for violations of § 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

342.    As alleged herein, the Blackstone Pre-LBO Entity Defendants, individually,

directly and indirectly, in connection with the offer or sale of securities, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal the Debtors' true anticipated financial condition prior to, during, and in connection with the LBO, and post-LBO. The Blackstone Pre-LBO Entity Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct that were intended to reap financial windfalls from the sale of the Debtors, while these defendants knew or recklessly ignored the fact that the LBO they created would render the Debtors insolvent, and thereafter result in bankruptcy.

343. The main purpose of the scheme to defraud was to denude the assets of the Debtors and provide for the Blackstone Pre-LBO Entity Defendants to obtain $1.9 billion in value from the Acquisition and to reap hundreds of millions of dollars in distributions post-LBO.

344. The Blackstone Pre-LBO Entity Defendants acted with scienter, in that they either had actual knowledge of the effect of the LBO given the reports by the ratings agencies and the actual performances of the Debtors in early 2007, or acted with reckless disregard for the truth.

345. The Blackstone Pre-LBO Entity Defendants had the opportunity and motive to commit the wrongful acts alleged herein. The Blackstone Pre-LBO Entity Defendants, by virtue of their positions controlled the Information Memorandum, press releases, public filings, communications with potential buyers and other statements issued by the Debtors in relation to the LBO transaction.

346. The Blackstone Pre-LBO Entity Defendants are liable as direct participants in the wrongs complained of herein.

347. The acts and practices of the Blackstone Pre-LBO Entity Defendants were intentional or reckless and done for the purposes of enriching themselves and concealing the

Debtors' true operating and financial condition.

348. The acts and practices of the Blackstone Pre-LBO Entity Defendants were the proximate cause of the LBO, and hence of the Debtors' injury.

349. The Debtors were or became insolvent as a result of the LBO transaction, and the bankruptcy estate suffered damages in an amount to be proven at trial, but not less than $2.1 billion.

350. As a result of the foregoing, pursuant to § 17 of the Securities Act, 15 U.S.C. § 77q(a), the Trustee is entitled to a judgment against the Blackstone Pre-LBO Entity Defendants W for compensatory damages and any damages pursuant to violations of the Securities Act.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

*i.* On the First Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial, but not less than $2.1 billion against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries; and (d) recovering attorneys' fees from the Blackstone Seller Entity Defendants and the Buyer;

*ii.* On the Second Claim for Relief, pursuant to §§ 273, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial, but not less than $2.1 billion against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers ; (b) directing

that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

*iii.*     On the Third Claim for Relief, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $2.1 billion against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers ; (b) directing that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

*iv.*     On the Fourth Claim for Relief, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $2.1 billion against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

*v.*     On the Fifth Claim for Relief, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act, judgment in an amount to be determined at trial but not less than $2.1 billion against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; and (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation

Trust and its creditor beneficiaries;

*vi.* On the Sixth Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $10,321,658 against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries; and (d) recovering attorneys' fees from the Professionals, Sellers and the Buyer;

*vii.* On the Seventh Claim for Relief, pursuant to §§ 273, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $10,321,658 against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

*viii.* On the Eighth Claim for Relief, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $10,321,658 against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

*ix.*     On the Ninth Claim for Relief, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $10,321,658 against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; and (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

*x.*     On the Tenth Claim for Relief, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act, judgment in an amount to be determined at trial but not less than $10,321,658 against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; and (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

*xi.*     On the Eleventh Claim for Relief, pursuant to common law contract and subrogation law, a judgment against the Buyer in the amount of the Seller Transfers;

*xii.*     On the Twelfth Claim for Relief, pursuant to § 502(d) of the Bankruptcy Code, disallowance of the claims of the Blackstone Seller Entity Defendants, Buyers, and Professionals;

*xiii.*     On the Thirteenth Claim for Relief, pursuant to § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, judgment in an amount to be determined at trial, but not less than $2.1 billion, against the Blackstone Pre-LBO Entity Defendants and DL-DW for compensatory damages and any

damages pursuant to violations of the Securities Exchange Act;

xiv.    On the Fourteenth Claim for Relief, pursuant to § 17 of the Securities Act, 15 U.S.C. § 77q(a), judgment in an amount to be determined at trial, but not less than $2.1 billion, against the Blackstone Pre-LBO Entity Defendants for compensatory damages and any damages pursuant to violations of the Securities Act;

xv.    On all Claims for Relief, pursuant to federal common law and New York Civil Practice Law and Rules §§ 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the transfers were received;

xvi.    On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of the liquidating trust;

xvii.    Awarding the Trustee all applicable interest, costs, attorneys' fees and disbursements of this action; and

xviii.    Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.


Dated: New York, New York                    Respectfully submitted,
       June 14, 2011

                                             **BAKER & HOSTETLER LLP**

                                             */s/ Marc D. Powers*
                                             45 Rockefeller Plaza
                                             New York, New York 10111
                                             Telephone:  (212) 589-4200
                                             Facsimile:  (212) 589-4201
                                             Marc D. Powers
                                             mpowers@bakerlaw.com
                                             Matthew R. Goldman
                                             mgoldman@bakerlaw.com
                                             George Klidonas
                                             gklidonas@bakerlaw.com

                                             AND

Brian A. Bash (*pro hac vice* application
forthcoming)
bbash@bakerlaw.com
Wendy J. Gibson (*pro hac vice* application
forthcoming)
wgibson@bakerlaw.com
Baker & Hostetler LLP
PNC Center
1900 East 9th Street, Suite 3200
Cleveland, OH 44114-3482
Telephone:     (216) 621-0200
Facsimile:     (216) 696-0740

*Counsel for Plaintiffs Extended Stay Litigation
Trust, and Hobart Truesdell and Walker,
Truesdell, Roth & Associates, as Trustees of
the Extended Stay Litigation Trust*