**Forman, Holt, Eliades & Ravin, LLC**
80 Route 4 East, Suite 290
Paramus, NJ 07652
Telephone: (201) 845-1000
Facsimile: (201) 845-9112
Michael J. Connolly, Esq.
mconnolly@formanlaw.com
Andrew Karas, Esq.
akaras@formanlaw.com
Joseph M. Cerra, Esq.
jcerra@formanlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>EXTENDED STAY, INC. *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br><br>No. 09-13764 (JMP)<br><br>(Jointly Administered) |
| WALKER, TRUESDELL, ROTH & ASSOCIATES, as Trustee for and on behalf of the Extended Stay Litigation Trust,<br><br>HOBART TRUESDELL, as Trustee for and on behalf of the Extended Stay Litigation Trust, and<br><br>THE EXTENDED STAY LITIGATION TRUST,<br><br>          Plaintiffs,<br><br>          v.<br><br>ARCHON GROUP, L.P., individually and as servicer; STARWOOD CAPITAL GROUP GLOBAL, L.P.; DEBT U ESH, L.P.; DEBT II ESH, L.P.; WACHOVIA BANK, NATIONAL ASSOCIATION; SQUARE MILE CAPITAL MANAGEMENT, LLC; ESH OWNER, LLC; KEYBANK, NATIONAL ASSOCIATION; U.S. BANK NATIONAL ASSOCIATION, not individually but solely as Trustee for Maiden | Adv. Pro. No. _____<br><br><br>**COMPLAINT** |

Lane Commercial Mortgage-Backed
Securities Trust 2008-1, Maiden Lane
Commercial Mortgage-Backed Securities
Trust 2008-1 and the Federal Reserve Bank of
New York; and  DOES 1 through 100,
inclusive.

                         Defendants.

Plaintiffs, Walker, Truesdell, Roth & Associates, as Trustee for and on behalf of the Extended Stay Litigation Trust (the "Trust"), Hobart Truesdell, as Trustee for and on behalf of the Trust (collectively, the "Trustee"), and the Trust, by the undersigned counsel, hereby file this Complaint, and allege as follows:

## NATURE OF ACTION

1.      The Plaintiffs bring this action to avoid obligations arising from the loans made and arranged to fund the June 11, 2007 disastrous leveraged buyout ("LBO") of the Extended Stay, Inc. and Homestead Village L.L.C. family of companies (collectively, the "Company," and including the debtor entities identified below), and to recover related fraudulent transfers, preferences and damages.  The LBO, which was tainted from start to finish, caused the Company to lose billions of dollars in value between the closing of the LBO and the Company's bankruptcy filings, which commenced on June 15, 2009 (the "Filing Date"), approximately two years later.  The LBO transaction was the cause of the Company ultimately filing for chapter 11 bankruptcy relief.

2.      The Company, a member of the hotel industry, was a profitable business prior to the LBO.  After the LBO, however, the Company was burdened with a devastating additional debt load without any corresponding increase in assets.  It was rendered insolvent and undercapitalized to enrich a small group of individuals and entities at the expense of the Company's preexisting and future non-LBO creditors and a number of other financial

2

institutions and other institutions, who are defendants herein that participated in and benefitted from the transactions.

3.     The Company's pre-LBO equity holders, all of which were entities affiliated with Blackstone (defined below) were paid handsomely for their equity interests using Company assets, while the Debtors were left with crushing debt.  In addition to the debt burden, the Company faced increased severe restrictions on its ability to use and control its own cash flow because of the new terms imposed by the loan agreements executed in connection with the LBO. The end result was that the Company no longer had the liquidity to survive in a more ordinary economy, let alone the economy that it was shortly about to face.

4.     The Company's approximately $8 billion dollar purchase price was funded almost entirely by debt the Company itself was forced to incur.  The purportedly arms-length LBO transaction was anything but, as the grossly inflated purchase price was engineered by the Blackstone-affiliated Sellers (defined below) looking to maximize their profits, working in concert with a Buyer (as defined below) that put in little else and, thus, assumed little to no risk of loss.  In short, the purchase price that enriched the Sellers was far from justifiable.

5.     All of the Defendants benefitted from the LBO.  The Company paid tens of millions of dollars to professionals and lenders for their "services" in connection with the LBO transaction.  The Company continued to pay hundreds of millions of dollars over the next two years to Mezzanine Lenders (defined below) in fees and interest on loans for which the Company had received no corresponding value.  The Company also paid tens of millions more in additional payouts to its post-LBO owners and insiders, despite being insolvent.  The Company did not receive value or a benefit in exchange for any of these payments.

6.     Blackstone knew the Company would be rendered insolvent by the LBO

transaction. The Confidential Information Memorandum (defined below) Blackstone prepared for the Company, with the assistance of the its professionals and agents, included figures and projections for growth rates that were patently unreasonable and belied by the actual performance of the Company at the time.

7.     The initial lenders involved in the LBO transaction, including J.P. Morgan Commercial Mortgage Inc. (then known as Bear Stearns Commercial Mortgage Inc.), Bank of America N.A. and Wachovia Bank, N.A., also knew or should have known that the LBO would leave the Company inadequately capitalized and that the mezzanine debt they were creating would be underwater from the start. Those lenders, nonetheless, combined with the other parties involved to push forward and structure the LBO in a way designed to provide maximum hindrance to preexisting creditors who would have to compete, at a disadvantage, for payment once the LBO was completed.

8.     Those initial lenders intended to syndicate or sell off most or all of the underlying mortgage and mezzanine debt incurred in the LBO. They intended to profit from the fees for arranging this unjustifiable debt, regardless of whether the Company succeeded or failed. In order to sell the debt, the initial lenders changed the terms of the LBO transaction to increase the Company's leverage, diminish the Company's liquidity, and impair the Company's ability to pay other creditors, in order to more readily sell the debt into the marketplace. They turned a blind eye to the Company's early failure to provide information on its Debt Yield (defined discussed below), that would be a harbinger of trouble. Certain of the lenders also sought to obtain or further relationships with Blackstone, which was on the verge of its own highly publicized initial public offering ("IPO"), and which also regularly paid those lenders millions their of dollars for financial and advisory services each year.

9.     The LBO's failure was foreseeable from the start.  Indeed, each of the three rating agencies that looked at the LBO came to the same conclusion: the total capitalization of the LBO substantially exceeded the value of the Company's assets.  The rating agencies' predictions were realized when, post-LBO, the Company was never able to meet the financial standards necessary to prevent its lenders from sequestering all cash flow beyond certain specifically budgeted items, which budgeted items did not include even the minimum requirements for continuing to operate the business and timely paying known Company obligations.  The only entity who had been willing to bid on the Company at the ostensibly required $8 billion purchase price was itself a substantially leveraged entity, and one whose principals had little experience in either the hotel industry or in the rarified world of multi-billion-dollar syndicated transactions.  The LBO deal had everything to do with the excesses of the financial marketplace in the last part of the boom years, and nothing to do with the Company's actual financial worth.

10.     The conduct of the Defendants left the Debtors hopelessly insolvent, inadequately capitalized and not able to pay their debts – even by future borrowing.  Meanwhile, enormous sums were diverted to or for the benefit of the Defendants in the form of transfers of cash and the transfer of liens and pledges in property.  The cost of the Defendants' misconduct and resulting gains was ultimately borne by the Debtors' creditors.  The Company predictably filed for bankruptcy approximately two years after the LBO transaction closed.

11.     Through this action, the Trust, established to bring claims against those responsible for the Company's demise as well as those who profited from it, seeks to recover damages caused by the Defendants and to avoid and recover the value of transfers and obligations that were made to or for the benefit of the Defendants.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 157(a) and 1334(b) because the claims asserted arise in, arise under, and are related to the chapter 11 case, *In re Extended Stay, Inc., et al.*, 09-13764 (JMP), pending in the United States Bankruptcy Court for the Southern District of New York.

13.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil litigation action arises under the laws of the United States.

14.     Venue is proper pursuant to 28 U.S.C. §§ 1408, 1409, 1391(a)(2), 1391(a)(3), and 1391(b)(2)-(3) because this adversary proceeding arises under and in connection with cases pending under title 11 of the United States Code.

15.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A).

16.     A companion action to the action herein is also being filed on behalf of the Trustee in this Court (the "Companion Action"). The Companion Action asserts claims against certain persons and/or entities that are not named as defendants in this action, but that are otherwise discussed herein. The Companion Action is premised upon nearly identical factual allegations and causes of action as set forth herein and relates to the same or similar transactions or occurrences as set forth herein. The filing of the two separate actions is necessitated by counsel conflicts that have arisen relative to the prosecution of the claims against the defendants named herein. But for such conflicts, the Defendants named in this Complaint would have been named in the Companion Action. For that reason, this Complaint is substantially the same as the Complaint in the Companion Action.

## THE PARTIES

**A.      The Extended Stay Litigation Trust, the Trustee and the Debtors**

17.      **The Extended Stay Litigation Trust** is a post-confirmation litigation trust established by the Extended Stay Litigation Trust Agreement, dated as of October 8, 2010 (the "Litigation Trust Agreement") in the United States Bankruptcy Court for the Southern District of New York, Case No.  09-13764 (JMP) (the "Bankruptcy Court").  The Trust Agreement was executed as part of the Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of June 8, 2010 and confirmed on or about July 20, 2010 (the "Plan") in the chapter 11 bankruptcy case of *In re Extended Stay, Inc. et al.* (the "Chapter 11 Cases").

18.      The Trust was established for the benefit of the creditors of the Debtors (collectively, the "Litigation Trust Beneficiaries").  Pursuant to the Plan and the Bankruptcy Court Order approving the Plan (the "Confirmation Order"), the Trust has title to all assets described in Section 1.89 of the Plan, as well as all assets transferred to the Trust pursuant to the "ESI Settlement Agreement" incorporated into the Plan.  These assets include, but are not limited to, any potential claims, causes of actions, charges, suits or rights of recovery of the Debtors and ESI (as defined below) referenced in the Examiner's Report of Ralph R. Mabey, examiner in the Chapter 11 Cases, filed with the Bankruptcy Court on April 8, 2010 (the "Litigation Trust Assets").  In that Examiner's Report, the examiner set forth his assertions of the facts leading up to the Chapter 11 Cases and causes of action that could be asserted against various parties arising therefrom, including causes of action asserted against the Defendants herein.

19.      Claims against certain specified entities in named capacities are excluded from the Litigation Trust Assets as the result of a settlement embodied in the Plan.  Nonetheless, the claims transferred to the Trust are protected against impairment by, among other things,

paragraph 75 of the Confirmation Order, which provides:

> 75. Nothing in the Plan, this Order, the ESI Settlement or the ESI Settlement Order will have the effect of impairing, enhancing, or altering either (i) the rights, remedies or defenses (or the enforceability thereof) of any defendant with respect to any rights, remedies, claims, causes of action (or interests therein) that are transferred to the Litigation Trust, or (ii) the rights, remedies, claims or causes of action (or interests therein) of any Debtor or ESI that are so transferred; it being understood that the effect of the Plan, this Order, the ESI Settlement and the ESI Settlement Order is to be "litigation neutral" with respect to all such rights, remedies, defenses, claims and causes of action.

20.     **Hobart Truesdell and Walker, Truesdell, Roth & Associates** (collectively, as defined above, the "Trustee") were duly appointed as the Trustees of the Trust in accordance with and pursuant to the Trust Agreement and the Confirmation Order.  The Trustee and the Trust are authorized to commence all claims and causes of action formerly owned by the Debtors, which have now been indefeasibly vested in the Trust, including all causes of action asserted herein.  The Trustee and the Trust exercise all pertinent rights of the Debtors that may be relevant to this Complaint.  The Trustee likewise has standing to assert all claims and causes action set forth herein as a representative of the Debtors, pursuant to the Plan and the ESI Settlement Agreement, and section 1123(b)(3)(B) of the Bankruptcy Code, to the extent that as to any causes of action herein failed to be transferred to the Litigation Trust because of an enforceable restriction on transferability under applicable non-bankruptcy law, and brings this cause of action in that capacity to the extent of any such failure to transfer.

21.     The Trustee's principal place of business is located at 380 Lexington Avenue, Suite 1014, New York, New York 10168.  The Trustees were appointed as Trustees of the Trust in New York County, effective as of October 8, 2010.

22.     For purposes of this Complaint, the following entities are the "Debtors:" ESA

2005 Operating Lessee Inc.; ESH 2005 Portfolio L.L.C.; ESA 2005-San Jose L.L.C.; ESA 2005-Waltham L.L.C.; ESA 2007 Operating Lessee Inc.; ESA Acquisition Properties L.L.C.; ESA Alaska L.L.C.; ESA Business Trust; ESA Canada Beneficiary Inc.; ESA Canada Operating Lessee Inc.; ESA Canada Properties Borrower L.L.C.; ESA Canada Properties Trust; ESA Canada Trustee Inc.; ESA FL Properties L.L.C.; ESA Management L.L.C.; ESA MD Beneficiary L.L.C.; ESA MD Borrower L.L.C.; ESA MD Properties Business Trust; ESA Mezz 10 L.L.C.; ESA Mezz 2 L.L.C.; ESA Mezz 3 L.L.C.; ESA Mezz 4 L.L.C.; ESA Mezz 5 L.L.C.; ESA Mezz 6 L.L.C.; ESA Mezz 7 L.L.C.; ESA Mezz 8 L.L.C.; ESA Mezz 9 L.L.C.; ESA Mezz L.L.C.; ESA MN Properties L.L.C.; ESA Operating Lessee Inc.; ESA P Mezz 10 L.L.C.; ESA P Mezz 2 L.L.C.; ESA P Mezz 3 L.L.C.; ESA P Mezz 4 L.L.C.; ESA P Mezz 5 L.L.C.; ESA P Mezz 6 L.L.C.; ESA P Mezz 7 L.L.C.; ESA P Mezz 8 L.L.C.; ESA P Mezz 9 L.L.C.; ESA P Mezz L.L.C.; ESA P Portfolio Holdings L.L.C.; ESA P Portfolio L.L.C.; ESA P Portfolio MD Beneficiary L.L.C. ; ESA P Portfolio MD Borrower L.L.C.; ESA P Portfolio MD Trust; ESA P Portfolio Operating Lessee Inc.; ESA P Portfolio PA Properties L.L.C.; ESA P Portfolio TXNC GP L.L.C.; ESA P Portfolio TXNC Properties L.P.; ESA PA Properties L.L.C.; ESA Properties L.L.C.; ESA TX Properties L.P.; ESA TXGP L.L.C.; ESA UD Properties L.L.C.; ESH/Homestead Mezz 10 L.L.C.; ESH/Homestead Mezz 2 L.L.C.; ESH/Homestead Mezz 3 L.L.C.; ESH/Homestead Mezz 4 L.L.C.; ESH/Homestead Mezz 5 L.L.C.; ESH/Homestead Mezz 6 L.L.C.; ESH/Homestead Mezz 7 L.L.C.; ESH/Homestead Mezz 8 L.L.C.; ESH/Homestead Mezz 9 L.L.C.; ESH/Homestead Mezz L.L.C.; ESH/Homestead Portfolio L.L.C.; ESH/HV Properties L.L.C.; ESH/MSTX GP L.L.C.; ESH/MSTX Property L.P.; ESH/TN Member Inc.; ESH/TN Properties L.L.C.; ESH/TX Properties L.P.; ESH/TXGP L.L.C.; Extended Stay Hotels L.L.C.; Extended Stay, Inc.; and Homestead Village, L.L.C. The

Plan covered all Debtors other than Extended Stay, Inc. All of the Debtors filed for bankruptcy on June 15, 2009 (the "Filing Date"), with the exception of the following Debtors who filed on February 18, 2010: ESH/MSTX GP L.L.C.; ESH/TXGP L.L.C.; ESA TXGP L.L.C.; ESA P Portfolio TXNC GP L.L.C.; and ESH/TN Member Inc. All of the Debtors were administratively consolidated under Case No. 09-13764 (JMP).

23.     Two of the Debtors are of particular significance. Extended Stay, Inc. ("ESI") is a corporation organized under the laws of the State of Delaware. A majority of the Debtors' pre- and post-LBO corporate organization was comprised of entities indirectly or directly owned by ESI, including, without limitation, all or substantially all of the real estate investment trust ("REIT") portion of the Debtors' businesses. Post-LBO, BHAC Capital IV, LLC was the direct majority owner of ESI. At all times relevant to this Complaint, ESI was managed by a board of directors that was comprised exclusively of insiders. Those directors were affiliated with direct or indirect equity holders of ESI.

24.     Homestead Village, L.L.C. ("Homestead") is a limited liability company organized under the laws of the State of Delaware. The portion of the Debtors' pre- and post-LBO corporate organization that was not within the ESI corporate chain was comprised of entities indirectly or directly owned by Homestead. Beginning shortly after the LBO, Homestead was also an owner (although not the sole owner) of BHAC Capital IV, LLC, and, therefore, an indirect owner of ESI. At all times relevant to this Complaint, Homestead was managed by a corporate-style board of directors, had no independent outside directors, and was managed by insiders.

**B.     The Defendant Mezzanine Co Lender**

25.     **Wachovia Bank, N.A.** ("Wachovia Bank"), a national banking association, was, together with Bank of America, N.A. ("Bank of America") and J.P. Morgan Commercial

Mortgage , Inc. ("J.P. Morgan Commercial"), formerly known as Bear Stearns Commercial Mortgage, Inc., one of the original co-lenders on each of the mezzanine loans made pursuant to the LBO.  Wachovia Bank was the recipient and/or beneficiary of payments on certain of the mezzanine loans in Exhibits "A" and "B" herein.

26.    Wachovia Bank is hereafter referred to as the "Mezzanine Co-Lender Defendant." The Mezzanine Co-Lender Defendant, and Subsequent Defendant Interest Holders in the Mezzanine Loans described in this Complaint, are hereafter referred to as the "Mezzanine Lenders."

**C.    Subsequent Defendant Interest Holders in Mezzanine Loan**

27.    **Archon Group, L.P.  ("Archon")** is a limited partnership organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business located at 6011 Connection Drive, Irving, Texas.    Archon is named as a Defendant both individually and in its capacity as servicer in connection with the Mezzanine Loans referred to herein.

28.    **Starwood Capital Group Global, L.P. ("Starwood")** is a limited partnership organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business located at 591 W. Putnam Avenue, Greenwich, Connecticut.    Starwood is named as a Defendant both individually and/or in its capacity as servicer in connection with the Mezzanine Loans referred to herein and/or in its affiliation with **Debt-U ESH, L.P.** and **Debt II ESH, L.P.** which are also named as Defendants herein.

29.    **Debt U ESH, L.P.** is a limited partnership organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business located at 591 W. Putnam Avenue, Greenwich, Connecticut.    Debt-U ESH, L.P.  is named as a Defendant in connection with the Mezzanine Loans referred to herein and as an affiliate of Starwood.

30.      **Debt II ESH, L.P.** is a limited partnership organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business located at 591 W. Putnam Avenue, Greenwich, Connecticut. Debt II ESH, L.P. is named as a Defendant in connection with the Mezzanine Loans referred to herein and as an affiliate of Starwood.

31.      **Square Mile Capital Management, LLC ("Square Mile")** is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business located at 450 Park Avenue, New York, New York. Square Mile is named as a Defendant in connection with the Mezzanine Loans referred to herein and/or in its affiliation with **ESH Owner, LLC** which is also named as a Defendant herein.

32.      **ESH Owner, LLC** is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business located at 450 Park Avenue, New York, New York. ESH Owner, LLC is named as a Defendant in connection with the Mezzanine Loans referred to herein and as an affiliate of Square Mile.

33.      **KeyBank, National Association ("Key Bank")** is a national banking association organized and existing under and by virtue of the laws of the United States of America with its principal place of business located at 127 Public Square, Cleveland, of Ohio. Key Bank is named as a Defendant in connection with the Mezzanine Loans referred to herein.

34.      **U.S. Bank National Association ("US Bank"),** not individually but solely as Trustee for Maiden Lane Commercial Mortgage-Backed Securities Trust 2008-1, Maiden Lane Commercial Mortgage-Backed Securities Trust 2008-1 and the Federal Reserve Bank of New York, is a national banking association organized and existing under and by virtue of the laws of the United States of America with its principal place of business located at 60 Livingston Avenue, St. Paul, Minnesota is named as a Defendant as set forth above in connection with the

Mezzanine Loans referred to herein.

35. The true names and capacities of Defendants, sued as DOES 1 through 100, inclusive, are presently unknown to the Trustee. The Trustee therefore sues those Defendants under such fictitious names. When their true names and capacities are ascertained, leave will be asked to amend this Complaint by inserting the same. The Trustee is informed and therefore believes that each of the fictitiously named Defendants received certain of the transfers that are the subject of this Complaint and are responsible for the return of them. Each reference in this Complaint to Defendant or Defendants refers also to all Defendants sued under fictitious names.

**D.    Non-Party Subsequent Interest Holders in Mezzanine Loans**

36. For purposes of this Complaint, the following entities are non-party subsequent interest holders in connection with the Mezzanine Loans referred to herein: Ashford Hospitality Finance LP;  Atlas Ventures I LLC; Barton Equities LLC ; BK ESH LLC; Bank of America, N.A.; CL Ventures LLC; Deuce Properties Limited; Ebury Finance Limited ("Ebury"); ESH Funding LLC; FIF V ESA LLC; FOA ESH LLC; GF ESH LLC; Hospitality F, LLC; JMPorgan Chase Bank, N.A.; JMPorgan Chase Bank, N.A. as Administrator; Legacy ESH LLC; Line Trust Corporation Limited; Merrill Lynch Mortgage Lending, Inc.; SFF ESH; SW ESH LLC; andWRP ESH LLC.

**E.    The Buyer and Its Affiliates (Non-Parties)**

37. **DL-DW Holdings, LLC** ("DL-DW" or "Buyer") was the nominal buyer of the Sellers' membership interests in BHAC Capital IV, LLC ("BHAC Capital") and BRE/Homestead Village, LLC.  DL-DW is a limited liability company organized under the laws of the State of Delaware with its principal place of business, upon information and belief, at 460 Park Avenue, Suite 1300, New York, New York 10022.  DL-DW was formed for the purpose of carrying out the LBO and, all times relevant to this Complaint, was owned or controlled by

David Lichtenstein who, at all times relevant to this Complaint, was the Chairman of the Board of Directors and Chief Executive Officer and President of the Debtor entities. Following the closing of the LBO, DL-DW was the sole direct member of Homestead and exercised at least indirect ownership or control over BHAC Capital (defined below), the majority shareholder of ESI, and ESI.

38.    David Lichtenstein ("Lichtenstein"), was, at all times relevant to this Complaint, the Chairman and Chief Executive Officer of Lightstone Holdings (defined below), Lightstone Commercial (defined below) and other affiliated entities, and held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" which, according to the minutes of consolidated Meetings of the Board of Directors of "Extended Stay Hotels family of companies," included DL-DW, BHAC Capital, Homestead (a Debtor) and ESI (also a Debtor) and each of their direct and indirect subsidiaries. All final decision-making authority for those entities and, indeed, for all of the Debtors, resided with and was exercised by the Board of Directors of the "Extended Stay Hotels family of companies."

39.    **Lightstone Holdings, LLC** ("Lightstone Holdings") was a member of DL-DW and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint. Lightstone Holdings is a limited liability company organized under the laws of the State of Delaware with its principal place of business, upon information and belief, at 460 Park Avenue, Suite 1300, New York, New York 10022. Lightstone Holdings was, at all times relevant to this Complaint, indirectly owned or controlled by Lichtenstein. As a holder of A-3 Series Units in the Buyer, Lightstone Holdings received a payment of $2,667,733 on August 31, 2007, and also received payment of asset management fees as set forth herein.

40. **Lightstone Commercial Management** ("Lightstone Commercial") is, or was at all times relevant to this Complaint, an affiliate of Lightstone Holdings and certain other Lichtenstein-owned or controlled entities. Lightstone Commercial is a limited liability company organized under the laws of the State of New Jersey with its principal place of business, upon information and belief, at 460 Park Avenue, Suite 1300, New York, New York 10022. Lightstone Commercial was, at all times relevant to this Complaint, at least indirectly owned or controlled by Lichtenstein. Lightstone Commercial received subsequent transfers of the LIBOR Floor Certificates (defined below) and their proceeds, as discussed *infra*, including (but not exclusively) as successor by transfer to the interests originally possessed by Park Avenue Funding LLC as a lender on the 25% Note (defined below). Lichtenstein, Lightstone Holdings and Lightstone Commercial are sometimes collectively referred to in this Complaint as "Lightstone."

41. **ABT-ESI LLC** ("ABT") is an affiliate and insider of the Buyer. As Lead Lender/Servicer of the 25% Note (defined below), ABT received subsequent transfers of the LIBOR Floor Certificates (defined below) and their proceeds. ABT is a limited liability company organized under the laws of the State of Delaware with its principal place of business, upon information and belief, at c/o Arbor Commercial Mortgage LLC, 333 Earle Ovington Boulevard, Uniondale, New York 11553.

42. **Mericash Funding, LLC** ("Mericash") is an affiliate and insider of the Buyer. As a lender on the 25% Note (defined below), Mericash received subsequent transfers of the LIBOR Floor Certificates (defined below) and their proceeds. Mericash is a limited liability company organized under the laws of the State of Delaware with its principal place of business, upon information and belief, at 404 Fifth Avenue, New York, New York 10018.

43.  **Park Avenue Funding LLC** ("Park Avenue") is an affiliate and insider of the Buyer.  As a lender on the 25% Note (defined below), Park Avenue received subsequent transfers of the proceeds of the LIBOR Floor Certificates (defined below) until the transfer of its interests to Lightstone Commercial.  Mericash is a limited liability company organized under the laws of the State of New York with its principal place of business, upon information and belief, at 460 Park Avenue, New York, New York 10022.

44.  **Princeton ESH LLC** ("Princeton") was a member of DL-DW and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Princeton is a limited liability company organized under the laws of the State of Delaware with its principal place of business, upon information and belief, at 375 Park Avenue, Suite 3401, New York, New York 10152.  Princeton was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group" of investors, which included various entities, including entities owned or controlled directly or indirectly by Ivan Kaufman, Arbor ESH II LLC, Atmar Associates, LLC, Glida One LLC, and Ron Invest LLC, as well as individuals Joseph Tabak and Joseph Chetrit.

45.  **BHAC Capital IV, LLC** ("BHAC Capital"), a non-debtor, was the majority shareholder of ESI (as defined below), and held, at all times relevant to this Complaint for the period after the LBO's closing, no less than approximately 99% of the equity of ESI.  BHAC Capital was also used as a vehicle for third parties to make equity investments through preferred A-1 or A-2 Series Equity Units (as those terms are defined below), which were to have a guaranteed rate of return supported by cash flow from the Debtors.  BHAC Capital is a limited liability company organized under the laws of the State of Delaware with its principal place of business, upon information and belief, at 460 Park Avenue, Suite 1300, New York, New York

10022.

46.     **Arbor Commercial Mortgage, LLC** ("Arbor Commercial"), was, and is, the manager and advisor for Arbor Realty Trust, Inc. and performs loan originating, underwriting and other related services on behalf of Arbor Realty Limited Partnership. Arbor Commercial is a limited liability company organized under the laws of the State of Delaware with its principal place of business, upon information and belief, at 333 Earle Ovington Boulevard, Suite 900, Uniondale, New York 11553. Arbor Commercial was a recipient of equity distributions by BHAC Capital.

**F.     The Sellers and Their Affiliates (Non-Parties)**

47.     The Blackstone Group, L.P. (individually, and in its capacity as a successor-in-interest to entities within its pre-IPO Real Estate or Corporate Private Equity operations, "Blackstone Group" or "Blackstone"), was, upon information and belief, the direct or indirect owner and controlling entity of the nominal sellers in the LBO or a successor-in-interest to the Blackstone affiliates that were the direct or indirect owners or controlling entities of the nominal sellers in the LBO and an entity that derived a substantial benefit in connection with its IPO as a result of the LBO. Up until the time of the LBO, Blackstone indirectly owned and controlled the Debtors and dominated them in all respects. From and after no later than approximately June 18, 2007, Blackstone Group was also the indirect owner of a substantial "rollover equity" interest in the post-LBO Debtors. Blackstone Group is a publicly traded limited partnership organized under the laws of the State of Delaware. As of March 31, 2011, according to recent SEC filings, Blackstone Group had managed assets of approximately $150 billion. Blackstone Group's principal place of business, upon information and belief, is located at 345 Park Avenue, New York, New York 10154.

48.     BHAC IV, LLC ("BHAC IV"), was a seller in the LBO. At the time of the LBO,

BHAC IV was an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group. BHAC IV received distributions in connection with the LBO as a nominal seller in the LBO. BHAC IV is a limited liability company organized under the laws of the State of Delaware and remains an affiliate of Blackstone Group. BHAC IV received distributions in connection with the LBO as a nominal seller in the LBO. Upon information and belief, BHAC IV is a shell entity that conducts no operations. BHAC IV's principal place of business, upon information and belief, is located at 345 Park Avenue, New York, New York, 10154.

49. BRE/HV Holdings, LLC ("BRE/HV"), was a seller in the LBO. At the time of the LBO, BRE/HV was an affiliate of Blackstone Group. BRE/HV received distributions in connection with the LBO as a nominal seller in the LBO. BRE/HV is a limited liability company organized under the laws of the State of Delaware and was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group. Upon information and belief, BRE/HV is a shell entity that conducts no operations. BRE/HV's principal place of business, upon information and belief, is located at 345 Park Avenue, New York, New York 10154.

50. BHAC IV and BRE/HV are sometimes referred to herein as the "Sellers." At all times relevant to the Complaint, BHAC IV and BRE/HV were owned, controlled or dominated in all respects by Blackstone Group and all business dealings by each of those entities were conducted solely for the benefit of Blackstone Group.

### FACTS COMMON TO ALL COUNTS

**A.     The Debtors Were Profitable Prior to the LBO**

51. Prior to the LBO, the Debtors owned the leading mid-priced extended-stay hotel business in the United States, with 684 hotels located in 44 states. Prior to the LBO, the Debtors were profitable and able to pay their debts in the ordinary course of business. The Debtors' financial performance from 2005 through the date of the LBO was generally positive. The

Debtors' business was encumbered by secured debt totaling approximately $3.3 billion and mezzanine debt totaling approximately $1.9 billion. The Debtors also owed approximately $39 million to certain subordinated noteholders.

52.     Prior to the LBO, the Debtors' corporate organization was similar to their organization after the LBO. All or substantially all of the Debtors' entities and operations ran through either the Homestead or ESI corporate ownership chain, as described above. Homestead and ESI were directly and nominally owned by BRE/HV and BHAC IV, respectively. BRE/HV and BHAC IV were, in turn, directly or indirectly owned and controlled by Blackstone Group (or Blackstone Group's predecessor-in-interest, as described above), their ultimate parent and the ultimate parent of all pre-LBO entities related to the pre-LBO Debtors and relevant to this Complaint.

53.     By the end of 2006, the Debtors' portfolio of hotels had an average age of approximately 7.5 years, though many of the hotels were around nine years old and were showing signs of significant wear and tear. In January 2007, a Confidential Information Memorandum was prepared to provide information to a limited number of parties regarding a possible acquisition of "Extended Stay Hotels" (the "Information Memorandum," as described and discussed more fully below). The Information Memorandum was created by Blackstone, Bear Stearns & Co., Inc., Banc of America Securities LLC and Merrill Lynch & Co., Inc. and characterized the hotels' condition as "excellent." But it was or ought to have been clear to Blackstone, the Debtors' pre-LBO management and others involved in the LBO that substantial capital expenditures would be needed in the near future.

54.     Pre-LBO, the Debtors' hotel properties were managed by HVM, L.L.C. ("HVM"). The Debtors' hotels were then operated under six different brand names, although

Blackstone had begun re-branding the portfolio to change all of the properties to one of three names: ExtendedStay Deluxe, ExtendedStay America, or ExtendedStay Economy. Around one-third of the portfolio remained to be re-branded at the time Blackstone commenced efforts to sell the pre-LBO Debtors. At the time, the cost to conclude the re-branding was expected to be substantial, although those costs were never provided for in the post-LBO budgets.

55. While economic trends in the hospitality industry generally had been positive in the years leading up to the LBO, certain of those trends reversed in late-2006, and continued to decline in early-2007. This led some analysts to project a downturn in the hospitality industry as a whole for the near-term. In certain key industry performance metrics at the time, the Debtors lagged behind their competitors during 2006.

56. It was or ought to have been clear to Blackstone, the Sellers and others involved in preparing to market the LBO that: (i) the Debtors' financial performance was declining in early-2007 as part of industry and economic trends that had begun in 2006; (ii) those trends were likely to continue after the LBO concluded; and (iii) the Debtors were already lagging behind their competitors.

**B. Blackstone Decides to Sell the Debtors**

**1. Blackstone Prepares and Circulates an Information Memorandum that Contains Intentionally Misleading Financial Information and Projections Designed to Sell the Debtors Prior to Blackstone's IPO**

57. Blackstone Group commenced its marketing effort by preparing an Information Memorandum for a sale of ownership of the Debtors as part of the "Extended Stay Hotels." Upon information and belief, preparation of the Information Memorandum was commenced during the latter half of 2006. The timing of Blackstone's decision to sell the Debtors was driven in part, upon information and belief, by Blackstone's initial public offering, or IPO, which was imminent at the time.

58.     Blackstone filed its IPO registration statement with the SEC on or around March 22, 2007, and eventually went public on June 21, 2007, ten days after the LBO closed.  Upon information and belief, Blackstone desired to carry out the sale of the Company prior to the IPO and stood to enhance its IPO valuation.

59.     The Information Memorandum represented that it was prepared from information furnished by the Debtors and from publicly available sources.  However, upon information and belief, Blackstone with the assistance of its professionals and advisors (i) created or compiled the financial information and projections in the Information Memorandum, (ii) prepared the non-financial, narrative content of the Information Memorandum, and (iii) was responsible for distribution of the Information Memorandum to potential buyers.

60.     The Information Memorandum contained an overview of the Debtors, and the reasons why Blackstone claimed the Debtors were a good investment opportunity for buyers.  The Information Memorandum represented that Extended Stay would increase revenues through re-branding, marketing and acquisition initiatives.  Blackstone and the others involved in the marketing of the Debtors knew or should have known at all relevant times that these initiatives could be successful only if the Debtors were left with sufficient capital and liquidity after the transaction to implement them.

61.     Prior to the LBO, the Debtors' capital expenditures generally fell into two categories.  The first category was maintenance associated with 444 hotels that were initially branded as "Homestead" or "Extended Stay America."  As to those 444 hotels, the five year historical investment in maintenance capital expenditures averaged approximately 4.3% of revenues, or $145.3 million in the aggregate from 2002 to 2006.  The second category was capital upgrades for the Debtors' remaining 238 hotels – branded StudioPlus, Crossland,

Wellesley and others. As to those 238 hotels, capital expenditures totaled approximately $129.6 million from 2004 to 2006. Total capital expenditures as a percentage of revenues were, in fact, approximately 10.2% for 2006 and 8.3% for 2005, both of which were significantly higher than the 4.5% projected capital expenditure levels that were set forth in the Blackstone Information Memorandum. Indeed, actual capital expenditures for the period from January 2007 through June 10, 2007, the eve of the LBO, were approximately 5.3% of revenues, higher than that projected by the Information Memorandum.

62. The Information Memorandum contained materially misleading projections regarding the Debtors' future financial performance. The Information Memorandum projected total revenue and property-level EBITDA growth rates of approximately 9.84% and 13.35%, respectively. However, Blackstone knew or should have known that the Debtors' actual financial performance at the time was, and was expected to be in light of performance trends in late-2006 and early-2007, well below the projections set forth in the Information Memorandum.

63. Upon information and belief, all of this information was available to the defendants involved in the transaction prior to the LBO's closing. At the time, the Debtors used Smith Travel Research ("STR") reports to benchmark their aggregate financial performance against the Debtors' chosen competitive set. On a weekly basis, the Debtors reported their hotel activity to STR. STR then provided the Debtors with weekly trend reports that displayed up to six years of monthly performance data for the Debtors and their competitors.

64. The STR reports, and other weekly financial reports shared with Blackstone and the Sellers, included detailed analyses regarding the Debtors' basic financial performance metrics, including occupancy rates (or "OCC:" the quotient of the total number of nights stayed by all customers divided by the total available room nights), average daily rate ("ADR:" the

quotient of total room revenues divided by occupied room nights (which provides the "room rate" for all occupied rooms)), revenue per available room ("RevPAR:" the product of OCC and ADR, which shows the revenue efficiency of a hotel), demand (the total of all room nights stayed by all hotel customers), and supply (the product of total available rooms and the number of total days in a year). The STR reports also measured each hotel property's performance, and the aggregated performance of the chosen competitive set with indices and rankings. In light of these, and other reports, Blackstone and the Sellers knew or should have known that the projections they were presenting in the Information Memorandum were unachievable and, therefore, misleading.

65. The projections contained in the Information Memorandum also improperly accounted for significant operating expenses, upon information and belief, so as to "hide" those expenses and make the operating hotels appear to be more profitable than they actually were. Among other things, the Information Memorandum inappropriately placed a significant amount of property-related expenses, including occupancy taxes, "above the line" at the corporate level. This had the practical effect of overstating the net operating income of the hotel properties. Since the lenders were prepared to lend based upon the property-level financial performance of the hotels, the effect of this misstatement was to increase the available debt in the LBO to amounts which would be impossible for the Debtors to service.

66. Likewise, the growth projections in the Information Memorandum were ostensibly based upon the post-LBO Debtors having adequate capital and liquidity to complete the re-branding, marketing and other initiatives that had been commenced by Blackstone prior to the LBO, as detailed in the Information Memorandum. However, based upon information available at the time, Blackstone and the Sellers: (i) knew or should have known that the

numbers contained in the Information Memorandum were inaccurate; (ii) nevertheless, intended that prospective buyers rely upon those misleading numbers; and (iii) knew or should have foreseen that, given the artificially increased debt to be imposed upon the Debtors in connection with the transaction (including the increased debt attributable to overstatement of net operating income, as described above), the post-LBO Debtors would not have sufficient capital or liquidity to carry out these strategies.

67.     Blackstone, the Sellers and their senior management knew or should have known that the Information Memorandum contained false and misleading financial information, as well as false, misleading, and unachievable projections.

**2.      The Stapled Financing Package Attached to the Information Memorandum Anticipated a Much Smaller Debt Load Than the LBO Ultimately Imposed**

68.     Blackstone had arranged for so-called "stapled financing" through several lenders (collectively, the "Stapled Financing Lenders") in connection with the LBO. "Stapled" financing refers to a financing package that is "stapled" to an offering memorandum and is available to a buyer for a specific transaction. Among other things, the stapled financing typically indicates the expected debt capacity of the business being sold and how much equity the buyer will need to provide to obtain the stapled financing.

69.     The Stapled Financing Lenders were prepared to finance up to $6.8 billion of the purchase price for a transaction. The stapled financing provided that the loan-to-value ratio could not exceed 87.5% when combined with the assumption of certain capital lease obligations of $200 million. As described more fully below, the loan-to-value ratio following the eventual LBO's closing (based on the price paid by the Buyer) was at least 95%, substantially more than that contemplated by the stapled financing attached to the Information Memorandum. This additional debt was fatal to the Debtors' continued profitable existence.

### 3. Lichtenstein "Wins" an Accelerated Bidding Process After Woefully Inadequate Due Diligence

70. Blackstone coordinated the distribution of the misleading Information Memorandum to approximately 150 potential buyers. A Lightstone affiliate and an Arbor Commercial affiliate, among others, signed confidentiality agreements in February 2007, permitting them access to due diligence information.

71. Around that same time, Blackstone informed potential purchasers that written, non-binding indications of interest had to be submitted within an accelerated time frame. Upon information and belief, Blackstone accelerated the time frame for bid submission (versus a typical time frame for a transaction of the LBO's size and complexity) in an attempt to coordinate the LBO closing with the launch of Blackstone's IPO planned for June 2007.

72. Citigroup Global Markets Inc. ("Citigroup") or an affiliate of Citigroup was at the time engaged, or about to be engaged, as one of two Global Coordinators on Blackstone's IPO, at the same time it was acting as the Buyer's advisor for the LBO. This engagement meant Citigroup would share with Morgan Stanley the largest split of the approximately $170 million of fees associated with the IPO, as well as have the ability to purchase a significant number of Blackstone IPO shares on "insider" terms". Citigroup had a vested interest in the success of the Blackstone IPO. Upon information and belief, Citigroup and some or all of Blackstone's other professionals sought to optimally position Blackstone prior to launching the IPO and to do so by, among other things, announcing around the time of the IPO, the consummation of a large, marquee sale of the "Extended Stay Hotels family of companies," for which Blackstone stood to reap substantial gains above its original equity investment.

73. Upon information and belief, Citigroup and Blackstone were therefore highly motivated to identify a buyer willing to pay a significant premium to the then-current value of

the Company. Fortunately for Citigroup and Blackstone, there was a client in Citigroup's client base that would serve as the "mark:" Lichtenstein.

74. Citigroup brought Lichtenstein into the deal in or around February 2007. Thereafter, Citigroup was instrumental in encouraging Lichtenstein to embark on the LBO and was instrumental in keeping Lichtenstein in the deal. Citigroup assured Lichtenstein that it had previously underwritten the properties to be acquired in the LBO, that the deal was "substantiated" by an appraisal and that Citigroup's team had already vetted the deal. Indeed, when Lichtenstein commissioned an independent valuation of the Company which contradicted the information and projections in the Information Memorandum, Citigroup dismissed that valuation and questioned Lichtenstein's judgment in relying on a relatively obscure source over the collective "wisdom" of Citigroup and the other financial institutions involved in the deal. Lichtenstein, ultimately, did not care, as the LBO was to be done using funds borrowed by the Debtors, and Lichtenstein and his affiliates were going to put little, if any cash, into the deal.

75. On or around March 1, 2007, Blackstone received four indications of interest, including one from Lichtenstein that proposed to pay $7.6 billion. Subsequently, the field was narrowed further to the two parties willing and able to consider concluding a transaction within the short time frame imposed by Blackstone. On March 25, 2007, Blackstone and its advisors demanded that definitive proposals for a transaction be submitted by the remaining potential buyers by no later than April 11, 2007.

76. On April 12, 2007, Lightstone formally offered to purchase 100% of the membership interests of one or more of the Sellers for $8 billion, net of the assumption of certain capital lease obligations. This was the only definitive proposal Blackstone received. Blackstone quickly accepted Lightstone's proposal. On or around April 17, 2007, DL-DW and one or more

of the Sellers executed a definitive acquisition agreement (the "Acquisition Agreement").

77.     Lightstone proposed to finance the overwhelming majority of the purchase price with debt of $7.4 billion and, at best, cash of only $400 million into the deal. This cash component was used to pay Blackstone and closing costs. The amount was therefore woefully insufficient to support the artificially inflated purchase price and the future needs of the now highly leveraged Company. An additional equity amount of $200 million was "rollover equity" provided to BRE.ESH for Blackstone's benefit. That interest did not represent any new cash or other value for the Debtors. The $200 million of Blackstone "rollover equity" in the "new" Debtors was included because it was the only way to reach the $8 billion purchase price insisted upon by Blackstone.

78.     Notwithstanding the dangerous debt levels of the proposed LBO, the sale was nevertheless structured to allow the Buyer's insiders to siphon value from the post-LBO Debtors regardless of their performance. One of Lichtenstein's affiliated entities was to reap substantial "asset management" fees post-LBO, even though HVM was to continue managing all aspects of the Debtors' day-to-day business. The sale proposed a cash management system that would allow post-LBO equity holders to receive improper distributions from the Debtors even if the Debtors' financial condition deteriorated. And, the Buyer obtained ownership of the Debtors while putting in little cash.

79.     Blackstone, at best, turned a blind eye to the post-LBO structure because Blackstone was eager to strip out $1.9 billion in cash from the Debtors while maintaining a post-LBO equity interest that Blackstone would receive in the LBO in exchange for nothing. Counsel advising the Debtors in the transaction was simultaneously representing Blackstone and Blackstone affiliates in the same transaction.

80.     The financial institutions advocating and knowingly participating in the transaction sought the significant fees they would receive in connection with financing the transaction.  Those financial institutions were also planning to simply sell the debt as soon as the LBO closed, and thereafter have no risk for the failure they knew or should have known was likely to occur.

81.     Moreover, upon information and belief, the financial institutions agreeing to fund the LBO had long-standing relationships with Blackstone and sought to curry favor with Blackstone so as to cement possible roles in Blackstone's IPO and possible future transactions Blackstone might carry out with respect to its portfolio companies.  Indeed, affiliates of Wachovia and Bank of America, among others, each were involved in Blackstone's IPO.

82.     Three rating agencies, Fitch Ratings ("Fitch"), Standard & Poor's ("S&P") and Moody's Investors Service ("Moody's"), issued presale reports relating to the securitization of the $4.1 billion of senior secured debt.  In these reports, each of the rating agencies noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets.

83.     Specifically, Fitch, S&P, and Moody's concluded that the LBO total debt was, respectively, 141.6%, 153.4% and 158.4% of the value of the Company's underlying assets.  In fact, these three rating agencies approximated the loan-to-value of the senior secured debt alone to be in the range of 78.4% and 87.8% of the cost of the Company's underlying assets.

84.     These three rating agencies also estimated the implied value of the Company to be substantially _less_ than the approximately $8 billion.  According to these third-party rating agencies, the $8 billion purchase price exceeded the Company's actual value by approximately $3 billion.

85.     On information and belief, the parties involved in negotiating, documenting and

closing the LBO knew or should have known of the rating agencies' likely determinations well in advance of the LBO's closing.

86.     Lichtenstein later aptly summarized the improper conduct of the various parties involved in formulating the LBO and their attitudes about what was about to be done to the Debtors and their creditors:

> at the end of the day, nobody put a gun to my head and said sign the documents. But it was like a lot of – it was – it was a brew that was cooked with a lot of people's help. Like the banks just said it's not – you know, blow the damn stuff out. It's – we really don't care, just sell the paper as fast as you can. Citibank just said pay us as many fees as you can. And I said I'm getting 95, 99 percent financing. Okay? So it was a combination; there were a lot of people who [erred] here.

87.     In short, no one involved at the time was looking out for the Debtors' interests.

### 4.     The LBO Debt Increases Prior to Closing

88.     The initial Acquisition Agreement required that most of the pre-LBO debt be satisfied by DL-DW at closing of the LBO, including two sets of subordinated notes owed by ESI at the time.  One set, known as the "9.15% Notes," was due on March 15, 2008 (only nine months later) and totaled approximately $31 million.  The second set, known as the "9.875% Notes," was due in June 2011 and totaled approximately $8.2 million.

89.     However, on May 31, 2007, on the eve of the LBO's closing, the parties entered into an Amendment to the Acquisition Agreement in which they removed entirely any obligation to ensure that the outstanding subordinated notes were paid off as part of the LBO.  Thus, when the LBO closed, no funds were escrowed to pay those notes, the notes remained unsatisfied and were reflected on the June 11, 2007 balance sheet of the "new" Debtors as assumed obligations.

90.     Although Lichtenstein's April 12, 2007 LBO proposal had contemplated that certain capital lease obligations would be assumed by the Buyer in the LBO, and that the post-LBO Debtors ultimately would purchase the hotel properties to which the capital lease related,

this, similarly, did not happen. As a result, and as described more fully below, the landlord under that capital lease declared defaults under that lease within a few days after the LBO closed.

**C. The LBO Closes, Blackstone Receives Approximately $2.1 Billion of Value and the Debtors Receive Nothing But Substantial Additional Debt and a New Owner With No Hotel Industry Experience**

**1. The Debtors' Post-LBO Corporate and Debt Structure Generally**

91. The LBO closed on June 11, 2007, at the law offices of Blackstone and the pre-LBO Debtors' counsel, Simpson Thacher & Bartlett LLP, both located in New York, New York.

92. On or around June 29, 2007, the Debtors' ownership structure was "restructured," as had been contemplated previously by the Buyer. Pursuant to that planned "restructuring," DL-DW's direct membership interests in BHAC Capital were transferred to Homestead. In addition, several other entities invested in BHAC Capital and, therefore, received a percentage of BHAC Capital's membership interests, resulting in DL-DW's and, indirectly, Homestead's membership interests in BHAC Capital, being reduced. Upon information and belief, the new investors in BHAC Capital paid less than fair consideration or reasonably equivalent value for their membership interests in that entity.

93. A chart showing the Debtors' corporate organizational structure following the restructuring described in the preceding paragraph is attached as Exhibit C and incorporated herein by reference. Upon information and belief, the corporate organizational structure described in Exhibit C hereto existed until the Debtors eventually (and inevitably) filed bankruptcy beginning on June 15, 2009.

94. The Debtor's post-LBO debt structure can be summarized as follows: (a) a mortgage loan in the amount of $4.1 billion, secured by encumbrances on the mortgaged properties; and (b) ten tranches of mezzanine loans, in an aggregate amount of $3.3 billion, each tranche owed by an indirect owner of the operating hotels secured by the equity in the borrower

beneath that owner. The debt structure was designed to permit the securitization of the mortgage loan by the mortgage lenders' sale of so-called "CMBS" (commercial mortgage backed securities) to third parties, many of which currently are Litigation Trust Beneficiaries.

### a. The Mortgage Loan Structure

95. The mortgage loan agreement was between the mortgage lenders and twenty-one mortgage borrowers, as summarized on the chart attached hereto as Exhibit D and incorporated herein by reference. All but three of the mortgage borrowers owned properties. The parent entities of the three non property-owning mortgage borrowers were also parties to, but not borrowers under, the mortgage loan agreement. In addition, four Debtor operating lessee entities were parties to, but not borrowers under, the mortgage loan agreement. The mortgage borrowers signed a single consolidated mortgage note in the amount of $4.1 billion, and the mortgage borrowers were jointly and severally liable for the mortgage debt.

96. Each of the eighteen property-owning mortgage borrowers and property owners secured the mortgage loan by first-priority encumbrances on their respective properties. The mortgage lenders, however, did not begin perfecting their mortgage liens with appropriate filings until June 22, 2007, and continuing thereafter through at least July 2007. The mortgage loan agreement, mortgage note, and related security instruments were cross-collateralized and cross-defaulted. Therefore, upon information and belief, although the entities that actually owned the Debtors' hotel properties were not all borrowers under the new mortgage loan agreements, all properties owned by any of the Debtors were nevertheless directly pledged as collateral for the mortgage loans. Upon information and belief, the entities that owned the hotel properties received none of the mortgage loan proceeds and, like the rest of the Debtors, received no value from the LBO.

### b. The Mezzanine Loan Structure

97.     Ten mezzanine loan agreements, labeled A to J, were executed in connection with the LBO.  The total mezzanine debt borrowed in the LBO was approximately $3.3 billion.  Each mezzanine loan agreement was between the applicable mezzanine lender and three equal-level mezzanine entities, as reflected on the chart attached as Exhibit E and incorporated herein by reference.  Each of the ten mezzanine loans (collectively, the "Mezzanine Loans") was structured as follows.  A set of three mezzanine borrowers signed a single consolidated mezzanine note in the amount of that particular mezzanine loan.  Each of the three mezzanine borrowers was jointly and severally liable under that mezzanine note and Mezzanine Loan agreement.  Each of the three mezzanine borrowers was "the legal and beneficial owner of all direct interests in" the entity beneath it (which, except for the Mezzanine A borrowers, was always a mezzanine borrower in the next level of Mezzanine Loan).  Each mezzanine borrower entered into a pledge and security agreement in connection with the LBO granting the Mezzanine Lender a first priority security interest in its equity interests in the borrower directly beneath it in its respective ownership chain, in an account that would be used to hold payment funds, and in certain proceeds.  The mezzanine borrowers were essentially shell entities that simply held equity interests in other shell entities (except for the lowest level of mezzanine borrowers – the Mezzanine A borrower – who were shell entities that, with limited exceptions, directly owned the mortgage borrower entities, i.e., the entities in which the hotel real estate and related operating assets actually resided).  The mezzanine borrower entities (collectively, the "Mezzanine Borrowers") served no practical purpose other than to facilitate the existence of multiple levels of Mezzanine Loans.

98.     Although the Mezzanine Loans did not directly encumber the mortgaged hotels and the hotels' owner entities were not borrowers under the Mezzanine Loans, the mezzanine

loan structure indirectly and improperly gave the Mezzanine Lenders subordinate interests in the hotels. The mezzanine loan structure (i) caused or allowed the Mezzanine Lenders to be paid directly from the proceeds of the operating hotels out of the Cash Management Account (as defined and described below), (ii) required the most junior Mezzanine Lender's approval of the Debtors' proposed annual budget even though the most junior Mezzanine Lender was not a lender to the mortgage borrowers, (iii) required the Mezzanine Borrowers to repay the Mezzanine Loans before any mortgaged properties could be released, and (iv) provided that, if any mortgage borrower paid more than its allocable share of the mortgage loan, such mortgage borrower could not exercise its contribution rights against other mortgage borrowers unless the Mezzanine Loans were paid in full. In fact, all payments on the Mezzanine Loans were made by payments channeled from the mortgage borrowers (none of which were Mezzanine Borrowers) into the Cash Management Account (as described below), and from there into separate payment accounts (one for each Mezzanine Loan). Each such separate payment account was controlled exclusively and completely by the respective Mezzanine Lenders, such that a payment into that account would be treated as a payment of the respective Mezzanine Loan pursuant to the Mezzanine Loan agreements. Debt service on the Mezzanine Loans was set up to be paid from the Cash Management Account before certain critical operating expenses.

99. Further, the mortgage and Mezzanine Loan agreements gave the lenders unusually broad control over the Debtors. Among other things, under the original mortgage and Mezzanine Loan agreements, the lenders had the right to shift loan liabilities around among different Debtor entities provided the aggregate loan burden of the Companies was not materially altered. They could even require the Debtors to create new entities and make them borrowers under new loans. For example, the Mezzanine D Loan Agreement provides in section 9.1.2:

"[A]fter the Closing Date, Lender shall have the right to establish different interest rates and to reallocate the amortization and principal balances . . . of each of the Loan, the Mortgage Loan and the Other Mezzanine Loans amongst each other and to require the payment of the Loan, the Mortgage Loan and the Other Mezzanine Loans in such order of priority as may be designated by Lender in its sole discretion . . . . Lender shall have the right to create one or more additional mezzanine loans (each, a "New Mezzanine Loan") . . . . In addition, Borrower shall cause the formation of one or more special purpose, bankruptcy remote entities as required by Lender to serve as the borrower under any New Mezzanine Loan and the Organizational Documents of Borrower, Mortgage Borrower and the Other Mezzanine Borrowers shall be amended and modified as necessary or required in the formation of any New Mezzanine Borrower . . . ."

Similar provisions appeared in other mezzanine and Mortgage Loan documents.

100.     As described above, the rating agencies reviewing the LBO, even prior to its consummation, concluded that the Debtors' value was woefully insufficient to support the mezzanine loans on the date the LBO closed.

### c.     The Cash Management Account

101.     The LBO imposed requirements that all cash generated by the hotels would be swept and used to pay debt service on both the new mortgage loans and the new Mezzanine Loans, even though the entities that owned the hotels were neither borrowers nor obligors under the Mezzanine Loans.   Those requirements were reflected in the main cash management agreement ("Cash Management Agreement") executed in connection with the LBO that established a "Cash Management Account."   That Cash Management Account was in the name of "ESP P Portfolio LLC [a Debtor] for the Benefit of Wachovia Bank."   The Cash Management Account was located at Wachovia at all times relevant to this Complaint.

102.     The mortgage lenders were granted a first priority security interest in the Cash Management Account. The mortgage borrowers, property owners, operating lessees, and HVM, as the Debtors' management company, were required to deposit all rents, receipts payable, and all other amounts received in connection with the hotels' operations into applicable property and

clearing accounts, which were to be swept daily into the single, commingled Cash Management Account. Distribution of funds from the Cash Management Account was governed by the Cash Management Agreement.

103.    The Mezzanine Loan agreements acknowledged that the Cash Management Account was controlled by the mortgage lenders. Provided no event of default had occurred, the mortgage lenders were to apply all funds in the Cash Management Account, which contained cash assets of the operating hotels only. The funds did not belong to the Mezzanine Borrowers (as described below). The Mezzanine Lenders were nevertheless paid with those funds, prior to the payment of critical hotel operating expenses.

104.    The Cash Management Agreement contained detailed requirements regarding the flow of funds through the cash management system. Numerous subaccounts of the Cash Management Account (each a "Subaccount") were maintained by the agent for the mortgage lenders on a ledger-entry basis: the Tax Escrow Subaccount; the Insurance Escrow Subaccount; the Agent Subaccount; the Replacement Reserve Subaccount; the Debt Service Subaccount (for the mortgage loan); the Ground Lease Reserve Subaccount; the Operating Expense Subaccount; the Management Fee Subaccount; the Excess Cash Flow Subaccount; the Special Reserve Subaccount; the Mezzanine A-J Debt Service Subaccounts; the Operating Lessee Remainder Subaccount; and the Preferred Equity Subaccount. All such Subaccounts were merely book entries, and all the funds were commingled in the single Cash Management Account at all times relevant to this Complaint. On each business day, the agent for the mortgage lenders was required to apply all funds on deposit in the Cash Management Account in the amounts and according to the priorities set forth in the Cash Management Agreement. A chart showing the flow of funds through the Debtors' post-LBO cash management system is attached as Exhibit F

and incorporated by reference.

### d. Pertinent Guarantee Obligations of the Debtors' Insiders

105.    Lichtenstein, certain entities controlled by Lichtenstein, ESI and Homestead (collectively, the "Guarantors") executed guarantees in favor of the respective lenders, guaranteeing certain of the respective borrowers' obligations under the mortgage loan and each Mezzanine Loan.  The Guarantors were liable under the guarantees to the extent of the lenders' damages arising out of various "bad boy" circumstances, including: (a) the borrowers' breach of any of the special purpose entity/separateness covenants (described below); and (b) the borrowers' filing for bankruptcy.  To the extent the Guarantors' obligations were triggered by a borrower's bankruptcy filing, the Guarantors' aggregate liability was capped at $100 million.

### e. Blackstone's Improper Receipt of Loan Proceeds

106.    At closing, the Sellers, who were owned, controlled, managed or dominated by Blackstone at the time, instructed that the funds borrowed by the Debtors in the LBO were to be used to retire certain, but not all, existing debt and pay the Sellers' fees and expenses associated with the transaction.  After retiring some, but not all, of the existing pre-LBO debt and paying the Sellers' fees and expenses associated with the LBO, the Sellers, which were Blackstone affiliates, received cash totaling nearly $1.9 billion (apart from Blackstone's rollover equity interest), as follows:

**Blackstone Entities' Cash Receipts**

| BHAC IV, LLC | Purchase Price payable to Seller | $1,282,764,450 |
| Blackstone Hospitality Acquisitions LLC | Purchase Price payable to Seller | $489,546,290 |
| Prime Hospitality LLC | Balance of the Gwinnett purchase price after payment of debt costs and closing costs | $4,110,604 |

| BHAC IV, LLC | Earnest Money Deposit payable to Seller | $85,611,012 |
| **Blackstone Entities' Cash Receipts** | **Total** | **$1,862,032,356** |

The reference above to cash receipts by Prime for the Gwinnett purchase price relates to a hotel that was owned by a Blackstone affiliate. The Gwinnett hotel was included in the hotels sold to the Buyer. The closing of the Gwinnett property sale occurred simultaneously with the closing of the LBO. In addition, even though Blackstone Hospitality was not a Seller under the Acquisition Agreement, it received over $489 million of loan proceeds.

107. The borrower Debtors were not required under the Acquisition Agreement to pay the purchase price to the Sellers. That was the Buyer's responsibility. Moreover, as described below, under the loan agreements, the Debtors appear to have been prohibited from using loan proceeds for that purpose even though everyone knew that the money being borrowed by the Debtors was the only source of funding for the LBO purchase price. Nevertheless, the Sellers, the Buyer, and the Mezzanine Co-Lenders caused the Debtors to improperly pay the purchase price on the Buyer's behalf with substantial borrowings the Debtors were obligated to repay. Upon information and belief, the Debtors then were caused to improperly, and in violation of the loan agreements, distribute these funds to Blackstone and the Sellers even though they no longer owned the Company.

108. In addition to the payments made to Blackstone and the Sellers described above, the Debtors used borrowed funds to pay a total of no less than approximately $150 million of fees and other amounts to the lenders, professionals and advisors involved in the deal. Those fees included lender loan and underwriting fees, so-called "hedge costs," property specific escrowed amounts, which included taxes, insurance, escrow fees, an interest payment due at closing, environmental fees and holdbacks, certain reserves, title-related expenses and the

professionals' fees incurred by all involved parties.

f.    **The Debtors Become Encumbered by Substantial Additional Debt for Blackstone's Benefit**

109.    All but $200 million of the $1.9 billion in cash payments to the Blackstone Group entities identified above came from loans made to the Debtors that they were unable to repay and that rendered them insolvent and undercapitalized at closing.  The total post-LBO mortgage debt borne by the Debtors (for Blackstone's benefit) increased over pre-LBO levels by $749.4 million and the total mezzanine debt increased over pre-LBO levels by $905.3 million, as follows:

**Summary of Pre and Post-LBO Mortgage Debt By Entity**

| Mortgage Borrower | Payoff Amount | New Debt | Difference |
|---|---|---|---|
| BRE/ESA 2005 Portfolio L.L.C. | 83,175,203 | 73,966,369 | (9,208,834) |
| BRE/ESA 2005-San Jose L.L.C. | 11,092,362 | 14,909,595 | 3,817,233 |
| BRE/ESA 2005-Waltham L.L.C. | 12,215,677 | 10,611,061 | (1,604,616) |
| BRE/ESA Alaska L.L.C. | 36,721,553 | 42,129,064 | 5,407,511 |
| BRE/ESA Acquisition Properties L.L.C. | 32,285,382 | 37,039,636 | 4,754,254 |
| BRE/ESA Canada Properties Trust | 42,680,978 | - | (42,680,978) |
| ESA Canada Properties Borrower L.L.C. | - | 43,074,603 | 43,074,603 |
| BRE/ESA FL Properties, L.L.C. | 29,694,951 | 53,588,108 | 23,893,157 |
| BRE/ESA MD Borrower L.L.C. | 0,09,3 | 51,742,056 | 11,532,745 |
| BRE/ESA MN Properties L.L.C. | 5,943,985 | 11,077,201 | 5,133,216 |
| BRE/ESA P Portfolio L.L.C. | 1,454,513,493 | 1,644,091,269 | 189,577,776 |
| BRE/ESA P Portfolio MD Borrower L.L.C. | 62,765,385 | 67,868,768 | 5,103,383 |
| BRE/ESA P Portfolio PA Properties L.L.C. | 49,945,630 | 56,883,343 | 6,937,713 |
| BRE/ESA P Portfolio TXNC Properties L.P. | 165,258,912 | 231,919,959 | 66,661,047 |
| BRE/ESA PA Properties L.L.C. | 15,442,706 | 23,660,878 | 8,218,172 |
| BRE/ESA Properties, L.L.C. | 524,163,473 | 788,096,085 | 263,932,612 |
| BRE/ESA TX Properties L.P. | 76,406,016 | 133,373,679 | 56,967,663 |
| BRE/Homestead Portfolio L.L.C. | 83,781,941 | 90,901,914 | 7,119,973 |
| BRE/HV Properties L.L.C. | 544,241,841 | 620,741,761 | 76,499,920 |
| BRE/MSTX Property L.P. | 2,872,538 | 4,359,990 | 1,487,452 |
| BRE/TN Properties L.L.C. | 16,496,143 | 21,064,531 | 4,568,388 |
| BRE/TX Properties LP. | 60,676,727 | 78,900,066 | 18,223,339 |

| Mortgage Borrower | Payoff Amount | New Debt | Difference |
|---|---|---|---|
| **Total Mortgage Debt of Borrowers** | **$3,350,584,208** | **$4,099,999,936** | **$749,415,728** |

### Summary of Pre and Post-LBO Mezzanine Debt By Level

| Mezzanine Borrower | Payoff Amt. | New Debt | Difference |
|---|---|---|---|
| Mezzanine A borrowers | 331,367,563 | 300,000,000 | (31,367,563) |
| Mezzanine B borrowers | 207,940,351 | 400,000,000 | 192,059,649 |
| Mezzanine C borrowers | 287,811,096 | 400,000,000 | 112,188,904 |
| Mezzanine D borrowers | 560,325,301 | 400,000,000 | (160,325,301) |
| Mezzanine E borrowers | 351,009,841 | 400,000,000 | 48,990,159 |
| Mezzanine F borrowers | 304,245,380 | 400,000,000 | 95,754,620 |
| Mezzanine G borrowers | 304,733,195 | 400,000,000 | 95,266,805 |
| Mezzanine H borrowers | 47,246,099 | 200,000,000 | 152,753,901 |
| Mezzanine I borrowers | - | 200,000,000 | 200,000,000 |
| Mezzanine J borrowers | - | 200,000,000 | 200,000,000 |
| **Total Mezzanine Debt of Borrowers** | **$2,394,678,827** | **$3,300,000,000** | **$905,321,173** |

110.     The entities listed in the chart above are all Debtors, but their names were changed after the LBO to drop the "BRE/," as was also done with the various Mezzanine Borrowers.   The attached Exhibit G lists the post-LBO names of the specific Mezzanine Borrowers on each level of Mezzanine Debt.

111.     After the LBO, the Debtors were overleveraged as a result of being subject to a significantly greater amount of debt than they were immediately prior to the LBO.   Virtually all of the Debtors' assets were over-leveraged.   The Debtors' debt load was significantly higher than that typical for hospitality REITs at the time.   Given these facts, the defendants involved in the

transaction or with the Debtors at the time knew or should have known that the Debtors would have no cash for necessary operating, marketing, maintenance, capital improvements and other expenditures, and no ability to secure additional loans or liquidity to meet their ongoing needs.

112. The borrowing capacity of the Debtors post-LBO was almost non-existent. Although the Debtors did maintain a working capital reserve of approximately $50 million, a pre-LBO line of credit in the amount of up to $105 million that previously provided for hotel acquisition funding was not available post-LBO. Moreover, there were no provisions in the limited liability company agreements for DL-DW or BHAC Capital to make additional capital calls from any investors after the LBO's closing, nor were there any commitments for capital infusions in the loan agreements. Therefore, the liquidity needed for capital expenditures, maintenance, upgrades, re-branding and expansion (all of which were critical if the Debtors were to have any chance whatsoever to achieve the financial performance "projected" by Blackstone in the Information Memorandum) was likely, and foreseeably, unavailable.

113. The parties involved in the LBO attempted to justify their conduct with an appraisal of the Debtors' assets, performed by HVS International ("HVS"), which purported to value the Debtors' assets at approximately $8 billion. That HVS appraisal was flawed for the following reasons, among others: the projected total revenue growth was overstated; the appraisal improperly assumed that the Debtors' room expense rate would continue to decrease; EBITDA growth was unreasonably projected; the appraisal assumed financing which was much less expensive than actually incurred in the LBO; and the appraisal's projected capital expenditures were dramatically underestimated.

114. As a result of the foregoing, among other errors, the value of the mortgage properties contained in the HVS appraisal was grossly overstated. The parties involved in the

LBO knew or should have known the HVS appraisal was flawed, resulted in a purported "fair value" of the mortgaged properties that was artificially inflated by billions of dollars and, therefore, could not be relied upon. Upon information and belief, many of the key assumptions made by HVS were provided to HVS by Blackstone or the Sellers in order to allow the values set forth in the HVS appraisal to be inflated.

115. In short, Blackstone and the Sellers, as direct and indirect equity holders in the pre-LBO Debtors, took all the cash they could get, while the Debtors and their estates were left insolvent, and the Debtors' new owners prepared to pay themselves hundreds of millions of dollars of the Debtors' desperately needed cash. Both groups knew that the LBO was structured to fail.

### 2. The Company Ignores the Separateness of Its Related Entities and the Requirements of the LBO Loan Documents

#### a. The Loan Proceeds' Uses Were Restricted, But The Parties Ignored The Restrictions and Paid Loan Proceeds Directly to the Sellers

116. The mortgage loan agreement restricted the use of proceeds from the new mortgage loans, as follows:

> [B]orrower shall use the proceeds of the Loan solely to (a) repay or discharge any existing loans relating to the Properties, (b) pay all past-due Basic Carrying Costs, if any, with respect to the Properties, (c) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, (d) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (e) fund any working capital requirements of the Properties and (f) distribute the balance, if any, to borrower.

117. The authorized uses, therefore, did not include making payments to the Sellers and other Blackstone affiliates that received sale proceeds, as described above. Notwithstanding this provision, the mortgage loan proceeds were not received by any mortgage borrower. To the contrary, all mortgage loan proceeds were deposited into an escrow account and a substantial

portion was paid out directly to one or more of the Sellers and other Blackstone affiliates, as described above, in violation of the restrictions contained in the mortgage loan agreement.

118.     The Mezzanine Loan agreements also restricted the use of proceeds from the new debt resulting from the LBO.  The Mezzanine Loan agreements provided that the Mezzanine Loan proceeds were to be paid first to the more senior Mezzanine Borrower, then, ultimately, provided to the mortgage borrowers as equity contributions:

> Borrower shall use the proceeds of the Loan solely to (a) make an equity contribution to Mortgage Borrower [through Senior Mezzanine Borrower] in order to cause Mortgage Borrower to use such amounts for any use permitted pursuant to Section 2.1.5 of the Mortgage Loan Agreement, (b) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender and (c) distribute the balance, if any, to Borrower.

Notwithstanding these provisions, the Mezzanine Loan proceeds were not received by any Mezzanine Borrower and were, like the mortgage loan proceeds, never contributed by equity contributions or otherwise to the mortgage borrowers through any senior Mezzanine Borrower. To the contrary, all Mezzanine Loan proceeds were deposited into an escrow account and, as with the mortgage loan proceeds, a substantial portion was paid out directly to one or more of the Sellers and other Blackstone affiliates, as described above, in violation of the restrictions contained in the Mezzanine Loan agreements.

### b.     Formalities Regarding the Post-LBO Debtors' Separateness and Accounting Are Violated

119.     The applicable loan agreements contained extensive "special purpose entity" and separateness representations and other covenants, requiring, among other things, that each mortgage borrower, operating lessee entity and property owning entity would (i) not make any loans or advances to any person; (ii) pay debts from its assets as such debts become due; (iii) do all things necessary to observe organizational formalities; (iv) maintain all of its books, records,

financial statements, and bank accounts separate from those of any other person; (v) except as expressly permitted under the applicable loan agreement or the Cash Management Agreement, not commingle assets; (vi) not guarantee or become obligated for the debts of any other person; (vii) not pledge assets for the benefit of any other person other than with respect to the applicable mortgage or Mezzanine Loans; (viii) remain solvent and maintain adequate capital in light of its contemplated business operations; (ix) maintain a sufficient number of employees in light of its contemplated business operations and pay the salaries of its own employees from its own funds; (x) not assume or incur any liabilities except the mortgage and Mezzanine Loans, certain other specified liabilities not germane to this Complaint, and "liabilities incurred in the ordinary course of business," subject to certain liability caps, which liabilities would not be more than 60 days past the date incurred; and (xi) maintain its assets and liabilities in such a manner that it would not be costly or difficult to segregate, ascertain or identify its individual assets and liabilities from those of any other person.

120.    These requirements, however, were disregarded.  For example, after the closing, an opening balance sheet for DL-DW showed the impact of the LBO on DL-DW and the appropriate allocation of the price paid for the LBO. The mortgage and Mezzanine Debt was recorded at the ESI and Homestead accounting database levels, as opposed to being recorded by each legal entity mortgage borrower or Mezzanine Borrower.  Similarly, the subsidiaries' assets and liabilities, including hotel property and equipment, were recorded at the ESI and Homestead database level, rather than being recorded at the individual entity level and treated as owned by that entity.  In short, the Company ignored the fiction of legal separateness of its entities.

121.    If the Debtors had established and maintained separate books for each of the individual mortgage borrowers and Mezzanine Borrowers as of the LBO, then the accounting by

the mortgage borrowers and Mezzanine Borrowers should have reflected:

- The mortgage debt and the related proceeds - at each legal entity level for the individual mortgage borrowers – allocated based on the release amounts included in the mortgage loan agreement; and

- The Mezzanine Debt and the related proceeds – at the legal entity level for the individual Mezzanine Borrowers – allocated based on the sum of the allocated release amounts included in the mortgage loan agreement for the mortgage borrowers directly below the relevant Mezzanine Borrower.

122. The Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements. The Debtors were treated internally at all relevant times as part of one company. The Debtors had common officers and directors, and had no separate governance. The Debtors conducted all material board of directors meetings on a consolidated basis for the so-called "Extended Stay Hotels family of companies," which included the Debtors' direct equity owners. In addition:

- The daily business and affairs of each of the Debtors were managed and controlled by HVM Manager, of which Lichtenstein was the sole member;

- The Debtors' operations were integrated and interdependent and each of the Debtors was run in the interest of the Buyer and the Debtors' ultimate equity owners;

- With few exceptions, all of the Debtors were wholly-owned by the Buyer;

- The Debtors did not have specific general ledger codes in their accounting system to track specific accounting activity for the Mezzanine Borrowers;

- None of the mortgage borrower entities or Mezzanine Borrower entities kept their own books and records, and adequate records of complete accounting activity related to each legal entity were not maintained;

- Debt to the mortgage and mezzanine lenders was recorded only at the ESI and Homestead levels, debt service was paid only from the Debtors' consolidated Cash Management Account, and the Debtors failed to properly record any financial or accounting activities (including debt service) relating to the mezzanine or mortgage loans;

- The Debtors' expenses were generally funded from the consolidated Cash

Management Account and a single working capital reserve account;

- The Debtors failed to observe corporate formalities for intercompany transfers, which generally were not properly recorded;

- The mortgage borrowers were jointly and severally liable on the mortgage debt, and yet paid the mezzanine debt for which the mortgage borrowers had no liability;

- Mezzanine Borrower entities were prevented from enforcing contribution rights against other Debtors until after all of the mezzanine debt and mortgage debt had been paid in full;

- The Debtors made substantial payments for the benefit of insiders;

- The Debtors failed to pay debts as they came due in the ordinary course, with certain liabilities being greater than 60 days outstanding at all relevant times from and after the date the LBO closed; and

- The Debtors were insolvent and undercapitalized on the date the LBO closed and at all relevant times thereafter.

**D.     Debt Yield and Financial Covenants Are Violated The Day The LBO Closed, and Key Differences Between the Debtors' Pre- and Post-LBO Debt Structures Cause Immediate Financial Distress**

   **1.     The Significance of a Debt Yield Event**

123.    The Debtors' loan agreements provided for severe consequences if a "Debt Yield Event" occurred.   The loan agreements defined "Debt Yield" roughly as a fraction: (a) the numerator of which was net operating income less (i) assumed management, marketing, and franchise fees equal to 4% gross income, (ii) replacement reserve fund contributions equal to 4% gross income, and (iii) income generated by leased properties; and (b) the denominator of which was the combined total outstanding principal balances on the mortgage and Mezzanine Loans. In essence, the Debt Yield calculation was intended to provide an indication of the amount of cash generated by the mortgaged properties compared to the level of debt associated with those properties, and to measure the debtors' ability to generate enough cash to service the LBO debt.

124.     The Debtors' failure to meet specific Debt Yield benchmarks under the LBO loan

agreements would cause the Debtors to have insufficient cash to pay their obligations as follows:

(1)     A so-called "Debt Yield Event" triggered a "Cash Trap Event." This meant that excess cash from operations (after taxes, reserves, and debt service) was "trapped" as additional collateral for the lenders. The cash was not available to pay costs of operations outside of the annual budget approved by the lenders under the Cash Management Agreement, including capital expenditures beyond a small reserve. The annual budget did not allow for the payment of crucial expenses such as occupancy taxes, reserves and management fees, among other things;

(2)     If the Debt Yield fell below the so-called "Debt Yield Amortization Threshold," then the borrowers had to make substantial amortization payments to the lenders beginning on June 12, 2009; and

(3)     No equity distributions could be made (except to holders of Series A-1 preferred equity in BHAC Capital) by either the mortgage borrowers, the property owner entities, the operating lessee entities, or the Mezzanine Borrowers unless the Debt Yield equaled or exceeded 7.75%.

125.     A Cash Trap Event, triggering a "Cash Trap Event Period," occurred upon: (a) an

event of default under the mortgage loan agreement or any Mezzanine Loan agreement; (b) a

Debt Yield Event; or (c) HVM's filing for bankruptcy. A Cash Trap Event could be cured under

certain circumstances, including, if it was caused by a Debt Yield Event, the mortgage

borrowers' achievement of certain Debt Yield numbers for six (6) consecutive months.

126.     On June 30, 2007, the Debt Yield was only 7.09%. Therefore, the Debt Yield was

less than 7.5% immediately after the date the LBO closed, and there was, in substance if not

form, a continuous Cash Trap Event Period within the meaning of the mortgage loan agreement.

For the first six months after the LBO's closing (including the day the LBO closed), the only

reason there was no technical Cash Trap Event Period was because a Debt Yield Event had no

consequences under the pertinent loan agreements until the seventh payment date, scheduled to

occur in January 2008. The Debt Yield percentage, however, was required to be reported to the

Debtors' lenders on as monthly basis, including during the first six months after the LBO closed.

But the Debtors' principals did not report the Debt Yield percentage to the lenders as should have been done. Upon information and belief, this failure to report was intentional and allowed improper distributions to continue to be made to equity holders.

127. The Debt Yield Event percentage would become even more difficult to achieve over time, as the required percentage was scheduled to grow from 7.5% (on the seventh payment date) to 8.1% (on the LBO loans' maturity date if certain options to extend the loans had been exercised by the Debtors). In short, the Debtors immediately failed the Debt Yield test under the LBO loan documents on the date the LBO closed, were unlikely to meet the test when it was first scheduled to formally occur in January 2008, and the Defendants involved in the LBO and any related entities all knew or should have known it.

**2.      The Post-LBO Debt Structure Improperly Restricts the Debtors' Cash**

128. Two significant differences between the pre- and post-LBO Cash Management Agreement and related agreements placed the Debtors at even graver risk of failure. First, the pre-LBO cash management agreement provided that management fees were higher in priority on the so-called "waterfall" than debt service on the Mezzanine Loans, and thus management fees would be paid before Mezzanine Loan debt service if there were insufficient funds to pay both. The post-LBO Cash Management Agreement provided just the opposite: Mezzanine Loan debt service was higher in priority than management fees, and was paid first if there were insufficient funds to pay both. This severely threatened the post-LBO Debtors' ability to maintain operations.

129. Management fees are not discretionary expenses for a hotel chain. Most of the hotels were indirectly owned by ESI, which was a REIT, or "real estate investment trust." A REIT is required to have an outside management company operate its hotels. However, management fees could be paid only if cash was available after debt service under the post-LBO

structure. Therefore, any cash difficulties, and especially a Cash Trap Event, made it likely the Debtors would be unable to pay critical management fees and costs necessary to keep the Debtors' hotels open. If those fees and costs were not paid, the Debtors' hotels would close and the Debtors' entire business would abruptly shut down, causing waste and destruction of the Debtors' hotels' value. Nevertheless, the Sellers, DL-DW, and the Buyer's principals agreed to terms placing the Debtors, and their creditors, improperly at risk.

130. The post-LBO Cash Management Agreement trapped 100% of excess cash flow during every Cash Trap Event Period, and defined excess cash flow in such a way as to trap the Debtors' cash prior to the payment of critical operating expenses. The pre-LBO Cash Management Agreement provided for a similar formula, but the excess cash flow concept was different: the cash trap occurred only after critical operating expenses were paid. Therefore, the post-LBO Debtors were placed in an untenable financial position to further the interests of the Defendants that were the Debtors' pre- and post-LBO owners, insiders or insiders' affiliates.

131. Under the pre-LBO mortgage loan agreement, in proposing each annual budget, the borrowers needed to obtain the approval of only the servicer for the mortgage loan. Post-LBO, in proposing an annual budget, the borrowers were required to obtain the approval of both the mortgage lenders (and after securitization of the CMBS, the servicer for the debt certificate holders) and the most junior mezzanine lender. This requirement placed the Debtors' need for cash to operate subordinate to the profit return for the junior mezzanine lenders, a situation which quite predictably caused great harm to the Debtors and their estates.

132. All of these problems were or should have been foreseen by the Defendants involved in the LBO.

**3.     The Debtors Immediately Violate Covenants Regarding The Payment of Ordinary Course Debts**

133.    The mortgage and Mezzanine Loan agreements contained extensive financial reporting covenants, which included:  (i) within 60 days after the end of each fiscal year, each borrower had to furnish its respective lender with certain annual financial statements audited by a "Big Four" accounting firm and prepared according to GAAP, along with an Officer's Certificate certifying whether there was an event of default under the applicable loan agreement and if so, what it was, how long it had existed, and what actions had been taken to remedy it; (ii) within 20 days after each month, each borrower had to furnish its respective lender an occupancy report, monthly and year-to-date operating statements, a calculation of the Debt Yield on the last day of the month and the amount of all operating rent due for the month; (iii) within 30 days after each quarter and each month, each borrower had to furnish its respective lender with an officer's certificate stating that the monthly financials provided were accurate, that the representations and warranties with respect to certain special purpose entity requirements were correct and that ordinary course of business liabilities had not exceeded certain amounts and had been paid within 60 days of the date they were incurred; and (iv) within 30 days before the start of each fiscal year, the mortgage borrowers and property owner entities had to submit a proposed annual budget, which was subject to the written approval of the mortgage lenders and the "Most Junior Mezzanine Lender."  Until the proposed annual budget was approved by that lender, the most recent "Approved Annual Budget" applied.

134.    Several of these covenants were ignored or violated.  For example, no monthly Debt Yield reports were prepared or furnished during 2007 following the LBO, and the first such report was not prepared until January 2008.  Also, F. Joseph Rogers ("Rogers"), the Assistant Secretary or Vice President of the Debtors, routinely submitted officer's certificates certifying each month after the LBO closed that ordinary course liabilities had not exceeded certain

amounts and had been paid within sixty (60) days of their incurrence. In fact, there were ordinary course liabilities outstanding for longer than sixty (60) days on the date the LBO closed and each month thereafter until the Debtors' eventual bankruptcy filing. Each of these events was an event of default under the loan agreements. In short, the Debtors were in technical default of their obligations the day the LBO closed.

### E. The Lenders Make Demands of Lichtenstein to Facilitate the Sale of Loan Certificates

#### 1. The Lenders Experience Difficulty Selling the LBO Debt

135.   The lenders that had committed to finance the LBO had always intended to sell most or all of the mortgage and mezzanine debt to third parties. Those efforts, however, were unsuccessful. As of the LBO's closing on June 11, 2007, the banks that financed the LBO held all or substantially all of the mezzanine and mortgage debt.

136.   Immediately after the LBO closed, the mortgage lenders marketed the CMBS for sale. At the beginning of those efforts, the market was active. However, the market quickly softened, starting no later than late-July or early-August 2007. As a result, the banks were forced to take more aggressive steps to sell the CMBS debt including, for example, as early as August 2007, discounting the CMBS debt.

137.   The mezzanine debt also was not selling, and was being discounted by the mezzanine lenders. The mezzanine lenders began offering to provide buyers of the mezzanine debt with financing ("repo financing") to help buyers purchase the debt.

138.   In addition to offering incentives to potential buyers of the CMBS and mezzanine debt, the lenders made certain demands on Lichtenstein and Lightstone regarding actions that the lenders claimed were needed to make the CMBS and mezzanine debt more marketable.

#### 2. The Lenders Demand that Lightstone Stop Efforts to Sell Preferred Equity

139.    Before the LBO had closed, in May 2007  Lichtenstein was in discussions with certain entities regarding a sale of a substantial piece of equity in the post-LBO Debtors.  Among others, Centerbridge Partners, L.P. ("Centerbridge") was supposedly interested in purchasing equity, and was discussing with  Lichtenstein the need to relieve the Debtors from a $200 Million junior tranche of LBO debt.  Other potential investors being solicited on the Buyer's behalf at the time commented to  Lichtenstein or  Lichtenstein's advisors that the proposed LBO was "too levered," that it "wouldn't take much to wipe them out," and thus declined interest. Unsurprisingly, those pre-LBO discussions did not result in a sale of preferred equity. Nevertheless, the LBO proceeded.

140.    After the LBO closed, Lichtenstein continued efforts to sell equity.  However, the lenders demanded that Lichtenstein cease those efforts because it was interfering with the lenders' efforts to sell their debt.  Upon information and belief, Lichtenstein complied with the lenders' demands, and ceased efforts to sell equity shortly after the LBO closed.

141.    In or around August 2007, in connection with the securitization of the mortgage loan that resulted from the LBO, Banc of America Securities LLC, together with three other banks, offered Commercial Mortgage Pass-Through Certificates in the amount of the $4.1 billion mortgage loan to institutional third-parties through a Confidential Offering Memorandum, dated August 17, 2007 (the "Mortgage Loan Issuance Offering Memorandum").

142.    Although the Mortgage Loan Issuance Offering Memorandum noted the ratings of the mortgage loan debt by Fitch, S&P, and Moody's as between BB and AAA, noticeably absent from the Mortgage Loan Issuance Offering Memorandum was any reference to the fact that, as described above, these rating agencies' July 2007 reports noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets.  According to S&P's and

Fitch's July 2007 reports, they expressly valued the Company at $4.8 billion and $5.2 billion, respectively – approximately $3 billion less than the $8 billion purchase price.

143.    Moreover, the Mortgage Loan Issuance Offering Memorandum cited the results of the HVS appraisal, which the Sellers, the Buyer, participating lenders, and others involved in the LBO, as discussed above, knew or should have known was flawed, and which was based upon assumptions provided to HVS by the Sellers, Blackstone, and other Blackstone-affiliated entities in order to inflate the values in the HVS appraisal.

**3.    The Alleged HPT Capital Lease is Declared in Default and the Lenders Demand that Lichtenstein "Resolve The Defaults or Else" to Facilitate the Banks' Efforts to Sell Their Paper**

144.    Prior to the LBO, HVI(2) Incorporated ("HVI"), an entity under the Debtors' corporate umbrella, entered into a lease agreement ("HPT Lease"), pursuant to which HPT HSD Properties Trust ("HPT HSD") leased eighteen hotels to HVI. The HPT Lease ran through December 31, 2015, subject to renewal options. HVI was required by the HPT Lease to, among other things, (i) maintain certain specified net worth, and (ii) adhere to certain requirements if a change of control, such as the LBO, was to be effected.

145.    Immediately after the LBO closed, HPT HSD alleged that Lightstone had failed to comply with one or more of these requirements. The Sellers and Buyer and their respective principals were or should have been well aware of this issue prior to the LBO's closing.

146.    One week after the LBO closed, on June 18, 2007, HPT HSD issued a notice of default under the HPT Lease and terminated the lease. That same day, HPT HSD issued a press release announcing the alleged defaults and that it had terminated the lease. This default was foreseeable prior to the LBO, caused great concern among the Debtors' lenders and caused the lenders to place further demands upon the Debtors.

147.    Shortly thereafter, HPT HSD offered Lichtenstein the option to purchase the

properties that were subject to the HPT Lease. To resolve the dispute, and to address the lenders' demands, on or around July 26, 2007, HFI Acquisitions Company LLC ("HFI"), an affiliate of Lichtenstein, purchased 17 of the 18 leased hotel properties under the HPT Lease for approximately $192 Million. Approximately $170.5 million of the $192 million used in the HPT HSD transaction came from new mortgage and Mezzanine Loans to HFI from certain of the Debtors' lenders. In connection with the transaction, HFI was assigned all of HPT HSD's rights under the HPT Lease, including HPT HSD's rights in a $15.96 million security deposit. Upon information and belief, one or more of the Debtors had an interest in those funds. Also, Homestead guaranteed a portion of the rent under the HPT Lease and posted cash collateral for that guaranty totaling approximately $10 million. Upon information and belief, Blackstone Hospitality was also released from its obligations under a letter of credit that Blackstone Hospitality had, prior to the LBO, posted as security for rent and other obligations owed under the HPT Lease.

148.    After the HFI transaction closed, HFI subsequently leased the purchased hotel properties to one or more of the Debtors. Upon information and belief, this enabled Lichtenstein, as the owner of HFI, to receive additional payments from the Debtors in the form of rents on those hotels.

### 4.    DL-DW's Acquisition of the "LIBOR Floor Certificates"

149.    Because the mortgage lenders were having so much difficulty selling their debt, Wachovia and the borrower Debtors entered into a letter agreement amendment, dated August 31, 2007, that amended the mortgage loan agreement and the Mezzanine Loan agreements. The amendment adjusted provisions relating to the application of the proceeds from prepayments of the mortgage and Mezzanine Loans to make the debt more palatable to potential buyers. In exchange for the Debtor borrowers' consent to the amendment, the lenders agreed to issue to the

borrowers (or their designees) Class X-A and X-B certificates from the securitization (collectively, the "LIBOR Floor Certificates"). The LIBOR Floor Certificates were investment grade (AAA) and represented the right to receive a payment stream, derived from the mortgage loan payments, of the difference between the LIBOR "floor" amount, on the one hand, and actual LIBOR on the other hand. Therefore, whenever LIBOR dropped below the floor, part of the money paid by the Debtor borrowers on the mortgage debt would be paid over, in turn, to the holder of the LIBOR Floor Certificates.

150. On November 2, 2007, the LIBOR Floor Certificates were issued, in physical form, and transferred directly to DL-DW, one of the ultimate equity owners of the Debtors, rather than to the Debtor borrowers making concessions and providing all payments under the loan agreements. Upon information and belief, no value was provided by DL-DW to the borrowers in exchange for these certificates and no accounting entries were made to reflect that property rightfully belonging to the Debtor borrowers was being diverted to DL-DW. At the time, the LIBOR Floor Certificates were valued at no less than approximately $25 million.

151. As LIBOR began dropping throughout 2008 and 2009, the LIBOR Floor Certificates became increasingly valuable to DL-DW because the amount of the "floor" was higher than the actual LIBOR-based loan payments. This value, however, should have belonged to the Debtors, not DL-DW, because the Debtors were the obligors under the mortgage and mezzanine agreements and were the parties who contracted to receive the certificates. The LIBOR Floor Certificates' issuance to DL-DW was an improper transfer of the Debtors' value to the Debtors' equity owners.

**F.      The Debtors' Post-LBO Performance Continues to be Predictably Dismal, But Substantial Distributions Are Nevertheless Made to Equity Holders**

**1.      2007 Post-LBO Financial Performance**

152.    Immediately after the LBO, the Debtors' financial performance continued to decline, performance metrics set forth in its budgets were missed, and the Debtors encountered significant (and predictable) economic problems.  The Debtors' senior management received regular financial and other reports on both a weekly and monthly basis (depending on the nature of the reports) after the LBO and therefore knew or should have known of relevant, material events relating to the Debtors' performance and inevitable downward spiral.

    a.    **2007 Financial Results**

153.    The Debtors' 2007 post-LBO revenues were approximately $623 million, below the pro-forma budget of approximately $655 million prepared in connection with the LBO.  The 2007 post-LBO EBITDA was approximately $327 million (or a 52% margin), as compared to a pro-forma budget EBITDA of $364 million (or a 56% margin).  During the second half of 2007, the Debtors experienced a continuing reduction in room demand, and the monthly ADR, OCC, and RevPAR were at or below budget in every month following the LBO in 2007.  Revenue growth reversed in the second half of 2007, and the Debtors missed projections for room revenue and property-level EBITDA in each of the last three quarters of 2007.

154.    The Debtors' performance relative to its selected competitive peer group reflected that, while the Debtors' occupancy rate was higher than those of some of their peers, the Debtors' revenue and room rate (as evidenced by RevPAR and ADR at the time) was below its peers by a significant amount: 10% to 22%.

155.    In addition to regular industry reports, the Debtors' management received weekly reports showing how the Debtors' deteriorating performance compared to the Debtors' peer group in the second half of 2007.  During the November 15, 2007 board of directors meeting for the Debtors, it was reported that during the third quarter, certain metrics were below budget: RevPAR was below budget by 3% and property-level EBITDA was below budget by 5.7% year

to date through September; RevPAR was below budget by 5.9% and property-level EBITDA was below budget by 10.5% for the third quarter 2007. The Debtors' principals were thus aware that the Debtors' performance was not only below their peer group, but was also below internal targets.

156. However, at a November 15, 2007 board meeting of the "Extended Stay Hotels family of companies," Kim "anticipated" double digit corporate EBITDA growth for 2008 and 2009, driven by anticipated RevPAR growth of more than 7% in both years, based on the Debtors' "re-branding" strategy. This re-branding strategy, however, was based upon having substantial funds available to spend on brand strategy initiatives in the first quarter of 2008. However, the projected Debt Yield calculation for the fourth quarter of 2007 and the first two quarters of 2008 were expected at that time to be below the minimum requirement under the LBO loan agreements. Funding for re-branding was not likely to be available because the Debt Yield calculations would in turn trigger a Cash Trap Event, depriving the Debtors of the much needed cash.

157. In addition, the Debtors' financial projections at the time reflected negative cash flows for the fourth quarter of 2007 and the first quarter of 2008. These projected results should have alerted anyone looking at them with an unjaundiced eye that the optimistic growth "anticipated" by Kim was not going to occur in the short term, nor was the cash going to be available to fund the rebranding expenditures from operations.

158. The Debtors' actual performance in late 2007 was below budgeted ADR, was not strong enough to mitigate the decline in OCC (also below budget at the time), and was adversely impacting the Debtors' liquidity situation.

### b. Critical Capital Expenditures Are Not Funded

159. In 2007, prior to the LBO, the Company spent approximately $67.1 million on

capital expenditures. However, during the post-LBO period, the Debtors did not (and, indeed, could not) fund any of the incremental capital expenditures critical to the Debtors' achievement of the inflated projections discussed in Blackstone's January 2007 Information Memorandum. In fact, the Debtors were changing the pre-LBO re-branding strategy and re-branding their hotels under the Homestead name rather than the Extended Stay brand, contrary to the recommended strategy stated in Blackstone's Information Memorandum, and this new re-branding strategy was not going smoothly.

c.      **Late-2007: A Cash Trap Event is Imminent**

160.    In a November 2007 board meeting, the Debtors' principals finally acknowledged the Debt Yield Event and the pending Cash Trap Event as imminent issues. Senior management knew or should have known the Debtors would likely fail the Debt Yield Test when it was to be reported on January 12, 2008. The anticipated Debt Yield was below the required monthly Debt Yield from the fourth quarter 2007 through the second quarter 2008.

161.    The Debtors submitted a proposed 2008 budget for approval by the lenders in early-December 2007. This budget reflected an increase in the overall property-level expenses. The budget submitted also included significant anticipated future costs related to non-recurring, discretionary capital expenditures associated with the Debtors' proposed re-branding strategy. Due to the anticipated Debt Yield Event and the pending Cash Trap Event that would be triggered in early 2008, the budget sought to ensure that all costs would be covered through funds available in the "waterfall" described above and on the attached Exhibit F (the "Waterfall") through the 2008 budget submitted for lender approval.

d.      **2008 Budget Negotiations: The Debtors Unsuccessfully Attempt to Gain Access to Cash They Should Have Had From the Closing of the Loans**

162.    In November 2007, the proposed annual budget for 2008 was due. HVM

prepared annual and monthly financial budgets for the Debtors, which were required to be approved by certain of the Debtors' lenders. If the proposed annual budget was not approved by the lenders, then the most recently approved annual budget governed the Debtors' operations. This, however, meant that the Debtors' cash was subject to the flawed Waterfall, and the Debtors were on the verge of a Cash Trap Event. Any cash remaining after the Waterfall was funded would not be provided to the Debtors. During a Cash Trap Event Period, excess cash that could have been transferred to the Debtors for operating expenses would be held by the lenders as additional collateral, leaving the Debtors unable to pay crucial operating expenses.

163. The 2007 approved annual budget had been created prior to the LBO. That budget had certain flaws that all parties should have known about. However, the post-LBO Company had not been provided with the 2007 annual budget being used at the time. That 2007 approved annual budget (i) did not include trust fund occupancy taxes (which totaled approximately $6-8 Million, or approximately 9.2% of room revenues, per month, and were collected by the Debtors and held in trust for taxing authorities), and (ii) did not allow for payment of necessary corporate overhead costs (e.g., reservation services, travel agent commissions and certain management fees), all of which were critical to the Debtors' ongoing operations because excess cash was to be trapped, and none of which could be paid once there was a Cash Trap Event Period.

164. In November 2007, when it became apparent that trust fund occupancy taxes were being swept into the Cash Management Account for application in accordance with the Waterfall, Rogers asked the lenders to treat those taxes as pass-through amounts, and to have the amounts distributed back to the Debtors for payment to applicable governmental authorities. The lenders responded that the occupancy taxes would have to be handled through the Debtors'

working capital account. In other words, the occupancy taxes collected would come into the lender's cash collateral, but no disbursements would be made to pay them. Upon information and belief, these were "trust fund" obligations, meaning that they were not the Debtors' property. That money belonged to various governments. The taxes were collected by the Debtors and held "in trust" for the benefit of taxing authorities. The lenders, however, knowingly expropriated the government's funds, held all cash and placed the Debtors in the position of wrongfully converting the government's funds to pay their lenders, all of which was pursuant to the agreements and documents executed in connection with the LBO.

165. Corporate overhead represented approximately 16% of the total property and corporate expenses of the Debtors in late 2007. Without any changes to the budget for 2008, the Debtors were about to experience significant cash flow constraints during a Cash Trap Event Period, which, under the pertinent loan agreements, would last for a minimum of six months. Further, during a Cash Trap Event Period, the Debtors would have had to fund corporate overhead and occupancy taxes from working capital, if any was available, as those expenses would not be paid through the Waterfall. These facts and circumstances were, or should have been, known to the Debtors and their principals, as well as to the Lenders.

### e. Despite the Debtors' Financial Distress, Improper Distributions Are Made to Equity Holders in 2007

166. The mortgage loan agreement provided that the Debt Yield, measured on a quarterly basis, had to be greater than 7.75% for equity distributions to be made. But other agreements entered into in connection with the LBO provided that the holders of Series A-1 preferred equity in the Debtors would receive their equity distributions regardless of the Debtors' financial condition, and regardless of whether those distributions were in violation of applicable law.

167.    On information and belief, although the first Debt Yield calculation should have been completed and reported in July 2007, and monthly thereafter, no such calculations was reported to the lenders at any point in 2007.  Had the Debtors' management performed an appropriate Debt Yield calculation in July 2007, that calculation would have shown that, immediately following the LBO's closing, the Debt Yield was 7.09%, compared to a requirement of 7.5% needed to avoid a Cash Trap Event in early 2008 and 7.75% for any equity distributions to be permitted.  The first calculation of the Debt Yield performed and reported to the lenders was in January 2008 for the 12 month period ending December 31, 2007. Foreseeably, the Debtors did not meet the minimum requirement of 7.75%.

168.    Notwithstanding the Debt Yield failure, the lack of any surplus, the Debtors' insolvency, and the future financial and operational declines that were or should have been foreseen by those running the Debtors at the time, the Debtors, directly or indirectly through affiliated entities, made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure totaling $8,835,000 to equity holders other than the A-1 Series Unit holders from June 11, 2007 through December 31, 2007:

**2007 Dividends or Distributions to A-2 and A-3 Series Units**

| Recipient | Date Paid | Amount |
|---|---|---|
| **Series A-2 Units** | | |
| PGRT ESH Inc. | 7/30/2007 | $1,067,000 |
| PGRT ESH Inc. | 8/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 9/27/2007 | $1,000,000 |
| PGRT ESH Inc. | 10/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 11/29/2007 | $1,000,000 |
| PGRT ESH Inc. | 12/28/2007 | $1,033,000 |
| **2007 A-2 Total** | | **$6,167,000** |
| | | |
| **Series A-3 Units** | | |
| Lightstone Holdings LLC | 8/31/2007 | $2,668,000 |
| **2007 A-3 Total** | | **$2,668,000** |

169.    In addition, during 2007 after the LBO closed, the Debtors made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure to the A-1 Series Unit holders, totaling approximately $13.1 million, in violation of the loan agreements and applicable law:

| RECIPIENT | DATE PAID | AMOUNT |
| --- | --- | --- |
| Arbor Commercial Mortgage LLC | 6/11/2007 | $233,333.33 |
| Polar Extended Stay USA L.P. | 7/13/2007 | $44,444.44 |
| Princeton ESH, LLC | 7/13/2007 | $44,444.44 |
| Arbor Commercial Mortgage LLC | 7/13/2007 | $1,661,111.11 |
| Polar Extended Stay USA L.P. | 7/26/2007 | $18,888.89 |
| Princeton ESH, LLC | 7/26/2007 | $18,888.89 |
| Arbor Commercial Mortgage LLC | 7/26/2007 | $358,888.89 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | $713,333.33 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | $20,000.00 |
| Polar Extended Stay USA L.P. | 8/15/2007 | $93,333.33 |
| Princeton ESH, LLC | 8/15/2007 | $93,333.33 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | $1,250,000.00* |
| Arbor Commercial Mortgage LLC | 9/17/2007 | $713,333.33 |
| Polar Extended Stay USA L.P. | 9/17/2007 | $103,333.33 |
| Princeton ESH, LLC | 9/17/2007 | $103,333.33 |
| Arbor Commercial Mortgage LLC | 9/17/2007 | $1,250,000.00* |
| Arbor Commercial Mortgage LLC | 10/15/2007 | $450,000.00 |
| Glida One LLC | 10/15/2007 | $550,000.00 |
| Polar Extended Stay USA L.P. | 10/15/2007 | $100,000.00 |
| Princeton ESH, LLC | 10/15/2007 | $100,000.00 |
| Arbor Commercial Mortgage LLC | 10/15/2007 | $900,000.00* |
| Arbor Commercial Mortgage LLC | 11/15/2007 | $495,000.00 |
| Glida One LLC | 11/15/2007 | $568,333.33 |
| Polar Extended Stay USA L.P. | 11/13/2007 | $103,333.33 |
| Princeton ESH, LLC | 11/15/2007 | $103,333.33 |
| Arbor Commercial Mortgage LLC | 11/15/2007 | $900,000.00* |
| Arbor Commercial Mortgage LLC | 12/17/2007 | $450,000.00 |
| Glida One LLC | 12/17/2007 | $550,000.00 |
| Polar Extended Stay USA L.P. | 12/17/2007 | $100,000.00 |
| Princeton ESH, LLC | 12/17/2007 | $100,000.00 |
| Arbor Commercial Mortgage LLC | 12/17/2007 | $900,000.00* |
| **2007 A-1 Total** | | **$13,089,999.96** |

Transfers marked with an asterisk above were sent to Arbor Commercial Mortgage LLC from the Cash Management Account, by ESA P Portfolio Operating Lessee Inc. fbo BHAC Capital

IV, LLC.

170.     Also, (i) on July 17, 2007, DL-DW received a wire transfer from an LBO closing account totaling approximately $77,366,984, which amount, upon information and belief, represented an apparent "overfunding" of an LBO closing account., and (ii) on October 17, 2007, a post-LBO "purchase price adjustment" resulted in a $2,342,000 payment from Blackstone to DL-DW.  Notwithstanding the fact that the LBO purchase price had been funded and paid on behalf of DL-DW with borrowings by the Debtors, these funds were improperly distributed to equity holders instead of being turned over to the Debtors.  Upon information and belief, these amounts constituted additional improper value that was siphoned from the Debtors for DL-DW's and Lichtenstein's benefit at times when the Debtors were insolvent, inadequately capitalized and without adequate surplus.

**2.     The Debtors' Condition Further Deteriorates Throughout 2008, But Prohibited Equity Distributions Continue**

**a.     2008 Debt Yield Test and Formal Cash Trap Event**

171.     The first Debt Yield calculation reported to the lenders was provided to the lenders on January 21, 2008 for the period ending December 31, 2007. As alleged above, since the calculation reflected that the Debtors did not meet the minimum Debt Yield of 7.5% at that time, both a Debt Yield Event and a Cash Trap Event were triggered. Therefore, as of February 2008, any unallocated cash available after the Waterfall had been satisfied on a monthly basis was "trapped" by the lenders in a restricted cash collateral account. The fact that cash was now "trapped" put significant strain on the Debtors, and required the use of over $27 Million from a working capital reserve account in order to keep the Debtors temporarily afloat.

172.     In addition, in November 2007, the Debtors' projections reflected that the Debt Yield could not be maintained above the cure amount of 7.6% for a period of six months in order

to eliminate the Cash Trap and reinstate the opportunity to receive any unallocated cash available after the Waterfall had been satisfied on a monthly basis.

### b. March 2008: The 9.15% Notes Become Due

173.    On March 15, 2008, the 9.15% Notes matured and the principal balance of $30.9 million, together with accrued interest of approximately $1.4 million, came due. The Debtors failed to pay those amounts when due, and a default was declared by the trustee for the noteholders, on March 24, 2008.

174.    On April 16, 2008, DL-DW secured a $22 million "loan" from affiliated investors in the Debtors.  All of the affiliated investors were insiders of the Debtors.  This new $22 million loan, together with additional funds from DL-DW, were used to pay off the matured 9.15% Notes.  But the new insider loan came with onerous terms: it was guaranteed by BHAC Capital, secured by the valuable LIBOR Floor Certificates owned by DL-DW, which should have been property of the Debtors.  Though the "loan" was therefore well collateralized, it nevertheless accrued interest at an annual rate of 25%.  The "loan" was to mature on May 1, 2011 (the "25% Note").  The following table is a summary of the insider "lenders" and participation in the 25% Note:

### Insiders' Interests in the 25% Note

| Lender | Affiliate Relation | Participation | Amount |
|---|---|---|---|
| ABT-ESI LLC | Arbor | Lead Lender / Servicer | $5,225,000 |
| Park Avenue Funding | Lichtenstein | Co-Lender | $11,000,000 |
| Princeton ESH LLC | Princeton | Co-Lender | $550,000 |
| Mericash Funding LLC | Joseph Chetrit | Co-Lender | $5,225,000 |
| **Total** | | | **$22,000,000** |

175.    Arbor, Lichtenstein, Princeton and Joseph Chetrit, a direct or indirect owner or member of senior management of certain entities with ownership interests in the Debtors ("Chetrit") structured this transaction as a "loan" with onerous terms to benefit themselves to the

Debtors' detriment, even though they should have put the funds into the Debtors as equity at the time the LBO closed so as to pay off the 9.15% Notes at that time, as had been originally contemplated.

176.    Concurrently with the execution of the 25% Note on April 16, 2008, the Debtors paid off the $31 million outstanding principal balance of the 9.15% Notes, together with the accrued interest of approximately $1.7 million and $100,000 of professional fees. The total payments of approximately $33 million were made using (a) the proceeds from the 25% Note of $22 million; plus (b) approximately $10.6 million of additional funds from DL-DW.  The Debtors accounted for activities related to the repayment of the 9.15% Notes and the securing of the 25% Note by recording the $22 million as additional "paid in capital" on the Debtors' books, with a corresponding intercompany note payable to DL-DW of approximately $10.6 million.

177.    DL-DW pledged the LIBOR Floor Certificates to the lenders of the 25% Note. The income generated from the LIBOR Floor Certificates went directly to make all interest and principal payments on the 25% Note, rather than DL-DW making payments separately.  The maximum monthly principal repayment under the 25% Note was $416,666.  Because cash income from the LIBOR Floor Certificates was greater than the principal and interest payments due (or even allowable) on the 25% Note, the excess income from the LIBOR Floor Certificates was deposited into a reserve bank account for the benefit of BHAC Capital Series A-1 Unitholders ("Floor Bonds Reserve Account"). As of December 31, 2008,  $3.3 million of the principal on the 25% Note had been repaid in this fashion, leaving a remaining principal balance outstanding of $18.7 million, and an additional $3.6 million had been paid during 2008 as interest.  Despite these payments, the Floor Bonds Reserve Account contained a balance of $2.1 million as of December 31, 2008.

### c. The Debtors' Proposed 2008 Annual Budget

178.    The Debtors had submitted a proposed 2008 annual budget for approval by the lenders in early December of 2007. The pertinent lenders objected to certain aspects of that proposed annual budget, including (a) certain revenue projections in light of the then-current economic climate and poor outlook for the industry; (b) proposed one-time capital expenditure expenses or corporate overhead costs that did not constitute property-level operating expenses; and (c) other costs that were not explained by the Debtors.  The Debtors then conducted discussions with the lenders regarding the objections.

179.    While those discussions were ongoing, the lenders continued to use the 2007 approved annual budget when administering the Waterfall throughout early 2008. This created additional financial strain on the Debtors, as funding for certain operating costs was not available through the Waterfall (e.g., reservation system, occupancy taxes, as described above), and the amounts disbursed were to the Debtors were lower than what was needed at the time to pay operating expenses.

180.    On April 16, 2008, certain issues relating to the 2008 annual budget were resolved.  As a result, the Debtors received some of the cash to which they should have been entitled dating back to January 1, 2008.  However, no provision was made to repair the damage caused to the Debtors during the latter half of 2007, when the Debtors were forced to operate under the 2007 approved annual budget of which the Debtors had never been provided a copy. Thus, the Debtors' cash problems were far from solved, and the Debtors and their principals knew or should have known it.  In fact, on May 1, 2008, after the 2008 annual budget had been approved, Lichtenstein himself remarked that vendor payments were being delayed and that "its demoralizing for the staff to have to be dodging vendors and local tax authorities who want their payments."

181.     On April 15, 2008, in exchange for the concessions granted by the lenders to facilitate budgeting of operating expenses, an amendment to the mortgage loan agreement was executed (the "Mortgage Loan Second Amendment"). The Mortgage Loan Second Amendment was between the same parties to the mortgage loan, except that by that time the original mortgage lenders had transferred their interest to Wachovia Bank Commercial Mortgage Trust in connection with the post-LBO securitization of the mortgage loan debt through CMBS.

182.     The Mortgage Loan Second Amendment added a new Section 5.2.14 to the original mortgage loan agreement, which contained extensive restrictions on the mortgage borrowers' use of income, cash, fees, proceeds, property or revenue from the mortgaged hotels (including disbursements to the mortgage borrowers of excess cash flow under the Cash Management Agreement) ("Restricted Excess Cash Flow").  The new Section 5.2.14 prohibited the mortgage borrowers' distribution of Restricted Excess Cash Flow except in limited circumstances.

183.     The Debtors finally retained both Weil Gotshal & Manges ("Weil") and Lazard Freres ("Lazard") in or around early 2008 as restructuring and insolvency professionals to assist with efforts to restructure the Debtors' suffocating LBO debt structure.

> **d.     As Events Unfold, the Debtors' Financial Condition Worsens and Liquidity Problems Become More Acute**

184.     As conditions worsened into the latter part of 2008, in part as a result of the Great Recession, the softening of room demand experienced by the Debtors in 2007 continued into early 2008. OCC decreased again, the extended-stay industry as a whole generally experienced ADR increase in the first half of 2008, however, overall supply in the industry increased at rates far exceeding only modest increases in demand.  The 2008 approved annual budget was not finalized until April 2008, and the Debtors were operating in a Cash Trap Event Period.  All of

these factors, among others, had a severe impact on the Debtors' liquidity.

185.    In the first quarter of 2008, liquidity became more constrained.  In January of 2008, the Debtors were required to transfer $8.1 million from their main operating account to the Cash Management Account to cover a shortfall in the Waterfall and ensure that certain obligations were met, including interest payments on the Mezzanine Loans. Consequently, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2008 decreased to $42 million from $52.4 million as of December 31, 2007.

186.    In the second quarter of 2008, OCC and RevPAR declined further. An "Audit Update" included in the May 15, 2008 board of directors package noted that: (a) debt waivers were required; and (b) significant liquidity concerns had to be addressed for audit issuance.  In addition, a cash flow forecast prepared by the Debtors predicted that the effect of LIBOR rates would significantly impact liquidity, such that cash at year end was projected to range from $19.5 million to $49.8 million, at best, depending on the LIBOR rates assumed.

187.    In fact, the Debtors' principals knew or should have known that the Debtors could be completely out of cash as soon as January 2009. The Company also anticipated that it would not meet certain Debt Yield amortization avoidance thresholds by June 2009, thereby triggering a requirement that the Debtors make amortization payments to the lenders, estimated at $51 million for 2009. This increase in anticipated cash needs when the Debtors' financial condition was rapidly declining caused the Debtors serious concern, as (i) all cash flows were subject to a Cash Trap and the Debtors were not projected to achieve a Debt Yield cure in 2008 or 2009, (ii) the Debtors would have difficulty obtaining an unqualified audit opinion at the end of 2008, which could result in a default under the pertinent LBO loan agreements, and (iii) approval of the 2009 proposed annual budget posed critical challenges given the questions raised by certain of

the lenders with respect to the annual budget in late-2007 and early-2008.

188.    In the third quarter of 2008, RevPAR decreased again, and was lower than the Debtors' budget for that time.  In the fourth quarter of 2008, ADR and OCC continued to decline, and RevPAR performance was far off of budgeted projections. As a result, fourth quarter 2008 revenue and property-level EBITDA performance had double-digit declines over the prior year.  By the end of 2008, the Debtors' total revenue and EBITDA had also dramatically declined.

189.    As a result of these financial difficulties, the Debtors' liquidity continued to deteriorate, and by December 31, 2008 the general ledger balance of cash available to fund operations had slipped to $26.5 million.

    e.    **Dividends and Distributions to Equity Holders Continue in 2008, Despite the Debtors' Financial Distress**

190.    Notwithstanding the face of the Debtors' precipitous financial and operational declines, the Debtors, directly or indirectly through affiliated entities, made the following substantial cash distributions directly, or indirectly through other entities in the Debtors' corporate structure, to equity holders or equity holders' affiliates, in violation of the loan agreements and applicable law:

**2008 Improper Equity and Related Distributions**

| RECIPIENT | DATE PAID | AMOUNT |
|---|---|---|
| Arbor Commercial Mortgage LLC & Ron Invest LLC | 1/15/2008 | $262,500.00 |
| Glida One LLC | 1/15/2008 | $473,611.11 |
| Polar Extended Stay USA L.P. | 1/15/2008 | $86,111.11 |
| Princeton ESH, LLC | 1/15/2008 | $86,111.11 |
| Arbor Commercial Mortgage LLC | 1/11/2008 | $900,000.00 |
| Arbor Commercial Mortgage LLC | 2/20/2008 | $1,808,333.33 |
| Arbor Commercial Mortgage LLC | 3/17/2008 | $241,865.08 |
| Ron Invest LLC | 3/17/2008 | $42,063.49 |
| Glida One LLC | 3/17/2008 | $115,674.61 |
| Polar Extended Stay USA L.P. | 3/17/2008 | $21,031.75 |
| Princeton ESH, LLC | 3/17/2008 | $21,031.75 |
| Arbor Commercial Mortgage LLC | 3/12/2008 | $684,523.81 |

| | | |
|---|---|---|
| Ron Invest LLC | 3/12/2008 | $119,047.62 |
| Glida One LLC | 3/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 3/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 3/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 4/15/2008 | $305,753.97 |
| Ron Invest LLC | 4/15/2008 | $53,174.60 |
| Glida One LLC | 4/15/2008 | $146,230.16 |
| Polar Extended Stay USA L.P. | 4/15/2008 | $26,587.30 |
| Princeton ESH, LLC | 4/15/2008 | $26,587.30 |
| Arbor Commercial Mortgage LLC | 4/11/2008 | $684,523.81 |
| Ron Invest LLC | 4/11/2008 | $119,047.62 |
| Glida One LLC | 4/11/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 4/11/2008 | $59,523.81 |
| Princeton ESH, LLC | 4/11/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 5/15/2008 | $500,000.00 |
| Arbor Commercial Mortgage LLC | 5/12/2008 | $684,523.81 |
| Ron Invest LLC | 5/12/2008 | $119,047.62 |
| Glida One LLC | 5/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 5/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 5/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | $27,418.63 |
| Ron Invest LLC | 6/16/2008 | $4,768.45 |
| Glida One LLC | 6/16/2008 | $13,113.26 |
| Polar Extended Stay USA L.P. | 6/16/2008 | $2,384.23 |
| Princeton ESH, LLC | 6/16/2008 | $2,384.23 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | $508,264.53 |
| Arbor Commercial Mortgage LLC | 6/12/2008 | $684,523.81 |
| Ron Invest LLC | 6/12/2008 | $119,047.62 |
| Glida One LLC | 6/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 6/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 6/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 7/15/2008 | $500,000.00 |
| Arbor Commercial Mortgage LLC | 7/11/2008 | $684,523.81 |
| Ron Invest LLC | 7/11/2008 | $119,047.62 |
| Glida One LLC | 7/11/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 7/11/2008 | $59,523.81 |
| Princeton ESH, LLC | 7/11/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 8/15/2008 | $558,333.33 |
| Arbor Commercial Mortgage LLC | 8/12/2008 | $684,523.81 |
| Ron Invest LLC | 8/12/2008 | $119,047.62 |
| Glida One LLC | 8/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 8/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 8/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 9/15/2008 | $558,333.33 |
| Arbor Commercial Mortgage LLC | 9/12/2008 | $684,523.81 |
| Ron Invest LLC | 9/12/2008 | $119,047.62 |
| Glida One LLC | 9/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 9/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 9/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 10/15/2008 | $500,000.00 |
| Arbor Commercial Mortgage LLC | 10/10/2008 | $684,523.81 |
| Ron Invest LLC | 10/10/2008 | $119,047.62 |
| Glida One LLC | 10/10/2008 | $327,380.95 |

| Polar Extended Stay USA L.P. | 10/10/2008 | $59,523.81 |
| Princeton ESH, LLC | 10/10/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 11/17/2008 | $558,333.33 |
| Arbor Commercial Mortgage LLC | 11/12/2008 | $684,523.81 |
| Ron Invest LLC | 11/12/2008 | $119,047.62 |
| Glida One LLC | 11/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 11/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 11/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 12/18/2008 | $1,750,000.00 |
| **2008 A-1 Total** | | **$21,349,999.99** |

191.    In early December of 2008, the Debtors submitted for the lenders' approval a proposed 2009 annual budget that assumed a significant decline in room revenues, and property-level EBITDA. At this point, the Debtors were simply trying to "stay[] alive for another few weeks," as Lichtenstein later stated. At a board meeting held on December 16, 2008, Chetrit suggested that there be "staff reduction[s] of hours . . . and that staff should be asked for a 20% reduction to make a significant impact upon cash flow." Upon information and belief, this suggestion was made in order to increase cash available to continue improper distributions to equity holders, including entities owned or controlled by Chetrit, all to the detriment of the Debtors.

192.    Although the Debtors passed a resolution stopping equity distributions in late-2008 in light of the financial and liquidity crises, improper distributions to equity actually continued even after that resolution from a so-called "Preferred Equity Holder Reserve Account" that had been created at the LBO's closing and was "security" for certain equity holders. The Preferred Equity Holder Reserve Account was funded with $20 million of the Debtors' funds at the LBO's closing, and certain equity holders could instruct that distributions be made from that reserve account to them. If the account was used for such distributions, then BHAC Capital, using the Debtors' cash, was required to replenish the reserve back up to $20 million. The following table represents the distributions from the preferred equity reserve account to an Arbor

affiliate *following* the November 13, 2008 board of directors meeting at which equity distributions were resolved to be stopped:

**Summary of Improper Distributions from the Preferred Equity Reserve Account**

| 12/18/2008 | Arbor Commercial Mortgage LLC | $1,750,000 |
|---|---|---|
| 1/20/2009 | Arbor Commercial Mortgage LLC | $1,808,333 |
| 2/20/2009 | Arbor Commercial Mortgage LLC | $1,808,333 |
| 3/11/2009 | Arbor Commercial Mortgage LLC | $15,178,971 |
| **Total** | | **$20,545,637** |

Eventually, in March 2009, as the Debtors continued their downward spiral, the Preferred Equity Reserve Account was liquidated and the balance was wired to the A-1 Series unit holders, as shown above.

193.    From the LBO's closing through the date the Preferred Equity Reserve Account was liquidated and given to the A-1 series unit holders, a total of no less than $100 million was improperly distributed to equity holders during periods of tremendous financial and liquidity stress.

194.    In addition to those amounts, upon information and belief, Lightstone received so-called "asset management fees" throughout that same period totaling approximately $1 million per year. This occurred even though Lightstone was not the Debtors' management company and HVM managed all aspects of the Debtors' daily operations.

195.    Before the LBO's closing, HVM and HVM Canada provided the operational, management, and administrative functions for all of the Extended Stay hotels. After the LBO's closing, all Extended Stay hotels continued to be managed by HVM, except for three properties in Canada, which were operated by HVM Canada. HVM's management fee arrangement was

different from the industry practice, and provided significantly higher management fees than those typically seen in the industry. In spite of the substantial fees being paid to HVM and HVM's management of all aspects of the Debtors' day-to-day business, Lightstone (i.e. Lichtenstein) received management fees after the LBO totaling approximately $1 million per year, for doing nothing. Moreover, HVM was managed by an entity known as "HVM Manager," which was itself owned and managed by Lichtenstein, HVM Manager's sole member.

### 3.    2009 Post-LBO Performance through the Bankruptcy Filing Date

#### a.    Shortfalls in the Waterfall Are Experienced

196.    Conditions worsened in the latter part of 2008, in part as a result of the Greant Recession. Moreover, as a result of declining performance in December 2008 and January 2009, the receipts transferred to the Waterfall were not sufficient to cover the interest due on the mezzanine debt in January 2009. Consequently, the Debtors were forced to transfer $5.9 million from their main operating account to the Cash Management Account to cover the shortfall. Only $19 million was distributed from the Cash Management Account to the Debtors for budgeted operating expenses in January 2009. This was the lowest monthly amount distributed to the Debtors since the LBO's closing. From mid December 2008 to late March 2009, the Debtors were forced to fund occupancy taxes and other expenses totaling approximately $20 million out of cash reserve account.

#### b.    Insider Obligations Are Paid In Full

197.    In February 2009, the Debtors' advisors issued a memorandum to the Debtors' independent directors regarding the deteriorating liquidity situation, and on March 11, 2009, the boards of directors of DL-DW, BHAC, Homestead, and ESI met to discuss the insider 25% Note. Joseph Teichman ("Teichman"), the Secretary and General Counsel of the Debtors, inexplicably informed the Boards that the 25% Note needed to be refinanced, even though it was

not scheduled to mature until May 1, 2011, and thus should not have been considered a pressing issue at the time, and proposed that the 25% Note be paid off by transferring the LIBOR Floor Certificates (which had been stolen from the Debtors by DL-DW) to the holders of the 25% Note. That same day, the boards approved this proposed transaction.

198.    On March 12, 2009, one day later, the so-called "Floor Bonds Agreement" was executed, pursuant to which the LIBOR Floor Certificates were assigned to ABT, as lead lender under the insider 25% Note. In connection with that agreement, all insider note interests (including those held by Lightstone Commercial, as successor by transfer to the interests originally possessed by Park Avenue) were contributed by the other 25% Note lenders to ABT. ABT was simultaneously restructured so that each of the other lenders became owners of ABT in proportion to their respective rights and interests in the 25% Note. Similarly, as part of the deal, the Series A-1 equity holders waived their rights to the $4,817,986 balance of the so-called "Floor Bonds Reserve Account," and the entire balance was required to be wire transferred to an account designated by Lightstone Commercial, which was to receive a Form 1099 in respect of this distribution.

199.    At the time the Floor Bonds Agreement was executed, the outstanding principal balance on the 25% Note was $17,416,674. The Floor Bonds Reserve Account then contained a balance of $4,817,986. The LIBOR Floor Certificates, which had apparently brought in at least $13 million in less than a year, were assigned an artificial value of $17,416,674, exactly equal to the balance of the 25% Note. Upon information and belief, the actual value of the LIBOR Floor Certificates was significantly greater.

200.    The LIBOR Floor Certificates were therefore transferred to pay the 25% Note, and the Floor Bonds Reserve Account was emptied to make a separate payment to Lightstone

Commercial. In short, the valuable LIBOR Floor Certificates that should have belonged to the Debtors were transferred to DL-DW for no consideration, and then to insiders as ostensible repayment for the $22 million loan to DL-DW. The remaining accumulated proceeds of the LIBOR Floor Certificates that had not been previously transferred to the insiders as payments on the $22 million loan, were diverted to insider Lightstone Commercial. Insiders were thus paid richly as the Debtors moved toward their inevitable bankruptcy. As described more fully below, bankruptcy was delayed for just over ninety days after the 25% Note was paid off, thus allowing the ninety-day preference period under the federal Bankruptcy Code to expire.

### c. 2009: Performance Worsens

201. During the first and second quarters of 2009, the Debtors experienced steep declines in ADR, OCC, room revenue and property-level EBITDA. As a result, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2009 decreased to only approximately $16.2 million, from approximately $26.5 million as of December 31, 2008.

202. In the second quarter of 2009, the Debtors continued capital expenditure freezes and instituted hiring freezes related to all full-time and part-time personnel. As the liquidity situation worsened, the Debtors' officers and directors at the time discussed actions to conserve cash. For example, in April of 2009, the board of directors of the "Extended Stay Hotels family of companies" discussed that vendor payments were being stretched to conserve cash. On April 30, 2009 the Debtors' outstanding accounts payable balance over 60 days old of $1.3 million was more than 10% of the total accounts payable balance of approximately $11 million, the highest percentage since the LBO.

203. By no later than May 14, 2009, the board was aware that the Debtors might not have enough unrestricted cash to fund operations through the end of May 2009. Further, the

Debtors' declining cash position was expected to be exacerbated by the pending amortization triggered by the anticipated breach of the Debt Yield amortization threshold covenant, as described above. These additional payments would have to be funded through the Cash Management Account beginning with the June 13, 2009 Waterfall cycle. Although restructuring alternatives were discussed by the board, none identified how, in the absence of a restructuring or bankruptcy, the Debtors might obtain the funds needed to make the upcoming Debt Yield amortization payments, which would total over $50 million for the remainder of 2009.

204.    As of May 31, 2009, the general ledger cash balance available to fund operating expenses had dropped to approximately $4.6 million, down from approximately $26.5 million as of December 31, 2008. In addition, the Debtors were incurring extensive restructuring expenses. In June 2009, as a result of the severe liquidity situation and the imminent amortization payments, the Debtors were projected to completely deplete liquidity by the end of June 2009, and would be unable to meet payroll of approximately $9 million on Tuesday, June 19, 2009.

## G.    The Failed Workout Negotiations

### 1.    Initial Mortgage Debt Workout Negotiations

205.    Immediately after the November 13, 2008 meeting of the Debtors' board of directors, Lazard began attempts to engage the Debtors' mortgage debt certificate holders (the "Certificate Holders") in workout discussions. Those discussions were far too little, far too late, as the Debtors were telling third parties – e.g., Centerbridge – even prior to the November 13, 2008 board meeting that the debtors had to have a restructuring plan in place by the end of 2008.

206.    In connection with early-2009 restructuring efforts, meetings were held with Centerbridge, its financial advisor, Houlihan Lokey ("Houlihan"), and Centerbridge's counsel, Fried Frank Harris Shriver & Jacobson LLP ("Fried Frank"), each of which were representing some of the Certificate Holders. In January 2009, the Debtors agreed to pay certain fees and

expenses incurred by Fried Frank and Houlihan.

207.    In late-January 2009, Fried Frank presented a restructuring proposal ("Fried Frank January Proposal") to the Debtors that contemplated a comprehensive restructuring of the Debtors in connection with a chapter 11 bankruptcy filing.   With respect to Lichtenstein's guarantees, the Fried Frank January Proposal provided that the parties were to discuss the satisfaction of his obligations in connection with a chapter 11 filing and that there was a possibility for a limited recourse indemnity in the form of the issuance of common stock to Lichtenstein in the post-chapter 11 corporate entity.

208.    Throughout the first quarter of 2009, the Debtors exchanged restructuring proposals with their various lender groups.   Those proposals generally proposed to (i) give the beneficial owners of the LBO mortgage debt a combination of reduced secured debt plus a mezzanine portion, (ii) give the mezzanine debt holders equity in exchange for their debt, and (iii) replace existing equity with reorganized equity and warrants; and (4) grant existing equity holders releases and indemnities from all guarantees.   Further, the Debtors' proposals generally assumed the reinstatement of the existing capital lease (involving the properties owned by Lichtenstein), and the negotiation of a satisfactory cash collateral agreement that provided sufficient cash to fund the Debtors' 2009 business plan (whether in or out of chapter 11). Although the Debtors' proposals sought substantial concessions from, in essence, the Certificate Holders that were the beneficiaries of the debt, most of those persons were never provided with the proposals themselves.

### 2.    Mezzanine Debt Negotiations

209.    In February 2009, Lazard sent a restructuring proposal (the "February 2009 Mezzanine Proposal") to Fortress Investment Group, LLC, direct or indirect owner of the junior-most tranche of the mezzanine debt, and others.   Under the February 2009 Mezzanine Proposal,

the Debtors proposed to (1) reinstate the $4.1 billion mortgage loan on its existing terms, (2) replace the $3.3 billion in mezzanine debt with a combination of mezzanine debt and equity; (3) replace existing equity with a combination of mezzanine debt and equity; and (4) grant equity holders releases from all existing guarantees, including Lichtenstein, from personal guarantees. The February 2009 Mezzanine Proposal required approval of 100% of the Mezzanine Lenders. As with the January 2009 proposals to the mortgage holders, Lazard never received a formal response.

### 3. "Conveyance-in-Lieu" Transaction Negotiations and the Trade Payables Default

210. In late January and early February 2009, the Company began discussions with a subset of the senior mezzanine lenders (collectively, the "Mezz B-E Lenders"). These lenders together held, at a minimum, all of the mezzanine debt in tranches B-E, totaling approximately $1.6 billion of the total $3.3 billion of Mezzanine Debt. After exchanging several draft term sheets, on April 20, 2009, Lichtenstein and Ivan Kaufman of Arbor Realty Trust, Inc., among others, met with representatives of the Mezz B-E Lenders regarding what would later come to be commonly referred to as the "CIL Transaction." Over the course of the next few weeks, several drafts of the documents governing the CIL Transaction were exchanged. On May 14, 2009, the Debtors' board of directors voted in favor of the resolution approving execution of an agreement permitting the consummation of the CIL Transaction.

211. On May 19, 2009, an "agreement" by and between certain Mezzanine Borrowers and lenders, and Lichtenstein, Lightstone, Homestead, and ESI as guarantors, was executed, providing, among other things, that the parties would, upon the occurrence of certain necessary conditions precedent, consummate the CIL Transaction. At a meeting of the board of the Debtors held the next day, Lichtenstein represented that the deal was "far superior for the Company than

any deal that was available with the mortgage lenders."

212. Also on May 19, 2009, the lenders ("Mezzanine B Lenders") under the mezzanine B loan ("Mezzanine B Loan") declared an event of default because a Debtor borrower had failed to maintain its special purpose entity status by failing to pay, within the permissible time period prescribed in the Mezzanine B Loan, approximately $3.5 million in trade payables ("Trade Payables Default"). The Mezzanine B Lenders alleged that the borrower under the Mezzanine B Loan failed to comply with the requirement that ordinary course of liabilities not be permitted to remain unpaid longer than sixty (60) days past the date they were incurred with respect to the $3.5 million in trade payables. The Trade Payables Default was the death knell to any attempts to consummate the CIL Transaction, and the Debtors' directors or officers at the time knew it.

213. After the LBO closed in June 2007, there always had been payables that were greater than 60 days outstanding. Thus, there likely had been a continuing Trade Payables Default since the closing of the LBO. On a monthly basis, however, Rogers signed certificates certifying that the representations and warranties of the borrower under the Mezzanine B Loan (and all of the other Mezzanine Loans and the mortgage loan) were true and correct as of the date of the certificate. These monthly certificates were inaccurate in light of the Trade Payables Default and the fact that such a default had been ongoing since the day the LBO closed.

214. Actions were then instituted by third parties in two separate courts seeking to enjoin the consummation of the CIL Transaction. Temporary restraining orders were entered in each action that brought a halt to attempts to consummate the CIL Transaction.

215. On May 12, 2009, Centerbridge and others contacted Wachovia about the following defaults under the mortgage loan agreement: (i) the debtors' failure to deliver timely audited financial statements, (ii) the debtors' failure to deliver a fully compliant monthly

officer's certificate, (iii) the Debtors' failure to obtain an unqualified opinion of a "Big Four" accounting firm, and (iv) the Debtors' failure to maintain SPE status. These defaults were incurable, so the Debtors' directors or officers at the time therefore knew or should have known that the Debtors could not exercise an option to extend the mortgage loan in June 2009 provided for in the mortgage loan agreement and could not continue to operate without a chapter 11 filing. Nevertheless, they delayed filing bankruptcy.

216. On May 15, 2009, Lazard received a restructuring proposal from, among others, Centerbridge. Drafts of that proposal were exchanged through the remainder of May and into June 2009. Throughout this time, Centerbridge, among others, continued to put pressure on the Debtors to file for chapter 11 protection and to cease efforts to carry out the CIL Transaction.

**4.  The Debtors File for Chapter 11 Protection Two Years and Four Days After the LBO's Closing, Just Over Ninety Days After Paying Off Insider Debt and a Group of Investors Including Blackstone "Re-Acquires" the Debtors for $3.9 Billion.**

217. Shortly after the June 11, 2009 two-year anniversary of the closing of the LBO, and after months of failed workout negotiations, the Debtors had to report whether the Debt Yield for 2009 was below the Debt Yield amortization threshold. If so, the borrowers were going to be liable for the payment of additional monthly amortization payments estimated to total as much as $51 million for the remainder of 2009. Given the Debtors' cash flow at the time, those amortization payments could not be made.

218. In addition, a significant interest payment was due to be made to the Mezzanine Lenders as soon as Friday, June 12, 2009. If that payment was made, then (i) the Debtors would be unable to survive the upcoming week, when payroll was due, and (ii) the Debtors would not have access to those funds as cash collateral in a chapter 11 case.

219. The only way to avoid these issues was to file for chapter 11 bankruptcy

protection. However, the first group of the Debtors' chapter 11 cases were filed on Monday, June 15, 2009, two years and four days after the LBO closed on June 11, 2007, and ninety-three days after paying off the insider 25% Note in full.

220.    Upon information and belief, at least part of senior management's motivation in 2009 for delaying the inevitable bankruptcy filings was to (i) do so after the statute of limitations under 11 U.S.C. § 548 expired and the ninety day preference look-back period ran  and (ii) give equity holders as much time as possible to consummate a restructuring transaction that preserved at least some of their equity in the Debtors and, more importantly, extricated equity holders from their significant guarantee obligations under the LBO debt.

221.    During the Debtors' bankruptcy cases, a group of investors including Blackstone Group, Paulsen & Co. and Centerbridge "re-acquired" the Debtors for $3.9 billion, substantially less than the total amount of crushing debt the Debtors were caused to incur in the LBO for Blackstone's benefit prior to the bankruptcy.   The post-bankruptcy transaction involving Blackstone was announced on or about April 2, 2010 and subsequently approved by the Bankruptcy Court as part of the Debtors' Plan on July 20, 2010.

## THE TRANSFERS

**H.    Transfers and Obligations at Issue in This Action.**

222.    The following are the transfers that this Complaint seeks to avoid.

**1.    The Mezzanine Transfers**

223.    **Incurrence of Obligations to the Mezzanine Lenders.**  At the closing of the LBO, the Debtors collectively incurred $3,300,000,000 of obligations to the Mezzanine Lenders, including the Mezzanine Co-Lender Defendant.  The Mezzanine Loans represented an increase of $905,321,173 over the mezzanine debt previously held by the Debtors, and they came with more onerous terms and with no additional benefit whatsoever to the Debtors.   The Trustee

seeks to avoid the incurrence of each of the Mezzanine Loan obligations to the Mezzanine Lenders.

224. **Transfer of Liens and Interests to the Mezzanine Lenders.** The Mezzanine Co-Lender Defendant received at the closing of the ten Mezzanine Loans, pledges of stock, and security interests in specified funds and accounts of the respective Mezzanine Borrowers. (collectively, the "Mezzanine Security Transfers"), which the Trustee also seeks to avoid since they provided no benefit to the Debtors. These Mezzanine Security Transfers were also assigned to or used by all of the other Mezzanine Lenders.

225. **Closing Fees and Interest Transfers to the Mezzanine Lenders.** At the close of the LBO, the Mezzanine Co-Lender Defendant received payments (the "Closing Fees and Interest Transfers") by offset against their loan amounts, of fees and disbursements in connection with the LBO. On information and belief, some or all of these payments are in respect of the Mezzanine Loans and are recoverable herewith.

226. **Payments to the Mezzanine Lenders.** Following the close of the LBO, beginning in July of 2007, the Mezzanine Lenders received, directly or indirectly, regular monthly payments of interest on account of the Mezzanine Loans in accordance with their respective interests. A chart of the over $300 million in payments made on the Mezzanine Loans (the "Mezzanine Loan Payments" and, collectively with the incurrence of the Mezzanine Loan obligations, Mezzanine Security Transfers, and the Closing Fees and Interest Transfers, the "Mezzanine Transfers"), to the extent presently known to the Trustee, is attached as Exhibit A. All of those payments were made and received within two years before the Filing Date.

227. Beginning at least with the October 2007 payments, and, upon information and belief, shortly after the inception of the loan, all the Mezzanine Loan Payments were made by

cash swept from the operating hotel entities (none of which were Mezzanine Loan Borrowers) into the Cash Management Account. The Cash Management Account was held in the name of "ESA P Portfolio for the Benefit of Wachovia Bank" and Wachovia acted as agent for the account, controlling it on behalf of the securitization trust for the mortgage lenders. ESA P Portfolio, a Debtor, was a mortgage loan borrower but not a Mezzanine Loan Borrower.

228.     Pursuant to the Cash Management Agreement, Wachovia then reserved certain of the cash in bookkeeping subaccounts for the payment of the various levels of Mezzanine Loans. On information and belief, Wachovia then moved the cash from each Mezzanine Loan subaccount to a separate Wachovia account owned or controlled by the relevant Mezzanine Lenders. From there, payments were wired directly or indirectly to or for the benefit of each individual Mezzanine Lender in respect of its share of the relevant Mezzanine Loan. The Mezzanine Lenders were the direct or indirect recipients of the Mezzanine Loan Payments.

229.     As a result of the Cash Management Agreement requirements, the payments to the Mezzanine Lenders were made from cash contributed by entities who were not obligors under the Mezzanine Loans but who were nonetheless compelled by the effect of the collective transaction documents to actually pay those loans. These paying entities received no benefit from those payments. The payments are fraudulent transfers not only because the underlying obligations are avoidable (for the reasons set out below), but because the entities that actually paid the money did not even owe the obligation. The Debtors did not perform any entity level accounting in connection with these transfers; indeed, the Debtors apparently did not even have any entity-level accounting codes for the Mezzanine Borrowers.

230.     The final two months of Mezzanine Loan Payments were made in April and May of 2009, and the final year of Mezzanine Loan Payments were those made from July 2008

through May 2009, inclusive. These payments (the "90 Day Mezzanine Loan Payments" and the "One Year Mezzanine Loan Payments", respectively), are also set out on Exhibit A and were made by the same procedures. Pleading in the alternative, to the extent that the payments are treated as payments of a Debtor to its creditor, they are preferential.

231. The payments transferred from the Debtors to the Cash Management Account, that were actually used to make the Mezzanine Loan Payments, the 90 Day Mezzanine Loan Payments, or the One Year Mezzanine Loan Payments, are referred to as their "Predicate CMA Payments."

232. The respective shares of the subsequent interest holders in the Mezzanine Loans during the 2009 and, upon information and belief, for varying periods prior thereto, are set out on Exhibit B. These relative shares are not believed to have changed since at least December 16, 2008. The possible exception to this is Fortress, which held all of the interests in the Mezzanine J Loan throughout 2008 and earlier, but which at some point after December 16, 2008 had its interest foreclosed upon by JPMorgan Chase Bank NA as Administrator.

233. Initially, only the co-lenders on the Mezzanine Loans, including Wachovia Bank, N.A., were signatories to the Mezzanine Loans on the lenders' side, and were the sole payees on the Mezzanine note for each level. Ebury also became a co-lender on some or all of the Mezzanine Loans by amendments dated August 17, 2007 or November 12, 2007. Upon information and belief, the attached Exhibit H shows, among other things, the Mezzanine Lenders who were actual parties to the Mezzanine Loan agreements and the respective time periods in which they were parties. Consequently, even though other interests were participated out or otherwise transferred by contract from the entities shown on Exhibit H to other Mezzanine Lenders, the Debtors were not privy to those contracts and their debt obligations, and hence all

payments by the Debtors on the Mezzanine Loans were made to and for the benefit of the Mezzanine Lenders who were actual parties to the Mezzanine Loan agreements. Consequently, the Mezzanine Co-Lender Defendant together with other Defendants listed in Exhibit H are, upon information and belief, initial transferees of all of the Mezzanine Loan Payments or beneficiaries of the payments made during the period when they were parties, at least to the extent of their nominal interests in those loans.

234.     Pleading in the alternative, the Trustee seeks to hold each of the Mezzanine Lenders to be direct creditors of the Mezzanine Borrowers and direct payees of the Mezzanine Loan Payments from such time as each Mezzanine Lender established a relationship with a Debtor.   In either event, whether treated as initial or subsequent transferees, each of the Mezzanine Lenders are liable to the Debtors for all payments made directly or indirectly to them or for their benefit.

**I.     The Transfers Were Fraudulent Transfers**

235.     The LBO transactions, including the incurrence of the Mezzanine Debt and the Mezzanine Transfers (collectively, the "LBO Transfers" or the "Transfers") were made with the actual intent to hinder, delay or defraud some or all of the Debtors' then existing or future creditors, and are, therefore, subject to avoidance and recovery under §§ 544, 548, 550 and 551 of the Bankruptcy Code, and §§ 276, and 278-279 of the New York Debtor & Creditor Law. They also meet the criteria for constructive fraudulent transfers under §§ 544, 548, 550 and 551 of the Bankruptcy Code, §§ 273-275 and 278-279 of the New York Debtor & Creditor Law, and § 3304(a) & (b) of the Federal Debt Collection Procedure Act.

236.     The LBO was designed to use the assets of the Debtors to make payments to Blackstone and the Sellers and enrich the lenders at the risk and expense of the creditors of the Debtors.   These creditors included, but were not limited to, the lenders under the pre-existing

bond issues of ESI.  The highly complex structure of the LBO was expressly designed to make it as difficult as possible for any such creditors to make recoveries from the participants in the LBO in the likely event of the eventual financial collapse of Debtors.

237.    The lenders who initially took part in the LBO transaction expected to profit regardless of the fate of the Debtors: not only were they reaping rich fees for the initial deal, but they did not anticipate retaining much, if any, of the debt.  Instead, they promptly embarked on their plan of ridding themselves of the debt by securitizing and trying to sell the mortgage debt and selling participations in the Mezzanine Debt.  Regardless of the outcome for the now highly leveraged Debtors, the initial lenders, therefore, expected to profit.  Their sole miscalculation was that they were unable to find sufficient people who were willing to take the debt off their hands.

238.    All of the participants in the initial LBO knew, or should have known, that the transaction would leave the Debtors insolvent or with unreasonably small usable capital.  The cash flow projections of the Debtors that were necessary to prevent Cash Trap Events (and eventual amortization payments) were dependant on growth and on actions, such as the rebranding initiative, that were dependant on more capital than was actually accessible by Debtors.  The initial budget lacked such basic categories as payment of trust fund taxes and placed payment of Mezzanine Debt ahead of payment of the management fees on which the Debtors depended for every facet of their existence.  There was no provision for repayment of bond debt that would soon fall due and no reasonable prospect of obtaining additional loans for that purpose due to the high leverage.  The Debtors were deprived of a line of credit that previously had been available to smooth over cash flow issues.  The deal proceeded based upon greed alone.

239.  However bad the initial budget was, once a Cash Trap Event occurred, the Debtors would be so starved of cash that a financial plan that relied on achieving growth projections could be nothing more than fantasy.  Thereafter, however, unless the Debtors could grow their way out of the Cash Trap Event by meeting the necessary financial criteria for six months, the cash situation would become even worse because they would be obligated to make principal reduction payments on both the mortgage and Mezzanine Loans.  Nonetheless, once the LBO concluded, Debtors could not meet the criteria necessary to avoid a Cash Trap Event, and were never able to meet it again.  They were only temporarily saved by delayed reporting Although equity distributions continued, cash was actually "trapped" beginning February of 2008, which put a significant strain on the Debtors.  The Mezzanine Lenders, Lightstone, DL-DW, BHAC Capital, and Arbor were on notice, *i.e.*, knew or should have known, that the LBO transaction would and did render the Debtors insolvent.  At a minimum, the Mezzanine Lenders, Lightstone, DL-DW, BHAC Capital, and Arbor were reckless in not knowing, or reasonably should have known, that the transfers described above were fraudulent.

240.  The Debtors received nothing of value in exchange for the $749.4 million in increased mortgage debt and the $905.3 million in increased Mezzanine Debt that they incurred as a result of the LBO.  They exchanged their existing owner for another who had little or no experience in the hotel business and offered no prospect of any sort of benefits that could ever be likely to enhance the balance sheet.  The debt that they paid off was replaced with additional debt that was not only higher in amount, but was under more onerous restrictions that were likely to (and did) prevent adequate cash flow to keep the business operating as it should.  In short, the LBO was an unmitigated disaster for the Debtors for reasons that should have been obvious to all.

## COUNT I

### *Avoidance and Recovery of Preferential Transfers under §§ 547, 550 and 551 of the Bankruptcy Code against the Mezzanine Lenders*

241.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

242.     Each of the 90 Day Mezzanine Loan Payments and its Predicate CMA Payments were made within the ninety (90) day period prior to the Filing Date.

243.     The Mezzanine Lenders and, in the alternative, the recipient of the Predicate CMA Payments, were creditors of the Debtors within the meaning of § 101(10) of the Bankruptcy Code.

244.     Each of the 90 Day Mezzanine Loan Payments and its Predicate CMA Payments constituted a transfer of an interest of the Debtors in property within the meaning of §§ 101(54) and 547(b) of the Bankruptcy Code.

245.     Each of the 90 Day Mezzanine Loan Payments and its Predicate CMA Payments were made to or for the benefit of the Mezzanine Lenders.

246.     Each of the 90 Day Mezzanine Loan Payments and its Predicate CMA Payments were made for or on account of an antecedent debt owed by the Debtors before such transfers were made.

247.     Each of the 90 Day Mezzanine Loan Payments and its Predicate CMA Payments were made while the Debtors were insolvent.

248.     Each of the 90 Day Mezzanine Loan Payments and its Predicate CMA Payments enabled the Mezzanine Lenders to receive more than they would receive if:

  a.  This case was a case under chapter 7 of the Bankruptcy Code;

  b.  The 90 Day Mezzanine Loan Payments and their Predicate CMA Payments had not been made; and

      c.     The Mezzanine Lenders received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

249.    Each of the 90 Day Mezzanine Loan Payments and its Predicate CMA Payments are avoidable and recoverable by the Trustee, from the Mezzanine Lenders pursuant to §§ 547, 550(a) and 551 of the Bankruptcy Code.

250.    As a result of the foregoing, pursuant to §§ 547, 550 and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Mezzanine Lenders: (a) avoiding and preserving the 90 Day Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments; (b) directing that the 90 Day Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments be set aside; and (c) recovering the 90 Day Mezzanine Loan Payments, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders.

### COUNT II
***Avoidance and Recovery of Preferential Transfers under §§ 547, 550 and 551 of the Bankruptcy Code against the Mezzanine Lenders as Insiders of the Debtors***

251.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

252.    Each of the One Year Mezzanine Loan Payments and its Predicate CMA Payments were made within the one year period prior to the Filing Date.

253.    The Mezzanine Lenders and, in the alternative, the recipient of their Predicate CMA Payments, were creditors of the Debtors within the meaning of § 101(10) of the Bankruptcy Code.

254.    As a result of their control and domination over the Debtors during the one year period prior to the Filing Date, the Mezzanine Lenders were insiders of the Debtors within the

meaning of § 101(31)(B).

255. Each of the One Year Mezzanine Loan Payments and its Predicate CMA Payments constituted a transfer of an interest of the Debtors in property within the meaning of §§ 101(54) and 547(b) of the Bankruptcy Code.

256. Each of the One Year Mezzanine Loan Payments and its Predicate CMA Payments were made to or for the benefit of the Mezzanine Lenders.

257. Each of the One Year Mezzanine Loan Payments and its Predicate CMA Payments were made for or on account of an antecedent debt owed by the Debtors before such transfers were made.

258. Each of the One Year Mezzanine Loan Payments and its Predicate CMA Payments were made while the Debtors were insolvent.

259. Each of the One Year Mezzanine Loan Payments and its Predicate CMA Payments enabled the Mezzanine Lenders to receive more than they would receive if:

    a.    This case was a case under chapter 7 of the Bankruptcy Code;

    b.    The One Year Mezzanine Loan Payments and its Predicate CMA Payments had not been made; and

    c.    The Mezzanine Lenders received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

260. Each of the One Year Mezzanine Loan Payments and its Predicate CMA Payments are avoidable and recoverable by the Trustee, from the Mezzanine Lenders pursuant to §§ 547, 550(a) and 551 of the Bankruptcy Code.

261. As a result of the foregoing, pursuant to §§ 547, 550 and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Mezzanine Lenders: (a) avoiding and preserving the One Year Mezzanine Loan Payments and, in the alternative, their Predicate CMA

Payments; (b) directing that the One Year Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments, be set aside; and (c) recovering the One Year Mezzanine Loan Payments, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders.

<u>**COUNT III**</u>

*Avoidance and Recovery of Actual Fraudulent Transfers under §§ 548(a)(1)(A), 550 and 551 of the Bankruptcy Code against the Mezzanine Lenders*

262.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

263.     The Mezzanine Loan Payments and their Predicate CMA Payments occurred on or within two years before the Filing Date.

264.     The Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments, each constituted a transfer of an interest of the Debtors in property within the meaning of §§ 101(54) and 548 of the Bankruptcy Code.

265.     The Mezzanine Loan Payments, as part of the LBO, and, in the alternative, their Predicate CMA Payments, were incurred and made with the actual intent to hinder, delay or defraud some or all of the Debtors' then existing or future creditors.

266.     The Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments, constitute fraudulent transfers that are avoidable and recoverable by the Trustee, from the Mezzanine Lenders, pursuant to §§ 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code.

267.     As a result of the foregoing, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Mezzanine Lenders: (a) avoiding and preserving the Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan Payments and, in the alternative, their

Predicate CMA Payments, be set aside; and (c) recovering the Mezzanine Loan Payments, or the value thereof, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders.

## COUNT IV
### *Avoidance and Recovery of Constructive Fraudulent Transfers under §§ 548(a)(1)(B), 550 and 551 of the Bankruptcy Code against the Mezzanine Lenders*

268. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

269. The Mezzanine Loan Payments and their Predicate CMA Payments occurred on or within two years before the Filing Date.

270. The Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments, constituted a transfer of an interest of the Debtors in property within the meaning of §§ 101(54) and 548 of the Bankruptcy Code.

271. The Debtors received less than a reasonably equivalent value in exchange for the Mezzanine Loan Payments and their Predicate CMA Payments.

272. At the time of the Mezzanine Loan Payments and their Predicate CMA Payments, the Debtors were insolvent or became insolvent as a result of the Seller Transfers.

273. At the time of the Mezzanine Loan Payments and their Predicate CMA Payments, the Debtors were engaged in a business or a transaction, or were about to engage in a business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital.

274. At the time of the Mezzanine Loan Payments and their Predicate CMA Payments, the Debtors intended to incur, or believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

275.    The Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Mezzanine Lenders, pursuant to §§ 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code.

276.    As a result of the foregoing, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Mezzanine Lenders: (a) avoiding and preserving the Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments, be set aside; and (c) recovering the Mezzanine Loan Payments, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders.

## COUNT V
### Avoidance and Recovery of Actual Fraudulent Transfers and Avoidance of Incurrence of Obligations under § 544, 550 and 551 of the Bankruptcy Code and §§ 276, 276-a and 278 and/or 279 of the New York Debtor & Creditor Law against the Mezzanine Lenders

277.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

278.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

279.    The Mezzanine Transfers and their Predicate CMA Payments constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

280.    The principals of the Debtors caused the Debtors to incur the obligations of the Mezzanine Loans, and to make the Mezzanine Transfers and their Predicate CMA Payments, with the actual intent to hinder, delay or defraud some or all of the Debtors' then existing or

future creditors.

281.    The Mezzanine Loan obligations are avoidable pursuant to §§ 276, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

282.    The Mezzanine Transfers and, in the alternative, their Predicate CMA Payments constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Mezzanine Lenders pursuant to §§ 276, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

283.    Each of the Mezzanine Transfers was received by the Mezzanine Lenders with actual intent to hinder, delay or defraud creditors of some or all of the Debtors at the time each of the Mezzanine Transfers, and/or future creditors of the Debtors.

284.    As a result of the foregoing, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Mezzanine Lenders: (a) avoiding and preserving the Mezzanine Loan obligations and Mezzanine Transfers and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan obligations and the Mezzanine Transfers and, in the alternative, their Predicate CMA Payments be set aside; (c) recovering the Mezzanine Transfers, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders; and (d) recovering attorneys' fees from the Mezzanine Lenders.

## COUNT VI
***Avoidance and Recovery of Constructive Fraudulent Transfers and Avoidance of Incurrence of Obligations under § 544, 550 and 551 of the Bankruptcy Code and §§ 273 and 278 and/or 279 of the New York Debtor & Creditor Law against the Mezzanine Lenders***

285.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

286.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

287.    The Mezzanine Transfers and their Predicate CMA Payments constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

288.    The Debtors did not receive fair consideration for the Mezzanine Transfers and their Predicate CMA Payments or for the incurrence of the Mezzanine Loan obligations.

289.    The Debtors were insolvent at the time they incurred the Mezzanine Loan obligations and made the Mezzanine Transfers and their Predicate CMA Payments or, in the alternative, the Debtors became insolvent as a result of the Mezzanine Loan obligations and Mezzanine Transfers and their Predicate CMA Payments.

290.    The Mezzanine Loan obligations are avoidable pursuant to §§ 273, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

291.    The Mezzanine Transfers and, in the alternative, their Predicate CMA Payments constitute a fraudulent transfer avoidable and recoverable by the Trustee, pursuant to §§ 273, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

292.    As a result of the foregoing, pursuant to §§ 273, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Mezzanine Lenders: (a) avoiding and preserving the

Mezzanine Loan obligations and Mezzanine Transfers and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan obligations and the Mezzanine Transfers and, in the alternative, their Predicate CMA Payments be set aside; and (c) recovering the Mezzanine Transfers, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders.

## COUNT VII

### *Avoidance and Recovery of Constructive Fraudulent Transfers and Avoidance of Incurrence of Obligations under § 544, 550 and 551 of the Bankruptcy Code and §§ 274 and 278 and/or 279 of the New York Debtor & Creditor Law against the Mezzanine Lenders*

293.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

294.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

295.     The Mezzanine Transfers and their Predicate CMA Payments constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

296.     The Debtors did not receive fair consideration for the Mezzanine Transfers and their Predicate CMA Payments.

297.     At the time the Debtors incurred the Mezzanine Loan obligations and at the time the Debtors made the Mezzanine Transfers and their Predicate CMA Payments, the Debtors were engaged, or were about to engage in a business or transaction for which the property remaining in their hands, after the incurrence of the debt and Mezzanine Transfers and their Predicate CMA Payments, was an unreasonably small capital.

298.    The Mezzanine Loan obligations are avoidable pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

299.    The Mezzanine Transfers and, in the alternative, their Predicate CMA Payments constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Mezzanine Lenders pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

300.    As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Mezzanine Lenders: (a) avoiding and preserving the Mezzanine Loan obligations and Mezzanine Transfers and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan obligations and the Mezzanine Transfers and, in the alternative, their Predicate CMA Payments be set aside; and (c) recovering the Mezzanine Transfers, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders.

### COUNT VIII
***Avoidance and Recovery of Constructive Fraudulent Transfers and Avoidance of Incurrence of Obligations under § 544, 550 and 551 of the Bankruptcy Code and §§ 275 and 278 and/or 279 of the New York Debtor & Creditor Law against the Mezzanine Lenders***

301.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

302.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of

the Bankruptcy Code.

303.    The Mezzanine Transfers and their Predicate CMA Payments constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

304.    The Debtors did not receive fair consideration for the Mezzanine Transfers and their Predicate CMA Payments.

305.    At the time the Debtors incurred the Mezzanine Loan obligations and at the time they made the Mezzanine Transfers and their Predicate CMA Payments, the Debtors had incurred, were intending to incur, or believed that they would incur debts beyond their ability to pay them as the debts matured.

306.    The Mezzanine Loan obligations are avoidable pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

307.    The Mezzanine Transfers and, in the alternative, their Predicate CMA Payments constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Mezzanine Lenders pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

308.    As a result of the foregoing, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Mezzanine Lenders: ((a) avoiding and preserving the Mezzanine Loan obligations and Mezzanine Transfers and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan obligations and the Mezzanine Transfers and, in the alternative, their Predicate CMA Payments, be set aside; and (c) recovering the Mezzanine Transfers, and, in the alternative, their Predicate CMA Payments, or the value

thereof, from the Mezzanine Lenders.

## COUNT IX

### Violations of the Federal Debt Collection Procedure Act under 28 U.S.C. §§ 3304(a) & (b) and §§ 544, 550 and 551 of the Bankruptcy Code against the Mezzanine Lenders

309.  The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

310.  The Mezzanine Transfers and their Predicate CMA Payments were made by the Debtors, after the Debtors incurred a debt owed to the United States insofar as the Internal Revenue Service has a claim against the Debtors for miscellaneous penalties.

311.  The Internal Revenue Service has claims against ESI for miscellaneous penalties, ESA Management LLC for miscellaneous penalties, ESA Operating Lessee Inc. for corporate income taxes, and ESA P Portfolio Operating Lessee Inc. for corporate income taxes.

312.  The Mezzanine Transfers and, in the alternative, their Predicate CMA Payments were in violation of the Federal Debt Collection Procedure Act §§ 3304(a) insofar as the Debtors received less than a reasonably equivalent value in exchange for the Mezzanine Transfers and their Predicate CMA Payments, and the Debtors were or became or insolvent as a result of the Mezzanine Transfers and their Predicate CMA Payments.

313.  The Mezzanine Transfers and, in the alternative, their Predicate CMA Payments were in violation of the Federal Debt Collection Procedure Act §§ 3304(b) insofar as the Debtors received less than a reasonably equivalent value in exchange for the Mezzanine Transfers and their Predicate CMA Payments, and the Debtors either:

    a.    Were engaged or about to engage in a business or transaction that left the Debtors with unreasonably small assets; or

    b.    Intended to incur or believed or reasonably should have believed that the Debtors would incur debts beyond the Debtors' ability to pay as they came due.

314. The Mezzanine Loan obligations are avoidable pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act.

315. The Mezzanine Transfers and, in the alternative, their Predicate CMA Payments constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Mezzanine Lenders Defendants pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act.

316. As a result of the foregoing, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act, the Trustee is entitled to a judgment against the Mezzanine Lenders: (a) avoiding and preserving the Mezzanine Loan obligations and Mezzanine Transfers and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan obligations and the Mezzanine Transfers and, in the alternative, their Predicate CMA Payments be set aside; and (c) recovering the Mezzanine Transfers, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders.

## COUNT X
### *Disallowance of Claims under § 502(d) of the Bankruptcy Code against all Defendants*

317. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

318. The Defendants are transferees of one or more transfers avoidable under §§ 544, 547 or 548 of the Bankruptcy Code, or are entities from which property is recoverable under § 550 of the Bankruptcy Code, and have not paid the amount or turned over the property for which they are liable.

319. As a result of the foregoing, pursuant to § 502(d) of the Bankruptcy Code, the

Trustee is entitled to disallow any filed or scheduled claims of the Defendants.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

*i.* On the First Claim for Relief, pursuant to §§ 547, 550 and 551 of the Bankruptcy Code, judgment in to be determined at trial but collectively not less than the amounts received by or paid to the benefit of the Mezzanine Lenders against the Mezzanine Lenders: (a) avoiding and preserving the 90 Day Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments; (b) directing that the 90 Day Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments be set aside; and (c) recovering the 90 Day Mezzanine Loan Payments, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders;

*ii.* On the Second Claim for Relief, pursuant to §§ 547, 550 and 551 of the Bankruptcy Code, judgment in to be determined at trial but collectively not less than the amounts received by or paid to the benefit of the Mezzanine Lenders against the Mezzanine Lenders: (a) avoiding and preserving the One Year Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments; (b) directing that the One Year Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments be set aside; and (c) recovering the One Year Mezzanine Loan Payments, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders;

*iii.* On the Third Claim for Relief, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but collectively not less than the amounts paid to or received for the benefit of the Mezzanine Lenders against the Mezzanine Lenders; (a) avoiding and preserving the Mezzanine Loan Payments and, in the alternative, their

Predicate CMA Payments; (b) directing that the Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments, be set aside; and (c) recovering the Mezzanine Loan Payments, or the value thereof, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders;

*iv.*    On the Fourth Claim for Relief, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but collectively not less than the amounts received by or paid to the benefit of the Mezzanine Lenders against the Mezzanine Lenders: (a) avoiding and preserving the Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan Payments and, in the alternative, their Predicate CMA Payments, be set aside; and (c) recovering the Mezzanine Loan Payments, or the value thereof, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders;

*v.*    On the Fifth Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but collectively not less than the amount received by or paid to the benefit of the Mezzanine Lenders against the Mezzanine Lenders (a) avoiding and preserving the Mezzanine Loan obligations and Mezzanine Transfers and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan obligations and the Mezzanine Transfers and, in the alternative, their Predicate CMA Payments be set aside; (c) recovering the Mezzanine Transfers, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders; and (d) recovering attorneys' fees from the Mezzanine Lenders;

*vi.*    On the Sixth Claim for Relief, pursuant to §§ 273, 278, and/or 279 of the New

York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but collectively not less than the amount received by or paid to the benefit of the Mezzanine Lenders against the Mezzanine Lenders: (a) avoiding and preserving the Mezzanine Loan obligations and Mezzanine Transfers and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan obligations and the Mezzanine Transfers and, in the alternative, their Predicate CMA Payments be set aside; (c) recovering the Mezzanine Transfers, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders; and (d) recovering attorneys' fees from the Mezzanine Lenders;

vii.    On the Seventh Claim for Relief, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but collectively not less than the amounts received by or paid to the benefit of the Mezzanine Lenders against the Mezzanine Lenders: (a) avoiding and preserving the Mezzanine Loan obligations and Mezzanine Transfers and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan obligations and the Mezzanine Transfers and, in the alternative, their Predicate CMA Payments be set aside; (c) recovering the Mezzanine Transfers, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders; and (d) recovering attorneys' fees from the Mezzanine Lenders;

viii.    On the Eighth Claim for Relief, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but collectively not less than the amounts received by or paid for the benefit of the Mezzanine Lenders: (a) avoiding and preserving the Mezzanine Loan

obligations and Mezzanine Transfers and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan obligations and the Mezzanine Transfers and, in the alternative, their Predicate CMA Payments be set aside; (c) recovering the Mezzanine Transfers, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders; and (d) recovering attorneys' fees from the Mezzanine Lenders;

*ix.* On the Ninth Claim for Relief, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act, judgment in an amount to be determined at trial but collectively not less than the amounts received by or paid to the benefit of the Mezzanine Lenders against the Mezzanine Lenders: (a) avoiding and preserving the Mezzanine Loan obligations and Mezzanine Transfers and, in the alternative, their Predicate CMA Payments; (b) directing that the Mezzanine Loan obligations and the Mezzanine Transfers and, in the alternative, their Predicate CMA Payments be set aside; (c) recovering the Mezzanine Transfers, and, in the alternative, their Predicate CMA Payments, or the value thereof, from the Mezzanine Lenders; and (d) recovering attorneys' fees from the Mezzanine Lenders;

*x.* On the Tenth Claim for Relief, pursuant to §502(d) of the Bankruptcy Code: (a) disallowance of any filed or scheduled claims of the Defendants;

*xi.* On all Claims for Relief, pursuant to federal common law and New York Civil Practice Law and Rules §§ 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the transfers were received;

*xii.* On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of the liquidating trust;

*xiii.*    Awarding the Trustee all applicable interest, costs, attorneys' fees and disbursements of this action; and

*xiv.*    Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Respectfully submitted,

Dated: New York, New York        By: /s/___Michael J. Connolly_____
       June 15, 2011                **Forman, Holt, Eliades & Ravin, LLC**
                               80 Route 4 East, Suite 290
                               Paramus, NJ 07652
                               Telephone: (201) 845-1000
                               Facsimile: (201) 845-9112
                               Michael J. Connolly, Esq.
                               mconnolly@formanlaw.com
                               Andrew Karas, Esq.
                               akaras@formanlaw.com
                               Joseph M. Cerra, Esq.
                               jcerra@formanlaw.com